# EXHIBIT C

```
 1   STATE OF SOUTH DAKOTA        )           IN CIRCUIT COURT
                                  : ss.
 2   COUNTY OF PENNINGTON         )        SEVENTH JUDICIAL DISTRICT

 3   ****************************************************************

 4   LINDA CORNELISON, on behalf  )
     of herself and all others    )
 5   similarly situated,          )
                                  )
 6              Plaintiff,        )
                                  )           Motion Hearing
 7   vs.                          )        Case No. CIV03-1350
                                  )
 8   VISA USA, INC., MASTERCARD   )
     INTERNATIONAL, INC.,         )
 9                                )
                Defendant.        )
10
     ****************************************************************
11
12   PROCEEDINGS:  The above-entitled matter commenced on the 28th

13                 day of September, 2004, at the Pennington County

14                 Courthouse, Rapid City, South Dakota.

     BEFORE:       The Honorable Janine M. Kern
15
     ****************************************************************
16
17
18
19
20
21
22
23
24
25
```

Jean A. Kappedal, RPR

```
 1   APPEARANCES:   Mr. Aaron D. Eisland
                    Attorney at Law
 2                  PO Box 6900
                    Rapid City, SD   57709
 3                  Representing the Plaintiff.

 4                  Mr. Steven J. Mitby
                    Attorney at Law
 5                  601 Montgomery Street, Suite 601
                    San Francisco, CA 94111
 6                  Representing the Plaintiff.

 7                  Mr. Gene LeBrun
                    Attorney at Law
 8                  PO Box 8250
                    Rapid City, SD   57709
 9                  Representing Defendant Visa.

10                  Mr. Stephen V. Bomse
                    Attorney at Law
11                  333 Bush Street
                    San Francisco, CA   94104
12                  Representing Defendant Visa.

13                  Mr. Gregory Erlandson
                    Attorney at Law
14                  PO Box 2670
                    Rapid City, SD   57709
15                  Representing Defendant Mastercard.

16                  Ms. Patricia C. Crowley
                    Attorney at Law
17                  1615 L Street N.W., Suite 1300
                    Washington, DC 20036-5694
18                  Representing Defendant Mastercard.

19

20

21

22

23

24

25
```

1           **THE COURT:** This is the time and place set for

2    motion hearing in File Civil C03-1350, in the matter of

3    Linda Cornelison, on behalf of herself and all others

4    simply situated, plaintiffs, versus Visa USA, Inc. and

5    Mastercard International, Inc.

6        If the Plaintiffs would begin by noting their

7    appearance with local counsel first, please.

8           **MR. EISLAND:** Aaron Eisland, local counsel for

9    Plaintiff.

10          **MR. MITBY:** Steve Mitby, your Honor, for

11   Plaintiff. I will spell my last name, M-I-T-B-Y.

12          **THE COURT:** Thank you.

13          **MR. LEBRUN:** Gene LeBrun for Visa USA, Inc.

14          **MR. ERLANDSON:** Good afternoon, Greg Erlandson,

15   local counsel on behalf of Mastercard.

16          **MR. BOMSE:** Stephen Bomse, B-O-M-S-E, for Visa.

17          **MS. CROWLEY:** Good afternoon, Patricia Crowley

18   on behalf of Mastercard International, Incorporated.

19          **THE COURT:** Thank you. Mr. Bushnell (sic) and

20   Mr. Erlandson, you have filed a motion to dismiss. I

21   would like to begin with you and then I'll hear from

22   Plaintiff's counsel.

23       I'm sorry, Mr. LeBrun.

24          **MR. LEBRUN:** Mr. Bromse will make the argument.

25          **MR. BOMSE:** Your Honor, I don't know if you

1      have any preference as to whether or not counsel stands

2      when they address you or remain seated.

3              THE COURT:  Either.  Whatever you are most

4      comfortable with.  You can sit, you can stand.

5              MR. BOMSE:  I'm actually going to stand up and

6      test my eye sight here, but if I find my notes are

7      swimming, I may change my mind.

8           Thank you, your Honor.  It's very nice of the Court

9      to set aside this time to hear us on this motion.  As

10     your Honor may be aware, from the papers, this is one of

11     a number of what we call follow-on lawsuits which were

12     filed in various states around the country, approximately

13     20 of them, in the wake of the settlement of a federal

14     antitrust class action against my client, Visa and

15     Mastercard.  And the way we have been doing this in the

16     various states, is Mastercard and Visa have divided up

17     the arguments so I will be speaking this afternoon

18     principally on behalf of both defendants.  If the

19     Court --

20              THE COURT:  That's fine.

21              MR. BOMSE:  In those cases we have argued a

22     number of these motions previously and five of them have

23     been decided already.

24          We referenced three in our papers, New York,

25     Michigan and North Dakota, where the courts granted our

1    motions to dismiss essentially on the same grounds that

2    we urge here.  There is a fourth case that was decided

3    subsequent to the last briefs which is Minnesota.  It's a

4    case called Gordon Gutzwiller and the Court has received

5    that opinion which we sent in subsequently.

6         There is -- in addition, a fifth case, which, like

7    the other four, also dismissed the antitrust claims,

8    although in that case it was on entirely unrelated

9    grounds.  Obviously, we hope that we'll be able to

10   persuade your Honor that those cases were correctly

11   decided and that your Honor will elect to follow them.

12        We believe that while it is clear that South Dakota,

13   like the other states in which these cases are pending,

14   has decided that it does not wish to bar all indirect

15   purchaser cases.  That in no means grants a license for

16   any and all indirect purchases or cases without regard to

17   any standing limitations.  We believe rather that the

18   intention of the legislature was that in appropriate

19   cases indirect purchaser cases be permitted, but that

20   there still needs to be an analysis of standing under

21   what the Supreme Court and various other courts have

22   referred to as the analytically distinct requirement of

23   standing.  Analytically distinct, that is from the

24   Illinois Brick Rule which is a specific federal policy

25   based rule.

1           Now, just to put this matter in some context

2    factually.  We, of course, accept the allegations of

3    Plaintiff's complaint for these purposes.  They claim·

4    that Visa and Mastercard have rules which improperly tie

5    the acceptance of Visa and Mastercards credit cards to

6    Visa and Mastercards debit cards.  They claim that, as a

7    result of that, merchants ended up paying more to accept

8    Visa debit cards then they otherwise would have.  To that

9    extent, these cases and the federal case are entirely

10   common.  That was that description I just gave you was a

11   description of the claim in 'the federal case.

12           In the federal case, that was where it stopped.

13   That is, the merchants claimed that they ended up paying

14   too much money and as your Honor again may know, if

15   you've had an opportunity to read the papers, we settled

16   those cases on the eve of trial facing a 100 billion

17   dollar damage exposure paying three billion dollars

18   seemed like the better part of valor.

19           Now, in these cases, we regard as important and we

20   find depositively a different additional step because the

21   claim now made is that once those merchants pay too much,

22   as it's alleged, to accept Visa and Mastercard debit

23   cards, they, in turn, raise the prices of everything they

24   sold to every consumer and regardless of how that

25   consumer paid for those things.  Thus we don't have a

1    claim here that involves the purchase of our service, our

2    debit card service, which is offered to merchants.  We

3    don't even have a claim, based upon the resale of a

4    product containing that service as an ingredient.  It's

5    hard -- hard to imagine litigation.  Particularly what

6    that means, it's clear that it doesn't include the claims

7    here because in fact we know that according to the

8    plaintiff's theory and their complaint, it doesn't matter

9    whether a debit card in fact entered into the resale

10   transaction.

11        In that sense, these claims are what we have

12   referred to in our papers as overhead claims.  It is, as

13   if some cost of doing business, we gave an example of a

14   telephone service where the telephone prices went up to

15   merchants and the theory would be the merchants then

16   raised the price of spaghetti or tennis rackets or

17   television sets because they paid too much for telephone

18   service.  Or to use an example that the Plaintiffs seem

19   to be fond of.  They say this is a tax and a tax is in

20   effect a form of overhead.  It's a cost of doing

21   business.  And the question that we confront here today

22   is, can you bring a claim like that merely because South

23   Dakota, which generally follows federal law, and there is

24   abundant law that says that they are expected to follow

25   antitrust law merely because in this case the South

1    Dakota legislature has decided that we are going to a

2    limited extent to depart from federal law by allowing

3    indirect purchaser cases to be brought.

