**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

|  |  |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., CAREFIRST BLUECHOICE, INC., and CFA, LLC d/b/a CAREFIRST ADMINISTRATORS, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>   v.<br><br>JOHNSON & JOHNSON and JANSSEN BIOTECH, INC.<br><br>       Defendants. | Civil Action No. 2:23-cv-00629-JKW-LRL |

**RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF REGARDING INDIRECT PURCHASER STANDING**

i

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   FACTS ....................................................................................................................2

III.  ARGUMENT ..........................................................................................................3

      A.    *Illinois Brick*'s bar on damages for indirect purchasers under federal
            antitrust law is "analytically distinct" from the question of standing under
            *AGC*........................................................................................................................3

      B.    To show antitrust standing for *injunctive* relief, purchasers must prove
            antitrust injury; plaintiffs meet this standing requirement. ....................................5

      C.    In "*Illinois Brick* repealer" states, courts routinely allow end payors in
            generic drug delay cases to bring state antitrust damages claims. ..........................6

      D.    The plaintiffs meet the *AGC* test as applied in *Illinois Brick* repealer states...........8

      E.    Federal patent law does not preempt state law claims alleging fraud on the
            PTO. ......................................................................................................................15

      F.    J&J does not challenge the plaintiffs' standing to bring consumer
            protection and unjust enrichment claims, and J&J's proximate cause
            argument is unavailing. ........................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Health-Care Services. v. Radford Community. Hospital*,
 910 F.2d 139 (4th Cir. 1990) ......................................................................2

*Arkansas Carpenters Health & Welfare Fund v. Bayer AG*,
 604 F.3d 98 (2d Cir. 2010).......................................................................19

*Associated General Contractors of California, Inc. v. California State Counseil of Carpenters*,
 459 U.S. 519 (1983)..............................................................................3, 9

*Blue Shield of Virginia v. McCready*,
 457 U.S. 465 (1982)...................................................................................5

*Buckman Co. v. Plaintiffs' Legal Committee*,
 531 U.S. 341 (2001).................................................................................19

*California v. ARC America Corporation*,
 490 U.S. 93 (1989).....................................................................................7

*In re Cardizem CD Antitrust Litig.*,
 105 F. Supp. 2d 618 (E.D. Mich. 2000)....................................................6

*In re Cipro. Hydrochloride Antitrust Litig.*,
 363 F. Supp. 2d 514 (E.D.N.Y. 2005) ....................................................19

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
 370 U.S. 690 (1962)............................................................................14, 15

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
 No. 9-cv-3690, 2015 WL 3988488 (N.D. Ill. June 29, 2015)....................7

*In re DDAVP Direct Purchaser Antitrust Litig.*,
 585 F.3d 677 (2d Cir. 2009).........................................................10, 11, 14

*In re DDVAP Indirect Purchaser Antitrust Litig.*,
 903 F. Supp. 2d 198 at 207 (S.D.N.Y. 2012).................................. *passim*

*Dow Chemical Co. v. Exxon Corp.*,
 139 F.3d 1470 (Fed. Cir. 1998)...............................................................17

*In re Dynamic Random Access Memory Antitrust Litig.*,
 No. 02-1486, 2007 WL 2385112 (N.D. Cal. Aug. 17, 2007) ....................4

*In re Effexor Antitrust Litig.*,
    337 F. Supp. 3d 435 (D.N.J. 2018) ...................................................................16, 18

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    336 F. Supp. 3d 1256 (D. Kan. 2018) .........................................................................18

*Farag v. Health Care Services Corp.*,
    No. 17-2547, 2017 WL 2868999, at *1 (N.D. Ill. July 5, 2017)................................12, 13, 18

*In re Generic Pharm. Pricing Antitrust Litig.*,
    338 F. Supp. 3d 404 (E.D. Pa. 2018) .............................................................................6

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968)...................................................................................................4

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
    153 F.3d 1318 (Fed. Cir. 1998), *overruled in part on other grounds by*
    *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir.
    1999). .......................................................................................................16, 18

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977).............................................................................................1, 4, 5

*In re Interior Molded Doors Antitrust Litig.*,
    No. 3:18-cv-00718, 2019 WL 4478734 (E.D.V.A. Sept. 18, 2019)...........................5, 6, 12

*In re K-Dur Antitrust Litig.*,
    No. CIV.A. 01-1652 (JAG), 2007 WL 5297755 (D.N.J. Mar. 1, 2007).......................8, 13, 18

*Kloth v. Microsoft*,
    444 F.3d 312 (4th Cir. 2006) .....................................................................................5

*In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*,
    172 F. Supp. 3d 724 (D.N.J. 2016) ...............................................................................6

*LCS Group, LLC v. Shire LLC*,
    2019 WL 1234848 (S.D.N.Y. Mar. 8, 2019) ................................................................20

*In re Lipitor Antitrust Litig.*,
    336 F. Supp. 3d 395 (D.N.J. 2018) ............................................................................18

*Lockwood v. Sheppard, Mullin, Richter & Hampton, LLP*,
    2009 WL 9419499 (C.D. Cal. Nov. 24, 2009)...............................................................20

*In re Loestrin 24 Fe Antitrust Litig.*,
    261 F. Supp. 3d 307 (D.R.I. 2017)..........................................................................17, 19

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    295 F. Supp. 2d 30 (D.D.C. 2003) ................................................................... *passim*

*Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.*,
    402 F. Supp. 2d 276 (D.D.C. 2005) ...............................................................15

*In re Netflix Antitrust Litig.*,
    506 F. Supp. 2d 308 (N.D. Cal. 2007) ...........................................................10, 15

*Novell, Inc. v. Microsoft Corp.*,
    505 F.3d 302 (4th Cir. 2007) .......................................................................4, 9, 10

*Picone v. Shire PLC*,
    No. 16-CV-12396-ADB, 2017 WL 4873506 (D. Mass. Oct. 20, 2017)...................18

*In re Propranolol Antitrust Litig.*,
    249 F. Supp. 3d 712 (S.D.N.Y. 2017)....................................................8, 9, 10, 12

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
    2019 WL 6341298 (D. Mass. Nov. 27, 2019) ........................................................20

*Ritz Camera & Image, LLC v. SanDisk Corp.*,
    700 F.3d 503 (Fed. Cir. 2012)....................................................................10, 15

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp.*,
    22 F.4th 103 (2d Cir. 2021) .........................................................................4

*Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*,
    204 F.3d 1368 (Fed. Cir. 2000)........................................................................19

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    64 F. Supp. 3d 665 (E.D. Pa. 2014) ................................................................ *passim*

*Sullivan v. DB Investments, Inc.*,
    667 F.3d 273 (3d Cir. 2011)............................................................................7

*Supermarket of Marlinton, Inc. v. Valley Rich Dairy*,
    161 F.3d 3, 1998 WL 610648 (4th Cir. Aug. 27, 1998) ........................................8

*In re Thalomid & Revlimid Antitrust Litig.*,
    2015 WL 9589217 (D.N.J. Oct. 29, 2015)....................................................16, 18

*In re Warfarin Sodium Antitrust Litig.*,
    214 F.3d 395 (3d Cir. 2000)....................................................................2, 3, 6

