**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

CAREFIRST OF MARYLAND, INC.,
GROUP HOSPITALIZATION AND
MEDICAL SERVICES, INC., and
CAREFIRST BLUECHOICE, INC.,
on behalf of themselves and all others
similarly situated,

                Plaintiffs,

      v.

JOHNSON & JOHNSON and JANSSEN
BIOTECH, INC.,

                Defendants.

Civil Action No. 2:23-cv-00629

District Judge Jamar K. Walker

Magistrate Judge Lawrence R. Leonard

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...........................................................................................1

II.  LEGAL STANDARD.....................................................................................2

III.  ARGUMENT .................................................................................................3

    A.  Partial summary judgment should enter as to monopoly power............................3

        1.  Relevant market is defined by cross-price elasticity of demand.......................................................................................4

        2.  The undisputed facts regarding J&J's monopoly power............................6

            a.  Stelara was profitable for J&J..........................................................6

            b.  J&J and biosimilar companies forecasted ███████ ██████████████████████████████.......................7

            c.  Ustekinumab prices were █████ after biosimilar entry. ..........................................................................................8

            d.  No drug other than biosimilar ustekinumab shows cross-price elasticity with Stelara. ......................................8

        3.  There is no evidence Stelara shares cross-price elasticity with any other drug. ..............................................................10

        4.  J&J had monopoly power in a relevant market limited to ustekinumab. .................................................................................11

    B.  Partial summary judgment should enter as to J&J's exclusionary conduct regarding the Momenta biosimilar patents................................13

        1.  A monopolist's patent acquisition can be a Section 2 exclusionary practice. ...............................................................13

        2.  The undisputed facts of J&J's acquisition of the Momenta biosimilar patents. ....................................................................14

            a.  J&J held monopoly power in the market for ustekinumab. .................................................................................14

            b.  J&J willfully acquired the Momenta biosimilar patents. ....................................................................................14

|  | c. | The Momenta patents cover processes used to make biosimilars. | 16 |

|  | d. | J&J is not a biosimilar manufacturer. | 17 |

|  | e. | J&J asserted the Momenta biosimilar patents against its competitors. | 18 |

| 3. | J&J's acquisition of the Momenta patents was exclusionary conduct in violation of antitrust law. | 21 |

| 4. | There is no procompetitive justification for J&J's acquisition of the Momenta biosimilar patents. | 24 |

C. Partial summary judgment should enter as to exclusionary conduct regarding sham enforcement of the '307 patent. .....................26

1. Proof of sham litigation requires the plaintiffs to show that J&J's litigation conduct was objectively baselessness and intended to impair competition. .....................26

2. The law on inherent anticipation is settled. .....................27

3. The undisputed facts of J&J's sham enforcement of the '307 patent. .....................29

    a. J&J publicly disclosed the use of ustekinumab to treat UC by 2017 and sought to patent that use in 2018. .....................29

    b. J&J asserted the '307 patent against its prospective biosimilar competitors. .....................32

4. No objective litigant could realistically have expected to succeed on the merits of a lawsuit asserting the '307 patent. .....................34

5. J&J asserted the '307 patent to thwart biosimilar competition. .....................37

IV. CONCLUSION .....................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Fisherman's Best, Inc. v. Recreational Fishing All.*,
310 F.3d 183 (4th Cir. 2002) ...................................................................................27, 37

*ABS Global Inc. v. Inguran, LLC*,
2016 WL 3963246 (W.D. Wis. July 21, 2016)..................................................................23, 24

*Am. Tobacco Co. v. U.S.*,
328 U.S. 781 (1946)..................................................................................................22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................................3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985).................................................................................................22

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
237 F.3d 394 (4th Cir. 2001) ...................................................................................27

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
483 F. Supp. 3d 38 (D. Mass. 2020) .........................................................................24

*Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co.*,
810 F.2d 1289 (4th Cir. 1987) .................................................................................25

*Consul, Ltd. v. Transco Energy Co.*,
805 F.2d 490 (4th Cir. 1986) ...................................................................................4

*In re Cruciferous Sprout Litig.*,
301 F.3d 1343 (Fed. Cir. 2002)................................................................................28

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
952 F.2d 802 (4th Cir. 1991) ...................................................................................39

*E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.* (*Dupont I*),
637 F.3d 435 (4th Cir. 2011) .............................................................................4, 13

*Eastman Kodak Co. v. Image Tech. Servs. Inc.*,
504 U.S. 451 (1992)..................................................................................................4

*Eli Lilly & Co. v. Barr Lab'ys, Inc.*,
251 F.3d 955 (Fed. Cir. 2001)..................................................................................29

*FTC v. AbbVie Inc.*,
976 F.3d 327 (3d Cir. 2020)................................................................................ *passim*

*FTC v. Lundbeck, Inc.*,
   650 F.3d 1236 (8th Cir. 2011) ...................................................................................11

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
   386 F.3d 485 (2d Cir. 2004).......................................................................................11

*GlaxoSmithKline LLC v. Glenmark Pharms. Inc., USA*,
   2017 WL 8944995 (D. Del. May 2, 2017)............................................................28, 29

*IGEN Int'l, Inc. v. Roche Diagnostics GmbH*,
   335 F.3d 303 (4th Cir. 2003) ....................................................................................26

*Inline Packaging LLC v. Graphic Packaging Int'l.*,
   164 F.Supp.3d 1117 (D. Minn. 2016).......................................................................39

*It's My Party, Inc. v. Live Nation, Inc.*,
   811 F.3d 676 (4th Cir. 2016) ......................................................................................5

*In re Loestrin 24 Fe Antitrust Litig.*,
   433 F. Supp. 3d 274 (D.R.I. 2019).............................................................................27

*In re Montgomery*,
   677 F.3d 1375 (Fed. Cir. 2012)........................................................................ *passim*

*Navient Sols., LLC v. Lohman*,
   136 F.4th 518 (4th Cir. 2025) ...................................................................................37

*NCAA v. Alston*,
   594 U.S. 69 (2021)....................................................................................................26

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984).....................................................................................................25

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014)..............................................................................................27, 37

*Perricone v. Medicis Pharm. Corp.*,
   432 F.3d 1368 (Fed. Cir. 2005)..................................................................................28

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* (*PRE*),
   508 U.S. 49 (1993)............................................................................................ *passim*

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
   333 F. Supp. 3d 135 (E.D.N.Y. 2018) .......................................................................27

*Schering Corp. v. Geneva Pharms.*,
   339 F.3d 1373 (Fed. Cir. 2003)..................................................................................28

*SCM Corp. v. Xerox Corp.*,
    645 F.2d 1195 (2d Cir. 1981)........................................................................................14

*Stelara. Times-Picayune Pub. Co. v. United States*,
    345 U.S. 594 (1953).......................................................................................................5

*Takeda Pharm. Co. Ltd. v. Zydus Pharms. (USA) Inc.*,
    358 F. Supp. 3d 389 (D.N.J. 2018) ..............................................................................27

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health &*
    *Welfare Fund v. Takeda Pharm. Co. Ltd.* (*Actos*),
    11 F.4th 118 (2d Cir. 2021) ..........................................................................................22

*United Food & Com. Workers Local 1776 v. Teikoku Pharma USA* (*Lidoderm*),
    296 F. Supp. 3d 1142 (N.D. Cal. 2017) ........................................................................12

*United States v. Google*,
    No. 1:23-cv-108-LMB-JFA, 2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ...........................25

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)........................................................................................................3

*United States v. Koziol*,
    993 F.3d 1160 (9th Cir. 2021) ......................................................................................39

*United States v. Singer*,
    374 U.S. 174 (1963)..................................................................................................23, 24

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
    375 F.3d 1341 (Fed. Cir. 2004), *rev'd on other grounds*, 546 U.S. 394 (2006).....................11

*Wai Man Tom v. Hospitality Ventures LLC*,
    980 F.3d 1027 (4th Cir. 2020) ........................................................................................3

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*,
    728 F.3d 354 (4th Cir. 2013) ...................................................................................35, 38

*In re Zetia (Ezetimibe) Antitrust Litig.* (*Zetia*),
    587 F. Supp. 3d 356 (E.D. Va. 2022) .................................................................5, 11, 12, 13

*In re Zetia (Ezetimibe) Antitrust Litig.* (*Zetia R&R*),
    No. 2:18-MD-2836-RBS-DEM, 2021 WL 6689718 (E.D. Va. Nov. 1, 2021)..............5, 11, 12

**Statutes & Regulations**

15 U.S.C. § 2.................................................................................................................. *passim*

35 U.S.C. § 102(b) ...............................................................................................................32

35 U.S.C. §§ 311–19.................................................................................................................39

42 U.S.C. § 282(j)(4)(C) .........................................................................................................30

42 C.F.R. § 11.64 ....................................................................................................................30

**Other Authorities**

L.R. 56 (B) ................................................................................................................................6

Fed. R. Civ. P. 56 .............................................................................................. *passim*

## I.       INTRODUCTION

This action alleges that the defendants, Johnson & Johnson and Janssen Biotech, Inc. (J&J), prolonged their multi-billion-dollar monopoly over Stelara by engaging in an anticompetitive scheme to delay and impair the entry of competitor ustekinumab products onto the U.S. market. The scheme included: (1) the unlawful acquisition of patents from a biosimilar drug manufacturer, Momenta; (2) fraud on the Patent and Trademark Office (PTO) to procure a patent (U.S. Patent No. 10,961,307 or the '307 patent) covering a method of using ustekinumab to treat ulcerative colitis (UC); and (3) later sham enforcement of that patent against biosimilar competitors. Through this scheme, J&J delayed biosimilar competition for 15 months, extracting billions from health benefit payers.

Pursuant to Rule 56(a), the plaintiffs, CareFirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc. and CareFirst BlueChoice, Inc., on behalf of themselves and a class of similarly situated payers, seek partial summary judgment on three issues.

*Monopoly power*. The plaintiffs ask the Court to rule that J&J had substantial market power over sales of ustekinumab in the United States from at least January 2020 to January 2025 (the relevant period). There is no genuine dispute of fact that from Stelara's 2009 launch through January 2025—when the first biosimilar ustekinumab entered the market—J&J sold Stelara at supracompetitive prices. Nor is there a genuine dispute that J&J sustained repeated price increases with no loss in profits and Stelara shares no cross-price elasticity of demand with any drug other than biosimilar ustekinumab. In short, J&J was a monopolist at the relevant time.

*Exclusionary conduct as to the Momenta patents*. The plaintiffs also ask the Court to rule that while monopolizing the U.S. market for ustekinumab, J&J willfully acquired exclusive rights to patents covering processes for making biosimilar drugs and then asserted those patents to delay competition. Because J&J has failed to adduce evidence establishing any legitimate,

procompetitive benefits for this exclusionary conduct, J&J's conduct violated state anti-monopolization laws.[1]

*Exclusionary conduct as to the '307 patent*. Finally, the plaintiffs ask the Court to rule that J&J pursued sham claims against biosimilar competitors alleging they infringed the '307 patent. Given settled patent law and the undisputed facts regarding (1) the '307 patent's claims and (2) the publication of an ongoing Phase 3 clinical trial testing the use of ustekinumab to treat UC, no objective litigant would realistically expect to overcome a defense of invalidity due to inherent anticipation. Nor is there a genuine dispute of material fact that J&J intended to use, and *did* use, the sham '307 patent litigation to thwart biosimilar competition. The *Noerr-Pennington* defense does not apply. J&J's conduct violated state anti-monopolization laws.

