# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

CAREFIRST OF MARYLAND, INC.,
GROUP HOSPITALIZATION AND
MEDICAL SERVICES, INC., and
CAREFIRST BLUECHOICE, INC., on
behalf of themselves and all others similarly
situated,

      Plaintiffs,

      v.

JOHNSON & JOHNSON and JANSSEN
BIOTECH, INC.,

      Defendants.

Case No. 2:23-cv-00629-JKW-LRL

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS JOHNSON & JOHNSON AND JANSSEN BIOTECH, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ............................................................... 3

    I.    Stelara ...................................................................................................... 3

    II.    J&J Conducted The First Phase III Clinical Trial Testing Stelara For UC .......... 3

    III.    The '307 Patent Claims The Novel Clinical Results From J&J's UNIFI Study ............................................................................................................. 7

    IV.    No J&J Employees With A Duty of Candor Were Aware of Any Undisclosed References They Believed Were Material ...................... 10

    V.    ████████████████████████████████ .................................. 12

    VI.    J&J Enforced Its Intellectual Property And Licensed It To Biosimilar Manufacturers ...................................................................................... 15

LEGAL STANDARD ................................................................................................. 16

ARGUMENT .............................................................................................................. 17

    I.    There Is No Evidence That J&J Committed Fraud on the Patent Office ............ 18

        A.    J&J Did Not Withhold Documents Or Make Misrepresentations With Specific Intent To Deceive The PTO ................................ 21

        B.    There Is No Evidence That The Non-Disclosed References Or Alleged Misrepresentations Are But-For Material ...................... 30

    II.    The Momenta Acquisition Was Not Anticompetitive ......................... 32

        A.    The Undisputed Record Shows That J&J Did Not Have The Required Intent to Monopolize ............................................... 34

        B.    The Momenta Acquisition Had No Effect On Competition At The Time The Acquisition Took Place In 2020. .............................. 36

    III.    Plaintiffs Fail to Establish Antitrust Injury ........................................ 37

        A.    The Entry Dates For Biosimilars Stem From Lawful Settlements, Not Anticompetitive Conduct. ............................................... 37

        B.    Plaintiffs Offer No Evidence That The '307 Patent Delayed Biosimilar Entry ................................................................. 39

    IV.    Plaintiffs' State Law Claims Fail ...................................................... 39

CONCLUSION ........................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1st Media, LLC v. Elec. Arts, Inc.*,
  694 F.3d 1367 (Fed. Cir. 2012)..........................................................................23

*In re Actos End Payor Antitrust Litig.*,
  2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015)....................................................38

*In re Aluminum Warehousing Antitrust Litig.*,
  2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014)....................................................39

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................17

*Baxter Int'l, Inc. v. CareFusion Corp.*,
  2022 WL 981115 (N.D. Ill. Mar. 30, 2022)........................................................20

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
  223 F. Supp. 2d 718 (D. Md. 2002)....................................................................33

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
  429 U.S. 477 (1977)............................................................................................37

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................................17

*Chandler v. Phoenix Servs. LLC*,
  1 F. 4th 1013 (Fed. Cir. 2021) ...........................................................................18

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
  363 F. Supp. 2d 514 (E.D.N.Y. 2005) ...............................................................40

*Crawl Space Door Sys., Inc. v. SmartVent Prods., Inc.*,
  No. 2:19-CV-320, 2020 WL 13691776 (E.D. Va. Apr. 28, 2020) .........................33

*Crown Packaging Tech., Inc. v. Belvac Production Machinery, Inc.*,
  591 F. Supp. 3d 52 (W.D. Va. 2022) ....................................................1, 19, 24

*Crucible, Inc. v. Stora Kopparbergs Bergslags AB*,
  701 F. Supp. 1157 (W.D. Pa. 1988)....................................................................36

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
  801 F.3d 758 (7th Cir. 2015) .............................................................................39

*DeCurtis LLC v. Carnival Corp.*,
2023 WL 2071915 (S.D. Fla. Feb. 7, 2023) .................................................19, 20, 22, 29

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) ...................................................................................17

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ...................................................................................17

*Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*,
533 F.3d 1353 (Fed. Cir. 2008)................................................................................31

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009)................................................................................19

*FTC v. Actavis*,
570 U.S. 136 (2013)............................................................................................37, 38

*Giuliano v. SanDisk LLC*,
705 F. App'x 957 (Fed. Cir. 2017) .....................................................................26, 27

*Health Grades, Inc. v. MDX Med., Inc.*,
51 F. Supp. 3d 1069 (D. Col. 2014)..........................................................................23

*Imaging Ctr., Inc. v. W. Md. Health Sys.*,
2004 WL 3168776 (D. Md. Aug. 10, 2004) ..............................................................39

*Inline Packaging LLC v. Graphic Packaging Int. LLC*,
962 F.3d 1015 (8th Cir. 2020) ......................................................................... *passim*

*Ironburg Inventions Ltd. v. Valve Corp.*,
418 F. Supp. 3d 622 (W.D. Wash. 2019)..................................................................26

*Janssen Biotech, Inc. v. Amgen, Inc.*,
22-cv-01549 (D. Del.), Dkt. No. 46..................................................................13, 15

*Joy MM Del. Inc. v. Cincinnati Mine Mach. Co.*,
834 F. Supp. 2d 360 (W.D. Pa. 2011)................................................................31, 32

*In re Katz Interactive Call Processing Patent Litig.*,
821 F. Supp. 2d 1135 (C.D. Cal. 2011) ....................................................................31

*Kimberly-Clark Worldwide, Inc., v. First Quality Baby Prods., LLC*,
2012 WL 529827 (M.D. Pa. Feb. 17, 2012) ...................................................1, 20, 24

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*,
791 F.3d 388 (3d Cir. 2017)......................................................................................37

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
    22 F.4th 1369 (Fed. Cir. 2022) ...........................................................................29

*Life Techs., Inc. v. Clontech Labs., Inc.*,
    224 F.3d 1320 (Fed. Cir. 2000)...........................................................................27

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) .......................................................................17

*Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*,
    878 F. Supp. 804 (D. Md. 1995) ..........................................................................39

*Mylan Pharma., Inc. v. Warner Chilcott Public Ltd. Co.*,
    838 F.3d 421 (3d Cir. 2016)...........................................................................8, 35

*National Bd. For Certification in Occupational Therapy, Inc. v. American*
    *Occupational Therapy Ass'n*,
    24 F. Supp. 2d 494 (D. Md. Sept. 30, 1998)........................................................37

*Navico v. Garmin Int'l, Inc.*,
    2017 WL 3701189 (E.D. Tex. Aug. 7, 2017) .....................................................23

*Network Signatures, Inc. v. State Farm Mutual Auto. Ins. Co.*,
    731 F.3d 1239 (Fed. Cir. 2013)...........................................................................19

*Nobelpharma AB v. Implant Innovations, Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998).....................................................................18, 27

*Nordberg, Inc. v. Telsmith, Inc.*,
    82 F.3d 394 (Fed. Cir. 1996).........................................................................25, 29

*Oksanen v. Page Mem'l Hosp.*,
    945 F.2d 696 (4th Cir. 1991) (en banc) .........................................................17, 33

*Rambus Inc. v. Infineon Techs. Ag.*,
    318 F.3d 1081 (Fed. Cir. 2003)...........................................................................28

*Seiko Epson Corp. v. Glory South Software Mfg., Inc.*,
    830 F. Supp. 2d 1071 (D. Oregon 2011).............................................................19

*Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*,
    204 F.3d 1368 (Fed. Cir. 2000)...........................................................................40

*Smith v. Schlage Lock Co., LLC*,
    986 F.3d 482 (4th Cir. 2021) ..............................................................................17

*SSS Enters., Inc. v. Nova Petroleum Suppliers, LLC*,
    2012 WL 3866490 (E.D. Va. Aug. 30, 2012)......................................................37

*Stoller Enters., Inc. v. Fine Agrochemicals Ltd.*,
　705 F. Supp. 3d 774 (S.D. Tex. Nov. 30, 2023) .................................................................32

*Therasense, Inc. v. Becton, Dickinson & Co.*,
　649 F.3d 1276 (Fed. Cir. 2011) ............................................................................... *passim*

*United States v. Grinnell Corp.*,
　384 U.S. 563 (1966) ............................................................................................................17

*Virginia Innovation Scis. Inc v. Samsung*,
　11 F. Supp. 3d 622 (E.D. Va. 2014) ...................................................................................20

*Wang Labs., Inc. v. Toshiba Corp.*,
　993 F.2d 858 (Fed. Cir. 1993) ............................................................................................29

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
　868 F.3d 132 (3d Cir. 2017) .........................................................................................38, 39

*Williamson Oil Co., Inc. v. Philip Morris USA*,
　346 F.3d 1287 (11th Cir. 2003) .........................................................................................16

## Other Authorities

21 C.F.R. § 312.20 ..................................................................................................................4

37 C.F.R. § 1.56 ..............................................................................................................1, 30

37 CFR § 11.303(a)(2) .........................................................................................................30

Fed. R. Civ. P. 56(a) ...........................................................................................................17

Manual of Patent Examining Procedure ("MPEP") § 410 ..............................................29

Defendants Johnson & Johnson and Janssen Biotech, Inc. (collectively, "J&J") respectfully submit this memorandum of law in support of their Motion for Summary Judgment.

## INTRODUCTION

Plaintiffs'[1] novel claims are unsupported by evidence and contrary to the antitrust laws. To succeed in their case, Plaintiffs must prove that J&J (i) willfully acquired or maintained monopoly power in a relevant antitrust market (ii) through anticompetitive conduct. They have evidence of neither. The undisputed record confirms that J&J legitimately acquired, enforced, and licensed properly issued patents covering ustekinumab, a monoclonal antibody developed and marketed by J&J under the brand name Stelara. Nevertheless, Plaintiffs strive to contort this record into (1) a narrow, difficult-to-prove exception to the bedrock principle that assertion of a patent is immune from antitrust liability; and (2) an unprecedented theory that a defendant can violate the law if it incidentally acquires patents—unaware of their claims—that happened to be owned, among other assets, by an acquired company. But neither theory is supported by fact or law:

*First*, Plaintiffs' allegation of fraud in J&J securing U.S. Patent No. 10,961,307 (the "'307 Patent") covering a new use of Stelara to treat ulcerative colitis ("UC") suffers from an utter failure of proof. Courts have set an extraordinarily high bar for Plaintiffs to prevail on such fraud claims. Plaintiffs must prove, with clear and convincing evidence, that (1) a J&J employee with a duty of candor[2] omitted or misrepresented information to the U.S. Patent and Trademark Office ("PTO")

---

[1] "Plaintiffs" refers to CareFirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc., and CareFirst BlueChoice, Inc.

