# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., CAREFIRST BLUECHOICE, INC., and CFA, LLC d/b/a CAREFIRST ADMINISTRATORS, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> JOHNSON & JOHNSON and JANSSEN BIOTECH, INC., <br><br> Defendants. | Case No. 2:23-cv-00629-JKW-LRL <br><br> **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY** |

## REBUTTAL EXPERT REPORT OF DR. SUE LIM

April 28, 2025

32.     Notably, as described in the above excerpt, the FDA itself observes that "Phase 3 studies usually include from several hundred to several thousand subjects."[20]

33.     The substantial evidence requirement for effectiveness described in the CFR has been generally interpreted by the FDA as the need for two adequate and well-controlled studies.  In my experience and based on my knowledge of FDA practices and procedures, positive efficacy and safety results from two adequate and well-controlled studies which are most typically "Phase 3" trials, is the most common way to achieve the substantial evidence of effectiveness requirement to obtain FDA approval for a new drug for a new indication, or a subsequent new indication for a previously approved drug.  Of course, there are exceptions to this requirement, such as certain drugs for orphan and rare diseases,[21] and life-threatening diseases where there is unmet medical need, but I note that none of these situations apply here.

34.     21 C.F.R. § 314.126, titled "Adequate and well-controlled studies," defines the criteria for adequate and well-controlled studies, which are essential for demonstrating the efficacy of a drug.[22]  Specifically, this section outlines several key requirements, including that the study must have clear objectives and hypotheses, ensuring that the purpose is well-defined and measurable.  The study design must be appropriate for the objectives and capable of providing a valid comparison with a control group, typically involving randomization to minimize bias.  The use of control groups, such as placebo controls, active treatment controls, historical controls, or no-treatment controls, is required, and the choice must be justified and appropriate for the study objectives.  Whenever possible, the study must also be double-blind, meaning that neither the participants nor the investigators know which treatment the participants are receiving.  The FDA notes that "[u]ncontrolled studies or partially controlled studies are not acceptable as the sole basis for the approval of claims of effectiveness."[23]

35.     Section 314.126 also requires the methods of assessing the drug's effects to be well-defined and reliable, including the primary and secondary endpoints, the timing of assessments, and the procedures for measuring outcomes.  The study must include a detailed statistical analysis plan, specifying the statistical methods to be used, the sample size calculation, and the criteria for determining statistical significance, often involving the use of p-values.[24]

---

[20] 21 C.F.R. § 312.21(c).

[21] A rare disease is a disease or condition that affects under 200,000 individuals in the United States at the time of designation.  21 C.F.R. § 316.

[22] 21 C.F.R. § 314.126.

[23] *Id.* § 314.126(e).

[24] *Id.* § 314.126(b)(7).

37.    These guidance documents collectively describe the key principles and considerations for designing and conducting clinical trials to determine safety and efficacy.  I address the primary relevant considerations below.

38.    **Sample Size**: The FDA has emphasized that "[t]he number of participants (sample size) in a study should be large enough to provide a reliable answer to the questions addressed."[33]  The FDA has further noted that "[a]dequate and well-controlled clinical investigations provide the primary basis for determining whether there is substantial evidence to support the claims of effectiveness."[34]  Having an adequate sample size in a clinical trial is crucial for several reasons.  Firstly, it ensures that the study has sufficient statistical power to detect a true effect of the treatment.  A larger sample size reduces the margin of error and increases the precision of the estimated treatment effects, making the results more reliable and generalizable to the broader population.  Additionally, a well-powered study minimizes the risk of false positive or false negative errors, thereby enhancing the validity of the conclusions drawn.  Also, a larger sample size can better account for variability among participants, ensuring that the findings are not unduly influenced by outliers or anomalies.

39.    The FDA has also published an overview of the clinical trial process on its website, noting the average sample size, which I summarize in the table below:[35]

| Phase | Sample Size | Purpose |
| --- | --- | --- |
| Phase 1 | 20-100 | Safety and dosage |
| Phase 2 | Several hundred | Efficacy and side effects |
| Phase 3 | 300-3,000 | Efficacy and monitoring of adverse reactions |
| Phase 4 | Several thousand | Safety and efficacy |

40.    **Statistical Significance**: The FDA guidance documents also discuss the general need for a statistically significant result for the primary endpoint to support a claim of effectiveness.[36]  Statistical significance refers to the likelihood that the observed

---

[33] FDA 2022 E8 Guidance at 15.

[34] FDA 2019 Biological Products Guidance at 5.

[35] Step 3: Clinical Research (January 4, 2018), https://www.fda.gov/patients/drug-development-process/step-3-clinical-research.

[36] *See* FDA 1998 E9 Guidance at 4 and 32.

