# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

CareFirst of Maryland, Inc., et al.

Plaintiffs,

v.

Johnson & Johnson and Janssen Biotech, Inc.,

Defendants.

Case No. 2:23-cv-00629-JKW-LRL

## EXPERT DECLARATION OF BYRON CRYER, M.D.

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Executed on: _Apr 24, 2025_

Byron Cryer, M.D.

**B.    Differences Between Crohn's Disease and Ulcerative Colitis**

43.    Similarities between Crohn's disease and ulcerative colitis are discussed above. Also discussed above are differences between the two diseases with respect to the IL pathways involved.  In terms of how patients present, the main differences between ulcerative colitis and Crohn's disease are the geographic distribution of the diseases within the gastrointestinal tract and their depth of penetration.  More specifically, ulcerative colitis and Crohn's disease differ as to which portion of the gastrointestinal tract and the depth of the mucosal wall that are impacted by the disease.

44.    First, depending on whether a person suffers from ulcerative colitis or Crohn's disease, the autoimmune attack on the GI tract can affect either any part of the tract, in the case of Crohn's disease, or be limited to the large intestine, in the case of ulcerative colitis.  Crohn's disease may impact the mouth, esophagus, stomach, small intestine, and large intestine. Ulcerative colitis affects only the colon, also known as the large intestine.  The region of the inflammation defines in part whether the disease is ulcerative colitis or Crohn's disease.

45.    Ulcerative colitis and Crohn's disease can also be distinguished by the depth of their penetration of the intestinal wall.  In ulcerative colitis, the depth of penetration only involves the inner-most layer, known as the mucosa.  In Crohn's disease, the depth of penetration affects all layers of the gastrointestinal tract—the mucosa, submucosa, muscularis, and serosa.

46.    The diseases' differences in the penetration of the gastrointestinal wall also impact patients' symptoms.  When the disease only involves the inner-most layer of the tract in ulcerative colitis, patients present with symptoms restricted to the inner-most layer, such as diarrhea and bloody diarrhea.  On the other hand, when Crohn's disease penetrates through the entire wall of the GI tract, physicians can see inflammation going all the way through the entire

wall or lumen, causing various periods of inflammation, healing, and resulting in obstructions or strictures formed by scar tissue. Inflammation caused by Crohn's disease can even extend through the layers of the GI wall and into an adjacent organ. For example, patients with Crohn's disease can present with inflammation through all the layers of the bowel wall and extending to the skin. The inflammation can tunnel from the intestine to the skin and create sinus tracts, called fistulae. As a result of this penetration, patients with Crohn's disease may present with cramping pain and blockages—the results of disease throughout the tract. Symptoms of Crohn's disease can also include leakages of puss in the perineum, the region between the genital area and the anus.

47.    Inflammation also presents differently in Crohn's disease and ulcerative colitis. Inflammation in Crohn's disease is not typically uniform; it happens in fixed and isolated segments that present like sausages. The inflammation, sometimes referred to as "skip lesions," looks like the thicker part of the sausage and then the stricture caused by the disease looks like the narrower area between two sausage links. It is also common to see dilated sections of the small intestine distributed throughout the intestine, as well as fistulae to areas such as the skin, urinary tract, bladder, vagina, and anywhere in the abdomen. The segmented inflammation throughout the intestine and appearance of fistulae typically result in non-uniform inflammation in patients' imaging studies. Patients showing this type of inflammation also typically describe symptoms of crampy abdominal pain.

48.    On the other hand, inflammation in ulcerative colitis is confined to the colon and often impacts only a portion of the colon. For patients with ulcerative colitis, physicians will look at imaging and can see the colon appearing like a smooth "lead pipe" without its usual haustral folds. The inflammation is confluent and uniform throughout the colon. Inflammation

15

caused by ulcerative colitis thus does not lead to fixed or isolated areas of inflammation, like in Crohn's disease. This inflammation more often leads to symptoms of diarrhea and bloody diarrhea; it is less likely to have a patient complain of abdominal pain.

### C.   Diagnosing Crohn's Disease and Ulcerative Colitis

49.    Physicians rely on a combination of clinical presentations, a patient's symptoms, imaging, endoscopy, and laboratory tests like stool tests to diagnose patients and differentiate between ulcerative colitis and Crohn's disease.

50.    Treating physicians typically first consider natural history—how the patients are presenting, their symptoms, and principal manifestations.

51.    Physicians often then utilize a confirmatory test such as an endoscopy like colonoscopy (an examination of the colon and rectum) and/or small intestinal imaging to look for defining features of the disease, such as confluent and unform inflammation confined to the colon (suggestive of ulcerative colitis) or segmented inflammation throughout the gastrointestinal tract (suggestive of Crohn's disease).

52.    The confirmatory tests enable physicians to consider other endoscopic features suggestive of chronic inflammation.   For example, on endoscopy, the normal colon typically presents as shiny with a reflection like a mirror.  A healthy colon will allow a physician to see blood vessels traversing the shiny surface.  When the colon is inflamed, physicians see granularity and lose the ability to see blood vessels.  This is called a loss of vascularity.  In modern times, physicians often use endoscopic evaluations to diagnosis and confirm ulcerative colitis and Crohn's disease.

53.    Physicians also commonly biopsy the intestine to confirm and score the disease. Pathologists, medical healthcare providers that examine bodies and body tissues, examine tissues

16

60.     I have also been informed that for a document to be prior art to the '307 patent, it must have been publicly accessible to a person of ordinary skill in the art prior to September 24, 2018.

### 1.     The Specification

61.     The '307 patent specification begins by explaining that, prior to its invention, biological therapies approved for treatment of ulcerative colitis ("UC") were either tumor necrosis factor ("TNF") or integrin inhibitors. '307 patent, column 2, lines 20-25. I agree with this. Because anti-TNFs were known to have certain safety risks, the '307 patent describes the need for "novel therapies with alternative mechanisms of action." '307 patent, column 2, lines 37-38. Additionally, not all patients showed an adequate response to anti-TNF treatments and there was only one other non-TNF approved therapy, vedolizumab, demonstrated efficacy in these patients. '307 patent, column 2, lines 20-38. I agree that, as of September 24, 2018, there was an "unmet need" for new therapies.

62.     The patent further explains that certain biologic therapies which had been approved for the treatment of ulcerative colitis had also demonstrated efficacy in Crohn's disease. The patent also notes evidence that IL-12 and IL-23 may play a role in both Crohn's disease and ulcerative colitis:

> When tested, biologic therapies that are currently approved for the treatment of UC have also demonstrated efficacy in Crohn's disease (Sandborn et al., Gastroenterology. 135(4):1130-1141 (2008)). Multiple lines of evidence suggest that inflammatory bowel disease (UC and Crohn's disease) is mediated by Th1 or Th17 cells with strong contribution from the proinflammatory cytokines, IL-12, and IL-23. Ustekinumab (STELARA®) is a fully human immunoglobulin G1 mAb to human IL-12/23p40 that prevents IL-12 and IL-23 bioactivity by inhibiting their interaction with their cell surface IL-12R131 receptor protein (Investigator's Brochure: STELARA® (ustekinumab), edition 18. Janssen Research & Development, LLC (2017)). Through this mechanism of action, ustekinumab effectively neutralizes IL-12 (Th1)- and IL-23 (Th17)-mediated cellular responses. Ustekinumab has received marketing approval globally, including countries in North America, Europe, South America, and the Asia-Pacific region, for the

19

treatment of adult subjects with moderately to severely active Crohn's disease (the first approval for Crohn's disease was received on 11 Nov. 2016), moderate to severe plaque psoriasis, or active psoriatic arthritis, as well as for pediatric subjects (12 to 17 years old) with moderate to severe plaque psoriasis.

'307 patent, column 2, lines 38-61.

63.    The '307 patent also discloses that ustekinumab showed preliminary effectiveness in Crohn's disease in two "clinical studies CRD3001 and CRD3002." '307 patent, columns 2-3, lines 62-12.  The patent states that "[i]n both studies, ustekinumab demonstrated clinically significant efficacy compared with placebo." '307 patent, columns 2-3, lines 62-12.  It then states that "[p]rior to the present invention, no studies had been conducted with ustekinumab for UC." '307 patent, column 3, lines 12-14.

64.    A person of ordinary skill in the art would understand that the phrase "no studies" in the patent refers to there not being any prior clinical studies, i.e., controlled clinical trials, testing ustekinumab as a treatment for ulcerative colitis.  The prior paragraph discussing the Crohn's disease clinical studies refers to them as "studies." '307 patent, column 3, lines 9-12.  Given this, it is clear to a person of ordinary skill in the art that the statement "no studies had been conducted with ustekinumab for UC" refers to the absence of a properly controlled clinical study.  Prior to the UNIFI trial conducted by J&J and described in the patent, there had not been such a study for ustekinumab as a treatment for UC.

65.    The paragraph which follows this statement notes that the "present application relates to *clinically proven* safe and *clinically proven* effective methods and compositions for treatment of moderately to severely active ulcerative colitis (UC)."  This further supports my opinion that the term "studies" as used in column 3 refers to "clinical studies" because it suggests that the inventors attempted to address the issue of "no studies" by initiating a clinical study.

20

The Examples of the '307 patent also repeatedly refer to clinical studies as "study" or "studies." '307 patent, Examples 1-2.

66.     The '307 patent then provides data in its Examples describing the results of the UNIFI Phase III clinical trial conducted by J&J.  That trial tested ustekinumab as a treatment for moderate to severely active ulcerative colitis.

67.     Example 1 of the '307 is entitled "Induction Study of Ustekinumab in the Treatment of Ulcerative Colitis in Humans." '307 patent, column 42, lines 12-15.  This Example describes the induction part of the UNIFI Phase III clinical trial where patients were administered an intravenous dose of ustekinumab.  The example discloses a "multicenter, randomized, double-blind, placebo-controlled, clinical study" in patients with "moderately to severely active ulcerative colitis." '307 patent, column 42, lines 17-20.  In the induction study, J&J assessed "the efficacy of intravenous (IV) administration of ustekinumab" in patients who demonstrated inadequate response or failure to tolerate other therapies. '307 patent, column 42, lines 26-36.  Subjects in the study received a single 130 mg, a single 6 mg/kg IV dose, or placebo at Week 0.  Subjects who did not have any clinical response after 8 weeks received an additional IV dose or a subcutaneous dose at week 8. '307 patent, column 42, lines 33-36.  The IV portion of the trial had 971 subjects in total (642 on one of the two IV doses and 319 on the placebo). '307 patent, Table 1.

68.     Example 1 describes how efficacy evaluations were made and refers to specific clinical endpoints based on the Mayo score, partial Mayo score, Mayo endoscopy subscores, mucosal healing, and responses to the Inflammatory Bowel Disease Questionnaire (IBDQ). '307 patent, column 44, lines 16-60.  Many of these endpoints align with the clinical endpoints

claimed in the claims of the '307 patent.  '307 patent, column 44, lines 16-60; '307 patent, claim

1.

69.    The safety results of the study show that intravenous ustekinumab was well-

tolerated and safe:

Intravenous ustekinumab doses of both ~6 mg/kg and 130 mg were generally well-tolerated with a safety profile that was generally comparable with placebo through Week 8.0f the 960 subjects in the safety analysis set, 1 or more treatment-emergent AEs was reported through Week 8 for 50.0%, 41.4%, and 48.0% of subjects in the ˜6 mg/kg, 130 mg, and placebo groups, respectively. Through Week 8, serious adverse effects (SAEs) were reported for 3.1%, 3.7%, and 6.6% of subjects in the ~6 mg/kg, 130 mg, and placebo groups, respectively.  AEs within 1 hour of infusion were 0.9%, 2.2%, and 1.9% in the ~6 mg/kg, 130 mg, and placebo groups, respectively.  The proportions of subjects with 1 or more infections were 15.3%, 15.9%, and 15.0% in the ~6 mg/kg, 130 mg, and placebo groups, respectively. Serious infections were reported for 0.3%, 0.6%, and 1.3% of subjects in the ~6 mg/kg, 130 mg, and placebo groups, respectively.

'307 patent, columns 44-45, lines 62-11.

70.    The efficacy results showed statistically significantly greater proportions of

subjects in the ustekinumab groups achieving clinical remission, endoscopic healing, clinical

response, than the placebo group.  '307 patent, columns 46-47, lines 7-48.  These results are

illustrated in Tables 1 through 4 of the '307 patent:

22

### TABLE 1

Number of Subjects in Clinical Remission
(Global Definition) at Week 8

| | Placebo | Ustekinumab IV | | |
| | IV | 130 mg | 6 mg/kg | Combined |
|---|---|---|---|---|
| Primary Efficacy Analysis Set | 319 | 320 | 322 | 642 |
| Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical remission | 17 (5.3%) | 50 (15.6%) | 50 (15.5%) | 100 (15.6%) |
| Adjusted Treatment difference | | 10.3 | 10.2 | 10.2 |
| (97.5% CI) | | (5.7, 14.9) | (5.6, 14.8) | (6.6, 13.9) |
| p-value | | <0.001 | <0.001 | <0.001 |

N = number of subjects;
CI = confidence interval

Table 1 shows that 15.5% and 15.6% of subjects in the ustekinumab groups achieved clinical remission as compared to only 5.3% in the placebo group. The low p-value shows that these results are statistically significant.

### TABLE 2

Number of Subjects in Clinical Remission
(US Definition) at Week 8

| | Placebo | Ustekinumab IV | | |
| | IV | 130 mg | 6 mg/kg | Combined |
|---|---|---|---|---|
| Primary Efficacy Analysis Set | 319 | 320 | 322 | 642 |
| Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical remission | 20 (6.3%) | 53 (16.6%) | 61 (18.9%) | 114 (17.8%) |
| Adjusted Treatment difference | | 10.3 | 12.7 | 11.5 |
| (97.5% CI) | | (4.8, 15.8) | (7.0, 18.4) | (7.0, 16) |
| p-value | | <0.001 | <0.001 | <0.001 |

N = number of subjects;
CI = confidence interval

Table 2 shows that 18.9% and 16.6% of subjects in the ustekinumab groups achieved clinical remission under the U.S. definition as compared to only 6.3% in the placebo group. The low p-value shows that these results are statistically significant.

TABLE 3

Number of Subjects with Endoscopic Healing at Week 8

| | Placebo | Ustekinumab IV | | |
| | IV | 130 mg | 6 mg/kg | Combined |
|---|---|---|---|---|
| Primary Efficacy Analysis Set Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects with endoscopic healing | 44 (13.8%) | 84 (26.3%) | 87 (27.0%) | 171 (26.6%) |
| Adjusted Treatment difference | | 12.4 | 13.3 | 12.8 |
| (95% CI) | | (6.5, 18.4) | (7.3, 19.3) | (7.9, 17.8) |
| (97.5% CI) | | (5.2, 19.2) | (6.4, 20.1) | (7.2, 18.5) |
| p-value | | <0.001 | <0.001 | <0.001 |

N = number of subjects;
CI = confidence interval

Table 3 shows that 27% and 26.3% of subjects in the ustekinumab groups achieved endoscopic healing as compared to only 13.8% in the placebo group. The low p-value shows that these results are statistically significant.

TABLE 4

| | Number of Subjects in Clinical Response | | | |
| | | Ustekinumab IV | | |
| | Placebo IV | 130 mg | 6 mg/kg | Combined |
|---|---|---|---|---|
| Primary Efficacy Analysis Set | 319 | 320 | 322 | 642 |
| Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical response | 100 (31.3%) | 164 (51.3%) | 199 (61.8%) | 363 (56.5%) |
| Adjusted Treatment difference | | 19.9 | 30.5 | 25.2 |
| (95% CI) | | (12.8, 27.3) | (23.2, 37.8) | (18.9, 31.5) |
| (97.5% CI) | | (11.4, 28.3) | (22.2, 38.8) | (18.0, 32.4) |
| p-value | | <0.001 | <0.001 | <0.001 |

N = number of subjects;
CI = confidence interval

Table 4 shows that 61.8% and 51.3% of subjects in the ustekinumab groups had a clinical response as compared to only 31.3% in the placebo group.  The low p-value shows that these results are statistically significant.

71.    Example 1 also notes that, at week 8, the median improvements from baseline in IBDQ scores were "significantly greater" in the ustekinumab groups than in placebo.  '307 patent, columns 47-48.

72.    Example 2 of the '307 is entitled "Maintenance Study of Ustekinumab in the Treatment of Ulcerative Colitis in Humans."  '307 patent, column 49, lines 57-60.  This Example describes the maintenance part of the UNIFI Phase III clinical trial where patients were administered subcutaneous 90 mg doses of ustekinumab every 8 weeks or 12 weeks.  The subjects who were in clinical response after receiving doses of ustekinumab intravenously were randomized into three groups: (1) "ustekinumab 90 mg SC every 8 weeks"; (2) "ustekinumab 90 mg SC every 12 weeks"; or (3) placebo.  '307 patent, columns 49-50, lines 61-13.  The study was conducted for 44 weeks and included 783 subjects in total.  '307 patent, column 50, lines 35-

55. Efficacy endpoints similarly included Mayo scores, partial Mayo scores, endoscopic scores, endoscopic healing, and IBDQ questionnaire responses. '307 patent, column 51, lines 10-56.

73.      The patent then discloses the results of the UNIFI Phase III maintenance study. It notes that "statistical significance can be claimed for both ustekinumab dose regimens" for the primary endpoint of clinical remission at Week 44 and the three major secondary endpoints of maintenance of clinical response, endoscopic healing, and corticosteroid free clinical remission at week 44. '307 patent, column 53, lines 6-19. The patent then provides the statistical data for each endpoint, identifying with statistical significance all the endpoints met by ustekinumab as a treatment. '307 patent, columns 53-55. The conclusion of the data is that:

> The ustekinumab maintenance study provided consistent and definitive evidence that the ustekinumab 90 mg SC q12w and q8w dose regimens were both effective in adult subjects with moderately to severely active UC who had responded to a single IV ustekinumab induction dose.
>
> The efficacy of ustekinumab was observed in subjects who were biologic failures as well as those who failed conventional but not biologic therapy (i.e., biology-naïve).
>
> Of note, while both doses of ustekinumab were effective, the q8w dose regimen demonstrated modestly better efficacy across several objective and/or more stringent endpoints (e.g., endoscopic healing and durable partial Mayo remission) as well as in overtime analyses of symptomatic and partial Mayo remission.
>
> Maintenance dosing with ustekinumab SC dose regimens of 90 mg q12w and 90 mg q8w was generally well-tolerated over 44 weeks in this population of adult subjects with moderate to severe ulcerative colitis.
>
> The safety and efficacy data from this study support a positive benefit/risk profile for ustekinumab SC maintenance therapy.
>
> '307 patent, column 58, lines 19-43.

74.      Based on the results of the UNIFI study, Stelara was approved by the FDA for the treatment of ulcerative colitis enabling doctors to use Stelara for the treatment of ulcerative colitis. Prior to the results of the UNIFI study and invention by J&J, I was not prescribing

26

Stelara for the treatment of ulcerative colitis, and guidelines did not endorse the use of Stelara for

the treatment of ulcerative colitis.  This invention was significant as it enabled physicians to

prescribe Stelara for the treatment of ulcerative colitis.  It also opened up a new avenue of

treatment for patients, providing another form of therapy outside of prior anti-TNF therapies and

vedolizumab as some patients did not respond to these therapies.  The number of biologic

therapies for moderate to severe ulcerative colitis in 2018 was limited, and the invention claimed

in the '307 patent provided much needed access to a new therapy for patients and physicians.

### 2.    The Claims

75.    Based on the specification, including Examples 1 and 2, the '307 patent contains

34 claims directed to methods of treating moderately to severely active ulcerative colitis subjects

by administering clinically proven safe and effective doses of ustekinumab for the achievement

of at least one of the specific clinical endpoints.  There are four independent claims to the '307

patent.  Those are claims 1, 19, 33, and 34.  '307 patent, claims 1, 19, 33-34.  Below I have

pasted claim 1 as a representative claim of the patent:

**Claim 1**: A method of treating moderately to severely active ulcerative colitis (UC) in a
subject in need thereof,

comprising administering to the subject a pharmaceutical composition comprising a
clinically proven safe and clinically proven effective amount of an anti-IL-12/IL-23p40
antibody,

wherein the antibody comprises a heavy chain variable region and a light chain variable
region, the heavy chain variable region comprising: a complementarity determining
region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino
acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3;
and the light chain variable region comprising: a complementarity determining region
light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid
sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6,

wherein after treating with the antibody, the subject is a responder to treatment by at least
one measure of response to treatment selected from the group consisting of:

27

(i) clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1,

(ii) endoscopic healing with a Mayo endoscopy subscore of 0 or 1,

(iii) clinical response based on the Mayo endoscopy subscore,

(iv) improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score,

(v) mucosal healing,

(vi) decrease from baseline in Mayo score, and

(vii) clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1.

### 3.    The Person of Ordinary Skill in the Art

76.    I understand from counsel that obviousness is determined from the perspective of a person having ordinary skill in the art to which the claimed invention pertains. I further understand that, in determining the level of ordinary skill in the art, factors considered include the (1) educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field.

77.    Applying these principles, it is my opinion that a person of ordinary skill in the art[2] is an IBD clinician, i.e., a gastroenterologist with an M.D. and several years of experience with the molecular immunology of IBD. A person of ordinary skill in the art would also have significant clinical experience with respect to personally diagnosing and treating IBD patients. As part of their clinical experience, they would have experience participating in clinical trials as an investigator and would have knowledge regarding the design of clinical trials.

---

[2] References in this report to a "person of skill," "skilled person," or the like are referring to the person of ordinary skill in the art.

78.     I qualify as a person of ordinary skill in the art under my definition or under the definition proposed by Dr. Matovcik.  Matovcik Rpt. ¶¶213-14 (stating that "such a person would have an M.D. and residency training in gastroenterology").  I agree with Dr. Matovcik's description of a person of ordinary skill in the art as someone who, in September 2018, would have knowledge regarding the mechanisms of action, diagnosis, clinical trials, and treatment of IBDs, including ulcerative colitis and Crohn's disease.  Matovcik Rpt. ¶213.

79.     I disagree with Dr. Matovcik's proposed definition to the extent it covers individuals with a "Ph.D. in immunology, biochemistry, or a related field," but who have no in-depth experience with the molecular immunology of IBD and IBD clinical trials.  Dr. Matovcik does not define what a "related field" is.  Biochemistry, for example, is the study of chemicals and chemistry in living organisms.  A Ph.D. in biochemistry can involve the study of molecules like DNA, proteins, lipids, etc., with no specialization or study of IBD or the digestive system.  A gastroenterologist with an M.D. specifically studies the digestive system, including how to diagnose and treat diseases including Crohn's disease and ulcerative colitis.

80.     A Ph.D. in immunology, biochemistry, microbiology, cell biology, or another "related field" by itself does not provide the necessary clinical experience or specialization in the study of the digestive system or IBD to qualify as a person of ordinary skill in the art.  Someone with a Ph.D. would need to have spent several years studying IBD, its molecular immunology, would need to have experience participating in or studying IBD clinical trials, and would also need to work as part of a team with an IBD clinician who has personal experience treating IBD patients and studying IBD.

81.     In the context of a multi-disciplinary team, a person of ordinary skill in the art (an M.D. with specialization in gastroenterology) may work with immunologists or biochemists who

29

In my view, a biologics-first approach will become more common over time. But, in the meantime, the problem from the patient's perspective is that they may develop complications before the switch occurs. Currently, physicians must tailor their treatment around the patient's real concern over who will pay for the treatment, while continuing to advocate for the treatment they feel evidence suggests is best.

189. Even when I or my fellow physicians attempt to administer biologics to our patients, certain formularies may require the use of one biologic over others. Formularies can dictate the specific biologics that can be prescribed for the treatment of ulcerative colitis or Crohn's disease. As a result, certain biologics may be preferred or required over others. For instance, a formulary might prioritize a biologic that has demonstrated superior outcomes in clinical trials or has a more favorable side effect profile. Negotiated pricing agreements between pharmaceutical companies and pharmacy benefit managers can also influence which biologics are included. Consequently, patients and physicians may need to adhere to the formulary's preferred biologics unless an exception is made based on medical necessity.

### E. The Allegedly Withheld Prior Art Is Not But-For Material to the '307 Patent

190. I understand that Plaintiffs have alleged that the following references would be but-for material to the claims of the '307 patent if they had been presented to the PTO during prosecution of the '307 patent:

- Thomas Ochsenkühn et al., *P759 Ustekinumab as rescue treatment in therapy-refractory or -intolerant ulcerative colitis*, 12 J. Crohn's & Colitis S495 (2018) ("Ochsenkühn (January 2018)") (JNJ-STELARA_001831063);

- Thomas Ochsenkühn et al., *Tu1713 Clinical Outcomes with Ustekinumab as Recue Treatment in Therapy Refractory or-Intolerant Ulcerative Colitis: Real*

*Worl Experience in a Large Single Center Cohort*, 155 Gastroenterology 6, S-997 (2018) ("Ochsenkühn (May 2018)") (JNJ-STELARA_001822449);

- Antonios G. A. Kolios, et al., *Paradoxical ulcerative colitis during adalimumab treatment of psoriasis resolved by switch to Ustekinumab*, 178 Brit. J. Dermatology 551 (2018) ("Kolios") (JNJ-STELARA_001822439);

- Senra Afonso et al., *CP-202 Ustekinumab treatment in refractory inflammatory bowel disease*, 24 Eur. J. Hosp. Pharmacy (2017) ("Afonso") (JNJ-STELARA_001829858);

- Canadian Agency for Drugs & Technology – Common Drug Review – Ustekinumab ISSUES FOR CONSIDER. – NCBI Bookshelf (2017) ("CADTH") (JNJ-STELARA_001830596); and

- G Tarr, *Superheroes in Autoimmune Warfare: Biologic Therapies in Current S. African Practice* (2014) ("Tarr 2014") (JNJ-STELARA_001829848).[6]

191.    It is my opinion that each of these references is not but-for material to the claims of the '307 patent and would not, either alone or in combination with other references, teach all of the limitations of the claims of the '307 patent or provide a reasonable expectation of success in achieving the invention of the '307 patent claims.  I disagree with Dr. Warfield that these references teach the "successful use" of ustekinumab to treat ulcerative colitis, that ustekinumab is "shown" to be effective, or that it "was expected that Stelara would be proven to be effective

---

[6] Plaintiffs' Second Amended Complaint refers to a reference authored by Dr. Tran-Minh.  Dr. Warfield and Dr. Matovcik have not offered opinions regarding Tran-Minh.  Therefore, I do not address this reference in my report.  I reserve the right to supplement my report if Plaintiffs' experts address this reference in reply.

in treating ulcerative colitis." Warfield Rpt. ¶¶39, 174, 177, 180, 183, 186.  I also disagree that

any gastroenterologist could "anticipate FDA approval" based on these references.  Warfield

Rpt. ¶¶175, 178, 181, 184, 187.  Below, I discuss each reference and the basis for my

disagreement.

