# EXHIBIT 8

CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT
2                    FOR the DISTRICT OF VIRGINIA
3                        NORFOLK DIVISION
4
5
6        ********************************
7        CAREFIRST OF MARYLAND, INC.;
         GROUP HOSPITALIZATION AND MEDICAL
8        SERVICES, INC.; and CAREFIRST
         BLUECHOICE, INC., on behalf of
9        themselves and all others
         similarly situated,
10
                           Plaintiffs
11
         vs.              CA NO. 2:23-cv-00629 JKW-LRL
12
13       JOHNSON & JOHNSON and
         JANSSEN BIOTECH, INC.,
14
                           Defendants
15
         ********************************
16
17               VIDEOTAPED DEPOSITION OF:
18                   ROBERT W. BAHR
19             HAGENS BERMAN SOBOL SHAPIRO LLP
20                 One Faneuil Hall Square
21                 Boston, Massachusetts
22             June 25, 2025        8:50 a.m.
23
24           Darlene M. Coppola, RPR, RMR, CRR

CONFIDENTIAL

Page 2

```
 1          APPEARANCES:
 2          Representing the Plaintiff:
 3              HAGENS BERMAN SOBOL SHAPIRO, LLP
 4              One Faneuil Hall Square
 5              Fifth Floor
 6              Boston, MA  02109
 7              BY:  HANNAH BRENNAN, ESQUIRE
 8                   REBEKAH GLICKMAN-SIMON, ESQUIRE
 9              E hannahb@hbsslaw.com
10                glickmansimonr@hbsslaw.com
11
12          Representing the Defendants:
13              DECHERT LLP
14              230 Northgate Street
15              Unit 209
16              Lake Forest, IL  60045
17              BY:  AMANDA ANTONS, PH.D.
18              T 312.646.5822
19              E amanda.antons@dechert.com
20
21
22          (Continued on next page)
23
24
```

CONFIDENTIAL

Page 3

1    APPEARANCES (Continued):

2    Representing the Defendants:

3        DECHERT LLP

4        Cira Centre

5        2929 Arch Street

6        Philadelphia, PA  19104

7        BY:  JUDAH BELLIN, ESQUIRE

8        T 215.994.4000

9        E judah.bellin@dechert.com

10    -and-

11    (Via Zoom)

12        DECHERT LLP

13        300 South Tryon Street

14        Suite 800

15        Charlotte, NC  28202

16        BY:  SHYAM SHANKER, ESQUIRE

17        E shyam.shanker@dechert.com

18

19

20    Also Present:

21    Bob Giannini, Videographer

22    Julia Biehler, Summer Associate

23

24

CONFIDENTIAL
**CONFIDENTIAL**

Page 29

1  anticipation, but the person of ordinary skill

2  in the art isn't used in Section 1 or 2 of the

3  patent code.

4  BY DR. ANTONS:

5      Q.  You would also agree that whether

6  patent claims are supported by an enabling

7  disclosure is determined from the perspective

8  of a person of ordinary skill in the art,

9  correct?

10                MS. BRENNAN:  Objection.

11     A.  I think that whether or not the claims

12  of a patent are enabled, the level of skill in

13  the art is a determining factor.  One of many

14  factors.

15  BY DR. ANTONS:

16     Q.  And in determining whether something

17  is -- determining whether the claimed subject

18  matter is obvious, the claims need to be

19  construed, correct?

20     A.  Yes, or interpreted.

21     Q.  Okay.  And that interpretation is done

22  from the perspective of a person of ordinary

23  skill in the art, correct?

24                MS. BRENNAN:  Objection.

CONFIDENTIAL
**CONFIDENTIAL**

Page 30

```
 1              A.   I mean, disclosures are drafted and
 2         directed to those of -- to those of skill in
 3         the art, and, yes, what -- what the terms of a
 4         claim mean, it's what do those terms mean to a
 5         person skilled in the art.
 6         BY DR. ANTONS:
 7              Q.   And when someone is determining
 8         whether a -- the subject matter of the claims
 9         is anticipated, those claims also need to be
10         interpreted, correct?
11              A.   Yes.
12              Q.   And interpreting the claims, the
13         decision-maker must do so from the perspective
14         of a person of ordinary skill in the art,
15         correct?
16                   MS. BRENNAN:   Objection.
17              A.   I don't know that I necessarily follow
18         that.
19         BY DR. ANTONS:
20              Q.   Well, I'll rephrase.
21                   In interpreting the claims for the
22         purposes of an anticipation analysis, the
23         interpretation of the subject matter must be
24         done from the perspective of a person of
```

CONFIDENTIAL
**CONFIDENTIAL**

Page 34

1      correct?

