# EXHIBIT 21

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CAREFIRST BLUECHOICE, INC., on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>   v.<br><br>JOHNSON & JOHNSON and JANSSEN BIOTECH, INC.<br><br>     Defendants. | Civil Action No. 2:23-cv-00629-JKW-LRL |

**OPENING EXPERT REPORT OF LISA MATOVCIK, Ph.D., J.D.**

**Submitted March 3, 2025**

**HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY INFORMATION**

subjects that responded to treatment were then given maintenance doses subcutaneously ("SC")

in a related study (NCT01369355).[21] The administration and dosage of the induction phase was

approximately 6 mg/kg body weight.[22] The administration and dosage regimen of the

maintenance phase was 90 mg SC every 8 or 12 weeks.[23] All of the trial subjects had either

failed treatment with or were intolerant of treatment with tumor necrosis factor ("TNF")

antagonist therapies. The primary endpoint for the induction phase was a clinical response at

week 6 and the primary endpoint for the maintenance phase was a clinical remission at week

44.[24] The trials were successful and led to the approval of the use of ustekinumab to treat

moderately to severely active Crohn's disease.[25]

26.    The data supporting the approval of ustekinumab for the treatment of Crohn's was

reported by Sands (2019).[26] In J&J's clinical trial concerning the use of ustekinumab to treat UC

(NCT02407236), the administration and dosage regimens and patient pool were identical to the

Crohn's clinical trials. In the UC trials, ustekinumab was compared to placebo in an IV induction

phase and those subjects that responded to treatment were given maintenance doses SC. The

administration and dosage of the induction phase was approximately 6 mg/kg body weight. The

administration and dosage regimen of the maintenance phase was 90 mg SC every 8 or 12

---

[21] ClinicalTrials.gov, Study Record NCT01369355, "A Study to Evaluate the Safety and Efficacy of Ustekinumab Maintenance Therapy in Patients With Moderately to Severely Active Crohn's Disease (IM-UNITI)," *available at* https://clinicaltrials.gov/study/NCT01369355 (hereafter, "CT '355").

[22] CT '329; CT '342.

[23] CT '355.

[24] CT '329 (defining the "[c]linical response at Week 6" in terms of reduction); CT '342. (same); CT '355 (same at week 44).

[25] Ltr. from U.S. Food & Drug Administration to Janssen Biotech, Inc., "BLA Approval" (Sep. 23, 2016) [JNJ-STELARA_001383446].

[26] B. Sands, et al., *Ustekinumab as Induction and Maintenance Therapy for Ulcerative Colitis*, 381 N. Engl. J. Med. 12 (2019), 1201-1214, *available at* https://www.nejm.org/doi/full/10.1056/NEJMoa1900750 (hereafter, "Sands (2019)").

requirement that the subject experiences certain clinically measured responses while being administered ustekinumab (claims 12-18).

**C.      Prosecution History of U.S. Patent No. 10,961,307**

89.      The '509 application was assigned to Primary Examiner Robert S. Landsman for examination of its patentability. As of 2019, when the '509 application was filed, he had approximately twenty years of experience with the USPTO. As of 2025, his three-year grant rate was 75%, i.e., 75% of his cases were granted within three years. According to the USPTO, he is ranked as in the 53rd percentile of difficulty across all examiners, with the 100th percentile considered the most difficult to obtain a granted patent. In cases that did not include an examiner interview over the past three years as of the time of this report, he granted 316 of 431, for a grant rate of 73%. In cases that included an examiner interview, his grant rate increased to 92%, with 44 of 48 interviewed applications granted.[43]

90.      Examiner Landsman ("the Office") issued the first examination report, i.e., a first Office Action, on July 16, 2020.[44]  The Office rejected all the claims. It opined that J&J's Phase III ClinicalTrials.gov disclosure,[45] which according to the Office's Notice of References Cited the Office accessed on July 13, 2020, anticipated the claims, thus they lacked novelty. A ClinicalTrials.gov disclosure is the document required by the FDA to be filed by an entity that conducts clinical trials. The Phase III clinical trial that tested the use of ustekinumab to treat moderate to severe UC is designated NCT02407236.[46]

---

[43] PatentBots, "Examiner Landsman Robert S," *available at* patentbots.com/stats/examiner/1647-LANDSMAN-ROBERT-S (accessed February 21, 2025).

