# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CAREFIRST BLUECHOICE, INC., on behalf of themselves and all others similarly situated,<br><br>                  Plaintiffs,<br><br>       v.<br><br>JOHNSON & JOHNSON and JANSSEN BIOTECH, INC.<br><br>                Defendants. | Civil Action No. 2:23-cv-00629-JKW-LRL |

## REBUTTAL EXPERT REPORT OF ROBERT W. BAHR[1]

---

[1] Some material referenced or quoted in this report refers to material that has been designated as Confidential. It is the responsibility of each party to confirm that all such material has been properly redacted before sharing it with parties to this litigation who would not be able to view such materials under the governing Confidentiality Order entered in this action.

**TABLE OF CONTENTS**

I.    INTRODUCTION ...........................................................................................................1

II.   BACKGROUND ...........................................................................................................1

III.  OPINIONS.....................................................................................................................9

      A.    Luis Ralat has a duty of disclosure under 37 C.F.R. § 1.56.....................................9

      B.    Dr. Cryer's patentability opinions are based on misapprehensions of patent
            law principles and their application by the PTO.....................................................13

            1.    *Dr. Cryer misunderstands the concept of prior art.* ...................................15

            2.    *Dr. Cryer misunderstands how claims are interpreted by the PTO.* .........17

            3.    *The 2017 NCT-236 ClinicalTrial.gov posting anticipates or
                  renders obvious at least the independent claims of the '307 patent.* .........19

            4.    *Dr. Cryer's but-for materiality position rests on a misconception of
                  the patentability analysis.* ..........................................................................24

      C.    Mr. Hirshfeld's opinions regarding what version of the ClinicalTrials.gov
            posting the examiner considered and reviewed on this webpage are
            unsupported and/or speculative................................................................................26

            1.    *The 2015 ClinicalTrials.gov posting (version 1 of the NCT-236
                  ClinicalTrials.gov posting) is the only version consistent with the
                  record of the '509 application.* ..................................................................26

            2.    *Dr. Cryer's and Mr. Hirshfeld's opinions that the examiner
                  reviewed all the information available on NCT-236 on
                  ClinicalTrials.gov is speculative.* ..............................................................29

      D.    The record of the '307 patent does not indicate the examiner reviewed any
            of the information cited in the PCT Search Report that Mr. Dichter cited to
            the PTO. ....................................................................................................................32

      E.    The 2022 Duties of Disclosure and Reasonable Inquiry Notice describes
            existing expectations for patent prosecutors. .........................................................39

      F.    The prior art references are material to patentability..............................................44

            1.    *The Standard for Materiality* .....................................................................46

            2.    *The Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso
                  publications are material to patentability.* ..................................................46

i

3.     *The updated postings on the NCT-236 clinical trial website are material to patentability.* .............................................................47

4.     *The NCT-236 clinical trial submissions are material to patentability.* ................................................................................48

G.     The publications and documents cited in my opening report are not cumulative of the information of record in the '509 application. ..........................49

1.     *A reference is not cumulative when it teaches more than the information already before the PTO.* ..........................................49

2.     *The Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso publications are not cumulative.* ...............................................51

3.     *The September 2017 NCT-236 ClinicalTrials.gov posting is not cumulative.* ...............................................................................52

4.     *The NCT-236 clinical trial submissions are not cumulative.* ....................53

H.     Other J&J actions during its prosecution of the '509 application were not consistent with PTO obligations and practice........................................................55

1.     *Statement in the Specification of the '509 application* ..............................55

2.     *Interviews During Prosecution of the '509 Application* ............................57

3.     *Statements During Prosecution of the '509 Application* ...........................58

## I.      INTRODUCTION

1.      I have been retained as an independent expert witness in this case by counsel for Plaintiff CareFirst of Maryland, Inc., et al. to investigate and provide expert opinions and testimony relating to the prosecution of U.S. Patent No. 10,961,307 (the '307 patent).

2.      I am a partner at the law firm of Maier & Maier PLLC (the "Maier & Maier law firm"), where I specialize in United States Patent and Trademark Office (PTO) patent policy, practice, and procedure. My expertise includes patent prosecution and post-issuance proceedings at the PTO, advising attorneys and our clients on complex patent prosecution matters and PTO patent policy, practice, and procedures.

3.      On March 3, 2025, I submitted my opening expert report ("Opening Rpt."). Since submitting my opening report, I testified as an expert witness at trial in the matter of *Zest Labs, Inc. et al. v. Walmart Inc.*, Civil Action No. 4:18-CV-500-JM (E.D. Ark.). I have not testified as an expert witness in an arbitration proceeding to date.

4.      I have been asked by counsel to prepare this rebuttal report to respond to the criticisms of my opening report contained in the expert reports of Mr. Andrew Hirschfeld and Dr. Byron Cryer. A full list of the materials I have relied upon in the preparation of this report is attached in Exhibit A.

## II.      BACKGROUND

5.      Since submitting my opening report, there have been three important and highly relevant developments in J&J's prosecution of the '310 patent application that I discussed in my opening report.

6.      As I explained in ¶¶ 203 through 210 in my opening report, J&J filed Application No. 18/383,310 (the '310 application) on October 24, 2023, for "Safe and Effective Method of Treating Ulcerative Colitis with Anti-IL12/IL23 Antibody." The '310 application-as-filed

1

included 148 pages of specification (written description), a sequence listing, an abstract, and 19 claims (three independent).

7.    J&J attorney Eric Dichter is the named prosecutor for the '310 application. In submissions to the PTO, he identified Jewel Johanns, Katherine Li, Colleen Marano, Richard Strauss, Hongyan Zhang, Christopher O'Brien, Omoniyi Adedokun, and Kimberly Shields-Tuttle as joint inventors of the subject matter claimed in the '310 application, and identified Janssen Biotech, Inc. as the applicant in the '310 application.

8.    The application data sheet for the '310 application designates the '310 application as a continuation of the '201 application, which in turn is designated as a division of the '509 application. In short, the '310 application is a grandchild of the '307 patent. The chart below is the patent tree for the '307 patent.

2



9.    Examiner Landsman has been assigned to examine the '310 application. Examiner Landsman was also assigned to examine the '509 application that resulted in the '307 patent, as well as the '201 application discussed in ¶¶ 192 through 202 of my opening report. It is typical, but not always the case, for the PTO to assign any continuing application to the same examiner who was assigned to its parent application.

3

10.     As explained in my opening report, on January 16, 2025, examiner Landsman: (1) rejected claims 1 through 19 under 35 U.S.C. § 103 as being unpatentable over ClinicalTrials.gov Identifier: NCT02407236 ("NCT-236"); (2) rejected claims 9 and 10 under 35 U.S.C. § 103 as being unpatentable over NCT-236 in view of "Stelara label 761044lbl"; (3) rejected claims 1 through 19 under 35 U.S.C. § 103 as being unpatentable over NCT-236 in view of Ochsenkühn and "Stelara label 761044lbl"; and (4) rejected claims 1 through 19 on the basis of "nonstatutory" obviousness-type double patenting over claims 1 through 34 of U.S. Patent No. 10,961,307 (the '307 patent).[2] *See* Opening Rpt. ¶ 206. The Office action of January 16, 2025 specifically states: "[t]he only reason NCT-236 does not anticipate the instant claims is due to the fact that it does not teach the exact dosages based on subject weight in claim l(a)."[3]

11.     The examiner made clear in this rejection that he had reviewed the *inter partes* review petitions, which were submitted in June and November of 2023 by Samsung Bioepis Co., Ltd. and Biocon Biologics, Inc. He discussed the case law cited in those petitions as "relevant to the" '310 application. *See* Opening Rep. ¶ 210.

12.     On March 26, 2025, Mr. Dichter initiated an interview with examiner Landsman. According to examiner Landsman's summary of that interview,

> Mr. Dichter requested clarification regarding the rejections under 35 U.S.C. 103. Essentially, the question revolved around the use of the ClinicalTrials.gov reference. This reference was also cited in the parent over similar claims and the parent has since been allowed. The Examiner indicated that the IPR raised points the Examiner wanted to add to the record via rejections. A phone interview is tentatively scheduled for Friday March 28, 2025 to further discuss these rejections.

---

[2] '310 application, Office action of January 16, 2025, at 4-10.

[3] '310 application, Office action of January 16, 2025, at 5. Notably, the claims of the '307 patent do not contain this "exact dosages based on subject weight" limitation.

Otherwise, the interview will be attempted the following week. Agreement was not currently reached.[4]

13.     Examiner Landsman issued another Interview Summary on April 7, 2025. In this Interview Summary, examiner Landsman first restated that Mr. Dichter "telephoned the Examiner on March 26, 2025 to inquire about the rejection under 35 U.S.C. 103 in the instant application in light of its withdrawal in the parent application, 16/580,509, which has similar claims and which issued as U.S. Patent No. 10,961,307."[5]

14.     The April 7, 2025 Interview Summary then explains "A tentative interview was scheduled for March 26, 2025. However, this interview was postponed until April 1, 2025. The Examiner left a voicemail with Mr. Dichter summarizing/explaining the following -"

> In the parent application, Applicants amended the claims to add that the subject is a responder to treatment based on measurements of treatment responses. They argued that ClinicalTrials does not teach treating moderate to severe UC using the recited antibody wherein the subject is a responder to treatment based on achieving the claimed measure of response. Further discussion can be found in the prosecution history of the parent. However, a major point argued by Applicants is that ClinicalTrials results were posted after the instant effective filing date and that the uncertainty of clinical outcomes and the failure of numerous medicines to satisfy designated endpoints do not anticipate or render obvious the parent instant invention. The Examiner has considered this; however, upon further review of the ClinicalTrials reference.
>
> The parent and instant applications use ustekinumab, which is taught in the ClinicalTrials reference. A further look at the reference (see the section with headers identified as "Outcome Measure" and "Measure Description") shows it teaches desired endpoints of clinical remission based on both the global definition and US definition which are identical to those recited in the instant claims.
>
> While results may have been posted after the instant effective filing date, it appears that the parameters (global and US definitions of remission) were present prior. While uncertainty of clinical trials may be common, these were the desired

---

[4] '310 application, Interview Summary issued on April 1, 2025 (interview date: March 26, 2025).

[5] '310 application, Interview Summary issued on April 7, 2025 (interview date: April 1, 2025).

endpoints of the Trial and it would have been expected that administering the same drug as the Trial would have produced essentially the same results. It is noted that, in the "Experimental: Induction Study - Ustekinumab 6 mg/kg Iv", "Participants will be randomized to receive ustekinumab approximating 6 mg/kg of body weight, as intravenous infusion at Week 0." These numbers fall into the range of mg/kg recited in instant claim 1.

Applicants are free to contact the Examiner to further discuss the issue.[6]

15.    Mr Dichter initiated another interview with examiner Landsman on May 16, 2025.

According to examiner Landsman's summary of that interview,

Mr. Dichter contacted the Examiner on May 16, 2025 to discuss the rejections of record. The conversation focused on the ClinicalTrials.gov reference (primary reference). A detailed conversation was held via phone on May 19, 2025. Points raised by Mr. Dichter were provided to the Examiner's supervisor. Those points are as follows -

1. There was an IPR in this case over parents, of which some references/rationale was incorporated into the instant rejections.

2. Applicants argue that the primary reference does not have results. The Examiner agrees. The reference basically recite hypothetical endpoints which essentially recite the claimed limitations.

3. These endpoints were used in the rejections of record and a conclusion was drawn that stated it would have been obvious to have performed the invention given the fact that the endpoint are basically identical to Applicants' limitations. Applicants, argued that hypotheticals should not be relied upon.

4. Applicants stated that the claims have a regimen and that the subject needs to respond to the endpoints (again, differentiating from the hypothetical).

5. Applicants argue that the secondary references (cited on the IPR - Ox and Cunn) [sic] are just observations, but the endpoints are not clear and no placebo was used to compare effects.

---

[6] '310 application, Interview Summary issued on April 7, 2025. My understanding of the penultimate sentence from the examiner is that he is explaining that approximately 6 mg per kg of body weight (what is disclosed in the ClinicalTrials.gov posting), yielding approximately 330 mg for a subject weighing 55 kg and 510 mg for a subject weighing 85 kg, is in line with the range of dosages recited in claim 1 of the '310 application: 260 mg if the subject weighs no more than 55 kg, 390 mg if the subject weights more than 55 kg but no more than 85 kg, or 520 mg if the subject weights more 85 kg.

6. Essentially, Applicants argue that the clinical post is not the protocol, nor a complete description of the trial, just a summary. The actual trial results do not get posted for a couple years (which is after Applicants' effective filing date).

To these points, the supervisor provided the following summarized feedback, which was read to Mr. Dichter on May 19. 2025 -

1. If the ClinicalTrials.gov printout showed the method steps were known at the time of filing, then it appears it would be prior art. The outcome of the results as recited in the claims would occur following the treatment regardless if you knew what they were.

2. If the outcome in the claims were different from what occurred in the prior art (or here, post-filing art), either a) something in the claimed method is missing or incorrect or b) the outcome is unexpected.

Mr. Dichter said he will consider these comments, which echo those in the rejections dated 1/16/25 and will follow up with the Examiner.[7]

16.     My understanding of this interview is: Mr. Dichter is continuing to argue that J&J's

posting of NCT-236 on ClinicalTrials.gov discloses "hypothetical" endpoints, and that the actual

trial results were not posted until after the effective filing date of the '307 patent.[8] Mr. Dichter is

_____

[7] '310 application, Interview Summary issued on May 22, 2025 (interview date: May 19, 2025).