4         They say that the language of the statute begins and

5    ends.  The inquiry although, as I'll explain in a few

6    minutes, even they don't really believe that because they

7    don't argue that there is no standing limitation.  They

8    just want you to adopt a different one.  Something they

9    call target area and I'll come back to that.

10        But their basic position is when Illinois Brick was

11   disavowed in South Dakota, that was the end of standing.

12   We say that that is not so.  Any more than it was found

13   to be so in New York or Michigan or North Dakota or

14   Minnesota and any more than courts in those states in

15   other cases not involving the Visa and Mastercard have

16   simply abandoned the standing inquiry because they are

17   Illinois Brick repealer states.

18        **THE COURT:**  Well, how would you respond to the

19   Plaintiff's alternative suggestion to the Court that if

20   the Court is persuaded by your argument, that they should

21   be allowed to redefine the class to include only South

22   Dakota residents who purchase goods or services using

23   Visa or Mastercard branded debit cards?

24        **MR. BOMSE:**  Well, I would say this.  I would

25   say that it is a class definition which makes no sense in

1   terms of the allegations.  It's an attempt really in a --
2   I don't want to be projective in suggesting it's cute
3   because that's not exactly what it is.  But it is
4   attempting to connect two things that have no connection.
5   Let me explain what I mean.  The theory that they have,
6   because that's -- we know it from the class that they
7   have originally defined here and everywhere is a class in
8   which the presence or absence of a debit card has nothing
9   to do with the offense.  So we know, as we start out,
10  that there is no causation here that involves a debit
11  card otherwise that would have been the class that they
12  would have defined.
13      Their theory inside is in the same way as my
14  telephone or tax or janitorial service example, somebody
15  pays too much, they end up passing the cost along in all
16  products.  So that the presence or absence of a debit
17  card is therefore unrelated to the theory of violation.
18  To give the Court an example, I'll go back to my
19  telephone example.  Let us say that the theory was that
20  there was a conspiracy to raise telephone prices.  The
21  claim is brought.  Say prices of everything were raised
22  to every purchaser in the State of South Dakota.  Motion
23  to dismiss is made.  They say, well, let us redefine our
24  class as people who bought things over the telephone as
25  opposed to coming into the store.  It seems to me we

1   would fairly say there, as we ought to fairly say here,

2   hey, wait a minute, that makes no sense. The existence

3   of a telephone sale as opposed to an in-person sale has

4   nothing to do with the theory of what was wrong anymore

5   than it does in this case.

6        So it seems to me that their attempt ought to fail

7   because it really doesn't have anything to do with the

8   case. I could in fact go further, but I think I would be

9   outside of the pleadings. But when we were arguing this

10  case with one of counsel's partners in Washington, DC,

11  the Judge said, you know -- because the same argument was

12  made by the same lawyers -- the Judge said, "you know, I

13  understand the theory, but isn't it somehow backwards to

14  say that it's the debit card people who somehow ought to

15  have the claim as opposed to anybody else? After all,

16  the debit card people are the people who presumably got

17  the benefit of having a debit card. They wanted to use

18  the debit card."

19       Now, I don't think you need to go that far here. I

20  think you merely need to find that there is no

21  relationship between the offense and the proposed

22  redefined class in order to say that that kind of a

23  redefinition isn't appropriate. Again, while this Court,

24  of course, is going to make up its own mind, this issue

25  was briefed specifically in Michigan on a motion for

1    reconsideration which the Court denied as having raised

2    no new arguments.

3         Now, your Honor, if we go back to the question of

4    why we say standing rules still ought to apply here.  It

5    seems to me, that we go back to the fact that we do have

6    a difference between Illinois Brick and standing rules.

7    As I said, analytically distinct.  And courts have

8    recognized that one needs to still look at whether a

9    claim is so remote, whether the damages claimed are so

10   speculative and complicated in proof that we really are

11   beyond the bounds of what is sensible even in a place

12   where indirect purchaser cases are allowed.

13        As I say, in none of the states where we have been

14   successful so far has the law been any different.  We

15   have here not a claim that somebody's bought a product

16   that indirectly passed through a chain of distribution,

17   we don't have a claim that this is a product that became

18   an ingredient in something that passed through a chain of

19   distribution.  We have a claim here that is in effect for

20   every single product purchased by anybody not even in a

21   way that involves this product.  This is, as we say, a

22   non-purchaser case just as the Court found in Michigan

23   and then more recently in Minnesota and North Dakota.

24        You really don't have an assault, Plaintiffs

25   arguments to the contrary notwithstanding.  You don't

```
 1      have an assault here on indirect purchaser cases.  You
 2      have here a sensible application of some limits to claims
 3      which really can't be proven and if we think about what
 4      it is that's being alleged here and what it is the Court
 5      is being asked to embark upon if this case goes forward,
 6      I think that that becomes clear.  I don't know what it is
 7      that Ms. Cornelison does or doesn't do herself in terms
 8      of purchase, but if I think of myself on a Saturday
 9      morning going out to do the errands, you go to the gas
10      station, you fill up your tank and you pay perhaps with
11      cash.  You go to the grocery store, maybe you buy 20 or
12      30 different items.  You might write a check there.  You
13      go pickup the dry cleaning, maybe you go and buy yourself
14      a new tennis racket, at night maybe you go out to dinner.
15      One day one person we now have to know what is it that
16      happened with respect to the dry cleaning and the corn
17      flakes and the gasoline and the meal in the restaurant
18      and the tennis racket.  We have to know what it is that
19      happened to the price of those goods because of some tiny
20      little fraction.  Because, to begin with, the price that
21      merchant pays for card services is on the order of one to
22      one and a half percent, if it's a debit card.  By the
23      time you spread -- decide what portion of that is, quote,
24      "an overcharge", and you then spread out that overcharge
25      out among all of the purchases, you can't be talking
```

1    about more than let's say ten cents on a hundred dollar

2    purchase.

3          And yet the theory is that for all of these various

4    things, somehow prices were affected in a way that

5    adversely affected Ms. Cornelison and any other consumer

6    in a class to be certified in this state.  And it doesn't

7    seem to me that once you think of it in those terms, that

8    the rhetoric which the courts have been prompted to use

9    in Michigan and in New York and in Minnesota is really

10   hyperbolic at all when they say these claims are far

11   beyond the capacity of a court to try.  So speculative

12   that no expert could possibly deal with them and

13   therefore not of a kind that are capable of being

14   adjudicated under the antitrust laws whether you allow

15   indirect purchaser claims or you don't.

16          I really do think that in some ways the Minnesota

17   Court, which is the most recent and I think the most

18   elaborate, pretty well incapsulated what we would have to

19   say to your Honor in the summary of its ruling.  The

20   Court said that, "despite the broad language of the

21   Minnesota antitrust law as set forth in that statute and

22   the broad language contained in a case in that court,

23   called Philip Morris, not every person claiming some

24   remote or tangential injury from an antitrust violation

25   can maintain a suit under the Minnesota antitrust laws."

1    The Judge then said "a literal reading of the Minnesota

2    statute is broad enough to encompass any harm it can be

3    attributed either directly or indirectly to the

4    consequences of an antitrust violation."  That being, of

5    course, exactly the argument that the plaintiffs make.

6    They say, "even though" -- I'm sorry, the Court in

7    Minnesota said, "even though the language of the statute

8    is clear and unambiguous, the Court must interpret the

9    statute in a manner which will not lead to an illogical

10   or absurd result."

11       "In this case, the Plaintiff's proposed

12   interpretation would lead to a decision that would

13   provide a remedy in damages for any injury, however

14   minor, that might conceivably be traced to the antitrust

15   violation in issue.  In short, the Plaintiff's proposed

16   construction of the Minnesota antitrust law, carried to

17   its logical conclusion, would provide the general public

18   and/or general taxpayer standing to sue for most

19   antitrust causes of action."

20       "In this case, the Plaintiff's proposed class is

21   likely as large or larger than a class limited to

22   Minnesota residents who pay property or income taxes."

23       "In this case, Plaintiff has only an abstract or

24   tenuous connection to the subject matter of the case.