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    No. 2:18-md-2836, 2023 WL 3064462 (E.D. Va. Apr. 18, 2023)...........................7

**Statutes**

15 U.S.C. § 15 ...................................................................................................................... 3

15 U.S.C. § 26 (2024) ........................................................................................................... 5

28 U.S.C. § 1295(a)(2) ........................................................................................................ 16

35 U.S.C. § 311(a) .............................................................................................................. 14

## I.     INTRODUCTION

Pursuant to this Court's June 17, 2024 Order, the plaintiffs file this brief to address the issues of antitrust standing under federal and state law. As with the scores of cases filed over the past two decades alleging that a brand manufacturer delayed or impaired generic/biosimilar drug competition, the end payors plaintiffs here seek relief from J&J's anticompetitive scheme to delay entry of biosimilar ustekinumab. While the specific methods drug makers use to delay competition vary (a centerpiece is often fraudulent patent procurement and enforcement), the legal standing for end payor antitrust claims differs little and can be reduced to several propositions. First, while end payors are the ultimate victims of the overcharges, they usually do not purchase the drug directly from the manufacturer. Thus, given *Illinois Brick*, end payors cannot bring *federal damages* claims. Second, when *federal injunctive* relief is sought, courts unanimously grant standing to end payors, both because *Illinois Brick* does not apply and because the threat of antitrust injury is particularly acute to end payors. Third, in states that explicitly provide a damages remedy to indirect purchasers for antitrust violations—"*Illinois Brick* repealer" states—courts grant standing to end payors because a remedy is available.[1]

J&J uses this briefing opportunity to make two new arguments for dismissal, both of which seriously misconstrue the law. First, J&J tries to read *Illinois Brick* back into every *Illinois Brick* repealer state's law, ignoring that the repeals *were promulgated for the sole purpose of allowing indirect purchasers to bring antitrust claims.* And given the simplicity of end payor claims—the end payor health plans are each paying for the exact same product made and overcharged by the manufacturer and bear the brunt of that overcharge—no court has ever done what J&J urges: repeal *Illinois Brick* repealer laws. Federal courts repeatedly hold that health

---

[1] In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) the Supreme Court held that indirect purchasers may not recover damages under *federal* antitrust law. The states under whose law the plaintiffs bring their claims have "repealed" the effect of this decision on their antitrust laws.

benefit providers—indistinguishable from plaintiffs here—have standing to seek state law damages against drug makers who have delayed more affordable competitor medications.

Second, J&J seizes on the Court's narrow request for supplemental briefing on *standing* to present new arguments regarding *preemption*. But an unbroken line of cases (which J&J ignores) squarely and repeatedly reject J&J's position, disparaging or distinguishing the exact argument (and authority) J&J raises here. J&J asks this Court to reach a conclusion that would put it at odds with nearly every other federal court that has analyzed the issue.

## II.     FACTS

The complaint alleges that J&J engaged in an anticompetitive scheme through its acquisition of the '307 and Momenta Patents. The "goal, purpose, and effect" of this scheme was to "delay and/or block ustekinumab biosimilars from entering the market, maintain its monopoly in that market, and maintain its supra-competitive prices for Stelara." ECF No. 36, Am. Compl. ¶¶ 317, 331. Courts must look beyond the individual acts, standing alone, and assess "the economic effects of the challenged conduct on consumers, competitors, and the alleged violator itself."[2] Here, the scheme extended J&J's monopoly by an additional 15 months, forcing the proposed end payor class to overpay by more than $1 billion. *Id.* ¶¶ 11, 199, 316.

Any standing analysis looks to the facts underlying the claims and the position of the plaintiff in the market. The plaintiffs' claim is for their purchases of the product J&J made (Stelara) and then sold at supracompetitive prices. For 25 years, courts have treated end payor drug purchaser classes as "fit[ing] the stereotypical indirect purchaser mold."[3] Such a class "alleges injury by an unlawful restraint on competition in the market," where "the high price paid by [health plan members] clearly result[s] in 'the type of loss that the claimed violations . . .

---

[2] *Advanced Health-Care Servs. v. Radford Cmty. Hosp.*, 910 F.2d 139, 148 (4th Cir. 1990).
[3] *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 399 (3d Cir. 2000).

would be likely to cause.'"[4] As such, the end payors are "'foreseeable and necessary victims' of [a drug company's] efforts to exclude the generic drug from the market."[5] Regardless of the existence of middlemen, "if there were no ultimate [payors], prices charged for the drug by [its maker] to distributors, pharmacies, etc., would be irrelevant. The excess amount paid by [the drug] users not only is 'inextricably intertwined' with the injury [the drug maker] aimed to inflict, the overcharge was the aim of [the manufacturer's] preclusive conduct. *It is difficult to imagine a more formidable demonstration of antitrust injury*."[6]

## III.    ARGUMENT

**A.**    ***Illinois Brick*'s bar on damages for indirect purchasers under federal antitrust law is "analytically distinct" from the question of standing under *AGC*.**

Section 4 of the Clayton Act—the federal antitrust law—provides: "*any* person who shall be injured in his business or property by reason of *anything* forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages . . . ."[7] Given the statute's breadth (*any* person; *any* violation) and its consequence (trebled damages), the Supreme Court has seen fit to place two limits on the universe of plaintiffs that may bring suit and the recovery they may make.

*First*, in *AGC*, the Supreme Court set forth five factors to consider when assessing federal antitrust standing.[8] The Fourth Circuit summarized those factors as:

> (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws; (3) the directness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust injury; and (5) problems of identifying

---

[4] *Id.* at 400 (quoting *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479 (1982)).

[5] *Id.*

[6] *Id.* at 401 (emphasis added).

[7] 15 U.S.C. § 15 (emphasis added).

[8] The factors are: (1) injury, (2) directness of injury, (3) "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement" (4) whether damages are "highly speculative"; and (5) risk of duplicative recovery "or the danger of complex apportionment of damages." 459 U.S. 519, 538-45 (1983).

damages and apportioning them among those directly and indirectly harmed.[9]

The *AGC* test is primarily used by *federal* courts to determine if a plaintiff's *federal* antitrust claims are too attenuated to confer antitrust standing. It is frequently used to assess antitrust standing where plaintiffs bought a product that has, *as a component*, another product subject to an antitrust violation in a separate market.[10] This is not the scenario here, where the plaintiffs purchase the *exact product* that is the subject of the antitrust violation, albeit through a middleman who does not alter the product. While J&J cites these inapposite cases to suggest the plaintiffs lack standing,[11] it declines to disclose that even in these component part cases, courts— including the Fourth Circuit—frequently find plaintiffs *have* standing to raise antitrust claims.[12]

*Second* (and even if standing to recover is shown), in *Illinois Brick Co. v. Illinois*,[13] the Supreme Court decided that only the first-in-line purchaser that overpays due to an antitrust violation should be permitted to recover monetary damages under § 4. The *Hanover Shoe* Court had earlier held a direct purchaser may recover full overcharges even if those charges had been passed on.[14] *Illinois Brick* held that since the direct purchaser obtains full recovery under *Hanover*, the policy concerns of double recovery and difficulty apportioning damages among purchasers should yield a rule that *only* direct purchasers can recover damages under § 4.[15]

---

[9] *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007) (quoting *Kloth v. Microsoft*, 444 F.3d 312, 324 (4th Cir. 2006)). Circuit and district courts vary in the way they summarize the five *AGC* factors. The Fourth Circuit splits the first *AGC* factor into two and combines the separate speculative and duplicative damages factors into one. *See Novell*, 505 F.3d at 311.