Based on these rulings, this Court should hold that, as a matter of law, J&J engaged in a scheme to extend and/or maintain its monopoly power over U.S. sales of ustekinumab.[2] This partial summary judgment ruling would leave three issues for trial: (i) whether J&J acquired the '307 patent through fraud on the PTO; (ii) whether J&J's violation of anti-monopolization laws delayed entry of biosimilar ustekinumab (i.e., causation); and, if so, (iii) an estimate of the aggregate overcharges the Damages Class incurred and the unjust profits the Unjust Enrichment Class should collect.

## II.    LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material fact and

---

[1] As used herein, "state anti-monopolization laws" covers all state laws the plaintiffs allege in their Second Amended Complaint (or, if the Court allows the pending motion to amend that complaint, all state laws the plaintiffs allege in their Third Amended Complaint).

[2] To the extent the Court is disinclined to enter a Rule 56(a) order on any of the three issues for which partial summary judgment is sought, the plaintiffs seek an order identifying the material facts that are not genuinely disputed pursuant to Rule 56(g).

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "'material'

if proof of its existence or non-existence would affect disposition of the case under applicable

law." *Wai Man Tom v. Hospitality Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 447

U.S. at 248.

### III.   ARGUMENT

Section 2 of the Sherman Act states that "[e]very person who shall monopolize" is

subject to penalties. 15 U.S.C. § 2. A defendant is liable for monopolization when that defendant

(1) possesses monopoly power in the relevant market, and (2) willfully acquires or maintains that

power. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). "Simply put, a § 2 violation has two

elements: power and conduct." ECF No. 119 (MTD Order) at 8.[3]

Here, the plaintiffs seek partial summary judgment on both elements, *viz.*, that J&J

possessed monopoly power over Stelara and that it willfully acquired or maintained that power

through unlawful acquisition of the biosimilar patents and sham enforcement of the '307 patent.

### A.   Partial summary judgment should enter as to monopoly power.

Partial summary judgment should be granted that J&J possessed monopoly power in an

antitrust market limited to the sale of ustekinumab (i.e., Stelara and its bioequivalents) in the

United States and its territories during the relevant period.

There is no genuine dispute of fact as to both direct evidence of market power (i.e., the

evidence indisputably shows J&J increased Stelara prices above the competitive level during the

---

[3] The plaintiffs seek monetary relief for violation of state laws. Throughout the brief, we cite to federal law as sufficient for addressing the substantive legal requirements applicable here. ECF No. 119 (MTD Order) at 42–43 ("Each state interprets their antitrust laws in harmony with federal law").

relevant period) and indirect evidence (i.e., the evidence indisputably shows a lack of pricing pressure from other, putatively competitive products, allowing J&J to price Stelara at supracompetitive levels). To focus the motion, the plaintiffs seek summary judgment on the indirect side: the undisputed facts show there was no significant cross-elasticity of demand between Stelara and any product besides biosimilar ustekinumab. (If needed, plaintiffs reserve the right to seek a directed verdict on market power based on the undisputed direct evidence.)

**1.      Relevant market is defined by cross-price elasticity of demand.**

To prove their antitrust claims, the plaintiffs must show that J&J possessed monopoly power during the timeframe of the alleged anticompetitive acts, i.e., when J&J acquired the Momenta biosimilar patents, when J&J pressed sham '307 patent claims to delay biosimilar entry, and when J&J precluded biosimilar competition. *See Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 481 (1992); *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.* (*Dupont I*), 637 F.3d 435, 441 (4th Cir. 2011). Courts find monopoly power in a particular "relevant market." As a result, defining the relevant market is a threshold issue. *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986).

A relevant antitrust market consists of two components: (1) the geographic area in which competition takes place, and (2) the products or services that compete on price. *Id.* at 493–94. In this case, the relevant geographic market is the United States and its territories; the defendants do not contest this finding. Decl. of Hannah W. Brennan (Brennan Decl.), Ex. 6 (Maestas) ¶ 67; Ex. 5 (Jena), *passim* (not challenging the geographic range).[4] The relevant product market must "be

---

[4] All exhibits cited herein are to the Declaration of Hannah W. Brennan in Support of Plaintiffs' Motion for Partial Summary Judgment and Motions to Exclude Certain Expert Testimony. Certain exhibits were also stamped as deposition exhibits and include a plaintiffs' exhibit (PX) number. To avoid confusion, the plaintiffs use new exhibit numbers, not the PX numbers. All cites to expert reports appear as the exhibit number followed by the expert's last

drawn narrowly" and include only those products that are economic substitutes for Stelara, meaning *they demonstrate significant cross-price elasticity of demand with Stelara*. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).

This Court recently mapped what constitutes a relevant market in a similar generic drug delay case. *See In re Zetia (Ezetimibe) Antitrust Litig.* (*Zetia*), 587 F. Supp. 3d 356 (E.D. Va. 2022). In *Zetia*, both the district court judge and the magistrate judge held that there was no genuine dispute of material fact that the only drugs exhibiting cross-price elasticity of demand with Zetia were its AB-rated generics. As a result, the relevant market was limited to Zetia (the brand) and its generics. *See Zetia*, 587 F. Supp. 3d at 366; *In re Zetia (Ezetimibe) Antitrust Litig.* (*Zetia R&R*), No. 2:18-MD-2836-RBS-DEM, 2021 WL 6689718, at *1 (E.D. Va. Nov. 1, 2021), *R. & R. adopted*, 587 F. Supp. 3d 356 (E.D. Va. 2022). There, the brand company (Merck) challenged market power using the same economist that J&J uses here (Dr. Anupam Jena). But *Zetia* concluded that Dr. Jena's approach to market power "'fails to address cross-price elasticity of demand and is therefore insufficient to create a genuine dispute of material fact regarding the relevant market.'" *Zetia*, 587 F. Supp. 3d at 364 (quoting *Zetia R&R*, 2021 WL 6689718, at *8).

The *Zetia* ruling is correct and controls. The Fourth Circuit requires parties to show significant positive cross-price elasticity of demand between drugs to establish they belong in the same relevant market. *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) (relevant market is defined by the "extent to which consumers will change their consumption of one product in response to a price change in another"). As in *Zetia*, the undisputed evidence here demonstrates that no product other than biosimilar ustekinumab (the biologic equivalent of an AB-rated generic) exhibits cross-price elasticity of demand with Stelara. And, as in *Zetia*, Dr.

---

name. Cites to reply expert reports are exhibit number followed by "[Expert last name] Reply."

Jena's opinions here fail to address cross-price elasticity of demand.

**2.    The undisputed facts regarding J&J's monopoly power.[5]**

The undisputed facts show that no drug other than biosimilar ustekinumab exhibits a cross-price elasticity of demand with Stelara, meaning no other drugs (besides ustekinumab) belong in the relevant antitrust product market.

**a.    Stelara was profitable for J&J.**

1.    *Product exclusivity*. On September 25, 2009, the FDA approved the first ustekinumab product: J&J's Stelara. It became available for commercial sale later that month. Ex. 12 (J&J's Obj. & Resp. to Pls.' 2nd Set of Requests for Admission (J&J's 2nd RFA Resp.)) Nos. 59–60. J&J has manufactured and sold Stelara in the United States since 2009. *See* ECF No. 260, J&J's Answer & Affirmative Defs. to Pls.' 2nd Am. Compl. (J&J Answer) ¶¶ 2, 123, 184.

2.    From its launch and through December 31, 2024, J&J was the sole U.S. supplier of ustekinumab. Ex. 11 (Smith Tr.) at 135:2-16.

3.    Until September 25, 2023, J&J had legitimate patent coverage for ustekinumab under U.S. Patent No. 6,902,734 (the '734 patent). J&J Answer ¶¶ 3, 118–19, 123. ██████ ████████████████████████████████████." Ex. 11 (Smith Tr.) at 20:24–21:24.

4.    On October 31, 2023, the FDA approved the first biosimilar ustekinumab, Amgen's Wezlana. Ex. 6 (Maestas) ¶ 23 & Ex. 1. However, it was not until on or about January 1, 2025, that Amgen first sold Wezlana in the United States. *Id.*

5.    *Stelara sales*. From fiscal years 2019 through 2023, Stelara's annual U.S. sales climbed from $4.3 billion to $7.0 billion, ranging from 7.8% to 12.8% of all J&J sales. For most of that time, Stelara was J&J's best-selling drug. Ex. 12 (J&J's 2nd RFA Resp.) Nos. 69–77.

---

[5] To satisfy Local Civil Rule 56(B), the undisputed facts for each of the three issues are separately captioned and laid out in the section relevant to those facts.

From October 2023 through December 2024, J&J earned approximately $⬛ in net sales from Stelara. Ex. 6 (Maestas) ¶ 114 & Ex. 19.

6.      *Margins*. From 2011 through 2023, Stelara's gross profit margins (defined as "net sales" minus "cost of goods sold" divided by "net sales") ranged from ⬛% to ⬛%, with an average gross margin of ⬛% over the course of that period.[6] Ex. 6 (Maestas) ¶ 73 & Ex. 10 (analyzing J&J's profit and loss statements). Between 2021 and 2023, gross profit margins ranged from ⬛% to ⬛%. *Id*. These margins mean that J&J priced Stelara between ⬛ to ⬛ times higher than its cost of producing Stelara, with an average price markup of ⬛ times production costs. *Id*. By way of comparison, the average gross margin for U.S. non-financial companies is 32.4% (i.e., an average price markup of 1.5 times production cost), the average U.S. biotechnology industry gross margin is 56.0% (2.3 times production cost), and the average U.S. pharmaceutical industry gross margin is 70.3% (3.4 times). *Id*.

### b.      J&J and biosimilar companies forecasted ⬛ ⬛.

7.      *J&J and biosimilar company forecasts*. J&J forecasted that biosimilar ustekinumab would be sold ⬛ than Stelara's. As a result, ⬛ ⬛ ⬛. Ex. 6 (Maestas) ¶ 77 (citing Ex. 11 (Smith Tr.) at 100:9-15). J&J forecasts expected Stelara's share of the ustekinumab market to ⬛ by ⬛% to ⬛% within four years of biosimilar entry. *Id*. ¶ 78 (citing Ex. 84 at -365).

8.      All eight biosimilar ustekinumab manufacturers forecasted that the net price of biosimilar ustekinumab would be ⬛

---

[6] Data necessary to calculate gross margins for 2024 were not yet available at the time of Dr. Maestas's report.

. *Id*. ¶¶ 81–91 (reviewing forecasts produced by each biosimilar manufacturer). Biosimilar manufacturers forecasted ▮% to ▮% erosion of Stelara's list price once biosimilars entered the market. *Id*. ¶ 92.