[2] "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section." 37 C.F.R. §1.56(a). "Only inventors and those substantively involved in patent prosecution have a duty of candor to the Patent Office." *Crown Packaging Tech., Inc. v. Belvac Production Machinery, Inc.*, 591 F. Supp. 3d 52, 63-65 (W.D. Va. 2022), *rev'd in part on other grounds*, 122 F.4th 919 (Fed. Cir. 2024); 37 C.F.R. §1.56(c).

and (2) did so with the specific intent to deceive.  And Plaintiffs must show that intent to deceive is the "single most reasonable inference able to be drawn from the evidence." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011).  Plaintiffs must also prove that the alleged omission or misrepresentation was "but-for" material, *i.e.*, that the PTO would not have allowed the '307 Patent but for the omission or misrepresentation.  Here, the record contains no evidence that any J&J employee with a duty of candor withheld material information or made any misrepresentations to the PTO during the '307 Patent prosecution, let alone that they did so with intent to deceive the PTO.

*Second*, Plaintiffs fare no better with their claim that J&J's acquisition of Momenta Pharmaceuticals, a clinical-stage biotechnology company, constituted anticompetitive conduct. To prevail on this theory, Plaintiffs must show that, at the time of the acquisition, J&J obtained patents that it "kn[ew] when added to [its] existing share" would "afford [it] monopoly power." Dkt. 119 at 29 (quoting *SCM*, 645 F.2d at 1207).  But the undisputed evidence shows that J&J's acquisition of Momenta had *nothing* to do with Stelara or biosimilar ustekinumab. Instead, at the time of the Momenta acquisition in October 2020: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; and (3) J&J could not have known what manufacturing processes a potential future biosimilar manufacture would use, let alone that any Momenta patents would cover those processes.  As a result, Plaintiffs cannot show that J&J acquired Momenta with the required intent to add to its alleged monopoly power over Stelara or that, at the time, the acquisition added anything to J&J's alleged monopoly power.

*Third*, Plaintiffs cannot show J&J's actions caused them antitrust injury, another essential element of their claims.  Plaintiffs claim that they were overcharged for Stelara due to purported

2

"delayed" biosimilar entry.  But the biosimilars' entry dates resulted from the biosimilar manufacturers' independent decisions to settle disputes regarding J&J's patents rather than risk challenging them and losing time and money.  Plaintiffs have never alleged that these commonplace settlement licensing agreements were unlawful, nor can they.  And Plaintiffs should not now be permitted to second-guess the biosimilars' business judgments to enter into such lawful settlement agreements.  Separately, Plaintiffs cannot now claim that J&J's assertion of the '307 Patent caused biosimilar delay because their own experts admitted that this patent could not and would not have prevented biosimilar entry due to its narrow claims, limited to the treatment of UC.

At summary judgment, Plaintiffs can no longer rely on "[t]he procedural posture of the case" to do their "heavy lifting."  Dkt. 119 at 26.  Now is the time for evidence.  Plaintiffs turned over every stone—over 1.2 million documents, 44 depositions, and 37 expert reports—to find evidence of wrongful conduct.  They failed.  The Court should grant summary judgment for J&J.

## STATEMENT OF UNDISPUTED FACTS

### I.     Stelara

1.     Stelara (ustekinumab) is a monoclonal antibody that binds and inhibits the activity of interleukin-12 (IL-12) and interleukin-23 (IL-23), two proteins involved in the immune system's inflammatory response.  Ex. 1 at 2:38-61, 59:1-2.  Stelara was a "first-in-class anti-IL agent" and "represent[ed] an important milestone in rational drug design."  Ex. 2 at 5.

2.     The Food & Drug Administration ("FDA") has approved Stelara for psoriasis (on September 25, 2009), psoriatic arthritis (on September 23, 2013), Crohn's disease ("CD") (on September 26, 2016), and UC (on October 21, 2019).  D.I. 1 ¶¶85-87.

### II.     J&J Conducted The First Phase III Clinical Trial Testing Stelara For UC

3.     In 2014, while J&J was engaged in clinical trials for CD, ███████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████    Ex. 3 at 15-16.  J&J began to explore FDA approval for a UC indication

for Stelara.  *See generally* Ex. 3; Ex. 4.

4.      Clinical trial sponsors such as J&J must obtain FDA approval before conducting

clinical trials.  21 C.F.R. § 312.20.  The FDA drug approval process generally involves three stages

of clinical trials.  Phase I trials test safety in a small population of patients.  Phase II trials test

safety and efficacy in a larger population and are the first time a drug is typically studied in subjects

with the condition for which approval might be sought.  Phase III trials test safety and efficacy in

a much larger population and, despite having safety and efficacy data from Phase II, fail 40-50%

of the time.  In rare instances, the FDA can approve "direct-to-Phase III" trials in which sponsors

skip Phase II.  Ex. 5 ¶¶14-30, 43-44, 47; Ex. 6 ¶¶39, 123; Ex. 7 ¶¶378, 380; Ex. 8 at 98:16-99:11.

5.      On July 10, 2015, J&J initiated its clinical trial to test whether Stelara was a

clinically safe and effective treatment for UC (the "UNIFI trial").  Ex. 9 at 6; Ex. 10 at 8514.  J&J

designed UNIFI as a direct-to-Phase III trial, and it included 971 subjects.  Ex. 11 75:2-15; Ex. 12

at 8272; Ex. 9 at 8.  There were no prior clinical studies testing the safety and efficacy of

ustekinumab in UC.  Ex. 7 ¶64.

6.      Every clinical trial must include clinical endpoints—the variables that measure a

drug's therapeutic effect—and a clinical trial's success depends on defining and meeting these

endpoints.  Ex. 6 ¶¶35, 47; Ex. 5 ¶¶38-42.  The primary endpoint for J&J's UNIFI trial was clinical

remission defined by the Mayo Score, an FDA-approved endpoint for clinical trials of UC

treatment drugs that measures UC "disease activity."  Ex. 10 at 8551-52; Ex. 12 at 8272; Ex. 6 ¶

49; Ex. 7 ¶248.

7. The FDA requires clinical trial sponsors to submit a clinical protocol that describes the objectives, rationale, methodology, and clinical endpoints of the clinical trial. Ex. 5 ¶¶35-37. Sponsors can also request a "Pre-Investigational New Drug" ("Pre-IND") meeting with the FDA to discuss their drug's development plan, and sponsors can send pre-meeting briefing documents to the FDA that discuss the rationale for the trial. Ex. 6 ¶156; Ex. 5 ¶¶76-78. Sponsors also submit "clinical study reports" that identify clinical trial results. *See generally* Ex. 13; Ex. 14.

8. Prior to beginning UNIFI, J&J submitted both a clinical protocol that outlined the UNIFI trial's design, rationale and endpoints (the "UNIFI Protocol"), as well as a Pre-IND briefing document that explained J&J's rationale for the direct-to-Phase III approach (the "Pre-IND Briefing"). Ex. 10; Ex. 12; Ex. 6 ¶¶152, 156. In those submissions, J&J asked the FDA for approval to go direct to Phase III for UC given certain genetic similarities between UC and CD and because J&J had clinically proven Stelara as a safe and effective treatment for CD. Ex. 10 at 8529; Ex. 12 at 8282, 8287; Ex. 15 at 66:11-67:7.

9. J&J's UNIFI team members, experienced with Stelara and clinical trials, recognized that no one had ever run a clinical study to test whether Stelara is a clinically safe and clinically effective UC treatment. Ex. 15 at 20:18-21:6; 28:5-24, 35:19-36:7, 93:8-94:1, 118:3-120:12; Ex. 16 at 16:22-17:11, 20:20-21:4, 138:4-20; Ex. 17 at 13:16-15:10 108:8-109:6; Ex. 10 at 8511. Moreover, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Ex. 18 at 52:11-17; Ex. 17 at 32:24-33:11; Ex. 16 at 55:3-6; Ex. 15 at 69:6-8, 70:8-24, 89:9-24, 94:13-95:5, 130:11-24, 131:23-25; Ex. 7 ¶¶43-48, 404-422; Ex. 6 ¶¶128-139. ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ *See* Ex. 17 at 31:1-32:23; Ex. 16 at 41:17-42:5, 49:9-

23, 156:21-157:17; Ex. 15 at 92:14-93:7, 94:13-95:5; Ex. 11 at 59:23-60:5; Ex. 6 ¶¶124-127, 141, 147-149; Ex. 4 at 1.

10.     The FDA expressed concern that Stelara may not work for UC, including because the two conditions had dissimilar symptomology and clinical characteristics, and because the FDA was concerned that UC patients might have different responses to Stelara doses.  Ex. 19 at 2759; Ex. 16 at 26:15-27:13, 28:24-29:11; Ex. 11 at 127:22-25; Ex. 20 at 36:24-37:9; Ex. 7 ¶ 431. Therefore, the only way to know whether Stelara was safe and effective in UC patients was to test it.  Ex. 20 at 36:24-37:9.

11.     J&J's UNIFI trial included a futility analysis—a statistical method for determining if it is unlikely that a clinical trial will reach its objectives.  Ex. 10 at 8497; Ex. 12 at 8282; Ex. 17 at 64:13-20; Ex. 16 at 160:20-161:5; Ex. 7 ¶505.  J&J did so to "account for the possibility that Stelara w[ould] be ineffective", telling the FDA that the futility analysis would "limit the exposure of subjects with UC should ustekinumab treatment *prove to be ineffective*" and that "[t]he *study may be stopped for futility*."  Ex. 8 at 182:9-186:18; Ex. 10 at 8520, 8526, 8580, 8582; Ex. 12 at 8282; Ex. 17 at 64:13-20; Ex. 16 at 160:20-161:5; Ex. 7 ¶505; Ex. 69 at 8393.

12.     UNIFI turned out to be successful, demonstrating for the first time in a well-controlled clinical trial that Stelara was effective in treating UC as defined by the study's specific endpoints.  Ex. 7 ¶¶64, 66-74.  After J&J obtained results, J&J drafted two clinical study reports (the "Clinical Study Reports") that discussed these results and noted that "it was reasonable to propose that ustekinumab may also be effective in the treatment of UC" due to the relationship of CD and UC.  Ex. 13 at 5761; Ex. 14 at 24.  The reports also noted that "[a]t the time the [UNIFI] protocol was developed, no studies had been conducted with ustekinumab for UC."  *Id.*

13.     Throughout the clinical trial, J&J posted updates for UNIFI on the public ClinicalTrials.Gov ("CT.Gov") website (the "CT.Gov Postings") that included brief descriptions of J&J's UNIFI trial, the treatments received by the clinical trial subjects, and the outcome measures to be tested by the trial.  Ex. 9; Ex. 7 ¶361.

14.     J&J's UNIFI study ended on August 10, 2018, and the FDA approved the UC indication for Stelara on October 21, 2019.   Ex. 9 at 6; Ex. 7 at 134; Ex. 21 ¶162.  The results from J&J's UNIFI trial were first publicly accessible on December 23, 2019.  Ex. 22 at 203.