Randomization ensures that both known and unknown factors which could affect the outcome are equally distributed across the study groups. A double-blind study is one in which neither the participants nor the researchers know who is receiving the experimental treatment and who is receiving the placebo/active control. This method helps prevent bias in how the participants report their symptoms, how the researchers interpret the results, and ensures that the outcomes are not influenced by expectations or preconceived notions about the experimental treatment's effectiveness or safety.

45.    Reducing bias is particularly important for trials evaluating gastrointestinal ("**GI**") diseases such as ulcerative colitis because these conditions often have subjective symptoms that can be influenced by psychological factors, such as abdominal pain, cramping, and the frequency and urgency of bowel movements. For example, the perception of pain or discomfort can vary greatly among individuals and can be affected by their expectations of the treatment or knowledge of treatment allocation. A double-blind study design helps ensure that the reported outcomes are more reliable, and that the effectiveness of the treatment when compared to the placebo/active control can be accurately assessed.

46.    Another method to reduce bias is to manage confounding factors which could lead to inaccurate conclusions of drug effect through careful definition of inclusion and exclusion criteria. For example, specifying that eligible subjects cannot have received another investigational product in a specific period of time before enrolling in the current trial is a common criterion. This ensures that any observed effects are attributed to the investigational product in question, and not a carryover effect from the previous investigational treatment.

47.    **<u>Clinical Endpoints</u>**: A clinical endpoint is a characteristic or variable that directly measures a therapeutic effect of a drug – an effect on how a patient feels (e.g., symptom relief), functions (e.g., improved mobility), or survives. The FDA guidance documents note the importance of clinical endpoints, explaining that "[t]he primary endpoint should be capable of providing clinically relevant and convincing evidence related to the primary objective of the study."[42]

48.    The FDA has published guidance specific to ulcerative colitis endpoints in August 2016, titled "Ulcerative Colitis: Clinical Trial Endpoints," which Drs. Warfield and Dontabhaktuni do not cite or mention in their opening reports.[43] This FDA 2016 UC Guidance "addresses the Food and Drug Administration's (FDA's) current thinking regarding efficacy endpoints for UC clinical trials."

49.    The FDA 2016 UC Guidance highlights the importance of capturing two aspects of treatment effect, namely improvement in clinical signs and symptoms, and an endoscopic

---

[42] FDA 2022 E8 Guidance at 16.

[43] I further note that the FDA updated its UC guidance document in April 2022, but for purposes of my Report, I focus on the FDA 2016 UC Guidance, which existed at the time of the Small Observational Reports.

evaluation. In particular, the guidance discusses the Mayo score, which is a disease activity index for ulcerative colitis consisting of several components. The guidance notes that clinical remission and clinical response based on components of the Mayo Score "have been accepted as primary endpoints in clinical trials that have supported prior approvals of treatments of UC."[44]

50.    In addition, the FDA 2016 UC Guidance further directs the reader to a "discussion of the general issues of statistical analysis or clinical trial design," citing to the FDA 1998 E9 Guidance and the FDA 2001 E10 Guidance.[45] The FDA E9 and E10 Guidance documents are two of several documents which describe how to address the requirement that clinical investigations are adequate and well-controlled. E9 and E10 discuss, among other things, the importance of a control group, minimizing the placebo effect, reducing bias, and statistical significance.

51.    **Safety**: Safety is a critical component of the FDA's evaluation process for new drugs. Along with effectiveness data, the FDA requires comprehensive safety data to ensure that the benefits of a drug outweigh its risks. As discussed in the FDA 2016 Safety Guidance, such safety data generally includes a collection of data including all serious adverse effects, data on non-serious adverse effects that lead to dose modification, drug discontinuation, or withdrawal from the trial, and data on unscheduled study visits, hospitalizations, and accidental injuries.[46] The FDA further notes that an adequate safety database is necessary to assess and characterize the risks and establish the required safety profile of a drug.[47]

### 2.    The Small Observational Reports Fail to Meet the Standards Set by the CFR and FDA Guidance to Show Effectiveness

52.    I have reviewed the Small Observational Reports and it is my opinion that these studies do not meet the characteristics of adequate and well-controlled studies necessary to meet the substantial evidence of effectiveness requirement, along with safety, that are necessary for FDA approval. Nor can they, or do they, suggest a future Phase 3 trial would show that Stelara® is effective in treating ulcerative colitis, where success is defined as meeting the endpoints in the UNIFI study. The data in the Small Observational Reports, taken alone, would not have supported proceeding to a Phase 3 clinical trial. I address each in turn.

---

[44] FDA 2016 UC Guidance at 9.

[45] *Id.* at 1.

[46] FDA 2016 Safety Guidance at 6.