192.    I understand that Dr. Matovcik and Mr. Bahr also offer opinions regarding the

Ochsenkühn 2018, Kolios, and Afonso references rendering the claims of the '307 patent invalid.

Bahr Rpt. ¶¶232-239 ("These publications disclose, or . . . render obvious, the treatment of

ulcerative colitis with ustekinumab); Matovcik Rpt. ¶¶207-210, 215-229.  For the same reasons I

discuss below, I also disagree with these opinions from Dr. Matovcik and Mr. Bahr.

### 1.    Relevant Legal Standards

193.    I am not an attorney, and therefore my understanding of patent law and the legal

standards set forth in this report is based on explanations provided to me by counsel.  I have

applied those principles in arriving at the opinions set forth herein.

194.    I understand that a reference is but-for material if, had a reference been disclosed

to the United States Patent and Trademark Office ("PTO"), the patent claims would not have

been allowed by the PTO.  I also understand that, to demonstrate fraud before the PTO, a

withheld reference must be but-for material.

195.    I also understand that a reference cannot be but-for material if it is cumulative of

information already provided to the US PTO during prosecution of a patent.

196.    I have been informed by counsel that a patent claim may be invalid if it would

have been obvious in view of a combination of prior art references.  I have further been informed

that a patent claim is obvious if the differences between the subject matter of the claim and the

prior art are such that the subject matter as a whole would have been obvious to the person of ordinary skill in the art in the relevant field at the time the invention was made.

197.    I have been informed that, in order for a reference or combination of references to render the claimed invention obvious, a person of ordinary skill in the art must have had a reasonable expectation of success in arriving at the claimed invention. I also understand that the claim is considered as a whole, so the obviousness analysis requires consideration of whether the claimed combination of elements was rendered obvious by the cited prior art.

198.    I also have been informed that a patent claim may be invalid if it is anticipated. I understand that, to anticipate a patent claim, a single prior art reference must disclose all elements of a claimed invention.

199.    I also understand that for a reference to be anticipatory, the reference must enable someone skilled in the art to make and use the invention without undue experimentation, and all elements must be explicitly or inherently disclosed in a reference.

200.    I further understand that an element is inherently disclosed only if it is necessarily present in the prior art reference. An inherent element must be inevitable, not merely probable or possible.

### 2.    Ochsenkühn 2018

201.    It is my opinion that the Ochsenkühn (January 2018) and Ochsenkühn (May 2018) are not but-for material to the claims of the '307 patent. Both are single-page abstracts describing a "retrospective data analysis" of 17 patients with ulcerative colitis who were administered ustekinumab. Ochsenkühn (January 2018) at JNJ-STELARA_001831063 ("A retrospective data analysis was performed in 17 UC patients"); Ochsenkühn (May 2018) at JNJ-STELARA_001822449. Substantively, other than different formatting and title, the abstracts are

almost identical in their disclosures.  I therefore address both Ochsenkühn (January 2018) and

Ochsenkühn (May 2018) as "Ochsenkühn 2018" in my report.  To be clear, each of the opinions

I express in my report regarding "Ochsenkühn 2018" or "Ochsenkühn" apply to both

Ochsenkühn (January 2018) and Ochsenkühn (May 2018) regardless of any minor differences

between the two abstracts.

202.    In my opinion, a person of ordinary skill in the art reviewing Ochsenkühn 2018

would not have a reasonable expectation that ustekinumab would work as a treatment for

ulcerative colitis or achieve the specific clinical end points recited by the '307 patent.  It is my

opinion that a person of ordinary skill in the art would immediately see serious flaws with this

study.  These flaws limit any conclusions regarding the efficacy of ustekinumab as a treatment

for moderately to severely active ulcerative colitis.  At best, I view Ochsenkühn 2018 as

hypothesis generating.  The abstract does not provide a reasonable expectation that ustekinumab

would work to treat moderately to severely active ulcerative colitis.

### a) Insufficient Sample Size

203.    Ochsenkühn 2018 is a retrospective study describing the administration of

ustekinumab to 17 subjects with ulcerative colitis.  This is a very small set of subjects for a study

evaluating the efficacy of a drug in a new indication.  I understand that Dr. Ochsenkühn himself

has described this study as a "small" study.  Ochsenkühn 2020 at p.96 (noting the "small study

size").

### (1)    Ulcerative Colitis Is a Relapsing & Remitting Disease

204.    Gastroenterologists understand that it is important for clinical studies to have

sufficient sample sizes to evaluate the efficacy of a drug as a treatment.  This is particularly true

for ulcerative colitis.  Ulcerative colitis is a relapsing and remitting disease.  Patients with

ulcerative colitis will go through "relapsing" periods involving flare-ups followed by "remitting" periods where the disease is naturally in remission. The cycle repeats and can vary in length. Due to the relapsing and remitting nature of ulcerative colitis, it is important for ulcerative colitis trials to have a sufficient sample size. Because these patients can naturally go into remission for months or even years, there is no way to know with certainty whether a given patient's remission is due to the administered treatment or due to the natural cycle of the disease. Ghosh 2000 at p. 1119 ("Many patients have long periods of complete remission").

205.    Because of the nature of ulcerative colitis, clinical studies testing efficacy enroll hundreds of patients to establish clinical efficacy with statistical significance. D'Amico 2020 at p.6 ("In fact, IBD trials require an extremely large number of patients because of their high variability"); Ma 2025 at p.484 ("This treat-through registrational trial was conducted with a relatively smaller sample size (n = 433)"); Wang 2013 at p.117 ("The sample size is the most important determinant of statistical power of a study, and a study with inadequate power, unless being conducted as a safety and feasibility study, is unethical"); Gupta 2016 at p.329 ("with smaller sample size in a study . . . the results of the study cannot be generalized to the population").

206.    The FDA itself has published guidance entitled "E9 Statistical Principles for Clinical Trials." FDA Guidance 1998. There, the FDA has noted that "the number of subjects in a clinical trial should always be large enough to provide reliable answers to the questions addressed." FDA Guidance at p.21.

207.    As I have explained above, see above ¶204, ulcerative colitis symptoms come in waves, followed by periods of remission. These periods of remission following a flare can be lengthy, lasting years. For example, in one study which followed 92 ulcerative colitis patients in

remission, 35 patients relapsed at various ranges of "three to 46 weeks." Riley 1990 at p.179. The remaining 57 patients, the majority, went over 48 weeks—close to a full year—without a relapse. Riley 1990 at p.179. In another study evaluating the potential effect of stress and other psychosocial factors on the natural history of disease, 62 ulcerative patients who were in clinical remission were followed for 68 months (close to 6 years). Levenstein 2000 at p.1213. Most of the patients were still in remission 12 months after the start of the evaluation period. Levenstein 2000, Fig. 2. These two studies illustrate the relapsing and remitting course of ulcerative colitis, and show how the rate and length of relapses and remission can vary from patient to patient often lasting months to years. In my personal experience, patients can sometimes go into remission for months up to a couple of years.

208. This highlights the problem with the sample size in Ochsenkühn 2018. If a subject had active disease before treatment with ustekinumab, remission could be due to the ustekinumab or due to the natural course of the disease. At such small sample sizes with no placebo comparison, a person of ordinary skill would understand there is insufficient data to come to any conclusion. Patients could have presented with the following relapsing and remitting cycle for their ulcerative colitis:



209.    As shown above, subject(s) in Ochsenkühn 2018's study may have started treatment *during* their flare after which their ulcerative colitis could naturally remit.  Under these circumstances, a study could improperly attribute a patient's natural remission to the treatment.  A skilled person would understand this and would not make any efficacy conclusions based on this study.  The abstracts are hypothesis generating material at most.

### (2)    Lack of Statistical Significance (P-Value, Power)

210.    In a clinical trial, researchers want to know if a new drug works better than a placebo (a fake treatment that looks like the real thing but has no active ingredients).  To figure this out, researchers would compare the results from patients who took the new drug with those who took the placebo.  "Statistical significance" refers to the likelihood that the observed differences in outcomes between the experimental arm and the placebo arm of a study are not

due to random chance. It is a measure used to determine whether the effect of the treatment is likely to be real and meaningful.

211.    A "p-value" is a statistical measure that enables researchers to determine the statistical significance of results, i.e., how likely patient improvement is due to mere chance as opposed to the treatment. The lower the p-value, the more likely the treatment has worked and the less likely the observations would have occurred by chance. Oftentimes, researchers set a significance value (frequently 0.05) before conducting the trial. Gupta 2016 at p.329. If the p-value is less than this level, this indicates that the results are statistically significant. It is essential for a proper clinical study to have a p-value. Shreffler 2023 at p.2 ("The p-value is the probability that the observed effect within the study would have occurred by chance if, in reality, there was no true effect.").

212.    A related concept is "power," which is a measure of a clinical trial's ability to detect whether there is a real effect to a drug if one exists. It is the probability, expressed as a percentage, that a trial's design will actually detect a true effect in a study. An important aspect of "power" is determining the appropriate number of patients needed in a study for researchers to be confident that observations are truly due to the drug's effects as opposed to chance or other intervening variables. In the context of clinical trials, researchers often look for a power of at least 80%. Gupta 2016 at p.329 (most clinical trials use "the power of 80%").

213.    For example, Gordon 2021 conducted a systematic review of the minimum samples size estimates for trials in inflammatory bowel disease to establish sufficient power for a clinical trial. Table 1 of Gordon 2021 illustrates the "Mean sample size needed" for Crohn's disease and ulcerative colitis trials:

| Table 1 Overall summary of power calculations and sample size deficits | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total studies | Studies with power calculation | Studies with difference of 10% and less | How many studies didn't achieve target sample size | Mean sample size underpowered (range) | Mean sample size needed | How many studies are underpowered |
| CD induction | 39 | 26 | 12 | 6 | 28 (2-70) | 231 | 11 |
| CD maintenance | 25 | 19 | 9 | 3 | 52 (7-79) | 300 | 10 |
| UC induction | 27 | 19 | 8 | 3 | 22 (1-55) | 219 | 4 |
| UC maintenance | 16 | 10 | 0 | 1 + 1 didn't report | 21 | 196 | 7 |

Gordon 2021, Table 1. These are the "minimum sample sizes that would achieve appropriate power using the actual clinical data." Gordon 2021 at p.7572. As shown above, the authors concluded that the ulcerative colitis studies required a mean sample size of 219 subjects for an induction phase and 196 subjects for a maintenance phase. Gordon 2021 at Table 1. This is over 10 times the number of patients in Ochsenkühn 2018's retrospective study.

214. Similarly, the UNIFI Study Protocol—which describes an FDA-approved clinical study evaluating ustekinumab as a treatment for ulcerative colitis—contained a section entitled "Sample Size Determination" where J&J calculated the minimum number of subjects needed to properly evaluate efficacy using "statistical power considerations." NCT 236 Protocol at JNJ-STELARA_001838566. J&J in March 2015 determined that a "target of 951 subjects (317 per treatment group) should be enrolled in the induction study." NCT 236 Protocol at JNJ-STELARA_001838567. A gastroenterologist in 2018 would have also understood that a study would need many hundreds of subjects to detect a treatment difference between ustekinumab vs. a placebo.

215. Even at a sample size of 951 subjects, J&J illustrated to the FDA how slight shifts in the results could dramatically reduce the likelihood of detecting a treatment effect:

| Table 5: | Power for detecting a treatment effect based on different proportions of subjects in clinical remission at Week 8 (US-specific definition) with a fixed sample size of 951 subjects (317 per treatment group) | |
|---|---|---|
| **Proportion of Subjects in Clinical Remission at Week 8 (%)** | | Power[a] (%) |
| Placebo | Ustekinumab | |
| 12 | 25 | 97 |
| | 23 | 92 |
| | 22 | 86 |
| | 21 | 79 |
| a: Based on α=0.025 (2-sided). | | |

NCT 236 Protocol at JNJ-STELARA_001838568. If 25% of subjects administered ustekinumab achieved clinical remission, the "[p]ower," or probability of detecting a real effect, was 97%. However, if 21% of subjects administered ustekinumab achieved clinical remission (201 subjects), that probability was significantly reduced to only 79%.

216.    In comparison, at only 17 patients, Ochsenkühn 2018 contains ***less than 2%*** of the number of subjects studied in UNIFI. If UNIFI required hundreds of subjects to achieve sufficient "power" to evaluate whether ustekinumab was an effective treatment, Ochsenkühn 2018 is far below the number of subjects required.

217.    Given the small size of the study, it would also have been impossible for Dr. Ochsenkühn to use p-values or assess statistical significance. Dr. Ochsenkühn agrees with my opinion. He agreed that there was "no disclosure of a p-value" in Ochsenkühn 2018. Ochsenkühn Dep. Tr. at 96:20-22, 121:13-15. As Dr. Ochsenkühn himself stated, a "P-value shows – it indicates the statistical significance of the result. So you would never come up with an idea like putting in a non – in a not prospective small study, you would not come up with a p-value because it wouldn't make sense. You need larger numbers." Ochsenkühn Dep. Tr. at 173:9-15, 173:2-8 (explaining that you use a p-value "when you have large numbers like 70,100, 150").

218.    As I explained above, a p-value is an essential measure that enables physicians to evaluate whether patient improvement is a result of treatment as opposed to mere chance. Without a p-value, a person of ordinary skill in the art could not interpret Ochsenkühn 2018 as showing that ustekinumab was an effective treatment for ulcerative colitis, as opposed to being due to random chance.  Random chance can occur with ulcerative colitis patients.  Because ulcerative colitis patients can naturally go into remission for months or even years, it is even more important to have statistically significant data when establishing efficacy.

219.    Ochsenkühn 2018 would also fail to meet the requirements of the U.S. FDA.  The FDA has outlined the number of study participants commonly required for the various phases of U.S. FDA-approved clinical trials.  A Phase I trial is a small trial intended to evaluate the safety of a drug, not its efficacy:



Phase 1

**Study Participants:** 20 to 100 healthy volunteers or people with the disease/condition.

**Length of Study:** Several months

Purpose: Safety and dosage

**Approximately 70% of drugs move to the next phase**

https://www.fda.gov/patients/drug-development-process/step-3-clinical-research; Muglia 1998 at p.236 ("Phase 1 trials are primarily designed to accumulate short-term safety (toxicity) and pharmacological data . . . . Evaluation of efficacy and of long-term toxicity requires longer,

76

larger, and controlled studies").  As shown above, the FDA states that such Phase I trials

typically have 20 to 100 healthy volunteers or people with the relevant disease.  Ochsenkühn

2018 does not even have 20 subjects.

220.    After a Phase I trial establishes that a drug at a particular dosage appears to be

safe, drug sponsors then move to Phases II and III where hundreds or thousands of subjects are

tested to establish whether a drug is efficacious:



https://www.fda.gov/patients/drug-development-process/step-3-clinical-research. Ochsenkühn

2018's description of 17 subjects falls far short of the many hundreds or thousands of subjects

required by FDA for Phase II or III studies evaluating clinical efficacy and adverse reactions.

221.    Given the small size of Ochsenkühn 2018, the nature of ulcerative colitis, and the

inability to assess efficacy using principles of statistical significance, a gastroenterologist cannot

make any conclusions regarding the efficacy of ustekinumab as a treatment for moderately to

severely active ulcerative colitis based on this study.

222.    The conclusion of Ochsenkühn 2018 confirms my opinion. Ochsenkühn 2018

states that it is "possible that large ongoing trials" "will confirm our findings." Ochsenkühn

2018. The authors recognized that their data was limited and that a large, properly-conducted

clinical trial could show different results. Others agree with my opinion. Viscido 2019 cited to

the Ochsenkühn 2018 ECCO abstract before the UNIFI results were published. In Viscido 2019,

the authors stated that:

> Antibodies toward interleukins (ILs)-12/23 (ustekinumab) and tofacitinib (a not
> biologic small molecule inhibiting Janus Kinase) have been used in small series of
> patients with severe UC but it is too early to hypothesize their use.

Viscido 2019 at p.28. Viscido cited to Ochsenkühn 2018, but they also concluded that the data

with the "small series of patients" made it "too early to hypothesize" the use of ustekinumab as a

treatment for ulcerative colitis. Other papers similarly noted that the UNIFI study was

evaluating ustekinumab's efficacy despite Ochsenkühn 2018. Shah 2019 at p.104 (citing

Ochsenkühn 2018, but then stating "[h]owever, larger studies are ongoing to evaluate its efficacy

in UC").

78

**b) Six Subjects in Remission Prior to Study**

223.    Another significant flaw is that 6 of the 17 subjects in Ochsenkühn 2018 were already in clinical remission before being administered ustekinumab.  Ochsenkühn 2018 ("At the start of the rescue therapy . . . 35% (6/17) were in remission').  This further hampers any conclusions one can make in reviewing Ochsenkühn 2018.  A person of skill in the art would understand that, for those 6 subjects already in remission, there is no way of knowing whether ustekinumab effectively treated ulcerative colitis because they were already in remission.

224.    The inclusion of these subjects in the Ochsenkühn 2018 study precludes an ability to make any conclusions regarding the efficacy of ustekinumab as a treatment of ulcerative colitis.  While Ochsenkühn 2018 reports that 11 of 17 subjects were in remission, a gastroenterologist would understand that it is possible that 6 of those 11 subjects were in remission at the start of the study before they were administered ustekinumab.

| Percentage of Subjects in Remission at End of Ochsenkühn 2018 Study | | |
|---|---|---|
| | [Number of Subjects in Remission]/[Total Number of Subjects] | % in Remission |
| Including 6 Subjects in Remission Before Study | 11/17 | 64.7% |
| Excluding 6 Subjects in Remission Before Study | 5/11 | 45.5% |

As shown above, if true, the inclusion of those 6 subjects who were already in remission at the start of the study (and could have been in remission at the end), increases the percentage of subjects in remission from approximately 46% to 65% at the end of Dr. Ochsenkühn's study.  At such a small sample size and given the natural variability of ulcerative colitis, a person of skill in the art could not reasonably expect ustekinumab to treat ulcerative colitis based on this limited data.

79

225.    In contrast, the UNIFI Phase III clinical trial conducted by J&J did not include any subjects who were already in remission prior to treatment.  Before inclusion in the UNIFI trial, subjects had to have "moderately to severely active UC (defined as a Mayo score of 6 to 12 inclusive, including a Mayo endoscopy score $\geq 2$)."  NCT 236 Protocol at JNJ-STELARA_001838525.  Thus, none of the subjects in the UNIFI clinical trial conducted by J&J were in remission before ustekinumab treatment.

### c)  No Placebo or Double-Blind Study

226.    Ochsenkühn 2018 as a retrospective study also lacks many of the hallmarks of clinical studies used to evaluate efficacy, including the use of a placebo or a double-blind study.

227.    A "blinded" trial refers to a trial where the patients participating in a trial do not know which group they are in.  A "double-blind" trial refers to a trial where both the patients and the investigators participating in the trial do not know which group the patients are in.  The use of double-blind studies reduces the risk of bias in data analysis.  Ochsenkühn 2018 does not disclose the use of any "blinded" trial as it is a retrospective study.  Therefore, the 17 subjects in Ochsenkühn 2018 were aware they were taking ustekinumab, increasing the risk of bias in the study results.

228.    A placebo is an inactive treatment, i.e., a fake treatment that has no therapeutic activity.   A placebo is used in clinical trials to test the effectiveness of treatments and is most often used in drug studies. In the context of a clinical trial, study subjects are often assigned to different groups, including placebo groups and treatment groups.  The use of placebos is important for clinical studies.  Comparing outcomes between the group of subjects who receive a treatment versus a placebo allows physicians to evaluate whether a drug is doing any better than no treatment at all.  An important aspect of this is something known as the "placebo effect."

229.    The placebo effect is when a subject experiences improvement after taking a placebo, i.e., the fake treatment.  While the science behind the placebo effect is still not quite understood, it has been well-established that subjects who take a placebo can nevertheless experience an improvement in their condition.  Colloca 2018 at p.2 ("Placebo effects and positive outcomes resulting from expectations about a treatment outcome should be considered as powerful components of modern medicine.").  It has been observed in the literature that the placebo effect is traditionally high in an IBD trial.  Ilnyckyj 1997 at p.1854 ("There is consistently a measurable benefit noted among placebo users in treatment trials of ulcerative colitis (UC)"); Walsh 2014 at p.369 ("trials in IBD have traditionally had a high placebo response rate.").

230.    By including a placebo in a clinical trial and hiding from the participants whether they are taking the placebo or the active drug, researchers can evaluate how both the placebo arm and experimental arm react.  If both the placebo arm and experimental arm experience similar levels of improvement, the improvement may not be due to the drug.

231.    Skilled persons were aware of the placebo effect in 2018.  In the context of IBD trials with biologics, as with ustekinumab, the placebo response rate was known to be even higher than other trials.  Jairath 2017 at p.2 ("Trials of biologics had the highest placebo response rate (35%; 95% CI 30 to 41%)").  And response to a "placebo" can include clinical remission.  Ilnyckyj 1997 at p.1854 (noting that in analysis of certain ulcerative colitis studies "clinical remission" was achieved in approximately 10% of placebo subjects and clinical improvement was observed in close to 30% of placebo subjects).

232.    Because Ochsenkühn 2018 does not use a placebo and because it is unblinded, the study is prone to bias.  A gastroenterologist would understand that both the placebo effect and

natural remission could account for many of the subjects' reported improvement, and that there is no way to conclude that ustekinumab was an effective treatment in such a small study without the use of any placebo, or comparison arm to the study.

233.    Unlike Dr. Ochsenkühn's retrospective study, the UNIFI clinical trial that is reported in the patent was conducted with a placebo arm and a comparison was conducted between data from the placebo arm and the treatment arm of the study to demonstrate that ustekinumab performed better than a placebo.  In doing so, the UNIFI clinical trial was able to appropriately address the placebo effect and demonstrate that ustekinumab was an effective treatment for ulcerative colitis.  NCT 236 Protocol at JNJ-STELARA_001838489 ("Double-blind, Placebo-controlled"), 1838528 ("Blinded treatment will be used to reduce potential bias during data collection and evaluation of clinical endpoints" and a "placebo control will be used to establish the frequency and magnitude of changes in clinical endpoints that may occur in the absence of active treatment"), 1838567 (discussing the detection of a "treatment difference" between ustekinumab and placebo).  The FDA itself has described that the "most important design techniques for avoiding bias in clinical trials are blinding and randomization."  FDA Guidance 1998 at p.40.

### d) No Washout Period

234.    A skilled person would understand that Ochsenkühn 2018 does not disclose the use of a washout period prior to the administration of ustekinumab.  A washout period is a period of time where a subject experiences no treatment before administering a new drug.  The purpose of a washout period is to remove any lasting effects from any prior treatments before administering a new drug.  Gupta 2013 at p.51 ("The purposes of a washout period include . . . [t]erminating the effects of any drug the subject may have been taking before entering the

clinical trial, so that the effects of the trial drug-and only the trial drug-may be observed."). Many IBD clinical trials have used washout periods to remove these lasting effects. Sandborn 2012 (Ustekinumab) at p.1520 ("Previous treatment with intravenous glucocorticoids, TNF antagonists, or natalizumab was not permitted for the prespecified washout periods of 3 weeks, 8 weeks, and 12 months"), Hanauer 2019 at p.140 (describing "2 weeks'," "4 weeks'," and "8 weeks' washout"). Absent a washout period, it is not possible to conclusively determine whether a subject's improvement is due to the new drug or due to lasting effects from prior treatments.

235.    Ochsenkühn 2018 does not disclose or use a washout period in its study. Ochsenkühn 2018. At his deposition, Dr. Ochsenkühn agreed that "Ochsenkühn 2018 does not disclose the use of a washout period to remove the effects of prior treatment." Ochsenkühn Dep. Tr. at 96:24-97:11 (agreeing that the study did not use a washout period). The Abstract states that all of its subjects were previously on "purine-analogues, TNF-antibody therapy, and the anti-integrin, vedolizumab." Ochsenkühn 2018 (ECCO version). A skilled person would understand that, absent a washout period, these treatments could have lasting effects on patients in the Ochsenkühn 2018 study.[7] These effects would further prevent a person of ordinary skill in the art from concluding that ustekinumab was the cause of remission.

236.    In contrast, the UNIFI study protocol approved by the FDA did use a washout period before the administration of ustekinumab to subjects enrolled in the trial:

---

[7] The absence of a washout period for vedolizumab is particularly problematic as the washout period for vedolizumab needs to be months long but Ochsenkühn 2018 only reports clinical remission results through 6 months. NCT 236 Protocol at JNJ-STELARA_001838531 (requiring washout of at least 4 months).

7. The following medications/therapies must have been discontinued before first administration of study agent:

    a. Vedolizumab for at least 4 months.

    b. TNF-antagonist therapy (eg, infliximab, etanercept, certolizumab, adalimumab, golimumab) for at least 8 weeks.

    c. Cyclosporine, tacrolimus, or sirolimus, for at least 4 weeks.

    d. 6-thioguanine (6-TG) must have been discontinued for at least 4 weeks.

    e. Rectal corticosteroids (ie, corticosteroids [including budesonide] administered to the rectum or sigmoid colon via foam or enema or suppository) for at least 2 weeks.

    f. Rectal 5-ASA compounds (ie, 5-ASAs administered to the rectum or sigmoid colon via foam or enema or suppository) for at least 2 weeks.

    g. Parenteral corticosteroids for at least 2 weeks.

    h. Total parenteral nutrition (TPN) for at least 2 weeks.

    i. Antibiotics for the treatment of UC (eg, ciprofloxacin, metronidazole, or rifaximin) for at least 2 weeks.

NCT 236 Protocol at JNJ-STELARA_001838531.

237.    I further understand that Dr. Ochsenkühn attempted to explain during his deposition that it would be unethical to use a washout period. Ochsenkühn Dep. Tr. at 173:16-18. I disagree. As discussed above, washout periods are frequently used in IBD clinical trials, including with the UNIFI clinical trial conducted by J&J and approved by the U.S. Food and Drug Administration. If a washout period was unethical in a study, it would not be routinely used in clinical trials and would not be a clinical trial approach approved by FDA.

### e) No Treatment of Severe Ulcerative Colitis

238.    Ochsenkühn 2018 does not disclose the treatment of a patient with "severely active ulcerative colitis," as required by the claims of the '307 patent, because the study did not treat any subjects with "severely active ulcerative colitis."

239.    Ochsenkühn 2018 utilized the modified Truelove and Witts colitis activity index ("CAI"), also known as the Lichtiger index, to assess the severity of each subject's ulcerative colitis. Ochsenkühn 2018; Ochsenkühn Dep. Tr. at 98:16-25. Ochsenkühn 2018 also reports

84

that the scores "at the start of the therapy ranged between 1 and 11 with a median of 8" using this index. But a score of 11, the worst score at the start of treatment in Ochsenkühn 2018, is not severely active ulcerative colitis.