2           A.   That's correct.

3           Q.   Would you consider yourself a person

4      of ordinary skill in the art with respect to

5      the subject matter of the '307 patent?

6           A.   I don't know that I consider myself a

7      person of ordinary skill in any art, including

8      those I examined for ten years.

9           Q.   So you would agree you are not a

10     person of ordinary skill in the art as it

11     relates to the subject matter of the '307

12     patent?

13                    MS. BRENNAN:   Objection.  Asked

14     and answered.

15          A.   I would agree that I am not that

16     hypothetical person of ordinary skill in the

17     art for the '307 patent.

18     BY DR. ANTONS:

19          Q.   Why not?

20          A.   Because that has a special definition

21     that I do not fit.

22          Q.   And what's that definition?

23          A.   That they are the hypothetical person

24     of ordinary skill in the art.

CONFIDENTIAL
**CONFIDENTIAL**

Page 82

1       and O'Brien breached their duty of candor by

2       failing to disclose J&J's submissions to the

3       FDA concerning the clinical trial of

4       ustekinumab to treat ulcerative colitis to the

5       PTO, are you providing an opinion as to any of

6       these individuals' intent?

7                MS. BRENNAN:  Objection.

8       Misstates the testimony.

9          A.   No, I'm not providing an opinion as to

10      these individuals' intent.

11      BY DR. ANTONS:

12         Q.   Are you providing opinions as to

13      Drs. Marano, Strauss, and O'Brien's knowledge

14      of the materiality of the J&J submissions to

15      the FDA?

16                MS. BRENNAN:  Objection.

17         A.   Again, I don't know how individuals

18      would consider this not material.  That being

19      said, I don't know what was in their minds.

20      BY DR. ANTONS:

21         Q.   Are you providing an opinion that

22      Drs. Marano, Strauss, and/or O'Brien committed

23      fraud?

24                MS. BRENNAN:  Objection to form.

CONFIDENTIAL
**CONFIDENTIAL**

Page 97

1          A.   I believe it may be the only

2     statement.  But if it's contended that the CT

3     reference is actually everything on that site,

4     then it is a misstatement to say that this

5     posting is limited to elements describing a

6     trial to be performed.

7          Q.   In -- in the following paragraph, 178,

8     you summarize how Mr. Dichter responded to the

9     rejection, correct?

10          A.   Yes.

11          Q.   And you identify specific arguments.

12     I'll read the -- I believe the second

13     sentence.  "Applicant specifically argued that

14     (1) the NCT-236 trial posting did not include

15     any trial results, (2) the results of the

16     NCT-236 trial were not published until after

17     the priority date of the '509 application, (3)

18     clinical trials are uncertain and numerous

19     clinical trials fail to meet their designated

20     endpoints (response to treatment), and (4) the

21     posting of elements of a clinical trial in

22     advance of a conduct of the trial do not

23     anticipate or render obvious the subject

24     matter of the claims."

CONFIDENTIAL
**CONFIDENTIAL**

Page 98

1          Did I read that correctly?

2      A.   Yes.

3      Q.   You would agree that the NCT-236 trial

4    posting did not include any trial results,

5    correct?

6      A.   The ones prior to the effective filing

7    date of -- or what I believe to be the

8    effective filing date of the claims of the

9    '307 patent.

10     Q.   And you also agreed that the results

11   of NCT-236 trial were not published until

12   after the priority date of the '509

13   application?

14     A.   That -- to my knowledge, that's

15   correct.

16     Q.   And you also agree that clinical

17   trials can be uncertain, and numerous clinical

18   trials fail to meet their designated

19   endpoints, correct?

20          MS. BRENNAN:  Objection.  Calls

21   for speculation.

22     A.   Well, it's like saying the average

23   temperature is 40 degrees but telling somebody

24   in Miami that they need to wear a jacket.

CONFIDENTIAL
**CONFIDENTIAL**

Page 99

1              I mean, it's -- yes, it's true that
2        clinical trials are, in general, uncertain,
3        but that's almost irrelevant here.
4        BY DR. ANTONS:
5             Q.   Okay.  So you agree that clinical
6        trials are uncertain?
7                      MS. BRENNAN:  Objection.  Asked
8        and answered.
9             A.   To my knowledge, in general, clinical
10       trials, if you average them all out, they are
11       uncertain.
12       BY DR. ANTONS:
13            Q.   And Mr. Dichter's conclusion that the
14       posting of elements of a clinical trial in
15       advance of conduct of the trial do not -- do
16       not anticipate or render obvious the subject
17       matter of the claims was an argument he was
18       making in an effort to overcome the rejection,
19       correct?
20                      MS. BRENNAN:  Objection.
21            A.   Well, it's a statement.  I mean, it
22       may have also been an argument, but it's just
23       a flat-out wrong statement.
24       BY DR. ANTONS:

CONFIDENTIAL
**CONFIDENTIAL**

Page 100

1          Q.   Okay.  And the examiner is free to

2     reject that argument, correct?