[44] File Wrapper, U.S. Patent Application No. 16/580,509 (filed Sept. 24, 2019) (available at USPTO Patent Center) [JNJ-STELARA_001693362, at -3595].

[45] *See* CT '329, Version 19: 2012-09-12 (navigate to "Record History" and select August 21, 2018 Study Record) (hereafter "ClinicalTrials.gov (August 2018)").

[46] ClinicalTrials.gov (August 2018).

combination would predictably lead to the claimed invention, i.e., that there was an expectation of success.

**B.      Scope and Content of Withheld Material Information.**

**1.      ClinicalTrials.gov (August 2018)**

153.     Janssen Research and Development Clinical Trial NCT02407236: "A phase III, randomized, double blind, placebo controlled, parallel-group, multicenter protocol to evaluate the safety and efficacy of ustekinumab induction and maintenance therapy in subjects with moderately to severely active UC (UNIFI)," Protocol CNTO1275UCO3001, began in August 2015 and concluded in August 2018.[106]

154.     According to ClinicalTrials.gov, the latest version of the study that was publicly available prior to the filing of the first provisional application was the ClinicalTrials.gov posting of August 14, 2018 (ClinicalTrials.gov (August 2018)). It sets forth the purpose, subject population, dosage and administration routes, and the efficacy outcome measures of the ongoing clinical Phase III study. As explained below in further detail, it discloses every efficacy endpoint of the claims granted in the '307 patent.

155.     The study was designed to test whether ustekinumab was superior to a placebo in inducing clinical remission of UC at week 8 in patients with moderately to severely active UC in an induction study. It was also designed to test whether ustekinumab was superior to placebo in achieving clinical remission, i.e., the absence of ongoing symptoms, at week 44 in those subjects who were induced into a clinical response at week 8 in a maintenance study. The study defined a clinical response as a decrease from induction baseline in the Mayo score by $\geq 30\%$ and $\geq 3$

---

[106] Sands (2019).

points, with either a decrease from baseline in the rectal bleeding subscore ≥1 or a rectal bleeding subscore of 0 or 1.[107]

156.     The Mayo score is a commonly used tool to assess the severity of IBD and is used in clinical trials to assess the effect of the test agent.[108] It is calculated from the sum of four subscores: stool frequency, rectal bleeding, findings on endoscopy, and the clinician's assessment. Each subscore ranges from 1-3, with 1 being normal for that subject and 3 being the most severe manifestation of UC. A score of 3-5 points indicates mildly active disease, a score of 6 to 10 points indicates moderately active disease, and a score of 11 to 12 points indicates severely active disease.

157.     The primary outcome measures were to induce clinical remission at week 8 and to maintain clinical remission in those subjects who had a clinical response at week 44. Clinical remission is defined specifically for the U.S. population as an absolute stool number ≤3, a rectal bleeding subscore of 0, and a Mayo endoscopy score of 0 or 1.[109] Clinical remission defined for a global population is defined as a Mayo score of ≤2 points, with no individual subscore >1.

158.     The secondary outcome measures of the induction study included inducing a clinical response, achieving endoscopic healing, defined as an improvement in the endoscopic appearance of the intestinal mucosa, inducing a clinical response, and evaluating the impact on disease-specific health-related quality of life by measuring the change from baseline in the Inflammatory Bowel Disease Questionnaire (IBDQ).[110]

---

[107] *Id.*

[108]  Ulcerative Colitis: Clinical Trial Endpoints Guidance for the Industry (Aug. 2016) at 8 [JNJ-STELARA_001829798, -9805].

[109] *See* ClinicalTrials.gov (August 2018) at "Primary Outcome Measures".

[110] *Id.* at "Secondary Outcome Measures."

159.    The secondary objectives of the maintenance study include maintaining the clinical response in those who had a clinical response, evaluating endoscopic healing, evaluating the efficacy of ustekinumab in achieving a corticosteroid free clinical remission, and evaluating the efficacy of ustekinumab in maintaining clinical remission.