[8] This report discusses the ClinicalTrials.gov posting generally, as well as two specific versions of NCT-236 posted on ClinicalTrials.gov. On ClinicalTrials.gov, a sponsor pharmaceutical company can update the information on its clinical trials as the clinical trial progresses. For NCT-236, J&J made over 35 updates prior to September 24, 2017 (the date one year before the September 24, 2018 "priority" date of the '307 patent). J&J submitted the first version of NCT-236 to ClinicalTrials.gov on March 30, 2015 (and it was posted on April 2, 2015). As explained in ¶¶ 55-60 of my report, I believe examiner Landsman viewed and considered the April 2015 version of NCT-236 on ClinicalTrials.gov. However, that is not 100% discernible from the patent prosecution record. I also discuss a version posted to ClinicalTrials.gov in September 2017, Version 35, submitted September 6, 2017 and posted on September 8, 2017 (hereinafter 2017 ClinicalTrials.gov posting). Whenever necessary for context, I refer to the version of ClinicalTrials.gov posting that examiner Landsman considered and Mr. Dichter and examiner Landsman discussed as the "2015 ClinicalTrials.gov posting" and refer to the version posted to ClinicalTrials.gov in September 2017 as the "2017 ClinicalTrials.gov posting." *See* ¶¶ 41, 55-60, for further explanation of the ClinicalTrials.gov website and the relevant versions of the NCT-236 posting.

7

also arguing that the ClinicalTrials.gov posting is just a summary of the trial and not the trial protocol or complete description of the trial. In so arguing, Mr. Dichter appears to tacitly acknowledge that the NCT-236 clinical trial *protocol* has pertinence beyond the ClinicalTrials.gov posting and is not cumulative of that posting.

17.    My understanding of the Interview Summary is that examiner Landsman is providing feedback that he received from his supervisor to Mr. Dichter. My understanding of this feedback is as follows: The ClinicalTrials.gov posting shows that the method or treatment steps were known as of the effective filing date of the '310 application (and thus the effective filing date of the '307 patent) and is thus prior art to the '310 application (and thus is also prior art to the '307 patent). First, the claimed results would occur in response to the treatment steps described in the ClinicalTrials.gov posting regardless of whether it was *known* that results would be achieved.[9] Second, the ClinicalTrials.gov posting instructs a person to administer ustekinumab to treat ulcerative colitis in the manner claimed in the '310 application. If J&J obtained different results from administering ustekinumab in accordance with the claims of the '310 application in its clinical trial than would be achieved following the instructions of the ClinicalTrials.gov posting, J&J did something in its clinical trial that was not reflected in the claims of the '310 application (or '307 patent).

---

[9] This feedback is consistent with the instructions provided by the MPEP to the examiner. As discussed in my opening report at ¶ 147: The MPEP instructs examiners that if a prior art process inherently produces the claimed result, a claim to the process and result is not patentable over the prior art process *even if* the prior art is silent as to producing the claimed result. MPEP § 2112.02. The MPEP also instructs examiners that "[t]here is no requirement that a person of ordinary skill in the art would have recognized the inherent disclosure *at the time of the invention* [or relevant time], but only that the subject matter is in fact inherent in the prior art reference." MPEP § 2112(II) (emphasis in the original) (citing *Schering Corp. v. Geneva Pharm. Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (rejecting the contention that inherent anticipation requires recognition by a person of ordinary skill in the art before the critical date and allowing post-critical date clinical trials to show inherency)).

8

18.    In this situation, there is no question that the claimed results do occur in response to the ClinicalTrials.gov posting treatment steps. *See* Sands, et al., *Ustekinumab as Induction and Maintenance Therapy for Ulcerative Colitis*, The New England Journal of Medicine, 381(13): 1201-1214 (2019) (Sands et al.) (results of the NCT-236 clinical trial).

19.    As of this date, no further action has been posted to the Patent Center in the '310 application.

### III.    OPINIONS

### A.    Luis Ralat has a duty of disclosure under 37 C.F.R. § 1.56.

20.    Mr. Hirshfeld contends that my opinions that Brian Carey, Melissa Miller and Luis Ralat owed a duty under 37 C.F.R. § 1.56(a) are unsupported. With respect to Brian Carey and Melissa Miller, I understand from counsel that the plaintiffs are no longer contending that these J&J employees owed a duty of candor and good faith to the PTO. Therefore, I do not respond to Mr. Hirshfeld's criticism on this point. As to Dr. Ralat, I disagree.

21.    As discussed in my opening report at ¶ 92, a person has a duty of candor and good faith under 37 C.F.R. § 1.56 if that person is an "individual associated with the filing or prosecution of a patent application." 37 C.F.R. § 1.56(a). Such individuals are defined as: "(1) [e]ach inventor named in the application; (2) [e]ach attorney or agent who prepares or prosecutes the application; and (3) [e]very other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, the applicant, an assignee or anyone to whom there is an obligation to assign the application."[10] The MPEP instructs that the duty extends broadly

---

[10] 37 C.F.R. § 1.56(c).

to individuals substantively involved in the application and limiting language is intended to exclude "typists, clerks, and similar personnel who assist with an application."[11]

22.    Dr. Ralat acknowledges that he was involved in drafting the '501 provisional application,[12] and that he had some involvement drafting the '818 provisional application and the '774 provisional application.[13] Mr. Dichter also stated in his deposition that Luis Ralat was involved in the drafting of the '501 provisional application.[14]

23.    Dr. Ralat acknowledges that he recalled the application for the '307 patent,[15] and that he understands that the '307 patent is for methods of treating ulcerative colitis with ustekinumab (Stelara).[16] Dr. Ralat also acknowledges that there is a duty of good faith in submitting a provisional application to the PTO.[17]

24.    Dr. Ralat states that after preparation of the provisional application, he was "completely disconnected" with the application, with "no role" in the application after submission of the provisional applications.[18] ███████████████████████████

███████████████████████████████████████████████

---

[11] MPEP § 2001.01.

[12] Luis Ralat Dep. Tr., May 14, 2025 (Ralat Dep. Tr.) 82:15-18; 87:10-15.

[13] Ralat Dep. Tr. 109:2-14.

[14] Eric Dichter states that patent agent Luis Ralat probably would have worked with him on the drafting of the '501 provisional application. Eric Dichter Dep. Tr., Feb. 20, 2025 (Dichter Dep. Tr.) 59:19-62:4.

[15] Ralat Dep. Tr. 79:15-24, 80:25-81:10.

[16] Ralat Dep. Tr. 82:25-83:13.

[17] Ralat Dep. Tr. 185:2-20.

[18] Ralat Dep. Tr. 110:2-13.

████████████████████████████.[19] Further, Mr. Hirshfeld touts Mr. Ralat's involvement when he explains that Mr. Dichter and Mr. Luis Ralat confirmed that the information in the background of the invention was accurate by reviewing that information to make sure it was consistent with their understanding of the invention. Hirshfeld Report ¶ 224 (quoting from Mr. Dichter's deposition).

25.    The duty of candor and good faith under 37 C.F.R. § 1.56 applies to "[e]very other person who is substantively involved in the *preparation* or prosecution of the application and who is associated with the inventor, the applicant, an assignee or anyone to whom there is an obligation to assign the application."[20] The '307 patent not only claims the benefit of the filing date of the '501 provisional application, but Mr. Dichter has stated that the '509 application (which became the '307 patent) "is entitled" to the filing date of the '501 provisional application for purposes of the patentability of the claims of the '509 application over the ClinicalTrials.gov posting.[21] This is true only if the disclosure or content of the '501 provisional application provides support under 35 U.S.C. § 112(a) for the claims of the '509 application. That is, this "is entitled . . ." statement by Mr. Dichter is accurate only if the content of the '501 provisional application actually provides support under 35 U.S.C. § 112(a) for the subject matter of the claims of the '509 application. Moreover, the "entire contents" of the '501 provisional application, the '818 provisional application, and the '774 provisional application are incorporated by reference into the '509

---

[19] Ralat Dep. Tr. 198:18–202:18 (*e.g.*, "I drafted the provisional background of the application. And if this made it all the way to the conversion, then -- and it was kept intact, then I suppose I was still -- authored it" (Ralat Dep. Tr. 202:10-14)).

[20] 37 C.F.R. § 1.56(c)(3) (emphasis added).

[21] '509 application, J&J Response of October 16, 2020, at 9.

11

application.[22] Thus, contributing to the content of the '501 provisional application is contributing to the content of the '509 application.[23]

26.    J&J's contention that the '509 nonprovisional application and the provisional applications to which the '509 application claims benefit are separate matters is not correct. When an application claims the benefit of the filing date of a prior domestic application, that application and the prior application are considered part of a common transaction before the PTO. As explained by the U.S. Court of Customs and Patent Appeals (C.C.P.A), a predecessor court of the U.S. Court of Appeals for the Federal Circuit (Federal Circuit):

> The Supreme Court's explanation [in *Godfrey v. Eames*] illuminates the meaning of "shall have the same effect" and clearly requires that we view appellants' applications as "parts of the same transaction" and "as constituting one continuous application" for the continuing subject matter recited therein.

*Application of Hogan*, 559 F.2d 595, 603-04 (C.C.P.A. 1977) (discussing *Godfrey v. Eames*, 68 U.S. (1 Wall.) 317, 325-26 (1863)).[24]

---

[22] '509 application, specification page 1, lines 5-9.

[23] Moreover, a provisional application forms part of the prosecution history of any resulting patent, as a provisional application can contribute to an understanding of the claims in that patent. *MPHJ Technology Invs., LLC v. Ricoh Americas Corp.*, 847 F.3d 1363, 1369 (Fed. Cir. 2017) (citing *Trs. of Columbia Univ. in New York v. Symantec Corp.*, 811 F.3d 1359, 1365 (Fed. Cir. 2016) and *Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1383 (Fed. Cir. 2014)); *see also DDR Holdings, LLC v. Priceline.com LLC*, 122 F.4th 911 (Fed. Cir. 2024).

[24] *Godfrey v. Eames* predates the enactment of provisions (35 U.S.C. §§ 119(e) and 120, each of which have this "shall have the same effect" language) setting conditions under which a later-filed application "shall have the same effect" "as though filed on the date of the" earlier application, and explains: "In our judgment, if a party choose to withdraw his application for a patent, and pay the forfeit, intending at the time of such withdrawal to file a new petition, and he accordingly do so the two petitions are to be considered parts of *the same transaction,* and both *as constituting one continuous application,* within the meaning of the law." 68 U.S. at 325-26 (emphasis added).

12

27.     The '509 application and the provisional applications to which it claims benefit are not distinct applications but are "parts of the same transaction" "constituting one continuous application" with respect to the subject matter of the provisional applications carried over to the '509 nonprovisional application.[25]

28.     Finally, that a person becomes "completely disconnected" with "no role" in the application after the submission of the provisional applications does not affect their status as a person owing a duty under 37 C.F.R. § 1.56(a). A person's duty under 37 C.F.R. § 1.56(a) does not end when they cease to be involved in the preparation or prosecution of an application.[26]

**B.     Dr. Cryer's patentability opinions are based on misapprehensions of patent law principles and their application by the PTO.**

29.     Dr. Cryer opines that: (1) Ochsenkühn, Kolios, Afonso, the ClinicalTrials.gov posting, Jostins, or van Gradlund,[27] standing alone, do not anticipate or render obvious the claimed

---

[25] The Federal Circuit has mentioned involvement with a foreign counterpart application as a factor in determining that a non-inventor was substantively involved in preparation of a patent application. *Avid Identification Systems, Inc. v. Crystal Import Corp.*, 603 F.3d 967, 976 (Fed. Cir. 2010). A provisional application for which benefit is claimed is far more related to an application than is a foreign counterpart application.

[26] *Duty of Disclosure*, 57 *Fed. Reg.* 2021, 2027 (Jan. 17, 1992) (final rule) (comment 34 and reply) (*Comment*: "proposed [37 C.F.R.] § 1.56(c) should be modified so that the duty of any individual designated as having a duty of disclosure would terminate when such individual ceases to be substantively involved in the preparation or prosecution of the application"; *Reply:* "The suggestion in the comment is not adopted. The duty to disclose information material to patentability rests on the individuals designated in § 1.56(c) until the application issues as a patent or becomes abandoned.").

[27] Dr. Cryer specifically mentions: (1) Ochsenkühn 2018; (2) Kolios 2018; (3) Afonso 2017; (4) Tarr 2014; (5) Canadian Agency for Drugs and Technologies in Health; (6) the August 2018 version of the NCT 236 ClinicalTrials.gov posting; (7) Stelara P.I.; (8) Jostins 2012; (9) Granlund 2013; and (10) Aggeletopoulou. Cryer Report ¶ 24. My opening report addressed Ochsenkühn ECCO (Ochsenkühn 2018), Ochsenkühn DDW (Ochsenkühn 2018), Kolios (Kolios 2018), Afonso (Afonso 2017), the NCT-236 clinical trial: Study Record (Ver. 35; Sept. 8, 2017) (2017 ClinicalTrials.gov posting), and NCT-236 FDA submissions, including van Beelen

13

invention of the '307 patent; (2) Ochsenkühn, Kolios, Afonso, ClinicalTrials.gov, Jostins, or

Gradlund are not "but-for" material; and (3) Ochsenkühn, Kolios, Afonso, ClinicalTrials.gov,

Jostins, or Gradlund are cumulative of information already of record. Cryer Report ¶ 24. I disagree.

30.    I disagree with Dr. Cryer's analysis of the patentability of the claims of the '307

patent. Dr. Cryer's analysis appears more appropriate to the FDA approval process than to the

patent examination or PTAB trial processes before the PTO. The PTO's patentability guidance

specific to the examination of the '307 patent is set forth in my opening report at ¶¶ 128 through

154. I note that Mr. Hirshfeld did not take issue with these paragraphs of my opening report.[28]

---

Granlund (Granlund 2013), and Jostins (Jostins 2012). *See, e.g.*, Opening Report ¶ 5. My
opening report addressed 2017 ClinicalTrials.gov posting rather than a later version (such as the
August 2018 version) because the versions prior to September 24, 2017 are available as prior art
to the '307 patent even if the inventor's own work. *See* Opening Report ¶ 167, 242 footnote 159.
Dr. Cryer's report also responds to reports of Dr. Paul Warfield and Dr. Lisa Matovcik, whose
reports discuss Tarr 2014, Canadian Agency for Drugs and Technologies in Health, Stelara P.I.,
and Aggeletopoulou.