25   Therefore, he lacks standing to sue for the injuries he

1     claims to have incurred."

2        Now, that's longer than I ordinarily would trouble

3     the Court to read, but it seems to me that there is a

4     particular reason why it is appropriate to read to the

5     Court at that length from the Minnesota opinion. And

6     that is that the Plaintiff's have in fact told your Honor

7     that you ought to pay particular attention.

8        **THE COURT:** What page, Counsel?

9        **MR. BOMSE:** Page 12. There is pages eight and

10    nine and pages 12 here. I'm reading, your Honor,

11    Minnesota's antitrust statute, exactly like South

12    Dakota's, grants standing to persons injured directly or

13    indirectly by an antitrust violation. They then refer to

14    this Philip Morris case which was referenced also by the

15    Judge. Then to quote again, "because Philip Morris

16    decisively rejects defendant's arguments, it must be

17    considered in some detail." In other words, they are

18    saying, take a look at the same statutory language, take

19    a look at what Minnesota does. Well, we say, amen to

20    that, but the decision that one, of course, needs to take

21    a look at, we suggest, is the decision addressing a claim

22    which is virtually identical brought by the same counsel

23    and decided within the past few weeks.

24       It is also the case, your Honor, that South Dakota

25    actually has a statute which urges the Court to construe

1    its laws in a way that is congruent with the laws of

2    other states.  Not only the federal law, but the laws of

3    other states.  It's 37-1-22.  And Plaintiff's also, in

4    their brief, again urge the same -- the same thing here

5    at pages eight and nine.  Decisions -- again quoting,

6    "decisions from other state courts construing statutes

7    with virtually identical language provide persuasive

8    authority as to how South Dakota courts should interpret

9    South Dakota's antitrust law and they quote there SDCL

10   37-1-22.  It is the intent of the legislature that in

11   construing this chapter, that the courts may use, as a

12   guide, interpretations given by state courts to

13   comparable antitrust statutes.

14       I would say, your Honor, that in this case the

15   comparable antitrust statutes, by their own terms, is

16   Minnesota, but it also is New York which is a repealer

17   state.  Michigan, that's the Stark case, which has

18   essentially identical language and is a case again

19   brought allegedly essentially identical violations by the

20   same counsel, and North Dakota.  It is not merely that

21   those courts have ruled in the way they have done, but

22   the fact that their analysis, we believe, is correct,

23   that together with the statute urging conformance, we

24   would suggest, adds yet further support for the broad

25   argument that we would make.

1          So, your Honor, we have tried to set out as

2     carefully as we can and as clearly as we can why we think

3     these cases can't go forward.  I've tried today to

4     summarize for the Court what our views are on that issue

5     and while I'm, of course, happy to respond to questions

6     that the Court has, at this point that would be our

7     submission.

8               **THE COURT:**  All right.  The Court would like to

9     hear from Ms. Crowley.  Is there anything you want to

10    add?

11              **MS. CROWLEY:**  No, I have nothing to add.  Thank

12    you, your Honor.

13              **THE COURT:**  All right.  Counsel?

14              **MR. MITBY:**  Thank you, your Honor.  Steven

15    Mitby on behalf of the -- on behalf of the Plaintiff.

16         Your Honor, this case is about South Dakota law not

17    federal law, not New York law and not the law of any

18    other state.

19         First, motions to dismiss are extremely disfavored

20    under South Dakota law and are rarely granted unless this

21    case is an extremely unusual case in which the pleadings

22    alone demonstrate to your Honor that there is no way that

23    the Plaintiffs could prove a cause of action, this Court

24    should not consider dismissing these claims of the

25    pleadings.

```
 1          Secondly, by enacting one of the broadest antitrust
 2    remedial statutes in the United States, the South Dakota
 3    legislature explicitly rejected the very limitations on
 4    standing that the Defendants advance here.  South Dakota
 5    Codified Law 37-1-33 states unequivocally, and I'm going
 6    to quote, "no provision of this chapter may deny any
 7    person who is injured directly or indirectly in his
 8    business or property by a violation of this chapter, the
 9    right to sue for and obtain any relief afforded under
10    Section 37-1-14.3".
11          Now, under the expressed terms of this statute,
12    Plaintiffs have an absolute right to bring this action in
13    a South Dakota court because they were injured by
14    defendant's anti-competitive conduct.  Defendant's
15    illegal tying arrangement caused injury to consumers by
16    raising the price of consumer goods throughout and in
17    fact, the defendants do not even deny that consumers made
18    a portion of the fees that they charged to merchants and
19    how could they?  Whatever portion.  Excessive fees
20    merchants didn't absorb of your overhead, consumers might
21    have paid in higher prices in this case.  There are two
22    groups of victims in the Defendants' anti-competitive
23    conduct, consumers and merchants.  Moreover, the injury
24    to merchants is not speculative or remote.  While
25    merchants absolve and part of it, like 12 billion dollars
```

1    over the nation by out of pocket.  No one, including the

2    defendants, disputes that the consumers also paid a

3    substantial share of those costs.

4        Now, in an effort to avoid the implication was South

5    Dakota broad remedial and defendants are here seeking to

6    draft the federal standing requirement under 37-1-33.

7    Federal standing requirements are not appropriate for

8    South Dakota law because they're based on an entirely

9    different type of antitrust injury.  Federal law doesn't

10    recognize antitrust injury to indirect purchasers or

11    anyone else besides those who bought directly from the

12    defendant engaged in the illegal anti-competitive

13    practice.

14        In this case, your Honor, the defendants ask this

15    Court to adopt the Supreme Court's five factor test for

16    antitrust standing which was articulated in the

17    Associated General Contractors case.  That case was

18    decided ten years after the Supreme Court decided the

19    Illinois Brick case and adopted the direct purchaser

20    limitation.  At the time Associated General Contractors

21    was decided, the direct purchaser limitation was a

22    feature federal antitrust law and standing requirements

23    were crafted liberally in order to further the purposes

24    of the federal antitrust statute which was to limit

25    compensation to direct purchasers and avoid a series of

```
 1        lawsuits by indirect purchasers who couldn't be
 2        compensated under substantive federal law anyway.  And
 3        consistent with the Supreme Court standing, Juris
 4        Prudence in other areas, the Court adopted a test that
 5        quite logically focussed on whether the plaintiff had
 6        sustained a legally cognizable injury and was capable of
 7        recovering damages.  That's the five factor test that the
 8        Supreme Court adopted and the Supreme Court encouraged
 9        lower courts in the federal system to consider factors
10        such as whether the plaintiff is a consumer or a
11        competitor in the restrained market, whether the injury
12        alleged is direct firsthand impact of the restraint
13        alleged, whether there were more directly injured
14        plaintiffs with a motivation to sue and whether the
15        plaintiffs claims would resist duplicative recoveries or
16        compensation from damages.  Precisely factors that
17        prompted the Court in Illinois Brick to adopt the direct
18        purchaser limitation in the first place, your Honor.
19            So the South Dakota legislature had an opportunity
20        to consider these factors when it rejected the direct
21        purchaser limitation and adopted Section 37-1-33 which
22        gives anyone who has been injured by an antitrust
23        violation the explicit right to sue.
24            THE COURT:  What is the import of the last part
25        of that statute "in any subsequent action arising from
```

1        the same conduct, the Court may take any steps necessary

2        to avoid duplicative recovery against a defendant"?

3                MR. MITBY:   Well, I think that is a logical

4        outgrowth of the statute.  It gives the Court the right

5        to limit damages in some way or take some other measure

6        in the context of an individual case to prevent a

7        duplicative recovery and that makes sense.  But what the

8        South Dakota legislature rejected, and I think this

9        second sentence of the statute proves it, is the idea

10       that the risk of duplicative recovery should somehow be

11       generalized that a standing requirement that applies to

12       all cases.

13            The South Dakota legislature has vested this court

14       and every other court in South Dakota with the duty of

15       fashioning remedies in a particular case such as

16       limitations on damages, such as some way of bringing

17       together all of the potential plaintiffs into a single

18       lawsuit as a way of avoiding duplicative recoveries.  The

19       legislature didn't authorize South Dakota courts to adopt

20       general rules of standing that would preclude a recovery

21       by an indirect purchaser simply because there is an

22       inherent risk of duplicative recoveries.