[10] *See, e.g.*, *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp.*, 22 F.4th 103, 116 (2d Cir. 2021); *In re Dynamic Random Access Memory Antitrust Litig.*, No. M 02-1486 PJH, 2007 WL 2385112, at *1, 3 (N.D. Cal. Aug. 17, 2007) ("*DRAM*").

[11] Def. Br. at 8 (citing *Kloth*, 444 F. 3d at 323-26 (purchasers of computers that had Microsoft software pre-installed lacked antitrust standing, under *AGC*, to litigate Microsoft's anticompetitive conduct in the separate software market)).

[12] *See, e.g.*, *Novell*, 505 F.3d at 311, 319; *DRAM*, 2007 WL 2385112, at *3.

[13] *Illinois Brick*, 431 U.S. 720, 746 (1977).

[14] *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968).

[15] *Illinois Brick*, 431 U.S. at 736-747.

Given *Illinois Brick*, plaintiffs do not argue that they have standing to recover *damages* under § 4. Although J&J argues that *AGC* should be read coterminously with *Illinois Brick* (i.e., that indirect purchaser plaintiffs should fail *AGC* based on *Illinois Brick*'s policy concerns), the Supreme Court explicitly explained *Illinois Brick*'s rule *is not a question of standing*.[16] *Illinois Brick*'s restriction on remedies is "analytically distinct" from the "conceptually more difficult question 'of which persons have sustained injuries *too remote* [from an antitrust violation] to give them standing to sue for damages under § 4.'"[17] Thus, a purchaser may have antitrust *standing* even if *Illinois Brick* bars her from recovering *damages* under federal antitrust law.

**B.    To show antitrust standing for *injunctive* relief, purchasers must prove antitrust injury; plaintiffs meet this standing requirement.**

Section 16 of the Clayton Act provides: "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ."[18] To evaluate a plaintiff's standing under a § 16 claim, courts examine whether the plaintiff has suffered an antitrust injury that is of a type that Congress sought to redress by providing a private remedy for violations of the antitrust laws—i.e., the first *AGC* factor.[19] The Third Circuit's analysis in *Warfarin* explains why: "a claim for injunctive relief does not present the countervailing considerations—such as the risk of duplicative or ruinous recoveries and the specter of a trial burdened with complex and conjectural economic

---

[16] *Id.* at 728 n.7 ("[T]he question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4.").

[17] *Blue Shield of Virginia v. McCready*, 457 U.S. at 476 (1982) (quoting *Illinois Brick*, 431 U.S. at 728 n.7); *see Kloth*, 444 F.3d at 323 (quoting the same language).

[18] 15 U.S.C. § 26 (2024).

[19] *In re Interior Molded Doors Antitrust Litig.,* No. 3:18-cv-00718, 2019 WL 4478734, at *9 (E.D.V.A. Sept. 18, 2019) (when determining antitrust standing for federal injunctive relief, courts look at "the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended" and "whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws," i.e., "whether a plaintiff alleges an 'antitrust injury'" (citing *Novell*, 505 F.3d at 311)).

analyses—that the Supreme Court emphasized" in *Illinois Brick*.[20] Thus, where certain *AGC* factors do not fit the law's intended policy goals, even federal courts modify the test.

Here, plaintiffs request *only* injunctive relief under federal law. Am. Compl. ¶¶ 325 & 336. To plaintiffs' knowledge, every court to address the issue concludes that end payors have standing for § 16 injunctive relief claims in drug delay cases.[21] *Warfarin* again explains why: "[t]he higher prices paid [by end payors] were the *raison d'etre* of [J&J's] antitrust conduct."[22] Because plaintiffs were "the target of [J&J's] antitrust violation"—" the overcharge [they paid] was the aim of [J&J's] preclusive conduct"—they suffered the antitrust injury J&J inflicted.[23]

**C.    In "*Illinois Brick* repealer" states, courts routinely allow end payors in generic drug delay cases to bring state antitrust damages claims.**

In the wake of *Illinois Brick*, many states enacted statutes—or courts interpreted existing antitrust statutes as—repealing the effect of this ruling. Known as *Illinois Brick* repealers, these state laws (and related court decisions) explicitly grant indirect purchasers, including end payors, the right to bring damages claims under their antitrust laws. Put another way, state legislatures and courts reviewed the Supreme Court's logic in *Illinois Brick* for limiting a damages remedy to direct purchasers only and decided the state's interest in allowing plaintiffs harmed by antitrust violations to recover (thereby deterring anticompetitive conduct) was more important.

---

[20] *Warfarin*, 214 F.3d at 400 (internal quotation omitted); *see also Molded Doors*, 2019 WL 4478734 at *9 ("injunctive relief vindicates the rights of all victims equally").

[21] *See, e.g.*, *Warfarin*, 214 F.3d at 401; *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 456-58 (E.D. Pa. 2018); *In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, 172 F. Supp. 3d 724, 740-41 (D.N.J. 2016); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 711 (E.D. Pa. 2014).

[22] *Warfarin*, 214 F.3d at 402.

[23] *Id.* at 401; *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 40 (D.D.C. 2003) (drug purchaser end payors "are indeed customers of the [manufacturer] Defendants, and as such are the entities chiefly harmed by Defendants' alleged anticompetitive conduct"); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 651 (E.D. Mich. 2000) (plaintiff health insurers are "customers" of drug companies and the injury claimed consists of higher prices paid for drugs as a result of the absence of competition between the defendants).

Twelve years after *Illinois Brick*, the Supreme Court analyzed its impact on the availability of damages under *state* antitrust laws. It held that "nothing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws."[24] Indeed, "[w]hen viewed properly, *Illinois Brick* was a decision construing the federal antitrust laws, not a decision defining the interrelationship between the federal and state antitrust laws."[25]

Despite this clear instruction, J&J hopes this Court will not notice the significance of the repealer statutes (J&J fails to mention them) and will import *Illinois Brick*'s policy choice for *federal* antitrust *damages* onto *state* antitrust *standing*.[26] Doing so would undermine the very purpose of the repealers. As with claims for injunctive relief, the dual *Illinois Brick* concerns of duplicative recovery and damages apportionment don't hold the same force in repealer states, as these states have already determined that such concerns should not automatically bar damages. As one federal court put it, "[i]t would be inconsistent for a state to allow indirect purchasers to bring antitrust claims, only for the courts to cursorily dismiss those claims on antitrust standing grounds simply because they have been brought by indirect purchasers."[27]

It is for this reason that courts confronting end payor antitrust damages claims under state law emphasize that these claims must be analyzed against the backdrop of the repealers.[28] And it is why—in conjunction with the direct nature of the antitrust harm end payors experience—most

---

[24] *California v. ARC Am. Corp.*, 490 U.S. 93, 103 (1989).