9. Neither J&J nor the biosimilar ustekinumab manufacturers forecasted that the ▮▮▮▮▮▮▮. *Id*. ¶¶ 77–91.

### c. Ustekinumab prices were ▮▮ after biosimilar entry.

10. ▮▮ *list and net prices*. Prior to biosimilar entry, Stelara 90mg/mL (the most frequently prescribed strength and form) had a list price of $▮▮ per syringe. When the first ustekinumab biosimilar (Wezlana) entered the market in January 2025, Wezlana's list price was as low as $▮▮ per syringe, an ▮▮▮ Stelara's list price one month earlier. Within two months of ustekinumab biosimilar entry, ustekinumab list prices further ▮▮▮ per syringe—an ▮▮▮ Stelara's pre-biosimilar-entry list price. Ex. 7 (Maestas Reply) ¶ 35 (reviewing ProspectoRx data). After biosimilar entry, J&J ▮▮ its list price for ustekinumab by launching an unbranded version of Stelara in April (literally, Stelara in a different package) at a list price of $▮▮ for the 90mg/mL syringe—a ▮▮▮ the brand's pre-biosimiliar-entry list price. *Id*. ¶ 36 (same). J&J's net prices also ▮▮ following biosimilar entry, ▮▮▮ from $▮▮ per 90mg/mL syringe in the last quarter of 2024 to $▮▮ per syringe by the end of the first quarter of 2025. *Id*. ¶ 37 (same).

### d. No drug other than biosimilar ustekinumab shows cross-price elasticity with Stelara.

11. *J&J repeatedly ▮▮ Stelara's price before biosimilar entry*. J&J ▮▮ Stelara's list price more than ▮ times between launch and the end of 2024. The list price for one Stelara 90mg/ml syringe increased from $▮▮ in 2010 to $▮▮ in 2024—a nearly ▮% ▮▮▮ Ex. 6 (Maestas) ¶ 110 (reviewing IQVIA NPA data). While Stelara's net prices show a

███████ starting in 2016 (primarily attributable to increases in rebates throughout the pharmaceutical industry), by the end of 2024, the net price of Stelara 90mg/ml was still $███ per syringe. *Id.* ¶ 113 (reviewing J&J's sales data). J&J's Stelara net sales in the first quarter of 2011 were approximately $███████. In the last quarter of 2024, Stelara earned approximately $██████ in net sales. *Id.* ¶ 114 (same).

12.     *Natural experiments show* ████████████████████████████ ███████████████. ████████ potential therapeutic substitutes launched between September 2009—when Stelara entered the market—and the end of 2024. ██████ potential therapeutic substitutes—██████████████████████—lost exclusivity and faced biosimilar competition in that period. *Id.* ¶ 116 & Ex. 20 (reviewing IQVIA NPA data). An empirical cross-price elasticity regression analysis of these and other potential substitute drugs shows █████████ ████████████████████████████████████████████ ████████████████████████████████████. Ex. 6 (Maestas) ¶ 123 & Ex. 22 (reviewing SSR Health data).

13.     *The Hypothetical Monopolist Test shows* ████████████████████████. Dr. Maestas applied the "Hypothetical Monopolist Test" (HMT) from DOJ's and FTC's *Horizontal Merger Guidelines*. The results show that Stelara ████████████████████████ ████████████████████████████. The *Guidelines* define a product market as "a product or group of products . . . such that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future producer or seller of those products in that area likely would impose at least a 'small but significant and nontransitory' increase in price . . . ." If a "Hypothetical Monopolist" that controlled the particular product(s) could profitably impose such a price increase without also having to control

additional products, this ability indicates the relevant market is limited to that particular product(s). Ex. 6 (Maestas) ¶¶ 125. ███████████████████. Ex. 5 (Jena) ¶¶ 207–11.

14.     Dr. Maestas's empirical analysis of the price of ustekinumab before and after biosimilar entry shows J&J's ability to maintain ████████████████ for Stelara before biosimilar ustekinumab entry. After biosimilar entry, Stelara's price ██████████████ ████. Ex. 6 (Maestas) ¶¶ 126–27 (reviewing J&J's sales data).

**3.      There is no evidence Stelara shares cross-price elasticity with any other drug.**

The evidence shows that there is *no* cross-price elasticity of demand between Stelara and any drug other than biosimilar ustekinumab, much less the "high" or "significant" cross-price elasticity of demand required to expand the drugs in the relevant antitrust market beyond Stelara and biosimilar ustekinumab. Prior to biosimilar entry, J&J repeatedly and profitably ████ the price of Stelara, taking ████████████ between 2010 and 2024 and █████████ the list price of the most popular dosage of the drug from $████ per syringe in 2010 to $█████ per syringe in 2024—a nearly ████████████. Fact No. 11. These list price increases were ████ ████████ J&J's net revenue for Stelara ████████ from $█████████ in the first quarter of 2011 *to* $█████████ in the last quarter of 2024. *Id.* J&J's ability to ████████████████████ Stelara's prices during this period—despite the launch of numerous biologic medications indicated to treat many of the same conditions as Stelara—shows an undisputed lack of cross-price elasticity of demand between Stelara and those other drugs. Fact Nos. 11–14.

The undisputed record evidence also shows that J&J and the biosimilar ustekinumab manufacturers ███████████████████████████████████████████████████████, whereas no other drug would have this effect on branded Stelara. Fact Nos. 7–9. J&J knew that if ████████████████████████████████████████████████████. Fact No. 7. Recent biosimilar ustekinumab market entry has confirmed these predictions. Fact No. 10.

- 10 -

Dr. Maestas's "natural experiment" regression analyses affirm what is evident from the ███████ when biosimilars entered the market: no products other than biosimilar ustekinumab exhibit substantial cross price elasticity of demand with Stelara. Fact No. 12. For each of the █ biologic drugs that are approved to treat some of the same conditions as Stelara and ███ biosimilars of such drugs, the regression analyses show there were no cross-price elasticity of demand with Stelara. *Id.* And use of the *Guidelines*' Hypothetical Monopolist Test (as recognized and employed in the *Zetia R&R*, 2021 WL 6689718, at *4) demonstrates no cross-price elasticity with any product other than biosimilar ustekinumab. Fact No. 13. J&J's expert, Dr. Jena, █████████████████████████████████████████.

### 4. J&J had monopoly power in a relevant market limited to ustekinumab.

In *Zetia*, this Court held that "therapeutic substitutability cannot replace the showing of cross-price elasticity key to defining the relevant product market." 587 F. Supp. 3d at 364. Nonetheless, Dr. Jena ████████████████████████████████████████ ██████████████████████████. *See* Ex. 5 (Jena) § V. This is the *exact* type of analysis the Court found unpersuasive and irrelevant in *Zetia*. Absent cross-price elasticity of demand, two drugs do not belong in the same antitrust market.

To be reasonably interchangeable for product market purposes, products must possess more than similar functions or purposes. *See FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1240 (8th Cir. 2011) (two drugs that treat the same ailment belong in separate markets due to lack of price competition); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1364 (Fed. Cir. 2004) (expert's "reliance upon technological, rather than economic, substitution is . . . a fatal flaw in establishing his proposed market definition"), *rev'd on other grounds*, 546 U.S. 394 (2006); *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (functional substitutability is important precisely and only "because the ability of consumers to

- 11 -

switch to a substitute restrains a firm's ability *to raise prices* above the competitive level") (emphasis added). Evidence that two products are sometimes, or even often, substituted for one another because of *functional* similarities is legally irrelevant if there are insufficient indicia of the required significant, positive cross-elasticity of demand between them. "[E]ven where products are essentially identical, that alone is insufficient to require their inclusion in the relevant market." *United Food & Com. Workers Local 1776 v. Teikoku Pharma USA* (*Lidoderm*), 296 F. Supp. 3d 1142, 1171 (N.D. Cal. 2017).

It is no answer to say, as Dr. Jena does, that cross-price elasticity is not determinative because of the ███████████████████████████████████████. Courts, including this one in *Zetia*, repeatedly reject this exact argument. 587 F. Supp. 3d at 361; *see also*, *e.g.*, *Lidoderm*, 296 F. Supp. 3d at 1172.

Dr. Jena's analysis of "████████████████████ is as irrelevant as his ███████████████████████████ analysis because he provides ████████████████████ ████████████████████████████████. Ex. 5 (Jena) § V.C. For example, just as he did in *Zetia*, Dr. Jena claims that J&J's ███████████████ is evidence that other drugs are in the same relevant market as Stelara. But Judge Smith explicitly rejected this argument in *Zetia*, noting that discounting and competition for formulary placement are not evidence that any other drug could significantly constrain the price of Zetia (ezetimibe). *Zetia*, 587 F. Supp. 3d. at 364-65. As Judge Miller explained, "seeking 'preferred formulary placement' is an example of [the brand company] (not the market) constraining Zetia's pricing." *Zetia R&R*, 2021 WL 6689718, at *18. The same evidence that Dr. Jena puts forth here was held to be "insufficient to raise a material question of fact on whether the availability of [other] drugs *constrained* the price charged for the brand drug at issue." *Zetia*, 587 F. Supp. 3d. at 365–66 (quoting *Lidoderm*, 296

- 12 -

F. Supp. 3d at 1174) (emphasis in original). Manufacturer payments for formulary access (i.e., rebates) do not show that other products constrained the price of Stelara to the competitive price; all they show is jockeying among products for favored positions on formularies—at most, "competition" at monopoly price levels. "[W]ithout some evidence of a non-ezetimibe drug's capacity to significantly constrain Zetia pricing, no reasonable jury could conclude that any drug had such capacity." *Zetia*, 587 F. Supp. 3d. at 365.

In sum, there is no genuine dispute of material fact with respect to the relevant factors for discerning market power. J&J has offered zero evidence to dispute the reality that no product other than biosimilar ustekinumab exhibited cross-price elasticity of demand with Stelara. As a result, the relevant market includes only Stelara and its biosimilars. It is undisputed that J&J was the sole seller of Stelara prior to biosimilar entry. As a result, as a matter of law, J&J held monopoly power in the relevant market for Stelara from at least 2020 through January 2025.

**B.    Partial summary judgment should enter as to J&J's exclusionary conduct regarding the Momenta biosimilar patents.**

Based on the undisputed facts and as a matter of law, partial summary judgment should be granted on the plaintiffs' claims that J&J willfully maintained its monopoly power in the market for ustekinumab by unlawfully acquiring the Momenta biosimilar patents.

**1.    A monopolist's patent acquisition can be a Section 2 exclusionary practice.**

A Section 2 monopolization claim requires "willful acquisition or maintenance of [monopoly] power." *Dupont I*, 637 F.3d at 441. "Conduct that might otherwise be lawful [if performed by a firm without monopoly power] may be impermissibly exclusionary under antitrust law when practiced by a monopolist." *Id.* This is true of a monopolist's acquisition of patents: "a monopolist's acquisition of exclusive rights to patents related to the subject matter of the monopoly can constitute anticompetitive conduct as a matter of law." MTD Order at 29; *see*

- 13 -

*also SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1205 (2d Cir. 1981). A "basic conclusion regarding patent acquisition is that '[a]cquisition by a monopolist of exclusive rights in related patents should presumptively be a § 2 exclusionary practice, and this applies with equal force to the acquisition of a firm that owns such patents.'" MTD Order at 33 (internal citation omitted); *see also id.* at 30 (citing *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 99 F. Supp. 3d 610 (D. Md. 2015), for the proposition that "patent acquisition can, by itself, constitute anticompetitive conduct when it is used to acquire or attempt to acquire monopoly power").