## III.     The '307 Patent Claims The Novel Clinical Results From J&J's UNIFI Study

15.     Because the UNIFI trial results were "a pretty significant innovation," J&J "file[d] new patent applications to cover that subject matter."  Ex. 23 at 246:12-247:12.  On September 24, 2019, J&J Assistant General Counsel Eric Dichter filed U.S. Patent Application No. 16/580,509 (the "'509 Application"), a non-provisional application that related to "methods of providing a clinically proven safe and clinically proven effective treatment of ulcerative colitis" and detailed the results from J&J's UNIFI trial.[3]  Ex. 22 at 3, 81-90, 139-44, 151, 157.

16.     The '509 Application claims originally recited "[a] method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising administering to the subject a pharmaceutical composition comprising a clinically proven safe and clinically proven effective amount of an anti-IL-12/IL-23p40 antibody . . . wherein after treating with the antibody, the subject is a responder to treatment."  Ex. 22 at 151-56.  The claims also included a specific dosing regimen.  *Id.* at 153-56.

---

[3]     The '509 Application claimed priority to three provisional applications: U.S. Prov. App. Nos. 62/735,501 (the "'501 Provisional Application"), 62/769,818 (the "'818 Provisional Application") and 62/895,774 (the "'774 Provisional Application").  Ex. 22 at 3.

17.    The '509 Application specification emphasized in some detail the relationship between UC and CD.  It noted, among other things, that "biologic therapies that are currently approved for the treatment of UC have also demonstrated efficacy in Crohn's disease."  Ex. 22 at 5-6.  After discussing the successful clinical results for CD, the specification stated that "prior to the present invention, no studies had been conducted with ustekinumab for UC."  Ex. 22 at 5-6.  Mr. Dichter and J&J patent manager Dr. Luis Ralat (who drafted this sentence in preparing the provisional application for the '307 Patent) testified that they believed this statement was accurate ███████████████████████████████████████████  Ex. 24 at 62:5-14; Ex. 25 at 90:12-18, 221:11-24, 246:9-248:2; Ex. 13 at 5761; Ex. 14 at 24.

18.    PTO examiners review patent applications for patentability, including whether the claimed invention is novel (*i.e.*, not "anticipated") or non-obvious over "prior art": information available to the *public* before the claimed invention's effective filing date.  Ex. 26 ¶¶21-22, 37-38; Ex. 27 ¶¶31-32.  If examiners preliminarily determine that an application is unpatentable, they issue an initial "non-final rejection" explaining the rejection.  Ex. 26 ¶48.

19.    Examiners conduct this analysis from the perspective of the "person of ordinary skill in the art" ("POSA"): a "hypothetical person who is presumed to have known the relevant art at the relevant time."  Ex. 26 ¶70 (quoting MPEP § 2141.03(I)); Ex. 27 ¶145.  In this case, the parties agree that the POSA for the subject matter of the '509 Application/'307 Patent is someone who, in September 2018, would at least have knowledge regarding the mechanisms of action, diagnosis, clinical trials, and treatment of inflammatory bowel diseases ("IBDs"), including ulcerative colitis and Crohn's disease.  Ex. 7 ¶¶77-79; Ex. 21 ¶¶213-14.  A POSA would understand that the '509 Application's statement that "no *studies* had been conducted with ustekinumab for UC" in the '509 Application referred to *clinical* studies.  Ex. 7 ¶¶61-65.

20.     The examiner for the '509 Application was Robert Landsman.  Ex. 26 ¶22; Ex. 1 at 1.  On July 16, 2020, Examiner Landsman issued a non-final rejection of the '509 Application claims as anticipated and/or obvious over a CT.Gov posting dated August 13, 2018 (the "August 2018 CT.Gov Posting") that provided an update on J&J's UNIFI trial because it "teaches the use of this drug for the instantly claimed purpose."  Ex. 22 at 171, 176; Ex. 21 ¶90, n. 45.

21.     In response to the non-final rejection, Mr. Dichter amended the claims to include the UNIFI study's specific clinical endpoints: the claims now defined a "responder to treatment" as someone who achieved one of those endpoints.  Ex. 22 at 205-10.  Relying on his experience with Stelara and clinical trials, Mr. Dichter also argued that the CT.Gov posting—which did not disclose the UNIFI clinical results—did not anticipate or render obvious the claims "[d]ue to the uncertainty of clinical outcomes and the failure of numerous medicines to satisfy designated clinical trial endpoints."  Ex. 22 at 203; Ex. 24 at 152:13-17.  Mr. Dichter also disclosed several articles that discussed the genetic relationship between CD and UC and Stelara's efficacy for CD.  Ex. 22 at 188-90; Ex. 7 ¶¶465, 494-496.

22.     Examiner Landsman allowed the '509 Application on November 13, 2020, stating only that a reference that he had considered—US Pat. App. US 2020/0262908 (the "'908 Publication"), which discussed a UC treatment device comprising an anti-IL-12/IL-13 inhibitor—did not render the claims unpatentable because it did not include any "dosing data" and thus did not show that "the (untaught) amount of ustekinumab would have the inherent effects (i.e. meeting the 'endpoint' requirements of the instant claims)."  Ex. 22 at 220-22; Ex. 7 ¶¶268-72.

23.     The '509 Application issued as the '307 Patent on March 30, 2021, and listed as the inventors Jewel Johanns, Katherine Li, Colleen Marano, Richard Strauss, Hongyan Zhang,

Christopher O'Brien, Omoniyi Adedokun, and Kimberly Shields-Tuttle. Ex. 1 at 1. The '307 Patent is set to expire on September 24, 2039. Ex. 27 ¶ 191.

## IV. No J&J Employees With A Duty of Candor Were Aware of Any Undisclosed References They Believed Were Material

24.    Plaintiffs identified three categories of documents that they contend J&J failed to disclose to the PTO: so-called "prior art" references (the "prior art"), J&J's UNIFI-related submissions to the FDA (the "FDA Submissions"), and J&J UNIFI-related updates to the CT.Gov website (the "CT.Gov Postings").[4]

25.    First, there is no record evidence that anyone with a duty of candor for the '307 Patent—Eric Dichter and the listed inventors—knew about the "prior art" at all, let alone believed that these references were material to patentability during prosecution of the '307 Patent. Ex. 8 132:21-133:3, 197:4-12; Ex. 29 ¶27; Ex. 24 at 166:13-22, 199:3-200:8. Further, none of the alleged "prior art" includes data showing that Stelara was a clinically proven effective treatment of UC, as defined by the endpoints of J&J's UNIFI study or in the '307 Patent claims. Ex. 7 ¶¶238-265, 273-299, 319-331, 341-347, 437-446, 451-463; Ex. 30 at 142:8-17, 146:12-147:21; Ex. 31 at 80:1-25, 121:22-122:10; Ex. 8 at 143:4-147:11. These references involve the treatment of very few, if any, patients, and none of these references were placebo-controlled clinical studies; moreover, all of these references either do not disclose the '307 Patent endpoints, including clinical remission using Mayo scores, or fail to disclose the claimed dosing regimen. Ex. 7 ¶¶201-340,

---

[4]    Plaintiffs characterized numerous articles as "prior art" but focused on only four articles: two abstracts by Dr. Thomas Ochsenkühn (the Ochsenkühn abstracts") and two articles by Luke Jostins and Atle van Beelen Granlund that discussed, among other things, UC and CD's genetic similarities ("Jostins/Granlund"). Ex. 28 at 8-10. Plaintiffs' expert Dr. Matovcik also identified the Stelara CD product label. Ex. 21 ¶¶178-181. Plaintiffs identified several allegedly non-disclosed FDA submissions, Ex. 28 at 8-10, but focused on the UNIFI Protocol (and amendments), Pre-IND Briefing, and Clinical Study Reports. Ex. 29 ¶¶84-110; Ex. 27 ¶¶264, 269, 289-90. Plaintiffs' experts focused on two CT.Gov Postings dated September 24, 2017 and August 13, 2018. Ex. 27 ¶¶ 243-44; Ex. 21 ¶¶ 153-63.

349-359, 396-460.   In particular, Dr. Thomas Ochsenkühn's abstracts (the "Ochsenkühn abstracts") described his non-controlled use of Stelara on 17 UC patients, six of whom were in remission prior to receiving Stelara, and did not disclose the claimed endpoints.  Ex. 32 at 103:9-105:23, 113:24-115:23, 117:17-124:20; Ex. 71; Ex. 72; Ex. 7 ¶¶245-272.

26.     Several '307 Patent inventors received "mass email[s]" addressed to large groups of J&J employees that included or attached summaries of numerous scientific articles, including Dr. Thomas Ochsenkühn's abstracts, but none of these inventors recalled ever having read Dr. Ochsenkühn's abstracts or knowing Dr. Ochsenkühn.   Ex. 18 at 78:4-85:20, 90:2-93:2, 116:18-122:6, 142:11-25, 146:20-25; Ex. 17 at 93:24-101:13, 111:20-23, 146:21-148:24; Ex. 33 at 85:12-91:9, 94:5-95:6, 97:8-12, 107:3-9; Ex. 15 at 101:19-105:24, 125:20-127:12; Ex. 16 at 134:15-16; Ex. 34 at 5558; Ex. 35 at 7112; Ex. 36 at 4; Ex. 37 at 30; Ex. 38 at 4393; Ex. 39 at 2, 4-5.  And while certain '307 Patent inventors reviewed materials that *cited* the Jostins/Granlund articles, there is no record evidence that they read the Jostins/Granlund articles themselves or believed these articles were material to patentability.  Ex. 11 at 108:4-111:25, 141:16-145:2.

27.     Second, there is no record evidence that anyone at J&J with a duty of candor believed that the FDA Submissions were material to patentability.  Ex. 8 at 177:16-21; Ex. 30 at 232:21-233:7.  The FDA Submissions stated that based on the Stelara CD clinical results and the genetic similarities between CD and UC, it was "reasonable to assume" or "reasonable to propose" that Stelara would be effective in UC.  Ex. 13 at 5761; Ex. 14 at 24; Ex. 10 at 8529; Ex. 12 at 8287; Ex. 68 at 8369; Ex. 70 at 8181.  Dr. Ralat, ███████████████████████████████████ ███████, testified that while the '509 Application specification did not include those "exact statement[s]", a POSA would understand that the specification conveyed the same idea.  Ex. 25 at 90:8-18, 229:13-230:4, 244:3-15; Ex. 7 ¶497.