[47] *Id.* at 4.

risk/benefit balance of P3 trials that bypassed P2 is less favourable than for trials supported by P2."[90]

122.   Additionally, the FDA itself noted that even Phase 2 success does not always translate to Phase 3 success.  In January 2017, the FDA published an article titled "22 Case Studies Where Phase 2 and Phase 3 Trials Had Divergent Results," where it detailed 22 instances where the outcomes of Phase 2 clinical trials did not align with the results of subsequent Phase 3 trials.[91]  The FDA noted that safety and efficacy failures occurred even when the Phase 2 studies were relatively large and "even when the product was already approved for another condition."  The divergence in results highlighted the complexities and challenges in drug development, including issues related to trial design, patient populations, endpoints, and statistical variability.  Of the 22 instances, the FDA highlighted 21 drugs where efficacy was shown to be a promising experimental therapy, but the Phase 3 clinical trials failed to demonstrate efficacy.  Nine of the 22 instances also involved a failure to demonstrate safety.  In summary, per the FDA, positive efficacy and safety results even in Phase 2 clinical trials do not always translate to Phase 3 success.

123.   In sum, given the publicly available information described above,[92] Phase 3 clinical trials routinely face risk with respect to achieving their endpoints and success despite Phase 2 and other evidence which would suggest otherwise.  This includes Direct-to-Phase 3 clinical trials, and Phase 3 clinical trials conducted for new indications for already-approved drugs.

   **C.    Opinion 3: J&J Faced Substantial Uncertainty Regarding Whether Ustekinumab Would be Effective in Treating Ulcerative Colitis, as Defined by the Endpoints in NCT 236.**

124.   Dr. Dontabhaktuni opines that J&J "would have expected its NCT 236 Phase 3 clinical trial to succeed."[93]  I disagree.  While as an expert, I cannot opine as to what specifically J&J expected, it is my opinion that there was uncertainty as to whether a Phase 3 trial studying the use of ustekinumab to treat ulcerative colitis would succeed.[94]

---

[90] Moyer H. et al., *Bypassing phase 2 in cancer drug development erodes the risk/benefit balance in phase 3 trials*, https://www.jclinepi.com/article/S0895-4356(23)00079-3/abstract.

[91] https://www.fda.gov/media/102332/download.

[92] I further note that given its access to its own data and information regarding ustekinumab, J&J was uniquely positioned to possess additional knowledge compared to the general public.

[93] Dontabhaktuni Report, ¶ 85.

[94] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████

125.    As an initial matter, Dr. Dontabhaktuni's opinion improperly assumes that ustekinumab has already shown safety and efficacy in treating ulcerative colitis.  For example, Dr. Dontabhaktuni's opinion assumes that "safety and *efficacy are known*" (emphasis added).[95]  This is an improper assumption to make.

126.    Instead, efficacy of ustekinumab for the treatment of ulcerative colitis was not known at the time that J&J began the Phase 3 clinical trial.  As I have explained above, the Small Observational Reports cannot and do not suggest that ustekinumab would be effective in treating ulcerative colitis, nor that the FDA would approve ustekinumab for the treatment of ulcerative colitis on the basis of the data from the Small Observational Reports.  At the time of the Phase 3 trial for ulcerative colitis, neither safety nor efficacy of ustekinumab for the treatment of ulcerative colitis had been previously demonstrated.  The safety profile of ustekinumab was first described with the original approval of ustekinumab for treatment of plaque psoriasis (2009), and the safety database grew and became more broadly established with the subsequent approvals of ustekinumab for the treatment of psoriatic arthritis (2013) and Crohn's disease (2016).  Notably the safety profile of ustekinumab as defined by adverse events and serious adverse events in these clinical trials did not substantively differ between these populations.  Beyond the safety profile established through clinical trials, real-world use and ongoing pharmacovigilance and registry studies have confirmed no new safety signals with ustekinumab use. This evidence suggests one would likely observe a similar safety profile of ustekinumab in patients with ulcerative colitis as in the previously approved populations if ustekinumab was used at a previously approved dose and dose schedule.

127.    In contrast, there was no similar body of evidence to suggest the efficacy of ustekinumab in ulcerative colitis.  This is because the clinical endpoints to assess for efficacy in plaque psoriasis (PASI scores) differ from psoriatic arthritis (ACR scores) which differ from Crohn's disease (clinical response and remission).  For example, ustekinumab had a 67% PASI 75 response rate (week 12) in plaque psoriasis, a 42-44% ACR20 response rate (week 24, 45 mg) in psoriatic arthritis and a 38-58% clinical response (week 8) in Crohn's disease.  But it is meaningless to compare quantitative results across different endpoints obtained at different time points in different disease populations.  Furthermore, the disease activity measure in Crohn's disease to define clinical response and remission in the pivotal studies which supported FDA approval of ustekinumab for the treatment of Crohn's disease was the Crohn's Disease Activity Index.  As previously discussed, the FDA recommends use of components of the Mayo score to assess for clinical response and remission in ulcerative colitis.  As the safety and efficacy of a new indication cannot

---

[95] Dontabhaktuni Report, § V.A (Question 1).

be accurately inferred or predicted, the FDA requires substantial evidence of effectiveness and safety from adequate and well-controlled studies to support approval of a drug for a new indication, or a new indication for a previously approved drug.