240. According to published literature, a score of "11" using the Lichtiger index qualifies as "moderate" ulcerative colitis, not severe ulcerative colitis:

**Supplementary Table 2.** Continued

|  |  |  | Activity score thresholds | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Tool | Parameters assessed | Scoring system | Remission | Mild | Moderate | Severe |
| SCCAI (Walmsley)[22] | Bowel movement frequency (day)<br>Bowel movement frequency (night)<br>Urgency of defecation<br>Blood in stool<br>Well-being | Cumulative score | ≤2[22,23]<br><2.5[24] | 3–20 | | |
| Lichtiger index[25,26] | Extracolonic features<br>Diarrhea frequency<br>Nocturnal diarrhea<br>Visible blood (% of movements)<br>Fecal incontinence<br>Abdominal pain/cramping<br>Well-being<br>Abdominal tenderness<br>Need for antidiarrheal medications | Cumulative score | ≤3 | 4–8 | 9–14 | >14 |

Peyrin-Biroulet 2016 at Supp. Table 2; Nakov 2017 at p.2 ("mild activity: 4-8 points; moderate activity 9-14 points; and high activity of the disease: >15 points"); Schoepfer 2013 at p.334 ("inactive (remission) disease: 0–3 points; mild activity: 4–8 points; moderate activity: 9–14 points; and high activity of the disease: ≥15 points"). Ochsenkühn 2018 does not disclose the rescue treatment or treatment of any subjects with severely active ulcerative colitis.

### f) Indeterminate Effect on Moderate Ulcerative Colitis

241. It is also my opinion that a person of ordinary skill reviewing Ochsenkühn 2018 would understand that the data do not support the efficacy of ustekinumab as a treatment of moderately active ulcerative colitis.

242. Because the median score, i.e., the half-way point, at the start of therapy in Ochsenkühn 2018 was 8, a person of ordinary skill in the art would understand that half of the 17

subjects were either in remission or only had mild disease at the beginning of therapy. Nakov 2017 at p.2 ("mild activity: 4-8 points"). Therefore, a person of ordinary skill would understand that Ochsenkühn 2018's statement that 11 patients had "moderately or severely active disease" was false. Overall, approximately 8-9 of the 17 subjects in Ochsenkühn 2018 did not even have moderate or severe ulcerative colitis. This further hinders the ability to make any conclusions regarding the efficacy of ustekinumab as a treatment for moderate or severe ulcerative colitis.

243.    Given what the literature stated regarding the Lichtiger index, a person of ordinary skill in the art would understand that Ochsenkühn 2018, at best, describes the administration of ustekinumab to approximately 8 patients with moderate ulcerative colitis. Because Ochsenkühn 2018 does not identify *which* specific patients were in clinical remission at the end of its study, a person of ordinary skill would not be able to determine how many of the patients with moderate disease experienced improvement as opposed to the patients with mild disease.

244.    For example, if one removes the 6 subjects who were in remission before the study was even conducted, 11 subjects remain. According to Ochsenkühn 2018, 8 of the remaining 11 subjects would have had moderate disease according to the Lichtiger index because the median CAI score was 8 ($8/17 \approx 50\%$), while 3 of the 11 had mild disease.[8] A person of ordinary skill in the art would understand that 3 subjects with mild disease (i.e., Lichtiger scores

---

[8] If 8 is the median, i.e. the half-way point for all 17 subjects, that would mean that half of the 17 subjects had CAI scores between 8 and 11 at the start of the study. Because there cannot be 8.5 patients, I have used 8 patients.

between 5-8) may have experienced remission[9] while *only* 3 of the 8 subjects with moderate

ulcerative colitis experienced remission.  I have illustrated this in the chart below:



This would not demonstrate that ustekinumab is a treatment for moderate ulcerative colitis.

Because of these significant limitations with Dr. Ochsenkühn's data, it is my opinion that a

person of ordinary skill in the art would not agree that Ochsenkühn 2018 supports the use of

---

[9] If the three patients with mild disease did not experience remission, but the patients with moderate disease did, this would still be problematic.  A person of ordinary skill would have significant doubt regarding the use of ustekinumab to treat moderate or acute disease.  If ustekinumab was failing to treat mild disease, a gastroenterologist could not have faith that it would treat moderate or acute disease.

ustekinumab to treat moderate ulcerative colitis, or its use as a rescue treatment for moderate
ulcerative colitis.

### g) The Claimed Clinical Endpoints

245.    For the reasons stated above regarding the small sample size, the subjects
already in remission, the lack of placebo or double-blind nature of the study, and the absence of a
washout period, it is my opinion that a skilled person would not reasonably expect ustekinumab
to treat ulcerative colitis based on Ochsenkühn 2018.

246.    However, even if Ochsenkühn 2018 could provide some expectation that
ustekinumab could improve an ulcerative colitis patient's condition, I understand that the claims
of the '307 patent are directed to the achievement of at least one of specific clinical endpoints.
'307 patent, claim 1.  Those endpoints are the following:

(i) clinical remission based on at least one of the global definition of clinical remission
with Mayo score ≤2 points with no individual subscore >1 and the US definition of
clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo
endoscopy subscore of 0 or 1;

(ii) endoscopic healing with a Mayo endoscopy subscore of 0 or 1;

(iii) clinical response based on the Mayo endoscopy subscore;

(iv) improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ)
score;

(v) mucosal healing;

(vi) decrease from baseline in Mayo score; or

(vii) clinical response as determined by a decrease from baseline in the Mayo score by

≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1

points or a rectal bleeding subscore of 0 or 1.

'307 patent, claim 1. These clinical endpoints align with the endpoints of the UNIFI clinical trial

conducted by J&J. NCT 236 Protocol at JNJ-STELARA_001838552-555. It is my opinion that

Ochsenkühn 2018 does not disclose or render obvious any of these clinical endpoints.

247.    The Ochsenkühn 2018 abstracts do not use Mayo scores but instead define

clinical remission using a modified Truelove and Witts colitis activity index, also known as the

Lichtiger index. Ochsenkühn 2018; Ochsenkühn Dep. Tr. at 98:16-25, 103:9-104:13. The

Lichtiger index is not a validated means of evaluating clinical remission in inflammatory bowel

disease. It also does not require the use of endoscopies, unlike the Mayo score. I have

personally never used this index to evaluate clinical remission, and it is my opinion that a

physician in September 2018 would understand that they could not adequately assess the state of

a patient's disease without performing an endoscopy.

248.    The Mayo scoring system is the most frequently used index in controlled clinical

trials for ulcerative colitis. National Library of Medicine 2016 ("The Mayo score is one of the

most commonly used disease activity indices in placebo-controlled trials in UC."). It contains

four parts: "rectal bleeding, stool frequency, physician assessment, and endoscopy appearance.

Each part is rated from 0 to 3, giving a total score of 0 to 12." National Library of Medicine

2016. It therefore requires the use of endoscopies, unlike other indices. The Mayo score is a

widely accepted means of evaluating ulcerative colitis in patients, and has been approved by the

FDA as a clinical trial endpoint. The Lichtiger Index does not involve the use of endoscopies

and is distinct from the Mayo score.

249.    An endoscopy is a medical procedure that involves the insertion of an endoscope, i.e., a camera, into the digestive tract to examine the organs and sometimes perform medical procedures.  It is a technique that allows gastroenterologists to visually inspect what is taking place within the body, including all parts of the digestive system (colon, large intestine, small intestine, stomach, and esophagus).  An upper endoscopy can be used to examine the upper part of the gastrointestinal tract, such as the esophagus and stomach.  A lower endoscopy, sometimes referred to as a colonoscopy, examines the lower part of the gastrointestinal tract, including the colon and rectum.  As a physician, we have been using endoscopy to diagnose and evaluate ulcerative colitis for decades and I cannot imagine a situation where a physician would not use it as a means of evaluating a patient's ulcerative colitis in the last several decades.

250.    The '307 patent teaches that "mucosal healing" as used in the patent refers to "both endoscopic healing and histological healing."  '307 patent, column 40, lines 41-42, and column 55, lines 57-58 ("mucosal healing (a combination of endoscopic healing and histological healing)").  This was a novel approach taken by J&J in connection with the UNIFI clinical trial.  Prior to the UNIFI study, a claim for "mucosal healing" simply referred to endoscopy findings that only assessed the "visual appearance of the mucosa."  FDA Guidance 2016 at p.4, 9-10.  J&J developed a novel approach for assessing mucosal healing, by combining both a histological assessment of the mucosa as well as a visual assessment of the mucosa.  A "histological assessment" refers to a microscopic examination of tissue samples taken from the mucosa during an endoscopy.  The Lichtiger Index does not involve the use of endoscopies or any histological assessment.

251.    I agree with Dr. Warfield that IBDQ is a specific 32-item questionnaire for IBD patients that is used to evaluate quality of life using 4 dimensional scores, with higher scores

indicating a better quality of life.  Warfield Rpt. ¶156.  The IBDQ is a specific questionnaire with
its own scoring criteria from 32-224 and is thus distinct from the Lichtiger index used by
Ochsenkühn 2018.

    252.    As I illustrate in the below chart, Ochsenkühn 2018 does not disclose that any of
its 17 subjects met any of the clinical endpoints recited in the claims of the '307 patent:

| Clinical Endpoint in '307 Patent Claims | Disclosed in the Ochsenkühn 2018 Abstract? | Explanation |
|---|---|---|
| (i) clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1 | Not Disclosed | The Ochsenkühn 2018 Abstract does not disclose the use Mayo scores or endoscopies to evaluate remission. |
| (ii) endoscopic healing with a Mayo endoscopy subscore of 0 or 1 | Not Disclosed | The Ochsenkühn 2018 Abstract does not disclose the use of endoscopies to evaluate its subjects. |
| (iii) clinical response based on the Mayo endoscopy subscore | Not Disclosed | The Ochsenkühn 2018 Abstract does not disclose the use of endoscopies to evaluate its subjects. |
| (iv) improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score | Not Disclosed | The Ochsenkühn 2018 Abstract does not disclose the use an IBDQ score. |
| (v) mucosal healing | Not Disclosed | The Ochsenkühn 2018 Abstract does not disclose the evaluation of mucosal healing. |
| (vi) decrease from baseline in Mayo score | Not Disclosed | The Ochsenkühn 2018 Abstract does not use Mayo scores. |

| (vii) clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1 | Not Disclosed | The Ochsenkühn 2018 Abstract does not use Mayo scores. |
|---|---|---|

253.    In 2016, the FDA issued guidance entitled "Ulcerative Colitis: Clinical Trial Endpoints, Guidance for Industry." FDA Guidance 2016.   That guidance emphasized that clinical remission should be "based on an absolute total Mayo Score and absolute Mayo endoscopy, stool frequency, rectal bleeding, and PGA subscores." FDA Guidance 2016 at p.9. That Guidance is consistent with the claimed clinical endpoints as used in the UNIFI trial, but not the scoring system used in the Ochsenkühn 2018 Abstract.  The FDA Guidance does not mention the Lichtiger score as a means of evaluating clinical remission and, to my knowledge, I know of no FDA-approved clinical trial for ulcerative colitis which has used the Lichtiger score as a means of evaluating clinical remission.

254.    A skilled person would also note that the Ochsenkühn 2018 Abstract itself does not define clinical remission correctly using the Lichtiger index.  This casts serious doubt on the authors' conclusions regarding the efficacy of ustekinumab.  According to published literature, clinical remission using the Lichtiger index is defined by a score of less than or equal to 3:



Supplementary Table 2. Continued

| Tool | Parameters assessed | Scoring system | Remission | Mild | Moderate | Severe |
|------|---------------------|----------------|-----------|------|----------|--------|
| SCCAI (Walmsley)[22] | Bowel movement frequency (day)<br>Bowel movement frequency (night)<br>Urgency of defecation<br>Blood in stool<br>Well-being<br>Extracolonic features | Cumulative score | ≤2[22,23]<br><2.5[24] | 3–20 | | |
| Lichtiger index[25,26] | Diarrhea frequency<br>Nocturnal diarrhea<br>Visible blood (% of movements)<br>Fecal incontinence<br>Abdominal pain/cramping<br>Well-being<br>Abdominal tenderness<br>Need for antidiarrheal medications | Cumulative score | ≤3 | 4–8 | 9–14 | >14 |

Peyrin-Biroulet 2016 at Supp. Table 2; Nakov 2017 at p.2 ("remission: 0-3 points; mild activity: 4-8 points; moderate activity 9-14 points; and high activity of the disease: >15 points"). But Ochsenkühn 2018 defines clinical remission as a score of less than or equal to 5, a score which would encompass patients who are not in remission:

> offered to them as only other option. The primary outcome was achievement of clinical remission at 3 and 6 months. Clinical remission was defined as score of ≤5 points in the modified Truelove and Witts colitis activity index (CAI).

Ochsenkühn 2018 at p.1. This further raises doubts regarding the data in the Ochsenkühn 2018 Abstract.

255.    It is therefore my opinion that Ochsenkühn 2018 does not teach or render obvious the claimed clinical endpoints, which are specific endpoints distinct from the unvalidated Lichtiger index used by Dr. Ochsenkühn.

### h) "Clinically proven safe and clinically proven effective amount"

256.    Ochsenkühn 2018 does not teach or render obvious the "clinically proven safe and clinically proven effective amount" of ustekinumab limitation of claim 1. The patent defines the term "clinically proven" to mean a dosage proven by an approved clinical trial:

> As used herein, unless otherwise noted, the term "clinically proven" (used independently or to modify the terms "safe" and/or "effective") shall mean that it has been proven by a clinical trial wherein the clinical trial has met the approval

93

standards of U.S. Food and Drug Administration, EMEA or a corresponding national regulatory agency.  For example, the clinical study may be an adequately sized, randomized, double-blinded study used to clinically prove the effects of the drug.

'307 patent, column 10, lines 34-42.  Ochsenkühn 2018 does not disclose a clinical study that has

met the approval standards of the FDA, EMEA, or a corresponding national regulatory agency,

for the treatment of ulcerative colitis.

### i) Published Criticisms of the Ochsenkühn 2018 Study

257.    My opinions are further supported by published criticism by other

gastroenterologists of Dr. Ochsenkühn's study.  In 2020, Dr. Ochsenkühn published a longer

journal article in in the United European Gastroenterology Journal describing in more detail the

work that underlies the Ochsenkühn 2018 Abstract and Poster ("Ochsenkühn 2020").

258.    I understand that this 2020 publication is not prior art to the '307 patent as it was

published in 2020.[10]  Thus, the PTO could not have relied on information from the 2020

publication to reject the claims.  But contemporaneous publications criticizing the 2020

publication support my opinions regarding how skilled persons would interpret Dr.

Ochsenkühn's abstracts in 2018.

259.    In conjunction with Ochsenkühn 2020, the United European Gastroenerology

Journal published an editorial authored by two gastroenterologists.  Pugliese and Armuzzi 2020.

An editorial is a short article which often provides commentary on a specific topic or issue,

including providing the opinions of the authors of the editorial.  This editorial, referred to as

---

[10] Even if it was prior art, I understand that neither Dr. Matovcik nor Dr. Warfield have provided any opinions regarding whether Ochsenkühn 2018 is material.  Matovcick Rpt. ¶12; Warfield Rpt. at Ex. B.  I therefore do not address the teachings of Ochsenkühn 2020 in this report.  I reserve the right to address Ochsenkühn 2020 if Plaintiffs' experts offer new opinions on it in their reply reports.

"Pugliese and Armuzzi 2020," is not prior art, but it is evidence which corroborates my opinions regarding how clinicians would view the retrospective study published in Ochsenkühn 2018.

260.    Pugliese and Armuzzi 2020 notes that the Ochsenkühn data was "very encouraging but should be interpreted with caution." Pugliese and Armuzzi 2020 at p.11. In particular, they note that the "number of patients included in the study is significantly smaller than [randomised controlled trials] . . . *precluding any definite conclusions* and subgroup analyses . . . for predictors of effectiveness." Pugliese and Armuzzi 2020 at p.11 (emphasis added). The authors therefore agree with my opinion that the Ochsenkühn 2018 study was too small to make any conclusions regarding the effectiveness of ustekinumab to treat ulcerative colitis. Pugliese and Armuzzi 2020 at p.11.

261.    Later in 2021, the same journal published a Letter to the Editor by two other gastroenterologists regarding Ochsenkühn 2020. Segal and Quraishi 2021. Those authors noted many issues with the retrospective analysis conducted by Dr. Ochsenkühn.

262.    Segal and Quraishi 2021 identified that that the study defined acute severe ulcerative colitis with a Lichtiger score of 8.5, which only indicates "very mild disease" and has not been "validated as a tool" to define severe ulcerative colitis. Segal and Quraishi 2021 at p.279. I agree. As I indicated above, the Ochsenkühn 2018 Abstract does not accurately define severe ulcerative colitis according to the Lichtiger index and the study does not report treatment of any patient with severe ulcerative colitis. See above ¶¶238-240. Ultimately, Segal and Quraishi agree with my opinion that Dr. Ochsenkühn's "does not demonstrate that ustekinumab can be used as rescue treatment" for severe ulcerative colitis. Segal and Quraishi 2021 at p.279.

263.    Next, Segal and Quraishi state that it is "difficult to appreciate why patients in or approaching clinical remission were commenced on ustekinumab." Segal and Quraishi 2021 at

95

p.279.  I agree.  I have explained above why the inclusion of these patients skews Dr.

Ochsenkühn's conclusions.

264.    Finally, Segal and Quraishi emphasize how it is "difficult to compare outcomes

with the UNIFI study" as the UNIFI study used "much stricter criteria."  Segal and Quraishi

2021 at p.279.  I agree.  The UNIFI study used specific clinical endpoints utilizing the Mayo

score, endoscopies, mucosal healing, and the IBDQ score, all reflected in the claims of the '307

patent.  Dr. Ochsenkühn utilized the Lichtiger index incorrectly[11], and one cannot compare

outcomes based on two distinct sets of criteria.

265.    I agree with each of these criticisms and believe that a gastroenterologist in 2018

looking at Ochsenkühn 2018 would not reasonably expect ustekinumab to treat ulcerative colitis

or reach the specific clinical endpoints of the '307 patent claims.

### j)  Ochsenkühn 2018 Is Unreliable Given the Ochsenkühn June 2018 Digestive Disease Week (DDW) Poster

266.    I understand that both Drs. Matovcik and Warfield rely on the January and May

2018 ECCO and Digestive Disease Week (DDW) abstracts by Dr. Ochsenkühn.  Matovcik Rpt.

¶12 (relying on the two abstracts as the documents that would have been material); Warfield Rpt.

¶2 (relying on abstracts).  Dr. Matovcik notes that there was also a June poster at DDW but does

not offer any opinions regarding that poster.  Matovcik Rpt. ¶175.  The poster suffers from all of

the issues I have identified above.  Because neither Dr. Matovcik or Dr. Warfield provide any

opinions regarding the poster, I do not address the poster independently.  I reserve the right to

---

[11] In the 2020 publication, Dr. Ochsenkühn changed the definition of clinical remission using the
Lichtiger index to less than or equal to 3.  Ochsenkühn 2020 at p.94.  This confirms my opinion
that a person of skill would understand the prior art Ochsenkühn 2018 abstracts incorrectly
define clinical remission using the Lichtiger index.

address the teachings of the poster if Drs. Matovcik or Warfield attempt to rely on it in their sur-rebuttal reports.

267.    In terms of the Ochsenkühn 2018 abstracts, it is my opinion that a person of skill in the art aware of the June DDW poster would have even more reason to question the reliability of Ochsenkühn 2018.  There are inconsistencies between Ochsenkühn 2018 and the June poster. Ochsenkühn 2018 has a different number of subjects (17) than the June poster (19).  11 subjects are reported to be in clinical remission at three months in Ochsenkühn 2018, but 15 subjects are reported to be in clinical remission at three months in the June DDW poster even though only 2 patients were added.  These inconsistencies add to the unreliability of the two Ochsenkühn 2018 abstracts that Drs. Warfield and Matovcik rely upon.

### k) Ochsenkühn 2018 Is Cumulative

268.    For the reasons discussed above, it is my opinion that Ochsenkühn 2018 does not provide a person of ordinary skill in the art with a reasonable expectation that they could use ustekinumab to treat ulcerative colitis.  It is also my opinion that it would be cumulative of US2020/0262908 (the "'908 Publication") even if it did provide such an expectation.

269.    The '908 Publication was published on August 20, 2020, and is the publication of a patent application filed first on December 14, 2017.  '908 Publication at p.1 ("PCT Filed:  Dec. 14, 2017").  I understand that a published patent application which names another inventor and was effectively filed before September 24, 2018 constitutes prior art to the '307 patent.  I therefore understand that the '908 Publication is prior art to the '307 patent.

270.    Much like Ochsenkühn, the '908 Publication does not disclose any data demonstrating that ustekinumab is an effective treatment for ulcerative colitis.  However, if

97

Ochsenkühn provides such an expectation, then it is also my opinion that these references are cumulative of the '908 Publication's disclosures.

271.    Claim 384 of the '908 Publication is directed towards a "method of treating ulcerative colitis in a subject" using a device comprising a therapeutically effective amount of an anti-IL-12-IL-23 antibody.  '908 Publication, claim 384.  Claim 387 which depends from claim 384 states that the "anti-IL-12/IL-23 antibody is ustekinumab or a generic equivalent thereof." '908 publication, [0310].  The '908 Publication therefore discloses the use of ustekinumab to treat ulcerative colitis like Ochsenkühn 2018.  I understand that the patent examiner ("Examiner") stated in the Notice of Allowance for the '307 patent that "Patent Application US 2020/0262908 (claims 384 and 387) teaches the use of ustekinumab for the treatment of UC . . . . No data has been presented in the '908 application which would make the instant claims in, e.g. claim 1, anticipated, nor obvious."

272.    I agree with the Examiner that the '908 publication does not present any data showing that administering ustekinumab is an effective treatment for ulcerative colitis that achieves the claimed clinical endpoints.  However, if Ochsenkühn provides this expectation with virtually no data, it is my opinion that they are cumulative of the '908 publication which was before the Examiner.

### 3.    Kolios 2018

273.    In my opinion, a person of ordinary skill in the art reviewing Kolios 2018 would not have a reasonable expectation that ustekinumab would work as a treatment for ulcerative colitis recited by the '307 patent.  It is my opinion that a person of ordinary skill in the art reviewing Kolios could not come to any conclusion regarding the efficacy of ustekinumab as a

treatment for moderately to severely active ulcerative colitis.  It is my opinion that Kolios 2018 is not but-for material to the claims of the '307 patent.

### a) Adalimumab Confounds the Results

274.    Kolios 2018 reports a case study of a single patient who developed ulcerative colitis "most likely caused by adalimumab."  JNJ-STELARA_001822439-443.  It further teaches that, after cessation of adalimumab, the colitis "improved significantly."  JNJ-STELARA_001822439.  Kolios 2018 reports that the patient was then administered ustekinumab and that the patient's colitis continued to improve.  However, as the authors report, because the patient's symptoms "had already significantly improved after cessation of adalimumab," they could not conclude that "ustekinumab was necessary to resolve" the ulcerative colitis completely.  JNJ-STELARA_001822442.  The authors made no conclusions that ustekinumab was an effective treatment for ulcerative colitis and acknowledged that the colitis may have been entirely resolved by stopping treatment with adalimumab.

275.    The authors also did not administer ustekinumab as a treatment for ulcerative colitis.  Instead, because the patient's psoriasis worsened, they administered ustekinumab as a treatment for the patient's psoriasis before they could identify whether discontinuing adalimumab treatment would entirely resolve the patient's ulcerative colitis.  Kolios 2018 at JNJ-STELARA_001822442.

### b) Mesalazine Treatment Confounds the Results

276.    Figure 2 of Kolios 2018 shows that single subject received Mesalazine treatment up until month 24 (boxed below):



277.    Mesalazine is one type of treatment for ulcerative colitis.  As shown above, while adalimumab was being administered to the subject, their stool frequency remained high.  But after adalimumab was stopped and mesalazine treatment continued, the stool frequency immediately improved significantly.  The skilled person reviewing Kolios 2018 would understand that the mesalazine treatment could account for the subject's improvement. Additionally, the subject's immediate stool improvement after cessation of adalimumab further supports my opinion above that cessation of adalimumab could have resolved the subject's colitis by itself.

### c) Different Dosing Regimen

278.    Kolios 2018 also does not describe the claimed dosing regimen of the '307 patent. Claim 1 of the '307 patent requires the administration of a "clinically proven safe and clinically proven effective amount" of ustekinumab.  '307 patent, claim 1.  Claims 19, 33, and 34 require

the use of an intravenous administration at a "dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration at week 0" and subcutaneous administration at a "dosage of 90 mg per administration at week 8 of the treatment." '307 patent, claims 19, 33, and 34. Claims 33 and 34 further require that the maintenance subcutaneous administration is provided once every 8 weeks or once every 12 weeks. '307 patent, claims 33 and 34.

279.    Kolios does not teach or render obvious the "clinically proven safe and clinically proven effective amount" of ustekinumab limitation of claim 1.  The patent defines the term "clinically proven" to mean a dosage proven by an approved clinical trial:

> As used herein, unless otherwise noted, the term "clinically proven" (used independently or to modify the terms "safe" and/or "effective") shall mean that it has been proven by a clinical trial wherein the clinical trial has met the approval standards of U.S. Food and Drug Administration, EMEA or a corresponding national regulatory agency.  For example, the clinical study may be an adequately sized, randomized, double-blinded study used to clinically prove the effects of the drug.

'307 patent, column 10, lines 34-42.  Kolios describes subcutaneous administration at 45 mg every 12 weeks, the dosing regimen for psoriasis, *not* ulcerative colitis.  Kolios 2018 at JNJ-STELARA_001822441.  This dosage has never been proven by a clinical trial to be safe and effective for IBD and Kolios therefore does not disclose administration of a "clinically proven safe and clinically proven effective amount" of ustekinumab for the treatment of ulcerative colitis.

280.    Kolios also does not teach or render obvious the specific dosage limitations of claims 19, 33, and 34.  Kolios does not disclose subcutaneous administration of a dosage of 90 mg per administration at week 8, as required by each of these claims.  '307 patent, claims 19, 33, and 34.  A person of ordinary skill in the art would understand that drug efficacy and safety can widely vary depending on the dosage used.  A skilled person could not conclude that the dosing

regimen of these claims is obvious when Kolios 2018 describes using half the dosage (45 mg) every 12 weeks.

### d) A Single Patient's Results Do Not Demonstrate Clinical Efficacy

281.    Kolios 2018 describes one observational report regarding a single patient.  A person of ordinary skill in the art could not evaluate whether a drug is efficacious based on only a single patient.