3                    MS. BRENNAN:  Objection.

4          A.   I mean, an examiner is free to reject

5     anything an applicant says either factually or

6     legally.

7     BY DR. ANTONS:

8          Q.   Okay.  And you agree that examiners

9     can reject patent claims on the grounds that

10    they are rendered obvious or anticipated by

11    certain prior art, correct?

12         A.   Just to clarify, you're asking me if

13    examiners are allowed to reject claims as

14    obvious or anticipated over the prior art?

15         Q.   Correct.

16         A.   Yes, examiners are authorized to

17    reject claims as anticipated or obvious over

18    the prior art.

19         Q.   And you also agree that, in response

20    to that, practitioners can respond to those

21    rejections by arguing that the prior art does

22    not render the claim obvious or rejected,

23    correct?

24         A.   Yes.  I mean, applicants can respond

CONFIDENTIAL
**CONFIDENTIAL**

Page 132

1      ECCO, Ochsenkuhn DDW, Kolios, and Afonso

2      disclose a study involving the treatment of UC

3      with ustekinumab.  Thus each of Ochsenkuhn

4      ECCO, Ochsenkuhn DDW, Kolios, and Afonso

5      appear to be material to patentability in that

6      each of Ochsenkuhn ECCO, Ochsenkuhn DDW,

7      Kolios, and Afonso appears to be, quote,

8      "inconsistent with the position the applicant

9      took in asserting an argument of

10     patentability."

11             Do you see that?

12        A.   Yes, I see that.

13        Q.   You're not offering an opinion that

14     these references are, in fact, inconsistent

15     with the position that the applicant took,

16     correct?

17                 MS. BRENNAN:  Objection to form.

18        A.   I don't know that I know enough to

19     know that they're inconsistent.

20     BY DR. ANTONS:

21        Q.   And your report does not offer any

22     opinion that anyone at J&J knew or believed

23     that the prior art references were material to

24     patentability, correct?

CONFIDENTIAL
**CONFIDENTIAL**

Page 133

1          A.    I'm not offering opinions that anybody

2       at J&J had actual knowledge of these or knew

3       they were material to patentability.

4                      DR. ANTONS:   I think I'm at a

5       good place to break.   It's ten until noon.

6                      MS. BRENNAN:   Okay.

7                      DR. ANTONS:   We can go off the

8       record.

9                      THE VIDEOGRAPHER:   The time is

10      11:47.   We're off the record.

11

12                 (Recess taken from 11:47 a.m.

13                 to 12:03 p.m.)

14

15                 (Exhibit No. 6 marked for

16      identification.)

17

18                 (Exhibit No. 7 marked for

19      identification.)

20

21                      THE VIDEOGRAPHER:   The time is

22      12:03.   We're back on the record.

23      BY DR. ANTONS:

24          Q.    Dr. Bahr, I've had the court reporter

CONFIDENTIAL
**CONFIDENTIAL**

Page 143

1          colitis -- Truelove and Witts colitis activity

2          index or the Lichtiger score?

3              A.   No.

4              Q.   The Ochsenkuhn references did not

5          evaluate clinical remissions using Mayo

6          scores, correct?

7              A.   I did not see anything about Mayo

8          scores in these references.

9              Q.   The Ochsenkuhn references do not

10         disclose taking baseline Mayo scores, correct?

11             A.   I do not see that in these.

12             Q.   The Ochsenkuhn references do not

13         describe evaluating a decrease in any Mayo

14         score, correct?

15             A.   From my understanding, they -- it did

16         not use the Mayo score to evaluate changes in

17         condition.

18             Q.   The Ochsenkuhn references do not

19         disclose the performance of any endoscopy on

20         its 17 subjects, correct?

21             A.   I don't see anything about endoscopy

22         scores.

23             Q.   The Ochsenkuhn references do not

24         disclose the use of IBDQ scores in the study,

CONFIDENTIAL
**CONFIDENTIAL**

Page 144

1       correct?

2              A.    I did not see IBDQ scores.

3              Q.    If you could, pull your copy of the

4       '307 patent, which is Exhibit 4.

5              A.    Okay.

6              Q.    And you can go to Claim 1.

7                    Do you see where the claims require

8       "administering to the subject a pharmaceutical

9       composition comprising a clinically proven

10      safe and clinically proven effective amount of

11      an anti-IL-12/IL-23p40 antibody"?