160.    The study population consisted of men and women eighteen years or older with moderately or severely active UC, as defined by a Mayo score of 6 to 12, inclusive, at the beginning of the induction phase of the study, including an endoscopy subscore $\geq 2$. Eligible subjects have failed are intolerant to biologic therapy, oral corticosteroids, or immunomodulators.[111]

161.    In the induction phase, subjects were randomly assigned to receive either a placebo, 130 mg ustekinumab, or ustekinumab in a weight-based dose of approximately 6 mg/kg via intravenous ("IV") administration.  At week 8, subjects who achieved a clinical response were randomized into a maintenance phase, where they received either a placebo, 90 mg ustekinumab subcutaneously ("SC") every 12 weeks, or 90 mg SC every 8 weeks.[112]

162.    Based on the results of this Phase III study, J&J received FDA approval for the use of ustekinumab in treating UC in October 2019.

163.    It  is my opinion, to a reasonable degree of certainty in the area of United States patent prosecution, and based on my experience, education and training, and my review of the materials considered, that a reasonable patent practitioner prosecuting the application that led to the '307 patent would have (1) expected that the disclosure of ClinicalTrials.gov (August 2018) would have been material to the patent examiner's consideration of the application that led to the

---

[111] *Id*.
[112] *Id.*

'307 patent; (2) would or should have known that ClinicalTrials.gov (August 2018) is non-duplicative prior art to the '307 patent; and (3) known that to the extent the prosecuting attorney, the inventors, or anyone substantively involved in prosecuting the application that led to the '307 patent was aware or on notice of ClinicalTrials.gov (August 2018), they had an affirmative duty to disclose it to the USPTO.

###     2.     FDA Materials (NCT '236 Protocol (2015) and Pre-IND Meeting Submissions)

164.    In its communications with the FDA that supported the Phase III clinical studies leading up to the approval of Stelara's UC indication, J&J consistently stated that the rationale for a successful trial of ustekinumab in UC was based on the success of ustekinumab in treating Crohn's.

165.    In the briefing document for the pre-IND meeting with the FDA, J&J stated, "There is no doubt that the pathophysiology of UC and Crohn's disease is similar. In the largest and most comprehensive analysis of the genetic loci for IBD, including those for IL-12 and IL-23, are common to both UD and Crohn's disease."[113] J&J made similar comparisons between Crohn's and UC in its NCT '236 Protocol, citing the similarities in its rationale for the ulcerative colitis study.[114]

166.    In the pre-IND briefing document, J&J stated unequivocally that "considering the similarities in the genetics and biology of UC and Crohn's disease, *it is reasonable to assume that ustekinumab will be effective in UC*."[115] J&J made a very similar comment in its Protocol for the study, stating, "considering the similarities in the genetics and biology of UC and Crohn's

---

[113] Janssen R&D Briefing Document for a Pre-IND/Pre-Phase 3 Meeting (December 18, 2014) at 24 [JNJ-STELARA_002258291].
[114] NCT '236 Protocol at 25 [JNJ-STELARA_001838489 at -513].
[115] Janssen R&D Briefing Document for a Pre-IND/Pre-Phase 3 Meeting (December 18, 2014) at 20 (italics added).

57

disease, it is reasonable to assume that ustekinumab will also be effective in UC. The doses

selected for this Phase 3 protocol for ustekinumab in subjects with UC parallel those being

studied in the Phase 3 program for ustekinumab in subjects with Crohn's disease."[116] Thus,

according to J&J's own assertion, there was a reasonable expectation of success that

ustekinumab, when provided in the doses and administration regimens used in the clinical trials

for Crohn's disease, would be successful in treating UC.

167.    Also in this pre-IND briefing document and NCT '236 protocol were references

to two documents that showed, by gene expression analysis, that there are no major differences

in gene expression between UC and Crohn's disease.

168.    The first, Jostins et al.,[117] reported the results of a meta-analysis of genome-wide

gene association scans that described the presence of 163 gene loci that are associated with

susceptibility to IBD. The great majority (110/163) were associated with both UC and Crohn's

disease, leading to the conclusion that this degree of sharing of genetic risk suggests nearly all

the biological mechanism involved in one disease play some role in the other.