[28] Mr. Hirshfeld provides an overview of the patent system and patent examination processes.
Hirshfeld Report ¶¶ 17 through 70. Some of Mr. Hirshfeld's experiences differ from mine. For
example, Mr Hirshfeld states that "examiners are not assigned applications they are not
technically competent to review and understand" and "[f]or example, an examiner with a
mechanical engineering degree may be assigned to a technology within Technology Center 3700
('Mechanical Engineering, Gaming, and Medical Devices/Processes'), but would not be assigned
applications in Technology Center 1600 ('Biology and Organic Chemistry')." Hirshfeld Report
¶ 65. This differs from my experience as a patent examiner: the PTO did assign other examiners
from my examining group – Examining Group 3300 (now part of Technology Center 3700) – to
Examining Group 1800 (now Technology Center 1600) on temporary basis to meet pendency
goals (*i.e.,* the PTO's goals for processing and examining an application from filing to issue or
abandonment). My assigned docket was exercise and physical therapy equipment, but when
necessary to address pendency, I was also assigned applications ranging from cigarette
manufacturing machines, to robotic milking machines, to paint sprayers, to cat litter boxes.

### 1.    *Dr. Cryer misunderstands the concept of prior art.*

31.    Dr. Cryer's opinion relies upon views on the availability and effect of a document or publication as prior art that are not present in patent law and thus not reflected in the patent examination procedures set forth in the Manual of Patent Examining Procedure (MPEP).

32.    The MPEP instructs that a printed publication is prior art even if the subject matter disclosed in the publication has not actually been reduced to practice and even if there is no evidence that it would be effective.[29] Put simply, a disclosure need not be any type of study, much less a study having adequate sample size, controls (placebo comparators), a washout period, or be free of criticism, to qualify and have effect as prior art.

33.    Putting the gap between Dr. Cryer's opinion and actual patent practice into perspective: in *Ciba-Geigy Corp. v. Alza Corp.*, an article containing a purely theoretical, off-hand suggestion that nicotine be applied via a transdermal patch in the manner of pre-existing nitro-glycerine and scopolamine patches was held sufficient, by both the court in a validity challenge and by the PTO when examining a continuing application, to anticipate claims to a nicotine patch.[30] The court rejected the patentee's arguments that this article was not enabling and that its

---

[29] MPEP § 2152.02(b); *see also In re Gleave*, 560 F.3d 1331, 1335 (Fed. Cir. 2009) (a prior art reference need not demonstrate the claimed utility or disclose proof of efficacy to anticipate a claimed method of treating a disease) (cited in MPEP § 2152.02(b)).

[30] 864 F. Supp. 429 (D.N.J. 1994). The Federal Circuit, in a non-precedential opinion, affirmed the decision that claims 1 and 2 were anticipated by article, but reversed the decision that dependent claims 4, 5, and 7 were anticipated by article, expressing no opinion on whether dependent claims 4, 5, and 7 were obvious over the article. *Ciba-Geigy Corp. v. Alza Corp.*, 68 F.3d 487 (Fed. Cir. 1995) (unpublished). The Federal Circuit decision with respect to dependent claims 4, 5, and 7 was based on the article, being a bare suggestion, not disclosing the particulars of those dependent claims, and not because of questions of the enablement or effectiveness of the nicotine patch described in the article.

patch would not be effective.[31] The court then quoted the PTO's ruling as buttressing its decision, specifically quoting the PTO's conclusion that the patentee's arguments, similar to Dr. Cryer's patentability opinions, were "generally non-sensical." [32]

34.    The article from *Ciba-Geigy Corp.* is discussed only to demonstrate how far-removed Dr. Cryer's opinions are from actual patent practice. The publications and documents discussed in my opening report—disclosing actual situations in which patients with ulcerative colitis were treated with ustekinumab or relating to a proposed clinical trial to study treating patients with ulcerative colitis with ustekinumab—are of much greater prior art value than the bare theoretical suggestion in the article in *Ciba-Geigy Corp.* The publications and documents discussed in my opening report are at least on par with the study proposal in *In re Montgomery* that was sufficient to anticipate the claims of the Montgomery application.[33]

35.    The MPEP instructs examiners that proof of efficacy is not required for a prior art reference to be enabling for purposes of anticipation. Instead, a prior art reference provides an enabling disclosure, and thus anticipates a claimed invention, if the reference describes the claimed invention in sufficient detail to enable a person of ordinary skill in the art to carry out the claimed invention.[34] That is, as to the claims of the '307 patent, a disclosure is enabling as prior art if it enables the treatment step(s): administering to the subject a pharmaceutical composition comprising a clinically proven safe and clinically proven effective amount of an anti-IL-12/IL-23p40 antibody (ustekinumab).

---

[31] *Ciba-Geigy Corp.*, 864 F. Supp. at 437-38.

[32] *Id*. at 438-39.

[33] 677 F.3d 1375 (Fed. Cir. 2012).

[34] MPEP § 2152.02(b).

16

36.     The MPEP further instructs examiners that for prior art to render a claimed invention obvious under 35 U.S.C. § 103, the prior art need not provide conclusive proof of efficacy; instead, the prior art need only provide a reasonable expectation of success in achieving the claimed invention.[35] The MPEP instructs examiners that while the prior art must offer some expectation of success, an absolute predictability of success is not required.[36] To be clear, the requirement for a "reasonable expectation of success" pertains to an obviousness rejection under 35 U.S.C. § 103, and not to an anticipation rejection under 35 U.S.C. § 102.

37.     None of Dr. Cryer's concerns with the Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso publications, the ClinicalTrials.gov posting, or the van Beelen Granlund and Jostins publications, take away from their prior art value in the patent examination process or PTAB trial process. Dr. Cryer's statement that the ClinicalTrials.gov posting does not disclose or enable a person of skill in the art to administer ustekinumab as a treatment because it is a plan for a test with no results is based upon a misapprehension of the applicable law.[37]

### 2.     *Dr. Cryer misunderstands how claims are interpreted by the PTO.*

38.     Dr. Cryer's opinion that the publications and documents discussed in my opening report do not anticipate or render obvious the claims of the '307 patent are also based upon a misunderstanding of how claims are interpreted during examination.  Dr. Cryer's opinion is specifically based upon a distinction between "treating" and "*testing*," whereby he contends that the prior art (including the ClinicalTrials.gov posting) does not disclose "*treating*." By way of reminder, the '307 claims a method of *treating* ulcerative colitis.

---

[35] MPEP § 2143.02.

[36] MPEP § 2143.02.

[37] *See*, *e.g*., *In re Montgomery*, 677 F.3d 1375 (Fed. Cir. 2012).

39.     As discussed in my opening report, the MPEP instructs examiners to apply a "broadest reasonable interpretation" or "broadest reasonable interpretation consistent with the specification" standard when interpreting the claims of a pending application.[38] My opening report at ¶¶ 215 through 220 explains how the limitations of claim 1 of the '307 patent would be interpreted during the patent examination process.[39] In addition, there is nothing in the prosecution history of the '307 patent that would warrant a narrower interpretation of the term "treating" (*e.g.*, prosecution counsel did not argue that the ClinicalTrials.gov posting does not disclose "treating" or otherwise distinguish "treating" from "testing").

40.     The specification of the '509 application provides as an example of "treating": "administering or contacting the cell, tissue, organ, animal, or subject with a therapeutic effective amount of IL-12/IL-23p40 or IL-23 specific antibody."[40] A claim to a method of treatment can be anticipated by a study or testing proposal.[41] Whether for purposes of testing or treating, the prior art (including the ClinicalTrials.gov posting) teaches "administering or contacting the cell, tissue, organ, animal, or subject with a therapeutic effective amount of IL-12/IL-23p40 or IL-23 specific

---

[38] The PTAB currently applies the "*Phillips*" (*Phillips* v. *AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) (en banc)) standard in its trial proceedings (*e.g.*, in *inter partes* review proceedings), meaning that the PTAB construes or interprets claims of a patent involved in its trial proceedings taking into account the claim language itself, specification, and prosecution history pertaining to the patent, as well as relevant extrinsic evidence. *Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board*, 83 *Fed. Reg*. 51,340, 51,343 (Oct. 11, 2018).

[39] There is no prosecution history or other relevant evidence that would justify a narrower interpretation of the limitations of the claims of the '307 patent even during an *inter partes* review proceeding.

[40] '509 application, specification page 51, lines 15-19.

[41] *In re Montgomery*, 677 F.3d 1375 (Fed. Cir. 2012) (claims to a method for the treatment or prevention of stroke anticipated by a study proposal).

antibody." Thus, the 2017 ClinicalTrials.gov posting anticipates "treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising administering to the subject a pharmaceutical composition comprising a clinically proven safe and clinically proven effective amount of an anti-IL-12/IL-23p40 antibody."[42]

### 3. The 2017 NCT-236 ClinicalTrial.gov posting anticipates or renders obvious at least the independent claims of the '307 patent.

41.     I disagree with Dr. Cryer's opinion that the ClinicalTrials.gov posting (again, this is J&J's posting regarding NCT-236 on ClinicalTrials.gov) does not anticipate or render obvious the claimed invention of the '307 patent. The NCT-236 Study Record update Version 35, submitted September 6, 2017, and posted on September 8, 2017 (again, the 2017 ClinicalTrials.gov posting)[43] either expressly or inherently discloses the elements of at least claims 1, 19, 33, and 34 (the independent claims)[44] of the '307 patent.

42.     The recent prosecution history of the '310 patent application supports this conclusion: the examiner who issued the '307 patent—Robert Landsman—is now of the opinion that the ClinicalTrials.gov posting renders obvious the pending claims of the '310 application.

43.     As previously explained, the '310 application is designated as a continuation of the '201 application, which in turn is designated as a division of the '509 application. Like the '307 patent ('509 application), the '310 application claims a method of treating ulcerative colitis with ustekinumab. However, the claims of the '310 application contain an additional limitation: claims

---

[42] '509 *application*, specification page 4, lines 18-21.

[43] *See supra* footnote 27 for explanation of why I refer to the 2017 ClinicalTrials.gov posting, while Dr. Cryer refers to an August 2018 version.

[44] This is not to suggest I believe any claim of the '307 patent to be patentable over NCT-236 clinical trial posting.

19

1, 11, and 18 of the '310 application[45] specify dosages of ustekinumab *based upon the patient's weight* for the intravenous treatment (260 mg if the subject weights no more than 55 kg, 390 mg if the subject weights more than 55 kg but no more than 85 kg, or 520 mg if the subject weights more 85 kg).

44.    On January 16, 2025, examiner Landsman rejected the pending claims of the '310 application as **obvious**, and therefore unpatentable under 35 U.S.C. § 103, in light of the ClinicalTrials.gov posting. Opening Report *¶¶* 206-210.

45.    In his obviousness rejection, examiner Landsman also discussed whether the ClinicalTrials.gov posting **anticipated** the '310 application under 35 U.S.C. § 102. Examiner Landman explained that the '310 patent application's additional weight-based-dosing limitation is "the only reason NCT-236 does not anticipate" the claims of the '310 application.[46]

46.    This reasoning suggests that examiner Landsman now views the ClinicalTrials.gov posting as **anticipating** at least claim 1 of the '307 patent. Claim 1 of the '310 application and claim 1 of the '307 patent are almost identical except for the '310 application's additional weight-based-dosing limitation. Therefore, if the only claim language preventing the ClinicalTrial.gov posting from anticipating the '310 application patent claims is the weight-based-dosing language, and claim 1 of the '307 patent does not contain this language, it follows that examiner Landsman now views the ClinicalTrial.gov posting as anticipating as least claim 1 of the '307 patent.

47.    As summarized earlier in this rebuttal report, after examiner Landsman rejected the '310 application as obvious, Mr. Dichter initiated an interview with the examiner on March 26, 2025. In that interview, Mr. Dichter pointed out that the ClinicalTrials.gov posting was cited in

---

[45] Claims 1, 11, and 18 are the currently pending independent claims of the '310 application.

[46] '310 application, Office action of January 16, 2025, at 5.

the '509 application that became the '307 patent,[47] and that the examiner had allowed the '307

patent.[48] Mr. Dichter expressed confusion as to why the '509 application ('307 patent) would be

allowed despite the ClinicalTrials.gov posting, but the '310 application would be rejected, given

the similarity of these two patent applications. As examiner Landsman explained in his summary

of that interview,

> Mr. Dichter requested clarification regarding the rejections under 35 U.S.C. 103.
> Essentially, the question revolved around the use of the ClinicalTrials.gov
> reference. This reference was also cited in the parent over similar claims and the
> parent has since been allowed. The Examiner indicated that the IPR raised points
> the Examiner wanted to add to the record via rejections. A phone interview is
> tentatively scheduled for Friday March 28, 2025 to further discuss these rejections.
> Otherwise, the interview will be attempted the following week. Agreement was not
> currently reached.[49]

48.    In the next interview between the examiner and Mr. Dichter, on April 1, 2025,

examiner Landsman explained the importance of the ClinicalTrials.gov posting:

> In the parent application, Applicants amended the claims to add that the subject is
> a responder to treatment based on measurements of treatment responses. They
> argued that ClinicalTrials does not teach treating moderate to severe UC using the
> recited antibody wherein the subject is a responder to treatment based on achieving
> the claimed measure of response. Further discussion can be found in the prosecution
> history of the parent. However, *a major point argued by Applicants is that
> ClinicalTrials results were posted after the instant effective filing date and that the
> uncertainty of clinical outcomes and the failure of numerous medicines to satisfy
> designated endpoints do not anticipate or render obvious the parent instant
> invention. The Examiner has considered this; however, upon further review of the
> ClinicalTrials reference* [sic].
>
> The parent [the '307 patent] and instant applications [the '310 application] use
> ustekinumab, which is taught in the ClinicalTrials reference. A further look at the
> reference (see the section with headers identified as "Outcome Measure" and
> "Measure Description") shows it teaches desired endpoints of clinical remission

---

[47] Strictly speaking, the '509 application is the grandparent of the '310 application. The parent
application (the '201 application) was not allowed  and became abandoned.