23            So I think that the second sentence of that statute

24       confirms the point that the Plaintiffs are trying to make

25       in this case, which is that we -- we are entitled to a

1   case -- a decision in the context of this individual case

2   about how best to reduce any potential risk of

3   duplicative recoveries and I think, as this Court will

4   recognize after discovery has been completed, the

5   settlement that Defendants paid to the merchants as a

6   result of the class action, the prior merchant class

7   action, was only a tiny fraction of the damage that was

8   actually caused in those cases and that is inconsistent

9   with the purpose of the antitrust laws which is to

10   provide for treble damages for violations of antitrust

11   policy.

12        **THE COURT:**  The parties chose to settle.  We

13   don't know what the damages would have been should the

14   matter been tried.

15        **MR. MITBY:**  That's correct, your Honor, but my

16   point is that this Court would be entitled to give them

17   settlement credit or find some other remedy to ensure

18   that there is no duplicative recovery in this case.  But

19   South Dakota has rejected the notion that the risk of

20   duplicative recovery should be incorporated into

21   generalized standing requirements.  The source that the

22   federal system has adopted.

23        The standing test in Associated General Contractors

24   is related to the types of injuries that are compensable

25   under federal law and, of course, this makes sense

1    because the Supreme Court has explained again and again

2    that a legally recognized injury is a fundamental

3    requirement for standing.  There is a series of decisions

4    on this point and I have brought along one with me to

5    show to the Court for illustrative purposes.  May I

6    approach, your Honor?

7              **THE COURT:**  Yes.

8              **MR. MITBY:**  This is a recent decision, Bennett

9    versus Spear from the 1997 term of the Court.  And if,

10   your Honor, will look to the highlighted text, Justice

11   Sclera wrote, "to satisfy the case or controversy

12   requirement of Article III, a plaintiff must, generally

13   speaking, and demonstrate that he has suffered injury in

14   fact, that the injury is fairly traceable to the actions

15   of the defendant and that the injury will likely be

16   redressed by a favorable decision".  There is language of

17   this sort in a variety of decisions from the United

18   States Supreme Court over the years addressing standing.

19        The point of this is that in the federal system

20   courts adopt standing rules that further the goal of

21   compensating plaintiffs who are entitled to be

22   compensated and who can show an injury.  Under federal

23   law an indirect purchaser can't show that type of injury

24   because that type of injury isn't recognized by federal

25   antitrust laws.  It would not make sense to take standing

1    requirements that have been developed for the sole

2    purpose of trying to screen out folks that can't allege a

3    legally recognized injury and import them into South

4    Dakota law which has rejected the federal concept of

5    injury allows indirect purchaser suits.  In fact, goes so

6    far to say that anyone injured by an antitrust violation

7    has a right to sue for damages under South Dakota law.

8        The only factor in the federal test that is not

9    explicitly related to whether the antitrust injury was

10    direct or indirect, is whether the damages claims are

11    speculative.  And in this case the defendants have no

12    basis at this very preliminary stage of the litigation

13    for arguing that the damages claims are speculative

14    because there has been no discovery, there has been no

15    expert analysis.  Plaintiffs haven't had an opportunity

16    to come forward to this Court as in responding to a

17    motion for summary judgment and show exactly what

18    evidence we have adduced that demonstrates that these

19    claims for damages are not speculative.

20        If, at some point down the road, defendants can

21    convincingly argue to this Court that the damages claims

22    are speculative, couldn't be proved with certainty,

23    aren't entitled to compensation under South Dakota law,

24    then this Court can and should revisit Battley

25    (phonetic), but defendants aren't arguing that because

1    thus motion to dismiss and under South Dakota law the

2    defendants can't attach any evidence or make any

3    evidentiary arguments that are based on the facts of this

4    case.  They have to look solely to the pleadings.

5        I would submit that when counsel for Visa says that

6    the damages claims in this case are speculative, he is

7    relying on an assumption about what the evidence is going

8    to show at a later stage and we, as Plaintiffs, have not

9    had the opportunity to show to this Court what the

10   evidence in fact proves.  So we would like to -- we would

11   like to save those arguments about whether this is --

12   this claim is speculative or not until both sides are in

13   full possession of the facts.

14       Now, defendants, throughout their argument this

15   morning, have offered no reason for this Court to

16   disregard the plain language of Section 33-1-33.

17   Defendants proposed limitation on standing would leave

18   most of the injured parties in this case without any kind

19   of remedy at all.  And I submit that that result,

20   your Honor, is plainly contrary to the legislature's

21   purpose in enacting Section 37-1-33 and that purchase was

22   to afford, quote, "any person", end of quote, injured by

23   an antitrust violation, the right to sue regardless of

24   whether the injury was direct or indirect.  And under

25   defendants rule, only the merchants could sue for

1    inflated prices paid to consumers as a result of an

2    illegal tying arrangement. This approach would leave

3    consumers who are, by far, the most populous group of the

4    defendants antitrust victims without any kind of redress

5    at all.

6        I want to respond briefly to a point that the

7    defendants made when they said that that the overcharges

8    are alleged to be spread over a wide variety of consumer

9    goods and weren't really limited to people who were

10    consumers in one imagination or another of Visa and

11    Mastercard. I think that that argument really proves too

12    much. It would leave consumers in this case without a

13    remedy precisely because of the manner in which the

14    defendants chose to implement their tying ring. In

15    particular, Visa and Mastercard specifically prohibit

16    merchants from assessing on a debit card transaction a

17    fee directly to the debit card user. Under Visa's own

18    rules merchants are required to spread whatever portion

19    of that cost that they don't absorb in that overhead on

20    to all consumers. They can't just target pick debit card

21    users. Presumably not very many people would use the

22    Visa debit card. This puts defendants in the position of

23    being able to adopt policies that automatically deny most

24    of their victims standing to sue and thus any possibility

25    of compensation and this lesson will not be lost on

1   future antitrust violaters.  It will almost certainly

2   endeavor to structure their conduct as to take advantage

3   of any judicially created bars to recover.  Given the

4   South Dakota legislature's unambiguous mandate in favor

5   of broad antitrust remedies, this outcome would be

6   unaccepted.

7        The defendants have also claimed that the

8   Plaintiff's injuries are somehow derivative or remote.

9   This is wrong for several reasons.  First, no one

10  disputes that South Dakota law provides a remedy for an

11  indirect purchasers injury.  Counsel for Visa has

12  conceded this afternoon, and I don't think there is

13  anyone that would attempt to read that type of provision

14  out of the statute, but in this case the injury to

15  consumers, is actually a lot less derivative or remote

16  than the injuries for indirect purchasers have recovered

17  in other cases.

18       In this case, remember, your Honor, that there are

19  only two groups of people who are potential plaintiffs

20  and potential victims of this tying arrangement,

21  merchants and consumers.  There is no long supply chain.

22  There is no long, long distribution chain.  There is no

23  passing through these charges through a series of middle

24  man.  There is two groups of merchants and consumers and

25  the defendants would concede, I suspect, that indirect

```
 1          purchaser cases where a good is sold to one purchaser who
 2          passes it onto another who passes that onto a third and
 3          even onto a fourth, that more than just the first
 4          indirect purchaser would be entitled to recover.  There
 5          are several case that address the very issue we have
 6          cited, some of them unbriefed and in the Holder versus
 7          Archer Daniels Midland case where numerous indirect
 8          purchasers of citric acid and other ingredients in food
 9          products brought suit against Archer Daniels Midland for
10          price fixes and Archer Midland's principle argument,
11          look, these people don't have standing to sue.  They
12          didn't buy citric acid, they bought orange juice and that
13          citric acid passed through a series of transformations in
14          the factory, passed through a series of distributers.
15          How can these purchasers even begin to tell us how much
16          they were overcharged because of illegal price fixing
17          conspiracy?  Well, this case is really not much different
18          than that except the difference is overcharges were
19          passed directly to the consumers by the merchants.  They
20          didn't pass through the middle man.  There was no change
21          of the product or repeated changing of hands in this
22          transaction.  The merchants decided, after they saw the
23          bill from Visa, how much they were going to raise their
24          prices on all consumer goods in order to compensate them
25          for some of that increased cost.
```

1      This is also not like some daisy chain of causation

2   where the telephone company is fix pricing and suddenly

3   everybody who buys anything is a victim of a vast

4   antitrust conspiracy because everybody is using --

5   because every merchant in the world uses a telephone.