[25] *Id*. at 105.

[26] Def. Br. at 4.

[27] *Suboxone*, 64 F. Supp. 3d at 698 (citation omitted).

[28] *See, e.g.*, *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-md-2836, 2023 WL 3064462, at *3 (E.D. Va. Apr. 18, 2023) (*Illinois Brick* repealers grant indirect purchasers the right to "recover for their own damages under state law at the end-payor level *separate and distinct* from damages recovered . . . under federal law."); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9-cv-3690, 2015 WL 3988488, at *6 (N.D. Ill. June 29, 2015) (recognizing "that by enacting a repealer statute, each state has taken some action to differentiate its antitrust-standing law from the federal landscape"); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 348 (3d Cir. 2011).

courts treat end payor standing under state antitrust law as a non-issue in drug delay cases. Across dozens of cases brought by end payor plaintiffs who have paid supra-competitive prices for a drug due to its maker's anticompetitive scheme, few address standing under state antitrust law at all (other than observing the availability of the repealer rights), despite analyzing (often at length) Article III standing, and hardly any address standing under *AGC*.[29] The issue is that well settled. When courts do analyze standing under state antitrust law, it is overwhelmingly to determine simply whether the state has repealer rights, and whether they apply. In deciding this question, courts look to the antitrust and/or repealer statutes themselves, not *AGC*.[30]

**D.    The plaintiffs meet the *AGC* test as applied in *Illinois Brick* repealer states.**

That end payors have standing to bring claims for damages under state law antitrust—no *AGC* analysis necessary—is confirmed by the fact that the parties, collectively, could only identify *four* cases in the scores of end payor cases that mention *AGC* in this context.[31] Of these cases, the only three that actually apply the *AGC* factors find that end payors pass it.

Because the *AGC* factors overlap, they are often distilled into a two-part test: whether the plaintiff has suffered an antitrust injury and, if so, whether she is an "efficient enforcer" of that claim.[32] The plaintiffs here satisfy both factors. First, as explained in Section III.B, the plaintiffs suffered an antitrust injury. To determine whether a plaintiff is an "efficient enforcer," courts examine: (1) the directness of the alleged injury, (2) the existence of more direct victims, and (3)

---

[29] Appendix B.

[30] Appendix B.

[31] *Suboxone*, 64 F. Supp. 3d at 696-98 (analyzing *AGC* factors and finding end payors meet this test); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 724-26 (S.D.N.Y. 2017) (same); *In re K-Dur Antitrust Litig.*, No. CIV.A. 01-1652 (JAG), 2007 WL 5297755, at *17 (D.N.J. Mar. 1, 2007) (mentioning *AGC* after concluding, for other reasons, the end payors lacked standing to bring an antitrust claim based on a *Walker Process* theory); *Lorazepam*, 295 F. Supp. 2d at 37-43 (finding end payors meet *AGC*).

[32] *Supermarket of Marlinton, Inc. v. Valley Rich Dairy*, 161 F.3d 3, 1998 WL 610648, at *2 n.14 (4th Cir. Aug. 27, 1998) (citations omitted).

the speculative or duplicative nature of recovery.[33] As to these factors, three end payor state law antitrust cases—*Suboxone*, *Propranolol*, and *Lorazepam*—are instructive.

First, as *Propranolol* explained, "[d]irectness in the antitrust context means close in the chain of causation."[34] *Propranolol* then emphasized that "the chain of distribution in the pharmaceutical industry is short, direct, and well-understood: manufacturers sell to wholesalers, which in turn sell to the pharmacies from which the End-Payors[sic] buy the drug."[35] *Lorazepam* similarly emphasized that "[a]lthough the physician prescribes, the pharmacist dispenses, and the patient takes the medication, in most cases, *it is the insurer such as Plaintiffs who actually pay. . . .* Accordingly, this Court finds that the Plaintiffs are indeed customers of the Defendants, and as such are the entities chiefly harmed by Defendants' alleged anticompetitive conduct."[36]

The same is true here: J&J sells Stelara to authorized distributors, who sell to pharmacies, hospitals, health care providers, and infusion therapy providers from whom the plaintiffs buy the drug.[37] Indeed, J&J publicly acknowledged that its commercialization of Stelara involved the establishment of "ongoing relationships with payors," i.e., the plaintiffs here. Am. Compl. ¶ 291. *Suboxone*, for its part, noted that this "directness of the injury" factor "must either carry significantly less weight or directness must be analyzed more generously than under federal law. *It would be inconsistent for a state to allow indirect purchasers to bring antitrust claims, only for the courts to cursorily dismiss those claims on antitrust standing grounds simply because they have been brought by indirect purchasers.*"[38]

Second, as to the presence of more directly interested plaintiffs, courts routinely find that

---

[33] *See AGC*, 459 U.S. at 538-45; *Novell*, 505 F.3d at 311.

[34] *Propranolol*, 249 F. Supp. 3d at 725 (internal quotation and citation omitted).

[35] *Id.* (internal citations omitted).

[36] *Lorazepam*, 295 F. Supp. 2d at 40.

[37] *Propranolol*, 249 F. Supp. 3d at 725; *see* Am. Compl. ¶¶ 12, 24, 306.

[38] *Suboxone*, 64 F. Supp. 3d at 698 (emphasis added).

end payors have "a sufficient self-interest in [] litigation" regarding overpayment for drug purchases.[39] In *Propranolol*, there was "another class of persons 'potentially inclined' to enforce the antitrust claims"—direct purchaser plaintiffs who brought a parallel suit—but the court nonetheless found their presence "does not necessarily destroy the End Payors' standing."[40]

Here, *no* direct purchaser has sued. Instead, the plaintiffs are the *only* purchasers seeking to hold J&J accountable for its antitrust violations. They "are significantly motived not only due to their natural economic self-interest in paying the lowest price possible, but also because [Stelara] is a life-saving drug for which no substitutes are available."[41]

J&J argues that the biosimilar manufacturers (J&J's competitors) are the "parties best positioned" to bring the *Walker Process* claim, and that the end payor plaintiffs are too removed from the '307 patent and its enforcement to be true "victims."[42] This argument fails. First, the Fourth Circuit has held that *both* competitors and consumers—like the purchaser plaintiffs here—"may be more likely . . . [to] suffer an antitrust injury."[43] Second, courts have routinely rejected the principle upon which J&J relies—that purchasers of patented products are too "attenuated" to bring *Walker Process* claims and market competitors are the only direct-enough plaintiff.[44] In *DDAVP*—on which J&J leans heavily—the Second Circuit emphasized that relying on competitors alone to raise *Walker Process* antitrust challenges "asks too much of the generic competitors and other potential patent challengers, who may not have the strategic interest or the

---

[39] *Propranolol*, 249 F. Supp. 3d at 725; *see Lorazepam*, 295 F. Supp. 2d at 43.

[40] *Propranolol*, 249 F. Supp. 3d at 725.

[41] *Id.* (internal quotation marks and citation omitted); *see* Am. Compl. ¶¶ 269-274.

[42] Def. Br. at 5-6.

[43] *Novell,* 505 F.3d 312 n.19. Indeed, since the non-competitor, non-purchaser claim in *Novell* satisfied the Fourth Circuit's application of *AGC* that reasoning would lead to the same result for an end payor drug purchaser. *Id.* at 312-19.