Here, the plaintiffs allege that J&J willfully extended its ustekinumab monopoly power by acquiring the Momenta biosimilar patents. This Court laid out the four factors that would be sufficient, if proven, to establish the acquisition as a Section 2 exclusionary practice: (1) "defendants are monopolists"; (2) "defendants acquired exclusive rights in four patents covering some of the processes used to make biosimilars"; (3) "defendants are not biosimilar producers"; and (4) "defendants asserted the acquired patents in subsequent litigation." MTD Order at 33.

### 2.      The undisputed facts of J&J's acquisition of the Momenta biosimilar patents.

There is no genuine dispute regarding the material facts of J&J's violation of monopolization laws due to its acquisition of the Momenta biosimilar patents.

#### a.      J&J held monopoly power in the market for ustekinumab.

15.      When it acquired the Momenta biosimilar patents in 2020, J&J was a monopolist in the relevant antitrust market for sale of ustekinumab in the U.S. *See* Section III.A., *supra*.

#### b.      J&J willfully acquired the Momenta biosimilar patents.

16.      In 2020, Momenta Pharmaceuticals, Inc. (Momenta) owned the four biosimilar patents: U.S. Patent Nos. 8,852,889 (expiring July 6, 2032), 9,217,168 (expiring March 14, 2033), 9,475,858 (expiring July 6, 2032), and 9,663,810 (expiring March 14, 2033) (the biosimilar patents). Exs. 15-18 (biosimilar patents); Ex. 14 (J&J/Amgen First Am. Compl.) ¶¶ 4–

- 14 -

5; Ex. 12 (J&J's 2nd RFA Resp.) Nos. 113–16; Ex. 19 (Pls.' Objs. & Resps. to J&J's First Set of Reqs. for Admission (Pls.' 1st RFA Resp.)) Nos. 17–20 (requesting plaintiffs admit expiry dates of the biosimilar patents).

17.    In or around April 2019, J&J ███████████████████████████. Ex. 13. As early as July 2020, J&J became aware that ████████████████████████; during its acquisition due diligence, J&J had ███████████████████████████████



████████████. Ex. 20 (M. Miller Tr.) at 164:9–172:4, 180:13–184:21, 188:21-24, 189:22–190:5; Ex. 21; Ex. 22 at -875, -877–88, -885.

18.    On August 18, 2020, J&J's ████████████████████████████

████████████████████████████████████████



████████████████████████████. Ex. 23.

19.    On August 19, 2020, ████████████████████████

████████████████████████████████████████

█████████████████████████████████████. Ex. 25 at -709-12; Ex. 26 at -649, -687, -753, -758-59; Ex. 20 (Miller Tr.) at 120:8–125:23.

20.    The ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████. Ex. 25 at -709-12; Ex. 20 (Miller Tr.) at 126:5–128:8.

21.    When J&J executed the ████████████████████████

████████████████████████████. Ex. 20 (Miller Tr.) at 129:6–130:19.

22.    Around the same time, J&J began █████████████████████

██████████████████. Ex. 27 (DeFranco Tr.) at 282:16–284:25.

- 15 -

23.      On October 1, 2020, the merger closed. J&J acquired Momenta, and, in so doing, acquired exclusive control over the biosimilar patents. *Id.* at 108:7-17; Ex. 12 (J&J 2nd RFA Resp.) Nos. 119, 122–26; Ex. 20 (Miller Tr.) at 51:3–52:5, 75:25–76:3, 102:17-22; Ex. 28 (Genus Tr.) at 168:23–170:10; Ex. 14 (J&J/Amgen First Am. Compl.) ¶¶ 5, 26, 61, 64, 67, 68; J&J Answer ¶¶ 7, 181; Ex. 29 (J&J's First Supp. Obj. & Resps. to Pls.' Second Set of Requests for Admission (J&J's Supp. 2nd RFA Resp.)) No. 174.

24.      When it acquired control of the biosimilar patents in 2020, J&J had patent coverage for ustekinumab under the '734 patent that would expire on September 25, 2023. J&J Answer ¶ 3. The biosimilar patents were set to expire between 10 and 11 years after September 2023. Ex. 12 (J&J's 2nd RFA Resp.) Nos. 113–16; Ex. 19 (Pls.' 1st RFA Resp.) Nos. 17–20.

25.      Before and since acquiring the biosimilar patents, J&J ███████████████

███████████████████████████████████████████████████

███████████. Ex. 20 (Miller Tr.) at 68:10–71:2, 190:11–193:6; *see* Ex. 73 (Clark) ¶¶ 78–113.

26.      J&J willfully acquired, and has maintained control over, the biosimilar patents.

**c.      The Momenta patents cover processes used to make biosimilars.**

27.      All four biosimilar patents claim technologies that facilitate the manufacture of near-identical copies of antibody biologic drugs. Ex. 8 (Way) ¶¶ 97–109; Ex. 9 (Way Reply) ¶¶ 8–36; Ex. 30 (D. Miller Tr.) at 82:4–83:11; Ex. 14 (J&J/Amgen First Am. Compl.) ¶¶ 5–7, 26. They claim scientific methods of controlling the natural variations in molecular composition that occur when antibodies are developed. Controlling such variation enables a biosimilar drug manufacturer to create as close a copy as possible to a brand biologic drug. Ex. 8 (Way) ¶¶ 45–46, 73–109; Ex. 32 (J&J PI Br. 1) at -450–51.

28.      The Momenta scientist who invented the biosimilar patents, Dr. Holly Prentice, confirmed that ███████████████████████████. Dr. Prentice

gave this testimony ███████████████ in its lawsuit against Amgen wherein J&J alleged Amgen's manufacture of biosimilar ustekinumab infringed these patents and others. Ex. 31 (Prentice Tr.) at 16:1-16, 71:13-24, 88:12-24, 259:15–260:8, 268:11-14; Ex. 14 (J&J/Amgen First Am. Compl.); *see* Section III.B.2.e., *infra* (discussing assertion of the Momenta patents).

29.    In court filings, J&J asserted that the biosimilar patents could be used—and were being used—by its competitor, Amgen, for biosimilar development and manufacturing. J&J described the patents as "████████████████████████████████████ ███████████████████████████████████████." Ex. 14 (J&J/Amgen First Am. Compl.) ¶ 26; *see also id.* ¶¶ 5–7, 26, 28; Ex. 32 (J&J PI Br. 1) at -450–51, -455–58, -464; Ex. 33 (J&J PI Br. 2) at -814, -817–21.

30.    J&J's expert in the *Amgen* litigation, Dr. Matthew Croughan, took the same position. Ex. 34 (Croughan Decl.) ¶¶ 70, 75, 168–244. Dr. Croughan explained that the ██████████████████████████████████. Ex. 35 (Croughan Tr.) at 9:4-11, 113:12–118:25, 119:7-20, 121:6–122:20, 124:11–125:6, 121:21–122:1 ("Q. ████████████ ██████████████████████████████████████████████████ █████████████████████████████████████? . . . [A:] ███ ."").

### d.    J&J is not a biosimilar manufacturer.

31.    J&J is not a biosimilar manufacturer. Its Vice President for Business Development, Michael Genus, testified that it ██████████████████████ ██████████████. Ex. 28 (Genus Tr.) at 137:18–138:12; 140:11-14, 143:18–144:4; Ex. 13 at -103; Ex. 36 at -043–046. ███████████████████████████ ████████████████████████████████████████████████████████ ██████████████ Ex. 37 (Jarosz Tr.) at 93:2-18, 97:2-15, 223:11-17, 228:3-9, 229:4-16 (J&J's economic expert in *Amgen* litigation testifying that ███████████████████████

████████████████); Ex. 38 (Rau) ¶¶ 292–99; J&J Answer ¶¶ 2, 123, 184; Ex. 12 (J&J 2nd RFA Resp.) Nos. 119, 122–26.

32.    ████████████████████████████████████████████████████

████████████████████████ Ex. 38 (Rau) ¶¶ 292–99; Ex. 9 (Way Reply) ¶¶ 35–36.

33.    The *only* commercial use J&J has made of the biosimilar patents is to assert infringement claims against J&J's potential competitors. Ex. 9 (Way Reply) ¶¶ 35–36; *see also* J&J Answer ¶ 7; Ex. 27 (DeFranco Tr.) at 182:4-11 (Samsung), 202:3–203:17 & 206:13–24 (Celltrion), 210:22–213:16 & 214:21–217:2 (Fresenius), 221:23–223:17 (Accord), 228:20–230:23 (Biocon); Ex. 56 ¶ 9 (defining Momenta patents); Ex. 39 at 1, ¶¶ 1.6, 2.2 (Alvotech); Ex. 40 at 1, ¶¶ 1.6, 1.7 (Samsung); Ex. 41 at 1, ¶¶ 1.5, 1.6 (Celltrion); Ex. 43 at 1-2, 4, ¶¶ 1.5, 1.6, 4.5 (Fresenius); Ex. 44 at 1, ¶¶ 1.5, 1.6 (Accord); Ex. 45 at 1, ¶¶ 1.8, 1.9 (Biocon).

### e.    J&J asserted the Momenta biosimilar patents against its competitors.

34.    In the years immediately after J&J acquired the biosimilar patents, seven companies were developing and seeking FDA approval for biosimilar ustekinumab: Amgen, Alvotech Holdings S.A./Teva Pharmaceuticals USA, Inc. (Alvotech), Samsung Bioepis Co., Ltd./Sandoz, Inc. (Samsung), Fresenius Kabi/Formycon AG (Fresenius), Accord BioPharma, Inc. (Accord), Biocon Biologics, Inc. (Biocon), and Celltrion. Ex. 12 (J&J's 2nd RFA Resp.) Nos. 143, 182–83, 187–89, 191–93, 195, 200, 202, 205, 212–13, 219, 221, 224, 229, 232, 238, 242; Ex. 39 at 1 (Alvotech); Ex. 40 at 1 (Samsung); Ex. 41 at 1 (Celltrion); Ex. 42 at 7 & Ex. 43 at 1–2 (Fresenius); Ex. 44 at 1 (Accord); Ex. 45 at 1 (Biocon).

35.    After acquiring the biosimilar patents, J&J asserted them against manufacturers of biosimilar ustekinumab. J&J Answer ¶ 7; Ex. 12 (J&J's 2nd RFA Resp.) No. 175.

36.    In early November 2022, Amgen informed J&J that it intended to launch its ustekinumab biosimilar upon FDA approval in or around May 2023. Ex. 14 (J&J/Amgen First

Am. Compl.) ¶ 8.

37.     On November 29, 2022, J&J sued Amgen for infringement of its ustekinumab composition patent (the '734 patent) and its method-of-use patent for the use of ustekinumab to treat UC (the '307 patent). The '734 patent was set to expire on September 25, 2023; the '307 patent was set to expire in September 2039. Ex. 27 (DeFranco Tr.) at 60:4, 62:25–63:5, 65:13-15; Ex. 46 (J&J/Amgen Compl.) ¶¶ 5–9; Ex. 12 (J&J's 2nd RFA Resp.) Nos. 81, 109; Ex. 19 (Pls.' 1st RFA Resp.) No. 15.

38.     On January 23, 2023, Amgen stipulated ██████████████████████████ ███████████████████████████. Ex. 47.

39.     On February 2, 2023, J&J's Momenta subsidiary assigned the biosimilar patents to J&J's Janssen subsidiary. Ex. 48; Ex. 49.