28.    Third, with respect to the CT.Gov Postings, the Examiner's July 16, 2020 office action listed the full CT.Gov website on a Notices of References cited, with the annotation "Accessed from the internet 7/13/2020"; the website included the CT.Gov Postings and UNIFI Protocol.  Ex. 22 at 178; Ex. 26 ¶¶125, 191-192; Ex. 7 ¶491.  In addition, the August 2018 CT.Gov posting for J&J's UNIFI study was not withheld from the Examiner.  Ex. 30 at 93:3-11; Ex. 21 ¶90, n.45.  During the '509 Application prosecution, J&J disclosed a search report that specifically identified this posting, the Examiner described the search report as a "reference[] considered," so the Examiner considered both the search report and the posting.  Ex. 22 at 188-91, 197, 201, 226; Ex. 7 ¶¶363-365; Ex. 21 ¶90, n.45; Ex. 30 at 93:12-94:6.  There are no substantive differences between the August 2018 CT.Gov Posting reviewed by the Examiner and the April 2015 and September 2017 CT.Gov postings.  Ex. 7 ¶¶360-62; Ex. 8 at 166:13-167:22; Ex. 29 at ¶67, n.51.

29.    There is no record evidence that anyone at J&J with a duty of candor believed that the CT.Gov Postings were material to patentability, and Mr. Dichter testified that he did not believe that these postings are material to patentability because "the claimed subject matter distinguishes from the elements of the clinical posting."  Ex. 8 at 160:18-161:8; Ex. 24 at 196:8-197:3.  Indeed, the CT.Gov Postings disclosed a protocol explaining how the trial would be run, not any results that showed that Stelara achieved the claimed clinical endpoints for UC.  Ex. 7 ¶¶366-76; Ex. 21 ¶201.

**V.**    ████████████████████████████████

30.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

31. 

32.

33.

34.    As part of the Momenta acquisition, J&J acquired Momenta's entire patent portfolio consisting of over 500 patents, patent applications, and patent application publications. Ex. 44 120:13-123:9; Ex. 45 at 4753-4780.  Four of those patents related to cell culture media used in the manufacturing process of biologic drugs generally, not Stelara specifically (the "Momenta Manufacturing Patents").  Ex. 46 ¶¶28, 68-82; Ex. 44 at 75:25-76:3; *Janssen Biotech, Inc. v. Amgen, Inc.*, 22-cv-01549 (D. Del.) (the "Amgen Litig. Dkt."), Dkt. No. 46 at ¶5; Ex. 47 ¶¶21,

293. ██████████████████████████████████████████████████

████████████ Ex. 44 at 161:14-162:19.

35. ████████████████████████████████████████████



36.     J&J announced it was acquiring Momenta in August 2020.  The acquisition was submitted for antitrust review to the Federal Trade Commission and Department of Justice in the required Hart-Scott-Rodino filings.  The antitrust authorities raised no questions about the deal and J&J closed the acquisition in October 2020.  Ex. 40 at 24:7-13, 111:9-113:8; Ex. 44 at 102:17-22; Ex. 46 ¶83; Ex. 43 at 14; Ex. 48 ¶¶33-36.  The FDA approved nipocalimab on April 29, 2025.  Ex. 49 at 1.

37.     ████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████████

38.     At the time of the Momenta acquisition, J&J was not aware—nor could it have been aware—of what cell culture media any potential biosimilar applicant for ustekinumab might use.  Ex. 46 ¶¶84, 90-104; Ex. 50 at 106:7-109:5, 111:14-115:20, 116:17-117:19, 118:19-119:8.  No biosimilar manufacturer had filed a Biologics License Application ("BLA") with the FDA seeking

approval of a biosimilar Stelara, and the first reports of any biosimilar clinical results were not announced until nearly two years after the acquisition.  Ex. 46 ¶84.  Amgen—the first company to submit a BLA for biosimilar ustekinumab—did so on October 31, 2022—two years after the Momenta acquisition.  Ex. 47 ¶84.

39.    Because the source or components of a company's cell culture media are not typically public,



## VI.    J&J Enforced Its Intellectual Property And Licensed It To Biosimilar Manufacturers

40.    J&J sued Amgen for infringement of the '307 Patent on November 29, 2022. Amgen Litig. Dkt., Dkt. No. 1, at ¶¶ 1-6.  At that time, J&J did not assert the Momenta Manufacturing Patents in its initial Complaint against Amgen.  *Id.*

Ex. 46 ¶¶92-100.

41.

Ex. 53 at 106:5-107:7, 243:4-258:16.  J&J then asserted the Momenta Manufacturing Patents when moving for a preliminary injunction against Amgen on March 1, 2023.  Amgen Litig. Dkt., Dkt. No. 46, at ¶¶12-15, 61-68.

42.    Amgen had every incentive to launch its biosimilar Stelara as early as possible, yet chose to settle with J&J rather than litigate the preliminary injunction.  Ex. 54 at 44:17-46:19; Ex. 55 ¶72.

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

43.    Other biosimilar applicants also had an incentive to launch their biosimilar Stelara products as early as possible, and they too chose to settle rather than litigate the J&J patents.  Ex. 54 at 44:17-46:16; Ex. 55 at ¶59.  That included Samsung Bioepis Co. Ltd. ("Samsung") and Biocon Biologics Ltd. ("Biocon"), who challenged the validity of the '307 Patent in virtually identical *inter partes* petitions filed on June 21, 2023 and November 22, 2023, but chose to settle rather than press their validity challenges.  Ex. 55 ¶76. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████    Ex. 55 ¶¶59, 88; Ex. 56 at 3582-83; Ex. 57 at 9015-16; Ex. 58 at 1476-77; Ex. 59 at 9030-9031; Ex. 60 at 6868-69; Ex. 61 at 9001-02; Ex. 62 at 9063-64.

44.    Plaintiffs' expert Li Wang opined that a "reasonable biosimilar manufacturer would launch its biosimilar ustekinumab" with all indications "as soon as possible and despite J&J's '307 patent."  Ex. 63 ¶¶20, 21, 62-74, 87; Ex. 64 at 220:3-13.  Ms. Wang could not "recall during [her] decades working in pharmaceutical companies an example of a time when a method-of-use patent became a strong barrier to block the product from being launched."  Ex. 63 ¶70.

45.    Likewise, Plaintiffs' expert Mr. Todd Clark opined that "that there would have been no patent-related barriers to biosimilar manufacturers launching their biosimilar versions of ustekinumab when they received a 'license' to do so from the FDA" because the biosimilar companies would have "carved out" the UC indication so "the '307 patent would not have served as a deterrent to biosimilar firms entering the market at an earlier date."  Ex. 55 ¶22.

## LEGAL STANDARD

"In the context of antitrust cases . . . summary judgment is particularly favored because of

the concern that protracted litigation will chill pro-competitive market forces." *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1300 (11th Cir. 2003) (citing *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002)).   A court must grant summary judgment if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The moving party need only demonstrate an absence of evidence on an essential element of Plaintiffs' claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   The burden is on the non-moving party to come forward with evidence creating a "*genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 352 (4th Cir. 2024).   Material facts are those that can "affect the outcome of the suit," and a dispute about material facts is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 247-48.   "[U]nsupported speculation is not sufficient to defeat a summary judgment motion."  *Smith v. Schlage Lock Co., LLC*, 986 F.3d 482, 486 (4th Cir. 2021) (citations omitted).

To succeed on their monopolization claim, Plaintiffs must prove that J&J (i) willfully acquired or maintained monopoly power in a relevant antitrust market (ii) through anticompetitive conduct.  *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966); *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 710 (4th Cir. 1991) (en banc); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011); *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 282 (4th Cir. 2012).   At this stage, Plaintiffs must present evidence sufficient to create a disputed issue of material fact with respect to each of these elements.  As explained below, they cannot do so.

## **ARGUMENT**

Plaintiffs have advanced two theories of anticompetitive conduct, but neither is supported

by the law or the facts.  First, Plaintiffs allege that J&J engaged in fraud on the PTO to secure its '307 Patent—but there is no evidence that anyone with a duty of candor made knowing omissions or misrepresentations with the specific intent to deceive the PTO, or that the PTO would not have allowed the '307 Patent absent the alleged omissions or misrepresentation.  Second, Plaintiffs allege that J&J's acquisition of Momenta was unlawful—but they have no evidence that J&J acquired Momenta with the intent of acquiring monopoly power, and the undisputed evidence confirms the contrary.  Nor does the undisputed evidence show any anticompetitive effect from the Momenta acquisition at the time of the transaction.  Finally, Plaintiffs' claims fail for the independent reason that they cannot show antitrust injury.  The Court must therefore grant summary judgment.

## I.    There Is No Evidence That J&J Committed Fraud on the Patent Office

A patentee's efforts to acquire or enforce patents are immune from antitrust liability, with two narrow exceptions: when the actions involve fraud on the PTO (also known as a *Walker Process* claim) or sham litigation.  *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)).  Here, Plaintiffs allege that J&J engaged in fraud on the PTO.[5] Plaintiffs must therefore show, at a minimum, that J&J obtained the '307 Patent "by knowing and willful fraud on the patent office" and "maintained and enforced that patent with knowledge of the fraudulent procurement."  *Chandler v. Phoenix Servs. LLC*, 1 F. 4th 1013, 1014 (Fed. Cir. 2021) (cleaned up); *Therasense,* 649 F.3d at 1290.  And because *Walker Process* fraud "is to be decided as a question of Federal Circuit law," *Nobelpharma*, 141 F.3d at 1068, courts must grant summary

---

[5]    After telling the Court more than a year ago that they did not want to pursue a sham litigation claim, Plaintiffs belatedly moved to amend their complaint to include sham litigation. Dkt. 335; Dkt. 369 at 1-2, 13-16.  Plaintiffs' motion is still pending, and J&J reserves the right to respond to any sham litigation claim should it become part of the case.

judgment on *Walker Process* claims when, like here, there is insufficient evidence of fraud on the PTO under the Federal Circuit's *Therasense* standard.[6]  *Inline Packaging LLC v. Graphic Packaging Int. LLC*, 962 F.3d 1015, 1017 (8th Cir. 2020); *DeCurtis LLC v. Carnival Corp.*, 2023 WL 2071915, at *6-8 (S.D. Fla. Feb. 7, 2023); *Chamberlain*, 2017 WL 3493799, at *8-9 (N.D. Ill. Aug. 14, 2017); *Seiko Epson Corp. v. Glory South Software Mfg., Inc.*, 830 F. Supp. 2d 1071, 1077 (D. Oregon 2011).