### 1. Not All Drugs that Successfully Treat Crohn's Disease Successfully Treat Ulcerative Colitis, and Vice Versa

128.    I understand, including based on my own experience from my time at the FDA, that Crohn's disease and ulcerative colitis are distinct diseases with many differences, such as the location of the diseases within the gastrointestinal tract, the symptoms of the diseases, and importantly, the differences in the inflammatory pathways and immune responses in the diseases.[96]  I have reviewed J&J's deposition transcripts and internal documents, and my understanding that Crohn's disease and ulcerative colitis are distinct is consistent with the differences that J&J recognized at the time.  For example, the key individuals involved in the NCT 236 Protocol testified to these differences during their depositions.[97]

129.    Dr. Dontabhaktuni argues that because other biologics, such as infliximab and adalimumab, worked in Crohn's disease and were later approved for ulcerative colitis, J&J expected ustekinumab to also be effective for ulcerative colitis.  While it is true that some biologics have shown success in both Crohn's disease and ulcerative colitis,[98] this is not always the case.  Instead, as explained in the examples below, efficacy in one IBD does not always translate to efficacy in the other IBD.

130.    I note that there are numerous examples of drugs that are approved for the treatment of Crohn's disease but not ulcerative colitis and vice versa,[99] as explained below:

131.    **Certolizumab pegol**: Certolizumab pegol, sold under the brand name Cimzia®, was approved by the FDA to treat Crohn's disease in 2008.[100]  In the late 2010s, there was a

---

[96] Cryer Report, ¶¶26-48, and 403-416.

[97] O'Brien Dep. Tr. at 52:11-17 (substantial differences between UC and CD); Marano Dep. Tr. at 32:24-33:11 (underlying pathophysiology between UC and CD remain unknown); Strauss Dep. Tr. at 69:6-8, 72:19-20, 73:22-74:180:17-81:14, 89:9-24; Szapary Dep. Tr. at 55:3-6 (CD and UC have different endpoints and approaches).

[98] To provide a complete picture, I note, for example, that there have been drugs that have been approved for both ulcerative colitis and Crohn's disease, such as corticosteroids, immunomodulators, infliximab, adalimumab, vedolizumab, upadacitinib, risankizumab, and mirikizumab.

[99] It is also my opinion that for the same reasons the Small Observational Reports cannot predict success of ustekinumab in treatment of ulcerative colitis, these studies of different molecules do not predict success in Crohn's disease and/or ulcerative colitis.

[100] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2008/125160s000ltr.pdf.

study of certolizumab pegol initiated for the treatment of ulcerative colitis[101] and in 2018 the investigators reported that "an open label (OL) study suggested that CZP is effective for induction of response in UC" and that their results in 13 patients showed effectiveness of CZP in maintenance at one year.[102]  In addition, an abstract from 2018 which was a proof of concept study in 6 patients with ulcerative colitis concluded that the use of certolizumab pegol to treat ulcerative colitis "seems to be an option in patients with UC who have had secondary failure to other anti-TNF."[103]  However, neither group published further results from a larger number of subjects and certolizumab pegol remains unapproved for the treatment of ulcerative colitis.[104]

132.    **Tofacitinib**: Tofacitinib, sold under the brand name Xeljanz®, was approved by the FDA to treat ulcerative colitis in 2018.  The sponsors of tofacitinib then attempted to pursue a Crohn's disease indication.  However, two Phase 2 trials studying the use of tofacitinib to treat Crohn's disease showed "no significant difference from placebo in the primary efficacy endpoint of clinical response."[105]  Several J&J witnesses also testified that they were aware that tofacitinib only worked for one type of IBD but not the other.[106]

133.    **Ozanimod**: Ozanimod, sold under the brand name Zeposia®, was approved by the FDA to treat ulcerative colitis in 2021.  However, the drug failed to demonstrate efficacy to treat Crohn's disease in a Phase 3 clinical trial in 2024.[107]

---

[101] Study of Cimzia® for the Treatment of Ulcerative Colitis (UC CIMZIA), https://clinicaltrials.gov/study/NCT01090154

[102] Osterman, M. et al., *P136 Certolizumab Pegol is Effective in the Maintenance of Response in Moderate-Severe Ulcerative Colitis: An Open-Label Maintenance Study,* 2018 Defining Optimal Treatment Algorithms S71, https://www.gastrojournal.org/article/S0016-5085(17)36541-1/fulltext.