### (1)    Ulcerative Colitis is a Relapsing & Remitting Disease

282.    As I have explained above, see above ¶¶204-209, ulcerative colitis is a relapsing and remitting disease.  This means that clinical studies testing efficacy in ulcerative colitis must enroll hundreds of subjects to establish efficacy with statistical significance.  See above ¶¶204-222.

283.    This highlights the problem with making efficacy conclusions based on one subject in Kolios 2018.  Because after cessation of adalimumab, the subject's ulcerative colitis improved, remission could be due to the natural course of the disease or simply because the patient ceased experiencing any of the lasting effects from adalimumab.  With only one patient and no placebo comparison, a person of ordinary skill would understand there is insufficient data to come to any conclusion.  A skilled person would understand this and would not make any efficacy conclusions based on this study.

### (2)    Lack of Statistical Significance (P-Value, Power)

284.    As I have also explained above, see above ¶¶209-218, it is important for clinical trials to be designed to establish that their data is statistically significant.  It is important to use p-values to allow researchers to evaluate the statistical significance of results, and important for

102

clinical trials to have sufficient power to detect whether there is a treatment effect. See above
¶¶209-218.

285.    For example, Gordon 2021 conducted a systematic review of the minimum
samples size estimates for trials in inflammatory bowel disease to establish sufficient power for a
clinical trial. Table 1 of Gordon 2021 illustrates the "Mean sample size needed" for Crohn's
disease and ulcerative colitis trials:

| Table 1 Overall summary of power calculations and sample size deficits | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total studies | Studies with power calculation | Studies with difference of 10% and less[1] | How many studies didn't achieve target sample size | Mean sample size underpowered (range) | Mean sample size needed | How many studies are underpowered[2] |
| CD induction | 39 | 26 | 12 | 6 | 28 (2-70) | 231 | 11 |
| CD maintenance | 25 | 19 | 9 | 3 | 52 (7-79) | 300 | 10 |
| UC induction | 27 | 19 | 8 | 3 | 22 (1-55) | 219 | 4 |
| UC maintenance | 16 | 10 | 0 | 1 + 1 didn't report | 21 | 196 | 7 |

Gordon 2021, Table 1. These are the "minimum sample sizes that would achieve appropriate
power using the actual clinical data." Gordon 2021 at p.7572. As shown above, the authors
concluded that the ulcerative colitis studies required a mean sample size of 219 subjects for an
induction phase and 196 subjects for a maintenance phase. Gordon 2021 at Table 1. Kolios
2018 does not even describe a report for more than one subject.

286.    The UNIFI Study Protocol—which describes an FDA-approved clinical study
evaluating ustekinumab as a treatment for ulcerative colitis—contained a section entitled
"Sample Size Determination" where J&J calculated the minimum number of subjects needed to
properly evaluate efficacy using "statistical power considerations." NCT 236 Protocol at JNJ-
STELARA_001838566. J&J in March 2015 determined that a "target of 951 subjects (317 per
treatment group) should be enrolled in the induction study." NCT 236 Protocol at JNJ-

STELARA_001838567.  A gastroenterologist in 2018 would have also understood that a study would need many hundreds of subjects to detect a treatment difference between ustekinumab vs. a placebo.

287.     Even at a sample size of 951 subjects, J&J illustrated to the FDA how slight shifts in the results could dramatically reduce the likelihood of detecting a treatment effect:

| Table 5: | Power for detecting a treatment effect based on different proportions of subjects in clinical remission at Week 8 (US-specific definition) with a fixed sample size of 951 subjects (317 per treatment group) | |
|---|---|---|
| **Proportion of Subjects in Clinical Remission at Week 8 (%)** | | **Power[a] (%)** |
| **Placebo** | **Ustekinumab** | |
| 12 | 25 | 97 |
| | 23 | 92 |
| | 22 | 86 |
| | 21 | 79 |
| a:  Based on $\alpha=0.025$ (2-sided). | | |

NCT 236 Protocol at JNJ-STELARA_001838568.  If 25% of subjects administered ustekinumab achieved clinical remission, the "[p]ower," or probability of detecting a real effect, was 97%. However, if 21% of subjects administered ustekinumab achieved clinical remission (201 subjects), that probability was significantly reduced to only 79%.

288.     In comparison, Kolios only has an observational report regarding a single patient whose ulcerative colitis was caused by adalimumab.  If UNIFI required hundreds of subjects to achieve sufficient "power" to evaluate whether ustekinumab was an effective treatment, Kolios is far below the number of subjects required.

289.     It would have impossible for Kolios to use p-values or assess statistical significance with only one patient.  As I explained above, a p-value is an essential measure that enables physicians to evaluate whether patient improvement is actually a result of treatment as opposed to mere chance.  Without a p-value, a person of ordinary skill in the art could not interpret Kolios as showing that ustekinumab was an effective treatment for ulcerative colitis, as

opposed to being due to random chance. Random chance can occur with ulcerative colitis patients. Because ulcerative colitis patients can naturally go into remission for months or even years, it is even more important to have statistically significant data when establishing efficacy.

290.    In addition, as I discussed above, see above ¶¶219-220, a case report for one patient would hardly meet any of the requirements for the U.S. FDA for an FDA-approved clinical trial at any Phase (Phases I-IV).

291.    Given the article reports only one patient, the nature of ulcerative colitis, and the inability to assess efficacy using principles of statistical significance, it would be irresponsible for any gastroenterologist to make any conclusions regarding the efficacy of ustekinumab as a treatment for moderately to severely active ulcerative colitis based on Kolios 2018.

### e)  No Placebo or Double-Blind Study

292.    Kolios 2018 also lacks many of the hallmarks of clinical studies used to evaluate efficacy, including the use of a placebo or a double-blind study. Above, I have explained concepts relating to the importance of a "double-blind" trial and the impact of the placebo effect on clinical trials, including IBD trials. See above ¶¶227-231.

293.    Because there were no placebos in Kolios 2018, and it is an unblinded case report of a single patient, the study is prone to bias. A gastroenterologist would understand that the placebo effect, natural remission, or cessation of adalimumab could account the patient's improvement, and that there is no way to conclude that ustekinumab was an effective treatment in one patient without the use of any placebo, or comparison arm to the study.

294.    Unlike the single patient report from Kolios, the UNIFI clinical trial that is reported in the patent was conducted with a placebo arm and a comparison was conducted between data from the placebo arm and the treatment arm of the study to demonstrate that

ustekinumab performed better than a placebo. In doing so, the UNIFI clinical trial was able to appropriately address the placebo effect and demonstrate that ustekinumab was an effective treatment for ulcerative colitis. NCT 236 Protocol at JNJ-STELARA_001838489 ("Double-blind, Placebo-controlled"), 1838528 ("Blinded treatment will be used to reduce potential bias during data collection and evaluation of clinical endpoints" and a "placebo control will be used to establish the frequency and magnitude of changes in clinical endpoints that may occur in the absence of active treatment"), 1838567 (discussing the detection of a "treatment difference" between ustekinumab and placebo). The FDA itself has described that the "most important design techniques for avoiding bias in clinical trials are blinding and randomization." FDA Guidance 1998 at p.40.

295.    For the reasons I have explained above, including that (1) adalimumab and mesalazine treatment confound any results; (2) a single patient's results cannot provide any expectation regarding a clinical treatment, (3) Kolios is not a double-blind, placebo study, and (4) Kolios uses a different dosing regimen, it is my opinion that Kolios is not but-for material to the claims of the '307 patent.

### f) Kolios 2018 Is Cumulative

296.    For the reasons discussed above, it is my opinion that Kolios 2018 does not provide a person of ordinary skill in the art with a reasonable expectation that they could use ustekinumab to treat ulcerative colitis. It is also my opinion that it would be cumulative of the '908 publication even if it did provide such an expectation.

297.    Much like Kolios, the '908 Publication does not disclose any data demonstrating that ustekinumab is an effective treatment for ulcerative colitis. However, if Kolios provides

such an expectation, then it is also my opinion that these references are cumulative of the '908 Publication's disclosures.

298.    Claim 384 of the '908 Publication is directed towards a "method of treating ulcerative colitis in a subject" using a device comprising a therapeutically effective amount of an anti-IL-12-IL-23 antibody. '908 Publication, claim 384. Claim 387 which depends from claim 384 states that the "anti-IL-12/IL-23 antibody is ustekinumab or a generic equivalent thereof." '908 publication, [0310]. The '908 Publicationtherefore discloses the use of ustekinumab to treat ulcerative colitis like Kolios 2018. I understand that the Examiner stated in the Notice of Allowance for the '307 patent that "Patent Application US 2020/0262908 (claims 384 and 387) teaches the use of ustekinumab for the treatment of UC . . . . No data has been presented in the '908 application which would make the instant claims in, e.g. claim 1, anticipated, nor obvious."

299.    I agree with the Examiner that the '908 Publication does not present any data showing that administering ustekinumab is an effective treatment for ulcerative colitis that achieves the claimed clinical endpoints. However, if Kolios provides this expectation with virtually no data, it is my opinion that they are cumulative of the '908 Publication which was before the Examiner.

### 4.    Afonso 2017

300.    In my opinion, a person of ordinary skill in the art reviewing Afonso 2017 would not have a reasonable expectation that ustekinumab would work as a treatment for ulcerative colitis or achieve the specific clinical end points recited by the '307 patent. It is my opinion that a person of ordinary skill in the art reviewing Afonso could not come to any conclusion regarding the efficacy of ustekinumab as a treatment for moderately to severely active ulcerative colitis. It is my opinion that the Afonso is not but-for material to the claims of the '307 patent.

107

### a) No Data or Support for Ustekinumab as Treatment for Ulcerative Colitis

301.     A person of ordinary skill in the art would understand that Afonso does not disclose effective treatment of ulcerative colitis patients.  Afonso 2017 describes a "retrospective observational study" with 7 patients, only 2 of which had ulcerative colitis.  Afonso 2017 at CP-202 ("2/7 patients" with ulcerative colitis and "5/7 patients" with Crohn's disease).  Afonso 2017 then describes that 3 of those 7 patients "continue receiving ustekinumab, showing clinical remission."  But Afonso does not ever say which patients showed clinical remission.  All three of those patients could have been patients with Crohn's disease, not ulcerative colitis.  Afonso therefore does not disclose or render obvious any use of ustekinumab for the treatment of ulcerative colitis.  And the fact that only 3 of 7 patients continue to receive ustekinumab is not the type of promising data that would inspire confidence by a gastroenterologist.

302.     Afonso 2017 itself recognizes the limitations of its disclosure.  The authors state that their data is "limited" as its study was conducted in only 7 subjects, and the authors state that "future prospective studies" will "be required" to confirm that ustekinumab can be a therapeutic approach for IBD in patients with poor response to other biologic therapies.  Afonso 2017 at CP-202.  I agree.  This is consistent with my opinions in this report that a clinician would expect a prospective, placebo-controlled clinical trial to evaluate the efficacy of ustekinumab as a treatment for ulcerative colitis.

### b) Insufficient Sample Size

303.     Afonso 2017 only describes the administration of ustekinumab to two patients with moderate to severe ulcerative colitis.   A person of ordinary skill in the art could not evaluate whether a drug is efficacious based on only two patients.

### (1)    Ulcerative Colitis Is a Relapsing & Remitting Disease

304.    As I have explained above, see above ¶¶204-209, ulcerative colitis is a relapsing and remitting disease.  This means that clinical studies testing efficacy in ulcerative colitis must enroll hundreds of subjects to establish efficacy with statistical significance.  See above ¶¶204-222.

305.    This highlights the problem with making efficacy conclusions based on two subjects in Afonso.  The subjects' ulcerative colitis could have improved due to the natural course of the disease as discussed above.  With only two patients and no placebo comparison, a person of ordinary skill would understand there is insufficient data to come to any conclusion.  A skilled person would understand this and would not make any efficacy conclusions based on this study.

### (2)    Lack of Statistical Significance (P-Value, Power)

306.    As I have also explained above, see above ¶¶209-218, it is important for clinical trials to be designed to establish that their data is statistically significant.  It is important to use p-values to allow researchers to evaluate the statistical significance of results, and important for clinical trials to have sufficient power to detect whether there is a treatment effect.  See above ¶¶209-218.

307.    For example, Gordon 2021 conducted a systematic review of the minimum samples size estimates for trials in inflammatory bowel disease to establish sufficient power for a clinical trial.  Table 1 of Gordon 2021 illustrates the "Mean sample size needed" for Crohn's disease and ulcerative colitis trials:

| Table 1 Overall summary of power calculations and sample size deficits | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total studies | Studies with power calculation | Studies with difference of 10% and less | How many studies didn't achieve target sample size | Mean sample size underpowered (range) | Mean sample size needed | How many studies are underpowered |
| CD induction | 39 | 26 | 12 | 6 | 28 (2-70) | 231 | 11 |
| CD maintenance | 25 | 19 | 9 | 3 | 52 (7-79) | 300 | 10 |
| UC induction | 27 | 19 | 8 | 3 | 22 (1-55) | 219 | 4 |
| UC maintenance | 16 | 10 | 0 | 1 + 1 didn't report | 21 | 196 | 7 |

Gordon 2021, Table 1. These are the "minimum sample sizes that would achieve appropriate power using the actual clinical data." Gordon 2021 at p.7572. As shown above, the authors concluded that the ulcerative colitis studies required a mean sample size of 219 subjects for an induction phase and 196 subjects for a maintenance phase. Gordon 2021 at Table 1. Kolios does not even describe a report for more than one subject.

308.    The UNIFI Study Protocol—which describes an FDA-approved clinical study evaluating ustekinumab as a treatment for ulcerative colitis—contained a section entitled "Sample Size Determination" where J&J calculated the minimum number of subjects needed to properly evaluate efficacy using "statistical power considerations." NCT 236 Protocol at JNJ-STELARA_001838566. J&J in March 2015 determined that a "target of 951 subjects (317 per treatment group) should be enrolled in the induction study." NCT 236 Protocol at JNJ-STELARA_001838567. A gastroenterologist in 2018 would have also understood that a study would need many hundreds of subjects to detect a treatment difference between ustekinumab vs. a placebo.

309.    Even at a sample size of 951 subjects, J&J illustrated to the FDA how slight shifts in the results could dramatically reduce the likelihood of detecting a treatment effect:

| Table 5: | Power for detecting a treatment effect based on different proportions of subjects in clinical remission at Week 8 (US-specific definition) with a fixed sample size of 951 subjects (317 per treatment group) | |
|---|---|---|
| **Proportion of Subjects in Clinical Remission at Week 8 (%)** | | Power[a] (%) |
| Placebo | Ustekinumab | |
| 12 | 25 | 97 |
| | 23 | 92 |
| | 22 | 86 |
| | 21 | 79 |
| a: Based on $\alpha=0.025$ (2-sided). | | |

NCT 236 Protocol at JNJ-STELARA_001838568. If 25% of subjects administered ustekinumab achieved clinical remission, the "[p]ower," or probability of detecting a real effect, was 97%. However, if 21% of subjects administered ustekinumab achieved clinical remission (201 subjects), that probability was significantly reduced to only 79%.

310.    In comparison, Afonso only has an observational report that three of seven patients were in remission, without identifying whether any of those three patients had ulcerative colitis. If UNIFI required hundreds of subjects to achieve sufficient "power" to evaluate whether ustekinumab was an effective treatment, Afonso is far below the number of subjects required.

311.    It would have impossible for Afonso to use p-values or assess statistical significance with only one patient. As I explained above, a p-value is an essential measure that enables physicians to evaluate whether patient improvement is actually a result of treatment as opposed to mere chance. Without a p-value, a person of ordinary skill in the art could not interpret Afonso as showing that ustekinumab was an effective treatment for ulcerative colitis, as opposed to being due to random chance. Random chance can occur with ulcerative colitis patients. Because ulcerative colitis patients can naturally go into remission for months or even years, it is even more important to have statistically significant data when establishing efficacy.

111

312.    In addition, as I discussed above, see above ¶¶219-220, a case report for two patients would hardly meet any of the requirements for the U.S. FDA for an FDA-approved clinical trial at any Phase (Phases I-IV).

### c)  No Placebo or Double-Blind Study

313.    Afonso 2017 also lacks many of the hallmarks of clinical studies used to evaluate efficacy, including the use of a placebo or a double-blind study.  Above, I have explained concepts relating to the importance of a "double-blind" trial and the impact of the placebo effect on clinical trials, including IBD trials.  See above ¶¶227-231.

314.    Because there were no placebos in Afonso 2017, and it is an unblinded case report of two ulcerative colitis patients, the study is prone to bias.  A gastroenterologist would understand that the placebo effect or natural remission could account for improvement, and that there is no way to conclude that ustekinumab was an effective treatment in these patients without the use of any placebo, or comparison arm to the study.

315.    Unlike the two-patient report from Afonso, the UNIFI clinical trial that is reported in the patent was conducted with a placebo arm and a comparison was conducted between data from the placebo arm and the treatment arm of the study to demonstrate that ustekinumab performed better than a placebo.  In doing so, the UNIFI clinical trial was able to appropriately address the placebo effect and demonstrate that ustekinumab was an effective treatment for ulcerative colitis.  NCT 236 Protocol at JNJ-STELARA_001838489 ("Double-blind, Placebo-controlled"), 1838528 ("Blinded treatment will be used to reduce potential bias during data collection and evaluation of clinical endpoints" and a "placebo control will be used to establish the frequency and magnitude of changes in clinical endpoints that may occur in the absence of active treatment"), 1838567 (discussing the detection of a "treatment difference" between

112

ustekinumab and placebo). The FDA itself has described that the "most important design techniques for avoiding bias in clinical trials are blinding and randomization." FDA Guidance 1998 at p.40.

### d) No Washout Period

316.    I have explained above what a washout period is and the importance of utilizing a washout period in clinical trials. See above ¶234. Absent a washout period, it is not possible to conclusively determine whether a subject's improvement is due to the new drug or due to lasting effects from prior treatments.

317.    Afonso 2017 does not disclose the use of a washout period prior to the administration of ustekinumab. "All patients had previously received infliximab, adalimumab or golimumab with inadequate response or intolerance." Afonso 2017 at CP-202. A skilled person would understand that, absent a washout period, these treatments could have lasting effects on patients in the Afonso study. These effects would further prevent a person of ordinary skill in the art from concluding that ustekinumab was the cause of remission.

318.    In contrast, the UNIFI study protocol approved by the FDA did use a washout period of 8 weeks for infliximab, adalimumab, and golimumab before the administration of ustekinumab to patients enrolled in the trial:

7. The following medications/therapies must have been discontinued before first administration of study agent:

   a. Vedolizumab for at least 4 months.

   b. TNF-antagonist therapy (eg, infliximab, etanercept, certolizumab, adalimumab, golimumab) for at least 8 weeks.

   c. Cyclosporine, tacrolimus, or sirolimus, for at least 4 weeks.

   d. 6-thioguanine (6-TG) must have been discontinued for at least 4 weeks.

   e. Rectal corticosteroids (ie, corticosteroids [including budesonide] administered to the rectum or sigmoid colon via foam or enema or suppository) for at least 2 weeks.

   f. Rectal 5-ASA compounds (ie, 5-ASAs administered to the rectum or sigmoid colon via foam or enema or suppository) for at least 2 weeks.

   g. Parenteral corticosteroids for at least 2 weeks.

   h. Total parenteral nutrition (TPN) for at least 2 weeks.

   i. Antibiotics for the treatment of UC (eg, ciprofloxacin, metronidazole, or rifaximin) for at least 2 weeks.

NCT 236 Protocol at JNJ-STELARA_001838531.

### e) The Claimed Clinical Endpoints

319. For the reasons stated above regarding the lack of disclosure of efficacy in ulcerative colitis, the small sample size, the lack of placebo or double-blind nature of the study, and the absence of a washout period, it is my opinion that a skilled person would not reasonably expect ustekinumab to treat ulcerative colitis based on Afonso 2017.

320. However, even if Afonso 2017 could provide some expectation that ustekinumab could improve an ulcerative colitis patient's condition, I understand that the claims of the '307 patent are directed to the achievement of at least one of specific clinical endpoints. '307 patent, claim 1. Those endpoints are the following:

(i) clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1;

114

(ii) endoscopic healing with a Mayo endoscopy subscore of 0 or 1;

(iii) clinical response based on the Mayo endoscopy subscore;

(iv) improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score;

(v) mucosal healing;

(vi) decrease from baseline in Mayo score; or

(vii) clinical response as determined by a decrease from baseline in the Mayo score by $\geq 30\%$ and $\geq 3$ points and a decrease from baseline in the rectal bleeding subscore $\geq 1$ points or a rectal bleeding subscore of 0 or 1.

'307 patent, claim 1. These clinical endpoints align with the endpoints of the UNIFI clinical trial conducted by J&J. NCT 236 Protocol at 1838552-555. It is my opinion that Afonso 2017 does not disclose or render obvious any of these clinical endpoints.

321. Afonso 2017 does not explain how it defines clinical remission. There are many different ways of defining clinical remission using both invasive and non-invasive tests. A person of ordinary skill in the art would understand that it is possible for one index to provide one result, while another index provides another. Afonso 2017 does not say which index it used, let alone whether the authors used any objective measurement for clinical remission.

322. Afonso 2017 also does not disclose the use of any endoscopy to evaluate remission. The Mayo scoring system is the most frequently used index in controlled clinical trials for ulcerative colitis. National Library of Medicine 2016 ("The Mayo score is one of the most commonly used disease activity indices in placebo-controlled trials in UC."). It contains four parts: "rectal bleeding, stool frequency, physician assessment, and endoscopy appearance. Each part is rated from 0 to 3, giving a total score of 0 to 12." National Library of Medicine

115

2016. It therefore requires the use of endoscopies, unlike other indices. The Mayo score is a widely accepted means of evaluating ulcerative colitis in patients, and has been approved by the FDA as a clinical trial endpoint. A person of ordinary skill in the art, given the lack of disclosure of any endoscopy, would interpret Afonso 2017 as not using Mayo scores.

323.    The '307 patent teaches that "mucosal healing" as used in the patent refers to "both endoscopic healing and histological healing." '307 patent, column 40, lines 41-42, and column 55, lines 57-58 ("mucosal healing (a combination of endoscopic healing and histological healing)"). This was a novel approach taken by J&J in connection with the UNIFI clinical trial. Prior to the UNIFI study, a claim for "mucosal healing" simply referred to endoscopy findings that only assessed the "visual appearance of the mucosa." FDA Guidance 2016 at p.4. J&J developed a novel approach for assessing mucosal healing, by combining both a histological assessment of the mucosa as well as a visual assessment of the mucosa. A "histological assessment" refers to a microscopic examination of tissue samples taken from the mucosa during an endoscopy. Afonso 2017 does not disclose the evaluation of remission with mucosal healing.

324.    I agree with Dr. Warfield that IBDQ is a specific 32-item questionnaire for IBD patients that is used to evaluate quality of life using 4 dimensional scores, with higher scores indicating a better quality of life. Warfield Rpt. ¶156. The IBDQ is a specific questionnaire with its own scoring criteria from 32-224. Afonso 2017 does not disclose the use of an IBDQ questionnaire.

325.    As I illustrate in the below chart, Afonso 2017 does not disclose that any of its two ulcerative colitis subjects met any of the clinical endpoints recited in the claims of the '307 patent:

116

| Clinical Endpoint in '307 Patent Claims | Disclosed in the Afonso 2017 Abstract? | Explanation |
|---|---|---|
| (i) clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1 | Not Disclosed | The Afonso 2017 Abstract does not disclose the use Mayo scores or endoscopies to evaluate remission. |
| (ii) endoscopic healing with a Mayo endoscopy subscore of 0 or 1 | Not Disclosed | The Afonso 2017 Abstract does not disclose the use of endoscopies to evaluate its subjects. |
| (iii) clinical response based on the Mayo endoscopy subscore | Not Disclosed | The Afonso 2017 Abstract does not disclose the use of endoscopies to evaluate its subjects. |
| (iv) improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score | Not Disclosed | The Afonso 2017 Abstract does not disclose the use an IBDQ score. |
| (v) mucosal healing | Not Disclosed | The Afonso 2017 Abstract does not disclose the evaluation of mucosal healing. |
| (vi) decrease from baseline in Mayo score | Not Disclosed | The Afonso 2017 Abstract does not use Mayo scores. |
| (vii) clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1 | Not Disclosed | The Afonso 2017 Abstract does not use Mayo scores. |

326.     It is therefore my opinion that Afonso 2017 does not teach or render obvious the claimed clinical endpoints, which are specific clinical endpoints that are not necessarily met by other methods of evaluating clinical remission.

### f) Different Dosing Regimen

327.     Afonso also does not describe the claimed dosing regimen of the '307 patent. Claim 1 of the '307 patent requires the administration of a "clinically proven safe and clinically proven effective amount" of ustekinumab.  '307 patent, claim 1.  Claims 19, 33, and 34 require the use of an intravenous administration at a "dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration at week 0" and subcutaneous administration at a "dosage of 90 mg per administration at week 8 of the treatment."  '307 patent, claims 19, 33, and 34. Claims 33 and 34 further require that the maintenance subcutaneous administration is provided once every 8 weeks or once every 12 weeks.  '307 patent, claims 33 and 34.

328.     Afonso does not teach or render obvious the "clinically proven safe and clinically proven effective amount" of ustekinumab limitation of claim 1.  The patent defines the term "clinically proven" to mean a dosage proven by an approved clinical trial:

> As used herein, unless otherwise noted, the term "clinically proven" (used independently or to modify the terms "safe" and/or "effective) shall mean that it has been proven by a clinical trial wherein the clinical trial has met the approval standards of U.S. Food and Drug Administration, EMEA or a corresponding national regulatory agency.  For example, the clinical study may be an adequately sized, randomized, double-blinded study used to clinically prove the effects of the drug.

'307 patent, column 10, lines 34-42.  Afonso describes induction administration with 90 mg weekly for four weeks, and then maintenance dosing of 90 mg every 2 or 8 weeks.   This dosage regimen has never been proven by a clinical trial to be safe and effective for IBD and Afonso

118

therefore does not disclose administration of a "clinically proven safe and clinically proven effective amount" of ustekinumab for the treatment of ulcerative colitis.

329.    Afonso also does not teach or render obvious the specific dosage limitations of claims 19, 33, and 34.  Afonso does not disclose intravenous administration of a dosage of 6 mg/kg or 130 mg at week 0, as required by each of these claims.  '307 patent, claims 19, 33, and 34.  A person of ordinary skill in the art would understand that drug efficacy and safety can widely vary depending on the dosage used.  A skilled person could not conclude that the dosing regimen of these claims is obvious when Afonso describes using a different induction dosage at a different rate, and maintenance dosing every 2 weeks, which is also not reflected in the claims.