12             A.    Yes.

13             Q.    Did you review the patent

14      specifications' definition of "clinically

15      proven"?

16             A.    I have -- I reviewed -- I don't know

17      if I did it for clinically proven safe.  I do

18      have something in there for clinically proven

19      effective.

20             Q.    If you could, go to Column 10, line 34

21      of the '307 patent.

22             A.    Column 10.

23             Q.    Column 10, line 34.

24                   Do you see where it says, "As used

CONFIDENTIAL
**CONFIDENTIAL**

Page 145

1     herein, unless otherwise noted, the term

2     'clinically proven' used independently or to

3     modify the term 'safe and/or effective' shall

4     mean that it has been proven by a clinical

5     trial wherein the clinical trial has met the

6     approval standards of U.S. Food and Drug

7     Administration EMEA or a corresponding

8     national agency"?

9            Do you see that?

10     A.   Yes.

11     Q.   The Ochsenkuhn references do not

12     describe a clinical trial, correct?

13     A.   I don't know.

14     Q.   The Ochsenkuhn references do not

15     disclose a clinical trial which has approval

16     standards of a national regulatory agency like

17     the FDA, correct?

18     A.   Not to my knowledge.

19     Q.   So you agree that the Ochsenkuhn

20     abstracts do not disclose clinically proven

21     safe and clinically proven effective as it's

22     recited in Claim 1 of the '307 patent?

23            MS. BRENNAN:  Objection to form.

24     A.   I -- I agree that it doesn't disclose

CONFIDENTIAL
**CONFIDENTIAL**

Page 146

1          it as specifically stated in these lines of

2          the specification.

3          BY DR. ANTONS:

4               Q.   Do you see Claim 1 of the '307 patent

5          requires the subject to be a responder to

6          various measures?

7               A.   Yes.

8               Q.   If we go back to the Ochsenkuhn

9          references, and direct you to the conclusion.

10         Let's start with Exhibit 6.

11                   Do you see where it says, "It seems

12         possible that large ongoing trials will

13         confirm my findings and ustekinumab become --

14         could become a new therapeutic option for

15         refractory UC"?

16                   Do you see that?

17              A.   Yes.

18              Q.   It's referring to the ongoing UNIFI

19         clinical trial conducted by J&J, correct?

20              A.   Are you asking me or telling me?

21              Q.   I'm asking you.

22              A.   I have no idea.

23                        MS. BRENNAN:   Objection to form.

24         BY DR. ANTONS:

CONFIDENTIAL
**CONFIDENTIAL**

Page 147

```
 1          Q.   The Ochsenkuhn references say it's
 2     possible because there was a chance that the
 3     clinical trial would fail to show that the
 4     ustekinumab was effective in treatment,
 5     correct?
 6          A.   I mean, it also says that.
 7          Q.   The Ochsenkuhn references does not say
 8     that the large ongoing clinical trials will
 9     confirm their findings, correct?
10               MS. BRENNAN:  Objection to form.
11          A.   It doesn't say that it's certain.
12     BY DR. ANTONS
13          Q.   Can you pull your copy of Kolios out,
14     please.
15          A.   Okay.
16          Q.   Do you have Exhibit 5 in front of
17     you?
18          A.   Yes.
19          Q.   And we confirmed earlier that this is
20     the Kolios reference you discussed in your
21     report?
22          A.   Yes.
23          Q.   And the title is "Paradoxical
24     ulcerative colitis during adalimumab treatment
```

CONFIDENTIAL
**CONFIDENTIAL**

Page 160

```
 1            Q.    No.   I'm asking you if you provided
 2       any opinions that anyone at J&J involved in
 3       the prosecution of the '509 application knew
 4       about any of these postings?
 5            A.    Well, Mr. Dichter had to know because
 6       he sent the -- he provided information from
 7       these postings to the examiner and made
 8       arguments based upon that.
 9            Q.    You don't -- you don't point to any
10       specific posting, of the 34 between April
11       25 -- April, 2015 and September, 2017 of which
12       Eric Dichter was aware of.
13                      MS. BRENNAN:   Objection to form.
14            A.    I don't know which specific ones he
15       was aware of.  But he was aware of at least
16       some of them or at least one of them.
17       BY DR. ANTONS:
18            Q.    You don't provide an opinion that
19       anyone at J&J knew that these postings were
20       material to the patentability of the '307
21       patent, correct?
22                      MS. BRENNAN:   Objection to form.
23            A.    Well, again, it's -- it's unfathomable
24       that Mr. Dichter did not see these as material
```

CONFIDENTIAL
**CONFIDENTIAL**

Page 161

1          to patentability given that he got a rejection

2          based upon them and that he amended to

3          overcome them.