169.    The second, Granlund et al.,[118] measured gene expression in the inflamed mucosa

of UC and Crohn's disease patients and found the results to be "remarkably similar." The

T helper cell involvement was nearly identical between UC and Crohn's, as well. These

submissions to the FDA demonstrate J&J's understanding and belief that UC and Crohn's

---

[116] NCT '236 Protocol at 41 [JNJ-STELARA_001838489 at -529].

[117] L. Jostins, et al., *Host-Microbe Interactions Have Shaped the Genetic Architecture of Inflammatory Bowel Disease*, 491 Nature 7422 (2012), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC3491803/.

[118] A. Granlund., et al., *Whole Genome Gene Expression Meta-Analysis of Inflammatory Bowel Disease Colon Mucosa Demonstrates Lack of Major Differences between Crohn's Disease and Ulcerative Colitis*, 8 PloS One 2 (2013), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC3572080/.

disease have similar causal mechanisms and support a conclusion that a therapy shown to be effective in treating Crohn's would also be effective in treating UC.

170.    It is my opinion, to a reasonable degree of certainty in the area of United States patent prosecution, and based on my experience, education and training, and my review of the materials considered, that a reasonable patent practitioner prosecuting the application that led to the '307 patent would have (1) expected that the disclosure of the FDA materials would have been material to the patent examiner's consideration of the application that led to the '307 patent; (2) would or should have known that the FDA materials are non-duplicative prior art to the '307 patent; and (3) known that to the extent the prosecuting attorney, the inventors, or anyone substantively involved in prosecuting the application that led to the '307 patent was aware or on notice of the FDA materials, they had a duty to disclose them to the USPTO.

### 3.    Ochsenkühn (January 2018)

171.    Ochsenkühn (January 2018) was published on January 16, 2018, i.e., before the effective filing date of the '307 patent (September 24, 2018). This abstract is the first published clinical data on the use of ustekinumab to treat UC. It reports the treatment of seventeen subjects, eleven of whom had moderately or severely active UC at the beginning of the ustekinumab treatment regimen.[119] All of the subjects had previously been steroid dependent or steroid refractory and had failed known UC treatments.

172.    The subjects were treated with ustekinumab at a dose of 6 mg/kg body weight administered by IV infusion followed by 90 mg SC every 8 weeks, i.e., the dosage regimen disclosed in ClinicalTrials.gov (August 2018) and approved for Crohn's. Clinical remission was measured by the Colitis Activity Index ("CAI").[120] At baseline the CAI ranged from 1 to 11

---

[119] *Id.*
[120] *Id.*

points, with a median of 8.  After four weeks of treatment, the median CAI was 5 points (range 1-8); after 3 months, the median CAI improved to 4.5 points (range 0-9); and after 6 months, the median CAI further improved to 2 points (range 0-7).[121] Thus, Ochsenkühn (January 2018) disclosed that ustekinumab was an effective treatment for moderately to severely active UC in patients who were refractory to or intolerant of other therapies. The abstract concluded by stating, "It seems possible that large ongoing trials will confirm our findings and ustekinumab could become a new therapeutic option for refractory UC."[122]

173.    Dr. Ochsenkühn also presented this abstract as a poster at the 13th congress of the European Crohn's and Colitis Organization (ECCO) held in Vienna, Austria, from February 14-17, 2018. The poster, like the abstract, disclosed the use of ustekinumab to effectively treat patients with moderately to severely active UC using the same two-step dosage regimen approved for Crohn's.

174.    It  is my opinion, to a reasonable degree of certainty in the area of United States patent prosecution, and based on my experience, education and training, and my review of the materials considered, that a reasonable patent practitioner prosecuting the application that led to the '307 patent would have (1) expected that the disclosure of Ochsenkühn (January 2018) would have been material to the patent examiner's consideration of the application that led to the '307 patent; (2) would or should have known that Ochsenkühn (January 2018) is non-duplicative prior art to the '307 patent; and (3) known that to the extent the prosecuting attorney, the inventors, or anyone substantively involved in prosecuting the application that led to the '307 patent was

---

[121] *Id*.
[122] *Id*.