[48] '310 application, Interview Summary issued on April 1, 2025.

[49] '310 application, Interview Summary issued on April 1, 2025.

based on both the global definition and US definition which are identical to those recited in the instant claims.

While results may have been posted after the instant effective filing date, it appears that the parameters (global and US definitions of remission) were present prior. While uncertainty of clinical trials may be common, these were the desired endpoints of the Trial and it would have been expected that administering the same drug as the Trial would have produced essentially the same results. It is noted that, in the "Experimental: Induction Study - Ustekinumab 6 mg/kg Iv", "Participants will be randomized to receive ustekinumab approximating 6 mg/kg of body weight, as intravenous infusion at Week 0." These numbers fall into the range of mg/kg recited in instant claim 1.[50]

49.     In other words, after reading the *inter partes* review petitions,[51] examiner Landsman came to understand that the results of a clinical trial *need not be available for a study protocol or posting to anticipate a claimed invention*: "[w]hile results may have been posted after the instant effective filing date, *it appears that the parameters (global and US definitions of remission) were present prior*. While uncertainty of clinical trials may be common, *these were the desired endpoints of the Trial and it would have been expected that administering the same drug as the Trial would have produced essentially the same results*."[52] Put another way, the record of the '310 application reveals that the *inter partes* review petitions disabused examiner Landsman of the misrepresentation that Mr. Dichter made when he prosecuted the '307 patent, arguing that

---

[50] '310 application, Interview Summary issued on April 7, 2025 (emphasis added). As discussed previously, my understanding of this last sentence from the examiner is that he is explaining that approximately 6 mg per kg of body weight (what is included in the ClinicalTrials.gov posting), yielding approximately 330 mg for a subject weighing 55 kg and 510 mg for a subject weighing 85 kg, is in line with the range of dosages recited in claim 1 of the '310 application: 260 mg if the subject weights no more than 55 kg, 390 mg if the subject weights more than 55 kg but no more than 85 kg, or 520 mg if the subject weights more 85 kg.

[51] In his Office action of January 16, 2025, which included a rejection of all of the claims of the '310 application, examiner Landsman referenced the *inter partes* review petitions of the '307 patent and discussed the case law—including *In re Montgomery*, 677 F.3d 1375 (Fed. Cir. 2012)—cited in those petitions.

[52] '310 application, Interview Summary issued on April 7, 2025 (emphasis added).

22

the claimed invention was patentable because the ClinicalTrial.gov posting did not include any results.[53]

50.     A further recent prosecution interview confirms this understanding. As summarized above, just weeks ago, on May 16, 2025, Mr. Dichter initiated another interview with examiner Landsman. According to examiner Landsman's summary of that interview, "The conversation focused on the ClinicalTrials.gov reference (primary reference). . . . Points raised by Mr. Dichter were provided to the Examiner's supervisor. Those points are as follows – 1. There was an [*inter partes* review] in this case over parents, of which some references/rationale was incorporated into the instant rejections. 2. Applicants argue that the primary reference does not have results. The Examiner agrees. The reference basically recite[s] hypothetical endpoints which essentially recite the claimed limitations. 3. These endpoints were used in the rejections of record and a conclusion was drawn that stated it would have been obvious to have performed the invention given the fact that the endpoint[s] are basically identical to Applicants' limitations. Applicants, argued that hypotheticals should not be relied upon."[54]

51.     But, in response to this argument, examiner Landsman's *supervisor* agreed with Examiner Landman's position in the '310 application that "If the ClinicalTrials.gov printout showed the method steps were known at the time of filing, then it appears it would be prior art. *The outcome of the results as recited in the claims would occur following the treatment regardless if you knew what they were*."[55] In other words, because the ClinicalTrials.gov posting lays out the

---

[53] The claims of the '310 application are not the same as the claims of the '307 patent, but the examiner does not consider the claims of the '310 application to be "patentably distinct" from the claims of the '307 patent. '310 application, Office action of January 16, 2025, at 10.

[54] '310 application, Interview Summary issued on May 22, 2025.

[55] '310 application, Interview Summary issued on May 22, 2025 (emphasis added).

23

treatment steps claimed in the '310 application, the *results* claimed in the '310 application (and '307 patent) would be the results of the treatment steps laid out in the ClinicalTrials.gov posting, even if those results were not available at the time of the application's (or patent's) effective filing date.

**4.** ***Dr. Cryer's but-for materiality position rests on a misconception of the patentability analysis.***

52.     My opening report mentioned the *Therasense*'s "but-for" materiality standard, but addressed Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, Afonso, the 2017 ClinicalTrials.gov posting, and J&J's submissions to the FDA concerning the NCT-236 clinical trial,[56] including the van Beelen Granlund and Jostins publications (hereinafter collectively NCT-236 clinical trial submissions), under the 37 C.F.R. § 1.56 materiality standard.[57]

53.     Dr. Cryer discusses whether the prior art references are "but for" material. Cryer Report Section VII.E. The "but for" materiality standard comes from *Therasense*. My

---

[56] The J&J submissions to the FDA (and other health authorities) concerning the NCT-236 clinical trial include (in addition to the van Beelen Granlund and Jostins publications): Janssen R&D Briefing Document for a Pre-IND/Pre-Phase 3 Meeting dated December 18, 2014 [JNJ-STELARA_002258268] (Janssen Pre-Phase 3 Briefing Document); Janssen R&D Scientific Advice Briefing Document dated January 7, 2015 [JNJ-STELARA_002258338] (Janssen Scientific Advice Briefing Document); Janssen R&D Clinical Protocol CNTO1275UCO3001 (Phase 3) dated March 17, 2015 [JNJ-STELARA_001838489] (Janssen Clinical Protocol CNTO1275); Janssen R&D Clinical Protocol CNTO1275UCO3001 (Phase 3) AMENDMENT 1 dated July 14, 2015 [JNJ-STELARA_002258135] (Janssen Clinical Protocol CNTO1275 AMDT 1); Janssen R&D Clinical Protocol CNTO1275UCO3001 (Phase 3) AMENDMENT 2 dated April 20, 2016 [JNJ-STELARA_001831844] (Janssen Clinical Protocol CNTO1275 AMDT 2); and Janssen Pre-IND Meeting Minutes (Jan. 21, 2015) [JNJ-STELARA_002258317] (Janssen Pre-IND Meeting Minutes). Opening Report ¶ 5, footnote 2.

[57] 37 C.F.R. § 1.56(b) states: "information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and: (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) It refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability."

24

understanding of *Therasense* is that information is "but-for" material under *Therasense* if the PTO would not have allowed the patent if it had known of that prior art.[58] To determine whether information is "but-for" material, one must engage in an analysis of the patentability of the allowed claim *in the manner that the PTO would have done that analysis* in a pending application with the undisclosed information. In short, the analysis focuses on how the PTO would have determined the patentability of the claimed invention in light of the undisclosed prior art, *i.e.*, whether the prior art establishes a case of unpatentability of the claimed invention (*cf.*, 37 C.F.R. § 1.56(b)(1)).

54.     Dr. Cryer's analysis of the prior art, and whether that prior art renders the invention claimed in the '307 patent obvious, bear no relationship or resemblance to how the PTO conducts patentability analyses (as reflected in the MPEP).[59] As explained in Section III.B.1, Dr. Cryer's views on what publications or other documents must disclose to constitute relevant prior art have no basis in the MPEP guidance, and those views demand more than that required by patent law and practice. And as explained in Section III.B.2, Dr. Cryer does not interpret the claims of the '307 patent in the manner that they would be interpreted by the PTO. Thus, Dr. Cryer's opinions on "but-for" materiality are not built on an analysis of patentability that resembles the manner the PTO would determine the patentability of the '307 patent claims. Put another way, because Dr. Cryer does not engage in the type of patentability analysis the PTO does, there is no basis for his opinion that the prior art would not be "but-for" material under *Therasense*.

---

[58] *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291-92 (Fed. Cir. 2011) ("[w]hen an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art" and that "[i]n making this patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction.").

[59] The gap between Dr. Cryer's patentability opinions and how the PTO actually conducts a patentability determination is further illustrated in the Office action of January 16, 2025 and subsequent interview summaries in the '310 application.

**C.      Mr. Hirshfeld's opinions regarding what version of the ClinicalTrials.gov posting the examiner considered and reviewed on this webpage are unsupported and/or speculative.**

**1.      *The 2015 ClinicalTrials.gov posting (version 1 of the NCT-236 ClinicalTrials.gov posting) is the only version consistent with the record of the '509 application.***

55.      Mr. Hirshfeld states: "in my opinion, Mr. Bahr's speculation that examiner Landsman's reference to 'ClinicalTrials.gov' was referring only to the April 2015 posting, is not consistent with typical examiner practices, particularly given the accessibility of postings on the ClinicalTrials.gov website." Hirshfeld Report ¶ 194. I disagree.

56.      The ClinicalTrials.gov website for NCT-236 contains a tab called "Record History."[60] This Record History Tab contains a hyperlinked list of all the study record versions of NCT-236 that J&J posted to ClinicalTrials.gov from April 2015 to as recently as April 2025. Below is a screen shot of part of this tab of the NCT-236 ClinicalTrials.gov webpage.

---

[60] ClinicalTrials.gov, A Study to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy in Participants With Moderately to Severely Active Ulcerative Colitis (UNIFI), Record History Tab, https://clinicaltrials.gov/study/NCT02407236?intr=Ustekinumab&aggFilters=status:com&cond=ulcerative%20colitis&rank=6&tab=history&a=1#version-content-panel.



**Study Record Versions**

- This table shows all the versions of this study record arranged in order by submitted date.
  - To view one version of the study record, click the submitted date.
  - To compare two versions, select them using the check boxes and click "Compare" at the bottom of the list.

| | Version | Date submitted (YYYY-MM-DD) | Changes |
|---|---|---|---|
| ☐ | 1 | 2015-03-30 | • None (earliest version on record) |
| ☐ | 2 | 2015-04-20 | • Study Status |
| ☐ | 3 | 2015-05-11 | • Study Status |
| ☐ | 4 | 2015-06-01 | • Study Status |
| ☐ | 5 | 2015-07-14 | • Study Status |
| ☐ | 6 | 2015-08-11 | • Study Status<br>• Contacts/Locations |
| ☐ | 7 | 2015-09-23 | • Study Status<br>• Contacts/Locations |
| ☐ | 8 | 2015-10-16 | • Recruitment Status |

57.    During prosecution of the '307 patent, when discussing the ClinicalTrials.gov posting that examiner Landsman found and cited in his initial rejection of the '509 application, Mr. Dichter argued that this "initial posting of the CT reference (*April 2, 2015* according to the www.clinicaltrials.gov record) is limited to certain elements describing the clinical trial *to be performed*" and "the posting of elements of a clinical trial in advance of conduct of the trial do not anticipate or render obvious the subject matter of the claims."[61] The examiner did not challenge or

---

[61] '509 application, J&J Response of October 16, 2020 at 9 (emphases added).

27

question Mr. Dichter's description of the ClinicalTrials.gov posting that the examiner cited as being the April 2015 posting.

58.    Based on these facts, one can surmise that examiner Landsman considered the first version of J&J's ClinicalTrials.gov posting of NCT-236 (the April 2015 version) for two reasons.

59.    *First*, the date provided in J&J's Response of October 16, 2020 regarding this ClinicalTrials.gov posting is "April 2, 2015." The ClinicalTrials.gov website for NCT-236 indicates that the version posted on April 2, 2015 (estimated) is Version 1 (the earliest version).[62]

Viewing **V1** (2015-03-30)

## Study Status

| Record Verification | 2015-03 |
| Overall Status | Not yet recruiting |
| Study Start | 2015-06 |
| Primary Completion | 2018-04 [Estimated] |
| Study Completion | 2021-07 [Estimated] |
| First Submitted | 2015-03-30 |
| First Submitted that Met QC Criteria | 2015-03-30 |
| First Posted | 2015-04-02 [Estimated] |
| Certification/Extension First Submitted | 2019-08-08 |
| Last Update Submitted that Met QC Criteria | 2015-03-30 |
| Last Update Posted | ███████████ |

---

[62] When viewed on ClinicalTrials.gov, it shows that the Apil 2015 posting was "first submitted" on March 30, 2015, and "first posted" on April 2, 2015.

28

Indeed, the only NCT-236 study record posting version that aligns with an April 2, 2015 date is Version 1.[63]

60.    *Second*, ClinicalTrials.gov indicates that NCT-236 began on July 10, 2015[64] and Mr. Dichter's description of this April 2015 ClinicalTrials.gov posting in J&J's Response of October 16, 2020 is: "the posting of elements of a clinical trial in *advance of conduct of the trial*."[65] The only versions of the ClinicalTrials.gov postings that align with his description (were posted before the trial began) are versions posted before July 10, 2015, of which there are only four. Any version posted after July 10, 2015 is not "in advance of the conduct of the trial." Put another way, if the J&J Response of October 16, 2020 is referring to the entire NCT-236 ClinicalTrials.gov webpage or any version of the ClinicalTrials.gov posting after July 10, 2015, Mr. Dichter mischaracterized the information available on the relevant web posting in the J&J Response of October 16, 2020.