6   That's not the case at all.  In this case, again, the

7   charge is passed on directly to consumers.  There is just

8   one middle man, that's the merchant, and the plaintiffs

9   are entitled to try to prove that there is a specific

10  amount by which they were injured in each of these cases.

11  And the -- I think this Court should consider, you know,

12  revisiting the issue of speculativeness after there are

13  some facts on the table by which the plaintiffs can try

14  to show exactly what types of injuries they sustained and

15  how much.

16      I'd like to address next the defendants' reliance on

17  case law from states with narrower remedial statutes than

18  South Dakota's.  I have to confess that I have not seen a

19  copy of the Minnesota decision.  It wasn't sent to me.  I

20  don't have one in front of me.  I would be happy to

21  comment on it at greater length for this Court after

22  having a chance to review what the Minnesota Appellate

23  Court in this case actually said.  But I would submit

24  initially that the Minnesota case is a decision that has

25  not passed through appellate review including review by

1    the Supreme Court of Minnesota and this Court should pay

2    special attention to what the Supreme Court of Minnesota

3    says the law says because the Supreme Court of Minnesota,

4    reading the same type of statute, has interpreted it very

5    broadly as they did in the Blue Cross Blue Shield case.

6    Keep in mind that Blue Cross Blue Shield was suing

7    tobacco companies for driving up health care costs even

8    though I don't think anyone would argue that Blue Cross

9    Blue Shield was, in some sense, was a consumer that

10   bought products from the tobacco companies.  So the

11   Minnesota Supreme Court needs a chance to be heard on

12   whether this decision is consistent with Minnesota law

13   before this Court assumes that Minnesota law would reject

14   these claims.

15        Secondly, plaintiffs rely on decisions from New York

16   and North Dakota.  Well, New York and North Dakota do not

17   have statutes that are anything like Section 37-1-33.  In

18   fact, if I may approach, your Honor, I brought a handout

19   for the Court that compares the language of the North

20   Dakota and New York statutes with the language of the

21   South Dakota statute.  May I approach, your Honor?

22             **THE COURT:**  Do you have a copy for counsel?

23             **MR. MITBY:**  Yes, I do.  Thank you, your Honor.

24   As your Honor will note, Section 5108.1 -- 08 and in any

25   tax for damages under this section, the fact that the

```
 1          state said, "a person threatened with injury or injured
 2          in its business or property by any violation of the
 3          provisions of this chapter has not dealt directly with
 4          the defendant does not bar recovery".  And looking to the
 5          language of New York general business law section 340
 6          subsection six, the state uses similar language.  It
 7          says, "the fact that the plaintiff hasn't dealt directly
 8          with the defendant, doesn't bar recovery".  That's very
 9          different from saying that any person injured by an
10          antitrust violation has the right to sue.  These statutes
11          tell courts what fact they can't use as a way of denying
12          recovery all together.  The South Dakota law is an
13          affirmative grant of the right to sue and implicitly of
14          standing to sue for any type of antitrust violation.
15              Now, defendants also point to the Michigan statute
16          which is approximately the same as the South Dakota
17          statute, however what defendants failed to note is that
18          Michigan courts have interpreted the rights of indirect
19          purchasers much more narrowly than South Dakota courts.
20          And I would refer your Honor to page 679 of the Microsoft
21          antitrust litigation opinion which was from the South
22          Dakota Supreme Court.  It's cited actually by the
23          defendants in their brief.  And when you look at what the
24          South Dakota Supreme Court has to say about Michigan law,
25          first the Supreme Court noted that Michigan was one of
```

1      only two states in the country that allowed indirect

2      purchaser suits, but actually refused to permit indirect

3      purchasers to participate in antitrust class actions.   So

4      the Michigan Supreme Court -- or the South Dakota Supreme

5      Court first noted that Michigan is an out liar in giving

6      a narrow reading to its antitrust remedies provision and

7      then it refused to follow Michigan's interpretation of

8      that statute finding that it's interpretation was too

9      narrow.

10          So I would submit, your Honor, that Michigan and

11     South Dakota, even faced with the same type of statute,

12     have taken different paths.   The South Dakota Supreme

13     Court is likely to give full effect to the broad remedial

14     provision that the legislature enacted.   Thus none of the

15     defendants' authorities really address the fundamental

16     difference in this case between South Dakota law and the

17     law of the states on which they place their reliance.

18          I'd like to close by noting that, you know,

19     defendants have not argued that there are no standing

20     requirements at all in South Dakota law.   That's a false

21     choice.   First of all, plaintiffs have to be able to show

22     that they sustained an injury for which they can show

23     damages and at some point in this litigation, after some

24     evidence has been presented, this Court will have to

25     determine whether defendants have presented a genuine

1   issue of material fact on that point so there are

2   limitations on who can bring an antitrust claim except

3   that those limitations are not necessarily ones that can

4   be applied at this stage of the proceedings before any

5   type of discovery.

6        The second point is that there are other standing

7   tests that this Court could adopt.  South Dakota law has

8   not specifically defined what the standing tests should

9   be for actions by indirect purchasers or other victims of

10  antitrust violations but Justice Brennan gave a full

11  account of what he thought the test should be in his

12  dissent in Illinois Brick.  I think this Court is

13  entitled to give some weight to Justice Brennan in

14  Illinois Brick.  That it's ultimately the decision that

15  the South Dakota legislature agreed with and Justice

16  Brennan said that the test should be whether the

17  plaintiff's injury would be a reasonably foreseeable

18  consequence of the defendant's illegal conduct.

19       That's the so-called target area test and it is

20  based accordingly on, Justice Brennan, an accepted

21  general tort principles who can sue for tort injury and

22  who can't.  But the point to return to is that the

23  defendants are trying to craft an antitrust standing rule

24  which the Supreme Court adopted for the purpose of

25  furthering federal antitrust policy on to South Dakota

```
 1          law which has an entirely different policy and entirely
 2          different scope and that effort should be rejected by
 3          this Court because it's inconsistent with the will of the
 4          South Dakota legislature.  Thank you, your Honor.
 5                    THE COURT:  All right.  We'll take a short
 6          recess and then I'll hear your response.
 7                    MR. BOMSE:  Thank you, your Honor.
 8                    (Whereupon, a recess was taken.)
 9                    THE COURT:  All right.  Mr. Bomse.
10                    MR. BOMSE:  Thank you, your Honor.  It seemed
11          to me trying to put Mr. -- put this argument together, we
12          are kind of following progression.  The first is that
13          there are no standing requirements.  Second, Associated
14          General Contractors is really just Illinois Brick.
15          Third, we don't --
16                    THE COURT:  Would you repeat that, please?
17                    MR. BOMSE:  Yes.  The second is that the
18          Associated General Contractors is just Illinois Brick.
19          It's the same considerations and the same analysis.
20                    THE COURT:  Well, if the South Dakota
21          legislature, in drafting 37-1-33, is attempting to use an
22          Illinois Brick repealer, what does that do to the
23          standing factors set out in the contractor's case?
24                    MR. BOMSE:  It says that you have to interpret
25          Associated General Contractors in light of that and
```

1     that's --

2                    THE COURT:   What does that mean, which survive?

3                    MR. BOMSE:   Very simple.   The first factor

4     needs to be modified.   That is, the first factor is

5     whether somebody is a competitor or a consumer.   That

6     factor means that you have to have somebody who is

7     someone somewhere in the chain of defendants

8     distribution.   That is, you can't -- you can't simply

9     have an interpretation which does away with what the

10    South Dakota legislature does any more than you can

11    simply interpret what the South Dakota legislature did as

12    doing away with all antitrust standing requirements.   So,

13    what you do is you look to the defendants chain of

14    distribution.   And the problem here is that the

15    plaintiffs don't satisfy that.   They are not somewhere in

16    the defendant's chain of distribution.