[44] *See, e.g.*, *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 315 (N.D. Cal. 2007); *Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 691-692 (2d Cir. 2009).

resources to start or win such a battle, or who may be presented with strong incentives to settle their challenge by patent holders seeking not only to preserve their patent's enforceability, but also to avoid potential *Walker Process* liability."[45] Thus, J&J's argument that we should rely on its competitors to vindicate the public's interest in more affordable medication fails; purchasers too must play this role. As *Suboxone* underscores, the existence of a "more direct" victim carries little weight in *Illinois Brick* repealer states: "[S]trict application of this factor, in the context of indirect purchasers, would always caution against standing, an outcome incompatible with the purposes of *Illinois Brick* repealer statutes."[46] To conclude otherwise would vitiate the very remedies the legislatures and courts in those states intended to grant indirect consumers.

Third, as to whether damages are speculative and can be apportioned, *Propranolol*, *Suboxone*, and *Lorazepam* all conclude that health benefit provider damages are not speculative. As *Suboxone* explained, damages in end payor pharmaceutical antitrust lawsuits "do 'not appear incapable of accurate calculation' such that the [plaintiffs] would not have standing."[47] As in *Suboxone*, the health benefit providers here allege that their damages "stem from overcharges due to [J&J's] scheme to keep [the ustekinumab biosimilars] from competing with its product."[48] The plaintiffs' damages are no more speculative than those upheld in *Suboxone*. While *Propranolol* recognized that "allowing both the Direct Purchasers' and End-Payors' suits to proceed would result in a duplicative recovery," it nonetheless "agree[d] *with the general view among district courts* that [s]tates . . . which have repealed *Illinois Brick* and allowed End-Payors to sue for antitrust violations, have necessarily made the policy decision that duplicative recovery may permissibly occur."[49] *Lorazepam* re-emphasized that because end payors were most directly

---

[45] *DDAVP*, 585 F.3d at 691.

[46] *Suboxone*, 64 F. Supp. 3d at 698 (internal citations omitted).

[47] *Id.* (internal citations omitted).

[48] *Suboxone*, 64 F. Supp. 3d at 698; *see* Am. Compl. ¶¶ 4-13, 294-306.

[49] *Propranolol*, 249 F. Supp. 3d at 725-26 (emphasis added) (internal citations omitted).

harmed, their damages were not speculative.[50] Finally, no direct purchasers have come forth. But even if they did, this Court should follow the "general view" that such duplication does not undermine standing. In sum, just like the health benefit providers in *Suboxone*, *Propranolol*, and *Lorazepam* the benefit providers here meet the *AGC* test and therefore have antitrust standing.[51]

J&J, for its part, assumes that if a state applies the *AGC* test, that test bars the purchasers' claims.[52] Not so. As this Court found in *Molded Doors*, indirect purchasers—even those that are not end payors—can meet the *AGC* test.[53] The two cases J&J relies on are unhelpful.

First, in *Farag v. Health Care Services Corp.*, a *pro se* patient and his wife sued Blue Cross for denying them coverage to take Novartis's more expensive, branded version of valsartan (Diovan) in lieu of a generic.[54] The plaintiffs also sued Novartis, alleging that the drug maker was able to overprice Diovan by obtaining patents through fraud on the PTO. Because the plaintiffs did not "cit[e] any provision of law authorizing their claims," the court "characterized" the claim "as a *Walker Process* claim based on fraudulent procurement of [the patent at issue] and its subsequent unlawful monopolization *under Section 2 of the Sherman Act*."[55] Although *Farag* proceeded to analyze that claim under *AGC*, it did not find that end payor plaintiffs lack standing under *state* antitrust law. Furthermore, *Farag* found the plaintiffs lacked standing to raise a federal antitrust claim under *AGC* primarily because they could not show any clear causal connection between Novartis's action and their injury.[56] In particular, the court noted that

---

[50] *Lorazepam*, 295 F. Supp. at 42-43.

[51] As noted in plaintiffs' opposition to J&J's motion to dismiss, many courts have implicitly found that indirect purchasers have standing by permitting the parties' antitrust claim based on *Walker Process* fraud to proceed. *See* ECF No. 57 at 25 n.89, Pls.' Opp. to Defs.' Mot. to Dis.

[52] Def. Br. at 4.

[53] *Molded Doors,* 2019 WL 4478734, at *13-16.

[54] No. 17-2547, 2017 WL 2868999, at *1 (N.D. Ill. July 5, 2017).

[55] *Id.* at *3 (emphasis added). *Farag* held that to the extent the plaintiffs raised a state law antitrust claim based on *Walker Process* fraud, patent law preempted this claim. *Id.* Plaintiffs address this holding *infra* Section III.E.

[56] *Id.*

generic Diovan was available, so Novartis' alleged patent fraud did not "erect[] (insurmountable) barriers to generic entry."[57] Here, the plaintiffs have alleged a clear causal connection between J&J's conduct—fraudulent procurement of the '307 patent and use of that patent to delay competition—and the higher prices they paid for Stelara as a result.[58] Furthermore, *Farag* premised its antitrust "standing" analysis on both *AGC* and *Illinois Brick*, a choice that is inappropriate when analyzing state law antitrust claims in repealer states.[59]

J&J also cites *In re K-Dur Antitrust Litigation*. But *K-Dur* does not engage in any analysis of the *AGC* factors nor does it mention, let alone account for, the relevant *Illinois Brick* repealer statutes.[60] Indeed, the special master's logic—that he "d[id] not believe that antitrust policy or patent law contemplates a scenario in which parties only tangentially affected by a patent holder's suit to enforce a patent against its competitors, . . . may be relitigated"—is incongruent with the "antitrust policy" explicitly expressed by the repealers.[61]

To the extent J&J argues that the Second Circuit's *DDAVP* decision suggests indirect purchasers cannot meet the *AGC* test, that argument also fails.[62] *DDAVP* was initially comprised

---

[57] *Id*. at *5.

[58] *See* Am. Compl. ¶¶ 294-306, 315-322.

[59] *Farag*, 2017 WL 2868999, at *5; *see supra* Section III.C & n.17. The chain of causation between the *Farag* plaintiffs' injury and the alleged anticompetitive conduct found wanting due to an additional factor not present here. The *Farag* plaintiffs were not end payors but a *patient* and his wife who sued their own end payor, co-defendant Blue Cross Blue Shield of Illinois. 2017 WL 2868999, at *1. Thus, he plaintiffs' injury was not the purchase price set by the Novartis, but an allegedly inflated copayment set by the Blue Cross. *Id.*

[60] *K-Dur*, 2007 WL 5297755, at *17.

[61] *Id*. at *18. In a lengthy footnote, Defendants present a motley collection of out-of-Circuit decisions that they claim express "reluctance to extend standing to indirect purchasers." Def. Br. at 7 n.4. In reality, however, these cases illustrate nothing more than the uncontested *Illinois Brick* bar on indirect purchaser damages claims under federal antitrust law. Although *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.* dismissed indirect purchasers' federal claim for injunctive relief due to factors not present here, the same decision sustained their claims under fifteen states' antitrust statutes—all of which are similarly asserted by plaintiffs here. 383 F. Supp. 3d 187, 255-64 (S.D.N.Y. 2019).