40.     On February 21, 2023, J&J amended its complaint against Amgen to allege infringement of the biosimilar patents. According to J&J, Amgen had "used and is using these patented methodologies to prepare to commercialize ABP 654, a biosimilar copy of Stelara— designed to . . . be sold as a substitute for Stelara." Ex. 14 (J&J/Amgen First Am. Compl.) ¶ 7; *see also id.* ¶¶ 5–6, 11, 15, 56, 148, 185, 222, 254, 276, 286, 316, 346, 372. J&J sought, *inter alia*, an injunction preventing Amgen from selling its biosimilar until the biosimilar patents and the '307 patent expired, about 16 years after the '734 patent. *Id.* ¶¶ 12, 119–20; J&J Answer ¶¶ 3, 170; Ex. 12 (J&J's 2nd RFA Resp.) Nos. 113–16; Ex. 19 (Pls.' 1st RFA Resp) Nos. 17–20.

41.     On March 1, 2023, J&J moved for a preliminary injunction seeking to bar Amgen from launching its biosimilar ustekinumab. Ex. 50 (J&J PI Mot.); Ex. 32 (J&J PI Br. 1) at -478. In support, J&J asserted two biosimilar patents. *Id.* at 462–466.

42.     On May 19, 2023, before Amgen had responded or the Court could rule on the

motion, J&J and Amgen settled. The settlement and license agreement resolved the litigation and

███████████████████████████████████████████████████████████████████

████. Ex. 51 (Amgen Settlement) at 1, ¶¶ 1.12, 3.1, 6; Ex. 12 (J&J's 2nd RFA Resp.) Nos. 181-

83, 185. Amgen ████████████████████████████████████████████████████

█████████████████. Ex. 51 (Amgen Settlement) ¶ 2.3. The J&J/Amgen settlement and the

January 1, 2025 entry date were publicly announced on May 23, 2023. Ex. 93.

43.    In 2023 and 2024, J&J asserted the biosimilar patents against six other

ustekinumab biosimilar manufacturers. *See, e.g.*, Ex. 52 (████████████████████

████████████████████████████████████████████████████████████████

██████); Ex. 53 (████████████████████████████████████████████████

████████████████████████████); Ex. 71 (in response to █████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████); Ex. 12 (J&J's 2nd RFA Resp.) No. 197;

Ex. 42 (████████████████████████████████████████████████████████████

██████████████); Ex. 54 (███████████████████████████████████████

████████████████████████████████████████); Ex. 86 at -41 (██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████).

44.    In each of these instances, J&J and the biosimilar manufacturers settled their

dispute before J&J filed an infringement lawsuit with a "Settlement and License Agreement."

These agreements granted the biosimilar manufacturers licenses to J&J's patents "████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████. In exchange for these licenses, the

biosimilar companies █████████████████████████████████████████████.

Ex. 27 (DeFranco Tr.) at 182:4-14, 202:3–203:17, 206:13-24, 210:22–213:16, 214:21–217:2,

221:23–223:17, 228:20–230:23; Ex. 39 at 1, ¶¶ 1.6, 2.2 (Alvotech); Ex. 40 at 1, ¶¶ 1.6, 1.7,

3.1(a), 4.4 (Samsung); Ex. 41 at 1, ¶¶ 1.5, 1.6, 2.1(a), 3.1, 3.2 (Celltrion); Ex. 43 at 1-2, ¶¶ 1.5,

1.6, 4.5 (Fresenius Kabi/Formycon); Ex. 44 at 1, ¶¶ 1.5, 1.6, 3.2, 3.3 (Accord); Ex. 45 at 1, ¶¶

1.8, 1.9, 3.1(a) (Biocon); Ex. 12 (J&J's 2nd RFA Resp.) Nos. 194–95, 197, 204–05, 212–13,

222–23, 231–32, 241–42; Ex. 29 (J&J's Supp. 2nd RFA Resp.) No. 197.

45.     Each settlement agreement stated that ████████████████████████

████████████████████████████████████████████. Ex. 39 at 1

(Alvotech); Ex. 40 at 1 (Samsung); Ex. 41 at 1 (Celltrion); Ex. 43 at 2 (Fresenius

Kabi/Formycon); Ex. 44 at 1 (Accord); Ex. 45 at 1 (Biocon).

46.     J&J told both the FTC and DOJ that the settlement agreements were entered into

████████████████████████████████████████████████████████

████████████████████████." Ex. 57 at 1 (Celltrion); Ex. 58 at 2

(Fresenius/Formycon); Ex. 59 at 2 (Samsung); Ex. 60 at 1-2 (Accord); Ex. 61 at 2 (Biocon).

**3.    J&J's acquisition of the Momenta patents was exclusionary conduct in violation of antitrust law.**

The material facts as to which there is no genuine dispute satisfy each of the four factors

this Court articulated. *See* MTD Order at 33.

*J&J is a monopolist.* As shown, during the relevant period, J&J was a monopolist in the

antitrust market limited to the sale of ustekinumab in the United States and its territories. *See*

Section III.A, *supra*.

*J&J willfully acquired exclusive rights to the biosimilar patents, which cover processes*

*for biosimilar development.* There is no dispute that in 2020, J&J acquired Momenta, a biosimilar manufacturing company, as well as exclusive rights to the four biosimilar patents. Fact Nos. 16–21. These patents enable a drugmaker to copy the reference biologic product with consistency and are primarily useful for manufacturing biosimilar drugs. Fact No. 27–30. The patents' inventor and J&J's Rule 30(b)(6) witness in the *Amgen* litigation (Dr. Prentice), J&J's infringement expert in the *Amgen* litigation (Dr. Croughan), J&J's expert here (Dr. Miller), the plaintiffs' expert (Dr. Way), and J&J all agree. *Id.*

J&J's acquisition of these patents was willful. Willfulness requires "mere intent to do the act." *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co. Ltd.* (*Actos*), 11 F.4th 118, 137 (2d Cir. 2021) (quoting *U.S. v. Aluminum Co. of Am.*, 148 F.2d 416, 432 (2d Cir. 1945) (internal quotation marks omitted)). In other words, a plaintiff need not prove that the defendant intended to do an *improper* act—just that the defendant intended to do the act that acquired or maintained monopoly power. *See Actos*, 11 F.4th at 137–8. Indeed, when a company already possesses monopoly power, actions that further that monopoly power always constitute willful maintenance: "an '[i]mproper exclusion (exclusion not the result of superior efficiency) is *always* deliberately intended' regardless of any colorable evidence of good faith." *Id.* (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 (1985)) (emphasis added). Said differently, courts agree that "no monopolist monopolizes unconscious of what he is doing" because "[i]mproper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." *Aspen Skiing*, 472 U.S. at 602–3 (quoting *Aluminum Co.*, 148 F.2d at 432); *see also Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 814 (1946). As this Court noted in its Memorandum Opinion denying J&J's motion to dismiss the complaint, "Simply put, a § 2 violation has two elements: power and

- 22 -

conduct." MTD Order at 8 (citing *U.S. v. Griffith*, 332 U.S. 100, 105 (1948)).

*J&J is not a biosimilar producer.* J&J willfully retained the biosimilar patents without using them to manufacture its own products. Fact Nos. 31–32. ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████ *Id*.; CFR § 601.12. ███████████████████████████

██████████ . *Id*. In the words of Michael Genus—J&J's current Vice President of Business Development—"███████████████████████████████████

███████████████████████████████ Ex. 28 (Genus Tr.) at 137:18–138:12; *see also* Fact No. 31.

In short, the undisputed facts establish the third factor—that J&J is not a biosimilar producer. MTD Order at 33; *see also ABS Global Inc. v. Inguran, LLC*, 2016 WL 3963246, at *18–*20 (W.D. Wis. July 21, 2016) (a defendant's unlawful acquisition of patents may violate the Sherman Act due, in part, to its failure to *use* the relevant patent that it acquired eight years before); *United States v. Singer*, 374 U.S. 174, 195 (1963) ("Singer cannot, of course, contend that it sought the assignment of the patent merely to assure that it could produce and sell its machines, since the preceding cross-license agreement had assured that right.").

*J&J asserted the Momenta biosimilar manufacturing patents against biosimilar competitors.* Rather than divest or surrender the biosimilar patents, J&J used them to *block* its competitors from launching ustekinumab products and competing with Stelara. Fact Nos. 34–46. J&J weaponized the patents against the only entities that could have driven down Stelara's cost.

Starting in 2023, J&J sued or threatened to sue each of its competitors based on the

- 23 -

biosimilar patents. Fact Nos. 37, 43, 45–46. In each instance, J&J asserted that its competitors' ustekinumab products would infringe the patents. Those competitors then agreed not to sell their products for more than ███████ after J&J's primary composition patent expired. Fact Nos. 42, 44. Tellingly, J&J's Global Head of IP Litigation ████████████████████████████████ ████████████████████████████████████████████████████████████. *See* Ex. 27 (DeFranco Tr.) at 282:16–284:25; Fact No. 22. J&J's decision to use these biosimilar patents to thwart competition underscores the anticompetitive nature of the acquisition. *See, e.g.*, *Singer*, 374 U.S. at 194–95. Put simply, J&J deployed the biosimilar patents to prolong its monopoly. *See ABS Global*, 2016 WL 3963246, at *18–*20 (denying summary judgment for defendant due, in part, to defendant's subsequent lawsuit asserting two acquired patents).

In sum, J&J unlawfully acquired the Momenta biosimilar manufacturing patents in violation of Section 2 of the Sherman Act. *See, e.g.*, *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 63, 67 (D. Mass. 2020) (a patent holder's possession of monopoly power and acquisition of patents covering a substantial share of the same market was sufficient for a Section 2 violation "because it indicates that a dominant competitor further entrenched its monopoly by consolidating its hold on the market."); *ABS Global*, 2016 WL 3963246, at *18–*20 (concluding that "a reasonable jury could find that [the defendant's] accumulation of patents . . . was part of an unlawful effort to maintain its monopoly in violation of § 2 of the Sherman Act."); MTD Order at 42–43 (the plaintiffs' state law claims are "in harmony" with the Sherman Act).

**4.    There is no procompetitive justification for J&J's acquisition of the Momenta biosimilar patents.**

Under the rule of reason framework, after a plaintiff makes a *prima facie* showing of anticompetitive conduct, the defendant is afforded an opportunity to "offer procompetitive justifications for [its] seemingly anticompetitive conduct, but may still be liable . . . if the

plaintiff can 'demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit.'" *U.S. v. Google*, No. 1:23-cv-108-LMB-JFA, 2025 WL 1132012, at *35 (E.D. Va. Apr. 17, 2025) (quoting *U.S. v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001)).

In denying J&J's motion to dismiss, this Court noted J&J might develop a record of such justification "at a later stage of the litigation." MTD Order at 33. J&J has not done so.