To survive summary judgment on a *Walker Process* claim, Plaintiffs must present evidence sufficient to allow a reasonable juror to find, by clear and convincing evidence, that a J&J employee with a duty of candor—*i.e.*, an individual "associated with the filing and prosecution of [the '509 A]pplication"—"(1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO."  *Network Signatures, Inc. v. State Farm Mutual Auto. Ins. Co.*, 731 F.3d 1239, 1242 (Fed. Cir. 2013); *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009); *Crown Packaging Tech., Inc. v. Belvac Production Mach., Inc.*, 591 F. Supp. 3d at 63-65.  Plaintiffs must also show that deceptive intent is "the single most reasonable inference able to be drawn from the evidence."  *Therasense*, 649 F.3d at 1290; *Network Signatures*, 731 F.3d at 1242.  And Plaintiffs must also come forward with evidence that would allow a reasonable jury to find "that the PTO would not have allowed the claim but for the nondisclosure or misrepresentation."  *Network Signatures*, 731 F.3d at 1242; *Therasense*, 649 F.3d at 1291.  Critically, "[i]ntent and materiality are separate requirements," and "a district court should not use a 'sliding scale,' where a weak showing of

---

[6]      As this Court recognized, because "the showing required for proving inequitable conduct and the showing required for proving the fraud component of *Walker Process* liability may be nearly identical," cases following the Federal Circuit's *Therasense* decision "may be instructive on *Walker Process* fraud."  Dkt. 119 at 25 n.10 (citing *TransWeb, LLC v. 3M Innovative Properties Co.*, 812 F.3d 1295, 1307 (Fed. Cir. 2016)).

intent may be found sufficient based on a strong showing of materiality, and vice versa." *Therasense*, 649 F.3d 1276 at 1290.

Given this well-settled, exacting standard, courts routinely grant summary judgment in favor of defendants on *Walker Process* claims.[7]  *See Inline Packaging*, 962 F.3d at 1028 (affirming summary judgment on *Walker Process* claims because evidence did not show that "'the single most reasonable inference' to be drawn is that [defendant's employees] acted with a specific intent to deceive the USPTO") (cleaned up); *DeCurtis*, 2023 WL 2071915, at *6-8 (granting summary judgment on *Walker Process* claims due to "the dearth of any intent-to-deceive evidence at all, never mind enough to show that the intent to deceive is the single most reasonable inference to be drawn from the record"); *Chamberlain*, 2017 WL 3493799, at *8-9 (granting summary judgment on *Walker Process* claims because "the testimony and evidence adduced . . . simply falls short of yielding a single, most reasonable inference of specific intent to deceive").

Since the Court had narrowed Plaintiffs' *Walker Process* fraud claims at the motion to dismiss phase, Dkt. 119 at 21-27, Plaintiffs now offer two theories of J&J's alleged fraud during the '307 Patent prosecution, which in part attempt to resurrect claims that the Court has already rejected:[8]

*First*, they claim that J&J withheld from the PTO three categories of documents: (a) J&J's

---

[7]    Likewise, courts routinely grant summary judgment as to inequitable conduct in patent cases. *See Virginia Innovation Scis. Inc v. Samsung*, 11 F. Supp. 3d 622, 639-46 (E.D. Va. 2014) (granting summary judgment because "no reasonable fact finder could find by clear and convincing evidence that 'the applicant misrepresented or omitted material information with the specific intent to deceive the PTO'"); *Baxter Int'l, Inc. v. CareFusion Corp.*, 2022 WL 981115, at *8 (N.D. Ill. Mar. 30, 2022) ("Summary judgment on inequitable conduct claims is appropriate where the evidence does not support a finding that deceptive intent is the single most reasonable inference to be drawn therefrom.").

[8]    Notably, even though the biosimilar Stelara manufacturers had every incentive to challenge the '307 Patent for any reason, none of them ever raised an inequitable conduct argument.

postings to the CT.Gov website that provided updates on UNIFI as the trial progressed (the "CT.Gov Postings"); (b) J&J's UNIFI-related submissions to the FDA (the "FDA Submissions"); and (c) several "prior art" articles that discuss ustekinumab, CD, or UC (the "prior art").[9]  But it is undisputed that several of these documents (or their underlying information) were disclosed to the PTO, and Plaintiffs cannot point to record evidence that any duty-bound individual at J&J knowingly withheld any of this material with a specific intent to deceive.

*Second*, Plaintiffs claim that J&J made two misrepresentations during prosecution: (a) Mr. Dichter's statement that the '307 Patent claims were not anticipated "due to the uncertainty of clinical outcomes", and (b) the statement in the patent specification itself that "prior to the present invention, no studies had been conducted with ustekinumab for UC."  But this Court already found that the first statement cannot support a *Walker Process* claim, Dkt. 119 at 21-23, and Plaintiffs cannot show that either statement was false, let alone made with specific intent to deceive. Moreover, Plaintiffs have no evidence that either the alleged omissions or the alleged misrepresentations were but-for material.

### A.    J&J Did Not Withhold Documents Or Make Misrepresentations With Specific Intent To Deceive The PTO

#### 1.    J&J Did Not Knowingly Withhold Documents With Specific Intent To Deceive The PTO

To survive summary judgment regarding the alleged omissions, Plaintiffs must present evidence sufficient for a jury to find, by clear and convincing evidence, that a J&J employee with the duty of candor (1) "knew of the reference" (2) "knew that it was material" to patentability; and (3) "made a deliberate decision to withhold it."  *Therasense*, 649 F.3d at 1290.  Plaintiffs cannot meet this "demanding" test with respect to any of the three categories of documents they allege

---

[9]    A timeline for the FDA Submissions and CT.Gov Postings appears as Appendix A.

were withheld.  They have no evidence that any duty-bound individuals knowingly withheld these documents with the specific intent to deceive, let alone evidence from which intent to deceive is the single most reasonable inference.  *See Therasense*, 649 F.3d at 1290 ("[W]hen there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found"); *Inline Packaging*, 962 F.3d at 1017; *DeCurtis*, 2023 WL 2071915, at *6-8; *Chamberlain*, 2017 WL 3493799, at *8-9.

### (a)    The CT.Gov Postings Were Before The Examiner

Plaintiffs' claim that J&J withheld CT.Gov Postings from the PTO, Bahr Op. Rpt. ¶¶ 245-46, is directly contrary to the undisputed evidence: Mr. Dichter disclosed—and the Examiner considered—a search report that disclosed the August 2018 CT.Gov Posting, Statement of Undisputed Facts ("SUF") ¶ 28.  Further, the Examiner identified and accessed the August 2018 CT.Gov Posting, which indisputably has no substantive differences from any other CT.Gov posting published during the prosecution of the '307 Patent.  SUF ¶ 28.

Moreover, even if the evidence showed that any duty-bound employee deliberately withheld these postings—and it does not—there is no evidence that any such employee believed these postings were material to patentability.  Rather, Mr. Dichter's uncontradicted testimony is that he does not believe that the postings "affect[] the patentability of the claimed subject matter" because the "claimed subject matter"—the clinical results from J&J's UNIFI trial—were "distinguish[able]" from the CT.Gov Postings—which disclosed only J&J's proposal for *testing* Stelara in UC.[10]  SUF ¶¶ 13, 29; Ex. 7 ¶¶ 366-395.  That was correct: the CT.Gov Postings disclosed a plan for a *test*, not the test *results* showing that Stelara achieved the claimed clinical endpoints

---

[10]    While Plaintiffs' expert Mr. Bahr said that he found Mr. Dichter's testimony "unfathomable," Ex. 8 at 160:18-161:8, that is another way of saying that Mr. Dichter "should have known" that the postings were material to patentability, and that "cannot establish specific intent to deceive."  *Therasense*, 649 F.3d at 1290.

for UC.  SUF ¶29.  Because the evidence permits the inference that Mr. Dichter "concluded the [CT.Gov Postings] are not material to patentability," summary judgment is appropriate.  *Navico v. Garmin Int'l, Inc.*, 2017 WL 3701189, at *2 (E.D. Tex. Aug. 7, 2017) *report and recommendation adopted*, 2017 WL 3676787 (E.D. Tex. Aug. 25, 2017) (recommending summary judgment of no inequitable conduct); *Health Grades, Inc. v. MDX Med., Inc.*, 51 F. Supp. 3d 1069, 1079-80 (D. Col. 2014). (granting summary judgment of no inequitable conduct where inventor testified that "he did not think the [undisclosed references] were material to patentability because they did not disclose [certain claim limitations]").

### (b)    J&J Disclosed The Relevant Information In The FDA Submissions

Plaintiffs allege that J&J withheld certain submissions to the FDA—including the UNIFI Protocol, Pre-IND Briefing, and Clinical Study Reports—in which J&J suggested that it was "reasonable" to expect that Stelara would be effective for UC given the successful CD data and CD and UC's genetic relationship.  SUF ¶¶8, 12, 27.  This cannot support their antitrust claim.

First, as the Court has already noted, the Examiner *did* consider the UNIFI Protocol— including J&J's statement that the similarities of CD and UC made it "reasonable to assume that ustekinumab will also be effective in [UC]."  Dkt. 119 at 21-22 (dismissing allegations related to "misrepresentation of NCT 236").  The undisputed evidence confirmed that the Examiner accessed the CT.Gov website on July 13, 2020—when the UNIFI Protocol was available on that website for the Examiner to review.  SUF ¶28.

Moreover, even if Plaintiffs contend that the Examiner did not consider these documents, they cannot provide any evidence of the necessary "*deliberate decision*" to withhold information about the relationship between UC and CD because J&J *disclosed that information* during the '307 Patent prosecution.  *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1374–1375 (Fed. Cir. 2012).

Specifically, the '509 Application's specification explicitly disclosed the genetic relationship between CD and UC to the PTO, that ustekinumab was clinically effective in CD, and that some UC therapies demonstrate efficacy in CD.  SUF ¶¶17, 27.  As Plaintiffs' own expert testified, "disclosures are drafted and directed to those of [] of skill in the art," Ex. 8 at 29:21-30:5, and Dr. Ralat—the drafter of this section—testified that a person of ordinary skill would understand that this section conveyed J&J's expectation that its UNIFI trial would be successful for UC.  SUF ¶27.  Mr. Dichter also disclosed to the Examiner numerous articles that discussed the relationship between CD and UC.  SUF ¶21; *Chamberlain*, 2017 WL 3493799, at *6.

Further, there is no evidence that anyone at J&J with the duty of candor believed that these submissions were material to the patentability of the '307 Patent.  In fact, Plaintiffs did not even *ask* anyone at J&J about the materiality of these submissions, and Plaintiffs' experts did not identify any evidence suggesting that any duty-bound J&J employee believed these submissions were material.  SUF ¶27.  At most, Plaintiffs suggest that individuals at J&J *should have known* that these references were material, Ex. 8 at 82:12-19, but that does not establish actual belief in materiality.  Moreover, "[p]roving that the applicant…should have known of its materiality…does not prove specific intent to deceive."  *Therasense*, 649 F.3d at 1290.  As a result, "no evidence in the record" shows that any duty-bound J&J employees believed that the FDA submissions were material.  *See Crown Packaging*, 591 F. Supp. 3d at 66-67 (granting summary judgment); *Inline Packaging*, 962 F.3d at 1027 (affirming summary judgment because "the record lacks evidence that" relevant individuals "knew that the sales were material to the patentability of the asserted patents."); *Kimberly-Clark Worldwide, Inc., v. First Quality Baby Prods., LLC*, 2012 WL 529827, at *3 (M.D. Pa. Feb. 17, 2012) (granting summary judgment where prosecuting attorney "knew about and read the [non-disclosed reference]" but non-movant "fail[ed] to prove that he recognized

it as material.").