[103] Cortes Espinosa, T. et al., *P092 Induction of clinical remission with certolizumab pegol in patients with ulcerative colitis who are not responders in Mexican population*, 2019 Am. J. of Gastroenterology 114: S24, https://journals.lww.com/ajg/abstract/2019/07001/P092_Induction_of_clinical_remission_with.93.aspx.

[104] Study of Cimzia for the Treatment of Ulcerative Colitis (UC CIMZIA), https://clinicaltrials.gov/study/NCT01090154.

[105] Sandborn et al., *A phase 2 study of tofacitinib, an oral Janus kinase inhibitor, in patients with Crohn's disease*, 2014 Clin Gastroenterol Hepatol 12 (9): 1485-93.e2, https://pubmed.ncbi.nlm.nih.gov/24480677/.

[106] Strauss Dep. Tr. at 70:15-24, 131:10-16; Szapary Dep. Tr. at 156:10-20.

[107] *Bristol Myers Squibb Provides Update on the First Phase 3 YELLOWSTONE Trial Evaluating Oral Zeposia (ozanimod) in Patients with Moderate to Severe Active Crohn's Disease* (March 28, 2024), https://news.bms.com/news/details/2024/Bristol-Myers-Squibb-Provides-Update-on-(continued…)

134. **Filgotinib**: Filgotinib, sold under the brand name Jyseleca®, was approved to treat ulcerative colitis by the European Medicines Agency ("**EMA**"), Medicines and Healthcare products Regulatory Agency ("**MHRA**"), and the Pharmaceuticals and Medical Devices Agency ("**PMDA**"), but not the FDA.[108]  However, the drug failed to demonstrate efficacy in treating Crohn's disease in both a Phase 2 and a subsequent Phase 3 clinical trial.[109]

135. **Oral mesalamine**: Oral mesalamine, sold under the brand name Asacol®, was approved by FDA in 1992 to treat ulcerative colitis.[110]  In 1994, a small study conducted in 38 patients suggested oral mesalamine could have effect in Crohn's disease, but to date oral mesalamine remains unapproved for the treatment of Crohn's disease.[111]

136. As shown in the examples above, approval for the treatment of one type of IBD (*i.e.*, Crohn's disease or ulcerative colitis) does not always mean that the drug would be effective in the treatment of the other type of IBD.  These examples further inform my opinion that J&J would not have expected that ustekinumab would be assumed to be effective in treating ulcerative colitis simply because it was effective in treating Crohn's disease.

137. Dr. Dontabhaktuni cites Remicade® (infliximab) and Humira® (adalimumab) as examples of drugs approved for the treatment of both Crohn's disease and ulcerative colitis, suggesting that because ustekinumab was already approved for Crohn's disease, it

---

the-First-Phase-3-YELLOWSTONE-Trial-Evaluating-Oral-Zeposia-ozanimod-in-Patients-with-Moderate-to-Severe-Active-Crohns-Disease/default.aspx; Tristan Manalac, *BMS' Zeposia Fails to Meet Primary Endpoint in Phase III Crohn's Trial* (March 29, 2024), https://www.bio-space.com/bms-zeposia-fails-to-meet-primary-endpoint-in-phase-iii-crohn-s-trial.

[108] *Jyseleca (filgotinib) approved in the European Union for the treatment of ulcerative colitis* (November 15, 2021), https://www.glpg.com/press-releases/jyseleca-filgotinib-approved-in-the-european-union-for-the-treatment-of-ulcerative-colitis/; *MHRA approves Jyseleca as new treatment for ulcerative colitis* (Jan. 20, 2022), https://bowelinterestgroup.co.uk/news/mhra-approves-jyseleca%E2%96%BC-as-new-treatment-for-ulcerative-colitis/; *Jyseleca approved in Japan for ulcerative colitis* (March 28, 2022), https://www.glpg.com/press-releases/jyseleca-approved-in-japan-for-ulcerative-colitis/.

[109] Honap, S. et al., *Are All Janus Kinase Inhibitors for Inflammatory Bowel Disease the Same?*, 2023 Gastroenterol Hepatol 19(12):727-738, https://pmc.ncbi.nlm.nih.gov/articles/PMC10885424.

[110] https://www.federalregister.gov/documents/2020/12/10/2020-27082/allergan.