330.    Afonso also describes two different rates of maintenance dosing (every 2 weeks or every 8 weeks), but Afonso does not tell a person of ordinary skill *which* patients were on which dosing rate.  Thus, there is no way to know which dosing regimen applied to the two ulcerative colitis patients.

331.    For the reasons I have explained above, including that Afonso (1) does not disclose the treatment of any ulcerative colitis subject; (2) has an insufficient sample size to provide any expectation regarding a clinical treatment, (3) is not a double-blind, placebo study, (4) lacks a washout period, (5) fails to teach the claimed clinical endpoints, and (6) uses a different dosing regimen, it is my opinion that Afonso is not but-for material to the claims of the '307 patent.

### g) Afonso 2017 Is Cumulative

332.    For the reasons discussed above, it is my opinion that Afonso 2017 does not provide a person of ordinary skill in the art with a reasonable expectation that they could use

ustekinumab to treat ulcerative colitis.  It is also my opinion that it would be cumulative of the
'908 Publication even if it did provide such an expectation.

333.    Much like Afonso, the '908 Publication does not disclose any data demonstrating
that ustekinumab is an effective treatment for ulcerative colitis.  However, if Afonso provides
such an expectation, then it is also my opinion that these references are cumulative of the '908
Publication's disclosures.

334.    Claim 384 of the '908 Publication is directed towards a "method of treating
ulcerative colitis in a subject" using a device comprising a therapeutically effective amount of an
anti-IL-12-IL-23 antibody.  '908 Publication, claim 384.  Claim 387 which depends from claim
384 states that the "anti-IL-12/IL-23 antibody is ustekinumab or a generic equivalent thereof."
'908 publication, [0310].  The '908 Publication therefore discloses the use of ustekinumab to
treat ulcerative colitis like Afonso 2017.  I understand that the Examiner stated  in the Notice of
Allowance for the '307 patent that "Patent Application US 2020/0262908 (claims 384 and 387)
teaches the use of ustekinumab for the treatment of UC . . . . No data has been presented in the
'908 application which would make the instant claims in, e.g. claim 1, anticipated, nor obvious."

335.    I agree with the Examiner that the '908 Publication does not present any data
showing that administering ustekinumab is an effective treatment for ulcerative colitis that
achieves the claimed clinical endpoints.  However, if Afonso 2017 provides this expectation with
virtually no data, it is my opinion that they are cumulative of the '908 publication which was
before the Examiner.

### 5.    Tarr 2014

336.    In my opinion, a person of ordinary skill in the art reviewing Tarr 2014 would not
have a reasonable expectation that ustekinumab would work as a treatment for ulcerative colitis

or achieve the specific clinical end points recited by the '307 patent. It is my opinion that a person of ordinary skill in the art reviewing Tarr 2014 could not come to any conclusion regarding the efficacy of ustekinumab as a treatment for moderately to severely active ulcerative colitis. It is my opinion that the Tarr 2014 is not but-for material to the claims of the '307 patent.

### a) No Data or Support for Ustekinumab as Treatment for Ulcerative Colitis

337.    Tarr 2014 is a review publication addressing a variety of biological therapies in South African medical practice for various medical conditions, including Rheumatoid arthritis, ankylosing spondylitis, psoriasis, IBD, juvenile idiopathic arthritis, and other diseases. Tarr 2014. The publication is not directed towards IBD specifically and is only a 5-page paper.

338.    The only disclosure in Tarr 2014 regarding ustekinumab and ulcerative colitis is one entry in Table 1:

**Table 1. Biologic drugs in South Africa**

| Biologic drug | Mechanism of action | Route of administration | Registered indications | Off-label indications | Major adverse effects |
|---|---|---|---|---|---|
| Ustekinumab (Stelara) | IL-12/23 monoclonal antibody | | PS, PSA,* CD* | UC | Serious infections |

ANCA = anti-neutrophilic cytoplasmic antibody; AS = ankylosing spondylitis; CD = Crohn's disease; CLL = chronic lymphocytic lymphoma; GCA = giant cell arthritis; GI = gastrointestinal; IL = interleukin; IV = intravenous; JIA = juvenile idiopathic arthritis; NHL =non-Hodgkin lymphoma; PAED = paediatrics; PMR = polymyalgia rheumatica; PS = psoriasis; PsA = psoriatic arthritis; RA = rheumatoid arthritis; RSSPE = relapsing seronegative symmetrical synovitis with pitting oedema; mab = monoclonal antibody; SC = subcutaneous; SJIA = systemic juvenile idiopathic arthritis; SLE = systemic lupus erythematosus; SScl = systemic sclerosis; TNF = tumour necrosis factor; UC = ulcerative colitis.
*Registration pending.
*Currently not available in South Africa.

As shown above, Tarr 2014 discloses that ustekinumab has been "[r]egistered," or approved by the South African government, for the treatment of Crohn's disease but not ulcerative colitis. In a column labeled "Off-label indications," Tarr lists "UC" (ulcerative colitis) as an off-label indication.[12] This does not tell a person of ordinary skill anything regarding the efficacy of Stelara as a treatment for ulcerative colitis.

---

[12] Tarr describes ulcerative colitis as an "off-label indication." In the U.S., "indication" is a term of art referring to the specific diseases have a drug has been approved to treat by the FDA. The proper term is "off-label use" rather than "off-label indication."

339.    Tarr 2014's reference to ulcerative colitis as an off-label indication contains no supporting citation.  Tarr 2014 also does not elsewhere in the paper explain what data supports the use of Stelara for the treatment of ulcerative colitis.  Tarr does not state how many patients were administered Stelara as an off-label treatment for ulcerative colitis, whether those patients' condition improved, or provide any other details to support the use of ustekinumab as a treatment for ulcerative colitis.  All that Tarr discloses is an unsupported entry in a Table.  Persons of ordinary skill in the art require much more to establish a medication as a treatment for ulcerative colitis.  If anything, a clinician would understand that ulcerative colitis being listed as an "off-label" indication means that ustekinumab has not received the appropriate approval for the treatment of ulcerative colitis by the relevant medical agency in South Africa.

340.    I disagree with Dr. Warfield's statement that a "key conclusion" of Tarr is the prospect of using ustekinumab as a possible off-label therapy for ulcerative colitis.  Warfield Rpt. ¶186.  Other than one unsupported entry in Table 1, there is no reference to ustekinumab as an off-label treatment for ulcerative colitis anywhere else in the publication.  The actual "Conclusion" of the paper does not even mention ustekinumab.  Tarr 2014 at p.4.  The only substantive discussion of ustekinumab anywhere in the Tarr publication relates to Crohn's disease, not ulcerative colitis.  There, Tarr states that "[u]stekinumab has been shown to be useful in TNF-resistant Crohn's disease."  Tarr 2014 at p.3.  There is no mention of ustekinumab as a treatment for ulcerative colitis in the section on "Inflammatory bowel disease."  Tarr 2014 at p.3.  Dr. Warfield is not correct that ustekinumab as an off-label therapy is a "key conclusion" of Tarr.

### b) The Claimed Clinical Endpoints

341.    However, even if Tarr 2014 could provide some expectation that ustekinumab could improve an ulcerative colitis patient's condition, I understand that the claims of the '307 patent are directed to the achievement of at least one of specific clinical endpoints. '307 patent, claim 1. Those endpoints are the following:

(i) clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1;

(ii) endoscopic healing with a Mayo endoscopy subscore of 0 or 1;

(iii) clinical response based on the Mayo endoscopy subscore;

(iv) improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score;

(v) mucosal healing;

(vi) decrease from baseline in Mayo score; or

(vii) clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1.

'307 patent, claim 1. These clinical endpoints align with the endpoints of the UNIFI clinical trial conducted by J&J. NCT 236 Protocol at 1838552-555. It is my opinion that Tarr 2014 does not disclose or render obvious any of these clinical endpoints.

342.    Tarr 2014 does not explain whether ustekinumab can cause clinical remission in ulcerative colitis patients, or how such remission is measured. As I illustrate in the below chart,

Tarr 2014 does not disclose that any patient administered ustekinumab off-label met any of the

clinical endpoints recited in the claims of the '307 patent:

| Clinical Endpoint in '307 Patent Claims | Disclosed in Tarr 2014? | Explanation |
|---|---|---|
| (i) clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1 | Not Disclosed | The Tarr 2014 Abstract does not disclose the use Mayo scores or endoscopies to evaluate remission. |
| (ii) endoscopic healing with a Mayo endoscopy subscore of 0 or 1 | Not Disclosed | Tarr 2014 does not disclose the use of endoscopies. |
| (iii) clinical response based on the Mayo endoscopy subscore | Not Disclosed | Tarr 2014 does not disclose the use of endoscopies to evaluate its subjects. |
| (iv) improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score | Not Disclosed | Tarr 2014 does not disclose the use an IBDQ score with a ulcerative colitis subject. |
| (v) mucosal healing | Not Disclosed | Tarr 2014 does not disclose the evaluation of mucosal healing in a ulcerative colitis subject. |
| (vi) decrease from baseline in Mayo score | Not Disclosed | Tarr 2014 does not use Mayo scores. |
| (vii) clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1 | Not Disclosed | Tarr 2014 does not use Mayo scores. |

343.    It is therefore my opinion that Tarr 2014 does not teach or render obvious the claimed clinical endpoints, which are specific clinical endpoints that are not necessarily met by other methods of evaluating clinical remission.

### c) No Disclosure of Dosing Regimen

344.    Tarr also does not describe the claimed dosing regimen of the '307 patent.  Claim 1 of the '307 patent requires the administration of a "clinically proven safe and clinically proven effective amount" of ustekinumab.  '307 patent, claim 1.  Claims 19, 33, and 34 require the use of an intravenous administration at a "dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration at week 0" and subcutaneous administration at a "dosage of 90 mg per administration at week 8 of the treatment."  '307 patent, claims 19, 33, and 34.  Claims 33 and 34 further require that the maintenance subcutaneous administration is provided once every 8 weeks or once every 12 weeks.  '307 patent, claims 33 and 34.

345.    Tarr does not teach or render obvious the "clinically proven safe and clinically proven effective amount" of ustekinumab limitation of claim 1.  The patent defines the term "clinically proven" to mean a dosage proven by an approved clinical trial:

> As used herein, unless otherwise noted, the term "clinically proven" (used independently or to modify the terms "safe" and/or "effective") shall mean that it has been proven by a clinical trial wherein the clinical trial has met the approval standards of U.S. Food and Drug Administration, EMEA or a corresponding national regulatory agency.  For example, the clinical study may be an adequately sized, randomized, double-blinded study used to clinically prove the effects of the drug.

'307 patent, column 10, lines 34-42.  Tarr simply states that ustekinumab could be used off-label for ulcerative colitis with no more detail.  It does not disclose any dosing regimen, let alone one that has been proven by a clinical trial to be safe and effective for IBD.  Tarr therefore does not

disclose administration of a "clinically proven safe and clinically proven effective amount" of ustekinumab for the treatment of ulcerative colitis.

346.    Tarr also does not teach or render obvious the specific dosage limitations of claims 19, 33, and 34. Tarr does not disclose intravenous administration of a dosage of 6 mg/kg or 130 mg at week 0, or subcutaneous administration at week 8 with 90 mg. '307 patent, claims 19, 33, and 34. A person of ordinary skill in the art would understand that drug efficacy and safety can widely vary depending on the dosage used. A skilled person could not conclude that the dosing regimen of these claims is obvious when Tarr does not disclose any dosing regimen.

347.    For the reasons I have explained above, including that Tarr (1) does not disclose the treatment of any ulcerative colitis subject with ustekinumab; (2) fails to teach the claimed clinical endpoints, and (3) fails to disclose a dosing regimen, it is my opinion that Tarr is not but-for material to the claims of the '307 patent.

### 6.    CADTH 2017

348.    In my opinion, a person of ordinary skill in the art reviewing CADTH 2017 would not have a reasonable expectation that ustekinumab would work as a treatment for ulcerative colitis or achieve the specific clinical end points recited by the '307 patent. It is my opinion that a person of ordinary skill in the art reviewing CADTH 2017 could not come to any conclusion regarding the efficacy of ustekinumab as a treatment for moderately to severely active ulcerative colitis. It is my therefore opinion that the CADTH 2017 is not but-for material to the claims of the '307 patent.

### a) No Data or Support for Ustekinumab as Treatment for Ulcerative Colitis

349.    CADTH is one paragraph with no supporting citations for any of its statements:

## 6    ISSUES FOR CONSIDERATION

Ustekinumab is currently indicated for plaque psoriasis and psoriatic arthritis. There is potential for ustekinumab to be used off-label as a treatment option for ulcerative colitis, thus leading to increased overall costs for this class of treatments. Also, ustekinumab is the only available biologic that requires IV infusions for the induction phase, followed by subcutaneous administration for the maintenance phase. Costing discrepancies between these modes of administration may affect the overall cost of treatment and budgets for jurisdictions. The manufacturer provided a response confirming that administration costs of the IV dose for ustekinumab would be reimbursed by the manufacturer under the same program that supports the administration of the IV doses of infliximab (Remicade).

350.    As shown above, CADTH states that ustekinumab is indicated for plaque psoriasis and psoriatic arthritis, not ulcerative colitis. It notes that there is "potential for ustekinumab to be used off-label as a treatment for ulcerative colitis." The qualification of "potential" is important—it reflects the fact that there were no data demonstrating that ustekinumab would treat ulcerative colitis and the need for clinical trials. This does not tell a person of ordinary skill anything regarding the efficacy of Stelara as a treatment for ulcerative colitis.

351.    CADTH's reference to ulcerative colitis as an off-label indication contains no supporting citation. CADTH also does not elsewhere explain what data supports the use of Stelara for the treatment of ulcerative colitis. CADTH does not state how many patients were administered Stelara as an off-label treatment for ulcerative colitis, whether those patients' condition improved, or provide any other data to support the use of ustekinumab as a treatment for ulcerative colitis. Persons of ordinary skill in the art require much more to establish a medication as a treatment for ulcerative colitis. If anything, a clinician would understand that ulcerative colitis being listed as an "off-label" indication means that ustekinumab has not

127

received the appropriate approval for the treatment of ulcerative colitis by the relevant medical agency in Canada.

352.    I disagree with Dr. Warfield's statement that a "key conclusion" of CADTH is that there was anticipation that ustekinumab would be used as an off-label therapy for ulcerative colitis.  Warfield Rpt. ¶183.  Other than one unsupported sentence, there is no evidence showing that ustekinumab could be used as an off-label treatment for ulcerative colitis anywhere else in the publication.  At most, the publication's reference to ustekinumab's "potential" means that the authors were awaiting results from clinical trials showing one way or the other whether ustekinumab could be a treatment for ulcerative colitis.

### b) The Claimed Clinical Endpoints

353.    However, even if CADTH could provide some expectation that ustekinumab could improve an ulcerative colitis patient's condition, I understand that the claims of the '307 patent are directed to the achievement of at least one of specific clinical endpoints.  '307 patent, claim 1.  Those endpoints are the following:

(i) clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1;

(ii) endoscopic healing with a Mayo endoscopy subscore of 0 or 1;

(iii) clinical response based on the Mayo endoscopy subscore;

(iv) improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score;

(v) mucosal healing;

128

(vi) decrease from baseline in Mayo score; or

(vii) clinical response as determined by a decrease from baseline in the Mayo score by

≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1

points or a rectal bleeding subscore of 0 or 1.

'307 patent, claim 1.  These clinical endpoints align with the endpoints of the UNIFI clinical trial

conducted by J&J.  NCT 236 Protocol at 1838552-555.  It is my opinion that CADTH 2017 does

not disclose or render obvious any of these clinical endpoints.

354.    CADTH 2017 does not explain whether ustekinumab can cause clinical remission

in ulcerative colitis patients, or how such remission would be measured.  As I illustrate in the

below chart, CADTH 2017 does not disclose that any patient administered ustekinumab off-label

met any of the clinical endpoints recited in the claims of the '307 patent:

| Clinical Endpoint in '307 Patent Claims | Disclosed in CADTH 2017? | Explanation |
|---|---|---|
| (i) clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1 | Not Disclosed | CADTH does not disclose the use Mayo scores or endoscopies to evaluate remission. |
| (ii) endoscopic healing with a Mayo endoscopy subscore of 0 or 1 | Not Disclosed | CADTH does not disclose the use of endoscopies. |
| (iii) clinical response based on the Mayo endoscopy subscore | Not Disclosed | CADTH does not disclose the use of endoscopies to evaluate its subjects. |
| (iv) improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score | Not Disclosed | CADTH does not disclose the use an IBDQ score with a |

| | | ulcerative colitis subject. |
|---|---|---|
| (v) mucosal healing | Not Disclosed | CADTH does not disclose the evaluation of mucosal healing in a ulcerative colitisC subject. |
| (vi) decrease from baseline in Mayo score | Not Disclosed | CADTH does not use Mayo scores. |
| (vii) clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1 | Not Disclosed | CADTH does not use Mayo scores. |

355.    It is therefore my opinion that CADTH does not teach or render obvious the claimed clinical endpoints, which are specific clinical endpoints that are not necessarily met by other methods of evaluating clinical remission.

### c) No Disclosure of Dosing Regimen

356.    CADTH also does not describe the claimed dosing regimen of the '307 patent. Claim 1 of the '307 patent requires the administration of a "clinically proven safe and clinically proven effective amount" of ustekinumab.  '307 patent, claim 1.  Claims 19, 33, and 34 require the use of an intravenous administration at a "dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration at week 0" and subcutaneous administration at a "dosage of 90 mg per administration at week 8 of the treatment."  '307 patent, claims 19, 33, and 34. Claims 33 and 34 further require that the maintenance subcutaneous administration is provided once every 8 weeks or once every 12 weeks.  '307 patent, claims 33 and 34.

357.    CADTH does not teach or render obvious the "clinically proven safe and clinically proven effective amount" of ustekinumab limitation of claim 1.  The patent defines the term "clinically proven" to mean a dosage proven by an approved clinical trial:

> As used herein, unless otherwise noted, the term "clinically proven" (used independently or to modify the terms "safe" and/or "effective") shall mean that it has been proven by a clinical trial wherein the clinical trial has met the approval standards of U.S. Food and Drug Administration, EMEA or a corresponding national regulatory agency.  For example, the clinical study may be an adequately sized, randomized, double-blinded study used to clinically prove the effects of the drug.

'307 patent, column 10, lines 34-42.  CADTH simply states that ustekinumab could potentially be used off-label for ulcerative colitis with no more detail.  It does not disclose any dosing regimen, let alone one that has been proven by a clinical trial to be safe and effective for IBD. CADTH therefore does not disclose administration of a "clinically proven safe and clinically proven effective amount" of ustekinumab for the treatment of ulcerative colitis.

358.    CADTH also does not teach or render obvious the specific dosage limitations of claims 19, 33, and 34.  CADTH does not disclose intravenous administration of a dosage of 6 mg/kg or 130 mg at week 0, or subcutaneous administration at week 8 with 90 mg.  '307 patent, claims 19, 33, and 34.  A person of ordinary skill in the art would understand that drug efficacy and safety can widely vary depending on the dosage used.  A skilled person could not conclude that the dosing regimen of these claims is obvious when CADTH does not disclose any dosing regimen.

359.    For the reasons I have explained above, including that CADTH (1) does not disclose the treatment of any ulcerative colitis subject with ustekinumab; (2) fails to teach the claimed clinical endpoints, and (3) fails to disclose a dosing regimen, it is my opinion that CADTH is not but-for material to the claims of the '307 patent.

### 7.    ClinicalTrials.gov

360.    The August 14, 2018 posting on ClinicalTrials.gov for NCT02407236 is a clinical trial posting describing the UNIFI Phase III trial that was to be conducted by J&J.  The trial is titled "A Phase 3, Randomized, Double-Blind, Placebo-controlled, Parallel-group, Multicenter Protocol to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy in Subjects with Moderately to Severely Active Ulcerative Colitis."  When I refer to the "ClinicalTrials.gov" reference, I am referring to this August 14, 2018 posting.  I understand that both Drs. Matovcik and Warfield rely on this August 14, 2018 posting.  Matovcik Rpt. ¶187 (relying on "August 2018" version); Warfield Rpt. ¶2 n.2 (relying on "Version 39: 2018-08-13"); ¶38 (the "NCT-236 posting in August 2018").

361.    I have also reviewed the initial posting on ClinicalTrials.gov on April 2, 2015 and have compared it with the ClinicalTrials.gov postings in September 2017 (Ver. 35), and August 2018 (Ver. 39).  It is my opinion that there are no meaningful differences between these postings relevant to the claims.  The Study Description, Arms and Interventions, Inclusion and Exclusion Criteria, and Outcome Measures are the same in each of these postings.  The later postings update other information related to study status such as the completion dates, the number of actual subjects enrolled, and the location of trial sites.  Thus, my opinions below regarding the August 2018 posting also apply to the April 2015 and September 2017 ClinicalTrials.gov postings.

362.    For the reasons discussed below, it is my opinion that ClinicalTrials.gov does not anticipate or render obvious the claims of the '307 patent.

### a) ClinicalTrials.gov Was Considered During Prosecution

363.     Dr. Matovcik lists the "ClinicalTrials.gov (August 2018)" reference under a section entitled "Scope and Content of Withheld Material Information."  Matovcik Rpt. at 54.  It is unclear whether Dr. Matovcik is stating that the ClinicalTrials.gov reference was withheld from the Examiner.  If so, I disagree.  The Examiner in a July 16, 2020 non-final rejection specifically rejected certain claims as "being unpatentable over ClinicalTrials.gov ('CT')."  July 16, 2020 Non-Final Rejection at p.6.  Thus, it is my opinion that the Examiner considered the ClinicalTrials.gov reference during prosecution of the '307 patent and still allowed the claims.  I agree with the Examiner's determination.

364.     In an October 2020 Information Disclosure Statement, J&J disclosed a search report to the Examiner.  That search report specifically identified the August 13, 2018 version of the ClinicalTrials.gov posting for NCT02407236:

| C. | DOCUMENTS CONSIDERED TO BE RELEVANT | |
| --- | --- | --- |
| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
| Y | (JANSSEN RESEARCH & DEVELOPMENT, LLC) A Study to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy in Participants With Moderately to Severely Active Ulcerative Colitis (UNIFI). 13 August 2018; retrieved from the internet <https://clinicaltrials.gov/ct2/show/NCT02407236> on 19 December 2019; pages 1-12; page 3/12, paragraph 2; 5/12, paragraphs 2-7 | 1-3, 4/1-3, 5/4/1-3, 6/4/1-3, 7/6/4/1-3, 8/7/6/4/1-3, 9/7/6/4/1-3, 10/9/7/6/4/1-3, 11/8/7/6/4/1-3, 12/8/7/6/4/1-3, 13/9/7/6/4/1-3 |

PCT Search Report at p.7.  The Examiner considered this search report.  In a document dated October 27, 2020, the Examiner stated that all "references considered except where lined through."  The PCT search report was not lined through.

365.     I have reviewed the initial posting on ClinicalTrials.gov on April 2, 2015 and have compared it with the ClinicalTrials.gov postings in September 2017 (Ver. 35), and August 2018 (Ver. 39).  It is my opinion that there are no meaningful differences between these postings relevant to the claims.  The Study Description, Arms and Interventions, Inclusion and Exclusion Criteria, and Outcome Measures are the same in all of these postings.  The later postings update

other information related to study status such as the completion dates, the number of actual
subjects enrolled, and the location of trial sites.

### b) ClinicalTrials.gov Discloses A Test, not a Method of Treatment

366.    The ClinicalTrials.gov reference describes a plan for a test, not a method of
treatment. The ClinicalTrials.gov reference does not contain any data or results from the trial. It
simply discloses the fact that J&J is conducting a Phase III trial testing ustekinumab in ulcerative
colitis. The ClinicalTrials.gov reference notes that the "purpose of this study is to evaluate the
efficacy and safety of ustekinumab" in patients with moderately to severely active ulcerative
colitis. ClinicalTrials.Gov at Brief Summary. The study was conducted to figure out whether
ustekinumab was effective in ulcerative colitis. It also discloses that the study is a double-blind,
placebo-controlled trial with 971 subjects.

367.    Dr. Matovcik states that "[b]ased on the results of this Phase III study, J&J
received FDA approval for the use of ustekinumab in treating UC in October 2019." Matovcik
Rpt. ¶162. I agree. Those results were published by J&J after the filing of the '307 patent and
reflect the results contained in the '307 patent. But the results of this Phase III study are not
contained in the ClinicalTrials.gov reference which Dr. Matovcik relies on. And there were no
prior clinical studies evaluating ustekinumab in ulcerative colitis.

368.    As explained above, see above ¶¶198-199, I understand that for a reference to be
anticipatory, the reference must enable someone skilled in the art to make and use the invention
without undue experimentation, and all elements must be explicitly or inherently disclosed in a
reference. The claims require the administration of Stelara as a method of treating a subject with
moderately to severely active ulcerative colitis. '307 patent, claim 1 ("[a] method of treating
moderately to severely active ulcerative colitis"). A person of ordinary skill would understand

that the claims require ustekinumab to be administered for the purpose of treating moderately to severely active ulcerative colitis. The claims also require that the administration of ustekinumab effectively treats the subject by requiring that the subject be a "responder to treatment" and achieve one of various clinical endpoints. '307 patent, claim 1.

369.    It is my opinion that the ClinicalTrials.gov posting fails to disclose a "method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof" as required by the claims of the '307 patent. It is also my opinion that the ClinicalTrials.gov posting fails to disclose that the subject with moderately to severely active ulcerative colitis is a responder to treatment to one of the claimed clinical endpoints. '307 patent, claim 1. For the same reasons, the reference does not enable a person of ordinary skill in the art to practice the claimed method achieving these clinical outcomes. This is because the ClinicalTrials.gov reference describes a plan for a test with no results. The reference does not disclose or enable a person of skill in the art to administer ustekinumab as a treatment.

370.    The ClinicalTrials.gov posting describes a plan for a Phase III test or experiment, not any results. The reference therefore does not enable a person of ordinary skill in the art to practice the claimed method. The ClinicalTrials.gov reference does not say that the tested doses will be effective. Prior to the UNIFI clinical trial results, no one knew whether Stelara would be a treatment for ulcerative colitis. The UNIFI clinical trial results are contained in the '307 patent, not the ClinicalTrials.gov reference. The ClinicalTrials.gov reference states that the "purpose of the study is to evaluate the efficacy and safety" of ustekinumab with IV and SC administration. ClinicalTrials.gov at Brief Summary. The authors therefore did not know whether ustekinumab would work as a treatment.