4                   So I understand he takes the position

5          he did not know they were material, but I

6          don't understand how a practitioner can think

7          that or conclude that based on the record of

8          this case.

9          BY DR. ANTONS:

10              Q.   Your reply report discusses the

11         April 4, 2015 clinical trial posting, correct?

12              A.   I believe it discusses it.

13              Q.   And that should be what has been put

14         in front of you as Exhibit 9.

15              A.   I'm sorry.  Could you ask that again.

16         Are you telling me this is the April --

17              Q.   Your reply report discusses the

18         April 4, 2015 clinical trial posting, correct?

19              A.   Yes.

20              Q.   And I'm now putting in front of you

21         Exhibit 9.

22              A.   Yes.

23              Q.   Does this appear to be that April,

24         2015 clinical trial posting?

CONFIDENTIAL
**CONFIDENTIAL**

Page 166

1     interventions will be made.

2          Q.   What's your understanding of

3     "exclusion criteria"?

4          A.   That if a -- I don't know if you want

5     to call them a test subject or patient meets

6     the conditions for an exclusion criteria.

7     They won't be permitted into the study.

8          Q.   What's your understanding of "outcome

9     measures"?

10         A.   It's a set of measures which will

11    determine whether or not the study is a

12    success from an FDA review perspective.

13         Q.   You agree that all of the sections are

14    identical in the April, 2015 and the

15    September, 2017 posting, correct?

16         A.   I didn't actually compare them.  I was

17    assuming Dr. Cryer stating it under oath that

18    it wasn't wrong so -- and it didn't really

19    matter to my answer.

20         Q.   You don't have -- you don't

21    disagree?

22         A.   I don't disagree.

23         Q.   You would agree that the September,

24    2017 posting did not provide any different

CONFIDENTIAL
**CONFIDENTIAL**

Page 167

1     information with regard to these sections,

2     correct?

3          A.   Well, I would agree if there's no

4     difference, then they're the same.

5          Q.   And is it your view that the only

6     difference is that the September, 2017 posting

7     provided information that the clinical trial

8     had started?

9                    MS. BRENNAN:  Objection to form.

10         A.   Well, I would say not that it had --

11    not simply that it had just started but that

12    it had been underway for several years.

13    BY DR. ANTONS:

14         Q.   You agree that the September, 2017

15    posting did not disclose the results of the

16    clinical trial itself, correct?

17         A.   The 2017 posting did not -- to my

18    knowledge, it did not disclose actual results.

19         Q.   It discusses an active, ongoing study

20    that had not yet concluded or yielded results,

21    correct?

22         A.   That's my understanding.

23         Q.   Are you aware of the date when the

24    clinical trial results were first published?

CONFIDENTIAL
**CONFIDENTIAL**

Page 177

```
 1              A.   I believe it's a -- a protocol is a

 2         draft study or proposal to the FDA to get

 3         approval for a Phase III -- or to get approval

 4         for some type of study that would be reviewed

 5         by the FDA to see whether or not they would

 6         approve a drug or a biologic.

 7              Q.   Prior to this case, had you ever

 8         reviewed a clinical trial protocol?

 9              A.   Not to my recollection.

10              Q.   In the list of documents that you

11         identify in Paragraph 248, you're not offering

12         an opinion that Mr. Dichter was aware of all

13         of these documents, correct?

14              A.   I don't know if he was aware of these

15         documents.

16              Q.   And you aren't offering any opinions

17         that Mr. Dichter knew that any of these

18         references were material to patentability,

19         correct?

20              A.   My understanding is Mr. Dichter had

21         it, but I don't know what he knew.

22              Q.   If you want to, turn to Paragraph 248

23         of your report.  This paragraph you have a

24         discussion about the Janssen pre-Phase III
```

CONFIDENTIAL
**CONFIDENTIAL**

Page 182

```
 1          A.   I did not do that type of

 2     claim-by-claim comparison.

 3          Q.   Okay.

 4

 5          (Exhibit No. 11 marked for

 6     identification.)

 7

 8     BY DR. ANTONS:

 9          Q.   So you've been handed a document

10     that's been marked Bahr Exhibit 11.  For the

11     record, this document bears Bates

12     JNJ-STELARA_001838489 through 8613.

13          Mr. Bahr, do you recognize this

14     document?

15          A.   (Witness reviews document.)

16          Yes.

17          Q.   And this is a document -- this is the

18     clinical trial protocol that you reference in

19     your reports, correct?

20          A.   Yes, I believe it is.

21          Q.   I'm going to refer to the

22     Bates-numbered pages down below.  If you

23     could, turn to the page that ends in 8525.

24          A.   8525?
```

CONFIDENTIAL
**CONFIDENTIAL**

Page 183

1          Q.    Correct.

2          A.    I am there.

3          Q.    Do you see at the bottom of the page

4     where it says "study design rational"?