60

aware or on notice of Ochsenkühn (January 2018), they had an affirmative duty to disclose it to the USPTO.

### 4. Ochsenkühn (May 2018)

175. Ochsenkühn (May 2018) was published in the May 2018 issue of the journal, also before the first effective filing date of the '307 patent (September 24, 2018). It disclosed the same data as Ochsenkühn (January 2018). Dr. Ochsenkühn presented the corresponding poster at the Digestive Disease Week (DDW) conference held in Washington, D.C. from June 2-5, 2018.

176. The results published in the Ochsenkühn (May 2018) and Ochsenkühn (January 2018) abstracts was subsequently published as a manuscript (Ochsenkühn 2020).[123] The manuscript acknowledged the declaration of conflicting interest that "Thomas Ochsenkühn has received travel grants, honoraria, and lecture fees from Janssen," strongly suggesting that J&J was aware of the Ochsenkühn (May 2018) and Ochsenkühn (January 2018) abstracts during the preparation and/or the prosecution of the '307 patent and violated its duty of disclosure by not submitting this material information to the USPTO.

177. It is my opinion, to a reasonable degree of certainty in the area of United States patent prosecution, and based on my experience, education and training, and my review of the materials considered, that a reasonable patent practitioner prosecuting the application that led to the '307 patent would have (1) expected that the disclosure of Ochsenkühn (May 2018) would have been material to the patent examiner's consideration of the application that led to the '307 patent; (2) would or should have known that Ochsenkühn (May 2018) is non-duplicative prior art to the '307 patent; and (3) known that to the extent the prosecuting attorney, the inventors, or

---

[123] T. Ochsenkühn, et al., *Clinical outcomes with ustekinumab as rescue treatment in therapy-refractory or therapy-intolerant ulcerative colitis*, 8 United Eur Gastroenterol J. 1, 91-98 (2020), *available at* https://pubmed.ncbi.nlm.nih.gov/32213052/.

anyone substantively involved in prosecuting the application that led to the '307 patent was aware or on notice of Ochsenkühn (May 2018), they had an affirmative duty to disclose it to the USPTO.

### 5. Stelara® Prescribing Information (2016)

178.    The Stelara® Prescribing Information ("Stelara P.I. (2016)"), i.e., the product label published in September 2016, discloses that Stelara had been approved for use in moderately to severely active Crohn's in September 2016 and had previously been approved to treat moderate to severe plaque psoriasis and active psoriatic arthritis. It defines Stelara as ustekinumab, a human interleukin-12 and -23 antagonist.[124]

179.    Stelara P.I. (2016) discloses that the approved administration and dosage regimen for Crohn's disease is an initial intravenous dose based on weight; 260 mg, weight ≤55 kg; 390 mg, weight >55 kg and ≤85 kg; and 520 mg weight >85 kg, i.e., approximately 6 mg/kg, followed by a subcutaneous maintenance regimen of 90 mg every eight weeks.[125]

180.    Stelara P.I. (2016) established that ustekinumab was safely administered to 1407 patients with moderately to severely active Crohn's.[126] It discloses that ustekinumab was effective in the three clinical trials that led to its FDA approval. The subjects in these studies had moderately to severely active Crohn's and had failed or were intolerant of prior treatments. The dosages and administration routes used in these trials were identical to those disclosed in the ClinicalTrials.gov (August 2018), J&J Protocol for the Phase III trials, Ochsenkühn (January 2018), Ochsenkühn (May 2018), and the claims of the '307 patent.[127]

---

[124] Stelara P.I. (2016) at 1 [JNJ-STELARA_002029703].
[125] *Id.* at 4-5 [JNJ-STELARA_002029703, at 706-07].
[126] *Id.* at 11 [JNJ-STELARA_002029703, at 713].
[127] *Id.* at 23-25 [JNJ-STELARA_002029703, at 725-27].