### 2.    *Dr. Cryer's and Mr. Hirshfeld's opinions that the examiner reviewed all the information available on NCT-236 on ClinicalTrials.gov is speculative.*

61.    Dr. Cryer and Mr. Hirshfeld also opine that the examiner would have reviewed or did review more information available on the ClinicalTrials.gov webpage for NCT-236 than the

---

[63] ClinicalTrials.gov, A Study to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy in Participants With Moderately to Severely Active Ulcerative Colitis (UNIFI), Record History Tab, Version 1, https://clinicaltrials.gov/study/NCT02407236?intr=Ustekinumab&aggFilters=status:com&cond=ulcerative%20colitis&rank=6&tab=history&a=1#version-content-panel.

[64] ClinicalTrials.gov, A Study to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy in Participants With Moderately to Severely Active Ulcerative Colitis (UNIFI), Study Overview, https://clinicaltrials.gov/study/NCT02407236?intr=Ustekinumab&aggFilters=status:com&cond=ulcerative%20colitis&rank=6&a=1.

[65] '509 application, J&J Response of October 16, 2020 at 9 (emphasis added).

2015 ClinicalTrials.gov posting. Mr. Hirshfeld states that "[i]n my opinion, based on my experience, when an Examiner lists an entire website on a Notice of References cited, this means that examiner accessed and reviewed all accessible documents on the website, and not only a single document within the website." Hirshfeld Report ¶ 191. Dr. Cryer, in turn, opines that the examiner considered the NCT-236 clinical trial protocol during his examination of the '509 application ('307 patent) even though the protocol was not posted to ClinicalTrials.gov until 2019. Cryer Report ¶ 491. I disagree.

62.    The Office action of July 16, 2020 refers to the document cited as "ClinicalTrials.gov" or "CT." This website—ClinicalTrials.gov—is an NIH website providing information about clinical studies from around the world, not just Clinical Trial No. NCT02407236. The Notice of References Cited states: "https://clinicaltrials.gov/ct2/show/NCT02407236. Accessed from the internet 7/13/20." The file history of the '509 application does not contain a copy of this document as provided for in MPEP § 707.05(a). Given the inconsistent and non-standard manner in which this document is cited by the examiner, Dr. Cryer's and Mr. Hirshfeld's opinions that the examiner accessed and reviewed all accessible documents on the NCT-236 website is highly speculative.

63.    Mr. Dichter did not discuss any ClinicalTrials.gov posting with the examiner until *after* the examiner discovered that website for himself and cited the posting in his Office action of July 16, 2020. Even then, Mr. Dichter provided only a printout of the cover page of the then-current NCT-236 clinical trial website (dated October 16, 2020) for the self-serving purpose of

30

arguing that NCT-236 clinical trial website did not include clinical trial results until after September 24, 2018.[66]

64.     Mr. Hirshfeld further opines that "when Examiner Landsman accessed the clinicaltrials.gov website on July 13, 2020, he would have had access to all of the materials available on the website as of that date." Hirshfeld Report ¶ 192. Dr. Cryer echoes this opinion. Cryer Report ¶ 491. What examiner Landsman had access to or could have done is immaterial: Mr. Dichter had a duty to disclose material information, and that duty is not relieved because an examiner had "access to" and "could" have found the information. What the examiner did review—beyond reviewing the 2015 ClinicalTrials.gov posting and the cover page of the NCT-236 ClinicalTrials.gov website as of October 16, 2020—is speculative. J&J had a duty to disclose non-cumulative material information, unless it was cited by the PTO (examiner). Mr. Dichter provided no information about the NCT-236 ClinicalTrials.gov website until after the examiner cited the April 2015 posting in the Office action of July 16, 2020. And, even then, Mr. Dichter provided only limited information from the website to support J&J's arguments. Mr. Dichter did not make a full disclosure of all information on that website that was material to patentability— including the fact that, starting in 2015, J&J was actively running the NCT-236 trial in many locations across the globe, nor did he submit the full NCT-236 Protocol—as 37 C.F.R. § 1.56 requires.

65.     Finally, the amount of information on the NCT-236 ClinicalTrials.gov website is voluminous. ClinicalTrials.gov is designed to provide information regarding clinical trials being conducted around the globe to interested members of the public. It is not designed to provide a

---

[66] '509 application, Non Patent Literature of October 16, 2020 (page 928 of file wrapper) & J&J Response of October 16, 2020, at 9.

prior art searching tool for patent examiners (as are the PTO's search systems). At the time examiner Landsman reviewed the '509 application, the PTO training and instruction to examiners regarding the FDA review and approval process focused on instructing examiners that considerations made by the FDA for approving clinical trials are different from those made by the PTO in patentability determinations.[67] Given the limited amount of time examiners have to conduct a prior art searches[68] and the lack of training and instruction on how to obtain information from websites relating to clinical trials (such as the ClinicalTrials.gov website), it is my opinion that it is unrealistic to believe that the examiner accessed and reviewed all accessible documents on the NIH ClinicalTrials.gov website.

**D.      The record of the '307 patent does not indicate the examiner reviewed any of the information cited in the PCT Search Report that Mr. Dichter cited to the PTO.**

66.      Dr. Cryer and Mr. Hirshfeld opine that Mr. Dichter's citation to, and examiner Landsman's consideration of, the Patent Cooperation Treaty (PCT) Search Report equates to consideration of the documents cited within that search report, including the NCT-236 ClinicalTrials.gov website. Cryer Report ¶¶ 364-365; Hirshfeld Report ¶¶ 195-197. I disagree.

67.      The PCT is an international treaty with more than 150 Contracting States (national or regional patent offices). The PCT permits applicants to seek patent protection in a large number

---

[67] *See*, *e.g*., MPEP §§ 2107.01(III), 2107.03(IV) and (V), and 2164.05.

[68] GAO-25-107218 (April 2025) (page 13) ("Examiners in all six focus groups said they aim to produce work that meets quality standards in the time they are given; however, in most of our focus groups, examiners noted they often do not complete a thorough search of prior art due to time constraints.").

I am not criticizing the examiner's search. I am simply pointing out that given the time constraints that examiners face, it is neither realistic nor fair to have an expectation that an examiner will chase down every link on a website for documents that even I was unable to find after spending far more time exploring that website than a primary examiner has time to search.

32

of countries by filing a single "international" patent application in place of separate national or regional patent applications. The PCT provides the applicant with an international search of the prior art and written opinion as to whether the invention appears to be novel, to involve an inventive step (to be non-obvious), and to be industrially applicable.[69] A PCT International Searching Authority (ISA) conducts the international search of the prior art. The PCT search report for PCT International Application No. PCT/IB19/58098, which is the PCT search report discussed by Dr. Cryer and Mr. Hirshfeld, was prepared by the PTO acting as a PCT ISA.

68.    Mr. Dichter cited this PCT Search Report in the Information Disclosure Statement (IDS) he submitted to examiner Landsman on October 16, 2020. The PCT Search Report mentioned the ClinicalTrials.gov posting of NCT-236. *See infra* ¶ 71. I did not discuss the PCT Search Report's citation to ClinicalTrials.gov in my opening report because the October 16, 2020 IDS's citation to the PCT Search Report is not a citation to the information on the NCT-236 ClinicalTrials.gov website. The citation to the PCT Search Report in the October 16, 2020 IDS is "PCT Search Report dated 01/13/2020."[70]

---

[69] MPEP § 1801.

[70] '509 application, IDS of October 16, 2020, PCT/IB19/58098; '509 application, Other reference-patent/application/search documents of October 16, 2020 (pages 255-64 of the file wrapper).

| | | | |
|---|---|---|---|
| | | Sandborn, et al., "Ustekinumab Induction and Maintenance Therapy in Refractory Crohn's Disease," The New England Journal of Medicine, 367: 1519-1528 (2012). | |
| | | Sands, et al., "Safety and Efficacy of Ustekinumab Induction Therapy in Patients with Moderate to Severe Ulcerative Colitis: Results from the Phase 3 UNIFI Study," American College of Gastroenterology Conference, Philadelphia, Pennsylvania (October 2018). (Poster Presentation). | |
| | | Sands, et al, "Ustekinumab as Induction and Maintenance Therapy for Ulcerative Colitis," The New England Journal of Medicine, 381(13): 1201-1214 (2019). | |
| | | Simon, et al., "Ustekinumab for the treatment of Crohn's disease: can it find its niche?" Therapeutic Advances in Gastroenterology, 9 (1): 26-36 (2016). | |
| | | Tally et al., "An Evidence-Based Systematic Review of Medical Therapies for Inflammatory Bowel Disease," American Journal of Gastroenterology, 106 Suppl 1:S2-S25 (2011) | |
| | | Uhlig et al., "Differential Activity of IL-12 and IL-23 in Mucosal and Systemic Innate Immune Pathology," Immunity. 25:309 318 (2006) | |
| | | Yen et al., "IL-23 is essential for T cell-mediated colitis and promoted inflammation via IL-17 and IL-6," The Journal of Clinical Investigation, 116(5):1310-1316 (2006) | |
| | | Yu et al., "Expression of Interleukin-22/STAT3 signaling pathway in ulcerative colitis and related carcinogenesis," World Journal of Gastroenterology, 19(17):2638-2649 (2013) | |
| | | ██████████████████████ | |
| | | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

1 Unique citation designation number. 2 Applicant is to place a check mark here if English language Translation is attached.

Burden Hour Statement: This form is estimated to take 2.0 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U. S. Patent and Trademark Office, Washington, DC 20231.
DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

69.    The only document Mr. Dichter submitted with the October 16, 2020 IDS pertaining to the PCT Search Report is the PCT Search Report itself. Mr. Dichter did not submit any of the documents cited *in* the PCT Search Report with the October 16, 2020 IDS. The fact that the examiner signed the IDS that lists the PCT Search Report (see below) means nothing more than that the examiner considered the PCT Search Report itself. It does not mean that the examiner considered the documents cited *in* the PCT Search Report.

34

| | | | | | |
|---|---|---|---|---|---|
| | ~~HO(3):1910-1910 (2000)~~ | | | | |
| | Yu et al., "Expression of Interleukin-22/STAT3 signaling pathway in ulcerative colitis and related carcinogenesis," World Journal of Gastroenterology, 19(17):2638-2649 (2013) | | | | |
| | PCT Search Report dated 01/13/2020. | | | | |
| | | | | | |

| Examiner Signature | /ROBERT S LANDSMAN/ | Date Considered | 10/27/2020 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

† Unique citation designation number. ² Applicant is to place a check mark here if English language Translation is attached.

Burden Hour Statement: This form is estimated to take 2.0 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U. S. Patent and Trademark Office, Washington, DC 20231.
DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

70.    The PCT Search Report is from the PCT international counterpart of the '509 application (PCT/IB19/58098). There is, however, nothing in the October 16, 2020 IDS or the PCT Search Report itself that identifies this search report as related to the '509 application. That is, while the '509 application and its PCT international counterpart (PCT/IB19/58098) both claim priority to a common provisional application ('060 provisional application), they do not have priority or benefit claims to each other. If an examiner was aware of a reason to suspect a connection between the PCT Search Report and the '509 application, the examiner could have uncovered the relationship between PCT international PCT/IB19/58098 and the '509 application, and therefore, he may have investigated further the documents listed in the PCT Search Report. However, the information Mr. Dichter provided to the examiner in the October 16, 2020 IDS (*i.e.*, "PCT Search Report dated 01/13/2020") did not inform the examiner of any relationship between PCT international application PCT/IB19/58098 and the '509 application. Without being informed of the relationship between PCT international application PCT/IB19/58098 and the '509 application, an examiner would have little reason to dig into the documents listed in PCT Search Report, and it is thus more likely that the examiner reviewed the PCT Search Report and moved on without looking up the references cited therein.

35

71.    The PCT Search Report lists a number of documents. Some of these documents, including the ClinicalTrials.gov webpage for NCT-236, are indicated as "Y" documents (see below).[71] A "Y" document is a document that shows that a claimed invention does not involve an inventive step (PCT terminology for the claimed invention is obvious) when the document is combined with one or more other documents of the same category, the combination of those documents being obvious to a person skilled in the art.