17         Now, where do I get that?   Well, I get that from the

18    statute -- from the notion that we want to reject

19    Illinois Brick.   But I get it somewhere else.   I get it

20    from Justice Brennan's dissent.   What you were told when

21    we finally got to the fourth step in plaintiff's argument

22    on page 20 of their brief where the heading is "standing

23    under South Dakota's antitrust law should be determined

24    according to the target area test from Justice Brennan's

25    dissent in Illinois Brick".   If you go to Justice

1      Brennan's dissent in Illinois Brick, this is what you

2      find.  You find Justice Brennan saying, "I concede that

3      despite the broad wording of Section 4, there is a point

4      beyond which the wrongdoer should not be held liable".

5      This is on pages 760 and 761 of that opinion.  And then

6      he goes down in the paragraph and he says, "but if the

7      broad language of Section 4 means anything, surely it

8      must render the defendant liable to those within the

9      defendant's chain of distribution".  That is, if you have

10     an indirect purchaser who bought a product further down

11     the chain or although I think this is less clear, you

12     have somebody who bought a product that contains an

13     ingredient, their vitamin example or the Microsoft

14     example, where the operating system gets incorporated

15     into a computer that is purchased by a consumer, you

16     would meet the South Dakota test, at least that part of

17     it.  But where you have just what we have called an

18     overhead suit.  That is something that just says because

19     the costs of doing business are increased, everybody can

20     sue for anything, then you're way outside.

21             THE COURT:  So you submit that the first factor

22     of Associated Contractors survives and Illinois Brick is

23     a repealer?

24             MR. BOMSE:  I suggested it survives in the

25     modified format indicated, yes.  Yes.

```
 1              THE COURT:   What about the remaining factors?
 2              MR. BOMSE:   The second factor is about whether
 3      injury is direct or derivative.   The Court in Associated
 4      General Contractors used the term indirect.   But if you
 5      go to that portion of the opinion, you'll see that they
 6      didn't cite Illinois Brick.   They weren't invoking the
 7      Illinois Brick part.   What they were talking about was
 8      injury that is derivative.   Injury that has some
 9      intervening cause.   And if you understand it in the way
10      that the Supreme Court actually is talking about it, as
11      opposed to turning into it into a simple slogan, then
12      that phrase applies -- that part of the test applies as
13      well.
14              The third factor is, is there somebody else more
15      directly injured?   It seems to me that the -- that is
16      what the Court in Minnesota suggested.   It's hard to
17      apply that factor literally here.   Although let me have a
18      caveat to that.   Because the factor actually is there is
19      somebody more directly injured with a motivation to sue.
20      What they're really saying is, do we have a trouble of
21      antitrust violation perhaps not being pursued by anybody
22      and if you take Microsoft as an example, in Microsoft,
23      the indirect purchaser suits.   The consumer suits tended
24      to be the only ones that were brought at least initially.
25      So in that case somebody could argue, under South Dakota
```

```
 1       law, we would meet the third -- the third factor.
 2            Then when you get to the fourth factor, and at some
 3       point I'm gonna outrun my memory, but we are concerned
 4       with speculativeness of damages and I would suggest to
 5       the Court that that factor absolutely was intended still
 6       to apply.
 7            THE COURT:  All right.  Now, does 37-1-33,
 8       which refers to the duplicative recovery which is the
 9       fifth factor.  What is the South Dakota legislature --
10       the fifth factor under Associated General Contractors is
11       whether the claim risk duplicative recovery.  What is the
12       South Dakota legislature intended by the last sentence of
13       37-1-33 when they indicate that the Court may take any
14       steps necessary to avoid duplicative recovery against a
15       defendant?
16            MR. BOMSE:  Well, I could -- I could be very
17       aggressive in my reading of that and say that the South
18       Dakota legislature intended not to allow this kind of a
19       suit where there already has been an earlier suit with a
20       recovery.  But I don't think that's right.  I think that
21       would be an overreading on my part.  Now, I don't have
22       legislative history here which answers that question
23       either way, but I don't want to over argue this because
24       I'm telling you that I think we have to have an
25       appropriate reading one way, so I'm not gonna tell you
```

1     that this was meant to take away this case as a matter of

2     law.  We didn't argue that in our papers.  I think what

3     it was reflecting was a clear sensitivity to it.  It is

4     plainly reflecting the notion that somewhere down the

5     line, if this case were to go forward, we would need to

6     deal with that, whether it means we're gonna bring in all

7     of the merchants in South Dakota and seek indemnity from

8     them.

9            THE COURT:  Is factor affecting standing?

10           MR. BOMSE:  I don't think it's factor... I don't

11    think it's a factor here affecting standing, but I

12    certainly think that it is a factor that is pertinent --

13    I think I'm not -- I think I didn't articulate that

14    correctly.  I don't think that this clause that you read

15    has to do with standing.  I do think that duplicative

16    recovery does have to do with standing.  That is, it is

17    something you are expected to take into account.

18    Remember, Associated General Contractors, your Honor, if

19    you look at the opinion, the Court is very clear about

20    this.  It's saying, look, we can't just give all federal

21    courts a checklist of things to go down in every case and

22    if you hit three out of five, you lose.  If you only hit

23    one out of five you win.  They said that's not the way

24    you do this.  You have to look at the overall situation

25    in light of these factors and you have to make a

1    judgment.

2              THE COURT:  Are you urging the Court to find

3    that the action will result in a duplicative recovery?

4              MR. BOMSE:  Absolutely.

5              THE COURT:  And therefore should bar standing?

6              MR. BOMSE:  I'm asking the Court to find that

7    because of the clear potential for duplicative recovery,

8    there is less need for this kind of litigation and that

9    is something that ought to be part of the Court's

10   calculus.  It is not sufficient standing alone, no pun

11   intended, to bar standing.  But it certainly is something

12   that plainly was intended to be taken into account and

13   the legislature made that clear.

14        All we're suggesting, your Honor, is that it is

15   clear enough that standing requirements are not simply

16   subsumed by Illinois Brick or by an Illinois Brick

17   repealer.  They are not the same thing.  If you go back

18   to footnote seven in Illinois Brick, the Court has a long

19   discussion there about the relationship between standing

20   on one hand and Illinois Brick on the other.  And that's

21   where the phrase analytically distinct comes from.

22        In fact, in that case, the Court recites the history

23   in footnote seven.  In that case, the defendants had

24   actually won on standing grounds in the lower court, but

25   then the Supreme Court chose, after it granted the cert,

 1          not to go off on generalized standing, but to in fact

 2          adopt the policy based response, the corollary to Hanover

 3          Shoe, and say we're not going to allow any indirect

 4          purchaser suits. That's a bright line test.

 5               As counsel pointed out to you, it was about seven

 6          years later when the Court got to the generalized

 7          question of standing in Associated General Contractors.

 8          Illinois Brick was already on the books. And it then

 9          went through those factors because it said and the Court

10          there in Associated General Contractors, started out with

11          actually the same kind of observation that you heard from

12          Mr. Mitby. That's with the observation that a literal

13          reading of the statute is broad enough to encompass every

14          harm that can be attributed directly to or indirectly to

15          the consequences of an antitrust violation.

16               And the Court then proceeded, of course, to reject

17          that. It did it by going through and I was -- I'm

18          starting here on pages 529 and 530. But if you then

19          start there and go through the next several pages, you

20          will see the Supreme Court, going through a very

21          elaborate analysis of limitations on similarly broad

22          statutes, saying you can't mean what that says. You have

23          to have some limitations. And it goes through the

24          variety of limitations that were applied at common law in

25          both tort and contract actions and it does it actually

1    for several pages.  It's not something we kind of throw

2    off.  And that was then the preclude to their discussion

3    of standing factors.  And as we say, the courts have been

4    fairly resolute and the Illinois Brick repealer states in

5    still, saying, yeah, we have to have standing limitations

6    because otherwise you get into certain situations that

7    really don't make any sense and in some ways if you

8    allow, as the Minnesota court concluded, a case this

9    broad, what do you really have?  You have, as I said,

10   these overhead cases with damages, to use its word,

11   "inherently and hopelessly speculative".