[62] Def. Br. at 4-5.

of both direct and indirect purchaser claims, but the district court dismissed the complaints, concluding, in part, that the plaintiffs lacked antitrust standing.[63] The Second Circuit's *DDAVP* decision overturned that decision as to the *direct* purchasers and remanded the *indirect* purchaser claims for consideration "in light of [the Second Circuit's direct purchaser] decision."[64] Despite this mandate, the district court did not question the indirect purchasers' antitrust standing under state law and upheld the indirect state law antitrust claims based on *Walker Process* fraud.[65]

J&J's suggestion that a *Walker Process* antitrust claim raises distinct standing issues fails. As explained at the outset, the plaintiffs' state law antitrust claims rely on two theories: (1) fraudulent procurement of the '307 (*Walker Process* fraud), and (2) unlawful acquisition of the Momenta patents. When examining a plaintiff's antitrust claim, courts must look to the scheme as a whole.[66] J&J's request that the Court treat each "disparate" fact separately invites error under *Continental Ore*. In addition, determining whether a plaintiff has antitrust standing to

---

[63] *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198 at 207 (S.D.N.Y. 2012).

[64] *Id.*

[65] *Id.* at 217. Furthermore, in analyzing whether direct purchasers have standing, the Second Circuit emphasized that—at the time of its 2009 decision—"[o]utside of an infringement suit counterclaim, a patent's validity can be challenged only by a party (1) producing or preparing to produce the patented product, and (2) being threatened or reasonably likely to be threatened with an infringement suit." *DDAVP*, 585 F.3d at 690. The Second Circuit then quoted *Walker Process*'s statement that "allowing antitrust recovery 'accord[ed]' with the 'long-recognized procedures' that controlled how parties could challenge a patent's validity." *Id.* at 691 (quoting *Walker Process Equip., Inc. v. Food Mach'y & Chemical Corp.*, 382 U.S. 172, 176-77 (1965)). The court reasoned that this statement "suggest[ed] that the Court may not have envisioned expanding the universe of potential patent challengers." *Id.* J&J emphasizes this quote, Def. Br. at 4, but fails to provide this Court with a key piece of information necessary to determine its continued vitality: After *DDAVP*, Congress expanded who can challenge a patent's validity by enabling *any person*—including direct and indirect purchasers—to invalidate a patent through *inter partes* review. 35 U.S.C. § 311(a). Given that patent law now *permits* indirect purchasers to challenge a patent's validity, indirect purchasers fall within the "universe of potential patent challengers." *DDAVP*, 585 F.3d at 691. J&J's quoted language therefore lacks bite.

[66] *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (holding that "[t]he character and effect" of the anticompetitive conduct "are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole").

bring a *Walker Process* fraud monopolization claim is no different than determining antitrust standing for any other monopolization claim.[67] *Walker Process* claims are "governed by the principles of antitrust law."[68] Indeed, "there is little reason to think that standing requirements for *Walker Process* claims differ from standing requirements in more conventional antitrust actions."[69] As set forth in plaintiffs' opposition to J&J's motion to dismiss, numerous courts have permitted indirect purchasers to bring state law claims alleging fraud on the PTO.[70]

Finally, because the end payors meet the *AGC* test for standing, this Court need not analyze which states have adopted *AGC* interpreted in light of the *Illinois Brick* repealers (following *Suboxone*'s lead). Nonetheless, for completeness, the plaintiffs have appended their own chart outlining the antitrust standing tests in each state under which they bring claims.[71]

**E.    Federal patent law does not preempt state law claims alleging fraud on the PTO.**

In the last decade, courts have consistently found that federal patent law does not preempt state law claims alleging fraud on the PTO. Of the five decisions that analyze *Walker Process* preemption, the four most recent reject J&J's position and rely on Federal Circuit precedent to do so.[72] J&J mentions only the oldest case (the 2007 *K-Dur* case) but fails to disclose that two

---

[67] *Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.*, 402 F. Supp. 2d 276, 280 & n.6 (D.D.C. 2005) (the Supreme Court did not "create[] a new cause of action in *Walker Process*," it simply clarified how a plaintiff could access protection under antitrust laws).

[68] *Ritz Camera*, 700 F.3d at 508; *see also Netflix*, 506 F. Supp. 2d at 316 ("the harm in a *Walker Process* claim comes not from fraudulently obtaining a patent, it comes from *creating or maintaining an unlawful monopoly using that patent*.").

[69] *Molecular Diagnostics*, 402 F. Supp. 2d at 281; *see Netflix*, 506 F. Supp. 26 at 316.

[70] *See supra* n.51. J&J also seems to rely on *DDAVP* to suggest a patent must be "tarnished" before an antitrust claim may be brought based on *Walker Process* fraud. Def. Br. at 4. The Federal Circuit rejected this requirement. *See Ritz Camera*, 700 F.3d at 504-506 (holding purchasers "of goods that are protected by the patent" could bring a *Walker Process* claim even if they could not "seek a declaratory judgment holding the patent invalid or unenforceable").

[71] *See* Appendix A.

[72] The Federal Circuit has exclusive appellate jurisdiction over patent cases, rendering its reading of patent law highly relevant. 28 U.S.C. § 1295(a)(2).

courts in the same district declined to follow it while a third expressed doubts about its finding.[73]

In *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, the Federal Circuit analyzed the rationale for and framing of the preemption analysis in the patent context.[74] After rejecting express and implied preemption, the appeals court concluded that preemption occurs only "when the application of state law would conflict with federal law."[75] After reviewing its own precedent, the Federal Circuit then held that "federal patent law bars the imposition of liability for conduct before the PTO *unless the plaintiff can show that the patentholder's conduct amounted to fraud* or rendered the patent application process a sham."[76] In reaching its conclusion, the appeals court derived support from its canonical *Nobelpharma* decision. There, the court explicitly distinguished *Walker Process* claims and, relying on "Supreme Court precedent," held that "federal patent law shields a patentholder from federal antitrust liability for conduct in obtaining a patent *unless* the antitrust plaintiff proves 'that the asserted patent was obtained through knowing and willful fraud.'"[77] *Hunter Douglas* applied *Nobelpharma* to state law, concluding that federal patent law does not preempt state law fraud-on-the-PTO claims.

When confronted with the same question, recent district court decisions have followed *Hunter Douglas*'s logic and found that patent law does not preempt state law claims, like the

---

[73] *See In re Effexor Antitrust Litig.*, 337 F. Supp. 3d 435, 450 (D.N.J. 2018) (reaching the opposite conclusion of *K-Dur*); *In re Thalomid & Revlimid Antitrust Litig.*, 2015 WL 9589217, at *20 (D.N.J. Oct. 29, 2015) ("*Thalomid*") (same); *DDAVP*, 903 F. Supp. 2d at 217 ("Plaintiffs argue that . . . *K-Dur* w[as] wrongly decided . . . and their arguments have some force.").

[74] 153 F.3d 1318, 1331-37 (Fed. Cir. 1998), *overruled in part on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999).