As its Second Affirmative Defense, J&J simply states that "the acquisition of the '307 Patent and Momenta Patents and J&J's subsequent enforcement of those patents against biosimilar manufacturers are lawful because they were procompetitive and justified by legitimate business reasons." J&J Answer ¶ 90. J&J pled no supporting facts. In response to the plaintiffs' interrogatory requesting J&J's factual basis for this defense, J&J writes only:

> J&J's acquisition of Momenta, and in turn, the Momenta Patents, was procompetitive and justified by legitimate business reasons. J&J's acquisition of Momenta gave J&J the global rights to nipocalimab, an anti-FcRn antibody, which in turn gave J&J the opportunity to expand treatment options for new and additional patients in the fields of maternal-fetal disorders, neuroinflammatory disorders, rheumatology, dermatology and autoimmune hematology. Further, although J&J's strategy in acquiring Momenta had nothing to do with the Momenta Patents, J&J's incidental acquisition of the Momenta Patents was procompetitive because J&J's acquisition of those patents resulted in J&J licensing the Momenta Patents to multiple biosimilar manufacturers years prior to their expiration.

Ex. 62 (J&J's First Supp. Obj. & Resps. to Pls.' Second Set of Interrogs.) No. 8.

J&J fails to excuse its exclusionary use of the biosimilar patents. The plaintiffs do not challenge the acquisition of Momenta; they challenge the anticompetitive acquisition and use of the *biosimilar patents*. Whatever supposed benefits the Momenta acquisition had, J&J fails to connect them to the biosimilar patents. *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 117 (1984) (procompetitive value of other "regulatory controls of the NCAA" could not outweigh anticompetitive effect of "[t]he specific restraints . . . challenged in this case"); *Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co.*, 810 F.2d 1289, 1294 (4th Cir. 1987)

- 25 -

(focusing rule of reason inquiry on "procompetitive justifications for the use of the *particular vertical restriction at issue*") (emphasis added). Indeed, even the acquisition benefits J&J claims are benefits *to J&J*, not to marketplace competition. Restraints of trade cannot be justified under the rule of reason by claims that they "serve uniquely important social objectives beyond enhancing competition." *NCAA v. Alston*, 594 U.S. 69, 94-95 (2021) (collecting cases). And even these allegedly procompetitive benefits could all have been achieved without obtaining and asserting the biosimilar patents against prospective competitors and delaying competition.

Based on the undisputed material facts, and as a matter of law, J&J engaged in anticompetitive conduct regarding its acquisition of the biosimilar patents.

## C. Partial summary judgment should enter as to exclusionary conduct regarding sham enforcement of the '307 patent.

Partial summary should enter as to J&J's exclusionary sham enforcement of the '307 patent against its would-be biosimilar competitors. Based on the undisputed facts of J&J's earlier public disclosure of its direct-to-Phase 3 clinical study on the use of ustekinumab for UC and the later filing of a patent application claiming that same use, no reasonable litigant could realistically expect to avoid invalidation of the '307 patent due to the black letter law on inherent anticipation. Nor is there a dispute that J&J used the '307 patent in a successful effort to thwart biosimilar competition. As a matter of law, J&J engaged in exclusionary conduct in violation of anticompetition laws by asserting the '307 patent in sham litigation and pre-litigation efforts in order to delay and impair competition for sales of ustekinumab.

### 1. Proof of sham litigation requires the plaintiffs to show that J&J's litigation conduct was objectively baselessness and intended to impair competition.

Upon assertion of a *Noerr-Pennington* defense (*see* J&J Answer ¶ 90), the plaintiff "has the burden of proving that its [opponent's] conduct was a sham." *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 312 (4th Cir. 2003) (quoting *Hosp. Bldg. Corp. v. Trs. of Rex*

*Hosp.*, 791 F.2d 288, 292-93 (4th Cir. 1986)).

To prove litigation is sham, plaintiffs must meet a two-part test. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* (*PRE*), 508 U.S. 49, 60–61 (1993). *First*, the lawsuit must be objectively baseless, i.e., "no reasonable litigant could realistically expect success on the merits." *Id*. at 60. The question is whether "an objective party can 'conclude that the suit is reasonably calculated to elicit a favorable outcome . . ..'" *Baltimore Scrap Corp. v. David J. Joseph Co*., 237 F.3d 394, 399 (4th Cir. 2001) (quoting *PRE*, 508 U.S. at 60). *Second*, "the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor . . . through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *PRE*, 508 U.S. at 60–61 (internal quotations omitted). "In other words, the plaintiff must have brought baseless claims in an attempt to thwart competition (*i.e.*, in bad faith)." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014); *A Fisherman's Best, Inc. v. Recreational Fishing All.*, 310 F.3d 183, 191 (4th Cir. 2002) (the "essential element of the sham exception is intent to injure a competitor").

Courts regularly apply the sham standard in pharmaceutical antitrust cases. *See, e.g.*, *FTC v. AbbVie Inc.*, 976 F.3d 327, 366 (3d Cir. 2020); *In re Loestrin 24 Fe Antitrust Litig*., 433 F. Supp. 3d 274, 313–15 (D.R.I. 2019); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig*., 333 F. Supp. 3d 135, 159 (E.D.N.Y. 2018); *Takeda Pharm. Co. Ltd. v. Zydus Pharms. (USA) Inc*., 358 F. Supp. 3d 389, 396–97 (D.N.J. 2018).

### 2.     The law on inherent anticipation is settled.

In 2012, the Federal Circuit wrote that it had "repeatedly held that 'newly discovered results of known processes directed to the same purpose are not patentable because such results are inherent.'" *In re Montgomery*, 677 F.3d 1375, 1381 (Fed. Cir. 2012) (quoting *Bristol-Myers*

*Squibb Co. v. Ben Venue Lab'ys, Inc.*, 246 F.3d 1368, 1376 (Fed. Cir. 2001)); *see also GlaxoSmithKline LLC v. Glenmark Pharms. Inc., USA*, 2017 WL 8944995, at *10 (D. Del. May 2, 2017), *R. & R. adopted*, 2017 WL 2290141 (D. Del. May 25, 2017) ("It is well-settled that a prior art reference may anticipate a patent claim when the claim limitations not expressly found in that reference are nonetheless inherent in it."). The law on inherent anticipation "does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure" and "[t]hus, recognition by a person of ordinary skill in the art before the critical date of the . . . patent is not required to show anticipation by inherency." *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003); *see also Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1377 (Fed. Cir. 2005) ("In some cases, the inherent property corresponds to a claimed new benefit or characteristic of an invention otherwise in the prior art[,]" but "the new realization alone does not render the old invention patentable."); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1350–51 (Fed. Cir. 2002) (finding inherent anticipation where the patentee merely recognized properties that "necessarily have existed as long as [the products] themselves").

The Federal Circuit applies the doctrine of inherent anticipation to preclude pharmaceutical companies from patenting methods of using a drug where that use (and the was publicly disclosed in a clinical trial description prior to the relevant priority date. In *Montgomery*, a drug manufacturer sought a patent for the use of ramipril to treat or prevent stroke. 677 F.3d at 1377. Before the priority date of the patent application, the drugmaker published a protocol for a large, ongoing clinical trial (HOPE) testing that use. *Id.* at 1378. The study disclosed the details of the study's design, including the patient population, the dosage and administration plan, and the study's objectives. *Id.* at 1378 & n.7. But HOPE *did not* disclose the results of that trial as the study was ongoing. *Id.* at 1378. Nonetheless, the Federal Circuit held that HOPE anticipated the

- 28 -

patent's claims: "HOPE discloses a protocol for the administration of ramipril to stroke-prone patients, and administering ramipril to stroke-prone patients inevitably treats or prevents stroke . . . . Thus, HOPE inherently anticipates the claims at issue." *Id*. at 1381.

In so holding, the Federal Circuit rejected the drugmaker's argument that if the patent includes an efficacy requirement, the prior art must disclose efficacy (i.e., the study results) to anticipate. *Id.* at 1381. The court found that "efficacy is inherent in carrying out the claim steps"—i.e., treating stroke-prone patients with ramipril—because "there is no question here that treating stroke-prone patients with ramipril does in fact inevitably treat or prevent stroke." *Id.*

*Montgomery*'s holding—that the public disclosure of a clinical study concerning the use of a drug to treat a specific condition inherently anticipates a patent claiming that same use, even if the results have not been disclosed—is controlling law. *Montgomery* applies a long-accepted principle to drug product patenting. *See, e.g.*, *Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 970–72 (Fed. Cir. 2001) (no patent for the ostensibly surprising result of a drug's inhibitory effects because "the natural result flowing from administration of fluoxetine hydrochloride is inhibition of serotonin uptake"). The Federal Circuit has neither overturned nor criticized *Montgomery*. And courts rely on it in analogous situations. *See, e.g.*, *GlaxoSmithKline*, 2017 WL 8944995, at *11–*18 (patent claiming method of treating heart failure with carvedilol was inherently anticipated by article describing trial evaluating same use on same population).

### 3. The undisputed facts of J&J's sham enforcement of the '307 patent.

#### a. J&J publicly disclosed the use of ustekinumab to treat UC by 2017 and sought to patent that use in 2018.

47. By December 2014, J&J had begun seeking FDA approval for a new Stelara indication: the treatment of moderately to severely active ulcerative colitis (UC). Ex. 88. To support FDA approval, J&J developed a direct-to-Phase 3 clinical trial (NCT 236) titled "A

Study to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy in Participants with Moderately to Severely Active Ulcerative Colitis (UNIFI)." *Id.*; *see also* Ex. 68 (2017 CT.gov reference); Ex. 63 (Ralat Tr.) at 148:4–149:14.

48.     J&J publicly posted information about NCT 236 to the FDA's website for clinical trials, ClinicalTrials.gov (CT.gov). The first posting was submitted on March 30, 2015 and published on April 2, 2015. Ex. 68 at 12 ("Study Status"); Ex. 77 (Dontabhaktuni) ¶ 99 n.70.

49.     As NCT 236 progressed, J&J updated CT.gov to reflect changes to the study protocol or its status. *See* 42 U.S.C. § 282(j)(4)(C); 42 C.F.R. § 11.64. Each update created a new "version" of the record and each new "version" was preserved in the "history" tab of the NCT 236 homepage on CT.gov. *See* Ex. 68 (2017 CT.gov reference) at 1–10 ("Record History"); Ex. 77 (Dontabhaktuni) ¶ 99 n.70.

50.     The last NCT 236 update on CT.gov prior to the September 24, 2017 priority date (*see* Fact No. 59, below) was posted on September 6, 2017. Ex. 68 at 6; Ex. 65 (Bahr) ¶ 242.

51.     The 2017 CT.gov reference disclosed that the "purpose of [NCT 236] is to evaluate the efficacy and safety of ustekinumab as intravenous (IV: into the vein) infusion in induction study in participants with moderately to severely active Ulcerative Colitis (UC) and as subcutaneous (SC) administration in maintenance study in participants with moderately to severely active Ulcerative Colitis (UC) who have demonstrated a clinical response to Induction treatment with IV ustekinumab.*" Ex. 68 (2017 CT.gov reference) at 14 ("Study Description").[7]

52.     Per the 2017 CT.gov reference, NCT 236 was a Phase 3, randomized, double-

---

[7] Ex. 68, the 2017 CT.gov reference, is also available online at https://clinicaltrials.gov/study/NCT02407236?a=35&tab=history. The plaintiffs note that some of the contents of the reference become unreadable when the website is converted to a PDF. That content is indicated with a * herein.

blind, placebo-controlled, parallel-group, multi-center study that enrolled 966 patients with "moderately to severely active UC." *Id.* at 14–16 ("Study Description" and "Study Design"). The inclusion and exclusion criteria are detailed in the posting. *Id.* at 21–23 ("Eligibility"). By the time of the 2017 CT.gov posting, the study was active and underway (having begun in July 2015).* *Id.* at 12 ("Study Status").