        **(c)**      **J&J Did Not Knowingly Withhold Any "Prior Art" References With Specific Intent to Deceive**

There is no evidence that any duty-bound J&J employee knowingly withheld any "prior art" reference with specific intent to deceive the PTO.  First, there is no evidence of *knowledge* for any of these references.  To satisfy the knowledge prong, Plaintiffs must prove that someone with a duty of candor had "actual knowledge" of the references, not simply that "a copy of the [reference] was in [someone's] files."  *See Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394, 396-97 (Fed. Cir. 1996).  Plaintiffs attempt to prove knowledge of only two sets of references: Dr. Ochsenkühn's abstracts and the Jostins/Granlund articles discussing the relationship between CD and UC.  Because Plaintiffs did not even *attempt* to demonstrate knowledge of the other references—and no such evidence exists—Plaintiffs' *Walker Process* theories related to those references must be dismissed.[11]

Moreover, the undisputed evidence shows that while certain '307 Patent inventors (along with many other J&J employees) received emails summarizing or attaching Dr. Ochsenkühn's abstracts along with numerous other abstracts or reports, these employees did not even know that they had these abstracts in their files, let alone read them.[12]  SUF ¶¶25-26.  Likewise, while certain '307 Patent inventors reviewed documents that *cited* the Jostins/Granlund articles, there is no

---

[11]    *See supra* n. 4.

[12]    While Janssen's German subsidiary sponsored Dr. Ochsenkühn's attendance at Digestive Diseases Week ("DDW") 2018 and asked him to present at a "special session" that was conducted in German, there is no evidence that any J&J US employee—let alone anyone with a duty of candor—attended the special session or met with Dr. Ochsenkühn, and Dr. Ochsenkühn testified that he did not know the '307 Patent inventors or Eric Dichter.  Ex. 32 at 44:14-20, 60:10-15, 77:1-84:5, 110:7-9, 148:5-6; Ex. 65 at 149:11-16; 254:11-15.  Moreover, Janssen did not sponsor Dr. Ochsenkühn's research, and there is no evidence that Janssen invited Dr. Ochsenkühn to any conference other than DDW 2018.  Ex. 32 at 24:7-15; Ex. 65 at 104:11-16.

evidence that they read or reviewed the Jostins/Granlund articles themselves.  SUF ¶26.

In addition, and critically, Plaintiffs can offer no evidence that these references were deliberately withheld, because nothing in the record shows that any duty-bound employee intentionally decided to withhold these references from the PTO.  *Giuliano v. SanDisk LLC*, 705 F. App'x 957, 961 (Fed. Cir. 2017) (affirming summary judgment and noting that "the mere presence of an undisclosed reference, where there [is] no evidence showing that the patentee had searched and found a copy of that reference during the prosecution of the patent, [is] not enough to show an intent to deceive . . . for *Walker Process* claims.")  Plaintiffs have thus failed to provide any evidence of specific intent to deceive, and the Court should grant summary judgment.  *Inline Packaging*, 962 F.3d at 1028 (granting summary judgment based on the reasonable inference that the inventors were "completely unaware of the existence of specific information later discovered."); *DuraSystems*, 666 F. Supp. 3d at 770–71 (C.D. Ill. 2023); *Intercontinental*, 118 F. Supp. 3d at 1045 (granting summary judgment because "there are many alternative reasonable inferences," such as "that Exner did not see the e-mail [or] forgot about the e-mail"); *Ironburg Inventions Ltd. v. Valve Corp.*, 418 F. Supp. 3d 622, 632-35 (W.D. Wash. 2019), *aff'd and vacated in part,* 64 F.4th 1274 (Fed. Cir. 2023).

### 2.    J&J Did Not Make False Representations With Specific Intent To Deceive The PTO

Plaintiffs claim that two of J&J's statements during prosecution of the '307 Patent were misrepresentations: (1) Mr. Dichter's argument to the Examiner that J&J's UNIFI clinical posting did not inherently anticipate or render obvious the claimed clinical endpoints "due to the uncertainty of clinical outcomes" and (2) the '509 Application's statement that "[p]rior to the present invention, no studies had been conducted with ustekinumab for UC."  To show liability, Plaintiffs must show that these statements were "false representation[s]" and J&J made them with

"intent to deceive the patent examiner." Dkt. 119 at 13 (citing *Nobelpharma*, 141 F.3d at 1070–71). Plaintiffs cannot do so.

      (a)     **The "Uncertainty of Clinical Outcomes" Statement Was Neither False Nor Made With Intent To Deceive**

In responding to the Examiner's initial rejection of the '509 Application based on the UNIFI clinical trial posting, Mr. Dichter *argued* that the posting did not inherently anticipate or render obvious the claimed endpoints "due to the uncertainty of clinical outcomes." This Court has already found that that statement—as well as other statements that Mr. Dichter made about the non-obviousness of the '509 Application claims—cannot support Plaintiffs' *Walker Process* fraud claims because the Examiner had the UNIFI Protocol before him and was "free to reach his own conclusion and accept or reject" Mr. Dichter's arguments. Dkt. 119 at 21-23 (citing *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1349 (Fed. Cir. 2007)). Plaintiffs cannot resurrect this theory now.

And, of course, Mr. Dichter's statement was not a misrepresentation of *fact*. Rather, as Plaintiffs' expert Robert Bahr conceded, Mr. Dichter's statement was an "argument," Bahr Tr. at 99:13-22, and "arguments . . . as a matter of law, cannot form the basis of a *Walker Process* fraud claim." *Giuliano*, 224 F. Supp. 3d at 863 (granting summary judgment when patentee's purported "misrepresentation" was an argument about how a person of ordinary skill would understand a claim element); *see also Nobelpharma*, 141 F.3d at 1068 (*Walker Process* claimant must prove that the patentee "knowingly and willfully misrepresent[ed] facts"); *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000) (argument that "merely advocated a particular interpretation of the [prior art], which the Examiner was free to accept or reject[,] did not contain any factual assertions that could give rise to a finding of misrepresentation.").

Further, Mr. Dichter's statement was accurate. It is undisputed that the outcomes of clinical trials are uncertain. Plaintiffs' own clinical trial expert conceded that Phase III trials fail 40-50%

of the time.  SUF ¶4.  Mr. Dichter's statement was also fully consistent with J&J's FDA submissions, which conveyed J&J's uncertainty about its UNIFI trial by noting that Stelara may "prove to be ineffective" and that "[t]he study may be stopped for futility" if the subjects did not achieve certain endpoints.  SUF ¶11.

Finally, Mr. Dichter's unchallenged testimony confirms that he made this statement in good faith ████████████████████████████████████████████  SUF ¶21. Accordingly, "[t]he evidence here does not establish [] that the single most reasonable inference to be drawn is that [Mr. Dichter] acted with a specific intent to deceive the USPTO," and the Court should grant summary judgment.  *See Inline Packaging*, 962 F.3d at 1028 (granting summary judgment on *Walker Process* claims).

### (b) The "No Studies" Statement Was Neither False Nor Made With Intent To Deceive

The statement that "[p]rior to the present invention, no studies had been conducted with ustekinumab for UC" was also accurate.  The face of the specification itself confirms that "studies" refers to "clinical studies," and it is undisputed that that no *clinical* studies had been conducted for Stelara in UC prior to UNIFI.  SUF ¶5.  Statements in patent specifications "must be read in context of the entire specification."  *Rambus Inc. v. Infineon Techs. Ag.*, 318 F.3d 1081, 1094 (Fed. Cir. 2003), and the specification as a whole is directed to "methods of providing a *clinically* proven safe and *clinically* proven effective treatment of ulcerative colitis."  SUF ¶15.  Moreover, when the "no studies" statement is read in context with the immediately preceding paragraphs, it conveys that certain treatments approved for UC were effective in CD, that UC and CD were genetically related, and that while "*clinical* studies" showed that Stelara was an effective treatment for CD, "no studies" had been conducted with Stelara in UC.  SUF ¶17.  The only reasonable interpretation of the phrase "no studies" is that it was meant to refer to the absence of clinical studies related to

28

UC in contrast to the discussion of "clinical studies" related to CD, and it is undisputed that a person of ordinary skill would read it that way.  SUF ¶19.

Plaintiffs rely on Mr. Bahr's opinion that "studies" meant "no studies of any kind," Ex. 66 ¶112, but "patent specification[s are] directed to one of ordinary skill in the art."  *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 866 (Fed. Cir. 1993).  Mr. Bahr admitted that he is not "a person of ordinary skill in *any* art," let alone the subject matter of the '307 Patent.  Ex. 8 at 29:21-30:5, 34:3-17 (emphasis added).  His understanding of the specification is therefore irrelevant and cannot create a fact issue at summary judgment.  *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1376-77 (Fed. Cir. 2022).

Plaintiffs also suggested that J&J's employees had a duty to search for prior art references before making this statement, but as Plaintiffs' expert Mr. Bahr conceded, that is contrary to the law.  Ex. 8 at 255:7-256:14; *see also* Manual of Patent Examining Procedure ("MPEP") § 410 ("37 CFR 11.18 does not create any new duty on the part of an applicant for patent to conduct a prior art search."); *Nordberg*, 82 F.3d at 397 (patent applicant "has no duty to conduct a prior art search").

Finally, specific intent to deceive is not the single most reasonable inference from the evidence.  There is no record evidence that the duty-bound J&J employees knew about the "prior art" references, and the uncontradicted evidence demonstrates that Mr. Dichter and Dr. Ralat believed this statement was accurate when they included it in the specification.  SUF ¶17.  "Even if [they] were incorrect in their beliefs"—which they were not—"without any evidence in the record showing that [they] were lying, the most that can be inferred is a mistake," not specific intent to deceive.  *See DeCurtis*, 2023 WL 2071915, at *8 (granting summary judgment on *Walker Process* claims because deceptive intent was not the "single most reasonable inference").

**B.** **There Is No Evidence That The Non-Disclosed References Or Alleged Misrepresentations Are But-For Material**

Plaintiffs' *Walker Process* fraud claims also fail because there is no evidence that the PTO would not have allowed the '307 Patent but-for J&J's alleged omissions or misrepresentations.