[111] Tremaine W.J. et al., *A randomized, double-blind, placebo-controlled trial of the oral mesalamine (5-ASA) preparation, Asacol, in the treatment of symptomatic Crohn's colitis and ileocolitis*. J Clin Gastroenterol. 1994 Dec;19(4):278-82.

should also succeed in passing a Phase 3 trial and get approval for the treatment of ulcerative colitis. This argument has several flaws.

138.    First, infliximab and adalimumab are both TNF inhibitors, which are a class of medications designed to reduce inflammation by blocking the activity of tumor necrosis factor ("**TNF**"), a cytokine involved in the body's immune response. By inhibiting TNF, these drugs help to alleviate symptoms and prevent disease progression. Ustekinumab, on the other hand, has a different mechanism of action from TNF inhibitors, instead, targeting interleukin-12 (IL-12) and interleukin-23 (IL-23). It is not scientifically valid to extrapolate the efficacy of a drug with a certain mechanism of action to a drug with a different mechanism of action.[112]

139.    Dr. Dontabhaktuni also fails to mention that unlike the selected examples of adalimumab and infliximab, other drugs in the class of TNF inhibitors have been evaluated and failed to show efficacy in Crohn's disease, ulcerative colitis, or both. For example, certolizumab pegol has shown efficacy in Crohn's disease but not in ulcerative colitis. Etanercept, another TNF inhibitor, fails to show efficacy in either Crohn's disease or ulcerative colitis. Mechanism of action or class of product, such as the class of TNF inhibitors, are not fully predictive of efficacy, which is why adequate and well-controlled clinical trials are necessary for approval of a new indication for a new drug, or a new indication for a previously approved drug.

### 2.    J&J's NCT 236 Protocol Was Designed Conservatively to Minimize Acknowledged Risk

140.    J&J described its Phase 3 clinical trial protocol in the NCT 236 Protocol, which outlined the methodology and objectives to evaluate the efficacy and safety of ustekinumab in treating ulcerative colitis.

141.    Based on my review of the NCT 236 Protocol[113], it is my opinion that J&J designed the Phase 3 UNIFI trial conservatively to minimize the risk of failure. This conservative design supports my opinion that there was risk and the design of the study itself illustrates this risk. For example, J&J utilized a futility analysis as part of the clinical trial. J&J also chose to evaluate two different dose levels for the induction study and two dose schedules for the maintenance portion of the study. From a statistical perspective this increases the risk of Type I error (false positive). There are methods to control Type I error, at a cost of increasing the sample size, which is what J&J chose to do. J&J also powered its study at 90% to ensure a high likelihood of meeting its study endpoints and achieving statistical significance.

---

[112] Benson J.M. et al., *Discovery and mechanism of ustekinumab: a human monoclonal antibody targeting interleukin-12 and interleukin-23 for treatment of immune-mediated disorders*, MAbs. 2011 Nov-Dec;3(6):535-45.

[113] JNJ-STELARA_002470273.

          (a)     **J&J's Use of a Futility Analysis Reflects Uncertainty in Phase 3 Success**

142.   Dr. Dontabhaktuni fails to bring up the fact that J&J conducted an interim analysis for futility as part of UNIFI.

143.   A futility analysis is an interim analysis conducted in the middle of a clinical trial to determine whether the clinical trial is unlikely to achieve its objectives. This type of analysis is designed to assess whether continuing the trial is futile, meaning that the probability of demonstrating the intended effect of the treatment is so low that it is not worth continuing the trial.[114]

144.   J&J conducted a futility analysis as part of its Phase 3 trial studying the efficacy of ustekinumab to treat ulcerative colitis.[115] The NCT 236 Protocol notes that "[a]n interim analysis to assess for futility is planned when the first 30% of subjects randomized in the induction study either complete the induction Week 8 visit or terminate study participation before Week 8."[116]

145.   The pre-IND briefing document submitted to the FDA also states: "Since this is a direct to Phase 3 program, there will be an interim analysis for futility when approximately 40% of randomized subjects reach Week 8 of the induction study."[117]

146.   In my opinion, the implementation of a futility analysis indicates that there was uncertainty that the Phase 3 trial would succeed. There would be no reason to conduct a futility analysis where there is little risk in that the clinical trial would meet all defined endpoints. The omission of this fact by Dr. Dontabhaktuni creates a misleading understanding of the relevant facts.

          (b)     **J&J's Dose Selection Reflects Their Uncertainty in Phase 3 Success**

147.   

---

[114] Szapary Dep. Tr. at 160:20-161:5.

[115] Marano Dep. Tr. 63:11-64:20; Strauss Dep. Tr. at 60:6-22, 66:23-67:7.

[116] JNJ-STELARA_002470273 at 9.

[117] JNJ-STELARA_002258268 at 15.

[118] JNJ-STELARA_002412663 at slide 13.

[119] JNJ-STELARA_002476258 at slide 57.



148.

149.