371.    ClinicalTrials.gov also discloses that the trial is a placebo-controlled, double-blind "Study."  ClinicalTrials.gov at Detailed Description.  The word "study" demonstrates to a person of ordinary skill that this is a test.  The disclosure of the trial being double-blinded tells a person of ordinary skill that neither the doctors nor patients knew who was receiving what.  Thus, any given doctor involved in the study would not know whether they were administering to a patient the placebo or ustekinumab.  The physicians are administering an unknown for the purpose of testing, not treatment.  A physician cannot intend to treat a subject in the UNIFI study, including by achieving the claimed clinical endpoints, if they do not know whether they are giving a placebo or the study drug.  The placebo and dosages of ustekinumab are being administered in the trial with a purpose to test whether ustekinumab is efficacious or not, and not with the purpose of treatment.

372.    Testing is not the same as treating.  For a person of ordinary skill in the art to administer ustekinumab for the purpose of treating ulcerative colitis, they would need well-supported evidence showing that ustekinumab was effective, such as the UNIFI clinical trial results.  The inclusion of ustekinumab in a Phase III trial, without more, does not show that ustekinumab is a treatment for moderately to severely active ulcerative colitis.  ClinicalTrials.gov therefore describes an investigation testing ustekinumab and does not disclose or enable the use of ustekinumab as a treatment for ulcerative colitis.

373.    The term "treatment" in the ClinicalTrials.gov posting does not convince me otherwise.  A person of ordinary skill in the art would understand that the term "treatment" in a clinical trial posting refers to what is known as a "treatment arm" in a clinical trial.  ClinicalTrials.gov at Arms and Interventions.  In a clinical trial, there are multiple "arms."  Each arm refers to a group of trial participants who will receive a specific intervention.  Clinical trials

136

will often have a "placebo" arm and a "treatment" arm (also referred to as an "experimental arm"). The placebo arm of the study refers to the participants who receive the placebo. The "treatment" arm of the study refers to the participants who will be receiving the test drug. The term "treatment" on ClinicalTrials.gov is not meant to convey that a biologic works as a treatment. https://www.fda.gov/about-fda/oncology-center-excellence/patient-friendly-language-cancer-clinical-trials (defining "Treatment Arm or Experimental Arm" as the group of patients given a new treatment that is "under evaluation"). That is why the clinical trial is conducted.

374.    The ClinicalTrials.gov reference discloses that the ustekinumab arms are "[e]xperimental arms":

**Experimental:** Induction Study - Ustekinumab 130 milligram (mg) IV

Participants will be randomized to receive single dose of ustekinumab 130 mg as IV infusion at Week 0. Participants with clinical response at Week 8 will be eligible to enter the Maintenance study and will be randomized.

ClinicalTrials.gov at Arms and Interventions. This supports my opinion that a person of ordinary skill in the art would understand that ClinicalTrials.gov discloses a test, not a method of treatment.

375.    The ClinicalTrials.gov reference also does not disclose or enable a method of treatment wherein the subject is a responder to treatment achieving at least one of the claimed clinical endpoints. The reference identifies the clinical endpoints that J&J would be testing in the UNIFI clinical trial, including those reflected in the claims of the '307 patent. '307 patent, claim 1. But this reference does not disclose any results showing that administration of ustekinumab at the claimed dosages achieves those clinical endpoints. This is unlike the '307

137

patent which discloses the results of the UNIFI trial showing that these clinical endpoints were achieved in certain patients.  The ClinicalTrials.gov reference therefore discloses the existence of a test but does not disclose any results showing that the administration of ustekinumab achieves the claimed clinical endpoints.  It therefore does not enable a person of ordinary skill to administer ustekinumab for the purpose of achieving any of the claimed clinical endpoints in a moderately to severely active ulcerative colitis subject without undue experimentation.

376.    I understand that Dr. Matovcik agrees that the ClinicalTrials.gov reference does not disclose any results showing that the clinical trial accomplished the claimed clinical endpoints.  Matovick Rpt. ¶201.  Dr. Matovcik contends that this "deficiency can be cured by combining the disclosure . . . with additional prior art references."  As I explain below, I disagree with Dr. Matovcik that each of these additional references provide any expectation that ustekinumab would work as a treatment for ulcerative colitis or would achieve the claimed clinical endpoints.

### c) The Existence of a Phase III Trial Does Not Create an Expectation of Success

377.    Additionally, the existence of a Phase III trial does not tell a person of ordinary skill in the art that the trial will succeed.  It was well-established in 2018 that many Phase III trials fail and, even where trials progress past Phase I and Phase II, they may fail at Phase III.  Takebe 2018 at p.597, 602-603 (observing a "59%" success rate "at Phase III"); Mullard 2016 at p.446 (noting a probability of success of "58% in Phase III trials").

378.    The above studies included both biologics and non-biologics, but biologics are not unique.  Many biologics, including antibodies like ustekinumab, do not proceed from Phase III to a biologics license application.  Numerous studies have been conducted showing that many Phase III clinical trials for biologics fail.  BIO 2016 Report at p.20 (noting that "57.2%" of

biologic Phase III trials proceed to BLA); BIO 2020 Report at p.15 (stating a "56.7%" rate for biologics from Phase III to BLA), 17 (68.1% success rate for monoclonal antibodies from Phase III to BLA); Hay 2014, Tables 4 and 5 ("63.2%" probability of success for Phase III to BLA for "Biologics" for "All indications"). Even excluding oncology biologics, which historically fail at higher rates than non-oncology biologics, a substantial number of non-oncology biologics have failed to pass Phase III. Hay 2014 at p.42, Table 6 (stating that the Phase III probability of success for "Non-oncology mAbs" is "66.7%" and probability of FDA approval is "55.9%").

379.    A person of skill in the art would understand that J&J's UNIFI study was a direct-to-Phase III approach. A person of skill reviewing ClinicalTrials.gov would see that J&J was testing the same dosing regimen as used with Crohn's disease in ulcerative colitis patients. Because J&J had already established that the dosing regimen was safe, it was reasonable for J&J to proceed directly to a larger Phase III trial.

380.    A person of ordinary skill in the art would not make any conclusions about ustekinumab in ulcerative colitis, particularly as there was no Phase II data showing efficacy. Most Phase III trials follow Phase II trials which show some preliminary evidence of efficacy and safety. But many of those Phase III trials still fail as the statistics above show. In Phase II trials, which are often the first time a biologic is being evaluated for efficacy, the success rates are even lower. Hay 2014 at Table 6 (Non-oncology mAbs success rate of 47.7% from Phase 2 to Phase 3); BIO Report 2016 at p.20 ("34%" rate of success for biologics from Phase II to Phase III); BIO Report 2020 at p.15, 17. Because J&J proceeded with a direct-to-Phase III approach with ulcerative colitis, it took an even greater risk.

381.    I understand that Drs. Matovcik and Warfield have suggested that other references, such as Ochsenkühn, Kolios, Afonso, Tarr, and CADTH, would provide confidence

to a person of ordinary skill that the UNIFI Phase III trial would succeed.  I disagree.  As discussed above, each of these references either has no patient data or relies on very limited sample sizes of ulcerative colitis subjects.  See above ¶¶201-359.

382.    These references fall well short of the number of subjects required for a Phase I trial, let alone a Phase II trial.  A skilled person would understand that many drugs have passed Phase II (with many more test subjects) only to fail to demonstrate efficacy at Phase III.  The FDA itself has published a document describing 22 exemplary case studies where Phase II and Phase III trials had different results.  FDA Jan. 2017 Guidance.  These Phase II trials had significantly larger number of test subjects than the Ochsenkühn (17), Kolios (1), and Afonso references (2), but still failed at Phase III.  FDA Jan. 2017 Guidance at p.5, 6, 10.  A person of ordinary skill reviewing references like Ochsenkühn, Kolios, and Afonso would understand that many clinical trials fail to show efficacy at Phase III despite earlier Phase II data which is much more robust than the data in these references.  These references would therefore not provide a person of ordinary skill any increased expectation that the UNIFI trial would succeed, particularly given the flaws of each reference discussed above.  See above ¶¶201-272 (Ochsenkühn), ¶¶273-299 (Kolios), ¶¶300-335 (Afonso).

383.    In the IBD space, Mongersen (GED-0301) was an antisense oligodeoxynucleotide which went through Phase II and Phase III trials for treatment of active Crohn's disease.  In the Phase II trial involving 166 patients, 55% of the 40 mg group and 65% of the 160 mg group achieved the primary endpoint, whereas only 10% of the placebo group did.  Monteleone 2015 at p.1104.  But when a Phase III trial was conducted in 701 patients, the conclusion was that "GED-0301 did not demonstrate efficacy vs placebo in active CD."  Sands 2020 at p.738.  This is yet

another example of preliminary results far superior to Ochsenkühn, Kolios, and Afonso which never panned out.

384.    Ozanimod also failed at Phase III despite positive Phase II data for Crohn's disease.  BMS had moved forward with the Phase III clinical trial based on preliminary data from 69 patients in a Phase II study studying ozanimod as a treatment for ulcerative colitis. Feagan 2020 at p.1.  That study found "clinical *improvement*" within 12 weeks of initiating ozanimod therapy in 69 patients.  Feagan 2020 at p.8.  Despite the Phase II results, the Phase III study involving over 600 patients failed to demonstrate efficacy.  BMS Press Release ("The study did not meet its primary endpoint of clinical remission at Week 12."); Feagan 2022.

385.    Similarly, etrolizumab, in a Phase II study (EUCALYPTUS) "showed clinically meaningful efficacy" for the treatment of moderately to severely active ulcerative colitis based on data from 124 subjects.  NCT 215 Protocol at p.2030; Vermeire 2014 at p.311.  The Phase III studies did not succeed and "[n]o significant differences were observed between maintenance etrolizumab and placebo in the primary endpoint of remission at week 62."  Vermeire 2022 at p.28;  Genentech Press Release 2020.

386.    The same is true with other trials regarding ustekinumab.  In a Phase II, proof-of-concept study with ustekinumab in subjects with systemic lupus erythematosus (SLE), 102 subjects were randomly assigned to ustekinumab or placebo.  The primary endpoint of the study was met in the Phase II trial.  NCT 722 Protocol at p.42-43.  J&J relied on those Phase II results to justify a Phase III clinical trial protocol testing ustekinumab in SLE subjects.  NCT 722 Protocol at p.45 ("In the Phase 2 . . . greater efficacy compared with placebo was observed across clinical and laboratory measures of disease activity").  J&J in its protocol also relied on prior research implicating IL-12 and IL-23 in the development of SLE.  NCT 722 Protocol at

141

p.41-42. Despite the preliminary evidence of efficacy in Phase II, the Phase III placebo-controlled study with ustekinumab in 516 SLE subjects failed to show efficacy. Van Vollenhoven 2022 at p.1556 ("Ustekinumab did not demonstrate superiority over placebo in this population of adults with active SLE").

387. Prior direct-to-Phase III trials did not always work, even with ustekinumab. Based on efficacy in psoriasis and psoriatic arthritis, J&J had moved directly to Phase III to evaluate the efficacy of ustekinumab in axial spondyloarthritis ("AxSpa"). The direct-to-Phase III trials failed, and the "efficacy of ustekinumab in the treatment of axial SpA was not demonstrated." Deodhar 2019 at p.258.

388. The clinical trial protocol for the Phase III study for ustekinumab in AxSpa stated that "[u]stekinumab has shown preliminary efficacy in the radiographic AxSpa population in a small open label study." NCT 162 Protocol at p.35. In that study, similar in size to the patient population in Ochsenkühn, "20 subjects" with AxSpa received ustekinumab. "65%" of the subjects achieved the primary endpoint of ASAS 40 response at Week 24. NCT 162 Protocol at p.37; Poddubnyy 2014 (describing "TOPAS" proof-of-concept study). The Phase III clinical trial had the same primary endpoint as the small open label study but had the goal of enrolling at least 327 subjects to detect a statistically significant difference versus placebo. NCT 162 Protocol at p.80 ("The sample size of 327 subjects was chosen to achieve 90% power to detect a treatment difference between ustekinumab and placebo for the primary endpoint at a significance level of 0.05 (2-sided)."). The Phase III study failed to show efficacy even though the small, open label study suggested it was efficacious. Deodhar 2019 at p.261. This is just one illustrative example. The person of ordinary skill in the art in 2018 understood that Phase III

142

trials did not always succeed even when there was limited data suggesting that a drug would be efficacious.

389.     Finally, Dr. Matovcik suggests that a person of ordinary skill would expect success because "the Phase III trial had passed its estimated primary completion date and had not been cancelled due to futility."  Matovcik Rpt. ¶225.  I disagree.  While I agree that the trial was not cancelled due to futility, a person of ordinary skill in the art in September 2018 did not know that the UNIFI trial had a futility analysis.  None of the ClinicalTrials.gov postings (April 2015, September 2017, August 2018) before the filing date of the '307 patent disclose that J&J was conducting an interim futility analysis as part of the trial protocol.  The use of a futility analysis became public when J&J, after September 2018, disclosed the use of an interim analysis in the NCT 236 protocol.  Thus, a person of ordinary skill reviewing ClinicalTrials.gov as of September 24, 2018 would not know whether the Phase III trial had a futility analysis.[13]

390.     A person of ordinary skill would understand this and would not leap to conclusions regarding efficacy based on these references.

### d) The Clinical Endpoints Are Not Inherent

391.     As I explained above, see above ¶200, I understand that an element is inherently disclosed only if it is necessarily present in the prior art reference.  An inherent element must be inevitable, not merely probable or possible.  I also understand that an invitation to investigate is not an inherent disclosure.

---

[13] As I explain below, see below ¶¶505-506, the existence of a futility analysis in the trial protocol reflects the significant doubt at J&J regarding the use of ustekinumab to treat ulcerative colitis.  But a person of ordinary skill in the art outside of J&J did not know as of September 2018 whether the trial had a futility analysis.

392.    It is my opinion that the claimed clinical trial endpoints are not inherent.  The Stelara Label, in Section 14.5, outlines the results of the UNIFI clinical trial's induction and maintenance studies.  Table 15 illustrates the results at Week 8 of the induction study:

**Table 15: Proportion of Subjects  Meeting Efficacy Endpoints at Week 8 in UC-1**

| Endpoint | Placebo N = 319 | | STELARA®[t] N = 322 | | Treatment difference and 97.5% CI[a] |
|---|---|---|---|---|---|
| | N | % | N | % | |
| **Clinical Remission**[*] | **22** | **7%** | **62** | **19%** | 12% (7%, 18%)[b] |
| Bio-naïve[↓] | 14/151 | 9% | 36/147 | 24% | |
| Prior biologic failure | 7/161 | 4% | 24/166 | 14% | |
| **Endoscopic Improvement**[§] | **40** | **13%** | **80** | **25%** | 12% (6%, 19%)[b] |
| Bio-naïve[↓] | 28/151 | 19% | 43/147 | 29% | |
| Prior biologic failure | 11/161 | 7% | 34/166 | 20% | |
| **Clinical Response**[t] | **99** | **31%** | **186** | **58%** | 27% (18%, 35%)[b] |
| Bio-naïve[↓] | 55/151 | 36% | 94/147 | 64% | |
| Prior biologic failure | 42/161 | 26% | 86/166 | 52% | |
| **Histologic-Endoscopic Mucosal Improvement**[‡] | **26** | **8%** | **54** | **17%** | 9% (3%, 14%)[b] |
| Bio-naïve[↓] | 19/151 | 13% | 30/147 | 20% | |
| Prior biologic failure | 6/161 | 4% | 21/166 | 13% | |

Stelara Label, § 14.5.  As shown above, of the 322 subjects receiving the 6 mg/kg induction Stelara dose, 19% achieved clinical remission, 25% achieved endoscopic remission, 58% achieved clinical response, and 17% showed histologic-endoscopic mucosal improvement.  Thus, while Stelara was better than placebo, it did not necessarily meet the claimed clinical endpoints in all patients at the conclusion of the induction study.

393.    Similarly, the results of the maintenance study are shown in Table 16:

**Table 16: Efficacy Endpoints of Maintenance at Week 44 in UC-2 (52 Weeks from Initiation of the Induction Dose)**

| Endpoint | Placebo* N = 175[†] | | 90 mg STELARA® every 8 weeks N = 176 | | Treatment difference and 95% CI |
|---|---|---|---|---|---|
| | N | % | N | % | |
| **Clinical Remission**[**] | 46 | 26% | 79 | 45% | 19% (9%, 28%)[a] |
| Bio-naïve[‡] | 30/84 | 36% | 39/79 | 49% | |
| Prior biologic failure | 16/88 | 18% | 37/91 | 41% | |
| **Maintenance of Clinical Response at Week 44**[†] | 84 | 48% | 130 | 74% | 26% (16%, 36%)[a] |
| Bio-naïve[‡] | 49/84 | 58% | 62/79 | 78% | |
| Prior biologic failure | 35/88 | 40% | 64/91 | 70% | |
| **Endoscopic Improvement**[§] | 47 | 27% | 83 | 47% | 20% (11%, 30%)[a] |
| Bio-naïve[‡] | 29/84 | 35% | 42/79 | 53% | |
| Prior biologic failure | 18/88 | 20% | 38/91 | 42% | |
| **Corticosteroid-free Clinical Remission**[‡] | 45 | 26% | 76 | 43% | 17% (8%, 27%)[a] |
| Bio-naïve[‡] | 30/84 | 36% | 38/79 | 48% | |
| Prior biologic failure | 15/88 | 17% | 35/91 | 38% | |
| **Maintenance of Clinical Remission at Week 44 in subjects who achieved clinical remission 8 weeks after induction** | 18/50 | 36% | 27/41 | 66% | 31% (12%, 50%)[b] |
| Bio-naïve[‡] | 12/27 | 44% | 14/20 | 70% | |
| Prior biologic failure | 6/23 | 26% | 12/18 | 67% | |

Stelara Label, § 14.5.  The maintenance study was only continued in patients who achieved clinical response after 8 weeks following the IV administration of either induction dose in the induction study.  The subjects were then randomized into placebo, 90mg subcutaneous regimen every 8 weeks, or 90mg subcutaneous regimen every 12 weeks.  The above data show that it was not inevitable that, for any patient administered Stelara, that it would treat their moderately or severely active ulcerative colitis.  Only 45% of the subjects taking Stelara every 8 weeks achieved clinical remission and only 47% achieved endoscopic improvement.

145

394.    I therefore disagree that the clinical endpoints are inherent in the ClinicalTrials.gov posting.  The ClinicalTrials.gov posting contains no evidence that ustekinumab administration would treat ulcerative colitis subjects or achieve the claimed clinical endpoints.  It is a notice of an investigation without any data.  In addition, the results of the trial demonstrate that the achievement of the clinical endpoint is not inevitable and dependent on the subject.  Many moderately to severely active ulcerative colitis subjects did not respond to ustekinumab administration.  This shows that the clinical endpoints are not an inherent feature of the intravenous and/or subcutaneous administration of ustekinumab to a moderately to severely active ulcerative colitis patient.

395.    Even if a few subjects achieved one of the trial's clinical endpoints, because of the placebo effect and the relapsing and remitting nature of the disease, this does not provide evidence that any given subject is a "responder to treatment."  '307 patent, claim 1; Bahr Rpt. ¶283.

### 8.    Stelara® Prescribing Information

396.    Dr. Matovcik relies on the Stelara® Prescribing Information as of 2016 (the "Stelara P.I.").[14]  The Stelara P.I. is sometimes known as the Package Insert and is the product label approved by the U.S. Food and Drug Administration.

### a) The Stelara P.I. Does Not Mention Ulcerative Colitis

397.    The Stelara P.I. in 2016 does not say anything about ulcerative colitis.  In 2016, Stelara had been approved to treat moderately to severely active Crohn's disease, moderate to

---

[14] JNJ-STELARA_002029703

severe plaque psoriasis, and active psoriatic arthritis.  The Stelara P.I. from 2016 therefore says

nothing about the use of ustekinumab as a treatment for ulcerative colitis:

---------------------------**INDICATIONS AND USAGE**------------------------

STELARA® is a human interleukin-12 and -23 antagonist indicated for the
treatment of adult patients with:

- *moderate to severe plaque psoriasis (Ps)* who are candidates for
  phototherapy or systemic therapy. (1.1)
- *active psoriatic arthritis (PsA)*, alone or in combination with
  methotrexate. (1.2)
- *moderately to severely active Crohn's disease (CD)* who have
  - failed or were intolerant to treatment with immunomodulators or
    corticosteroids, but never failed a tumor necrosis factor (TNF)
    blocker or
  - failed or were intolerant to treatment with one or more TNF
    blockers. (1.3)

Stelara P.I., JNJ-STELAR_002029703.

398.    The Stelara P.I. from 2016 therefore discloses an approved dosing regimen for

Crohn's disease specifically, not ulcerative colitis:

**2.3    Crohn's Disease**

Intravenous Induction Adult Dosage Regimen

A single intravenous infusion dose of STELARA® using the weight-based dosage regimen
specified in Table 1 *[see Instructions for dilution of STELARA® 130 mg vial for intravenous
infusion (2.6)]*.

| Table 1:    Initial Intravenous Dosage of STELARA® | | |
|---|---|---|
| **Body Weight of Patient at the time of dosing** | **Dose** | **Number of 130 mg/26 mL (5 mg/mL) STELARA® vials** |
| 55 kg or less | 260 mg | 2 |
| more than 55 kg to 85 kg | 390 mg | 3 |
| more than 85 kg | 520 mg | 4 |

Subcutaneous Maintenance Adult Dosage Regimen

The recommended maintenance dosage is a subcutaneous 90 mg dose administered 8 weeks after
the initial intravenous dose, then every 8 weeks thereafter.

Stelara P.I., JNJ-STELARA_002029706 (§ 2.3).

### b) The Stelara P.I. Is Cumulative of Other References Before the Examiner

399.    The Stelara P.I. label is cumulative of information already before the Examiner during prosecution of the '307 patent.  During prosecution, J&J identified the Feagan 2016 and Sandborn 2018 for the Examiner in an October 2020 disclosure statement.  October 2020 Information Disclosure Statement at p.2.  Each of these references discloses the effectiveness of Stelara in Crohn's disease and was before the Examiner during prosecution of the '307 patent.  Feagan 2016, for example, discloses the "intravenous infusion" of 130 mg of ustekinumab at week 0, followed by a "subcutaneous injections of 90 mg of ustekinumab every 8 weeks." Feagan 2016 at p.1948.  The paper concluded that "intravenous ustekinumab induces response and remission in patients with moderately to severely active Crohn's disease" and that subcutaneous ustekinumab "was more effective than placebo for maintaining remission." Feagan 2016 at p.1958.  Sandborn 2018 itself disclosed that ustekinumab "has been approved for use in the treatment of psoriasis, psoriatic arthritis, and Crohn's disease," citing the Stelara package insert.  Sandborn 2018 at p.66 fn. 23.  Thus, in my opinion, the Stelara P.I. label contains no additional meaningful disclosure than the information that was already before the Examiner regarding Crohn's disease.

400.    J&J also disclosed references regarding the genetic similarities between Crohn's disease and ulcerative colitis.  J&J in its October 16, 2020 disclosed Anderson 2011 which noted that there were many IBD risk loci identified, "including a minimum of 28 shared association signals between Crohn's disease (CD) and UC."  Anderson 2011 at p.1; October 2020 Information Disclosure Statement at p.1.

148

401.    Additionally, the Examiner was informed by J&J that many biologic therapies have worked in both Crohn's disease and ulcerative colitis.  The Background section of the '307 patent states that:

> When tested, biologic therapies that are currently approved for the treatment of UC have also demonstrated efficacy in Crohn's disease (Sandborn et al., Gastroenterology. 135(4):1130-1141 (2008)). Multiple lines of evidence suggest that inflammatory bowel disease (UC and Crohn's disease) is mediated by Th1 or Th17 cells with strong contribution from the proinflammatory cytokines, IL-12, and IL-23. Ustekinumab (STELARA®) is a fully human immunoglobulin G1 mAb to human IL-12/23p40 that prevents IL-12 and IL-23 bioactivity by inhibiting their interaction with their cell surface IL-12R131 receptor protein (Investigator's Brochure: STELARA® (ustekinumab), edition 18. Janssen Research & Development, LLC (2017)). Through this mechanism of action, ustekinumab effectively neutralizes IL-12 (Th1)- and IL-23 (Th17)-mediated cellular responses. Ustekinumab has received marketing approval globally, including countries in North America, Europe, South America, and the Asia-Pacific region, for the treatment of adult subjects with moderately to severely active Crohn's disease (the first approval for Crohn's disease was received on 11 Nov. 2016), moderate to severe plaque psoriasis, or active psoriatic arthritis, as well as for pediatric subjects (12 to 17 years old) with moderate to severe plaque psoriasis.

'307 patent, column 2, lines 38-61.  J&J therefore told the Examiner that (1) certain biologics that were approved for treatment of ulcerative colitis also showed efficacy in Crohn's disease; (2) ustekinumab targets IL-12 and IL-23, and evidence suggest that both play a role in ulcerative colitis and Crohn's disease; and (3) ustekinumab had already received approval for moderate to severely active Crohn's disease.  As explained below, I agree with the Examiner's decision to not reject the claims based on ustekinumab's Crohn's data.  However, if the Examiner had wanted to reject the claims as obvious based on ustekinumab's efficacy in Crohn's disease, the Examiner had that information available during prosecution.

### c) Efficacy in Ulcerative Colitis Cannot Be Predicted Based on Crohn's Disease

402.    As I have explained below in paragraphs 403-431, Crohn's disease and ulcerative colitis, while sharing similarities, are distinct diseases and efficacy in one does not equate to

efficacy in the other.  For the same reasons, the fact that Stelara was approved for Crohn's disease does not provide a person of ordinary skill in the art any expectation that Stelara would work to treat ulcerative colitis.

### 9.    Crohn's Disease and Ulcerative Colitis

403.    One overarching theme in Dr. Warfield and Dr. Matovcik's reports is the idea that efficacy for ustekinumab in ulcerative colitis could be predicted based on data in Crohn's disease.  Matovcik Rpt. ¶¶223-224 (noting the "shared biology between UC and Crohn's"); Warfield Rpt. ¶¶188-196 (discussing that "Jostins, Granlund, and Aggeletopolulou [sic] reports in combination provide data that would predict efficacy for ustekinumab in treating ulcerative colitis").

404.    I disagree.  As I explain below, while Crohn's disease and ulcerative colitis share similarities, they are distinct diseases with unique symptoms and measures of remission.  A person of ordinary skill in 2018 would not predict efficacy in ulcerative colitis based on Crohn's disease.  They would be aware of several treatments which have only worked in one but not the other.  These include other antibodies which targeted cytokines historically thought to play a role in either Crohn's disease or ulcerative colitis.  While ustekinumab's success in Crohn's disease provided a rationale for testing ustekinumab in ulcerative colitis, a person of ordinary skill would not reasonably expect it to treat ulcerative colitis based on this rationale alone.