5          A.    Yes.

6          Q.    And in the second subheading, 3.2.11,

7     it says "Induction."

8                Do you see that?

9          A.    Yes.

10         Q.    What is an induction?

11                    MS. BRENNAN:   Objection to form.

12         A.    I don't know that I know the clinical

13    answer, but my impression when I read these

14    documents is that's when the treatment begins

15    or an initial treatment.

16    BY DR. ANTONS:

17         Q.    Let's turn to the next page that ends

18    in 8526.

19                In the paragraph just above the

20    "Maintenance" heading states, "To limit the

21    exposure of subjects with UC should

22    ustekinumab treatment prove to be ineffective,

23    a futility analysis based on the primary

24    endpoint of clinical remission at Week 8 will

CONFIDENTIAL
**CONFIDENTIAL**

Page 184

1    be conducted when the first 30 percent of

2    randomized subjects in induction study reach

3    Week 8."

4           Do you see that?

5       A.   Yes.

6       Q.   And again, you agree that J&J is

7    telling the FDA that ustekinumab may be proven

8    to be ineffective and, therefore, it will be

9    conducting a futility analysis; correct?

10              MS. BRENNAN:  Objection to form.

11      A.   That is my understanding of that.

12   BY DR. ANTONS:

13      Q.   If we look now under -- just under the

14   heading -- the "Maintenance" heading, do you

15   see where it refers to "Maintenance Study"?

16      A.   I'm sorry.  Is that a separate headed

17   unit?

18           Sure.  I'll just reorient you.  Do you

19   see the heading "3.2.1.2 Maintenance"?

20      A.   Yes.

21      Q.   And in the second line under that

22   heading, do you see "primary population in the

23   maintenance study"?

24              Do you see that?

CONFIDENTIAL
**CONFIDENTIAL**

Page 185

1          A.    Oh, yes.

2          Q.    What is a maintenance study?

3                MS. BRENNAN:   Objection to

4     form.

5          A.    I believe the maintenance study is

6     after the induction.   It's -- in this

7     particular case, the induction studies or

8     induction part is when they are getting the

9     IVs, and the maintenance is when they're

10    getting the subcutaneous.

11    BY DR. ANTONS:

12         Q.    And then turn to the next page ending

13    in 8527.

14                Do you see the paragraph that is just

15    above the heading titled "Endpoints"?

16         A.    Yes.

17         Q.    It states, "To limit exposure to a

18    potentially ineffective therapy, subjects will

19    be evaluated for response 16 weeks after loss

20    of clinical response (Section 3.1.2.1).   If a

21    prespecified measure of response is not

22    achieved (i.e., partial Mayo response), the

23    administration of further study agent will be

24    discontinued."

CONFIDENTIAL
**CONFIDENTIAL**

Page 186

1              Do you see that?

2         A.    Yes.

3         Q.    And you agree that this is a futility

4    analysis that will be conducted in the context

5    of the maintenance part of the clinical trial,

6    correct?

7              MS. BRENNAN:  Objection to form.

8         A.    I mean, I don't see futility analysis

9    here, but it looks like it is discussing a

10   futility analysis.

11   BY DR. ANTONS:

12        Q.    And you agree that J&J is referring to

13   Stelara as a potentially ineffective therapy,

14   correct?

15             MS. BRENNAN:  Objection to form.

16        A.    I agree in that J&J is accounting for

17   the possibility that Stelara will be

18   ineffective.

19   BY DR. ANTONS:

20        Q.    If we could, turn back to page ending

21   in 8520.

22        A.    8520.

23        Q.    Correct?

24        A.    Okay.

CONFIDENTIAL
**CONFIDENTIAL**

Page 197

1     form.

2          A.   I don't know what they knew.

3     BY DR. ANTONS:

4          Q.   Do you provide any opinions that

5     Mr. Dichter knew that the van Beelen Granlund

6     and Jostins references were material to the

7     patentability of the '307 --

8                    MS. BRENNAN:   Objection to form.

9     BY DR. ANTONS:

10         Q.   -- patent?

11         A.   I don't know whether he knew they were

12    material to patentability.

13         Q.   Do you provide any opinions that

14    anyone else at J&J knew that the van Beelen

15    Granlund and Jostin references were material

16    to the patentability of the '307 patent?

17                    MS. BRENNAN:   Objection to

18    form.