181.    It  is my opinion, to a reasonable degree of certainty in the area of United States patent prosecution, and based on my experience, education and training, and my review of the materials considered, that a reasonable patent practitioner prosecuting the application that led to the '307 patent would have (1) expected that the disclosure of Stelara P.I. (2016) would have been material to the patent examiner's consideration of the application that led to the '307 patent; (2) would or should have known that Stelara P.I. (2016) is non-duplicative prior art to the '307 patent; and (3) known that to the extent the prosecuting attorney, the inventors, or anyone substantively involved in prosecuting the application that led to the '307 patent was aware or on notice of Stelara P.I. (2016), they had an affirmative duty to disclose it to the USPTO.

### 6.    Kolios (2018)

182.    Kolios (2018) was published on February 1, 2018, i.e., prior to the effective filing date of the '307 patent. The journal article describes a patient who, while being treated for psoriasis with the TNF inhibitor adalimumab, developed highly active UC with a Mayo endoscopic subscore of 3, the most severe level. The patient was switched to ustekinumab and their UC completely resolved. One month after beginning ustekinumab therapy, a colonoscopy showed nearly normal mucosa with no histological inflammation, and the patient had normal stool frequency. Thus, Kolios (2018) documents the use of ustekinumab to successfully treat UC and is prior art to the '307 patent.

183.    It  is my opinion, to a reasonable degree of certainty in the area of United States patent prosecution, and based on my experience, education and training, and my review of the materials considered, that a reasonable patent practitioner prosecuting the application that led to the '307 patent would have (1) expected that the disclosure of Kolios (2018) would have been material to the patent examiner's consideration of the application that led to the '307 patent; (2) would or should have known that Kolios (2018) is non-duplicative prior art to the '307 patent;

and (3) known that to the extent the prosecuting attorney, the inventors, or anyone substantively involved in prosecuting the application that led to the '307 patent was aware or on notice of Kolios (2018), they had an affirmative duty to disclose it to the USPTO.

### 7.    Afonso (2017)

184.    Afonso (2017) is a published abstract that disclosed the use of ustekinumab in patients with refractory inflammatory bowel disease that had been treated with ustekinumab. Two patients with UC who had previously received an anti-TNF antibody and who either were intolerant or did not respond to itwere treated with ustekinumab administered subcutaneously at a dose of 90 mg weekly for four weeks, followed by a maintenance regimen of 90 mg administered subcutaneously. Thus, Afonso (2017) documents the use of ustekinumab to treat UC prior to the first effective filing date of the '307 patent.

185.    It  is my opinion, to a reasonable degree of certainty in the area of United States patent prosecution, and based on my experience, education and training, and my review of the materials considered, that a reasonable patent practitioner prosecuting the application that led to the '307 patent would have (1) expected that the disclosure of Afonso (2017) would have been material to the patent examiner's consideration of the application that led to the '307 patent; (2) would or should have known that Afonso (2017)  is non-duplicative prior art to the '307 patent; and (3) known that to the extent the prosecuting attorney, the inventors, or anyone substantively involved in prosecuting the application that led to the '307 patent was aware or on notice of, Afonso (2017), they had an affirmative duty to disclose it to the USPTO.

*(vii): clinical response as determined by a decrease in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore at ≥1 points or a rectal bleeding score of 0 or 1.*

200.    ClinicalTrials.gov (August 2018) defines a clinical response as a decrease from induction baseline in the Mayo score by ≥30% and ≥3 points, with either a decrease from baseline in the rectal bleeding subscore ≥1 or a rectal bleeding subscore of 0 or 1.

201.    Therefore, the ClinicalTrial.gov disclosure published on August 14, 2018 discloses every criteria for efficacious treatment of UC that is recited in claim 1. During prosecution of the '307 patent, J&J argued that the claims were patentable because the clinical trial protocol did not disclose the results of the study, i.e., did not disclose "a clinically proven safe and clinically proven effective amount" of ustekinumab because the clinical trial had not been completed at the time the application was filed. This deficiency can be cured by combining the disclosure of ClinicalTrials.gov (August 2018) with additional prior art references.

### 2.    Stelara Prescribing Information (2016)

202.    Stelara P.I. (2016) discloses that ustekinumab is Stelara and that it acts as a human IL-12 and IL-23 antagonist. "Ustekinumab is a fully human immunoglobulin G1 kappa (IgG1k) monoclonal antibody that binds with specificity to the p40 subunit used by both the IL-12 and IL-23 cytokines. Ustekinumab prevents IL-12 and IL-23 bioactivity by preventing their interaction with their cell surface IL-12Rβ1 receptor protein."