---

[71] '509 application, IDS of October 16, 2020, PCT/IB19/58098; '509 application, Other reference-patent/application/search documents of October 16, 2020 (page 261-64 of the file wrapper).

| | INTERNATIONAL SEARCH REPORT | International application No. |
| | | PCT/IB19/58098 |

**A.    CLASSIFICATION OF SUBJECT MATTER**

IPC  -  A61K 39/395; C07K 16/244, 14/54 (2019.01)

CPC  -  A61K 39/395; C07K 16/244, 14/54

According to International Patent Classification (IPC) or to both national classification and IPC

**B.    FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
See Search History document

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched
See Search History document

Electronic data base consulted during the international search (name of data base and, where practicable, search terms used)
See Search History document

**C.    DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| Y | (JANSSEN RESEARCH & DEVELOPMENT, LLC) A Study to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy In Participants With Moderately to Severely Active Ulcerative Colitis (UNIFI). 13 August 2018; retrieved from the internet <https://clinicaltrials.gov/ct2/show/NCT02407236> on 19 December 2019; pages 1-12; page 3/12, paragraph 2; 5/12, paragraphs 2-7 | 1-3, 4/1-3, 5/4/1-3, 6/4/1-3, 7/6/4/1-3, 8/7/6/4/1-3, 9/7/6/4/1-3, 10/9/7/6/4/1-3, 11/9/7/6/4/1-3, 12/8/7/6/4/1-3, 13/9/7/6/4/1-3, 14/9/7/6/4/1-3, 15/9/7/6/4/1-3, 16/9/7/6/4/1-3, 17/9/7/6/4/1-3, 18/9/7/6/4/1-3, 19-21, 22/19-21, 23/22/19-21, 24/19-21, 25/19-21, 26/19-21, 27/19-21, 28/19-21, 29/19-21, 30/19-21, 31/19-21, 32/19-21, 33-34 |
| Y | US 2009/0181027 A1 (DAL MONTE, P et al.) 16 July 2009; paragraphs [0076]; claim 3 | 1-3, 4/1-3, 5/4/1-3, 6/4/1-5, 7/6/4/1-3, 8/7/6/4/1-3, 9/7/6/4/1-3, 10/9/7/6/4/1-3, 11/9/7/6/4/1-3, 12/8/7/6/4/1-3, |

72.    Mr. Hirshfeld states that "it would be typical and expected that an examiner would review a reference indicated as a 'Y' in a search report from a related international application." Hirshfeld Report ¶ 197. I disagree. As previously discussed, the information Mr. Dichter provided to the examiner with the October 16, 2020 IDS did not inform the examiner of any relationship between PCT international application PCT/IB19/58098 and the '509 application. I do not know

examiners to typically track down references indicated as "Y" (or even "X"[72]) documents on a PCT Search Report, as the claims in a counterpart PCT application may differ from the claims in the U.S. application. Thus, what is relevant to the PCT application may not be relevant to the U.S. application. Rather, what is typical is that the applicant, wanting to ensure compliance with the duty of disclosure under 37 C.F.R. § 1.56, will cite not only a PCT Search Report in an IDS, *but will also cite any relevant references cited in the PCT Search Report in the IDS* (whether indicated as an "X," "Y", or even "A" document), for any counterpart PCT international application.

73.     I also disagree that an examiner is "expected" to track down any reference cited in PCT Search Report. I am unaware of any direction to examiners that they are expected to track down "Y" (or even "X") references from a PCT Search Report. The MPEP provides that "consideration by the examiner of the information submitted in an IDS means nothing more than considering the documents in the same manner as other documents in [the PTO] search files are considered by the examiner while conducting a search of the prior art in a proper field of search" and "[t]he initials of the examiner placed adjacent to the citations on the PTO/SB/08[73] or its equivalent mean that the information has been considered by the examiner to the extent noted above."[74] The MPEP does not suggest that examiners are expected to treat documents cited in an IDS as the starting point for further investigation into references cited the submitted document.

---

[72] An "X" document is a document that, taken alone, shows that a claimed invention is not novel or, when considered in light of common general knowledge, shows that a claimed invention does not involve an inventive step (non-obvious in PCT terminology).  An "A" document is a document that represents state of the art but does not negate the novelty or inventive step of the claimed invention. MPEP § 1844.01(VII).

[73] USPTO form PTO/SB/08 is an IDS form, specifically the form the PTO provides for use by applicants for the list required by 37 C.F.R. § 1.98(a)(1) of the information being cited in the IDS. MPEP § 609.

[74] MPEP § 609.

**E.**    **The 2022 Duties of Disclosure and Reasonable Inquiry Notice describes existing expectations for patent prosecutors.**

74.    Mr. Hirshfeld states that a "main driver" of the *Duties of Disclosure and Reasonable Inquiry Notice*, 87 Fed. Reg. at 45767, was a letter from two Senators stating in part: "'[u]nfortunately, it has come to our attention that some patent applicants may, in certain circumstances, make significantly different statements in submissions to other federal agencies that conflict directly with those made at the U.S. Patent and Trademark Office (PTO).'" Hirshfeld Report ¶ 106. The origin of this Notice does not change the fact that it describes existing duties of patent prosecutors to be candid with the PTO and to not make different statements to different federal agencies. Furthermore, the conduct at issue in the '509 application—taking one position before the FDA and another before the PTO—*is the very conduct the two Senators brought to his attention*. Mr. Hirshfeld avoids addressing this reality and instead focuses on the definition of the word "remind" versus "clarify" in his criticism of my description of the Notice. Hirshfeld Report ¶¶ 108-09. I disagree with Mr. Hirshfeld's criticism, as discussed below at ¶ 81.

75.    Before the PTO, J&J urged that the effectiveness of ustekinumab in treating ulcerative colitis was "uncertain" as of September 24, 2018. Even now, J&J's experts contend that J&J "hoped" that ustekinumab would be effective in treating ulcerative colitis, with no expectation of success. They argue that the Phase 3 trial was "risky" and not certain to work. Hirshfeld Report ¶ 213 (citing Dr. Cryer Report ¶¶ 499-516, and the deposition transcripts of Strauss, Szapary, and Marano).

76.    However, before the FDA, J&J represented repeatedly that the available data on, shared biology of, and similar response to current treatments between Crohn's disease and ulcerative colitis provided a substantial scientific and clinical rationale to justify a direct-to-Phase-

39

3 approach to the study of ustekinumab to treat ulcerative colitis.[75] Put another way, J&J was so confident that ustekinumab would treat ulcerative colitis that J&J told the FDA it should be permitted to skip Phase 2 efficacy trials.



77. J&J's various FDA submissions regarding NCT-236 do *not* state that J&J "hoped" that ustekinumab would be effective in treating ulcerative colitis—with no expectation of success. And J&J's FDA submissions did not state that it viewed the Phase 3 trial as "risky."

78. The MPEP instructs that a reasonable expectation of success is necessary for an obviousness rejection, but the level of certainty necessary for an obviousness rejection is not comparable to the level of certainty necessary for FDA approval of Phase 3 testing. Putting the degree of certainty necessary for FDA approval versus the degree of certainty necessary for an obviousness rejection into perspective: (1) the MPEP instructs examiners that the type of evidence necessary for FDA approval (even to begin human trials) is not necessary to show utility or

---

[75] Janssen Clinical Protocol CNTO1275, Section 1.2 (Overall Rational for the Study), pages 25-26; Janssen Clinical Protocol CNTO1275 AMDT 1, Section 1.2 (Overall Rational for the Study), pages 31-32; and Janssen Clinical Protocol CNTO1275 AMDT 2, Section 1.2 (Overall Rationale for the Study), pages 42-43.

[76] Janssen Pre-IND Meeting Minutes, page 3.

[77] Janssen Pre-IND Meeting Minutes, page 3.

40

enablement under 35 U.S.C. §§ 101 and 112 for the applicant's own disclosure;[78] (2) the MPEP further instructs examiners that the level of disclosure necessary for a document or publication to anticipate a claimed invention is not the same as the level of disclosure necessary for an application to support that claimed invention under 35 U.S.C. § 112(a);[79] and (3) the MPEP further instructs examiners that a disclosure may qualify as prior art for purposes of obviousness even if the disclosure is not sufficient to anticipate the claimed invention.[80] Moreover, the reasonable expectation of success for purposes of obviousness under patent law requires neither conclusive proof of efficacy nor absolute predictability.[81] In sum, the degree of certainty necessary for FDA

---

[78] MPEP §§ 2107.01(III), 2107.03(IV) and (V), and 2164.05. The MPEP specifically states:

> Before a drug can <u>enter</u> human clinical trials, the sponsor, often the applicant, must provide a convincing rationale to those <u>especially</u> skilled in the art (e.g., the Food and Drug Administration (FDA)) that the investigation may be successful. Such a rationale would provide a basis for the sponsor's expectation that the investigation may be successful. In order to determine a protocol for phase I testing, the first phase of clinical investigation, some credible rationale of how the drug might be effective or could be effective would be necessary. <u>Thus, as a general rule, if an applicant has initiated human clinical trials for a therapeutic product or process, Office personnel should presume that the applicant has established that the subject matter of that trial is reasonably predictive of having the asserted therapeutic utility.</u>

MPEP 2107.03(IV) (emphasis in the original).

[79] MPEP § 2152.02(b).

[80] MPEP § 2152.02(b).

[81] MPEP § 2143.02; *OSI Pharm., LLC v. Apotex Inc.,* 939 F.3d 1375, 1385 (Fed. Cir. 2019) ("To be clear, we do not hold today that efficacy data is always required for a reasonable expectation of success. Nor are we requiring 'absolute predictability of success.'"); *Acorda Therapeutics, Inc. v. Roxane Lab., Inc.,* 903 F.3d 1310, 1333 (Fed. Cir. 2018) ("This court has long rejected a requirement of '[c]onclusive proof of efficacy' for obviousness.") (citing *Hoffmann-La Roche Inc. v. Apotex Inc.,* 748 F.3d 1326, 1331 (Fed. Cir. 2014); *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.,* 491 F.3d 1342, 1364 (Fed. Cir. 2007) (and cited cases); *Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348, 1364, 1367-68 (Fed. Cir. 2007) ("the expectation of success need only be reasonable, not absolute."). These decisions are cited in current MPEP § 2143.02(I) (Ninth edition, revision 01.2024).

approval of a Phase 3 trial is several levels higher than the degree of certainty necessary to show

a reasonable expectation of success for purposes of an obviousness rejection under patent law and

practice.

79.    Dr. Ralat, a drafter of the content of the '509 application, appears to understand that

the PTO rules prohibit a patent prosecutor from telling the FDA one thing and the FDA something

else. Dr. Ralat acknowledges that



Despite this statement, Dr. Ralat acknowledged that patent applicants have a duty to

---

[82] Ralat Dep. Tr. 150:9-12.

[83] Ralat Dep. Tr. 230:24-231:9.

[84] Ralat Dep. Tr. 232:8-233:8; 234:9-13.

[85] Ralat Dep. Tr. 235:17-237:14.

[86] Ralat Dep. Tr. 234:15-22.

[87] Ralat Dep. Tr. 237:13-23.

disclose to the PTO relevant information that they disclosed to the FDA.[88] Therefore, Dr. Ralat seems to understand that the PTO's rules do not allow an applicant to withhold from the PTO statements or other information provided to the FDA because the applicant is pursuing different goals before the two agencies.[89]

80.    Dr. Ralat attempts to excuse J&J's failure to provide the PTO the same information it provided to the FDA by arguing that one skilled in the art would have gleaned from the disclosures J&J made to the PTO the more fulsome information provided to the FDA.[90] What the examiner (or those skilled in the art) may be able to glean from a disclosure is immaterial: there was a duty to disclose material information and that duty is not relieved because those skilled in the art would be able to connect the dots.[91]

81.    As discussed in my opening report, the *Duties of Disclosure and Reasonable Inquiry Notice* indicates that it is a clarification of existing duties.[92] Whether the *Duties of Disclosure and Reasonable Inquiry Notice* "clarified" or "reminded" applicants of their duties before the PTO, my opinion regarding this Notice is the same: applicants have long had a duty to disclose to the PTO all information material to patentability, especially if the applicant provided

---

[88] Ralat Dep. Tr. 234:24-235:8.

[89] Ralat Dep. Tr. 240:20-241:3.

[90] Ralat Dep. Tr. 228:4-229:10; 233:22-234:7; 241:14-242:3; 243:21-244:1; 244:16-24.

[91] It is interesting that Dr. Ralat would feel an explanation that was provided for the FDA would be unnecessary for the PTO, stating that those skilled in the art would understand the relationship. The PTO views those at the FDA to be "especially skilled in the art." MPEP § 2107.03(IV) (emphasis in the original).

[92] *Duties of Disclosure and Reasonable Inquiry During Examination, Reexamination, and Reissue, and for Proceedings Before the Patent Trial and Appeal Board*, 87 *Fed. Reg.* 45764, 45764-65 (July 29, 2022).

that information to other agencies. My opening report notes that the *Duties of Disclosure and Reasonable Inquiry Notice* cites and discusses *Belcher Pharms., LLC v. Hospira, Inc.*, 11 F.4th 1345 (Fed. Cir. 2021), and *Bruno Independent Living Aids, Inc. v. Acorn Mobility Services, Ltd.*, 394 F.3d 1348 (Fed. Cir. 2005), as examples of inequitable conduct that resulted from a patent owner providing information to the FDA material to patentability, but failing to provide that information to the PTO. Opening Report ¶ 113. Patent applicants who appear before both the FDA and the PTO should require neither a reminder nor a clarification of their duties. The Federal Circuit did not view the patent owners in *Belcher Pharms* and *Bruno Independent Living Aids* as needing a clarification or reminder of those duties.

**F.      The prior art references are material to patentability.**

82.      Mr. Hirshfeld criticizes my opening report as implying that 37 C.F.R. § 1.56 has a "reasonable patent examiner" standard. Hirshfeld Report ¶¶ 100-01. My opening report accurately describes the Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, Afonso, the 2017 ClinicalTrials.gov posting, and the NCT-236 clinical trial submissions (including van Beelen Granlund, and Jostins) as information that "would have been relevant and material to a reasonable patent examiner when considering whether to allow the claims of the '307 patent" or information that "would likely have led a reasonable patent examiner to reject the application that issued as the '307 patent." Opening Report ¶ 5. The Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, Afonso, the 2017 ClinicalTrials.gov posting, and the NCT-236 clinical trial submissions (including van Beelen Granlund, and Jostins) also are also material to patentability as defined in 37 C.F.R. § 1.56. These statements are not inconsistent.

44

83.    Mr. Hirshfeld does not offer any opinion of his own on the materiality of
Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, Afonso, the 2017 ClinicalTrials.gov posting, van
Beelen Granlund, or Jostins. Instead, Mr. Hirshfeld states:

> I understand that Dr. Cryer disagrees with Mr. Bahr's and Dr. Matovcik's opinions.
> Cryer Decl. ¶¶ 201-267, 273-295, 300-331. Below I address the PTO's Duty of
> Disclosure from a policy perspective, assuming a prior art reference either refutes,
> or is inconsistent with, a position taken by an applicant in opposing an argument of
> unpatentability relied on by the Office, or asserting an argument of patentability. I
> am not opining on whether the references identified by Mr. Bahr and Dr. Matovcik
> refute, or are inconsistent with, a position taken by the Applicant for the application
> leading to the '307 Patent. Rather, I am discussing USPTO policies and procedures
> related to the USPTO's duty of candor, assuming a prior art reference does refute,
> or is inconsistent with, a position taken by an applicant during the prosecution of
> any patent application.