12        I mean, on our way to lunch today we were talking

13   about the telephone example, Mr. LeBrun and I, and he

14   observed that under this theory of standing and the

15   telephone case really isn't, with all respect to

16   Mr. Mitby, any different in terms of it's breath or in

17   terms of the number of layers.  You have a situation in

18   which the telephone company overcharges a business, a law

19   firm.  A law firm raises its rates to its clients.  The

20   clients, a restaurant, then serves food to a consumer and

21   the consumer says I paid an overcharge somewhere in that

22   because it would be passed down along that chain.  I

23   mean, if one wants to really say that that is it because

24   of the words of the statute, I think you have done a

25   disservice to what the South Dakota legislature actually

1    had in mind in these cases.  I think that granting our

2    motion to dismiss here is not in any way going to cause

3    harm to the intent of the legislature and to appropriate

4    indirect purchaser cases.

5    I think on the other hand, opening up this kind of

6    an overhead case will do that kind of harm.  And I think

7    that the standing rules exist for the purpose of

8    preventing that from happening and they do have an

9    independent life independent of Illinois Brick.

10   The argument here, you know, it isn't like standing

11   somehow was invented after or at the time of Illinois

12   Brick.  We have had standing rules in antitrust cases

13   both federal and state going well back into the beginning

14   of the Sherman Act.  One of the most famous cases Hawaii

15   against -- Hawaiian Standard Oils in 1972 and many other

16   standing cases before that.

17   What they are suggesting to you is that somehow when

18   the State of South Dakota responded to Illinois Brick by

19   saying we're gonna allow indirect purchaser claims, that

20   they somehow silently intended to wipe out that whole

21   body of law and I think that's just a heroic and

22   unjustified reading which will have mischief and, you

23   know, I don't know if I'm being persuasive to this Court,

24   but I have been persuasive in other courts because I

25   think that when you do think, and I tried to listen

1    carefully, and the one thing that I didn't hear, other

2    than the conclusions about how this isn't speculative and

3    it isn't something that we can decide now, I didn't hear

4    a response to how you deal with what is manifest on the

5    face of this complaint.

6        My example about the Saturday morning errands or my

7    discussion of overhead or the fact that you are simply

8    opening the doors to claims that we don't need to have

9    further procedures in order to determine that they're

10   inherently and hopefully less speculative or as the Court

11   in New York said, "the complexity and speculative nature

12   are overwhelming" or as Michigan said, "the claims are

13   speculative and would be incredibly complex". I

14   respectfully submit, your Honor, that it stands there on

15   the face of this -- of this complaint. Standing cases

16   are resolved with all respect at the pleading stage.

17   That's almost always the way they are resolved because we

18   can cut them off that way. We're not asking you to deny

19   the allegations of the complaint, we're asking you to

20   accept them and to say accepting them, but accepting them

21   without leaving our common sense at the door. We can

22   figure out what it is you're asking us to do here and

23   we're gonna say that this simply goes -- goes too far.

24       Now, you know, I have some very specific things I

25   could tell your Honor about what plaintiffs have to say.

1    For example, their reference to Article III standing in
2    the case that they gave you.  I was -- I was puzzled,
3    since most of us know who do antitrust, that Article III
4    standing and antitrust standing are two different
5    animals.  And if you need to have a cite for that, it
6    happens that the Court said it in Associated General
7    Contractors in footnote 31 where they talk about the fact
8    that the two things are different.  I mean, it talks
9    about court antitrust cases needing to make a further
10   determination whether the plaintiff is a proper party to
11   bring a private antitrust action so it isn't just Article
12   III standing.

13       The other piece of paper that we were all handed
14   about the difference between New York and North Dakota
15   antitrust laws versus South Dakota.  I would say that
16   while the words may not be identical, the meaning is
17   identical and, of course, that leaves Michigan and
18   Minnesota unaddressed at all including the assertions
19   made in the briefs that were submitted by the plaintiffs'
20   firm here about how the Minnesota statute is identical
21   and interpretations are particularly important.

22       I think I have dealt with the target area issue in
23   the sense of explaining to you exactly what it was
24   they're arguing, the Justice Brennan test and referring
25   you to what he had to say what that means.  I mean, their

1    own recognition that there needs to be some test, says

2    that even they can't bring themselves at the end of the

3    day to really argue that there should be no standing

4    limits.  What they want you to do is instead to accept a

5    test that has been rejected and reject a test which has

6    been accepted, but when we look at the test that they

7    offer you, it is a test that were in fact -- that they

8    don't meet.  That is, Justice Brennan, in the chain of

9    distribution.  These people who are not in the chain of

10   distribution don't even have to have a debit card.

11   They're not indirect purchasers.  They're not purchasers

12   of a product with ingredients.  They are simply people

13   who purchased something that's supposedly went up in cost

14   because instead of telephone service or janitorial

15   services or rent being increased, debit card fees were

16   increased and that brings us back to whereas the

17   Minnesota court, we think, correctly concluded, you have

18   no limits at all.  We don't think that makes sense.

19            **THE COURT:**  Mr. Mitby, do you want to respond?

20            **MR. MITBY:**  Thank you, your Honor.  We're not

21   arguing for no limits at all.  There are limits.  The

22   limits are that you have a cognizable antitrust injury

23   that the Plaintiffs have done in this case.  It is not a

24   situation where some law firm was passing a minute charge

25   from on a telephone bill to its customers.  This is a

1      situation where the debit card fees are in the order of

2      1.5 percent or a little bit less on every hundred dollars

3      spent using a debit card.  That's a lot of money.  That's

4      why we have alleged that the actual damages in this case

5      exceed 12 billion dollars, treble would be 36 billion

6      potentially and that's why we believe that consumers in

7      South Dakota bore a significant part of this overcharge.

8      It's not a daisy chain of causation.  In this case there

9      are two injured parts here, merchants and consumers.

10     Whatever portion of these illegal overcharges, the

11     merchants did not absorb in their overhead, consumers had

12     to pay out of pocket.  Consumers under South Dakota law

13     have standing to sue because Section 37-1-33 grants

14     standing to any party who has been injured by an

15     antitrust violation and the courts across the country

16     have dealt with consumer class actions in the antitrust

17     context and outside the antitrust context.  It's not a

18     case that the complexities in this instance are so

19     overwhelming that we should disregard the plain language

20     of the South Dakota legislature and decide to ignore the

21     South Dakota legislature's rejection of the very standard

22     that the defendants advocate here and then simply allow

23     these claims to go without any compensation at all.

24     Should the defendants just get away with this?  Should

25     the defendants be allowed to get away with illegal

```
 1          antitrust activity simply because they adopted rules that
 2          require merchants to plead the costs?  These illegal
 3          arrangements controls all goods instead of simply charge
 4          the debit customers on those goods, that would allow
 5          defendants to profit from their own ability to implement
 6          this illegal scheme in a particular way.  And this Court
 7          shouldn't allow that.  That's gonna allow every defendant
 8          to structure its conduct so that it can come into court,
 9          as the defendants are doing today, and argue that the
10          very victims of their illegal practices don't have
11          standing or fail for some other reason under the
12          antitrust laws.
13              Now, I like to address the point that Mr. Bomse made
14          regarding the so-called analytical distinction between
15          standing requirements and the concept of a legal injury
16          question.  The two injuries may be analytically distinct,
17          but as a practical matter, they're related.  That's why
18          five out of five of the factors are articulated in
19          Associated General Contractors relate to whether the
20          plaintiff had suffered a cognizable injury under federal
21          law, i.e. was a direct purchaser, and whether the
22          plaintiff was in a position to recover damages for that.
23          And I've given you one example of a standing case in the
24          Article III context where the Court explained the
25          relationship between substantive injury and standing, but
```

1    could I give you examples from other contexts as well?  I

2    don't think -- and I think perhaps the best example is

3    Associated General Contractors, itself, where the

4    standing factors that the Supreme Court asked courts to

5    consider when evaluating standing are based on the same

6    set of factors that it used in Illinois Brick to adopt

7    the direct purchaser rule.  The point is that if a

8    standing requirement is based on the notion that only

9    direct purchasers are ever gonna be entitled to recover

10   for an antitrust injury and so therefore we ought not to

11   hear claims from people who don't allege that they are in

12   fact direct purchasers, we can't import that concept into

13   South Dakota law because, your Honor, if we import that

14   concept into South Dakota law, we'll be overriding what

15   the legislature intended which is for anyone injured by

16   antitrust violations to be able to recover not just

17   direct purchasers, as the US Supreme Court has said.