[75] *Id.* at 1335; *see id.* at 1332 ("Because federal patent law plainly does not provide for explicit preemption . . . we of course agree with the district court that there is no preemption on this ground."); *id.* at 1333 (rejecting implied preemption argument and finding that "there is no reason to believe that the clear and manifest purpose of Congress was for federal patent law to occupy exclusively the field pertaining to state unfair competition law").

[76] *Id.* at 1336.

[77] *Id.* (quoting *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998)) (emphasis added).

plaintiffs' claims here, where the allegations include fraud on the PTO. First, in 2012, *DDAVP* expressly rejected defendants' preemption claim where "Plaintiffs have plausibly pleaded both fraud on the PTO and bad-faith enforcement of the patent."[78] *DDAVP* noted that there, as here, "[p]laintiffs plausibly allege bad-faith enforcement [of the fraudulent patent], not just bad behavior before the PTO."[79] In 2017, in *Loestrin*, the District Court of Rhode Island offered a parallel analysis while rejecting an identical preemption argument. Citing *Hunter Douglas*, the court found that "state law claims based on *Walker Process*-type fraud do not frustrate the purposes or objectives of federal patent law."[80] The court found that the state claims "'require[] entirely different elements' than 'those required for inequitable conduct before the PTO,' and 'the tort occurred not at the PTO but later in the marketplace, even though the conduct before the PTO might be used to prove it.'"[81] One year later, in *Effexor* and *Lipitor*, the District Court of New Jersey (the same court that decided *K-Dur*) agreed that "state antitrust and consumer

---

[78] *DDAVP*, 903 F. Supp. 2d at 217.

[79] *Id.* at 218; *see* Am. Compl. ¶¶ 5-7, 8-10, 183, 199, 246, 295, 315-16, 330-31, 344, 363. While plaintiffs, unlike the *DDAVP* plaintiffs, do not allege sham litigation, *DDAVP* merely discusses "bad-faith enforcement" or "bad faith conduct in the marketplace"—not sham litigation. The drug company's use of the fraudulently procured patent was important based on the logic of another Federal Circuit decision, *Dow Chemical Co. v. Exxon Corp.*, 139 F.3d 1470 (Fed. Cir. 1998). *Dow* held that a plaintiff may plead both state and patent law claims based in part on the same conduct when the claims "address entirely different wrongs and also provide different forms of relief." *Id.* at 1478. *Dow* found that if a defendant engaged in "bad faith enforcement of a reputedly unenforceable patent" by threatening to sue on a patent it knew to be invalid, *id.* at 1476, or brought baseless infringement claims, *id.* at 1477, a state law claim would lie because it would address a different wrong than a claim for inequitable conduct before the PTO. "The difference was that the former claim would be premised on 'bad faith misconduct in the *marketplace*,' as opposed to 'bad faith misconduct in the *PTO*.'" *DDAVP*, 903 F. Supp. at 216 (quoting *Dow*, 139 F.3d at 1477) (emphasis added). Nonetheless, *DDAVP* was careful to emphasize that under "Federal Circuit precedent, it seems that either fraud on the PTO *or* bad faith conduct in the marketplace is sufficient to strip a patent holder of its antitrust immunity and render an antitrust claim not preempted by patent law." *Id.* at 218.

[80] *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 357 (D.R.I. 2017).

[81] *Id.* (quoting *DDAVP*, 903 F. Supp. at 218 (quoting *Dow*, 139 F.3d at 1477–78)).

protection claims require proof of elements not found in a patent cause of action."[82] The court, therefore, concluded that patent law does not preempt state law claims alleging fraud on the PTO.[83] Other courts rely on these decisions to reject preemption in generic drug delay cases.[84]

J&J ignores these cases and their reasoning, citing only *K-Dur*. This 2007 decision found that because the plaintiffs' state law claims were based solely on fraud on the PTO, not any marketplace misconduct, they were preempted.[85] Addressing *K-Dur*, *DDAVP* first acknowledged that it may have been wrongly decided, before concluding it was distinguishable on its facts.[86] The *DDAVP* plaintiffs *did* allege the drug company used the fraudulent patent, in bad faith, to block competitors. Just so here: plaintiffs allege that J&J used the '307 patent in bad faith to block Amgen's and other's more affordable biosimilars.[87]

Unlike *DDAVP*, *Loestrin*, *Lipitor*, and *Effexor*, which many courts cite with approval, only *one* published decision follows *K-Dur*'s finding: *Farag*. The distinct factual posture of *Farag*, combined with the inadequacy of the complaint, render it unhelpful to J&J. The *Farag* court characterized a consumer's claim as one of *Walker Process* fraud, and then, without substantive analysis, found it preempted. The decision holds little persuasive value compared to

---

[82] *Effexor*, 337 F. Supp. 3d at 450; *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 409 (D.N.J. 2018) (same language). The court issued the same opinion in *Lipitor* and *Effexor*.

[83] *Effexor* and *Lipitor* found support for this determination in *Thalomid*, 2015 WL 9589217, at *19-20. *See Effexor*, 337 F. Supp. 3d at 450; *Lipitor*, 336 F. Supp. 3d at 409. *Thalomid* found that patent law did not preempt indirect purchasers' state law antitrust claims alleging a drug company obtained patents through fraud on the PTO and brought lawsuits based on those patents to delay generic entry.

[84] *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1333–34 (D. Kan. 2018) (favorably citing *DDAVP* and *Loestrin*'s preemption findings); *Picone v. Shire PLC*, No. 16-CV-12396-ADB, 2017 WL 4873506, at *14 (D. Mass. Oct. 20, 2017) (relying on *Hunter Douglas* and *Loestrin* to hold that patent law did not preempt state law claims for tortious interference in the marketplace).

[85] *K-Dur*, 2007 WL 5297755, at *24 (explaining that the end payor plaintiffs' allegations "relate to Schering's alleged unlawful conduct in obtaining the '743 patent through fraud on the PTO" and emphasizing that "evidence of marketplace conduct . . . is sorely lacking.").

[86] *DDAVP*, 903 F. Supp. 2d at 217.

[87] *See* Am. Compl. ¶¶ 5-7, 8-10, 183, 199, 246, 295, 315-16, 330-31, 344, 363.

the decisions that thoroughly engage with the relevant Federal Circuit and district court case law.

J&J's other cases are also inapposite. *Loestrin* and *DDAVP* undertook the work of distinguishing these cases to reach their findings. For example, J&J cites *Ciprofloxacin*.[88] But as *DDAVP* and *Loestrin* explained, the *Ciprofloxacin* plaintiffs alleged *inequitable conduct*, not *fraud* on the PTO, and failed to allege "tortious conduct in the marketplace."[89] Here, like *Loestrin* and *DDAVP*, the plaintiffs allege that (1) J&J's misrepresentations were *material* to the PTO's issuance of the '307 patents and therefore J&J committed *fraud*, not merely inequitable conduct; and (2) J&J engaged in misconduct in the marketplace, not just before the PTO.[90]

J&J misreads the Supreme Court's *Buckman* decision as supporting the expansive proposition that federal law *generally* preempts *any* claim of fraud on a federal agency.[91] In *Buckman*, the Court held that the highly complex federal regime for regulating medical devices impliedly preempted state law tort claims that the manufacturer acquired FDA approval through fraud. The Court's analysis was ground in the fact-specific nature of the FDCA's regulations and

---

[88] *In re Cipro. Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514 (E.D.N.Y. 2005).