53.    The 2017 CT.gov reference also discloses NCT 236's dosing regimen. It details what doses the placebo and experimental groups each received during each phase. *Id.* at 16–18 ("Arms and Interventions"). For example, during induction, the experimental group received either a 130 mg IV infusion or an IV infusion of 6 mg of ustekinumab per 1 kg of body weight. *Id.* at 17. Experimental participants "in clinical response (at Week 8 or Week 16)" were "randomized to receive ustekinumab 90 mg subcutaneously" every 8 or 12 weeks.* *Id.* at 18.

54.    The 2017 CT.gov reference further specified the primary and secondary outcome measures used to assess the results of the study. *Id.* at 19–21 ("Outcome Measures").

55.    The 2017 CT.gov reference listed where the  trial was being run (i.e., where ustekinumab was actively being used to treat UC). *Id.* at 23–31 ("Contacts/Locations"). It also indicated that it was "active"—and thus not suspended or abandoned. *Id.* at 13 ("Study Status").

56.    On September 24, 2018, J&J submitted provisional patent application 62/735,501, which claimed methods of treating moderately to severely active UC by administering ustekinumab (Stelara). Ex. 63 (Ralat Tr.) at 85:12–89:8.

57.    The '501 provisional application served as the basis for non-provisional application 16/580,509 (the '509 application), filed on September 24, 2019. On March 30, 2021, the '509 application issued as U.S. Patent No. 10,961,307 (the '307 patent), which is set to expire in September 2039. Ex. 67 ('307 patent); Ex. 12 (J&J's 2nd RFA Resp.) No. 109.

58.    The '307 patent is directed towards "methods of providing a clinically proven safe and clinically proven effective treatment" of UC with ustekinumab. Ex. 67 ('307 patent) at col. 1. Claim 1 claims, "A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising administering to the subject a pharmaceutical composition comprising a clinically proven safe and clinically proven effective amount of [ustekinumab] . . . wherein after treating with the antibody, the subject is a responder to treatment by at least one [of seven endpoints]." *Id.* at col. 119, lines 33–65. The '307 patent has 34 claims, of which four are independent claims. *Id.* at cols. 119–24.

59.    The priority date of the '307 patent differs depending on the author of the prior art at issue. If the reference was disclosed by J&J (e.g., the 2017 CT.gov reference), the relevant priority date is September 24, 2017. 35 U.S.C. § 102(b). J&J's public disclosures before that date are prior art to the '307 patent. *Id.*; Ex. 65 (Bahr) ¶¶ 167, 242–44; Ex. 1 (Cryer) ¶ 60, 438; Ex. 4 (Bahr Reply) ¶ 29 n.27; Ex. 3 (Hirshfeld) ¶ 121.

60.    The outcome measures in the 2017 CT.gov reference correspond to the seven alternative endpoints in the '307 patent. *Compare* Ex. 67 ('307 patent) at col. 119, ll. 49–65 *with* Ex. 68 (2017 CT.gov reference) at 19–21 ("Outcome Measures"); *see also* Ex. 64 ('307 File Wrapper) at -601; Ex. 66 (Matovcik) ¶ 154; Ex. 82 (Matovcik Reply) ¶ 59; Ex. 65 (Bahr) ¶ 169; Ex. 1 (Cryer) ¶ 246.

61.    In September 2019, six named inventors of the '307 patent (among others) published the results of NCT 236. The article confirmed that the steps taught in the 2017 CT.gov reference are effective for treating UC. Ex. 89.

### b.    J&J asserted the '307 patent against its prospective biosimilar competitors.

The plaintiffs incorporate by reference Fact Nos. 36–37, 42–46.

- 32 -

62.     In its original complaint against Amgen, filed November 29, 2022, J&J sought preliminary and permanent injunctions to bar Amgen from "infringing [the '734 and the '307 patents] by manufacturing or selling the Amgen biosimilar product." Ex. 46 (J&J/Amgen Compl.) at 26 ("Prayer for Relief"). J&J sought to bar Amgen from competing with Stelara until September 2039, the '307 patent's expiry date, and claimed that Amgen's sale of a biosimilar would cause it "irreparable injury." *Id.* ¶¶ 3, 6, 29–31, 82, 86–87, 109. *See also* Fact No. 37.

63.     J&J also filed a motion for a preliminary injunction against Amgen. Unlike the injunctive relief requested in its complaint, J&J's injunction motion was based *only* on Amgen's alleged infringement of two of the biosimilar patents. J&J told the court this was "[t]o streamline the proceedings." Ex. 32 (J&J PI Br. 1) at 13. *See also* Fact No. 41.

64.     J&J's Amended Complaint against Amgen, filed in February 2023, added claims for infringement of the biosimilar patents and continued to seek a permanent injunction barring Amgen from launching its biosimilar ustekinumab until expiration of the '307 patent in September 2039—16 years after the expiration of the '734 patent. Ex. 14 (J&J/Amgen First Am. Compl.) at 109–10 ("Prayer for Relief"). *See also* Fact No. 40.

65.     J&J thought Amgen's biosimilar launch was imminent. *See, e.g.*, *id.* ¶¶ 51–53 (anticipating launch in ███████████████████████). J&J alleged that Amgen's launch would cause "immediate, substantial, and irreparable harm" to J&J's sales of Stelara as well as "accelerated, long-term loss of market share." Ex. 32 (J&J PI Br. 1) at 18–19.

66.     A May 19, 2023 settlement agreement between J&J and Amgen ended the litigation and █████████████████████████████████████████████ ███████████████████. Ex. 51 (Amgen License) at ¶¶ 1.12, 1.13, Ex. B, and Schedule 1.1 to Ex. B. Amgen was ███████████████████████████████████. *Id.* ¶ 2.3.

67.     J&J asserted the '307 patent against Amgen, Alvotech, Accord, Celltrion, Fresenius, Biocon, and Samsung by threatening litigation for infringement of the '307 patent and biosimilar manufacturing patents. *See* Fact Nos. 43–46.

68.     J&J settled with Alvotech, Accord, Celltrion, and Fresenius before any formal legal proceedings were instituted, ███████████████████████████████████████ ███████████████████████████████████████████████. *See* Fact No. 44. Each settlement agreement stated that ███████████████████████████████████ ███████████████████████████████████. *See* Fact No. 45. J&J told the DOJ and FTC the same. *See* Fact No. 46.

69.     In 2023, two biosimilar competitors, Biocon and Samsung, filed petitions for *inter partes* review of the PTO's decision to approve the '307 patent. Ex. 90 (Biocon IPR petition); Ex. 91 (Samsung IPR petition). In those petitions, each company claimed that the 2017 CT.gov reference inherently anticipated the '307 patent and cited *In re Montgomery*, 677 F.3d 1375, in support. *See* Ex. 90 (Biocon IPR Petition) at 21–39; Ex. 91 (Samsung IPR petition) at 20–36.

70.     Rather than respond to the petitions, J&J entered into quick settlement agreements with both Biocon and Samsung, ███████████████████████████████████ ███████████████████████████████████. Ex. 92 (Mot. to Terminate Samsung IPR); Ex. 40 (Samsung Settlement Agreement) at ¶¶ 1.9, 3.1; Ex. 10 (Mot. to Terminate Biocon IPR); Ex. 45 (Biocon Settlement Agreement) at ¶¶ 1.9, 3.1; Fact No. 44.

### 4.     No objective litigant could realistically have expected to succeed on the merits of a lawsuit asserting the '307 patent.

A determination of whether J&J's assertions of the '307 patent were objectively baseless is a matter of law for this Court to decide. *See* Fed. R. Civ. P. 56(a). If there "is no dispute over the predicate facts of the underlying legal proceeding," courts may decide sham as a matter of

law. *PRE*, 508 U.S. at 63. "[I]t is relatively simple for a judge to decide whether the singular claim it is presiding over is objectively baseless." *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 364 (4th Cir. 2013) (citing *PRE*, 508 U.S. at 59–61).

As a matter of law, no reasonable litigant could realistically expect to succeed on the merits of a lawsuit asserting the '307 patent due to the plain application of the inherent anticipation doctrine. When J&J undertook its enforcement efforts in 2022 through 2024, (i) the law of inherent anticipation was settled, (ii) NCT 236's public disclosures and the claims of the '307 patent were undisputed, and (iii) the application of settled law (including a directly analogous Federal Circuit decision) to those facts would lead to a conclusion of invalidity.

*Settled law of inherent anticipation.* At the time J&J asserted the '307 patent against its competitors, the law of inherent anticipation was settled—and had been for decades. Generally, the more settled the law, the more unreasonable it is to believe an argument that runs contrary to it will succeed. *AbbVie*, 976 F.3d at 360 (expressing the inverse and citing *PRE*, 508 U.S. at 64–65). Where "the law [is] settled against the defendant," *Abbvie*, 976 at 360, the defendant must show that their position "*at the very least* was based on an objectively 'good faith argument for the extension, modification, or reversal of existing law.'" *PRE*, 508 U.S. at 64–65 (quoting Fed. R. Civ. P. 11) (emphasis added). Given the settled law of inherent anticipation as applied to drug patents, J&J does not, as it cannot, argue for such a modification, extension, or reversal.

*The undisputed facts of NCT 236's public disclosure.* Nor can J&J argue that the facts relevant to inherent anticipation are disputed. J&J itself published the September 2017 posting concerning NCT 236 on CT.gov. The disclosures in that posting are detailed and plain. And, of course, J&J cannot dispute the subject matter of the '307 patent's claims.

*The application of settled law to the undisputed facts.* The Federal Circuit's 2012

- 35 -

*Montgomery* decision dictates a finding that the '307 patent was invalid due to inherent anticipation. 677 F.3d 1375. The facts of *Montgomery* are on all fours with the facts here; the disclosures in the HOPE Protocol and the 2017 CT.gov reference are indistinguishable:

| HOPE's Disclosures | CT.gov's Disclosures (Ex. 68) |
|---|---|
| The "design of a large, simple randomized trial of . . . ramipril . . . and vitamin E . . . in the prevention of myocardial infarction, stroke, or cardiovascular death." *Montgomery*, 677 F.3d at 1378. | The design of a Phase 3, randomized, double-blind, placebo-controlled, parallel-group, multi-center study, Fact No. 52, "to evaluate the efficacy and safety of ustekinumab . . . in participants with moderately to severely active Ulcerative Colitis (UC)." Fact No. 51. |
| The inclusion and randomization of more than 9,000 patients "at high risk for cardiovascular events such as myocardial infarction and stroke." *Montgomery*, 677 F.3d at 1378. | The inclusion and randomization of 966 patients with "moderately to severely active Ulcerative Colitis (UC)." Fact No. 52. |
| The administration of "ramipril or a placebo for at least one month" before publication of the protocol. *Montgomery*, 677 F.3d at 1378. | The administration of ustekinumab or a placebo to patients since July 2015 (more than two years before publication of the reference). Fact Nos. 52–53. |
| A dosing schedule of "seven to 10 days of 2.5 mg active ramipril," or "2.5 mg [ramipril] for one week, then 5 mg every day for three weeks." *Montgomery*, 677 F.3d at 1382 n.12. | A dosing schedule of either 6 mg/kg or 130 mg during induction phase and 90 mg every 8 or 12 weeks during maintenance phase. Fact No. 53. |

In this case, as in *Montgomery*, the clinical trial disclosure amounted to much more than a mere "invitation to investigate" or "abstract theory." 677 F.3d at 1382. The disclosure is a detailed record of an ongoing, multi-site clinical trial of Stelara to treat UC in humans. *Id.*; Facts No. 51–55. As in *Montgomery*, J&J's 2017 CT.gov concerned "an advanced stage of testing designed to secure regulatory approval[,]" and was "designed to obtain data for submission to regulatory agencies" concerning the efficacy of this proposed use. *Id.*; *see* Fact No. 47.