**1.** **None of the Allegedly Non-Disclosed Documents Are But-For Material**

While "the materiality required to establish inequitable conduct is *but-for* materiality," *Therasense*, 649 F.3d at 1291, Plaintiffs' experts did not explicitly opine that any reference was but-for material.[13] *See* Ex. 66 ¶52; Ex. 29 ¶¶111-145; Ex. 30 at 140:15-142:5. This alone defeats their *Walker Process* claim. Moreover, the undisputed record confirms that the allegedly non-disclosed documents are not but-for material.[14]

**(a)** **The FDA Submissions Are Not But-For Material**

Information is not material to patentability when it is "cumulative to information already of record" during prosecution. 37 C.F.R. § 1.56(b). Here, the FDA Submissions—which disclosed the CD clinical data and UC and CD's genetic similarities—are cumulative of information before the PTO during the '307 Patent prosecution: (1) the '509 Application specification, which disclosed that certain biologics approved for UC were effective for CD, that Stelara targets the IL-12/IL-23 pathways that play a role in CD and UC, and that Stelara was approved for CD, and (2)

---

[13] Nor could they. J&J has filed Rule 702 motions to exclude these experts (Lisa Matovcik and Robert Bahr) because they are not POSAs in the subject matter of the '307 Patent and thus cannot provide technical opinions related to the '307 Patent or the "non-disclosed" documents.

[14] Plaintiffs cannot argue that Mr. Dichter violated a duty by not disclosing the Federal Circuit's *In re Montgomery* decision to the PTO., Ex. 27 ¶¶284-85, because the Court found that it is "not [] reasonable" to infer that the Examiner was not aware of *In re Montgomery*, so the "non-disclosure" of this decision could not have affected the '307 Patent prosecution. Dkt. 119 at 22-23; Dkt. 36 ¶¶133-34. Further, Plaintiffs' expert Mr. Bahr conceded that patent practitioners are not required to disclose decisions that they do not know about, ███████████████████████████████████████████████████████████ Ex. 8 at 262:19-263:21; 37 CFR § 11.303(a)(2); Ex. 24 at 103:10-22. Finally, Mr. Bahr did not opine that anyone at J&J violated a duty by not disclosing this decision. Ex. 8 at 263:23-264:10.

the articles that Mr. Dichter submitted during prosecution that disclosed CD and UC's genetic similarities and Stelara's effectiveness for CD.  SUF ¶ 17, 21; Ex. 1 at 2:38-3:19.  Plaintiffs' experts insisted that J&J failed to disclose CD and UC's genetic relationship, but the face of the '307 Patent itself contradicts that assertion.  Ex. 29 ¶143; Ex. 66 ¶107; Ex. 1 at 2:38-3:19.  The FDA Submissions were thus cumulative of information already before the PTO and not but-for material.  *See In re Katz Interactive Call Processing Patent Litig.*, 821 F. Supp. 2d 1135, 1160-61 (C.D. Cal. 2011) (granting summary judgment because non-movant "never explains what limitations found in the [] undisclosed references are not found in the cited references"); *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1361 (Fed. Cir. 2008).

### (b)    The CT.Gov Postings Are Not But-For Material

Plaintiffs cannot show that the CT.Gov Postings are but-for material because it is undisputed that (1) the PTO allowed the claims after considering the August 2018 Clinical Posting and (2) there are no substantive differences between this posting and any other posting J&J published during the '307 Patent prosecution.  SUF ¶¶ 20-23, 28.  Plaintiffs thus cannot show that "the PTO would not have allowed a claim *had it been* aware of the [postings]" because the PTO *was* aware of them and allowed the '307 Patent.  *Therasense,* 649 F.3d at 1291.

### (c)    The "Prior Art" References Are Not But-For Material

Plaintiffs cannot show that the "prior art" references are but-for material.  These references do not render the '307 Patent obvious because they do not disclose the claimed dosing regimen or a "clinically proven" effective treatment of UC as defined by the endpoints of J&J's UNIFI study or the '307 Patent: they involve small sample sizes, lack statistical significance, and are not placebo-controlled, double-blinded studies.  SUF ¶ 25; Ex. 7 ¶¶190-466.  Dr. Ochsenkühn also admitted that his abstracts did not disclose the claimed endpoints.  SUF ¶ 25.  Further, Plaintiffs' experts did not "compare the [non-disclosed references] *to the claims of the ['307] Patent*."  *Joy*

*MM Del. Inc. v. Cincinnati Mine Mach. Co.*, 834 F. Supp. 2d 360, 384-85 (W.D. Pa. 2011), *rev'd on other grounds*, 497 F. App'x 970 (Fed. Cir. 2012); Ex. 30 at 269:2-20; Ex. 8 at 278:1-23; Ex. 67 ¶¶172-196. Instead, they relied on broad comparisons, including that the Ochsenkühn abstracts purportedly disclose the effective treatment of UC with Stelara and that Jostins/Granlund disclose UC and CD's genetic relationship. Ex. 66 ¶89; Ex. 29 ¶¶121-27; Ex. 27 ¶265; Ex. 21 ¶¶164-185; Ex. 67 ¶¶172-196. That cannot show but-for materiality. *Joy MM*, 834 F. Supp. 2d at 385 (no materiality when expert merely opined on "[g]eneral similarities between" and "common benefits of" the invention and non-disclosed product); *Chamberlain*, 2017 WL 3493799, at *4.

### 2. The Alleged "Misrepresentations" Were Not But-For Material

J&J's two alleged "misrepresentations"—Mr. Dichter's argument about "the uncertainty of clinical outcomes" and the specification's statement about no prior studies for Stelara in UC— were not but-for material. The Court found that the "uncertainty of clinical outcomes" statement could not be material because "NCT 236," including the UNIFI Protocol, was before the Examiner, who was "free to…accept or reject" Mr. Dichter's arguments. Dkt. 119 at 21-23. Further, Plaintiffs' own experts did not opine that the "no studies" statement was but-for material, and while they speculated that the "uncertainty of clinical outcomes" statement led to the '307 Patent's allowance, they offered no evidence to support this view and ignored that the Notice of Allowability did not mention this statement. Ex. 27 at ¶¶278-79; Ex. 8 at 97:7-100:6, 261:10-22; Ex. 29 ¶60. Rather, the Examiner's Notice of Allowability noted only that the '908 Publication did not invalidate the claims. SUF ¶ 22. Plaintiffs thus have "failed to raise a fact issue on but-for materiality," and the Court should grant summary judgment. *Stoller Enters., Inc. v. Fine Agrochemicals Ltd.*, 705 F. Supp. 3d 774, 807 (S.D. Tex. Nov. 30, 2023).

## II. The Momenta Acquisition Was Not Anticompetitive

A monopolization claim requires "willful" acquisition of monopoly power. *See* Dkt. 328

at 7 (holding that "[a] failure of willfulness would defeat" Plaintiffs' monopolization claim); *see also Friedman*, 672 F. Supp. at 195 (granting summary judgment on monopolization claim because "no evidence" showed that "defendants had any intent to monopolize"). Establishing willfulness requires evidence showing "monopolistic intent"—*i.e.*, that a defendant acted for anticompetitive purposes and that "a jury could find no valid business reason or concern for efficiency" for the conduct. *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 710 (4th Cir. 1991) (quoting *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 105 (4th Cir. 1987)); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 735 (D. Md. 2002) (granting summary judgment on monopolization claims when "there is no evidence that any particular conduct was without efficiency and instead was aimed at driving out competitors").

Purchasing patents may constitute willful monopolization if "the dominant competitor in a market acquires a patent covering a substantial share of the same market that [it] know[s] when added to [its] existing share will afford [it] monopoly power." Dkt. 119 at 29 (quoting *SCM*, 645 F.2d at 1207). In addition, because "a monopolist's act must have an anticompetitive effect" to be unlawful, patent acquisitions are only anticompetitive if they "harm the competitive process and thereby harm consumers." *Crawl Space Door Sys., Inc. v. SmartVent Prods., Inc.*, No. 2:19-CV-320, 2020 WL 13691776, at *5 (E.D. Va. Apr. 28, 2020) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001))). This analysis must focus on "circumstances [] at the time of the acquisition." Dkt. 119 at 29 (quoting *SCM*, 645 F.2d at 1207).

Therefore, Plaintiffs must show that, at the time of the acquisition, (a) J&J *knew* it was acquiring monopoly power in an alleged market for Stelara, which motivated the acquisition, and (b) the acquisition had anticompetitive effects *at the time of the acquisition*. *Id.* Plaintiffs cannot make either showing. First, it is undisputed that J&J purchased Momenta for reasons entirely

33

unrelated to the Momenta Manufacturing Patents or Stelara, ██████████████████ ███████████████████, and could not have known that they might someday be asserted against biosimilar Stelara manufacturers.    Second, J&J's acquisition of the Momenta Manufacturing Patents in 2020 had no anticompetitive effects whatsoever.

Allowing Plaintiffs' monopolization claims to move forward under these circumstances risks placing an unprecedented burden on parties to corporate acquisitions to extensively diligence every patent and patent application being acquired in a transaction (here, more than 500) and engage in a speculative analysis regarding the potential for theoretically possible future competitive impacts.  This Court would be the first to ever do so.  Not even the federal antitrust agencies place such a burden on parties to an acquisition.  Ex. 48 ¶¶18, 31-32.

**A.    The Undisputed Record Shows That J&J Did Not Have The Required Intent to Monopolize**

    **1.**    ████████████████████████████████ ████████████████

All of the evidence surrounding J&J's acquisition of Momenta shows the Momenta Manufacturing Patents had nothing to do with the Momenta acquisition.  ██████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████  ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████  Plaintiffs cannot point to any

---

[15]    The remaining 5% was attributed to a biosimilar version of Eylea.  SUF ¶32.

evidence that the Momenta Manufacturing Patents played any role in J&J's acquisition of Momenta. *Id.*

2. 

SUF ¶35.  Momenta had over 500 patents, patent applications, and patent application publications at the time of the acquisition,

SUF ¶33-34.

SUF ¶35.

### 3.    J&J Could Not Have Known That Future Biosimilar Manufacturers Might Someday Infringe The Momenta Manufacturing Patents.

Finally, even if J&J knew what the Momenta Manufacturing Patents claimed when it acquired them in 2020, it still could not have predicted the future and known that they might at some point be infringed by future biosimilar Stelara manufacturers.  The Momenta Manufacturing Patents cover one specific way of making biologic drugs.  SUF ¶34.

SUF ¶37.  Simply owning or acquiring these patents does not give J&J the ability to prevent biosimilar competition.  *Cf. Mylan Pharma., Inc. v. Warner Chilcott Public Ltd. Co.*, 838 F.3d 421, 438 (3d Cir. 2016) (affirming summary judgment on monopolization claim when "companies were free to engineer their own versions" of a product).

For J&J to have had the requisite intent to monopolize a market by acquiring these patents

to block biosimilar competition, then, ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████  Nor can it

because biosimilar manufacturers do not publicly disclose their manufacturing process.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████  SUF ¶¶38-39.

        Indeed, █████████████████████████████████████████████████████

███████████████████████████████  SUF ¶¶40-41.  This underscores that J&J did not

(and had no way to) know that the patents had any relevance to manufacturing biosimilar Stelara

at the time of the Momenta acquisition, confirming that Plaintiffs cannot show that J&J *willfully*

acquired monopoly power in 2020.