> **(c)    J&J Powered its Study at 90% and Enrolled 951 Patients to Ensure a High Likelihood of Meeting Study Endpoints and Achieving Statistical Significance**

150.    The NCT 236 Protocol contains a section entitled "Sample Size Determination" where J&J calculated the minimum number of subjects needed to properly evaluate efficacy in both induction and maintenance phases using "statistical power considerations."[122]    J&J determined that a "target of 951 subjects (317 per treatment group)" should be enrolled in the induction study to provide for a sufficient number of subjects for the primary population in the maintenance study.

151.    Clinical trials are very expensive undertakings for a pharmaceutical company. One contributing factor to the expense of a trial is the sample size, so companies look to conduct a study with the minimum needed sample size. A larger sample size, however, also increases the statistical power of the study, which is the probability of detecting a true drug effect if one exists.  High power reduces the risk of false negatives, where a

---

[120] JNJ-STELARA_002412663 at slide 20.

[121] JNJ-STELARA_002476258 at slide 59.

[122] NCT 236 Protocol (JNJ-STELARA_002470273) at 78.

potentially effective treatment might be incorrectly deemed ineffective. It is financially and ethically unacceptable for a sponsor to conduct an underpowered study and therefore generally companies conducting clinical trials select a power level of 80% to 90%,[123] as a balance between being able to detect a true effect, sample size and cost. J&J selected a power of 90% for UNIFI and accordingly enrolled 951 subjects in the study. A larger sample size increases statistical power, making it more likely that the results are statistically significant, which means the observed effect is unlikely to be due to chance. In my opinion, J&J took a conservative approach by enrolling 951 subjects so the study would have a 90% chance of reaching statistical significance.

> (d)  **Dosage was Selected in Part Based on Crohn's Disease Phase 2 Clinical Trial Safety Data and the Hypothesis that Ustekinumab Would Be Safe and Effective in Ulcerative Colitis**

152.    When a protocol like the NCT 236 Protocol is submitted for FDA review, the dose(s) and dose schedules(s) must be supported by data and/or a justification that the proposal is appropriate. As the goal is to obtain regulatory acceptance of the protocol, sponsors will put forward a rationale which best supports their proposed dose(s) and schedule(s). There was no Phase 2 data for ustekinumab in the treatment of ulcerative colitis to guide dose selection for the NCT 236 Protocol, and therefore J&J provided a rationale based on similarities between Crohn's disease and ulcerative colitis.[124]  The NCT 236 Protocol notes that "[t]he doses selected for this Phase 3 protocol for ustekinumab in subjects with UC parallel those being studied in the Phase 3 program for ustekinumab in subjects with Crohn's disease."[125]  I have reviewed the section titled "Dose Rationale" in the context of the entire NCT 236 Protocol and conclude that J&J hypothesized that ustekinumab would work in ulcerative colitis due to the similarities between Crohn's disease and ulcerative colitis.  J&J formed a hypothesis, selected doses and put forward a justification that could best support this hypothesis which the clinical trial was designed to test.  J&J did not represent that there was guaranteed success of trial outcome, which is further supported by the built-in futility analysis and dose selection described above.

153.    The dosage regimen used by J&J for the NCT 236 Protocol was based in part on the safety data obtained from a Phase 2a and a Phase 2b (CERTIFI) study in patients with Crohn's disease.[126] Based on the results of CERTIFI, J&J advanced selected ustekinumab

---

[123] Ring, A. et al., *Sample Size determination in bioequivalence studies using statistical assurance*, 88 British J. Clinical Pharmacology 10, p. 2369-2377 (2019); Multiple Endpoints in Clinical Trials Guidance for Industry (October 2022), https://www.fda.gov/media/162416/download.

[124] NCT 236 Protocol, § 3.2.9 ("considering the similarities in the genetics and biology of UC and Crohn's disease, it is reasonable to assume that ustekinumab will also be effective in UC").

[125] NCT 236 Protocol at 41.

[126] Sandborn WJ et al., *Ustekinumab Crohn's Disease Study Group. A randomized trial of Ustekinumab, a human interleukin-12/23 monoclonal antibody, in patients with moderate-to-* (continued…)

—

doses to further evaluate in their Phase 3 development program for ustekinumab for the treatment of Crohn's disease.[127]  Because FDA had already accepted these doses and dosing regimens as safe for Crohn's disease, it was reasonable for J&J to propose directly proceeding to a Phase 3 trial using the same doses and dosing regimens in ulcerative colitis as for Crohn's disease from a safety perspective.  In my opinion, J&J was able to minimize safety risks by leveraging existing data.

154.