### a) While Crohn's Disease and Ulcerative Colitis Share Similarities, They Are Distinct Diseases

405.    A person of ordinary skill in the art would also understand that the approval of Stelara for Crohn's disease does not demonstrate or create an expectation that Stelara would work in ulcerative colitis.  As I have explained above, Crohn's disease and ulcerative colitis are two distinct diseases within the umbrella of IBD.  See above ¶¶43-48.  While they share

similarities, there are also important differences that a person of ordinary skill in the art would understand as of 2018.

406.    <u>Location</u>.  Crohn's disease affects any part of the gastrointestinal tract from mouth to anus.  Ulcerative colitis does not impact the entire gastrointestinal tract and is limited to the colon and rectum.

407.    <u>Inflammation</u>.  In Crohn's disease, inflammation can occur in patches.  In between the patches, healthy tissue can exist.  In ulcerative colitis, inflammation is continuous, starting from the rectum and extending proximally through the colon.  There are also important differences in the depth of inflammation.  Crohn's disease can impact all layers of the bowel wall, while ulcerative colitis only impacts the innermost lining of the colon.  Thus, the formation of what are known as "fistulae" can indicate a patient has Crohn's disease as opposed to ulcerative colitis.

408.    The below figure illustrates some of the important differences between Crohn's disease and ulcerative colitis:



Marsal 2012, Figure 5.

409.    <u>Different Definitions of Disease Activity.</u>  A person of skill in the art would have also understood that the indexes used to measure remission in Crohn's disease and ulcerative colitis are distinct.  As discussed above, the Mayo score is the most used index for assessing treatments in ulcerative colitis, taking into account rectal bleeding, stool frequency, physician assessment, and endoscopy appearance.  National Library of Medicine 2016.  The score ranges from 0-12.  Each factor is scored from 0-3 and added together to give a composite score.

410.    The most used index for evaluating disease response in Crohn's Disease is the Crohn's Disease Activity Index ("CDAI").  The CDAI is calculated using weighted scoring for 8 factors (liquid stools, abdominal pain, general well-being, extraintestinal manifestations, anti-diarrheals, abdominal mass, hematocrit, and weight), shown below:

**Table 3.** Crohn's Disease Activity Index (CDAI)

| Clinical or laboratory variable | Weighting factor |
|---|---|
| Number of liquid or soft stools each day for 7 days | × 2 |
| Abdominal pain (graded from 0 to 3 based on severity) each day for 7 days | × 5 |
| General well being, subjectively assessed from 0 (well) to 4 (terrible) each day for 7 days | × 7 |
| Complications* | × 20 |
| Use of diphenoxylate or opiates for diarrhea | × 30 |
| An abdominal mass (0 for none; 2 for questionable; 5 for definite) | × 10 |
| Absolute deviation of hematocrit from 47% in men and 42% in women | × 6 |
| Percentage deviation from standard weight | × 1 |

*One point is added for each set of complications: arthralgia or frank arthritis; inflammation of the iris or uveitis; erythema nodosum, pyoderma gangrenosum, or aphthous ulcers; anal fissures, fistulas, or abscesses; other fistulas; and fever (>100 °F) during the previous week.

Remission: CDAI score <150 points.
Moderate-to-severe disease: CDAI score 230–400 points.

Di Palma 2011, Table 3. The CDAI can range from 0 to approximately 600, with scores below 150 indicating that a patient is in remission. The CDAI and Mayo scores are distinct, taking into account different factors and weighing them differently.

411. Clinical remission is also defined differently between ulcerative colitis and Crohn's disease. Using the Mayo score, clinical remission is defined as a Mayo score of less than or equal to 2 with no individual subscore greater than 1. Using the CDAI, clinical remission for Crohn's disease is considered to be less than 150.

412. <u>Genetics</u>. The underlying mechanism for ulcerative colitis and Crohn's disease is still not fully known. This is true today as it was in 2018. Persons of ordinary skill in the art in

153

2018 understood that there are various factors that play a role in the development of these conditions, including both genetic and environmental factors.

413.    Genome wide association studies have identified a number of genetic loci, or genetic positions, that make individuals more susceptible to Crohn's disease, ulcerative colitis, or both.  In 2011, one study identified 99 genetic loci and found that 47 were associated with ulcerative colitis, 71 were associated with Crohn's disease, and 28 were common to both.  Lees 2011 at p.1739.  While there is some overlap, there are genetic positions unique to Crohn's disease and ulcerative colitis.  Various academic papers have noted these unique differences.  Liu 2014 at p.376 (noting that "genes in the human leucocyte antigen (HLA) region only confer a modest effect on Crohn's disease risk (ORs 1.1–1.2). This contrasts with ulcerative colitis, where several variants in HLA-B make the largest contribution to genetic risk (ORs 1.4–1.5)"); Ellinghaus 2015 at p.16 (noting that 53 out of 163 identified genetic loci are unique to either Crohn's disease or ulcerative colitis).  Other studies in identical twins studying "concordance rates," or the percentage of pairs of twins who share a trait, have suggested that there is lower heritability in ulcerative colitis than Crohn's disease.   Orholm 2000 at p.1078-1080 ("concordance rate among monozygotic pairs was 58.3% for Crohn disease and 18.2% for ulcerative colitis").

414.    Genetics alone cannot account for Crohn's disease or ulcerative colitis. Thompson 1996 at p.96 (showing that many identical twins do not clinically share Crohn's disease or ulcerative colitis).  It was also understood that various environmental factors play a role in the development of ulcerative colitis and Crohn's disease.  A patient's microbiome in their gut can play role in the development of each disease.  Smoking is also a known risk factor

154

for Crohn's disease, but smoking has been shown to have the opposite effect for ulcerative colitis.  Smoking can have a protective effect for individuals with ulcerative colitis.

415.    <u>Cell Pathways</u>.  IBD diseases involve the triggering of inflammatory pathways at a molecular level.  In 2018, persons of ordinary skill in the art understood that various cells can be involved in inflammation associated with Crohn's disease and ulcerative colitis.  These cells produce certain proteins known as cytokines.  Cytokines can be either anti-inflammatory or pro-inflammatory.  Certain cytokines can activate inflammation (pro-inflammatory) while others inhibit inflammation (anti-inflammatory).  "IL" stands for interleukin, which is a type of cytokine protein produced by white blood cells, including T helper (Th) cells, which act as chemical messengers in the body.

416.    As of September 2018, the person of ordinary skill in the art would understand that the IL pathways for Crohn's disease and ulcerative colitis were not the same.  One paper from 2017 presented a figure illustrating some of the different roles that different cytokines have in ulcerative colitis and Crohn's disease:



155

Neurath 2017, Figure 3.  As shown above, there are important differences between the
interleukin proteins which are proinflammatory for Crohn's disease and ulcerative colitis.  The
above figure is not exhaustive as there are additional cytokines involved.

### b) Efficacy in Crohn's Disease Does Not Equate to Efficacy in Ulcerative Colitis

417.    Given important differences between Crohn's disease and ulcerative colitis, a
person of ordinary skill in the art in September 2018 would not expect ustekinumab to
effectively treat ulcerative colitis based on its efficacy in Crohn's disease.  A person of ordinary
skill in the art would believe that it would be good to test ustekinumab in ulcerative colitis based
on the Crohn's disease data, but they would not reasonably expect efficacy.

### (1)    Medications Do Not Always Work for Both Ulcerative Colitis and Crohn's Disease

418.    There are a variety of medications which have only shown efficacy in Crohn's
disease or ulcerative colitis, but not both.  A person of ordinary skill in the art would understand
this.  Given this, it would be impossible to expect efficacy in one condition solely on the basis
that a medication works in the other.   This is why researchers conduct elaborate clinical trials,
such as the UNIFI trial, to evaluate whether a medication works for both conditions.

419.    Tofacitinib is approved for the treatment of ulcerative colitis but not Crohn's
disease.  But tofacitinib also went through two Phase II clinical trials in patients with moderate to
severe Crohn's disease.  Each of those Phase II studies concluded that the response was not
significantly better than placebo in Crohn's disease.  Panes 2017 at p.1057 (stating that the
"proportion of patients in clinical remission . . . was not statistically significant compared with
placebo"); Sandborn 2014.  Tofacitinib is a type of JAK inhibitor.  At the time, it was thought
that JAK inhibitors would work against both ulcerative colitis and Crohn's disease.  For

example, filgotinib is a JAK inhibitor "investigated in treatment of Crohn's disease, [which] was superior to placebo." De Vries 2017 at p.885. Yet, tofacitinib, another JAK inhibitor, only works in ulcerative colitis but not Crohn's disease.

420.    Ozanimod is an approved biologic for the treatment of ulcerative colitis. However, Bristol-Myers Squibb also announced that in a Phase III clinical trial (the YELLOWSTONE trial) studying ozanimod in adult patients with moderate to severe Crohn's disease, the study did not meet its primary endpoint of clinical remission in Crohn's disease. BMS Press Release ("The study did not meet its primary endpoint of clinical remission at Week 12."); Feagan 2022. BMS had moved forward with the Phase III clinical trial based on preliminary data from 69 patients in a Phase II study evaluating ozanimod as a treatment for ulcerative colitis. Feagan 2020. That study found "clinical improvement[]" within 12 weeks of initiating ozanimod therapy in 69 patients. Feagan 2020 at p.1. Despite the Phase II results, the Phase III study involving over 600 patients failed to demonstrate efficacy.

421.    Another example are 5-aminosalicylic acid ("5-ASAs") medications. These compounds have typically been used to treat ulcerative colitis but have not been shown to be efficacious in Crohn's disease patients. Akobeng 2016 at p.15 ("5-ASA preparations have been found to be superior to placebo for the maintenance of remission in ulcerative colitis, but its efficacy in Crohn's disease is controversial"), p.16 ("We found no evidence in this review to suggest that 5-ASA preparations are superior to placebo for the maintenance of medically-induced remission in Crohn's disease.").

422.    Cyclosporine is another example of a compound which was known to treat ulcerative colitis, but generally not utilized for the treatment of Crohn's disease. Zenlea 2014 at

p.3148 ("CSA has proven to have promise in the induction of remission of refractory ulcerative colitis, but the data with regards to it's use in Crohn's disease are less convincing.").

### (2)  IL-12/IL-23p40 mAbs Did Not Always Work

423.    I understand that Dr. Warfield opines that ustekinumab would be expected to work in ulcerative colitis because the "role of IL-23" in ulcerative colitis had been recognized. Warfield Rpt. ¶146.  I disagree.  As I explained above, tofacitinib was a JAK inhibitor and it was also theorized that JAK inhibitors would work in both ulcerative colitis and Crohn's disease. When the clinical trials were conducted, this was not true.  A person of ordinary skill in the art would be aware of this, would understand that the pathophysiology of these diseases is complex, and would understand that efficacy cannot be expected without conducting the clinical trial.

424.    Ustekinumab was known to target the shared p40 subunit of IL-12/IL-23.  Dr. Warfield agrees.  Warfield Rpt. ¶96.  But efficacy cannot be predicted on this fact alone.  Other antibodies targeted the same p40 subunit of IL-12/IL-23 but nonetheless failed.  Briakinumab, another antibody against IL-12/IL-23p40 failed to successfully treat Crohn's disease in a clinical trial.  Panaccione 2010 at p.S457 ("Among pts with moderate to severe CD, briakinumab was not effective for induction or maintenance of remission.").  A person of ordinary skill in the art would have known this in 2018.  It is an oversimplification to conclude that any antibody which targets IL-12/IL-23p40 would be expected to treat Crohn's disease or ulcerative colitis.  This was not true in 2018 and remains not true today.  While the role of IL-12/IL-23p40 is a reason to test antibodies for each condition, efficacy cannot be predicted or expected until one receives results from a clinical trial.

### (3)    Hypothesized Pathways Have Not Always Predicted Successful Treatments

425.    There were numerous other cytokines which were thought to be involved in the pathways of Crohn's disease and ulcerative colitis.  These include IL-2, IL-13, IL-6, and IL-17.  As described below, as of September 2018, a number of monoclonal antibodies inhibiting each of these had been tested for Crohn's disease or ulcerative colitis.  Even though the cytokine targeted by each of these antibodies was thought to play a role in the development of either Crohn's or ulcerative colitis, these treatments failed in clinical studies.  A person of ordinary skill would therefore not assume that an antibody works because it targets a pathway thought to be involved in ulcerative colitis.

426.    <u>IL-2</u>: In a randomized, double blind, placebo-controlled trial evaluating daclizumab, an anti-IL-2 humanized monoclonal antibody, "[p]atients with moderate ulcerative colitis who are treated with daclizumab are not more likely to be in remission or response at eight weeks than patients treated with placebo."  Van Assche 2006 at p.1568.  The same was true for basiliximab, another antibody which binds to CD25, inhibiting IL-2-mediated proliferation of lymphocytes.  The clinical trial failed for ulcerative colitis.  Sands 2012 at p.356 ("Basiliximab does not increase the effect of corticosteroids in the induction of remission in outpatients with corticosteroid-resistant moderate to severe UC.").  These antibodies did not succeed in clinical trial even though some literature suggested a relationship between the IL-2 gene and ulcerative colitis.  Festen 2009 at p.2 (noting association with IL2/IL21 locus with ulcerative colitis).

427.    <u>IL-13</u>:  IL-13 was also "thought to play a key role as an effector cytokine in UC."  Reinisch 2015 at p.894.  In a double-blind, placebo-controlled study, anrukinzumab (an anti-IL-13 antibody) failed to demonstrate a statistically significant therapeutic effect.  Reinisch 2015 at

p.894.  Tralokinumab, another anti-IL-13 antibody, "did not significantly improve clinical response" in another clinical trial.  Danese 2015 at p.243.

428.    IFN-γ:  In a Phase II trial with fontolizumab, a humanized anti-interferon gamma antibody, the primary efficacy endpoint of a decrease of CDAI of at least 100 points at day 29 was not met.  Response rates were similar in all treatment groups at day 29, including placebo. Reinisch 2010 at p.241.

429.    IL-17:  In a proof-of-concept trial, secukinumab, an anti-IL-17A monoclonal antibody was "ineffective" in treating moderate to severe Crohn's disease.  Hueber 2012 at p.1693-1694.  This was despite "genome-wide association" study cohorts "implicating the IL-23-IL-17 axis in disease pathogenesis."  Hueber 2012 at p.1694.  Another clinical trial with brodalumab, an anti-IL-17 monoclonal antibody worsened Crohn's disease in patients with "no evidence of meaningful efficacy."  Targan 2016 at p.1599.

430.    Even for biologics approved by the FDA for the treatment of ulcerative colitis and Crohn's disease, a person of ordinary skill in the art understood that the quality of results could differ between the two indications.  Humira (adalimumab) is approved for both ulcerative colitis and Crohn's disease.  There were two Phase III studies for adalimumab in ulcerative colitis (ULTRA 1 and ULTRA 2).  The first Phase III study (ULTRA 1) suggested that ulcerative colitis patients would need to receive higher doses (160 mg at week 0, 80 mg at week 2) compared to Crohn's disease patients (80/40 mg).  Reinisch 2011 at p.780 ("ADA160/80 was safe and effective"), p.786 ("our data suggest the possibility that a substantial proportion of patients with ulcerative colitis may require a higher dose of adalimumab to induce remission, compared with Crohn's disease patients, though the biological rationale for this remains unclear.").  That higher dose also failed to show a difference between adalimumab and placebo

160

for most of the secondary clinical endpoints in ULTRA 1.  Sandborn 2012 at p.262 ("in the

earlier study . . . significant differences between adalimumab and placebo groups were only

achieved for 2 of the secondary end points at week 8.").  It was only after the second Phase III

study (ULTRA 2) was conducted that adalimumab's efficacy in ulcerative colitis was

established.  Sandborn 2012; Strauss Dep. Tr. at 130:11-132:6.[15]

### (4)  The FDA Agreed that Efficacy in Crohn's Disease Alone Does Not Support Efficacy in Ulcerative Colitis

431.    I have also reviewed documents exchanged between J&J and the FDA concerning

the UNIFI trial and believe the FDA agrees with my opinion.  While J&J offered the Crohn's

disease data as a rationale for testing ustekinumab in ulcerative colitis, the FDA in January 21,

2015 preliminary meeting comments stated that:

> Although there may be pathophysiologic similarities between UC and CD we cannot agree that the efficacy in CD can be leveraged to support a larger Type I error rate in a single UC induction trial to obtain approval.  Both CD and UC have dissimilar symptomatology and clinical characteristics and therefore studies in these diseases traditionally have utilized different clinical endpoints.  It is not clear that efficacy of ustekinumab for both CD and UC will share either the same dose-response relationship or size of clinical benefit across their respective endpoint models and it is not clear if such data would be available to make such determinations at the time of BLA review (particularly since you propose a "straight to-phase 3" approach).

JNJ-STELARA_002258317 at 2258325.  In other words, the FDA agreed that (1) it would be

improper to use efficacy in Crohn's disease to support efficacy in ulcerative colitis; (2) ulcerative

colitis and Crohn's have different symptomatology and use different clinical endpoints; and (3) it

is not clear that ustekinumab's dosing regimen would have the same effect in ulcerative colitis as

---

[15] Sandborn 2012 noted that the "discrepancy between the 2 trials might be due to the relatively high placebo response rates that were observed during ULTRA 1."  Sandborn 2012 at p.262.  If a high placebo response rate could alter outcomes in a large, Phase III trial, it surely could impact the outcomes of small, observational studies like Ochsenkühn, Kolios, and Afonso.

previously seen in Crohn's disease or achieve the desired clinical endpoints in the UNIFI study. While the Crohn's data was sufficient for FDA to approve a phase III trial, the FDA themselves understood that efficacy in Crohn's disease does not mean that ustekinumab would work in ulcerative colitis.

### c) Dr. Warfield's Additional References (Jostins, Granlund, Aggeletopoulou)

432.    Dr. Warfield points to three different references discussing genetic studies and IL-12/IL-23:  (1) Jostins, (2) Granlund, (3) Aggeletopoulou.  Warfield Rpt. ¶¶188-196.  As an initial matter, I have not seen these references mentioned in Plaintiffs' Second Amended Complaint.

433.    Dr. Warfield concludes that these references "in combination" would predict efficacy in ulcerative colitis.  Warfield Rpt. ¶195.  I disagree.  None of these references discloses any data or treatment of ulcerative colitis with ustekinumab.  They instead disclose general genetic studies and research relating to Crohn's disease and ulcerative colitis.  Efficacy cannot be predicted on such general genetic studies.  If this were the case, the FDA would not require drug developers to conduct rigorous clinical trials to determine whether a drug treats a condition.  As shown above, many trials fail even though researchers hypothesize that a drug will work based on prior studies.  See above ¶¶418-430.

434.    As also discussed above, the genetic markers associated with Crohn's disease and ulcerative colitis were still being studied and were not well-understood in 2018.  See above ¶¶412-416.  Moreover, genetics is only one of many factors that plays a role in the development of Crohn's disease or ulcerative colitis.  Roda 2011 at p.1 ("genetic susceptibility itself is not sufficient to explain the development of IBD").  A number of treatments only work in one disease but not the other, and clinical trials targeting cytokines thought to play a role in ulcerative colitis or Crohn's disease based on genetic analyses have nonetheless failed.  See

above ¶¶418-430.  Thus, a person of ordinary skill in the art in 2018 would not and could not

predict efficacy for ustekinumab as a treatment of ulcerative colitis based on these papers.

435.    I understand that the Jostins and Granlund references were cited in the NCT 236

Protocol by J&J.  NCT 236 Protocol at JNJ-STELARA_001838513, 1838602.  This does not

change my view.  J&J cited these papers as part of its "scientific and clinical rationale to justify .

. . *the study* of ustekinumab in UC."  NCT 236 Protocol at JNJ-STELARA_001838514.  I do not

interpret the protocol as predicting efficacy based on these references.  The protocol relies on

these references to justify why it would be good to study ustekinumab in ulcerative colitis.

436.    Below I address each of the papers discussed by Dr. Warfield.

### (1)    Aggeletopoulou

437.    Dr. Warfield lists Aggeletopoulou as a "prior art" reference.  Warfield Rpt. at

p.47.  He then states that a gastroenterologist would have anticipated FDA approval for

ulcerative colitis "after reading the Aggletopoulou reference prior to September 24, 2018."

Warfield Rpt. ¶196.  I understand that for a publication to be prior art to the '307 patent, it must

have been publicly accessible to a person of ordinary skill in the art prior to September 24, 2018.

I understand that a reference is publicly accessible if the document has been made available such

that persons of ordinary skill in the art exercising reasonable diligence can locate it.

### i.    Aggeletopoulou Is Not Prior Art

438.    First, I do not see any evidence that Aggeletopoulou is prior art to the '307 patent.

The article was published in Volume 24, Issue 36 of the World Journal of Gastroenterology on

September 28, 2018:

*World J Gastroenterol*  2018 September 28; 24(36): 4093-4103

September 28, 2018 | Volume 24 | Issue 36 |

Aggeletopoulou at p.4093. This is after the priority date of September 24, 2018 of the '307

patent such that Aggeletopoulou is not prior art to the patent.

439.    The World Journal of Gastroenterology also has a "Timeline of Article

Publication" on its website:



Interleukin 12/interleukin 23 pathway: Biological basis and therapeutic effect in patients with Crohn's disease

Ioanna Aggeletopoulou, Stelios F Assimakopoulos, Christos Konstantakis, Christos Triantos

World J Gastroenterol 24(36):4093-4103. Published online Sep 28, 2018. doi: 10.3748/wjg.v24.i36.4093

Abstract (1117) | Core Tip (1580) | Full Article (HTML) (7554) | Figures (1-1) (468) | Tables (1-2) (326) | Full Article (PDF)-1749K (869) | Audio-2043K (17) | Peer-Review Report-154K (168) | Answering Reviewers-127K (213) | Received: 07/14/2018 | Revised: 08/02/2018 | Accepted: 08/24/2018 | PubMed | PubMed Central | CrossRef | Google Scholar | Times Cited (41) | Total Visits (16241) | Similar Articles (0) | Timeline of Article Publication (7) | Authors Evaluation (5) | Article Quality Tracking (0) | What about the content of this article? (0) | Cite | (0) | Open

https://www.wjgnet.com/1007-9327/journal/v24/i36/index.htm. That timeline shows that, at the

earliest, the online manuscript was published on September 25, 2018, which is still after

September 24, 2018:

| Manuscript submission to publication | Online manuscript submission | 2018-07-14 08:32 | 72 Days and 19 Hours |
|---|---|---|---|
| | Online manuscript publication | 2018-09-25 03:44 | |

### ii.    Aggeletopoulou Does Not Provide An Expectation that Ustekinumab Treats Ulcerative Colitis

440.    Second, even if Aggeletopoulou were prior art, I disagree with Dr. Warfield that it

provides any reasonable expectation of success for the use of ustekinumab to treat ulcerative

colitis. Aggeletopoulou is an article entitled "Interleukin 12/interleukin 23 pathway: Biological

basis and therapeutic effect in patients with Crohn's disease." The article does not mention

ulcerative colitis once anywhere in the paper. It concerns the role of IL-12 and IL-23, which are

164

two of many cytokines which play a role in the induction of inflammation in Crohn's disease. Aggeletopoulou 2018 at p.4094.

441.    Depending on which publication you looked at, various authors would point to the importance of various cytokines in Crohn's disease and ulcerative colitis.  These include a variety of cytokines other than IL-12/IL-23.  Waldner 2014 at p.75 ("IL-6 signaling is of central importance for the maintenance of chronic intestinal inflammation in inflammatory bowel diseases (IBD) such as Crohn's disease and ulcerative colitis."); Roda 2011 at p.2 ("Beside the classical proinflammatory cytokines, such as IL-1,IL-6, and TNF-α, in the pathogenesis of UC we find a complex network in which the Th2 cytokines, IL-10 and IL-13, play a key role"); Heller 2005 at p.551 ("Here we report findings indicating that most of the functional defects of the mucosa can in fact be traced to direct effects of IL-13 on epithelial cells."); Neurath 2014. The pathogenesis of ulcerative colitis is far more complex than simply identifying IL-12/IL-23. A person of ordinary skill in 2018 would not have this reductive view of the science.

442.    Aggeletopoulou itself never states or suggests that an antibody which targets IL-12/IL-23 will successfully treat ulcerative colitis.  Aggeletopoulou instead summarizes recent evidence suggesting that IL-12 and IL-23 may play a role in intestinal inflammation in *Crohn's disease* patients.  It further summarizes ustekinumab clinical trials in Crohn's disease, not ulcerative colitis.

443.    As I have explained above, a person of ordinary skill in the art would not expect efficacy in ulcerative colitis just because a drug works in Crohn's disease.  See above ¶¶403-431. Tofacitinib is a notable example which failed multiple Crohn's disease studies even though it is approved for the treatment of ulcerative colitis.  Panes 2017 at p.1057.

444.    A person of ordinary skill would also not expect efficacy in ulcerative colitis simply because ustekinumab targets the shared p40 subunit of IL-12/IL-23.  Briakinumab also targeted IL-12/IL-23p40 but failed to successfully treat Crohn's disease in a clinical trial. Panaccione 2010 at p.S457 ("Among pts with moderate to severe CD, briakinumab was not effective for induction or maintenance of remission.").  Aggeletopoulou itself notes that briakinumab failed in clinical trials.  Aggeletopoulou 2018 at p.4095 ("[b]riakinumab is an IgG1 monoclonal antibody with similar mechanism of action as ustekinumab . . . . it did not achieve the primary endpoint of clinical remission at week 6" in Crohn's disease).

445.    A person of ordinary skill in the art would have known this in 2018.  It is an oversimplification to conclude that any antibody which targets IL-12/IL-23p40 could treat Crohn's disease or ulcerative colitis.  This was not true in 2018 and remains not true today. While the role of IL-12/IL-23p40 is a reason to test antibodies for each condition, efficacy cannot be predicted or expected until you receive results from a clinical trial.

446.    There were numerous other cytokines which were thought to be involved in the pathways of Crohn's disease and ulcerative colitis.  These include IL-2, IL-13, IL-6, and IL-17. As of September 2018, various monoclonal antibodies directed towards pathways involving these cytokines had been tested for Crohn's disease or ulcerative colitis.  Even though the cytokine targeted by each of these antibodies was thought to play a role in the development of either Crohn's or ulcerative colitis, these treatments failed.  A person of ordinary skill would therefore not assume that an antibody works because it targets a pathway thought to be involved in ulcerative colitis.  The relationship of IL-12/IL-23 to ulcerative colitis provided good reason for J&J to conduct the clinical trial to test whether ustekinumab would work as a treatment, but a person of ordinary skill would not have expected efficacy prior to obtaining the trial results.