19         A.   Well, there was Dr. Ralat, which was

20    involved in this matter, I'll say, generally.

21    But again, I don't know, you know, what he

22    knew or whether he saw these as material.

23    BY DR. ANTONS:

24         Q.   Okay.   You agree that the '509

CONFIDENTIAL
**CONFIDENTIAL**

Page 255

1          Q.   And you don't compare the clinical
2     trial submissions to any of the other
3     references before the examiner, correct?
4          A.   That is -- yes, I did not compare the
5     clinical trial submissions to the other
6     references.
7          Q.   Your opening report discusses the duty
8     of reasonable inquiry, correct?
9          A.   Yes.
10          Q.   What does that duty involve?
11          A.   (Witness reviews document.)
12               So that duty involves -- it requires
13     "that allegations and other factual
14     contentions must have evidentiary support"
15     unless they're identified, that "denials of
16     factual contentions must be warranted," and
17     that "Both must be formed 'after an inquiry'
18     reasonable under the circumstances."
19          Q.   And are you reading from your opening
20     report?
21          A.   Yes.
22          Q.   What paragraph?
23          A.   Paragraph 106.
24          Q.   And you agree that this duty does not

CONFIDENTIAL
**CONFIDENTIAL**

Page 256

1    require prior art search, correct?

2        A.    This duty does not require a prior art

3    search.

4        Q.    Given that a prior art -- the USPTO

5    guidance that a prior art search is not

6    required, can a practitioner or an applicant

7    file and prosecute an application without

8    having a prior art search performed?

9        A.    I have to give the answer it depends.

10    If the question is does Rule 56 require a

11    prior art search, the answer to that would be

12    no.  If the question is does 37 CFR 11.18

13    require a prior art search, the answer to that

14    is no.

15        But a practitioner also has a duty to

16    competently represent people before the

17    office.  And depending upon the circumstances,

18    if a practitioner does not -- is not familiar

19    with the subject matter, they may need to

20    educate themselves on the subject matter to be

21    competent to practice before the -- to take

22    actions before the PTO in filing or

23    prosecuting an application.  So it would not

24    be correct to say there's never a duty to do a

CONFIDENTIAL
**CONFIDENTIAL**

Page 261

1      this interview reference violated the duty of

2      candor, if I heard right.

3      BY DR. ANTONS:

4           Q.   Yes.

5           A.   Right.

6           Q.   In your opening paragraph, 176, you

7      discuss Mr. Dichter's October 16, 2020 office

8      action, correct?

9           A.   Yes.

10          Q.   You don't offer any opinion that

11     Mr. Dichter's response was a violation of the

12     duty of candor, correct?

13          A.   I think I said that his response was

14     misleading.

15          Q.   By using the term "misled," are you

16     making a statement about Mr. Dichter's intent?

17          A.   I don't know his intent.

18          Q.   And you don't offer any evidence

19     related to the examiner's state of mind in

20     response to that statement, correct?

21          A.   I don't know the examiner's state of

22     mind, as such.  I simply know what the record

23     reflects.

24          Q.   And that -- the record does not

CONFIDENTIAL
**CONFIDENTIAL**

Page 262

1           reflect the examiner's state of mind,

2           correct?

3                       MS. BRENNAN:  Objection to form.

4               A.   If by that question you mean does the

5           record say -- have the examiner say, My state

6           of mind is that I have been misled, that's

7           correct.  That is actually not in there.  But

8           as an examiner, if I were to put things in

9           bold or highlighting or -- not highlighting

10          but underlining and block copies a large part

11          of another document, it would mean something,

12          that it had an impression on me.

13          BY DR. ANTONS:

14              Q.   Your opening report discusses what you

15          call the "Nondisclosure of adverse legal

16          authority during prosecution of the '509

17          application," correct?

18              A.   Yes.

19              Q.   And by referencing legal authority,

20          you discuss in this section the federal

21          circuit's decision In re Montgomery?

22              A.   Yes.  Yes, I do.

23              Q.   You agree that practitioners need only

24          disclose legal authority known to the

CONFIDENTIAL
**CONFIDENTIAL**

Page 263

1          practitioner to be directly adverse to the

2          position of the client if such authority is

3          not otherwise disclosed, correct?

4               A.    That's correct.  Sounds like the rule.

5               Q.    So in other words, if the practitioner

6          doesn't know about the legal authority, they

7          don't need to disclose it, correct?

8               A.    If a practitioner is not aware of a

9          case or legal authority, then they don't have

10         a duty to disclose it.

11              Q.    And if the practitioner is aware of

12         the legal authority but doesn't know that it

13         is adverse to the client's position, it also

14         does not need to disclose it, correct?