203.    Combining the prior art disclosure of ClinicalTrials.gov (2018) and Stelara P.I. (2016) for Crohn's shows that the Phase III dosage and administration routes and the clinical remission criteria were identical to those that led to the approval of ustekinumab for Crohn's.

204.    Both ClinicalTrials.gov (August 2018) and Stelara P.I. (2016) disclose that ustekinumab was administered at a weight-based dose of 6 mg/kg IV in the induction phase and

212.    This gives an objective standard for identifying inventions that provide an advance that is sufficient over the prior art to deserve a patent. This person of ordinary skill in the art ("POSITA") is a hypothetical person who is presumed to have knowledge of all relevant published information as of the effective filing date. The POSITA would know how the prior art approached the problem solved by the invention, which in this case was how to treat UC with ustekinumab. A POSITA at the time of the effective filing date of September 24, 2018, would have been aware of the prior art and would therefore have had knowledge of the past and current treatments for, and of the clinical trials directed to, the treatment of IBD. A POSITA in the field of pharmaceutical therapeutics would have been able to fit the teachings of the prior art together and make inferences about whether a proposed invention is obvious or non-obvious.

213.    In its post-grant challenge to the '307 patent, Samsung described the hypothetical POSITA in September 2018 as someone who "had knowledge regarding the mechanism of action, diagnosis, clinical trials, and treatment of IBDs, including at least UC and Crohn's disease and had the ability to understand results and findings presented or published in the field." The POSITA "also had knowledge of the structure of antibodies used to treat IBD . . . may have worked as part of a multidisciplinary team including specialties including, for example, a clinician, a biochemist knowledgeable about antibody sequences, and a formulation chemist. Typically, such a person would have an M.D. and residency training in gastroenterology and/or a Ph.D. in immunology, biochemistry, or a related field."[136]

---

[136] Samsung IPR Petition, at 14 [JNJ-STELARA_001833280].

214.    In Biocon's post-grant challenge to the '307 patent, Biocon described the hypothetical POSITA using exactly the same language as Samsung.[137] I agree with and adopt the definition of a POSITA as defined by both Biocon and Samsung.

### 2.    Motivation to Combine

215.    A POSITA would have been motivated to consider the references in the prior art in combination. The ClinicalTrial.gov (August 2018) disclosure of dosage, patient population, and endpoints, in view of the knowledge from the references that taught that the same dosage of ustekinumab had successfully treated UC (including Ochsenkühn (January 2018), Ochsenkühn (May 2018), Alfonso (2017), and Kolios (2018)), would have shown the POSITA that treating UC with ustekinumab would provide the commercial benefit of an increase in sales of Stelara brought about by an additional approved indication. An FDA approval of ustekinumab for the treatment of UC would lead a POSITA to view the ClinicalTrial.gov (August 2018) disclosure in light of the prior art reports that ustekinumab was effective in treating UC.

216.    A POSITA reading ClinicalTrial.gov (August 2018) on September 24, 2018 would have known that ustekinumab was approved for use in Crohn's.[138] Given the similarities between Crohn's and UC, a POSITA would have found Stelara P.I. (2016) for Crohn's highly relevant to treating UC. They would have been aware of the information in the Stelara P.I. (2016) and would have recognized that the dosage and administration regimen in the Crohn's P.I. were identical to that of ClinicalTrial.gov (August 2018).

---

[137] Biocon IPR Petition at 15.
[138] J&J, "FDA approves Stelara® (Ustekinumab) for the treatment of adults with moderately to severely active Crohn's disease" (September 26, 2016), *available at* https://www.jnj.com/media-center/press-releases/fda-approves-stelara-ustekinumab-for-treatment-of-adults-with-moderately-to-severely-active-crohns-disease; Stelara® P.I. (2016).

inquire about the veracity of statements of fact made to the USPTO during prosecution of the application that led to the '307 patent.

_Lisa Michele Matovcik_

Lisa Michele Matovcik, Ph.D., J.D.

Dated: March 3, 2025

80