Hirshfeld Report ¶ 187.

84.    Mr. Hirshfeld further adds that he understands that the statements comparing
Crohn's Disease and ulcerative colitis reflect J&J's "hope" that ustekinumab would work to treat
ulcerative colitis (not an expectation that it would work to treat ulcerative colitis), and that J&J
recognized that NCT-236 "was risky and was not certain to work." Hirshfeld Report ¶ 213.

85.    As discussed previously, Dr. Cryer's patentability opinions (and, therefore,
opinions on materiality) bear no relationship to how the PTO conducts patentability analyses as is
reflected in the MPEP. As also discussed previously, the degree of certainty necessary for FDA
approval of a Phase 3 trial is levels higher than the degree of certainty necessary for a document
or publication to anticipate or render obvious a claimed invention under patent law and practice.
Therefore, to the extent that Mr. Hirschfeld relies on Dr. Cryer's opinions regarding materiality,
those opinions lack a proper foundation.

45

## 1.    *The Standard for Materiality*

86.    37 C.F.R. § 1.56(b) defines "material to patentability" for purposes of practice before the PTO. 37 C.F.R. § 1.56(b) provides that "information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) [i]t establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or

(2) [i]t refutes, or is inconsistent with, a position the applicant takes in:

(i) [o]pposing an argument of unpatentability relied on by the Office, or
(ii) [a]sserting an argument of patentability.

87.    37 C.F.R. § 1.56(b) further provides that "[a] *prima facie* case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability."

## 2.    *The Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso publications are material to patentability.*

88.    Dr. Cryer opines that Ochsenkühn, Kolios, Afonso, ClinicalTrials.gov, Jostins, or Gradlund are not "but-for" material. Cryer Report ¶ 24. I disagree. Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso are material to patentability as defined in 37 C.F.R. § 1.56 for the reasons stated in ¶¶ 232 through 239 of my opening report.[93]

---

[93] Mr. Hirshfeld mentions that Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso are not listed on international search report for PCT international Application No. PCT/IB19/58098, which, again, is a PCT counterpart to the '509 application. Hirshfeld Report ¶ 166. That says nothing about whether a document is material. The whole point of a duty to disclose material information is that searches do not always uncover all material information. There would be no need for a duty of disclosure if prior art searches could always be relied upon to uncover all material information. As discussed previously, the search report for PCT

46

89.    In brief, my understanding is that each of Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso describes actual treatment of ulcerative colitis patients with ustekinumab. And the references conclude that treatment with ustekinumab *successfully* improved ulcerative colitis symptoms. Further, Kolios describes the patient's response to treatment consistent with endoscopic and histologic mucosal healing (which satisfies one of the claimed measures of response to treatment). Thus, each of Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso is material to patentability, in that each of Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso alone, or in combination with other information of record in the '509 application, establishes a *prima facie* case of unpatentability under 37 C.F.R. § 1.56(b)(1).

### 3.    *The updated postings on the NCT-236 clinical trial website are material to patentability.*

90.    The 2017 ClinicalTrials.gov posting is material to patentability as defined in 37 C.F.R. § 1.56 for the reasons stated in ¶¶ 240 through 246 of my opening report.

91.    In brief, the 2017 ClinicalTrials.gov posting discloses—in *an active ongoing study* started on July 10, 2015 (years before the earliest filing date any claim in the '307 patent could be entitled to)—the treatment of subjects for moderately to severely active ulcerative colitis through administration of an effective amount of ustekinumab. The 2017 ClinicalTrials.gov posting discloses response to treatment measures enumerated in the claims of the '307 patent, and those response to treatment measures were met by the treatment regime undertaken in the NCT-236 clinical trial.[94] The 2017 ClinicalTrials.gov posting is material to patentability in that the posting,

---

international Application No. PCT/IB19/58098 was prepared by the PTO as a PCT International Searching Authority.

[94] Sands et al. (results of the NCT-236 clinical trial). As discussed previously, post-effective filing date, evidence is available to show that a claimed characteristic or result is inherent in the prior art. *See* MPEP § 2112(II) (citing S*chering Corp. v. Geneva Pharm. Inc.,* 339 F.3d 1373,

47

alone, or in combination with other information of record in the '509 application, establishes a *prima facie* case of unpatentability under 37 C.F.R. § 1.56(b)(1).

### 4. *The NCT-236 clinical trial submissions are material to patentability.*

92. Dr. Cryer and Mr. Hirshfeld based their opinions that the NCT-236 clinical trial submissions to the FDA are not material to patentability at least, in part, on the fact that they were not publicly available prior art as of September 24, 2018. Cryer Report ¶¶ 487-90; Hirshfeld Report ¶ 209. But whether a reference is material to patentability does not turn on whether it qualifies as prior art.[95] Put another away, information that does not qualify as prior art can still be material. The NCT-236 clinical trial submissions contain statements about what was known to the scientific community prior to September 24, 2018. The PTO may rely on a non-public document that contains statements about the state of scientific knowledge as evidence of what was previously known.[96] The NCT-236 clinical trial submissions are material to patentability as defined in 37 C.F.R. § 1.56 for the reasons stated in ¶¶ 247 through 269 of my opening report.

93. In brief, in seeking approval for a direct-to-Phase 3 study, J&J represented repeatedly to the FDA (in the NCT-236 clinical trial submissions) that it would be reasonable to assume that ustekinumab would be effective in treating ulcerative colitis. As stated above, J&J represented to the FDA that the scientific community considered Crohn's disease and ulcerative colitis to be a spectrum of immune-mediated gut inflammation that share common genetic factors, including involvement of IL-12 and IL-23 in the pathogenesis of both diseases. J&J cited the van

---

1377 (Fed. Cir. 2003)); *see also* MPEP § 2124 (explaining when post-effective filing date may be used).

[95] MPEP § 2001.04.

[96] MPEP § 2152 (citing *In re Epstein,* 32 F.3d 1559 (Fed. Cir. 1994)).

Beelen Granlund and Jostins publications to the FDA in support of this representation. J&J also

represented to the FDA that based upon the similarities in the genetics and biology of ulcerative

colitis and Crohn's disease, it would be reasonable to assume that ustekinumab would be effective

in treating ulcerative colitis. The NCT-236 clinical trial submissions, including the citations to the

van Beelen Granlund and Jostins publications, would support a patent examiner's conclusion that

it would have been obvious to those of skill in the art, based upon publications and knowledge of

the scientific community available prior to September 24, 2018, that ustekinumab would have been

effective in treating ulcerative colitis. The NCT-236 clinical trial submissions, including their

citations to the van Beelen Granlund and Jostins publications, alone, or in combination with other

information of record in the '509 application, establish a *prima facie* case of unpatentability under

37 C.F.R. § 1.56(b)(1).

**G.    The publications and documents cited in my opening report are not cumulative of the information of record in the '509 application.**

94.    Dr. Cryer's opinion that Ochsenkühn, Kolios, Afonso, ClinicalTrials.gov

references are cumulative is tied to his opinion that they do not provide a person of ordinary skill

in the art with a reasonable expectation that ustekinumab could be used to treat ulcerative colitis.

Cryer Report ¶¶ 268-72, 296-99, 332-35, 361, 492-95. I both disagree with his assessment of these

publications and take issue with his use of the term "cumulative." Dr. Cryer is not using the proper

standard for determining whether material is "cumulative" within the meaning of 37 C.F.R. § 1.56.

**1.    *A reference is not cumulative when it teaches more than the information already before the PTO.***

95.    The PTO rules of practice or MPEP do not define "cumulative." That said, the

Federal Circuit has concluded that information is considered "cumulative" under 37 C.F.R.

§ 1.56(a) if it "'teaches no more than what a reasonable examiner would consider to be taught by

the prior art already before the PTO.'"[97] For example, Ochsenkühn ECCO and Ochsenkühn DDW

provide an example of information that is cumulative under 37 C.F.R. § 1.56. If either Ochsenkühn

ECCO or Ochsenkühn DDW had been disclosed to the PTO during prosecution of the '509

application, the other of these publications would have been cumulative.

96.    Information is not cumulative when it contains a more complete or clearer showing

of the claimed invention than any item of information already of record before the PTO.

Furthermore, information is not cumulative when it discloses what the applicant argued was

missing from the prior art of record to secure allowance of an application, or what the examiner

stated was missing from the prior art of record when allowing an application.[98] In addition, a

reference is not cumulative if contains a more complete combination of the claim elements than

any other reference before the examiner, even if those claim elements are in other references before

the examiner.[99]

97.    Mr. Hirshfeld's opinions appear to be largely based upon Dr. Cryer's technical

opinions and also focuses on my opening report not anticipating their (Dr. Cryer's and Mr.

Hirshfeld's) arguments that these references are cumulative. Hirshfeld Report ¶ 214.

---

[97] *Regeneron Pharm., Inc. v. Merus N.V.*, 864 F.3d 1343, 1350 (Fed. Cir. 2017) (quoting *Regents of the Univ. of Calif. v. Eli Lilly & Co.*, 119 F.3d 1559, 1575 (Fed. Cir. 1997).

[98] *Belcher Pharm. v. Hospira, Inc.*, 11 F.4th 1345, 1353 (Fed. Cir. 2021).

[99] *Semiconductor Energy Laboratory Co. v. Samsung Electronics Co., Ltd.*, 204 F.3d 1368, 1374 (Fed. Cir. 2000).

2.    *The Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso publications are not cumulative.*

98.    Based upon my understating of Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso, none of these publications are cumulative—within the meaning of 37 C.F.R. § 1.56—of the information of record in the '307 patent prosecution.

99.    Mr. Hirshfeld states that U.S. Patent Application Publication 2020/0262908 ('908 Published Application) was of record in the '509 application and the examiner indicated that the '908 Published Application "teaches the use of ustekinumab for the treatment of UC." Hirshfeld Report ¶¶ 135 and 182. The examiner also stated:

> However, claim 384 [of the '908 Published Application] appears to be focused on an ingestible device for delivery of antibodies. No data has been presented in the '908 application which would make the instant claim limitations in, e.g. claim 1, anticipated, nor obvious. Furthermore, in the absence of any dosing data or discussion in the '908 specification, the Examiner cannot make the case that the (untaught) amount of ustekinumab would have the inherent effects (i.e. meeting the "endpoint" requirements of the instant claims).

'509 application, Notice of Allowability of November 13, 2020 at 3.

100.    In other words, the '908 Published Application suggests treating ulcerative colitis (among other conditions) by *orally* administering an *ingestible device* containing ustekinumab (among other IL-12/IL-23 inhibitors). Thus, the '908 Published Application is directed to a different mode (ingestion) of administration than that disclosed in the '307 patent (intravenous and then subcutaneous). And, as noted by the examiner, the '908 Published Application lacks any data on dosing or any other discussion.

101.    In contrast, the Ochsenkühn ECCO, Ochsenkühn DDW, Kolios, and Afonso publications disclose *actual situations* in which patients with ulcerative colitis were successfully treated with ustekinumab or experienced improvement in ulcerative colitis symptoms,

51

subcutaneously, with dosing data and outcome results. This information is not cumulative of the information disclosed in the '908 Published Application or any other prior art of record.

### 3.    *The September 2017 NCT-236 ClinicalTrials.gov posting is not cumulative.*

102.    As discussed previously, the J&J employees who owed a duty of candor to the PTO[100] did not inform the examiner of the NCT-236 website until *after* the examiner cited the 2015 ClinicalTrials.gov posting in the Office action of July 16, 2020. And again, the only version of NCT-236 ClinicalTrials.gov posting consistent with the record of the '509 application is the first version from April of 2015.

103.    The 2017 ClinicalTrials.gov posting (posted on September 8, 2017) also is **not** cumulative—within the meaning of 37 C.F.R. § 1.56—of the information of record in the '307 patent prosecution, including the 2015 ClinicalTrials.gov posting. The Study Description, Arms and Interventions, Inclusion and Exclusion Criteria, and Outcome Measures may be the same between the 2017 ClinicalTrials.gov posting and the 2015 ClinicalTrials.gov posting. But the 2017 ClinicalTrials.gov posting discloses an *ongoing* study—not just the advance publication of a study to be conducted.

104.    J&J argued that the 2015 ClinicalTrials.gov posting was only "the posting of elements of a clinical trial in advance of conduct[ing that] trial." [101] However, the 2017 ClinicalTrials.gov posting discloses an active ongoing study that began on July 10, 2015 (years before the earliest filing date to which any claim in the '509 application could be entitled) to evaluate ustekinumab as a treatment for patients with ulcerative colitis, where outcomes would be

---

[100] These include: Jewel Johanns, Katherine Li, Colleen Marano, Richard Strauss, Hongyan Zhang, Christopher O'Brien, Omoniyi Adedokun, Kimberly Shields-Tuttle, Eric Dichter, and Luis Ralat. Opening Report ¶ 21.

[101] '509 application, J&J Response of October 16, 2020 at 9.