18            THE COURT:  What assumption can you draw about

19   the repealer?  Are you assuming that the repealer goes

20   beyond the mere holding of Illinois Brick?

21            MR. MITBY:  Yes, your Honor, I am assuming that

22   because the repealer is broader than repealers adopted by

23   other states.  We seen two examples, North Dakota and New

24   York.  Those repealers are not substantively identical as

25   the defendants claim.  What they say is that a Court

```
 1        can't use the fact that the plaintiff didn't have a
 2        direct relationship with the antitrust violater.  In
 3        other words, won't in privity.

 4            I believe that the language from the statute is
 5        dealt directly.  You can't use the fact that the
 6        plaintiff didn't deal directly with the defendant to bar
 7        recovery.  That's different from saying that anyone who
 8        suffers an injury and I'll just quote the statute from
 9        the beginning again.  The statute says "no provision of
10        this chapter may deny any person who is injured directly
11        or indirectly in his business or property, by a violation
12        of this chapter, the right to sue for and obtain any
13        relief afforded under 37-1-14-3".  That's different from
14        saying simply that's the fact and I quote, "the fact that
15        the state political subdivision, public agency or person
16        threatened with injury or injured in its business or
17        property by any violation of the provisions of this
18        chapter, has not dealt directly with the defendant, does
19        not bar recovery".  In other words, in North Dakota and
20        New York other factors might bar recovery even from
21        someone who has a bona fide antitrust injury.  In South
22        Dakota the legislature has said that that approach is
23        wrong and is not gonna be the policy of this state.
24            I'd like to call your Honor's attention to the
25        second part of 37-1-33 which allows this Court to take
```

1    measures necessary to prevent duplicative recoveries.  I

2    notice from your Honor's questions that your Honor is

3    wondering about the relationship between those two

4    provisions and contrary to what the defendants are

5    saying, I submit to you that that second part of the

6    statute basically says the legislature says we recognize

7    the concerns about duplicative recoveries, but we don't

8    want to simply bar indirect purchaser suits all together

9    whether on standing grounds or injury grounds.  We want

10   courts to deal with this on a case-by-case basis and we

11   want courts to use the many tools that are available from

12   joinder to class action devices to settlement credits to

13   some kind of jury instruction reducing the amount of

14   damages in an appropriate case.  We want courts to make

15   this decision on a case-by-case basis, not a Supreme

16   Court to incorporate the concern about duplicative

17   recoveries into a bar to standing which is one of the

18   things that the -- which is the approach that federal law

19   has taken.  South Dakota's rejected that approach and it

20   has instead asked courts to do the work in an individual

21   case of deciding how to minimize the risk of duplicative

22   recoveries rather than trying to generalize that issue

23   into a bar to standing that would leave some people

24   uncompensated.

25        In this case, we have conduct that, according to the

1        allegations in this complaint, I don't even think the

2        defendants are disputing this part of it.  That

3        Mastercard and Visa don't allow their merchant

4        subscribers to pass on the charges of these debit

5        transactions to debit customers.  They have to spread

6        them across the cost of goods generally or else they get

7        thrown out of the Mastercard/Visa system.  Now, should

8        Mastercard and Visa be entitled to profit from an illegal

9        tying arrangement that has this feature by being able to

10       bar consumers at the courthouse door, I think not.  And I

11       think that -- I submit to you, your Honor, that the South

12       Dakota legislature has said that anyone who suffers an

13       antitrust injury is entitled to sue for damages and these

14       consumers are entitled to sue.  Thank you.

15              MR. BOMSE:  Your Honor, may I, as moving party,

16       in closing in less than a minute, I believe.

17              THE COURT:  You may.

18              MR. BOMSE:  First of all, may I respectfully

19       rise to the challenge that was made.  It isn't in the

20       motion you would have to justify the proceedings, maybe

21       it's entirely incorrect in his statement about our rules.

22       If the Court had any question about that, we could submit

23       the rule which does allow a differential in pricing, but

24       I don't think it's here nor there.  I just don't want to

25       let that misstatement go uncorrected, particularly when

1       it's suggested we concede that that is the situation.

2       But as I say, that is neither here nor there.

3            It seems to us, and this is the only point I want to

4       make, that Plaintiffs have really put to the Court a

5       challenge.  That is to conclude that the legislature

6       silently intended to do more than repeal Illinois Brick,

7       when I think it's quite clear from the legislative

8       history here, as everywhere else, that it was an Illinois

9       Brick repealer statute.  The timing all came about, it

10      would have been an easy enough thing for the legislature

11      to say that we intend to eliminate standing requirements.

12      So I think that they are in fact asking your Honor to go

13      beyond where the legislature actually chose to go.

14           I would observe, your Honor, that if you go back to

15      the federal statute, itself, that was at issue in AGC.

16      It is every bit as broad in its terms as the statute in

17      South Dakota.  Any person who shall be injured in his

18      business or property by reason of anything forbidden in

19      the antitrust laws may sue therefore that's the statute

20      that the Court -- the Supreme Court voted in AGC just

21      before it talked about how a literal reading of the

22      statute is broad enough to encompass any harm that can be

23      contributed to directly or indirectly to the consequence

24      of a antitrust violation.  So we have -- this Court has

25      the same issue in front of it that the Court had -- the

Case 2:23-cv-00629-JKW-LRL   Document 92-3   Filed 07/01/24   Page 55 of 57 PageID#
1288.

·54·

1       United States Supreme Court, that is the AGC case, that

2       is what to make of this language and both sides have

3       suggested to you what we think you should make of it.

4               THE COURT: . All right.   Thank you.   Counsel,

5       the Court has considered the numerous authorities that

6       you have presented and the briefs you have submitted as

7       well as the at least an hour and a half of oral argument.

8       The Court in this case grants the motion to dismiss.   The

9       Court relies on significant portions of Associated

10      General Contractors in applying several of the factors,

11      specifically factors one and five.   The Court finds that

12      the Plaintiffs lack standing as they are not alleging

13      injury as consumers in the relevant market.   Debit card

14      services that the antitrust law would seek to protect and

15      since the class of merchants has already recovered a

16      judgment, this suit would only threaten to duplicate the

17      recovery.

18          So the Court relies on factor one in Associated

19      General Contractor and factor five in making its

20      determination that the plaintiffs lack standing in this

21      case.

22          Again, the plaintiffs are not participants in the

23      relative market affected by the anti-competitive conduct

24      and further that the merchants have already recovered and

25      that there is a significant and real risk of duplicative

1    recovery.

2         The Court assumes that there may be an appeal

3    brought to the South Dakota Supreme Court from this

4    Court's ruling and the Court thanks you for the effort

5    that you have put into preparing both of your arguments.

6    They were very well prepared and well argued.

7         You are directed to prepare an order for dismissal

8    on behalf of Visa and Mastercard, Mr. Bomse to submit it

9    to Mr. Mitby for his review prior to submission to the

10   Court.

11        With that, we're adjourned.

12                    (End of proceedings.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF SOUTH DAKOTA        )
                                  )  ss.          CERTIFICATE
2    COUNTY OF PENNINGTON         )

3

4

5            I, Jean A. Kappedal, RPR, Official Court Reporter

6    of the Seventh Judicial Circuit and Notary Public

7    within and for the State of South Dakota, do

8    hereby certify that the testimony of the proceedings

9    that came on for hearing in the aforecaptioned matter,

10   contained on the foregoing pages, 1 - 55, inclusive,

11   was reduced to stenographic writing by me and hereafter

12   caused to be transcribed; that said testimony commenced

13   on the 28th day of September, 2004, in the Courtroom

14   of the Pennington County Courthouse, Rapid City,

15   South Dakota; and the foregoing is a full, true and

16   complete transcript of my shorthand notes of the

17   proceedings had at the time and place above set forth.

18           Dated this 22nd day of October, 2004.

19

20

21

22

23                              Jean A. Kappedal, RPR
                                My Commission Expires:  2/13/10
24

25
```



Jean A. Kappedal, RPR