[89] *DDAVP*, 903 F. Supp. 2d at 216; *Loestrin*, 261 F. Supp. 3d at 356-57. J&J further claims that the Second Circuit affirmed *Ciprofloxacin*'s finding that "that there was preemption." Def. Br. at 18 (citing *Arkansas Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98, 103 n.10 (2d Cir. 2010), as corrected (June 17, 2010)). Not so: J&J confuses the concepts of federal law *preemption* and federal court *jurisdiction*. While the Second Circuit footnote J&J quotes is not a model of clear writing, the Second Circuit appears to be merely transferring the indirect purchaser's appeal to the Federal Circuit based on that court's exclusive jurisdiction over patent law. *Arkansas Carpenters*, 604 F.3d at 103 n.10 ("Because the *Walker Process* claims are preempted by patent law we transferred the indirect purchaser plaintiffs' appeal to the Federal Circuit, while retaining jurisdiction over the direct purchaser plaintiffs' appeals." (internal citation omitted)). Because the Second Circuit transferred the appeal, it neither affirmed nor reversed the district court's preemption finding. And, as J&J acknowledges, the Federal Circuit's decision, upon transfer, "did not reach the issue of preemption." Def. Br. at 18.

[90] *See* Am. Compl. ¶¶ 5-6, 8-10, 140, 145, 149-52, 258; *supra n.* 87. J&J cites *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368 (Fed. Cir. 2000). But as *Loestrin* and *DDAVP*'s explain (and J&J admits, Def. Br. at 18), *Semiconductor* dealt with *inequitable conduct*, not fraud. *See Loestrin*, 261 F. Supp. 3d at 356; *DDAVP*, 903 F. Supp. 2d at 215.

[91] Def. Br. at 17; *see Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).

the state law tort claim at issue.[92] The decision does not imply—and has not been found by other

courts to hold—that federal laws preempt all fraud-on-agency claims.[93]

Finally, the Court's June 17, 2024Order, directed J&J to address only the issue of

"whether the plaintiffs have *standing* to bring a *Walker Process* fraud claim under federal law

and the relevant state laws." Order, ECF No. 89 at 3 (emphasis added). The Court did not grant

J&J permission to raise new arguments, not in its original motion to dismiss brief, regarding

federal preemption of state law. As such, J&J's entire preemption argument should be struck.

**F.      J&J does not challenge the plaintiffs' standing to bring consumer protection and
          unjust enrichment claims, and J&J's proximate cause argument is unavailing.**

Finally, J&J argues that, to the extent the plaintiffs do not have antitrust standing (which

they do), their consumer protection and unjust enrichment claims fail because they cannot show

proximate causation. J&J is wrong. First, J&J's *proximate cause* argument—a substantive

element of certain consumer protection and unjust enrichment claims—does not fall within this

Court's mandate seeking supplemental briefing on plaintiffs' *standing*. J&J does not challenge,

and thus concedes, the plaintiffs' standing under consumer protection statutes and common law

unjust enrichment. As to proximate cause, J&J already argued this point in their initial motion to

dismiss, and plaintiffs responded.[94] J&J is not entitled to rehash those arguments.

---

[92] *Buckman* reasoned that the plaintiffs' "suit was one for enforcement of the FDCA rather than
for remediation of tortious conduct and thus inevitably conflicted" with the FDA's role. *In re
Ranbaxy Generic Drug Application Antitrust Litig.*, 2019 WL 6341298, at *5 (D. Mass. Nov. 27,
2019) (citing *Buckman*, 531 U.S. at 343, 350-53).

[93] *LCS* and *Lockwood* did not hold that *Buckman* preempts claims based on misconduct before
the PTO. Those cases dealt with: (1) the fraudulent filing of an *inter partes* review petition; and
(2) the fraudulent initiation of patent reexamination proceedings (i.e., actions to *invalidate*
patents, not obtain them). These cases did not examine the fraudulent prosecution of patent
claims resulting in a patent that a monopolist then used to exclude its competitors from the
marketplace. *LCS Group, LLC v. Shire LLC*, 2019 WL 1234848, at *6-13 (S.D.N.Y. Mar. 8,
2019); *Lockwood v. Sheppard, Mullin, Richter & Hampton, LLP*, 2009 WL 9419499, at *5-11
(C.D. Cal. Nov. 24, 2009)).

[94] *See* Appendix to J&J's Mot. to Dismiss at 2-5, ECF No. 46-3; Plfs. Opp. to Mot. to Dismiss
at 29-30, ECF No. 57; Ex. A to Plfs. Opp. to Mot. to Dismiss at 4, ECF No. 58-1.

Dated: July 17, 2024                          Respectfully submitted,

/s/ William H. Monroe, Jr.
William H. Monroe, Jr. (VSB No. 27441)
Marc C. Greco (VSB No. 41496)
Kip A. Harbison (VSB No. 38648)
Michael A. Glasser (VSB No. 17651)
**GLASSER AND GLASSER, P.L.C.**
Crown Center, Suite 600
580 East Main Street
Norfolk, VA 23510
Tel: (757) 625-6787
Fax: (757) 625-5959
bill@glasserlaw.com
marcg@glasserlaw.com
kip@glasserlaw.com
michael@glasserlaw.com

Thomas M. Sobol *(*admitted *pro hac vice)*
Hannah W. Brennan *(*admitted *pro hac vice)*
Abbye R. K. Ognibene (admitted *pro hac vice)*
Rebekah Glickman-Simon *(admitted pro hac vice)*
Kristen A. Johnson *(*admitted *pro hac vice)*
**HAGENS BERMAN SOBOL SHAPIRO LLP**
One Faneuil Hall Square, 5th Floor
Boston, MA 02109
Tel: (617) 482-3700
Fax: (617) 482-3003
tom@hbsslaw.com
hannahb@hbsslaw.com
abbyeo@hbsslaw.com
rebekahgs@hbsslaw.com
kristenj@hbsslaw.com

Peter D. St. Phillip *(*admitted *pro hac vice)*
Uriel Rabinovitz *(*admitted *pro hac vice)*
Raymond Girnys *(*admitted *pro hac vice)*
Charles Kopel *(*admitted *pro hac vice)*
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: 914.997.0500
PStPhillip@lowey.com
URabinovitz@lowey.com
Rgirnys@lowey.com
Ckopel@lowey.com

John Radice (admitted *pro hac vice)*
April Lambert (admitted *pro hac vice)*

21

Kenneth Pickle (admitted *pro hac vice*)
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
alambert@radicelawfirm.com
kpickle@radicelawfirm.com

*Counsel for Plaintiffs CareFirst of Maryland, Inc.,
Group Hospitalization and Medical Services, Inc.,
and CareFirst BlueChoice, Inc.*

**CERTIFICATE OF SERVICE**

I, William H. Monroe, Jr., certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.

Dated: July 17, 2024                                         _/s/ William H. Monroe, Jr._____
                                                             William H. Monroe, Jr.