The 2017 CT.gov reference discloses all the elements of the '307 patent's claims. The '307 patent claims "[a] method of treating moderately to severely active ulcerative colitis (UC) .

. . [through administering] a clinically proven safe and clinically proven effective amount of [ustekinumab] . . . wherein . . . the subject is a responder to treatment by at least one [of seven endpoints]." Ex. 67 ('307 Patent) at col. 119, lines 33–65.

The 2017 CT.gov reference describes the use of ustekinumab to treat "participants with moderately to severely active Ulcerative Colitis." *Compare* Ex. 68 (2017 CT.gov reference) at 14 ("Study Description") *with Montgomery*, 677 F.3d at 1380 (the prior art satisfies the claim requirement where it "explicitly disclosed the administration of ramipril to patients at high risk for cardiovascular events such as myocardial infarction and stroke."). The '307 patent's arguable requirement that the amount of ustekinumab administered be clinically effective is inherent to the 2017 CT.gov reference: carrying out NCT 236 inherently results in effective treatment, even if that efficacy was not proven when the trial began. Put another way, "efficacy is inherent in carrying out the claim steps" because "there is no question here that treating [UC] patients with [Stelara] does in fact inevitably treat . . . [UC]." *Montgomery*, 677 F.3d at 1381; *see* Fact No. 61.

The 2017 CT.gov reference also discloses the endpoints that the '307 patent claims. Fact Nos. 60–61. Again, to be anticipatory, the reference need not disclose *efficacy* as measured by one of the seven enumerated endpoints because such efficacy is inherent in carrying out the steps in the reference. The '307 patent lists each of these endpoints in the alternative—meaning if even one was inherent to the 2017 CT.gov posting, it would read on the claims. *See* Fact No. 58. The posting therefore fully describes the elements of the '307 patent's claims.

### 5.   J&J asserted the '307 patent to thwart biosimilar competition.

*PRE*'s second prong requires the plaintiffs to show J&J "brought baseless claims in an attempt to thwart competition (*i.e.*, in bad faith)." *Octane*, 572 U.S. at 556; *see also A Fisherman's Best*, 310 F.3d at 191. "A classic example [of sham litigation] is the filing of frivolous [matters] . . . to impose expense and delay" on a competitor. *Navient Sols., LLC v.*

*Lohman*, 136 F.4th 518, 523 (4th Cir. 2025) (quoting *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991)) (first alteration in original); *see also PRE*, 508 U.S. at 62 (the defendant must have "pressed the action for an improper, malicious purpose"); *Waugh*, 728 F.3d at 363 (*PRE*'s "second inquiry focuses on the 'litigant's subjective motivation . . . [and] whether the baseless lawsuit conceals an attempt to' violate federal law 'through the use of the governmental process'") (quoting *PRE*, 508 U.S. at 60–61). But this prong does not require the plaintiffs to show that J&J believed it would not succeed in its meritless claims; "[t]he ultimate inquiry under sham litigation's subjective prong is a defendant's subjective motivation, not its subjective belief about the merits of its claims." *AbbVie*, 976 F.3d at 369 (citing *PRE*, 508 U.S. at 60–61 and *Octane*, 572 U.S. at 556).

Based on the undisputed facts of J&J's use of the '307 patent, *PRE*'s second prong is satisfied as a matter of law. J&J admitted in federal court that its intent in asserting the '307 patent was to delay a competitor's sale of biosimilar ustekinumab—competition that J&J claimed would cause it "irreparable injury." Fact No. 62. J&J's complaint explicitly sought to preclude Amgen from entering the ustekinumab market for the duration of the '307 patent—years beyond expiration of J&J's ustekinumab compound patent. Fact Nos. 37, 40, 62, 64. J&J, of course, had the same goal when it asserted the '307 patent against every other drugmaker seeking to launch biosimilar Stelara (Fact Nos. 43–46, 67–70): to prolong patent protection and, with it, its monopoly prices for Stelara. Each biosimilar presented the same financial threat: competition that would prevent J&J from continuing to charge supracompetitive prices. *AbbVie*, 976 F.3d at 369 (noting the "extensive financial benefits to [brands] if generic[s]. . . were kept or delayed from entry into the market.").

While unnecessary for this motion in light of J&J's admissions concerning its subjective

- 38 -

intent in asserting the '307 patent, other undisputed facts show that J&J's assertions were not an effort to enforce the '307 patent on its merits. *First*, J&J's preliminary injunction motion in the *Amgen* litigation betrayed an absence of genuine intent to prevail on the '307 patent. There, J&J did not move for injunctive relief based on the '307 patent and thereby avoided any need to show it was likely to succeed in upholding the patent's validity. Fact No. 63; *see also Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 813 (4th Cir. 1991) ("[I]f there is doubt as to the probability of plaintiff's ultimate success on the merits, the preliminary injunction must be denied.") (quotation marks and citation omitted); *United States v. Koziol*, 993 F.3d 1160, 1171–72 (9th Cir. 2021) (threat to litigate when no suit is ever filed supports the second prong of the sham exception because it evidences an intent to achieve aims "through the litigation *process* rather than the *result* of that process"); *AbbVie*, 976 F.3d at 370–71 (circumstantial evidence may be used to establish second *PRE* prong); *Inline Packaging LLC v. Graphic Packaging Int'l.*, 164 F.Supp.3d 1117, 1334 (D. Minn. 2016) (in Sherman Act monopolization claim, threats of baseless litigation can create exception to *Noerr-Pennington* based on sham).

*Second*, J&J's rapid settlement of two *inter partes* review petitions evinces its intent.[8] In 2023, Samsung and Biocon—drugmakers seeking to launch biosimilar ustekinumab—challenged the '307 patent before the PTO's Patent and Trial Appeals Board (PTAB). Fact No. 69. They argued that the CT.gov reference inherently anticipated the '307 patent pursuant to *Montgomery*. *Id.* J&J did not respond but instead quickly settled, agreeing to let its competitors ███████, *despite the fact that the '307 patent does not expire until September 2039*. Fact No. 70. At every turn, J&J has avoided any determination of the merits of the '307

---

[8] *Inter partes* review is a trial proceeding conducted at the PTAB to review the patentability of one or more claims in a patent. 35 U.S.C. §§ 311–19.

patent. Fact Nos. 66, 68, 70. The urgency with which J&J settled challenges to the '307 patent exposes its subjective intent in asserting the '307 patent against competitors: J&J sought the delay that the *process* imposed, rather than an outcome on the merits.

*Finally*, undisputed facts show subjective intent to thwart competition as a matter of law because a patent's objective weakness is related to, and can serve as proof of, the patent holder's subjective intent in asserting it. In *AbbVie*, the Third Circuit explained that the objective baselessness of a patent lawsuit speaks to the patentee's subjective intent in filing it:

> To see how, consider the following syllogism: (1) A lawsuit is objectively baseless if "no reasonable litigant could realistically expect success on the merits," . . . (2) and a litigant who files an objectively baseless lawsuit must have had some subjective motivation for suing; (3) but because the lawsuit was objectively baseless, the litigant's subjective motivation *could not have been success on the merits*, unless the litigant was unreasonable; (4) thus, a reasonable litigant's subjective motivation for filing an objectively baseless lawsuit must be something besides success on the merits.

976 F.3d at 370 (quoting *PRE*, 508 U.S. at 60) (emphasis added).

J&J disclosed exactly what that "something" was: delaying its biosimilar competitors from launching competing ustekinumab products. This is precisely what *PRE* and its progeny prohibit; the second prong of *PRE* is satisfied as a matter of law. Partial summary judgment should enter that J&J engaged in exclusionary conduct in violation of anti-monopolization laws through sham enforcement of the '307 patent.

## IV.    CONCLUSION

For the foregoing reasons, pursuant to Rule 56(a), the Court should grant the plaintiffs' motion for partial summary judgment on each of the three issues identified herein. To the extent the Court is disinclined to do so, alternatively and pursuant to Rule 56(g), the plaintiffs request the Court enter an order identifying the material facts for which there are no genuine disputes and treat those identified facts as established for the case.

DATED: August 6, 2025                          Respectfully submitted,

**GLASSER AND GLASSER, P.L.C.**

*/s/ William H. Monroe*
William H. Monroe, Jr. (VSB No. 27441)
Marc C. Greco (VSB No. 41496)
Kip A. Harbison (VSB No. 38648)
Michael A. Glasser (VSB No. 17651)
**GLASSER AND GLASSER, P.L.C.**
Crown Center, Suite 600
580 East Main Street
Norfolk, VA 23510
Telephone: (757) 625-6787
bill@glasserlaw.com
marcg@glasserlaw.com
kip@glasserlaw.com
michael@glasserlaw.com

Thomas M. Sobol (*pro hac vice*)
Hannah W. Brennan (*pro hac vice*)
Abbye R. K. Ognibene (*pro hac vice)*
Whitney E. Street (*pro hac vice*)
Hannah Schwarzschild (*pro hac vice)*
Rebekah Glickman-Simon (*pro hac vice*)
Audley Fuller (*pro hac vice)*
**HAGENS BERMAN SOBOL SHAPIRO LLP**
One Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
tom@hbsslaw.com
hannahb@hbsslaw.com
abbyeo@hbsslaw.com
whitneyst@hbsslaw.com
hannahs@hbsslaw.com
rebekahgs@hbsslaw.com
audleyf@hbsslaw.com

Peter D. St. Phillip (*pro hac vice*)
Uriel Rabinovitz (*pro hac vice*)
Raymond Girnys (*pro hac vice*)
Noelle Ruggiero (*pro hac vice*)
Alexis Castillo (*pro hac vice*)
Thomas Griffith *(pro hac vice)*
**LOWEY DANNENBERG, P.C.**

- 41 -

44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
PStPhillip@lowey.com
URabinovitz@lowey.com
RGirnys@lowey.com
NRuggiero@lowey.com
ACastillo@lowey.com
tgriffith@lowey.com

John Radice (*pro hac vice*)
April Lambert (*pro hac vice*)
Kenneth Pickle (*pro hac vice*)
Charles Kopel (*pro hac vice*)
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Telephone: (646) 245-8502
jradice@radicelawfirm.com
alambert@radicelawfirm.com
kpickle@radicelawfirm.com
ckopel@radicelawfirm.com

*Counsel for Plaintiffs CareFirst of Maryland, Inc.,
Group Hospitalization and Medical Services, Inc.,
and CareFirst BlueChoice, Inc.*

## CERTIFICATE OF SERVICE

I, William H. Monroe, Jr., certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.

DATED: August 6, 2025                    /s/ William H. Monroe, Jr.
                                         William H. Monroe, Jr.