    **B.    The Momenta Acquisition Had No Effect On Competition At The Time The Acquisition Took Place In 2020.**

        As this Court recognized, any potential anticompetitive effects of patent acquisition must

be evaluated "at the time of the acquisition."  *See* Dkt. 119 at 29; *SCM Corp.*, 645 F.2d at 1207;

*Crucible, Inc. v. Stora Kopparbergs Bergslags AB*, 701 F. Supp. 1157, 1162 (W.D. Pa. 1988)

(granting summary judgment on monopolization claim when there was no anticompetitive conduct

"at the time of the patent acquisitions").  And at the time of J&J's acquisition of the Momenta

Manufacturing Patents in 2020, there was no effect whatsoever on biosimilar ustekinumab.  ████

████████████████████████████████████████████████████████████████

SUF ¶34.  Further, the first BLA for biosimilar ustekinumab was not filed until two years after the

acquisition closed.  SUF ¶38.  *See SCM*, 645 F.2d at 1211-12 (holding that "as a matter of law," if

a company lawfully acquires patents that do not confer market power, then it "must be entitled to hold them free from the threat of antitrust liability").

The fact that J&J *later* enforced the Momenta Manufacturing Patents (years after J&J acquired them) does not change this conclusion. ███████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████ This had no effect on competition in 2020, and it would have been impossible then to even speculate about any *theoretical* anticompetitive effects it might have had in the future because it was impossible to know at the time of the acquisition whether the Momenta Manufacturing Patents were relevant to making biosimilar Stelara.

## III.    Plaintiffs Fail to Establish Antitrust Injury

Plaintiffs must also show that J&J's alleged misconduct caused antitrust injury. *SSS Enters., Inc. v. Nova Petroleum Suppliers, LLC*, 2012 WL 3866490, at *2 (E.D. Va. Aug. 30, 2012). Antitrust injury is "injury of the type the antitrust laws were designed to prevent," that "flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc*., 429 U.S. 477, 489 (1977). If Plaintiffs cannot make this showing, summary judgment is appropriate. *SSS Enters.,* 2012 WL 3866490, at *3; *National Bd. For Certification in Occupational Therapy, Inc. v. American Occupational Therapy Ass'n*, 24 F. Supp. 2d 494, 509 (D. Md. Sept. 30, 1998). Because Plaintiffs concede that '307 Patent would not have delayed biosimilar entry at all, Plaintiffs' claims must fail.

### A.    The Entry Dates For Biosimilars Stem From Lawful Settlements, Not Anticompetitive Conduct.

The negotiated biosimilar entry dates that Plaintiffs here claim as "delay" flow from each of the biosimilar manufacturers' rational, independent business decisions to enter into settlement agreements with J&J, not from J&J's conduct. Plaintiffs have never challenged these settlements

37

as unlawful, and nothing in the record remotely suggests they are.  Ex. 55 ¶¶59, 88; DeFranco Tr. 288:24-289:25.  Rather, these agreements are "commonplace" early-entry licensing agreements that are not "subject to antitrust liability."  *FTC v. Actavis*, 570 U.S. 136, 151-52, 158 (2013); *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 407-08 (3d Cir. 2017) ("[T]he *Actavis* Court expressly identified early-entry licensing as a traditional form of settlement whose legality the opinion took pains not to disturb[.]") (internal quotations omitted); *In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752, at *14 (S.D.N.Y. Sept. 22, 2015) ("[T]he settlements at issue simply granted the Generic Defendants a compromise date of generic entry— the very type of settlement sanctioned by the *Actavis* Court.").

Further, there is no dispute that biosimilar manufacturers have every incentive to launch their biosimilar Stelara products as quickly as possible.  SUF ¶¶42-43.  But because J&J had patents that, if valid and infringed, could lead a court to enjoin them from entering, rational biosimilar manufacturers "might . . . not enter . . . until that risk was mitigated."  Kesselheim Tr. 40:19-41:7, 48:4-14.  The biosimilar manufacturers here thus faced a choice: they could either (1) launch at risk of an adverse patent decision, or (2) agree to early entry dates.  *Id.* 48:16-49.  Here, *every* biosimilar manufacturer settled with J&J—including the manufacturers who had begun the process of challenging the validity of J&J's patents in litigation.  SUF ¶¶42-43.  Plaintiffs should not be permitted to second-guess the judgments of sophisticated biosimilar manufacturers to enter into such lawful settlements after weighing the risks and benefits of proceeding with patent challenges.  And because the purportedly delayed entry dates flow from these agreements, Plaintiffs cannot show antitrust injury.  *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 164–70 (3d Cir. 2017) (finding no antitrust injury and affirming summary judgment when delayed generic entry was caused by independent lawful conduct).

### B.    Plaintiffs Offer No Evidence That The '307 Patent Delayed Biosimilar Entry

In addition, Plaintiffs cannot show antitrust injury for their *Walker Process* claim because there is no evidence that the '307 Patent delayed biosimilar entry.  Rather, Plaintiffs' expert, Ms. Wang, opined that—regardless of the '307 Patent—manufacturers of biosimilar Stelara would have launched upon FDA approval with "all indications" because method-of-use patents like the '307 Patent are not "significant barriers for launch."  SUF ¶44.  She could not recall any examples of "a method-of-use patent [becoming] a strong barrier" for launch.  *Id.*  As a result, Plaintiffs cannot show that the '307 Patent delayed the launch of biosimilar ustekinumab or otherwise caused antitrust injury,[16] and the Court should grant summary judgment on Plaintiffs' *Walker Process* claims.  *Wellbutrin*, 868 F.3d at 166-67.

## IV.    Plaintiffs' State Law Claims Fail

Plaintiffs' state law claims fail for the same reasons as the federal antitrust claims. Plaintiffs concede that their state law antitrust and consumer protection claims are derivative of their federal antitrust claims.  *See* Dkt. 349-5 at 13-32 (collecting cases showing that state antitrust and consumer protection laws are interpreted in harmony with federal law); *see also* Dkt. 46 at 25-29.  Accordingly, "summary judgment is warranted as to Plaintiffs' state law [] claims for the same reasons as their federal claims."  *Imaging Ctr., Inc. v. W. Md. Health Sys.*, 2004 WL 3168776, at *6 n.6, (D. Md. Aug. 10, 2004); *Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 878 F. Supp. 804, 818 (D. Md. 1995), *aff'd*, 91 F.3d 132 (4th Cir. 1996) (granting summary judgment on state law antitrust claim after dismissing Sherman Act claim).  Plaintiffs' unjust enrichment claims should be dismissed for the same reason. *See In re Aluminum Warehousing*

---

[16]    Additionally, Plaintiffs' expert Mr. Clark testified that "the '307 patent would not have served as a deterrent" to launch because the biosimilar manufacturers would have launched with "skinny labels" with a UC indication.  SUF ¶45.

*Antitrust Litig.*, 2014 WL 4743425, at \*4 (S.D.N.Y. Sept. 15, 2014), *aff'd*, 833 F.3d 151(2d Cir. 2016) (dismissing unjust enrichment claims with federal claims because they were "predicated on defendants' alleged violations of antitrust or consumer protection laws"); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 765 (7th Cir. 2015).

Finally, Plaintiffs' state law claims based solely on allegations of fraud on the PTO should be dismissed because "federal patent law preempts any state antitrust cause of action premised on [J&J's] alleged bad faith conduct before the PTO." *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 544 (E.D.N.Y. 2005), *aff'd in part sub nom. Arkansas Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98 (2d Cir. 2010) (dismissing state law antitrust claim); *see also Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1380-83 (Fed. Cir. 2000) (affirming summary judgment dismissing state law claim as preempted because it "occup[ied] a field identical in scope with the inequitable conduct defense").

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion and enter summary judgment in favor of Defendants.

Dated: August 6, 2025

Respectfully submitted,

*/s/ Christina Guerola Sarchio*
George G. Gordon *(pro hac vice)*
Julia E. Chapman *(pro hac vice)*
Katherine Unger Davis *(pro hac vice)*
Forrest E. Lovett *(pro hac vice)*
Judah Bellin *(pro hac vice)*
David M. Costigan *(pro hac vice)*
**DECHERT LLP**
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Tel.: (215) 994 4000
Fax: (215) 994-2222
george.gordon@dechert.com
julia.chapman@dechert.com
katherine.ungerdavis@dechert.com
forrest.lovett@dechert.com
judah.bellin@dechert.com
david.costigan@dechert.com

Christina Guerola Sarchio VSB No. 87166
**DECHERT LLP**
1900 K Street, NW
Washington, DC 20006
Tel.: (202) 261-3300
Fax: (202) 261-3333
christina.sarchio@dechert.com

Katherine A. Helm *(pro hac vice)*
**DECHERT LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel.: (212) 698-3500
Fax: (212) 698-3599
khelm@dechert.com

Amanda K. Antons *(pro hac vice)*
**DECHERT LLP**
230 Northgate Street #209
Lake Forest, IL 60045
Tel.: (312) 646-5800
Fax: (312) 646-5858
amanda.antons@dechert.com

*Counsel for Defendants Johnson & Johnson and Janssen Biotech, Inc.*

<u>**Appendix A - Timeline of Documents Related to UNIFI Study**</u>

<u>**Relevant FDA Submissions**</u>

- **Dec. 18, 2014**: "Briefing Document for Pre-IND/Pre-Phase 3 Meeting" (the "Pre-IND Briefing")

- **Jan. 21, 2015:** "Pre-IND Meeting – Stelara in Adult Ulcerative Colitis"

- **Mar. 17, 2015**: "Clinical Protocol CNTO1275UCO3001 (Phase 3)" (the "UNIFI Protocol")

- **July 14, 2015**: UNIFI Protocol Amendment 1

- **Apr. 20, 2016**: UNIFI Protocol Amendment 2

- **July 13, 2018**: "Clinical Study Report: A Phase 3, Randomized, Double-blind, Placebo-controlled, Parallel-group, Multicenter Study to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy in Subjects with Moderately to Severely Active Ulcerative Colitis (UNIFI)" (July 13, 2018)"

- **Nov. 1, 2018**: "Clinical Study Report: A Phase 3, Randomized, Double-blind, Placebo-controlled, Parallel-group, Multicenter Study to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy in Subjects with Moderately to Severely Active Ulcerative Colitis (UNIFI)"

<u>**Relevant CT.Gov Postings**</u>

- **March 3, 2015 – August 13, 2018**: FDA, ClinicalTrials.gov, Study Record NCT02407236, "A Study to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy in Participants with Moderately to Severely Active Ulcerative Colitis (UNIFI)." (the "CT.Gov Postings")

  o **September 6, 2017**: CT.Gov Posting

  o **August 13, 2018:** CT.Gov Posting