### 3.    Dr. Dontabhaktuni Presents an Incomplete Picture of J&J's Correspondence with the FDA

155.    Dr. Dontabhaktuni further cites statements in the NCT 236 Protocol and meetings with the FDA as support that J&J believed it was certain that ustekinumab would be effective in treating ulcerative colitis.

156.    On January 21, 2015, J&J and the FDA participated in a Pre-Investigational New Drug ("Pre-IND") meeting.[129]  A pre-IND meeting is a critical early interaction between a drug sponsor and the FDA that typically occurs before the submission of an IND application. The purpose of the pre-IND meeting is for a sponsor to seek feedback and guidance from FDA, to clarify open questions and regulatory requirements and to seek concurrence on the development plan for their drug candidate.  In advance of the pre-IND meeting, J&J submitted a briefing document previewing the rationale behind the decision to go direct

---

*severe Crohn's disease.* Gastroenterology. 2008 Oct;135(4):1130-41. https://www.gastrojournal.org/action/showPdf?pii=S0016-5085%2808%2901322-X; Sandborn WJ et al, *CERTIFI Study Group. Ustekinumab induction and maintenance therapy in refractory Crohn's disease.* N Engl J Med. 2012 Oct 18;367(16):1519-28. https://www.nejm.org/doi/full/10.1056/NEJMoa1203572

[127] Feagan, B., et al., *Ustekinumab as Induction and Maintenance Therapy for Crohn's Disease*, 2016 N. England J. Med. 375:1946-1960, https://www.nejm.org/doi/full/10.1056/NEJMoa1602773; Sandborn et al., *Long-term efficacy and safety of Ustekinumab for Crohn's disease through the second year of therapy*, 2018 Wiley 65-77, https://pmc.ncbi.nlm.nih.gov/articles/PMC6032827/pdf/APT-48-65.pdf.

[128] JNJ-STELARA_002412663; JNJ-STELARA_002476258.

[129] JNJ-STELARA_002258317.

to Phase 3 and indicating their interest in pursuing this approach.[130]  Following the pre-IND meeting, J&J and the FDA also held a subsequent pre-sBLA meeting on February 27, 2018.

157.    In Dr. Dontabhaktuni's report, she cites statements made by J&J in these meetings, including statements regarding the similarities between Crohn's disease and ulcerative colitis, the prior safety data on ustekinumab, and J&J's opinion that the Crohn's disease data could be leveraged for ulcerative colitis as support that J&J was certain that ustekinumab would be effective in treating ulcerative colitis.[131]  Consistent with evaluating these types of documents during my time at the FDA, I view these statements, however, as facts and opinions J&J deemed relevant to support J&J's rationale for proceeding directly to Phase 3 testing, rather than statements indicating that J&J knew for certain that its Phase 3 trial of ustekinumab for the treatment of ulcerative colitis would be successful.  In other words, J&J was justifying their proposal to conduct NCT 236 as designed, not stating that they knew the outcome of the planned trial.

158.    In my experience, pharmaceutical companies frequently present their best case to justify their development strategies, it would be no different when seeking to bypass Phase 2 and go directly to Phase 3 studies.  The FDA's review process is designed to be rigorous, informed by risk-benefit considerations and evidence-based, requiring sponsors to submit substantial data and/or evidence to justify proposed development steps.  While J&J may have highlighted similarities between Crohn's disease and ulcerative colitis or pointed to prior safety data to support a different development approach, *i.e.*, Direct-to-Phase 3, these similarities do not eliminate the inherent scientific and clinical uncertainties involved in testing a drug for a new indication.  The FDA does not approve drugs based solely on advocacy or justification —it relies on empirical evidence, the substantial evidence requirement met by data obtained through adequate and well-controlled clinical trials.

159.    In my opinion, J&J's statements are justifications aimed at securing regulatory acceptance to initiate the NCT 236 protocol, rather than proof that ustekinumab was expected to successfully treat ulcerative colitis as defined as meeting the primary clinical endpoints of the trial.  In other words, statements of intended success do not indicate whether a trial will meet its endpoints.  Until a trial is completed and results are available, effectiveness and safety can only be estimated at best.

160.    Additionally, during the meetings between J&J and the FDA, ████████████████ ██████████████████████████████████████  Dr. Dontabhaktuni omits this in her report, which results in a misleading picture of the acceptability and risks of J&J's approach.  For example, FDA disagreed with several aspects of J&J's proposal, as I discuss below.

---

[130] JNJ-STELARA_002258268.

[131] JNJ-STELARA_002258317; JNJ-STELARA_002258268.

[132] Szapary Dep. Tr. at 26:22-27:13 (referring to FDA pre-IND meeting minutes); *id.* at 29:3-11.

I affirm that the foregoing statement is true and correct to the best of my knowledge and belief.

Dated: April 28, 2025

_____
Dr. Sue Lim