### iii.    Aggeletopoulou Is Cumulative of Other Art Cited to the Examiner

447.    Aggeletopoulou is also cumulative of other art cited before the Examiner.  During prosecution, J&J identified Feagan 2016 and Sandborn 2018 for the Examiner in an October 2020 disclosure statement.  October 2020 Information Disclosure Statement at p.2.  Each of these references discloses the Sandborn 2018 disclosed that ustekinumab "has been approved for use in the treatment of psoriasis, psoriatic arthritis, and Crohn's disease," citing the Stelara package insert.  Sandborn 2018 at p.66 fn. 23.

448.    J&J disclosed references regarding the genetic similarities between Crohn's disease and ulcerative colitis and the role of IL-12/IL-23.  J&J in its October 16, 2020 disclosed Anderson 2011 which noted that there were many IBD risk loci identified, "including a minimum of 28 shared association signals between Crohn's disease (CD) and UC."  Anderson 2011 at p.1.  Ahern 2010, also disclosed by J&J in October 2020, disclosed that "[m]utations in the IL23R gene are linked to inflammatory bowel susceptibility" and that "Human IBD is associated with increased expression of IL-23."  Ahern 2010 at p.279.  Uhlig 2006, also disclosed during prosecution, stated that its experiments suggested that "IL-23" could be a "more specific target for the treatment of IBD."  Uhlig 2006 at p.309.  J&J also disclosed U.S. Patent Publication No. US 2018/0252728, which notes that IL-23 "is a proinflammatory cytokine implicated in the pathogenesis of various inflammatory conditions including but not limited to Crohn's disease (CD), ulcerative colitis (UC), psoriasis, psoriatic arthritis, rheumatoid arthritis, and ankylosing spondylitis."  '728 Publication at [0003].   J&J also submitted Davidson 1998, which found that anti-IL-12 monoclonal antibodies were able to prevent colitis disease development in mice.  Davidson 1998 at p.3143.

449.    The Examiner was also informed by J&J that many biologic therapies have

worked in both Crohn's disease and ulcerative colitis.  The Background section of the '307

patent states:

> When tested, biologic therapies that are currently approved for the treatment of UC have also demonstrated efficacy in Crohn's disease (Sandborn et al., Gastroenterology. 135(4):1130-1141 (2008)). Multiple lines of evidence suggest that inflammatory bowel disease (UC and Crohn's disease) is mediated by Th1 or Th17 cells with strong contribution from the proinflammatory cytokines, IL-12, and IL-23. Ustekinumab (STELARA®) is a fully human immunoglobulin G1 mAb to human IL-12/23p40 that prevents IL-12 and IL-23 bioactivity by inhibiting their interaction with their cell surface IL-12R131 receptor protein (Investigator's Brochure: STELARA® (ustekinumab), edition 18. Janssen Research & Development, LLC (2017)). Through this mechanism of action, ustekinumab effectively neutralizes IL-12 (Th1)- and IL-23 (Th17)-mediated cellular responses. Ustekinumab has received marketing approval globally, including countries in North America, Europe, South America, and the Asia-Pacific region, for the treatment of adult subjects with moderately to severely active Crohn's disease (the first approval for Crohn's disease was received on 11 Nov. 2016), moderate to severe plaque psoriasis, or active psoriatic arthritis, as well as for pediatric subjects (12 to 17 years old) with moderate to severe plaque psoriasis.

'307 patent, column 2, lines 38-61.  J&J told the Examiner that (1) certain biologics that were

approved for treatment of ulcerative colitis also showed efficacy in Crohn's disease; (2)

ustekinumab targets IL-12 and IL-23, and evidence suggested that both play a role in ulcerative

colitis and Crohn's disease; and (3) ustekinumab had already received approval for moderate to

severely active Crohn's disease.

450.    I agree with the Examiner's decision to not reject the claims based on

ustekinumab's efficacy in Crohn's and prior art regarding the potential role of IL-12 and IL-23 in

Crohn's disease or ulcerative colitis.  I have noted that this art was submitted during prosecution

to illustrate that Aggeletopoulou is cumulative of art before the Examiner.

### (2)    Jostins 2012

451.    Dr. Warfield states that Jostins reports a "meta-analysis of genome-wide

association scans of IBD patients" and that most identified loci "were common to both Crohn's

168

disease and ulcerative colitis." Warfield Rpt. ¶188. I agree with this general description of Jostins, but I disagree with Dr. Warfield's conclusion that this would "predict efficacy for ustekinumab in treating ulcerative colitis." Warfield Rpt. ¶189.

452.    Jostins itself does not mention ustekinumab or the administration of ustekinumab to any ulcerative colitis patient. Jostins also does not discuss any potential treatments for ulcerative colitis or Crohn's disease. Jostins simply discloses one analysis of genetic loci and their relationship to Crohn's disease or ulcerative colitis.

453.    Jostins identified 163 total genetic loci which reflected susceptibility to IBD. Of those, Jostins notes that 110/163 IBD susceptibility loci were shared between Crohn's disease and ulcerative colitis. That means 53 loci were unique to either Crohn's disease or ulcerative colitis. This is a significant percentage of loci (approximately 33%), which again reflects that these are distinct diseases.

### i.    Jostins Is Cumulative of Other Art Before the Examiner

454.    First, in my opinion Jostins is cumulative of information already presented to the Examiner during prosecution. During examination, J&J identified Brant 2013 in its October 2020 Information Disclosure Statement. October 2020 Information Disclosure Statement at p.1. Brant 2013 summarizes the findings of Jostins 2012, noting that investigators have identified "over 163" "genetic loci containing susceptibility genes for inflammatory bowel disease (IBD) and its 2 major phenotypes." Brant 2013 at p.22. Brant 2013 further stated that "most loci cause both CD and UC risk." Brant 2013 at p.22. Brant 2013 had an entire section of its paper devoted to summarizing the data from Jostins 2012:

GWAS has been extremely productive, ultimately contributing to 163 independent loci for "conventional" IBD, 92 further confirmed and 71 newly established in the recent International IBD Genetics Consortium "Immunochip" study.[4] The Immunochip study has been the ultimate GWAS. It compiled data from 7 CD and 8 UC GWAS's in whites with replication/extension of those GWAS signals with $P$ values $< .01$ performed by genotyping additional CD, UC, and control DNAs using the Immunochip genotyping chip. This chip enabled high-throughput genotyping of ~200,000 SNPs (and a small number of insertion-deletion polymorphisms). It was designed for simultaneous replication and high-resolution fine mapping of IBD loci as well as loci for multiple other common immune-mediated disorders including ankylosing spondylitis (AS), celiac disease, multiple sclerosis, psoriasis, thyroiditis, type 1 diabetes, and systemic lupus erythematosus. For IBD, the Immunochip study evaluated combined GWAS and Immunochip genotyping data from >20,000 CD patients, >15,000 UC patients, and >25,000 controls.

There are several major themes emanating from the 163 now-established IBD loci.

(1) Most loci (67%) are associated with both CD and UC, with 38% showing equal risk for both phenotypes. Only 38 CD and 23 UC loci are phenotype specific (including NOD2 and IFNGR2 as noted).[4]

(2) IBD shares 113 of the 163 loci with numerous traits (eg, height) and diseases, especially other immune-mediated diseases (60 of 163 loci).[4] For AS and psoriasis, 2 diseases that are found increased among IBD patients, overlap is especially remarkable (8/11 AS and 14/17 psoriasis loci).[4] When testable, the risk alleles are more often the same or in LD. An interesting exception is the functional PTPN22 Arg620Trp variant allele is associated with increased thyroiditis, rheumatoid arthritis, lupus, and type 1 diabetes risks but decreased CD risk.[1]

Brant 2013 at p.24-25. As shown above, Brant identified the same data from Jostins 2012 that Dr. Warfield points to: "a total of 163 IBD susceptibility loci and that most of these loci were common to both Crohn's disease and ulcerative colitis." Warfield Rpt. ¶188. There are only four references in Brant 2013 and reference 4 is Jostins 2012:

4. Jostins L, Ripke S, Weersma RK, et al. Host-microbe interactions have shaped the genetic architecture of inflammatory bowel disease. Nature;491:119–124.

170

Brant 2013 at p.26.

### ii. Jostins Does Not Provide a Reasonable Expectation that Ustekinumab Would Treat Ulcerative Colitis

455.    Second, even if not cumulative, Jostins does not provide a person of ordinary skill with a reasonable expectation that ustekinumab would treat ulcerative colitis. Jostins itself notes that for the loci which are common between Crohn's disease and ulcerative colitis, they have "very different effects" in each disease. Jostins, Fig. 1 (noting that many loci "show very different effects in CD and UC despite being strongly associated to both").

456.    Figure 1 of Jostins illustrates the various genes where these 163 loci reside:



As can be seen in Figure 1, Jostins demonstrates that a wide variety of genetic loci beyond IL23 and IL12 are associated with ulcerative colitis and Crohn's disease.  These include RORC, FCGR2, REL, MST1, PTGER4, TNFAIP3, JAK2, and others.  Because ustekinumab is only directed to IL-12/IL-23, ustekinumab does not target most of the gene pathways implicated by the Jostins' gene analysis.  Jostins does not tell a person of skill in the art that any antibody which works in Crohn's disease will work to treat ulcerative colitis.  Nor does Jostins tell a person of ordinary skill in the art that all treatments of IL-12/IL-23 will work in both ulcerative colitis and Crohn's disease, particularly given the diverse array of genes implicated by both diseases.

457.    The authors of Jostins do not express anything close to Dr. Warfield's conclusions.  Jostins states that the 163 identified loci in their study "explains only a minority of the variance in disease risk, which suggests that other factors such as rarer genetic variation . . . or environmental exposures make substantial contributions to pathogenesis."  Jostins at p.5.  Thus, even the authors of the publication understood that these genetic factors are only a small part of the overall story regarding ulcerative colitis.  Environmental factors also play a significant role.

458.    As of the publication of Jostins, there had not been any approved monoclonal antibodies for the treatment of either ulcerative colitis or Crohn's disease that targeted both IL-12 and IL-23.  As of September 2018, no anti-IL-12/23 antibody had ever been approved for the treatment of ulcerative colitis.  The mechanisms by which these diseases work were not fully known and are still not fully known.  I disagree with Dr. Warfield that Jostins would lead to a gastroenterologist expecting ustekinumab to treat ulcerative colitis.

172

459.    I also disagree with Dr. Warfield's conclusion that common genetic loci are sufficient to "predict efficacy" for ustekinumab in Crohn's disease and ulcerative colitis.  If this were true, drugs which target identified common genetic loci would always be expected to work in both ulcerative colitis and Crohn's.  But a person of ordinary skill in the art in September 2018 already knew this was not true.

- Briakinumab targeted IL-12/IL-23p40 but failed to successfully treat Crohn's disease in a clinical trial.  Panaccione 2010 at p.S457 ("Among pts with moderate to severe CD, briakinumab was not effective for induction or maintenance of remission.").

- Tofacitinib failed to show efficacy in Crohn's disease even though it showed efficacy in ulcerative colitis.   This was so even though "Tofacitinib inhibits a broad range of JAK, not only JAK2."  Festen 2014 at p.389.

460.    Neurath 2014, citing Jostins 2012, noted that Jostins showed that "IBD risk loci . . . contain genes that encode cytokines (for example, IL-2, IL-21, interferon-y (IFNy), IL-10 and IL-27)."  Neurath 2014 at p.330; Jostins, Table 1 (listing these key genes).  Despite these markers, other trials of anti-IL-2 and IFN-y drugs did not always work. These include daclizumab, basiliximab, and fontolizumab.  Van Assche 2006; Sands 2012; Reinisch 2010.

### (3)    Granlund 2013

461.    Dr. Warfield states that Granlund reports a "meta-analysis of a whole genome gene expression in inflamed mucosa of IBD patients."  Warfield Rpt. ¶191.  I agree with this general description of Granlund, but I disagree with Dr. Warfield's conclusion that this would "predict efficacy for ustekinumab in treating ulcerative colitis."  Warfield Rpt. ¶192.

### i. Granlund Does Not Provide a Reasonable Expectation that Ustekinumab Would Treat Ulcerative Colitis

462.    Granlund does not mention ustekinumab, or the administration of ustekinumab to any ulcerative colitis patient.  Granlund instead discloses a gene expression analysis from certain IBD patients taking samples of inflamed and un-inflamed mucosa from Crohn's disease and ulcerative colitis patients.

463.    As I have explained above, genetic markers alone would not provide a person of ordinary skill in the art with an expectation that a drug would work in Crohn's disease or ulcerative colitis.  See above ¶¶403-431.  A person of ordinary skill in the art would have been aware of numerous prior drugs which failed to show efficacy despite gene studies suggesting that they may be effective.  Granlund 2013 would not provide a skilled person with a reasonable expectation of success that ustekinumab would treat ulcerative colitis.

### ii. Granlund Is Cumulative of Other Art Before the Examiner

464.    It is also my opinion that Granlund is cumulative of what was before the Examiner.  Granlund teaches that a gene analysis from certain IBD patients showed that gene expression was "remarkably similar" between Crohn's disease and ulcerative colitis.  Granlund 2013 at p.1.  It also noted that IL23A appeared to be expressed higher in ulcerative colitis patients than in Crohn's disease.  Granlund 2013 at p.1.

465.    During examination, J&J identified Brant 2013 in its October 2020 Information Disclosure Statement.  Brant 2013 summarizes the findings of Jostins 2012, noting that investigators have identified "over 163" "genetic loci containing susceptibility genes for inflammatory bowel disease (IBD) and its 2 major phenotypes."  Brant 2013 at p.22.  Brant 2013 further stated that "most loci cause both CD and UC risk."  Brant 2013 at p.22.  J&J also disclosed Anderson 2011 which noted that there were many IBD risk loci identified, "including a

174

minimum of 28 shared association signals between Crohn's disease (CD) and UC."  Anderson

2011 at p.1.

466.    J&J also disclosed references discussing the role of IL-23 in the development of

Crohn's disease and ulcerative colitis.  Ahern 2010, also disclosed by J&J in October 2020,

disclosed that "[m]utations in the IL23R gene are linked to inflammatory bowel susceptibility"

and that "Human IBD is associated with increased expression of IL-23."  Ahern 2010 at p.279.

Uhlig 2006, also disclosed during prosecution, stated that its experiments suggested that "IL-23

could be a "more specific target for the treatment of IBD."  Uhlig 2006 at p.309.  J&J also

disclosed U.S. Patent Publication No. US 2018/0252728, which notes that IL-23 "is a

proinflammatory cytokine implicated in the pathogenesis of various inflammatory conditions

including but not limited to Crohn's disease (CD), ulcerative colitis (UC), psoriasis, psoriatic

arthritis, rheumatoid arthritis, and ankylosing spondylitis."  '728 Publication at [0003].

### 10.    The Prior Art Combinations Do Not Render the Claims Obvious

467.    As discussed above, it is my view that the Ochsenkühn 2018, Kolios 2018,

Afonso 2017, Tarr 2014, and CADTH 2017 references do not provide any expectation to a

person of ordinary skill in the art that ustekinumab would work as a treatment for ulcerative

colitis, or render the specific claims of the '307 patent obvious.

468.    I understand that Dr. Matovcik has offered opinions regarding obviousness.  Dr.

Matovcik has opined that a person of ordinary skill in the art would have been motivated to

combine the "ClinicalTrial.gov (August 2018)" reference with Ochsenkühn, Afonso, and/or

Kolios with a reasonable expectation at arriving at the claimed invention.  Matovcik Rpt. ¶¶215-

219, 207-210.

understand that a reference is publicly accessible if the document has been made available such that persons of ordinary skill in the art exercising reasonable diligence can locate it.

488.     Dr. Warfield states that he understands that "the full phase 3 protocol for NCT-236 was not publicly available as of September 24, 2018." Warfield Rpt. ¶150. I agree. The April 20, 2016 version of the NCT 236 Protocol was first uploaded on November 15, 2019 to ClinicalTrials.gov:

**Document Section**

| Study Protocol | • Document Label | Study Protocol |
|---|---|---|
| | Date | 2016-04-20 |
| | Uploaded | 2019-11-15 12:24 |
| | File name | Prot_000.pdf |

https://clinicaltrials.gov/study/NCT02407236?tab=history&a=50#document-section-card.

489.     I have also seen no evidence that the specific March 17, 2015 NCT 236 Protocol relied upon by Dr. Matovcik (JNJ-STELARA_001838489) was publicly accessible to a person of ordinary skill in the art prior to September 24, 2018. Until made public on ClinicalTrials.gov, this protocol would have been kept confidential between J&J, the FDA, and investigators participating in the clinical trials.

490.     Dr. Matovcik further cites to a "pre-IND briefing document," produced as JNJ-STELARA_002258268. Matovcik Rpt. ¶¶15, 165-166. I have also seen no evidence that this document was publicly accessible to persons of ordinary skill in the art before September 24, 2018. It is a confidential briefing document for a Pre-IND meeting between J&J and the FDA. It is my opinion that this document is not prior art to the '307 patent.

**b) The NCT 236 Protocol Was Considered by the PTO**

491.     Regardless, it is also my opinion that the NCT 236 Protocol was considered by the PTO during examination of the '307 patent. The Examiner in a July 16, 2020 non-final

rejection specifically rejected certain claims as "being unpatentable over ClinicalTrials.gov

('CT')."  July 16, 2020 Non-Final Rejection at p.6.  In an accompanying "Notice of References

Cited," the Examiner listed the webpage for the NCT 236 clinical trial posting, stating that it was

"Accessed from the internet 7/13/20:"

| * | V | https://clinicaltrials.gov/ct2/show/NCT02407236. Accessed from the internet 7/13/20 |

As of July 13, 2020, this webpage contained the full NCT 236 Protocol for the Examiner to

review.  https://clinicaltrials.gov/study/NCT02407236?tab=history&a=56#version-content-panel.

Thus, the Examiner reviewed the NCT 236 Protocol during examination.

### c) The NCT 236 Protocol and Pre-IND Briefing Document Are Cumulative of Other Information Before the Examiner

492.    The NCT 236 Protocol and Pre-IND Briefing Document are also cumulative of

other information before the Examiner.  As explained above, the ClinicalTrials.gov posting was

considered by the Examiner during prosecution.  See above ¶¶363-365.

493.    Dr. Matovcik relies on statements made by J&J in the NCT 236 Protocol and the

Pre-IND Briefing Document regarding the relationship between Crohn's disease and ulcerative

colitis, and whether it was "reasonable to assume" that ustekinumab will be effective in

ulcerative colitis based on data in Crohn's disease.  Matovcik Rpt. ¶166; NCT 236 Protocol at

JNJ-STELARA_001838529.  I believe this is cumulative of the information already before the

Examiner during prosecution.

494.    During prosecution, J&J identified the Feagan 2016 and Sandborn 2018 for the

Examiner in an October 2020 disclosure statement.  October 2020 Information Disclosure

Statement.  Each of these references discloses the effectiveness of Stelara in Crohn's disease and

was before the Examiner.  Feagan 2016, for example, discloses the "intravenous infusion" of 130

184

mg of ustekinumab at week 0, followed by "subcutaneous injections of 90 mg of ustekinumab

every 8 weeks." Feagan 2016 at p.1948. The paper concluded that "intravenous ustekinumab

induces response and remission in patients with moderately to severely active Crohn's disease"

and that subcutaneous ustekinumab "was more effective than placebo for maintaining

remission." Feagan 2016 at p.1958. Sandborn 2018 disclosed that ustekinumab "has been

approved for use in the treatment of psoriasis, psoriatic arthritis, and Crohn's disease," citing the

Stelara package insert. Sandborn 2018 at p.66 n. 23.

495. J&J disclosed references regarding the genetic similarities between Crohn's

disease and ulcerative colitis and the role of IL-12/IL-23. J&J in its October 16, 2020 disclosure

statement disclosed Anderson 2011 which noted that there were many IBD risk loci identified,

"including a minimum of 28 shared association signals between Crohn's disease (CD) and UC."

Anderson 2011 at 1. J&J also identified Brant 2013, as discussed above. See above ¶454.

Brant 2013 summarizes the findings of Jostins 2012, noting that investigators have identified

"over 163" "genetic loci containing susceptibility genes for inflammatory bowel disease (IBD)

and its 2 major phenotypes." Brant 2013 at p.22. Brant 2013 further stated that "most loci cause

both CD and UC risk." Brant 2013 at p.22. Brant 2013 had an entire section of its paper

devoted to summarizing the data from Jostins 2012, including the 110 loci shared between

Crohn's and ulcerative colitis. Brant 2013 at p.24. Brant identified the same data from Jostins

2012 that Matovcik points to: "a meta-analysis of genome-wide gene association scans that

described the presence of 163 gene loci . . . The great majority (110/163) were associated with

both . . . ." Matovcik Rpt. ¶168. There are only four references in Brant 2013 and reference 4 is

Jostins 2012:

4. Jostins L, Ripke S, Weersma RK, et al. Host-microbe interactions have shaped the genetic architecture of inflammatory bowel disease. Nature;491:119–124.

Brant 2013 at p.26.

496.    J&J also disclosed references discussing the role of IL-12 and IL-23 in the development of Crohn's disease and ulcerative colitis.  Ahern 2010, also disclosed by J&J in October 2020, disclosed that "[m]utations in the IL23R gene are linked to inflammatory bowel susceptibility" and that "Human IBD is associated with increased expression of IL-23."  Ahern 2010 at p.279.  Uhlig 2006, also disclosed during prosecution, stated that its experiments suggested that "IL-23" could be a "more specific target for the treatment of IBD."  Uhlig 2006 at p.309.  J&J also disclosed U.S. Patent Publication No. US 2018/0252728, which notes that IL-23 "is a proinflammatory cytokine implicated in the pathogenesis of various inflammatory conditions including but not limited to Crohn's disease (CD), ulcerative colitis (UC), psoriasis, psoriatic arthritis, rheumatoid arthritis, and ankylosing spondylitis." '728 Publication at [0003]. J&J also submitted Davidson 1998, which found that anti-IL-12 monoclonal antibodies were able to prevent colitis disease development in mice.  Davidson 1998 at p.3143.

497.    The Examiner was also informed by J&J that many biologic therapies have worked in both Crohn's disease and ulcerative colitis.  The Background section of the '307 patent states:

When tested, biologic therapies that are currently approved for the treatment of UC have also demonstrated efficacy in Crohn's disease (Sandborn et al., Gastroenterology. 135(4):1130-1141 (2008)). Multiple lines of evidence suggest that inflammatory bowel disease (UC and Crohn's disease) is mediated by Th1 or Th17 cells with strong contribution from the proinflammatory cytokines, IL-12, and IL-23. Ustekinumab (STELARA®) is a fully human immunoglobulin G1 mAb to human IL-12/23p40 that prevents IL-12 and IL-23 bioactivity by inhibiting their interaction with their cell surface IL-12R131 receptor protein (Investigator's Brochure: STELARA® (ustekinumab), edition 18. Janssen Research & Development, LLC (2017)). Through this mechanism of

186

action, ustekinumab effectively neutralizes IL-12 (Th1)- and IL-23 (Th17)-mediated cellular responses. Ustekinumab has received marketing approval globally, including countries in North America, Europe, South America, and the Asia-Pacific region, for the treatment of adult subjects with moderately to severely active Crohn's disease (the first approval for Crohn's disease was received on 11 Nov. 2016), moderate to severe plaque psoriasis, or active psoriatic arthritis, as well as for pediatric subjects (12 to 17 years old) with moderate to severe plaque psoriasis.

'307 patent, column 2, lines 38-61. J&J told the Examiner that (1) certain biologics that were approved for treatment of ulcerative colitis also showed efficacy in Crohn's disease; (2) ustekinumab targets IL-12 and IL-23, and evidence suggested that both play a role in ulcerative colitis and Crohn's disease; and (3) ustekinumab had already received approval for moderate to severely active Crohn's disease.

498.    I agree with the Examiner's decision to not reject the claims based on ustekinumab's Crohn's data. See above ¶¶403-431, 396-402. Success in Crohn's disease provides a good reason to test a biologic in ulcerative colitis, but a person of ordinary skill in the art would not expect efficacy in one indication based on success in the other. Regardless, if the Examiner had wanted to reject the claims as obvious based on ustekinumab's efficacy in Crohn's disease, the Examiner had that information available during prosecution. It is therefore my opinion that the NCT 236 Protocol and Pre-IND Briefing Document are cumulative of what was before the Examiner.

### d) The NCT 236 Protocol Describes a Rationale for a Test, Not an Expectation that Ustekinumab Will Treat Ulcerative Colitis

499.    Even if the NCT 236 Protocol was not considered by the Examiner, it is my opinion that a person of ordinary skill in the art would understand the NCT 236 Protocol and Pre-IND Briefing Book as providing a rationale to test ustekinumab in ulcerative colitis. I disagree that these documents reflect that a person of ordinary skill in the art would expect

505.     If J&J expected ustekinumab to effectively treat ulcerative colitis, they also would

not have included a futility analysis in the clinical trial design.  In the NCT 236 Protocol design,

J&J planned to conduct an interim analysis 8 weeks into the trial "to assess for futility" based on

the induction study data from the first 30% of randomized subjects.  NCT 236 Protocol at JNJ-

STELARA_001838497.  If based on early data the "probability of success at the end of the

study" was too low, the study could "be stopped for futility."  NCT 236 Protocol at JNJ-

STELARA_001838582.  Thus, J&J included an interim analysis to determine if it was futile and

potentially halt the study before its completion.  A person of ordinary skill in the art would

understand that not every clinical trial protocol includes a futility analysis.  NCT 830 Protocol at

p.86 ("No interim analysis is planned" in vedolizumab Phase III trial).  The inclusion of a futility

analysis reflects uncertainty by both J&J and the FDA regarding whether ustekinumab would

treat ulcerative colitis or achieve the claimed clinical endpoints in the UNIFI trial.

506.     There was no preceding Phase II trial.  J&J took a risk and proceeded directly to

conducting a Phase III clinical trial.  There was a significant risk that the trial could fail, which is

why J&J included a futility analysis.  Pre-IND Briefing Document at JNJ-

STELARA_002258282 ("Since this is a direct to Phase 3 program, there will be an interim

analysis for futility . . . This analysis is described in the Protocol Elements Document and is

intended to minimize subject exposure to ustekinumab if efficacy is not observed").

507.     A clinical trial sponsor needs a rationale to test a drug.  The FDA will not permit a

sponsor to conduct a Phase III clinical trial without some reason to think the drug may work.  As

the NCT 236 Protocol and Pre-IND Briefing Document explain, Crohn's disease and ulcerative

colitis are similar diseases with common—but not identical—genetic markers.  Given that Phase

II data with ustekinumab in Crohn's disease was promising and safety had been established, J&J

190

# EXHIBIT A

**Stelara (ustekinumab) FDA Labeling-Package Insert**

Original FDA Approval:

- September 25, 2009 (FDA approval for treatment of psoriasis)

Additional FDA Indications relevant to opinions:

- September 26, 2016 (FDA approval for treatment of Crohn's disease)
- October 21, 2019 (FDA approval for treatment of ulcerative colitis)