15              A.    I apologize.  I want to see exactly

16         how the rule is worded on that one.

17                    MS. BRENNAN:  Take your time.

18              A.    (Witness reviews document.)

19                    Yes.  The rule says known to be --

20         known to the practitioner to be directly

21         adverse to the position of the client.

22         BY DR. ANTONS:

23              Q.    You haven't offered any opinions that

24         Mr. Dichter knew about the In re Montgomery

CONFIDENTIAL
**CONFIDENTIAL**

Page 264

1        decision, correct?

2            A.    I haven't offered any opinion that he

3        knew of that decision.

4            Q.    And you haven't offered any opinion

5        that anyone at J&J violated the duty of candor

6        by failing to disclose the In re Montgomery

7        decision, correct?

8            A.    I haven't offered an opinion that

9        anybody at J&J violated their duty of candor

10       by not disclosing that decision.

11           Q.    Your reports also discuss J&J's

12       prosecution of the pending '310 application,

13       correct?

14           A.    Yes.

15           Q.    And you're aware that the examiner

16       issued a nonfinal rejection of the claims in

17       that application, correct?

18           A.    Yes, I understand that.

19           Q.    And you agree that the examiner, as of

20       today, has not issued a final rejection of

21       those claims, correct?

22           A.    Well, I'm aware of that as of

23       yesterday he hasn't.

24           Q.    Okay.  And let's look at Paragraph 46

CONFIDENTIAL
**CONFIDENTIAL**

Page 278

1        Q.   Mr. Bahr, earlier we discussed if you

2     compared the references -- certain references

3     to the claims of the '307 patent, including

4     Ochsenkuhn ECCO, Ochsenkuhn DDW, Afonso, and

5     Kolios.

6              Do you recall that?

7        A.   Yes.

8        Q.   And you didn't make any comparison of

9     those references to the claims for any part of

10    your materiality analysis, correct?

11       A.   I don't understand -- I mean,

12    materiality and prima facie unpatentability go

13    hand in hand.  So to the extent that I opine

14    that they were unpatentable, those references

15    or those references in combination with other

16    references, I did use them when I was looking

17    at the materiality.

18       Q.   But you didn't do an analysis that

19    compared the limitations of the claims to the

20    disclosures of the references, correct?

21       A.   No, I didn't map the limitations of

22    the claim to the disclosures in the

23    references.

24       Q.   And you recall discussing NCT 236 2017

CONFIDENTIAL
**CONFIDENTIAL**

Page 297

CERTIFICATION

1

2         I, DARLENE M. COPPOLA, a Notary Public, do hereby

3     certify that ROBERT W. BAHR, after having

4     satisfactorily identifying himself, came before me on

5     the 25th day of June, 2025, in Boston, Massachusetts,

6     and was by me duly sworn to testify to the truth and

7     nothing but the truth as to his knowledge touching and

8     concerning the matters in controversy in this cause;

9     that he was thereupon examined upon his oath and said

10    examination reduced to writing by me; and that the

11    statement is a true record of the testimony given by

12    the witness, to the best of my knowledge and ability.

13         I further certify that I am not a relative or

14    employee of counsel/attorney for any of the parties,

15    nor a relative or employee of such parties, nor am I

16    financially interested in the outcome of the action.

17         WITNESS MY HAND THIS 29th day of JUNE, 2025.

18

19         _Darlene M. Coppola_

20

21    DARLENE M. COPPOLA              My commission expires:

22    NOTARY PUBLIC                   November 2, 2029

23    REGISTERED MERIT REPORTER

24    CERTIFIED REALTIME REPORTER

CONFIDENTIAL
**CONFIDENTIAL**

Page 298

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF VIRGINIA

 3                   NORFOLK DIVISION

 4

 5       ********************************

         CAREFIRST OF MARYLAND, INC.;

 6       GROUP HOSPITALIZATION AND MEDICAL

         SERVICES, INC.; and CAREFIRST

 7       BLUECHOICE, INC., on behalf of

         themselves and all others

 8       similarly situated,

 9                      Plaintiffs

10       vs.            CA NO. 2:23-cv-00629 JKW-LRL

11

         JOHNSON & JOHNSON and

12       JANSSEN BIOTECH, INC.,

13                      Defendants

         ********************************

14

15           I, ROBERT W. BAHR, say that I have read the

16       foregoing deposition and hereby declare under penalty

17       of perjury the foregoing is true

18       and correct:  (as prepared)  (as corrected on errata.)

19           Executed this _____ day of _____,

20       2025, at _____, _____.

21

22

23                    _____

24                    ROBERT W. BAHR
```