52

assessed at induction week eight and maintenance week forty-four. Thus, the 2017 ClinicalTrials.gov posting is not simply the publication of elements of a clinical trial in advance of conduct of the trial; it is a posting describing a *live* trial in progress for several years and for which it is expected that there would have been some results. Therefore, the 2017 ClinicalTrials.gov posting is not cumulative of the information disclosed in the 2015 ClinicalTrials.gov posting or any other prior art of record.[102]

### 4.    *The NCT-236 clinical trial submissions are not cumulative.*

105.    Dr. Cryer opines that "NCT 236 Protocol and Pre-IND materials . . . are cumulative of other information before the Examiner during prosecution of the '307 patent; and [] that a person of ordinary skill in the art would understand these documents to describe a rationale for a Phase III test, not an expectation that ustekinumab would treat ulcerative colitis."[103]

106.    As explained in my opening report, in its NCT-236 clinical trial submissions (the NCT 236 Protocol and Pre-IND materials), J&J represented to the FDA (and other health authorities) that it is reasonable to assume that ustekinumab will be effective in ulcerative colitis.[104] J&J told the FDA that the scientific community considered Crohn's disease and ulcerative colitis to be a spectrum of immune-mediated gut inflammation that share common genetic factors, including involvement of IL-12 and IL-23 in the pathogenesis of both diseases.[105]

---

[102] *Belcher Pharm. v. Hospira, Inc.*, 11 F.4th 1345, 1353 (Fed. Cir. 2021) (information is not cumulative when it discloses what the applicant argued in securing allowance, or the examiner stated when allowing an application, was missing from the prior art of record).

[103] Cryer Report ¶ 25; *see also* Cryer Report ¶¶ 485, 492-98.

[104] Opening Report SectionVII.C.2-3.

[105] *Id.* ¶ 258.

107.    Mr. Dichter did not tell the examiner that the scientific community considered Crohn's disease and ulcerative colitis to be a spectrum of immune-mediated gut inflammation that share common genetic factors, including involvement of IL-12 and IL-23 in the pathogenesis of both diseases. And none of the prior art references that Mr. Dichter provided to examiner Landsman, as discussed by Dr. Cryer, disclose this information. In short, there is nothing of record indicating that it is reasonable to assume that ustekinumab would be effective in treating ulcerative colitis. Therefore, the NCT-236 clinical trial submissions are **not** cumulative —within the meaning of 37 C.F.R. § 1.56—of the information of record in the '307 patent prosecution.

108.    Again, the recent prosecution history of the '310 patent is illuminating and appears to suggest that Mr. Dichter understood that the NCT 236 Protocol was not cumulative.

109.    In the May 16, 2025 interview between Mr. Dichter and examiner Landsman, "Applicants argue that the clinical post [the 2015 ClinicalTrial.gov posting] is not the protocol [the NCT 236 Protocol], nor a complete description of the trial, just a summary. The actual trial results do not get posted for a couple years (which is after Applicants' effective filing date)."[106] This argument—made by Mr. Dichter to examiner Landsman—appears to implicitly acknowledge that the NCT 236 Protocol contains information not contained in the 2015 ClinicalTrials.gov posting the examiner found on his own. Although the NCT 236 Protocol itself would not have been prior art to the '307 patent (because it was a confidential document until after the effective filing date of the '307 patent), ███████████████████████████████████████

███████████████████████████████████████████████

---

[106] '310 application, Interview Summary issued on May 22, 2025 (interview date: May 19, 2025).

[107] Dichter Dep. Tr. 134:17-22.

███████████████████████████████████████████████████████████████ This

is *despite* 37 C.F.R. 1.56's requirement that a patent prosecutor "disclose to the Office all

information known to that individual to be material to patentability."

## H. Other J&J actions during its prosecution of the '509 application were not consistent with PTO obligations and practice.

### 1. Statement in the Specification of the '509 application

110.    Mr. Hirshfeld states that Mr. Dichter did not violate 37 C.F.R. 11.18 when he stated

that "[p]rior to the present invention, no studies had been conducted with ustekinumab for UC."

Hirshfeld Report ¶¶ 223-228. It remains my opinion that this statement constitutes a violation of

the certification requirements of 37 C.F.R. § 11.18(b) if Mr. Dichter made this statement without

conducting a reasonable inquiry or investigation into its factual basis (*i.e.*, into whether any studies

with ustekinumab for ulcerative colitis had actually been conducted prior to the present invention).

111.    The specification of the '509 application stated:

> Prior to the present invention, no studies had been conducted with ustekinumab for UC. [T]here is a need in the art for improved methods of treating UC, particularly moderately to severely active UC, in subjects who had previously failed or were intolerant of a biologic therapy or other conventional therapy, or subjects who had demonstrated corticosteroid dependence.

'509 application, Specification at page 4, lines 7-10.

112.    In his report, Mr. Hirshfeld opines that "no studies" actually means no "*clinical*

studies." Hirshfeld Report ¶ 224. The statement in the specification of the '509 application,

however, does not include the qualifier "clinical." The most reasonable interpretation of an

unqualified "no studies" is no studies of any kind.

113.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

55

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ ██ In addition, Mr. Hirshfeld also states that there is no evidence (or at least none in my opening report) that Mr. Ralat was substantively involved in the '509 application. Hirshfeld Report ¶ 160. As discussed previously, Dr. Ralat specifically states that after preparation of the provisional application, he was "completely disconnected" with the application, with "no role" in the application after submission of the provisional applications.[109] It cannot be both ways: either (1) Dr. Ralat and Mr. Dichter discharged their duty under 37 C.F.R. § 11.18(b)(2) by speaking with the inventors, or (2) Mr. Dichter did not speak to the inventors, and Dr. Ralat was not involved, therein undermining Mr. Hirshfeld's basis for stating that they discharged their duties under 37 C.F.R. § 11.18(b)(2).

114.    Mr. Hirshfeld also takes issue with the word "research" rather than "inquiry reasonable under the circumstances" from 37 C.F.R. § 11.18(b)(2). Hirshfeld Report ¶ 227. My opening report uses the word "research" only when it is references the statement by Mr. Dichter in his deposition:[110] Opening Report ¶ 274.



---

[108] Dichter Dep. Tr. 193:10-194:8.

[109] Ralat Dep. Tr. 110:2-13.

[110] Dichter Dep. Tr. 62:5-22.



### 2.    *Interviews During Prosecution of the '509 Application*

116.    Mr. Hirshfeld disagrees with my opinion that the interview summary Mr. Dichter wrote up in J&J's October 16, 2020 response does not comply with the requirements in 37 C.F.R. § 1.133. However, Mr. Hirshfeld does not argue that this interview summary *does* comply with the requirements of 37 C.F.R. § 1.133. Instead, Mr. Hirshfeld contends that other practitioners provide a short or no interview summary and the examiner did not question the interview summary. Hirshfeld Report ¶¶ 230-32. This is an argument that a practice is acceptable if others engage in it and one's noncompliance is not questioned. This argument, however, is not an explanation of how

---

[111] JNJ-STELARA_002748902-JNJ-STELARA_002748953.

[112] JNJ-STELARA_002748902 at -909 (emphasis added).

Mr. Dichter's perfunctory interview summary in J&J Response of October 16, 2020 complies with the requirement in 37 C.F.R. § 1.133.

### 3.    *Statements During Prosecution of the '509 Application*

117.    Mr. Hirshfeld contends that my opinion that the examiner was misled is unsupported, arguing that I do not know the examiner's state of mind. Hirshfeld Report ¶ 234. I disagree. The file history of the '307 patent and the '310 application make clear that the examiner was misled by J&J's remarks in its Response of October 16, 2020.

118.    The examiner stated in the Notice of Allowability issued November 13, 2020 that: "in the absence of any dosing data or discussion in the '908 specification, the Examiner cannot make the case that the (untaught) amount of ustekinumab would have the inherent effects (i.e. meeting the 'endpoint' requirements of the instant claims)."[113] This was in response to Mr. Dichter's remarks in J&J's Response of October 16, 2020 that the ClinicalTrials.gov posting did not anticipate or render obvious the claimed invention because it "did not include any clinical trial results" "[a]s of the September 24, 2018 filing date" of the '501 provisional application.[114]

119.    After a petition for *inter partes* review of the '307 patent was filed, and during examination of the '310 application (the grandchild of the '307 patent), the examiner took a new position in the Office action of January 16, 2025 (in the '310 application). In rejecting the claims of the '310 application,[115] the examiner: (1) stated that "The only reason NCT-236 does not anticipate the instant claims is due to the fact that it does not teach the exact dosages based on

---

[113] '509 application, Notice of Allowability of November 13, 2020, at 3.

[114] '509 application, J&J Response of October 16, 2020, at 9.

[115] As discussed previously, the claims of the '310 application are not the same as the claims of the '307 patent, but the examiner does not consider the claims of the '310 application to be patentably distinct from the claims of the '307 patent.

58

subject weight in claim l(a)";[116] (2) then stated "[t]hough the Examiner does not believe a rejection

under 35 USC 102 is warranted, the following arguments regarding case law from the *inter partes*

review of parent U.S. Patent No. 10,961,307, . . . is relevant to the instant application";[117] and (3)

followed that statement with a multi-paragraph discussion largely quoting from a section of the

petition for *inter partes* review of the '307 patent that dispelled the misstatements of law by Mr.

Dichter.[118]

120.    The Office actions and examiner's interview summaries of file history of the '509

and '310 applications are clear: the examiner allowed the '509 application (the '307 patent) based

upon remarks from Mr. Dichter that misstated what information needs to be expressly disclosed in

the ClinicalTrials.gov posting for it to anticipate (or render obvious) the claimed invention. The

examiner—now disabused of those misstatements—has taken different a position in the '310

application, both in the Office action of January 16, 2025 and subsequent interviews with Mr.

Dichter, on what information needs to be expressly disclosed in the ClinicalTrials.gov posting for

it to anticipate (or render obvious) a claimed invention. The examiner's communication of that

different position was emphatic and with a lengthy quote from a petition for *inter partes* review of

the '307 patent to correct those misstatements. Moreover, the examiner has maintained this

position in the '310 application, despite Mr. Dichter stating in an interview with examiner

Landsman that the ClinicalTrials.gov posting was also cited in the parent application (the '509

---

[116] '310 application, Office action of January 16, 2025, at 5 (bold in the original).

[117] '310 application, Office action of January 16, 2025, at 7 (again bold in the original). While the examiner did not make an anticipation rejection under 35 U.S.C. § 102, the examiner did reject all of the pending claims (claims 1 through 19) under 35 U.S.C. § 103 as unpatentable over the  ClinicalTrials.gov posting alone and in combination with Ochsenkühn and the Stelara label. '310 application, Office action of January 16, 2025, at 5-7.

[118] '310 application, Office action of January 16, 2025, at 5, 7-9.

application) over similar claims and that the parent has since been allowed (the '307 patent). It is

not necessary to know the examiner's state of mind to see that he was misled by Mr. Dichter's

remarks in the response of October 16, 2020 and the October 2020 interviews.


Dated: June 10, 2025

Robert Bahr

Exhibit A

## ROBERT BAHR MATERIALS CONSIDERED

In addition to the materials listed in Exhibit B to my opening report, in preparing this rebuttal report I also considered:

### 1. Bates Labeled Documents (by Begin Bates)

JNJ-STELARA_002748902

### 2. Litigation Documents

Luis Ralat Deposition Transcript. *CareFirst of Maryland, Inc. et al., v. Johnson & Johnson, et al.*, 2:23-cv-00629, May 14, 2025

Rebuttal Expert Report of Andrew Hirshfeld, *CareFirst of Maryland, Inc. et al., v. Johnson & Johnson, et al.*, 2:23-cv-00629, April 28, 2025

Expert Declaration of Byron Cryer, M.D., *CareFirst of Maryland, Inc. et al., v. Johnson & Johns, et al.*, 2:23-cv-00629, April 24, 2025

### 3. Statutes, Regulations, and Related Materials

Manual of Patent Examining Procedure (Revision 01.2024 of the Ninth edition (9th ed., rev. 01.2024) (November 2024)).

37 C.F.R. § 1.56

GAO-25-107218 (April 2025)

*Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board*, 83 *Fed. Reg.* 51,340, 51,343 (Oct. 11, 2018)

### 4. Case Law

*MPHJ Technology Invs., LLC v. Ricoh Americas Corp.*, 847 F.3d 1363 (Fed. Cir. 2017)

*Trs. of Columbia Univ. in New York v. Symantec Corp.*, 811 F.3d 1359 (Fed. Cir. 2016)

*Vederi, LLC v. Google, Inc.*, 744 F.3d 1376 (Fed. Cir. 2014)

*DDR Holdings, LLC v. Priceline.com LLC*, 122 F.4th 911 (Fed. Cir. 2024)

*Application of Hogan*, 559 F.2d 595, 603 (C.C.P.A. 1977)

*Godfrey v. Eames*, 68 U.S. (1 Wall.) 317 (1863)

*Ciba-Geigy Corp. v. Alza Corp.*, 864 F. Supp. 429 (D.N.J. 1994)

*Ciba-Geigy Corp. v. Alza Corp.*, 68 F.3d 487 (Fed. Cir. 1995) (unpublished)

*OSI Pharm., LLC v. Apotex Inc.,* 939 F.3d 1375 (Fed. Cir. 2019)

*Acorda Therapeutics, Inc. v. Roxane Lab., Inc.,* 903 F.3d 1310 (Fed. Cir. 2018)

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.,* 491 F.3d 1342 (Fed. Cir. 2007)

*Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348 (Fed. Cir. 2007)

*In re Epstein,* 32 F.3d 1559 (Fed. Cir. 1994)

*Regeneron Pharm., Inc. v. Merus N.V.*, 864 F.3d 1343 (Fed. Cir. 2017)

*Regents of the Univ. of Calif. v. Eli Lilly & Co.*, 119 F.3d 1559 (Fed. Cir. 1997)

## 5.   Other Documents

Janssen Clinical Protocol CNTO1275, Section 1.2 (Overall Rational for the Study)

Janssen Clinical Protocol CNTO1275 AMDT 1, Section 1.2 (Overall Rational for the Study)

Janssen Clinical Protocol CNTO1275 AMDT 2, Section 1.2 (Overall Rationale for the Study)