**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CAREFIRST BLUECHOICE, INC, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JOHNSON & JOHNSON and JANSSEN BIOTECH, INC.<br><br>Defendants. | Civil Action No. 2:23-cv-00629-JKW-LRL |

**EXPERT REPORT OF NICOLE MAESTAS, PH.D.**

**CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY – SUBJECT TO PROTECTIVE ORDER** [1]

---

[1] Some material referenced or quoted in this Report refers to material that has been designated as "Confidential Information," "Highly Confidential—Attorneys' Eyes Only Information," or "Highly Confidential – Outside Attorneys' Eyes Only Information." It is the responsibility of each party to confirm that all such material has been properly redacted before sharing it with parties to this litigation who would not be able to view such materials under the governing Protective Orders entered in these coordinated actions.

**TABLE OF CONTENTS**

I.    QUALIFICATIONS .................................................................................................... 1

II.   ASSIGNMENT AND EXECUTIVE SUMMARY ..................................................... 2

III.  FACTUAL BACKGROUND AND ALLEGATIONS................................................. 4

      A.   Factual Background ......................................................................................... 4

      B.   Allegations in the Current Matter ................................................................. 10

IV.   BACKGROUND ON THE U.S. PHARMACEUTICAL INDUSTRY ...................... 11

      A.   Economics of the Pharmaceutical Industry .................................................. 11

      B.   Biologic Drug Products.................................................................................. 16

           1)   Biologic License Process................................................................... 17

           2)   Biologics Price Competition and Innovation Act of 2009................. 20

           3)   Current State of Biosimilar Competition ........................................... 24

           4)   Impact of Biosimilar Competition ..................................................... 26

V.    OVERVIEW OF MARKET POWER ....................................................................... 38

VI.   DIRECT EVIDENCE OF MARKET POWER ......................................................... 40

      A.   Gross Margins................................................................................................ 40

      B.   J&J and Biosimilar Manufacturers Expected Price Declines Upon Biosimilar Entry ......... 45

           1)   Forecasted Stelara Biosimilar Erosion in J&J Forecasts ................... 46

           2)   Biosimilar Manufacturers Also Forecast Biosimilar Erosion ............ 47

      C.   In Just Over Two Months of Biosimilar Entry, Ustekinumab Prices Have Declined.......... 58

      D.   Misconduct to Delay Biosimilar Entry.......................................................... 60

      E.   Summary of Direct Evidence of Market Power ............................................ 60

VII.  INDIRECT EVIDENCE OF MARKET POWER ..................................................... 61

      A.   Overview of Economic Competition and Cross-Price Elasticity .................. 61

      B.   Identification of Potential Economic Substitutes for Stelara ........................ 64

      C.   Data on Stelara and its Potential Economic Substitutes................................ 65

           1)   J&J's Pricing and Sales Trends for Stelara........................................ 67

      D.   Natural Experiments...................................................................................... 74

      E.   Hypothetical Monopolist Test (HMT) .......................................................... 80

      F.   Summary of Indirect Evidence of Market Power.......................................... 82

VIII. CONCLUSIONS ...................................................................................................... 83

## I.    QUALIFICATIONS

1.    My name is Nicole Maestas, Ph.D. I am the John D. MacArthur Professor of Economics and Health Care Policy, and Chair of the Department of Health Care Policy at Harvard Medical School. I am a member of the National Academy of Medicine and a Research Associate at the National Bureau of Economic Research. I am also an Academic Affiliate of Greylock McKinnon Associates, a consulting and litigation support firm.

2.    I am an economist with broad training in the field of health economics and health policy. My research concerns the economics of health care utilization, health insurance, and health outcomes. I have many years of experience analyzing health care data of different types, including pharmacy claims data[2] and health care utilization data,[3] and in using a wide range of econometric methodologies.

3.    I publish my research in leading journals in the fields of economics and medicine, including the *American Economic Review*, the *New England Journal of Medicine*, *Annals of Internal Medicine*, and the *Quarterly Journal of Economics*.[4] In addition, I have been quoted and/or my work has been described in

---

[2] W. Zhu, *et al.*, "Initial Opioid Prescriptions in Commercial Health Insurance in the United States, 2012-2017," *New England Journal of Medicine*, 380(11), 2019, pp. 1043-52; N. Maestas and T. Sherry, "Opioid Treatment for Pain and Work and Disability Outcomes: Evidence from Health Care Providers' Prescribing Patterns," National Bureau of Economic Research (NBER) Working Paper No. NB19-28-2, 2021; S. Balestra, *et al.*, "Behavioral Responses to Supply-Side Drug Policy During the Opioid Epidemic," NBER Working Paper No. 29596, 2021; L. Cusimano and N. Maestas, "Full Practice Autonomy for Nurse Practitioners did not Increase Risky Opioid Prescribing Among Commercially Insured," Harvard Medical School, June 2023; and T. Layton, *et al.*, "Healthcare Rationing in Public Insurance Programs: Evidence from Medicaid," *American Economic Journal: Economic Policy*, 14(4), 2022, pp. 397-431.

[3] T. Sherry, A. Sabety, and N. Maestas, "Documented Pain Diagnoses in Adults Prescribed Opioids: Results from the National Ambulatory Medical Care Survey, 2006-2015," *Annals of Internal Medicine*, 169(12), 2018, pp. 892-4; A. Sabety, T. Sherry, and N. Maestas, "Opioid Use in Older Adults and Medicare Part D," *Health Services Research*, 56(2), 2021, pp. 289-98; M. Anderson, *et al.*, "Health Insurance and Access to Care for the Near Elderly," *Mimeo*, 2022; D. Card, C. Dobkin, and N. Maestas, "The Impact of Nearly Universal Insurance Coverage on Health Care Utilization and Health: Evidence from Medicare," *American Economic Review*, 98(5), 2008, pp. 2242-58; D. Card, C. Dobkin, and N. Maestas, "Does Medicare Save Lives?" *Quarterly Journal of Economics*, 124(2), 2009, pp. 597-636; N. Maestas, T. Sherry, and A. Strand, "Opioid Use Among Social Security Disability Insurance Applicants, 2013-2018," *Journal of Disability Policy Studies*, 35(1), 2023, pp. 43-53.

[4] N. Maestas, *et al.*, "The Value of Working Conditions in the United States and the Implications for the Structure of Wages," *American Economic* Review, 113(7), 2023, pp. 2007-47; N. Maestas, K. Mullen, and A. Strand, "Does Disability Insurance Receipt Discourage Work? Using Examiner Assignment to Estimate Causal Effects of SSDI Receipt," *American Economic* Review, 103(5), 2013, pp. 1797-1829.

---

the *New York Times*,[5] the *Wall Street Journal*,[6] the *Washington Post*,[7] *National Public Radio*,[8] and many other media outlets. At Harvard, I teach health economics and health policy to medical students and doctoral students.

4.      I received a B.A. in English and Spanish from Wellesley College in 1991, a M.P.P. in Public Policy from the Goldman School of Public Policy, at the University of California, Berkeley in 1997, and a Ph.D. in Economics from the University of California, Berkeley in 2002. A more complete description of my qualifications, including a list of my publications and a list of the cases in which I have testified, is found in my Curriculum Vitae, included as Attachment A to this Report.

5.      Greylock McKinnon Associates is currently compensated for my time at a rate of $900 per hour. My compensation is not dependent on my opinions or on the outcome of this litigation.

6.      I have no conflict of interest with Johnson & Johnson (also referred to as J&J) or any of its affiliates.

7.      The documents and materials I have considered in preparation of this Report are listed in Attachment B. Should additional materials become available, I reserve the right to update my opinions as needed.

## II.      ASSIGNMENT AND EXECUTIVE SUMMARY

8.      I have been retained by counsel for the indirect-purchaser or health plan plaintiffs in this matter (collectively, "The health plans").[9] Counsel have asked me to provide institutional background about the organization and economics of the U.S. pharmaceutical market and analyze whether J&J had market

---

[5] J. Sommer, "Women Outlive Men. Why Do They Retire Earlier?" *New York Times*, July 6, 2018 (https://www.nytimes.com/2018/07/06/business/women-men-longevity-retirement.html).

[6] E. Morath, "America's Hidden Workforce Returns," *Wall Street Journal*, January 26, 2019 (https://www.wsj.com/articles/americas-hidden-workforce-returns-11548478801).

[7] R. Samuelson, "Are Aging and the Economic Slowdown Linked?" *The Washington Post*, August 21, 2016 (https://www.washingtonpost.com/opinions/are-aging-and-the-economic-slowdown-linked/2016/08/21/ffd6b270-6626-11e6-96c0-37533479f3f5_story.html).

[8] S. Inskeep, "What Does an Older Population Mean for the Economy, Society at Large?" National Public Radio, June 26, 2023 (http://www.npr.org/2023/06/26/1184268060/what-does-an-older-population-mean-for-the-economy-society-at-large).

[9] Second Amended Class Action Complaint and Demand for Jury Trial, in this matter, November 19, 2024, (hereafter referred to as "Health Plans Complaint"). Further, because my Report cites to materials that were designated as confidential, or highly confidential/attorneys' eyes only, by the producing party, this Report is designated as highly confidential attorneys eyes only; in doing so I offer no opinions as to whether the materials cited are in fact confidential/highly confidential.

power with respect to Stelara. To determine whether J&J had market power with respect to Stelara I analyzed both direct and indirect evidence of market power, either of which is sufficient to demonstrate market power. The health plans allege that Defendant J&J[10] engaged in an anticompetitive scheme designed to delay biosimilar entry of Stelara and that it did, in fact, delay the entry of biosimilar competition for Stelara.[11]

9.      I have reached the opinions described herein to a reasonable degree of professional certainty in the field of economics based on (i) my review of relevant materials in this matter, (ii) my education and experience in the fields of health economics and microeconomics, and (iii) my examination of direct and indirect evidence on whether J&J had market power with respect to Stelara.

10.     Direct evidence of market power indicates that J&J had substantial market power with respect to Stelara prior to biosimilar entry in January 2025. Direct evidence of J&J's market power includes evidence of Stelara's supracompetitive prices, and J&J's abnormally high gross profit margins for Stelara prior to biosimilar entry in January 2025.

11.     Indirect evidence of market power also indicates that J&J had substantial market power with respect to Stelara until biosimilar entry in January 2025. Indirect evidence of J&J's market power includes: J&J's dramatic increases in Stelara sales over time despite their supracompetitive pricing of Stelara; empirical regression results from natural experiments showing that potential economic substitutes had no economic ability to constrain J&J from pricing Stelara at supracompetitive levels; and conclusions of the Hypothetical Monopolist test showing that the relevant antitrust market is brand and biosimilar Stelara, and that J&J had substantial market power in that relevant market during the period of interest.

12.     The remainder of my Report proceeds as follows: In Section III, I briefly review the facts and allegations of this case. In Section IV, I provide background information on the U.S. pharmaceutical industry. In Section V, I provide an overview of market power in the antitrust context. In Section VI, I evaluate direct evidence of market power. In Section VII, I assess indirect evidence of market power. In Section VIII, I summarize my conclusions.

13.     One note on conventions for the remainder of the report. I differentiate between brand drugs, biosimilar drugs, and the overall molecule using the following conventions: Brand and biosimilar names are displayed using initial capitalization. The molecule name is lower case and unless otherwise specified

---

[10] Named Defendants in this matter include Johnson & Johnson and its wholly owned subsidiary, Janssen Biotech, Inc. (now known as Johnson & Johnson Innovative Medicine). For ease of reference, I refer to the Defendant as Johnson & Johnson or J&J.

[11] Health Plans Complaint, ¶ 323.

refers to both the brand and biosimilar versions of that molecule. For biosimilars, I use a superscript to denote the biosimilar's reference brand drug, where an S is used for Stelara, H for Humira, and R for Remicade. For instance, Wezlana[S] indicates that Wezlana is a Stelara biosimilar. Finally, an asterisk following a drug name (e.g. Remicade*) indicates that it is a J&J product.

### III.    FACTUAL BACKGROUND AND ALLEGATIONS

#### A.    Factual Background

14.    Stelara (ustekinumab) is an injection formulation of a human immunoglobulin G1 monoclonal antibody that was developed by Centocor, Inc., a subsidiary of Johnson & Johnson (J&J).[12] Stelara is a biologic drug, also referred to as a large molecule drug. Since 2009, J&J (through subsidiaries) has exclusively marketed Stelara in the U.S. For ease of reference, I refer to the brand manufacturer of Stelara as J&J. Stelara is currently available in three strengths: 45 mg/0.5 ml, 90 mg/1 ml, and 130 mg/26 ml. For ease of reference, I refer to the drug of interest as Stelara throughout this Report and indicate the strength when necessary.

15.    J&J filed a patent application covering ustekinumab in August 2001.[13] In June 2005, the U.S. Patent and Trademark Office (USPTO) granted the ustekinumab compound patent (patent number 6,902,734 (the '734 patent)), with an expiration date of September 25, 2023.[14] In 2007, J&J submitted a biologics license application (BLA) to the U.S. Food and Drug Administration (FDA) to market Stelara.

16.    The Stelara (45 mg/0.5 ml and 90 mg/1 ml) BLA was approved by the FDA on September 25, 2009 and granted two periods of exclusivity as a new biologic: a four year period during which a biosimilar could not submit an application to the FDA and a concurrent twelve year period where a

---

[12] U.S. Food and Drug Administration (FDA), Stelara Label, March 18, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/125261s163lbl.pdf). Centocor is the subsidiary of J&J that developed Stelara. Centocor was initially assigned the patent. In 2011, Centocor changed its name to Janssen Biotech and has remained a subsidiary of J&J. Johnson & Johnson, "Timeline of Our Story: Centocor Joins Johnson & Johnson, 1999" (https://ourstory.jnj.com/centocor-joins-johnson-johnson); Johnson & Johnson, "Tibotec Therapeutics Becomes Janssen Therapeutics, Part Of The Janssen Pharmaceutical Companies," June 22, 2011 (https://www.jnj.com/media-center/press-releases/tibotec-therapeutics-becomes-janssen-therapeutics-part-of-the-janssen-pharmaceutical-companies); N. Pagliarulo, "J&J to phase out Janssen name in corporate rebrand," *Biopharma Dive*, September 15, 2023 (https://www.biopharmadive.com/news/janssen-brand-retire-johnson-johnson-innovative-medicine/693744).

[13] J. Giles-Komer, *et al.*, United States Patent No. 6,902,734, June 7, 2005 (https://patentimages.storage.googleapis.com/4b/84/33/4fafefcebbd600/US6902734.pdf).

[14] *Ibid*. JNJ-STELARA_001828863-906, at 904.

biosimilar could not be approved by the FDA.[15] Stelara was originally approved for adult patients as treatment for moderate to severe plaque psoriasis.[16] Plaque psoriasis is "a long-lasting (chronic) autoimmune disease that causes … thick, scaly patches called plaques on your skin"[17] and can interfere with quality of life.[18] J&J launched Stelara in October 2009, shortly after its first FDA approval in late September 2009.[19] On September 20, 2013, the FDA approved Stelara for the treatment of psoriatic arthritis in adults.[20] Psoriatic arthritis is a form of arthritis (a disorder causing joint pain and inflammation) that is accompanied by psoriasis.[21]

17.    Stelara obtained subsequent approvals to treat pediatric patients. Stelara was approved in October 2017 for the treatment of plaque psoriasis in adolescents aged 12-17 years old.[22] Stelara was approved for treating plaque psoriasis in children ages 6 and up on June 29, 2020.[23] Two years later, Stelara was approved for treating psoriatic arthritis in children ages 6 and up.[24] FDA approval for use in pediatric populations made Stelara eligible for an additional six months of exclusivity.[25]

---

[15] See FDA, Approval Letter for BLA 125261 (Stelara), September 25, 2009 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/125261s000ltr.pdf). See ¶ 33 below for further explanation on regulatory exclusivity. Note that the 12 years of exclusivity is granted only on the first FDA approval. Additional exclusivities are awarded for orphan drugs and drugs for pediatric patients. Stelara also has a Risk Evaluation and Mitigation Strategy (REMS) consisting of a medication guide and communication plan that educates prescribers and patients on the risks of taking this medication.

[16] FDA, Approval Letter for BLA 125261 (Stelara), September 25, 2009 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/125261s000ltr.pdf) ("Stelara™ (ustekinumab) is indicated for the treatment of adult patients with moderate to severe plaque psoriasis who are candidates for phototherapy or systemic therapy.").

[17] Cleveland Clinic, "Plaque Psoriasis" (https://my.clevelandclinic.org/health/diseases/22842-plaque-psoriasis).

[18] Mayo Clinic, "Psoriasis" (https://www.mayoclinic.org/diseases-conditions/psoriasis/symptoms-causes/syc-20355840).

[19] IQVIA National Prescription Audit (NPA) Data.

[20] FDA, Supplemental Approval Letter for BLA 125261 (Stelara), September 20, 2013 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2013/125261Orig1s103ltr.pdf).

[21] Cleveland Clinic, "Psoriatic Arthritis" (https://my.clevelandclinic.org/health/diseases/13286-psoriatic-arthritis)

[22] FDA, Supplemental Approval Letter for BLA 125261 (Stelara), October 13, 2017 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/125261Orig1s138ltr.pdf).

[23] FDA, Supplemental Approval Letter for BLA 125261 (Stelara), July 29, 2020 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/125261Orig1s150ltr.pdf).

[24] FDA, Supplemental Approval Letter for BLA 125261 (Stelara), July 29, 2022 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/125261Orig1s161ltr.pdf).

[25] See ¶ 33 below.

18.     Under a different BLA, Stelara (130 mg/26 ml) was approved on September 23, 2016, for the treatment of moderate to severe active Crohn's disease (CD) in adults.[26] On this date, the FDA authorized Stelara 130 mg/26 ml to be marketed under the same label as Stelara 45mg/0.5ml and 90mg/1ml.[27] Crohn's disease is a chronic "inflammatory bowel disease (IBD) that causes swelling and irritation of the tissues, called inflammation, in the digestive tract."[28] On October 18, 2019, the FDA approved Stelara for the treatment of moderate to severe active ulcerative colitis (UC) in adults.[29] Similar to Crohn's disease, ulcerative colitis is a chronic "inflammatory bowel disease (IBD) that causes inflammation and ulcers (sores) in your digestive tract."[30]

19.     On September 24, 2019, approximately a month before the FDA approved Stelara for ulcerative colitis, J&J submitted a "method of use" patent application for ustekinumab to treat ulcerative colitis.[31] Then a day later on September 25, 2019, J&J scientists published results from a clinical trial testing Stelara in the treatment of ulcerative colitis in the *New England Journal of Medicine*.[32] In mid-2020, the

---

[26] FDA, Approval Letter for BLA 761044 (Stelara), September 23, 2016 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2016/761044Orig1s000ltr.pdf) ("STELARA is indicated for the treatment of adult patients with moderately to severely active Crohn's disease (CD) who have failed or were intolerant to treatment with immunomodulators or corticosteroids, but never failed treatment with a tumor necrosis factor (TNF) blocker, or failed or were intolerant to treatment with one or more TNF blockers."). For Crohn's disease, Stelara is taken with 2-4 vials (depending on weight of patient) of the 130 mg/26 ml strength as the initial dose, with follow up/maintenance with 90 mg/ 1 ml vials. FDA, Stelara Label (March 18, 2024), *op. cit.*

[27] See FDA, Stelara Label, September 23, 2016 (https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/761044lbl.pdf) and FDA, Stelara Label (March 18, 2024), *op. cit.*

[28] Mayo Clinic, "Crohn's Disease: Overview," October 29, 2024 (https://www.mayoclinic.org/diseases-conditions/crohns-disease/symptoms-causes/syc-20353304).

[29] FDA, Supplemental Approval Letter for BLAs 761044/125261 (Stelara), October 18, 2019 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2019/761044Orig1s003,%20125261Orig1s152ltr.pdf). Like Crohn's disease, ulcerative colitis is treated with an initial dose of Stelara with 2-4 vials (depending on weight of patient) of the 130 mg/26 ml strength, with follow up/maintenance with 90 mg/1 ml vials. See FDA, Stelara Label (March 18, 2024), *op. cit.*

[30] Mayo Clinic, "Ulcerative Colitis: Overview," November 22, 2022 (https://www.mayoclinic.org/diseases-conditions/ulcerative-colitis/symptoms-causes/syc-20353326).

[31] See J. Johanns, *et al.*, United States Patent No. 10,961,307, March 30, 2021, p. 1 (https://patentimages.storage.googleapis.com/7f/42/f0/e801526b8dcdef/US10961307.pdf). See ¶ 35 below.

[32] See B. Sands, *et al.*, "Ustekinumab as Induction and Maintenance Therapy for Ulcerative Colitis," *New England Journal of Medicine,* 381(13), 2019, pp. 1201-14 (https://www.nejm.org/doi/full/10.1056/NEJMoa1900750).

---

patent was denied due to obviousness[33] and in response, J&J petitioned for a reversal of this decision.[34] On March 30, 2021 the denial was revoked and patent number 10,961,307 (the '307 patent) was approved and set to expire on September 24, 2039.[35]

20.      On October 1, 2020, J&J acquired a biosimilar manufacturer company, Momenta, giving J&J control over Momenta's biosimilar technologies and manufacturing patents including, U.S. Patent No. 8,852,889 (the '889 patent), U.S. Patent No. 9,217,168 (the '168 patent), U.S. Patent No. 9,475,858 (the '858 patent), and U.S. Patent No. 9,663,810 (the '810 patent) (hereafter referred to as "Momenta biosimilar manufacturing patents").[36] These patents claim technologies that would improve the complex process of developing biosimilar products.[37]

21.      Prescriptions of Stelara rose rapidly during its first years on the market.[38] After Stelara's commercial success, several biosimilar manufacturers began developing biosimilar versions of Stelara. Following the FDA guidance on clinical data to support biosimilarity to a reference product,[39] at least

---

[33] Prior to J&J's patent application claiming the method of using ustekinumab to treat ulcerative colitis, several global studies had already been published: G. Tarr, *et al.*, "Superheroes in Autoimmune Warfare: Biologic Therapies in Current South African Practice," *South African Medical Journal*, 104(11), 2014, pp. 787-91; M. Tran-Minh, M. Allez, and J. Gornet, "Successful Treatment With Ustekinumab for Chronic Refractory Pouchitis," *Journal of Crohn's & Colitis*, 11(9), 2017, p. 1156; L. Senra Afonso, *et al.*, "CP-202 Ustekinumab treatment in refractory inflammatory bowel disease," Eur. J. Hosp. Pharmacy, 24, 2017; "Issues for Consideration," *Ustekinumab (Stelara)*, Ottowa, ON: Canadian Agency for Drugs & Technologies in Health, 2017; T. Ochsenkühn, *et al.*, "P759 Ustekinumab as Rescue Treatment in Therapy-Refractory or -Intolerant Ulcerative Colitis," *Journal of Crohn's & Colitis*, 12(Suppl 1), 2018, S495; A. Kolios, *et al.*, "Paradoxical Ulcerative Colitis During Adalimumab Treatment of Psoriasis Resolved by Switch to Ustekinumab," *British. Journal of Dermatology*, 178(2), 2018, pp. 551-5.

[34] Health Plans Complaint, ¶¶ 164-171. See the patent files wrapper: JNJ-STELARA_001693362-5609.

[35] See J. Johanns, *et al.*, United States Patent No. 10,961,307, March 30, 2021 (https://patentimages.storage.googleapis.com/7f/42/f0/e801526b8dcdef/US10961307.pdf).

[36] Johnson & Johnson, "Johnson & Johnson Completes Acquisition of Momenta Pharmaceuticals, Inc.," October 1, 2020 (https://www.jnj.com/media-center/press-releases/johnson-johnson-completes-acquisition-of-momenta-pharmaceuticals-inc); J. Gardner, "Acquired Patents Aid J&J Defense of Top-Selling Drug from Biosimilar Challenge," *Biopharma Dive*, March 29, 2023 (https://www.biopharmadive.com/news/johnson-johnson-stelara-patents-amgen-biosimilar-momenta/646277). See also Health Plans Complaint, ¶¶ 177-179.

[37] H. Prentice, United States Patent No. 8,852,889, October 7, 2014 (https://patentimages.storage.googleapis.com/c3/be/4d/9f7686fe78363f/US8852889.pdf); H. Prentice, United States Patent No. 9,217,168, December 22, 2015 (https://patentimages.storage.googleapis.com/c7/b3/0a/c826d4c378319c/US9217168.pdf); H. Prentice, United States Patent No. 9,475,858, October 25, 2016 (https://patentimages.storage.googleapis.com/a7/d4/ab/cad50a0cb8 2445/US9475858.pdf); H. Prentice, United States Patent No. 9,663,810, May 30. 2017 (https://patentimages.storage.googleapis.com/df/74/5e/5747fdabec834f/US9663810.pdf).

[38] IQVIA National Prescription Audit (NPA) Data.

[39] FDA, "Clinical Pharmacology Data to Support a Demonstration of Biosimilarity to a Reference Product: Guidance for Industry," December 2016 (https://www.fda.gov/media/88622/download).

---

eight manufacturers began biosimilarity and interchangeability phase 3 clinical trials between 2020 and 2023.[40]

22.     On October 31, 2022, Amgen, one of the biosimilar manufacturers, submitted an abbreviated BLA (ABLA) to the FDA.[41] Amgen notified J&J on November 7, 2022 of its ABLA application and intent to market its biosimilar ustekinumab following FDA approval, setting off patent litigation, also known as the "patent dance" for biologic products.[42] On November 29, 2022, J&J filed patent infringement claims against Amgen on the '734 composition patent and its '307 method-of-use patent.[43] On May 22, 2023, J&J and Amgen entered into a settlement agreement in which Amgen agreed to delay the sale of a biosimilar version of Stelara until January 1, 2025.[44] Amgen received FDA approval and an interchangeable designation for its biosimilar Wezlana[S].

23.     Additional biosimilar manufacturers have entered into settlement agreements with J&J and have either launched or are expected to launch this year (see Exhibit 1). As of the submission of this Report, Stelara's biosimilars, Amgen (Wezlana[S]), Alvotech/Teva (Selardsi[S]), Samsung Bioepis/Sandoz (Pyzchiva[S]),[45] Biocon (Yesintek[S]), and Formycon/Fresenius Kabi (Otulfi[S]), have launched in the U.S.[46] Celltrion, Hikma/Bio-Thera, and Accord/Dong-A ST/Meiji are expected to launch later in 2025.

---

[40] Health Plans Complaint, ¶¶ 230-262.

[41] FDA, Approval Letter for ABLAs 761285/761331 [Wezlana, Amgen], October 31, 2023, p. 1 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/761285Orig1s000;%20761331Orig1s000ltr.pdf).

[42] Health Plans Complaint, ¶ 207. See also ¶¶ 40-41 below.

[43] Health Plans Complaint, ¶ 210.

[44] Stipulation and Proposed Order of Dismissal with Prejudice, in the matter of Janssen Biotech Inc. v. Amgen Inc., May 22, 2023 (https://www.pearceip.law/wp-content/uploads/2023/05/Janssen-v-Amgen-dismissal.pdf); B. Brittain, "Amgen Settles Patent Lawsuit Over Biosimilar of J&J's Big-Selling Stelara," *Reuters*, May 23, 2023 (https://www.reuters.com/business/healthcare-pharmaceuticals/amgen-settles-jj-patent-lawsuit-over-drug-similar-blockbuster-stelara-2023-05-23).

[45] On November 30, 2023, Samsung Bioepis also announced that they entered into an agreement with Sandoz to commercialize the biosimilar in the U.S. Samsung Bioepis Press Release, "Samsung Bioepis Secures US License Date for SB17, a Proposed Biosimilar to Stelara®," *BioSpace*, November 30, 2023 (https://www.biospace.com/samsung-bioepis-secures-us-license-date-for-sb17-a-proposed-biosimilar-to-stelara).

[46] R. Schwartz, "Amgen Launches Wezlana™ as the First Stelara® Interchangeable Biosimilar through Optum's Nuvaila," *JD Supra*, January 17, 2025 (https://www.jdsupra.com/legalnews/amgen-launches-wezlana-tm-as-the-first-5034283); K. Choudhury, "Teva Pharma and Alvotech Launch Biosimilar to J&J's Stelara in US," *Reuters*, February 21, 2025 (https://www.reuters.com/business/healthcare-pharmaceuticals/teva-pharma-alvotech-launch-us-biosimilar-jjs-stelara-2025-02-21). Sandoz Press Release, "Sandoz launches biosimilar Pyzchiva® (ustekinumab-ttwe) in the US, offering new treatment for around 12 million patients[1-4]," February 24, 2025 (https://www.us.sandoz.com/sandoz-launches-biosimilar-pyzchivar-ustekinumab-ttwe-us-offering-new-treatment-around-12-million/); Biocon Press Release, "Biocon Biologics Launches Yesintek™ (ustekinumab-kfce) Biosimilar to Stelara® in the United States," *BioSpace,* February 24, 2025 (https://www.biospace.com/press-releases/biocon-biologics-launches-yesintek-ustekinumab-kfce-biosimilar-to-stelara-in-the-united-states). See Exhibit 1.

---

**Exhibit 1: Ustekinumab Biosimilars**

| Biosimilar Manufacturer | Biosimilar Product Name | Is it FDA Approved as an Interchangeable Biosimilar? | FDA Approval Date | J&J Settlement Date | Actual or Expected Launch Date[47] |
|---|---|---|---|---|---|
| Amgen | Wezlana | Yes | Oct. 31, 2023[48] | May 22, 2023[49] | Jan. 1, 2025[50] |
| Alvotech/Teva | Selarsdi | Yes | Apr. 16, 2024[51] | Apr. 16, 2024[52] | Feb. 21, 2025[53] |
| Samsung Bioepis / Sandoz | Pyzchiva | Yes | Jun. 28, 2024[54] | Aug. 3, 2023[55] | Feb. 24, 2025[56] |
| Biocon | Yesintek | No | Nov. 29, 2024[57] | Feb. 29, 2024[58] | Feb. 24, 2025[59] |
| Formycon/Fresenius Kabi | Otulfi | Yes | Sep. 27, 2024[60] | Aug. 7, 2023[61] | Mar. 3, 2025[62] |
| Celltrion | Steqeyma | No | Dec. 17, 2024[63] | Aug. 1, 2023[64] | Mar. 7, 2025 |
| Hikma/Bio-Thera | BAT2206 | - | *Pending* | - | May 2025 |
| Accord/Dong-A ST/Meiji | Imuldosa | No | Oct. 10, 2024[65] | Oct. 1, 2023[66] | Jul. 15, 2025[67] |

---

[47] Expected launch dates are based on instruction from counsel.

[48] FDA, Approval Letter for BLAs 761331/761285 (Wezlana), October 31, 2023 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/761285Orig1s000;%20761331Orig1s000ltr.pdf).

[49] See fn. 44.

[50] P. Wehrwein, "Wezlana, First Stelara Biosimilar To Hit the Market, Available Only Through Optum's Nuvaila," *Managed Healthcare Executive,* January 22, 2025 (https://www.managedhealthcareexecutive.com/view/wezlana-first-stelara-biosimilar-to-hit-the-market-available-only-through-optum-private-label). S. Jeremias, "Welcome Wezlana: The First Stelara Biosimilar to Launch in the US," January 21, 2025 (https://www.centerforbiosimilars.com/view/welcome-wezlana-the-first-stelara-biosimilar-to-launch-in-the-us).

[51] FDA, Approval Letter for BLA 761343 (Selarsdi), April 16, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761343Orig1s000ltr.pdf).

[52] Teva Press Release, "Alvotech and Teva Secure U.S. License Date for AVT04, a Proposed Biosimilar to Stelara®," June 12, 2023 (https://www.tevapharm.com/news-and-media/latest-news/alvotech-and-teva-secure-u.s.-license-date-for-avt04-a-proposed-biosimilar-to-stelara).

[53] Teva Press Release, "Teva and Alvotech Announce SELARSDI™ (ustekinumab-aekn) Injection Now Available in the U.S.," *TevaPharm,* February 21, 2025 (https://www.tevapharm.com/news-and-media/latest-news/teva-and-alvotech-announce-selarsdi-ustekinumab-aekn-injection-now-available-in-the-u.s).

[54] FDA, Approval Letter for BLAs 761373/761425 (Pyzchiva), July 4, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761373Orig1s000;761425Orig1s000correctedltr.pdf).

[55] Samsung Bioepis Press Release, *op. cit*.

---

## B.   Allegations in the Current Matter

24.   The health plans allege that Defendant J&J engaged in an anticompetitive scheme designed to delay biosimilar entry of Stelara until 2025.[68] The health plans allege that "J&J willfully and unlawfully maintained its monopoly power in the market for ustekinumab through the following an anticompetitive scheme: (i) J&J fraudulently obtained the '307 method-of-use patent; (ii) J&J unlawfully acquired the

---

[56] Sandoz Press Release, "Sandoz launches biosimilar Pyzchiva® (ustekinumab-ttwe) in the US, offering new treatment for around 12 million patients[1-4]" Sandoz, February 24, 2025 (https://www.sandoz.com/sandoz-launches-biosimilar-pyzchivar-ustekinumab-ttwe-us-offering-new-treatment-around-12-million/).

[57] FDA, Approval Letter for BLA 761406 (Yesintek), November 29, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761406Orig1s000correctedltr.pdf).

[58] Biocon Biologics Ltd. Press Release, "Biocon Biologics Secures US Market Entry Date for Bmab 1200, a Proposed Biosimilar to Stelara®," February 29, 2024 (https://www.biocon.com/biocon-biologics-secures-us-market-entry-date-for-bmab-1200-a-proposed-biosimilar-to-stelara/).

[59] Biocon Biologics Press Release, "Biocon Biologics Launches Yesintek™ (ustekinumab-kfce) Biosimilar to Stelara® in the United States," February 24, 2025 (https://www.bioconbiologics.com/biocon-biologics-launches-yesintek-ustekinumab-kfce-biosimilar-to-stelara-in-the-united-states/).

[60] FDA, Approval Letter for BLA 761379 (Otulfi), September 27, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761379Orig1s000ltr.pdf).

[61] The original press release stated an entry date of April 2025. *See* Formycon Press Release, "Formycon and Fresenius Kabi Secure U.S. License Date for Proposed Ustekinumab Biosimilar," August 7, 2023 (https://www.formycon.com/en/blog/press-release/fyb202-settlement-agreement-us).

[62] Fresenius Kabi Press Release, "Continuing Biopharma Growth with U.S. and EU Launch of Ustekinumab Biosimilar, March 3, 2025 (https://www.fresenius-kabi.com/news/continuing-biopharma-growth-with-us-and-eu-launch-of-ustekinumab-biosimilar).

[63] FDA, Approval Letter for BLA 761338 (Steqeyma), December 17, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761338Orig1s000ltr.pdf).

[64] M. Chang, "Celltrion Completes U.S. Patent Settlement with J&J, Eyeing Stelara Biosimilar Launch in March 2025," *Korea Biomedical Review*, August 25, 2023 (https://www.koreabiomed.com/news/articleView.html?idxno=21913).

[65] FDA, Approval Letter for BLA 761364 (Imuldosa), October 10, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761364Orig1s000ltr.pdf).

[66] Accord BioPharama Press Release, "Accord BioPharma, Inc. Announces U.S. FDA Acceptance of Biologics License Application for Proposed STELARA® Biosimilar DMB-3115," *PR Newswire,* January 4, 2024 (https://www.prnewswire.com/news-releases/accord-biopharma-inc-announces-us-fda-acceptance-of-biologics-license-application-for-proposed-stelara-biosimilar-dmb-3115-302025983.html).

[67] Per Accord's settlement with J&J, Accord could enter as early as ███████, but per Accord's 30b6 deposition, expected entry will likely be delayed until ████████. Deposition of George Esgro, Accord BioPharma, in this matter, January 10, 2025, at 26:2-20 (hereafter "Esgro Deposition").

[68] Health Plans Complaint, ¶¶ 128-262, including ¶¶ 219 ("[Delayed entry date] extracted from Amgen based on J&J's assertion of the fraudulently acquired '307 patent and the unlawfully acquired Momenta patents"), 226-7, 234, 241, 246, 252, and 261 (those patents were also used to extract delayed entry dates from other biosimilar manufacturers).

rights to the Momenta biosimilar manufacturing patents;[69] and (iii) J&J used those patents to delay competition from would-be ustekinumab biosimilar competitors."[70] Further, the health plans allege that "[t]hese acts, individually and in combination, were anticompetitive" and "[t]here is and was no cognizable, non-pretextual procompetitive justification for its exclusionary conduct that outweighs that conduct's harmful effects."[71] My understanding is that the health plans intend to prove at trial that absent J&J's scheme, biosimilar versions of Stelara would have been available as early as October 2023.

## IV.    BACKGROUND ON THE U.S. PHARMACEUTICAL INDUSTRY

### A.  Economics of the Pharmaceutical Industry

25.      The prescription drug market differs from other product markets in important ways. In most economic markets, the consumer chooses the product (based on attributes and price), pays for the product, and uses the product. In the prescription drug market, more parties are involved than just the consumer. Instead of choosing the product themselves, the consumer (patient) relies on their doctor to prescribe a prescription drug. Doctors make prescribing decisions based on product attributes, the doctor's training, experience treating patients with the relevant condition, and factors specific to the individual patient.[72] Price does not generally play a significant role in doctors' prescribing decisions. One reason for this is that prescribers often have limited information on the prices of prescription drugs because prices vary significantly depending on the patient's health insurance.[73]

26.      Another difference between pharmaceutical markets and other markets involves payment for the product. Patients are typically responsible for a relatively small portion of the total cost of a prescription

---

[69] The health plans allege that J&J had no actual use for these patents and acquired them in order to block or delay competition from biosimilar versions of Stelara. Health Plans Complaint, ¶¶ 181-189.

[70] Health Plans Complaint, ¶ 323.

[71] Health Plans Complaint, ¶¶ 323 and 350.

[72] American Bar Association (ABA), Section of Antitrust Law, *Pharmaceutical Industry Antitrust Handbook*, 2nd ed., ABA Publishing, 2018 (hereafter "ABA Pharmaceutical Industry Antitrust Handbook, 2nd ed."), pp. 163-164; J. Reschovsky, E. Rich, and T. Lake, "Factors Contributing to Variations in Physicians' Use of Evidence at The Point of Care: A Conceptual Model," *Journal of General Internal Medicine,* 30(Suppl. 3), 2015, pp. S555-S561, p. S557 ("Physician decision-making skills and perceptions of what constitutes evidence-based practice are influenced by the training they received…clinical experience, efforts to keep their medical knowledge current, susceptibility to product marketing and financial incentives"); J. Haug, "Physicians' Preferences for Information Sources: A Meta-Analytic Study," *Bulletin of the Medical Library Association*, 85(3), 1997, pp. 223-32, p. 230.

[73] C. Sloan, *et al.*, "Accuracy of Physician Estimates of Out-of-Pocket Costs for Medication Filling," *JAMA Network Open*, 4(11), 2021, pp. 1-11, pp. 1 and 7; P. Ubel, *et al.*, "Study of Physician and Patient Communication Identifies Missed Opportunities to Help Reduce Patients' Out-of-Pocket Spending," *Health Affairs*, 35(4), 2016, pp. 654-61;

---

drug, which takes the form of copayment or coinsurance, while health plans pay the lion's share of the drug price.[74] A copayment is typically a set amount, while coinsurance is a percentage of the drug's total cost. Patients' copayment and coinsurance amounts vary depending on a drug's formulary status. Specifically, health plans typically have a tiered system where low-cost drugs and generics have lower out-of-pocket costs for patients, preferred brands have higher costs, and non-preferred brands have the highest cost. Overall, the amount the patient is responsible for is determined by the total cost of the drug, their cost-sharing type (copayment vs. coinsurance), and the formulary status of the given drug. Pharmaceutical manufacturers pay rebates to health plans based on formulary position. Rebate payments are not done at the point of sale; instead, these payments are often made quarterly and thus lag behind the actual payment of drugs payers.

27.    There are several price data points in the supply chain of the pharmaceutical industry. For example, the wholesale acquisition cost (WAC) is the list price that manufacturers set for their products.[75] This is also sometimes called the "gross price," because it is the price "gross of" (before netting out) any sales adjustments such as discounts and rebates.[76] WAC prices are important because all the other downstream prices paid for a drug (e.g. by wholesalers/distributors, retail pharmacies, and non-retail providers) are tied to its WAC price. For instance, the list price is the price upon which the manufacturer negotiates any sales adjustments.[77]

---

C. Tseng, *et al.*, "Health Information Technology and Physicians' Knowledge of Drug Costs," *American Journal of Managed Care*, 16(4), 2010, pp. e105-10; W. Shrank, *et al.*, "Physicians' Perceptions of Relevant Prescription Drug Costs: Do Costs to the Individual Patient or to the Population Matter Most?" *American Journal of Managed Care*, 12(9), 2006, pp. 545-51; W. Shrank, *et al.*, "Physicians' Perceived Knowledge of and Responsibility for Managing Patients' Out-of-Pocket Costs for Prescription Drugs," *Annals of Pharmacotherapy*, 40(9), 2006, pp. 1534-40; G. Allan, J. Lexchin, and N. Wiebe, "Physician Awareness of Drug Cost: A Systematic Review," *PLoS Medicine*, 4(9), 2007, pp. 1486-96, p. 1491.

[74] IQVIA Institute, "Medicine Use and Spending in the US: A Review of 2018 and Outlook to 2023," May 2019, pp. 1-56, p. 27 (https://www.mass.gov/doc/medicine-use-and-spending-in-the-us-a-review-of-2018-and-outlook-to-2023/download); J. Cubanski, *et al.*, "How Does Prescription Drug Spending and Use Compare Across Large Employer Plans, Medicare Part D, and Medicaid?" *Kaiser Family Foundation*, May 20, 2019 (https://www.kff.org/medicare/issue-brief/how-does-prescription-drug-spending-and-use-compare-across-large-employer-plans-medicare-part-d-and-medicaid/).

[75] WAC data for this Report is provided by ProspectoRx and SSR Health.

[76] J. Mattingly, "Understanding Drug Pricing," *U.S. Pharmacist*, June 20, 2012 (https://www.uspharmacist.com/article/Understanding-drug-pricing).

[77] A. Smith, "Drug Pricing – Market Access and Reimbursement," *Edison Investment Research*, March 4, 2019 (https://d3s3shtvds09gm.cloudfront.net/73579d92f172e58fc26c1cdcac6d3605.pdf). Sometimes technically the average wholesale price (AWP) is the price upon which reimbursement is based, but the WAC and AWP are connected via a simple mathematical relationship (AWP is 1.2 times the WAC).

---

28.      As depicted in Exhibit 2, manufacturers sell drugs directly to wholesalers/distributors and to some retail and non-retail providers, including hospitals, retail pharmacies, mail pharmacies, and long-term care.[78] These are called "direct sales," as they are a sale that is *direct* from the manufacturer. Wholesalers and distributors also sell drugs to retail and non-retail providers. These are called "indirect sales," because they are a sale that is sold *indirectly* from the manufacturer to the retailer (via the wholesaler/distributor).[79] These sales are reported by manufacturers (direct sales) and wholesalers (indirect sales), and reflect the actual invoice prices paid by outlets to manufacturers or wholesalers, accounting for various price discounts.[80] These wholesale prices are available through IQVIA National Sales Perspective (NSP) data and capture approximately 90% of all U.S. sales.[81] Retail prices are the prices paid at the retail setting by a patient, including at retail, mail service, and long-term care pharmacies. Retail prices are available through IQVIA National Prescription Audit (NPA) data.[82]

---

[78] See Exhibit 2.

[79] See Exhibit 2.

[80] Note that rebates are not included in this price. IQVIA, "National Sales Insights" (https://www.iqvia.com/-/media/iqvia/pdfs/us/fact-sheet/iqvia-nsp-data-fact-sheet-2021.pdf).

[81] IQVIA, "Available IQVIA Data" (https://www.iqvia.com/insights/the-iqvia-institute/available-iqvia-data). IQVIA is considered by economists and pharmaceutical industry personnel to be the gold standard of prescription data and is widely used for research on the pharmaceutical industry. See for example the following peer-reviewed literature: E. Berndt, *et al.*, "Information, Marketing, and Pricing in the U.S. Antiulcer Drug Market," *American Economic Review*, 85(2), 1995, pp. 100-05; S. Ellison, *et al.*, "Characteristics of Demand for Pharmaceutical Products: An Examination of Four Cephalosporins," *RAND Journal of Economics*, 28(3), 1997, pp. 426-46; M. Rosenthal*, et al.*, "Demand Effects of Recent Changes in Prescription Drug Promotion," *Forum for Health Economics & Policy*, 6(1), 2003, pp. 1-26; E. Berndt, M. Kyle, and D. Ling, "The Long Shadow of Patent Expiration: Generic Entry and Rx-to-OTC Switches," in R. Feenstra and M. Shapiro, eds., *Scanner Data and Price Indexes*, University of Chicago Press, 2003, pp. 229-73.

[82] "IQVIA collects new and refilled prescription data daily from sample pharmacies covering 93% of outpatient prescription activity, and projects this information to create a national estimate for all products, therapeutic classes and manufacturers." IQVIA, "Available IQVIA Data" (https://www.iqvia.com/insights/the-iqvia-institute/available-iqvia-data).

**Exhibit 2: Flow of Pharmaceutical Sales[83]**



29.     Another reported price for pharmaceutical products is the average sales prices (ASP). ASPs are used to determine payment limits for prescription drugs, and include adjustments for chargebacks, credits, discounts, and rebates.[84] ASPs are reported by the manufacturers.[85] ASPs are only reported for Medicare Part B drugs, such as drugs that are physician administered and are thus covered as a medical benefit.[86] In other words, ASPs are not available for all drugs.[87] ASPs are sometimes considered an approximation of

---

[83] IQVIA, "National Sales Perspectives & National Prescription Audit Overview," 2017, p. 6. See also Kaiser Family Foundation, "Follow The Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain," Health Strategies Consultancy, March 2005, p. 14 (https://www.kff.org/wp-content/uploads/2013/01/follow-the-pill-understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf).

[84] 42 CFR § 414.904. Center for Medicare and Medicaid Services (CMS), "Medicare Part B Drug Average Sales Price," January 7, 2025 (https://www.cms.gov/medicare/payment/fee-for-service-providers/part-b-drugs/average-drug-sales-price). R. H., "ASP Drug Pricing in Healthcare: What Providers Need to Know in 2024," *MD Clarity*, January 27, 2023 (https://www.mdclarity.com/blog/asp-drug-pricing-healthcare).

[85] CMS, *op. cit.*

[86] CMS, "Average Sales Price (ASP) Reporting" (https://www.cms.gov/medicare/payment/part-b-drugs/asp-reporting).

[87] CMS, "Average Sales Price (ASP) Quarterly Publication Process: Frequently Asked Questions: Version 2.0," January 17, 2025, p. 4 (https://www.cms.gov/files/document/frequently-asked-questions-faqs-asp-data-collection.pdf); CMS, "Prescription drugs (outpatient)" (https://www.medicare.gov/coverage/prescription-drugs-outpatient). Coverage as a medical benefit is for physician administered drugs, whereas coverage for a pharmacy benefit is for self-administered drugs. A. Levine, *et al.*, "Specialty Drug Coverage Varies Between Health Plans' Medical and Pharmacy Benefit Policies," *Journal of Managed Care and Specialty Pharmacy*, 29(6), 2023, pp. 607-13 (https://pmc.ncbi.nlm.nih.gov/articles/PMC10387921/pdf/jmcp.2023.29.6.607.pdf).

the price that the manufacturer receives for their product after netting out *all sales adjustments*, known as the net price (since some sales are excluded from ASP calculations, the ASP is not an exact analog for net prices, but it remains a very good proxy for it).[88] Net prices, and specifically rebates, are "highly proprietary" information and are not widely publicly available.[89] However, net prices can be estimated for companies that do publicly report sales by product.[90] SSR Health collects this public information to estimate net prices for a variety of drugs.[91]

30.     The difference between gross prices (WACs) and net prices shows the amount of sales adjustments a drug company is providing off of their list price. Sales adjustments include returns, coupons, trade discounts (e.g., prompt-pay discounts), chargebacks, and rebates. For the pharmaceutical industry as a whole, the difference between list and net prices has been growing over time, indicating increasing sales adjustments.[92] A study estimates that from 2007-2018 discounts to Medicaid increased from 40% to 76% and discounts to other payers increased from 23% to 51%.[93] It might seem like increased industry-level discounting would imply that, on average, pharmaceutical products are getting cheaper, but this is not the case. In fact, list prices increased by more than the increase in discounts, such that in aggregate, the discounts only offset a portion (62%) of the increases to list price– in other words, in aggregate drugs got more expensive despite increased discounting.[94] The same study found similar price and discounting trends among tumor necrosis factor (TNF) inhibitors, which, like Stelara, are

---

[88] CMS, "Part B Average Sales Price (ASP) Data Reporting Guidance: Clarification on Medicaid Drug Rebate Program 'Multiple Best Prices' Reporting Option," (https://www.cms.gov/files/document/part-b-average-sales-price-asp-data-reporting-guidance-clarification-medicaid-drug-rebate-program.pdf).

[89] Berndt, Kyle, Ling, *op. cit.*, p. 240.

[90] Often, these data are collected from publicly traded companies. See I. Hernandez, *et al.*, "Changes in List Prices, Net Prices, and Discounts for Branded Drugs in the U.S., 2007-2018," *JAMA*, 323(9), 2020, pp. 854-62.

[91] SSR Health, "US Brand Rx Net Price Tool" (https://www.ssrhealth.com/us-brand-rx-net-price-tool). SSR Data is used in a following peer-reviewed literature: P. Kakani, M. Chernew, and A. Chandra, "Rebates in the Pharmaceutical Industry: Evidence from Medicines Sold in Retail Pharmacies in the U.S.," NBER Working Paper No. 26846, March 2020 (http://www.nber.org/papers/w26846); S. Dusetzina and P. Bach, "Prescription Drugs – List Price, Net Price, and the Rebate Caught in the Middle," *JAMA*, 321(16), 2019, pp. 1563-64; Hernandez, *et al., op. cit.*; N. Wineinger, Y. Zhang, and E. Topol, "Trends in Prices of Popular Brand-Name Prescription Drugs in the United States," *JAMA Network Open*, 2(5), 2019, pp. 1-9; A. San-Juan-Rodriguez, *et al.*, "Trends in List Prices, Net Prices, and Discounts for Originator Biologics Facing Biosimilar Competition," *JAMA Network Open*, 2(12), 2019, pp. 1-4; W. Feldman, *et al.*, "Estimation of Medicare Part D Spending on Insulin for Patients With Diabetes Using Negotiated Prices and a Defined Formulary," *JAMA Internal Medicine*, 180(4), 2020, pp. 597-601. See also B. Ippolito and J. Levy, "Best Practices Using SSR Health Net Drug Pricing Data," *Health Affairs*, March 10, 2022 (https://www.healthaffairs.org/content/forefront/best-practices-using-ssr-health-net-drug-pricing-data).

[92] Hernandez, *et al.*, *op. cit*.

[93] *Ibid.*

[94] *Ibid.* Between 2007 and 2018, list prices increased by 159%, and net prices rose by 60%.

---

biologic immunology drugs.[95] Specifically, the study showed that while TNFs also have an increasing spread between their list and net price, indicating an increase in discounting overtime, these discounts were more than fully offset by increases in list prices.[96]

**Exhibit 3: Changes in List Price and Net Price, 2007-2018[97]**



### B.    Biologic Drug Products

31.    This Report focuses on prescription biologic drugs and a few conventional drugs. Conventional drugs are small molecules that are chemical compounds and are often taken orally as pills or tablets. For example, aspirin is a conventional small molecule drug. Biologics, on the other hand, are larger and more complex molecules.[98] They can be living things, like cells or bacteria, which can be more difficult to control and stabilize. Typically, biologics are administered through an injection or intravenously. As mentioned above, Stelara is a biologic large molecule drug.

---

[95] *Ibid.*

[96] Increased discounting rates for TNFs only offset 56% of the list price increases that TNFs had over the same period. *Ibid.*

[97] *Ibid.*

[98] FDA, "What Are 'Biologics' Questions and Answers," February 6, 2018 (https://www.fda.gov/about-fda/center-biologics-evaluation-and-research-cber/what-are-biologics-questions-and-answers); FDA, "Frequently Asked Questions About Therapeutic Biological Products," May 16, 2024 (https://www.fda.gov/drugs/therapeutic-biologics-applications-bla/frequently-asked-questions-about-therapeutic-biological-products).

### 1)  Biologic License Process

32.        Therapeutic biologics are regulated by the FDA through both the Center for Drug Evaluation and Research (CDER) and Center for Biologics Evaluation and Research (CBER).[99] These medications must be granted a license by the FDA via a Biologics License Applications (BLA)[100] – rather than (but similar to) how new conventional prescription drugs must be approved by the FDA via a New Drug Application (NDA).[101] Biologics, like other new drugs, are subject to extensive research and testing prior to approval by the FDA, including multiple phases of clinical trials.[102] The FDA through the NDA approval process

---

[99] "FDA generally regulates biologics pursuant to its authorities under the Public Health Service Act (PHSA), but regulates some biologics as drugs under authorities in the Federal Food, Drug and Cosmetic Act (FFDCA). Responsibility for regulation of biologics within FDA is shared by both the Center for Biologics Evaluation and Research (CBER) and the Center for Drug Evaluation and Research (CDER)." FDA (May 16, 2024), *op. cit.*. The Center for Biologics Evaluation and Research (CBER) is "the Center within the FDA that regulates biological products for human use under applicable federal laws, including the Public Health Service Act and the Federal Food, Drug and Cosmetic Act." FDA, "Center for Biologics Evaluation and Research (CBER)," September 18, 2024 (https://www.fda.gov/about-fda/fda-organization/center-biologics-evaluation-and-research-cber).

[100] FDA, "Biologics License Applications (BLA) Process (CBER)," January 27, 2021 (https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/biologics-license-applications-bla-process-cber); Congressional Research Service (CRS), "The Role of Patents and Regulatory Exclusivities in Drug Pricing," Updated January 30, 2024, Table 3 (https://crsreports.congress.gov/product/pdf/R/R46679).

[101] FDA (May 16, 2024), *op. cit.* ("Q. Are the biologic development requirements different than the requirements for a new drug product?

A. Biological products are a subset of drugs; therefore both are regulated under provisions of the FDC Act. However, only biological products are licensed under section 351 of the PHS Act. (As previously noted, some therapeutic protein products are approved under section 505 of the FDC Act, not under the PHS Act.)

Following initial laboratory and animal testing that show that investigational use in humans is reasonably safe, biological products (like other drugs), can be studied in clinical trials in humans under an investigational new drug application (IND) in accordance with the regulations at 21 CFR 312. If the data generated by the studies demonstrate that the product is safe and effective for its intended use, the data are submitted as part of a marketing application. Whereas a new drug application (NDA) is used for drugs subject to the drug approval provisions of the FDC Act, a biologics license application (BLA) is required for biological products subject to licensure under the PHS Act. FDA form 356h is used for both NDA and BLA submissions. FDA approval to market a biologic is granted by issuance of a biologics license.").

[102] A BLA is submitted by any legal person or entity who is engaged in manufacture or an applicant for a license who takes responsibility for compliance with product and establishment standards. Form 356h specifies the requirements for a BLA. This includes: Applicant information, Product/Manufacturing information, Pre-clinical studies, Clinical studies [and] Labeling." FDA (January 27, 2021), *op. cit.*. "At the preclinical stage, the FDA will generally ask, at a minimum, that sponsors: (1) develop a pharmacological profile of the drug; (2) determine the acute toxicity of the drug in at least two species of animals, and (3) conduct short-term toxicity studies." FDA, "Drug Development and Review Definitions," August 20, 2015 (https://www.fda.gov/drugs/investigational-new-drug-ind-application/drug-development-and-review-definitions).

---

approves conventional drugs that are "safe and effective;" whereas for the BLA license process, "the equivalent terminology for biologics is 'safe, pure and potent.'"[103]

33.      Following approval of a BLA, the FDA grants the brand company regulatory exclusivity, a defined period during which they are permitted to be the exclusive seller of that product.[104] The length of regulatory exclusivity granted by the FDA varies depending on the BLA, but all exclusivities start on the date of FDA approval.[105] Newly licensed biologics receive two periods of exclusivity – four years of exclusivity where a biosimilar application cannot be submitted to the FDA and twelve years of exclusivity where a biosimilar cannot be approved.[106] Orphan biologic drug products, or drugs used to treat rare conditions affecting fewer than 200,000 people, are eligible for seven years of exclusivity.[107] If drugs are studied and approved for use in pediatric populations, they are eligible for an additional six months of exclusivity.[108] These regulatory exclusivities prevent the FDA from licensing, or even reviewing, biosimilar applications referencing the brand drug product.[109] Regulatory exclusivity for brand

---

[103] FDA (May 16, 2024), *op. cit.*; A. Dabrowska, "Biologics and Biosimilars: Background and Key Issues," CRS, Updated June 6, 2019, fn. 16 (https://www.everycrsreport.com/files/20190606_R44620_95cb826e2625cc3433d6ee7954407cfbe4f8dec2.pdf).

[104] FDA, "Frequently Asked Questions on Patents and Exclusivity," February 5, 2020 (https://www.fda.gov/drugs/development-approval-process-drugs/frequently-asked-questions-patents-and-exclusivity).

[105] CRS (January 30, 2024), *op. cit.*, Table 1; IQVIA Institute, "Orphan Drugs in the United States: Exclusivity, Pricing, and Treated Population," December 2018, pp. 1-22, p. 18 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/orphan-drugs-in-the-united-states-exclusivity-pricing-and-treated-populations.pdf).

[106] Dabrowska (June 6, 2019), *op. cit.*, p. 9 ("During the four-year exclusivity period, a BLA for a biosimilar or interchangeable product referencing the brand-name biologic may not be submitted to FDA. During the 12-year exclusivity period, approval of a BLA for a biosimilar or interchangeable product referencing the brand-name biologic may not be made effective. This means that FDA may not approve a BLA for a biosimilar or interchangeable product until 12 years after the date on which the reference product was first licensed, and a BLA for a biosimilar or interchangeable product cannot be submitted to FDA until four years after the date on which the reference product was licensed."). IQVIA Institute (December 2018), *op. cit.*, p. 18.

[107] Dabrowska (June 6, 2019), *op. cit.*, p. 9 ("Additionally, a biologic approved to treat a rare disease or condition may be granted seven years of orphan drug exclusivity for the protected indication, in which case FDA may not license another biologic for the protected orphan indication until after the expiration of the 7-year or 12-year exclusivity period, whichever is later."); IQVIA Institute (December 2018), *op. cit.*, p. 18.

[108] IQVIA Institute (December 2018), *op. cit.*, p. 18.

[109] *Ibid.* As stated above, Stelara was granted the two periods of regulatory exclusivity as a biologic when it was approved to treat moderate to severe plaque psoriasis in adults on September 25, 2009. An additional six months of exclusivity were added when Stelara was approved for use in pediatric plaque psoriasis and arthritis patients. See ¶ 17 above.

---

pharmaceutical products is designed to incentivize pharmaceutical companies to invest in innovative products.[110]

34.    Like the regulatory exclusivity granted by the FDA, patents are designed to incentivize pharmaceutical companies to invest in novel products. The U.S. Patent and Trademark Office (PTO) encourages innovation by granting individuals or entities protection over their intellectual property for a limited period of time. Pharmaceutical products are covered by three main types of patents: drug substance, drug product, and method-of-use.[111] A single drug is often covered by multiple patents, and patents can be applied for at any time, even after a drug is approved and marketed.[112]

35.    Drug substance patents pertain to the active ingredient of the given product.[113] Drug product patents cover the formulation or composition of a drug product.[114] Method-of-use patents cover the method of using the product, or the FDA-approved indication for which the product is used to treat a disease or condition.[115] Patent terms expire 20 years from the date on which the patent application was filed.[116] As mentioned above, Stelara's drug substance patent expired in September 2023. Patent exclusivity is independent of the regulatory exclusivity that is granted by the FDA. The FDA plays no role in evaluating or granting patents; their role is purely ministerial.[117] Biological drug products' patents

---

[110] Note that patent exclusivities may extend beyond regulatory exclusivities.

[111] FDA, "Frequently Asked Questions on Patents and Exclusivity," *op. cit.* See also FDA, "Approved Drug Products with Therapeutic Equivalence Evaluations," 34th ed., 2014, p. ADA 123; 21 C.F.R. § 314.53(b).

[112] CRS, "Patent Listing in FDA's Orange Book," Updated December 27, 2024 (https://crsreports.congress.gov/product/pdf/IF/IF12644).

[113] *Ibid.*

[114] FDA, "Frequently Asked Questions on Patents and Exclusivity," *op. cit.* "By statute, a company seeking FDA approval of a new drug must include in their new drug application…a drug product (formulation or composition) patent." CRS, *op. cit.* (December 27, 2024).

[115] CRS, *op. cit.* (December 27, 2024). FDA, "Frequently Asked Questions on Patents and Exclusivity," *op. cit.* A "method of use" patent covers "the use of chemical compound or composition in a specified way," or in other words the therapeutic use of a drug product. S. Schweitzer, *Pharmaceutical Economics and Policy*, 2nd ed., Oxford University Press, 2007, p. 225.

[116] FDA, "Frequently Asked Questions on Patents and Exclusivity," *op. cit.* See also U.S. Federal Trade Commission (FTC), "Generic Drug Entry Prior to Patent Expiration: An FTC Study," July 2002, pp. 3, 4, and 41 (https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf).

[117] "FDA serves a ministerial role with regard to the listing of patent information." 21 U.S.C. § 355(b)(1)(A)(viii). "With respect to patents, FDA has only a 'ministerial' role." FDA, "Prioritizing Public Health: The FDA's Role in the Generic Drug Marketplace," Statement of Janet Woodcock, Director, Center for Drug Evaluation and Research, FDA, September 21, 2016 (https://www.fda.gov/news-events/congressional-testimony/prioritizing-public-health-fdas-role-generic-drug-marketplace-09262016).

---

are reported in the Purple Book, a database that contains information about all FDA-licensed biologics and only has limited information on patents.[118]

36.     When regulatory and relevant patent exclusivities end for biologics, the time-limited protection against copying the intellectual property has ended, and other companies may enter the market with biosimilar products. A biosimilar "is highly similar to a biologic medication already approved by FDA – the original biologic (also called the reference product)."[119] The current pathway for biosimilars to enter was established in the Biologics Price Competition and Innovation Act (BPCIA) of 2009.[120]

### 2)     Biologics Price Competition and Innovation Act of 2009

37.     Prior to the Biologics Price Competition and Innovation Act (BPCIA) of 2009, the FDA did not have the authority to approve biosimilars in relation to reference products.[121] The BPCIA included two main regulatory changes that are important for biologic innovation and biosimilar entry.[122] First, for brand drug companies, the BPCIA encourages brand drug innovation as it added the aforementioned FDA-

---

[118] FDA, "Purple Book: Database of Licensed Biological Products," p. 5 (https://purplebooksearch.fda.gov/about); "With respect to patents, FDA has only a 'ministerial' role." CRS (January 30, 2024), *op. cit.*, p. 36. The Orange Book is for conventional drug products and lists all patent information. FDA, "The Listing of Patent Information in the Orange Book," 2021, p. 5 (https://www.fda.gov/media/155200/download).

[119] Note that I refer to the innovator's branded product as the "reference product" throughout my report. FDA, "Biosimilars Basics for Patients," August 1, 2024 (https://www.fda.gov/drugs/biosimilars/biosimilars-basics-patients). See also Dabrowska (June 6, 2019), *op. cit.*, p. 1 ("A biosimilar, sometimes referred to as a follow-on biologic, is a therapeutic drug that is highly similar but not structurally identical, to a brand-name biologic (i.e., the reference product). This is in contrast to a generic chemical drug, which is an exact copy of a brand-name chemical drug (i.e., the reference listed drug). Because biologics are more complex than chemical drugs, both in composition and method of manufacture, biosimilars will not be exact replicas of the brand-name product, but may instead be shown to be highly similar").

[120] For conventional small molecule drugs, the pathway for generics to enter was established in the Hatch-Waxman Act of 1984. R. Caves, M. Whinston, and M. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers: Microeconomics*, 1991, pp. 1-48, p. 10; ABA Pharmaceutical Industry Antitrust Handbook, 2nd ed., pp. 95-7. See also Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(j)(2)(A)(vii)(I) to (IV) (https://www.govinfo.gov/content/pkg/USCODE-2022-title21/pdf/USCODE-2022-title21-chap9-subchapV-partA-sec355.pdf).

[121] "The Hatch-Waxman Act provided a mechanism for the approval of generic drugs and certain follow-on biologics under the FFDCA, but not for follow-on biologics or biosimilars under the PHSA. As a result, after Hatch-Waxman, companies could submit so-called follow-on applications (i.e., 505(b)(2) NDAs) for FDA review only for the small number of biologics that had been approved under the FFDCA (e.g., insulin). Companies were effectively blocked from submitting follow-on applications for the much larger group of therapeutic biologics that had been licensed under the PHSA. Even when patent protection for biological products was approaching expiration, the market competition that occurred with chemical drugs via generics could not happen with therapeutic biologics because FDA lacked clear regulatory authority to approve biosimilars." CRS (January 30, 2024), *op. cit.*, p. 6.

[122] The BPCIA falls under the PHSA Act, specifically, 42 U.S.C. § 262. The BPCIA is parallel to "Hatch-Waxman Act."

---

granted period of regulatory exclusivity.[123] Second, the Act reduced costs of and barriers to biosimilar drug entry by allowing biosimilar manufacturers to use a streamlined biologic license process.

38.    The BPCIA is similar to the Hatch-Waxman Act that established a streamlined generic drug approval process called an Abbreviated New Drug Application (ANDA).[124] Under the BPCIA,[125] the biosimilar manufacturer must submit its own BLA (commonly referred to as an abbreviated BLA or "ABLA") to the FDA that "provides information demonstrating, among other things, biosimilarity,"[126] including:

    i.    "Data derived from:

        a.    analytical studies that demonstrate that the biological product is highly similar to the reference product notwithstanding minor differences in clinically inactive components;

        b.    an assessment of toxicity (which may rely on, or consist of, a study or studies described in item (a) or (c)); and

        c.    a clinical study or studies (including the assessment of immunogenicity and pharmacokinetics or pharmacodynamics) that are sufficient to demonstrate safety, purity, and potency in 1 or more appropriate conditions of use for which the reference product is licensed and intended to be used and for which licensure is sought for the biological product;

    ii.    The biological product and reference product utilize the same mechanism or mechanisms of action for the condition or conditions of use prescribed, recommended, or suggested in the proposed labeling, but only to the extent the mechanism or mechanisms of action are known for the reference product;

    iii.    The condition or conditions of use prescribed, recommended, or suggested in the labeling proposed for the biological product have been previously approved for the reference product;

    iv.    The route of administration, the dosage form, and the strength of the biological product are the same as those of the reference product; and

---

[123] CRS (January 30, 2024), *op. cit.*, p. 9.

[124] See Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(j)(2)(A)(vii)(I) to (IV) (https://www.govinfo.gov/content/pkg/USCODE-2022-title21/pdf/USCODE-2022-title21-chap9-subchapV-partA-sec355.pdf). CRS (January 30, 2024), *op. cit.*, Table 3. See also Attachment C for more information on the Hatch-Waxman Act.

[125] "In March 2010, the BPCIA—enacted as Title VII of the ACA—established a new regulatory authority for FDA by creating an abbreviated licensure pathway in Section 351(k) of the PHSA for biological products that are demonstrated to be 'highly similar' (biosimilar) to or 'interchangeable' with an FDA-licensed biological product." CRS (January 30, 2024), *op. cit.*, p. 8.

[126] *Ibid.* FDA, "Review and Approval," December 13, 2022 (https://www.fda.gov/drugs/biosimilars/review-and-approval) ("FDA has discretion to determine that an element is unnecessary in a proposed biosimilar application."). 42 U.S.C. § 262(a).

v.  The facility in which the biological product is manufactured, processed, packed, or held meets standards designed to assure that the biological product continues to be safe, pure, and potent."[127]

39.  Biosimilarity to the reference product is demonstrated by such data to show the product is "highly similar" and has no meaningful clinical difference to the reference product[128] (rather than bioequivalence status required of conventional generic drugs), yet biosimilars are not inherently granted interchangeability. An interchangeable biosimilar means "that the biological product may be substituted for the reference product without the intervention of the health care provider who prescribed the reference product."[129] In addition to demonstrating biosimilarity, a biosimilar manufacturer must go through another process to be granted FDA distinction of an interchangeable status: it must show that its biosimilar can "be expected to produce the *same* clinical result as the reference product in any given patient."[130] While the first biosimilar for a brand-name reference product is not eligible for any exclusivity, the first interchangeable product is.[131]

40.  Biologics and biosimilars have a different patent dispute procedure than brand NDA and generic ANDA products. Biologics go through a patent dispute procedure known as the "patent dance."[132] The patent dance is "'a carefully calibrated scheme for preparing to adjudicate, and then adjudicating, claims of infringement' by reference product sponsors (i.e., the brand-name biologic manufacturers) against biosimilar applicants."[133]

---

[127] 42 U.S.C. § 262(a)(2)(k).

[128] Dabrowska (June 6, 2019), *op. cit.*, p. 8.

[129] 42 U.S.C. § 262(a)(3)(i)(3).

[130] FDA (December 13, 2022), *op. cit.*, emphasis added. "Also, for certain interchangeable biosimilars, FDA evaluates information on the effects of switching between the reference product and the interchangeable biosimilar. Therefore, manufacturers typically conduct a switching study, in which patients alternate between the reference product and the interchangeable biosimilar, and then compare those patients to patients who are treated with only the reference product. While this additional information helps FDA to determine if a biosimilar is an interchangeable biosimilar, this does not mean that an interchangeable biosimilar is safer or more effective than other biosimilars. Both biosimilar and interchangeable biosimilars meet the same high standards for quality and similarity to the reference product. All biological products are approved only after they meet FDA's rigorous approval standards." *Ibid.* Conventional small molecule generic drugs through the "abbreviated new drug application" (ANDA) have to show "bioequivalence" to be approved by the FDA and are known as AB-rated generics. In some states, there are automatic substitution laws for AB-rated generics that contribute to the uptake of generic products. Congressional Budget Office (CBO), "How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry," July 1998, p. xiii (https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/6xx/doc655/pharm.pdf).

[131] CRS (January 30, 2024), *op. cit.*, Table 2.

[132] *Ibid.* See also 42 U.S.C. § 262 (l)(2).

[133] CRS (January 30, 2024), *op. cit.*, p. 36.

---

41.    There are two phases of the patent dance. Phase one commences upon receipt of notice that the FDA is reviewing an ABLA. The biosimilar manufacturer has 20 days to provide, both, its ABLA and information of its manufacturing process(es) to the reference product.[134] Then, the brand has a choice to provide a list of patents it believes "could reasonably" assert infringement against the biosimilar or the brand may provide a list of patents it would be prepared to license to the biosimilar manufacturer.[135] In response, the biosimilar manufacturer provides such a list of patents it may not contend with or a "detailed statement that describes, on a claim by claim basis, the factual and legal basis of the opinion of the [biosimilar manufacturer] that such patent is invalid, unenforceable, or will not be infringed by the commercial marketing of the biological product."[136] The brand manufacturer would then respond back to the biosimilar manufacturer with its own detailed statements with factual and legal bases for its opinions.[137] The two manufacturers then commit to "good faith" patent resolution negotiations, which may result in either an agreement amongst them or filing an immediate patent infringement action.[138] Phase one of the patent dance ends with either an agreement between the parties or a final court decision in the patent infringement action.[139] Phase two commences when the biosimilar manufacturer notifies the brand manufacturer no later than 180 days before of its intent to commercially market the biologic.[140] At this time, the brand manufacturer may opt to seek a preliminary injunction from the court and to sue for patent infringement on any patent not listed from phase one.[141] See Exhibit 4 below for a visual on the "patent dance."

---

[134] 42 U.S.C. § 262 (l)(2)(A-B).

[135] 42 U.S.C. § 262 (l)(3)(A).

[136] 42 U.S.C. § 262 (l)(3)(B).

[137] 42 U.S.C. § 262 (l)(3)(C).

[138] 42 U.S.C. § 262 (l)(4-6).

[139] 42 U.S.C. § 262 (l)(4-6). Between "phase one" and "phase two," the parties exchange the same information from phase one for any newly issued or licensed patents. 42 U.S.C. § 262 (l)(7).

[140] 42 U.S.C. § 262 (l)(8).

[141] 42 U.S.C. § 262 (l)(8-9). Indeed, J&J did file a motion for a preliminary injunction against biosimilar manufacturer Amgen. An agreement was reached between J&J and Amgen before the courts issued any decision on the preliminary injection. *See Janssen Biotech, Inc. v. Amgen Inc.*, 1:22-cv-1549-MN (D. Del.), Plaintiff's Motion for a Preliminary Injunction, ECF No. 24.

---

**Exhibit 4: The BPCIA "Patent Dance"**



Source: CRS, "The Role of Patents and Regulatory Exclusivities in Drug Pricing," Updated January 30, 2024, Figure 2 (https://crsreports.congress.gov/product/pdf/R/R46679).

### 3) Current State of Biosimilar Competition

42.     Like the Hatch-Waxman Act, the BPCIA has facilitated a rise in the number of biosimilars entering the market. While the impact of biosimilar competition has not been as intense as generic competition,[142] competition from biosimilars is increasing.[143] The 2023 IQVIA Institute biosimilar outlook report estimated the biologics market to be roughly $260 billion dollars.[144] Of that $260 billion, only $38 billion dollars of sales were actively facing biosimilar competition, and an additional $96 billion dollars of molecule sales have biosimilars in development.[145]

---

[142] See Attachment C.

[143] IQVIA Institute, "Biosimilars in the United States 2023–2027," January 2023, p. 5 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/biosimilars-in-the-united-states-2023-2027/iqvia-institute-biosimilars-in-the-united-states-2023-usl-orb3393.pdf).

[144] *Ibid*.

[145] *Ibid.*, p. 6.

43.    Between 2007 and 2022, 30 biosimilars launched.[146] In 2023, Humira experienced biosimilar competition, with a total of 10 Humira biosimilars entering the market. In 2024, three additional biologics experienced biosimilar entry (Actemra, Lucentis, and Eylea), followed by Stelara in January 2025.

**Exhibit 5: Biologics with Biosimilar Competition**

| Brand Biologic | Molecule | Reimbursed Under Drug Benefit? | Year of Biosimilar Launch[147] | Interchangeable Biosimilar? | Biosimilar Count[148] |
|---|---|---|---|---|---|
| Neupogen | filgrastim | - | 2015 | - | 3 |
| Lantus | insulin glargine | Yes | 2016 | Yes | 4 |
| Remicade* | infliximab | - | 2017 | - | 4 |
| Epogen | epoetin alfa | - | 2018 | - | 1 |
| Neulasta | pegfilgrastim | - | 2018 | - | 6 |
| Avastin | bevacizumab | - | 2019 | - | 4 |
| Herceptin | trastuzumab | - | 2020 | - | 5 |
| Rituxan | rituximab | - | 2020 | - | 3 |
| Humira | adalimumab | Yes | 2023 | Yes | 10 |
| Actemra | tocilizumab | - | 2024 | - | 2 |
| Lucentis | ranibizumab | - | 2024 | Yes | 2 |
| Eylea | aflibercept | - | 2024 | Yes | 1 |
| Stelara | ustekinumab | Yes | 2025 | Yes | 5[149] |

44.    Among the 13 biologics that have experienced biosimilar entry, the number of biosimilar competitors varies. Thus far, three of the branded biologics have five or more biosimilar competitors: Humira, Neulasta, and Herceptin. Stelara currently has five biosimilar competitors and is expected to have at least seven biosimilars in the first year of its biosimilar entry.

45.    Among biologics that have biosimilar competition, five have at least one biosimilar with an interchangeable designation: Stelara, Humira, Lantus, Eylea, and Lucentis (see Exhibit 5). As mentioned above, the presence of an interchangeability rating allows automatic substitution at the pharmacy, increasing biosimilar uptake.[150] All but three states now have interchangeability laws that allow

---

[146] *Ibid.*, Exhibit 5.

[147] 20 or more prescriptions in IQVIA NPA Data.

[148] Includes branded and unbranded biosimilars. IQVIA NPA Data.

[149] As of the filing of this Report.

[150] Cardinal Health, "2023 Biosimilars Report: Tracking Market Expansion and Sustainability Amidst a Shifting Industry," 2023, p. 7 (https://www.cardinalhealth.com/content/dam/corp/web/documents/Report/cardinal-health-biosimilars-report-2023.pdf) ("An interchangeability designation allows for the biosimilar to be automatically substituted for its reference product, per state laws, and is generally most relevant for products primarily dispensed in the pharmacy benefit.").

pharmacists to substitute an interchangeable biosimilar for the branded reference drug.[151] However, in some states, interchangeable substitution is conditional on the biosimilar having a lower price, and/or requires the pharmacist to get permission from the physician, patient, and/or payer in order to substitute an interchangeable.[152] This is different from small molecule generic substitution where those additional requirements are often not present.[153]

### 4) Impact of Biosimilar Competition

46.     In this section, I show the impact of biosimilar competition for Remicade*, Humira, Herceptin, and Rituxan. Remicade is J&J's other immunology biologic that has experienced biosimilar entry. It currently has four biosimilar competitors. In addition to Remicade I evaluate biologics that have at least three biosimilar competitors (Stelara currently has five biosimilar competitors but is expected to have seven in the first year)[154] and experienced biosimilar competition relatively recently.[155]

47.     Biosimilars that entered in the nascent period of the BPCIA are less likely to be representative of more recent biosimilar entries.[156] This is because frictions surrounding biosimilar uptake have been reduced in recent years as biosimilar competition has increased, interchangeable biosimilars have been approved, states have passed biosimilar interchangeability substitution laws, physicians and patients have grown more comfortable with biosimilars, and payer coverage for biosimilars has increased.[157] These

---

[151] Cardinal Health, "State Laws for Biosimilar Interchangeability" (https://www.cardinalhealth.com/en/product-solutions/pharmaceutical-products/biosimilars/state-regulations-for-biosimilar.html).

[152] *Ibid.*

[153] See Attachment C.

[154] See Exhibit 5 above. As of the filing of this Report, four Stelara biosimilars have launched: Amgen's Wezlana[S], Sandoz and Samsung's Pyzchiva[S], Biocon Biologics' Yesintek[S], and Teva and Alvotech's Selarsdi[S].

[155] Biologics that had biosimilar entry in 2020 or later (Exhibit 5).

[156] "Biosimilars first entered the market nearly a decade ago, but it took several years for them to have a meaningful impact on specialty drug spending." Pharmaceutical Strategies Group (PSG), "State of Specialty Spend and Trend Report," Summer 2024, pp. 1-35, p. 20 (https://link.psgconsults.com/2024-spend-and-trend-report). "The first biosimilar approved under the abbreviated pathway established by the Biologics Price Competition and Innovation Act launched in the U.S. in 2015, while some non-original biologics have been approved through other pathways both before and since. Despite slower initial uptake, biosimilar launches in the last three years have generally been more successful than earlier." IQVIA Institute (January 2023), *op. cit.*, p. B.

[157] "Interchangeability has increased biosimilar use where biosimilar uptake has remained low due to originator defense strategies." IQVIA Institute (January 2023), *op. cit.*, p. 19. "Payer coverage for biosimilars has been improving and increased significantly between the end of 2019 and the end of 2021, leading many biosimilars to have better coverage scores than their reference products. The increase in coverage may contribute to increased usage of biosimilars, as there does seem to be a correlation between payer coverage and market share." A. Menon and H. Kung Wong, "The State of Biosimilars in 2023," *Biologics HQ*, March 17, 2023, pp.1-10, p. 8 (https://biologicshq.com/the-state-of-biosimilars-in-2023). Amgen Inc., "2022 Biosimilar Trends Report," 2022, p. 71 (https://www.amgenoncology.com/assets/USA-CBU-80962.pdf).

---

developments have increased the impact of biosimilar competition, compared to the impact in earlier years.[158]

48.     Overall, biosimilar competition is associated with a decline in the average price of the drug molecule ("biosimilar price erosion").[159] Whether the brand loses market share depends on whether it chooses to compete with biosimilars on price.

49.     Specifically, when biosimilars launch, the brand biologic manufacturer is faced with two possible strategies: 1) lower price, retain share, 2) maintain price, lose share. An industry report by IQVIA describes this strategy tradeoff:

> "The **volume maintained by originators after facing biosimilar competition is correlated with the relative price reduction** in the originator product compared to the biosimilar. Generally, originators which have reduced prices to similar levels as biosimilar competitors have lost less volume following biosimilar entry, while **originators maintaining higher prices see significant volume loss**."[160]

50.     In other words, when lower-priced biosimilars enter the market, the brand biologic manufacturer faces a choice between giving up *price* or *quantity*: They cannot keep price the same without losing quantity. And they can only keep quantity the same by lowering price. Either way, the brand manufacturer faces a decline in net sales, since net sales are equal to price times quantity.[161] Indeed, I see this pattern of a steep decline in branded net sales data at the time of biosimilar entry (Exhibit 6).[162] For instance, Humira's net sales in the year prior to biosimilar entry (2022) were $████████ annually. In the following year, when Humira biosimilars entered, annual Humira net sales dropped to $████████.[163]

---

[158] "Recent biosimilars have achieved high volume shares, reaching more than 60% within the first three years, varying by channel." IQVIA Institute (January 2023), *op. cit.*, p. 14.

[159] For example, see Optum, "Biosimilars to Save Billions in this Decade," May 4, 2023 (https://business.optum.com/en/insights/biosimilar-savings.htm); H. Chen, T. Yemeke, and S. Ozawa, "Reduction of biologic pricing following biosimilar introduction: Analysis across 57 countries and regions, 2012–19," *PLoS One*, 19(6), 2024, pp. 1-15 (https://pmc.ncbi.nlm.nih.gov/articles/PMC11156405/pdf/pone.0304851.pdf).

[160] Emphasis added. IQVIA Institute (January 2023), *op. cit.*, p. 20. See Deposition of Brian Smith, Johnson and Johnson, in this matter, February 20, 2025, at 100:9-15 (hereafter "Smith Deposition"). ("Q. And the choice is to either offer deeper rebates and discounts for PBM[s] to maintain access on the one hand, or maintain Stelara's current net price and suffer significant market share and revenue losses, right? … A. Correct.").

[161] See Smith Deposition at 100:9-15, *op. cit.*.

[162] SSR Health Data. See also Attachment D.

[163] SSR Health Data.

The other drugs also show large drops in net sales. Similarly, Herceptin's net sales declined from $ ███

███ in the year prior to biosimilar entry to $ ██ the year of biosimilar entry.[164]

---

[164] SSR Health Data. Net sales in one year prior are the sum of net sales in the four quarters prior to biosimilar entry. Net sales in the year after biosimilar entry are the sum of net sales for the four quarters post-biosimilar entry, starting in the first quarter where biosimilar net sales appear in SSR Health Data.

**Exhibit 6: Brand Biologic Net Sales Decline Following Biosimilar Competition (in Billions)[165]**

| Humira | Remicade* |
|---|---|

| Herceptin | Rituxan |
|---|---|

Red vertical line denotes entry of first biosimilar for the brand biologic in SSR Health data. Net sales data are in billions.

51.     The trade-off between price and quantity that brand biologic manufacturers face post-loss of exclusivity (LOE) is also evident in Exhibit 7 below. To illustrate the relationship between a brand's price and quantity following biosimilar entry, I present *brand* biologics' net price trends before and after biosimilar entry, paired with their corresponding quantity trends (measured in extended units) over the same period. These charts show that drugs whose branded net price decline at the time of biosimilar entry (Humira and Remicade*), are able to retain more quantity (at least initially) compared to brands whose net prices remain relatively constant (Rituxan and Herceptin).

---

[165] SSR Health Data. See backup materials to Exhibit 6.

**Exhibit 7: Net Price and Quantity Trends for Brand Biologic Drugs**

| Brand Net Unit Prices | Brand Quantity (Extended Units)[166] |
|---|---|
| **Humira** | |
| | |
| **Remicade\*** | |
| | |

[166] As a pharmacy benefit drug, Humira is well represented in retail data (IQVIA NPA Data), therefore the source for Humira quantity is NPA extended units. As medical benefit drugs, Remicade\*, Rituxan, and Herceptin are predominantly captured in non-retail settings and therefore the source for quantity for these drugs is IQVIA wholesale data (IQVIA NSP extended units). Net prices from SSR are per unit. Humira, Remicade\*, and Herceptin are per "each" (for example, per syringe) and Rituxan is per milliliter.

| | *Exhibit 7 continued* |
|---|---|
| *Brand Net Unit Prices* | *Brand Quantity(Extended Units)[167]* |
| **Herceptin** | |
| | |
| **Rituxan** | |
| | |

Red vertical line denotes entry of first biosimilar for the brand biologic. Quantity is measured in extended units. Humira chart is limited to the 40mg/.4ml strength; the trends are identical across strengths. Remicade* has only one strength (100mg) on the market. Herceptin chart is limited to brand forms that were still on the market at the time of biosimilar entry. Rituxan chart is limited to 10mg/ml form; the 1400/11.7 trend is identical but at a higher price point.

Sources: SSR Health data and IQVIA NPA and NSP data.

---

[167] As a pharmacy benefit drug, Humira is well represented in IQVIA NPA Data, therefore the source for quantity is NPA extended units. As medical benefit drugs, Remicade*, Rituxan, and Herceptin are not well represented in retail settings (IQVIA NPA Data), and therefore the source for quantity for these drugs is NSP extended units. Net prices from SSR are per unit. Humira, Remicade*, and Herceptin are per "each" (for example, per syringe) and Rituxan is per milliliter.

52.    The above charts show that when Humira biosimilars entered, Abbvie cut Humira's 40mg/.4ml average net price almost in half in a single quarter, decreasing its net price from $⬛ per syringe in the quarter prior to biosimilar entry to $⬛ the following quarter.[168] Humira's decline in net price allowed Humira to retain substantial quantity: Humira brand quantity remained almost flat at approximately ⬛ extended units for the first year of biosimilar entry. It was not until 2024Q2 that Humira's quantity declined more substantially, to ⬛ extended units. Even then, the quantity trend regained stability and remained at that level for the remainder of the data period, rather than continuing to decline. J&J similarly competed on net price when Remicade* faced biosimilar entry. J&J steadily reduced Remicade's net price, and as a result Remicade's quantity remained at almost pre-LOE levels until 2021Q1 – four years after Remicade's biosimilar entry.

53.    In contrast, Genentech, which manufactures Herceptin and Rituxan, took a different approach, and kept their net prices relatively constant after their biosimilars entered the market.[169] The corresponding brand quantity charts show the outcome of Genentech's decision not to compete with biosimilars on net price: Herceptin and Rituxan's quantities eroded much more steeply and to a much lower level than that observed for Humira and Remicade, which did compete on net price.

54.    Although Exhibit 7 focuses on *brand* biologic net prices, *biosimilar* net prices also drive molecule-level erosion in net price.[170] The relative net prices of the brand vs. biosimilar will influence their market shares. For instance, as described above, competing on net price allowed Humira and Remicade to retain substantial brand quantity. However, whether it is the brand or the biosimilars that have the molecule market share is immaterial for the question of market power. Instead, the relevant metric is whether the *overall molecule price goes down* with the removal of the challenged restraint, here, the delay in biosimilar entry. In other words, if the molecule price that prevailed prior to biosimilar entry (pre-LOE brand price) is higher than the post-LOE molecule prices (brand and/or biosimilar prices), that implies that the price without competition is higher than the price with competition (i.e. the brand price was supracompetitive). Attachment D shows the relative brand and biosimilar net prices for Humira, Remicade, Herceptin, and Rituxan before and after biosimilar entry. The charts in Attachment D show that molecule net prices decline following biosimilar entry for all four molecules.

---

[168] SSR Health Data. See Smith Deposition, at 200:22-201:5. ("Q. [I]n the middle of the chart is the Humira net pre-biosim of 45,000 and dropping to 23,000 post-biosimilar, right? A. … Yes, I see that."); JNJ-STELARA_002712464, at slide 4. See also Attachment D, Exhibit D.1.

[169] Rituxan had a temporary, relatively small decline in net price from 2020Q1 to 2021Q3 and then returned to close to its prior net price levels.

[170] See Attachment D.

[Content redacted]

56.     Relative prices of brand versus biosimilars influence biosimilar uptake in many ways. First, it influences whether a pharmacy can substitute the biosimilar for the branded reference product. Biosimilars that receive the interchangeability designation from the FDA can be substituted for the branded product in many states.[175] However, as discussed above, many states require the interchangeable biosimilar to be cheaper than the brand biologic reference product in order to allow substitution with the biosimilar product by the pharmacist.

57.     Relative prices also play a role in formulary coverage for branded versus biosimilar products. If the brand biologic lowers its net price following biosimilar entry, the biosimilar will have to discount (increase rebates) similarly to gain favorable formulary access. Biologic industry reports and articles noted that Remicade[176] and Humira[177] both faced slow erosion initially due to lags in favorable formulary placement for their biosimilars, due to J&J and Abbvie's respective aggressive net price discounting, as shown above.

58.     Brand biologics' strategy to lower net prices at the time of biosimilar entry is even implemented into their contracts with pharmacy benefit managers (PBMs) in advance of biosimilar entry: Brand manufacturers utilize long-term contracts with PBMs to lock in favorable formulary coverage for their brand product(s) beyond loss of exclusivity, sometimes including bundled rebates with their other branded products, or including clauses that automatically increase rebates at the time of biosimilar

---

[175] See ¶ 39 above and Cardinal Health (2023), *op. cit*, p. 7.

[176] IQVIA found that even after the launch of infliximab biosimilars, most commercial plans preferred the originator. As formulary status improved for the infliximab biosimilars, market share increased over time, which was about four to five years for meaningful uptake. Managed HealthCare Executive, "IQVIA: Rebates put Biosimilar Manufacturers at a Disadvantage," Formulary Watch, February 2024 (https://www.managedhealthcareexecutive.com/view/iqvia-rebates-put-biosimilar-manufacturers-at-a-disadvantage). See also, IQVIA Institute, "Long-term Market Sustainability for Infused Biosimilars in the U.S.," January 2024 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/long-term-market-sustainability-for-infused-biosimilars-in-the-us/iqvia-us-biosimilars-sustainability-01-2024-forweb.pdf) ("Took four years for Remicade (infliximab) biosimilars to receive a formulary position to encourage use.").

[177] "In 2023, adalimumab biosimilars[H] gained virtually no traction when covered at parity with the reference product Humira®. Only once CVS Health launched its Cordavis distributor subsidiary in April 2024 did adalimumab biosimilar[H] uptake begin to rise. And rise it did: Within a month's time, overall biosimilar utilization jumped to 10%, from 2% in March 2024. S. Mehr, "PBM Private Labeling A Boon or Bane to Biosimilar Drug Makers," BR&R, November 26, 2024 (https://biosimilarsrr.com/2024/11/26/pbm-private-labeling-a-boon-or-bane-to-biosimilar-drug-makers).

entry.[178]

59.    "Dual pricing" is another strategy used for formulary placement and involves brand biologics and biosimilars entering the market with two versions of the same product (identical in strength, form, dose, package size), but with two different list prices – a high WAC and a low WAC.[180] In this case, the high WAC product is used in contracts with PBMs in conjunction with high rebates, whereas the low WAC version has a lower list price, but little to no rebates.[181] Note that the low WAC version would necessarily be closer to the net price, since that price has few or no rebates.[182]

60.    Brand manufacturers can implement dual pricing by launching an unbranded biosimilar version of their product to compete with the biosimilars on net price.[183] This strategy is in the same vein as the strategy observed above of reducing the branded net price to compete with biosimilars. Instead (or in addition to) reducing its own brand price in line with the biosimilar competition, the brand manufacturer can launch an unbranded biosimilar as a way to compete with biosimilars at a lower price.

---

[178] "One of AbbVie's strategies was to warn health plans that if they recommended biosimilars over Humira they would lose rebates on purchases of Skyrizi and Rinvoq, …In other words, dropping one AbbVie drug would lead to higher costs for others." A. Allen, "Save Billions or Stick With Humira? Drug Brokers Steer Americans to the Costly Choice" (https://kffhealthnews.org/news/article/humira-abbvie-biosimilar-biologic-savings-pbm-rebates/). "The immunology space has historically been heavily contracted, and AbbVie prepared the loss of exclusivity in advance by securing contracts to entrench Humira in formularies. Our research indicates that Humira discounts and rebates have reached 60%-85% off the brand WAC price. AbbVie also seems to have leveraged its broader immunology portfolio with Skyrizi and Rinvoq in contracting to solidify and defend its franchise." M. Tomassi and N. Economides, "Biosimilar Makers Carve New Path Via Contracting, Partnering" (https://www.oliverwyman.com/our-expertise/perspectives/health/2024/jun/biosimilar-makers-carve-new-path-via-contracting-partnering.html). "AbbVie also has two-year deals with several PBMs to secure Humira's placement on their reimbursement lists…slowing the adoption of the biosimilars by payers until they review the contracts that are currently in place." C. Humphries and J. Scanlan, "Humira Biosimilars: Pricing, Contracting and Interchangeability" (https://www.mmitnetwork.com/thought-leadership/humira-biosimilars-pricing-contracting-interchangeability/).



[180] Humphries and Scanlan, *op. cit.* B. Comer, "That Price is WAC: Boehringer's Push for Access to Humira Biosimilars," (https://www.lifescienceleader.com/doc/that-price-is-wac-boehringer-s-push-for-access-to-humira-biosimilars-0001). Samsung Bioepis, "Biosimilar Market Report," 2024, Figure 6 (https://www.samsungbioepis.com/upload/attach/SB+Biosimilar+Market+Report+Q1+2024.pdf).

[181] Humphries and Scanlan, *op. cit.* Comer, *op. cit.* Samsung Bioepis, "Biosimilar Market Report," *op. cit.*

[182] Humphries and Scanlan, *op. cit.* Comer, *op. cit.* Samsung Bioepis, "Biosimilar Market Report," *op. cit.*

[183] IQVIA Institute (January 2023), *op. cit.*, p. 2.

---

██████████████████████████████████████████████ ██ ████████

████

61.     In recent years, biosimilars have received more favorable formulary status than they did when biosimilars were newer and fewer.[186] One reason that biosimilars have been more successful in gaining formulary coverage is the emergence of "private-label" partnerships. In the last four years, all of the "big three" PBMs have launched biosimilar procurement subsidiaries that are known as private-label distributors.[187] Private-label distributors are sometimes the sole distributor, and sometimes jointly distribute the biologics.[188]

**Exhibit 9: Private Label Distributors**

| Parent company | PBM | Private-Label Distributor | Date Private Label Subsidiary Formed |
|---|---|---|---|
| **United Health** | OptumRx | Nuvaila | June 2024 |
| **CVS Health** | CVS Caremark | Cordavis | August 2023 |
| **Cigna** | Express Scripts (ESI) | Quallent[189] | 2021 |

62.     Partnerships with private-label distributors often involve include favorable formulary coverage on the private-label parent company PBM's plans, but an agreement with a given PBM's private-label does

---

[184] JNJ-STELARA_000167000_CONFIDENTIAL, at tab "Per Unit Profitability Table."

██ ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[186] See Segal, "Q1 2025 Trends Focus: Biosimilars," 2025 (https://www.segalco.com/consulting-insights/q1-2025-trends-focus-biosimilars).

[187] A. Maas, "PBM Private-Label Units Are Drawing Pharma Contracting, Scrutiny," *AIS Health*, October 3, 2024 (https://aishealth.mmitnetwork.com/blogs/spotlight-on-market-access/pbm-private-label-units-are-drawing-pharma-contracting-scrutiny).

[188] A sole distribution agreement example is Amgen's Wezlana, which is distributed solely by Nuvaila. But, several Humira biosimilars have joint distribution agreements: Amgen's Amjevita is distributed jointly by Nuvaila and Amgen, and Sandoz's Hyrimoz is distributed jointly by Sandoz and Cordavis. See IQVIA Data; FDA NDC Directory; and A. Maas, "Optum's Nuvaila Is Sole Distributor of First Stelara Biosimilar, Wezlana," *AIS Health*, January 9, 2025 (https://aishealth.mmitnetwork.com/blogs/radar-on-specialty-pharmacy/optum-s-nuvaila-is-sole-distributor-of-first-stelara-biosimilar-wezlana).

[189] Quallent has private label small molecules as well as biologics. FDA, NDC Directory: "Quallent," Current through February 28, 2025 (https://dps.fda.gov/ndc/searchresult?selection=finished_product&content=LABELERNAME&type=quallent).

not preclude coverage on other PBMs' formularies.[190] When a biosimilar receives favorable formulary coverage, it acts as an accelerant for biosimilar uptake; for instance, when CVS' private-labeler Cordavis partnered with biosimilar manufacturer Sandoz on their Humira biosimilar (Hyrimoz[H]), the Hyrimoz[H] market share increased dramatically in the first month.[191] Nuvaila, Cordavis, and Quallent all have private-label versions of Humira biosimilars.[192] Additionally, Cordavis has a private-label deal with Abbvie's Humira that allows Cordavis to sell a private-label version of branded Humira.[193]

63.    Stelara's biosimilars have already entered private-label deals with all three private-label distributors. Amgen's Wezlana[S] will be distributed exclusively via Nuvaila.[194] Cordavis and Quallent also have announced Stelara biosimilar private label deals, but have not yet disclosed which biosimilar.[195] ▮



---

[190] Optum offers favorable formulary coverage not just for their co-labeled Amjevita, but also for Quallent's private label Humira biosimilar. OptumRx, "Optum Rx Medicare Prescription Drug Plan: Your 2024 Comprehensive Formulary," August 1, 2024 (https://content-hub.optumrx.com/media/2024-08/2024-EGWP-Formulary.pdf).

[191] Mehr, *op. cit.* ("In 2023, adalimumab biosimilars gained virtually no traction when covered at parity with the reference product Humira®. Only once CVS Health launched its Cordavis distributor subsidiary in April 2024 did adalimumab biosimilar uptake begin to rise. And rise it did: Within a month's time, overall biosimilar utilization jumped to 10%, from 2% in March 2024.").

[192] *Ibid.*

[193] L. Small, "2025 Formularies: Humira Is Out, White-Label Biosimilars Are In," *AIS Health*, February 20, 2025 (https://aishealth.mmitnetwork.com/blogs/spotlight-on-market-access/2025-formularies-humira-is-out-white-label-biosimilars-are-in).

[194] P. Wehrwein, "Wezlana, First Stelara Biosimilar To Hit the Market, Available Only Through Optum's Nuvaila," *Managed Healthcare Executive*, January 22, 2025 (https://www.managedhealthcareexecutive.com/view/wezlana-first-stelara-biosimilar-to-hit-the-market-available-only-through-optum-private-label).

[195] PSG, "Stelara Biosimilars: Preparing for the Upcoming Market Shift," December 16, 2024 (https://www.psgconsults.com/blog/stelara-biosimilars-preparing-for-the-upcoming-market-shift). Per ProspectoRx (see backup materials to Exhibit 15), it appears Quallent has partnered with Sandoz.

████████████████████████████ Thus far, the only biologics that are sold via Nuvaila, Cordavis, and Quallent are Humira brand and biosimilars, and Stelara biosimilars.[198]

64.   While there is variation in the *relative* price erosion for the brand vs. its biosimilars, biosimilar entry is associated with a decline in prices for the *molecule as a whole* (Exhibits 7-8, Attachment D). In other words, biosimilar competition results in a decline in prices.

## V.   OVERVIEW OF MARKET POWER

65.   There are two main forms of evidence used to assess market power: direct evidence and indirect evidence. *Direct evidence* of market power includes evidence of prices and profit margins that is then used to determine whether defendants raised the price of the focal product to supracompetitive levels for a sustained period of time without a substantial loss in profits. *Indirect evidence* involves economic analyses to determine which other products are part of the focal product's relevant market.

66.   Antitrust in the pharmaceutical industry involves measuring whether a firm has enough market power to harm competition in the market where it sells its products. In the United States, the Department of Justice (DOJ) and Federal Trade Commission (FTC) are responsible for antitrust enforcement under key regulations enacted by Congress. The primary regulation involved in antitrust matters is the Sherman Act, which prohibits restraint of trade. Under Section 1 of this Act, the courts have defined a firm's "market power" as when "pric[e] can be raised above the levels that would be charged in a competitive market."[199] In a perfectly competitive market, price is set at marginal cost and profits from incremental



---

[198] Sometimes the agreement pertains to a branded biosimilar or brand, and sometimes an unbranded version. FDA, "National Drug Code Directory [Quallent]" (https://dps.fda.gov/ndc/searchresult?selection=finished_product&content=LABELERNAME&type=quallent). FDA, "National Drug Code Directory [Optum]" (https://dps.fda.gov/ndc/searchresult?selection=finished_product&content=LABELERNAME&type=optum). FDA, "National Drug Code Directory [Cordavis]" https://dps.fda.gov/ndc/searchresult?selection=finished_product&content=LABELERNAME&type=cordavis.

[199] *NCAA v. Board of Regents*, 468 U.S. 85, 109 n.38 (1984); *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 27 n.46 (1984) ("market power exists whenever prices can be raised above the levels that would be charged in a competitive market").

sales are zero.[200] Thus, market power is measured by a firm's ability to raise its price above marginal cost and earn profits. Higher profit margins indicate greater market power. This is called direct evidence of market power.

67.     In considering indirect evidence of market power, courts have established two characteristics of a relevant antitrust market: a geographic market, which determines where these products are being sold, and a product market, consisting of specific goods that constrain the firm's ability to price above marginal cost.[201] In the pharmaceutical industry, the relevant geographic market is the entire United States.

68.     In order to determine the products that are part of the relevant antitrust market, the DOJ and FTC have published and updated "Horizontal Merger Guidelines" that explain how to define "a group of products [that] is sufficiently broad to constitute a relevant antitrust market."[202] One way the Guidelines measure this is by utilizing the Hypothetical Monopolist Test (HMT).[203] The HMT asks whether a hypothetical monopolist that controlled one or more candidate products would find it profitable to impose a "'small but significant and non-transitory' increase in price" ("SSNIP") on at least one product.[204] If the hypothetical monopolist would find it profitable to impose this SSNIP (because buyers would not switch to a substitute product outside the candidate market in sufficient numbers to render the SSNIP unprofitable), then the market is correctly defined, and the antitrust analysis of market power can proceed. However, if the hypothetical monopolist would *not* find it profitable to raise the price of at least one product (because buyers would switch to a substitute product outside the candidate market in sufficient numbers to render the SSNIP unprofitable), then the relevant market is defined too narrowly and should be expanded to include the substitute product. Once the relevant product market is correctly determined, then the conduct of defendant firms is analyzed to determine if there is evidence of market power.

69.     I present direct evidence of market power in Section VI by showing that J&J had abnormally high gross profit margins for Stelara, and that J&J priced Stelara supracompetitively prior to biosimilar entry in

---

[200] J. Perloff, *Microeconomics*, 6th ed., Addison-Wesley for Pearson Education, 2012, p. 438. ("[A] competitive firm faces a horizontal demand curve, so its price equals its marginal cost."). D. Carlton, and J. Perloff, *Modern Industrial Organization*, 4th ed., Pearson/Addison-Wesley, 2005, pp. 92-93.

[201] ABA Pharmaceutical Industry Antitrust Handbook, 2nd ed., p. 159.

[202] *Ibid.* Department of Justice (DOJ) and FTC, *1992 Horizontal Merger Guidelines*, April 2, 1992 (hereafter "Horizontal Merger Guidelines"); revised August 19, 2010, p. 8 (https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf); DOJ and FTC, "Merger Guidelines," December 18, 2023 (hereafter "2023 Merger Guidelines"), at §4.3, § 1.0 and § 1.11 (https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf).

[203] Horizontal Merger Guidelines.

[204] Horizontal Merger Guidelines.

January 2025. I present indirect evidence of market power in Section VII by showing the following: 1) J&J's dramatic increases in Stelara sales over time despite their supracompetitive pricing of Stelara; 2) empirical regression results from natural experiments showing that potential economic substitutes had no economic ability to constrain J&J from pricing Stelara at supracompetitive levels; and 3) conclusions of the Hypothetical Monopolist test showing that the relevant antitrust market is brand and biosimilar Stelara, and that J&J had substantial market power in that relevant market during the period of interest. Both direct and indirect evidence of market power indicates that J&J had substantial market power with respect to Stelara prior to biosimilar entry in January 2025.

## VI.    DIRECT EVIDENCE OF MARKET POWER

70.     As stated above, market power is defined as the ability of a firm to sustain supracompetitive prices for a sustained period of time, without a substantial loss in profits. As I show below, there is clear evidence that J&J was able to price Stelara supracompetively. Specifically, in this section I present the following direct evidence of J&J's market power with respect to Stelara: 1) J&J's high gross profit margins on Stelara indicate prices above competitive levels, 2) J&J priced Stelara well-above the prices that are expected to prevail with full biosimilar entry, and the actual prices that have already prevailed in just over two months of biosimilar entry.

### A.    Gross Margins

71.     According to economic theory, in a perfectly competitive market, price is *equal* to marginal cost. In contrast, in a monopoly market, a firm can set prices *above* marginal cost.[205] The Lerner Index is a measure that quantifies the extent to which a firm's price for a product is higher than its marginal cost. Specifically, the Lerner Index is calculated as the difference between price (P) and marginal cost (MC), divided by price (P):

$$L = \frac{P - MC}{P}$$

72.     The Lerner Index ranges from 0 to 1, with a value close to 1 indicating a very high presence of market power, and 0 indicating no market power. The Lerner Index is in effect a product-level gross

---

[205] In order to maximize profit, a monopolist will set their price such that the marginal revenue they receive from selling one more unit (e.g., capsule) equals their marginal cost of producing that unit. Carlton and Perloff, *op. cit.*, p. 93.

profit margin. Gross profit margins are calculated as "net sales" minus "cost of goods sold," divided by "net sales." High gross profit margins indicate large markups of price over marginal cost.





74.     Notably, gross margins do not include past investments, known as sunk costs, such as research and development (R&D) or marketing costs. Sunk costs are expenses that have already been incurred and are not recoverable. It is well known in economics that sunk costs do not matter.[210] More generally, gross profit is an established accounting measure that captures the portion of sales revenue that remains as profit after subtracting the cost of producing the product.[211] ███████████████████████

---

[209] ████████████████████████████████████████████████
████████████████████████████

[210] Moreover, a company does not set prices based on what it needs to charge to make up for sunk costs, such as research and development. F. Scherer, "The Pharmaceutical Industry: Prices and Progress," *New England Journal of Medicine*, 351(9), 2004, pp. 927-32, p. 929. U.S. Congressional Budget Office, "Research and Development in the Pharmaceutical Industry," October 2006, p. 4, fn. 2 (https://www.cbo.gov/sites/default/files/109th-congress-2005-2006/reports/10-02-drugr-d.pdf). █████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

[211] A. Hayes, "Gross Profit: What It Is & How to Calculate It," June 27, 2024 (https://www.investopedia.com/terms/g/grossprofit.asp#:~:text=Gross%20profit%20is%20calculated%20by,operating%20expenses%20from%20gross%20profit). Corporate Finance Institute, "Cost of goods sold (COGS)," November 27, 2022 (https://corporatefinanceinstitute.com/resources/knowledge/accounting/cost-of-goods-sold-cogs/).







### B.    J&J and Biosimilar Manufacturers Expected Price Declines Upon Biosimilar Entry

76.    The Supreme Court has defined a firm's "market power" as when "pric[e] can be raised above the levels that would be charged in a competitive market."[216] Others similarly state that a firm has market power "if it is profitably able to charge a price above that which would prevail under competition."[217] Not only do these established legal standards for market power make it clear that the competitive benchmark is the price that would prevail absent the challenged conduct, *i.e.*, the price that prevails with full biosimilar entry, this is also true as a matter of applied microeconomics. Since economists use the concept of market power to test for whether some specified conduct can have anticompetitive effects, our analyses of price and output are necessarily shaped by the empirical question at issue. Given the recent timing of the actual Stelara biosimilar launch, the competitive market, and thus the competitive price, will not be observed for some time because prices are forecast to decline over time, consistent with the experience of

---

[216] See ¶¶ 65-67 and fn. 199 above.

[217] See ¶¶ 65-67 and fn. 200 above.

other molecules that have faced biosimilar entry.[218] Although the ustekinumab competitive price has not yet emerged, the initial list price declines already seen show that the competitive price is much lower than that which prevailed over the period of challenged conduct.[219]



---

[218] Stelara biosimilars have just started to launch, with Wezlana[S] launching on January 1, 2025, just over two months before the filing of this Report, four others launching in the last ten days, and one more expected to launch in several days. As illustrated in Exhibit 7 above, and in Attachment D, while there is an initial drop in the molecule price (brand, biosimilar, or both) at the time of biosimilar entry, this initial decline is a conservative boundary for the competitive price because prices continue to decline overtime. Prior research shows that it can take years to reach the eventual competitive equilibrium following biosimilar entry. Amgen Inc., "2022 Biosimilar Trends Report," *op. cit.*, p. 13.

[219] See Exhibit 15 below.



### 2) Biosimilar Manufacturers Also Forecast Biosimilar Erosion

80.     In addition to forecasts from J&J, I have reviewed forecasts from biosimilar manufacturers that have already launched or are expected to launch ustekinumab biosimilars. These biosimilar forecasts provide insights regarding biosimilars planned pricing strategies, expected biosimilar uptake, expected brand market share erosion, expected biosimilar launch dates, and the expected number of ustekinumab biosimilars.

<u>Amgen Forecasts</u>

81.     Amgen received FDA approval on October 31, 2023, for its biosimilar and interchangeable version of Stelara, known as Wezlana[S].[228] I understand that the health plans allege that Amgen was ready,



[228] FDA, Approval Letters for BLAs 761285/761331 [Wezlana, Amgen] (October 31, 2023), *op. cit.*

willing, and able to commercialize Wezlana[S] as early as October 2023, absent J&J's alleged unlawful conduct.[229] To assess Amgen's expectations prior to their settlement with J&J, I review forecasts made by Amgen before and after their settlement with J&J.[230] These forecasts indicate Amgen's expectations regarding launch timing, other biosimilar entry, projected Wezlana[S] sales, payer coverage, and planned pricing strategy (discount rates, gross prices, and net prices).[231] Amgen forecasted the direct impacts of ███████████████████████████████. Amgen forecasts look at the █████████████ ██████ for both Stelara and Wezlana[S] with the cheapest estimated cost of therapy for Stelara being ████████.[232] In a 2024 forecast, Amgen estimated the gross cost of therapy per patient per year for Wezlana[S] to be $█████ – █████████ than Amgen's forecasted annual gross cost for Stelara.[233] Furthermore, Amgen estimated the annual net cost per patient. The ██████████████ is important because Amgen planned to, and currently is, offering ████████████████████████████████. As previously discussed, ██████████████████████████ options are likely to have similar net prices.[234] Regardless of the WAC price, Amgen planned to ███████████ their Wezlana[S] product and frequently estimated the ██████████████ for Wezlana[S] to be less than █████████ dollars a year.[235] While some earlier years may have forecasted ███████████████, the general trend of forecasted annual net costs for a patient declined as loss of exclusivity approached.[236] One Amgen forecast aimed to undercut Stelara's net price by ██%.[237] Furthermore, Amgen aimed to measure the impact of their private label deal with ██████ One document shows that in the first year alone, Amgen's deal with ██████ increased their forecasted net sales by $█████████, followed by an additional $█████████ in net sales

---

[229] Health Plans Complaint; Amgen Reply in Support of Amgen's Inc.'s Motion to Quash Carefirst of Maryland, Inc., *et al*.'s Deposition Subpoena, January 1, 2025, p. 1.

[230] Amgen Reply in Support of Amgen's Inc.'s Motion to Quash Carefirst of Maryland, Inc., *et al*.'s Deposition Subpoena, January 1, 2025, pp. 2-3, 12-13.

[231] Amgen Reply in Support of Amgen's Inc.'s Motion to Quash Carefirst of Maryland, Inc., *et al*.'s Deposition Subpoena, January 1, 2025, pp. 2-3, 12-13.

[232] AMG_23CV629_000000206, at tabs "LLP," "SLP," and "LLP+SLP"; AMG_23CV629_000000207, at tabs "LLP," "SLP," and "LLP+SLP"; AMG_23CV629_000000008, at tab "Sales."

[233] AMG_23CV629_000000008, at tab "Sales."

[234] See ¶ 59 above.

[235] AMG_23CV629_000000206, at tabs "LLP," "SLP," and "LLP+SLP"; AMG_23CV629_000000207, at tabs "LLP," "SLP," and "LLP+SLP"; AMG_23CV629_000000011, at 014; AMG_23CV629_000000008, at tab "Sales"; AMG_23CV629_000000027-034, at 031.

[236] See AMG_23CV629_000000079-205, at 149. This document also estimated ██████████████████ than later documents, perhaps allowing Amgen to have more pricing power (AMG_23CV629_000000079-205, at 144).

[237] AMG_23CV629_000000035-074, at 051.

through ▮.[238] This is likely due to the increased market share erosion Amgen forecasted as a result of the ▮▮▮▮, which nearly quadrupled.[239]

Teva and Alvotech Forecasts

82.    Teva and Alvotech were granted FDA approval of their biosimilar version of Stelara under the trade name "Selarsdi" on April 16, 2024.[240] Teva is the commercializing partner of Alvotech, and they plan to bring Selarsdi[S] to market together.[241] An Alvotech forecast shows that they originally expected to launch their ustekinumab biosimilar in ▮▮▮, almost a year earlier than the February 21, 2025 entry date agreed to in Teva/Alvotech's settlement with J&J.[242] Alvotech expected that Stelara's biosimilars would erode a substantial portion of the ustekinumab market, with biosimilar market share increasing from ▮% to ▮% in the first 5 years of biosimilar entry.[243] Alvotech noted that they expected price erosion of ▮% in the first year of biosimilar entry, followed by an additional ▮% decline every year after that until 2031.[244]

83.    Teva's produced forecasts indicate a planned launch date of February 21, 2025, aligning with the date agreed upon in their settlement with J&J, and with their actual launch date.[245] These forecasts show Teva anticipates substantial price erosion: Teva planned to set a WAC price ▮% lower than the Stelara brand WAC[246] with additional discounts resulting in a net price over ▮% below the branded WAC.[247] Indeed, Teva launched with a WAC ▮% below Stelara's pre-LOE WAC (Exhibit 15 below). Assuming

[238] AMG_23CV629_000000003-005, at 004.

[239] AMG_23CV629_000000321, at tab "Revenue Model."

[240] See FDA, Alvotech Approval Letter for BLA 761343 (Selarsdi), April 16, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761343Orig1s000ltr.pdf).

[241] Health Plans Complaint, ¶ 230.

[242] USTE_ALVO_0000023430, at tab "Uste Forecast." Teva Press Release, "Alvotech and Teva Secure U.S. License Date for AVT04, a Proposed Biosimilar to Stelara®," June 12, 2023 (https://www.tevapharm.com/news-and-media/latest-news/alvotech-and-teva-secure-u.s.-license-date-for-avt04-a-proposed-biosimilar-to-stelara/).

[243] USTE_ALVO_0000023430, at tab "Uste Assumptions."

[244] Note that this forecast does not specify which price this erosion is based on. USTE_ALVO_0000023430, at tab "Uste Forecast."

[245] USTE_TEVA_0000000035-055 at 039; USTE_TEVA_0000000056-063 at 062; USTE_TEVA_0000000064-072 at 071. Teva Press Release, "Teva and Alvotech Announce SELARSDI™ (ustekinumab-aekn) Injection Now Available in the U.S.," TevaPharm, February 21, 2025 (https://www.tevapharm.com/news-and-media/latest-news/teva-and-alvotech-announce-selarsdi-ustekinumab-aekn-injection-now-available-in-the-u.s).

[246] USTE_TEVA_0000000056-063 at 061; USTE_TEVA_0000000064-072 at 070; USTE_TEVA_0000000035-055 at 045.

[247] USTE_TEVA_0000000056-063 at 061; USTE_TEVA_0000000064-072 at 070.

that their forecasted discounts remained unchanged from these forecasts, Teva's unit net price for the 90mg/ml per syringe will be over \$█████ cheaper than Stelara's corresponding net price prior to biosimilar entry.[248] The net price indicates the price net of all discounts, rebates, and any other sales adjustments. Teva expected Selarsdi[S] to capture between ████% of the ustekinumab market in the first year, and between ████% in the second year on the market.[249]

<u>Samsung and Sandoz Forecasts</u>

84. Samsung partnered with Sandoz, a subdivision of Novartis that focuses on generic and biosimilar products, in September 2023 to develop and commercialize their biosimilar ustekinumab.[250] Samsung Bioepis was granted FDA approval on June 28, 2024, for their biosimilar named "Pyzchiva" under two separate BLAs.[251] Samsung has provided a series of long range projections (LRPs) for the launch of Pyzchiva[S] dating back to █████.[252] Samsung expected Stelara biosimilar entry to occur between ██ ██ ███████████, and forecasted their own biosimilar entry (Pyzchiva[S]) to occur ████████████████████ ████████████████████████████.[253] In total, Samsung anticipated there being at least 5 other biosimilars in the market.[254] In ████████████████████, Samsung expected peak market share erosion between ██████%, but more ████████████████████ indicate higher expected market share erosion between ██████%.[255] In 2023, Samsung forecasts indicate their strategy to set Pyzchiva[S] net prices at a ████████████ from the Stelara branded ████████. Net price discounts from Stelara's WAC range from a ██% discount for the 130MG vial form to a ██% discount for the 45MG vial in their first year on

---

[248] Stelara's net price prior to loss of exclusivity for the 90mg strength was \$8,543. Teva's average forecasted net price for the 90mg strength was \$████. See backup materials to Exhibits 13 and 14. Note that Teva's actual net prices for Selarsdi and/or data that would allow me to calculate them is not yet available. Once those data are available, I can check how those net prices compare to Stelara's pre-LOE net prices.

[249] USTE_TEVA_0000000056-063 at 059; USTE_TEVA_0000000064-072 at 068.

[250] Sandoz Announces Exclusive Deal to Commercialize Biosimilar Ustekinumab, Further Reinforcing Growing Pipeline and Immunology Patient Offering," September 11, 2023 (https://www.novartis.com/news/media-releases/sandoz-announces-exclusive-deal-commercialize-biosimilar-ustekinumab-further-reinforcing-growing-pipeline-and-immunology-patient-offering).

[251] See FDA, Samsung Bioepis Approval Letter for BLAs 761373/761425 (Pyzchiva), June 28, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761373Orig1s000;761425Orig1s000correctedltr.pdf); BLA 761373 is for the 45 mg/0.5mL and 90 mg/mL pre-filled syringe, whereas BLA 761425 is for the 130 mg/26mL vial.

[252] CARE-SB-00000264.

[253] CARE-SB-00000264.

[254] CARE-SB-00000264, at tab "2022 LRP." The Korean to English translation of "□ □ □ 5□ □" is "Number of companies 5 or more" (https://translate.google.com/?sl=auto&tl=en&text=%EC%97%85%EC%B2%B4%EC%88%985%EC%9D%B4%EC%83%81&op=translate).

[255] CARE-SB-00000264.

the market. All forms but the 130MG vial reach ▮▮ erosion in the first ▮▮▮▮ on the market.[256] In the final year of the forecast, Samsung anticipates the minimum discount to be ▮% for the 130MG vial after it being on the market for 10 years, and ▮% for all other forms after ▮▮▮▮ on the market depending on the form.[257]

85.    Sandoz forecasted biosimilar market share erosion and net price erosion on a form and dosage basis. Sandoz expected biosimilars to capture ▮%[258] to ▮%[259] of the ustekinumab market in their first year on the market, ultimately increasing to ▮▮▮% of the market.[260] Sandoz reports price erosion in terms of discount from the branded WAC price to their own net price. In the first year, Sandoz's highest potential net price for Pyzchiva$^S$ is ▮% below the branded WAC price.[261] Sandoz's lowest net price for Pyzchiva$^S$ in Year 1 ranges from ▮▮▮% off of the branded WAC.[262] Sandoz forecasts anticipated launching the prefilled syringe and vial formulations in late 2024, with the autoinjector formulation coming in 2025.[263]

Fresenius Kabi and Formycon AG Forecasts

86.    Fresenius Kabi and Formycon AG plan to bring an ustekinumab biosimilar to market, with Formycon acting as the commercializing partner.[264] Fresenius received FDA approval to market their biosimilar on September 27, 2024, under the trade name "Otulfi."[265] One Fresenius forecast anticipated a

---

[256] CARE-SB-00000264, at tab "2023 LRP."

[257] CARE-SB-00000264, at tab "2023 LRP."

[258] SANDOZ_USTEK_0001093, at 100-101; SANDOZ_USTEK_0001261-272, at 262; SANDOZ_USTEK_0001362, at tab "Forecast_Input."

[259] SANDOZ_USTEK_0001199, at tab "PFS Forecast Model."

[260] SANDOZ_USTEK_0001261-272, at 262; SANDOZ_USTEK_0001473, at tab "Forecast_Input"; SANDOZ_USTEK_0001362, at tab "Forecast_Input"; SANDOZ_USTEK_0001305, at tab "Forecast_Input"; SANDOZ_USTEK_0001304, at tab "Forecast_Input"; SANDOZ_USTEK_0001471, at tab "Net sales assessment"; SANDOZ_USTEK_0001093-120, at 100-101; SANDOZ_USTEK_0001196, at tab "Forecast_Input"; SANDOZ_USTEK_0001199, at tab "PFS Forecast Model."

[261] SANDOZ_USTEK_0001261-272, at 262; SANDOZ_USTEK_0001362, at tab "Forecast_Input."

[262] SANDOZ_USTEK_0001261-272, at 262; SANDOZ_USTEK_0001473, at tab "Forecast_Input"; SANDOZ_USTEK_0001362, at tab "Forecast_Input"; SANDOZ_USTEK_0001305, at tab "Forecast_Input"; SANDOZ_USTEK_0001304, at tab "Forecast_Input"; SANDOZ_USTEK_0001471, at tab "Net sales assessment"; SANDOZ_USTEK_0001093-120, at 100-101; SANDOZ_USTEK_0001196, at tab "Forecast_Input"; SANDOZ_USTEK_0001199, at tab "PFS Forecast Model."

[263] *Ibid*.

[264] Health Plans Complaint, ¶ 236.

[265] See FDA, Fresenius Kabi USA Approval Letter for BLA 761379 (Otulfi), September 27, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761379Orig1s000ltr.pdf).

---



November 2024 launch date, and expected there to be between ██% biosimilar market share in 2024, ██% share in 2025, and ██% in 2026.[266] Paired with this market share erosion is a █% discount off of the Stelara WAC price at the time of launch, followed by an additional ██% in discounting from the WAC to net price.[267] An additional Fresenius forecast with an anticipated launch date of February 22, 2025 expected biosimilar uptake to be █% in the first year.[268] This same forecast called for a Otulfi[S] net price "█%+ lower than Stelara WAC" and noted that it's likely other ustekinumab biosimilars will have similar net prices.[269] Additionally, Fresenius plans on ████████████████████████████ ████████████████[270] Fresenius assumes that 8-10 biosimilars will come to market.[271]

Celltrion Forecasts:

87.      Celltrion received FDA approval for their ustekinumab product under the trade name "Steqeyma" on December 17, 2024.[272] Celltrion forecasts were a series of scenarios regarding bids that they planned to submit for placement on formularies. These documents once again illustrate the tradeoff between price and quantity faced by manufacturers.[273] Specifically, in order to gain formulary access (and thus increase quantity sold), manufacturers need increase discounting (i.e. decrease net prices). One of the main formularies Celltrion aimed to acquire access to was Kaiser. This is because "████████████ ████████████████████████████."[274] One bid placed for the ████ formulary considered a series of discounts to the Stelara branded product. The scenarios considered a ████████████ to the Stelara WAC, a █% WAC discount, and an █% WAC discount for the 90mg pre-filled syringe.[275] These same scenarios planned to further provide rebates, targeting a "payer net acquisition cost" that was at *least* █% below the Stelara WAC price, and in one case, a █% discount

---

[266] FKUSA_USTE_SUB0000043-098, at 098. This forecast also discusses the launch of the 45 mg and 90 mg autoinjector pen in September 2026.

[267] *Ibid.*

[268] FKUSA_USTE_SUB0000099-121, at 102 and 105.

[269] *Ibid*, at 112.

[270] *Ibid.*

[271] FKUSA_USTE_SUB0000043-098, at 052 and 081; FKUSA_USTE_SUB0000099-121, at 105 and 121.

[272] See FDA, Celltrion Approval Letter for BLA 761338 (Steqeyma), December 17, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761338Orig1s000ltr.pdf).

[273] See ¶¶ 49-51, 79 above.

[274] CTUSAUSTK_000063-066, at 064.

[275] CTUSAUSTK_000063-066, at 064 and 065; CTUSAUSTK_000396, at tabs "90% Discount @ All WACs" and "Disc to Equal Stelara @ 90%."

off the Stelara WAC price.[276] Another Celltrion document forecasted bids for all strengths to ███ using a ████████ scenario.[277] The lowest discount implied to Stelara's WAC price across all strengths was ███% below Stelara's WAC price at a net level.[278] Celltrion describes their pricing strategy as a result of feedback they have received from payers, saying that ████████████████████████████████ ████████████████████████ and that this would include offering a ████████████████, with further ████████████████████████████.[279] ████ stated that "████████████████████████ ████████████████████████████████████[280] Discounts from the high WAC price were expected to range from ██% to ██%, and between ██% to ██% off the low WAC prices.[281] In addition to bids for ████, Celltrion analyzed a bid for the ████████ formulary.[282] While the bids for the ████ formulary placement were higher based on the net payer cost proposed to ████, this is likely not a competitive bid as these bids were based off of the structure of another product, and ████████████████████[283] While these offers may not be fully representative of a bid-winning, competitive offer, they are still significantly lower than Stelara's pre-LOE 90mg prices: The ███ bid drastically undercut the pre-biosimilar Stelara WAC and net prices for the 90mg strength ($████████ and $████████ respectively).[284] The ████████████████ was $████████, with a net selling price of $████████, and the high WAC bid was $████████ as a list price, and $████████ as the net selling price.[285] Note that the low WAC version is closer in price to the net prices for both the high and low WAC versions, because for the high WAC versions the high rebates that are necessarily a part of high WAC versions are not netted out of the list price, whereas the low WAC versions have already been discounted substantially, and thus have little to no rebates.[286]

---

[276] CTUSAUSTK_000063-066, at 064 and 065; CTUSAUSTK_000396, at tabs "90% Discount @ All WACs" and "Disc to Equal Stelara @ 90%."

[277] CTUSAUSTK_000073-074, at 74.

[278] CTUSAUSTK_000073-074, at 74.

[279] CTUSAUSTK_000397-403, at 400.

[280] CTUSAUSTK_000397-403, at 400.

[281] CTUSAUSTK_000397-403, at 400.

[282] Zinc is a GPO (group purchasing organization) owned by CVS health. A. Paavola, "CVS Health Reportedly Launching a GPO called Zinc," *Becker's Hospital Review*, June 30, 2020 (https://www.beckershospitalreview.com/pharmacy/cvs-health-reportedly-launching-a-gpo-called-zinc.html).

[283] CTUSAUSTK_000406-411, at 406 and 407.

[284] JNJ-STELARA_003670610, at tab "Consolidated." ProspectoRx Data. See backup materials to Exhibit 13, at tab "Celltrion."

[285] CTUSAUSTK_000406-411, at 406 and 407.

[286] Comer, *op. cit.*

---

Accord Forecasts

88.     Accord BioPharma (Accord), the commercializing partner of Dong-A ST Co., Ltd. (Dong-A) and Meiji Seika Pharma Co. Ltd.,[287] received FDA approval on October 10, 2024 for their biosimilar version of Stelara, which will be marketed under the name "Imuldosa." [288]

89.     Accord forecasted the biosimilar share of the ustekinumab market for all of their forms of the biosimilar version of Stelara (pre-filled syringe, vial, and autoinjector). Accord expected biosimilar (ustekinumab biosimilars as a whole, not just Accord's) market share erosion of the pre-filled syringe and vial forms ranging from ▮% to ▮% of the ustekinumab market in the first year of biosimilar entry, increasing to ▮▮▮ the market in year four, and up to a peak market share of ▮% by their seventh year on the market.[289] Accord expected biosimilar manufacturers to make up ▮% of the autoinjector market for ustekinumab by 2026.[290] Accord forecasted their net price based on product form and dosage, and prices were forecasted to decrease every year with the smallest year over year decrease being ▮% and the largest being ▮%.[291] Accord aimed to have the pre-filled syringe and vial forms on the market in the ▮▮▮▮▮, with the autoinjector following in the ▮▮▮▮▮.[292]

Biocon Forecasts:

90.     Biocon Biologics also forecasted market share and price erosion for their biosimilar version of Stelara. Biocon sells their ustekinumab biosimilar under the trade name "Yesintek" which received FDA approval on November 29, 2024.[293] Biocon forecasted a range of scenarios measuring market share and

---

[287] Health Plans Complaint, ¶¶ 247-248.

[288] See FDA, Accord Approval Letter for BLA 761364 (Imuldosa), October 10, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761364Orig1s000ltr.pdf).

[289] See ACC-STEL-00343207, at tab "Forecast"; ACC-STEL-00343206, at tab "Ustekinumab Summary"; ACC-STEL-00343205, at tab "Ustekinumab Summary"; ACC-STEL-00343203, at tab "Ustekinumab Summary"; ACC-STEL-00343204, at tab "Ustekinumab Summary."

[290] See ACC-STEL-00343206, at tab "Ustekinumab Summary"; ACC-STEL-00343205, at tab "Ustekinumab Summary"; ACC-STEL-00343203, at tab "Ustekinumab Summary"; ACC-STEL-00343204, at tab "Ustekinumab Summary."

[291] See ACC-STEL-00343207, at tab "Forecast"; ACC-STEL-00343206, at tab "Ustekinumab Summary"; ACC-STEL-00343205, at tab "Ustekinumab Summary"; ACC-STEL-00343203, at tab "Ustekinumab Summary"; ACC-STEL-00343204, at tab "Ustekinumab Summary."

[292] *Ibid.*

[293] See FDA, Biocon Biologics Approval Letter for BLA 761406 (Yesintek), November 29, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761406Orig1s000correctedltr.pdf).

price erosion.[294] Biocon used a SKU method of standardizing units and measuring their difference compared to the Stelara net price.[295] One forecast that captures a variety of different scenarios (like interchangeability ratings and market share erosion), consistently measured a net price discount between ██% and ██% lower to Stelara's branded net price for the 45mg strength.[296] Another forecast measured the Biocon net price to be at a ██% discount to the Stelara net price ████ after entering the market.[297] A third Biocon forecast measured the price erosion in the ██████ to be ██% lower than the branded Stelara net price, and increasing to an ██% discount in ████████████.[298] This same forecast estimated that Biocon's Yesintek[S] alone would capture roughly ████% of the ustekinumab market.[299]

Hikma Forecasts:

91.    Hikma, in partnership with Bio-Thera, has not yet been granted FDA approval, but still forecasts biosimilar entry starting in 2025 or early 2026.[300] Hikma expects there to be a minimum of 3 other biosimilars on the market upon their launch, and for total biosimilar entrants to reach a maximum of 9 different players.[301] Biosimilar erosion was forecasted to be ██% for Hikma's ████████ on the market, rising to ██% market share for the foreseeable future.[302] Hikma forecasted their net price in reference to the ████████████, as opposed to the ████████████ like other manufacturers. Specifically, Hikma

---

[294] BIOCON(USTEK)_012553, at tabs "Commercial Inputs," "3. BBL Forecast Database," "DCF Template," "Ustek (McK, IC)," "Ustek (IC) MS," "Ustek (IC) CS," "Ustek (IC) PS"; BIOCON(USTEK)_012554, at tab "Ustekinumab – US"; BIOCON(USTEK)_012555, at tab "3. DCF."

[295] BIOCON(USTEK)_012554, at tab "Ustekinumab – US." Biocon forecasts generally carry the same template structure across documents. BIOCON(USTEK)_012554 is the only document that explicitly states that their ████████████████████████████████████████████████ Due to the similar layouts and erosion measurements of the other forecasts, I assume that these documents all capture net to net price erosion.

[296] BIOCON(USTEK)_012553, at tabs "Commercial Inputs," "3. BBL Forecast Database," "DCF Template," "Ustek (McK, IC)," "Ustek (IC) MS," "Ustek (IC) CS," "Ustek (IC) PS."

[297] BIOCON(USTEK)_012554, at tab "Ustekinumab – US."

[298] BIOCON(USTEK)_012555, at tab "3. DCF."

[299] BIOCON(USTEK)_012555, at tab "3. DCF."

[300] Entry in 2025: Hikma-Ustek_000078, at tab "Ustekinumab P&L_Sensitivity"; Hikma-Ustek_000221-256, at 244, scenarios "Upside" and "Base Case." Entry in 2026: Hikma-Ustek_000099, at tab "Ustekinumab P&L_Sensitivity"; Hikma-Ustek_000221-256, at 244, scenario "Downside."

[301] *Ibid.*

[302] Hikma-Ustek_000221-256, at 244.

anticipated pricing their biosimilar ustekinumab at least ██% below the *net* price of Stelara in their first year on the market, eventually declining to ██% below the branded net price by ███ in one scenario.[303]

Overview of Biosimilar Forecasts:

██  ████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████  ████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████  ████████████████████████████████████████
██████████████████████████████████████████████████
██ ██

[303] Hikma-Ustek_000078, at tab "Ustekinumab P&L_Sensitivity"; Hikma-Ustek_000221-256 at 244, scenarios "Upside" and "Base Case"; Hikma-Ustek_000099, at tab "Ustekinumab P&L_Sensitivity"; Hikma-Ustek_000221-256 at 244, scenario "Downside."

██  ████████████████████████████████████████████████
██  ████████████████████████████████████████████████████
████████████████████████████████
██  ██████████████████████████████████████████████
██████████████████████████





**C.** **In Just Over Two Months of Biosimilar Entry, Ustekinumab Prices Have Declined**











## VII.    INDIRECT EVIDENCE OF MARKET POWER

### A.    Overview of Economic Competition and Cross-Price Elasticity

100.    Evaluating indirect evidence of market power requires two steps: 1) identifying the relevant product market, and 2) evaluating whether the firm had market power in that market. In the economics or antitrust context, the term "market" has a very specific meaning. Specifically, a relevant product market

---

[318] In reaching this opinion, I do not need to also rely upon evidence of a finding by the jury of wrongful conduct regarding the patents at issue.

refers to a set of products that buyers consider to be reasonably interchangeable with one another so that price will be the primary consideration in deciding between them.[319] In other words, products are considered to be part of the same relevant product market if buyers will substitute between them readily enough so that they compete with one another primarily based on price rather than on the basis of differentiated product characteristics.[320] Products that compete primarily on price are referred to as *economic competitors* or *economic substitutes* and are considered to be in the same relevant market.

101.    Cross-price elasticity is one of the main tools that economists use to determine whether two products compete on price, and if so, to assess the degree of price competition between those products. Cross-price elasticity measures the change in *quantity* demanded of one product (product B) associated with the change in *price* of another product (product A). Cross-price elasticity can be calculated empirically using sales and price data on products. Cross-price elasticity is calculated as follows:

$$\text{Cross price elasticity of demand} = \frac{\%\text{ change in quantity demanded of product B}}{\%\text{ change in price of product A}}$$

102.    The sign (direction) of the cross-price elasticity is important. If two products have *positive* cross-price elasticity, it indicates that when the price of product A *increases*, the quantity demanded of product B *increases* – in other words there is substitution away from product (A) to the other product (B). Positive cross-price elasticity suggests that two products are economic substitutes, such as Coke and Pepsi. The products are weak substitutes if the cross-price elasticity is less than 1 and close substitutes if it is greater than 1. On the other hand, if two products have *negative* cross-price elasticity, it indicates that when the relative price of product A *increases*, the quantity demanded of the other product *decreases*. A *negative* cross-price elasticity indicates that the products are complements; in other words, the products are used together, so as one product becomes more expensive, it decreases use of the other product, such as hot dogs and hot dog buns. If products have a cross-price elasticity of *zero*, it implies there is no relationship between the products – if product A becomes more expensive, there is no concern about consumers switching to product B.

103.    In addition to assessing the *sign* of the cross-price elasticity, it is important to evaluate the *magnitude* of the cross-price elasticity. The presence of a weak substitute – a product that has a very small positive cross-price elasticity with product A – is unlikely to indicate real economic competition because

---

[319] ABA, Section of Antitrust Law, *Market Definition in Antitrust: Theory and Case Studies*, ABA Publishing, 2012, (hereafter "ABA Market Definition in Antitrust: Theory and Case Studies"), pp. 2-3.

[320] For example, cars, restaurants, and clothing brands primarily compete with one another on the basis of differentiated product offerings, while different sellers of gasoline and table sugar are considered reasonably interchangeable by consumers and primarily compete on price.

minimal substitution is insufficient to constrain another firm from setting prices at supra-competitive levels.[321] Moreover, a small-magnitude, positive cross-price elasticity is not uncommon in a monopoly market because a profit-maximizing monopolist will raise prices until it reaches the elastic portion of the product demand curve, resulting in some level of substitution to products that otherwise would not be considered reasonable substitutes in a competitive market.[322] This phenomenon is referred to as the *Cellophane Fallacy* in reference to a case where monopolist Dupont priced Cellophane so astronomically high that consumers were substituting with products that would otherwise not be used in that setting.[323] The reason that cross-price elasticity is important for determining whether a given product can limit another product's high prices (product A), is that product A's own-price elasticity (denoted $\eta_{AA}$) – the change in quantity demanded of product A in response to a change in its own price – equals 1 plus the weighted sum of the cross-price elasticities with the $j$ other products in the market (denoted $\eta_{jA}$):[324]

$$\eta_{AA} = 1 + \sum_{j=1}^{N}\left[\eta_{jA} * \frac{R_j}{R_A}\right]$$

104.    The equation above also shows that even if product $j$ has a positive and large cross-price elasticity, the ability of product $j$ to constrain product A from pricing at supra-competitive levels also depends on the relative revenues of the two products, $\frac{R_j}{R_A}$ (the weight in the weighted sum).[325] If product j has low revenues compared to product A, then it will be too small to constrain the price of product A,

---

[321] Economics literature indicates that the strength or "closeness" of a substitute has important implications for whether a monopolist could profitability set prices at supra-competitive levels. For example, G. Werden, "Demand Elasticities in Antitrust Analysis," *Antitrust Law Journal*, 66(2), 1998, pp. 363-414, p. 367 ("A monopolist is the supplier of a product with neither perfect nor even "close" substitutes. The absence of close substitutes… means that substitutes are sufficiently distant that, as the monopolist changes price or quantity, it reasonably ignores any feedback effects, i.e. effects on its demand curve caused by changes in the prices of other products in response to changes in its own price.").

[322] Even a monopolist has a profit-maximizing price. Werden, *op. cit.*, p. 368 ("[A] monopolist will always restrict output enough so that it operates in the elastic region of its demand curve." ); H. Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice,* 5th ed., St. Paul: Hornbook Series, West Academic Publishing, 2016, p. 139 ("[A] monopolist that is not pricing at a level where the elasticity of demand is high is probably not maximizing its profits, and we would ordinarily regard such behavior as irrational.").

[323] ABA Market Definition in Antitrust: Theory and Case Studies, p. 22; Hovenkamp, *op. cit.*, p. 139; Carlton and Perloff, *op. cit.*, pp. 646-47.

[324] L. Kaplow and C. Shapiro, "Antitrust," *Handbook of Law and Economics*, 2, 2007, eds. A. Polinsky and S. Shavell, pp. 1090-93; ABA Market Definition in Antitrust: Theory and Case Studies, 2012, pp. 41-42.

[325] *Ibid.*

---

even if it has a positive and large value of $\eta_{jA}$.[326] This is because the small amount of switching from A to $j$ when the price of A increases will not be enough to make the price increase unprofitable for A. Thus, cross-price elasticity alone is not enough to characterize product substitution; relative revenues must also be considered.[327]







108.    To analyze potential economic substitution (if any) between Stelara and other products, I requested wholesale and retail sales data from data vendor IQVIA (formerly IMS Health) for the potential economic substitutes listed below. IQVIA is considered by economists and pharmaceutical industry personnel to be the gold standard of prescription data and is widely used for research on the pharmaceutical industry.[343]



---

[340] IQVIA NPA Data. I determined a biosimilar launch date by identifying when the biosimilar's retail prescriptions exceed 20.

[341] The FDA has issued a warning about increased risk of blood clots and death when taking Xeljanz (IR and ER formulations). FDA, "FDA approves Boxed Warning about increased risk of blood clots and death with higher dose of arthritis and ulcerative colitis medicine tofacitinib (Xeljanz, Xeljanz XR)," February 4, 2021 (https://www.fda.gov/drugs/drug-safety-and-availability/fda-approves-boxed-warning-about-increased-risk-blood-clots-and-death-higher-dose-arthritis-and)

[342] Note that Stelara is also an IL-12.

[343] See for example the following peer-reviewed literature: E.R. Berndt, *et al.*, "Information, Marketing, and Pricing in the U.S. Antiulcer Drug Market," *American Economic Review*, 85(2), 1995, pp. 100-05; S. Ellison, *et al.*, "Characteristics of demand for pharmaceutical products: An examination of four cephalosporins," *RAND Journal of Economics*, 28(3), 1997, pp. 426-46; M. Rosenthal*, et al*., "Demand effects of recent changes in prescription drug promotion," *Forum for Health Economics and Policy*, 6(1), 2003, pp. 1-26; E. Berndt, M. Kyle, and D. Ling, "The Long Shadow of Patent Expiration: Generic Entry and Rx-to-OTC Switches," in R. Feenstra and M. Shapiro, eds., *Scanner Data and Price Indexes*, University of Chicago Press, 2003, pp. 229-73.























██████████████████████████████████████████████████████████████████

████████████████████████████████████ ██

### D.    Natural Experiments

117.    As explained above, cross-price elasticity is a measure of how the quantity demanded of one product responds to changes in the price of another product.[369] Ideally, I would utilize Stelara's biosimilar entry as the opportunity to assess cross-price elasticity of Stelara with potential economic substitutes via a natural experiment. Specifically, I would utilize the ustekinumab molecule-level price change that would be triggered by Stelara's biosimilar entry to assess whether a drop in Stelara molecule price triggered economic competition with potential economic substitutes. However, given the recency of Stelara's biosimilar entry, there is not yet sufficient data to undertake a test, using actual entry data, of whether the entry has caused a change to the quantity demanded of potential economic substitutes.[370]

██ ██████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████ ██
██████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████

---

██ ██████████

[369] Section VII.A above.

██ ██████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████

██ ██████████████













### E.    Hypothetical Monopolist Test (HMT)

125.    The U.S. Department of Justice (DOJ) and the Federal Trade Commission (FTC)'s *Horizontal Merger Guidelines* describe how to define relevant antitrust markets and market power within them. One of the concepts introduced in *the Horizontal Merger Guidelines* is the "Hypothetical Monopolist Test" (HMT), defined as follows:[376]

> "A market is defined as a product or group of products and a geographic area in which it is produced or sold such that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future producer or seller of those products in that area likely would impose at least a 'small but significant and non-transitory' increase in price [SSNIP], assuming the terms of sale of all other products are held constant."

> "…the Agency will begin with each product (narrowly defined) produced or sold by each merging firm and ask what would happen if a hypothetical monopolist of that product imposed at least a 'small but significant and non-transitory' increase in price [SSNIP], but the terms of sale of all other products remained constant. If, in response to the price increase, the reduction in sales of the product would be large enough that a hypothetical monopolist would not find it profitable to impose such an increase in price, then the Agency will add to the product group the product that is the next-best substitute for the merging firm's product. … This process will continue until a group of products is identified such that a hypothetical monopolist over that group of products would profitably impose at least a 'small but significant and non-transitory' increase. … The Agency generally will consider the relevant product market to be the smallest group of products that satisfies this test."

---

[376] Horizontal Merger Guidelines, § 1.0 and § 1.11. 2023 Merger Guidelines, § 4.3.

The *Horizontal Merger Guidelines* assume that a "small but significant" price increase corresponds to a 5% increase.[377]

126.    In the current matter, the HMT would proceed as follows: If a hypothetical monopolist were to control branded Stelara and its next best substitute, could they profitably impose a small but significant and non-transitory increase in price (SSNIP)? Should the test indicate that the hypothetical monopolist would not be able to profitably sustain a SSNIP, the HMT would be repeated with the next best candidate substitute until identifying the "smallest group of products that satisfies this test." [378] The relevant antitrust market is then this smallest group of products that satisfies the HMT.

---

[377]"[T]he Agencies will often use a SSNIP of five percent of the price charged by firms for the products or services to which the merging firms contribute value." (2023 Merger Guidelines, § 4.3.A-B).

[378] Horizontal Merger Guidelines, § 1.11. 2023 Merger Guidelines, § 4.3.





## VIII.    CONCLUSIONS



133.    Based on my review of direct and indirect evidence, I conclude that J&J had substantial market power during the period of interest.

Nicole Maestas

_____

Nicole Maestas, Ph.D.

March 3, 2025

**ATTACHMENT A**

## Curriculum Vitae

**Date Prepared:**   **March 1, 2025**

**Name:**   **Nicole A. Maestas**

**Office Address:**   **Department of Health Care Policy, Harvard Medical School**
**180 Longwood Avenue, Boston, MA 02115**

**Work Phone:**   **(617) 432-3455**

**Work Email:**   **maestas@hcp.med.harvard.edu**

### Education:

| | | | |
|---|---|---|---|
| 1991 | B.A. | English and Spanish | Wellesley College |
| 1997 | M.P.P. | Public Policy | Goldman School of Public Policy, University of California, Berkeley |
| 2002 | Ph.D. | Economics (Advisor: David Card) | University of California, Berkeley |
| 2023 | A.M. (Honorary) | Master of Arts | Harvard University |

### Predoctoral Training:

| | | | |
|---|---|---|---|
| 1995-1996 | Virginia McCrossin Fellowship | University of California, Berkeley | Berkeley, California |
| 1997-2001 | Pre-Doctoral Traineeship | National Institute on Aging | Berkeley, California |
| 2001-2002 | Phi Beta Kappa Graduate Fellowship | Alpha Chapter, University of California, Berkeley | Berkeley, California |
| 2001-2002 | Burch Center Dissertation Fellowship | Department of Economics, University of California, Berkeley | Berkeley, California |

### Faculty Academic Appointments:

| | | | |
|---|---|---|---|
| 2006-2015 | Core Faculty | Economics | Pardee RAND Graduate School |
| 2015- | Associate Professor of Health Care Policy | Department of Health Care Policy | Harvard Medical School |
| 2017-2017 | Lecturer | Economics | University of St. Gallen, Switzerland (non-voting) |
| 2017- | Affiliated Faculty Member | Harvard Center for Population and Development Studies | Harvard University |
| 2023-2023 | Professor of Health Care Policy | Department of Health Care Policy | Harvard Medical School |
| 2023-2024 | Margaret T. Morris | Department of Health Care | Harvard Medical School |

1

| | | | |
|---|---|---|---|
| | Professor of Health Care Policy | Policy | |
| 2024- | John D. MacArthur Professor of Economics and Health Care Policy | Department of Health Care Policy | Harvard Medical School |
| 2024- | Chair | Department of Health Care Policy | Harvard Medical School |

**Professional Positions:**

| | | | |
|---|---|---|---|
| 2002-2007 | Associate Economist | Economics & Statistics | RAND |
| 2002-2020 | Affiliated Researcher | Michigan Retirement and Disability Research Center | University of Michigan |
| 2003-2004 | Visiting Associate Researcher | Institute of Business and Economic Research | University of California, Berkeley |
| 2007-2011 | Economist | Economics & Statistics | RAND |
| 2011-2015 | Senior Economist | Economics, Sociology & Statistics | RAND |
| 2015-2019 | Adjunct Senior Economist | Economics, Sociology & Statistics | RAND |
| 2019- | Academic Affiliate | | Greylock McKinnon Associates |

**Major Administrative Leadership Positions**

**Local**

| | | |
|---|---|---|
| 2009-2010 | Associate Director, Health Economics, Finance and Organization | RAND Health |
| 2009-2015 | Director, Summer Institute Mini-Medical School Workshop | RAND Labor and Population |
| 2010-2013 | Acting Director, Bing Center for Health Economics | RAND |
| 2010-2015 | Director, Center for Disability Research | RAND Labor and Population |
| 2010-2012 | Manager, Economics and Statistics Research Group | RAND |
| 2011-2015 | Director, Post-Doctoral Training Program in the Study of Aging | RAND Labor and Population |
| 2012-2014 | Director, Economics, Sociology and Statistics Research Department | RAND |

**National**

| | | |
|---|---|---|
| 2016-2017 | Associate Director, NBER Disability Research Center (1 of 2 national centers funded by Social Security Administration) | National Bureau of Economic Research (NBER) |
| 2017- | Director, Postdoctoral Fellowship Program on the Economics of an Aging Workforce | National Bureau of Economic Research |
| 2017-2018 | Director, NBER Disability Research Center (1 of 2 national centers funded by Social Security Administration) | National Bureau of Economic Research (NBER) |

| 2018-2025 | Director, NBER Retirement and Disability Research Center (1 of 6 national centers funded by Social Security Administration) | National Bureau of Economic Research (NBER) |
|---|---|---|

## Committee Service

### Local

| 2010-2014 | Qualifying Exam Committee | Pardee RAND Graduate School Chair of Exam |
|---|---|---|
| 2016- | Standing Committee on Health Policy | Faculty of Arts and Sciences, Harvard University Member |
| 2018-2018 | University-wide New Ladder Faculty Institute | Office of the Senior Vice Provost for Faculty Development and Diversity, Harvard University Panelist |
| 2018-2018 | Dean's Innovation Grants in the Basic and Social Sciences | Harvard Medical School Reviewer |
| 2021-2022 | Faculty Search Committee—Asst./Assoc. Prof. of Economics in HCP | Harvard Medical School Member |
| 2022-2025 | Steering Committee | Harvard Center for Population and Development Studies Member |
| 2022-2025 | Executive Committee, Health Policy PhD Program | Faculty of Arts and Sciences, Harvard University Placement Director |

### National

| 2014-2014 | Disability Policy Panel | Social Security Advisory Board Member |
|---|---|---|
| 2015-2020 | Steering Committee, Mini-Medical for Social Scientists | RAND/National Institute on Aging Member |
| 2016-2016 | Technical Advisory Panel, Promoting Opportunity Demonstration | Social Security Administration Member |
| 2016-2027 | Data Monitoring Committee—Health and Retirement Study | NIH/National Institute of Aging Member |
| 2016-2018 | Committee on Health Care Utilization and Adults with Disabilities | National Academies of Sciences, Engineering and Medicine Member |
| 2019-2019 | Technical Expert Panel, Claimant Representative Demonstration | Social Security Administration Member |
| 2019- | Technical Review Committee—National Longitudinal Surveys Program | Bureau of Labor Statistics Member |
| 2020-2020 | Roundtable on Testing and Evaluating Proposed Improvements to Disability Determinations | Social Security Advisory Board Roundtable Expert |
| 2020-2025 | Advisory Committee to the NBER Center for Aging and Health Research | National Bureau of Economic Research Member |

3

| 2021-2022 | COVID-19 Task Force, Policy Translation Working Group (Health Security) | National Academy of Social Insurance Member |
| 2024-2028 | Standing Committee of Medical and Vocational Experts for the Social Security Administration's Disability Programs | National Academies of Sciences, Engineering and Medicine Member |
| 2024 | Health and Disability among Working-Age Adults: Trends, Disparities, and Implications for Employment and Federal Programs (Workshop) | National Academies of Sciences, Engineering and Medicine Member |

## Professional Societies

| 2001- | Population Association of America | Member |
| 2016 | | Session Organizer |
| 2001- | American Economic Association | Member |
| 2017 | | Mentor, 8th CeMENT Mentoring Workshop for Faculty in Doctoral Programs |
| 2009- | American Society of Health Economists | Member |
| 2018, 2019 | | Program Area Chair, Health, Labor Markets and the Economy |
| 2023 | | Mentor, Successfully Navigating Your Ph.D.: A Mentoring Workshop for Women & Non-Binary Ph.D. Students in Health Economics & Health Policy |
| 2002- | Society of Labor Economists | Member |
| 2019 | | Program Committee |

## Grant Review Activities

| 2008-2008 | United Kingdom Economic and Social Research Council Grant Proposal Review | Economic and Social Research Council, U.K. Ad hoc Reviewer |
| 2010-2010 | NIA Social Science and Population Studies Study Section ZRG1-PSE-H80 | NIH Ad hoc Member |
| 2011-2019 | Working Longer Program | Alfred P. Sloan Foundation Periodic Reviewer |
| 2012-2012 | NIA Datasets in Aging Review Panel ZAG1 ZIJ-9 (M2) | NIH Ad hoc Member |
| 2013-2013 | NIH Social Sciences and Population Studies Study Section (SSPS-B) | NIH Ad hoc Member |
| 2014-2018 | NIA Behavior and Social Science of Aging Review Committee (NIA-S) | NIH Permanent Member |
| 2018-2020 | NIA Behavior and Social Science of Aging Review Committee (NIA-S) | NIH Chair |
| 2020-2020 | NIA Special Emphasis Panel, MD-PhD Training Program in Alzheimer's Disease and Related Dementias (T32) ZAG1 ZIJ-9 (M3) | NIH Chair |
| 2020-2020 | NIA Special Emphasis Panel, Research Education on Alzheimers' Disease and Related Dementias (R25) ZAG1 ZIJ-4 (A1) | NIH Chair |

4

| 2022-2022 | NIA Special Emphasis Panel, Behavioral and Social Sciences Research on Aging (R25) ZAG1ZIJ-9 (M1) | NIH Member |
| 2024 | NIA Scientific Review Group, Resources Across Phenotyped Longitudinal Behavioral and Social Studies of Aging (U24), 2024/10 ZAG1 ZIJ-9 (O1) | NIH Chair |

**Editorial Activities:**

**Ad hoc Reviewer**

American Economic Review
American Economic Review: Insights
Quarterly Journal of Economics
Journal of the European Economic Association
Review of Economic Studies
Review of Economics and Statistics
New England Journal of Medicine
Science
American Economic Journal: Economic Policy
American Economic Journal: Applied Economics
Journal of Policy Analysis and Management
Journal of Human Resources
Journal of Labor Economics
Journal of Public Economics
Journal of Health Economics
American Journal of Health Economics
Journal of Applied Econometrics
Industrial & Labor Relations Review
Economic Journal
Labour Economics
Journal of Economic Literature
Work, Aging & Retirement
Journal of the Economics of Ageing

**Other Editorial Roles**

| 2012- | Editorial Board Member | Industrial Relations |
| 2013- | Editorial Board Member | Journal of Pension Economics and Finance |
| 2014- | Editorial Board Member | Journal of Policy Analysis and Management |
| 2018-2018 | Selection Committee, Vernon Prize | Journal of Policy Analysis and Management |
| 2019- | Associate Editor | Journal of the Economics of Ageing |

**Honors and Prizes**

| 1991 | Phi Beta Kappa | Wellesley College |
| 2010 | Finalist, Research Award | National Institute for Health Care Management Foundation |
| 2011 | Best Paper Award | Annual Paris Conference on Money, Economy, and Management |

5

| | | |
|---|---|---|
| 2011 | Bronze Medal Award | RAND Corporation |
| 2012 | Bronze Medal Award | RAND Corporation |
| 2015-2016 | Faculty Research Fellow | National Bureau of Economic Research, Aging Program, Labor Studies Program |
| 2016- | Research Associate | National Bureau of Economic Research, Aging Program, Labor Studies Program |
| 2018 | Finalist, TIAA Paul A. Samuelson Award | TIAA Institute |
| 2018 | Elected Member | National Academy of Social Insurance |
| 2024 | Elected Member | National Academy of Medicine |

# Report of Funded and Unfunded Projects

## Funding Information:

**Past**

2002-2003    Back to Work: Trends in Post-Retirement Employment
UM03-15/Social Security Administration/Michigan Retirement Research Center (Laitner)
Project Leader ($50,000)
The goal of this research is to analyze trends in labor market re-entry after retirement

2003-2006    The Economic Cost of Joint Retirement
NIA/R03AG023108
PI ($154,776)
The goal of this research is to explore the retirement ages of married and single women and simulate the costs of foregone earnings, pension accruals, and savings of married women who tend to retire at a younger age than their husbands.

2004-2009    Economic and Health Determinants of Retirement Behavior
NIA/P01AG022481 (Kapteyn)
Co-Investigator ($1,037,558)
The major goals of this P01 are to analyze economic and health determinants of retirement behavior, such as wealth accumulation, disability application, and joint retirement.

2005-2008    Delayed Health Care Among the Near-Elderly
NIA/R03AG025155
PI ($122,199)
The goal of this research is to examine the measured increases in health care utilization at age 65 and whether this increase represents strategic delay in the timing of health care services.

2005-2009    Self-Employment at Older Ages
NIA/R01AG025552 (Karoly)
Co-Investigator ($152,051)
The major goal of this project is to analyze transitions by older individuals to and from self-employment.

2005-2006    Rising Economic Risk and the Labor Supply of Older Workers
UM06-21/Social Security Administration/Michigan Retirement Research Center (Laitner)
Project Leader ($50,000)
The major goal of this project is to study whether returning to work is a viable option for retired individuals who experience consumption shocks.

2006-2009    Impact of Medicare on Utilization and Health Disparities

6

NIA/R01AG026290 (Card)
Co-Investigator ($675,000)
The goal of this research is to analyze whether the Medicare program mitigates or exacerbates disparities in health care utilization, treatment intensity, and health outcomes.

2006-2007    A Model of Unretirement
UM07-03/Social Security Administration/Michigan Retirement Research Center (Laitner)
Project Leader ($75,000)
This project develops a theoretical model of retirement and re-entry decisions and uses this framework to guide analyses of reduced form relationships.

2006-2007    A Cross-National Comparison of Self-Employment Dynamics at Older Ages
UM07-18/ Social Security Administration/Michigan Retirement Research Center (Laitner)
Project Leader with Zissimopoulos ($100,000)
The major goal of the project is to compare the retirement patterns of self-employed older workers in the U.S. and U.K., focusing on institutional difference in retirement incentives.

2007-2009    Stated Preferences for Collective Household Labor Supply Models
NIA/Competing Supplement to 1 P01 AG022481-01 (Kapteyn)
Co-Investigator ($455,878)
The purpose of this project is to expand the scope for identification in collective household models of retirement by collecting innovation survey data on stated preferences (SP) for different retirement scenarios.

2007-2010    The Effect of Peer Groups on the Employment Outcomes of Young Adults
NICHD/R03HD054417
PI ($187,744)
The goal of this research is to study how the race and gender composition of peers and superiors affects performance outcomes. We use personnel data from the U.S. Army, where individuals are randomly assigned to groups conditional upon a defined set of observable characteristics.

2007-2008    Labor Supply Effects of the Interaction between Social Security Disability and Retirement Benefits
UM08-13/ Social Security Administration/Michigan Retirement Research Center (Laitner)
Project Leader ($75,000)
The goal of this research is to examine how an abrupt relaxation in the implicit tax on work affects the labor force participation of individuals on DI.

2007-2008    Are Early Retirees Less Healthy? The Role of Health in Social Security Claiming Decisions
UM08-21/Social Security Administration/Michigan Retirement Research Center (Laitner)
Project Leader ($50,000)
The goal of this research is to examine how the probability of claiming early retirement benefits at age 62 varies with different pre-retirement health trajectories, and to investigate spillover effects of the increase in the Social Security full retirement age on SSDI applications.

2009-2010    Research Design to Estimate Induced Entry into the SSDI Program Resulting from a Proposed Program Policy Change (Benefit Offset)
SS00-09-31428/Social Security Administration
PI ($393,885)
This task order contract develops a set of research design options for evaluating the effect of a change in the Social Security Disability Insurance program's implicit tax on earnings on program entry.

7

2009-2010    The Labor Supply Effects of Disability Insurance Work Disincentives: Evidence from Administrative Data
UM10-01/Social Security Administration/Michigan Retirement Research Center (Laitner)
Project Leader ($50,000)
This project examines whether the SSDI work disincentives are binding using a quasi-experimental research design and SSA Administrative Data.

2009-2010    Consistency of the Disability Determination Process and Labor Supply Outcomes
UM10-04/Social Security Administration/Michigan Retirement Research Center (Laitner)
Project Leader with Mullen ($100,000)
In this project, we examine variation in the SSDI award rate and subsequent labor supply outcomes of applicants.

2010-2011    What Are the Real Application Costs of SSDI? The Effect of Waiting Time on Labor Force Participation and Earnings
UM11-01/Social Security Administration/Michigan Retirement Research Center (Laitner)
Co-Investigator ($75,000)
Using a unique administrative workload database, we evaluate how the substantial time spent out of the labor market during the application and appeals process affects subsequent employment opportunities and earnings of disability applicants.

2010-2011    Induced Entry into the SSDI Program: Using SGA Changes as a Natural Experiment
UM11-Q1/Michigan Retirement Research Center
Co-Investigator ($75,000)
This project examines the effect of changes in the threshold for substantial gainful activity (SGA) on SSDI applications over time and across states.

2010-2013    Labor Market Shocks and the Timing of Social Security Benefit claims
UM11-14/ Social Security Administration/Michigan Retirement Research Center (Laitner)
Project Leader with Card ($100,000)
The project analyzes the effect of recent labor market shocks on the decision to claim Social Security retirement and disability benefits.

2011-2012    SSDI and Healthcare Reform: Evidence from Massachusetts
UM12-17/ Social Security Administration/Michigan Retirement Research Center (Laitner)
Project Leader ($100,000)
This study examines the effect of the health care reform in Massachusetts in 2006 on applications for disability benefits.

2011-2012    Does Disability Insurance Save Lives?
UM12-18/ Social Security Administration/Michigan Retirement Research Center (Laitner)
Co-Investigator ($75,000)
Using a unique administrative workload database, we evaluate the effect of Social Security Disability Insurance benefit receipt on mortality outcomes using exogenous variation in benefit receipt.

2011-2013    Pathways from Disability Onset to Retirement: The Roles of Employer Accommodation and Health Insurance
2011-3-17/Alfred P. Sloan Foundation
PI ($609,511)
Using data from the Health and Retirement Study (HRS), this project examines how employer accommodation of work disabilities and provision of health insurance affect labor force participation of older disabled workers.

2011-2018    Universal Health Insurance and the Adequacy and Efficiency of Health Care
NIA/ R01AG026290 (Card)

8

Co-Investigator ($1,200,000)

This project will measure how the availability of nearly universal health insurance for those over 65 affects the use of primary care versus Emergency Department services; the quality of health care services provided outside the hospital, and the treatment intensity and health outcomes of people admitted to the hospital for acute myocardial infarction.

2012-2014    The Effect of Labor Demand on Work and Retirement Outcomes

2012-3-18/Alfred P. Sloan Foundation

PI ($544,638)

This project examines the effect of labor demand on work and retirement outcomes using the Health and Retirement Study linked to local labor marker data.

2013-2014    Effects of SSDI Application Processing Times and Receipt on Labor Supply and Earnings

NB14-10/Social Security Administration/NBER Disability Research Center (Wise)

Project Leader with Autor and Mullen ($100,974)

This project will test whether long SSDI application processing times cause disability applicants to lose workforce-related human capital.

2013-2021    Human Capital of Disabled Workers

NIA/R01AG046290

PI ($2,806,341)

This project will produce the best estimates to date of the latent work capacity of disabled workers overall, and of older workers specifically.

2014-2015    How Effective is Workplace Accommodation in Keeping Disabled Workers on the Job?

NB15-07/Social Security Administration/NBER Disability Research Center (Wise)

Co-Investigator (~$75,000)

This project will analyze new data about the need for and provision of workplace accommodation to workers experiencing health problems.

2014-2015    Working Conditions over the Life Course

UM15-03/Social Security Administration/Michigan Retirement Research Center (Laitner)

Project Leader with Mullen ($119,800)

This grant funds data collection on working conditions using the RAND American Life Panel.

2014-2018    Sustainable Work Conditions and Employment of Older Workers

2013-10-21/Alfred P. Sloan Foundation

PI with von Wachter ($1,120,309)

The overarching goal of this project is to advance knowledge about actual and desired job characteristics and how these characteristics affect the likelihood of employment at older ages.

2015-2019    Technological Change, Training and Employment of Older Workers

2015-13870

PI ($441,606)

The goal of this project is to advance knowledge on how technological change affects older works and on the role of training in modifying those effects.

2015-2017    The Effect of the Great Recession on the Flow of SSDI Claims to ALJ's

NB16-16/Social Security Administration/NBER Disability Research Center (Wise)

Project Leader with Mullen (~$120,000)

This project will estimate the effect of the Great Recession on the rate of appeal to the hearings level and subsequent case outcomes.

2016-2018    Geographic Variation in SSDI Receipt: The Role of Claimants' Representatives, Part II

NB17-18/Social Security Administration/NBER Disability Research Center

9

(Autor/Maestas)
Project Leader with Hoynes ($37,763)
This project will analyze spatial patterns of legal representation in SSDI claims and the effect of representation on case outcomes.

2016-2018    Disability Insurance and Treatment for Pain
NB17-15/Social Security Administration/NBER Disability Research Center (Autor/Maestas)
Project Leader ($55,158)
This project aims to estimate the fraction of disability insurance recipients who initiated opioid therapy to treat chronic prior to applying for disability benefits.

2017-2019    The Effects of Medicaid Policy on the Health Care Utilization and Health of SSI Beneficiaries
NB18-13/Social Security Administration/NBER Disability Research Center (Maestas)
Project Leader with Layton (~$50,000)
This project examines whether the shift to Medicaid Managed Care for SSI beneficiaries led to beneficial changes in utilization, health, and health care spending.

2017-2019    NBER Disability Research Center
Social Security Administration (SSA)/DRC12000002 (Maestas)
PI ($1,737,486 Year 5)
The Center conducts research that can inform disability policy evaluation and reform. As PI of the Center, I oversee approximately 15 research projects per year conducted by researchers at universities in the US and Europe. The Center also provides training fellowships to predoctoral and postdoctoral scholars.

2017-2020    Preferences for Working Conditions and Employment at Older Ages
G-2017-9694
Alfred P. Sloan Foundation
PI ($657,748)
The goal of this project is to understand how preferences for working conditions at older ages influence the length of working lives.

2018-2019    Employer Incentives in Disability Insurance: Evidence from Social Security Administration Data
NB18-Q10/Social Security Administration/NBER Disability Research Center (Maestas)
Project Leader (~$50,000)
The purpose of this project is to examine variation across firms in disability claiming by former employees.

2018-2020    Causes and Consequences of Geographic Variation in Healthcare Spending for Individuals with Disabilities
NB19-24/Social Security Administration/NBER Retirement and Disability Research Center (Maestas)
Project Leader with Layton/Shepard (~$50,000)
This project will investigate the sources of difference in Medicaid generosity across states and how these differences affect the health outcomes of people with disabilities.

2019-2021    Estimating Work-Related Functional Capacity among Older Americans
Harvard Medical School, Dean's Initiative Grants Program, Innovation Pilot Award in Healthy Aging (Maestas)
PI ($230,000)
This project will collect new survey data from a nationally representative sample of

10

Americans that measures their functional capacity to work across eight functional domains.

2019-2021    Exploration of an Alternative Disclosure Approach for SSA Statistics
SSA-NBER Retirement and Disability Research Center/NB20-12 (Maestas)
Project Leader with John Friedman (~$80,000 Total)
This project seeks to understand how a new method for reducing privacy loss when
disclosing statistics based on small numbers of observations would work in the SSA setting.

2019-2022    Opioid Prescribing Practices in Adolescents and State Policies
NIA-RAND/P50 DA046351 (Sherry)
Co-Investigator ($40,529 Total)
The goals of this project are to examine what share of opioid prescriptions among
adolescents and young adults lack a documented medical indication for pain, and examine
how this practice varies by patient, provider, and practice setting, and state policies.

2020-2021    Applying Disability Determination Methods from the Netherlands in the US
SSA-NBER Retirement and Disability Research Center/ NB21-08 (Maestas)
Project Leader with Mullen/Ravesteijn ($40,968 Total)
This project aims to provide a detailed review of the disability determination procedure used
in the Netherlands to identify specific jobs applicants have the functional ability to perform.

2016-2022    Health and Disability over the Life Course
NIA/R01AG056238
PI ($440,001)
This project will investigate the health and work capacity of individuals with moderate and
severe health problems, examining how work capacity varies with characteristics of the
disability and in relation to economic conditions over time, using administrative and survey
data.

2016-2022    Disability Among Older Low-Skilled Workers
NIA/R01AG056239
PI ($395,000)
This project will investigate the health and work abilities of low-skilled, older individuals
with moderate health problems, by education and work history, and in relation to economic
conditions over time, using administrative and survey data.

2018-2023    NBER Retirement and Disability Research Center (RDRC)
Social Security Administration (SSA)/1-RDR18000003 (Maestas)
PI ($3,317,253 Year 1)
The Center conducts research that contributes to the scientific basis for retirement and
disability policy design. As PI of the Center, I oversee approximately 25 research projects
per year conducted by researchers at universities in the US and Europe. The Center also
provides training fellowships to predoctoral and postdoctoral scholars.

2020-2022    The Effect of Health Insurance Affordability on the Employment of People with Disabilities
SSA-NBER Retirement and Disability Research Center/NB21-13 (Maestas)
Project Leader with Ari Ne'eman (~$80,382 Total)
This project will investigate the role of health insurance affordability as a potential
explanation for the increase in labor supply among people with disabilities (pre-pandemic).

11

2020-2023     Understanding Variation in Occupational Requirements
SSA-NBER Retirement and Disability Research Center/ NB21-07 (Maestas)
Project Leader with Mullen/Sherry ($40,968 Total)
The goal of this project is to characterize the variation in functional requirements within occupations.

2020-2023     Measuring Geographic Variation in Utilization of Long-term Services and Supports Among Supplemental Security Income Recipients
SSA-NBER Retirement and Disability Research Center/NB21-12 (Maestas)
Project Leader with Layton/Shepard (~$50,000 Total)
This project will construct a novel dataset tracking LTSS utilization by SSI recipients, and document geographic variation in health, use of LTSS services, and functional status.

2022-2023     Reform of the Disability Determination Process at the Hearing Level and Employment After Application
SSA-NBER Retirement and Disability Research Center/NB23-19 (Maestas)
Project Leader w/ Hoynes ($151,860 Total)
This project will investigate the impacts of the several policy initiatives launched by the Social Security Administration to improve the quality and consistency of disability case reviews performed by Administrative Law Judges.

2022-2023     Expanding Research Capacity at Historically Black Colleges and Universities (HBCUs)
SSA-NBER Retirement and Disability Research Center/NB23-1 (Maestas)
Project Leader w/ Viceisza ($62,824 Total)
This project will seek to strengthen, expand, and build the capacity for conducting research on retirement and disability policy at HBCUs.

2020-2023     HealthCare Markets and Regulation Lab
Arnold Foundation 20-04402 (Chernew)
Co-Investigator ($2,665,646)
The objective of this project is to provide the critical evidence, analyses, and tools necessary to support private and public sector innovations that promote high quality health care at a sustainable cost.

**Current**

2018-2024     Improving Health Outcomes for an Aging Population (P01)/Opioid Treatment for Pain: Causes and Consequences (Project 2)
NIA/P01AG005842 (Baicker)
Project Leader, Project 2 (~$360,000)
This project seeks to understand the causes of rising opioid treatment for pain and its effect on the health and functional outcomes of middle-aged and older Americans.

2020-2025     Improving Medicare in an Era of Change (P01)/ Lessons for Medicare from State Medicaid Programs: The Laboratory of Democracy (Project 3)
NIA/P01AG032952 (Landon and McWilliams)
Co-Investigator, Project 3 ($171,839)
This project estimates causal differences in care quality and health outcomes between Medicaid and Medicare, then leverages heterogeneity in Medicare-Medicaid differences

12

across states to determine which Medicaid policies are responsible for beneficial outcomes.

2020-2025   Disability-Inclusive Employment Policy Research and Resource Training Center (RRTC)
NIDILRR/ACL-Syracuse University (Blanck)
Co-PI ($909,157 Total)
This center grant encompasses an array of projects designed to test the effect of various employment policies on the employment of people with disabilities.

2022-2027   Assessment of Health-Related Work Capacity to Improve Independence of Older Adults
NIA/2R01AG046290
M-PI ($3,142,170 Total)
This project develops a new way of measuring functional abilities that enables direct comparison with occupational requirements. We use the new measures to identify whether it is possible to design interventions to restore lost work capacity to individuals whose functional abilities have declined.

2023-2028   Identifying Targets for Interventions to Improve Functional Ability to Work over the Life Course NIA/1R01AG078301
M-PI ($4,106,404 Total)
The goal of this project is to adapt international methods for measuring functional ability to work to the U.S. context and use this information to identify targets for interventions that would restore or prevent loss of specific functional abilities among Americans.

2023-2028   NBER Retirement and Disability Research Center (RDRC)
Social Security Administration (SSA)/1-RDR23000006-01-00 (Maestas)
PI ($1,989,509 Direct Year 1)
The Center conducts research that contributes to the scientific basis for retirement and disability policy design. As PI of the Center, I oversee approximately 25 research projects per year conducted by researchers at universities in the US and Europe. The Center also provides training fellowships to predoctoral and postdoctoral scholars (also listed below).

**Training Grants and Mentored Trainee Grants**

2010-2015   RAND Postdoctoral Training Program in the Study of Aging Years 18-22
NIA/T32 AG000244
PI/Faculty
This program provided research training in aging to postdoctoral fellows.

2013-2018   RAND Mini-Medical School for Social Scientists for Years 13-17
NIA/R13 AG018327 (13-17)
PI/Conference Organizer
This conference grant provided funding for the Mini-Medical School for Social Scientists, a two-day summer workshop that was part of the RAND Summer Institute. The workshop consisted of master lectures delivered by leading biomedical scientists to approximately 40 competitively selected, promising junior scholars in the field of aging.

2018-2025   National Bureau of Economic Research Post-Doctoral Fellowship Program on the

13

Economics of an Aging Workforce
Alfred P. Sloan Foundation
PI/Faculty
This program provides postdoctoral fellowships to junior faculty studying the labor market consequences of an aging population.  I am program director and faculty mentor.

2019-2023    Health Policy Training Program: Promoting Outcomes, Quality, and Diffusion of Medical Advances
NIA/5T32MH019733-27
Faculty
This program provides training in mental health policy to pre- and postdoctoral scholars.

2021-2025    National Bureau of Economic Research Training Program in Aging and Health Economics
NIA/T32AG000186
Faculty
This program provides training in aging and health economics to pre- and postdoctoral scholars. I serve as a faculty director and mentor.

2022-2026    Harvard Medical School MD-PhD Program in Aging and Social/Behavioral Sciences
NIA/2T32AG051108-06A1
Faculty
This program provides training in social/behavioral aspects of aging for MD-PhD students.

2023-2028    NBER Retirement and Disability Research Center (RDRC) Fellowship Program
Social Security Administration 1-RDR23000006-01-00/Center Grant with Training Program
PI/Faculty
This program provides training fellowships to pre- and postdoctoral scholars studying retirement and disability policy. I serve as program director and faculty mentor.

# Report of Local Teaching and Training

**Teaching of Students in Courses**

| | | |
|---|---|---|
| 2016-2019, 2022-2024 | PWY 120 Essentials of the Profession I<br>*Required for first-year M.D. students* | Harvard Medical School<br>Small Group Leader<br>20 hours (4 weeks, 5 hours/week) |
| 2016 | Econ 970 Social Insurance: Connecting Theory to Data<br>*Undergraduate course* | Harvard University, Department of Economics: 2 hours |
| 2016- | Economics 2465 Health Economics<br>*Field Course in Economics Ph.D. Program* | Harvard University, Department of Economics: 2 hours |
| 2016- | Health Policy 2000B/SUP958/HPM246-01<br>*Core Course in Health Policy Ph.D. Program* | Harvard University, Interfaculty Initiative in Health Policy: 2 hours |
| 2017 | Econ 985 Senior Thesis Research Seminar in Public Economics, Education, and Health<br>*Undergraduate course* | Harvard University, Department of Economics: 2 hours |
| 2019-2020 | PWY 120 Essentials of the Profession I<br>*Required for first-year M.D. students* | Harvard Medical School<br>Course Co-Leader, Health Policy<br>20 hours (4 weeks, 5 hours/week) |
| 2020-2021 | PWY 120 Essentials of the Profession I<br>*Required for first-year M.D. students* | Harvard Medical School<br>Course Leader, Health Policy |

14

| | | |
|---|---|---|
| 2021- | HPM 509 Disability Policy in the US<br>*Elective course in MPH program* | 20 hours (4 weeks, 5 hours/week)<br>Harvard University, Chan School of<br>Public Health: 1 hour |
| 2021 | Economics 50 Using Big Data<br>to Solve Economic and Social Problems<br>*Undergraduate course* | Harvard University, Department of<br>Economics: 1.5 hours |
| 2021, 2023 | Mental Health Policy<br>*Seminar for Postdoctoral and PhD students* | Harvard University, Interfaculty<br>Initiative in Health Policy: 1.5 hours |

**Research Supervisory and Training Responsibilities:**

| | | |
|---|---|---|
| 2016-2022 | Supervision of postdoctoral research fellows (average 1 fellow per year) | Harvard Center for Population and Development Studies<br>1:1 supervision 2.0 hours per month per fellow; 1.0 hour lab meeting per month |
| 2016- | Supervision of postdoctoral research fellows (average 1 fellow per year) | Harvard Medical School<br>1:1 supervision 2.0 hours per month per fellow; 1.0 hour lab meeting per month |
| 2016- | Supervision of postdoctoral research fellows (average 3 fellows per year) | National Bureau of Economic Research<br>1:1 supervision 0.75 hours per month per fellow; 1.0 hour lab meeting per month |

**Formally Mentored Harvard Medical, Dental, and Graduate Students:**

| | |
|---|---|
| 2016-2021 | Daniel Prinz, Ph.D. in Health Policy (Economics) 2021, Harvard University<br>Dissertation Committee Chair "Essays on Social Insurance"– *Honorable Mention Winner, National Tax Association; Honorable Mention Winner, National Academy of Social Insurance Heinz Dissertation Award* |
| 2017-2018 | Gregory Vanderhorst, Harvard College Class of 2018<br>Supervisor of Senior Thesis "Perverse Incentives or Pre-existing Trends: Has the Expansion of Medicaid Exacerbated the Opioid Crisis?"– *Awarded 2018 Thomas Temple Hoopes Prize, Harvard University* |
| 2019-2020 | Thomas Micajah "Cage" Reeder, Harvard College Class of 2019<br>Supervisor of Senior Thesis "Overextended and Overprescribing? Labor Force, Health, and Opioid Prescribing Propensity Implications of Expanded Physician Extender Autonomy" |
| 2019- | Alexandra Mitukiewicz, Ph.D. Candidate in Sociology, Harvard University<br>Dissertation Committee Member |
| 2019- | Marai Hayes, Ph.D. Candidate in Health Policy (Economics), Harvard University<br>Faculty Advisor; Dissertation Committee Chair |
| 2020-2024 | Ari Ne'eman Ph.D. Candidate in Health Policy (Political Analysis), Harvard University<br>Dissertation Committee Chair |
| 2021-2023 | Travis Donahoe, Ph.D. Candidate in Health Policy (Economics), Harvard University<br>Dissertation Committee Member—*Winner, ASHEcon Best Student Paper Award 2023* |
| 2022- | Reigne Dadey, Ph.D. Candidate in Health Policy (Economics), Harvard University<br>Faculty Advisor |
| 2023- | Ilana Salant, Ph.D. Candidate in Health Policy (Economics), Harvard University<br>Dissertation Committee Chair |
| 2024- | Wyatt Koma, Ph.D. Candidate in Health Policy (Political Analysis), Harvard University<br>Faculty Advisor |

15

| 2024- | Hailey Brace, Ph.D. Candidate in Health Policy (Economics), Harvard University Dissertation Committee Member |
| 2024- | Andrew Bolibol, Ph.D. Candidate in Health Policy (Economics), Harvard University, Faculty Advisor |
| 2024- | Simone Mantecna, Ph.D. Candidate in Health Policy (Economics), Harvard University, Faculty Advisor |

**Other Mentored Trainees and Faculty:**
**\*Denotes Harvard Affiliate**

2005-2006    Mathis Schroeder, Ph.D. / Head, Scientific Information Department, Max Planck Institute for Social Law and Social Policy
*Career stage:* Ph.D. candidate at Cornell University, Economics. *Mentoring role:* dissertation committee member (external).

2007-2010    Xiaoyan Li, Ph.D. / Senior Scientist, CS PharmSciences
*Career stage*: Ph.D. candidate at Pardee RAND Graduate School. *Mentoring role*: dissertation committee chair.

2009-2010    Johanna Lahey, Ph.D. / Associate Professor, The Bush School of Government & Public Service, Texas A&M University
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship grant-writing mentor. *Accomplishments*: submitted grant proposal.

2011-2012    Adam Gailey, Ph.D. / Principal, Charles River Associates
*Career stage*: Ph.D. candidate at Pardee RAND Graduate School. *Mentoring role*: dissertation committee chair.

2011-2012    Christopher Marcum, Ph.D. / Staff Scientist, National Human Genome Research Institute
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor. *Accomplishments*: submitted dissertation papers.

2012-2013    Matthew Hill, Ph.D. / Clinical Assistant Professor, Department of Economics, Loyola Marymount University
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor, research advisor. *Accomplishments*: co-authored two papers.

2013-2014    Alma Vega, Ph.D. / Senior Data Consultant, Kaiser Permanente
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor, research advisor. *Accomplishments*: submitted dissertation papers.

2013-2015    Jeffrey B. Wenger, Ph.D. / Senior Policy Researcher, RAND
*Career stage*: mid-career postdoctoral fellow. *Mentoring role*: fellowship mentor, research advisor. *Accomplishments*: co-authored two papers, submitted grant proposal.

2016-2021    \*Tisamarie Sherry, M.D., Ph.D. / Deputy Assistant Secretary for Planning and Evaluation, Office of Behavioral Health, Disability, and Aging Policy, U.S. Dept. of Health and

16

Human Services
*Career stage*: internal medicine residency at Brigham and Women's Hospital; junior faculty at RAND. *Mentoring role*: research mentor. *Accomplishments*: co-authored multiple papers, national conference presentations, submitted grant proposals.

2016-    *Yulya Truskinovsky, Ph.D. / Assistant Professor, Department of Economics, Wayne State University
*Career stage*: postdoctoral fellow; junior faculty. *Mentoring role*: fellowship mentor, research and career advisor. *Accomplishments*: co-authored paper, national conference presentations, submitted grant proposal.

2017-2018    *Brian McGarry, Ph.D. / Assistant Professor, Division of Geriatrics and Aging, University of Rochester
*Career stage*: postdoctoral fellow. *Mentoring role*: research advisor. *Accomplishments*: co-authored papers, submitted career development application.

2017-2019    *Wenjia Zhu, Ph.D. / Health Researcher, Mathematica Policy Research
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor, research advisor. *Accomplishments*: co-authored three papers.

2017-2018    *Brian Asquith, Ph.D. / Economist, W.E. Upjohn Institute for Employment Research
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor, research advisor *Accomplishments*: completed fellowship paper, submitted dissertation paper.

2018-2019    *Andrew Garin, Ph.D. / Assistant Professor, Department of Economics, University of Illinois, Urbana-Champagne
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor, research advisor *Accomplishments*: completed fellowship paper.

2018-2019    Keith Meyers, Ph.D. /Assistant Professor, University of Southern Denmark
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor, research advisor *Accomplishments*: completed fellowship paper.

2019-2020    *Helge Liebert, Ph.D. / Fellow, Department of Economics, University of Zurich
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor, research advisor *Accomplishments*: co-authored two papers, presented at NBER conference

2019-2020    Molly Hawkins, Ph.D. / Assistant Professor, Department of Economics, Brandeis University
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor, research advisor *Accomplishments*: completed fellowship paper.

2019-2020    Michael Stepner, Ph.D. / Assistant Professor, Department of Economics, University of Toronto
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor. *Accomplishments*: completed fellowship paper.

17

2019-2020    Taha Choukhmane, Ph.D. / Assistant Professor of Finance, MIT Sloan School of
Management
*Career stage*: postdoctoral fellow; junior faculty. *Mentoring role*: fellowship mentor.
*Accomplishments*: completed fellowship paper.

2020-2021    *Adelina Yanyue Wang, Ph.D. / Associate, McKinsey & Company
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor. *Accomplishments*:
completed fellowship paper.

2020-2023    *Adrienne Sabety, Ph.D. / Assistant Professor Health Policy, Stanford University
*Career stage*: postdoctoral fellow; junior faculty. *Mentoring role*: fellowship mentor,
research and career advisor. *Accomplishments*: co-authored multiple papers, national
conference presentation, submitted grant proposal.

2020-2023    *Leah Abrams, Ph.D. / Sloan Fellow at the Center for Population and Development
Studies at Harvard University
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor, research advisor
*Accomplishments*: co-authoring paper.

2021-2022    Kuan-Ming Chen, Ph.D. / Postdoctoral Fellow in Disability Research, National Bureau of
Economic Research
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor. *Accomplishments*:
preparing fellowship paper.

2021-2022    Max Kellogg, Ph.D./ Postdoctoral Fellow in Disability Research, National Bureau of
Economic Research
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor. *Accomplishments*:
preparing fellowship paper.

2022    Tobias Lehmann, Ph.D. Candidate in Economics, University of Lausanne, Switzerland
*Career stage:* Ph.D. candidate at University of Lausanne, Department of Economics,
Switzerland. *Mentoring role:* external dissertation committee member.

2022-2023    *Zhixiu Yu, Ph.D./ Postdoctoral Fellow in Disability Research, National Bureau of
Economic Research
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor.

2024-2025    *Bahar Eftekhari, Ph.D. / Postdoctoral Fellow in Disability Research, National Bureau of
Economic Research
*Career stage*: postdoctoral fellow. *Mentoring role*: fellowship mentor.

2024    *Anne Katrine Borgbjerg, Ph.D. Candidate Aarhus University, Department of Economics
*Career stage*: doctoral student. *Mentoring role*: sponsor and advisor of visiting student

## Local Invited Presentations
*No presentations below were sponsored by 3rd parties/outside entities.*
2003    Effect of Medical Expense Risk on Portfolio Choices

18

| | |
|---|---|
| | UC Berkeley Department of Economics Labor Lunch Seminar, Berkeley, California |
| 2003 | Effect of Medical Expense Risk on Portfolio Choices |
| | UC Berkeley Department of Demography Brown Bag Seminar, Berkeley, California |
| 2004 | The Impact of Nearly Universal Insurance Coverage on Health Care Utilization and Health: Evidence from Medicare |
| | UCLA Department of Economics, Applied Microeconomics Seminar, Los Angeles, California |
| 2005 | Medical Expenditure Risk and Household Portfolio Choice |
| | UC Irvine School of Business, Irvine, California |
| 2008 | Peer Groups and Employment Outcomes: Evidence from Conditional Random Assignment in the U.S. Army |
| | UCLA Department of Economics, Applied Microeconomics Seminar, Los Angeles, California |
| 2011 | Constructing Successful NIH Proposals by Thinking Like a Reviewer |
| | UCLA-California Health Interview Survey Workshop on Aging Research (Webinar), Los Angeles, California |
| 2012 | Disability Insurance Reform: What do we know? What do we need to know? |
| | RAND Summer Institute Workshop on Aging, Santa Monica, California |
| 2015 | The Effect of Population Aging on Economic Growth, the Labor Force, and Productivity |
| | Harvard University Labor Economics Workshop, Cambridge, MA |
| 2016 | Effect of Medicare Coverage on Treatment of Pain |
| | Boston University/Harvard/MIT Health Economics Workshop, Cambridge, MA |
| 2016 | Opioids Without Pain? Medical Indications for Opioid Prescriptions in Ambulatory Care |
| | Mongan Institute for Health Policy, Massachusetts General Hospital |
| 2017 | Living Longer, Working Longer? |
| | Harvard Medical School Media Fellowship on *The Quest for Immortality: Re-thinking an Age-Old Question* |
| 2018 | Medicaid and the Disability Programs Intertwined Reforms |
| | 30th Anniversary Health Care Policy Symposium, Harvard Medical School, Boston, MA |
| 2019 | Improving Functional Capacity to Work |
| | Harvard Symposium on Healthy Aging: From Molecules to Meaning, Harvard Medical School, Boston, MA |
| 2019 | The Link between Health and Working Longer |
| | *Can't Work, Can't Retire: America's Aging Workforce*, Author's Conference, Harvard Center for Population and Development Studies, Cambridge MA |
| 2021 | The NBER Retirement and Disability Research Center: Update |
| | Board of Directors Meeting, National Bureau of Economic Research (NBER), Cambridge MA |
| 2023 | Legal Representation in Disability Claims |
| | Harvard Kennedy School of Government, Economics and Social Policy Seminar |

## Report of Regional, National and International Invited Teaching and Presentations

**Invited Presentations and Courses**

**Regional**
*No presentations below were sponsored by 3rd parties/outside entities.*

| | |
|---|---|
| 2013 | The Effect of Local Labor Demand Conditions on the Labor Supply Outcomes of Older |

19

|      |   |
|------|---|
| | Americans |
| | SIEPR/SCL/Sloan Foundation Working Longer and Retirement Conference, Stanford University, California |
| 2013 | Does Delay Cause Decay? Administrative Decision Time and the Employment and Earnings of Social Security Disability Applicants |
| | UC Berkeley, Institute for Research on Labor and Employment (IRLE) Seminar, Berkeley, California |
| 2013 | The Effect of Local Labor Demand Conditions on the Labor Supply Outcomes of Older Americans |
| | SIEPR/SCL/Sloan Foundation Working Longer and Retirement Conference, Stanford University, Palo Alto, California |
| 2014 | The Effect of Population Aging on Economic Growth |
| | SIEPR/Sloan Foundation Working Longer Conference, Stanford University, Palo Alto, California |
| 2016 | American Working Conditions and Preferences for Job Attributes |
| | Boston College, Center for Retirement Research, Boston, MA |
| 2017 | The Value of Working Conditions in the U.S. |
| | Wellesley College, Department of Economics, Wellesley, MA |
| 2018 | The Effect of Economic Conditions on the Disability Insurance Program: Evidence from the Great Recession |
| | University of Connecticut Economics Department Seminar |
| 2018 | The Effect of Economic Conditions on the Disability Insurance Program: Evidence from the Great Recession |
| | Dartmouth College Economics Department Microeconomics Seminar |
| 2018 | Privatization of Social Insurance: Evidence from Medicaid |
| | Yale University, School of Public Health |
| 2020 | The Link between Health and Work: Differences in Work Capacity |
| | Tufts University, Department of Economics Seminar, Boston, Massachusetts |
| 2022 | Legal Representation in Disability Claims |
| | Brandeis University, Department of Economics Seminar, Waltham, Massachusetts |
| 2023 | Opioid Treatment for Pain and Work and Disability Outcomes: Evidence from Healthcare Providers' Prescribing Patterns |
| | Federal Reserve Bank of Boston's New England Public Policy Center Applied Micro Study Group Seminar |

**National**

*No presentations below were sponsored by 3rd parties/outside entities*

|      |   |
|------|---|
| 2001 | Labor, Love and Leisure: Complementarity and the Timing of Retirement by Working Couples |
| | Population Association of America Annual Meeting, Washington, DC |
| 2001 | Labor, Love and Leisure: Complementarity and the Timing of Retirement by Working Couples |
| | Princeton University Labor Lunch Seminar, New Jersey |
| 2002 | Labor, Love and Leisure: Complementarity and the Timing of Retirement by Working Couples |
| | Society of Labor Economists Annual Meetings, Baltimore, MD |
| 2004 | The Impact of Nearly Universal Insurance Coverage on Health Care Utilization and Health: Evidence from Medicare |

20

|      | Southern Economic Association Meetings, New Orleans, LA |
|------|---|
| 2004 | The Impact of Nearly Universal Insurance Coverage on Health Care Utilization and Health: Evidence from Medicare |
|      | NBER Summer Institute, Health Economics Workshop, Cambridge, Massachusetts |
| 2004 | Medical Expenditure Risk and Household Portfolio Choice |
|      | NBER Fall Health Care Meetings, Cambridge, Massachusetts |
| 2005 | Back to Work: Expectations and Realizations of Work after Retirement |
|      | Population Association of America Annual Meeting, Economic Demography Workshop, New York |
| 2005 | Post-Retirement Labor Supply: Future Research |
|      | Michigan Retirement Research Center Research Conference, Ann Arbor, Michigan |
| 2005 | Back to Work: Expectations and Realizations of Work after Retirement |
|      | NBER Summer Institute, Aging Workshop, Cambridge, Massachusetts |
| 2005 | Back to Work: Expectations and Realizations of Work after Retirement |
|      | Society of Labor Economists Annual Meetings, San Francisco, California |
| 2006 | Medical Expenditure Risk and Household Portfolio Choice |
|      | NBER Universities Research Conference, Cambridge, Massachusetts |
| 2006 | Cohort Differences in Retirement Expectations and Realizations |
|      | Wharton Pension Research Council Symposium, Philadelphia, Pennsylvania |
| 2007 | Retirement Transitions of the Self-Employed in the United States and England |
|      | Michigan Retirement Research Center Research Conference, Ann Arbor, Michigan |
| 2008 | Burnout and the Retirement Decision |
|      | Society of Labor Economists Annual Meetings, New York |
| 2008 | Price Variation in Markets with Homogeneous Goods: The Case of Medigap |
|      | Duke/UNC Triangle Health Economics Workshop, Durham, North Carolina |
| 2009 | The Labor Supply Effects of Disability Insurance Work Disincentives: Evidence from the Automatic Conversion to Retirement Benefits at Full Retirement Age |
|      | Michigan Retirement Research Center Research Conference, Ann Arbor, Michigan |
| 2009 | Peer Groups and Employment Outcomes: Evidence from Conditional Random Assignment in the U.S. Army |
|      | ASSA/American Economic Association Annual Meeting, San Francisco, California |
| 2010 | The Labor Supply Effects of Disability Insurance Work Disincentives: Evidence from Administrative Data |
|      | 12th Annual Conference of the Retirement Research Consortium (Social Security Administration), Washington, DC |
| 2010 | The Labor Supply Effects of Disability Insurance Work Disincentives: Evidence from the Automatic Conversion to Retirement Benefits at Full Retirement Age |
|      | NBER Summer Institute, Aging Workshop, Cambridge, Massachusetts |
| 2010 | Consistency of the Disability Determination Process and Labor Supply Outcomes |
|      | University of Illinois, Urbana-Champaign Center for Business and Public Policy,  Urbana-Champaign, Illinois |
| 2010 | Consistency of the SSDI Disability Determination Process and Labor Supply Outcomes |
|      | Michigan Retirement Research Center Research Conference, Ann Arbor, Michigan |
| 2010 | The Labor Supply Effects of Disability Insurance Work Disincentives: Evidence from the Automatic Conversion to Retirement Benefits at Full Retirement Age |
|      | American Society of Health Economists (ASHEcon) Conference, Ithaca, New York |
| 2010 | Burnout and the Retirement Decision |
|      | American Society of Health Economists (ASHEcon) Conference, Ithaca, New York |

21

| | |
|---|---|
| 2011 | Evaluating Proposals to Slow SSDI Inflows: Evidence Needed |
| | Michigan Retirement Research Center Research Conference – Invited Lunch Panel, Ann Arbor, Michigan |
| 2011 | Does Disability Insurance Receipt Discourage Work? Using Examiner Assignment to Estimate Causal Effects of SSDI Receipt |
| | 13th Annual Joint Conference of the Retirement Research Consortium (Social Security Administration) Washington, DC |
| 2012 | Disability Insurance and Healthcare Reform: Evidence from Massachusetts |
| | University of Pennsylvania, Leonard Davis Institute of Health Economics, Philadelphia, Pennsylvania |
| 2012 | Does Delay Cause Decay? The Effect of Administrative Decision Time on the Labor Force Participation of Disability Applicants |
| | 14th Annual Joint Conference of the Retirement Research Consortium (Social Security Administration), Washington, DC |
| 2012 | Does Disability Insurance Receipt Discourage Work? Using Examiner Assignment to Estimate Causal Effects of SSDI Receipt |
| | National Academy of Social Insurance, Washington, DC |
| 2013 | Disability Insurance and Healthcare Reform: Evidence from Massachusetts |
| | Smith Group/Munich Reinsurance Group Maine Event, Portland, Maine |
| 2013 | The Effect of SSDI on Employment |
| | Social Security Advisory Board Forum on Social Security Disability Insurance: The Time for Reform, Washington, DC |
| 2013 | The Effect of SSDI on Employment and Earnings |
| | Cornell University, Department of Policy Analysis and Management, Ithaca, New York |
| 2013 | Does Delay Cause Decay? Administrative Decision time and the Employment and Earnings of Social Security Disability Applicants |
| | Princeton University, Industrial Relations Section/Health and Well-Being Center Joint Seminar, Princeton, New Jersey |
| 2013 | Are Older Workers in Greater Demand? |
| | TIAA-CREF Institute/Alfred P. Sloan Foundation Colloquium "Towards a Policy Agenda for an Aging America," U.S. Capitol Visitors Center, Washington, D.C. |
| 2014 | Does Delay Cause Decay? Administrative Decision Time and the Employment and Earnings of Social Security Disability Applicants |
| | University of Texas, Austin, Economics Department, Austin, Texas |
| 2014 | Disability Insurance and Healthcare Reform: Evidence from Massachusetts |
| | Harvard Medical School, Department of Health Care Policy, Boston, Massachusetts |
| 2014 | American Working Conditions |
| | NYU/Sloan Foundation Workshop on Measuring, Modeling, and Modifying Late in Life Workplace Dynamics, New York |
| 2015 | Disability Insurance and the Great Recession |
| | ASSA/American Economic Association Annual Meeting, Boston, Massachusetts |
| 2015 | Labor Market Shocks and Early Social Security Benefit Claiming |
| | Michigan Retirement Research Center Research Conference, Ann Arbor, Michigan |
| 2015 | American Working Conditions |
| | SIEPR/Sloan Foundation Working Longer Conference, Stanford University, Palo Alto, California |
| 2016 | Factors Influencing Working Longer |
| | Age Boom Academy, Columbia University, New York |

22

2016        Disability Insurance and the Great Recession
            American Society of Health Economists (ASHEcon) Conference, Philadelphia,
            Pennsylvania
2016        Work and Retirement (Master Lecture)
            RAND Summer Institute, Workshop on Aging (NIH/NIA-Sponsored), RAND, Santa
            Monica, CA
2016        American Working Conditions and Preferences for Job Attributes
            University of Illinois, Champagne-Urbana, Center for Business and Public Policy
            Champaign, Illinois
2016        American Working Conditions and Preferences for Job Attributes
            National Bureau of Economic Research Summer Institute, Aging Program, Cambridge,
            MA
2016        The Return to Work and Women's Employment Decisions
            National Bureau of Economic Research (NBER) Women Working Longer Conference,
            Cambridge, MA
2016        The Role of Attorneys in the Disability Determination Process
            Social Security Administration, Washington, D.C.
2017        Disability Insurance and the Great Recession
            Vanderbilt University, Nashville, Tennessee
2017        Expanding Access to Paid Time Off to Support Caregiving
            Brookings Institution Hamilton Project Author's Conference, Washington DC
2017        Preferences for Work at Older Ages
            Stanford University Center on Longevity, Conference on Working Longer and Retirement:
            Applying Research to Help Manage an Aging Workforce, Stanford, California
2017        Opioid Treatment for Pain
            Blue Cross Blue Shield Association Alliance Meeting, Chicago Illinois
2017        The Value of Working Conditions
            SIEPR/Sloan Foundation Working Longer Conference, Stanford University, Palo Alto,
            California
2018        The Return to Work and Women's Employment Decisions
            ASSA/American Economic Association Annual Meeting, Philadelphia, PA
2018        The Effect of Economic Conditions on the Disability Insurance Program: Evidence from
            the Great Recession
            Tulane University Economics Department Seminar
2018        Initial Opioid Prescriptions in Commercial Health Insurance
            Blue Cross Blue Shield Association Alliance Meeting, Chicago, IL
2018        The Decline in SSDI Awards: Reasons, Implications and Future Outlook
            NBER Summer Institute Symposium on Disability Insurance, Cambridge, MA
2018        The Consequences of (Partial) Privatization of Health Insurance for Individuals with
            Disabilities: Evidence from Medicaid
            Disability Research Consortium Meeting, National Press Club, Washington, DC
2018        Privatization of Social Insurance: Evidence from Medicaid
            Cornell University, Institute on Health Economics, Health Behaviors, and
            Disparities
2018        The Return to Work and Women's Employment Decisions
            SIEPR/Sloan Foundation Working Longer Conference, Stanford University, Palo Alto,
            California
2019        Opioid Treatment for Pain and Work Outcomes: Evidence from Physicians' Prescribing

23

Patterns
National Bureau of Economic Research, Workshop on Pain: Measurement, Causes, and Consequences, Cambridge, MA

2019   Tap the Work Capacity: A Strategy for Modernizing the SSDI Program
*The ANNALS of the American Academy of Political and Social Science*, Author's Conference; Annenberg Public Policy Center, University of Pennsylvania

2019   Working Conditions and Work Capacity among Older Workers
National Academy of Sciences, Planning Meeting on Work, The Workplace, and Aging, Washington, D.C.

2019   Latent Work Capacity and Retirement Expectations
SIEPR/Sloan Foundation Working Longer Conference, Stanford University, Palo Alto, California

2019   Identifying Work Capacity and Promoting Work: A Strategy for Modernizing the SSDI Program, Pihl Lecture, Wayne State University Department of Economics, Detroit, Michigan

2020   Economic Impacts of Covid-19 on the SSDI Program
National Academies of Sciences, Engineering and Medicine, Standing Committee of Medical and Vocational Experts for the Social Security Administration's Disability Program, Washington, DC (Virtual)

2020   The Link between Health and Work: Differences in Work Capacity
SIEPR/Sloan Foundation Working Longer and Retirement Conference, Stanford University, Palo Alto, California (Virtual)

2020   Webinar: RRTC Disability Inclusive Employment Policy Center, Southeast ADA Center (Syracuse University)

2021   The Link between Health and Work: Disparities in Work Capacity,
Michigan State University, Lansing, Michigan (Virtual)

2021   Legal Representation in Disability Claims
NBER Summer Institute, Social Security Program, Cambridge, MA (Virtual)

2021   Disability status and Health Equity
Economics of Health Equity Interest Group: 1st Workshop
American Society of Health Economists (ASHEcon) (Virtual)

2021   The Changing Nature of Work and Work Capacity
SIEPR/Sloan Foundation Working Longer and Retirement Conference, Stanford University, Palo Alto, CA (Virtual)

2021   Behavioral Responses to Supply-Side Drug Policy During the Opioid Epidemic
Improving Health Outcomes for an Aging Population, NBER (Virtual)

2022   Caregiving and Labor Force Participation
Changing Labor Market for Older Workers: Short and Long-Term Trends Conference, NBER, Cambridge, MA

2022   Caregiving and Labor Supply: New Evidence from Administrative Data
Dave Fest 2022: A Conference in Honor of David Card
UC Berkeley, Berkeley, California

2022   Legal Representation in Disability Claims
Clemson University, Department of Economics Seminar, Clemson, South Carolina

2022   Legal Representation in Disability Claims
University of Pennsylvania Leonard David Institute of Health Economics Seminar, Philadelphia, Pennsylvania

24

| 2023 | Strengthening Social Security for Older Adults, People with Disabilities, and Their Families, Panel with Acting Commissioner Kilolo Kiljakazi and Sarah Rosen Wartell Urban Institute (virtual) |
|------|---|
| 2023 | Reform of the Disability Determination Process at the Hearing Level and Employment After Application |
|      | Social Security Administration, Work-in-Progress Seminar |
| 2023 | Legal Representation in Disability Claims |
|      | 14th Annual Empirical Health-Law Conference |
|      | Boston University School of Law, Questrom School of Business, Boston, MA |
| 2023 | Long-term Dynamics of the Employment-to-Population Ratio: Panel Discussion |
|      | NBER Summer Institute, Social Security Program, Cambridge, MA |
| 2023 | Legal Representation in Disability Claims |
|      | University of Georgia, Department of Economics Seminar, Athens, GA |
| 2023 | Social Security Disability Reform and Implications for Employment |
|      | University of Wisconsin, Department of Economics Public Seminar, Madison, WI |
| 2024 | Social Security Disability Reform and Implications for Employment |
|      | Stanford University, Health Economics Seminar, Palo Alto, CA |

**International**

*No presentations below were sponsored by 3rd parties/outside entities.*

| 2001 | Labor, Love and Leisure: Complementarity and the Timing of Retirement by Working Couples |
|------|---|
|      | International Atlantic Economics Society Conference, Athens, Greece |
| 2004 | The Impact of Nearly Universal Insurance Coverage on Health Care Utilization and Health: Evidence from Medicare |
|      | Human Mortality Database Symposium, Max Plank Institute, Rostock, Germany |
| 2013 | The Effect of SSDI on Employment and Earnings |
|      | University College London, Economics Department, London, U.K. |
| 2014 | American Working Conditions |
|      | Institute of Fiscal Studies Workshop, London, U.K. |
| 2015 | American Working Conditions Survey |
|      | Institute of Fiscal Studies Workshop, London, U.K. |
| 2015 | Does Delay Cause Decay? Administrative Decision Time and the Employment and Earnings of Social Security Disability Applicants |
|      | Conference on Evaluation and Design of Retirement and Savings Programs, CIRANO, Université Laval, ESG-UQAM, Montreal, Canada |
| 2016 | Working Conditions and Preferences for Work of Older Workers in the US |
|      | Institute of Fiscal Studies Workshop, London, U.K. |
| 2016 | The Role of Attorneys in the Disability Determination Process, |
|      | Pompeu Fabra University, Barcelona, Spain |
| 2017 | The Effect of Population Aging on Economic Growth, the Labor Force and Productivity |
|      | CEPRA/NBER Workshop on Ageing and Health, Universita Svizzera Italiana, Lugano, Center for Economic and Political Research on Aging, Lugano, Switzerland |
| 2017 | Topics in Empirical Health and Labor Economics, |
|      | Universität St.Gallen, St. Gallen Switzerland |
| 2018 | The Value of Working Conditions in the United States and Implications for the Structure of Wages |
|      | Tinbergen Institute (Economics), Amsterdam, The Netherlands |

25

| | | |
|---|---|---|
| 2018 | The Value of Working Conditions in the United States and Implications for the Structure of Wages | |
| | Department of Economics, University of Lausanne, Lausanne, Switzerland | |
| 2018 | The Value of Working Conditions in the United States and Implications for the Structure of Wages | |
| | Department of Economics (GATE), University of Lyon-Etienne, France | |
| 2018 | The Decline in Disability Awards in the U.S. | |
| | 20th Neemrana Conference, Neemrana, India | |
| 2020 | The Link between Health and Work: Differences in Work Capacity | |
| | Keynote Presentation at 1st Stockholm Workshop on Diversity and Workplace Inclusion, Swedish Institute for Social Research, Stockholm University, Sweden (Virtual) | |
| 2022 | Legal Representation in Disability Claims | |
| | Nuremberg Research Seminar in Economics, University of Nuremberg (Virtual) | |
| 2022 | Legal Representation in Disability Claims | |
| | Department of Economics, Erasmus University Rotterdam, Netherlands | |
| 2023 | Keynote Lecture | |
| | UWV, Amsterdam, Netherlands | |
| 2023 | Keynote Lecture | |
| | Workshop on Disability Economics, Facultat D'Economia – Universitat de Barcelona, Barcelona, Spain | |
| 2023 | Legal Representation in Disability Claims | |
| | University of Lausanne, Department of Economics Seminar (Cancelled) | |
| 2023 | Keynote Lecture | |
| | Swiss Health Economics Association, Bern, Switzerland | |
| 2024 | Social Security Disability Reform and Implications for Employment | |
| | IFS-STICERD Public Economics Seminar | |
| 2024 | Keynote Lecture | |
| | London Longevity and Ageing Conference, London, UK | |

# Report of Education of Patients and Service to the Community

*No activities or materials below were sponsored by 3rd parties/outside entities.*

**Educational Materials for Patients and the Lay Community:**

**Books, Monographs, Articles, and Presentations in Other Media:**

1. Maestas N, Zissimopoulos J, Rohwedder S, Martin LG. "When I'm 64" How Aging U.S. Baby Boomers Have Begun to Carry That Weight." RAND Review, CP22-2010-08, 2010.

2. **Maestas N**. Economy Needs Unretired. The RAND Blog, 2012.

3. **Maestas N,** Mullen KJ. The SSDI Program's Impact on Human Capital. The RAND Blog, 2013.

4. **Maestas N,** Armour P. Addressing SSDI's Looming Insolvency. The RAND Blog, 2014.

5. Hill M, **Maestas N**, Mullen KJ. Effects of Employer Health Insurance on Disability Insurance Claiming. RAND Corporation, 2014.

6. **Maestas N**, Mullen KJ, Powell D, Wachter TV, Wenger JB. How Americans Perceive the

26

Workplace: Results from the American Working Conditions Survey. RAND Corporation, 2017.

7. McGarry B, **Maestas N**, Grabowski DC. Placing a Premium on Premiums: Assessing the Redesigned Medicare Plan Finder Tool, Health Affairs Blog, 2019.

8. Layton TJ, **Maestas N,** Prinz D, Vabson B. The Bitter(sweet) Pill: The Impacts of Private Provision of Medicaid. VoxEU, 2019.

9. **Maestas N**, Mullen KJ, Powell D, Wachter TV, Wenger JB. The American Working Conditions Survey Finds That Nearly Half of Retirees Would Return to Work. RAND Corporation, 2019.

10. **Maestas N.** The NBER Retirement and Disability Research Center. NBER Reporter, 2020.

11. Layton TJ, **Maestas N,** Prinz D, Vabson B. Private versus Public Provision of Social Insurance: Evidence from Medicaid. CATO Institute, 2020.

12. Balestra S, Liebert H, **Maestas N**. Behavioral Responses to Supply-Side Drug Policy During the Opioid Epidemic. Forthcoming CATO Institute, 2022.

# Report of Scholarship

## Peer-Reviewed Scholarship in Print or Other Media

1. Card D, Dobkin C, **Maestas N**. The Impact of Nearly Universal Insurance Coverage on Health Care Utilization and Health: Evidence from Medicare. Am Econ Rev. 2008 98(5): 2242-58.
2. Card D, Dobkin C, **Maestas N**. Does Medicare Save Lives? Quarterly Journal of Economics 2009 124(2): 597-636.
3. **Maestas N**. Back to Work: Expectations and Realizations of Work after Retirement. Journal of Human Resources 2010. 45(3), p. 718-748
4. **Maestas N**, Zissimopoulos J. How Longer Work Lives Ease the Crunch of Population Aging. Journal of Economic Perspectives 2010. 24(1): p.139-160.
5. Atella V, Brunetti M, **Maestas N**. Household Portfolio Choices, Health Status and Health Care Systems: A Cross Country Analysis Based on SHARE. Journal of Banking and Finance 2012. 36(5): p. 1320-1335.
6. Goldman D, **Maestas N**. Medical Expenditure Risk and Household Portfolio Choice. Journal of Applied Econometrics 2013 28(4): 527-550.
7. **Maestas N**, Mullen KJ, Strand A. Does Disability Insurance Receipt Discourage Work? Using Examiner Assignment to Estimate Causal Effects of SSDI Receipt. Am Econ Rev. 2013 103(5): 1797-1829.
8. **Maestas N**, Mullen KJ, Strand A. Disability Insurance and Health Insurance Reform: Evidence from Massachusetts. Am Econ Rev. 2014 104(5): 329-335.
9. **Maestas N**, Mullen KJ, Strand A. Disability Insurance and the Great Recession. Am Econ Rev. 2015 105(5):177-82.
10. Hill M, **Maestas N,** Mullen KJ. Employer Accommodation and Labor Supply of Disabled Workers. Labour Econ. 2016 Aug; 41: 291-303.
11. Coile CC. and **Maestas N**. The Value of the Health and Retirement Study for Health Economics Research. Forum Health Econ Policy. 2017 Oct 31: 21(1).
12. McGarry B, **Maestas N**, Grabowski D. Simplifying the Medicare Plan Finder Tool Could Help Older Adults Choose Lower Cost Part D Plans. Health Aff. 2018 37(8): 1290-1297.
13. Sherry TB, Sabety A, **Maestas N**. Documented Pain Diagnoses in Adults Prescribed Opioids:

27

Results from the National Ambulatory Medical Care Survey, 2006-2015. Annals of Internal Medicine. 2018 Sept.; 169(12): 892-894.

14. Zhu W, Chernew ME, Sherry TB, **Maestas N.** Initial Opioid Prescriptions in Commercial Health Insurance in the United States, 2012-2017. N Engl J Med. 2019 Mar 14;380(11):1043-1052

15. **Maestas N**, Mullen KJ. Unmet Need for Workplace Accommodation. J Policy Anal Manage. 2019 Fall; 38(4):1004-1027.

16. **Maestas N.** Identifying Work Capacity and Promoting Work: A Strategy for Modernizing the SSDI Program. Ann Am Acad Pol Soc Sci. 2019 Nov; 686(1):93-120.

17. Autor D., **Maestas N**, Woodbury R.  Disability Policy, Program Enrollment, Work, and Wellbeing among People with Disabilities. Social Security Bulletin 2020-02-01, Vol.80, p. 57-VI

18. **Maestas N**. America in Pain, the Nation's Wellbeing at Stake. Proceedings of the National Academy of Sciences. 19 October 2020 117 (43) 26559-26561

19. **Maestas N**, Mullen KJ, Rennane S. Absenteeism and Presenteeism among American Workers. Journal of Disability Policy Studies, 2021;32(1):13-23.

20. Sabety A, Sherry TB, **Maestas N**. The Impact of Medicare Part D on Opioid Use by Older Adults. Health Services Research, 2021; Apr; 56(2): 289–298.

21. **Maestas N**, Mullen KJ, Strand A. The Effect of Economic Conditions on the Disability Insurance Program: Evidence from the Great Recession. Journal of Public Economics, Volume 199, July 2021, 104410.

22. Layton T, Prinz D, **Maestas N**, Vabson B. Healthcare Rationing in Public Insurance Programs: Evidence from Medicaid. American Economic Journal: Economic Policy 2022; 14(4):397-431.

23. **Maestas N**, Mullen KJ, Powell D. The Effect of Population Aging on Economic Growth, the Labor Force and Productivity. American Economic Journal: Macroeconomics 2023, 15 (2): 306-32.

24. Ne'eman A, **Maestas, N**. How Has COVID-19 Impacted Disability Employment? Disability and Health Journal, 2022,101429.

25. **Maestas N,** Sherry T, Strand A. Opioid Use Among Social Security Disability Insurance Applicants, 2013-2018. Journal of Disability Policy Studies, 2021: 10442073221150613.

26. **Maestas N**, Mullen KJ, Powell D, Wachter TV, Wenger J. The Value of Working Conditions in the United States. American Economic Review 2023, 113.7 (2023): 2007-2047.

27. Abrams L, Friedman K, **Maestas, N**. The role of physical and cognitive/emotional functioning in the association between common health conditions and working. Social Science and Medicine 2023, 322 (2023): 115816.

28. **Maestas N**, Messel M, Truskinovsky Y. Caregiving and Labor Supply: New Evidence from Administrative Data. Journal of Labor Economics 2024; 42(S1), April 2024.

29. Cusimano L., **Maestas N**, "Full practice autonomy for nurse practitioners did not increase risky opioid prescribing among commercially insured," JAMA Health Forum, 2024; 5(12):e244544.


## Other Peer-Reviewed Scholarship

30. **Maestas N,** Gaillot SJ. An Outcome Evaluation of the Success for Kids Program. RAND Corporation, TR-575-1-SFK. 2010.

31. **Maestas N**, Mullen KJ, Zamarro G. Research Designs for Estimating Induced Entry into the SSDI Program Resulting from a Benefit Offset. Report prepared for the Social Security Administration. RAND Corporation, TR908, 2010.

32. **Maestas N**, Mullen KJ, Powell D, Wachter TV, Wenger J. Working Conditions in the United States: Results of the 2015 American Working Conditions Survey. RAND Corporation, RR-2014-APSF. 2017.

33. Bazarian J, Blazer DG, Bogner J, Fitzpatrick AL, Harrison TC, Harvey PD, Hernan M, Hsia RY, **Maestas N**, McKenzie J, Mullen KJ, Nguyen LA, Osbahr AJ, Schulman KA, Seabury S, Taylor DH. Health Care Utilization as a Proxy in Disability Determination. Committee on Health Care Utilization and Adults with Disabilities, Board of Health Care Services, Health and Medical Division, The National Academies of Sciences, Engineering and Medicine. Washington, DC: National Academies Press. 2018.

## Non-peer reviewed scholarship in print or other media

**Working Papers:**

1. **Maestas, N,** Mullen, KJ, Powell D. The Effect of Local Labor Demand Conditions on the Labor Supply Outcomes of Older Americans. RAND Working Paper #WR-1019. 2013.
2. Card D, **Maestas N,** Purcell PJ. Labor Market Shocks and Early Social Security Benefit Claiming. University of Michigan Retirement Research Center, MRRC WP 2014-317. 2014.
3. Hill M, **Maestas N**, Mullen KJ. Source of Health Insurance Coverage and Employment Survival Among Newly Disabled Workers: Evidence from the Health and Retirement Study. RAND Working Paper #WR-1040. 2014.
4. Autor D, **Maestas N**, Mullen KJ, Strand A. Does Delay Cause Decay? The Effect of Administrative Decision Time on the Labor Force Participation and Earnings of Disability Applicants. NBER Working Paper #20840. 2015.
5. Lopez-Garcia I, **Maestas N,** Mullen KJ. Latent Work Capacity and Retirement Expectations. University of Michigan Retirement and Disability Research Center, MRDRC Working Paper 2019-400. 2019.
6. Lopez-Garcia I, **Maestas N,** Mullen K. The Changing Nature of Work. University of Michigan Retirement and Disability Research Center, MRDRC WP 2020-415. 2020.
7. **Maestas N,** Sherry T. Opioid Treatment for Pain and Work and Disability Outcomes: Evidence from Health Care Providers' Prescribing Patterns. NBER RDRC Working Paper NB19-28-2. 2021.
8. Balestra S, Liebert H, **Maestas N**, Sherry TB. Behavioral Responses to Supply-Side Drug Policy During the Opioid Epidemic. NBER Working Paper #w29596. 2021.
9. Hoynes HW, **Maestas N**, Strand A. Legal Representation in Disability Claims. NBER Working Paper #w29871. 2022.
10. Anderson M, Dobkin C, **Maestas N**, Rose, L. Health Insurance and Access to Care for the Near Elderly. Mimeo 2022. Revise & Resubmit.
11. Ne'eman A, **Maestas, N**. Disability Heterogeneity in the Impact of the ACA's Medicaid Expansions on Disability Employment. Mimeo 2022.
12. Clark, Hailey, Ravesteijn Bastian, Mullen Kathleen J., **Maestas Nicole**. The Prevalence of Functional Limitations in the United States Workforce. September 2024. Under review.

**Book Chapters:**

1. **Maestas N.** "Cohort Differences in Retirement Expectations and Realizations" in Madrian, Brigitte, Olivia S. Mitchell, and Beth J. Soldo, eds. *Redefining retirement: How will boomers fare?*

29

Oxford, UK: Oxford University Press. 2007.

2. **Maestas N**. "Comment on 'Nudged, Pushed, or Mugged: Policies to Encourage Older Workers to Retire Later in Burtless, Gary T., and Henry J. Aaron, Eds. *Closing the Deficit : How Much Can Later Retirement Help?* Washington, D.C. : Brookings Institution Press. 2013.

3. **Maestas N. "**Expanding Access to Earned Sick Leave to Support Caregiving" in Schanzenbach, Diane and Ryan Nunn, Eds. *The 51%: Driving Growth through Women's Economic Participation.* Washington, DC.: Brookings Institution, The Hamilton Project. 2017.

4. **Maestas N**. "The Return to Work and Women's Employment Decisions" in Claudia Goldin and Lawrence F. Katz, Eds. Women Working Longer: Facts and Some Explanations. Chicago, IL: Chicago University Press. 2018.

5. **Maestas, N,** Jetsupphasuk M. "What Do Older Workers Want?" in Bloom, David, Ed. *Live Long and Prosper? The Economics of Ageing Populations*, CEPR Press. 2019.

6. Berger, B, Lopez-Garcia, I, **Maestas N**, Mullen KJ. "The Link between Health and Working Longer: Differences in Work Capacity." In *Can't Work, Can't Retire: America's Aging Workforce.* Eds. Lisa Berkman and Beth C. Truesdale. Oxford University Press. 2022.

7. **Maestas N**, Mullen KJ. "Economic Conditions, the COVID-19 Pandemic Recession, and Implications for Disability Insurance in the United States." In: *Real-World Shocks and Retirement System Resiliency*. Edited by: Olivia S. Mitchell, John Sabelhaus, and Stephen P. Utkus, Oxford University Press. 2024.

**Letters to the Editor and Book Reviews:**

1. **Maestas, N**. Review of *Perspectives on the Economics of Aging* by D.A. Wise. Journal of Economic Literature, 44 (1):163-164. 2006.

2. **Maestas, N**. Review of *Medicare and Medicaid at 50: America's Entitlement Programs in the Age of Affordable Care* by Alan B. Cohen, et al. eds. Journal of Economic Literature, 53(4): 1026-1027.

3. Zhu W, Sherry TB, **Maestas N**. Initial Opioid Prescriptions among U.S. Patients, 2012-2017. Reply. *N Engl J Med*. 2019;380(26):2588

4. Sherry TB, Sabety A, **Maestas N**. Documented Pain Diagnoses in Adults Prescribed Opioids (Reply). *Annals of Internal Medicine*. 2019 Aug 20;171(4):307-308. doi: 10.7326/L19-0215.

**Congressional Testimony:**

1. **Maestas N**. "Choosing to Work During Retirement and the Impact on Social Security," U.S. Senate Finance Committee Hearing, July 15, 2010.
   Written Testimony: http://www.rand.org/pubs/testimonies/CT350.html
   Oral Testimony: https://www.c-span.org/video/?294563-1/work-retirement#

2. **Maestas N**. U.S. House Ways and Means Committee, Subcommittee on Social Security, "Securing the Future of the Disability Insurance Program," March 20, 2012.
   Written Testimony:http://waysandmeans.house.gov/Calendar/EventSingle.aspx?EventID=284802.
   Oral Testimony: http://waysandmeans.granicus.com/MediaPlayer.php?view_id=2&clip_id=195.

**Professional Educational Materials or Reports in Print or Other Media:**

1. **Maestas N**, Mullen KJ, Powell D, Wachter TV, Wenger JB. The American Working Conditions Survey [2015] Data: Codebook and Data Description 2015. Santa Monica, CA: RAND Corporation,

30

2. **Maestas N**, Mullen KJ, Powell D, Wachter TV, Wenger JB. The American Working Conditions Survey [2018] Data: Codebook and Data Description 2017. Santa Monica, CA: RAND Corporation.
3. Lopez-Garcia I, **Maestas N**, Mullen KJ. 2018. American Work Capacity and Abilities Survey. Santa Monica, CA. RAND American Life Panel (ALP).
4. **Maestas N**, Mullen KJ, Ravesteijn B, Sherry TB. 2019. Health and Functional Capacity Survey. Santa Monica, CA. RAND American Life Panel (ALP).

**Thesis**

1. **Maestas N**. Labor, Love & Leisure: Complementarity and the Timing of Retirement by Working Couples. Mimeo, University of California, Berkeley, Department of Economics. 2001
2. **Maestas N**. The Impact of Annuity Selection on the Income of Elderly Widows. Mimeo University of California, Berkeley, Department of Economics. 2002.

31

**NICOLE MAESTAS: LISTING OF TESTIMONY**

*In re State of Hawai'i, ex rel. Russell A. Suzuki, Attorney General v. Bristol Myers Squibb Company, et al.,* Civil No. 14-1-0708-03.

*In re State of New Hampshire, v. Johnson & Johnson; et al.,* State of New Hampshire, Merrimack, SS Superior Court, Docket No. 217-2018CV-00678.

*In re State of New Mexico, ex rel. Hector Balderas, Attorney General v. Bristol-Myers Squibb Company, et al.,* State of New Mexico, County of Stanta Fe, First Judicial District Court, No. D-101-CV-2016-02176.

*In re State of New Mexico ex rel. Hector Balderas v. Solvay America, Inc. et al.,* Case No. D-101-CV-2019-01897.

*In re Stafford v. Rite Aid Corp*, Case No. 17-cv-01340-AJB-JLB.

*In re State of Hawai'i ex. rel. Anne E. Lopez, Attorney General v. Briston-Myers Squibb Company et al.*, Case No. 1CC141000708.

*In re Amitiza Antitrust Litigation*, District of Massachusetts, Case No. 1:21-cv-11057-MJJ.

**ATTACHMENT B**

### ATTACHMENT B: MATERIALS RELIED ON OR CONSIDERED

**Legal Documents**

Second Amended Class Action Complaint and Demand for Jury Trial, in this matter, November 19, 2024.

Amgen Reply in Support of Amgen's Inc.'s Motion to Quash Carefirst of Maryland, Inc., *et al.*'s Deposition Subpoena, January 1, 2025.

Deposition of George Esgro, Accord BioPharma, in this matter, January 10, 2025.

Deposition of Matthew Hales, Johnson and Johnson, in this matter, January 8, 2025.

Deposition of Nancy Paliotta, Johnson and Johnson, in this matter, January 24, 2025.

Deposition of Brian Smith, Johnson and Johnson, in this matter, February 20, 2025.

**Bates Numbered Documents**

ACC-STEL-00343203

ACC-STEL-00343204

ACC-STEL-00343205

ACC-STEL-00343206

ACC-STEL-00343207

AMG_23CV629_000000003-005

AMG_23CV629_000000008

AMG_23CV629_000000011

AMG_23CV629_000000027-034

AMG_23CV629_000000035-074

AMG_23CV629_000000079-205

AMG_23CV629_000000206

AMG_23CV629_000000207

AMG_23CV629_000000321

BIOCON(USTEK)_012553

BIOCON(USTEK)_012554

BIOCON(USTEK)_012555

CARE-SB-00000264

CTUSAUSTK_000063-066

CTUSAUSTK_000073-074

CTUSAUSTK_000396

CTUSAUSTK_000397

CTUSAUSTK_000406

FKUSA_USTE_SUB0000043-098

FKUSA_USTE_SUB0000099-121

Hikma-Ustek_000078

Hikma-Ustek_000099

Hikma-Ustek_000221-256

JNJ_STELARA_003632356

JNJ-STELARA_000000065

JNJ-STELARA_000000066

JNJ-STELARA_000000067

JNJ-STELARA_000000068

JNJ-STELARA_000032356

JNJ-STELARA_000033960

JNJ-STELARA_000034407

JNJ-STELARA_000097294-328

JNJ-STELARA_000142407

JNJ-STELARA_000142473

JNJ-STELARA_000143524

JNJ-STELARA_000144879

JNJ-STELARA_000150485

JNJ-STELARA_000167000

JNJ-STELARA_000170411

JNJ-STELARA_000174268

JNJ-STELARA_000297243

JNJ-STELARA_000375989

JNJ-STELARA_000376279-280

JNJ-STELARA_000389788

JNJ-STELARA_000391005

JNJ-STELARA_000391969

JNJ-STELARA_000545083

JNJ-STELARA_000554555

JNJ-STELARA_000571107

JNJ-STELARA_000636194

JNJ-STELARA_000665742

JNJ-STELARA_000721492

JNJ-STELARA_001693362-5609

JNJ-STELARA_001701644-660

JNJ-STELARA_001709444

JNJ-STELARA_001709796

JNJ-STELARA_001710684

JNJ-STELARA_001754108

JNJ-STELARA_001758405

JNJ-STELARA_001800365

JNJ-STELARA_001800366-370

JNJ-STELARA_001801979

JNJ-STELARA_001804135

JNJ-STELARA_001805028

JNJ-STELARA_001805300-405

JNJ-STELARA_001828863-906

JNJ-STELARA_002326647-658

JNJ-STELARA_002424930

JNJ-STELARA_002695130

JNJ-STELARA_002755517

JNJ-STELARA_002780414

JNJ-STELARA_002988241

JNJ-STELARA_003018623

JNJ-STELARA_003027431

JNJ-STELARA_003037235

JNJ-STELARA_003106559-579

JNJ-STELARA_003110782

JNJ-STELARA_003138135-136

JNJ-STELARA_003225258-259

JNJ-STELARA_003236233-289

JNJ-STELARA_003250952

JNJ-STELARA_003264712

JNJ-STELARA_003376317

JNJ-STELARA_003379426

JNJ-STELARA_003398092

JNJ-STELARA_003424243

JNJ-STELARA_003540667

JNJ-STELARA_003600301

JNJ-STELARA_003602580-595

JNJ-STELARA_003626039-064

JNJ-STELARA_003627114-124

JNJ-STELARA_003627510-563

JNJ-STELARA_003632353

JNJ-STELARA_003632357

JNJ-STELARA_003632362

JNJ-STELARA_003646131

JNJ-STELARA_003646132

JNJ-STELARA_003670610

JNJ-STELARA_003670614.

JNJ-STELARA_003673840-871

JNJ-STELARA_003673872-986

JNJ-STELARA_003673987-4074

JNJ-STELARA_003674075-149

JNJ-STELARA_003674266-367

JNJ-STELARA_003674658-668

JNJ-STELARA_003674683-729

JNJ-STELARA_003675288-305

JNJ-STELARA_003675309-370

JNJ-STELARA_003675371-437

JNJ-STELARA_003675438-496

SANDOZ_USTEK_0001093-120

SANDOZ_USTEK_0001196

SANDOZ_USTEK_0001199

SANDOZ_USTEK_0001261-272

SANDOZ_USTEK_0001304

SANDOZ_USTEK_0001305

SANDOZ_USTEK_0001362

SANDOZ_USTEK_0001471

SANDOZ_USTEK_0001473

USTE_ALVO_0000023430

USTE_TEVA_0000000035-055

USTE_TEVA_0000000056-063

USTE_TEVA_0000000064-072

**Other Documents**

"Issues for Consideration," *Ustekinumab (Stelara)*, Ottowa, ON: Canadian Agency for Drugs & Technologies in Health, 2017.

21 C.F.R. § 314.

21 U.S.C. § 355.

42 CFR § 414.904.

42 U.S.C. § 262

AAD, "Psoriasis Treatment: Phototherapy" (https://www.aad.org/public/diseases/psoriasis/treatment/medications/phototherapy).

Accord BioPharama Press Release, "Accord BioPharma, Inc. Announces U.S. FDA Acceptance of Biologics License Application for Proposed STELARA® Biosimilar DMB-3115," *PR Newswire,* January 4, 2024 (https://www.prnewswire.com/news-releases/accord-biopharma-inc-announces-us-fda-acceptance-of-biologics-license-application-for-proposed-stelara-biosimilar-dmb-3115-302025983.html).

Allan G., J. Lexchin, and N. Wiebe, "Physician Awareness of Drug Cost: A Systematic Review," *PLoS Medicine*, 4(9), 2007, pp. 1486-96.

Allen A., "Save Billions or Stick With Humira? Drug Brokers Steer Americans to the Costly Choice" (https://kffhealthnews.org/news/article/humira-abbvie-biosimilar-biologic-savings-pbm-rebates/).

Altman D.G., *et al.,* "Statistical guidelines for contributors to medical journals," *British Medical Journal (Clinical Research Ed),* 286(6376), 1983, pp. 1489-93.

American Bar Association (ABA), Section of Antitrust Law, *Market Definition in Antitrust: Theory and Case Studies*, ABA Publishing, 2012.

American Bar Association (ABA), Section of Antitrust Law, *Pharmaceutical Industry Antitrust Handbook*, 2nd ed., ABA Publishing, 2018.

Amgen Inc., "2022 Biosimilar Trends Report," 2022 (https://www.amgenoncology.com/assets/USA-CBU-80962.pdf).

Anderson M., *et al*., "Health Insurance and Access to Care for the Near Elderly," *Mimeo*, 2022.

Badri T., P. Kumar, and A. Oakley, "Plaque Psoriasis," 2025 (https://www.ncbi.nlm.nih.gov/books/NBK430879).

Berndt E.R., *et al.*, "Information, Marketing, and Pricing in the U.S. Antiulcer Drug Market," *American Economic Review*, 85(2), 1995, pp. 100-05.

Berndt E.R., M. Kyle, and D. Ling, "The Long Shadow of Patent Expiration: Generic Entry and Rx-to-OTC Switches," in R. Feenstra and M. Shapiro, eds., *Scanner Data and Price Indexes*, University of Chicago Press, 2003, pp. 229-73.

Berndt E.R. and M. Aitken, "Brand Loyalty, Generic Entry, and Price Competition in Pharmaceuticals in the Quarter Century after the 1984 Waxman-Hatch Legislation," *International Journal of the Economics of Business*, 18(2), July 2011, pp. 177-201.

Biocon Biologics Ltd. Press Release, "Biocon Biologics Secures US Market Entry Date for Bmab 1200, a Proposed Biosimilar to Stelara®," February 29, 2024 (https://www.biocon.com/biocon-biologics-secures-us-market-entry-date-for-bmab-1200-a-proposed-biosimilar-to-stelara/).

Biocon Press Release, "Biocon Biologics Launches Yesintek™ (ustekinumab-kfce) Biosimilar to Stelara® in the United States," *BioSpace,* February 24, 2025 (https://www.biospace.com/press-releases/biocon-biologics-launches-yesintek-ustekinumab-kfce-biosimilar-to-stelara-in-the-united-states).

Brittain B., "Amgen Settles Patent Lawsuit Over Biosimilar of J&J's Big-Selling Stelara," *Reuters*, May 23, 2023 (https://www.reuters.com/business/healthcare-pharmaceuticals/amgen-settles-jj-patent-lawsuit-over-drug-similar-blockbuster-stelara-2023-05-23).

Cardinal Health, "2023 Biosimilars Report: Tracking Market Expansion and Sustainability Amidst a Shifting Industry," 2023 (https://www.cardinalhealth.com/content/dam/corp/web/documents/Report/cardinal-health-biosimilars-report-2023.pdf).

Cardinal Health, "State Laws for Biosimilar Interchangeability" (https://www.cardinalhealth.com/en/product-solutions/pharmaceutical-products/biosimilars/state-regulations-for-biosimilar.html).

Carlton D., and J. Perloff, *Modern Industrial Organization*, 4th ed., Pearson/Addison-Wesley, 2005, pp. 92-93.

Caves R., M. Whinston, and M. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers: Microeconomics*, 1991, pp. 1-48.

Center for Medicare and Medicaid Services (CMS), "Medicare Part B Drug Average Sales Price," January 7, 2025 (https://www.cms.gov/medicare/payment/fee-for-service-providers/part-b-drugs/average-drug-sales-price).

Chang M., "Celltrion Completes U.S. Patent Settlement with J&J, Eyeing Stelara Biosimilar Launch in March 2025," *Korea Biomedical Review*, August 25, 2023 (https://www.koreabiomed.com/news/articleView.html?idxno=21913).

Chen H., T. Yemeke, and S. Ozawa, "Reduction of biologic pricing following biosimilar introduction: Analysis across 57 countries and regions, 2012–19," *PLoS One*, 19(6), 2024, pp. 1-15 (https://pmc.ncbi.nlm.nih.gov/articles/PMC11156405/pdf/pone.0304851.pdf).

Choudhury K., "Teva Pharma and Alvotech Launch Biosimilar to J&J's Stelara in US," *Reuters*, February 21, 2025 (https://www.reuters.com/business/healthcare-pharmaceuticals/teva-pharma-alvotech-launch-us-biosimilar-jjs-stelara-2025-02-21).

Cleveland Clinic, "Plaque Psoriasis," April 25, 2022 (https://my.clevelandclinic.org/health/diseases/22842-plaque-psoriasis).

Cleveland Clinic, "Psoriatic Arthritis," September 19, 2023 (https://my.clevelandclinic.org/health/diseases/13286-psoriatic-arthritis).

CMS, "ASP Pricing Files" (https://www.cms.gov/medicare/payment/part-b-drugs/asp-pricing-files).

CMS, "Average Sales Price (ASP) Quarterly Publication Process: Frequently Asked Questions: Version 2.0," January 17, 2025 (https://www.cms.gov/files/document/frequently-asked-questions-faqs-asp-data-collection.pdf).

CMS, "Average Sales Price (ASP) Reporting" (https://www.cms.gov/medicare/payment/part-b-drugs/asp-reporting).

CMS, "Part B Average Sales Price (ASP) Data Reporting Guidance: Clarification on Medicaid Drug Rebate Program 'Multiple Best Prices' Reporting Option" (https://www.cms.gov/files/document/part-b-average-sales-price-asp-data-reporting-guidance-clarification-medicaid-drug-rebate-program.pdf).

CMS, "Prescription drugs (outpatient)" (https://www.medicare.gov/coverage/prescription-drugs-outpatient).

Comer B., "That Price is WAC: Boehringer's Push for Access to Humira Biosimilars" (https://www.lifescienceleader.com/doc/that-price-is-wac-boehringer-s-push-for-access-to-humira-biosimilars-0001).

Congressional Budget Office (CBO), "How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry," July 1998 (https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/6xx/doc655/pharm.pdf).

Congressional Research Service (CRS), "Patent Listing in FDA's Orange Book," May 1, 2024 (https://crsreports.congress.gov/product/pdf/IF/IF12644).

Congressional Research Service (CRS), "The Role of Patents and Regulatory Exclusivities in Drug Pricing," Updated January 30, 2024 (https://crsreports.congress.gov/product/pdf/R/R46679).

Conrad R. and R. Lutter, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," December 2019 (https://www.fda.gov/media/133509/download).

Corporate Finance Institute, "Cost of goods sold (COGS)," November 27, 2022 (https://corporatefinanceinstitute.com/resources/knowledge/accounting/cost-of-goods-sold-cogs/).

CRS, "Patent Listing in FDA's Orange Book," Updated December 27, 2024 (https://crsreports.congress.gov/product/pdf/IF/IF12644).

CRS, "The Role of Patents and Regulatory Exclusivities in Drug Pricing," Updated January 30, 2024, Table 3 (https://crsreports.congress.gov/product/pdf/R/R46679).

Cubanski J., *et al.*, "How Does Prescription Drug Spending and Use Compare Across Large Employer Plans, Medicare Part D, and Medicaid?" *Kaiser Family Foundation*, May 20, 2019 (https://www.kff.org/medicare/issue-brief/how-does-prescription-drug-spending-and-use-compare-across-large-employer-plans-medicare-part-d-and-medicaid/).

Dabrowska A., "Biologics and Biosimilars: Background and Key Issues," CRS, Updated June 6, 2019 (https://www.everycrsreport.com/files/20190606_R44620_95cb826e2625cc3433d6ee7954407cfbe4f8dec2.pdf).

Damodaran A., "Margins by Sector (US)," data as of January 2025 (https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/margin.html).

Department of Justice (DOJ) and FTC, "Merger Guidelines," December 18, 2023 (https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf).

Department of Justice (DOJ) and FTC, *1992 Horizontal Merger Guidelines*, April 2, 1992.

Department of Justice (DOJ) and FTC, *Horizontal Merger Guidelines,* revised August 19, 2010 (https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf).

Drake K., *et al.*, "No Free Launch: At-Risk Entry by Generic Drug Firms," *International Journal of the Economics of Business*, 2022, 29(3), pp. 301-315.

Dusetzina S. and P. Bach, "Prescription Drugs – List Price, Net Price, and the Rebate Caught in the Middle," *JAMA*, 321(16), 2019, pp. 1563-64.

Ellison S., *et al.*, "Characteristics of Demand for Pharmaceutical Products: An Examination of Four Cephalosporins," *RAND Journal of Economics*, 28(3), 1997, pp. 426-46.

Elmets C., *et al*., "Joint AAD-NPF Guidelines of Care for the Management and Treatment of Psoriasis with Awareness and Attention to Comorbidities," *Journal of the American Academy of Dermatology*, 80(4), 2019, pp. 1073-113.

FDA, "Approved Drug Products with Therapeutic Equivalence Evaluations | Orange Book," May 10, 2024 (https://www.fda.gov/drugs/drug-approvals-and-databases/approved-drug-products-therapeutic-equivalence-evaluations-orange-book).

FDA, "Approved Drug Products with Therapeutic Equivalence Evaluations," 34th ed., 2014.

FDA, "Biologics License Applications (BLA) Process (CBER)," January 27, 2021 (https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/biologics-license-applications-bla-process-cber).

FDA, "Biosimilars Basics for Patients," August 1, 2024 (https://www.fda.gov/drugs/biosimilars/biosimilars-basics-patients).

FDA, "Center for Biologics Evaluation and Research (CBER)," September 18, 2024 (https://www.fda.gov/about-fda/fda-organization/center-biologics-evaluation-and-research-cber).

FDA, "Clinical Pharmacology Data to Support a Demonstration of Biosimilarity to a Reference Product: Guidance for Industry," December 2016 (https://www.fda.gov/media/88622/download).

FDA, "Drug Development and Review Definitions," August 20, 2015 (https://www.fda.gov/drugs/investigational-new-drug-ind-application/drug-development-and-review-definitions).

FDA, "Exclusivity and Generic Drugs: What Does It Mean?" (https://www.fda.gov/files/drugs/published/Exclusivity-and-Generic-Drugs--What-Does-It-Mean-.pdf).

FDA, "FDA approves Boxed Warning about increased risk of blood clots and death with higher dose of arthritis and ulcerative colitis medicine tofacitinib (Xeljanz, Xeljanz XR)," February 4, 2021 (https://www.fda.gov/drugs/drug-safety-and-availability/fda-approves-boxed-warning-about-increased-risk-blood-clots-and-death-higher-dose-arthritis-and).

FDA, "Frequently Asked Questions About Therapeutic Biological Products," May 16, 2024 (https://www.fda.gov/drugs/therapeutic-biologics-applications-bla/frequently-asked-questions-about-therapeutic-biological-products).

FDA, "Frequently Asked Questions on Patents and Exclusivity," February 5, 2020 (https://www.fda.gov/drugs/development-approval-process-drugs/frequently-asked-questions-patents-and-exclusivity).

FDA, "New Drug Application (NDA)," January 21, 2022 (https://www.fda.gov/drugs/types-applications/new-drug-application-nda).

FDA, "Prioritizing Public Health: The FDA's Role in the Generic Drug Marketplace," Statement of Janet Woodcock, Director, Center for Drug Evaluation and Research, FDA, September 26, 2016 (https://www.fda.gov/news-events/congressional-testimony/prioritizing-public-health-fdas-role-generic-drug-marketplace-09262016).

FDA, "Purple Book: Database of Licensed Biological Products" (https://purplebooksearch.fda.gov/about).

FDA, "Review and Approval," December 13, 2022 (https://www.fda.gov/drugs/biosimilars/review-and-approval).

FDA, "Step 3: Clinical Research," January 2018 (https://www.fda.gov/patients/drug-development-process/step-3-clinical-research).

FDA, "The Listing of Patent Information in the Orange Book," 2021
(https://www.fda.gov/media/155200/download).

FDA, "Understanding Unapproved Use of Approved Drugs 'Off Label,'" February 5, 2018
(https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-
unapproved-use-approved-drugs-label).

FDA, "What Are 'Biologics' Questions and Answers," February 6, 2018 (https://www.fda.gov/about-
fda/center-biologics-evaluation-and-research-cber/what-are-biologics-questions-and-answers).

FDA, "What are Generic Drugs?" August 24, 2017 (https://www.fda.gov/drugs/generic-drugs/what-are-
generic-drugs).

FDA, Accord Approval Letter for BLA 761364 (Imuldosa), October 10, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761364Orig1s000ltr.pdf).

FDA, Alvotech Approval Letter for BLA 761343 (Selarsdi), April 16, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761343Orig1s000ltr.pdf).

FDA, Approval Letter for ABLAs 761285/761331 [Wezlana, Amgen], October 31, 2023
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/761285Orig1s000;%20761331Orig1s00
0ltr.pdf).

FDA, Approval Letter for BLA 125261 (Stelara), September 25, 2009
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/125261s000ltr.pdf).

FDA, Approval Letter for BLA 761044 (Stelara), September 23, 2016
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2016/761044Orig1s000ltr.pdf).

FDA, Approval Letter for BLA 761338 (Steqeyma), December 17, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761338Orig1s000ltr.pdf).

FDA, Approval Letter for BLA 761343 (Selarsdi), April 16, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761343Orig1s000ltr.pdf).

FDA, Approval Letter for BLA 761364 (Imuldosa), October 10, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761364Orig1s000ltr.pdf).

FDA, Approval Letter for BLA 761379 (Otulfi), September 27, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761379Orig1s000ltr.pdf).

FDA, Approval Letter for BLA 761406 (Yesintek), November 29, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761406Orig1s000correctedltr.pdf).

FDA, Approval Letter for BLAs 761331/761285 (Wezlana), October 31, 2023
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/761285Orig1s000;%20761331Orig1s00
0ltr.pdf).

FDA, Approval Letter for BLAs 761373/761425 (Pyzchiva), July 4, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761373Orig1s000;761425Orig1s000corr
ectedltr.pdf).

FDA, Approval Letter for BLA 103772 (Remicade), August 24, 1998
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/1998/inflcen082498L.htm).

FDA, Approval Letter for BLA 103795 (Enbrel), November 02, 1998
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/1998/etanimm110298L.htm).

FDA, Approval Letter for BLA 125057 (Humira), December 31, 2002
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2002/adalabb123102L.htm).

FDA, Approval Letter for BLA 125104 (Tysabri), November 23, 2004
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2004/125104_0000_ltr.pdf).

FDA, Approval Letter for BLA 125118 (Orencia), December 23, 2005
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2005/125118rev2.pdf).

FDA, Approval Letter for BLA 125160 (Cimzia), April 22, 2008
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2008/125160s000ltr.pdf).

FDA, Approval Letter for BLA 125261 (Stelara), September 25, 2009
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/125261s000ltr.pdf).

FDA, Approval Letter for BLA 125276 (Actemra), January 8, 2010
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2010/125276s000ltr.pdf).

FDA, Approval Letter for BLA 125289 (Simponi), April 24, 2009
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/125289s000ltr.pdf).

FDA, Approval Letter for BLA 125433 (Simponi Aria), July 18, 2013
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2013/125433Orig1s000ltr.pdf).

FDA, Approval Letter for BLA 125476 (Entyvio), May 20, 2014
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2014/125476Orig1s000ltr.pdf).

FDA, Approval Letter for BLA 125504 (Cosentyx), January 21, 2015
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/125504Orig1s000ltr.pdf).

FDA, Approval Letter for BLA 125521 (Taltz), March 22, 2016
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2016/125521Orig1s000ltr.pdf).

FDA, Approval Letter for NDA 203214 (Xeljanz), November 6, 2012
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2012/203214Orig1s000ltr.pdf).

FDA, Approval Letter for NDA 205437 (Otezla), March 21, 2014
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2014/205437Orig1s000ltr.pdf).

FDA, Approval Letter for NDA 208246 (Xeljanz XR), February 23, 2016
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2016/208246Orig1s000ltr.pdf).

FDA, Approval Letter for NDA 209899 (Zeposia), March 25, 2020
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/209899Orig1s000ltr.pdf).

FDA, Approval Letter for NDA 211675 (Rinvoq), August 16, 2019
(https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=211675).

FDA, Approval Letter for NDA 213082 (Xeljanz Oral Solution), September 25, 2020
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/213082Orig1s000ltr.pdf).

FDA, Approval Letter for NDA 216956 (Velsipity), October 12, 2023
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/216956Orig1s000ltr.pdf).

FDA, Approval Letter for NDA 218347 (Rinvoq Oral Solution), April 26, 2024
(https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=218347).

FDA, Approval Letter for BLA 761037 (Kevzara), May 22, 2017
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/761037Orig1s000ltr.pdf).

FDA, Approval Letter for BLA 761032 (Siliq), February 15, 2017
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/761032Orig1s000Ltr.pdf).

FDA, Approval Letter for BLA 761061 (Tremfya), July 13, 2017
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/761061Orig1s000ltr.pdf).

FDA, Approval Letter for BLA 761067 (Ilumya), March 20, 2018
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2018/761067Orig1s000REPLACEMENT_ltr.
pdf).

FDA, Approval Letter for BLA 761105 (Skyrizi), April 23, 2019
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2019/761105s000ltr.pdf).

FDA, Approval Letter for BLA 761151 (Bimzelx), October 17, 2023
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/761151Orig1s000ltr.pdf).

FDA, Approval Letter for BLA 761279 (Omvoh), October 26, 2023
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/761279Orig1s000ltr.pdf).

FDA, Biocon Biologics Approval Letter for BLA 761406 (Yesintek), November 29, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761406Orig1s000correctedltr.pdf).

FDA, Celltrion Approval Letter for BLA 761338 (Steqeyma), December 17, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761338Orig1s000ltr.pdf).

FDA, Fresenius Kabi USA Approval Letter for BLA 761379 (Otulfi), September 27, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761379Orig1s000ltr.pdf).

FDA, Label for BLA 125433 (Simponi Aria), July 18, 2013
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2013/125433Orig1s000ltr.pdf).

FDA, "National Drug Code Directory [Cordavis]"
(https://dps.fda.gov/ndc/searchresult?selection=finished_product&content=LABELERNAME&type=cord
avis).

FDA, "National Drug Code Directory [Optum]"
(https://dps.fda.gov/ndc/searchresult?selection=finished_product&content=LABELERNAME&type=optu
m).

FDA, "National Drug Code Directory [Quallent]"
(https://dps.fda.gov/ndc/searchresult?selection=finished_product&content=LABELERNAME&type=qual
lent).

FDA, NDC Directory: "Quallent," Current through February 28, 2025
(https://dps.fda.gov/ndc/searchresult?selection=finished_product&content=
LABELERNAME&type=quallent).

FDA, Samsung Bioepis Approval Letter for BLAs 761373/761425 (Pyzchiva), June 28, 2024
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/761373Orig1s000;761425Orig1s000corr
ectedltr.pdf).

FDA, Stelara Label, September 23, 2016
(https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/761044lbl.pdf).

FDA, Supplemental Approval Letter for BLA 125261 (Stelara), July 29, 2020
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/125261Orig1s150ltr.pdf).

FDA, Supplemental Approval Letter for BLA 125261 (Stelara), July 29, 2022
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/125261Orig1s161ltr.pdf).

FDA, Supplemental Approval Letter for BLA 125261 (Stelara), October 13, 2017
(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/125261Orig1s138ltr.pdf).

FDA, Supplemental Approval Letter for BLA 125261 (Stelara), September 20, 2013 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2013/125261Orig1s103ltr.pdf).

FDA, Supplemental Approval Letter for BLAs 761044/125261 (Stelara), October 18, 2019 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2019/761044Orig1s003,%20125261Orig1s152ltr.pdf).

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(j)(2)(A)(vii)(I) to (IV) (https://www.govinfo.gov/content/pkg/USCODE-2022-title21/pdf/USCODE-2022-title21-chap9-subchapV-partA-sec355.pdf).

Feldman W., *et al.*, "Estimation of Medicare Part D Spending on Insulin for Patients With Diabetes Using Negotiated Prices and a Defined Formulary," *JAMA Internal Medicine*, 180(4), 2020, pp. 597-601.

Feuerstein J., *et al.*, "AGA Clinical Practice Guidelines on the Management of Moderate to Severe Ulcerative Colitis," Gastroenterology, 158(5), 2020, pp. 1450-61 (https://www.gastrojournal.org/article/S0016-5085(20)30018-4/fulltext).

Formycon Press Release, "Formycon and Fresenius Kabi Secure U.S. License Date for Proposed Ustekinumab Biosimilar," August 7, 2023 (https://www.formycon.com/en/blog/press-release/fyb202-settlement-agreement-us).

Fresenius Kabi Press Release, "Continuing Biopharma Growth with U.S. and EU Launch of Ustekinumab Biosimilar, March 3, 2025 (https://www.fresenius-kabi.com/news/continuing-biopharma-growth-with-us-and-eu-launch-of-ustekinumab-biosimilar).

Gardner J., "Acquired Patents Aid J&J Defense of Top-Selling Drug from Biosimilar Challenge," *Biopharma Dive*, March 29, 2023 (https://www.biopharmadive.com/news/johnson-johnson-stelara-patents-amgen-biosimilar-momenta/646277).

Ghazi L. and P. Roy, "Crohn Disease Medication," Medscape, February 3, 2025 (https://emedicine.medscape.com/article/172940-medication#showall).

Giles-Komer J., *et al.*, United States Patent No. 6,902,734, June 7, 2005 (https://patentimages.storage.googleapis.com/4b/84/33/4fafefcebbd600/US6902734.pdf).

Google Translate (https://translate.google.com).

Grabowski H., *et al.*, "Continuing trends in US brand-name and generic drug competition," *Journal of Medical Economics*, 24(1), August 2021, pp. 908-917.

Haug J., "Physicians' Preferences for Information Sources: A Meta-Analytic Study," *Bulletin of the Medical Library Association*, 85(3), 1997, pp. 223-32.

Hayes A., "Gross Profit: What It Is & How to Calculate It," June 27, 2024 (https://www.investopedia.com/terms/g/grossprofit.asp#:~:text=Gross%20profit%20is%20calculated%20by,operating%20expenses%20from%20gross%20profit).

Hernandez I., *et al.*, "Changes in List Prices, Net Prices, and Discounts for Branded Drugs in the U.S., 2007-2018," *JAMA*, 323(9), 2020, pp. 854-62.

Hovenkamp H., *Federal Antitrust Policy: The Law of Competition and its Practice,* 5th ed., St. Paul: Hornbook Series, West Academic Publishing, 2016.

Humphries C. and J. Scanlan, "Humira Biosimilars: Pricing, Contracting and Interchangeability" (https://www.mmitnetwork.com/thought-leadership/humira-biosimilars-pricing-contracting-interchangeability/).

Inskeep S., "What Does an Older Population Mean for the Economy, Society at Large?" National Public Radio, June 26, 2023 (http://www.npr.org/2023/06/26/1184268060/what-does-an-older-population-mean-for-the-economy-society-at-large).

Ippolito B. and J. Levy, "Best Practices Using SSR Health Net Drug Pricing Data," *Health Affairs*, March 10, 2022 (https://www.healthaffairs.org/content/forefront/best-practices-using-ssr-health-net-drug-pricing-data).

IQVIA Institute, "Biosimilars in the United States 2023–2027," January 2023 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/biosimilars-in-the-united-states-2023-2027/iqvia-institute-biosimilars-in-the-united-states-2023-usl-orb3393.pdf).

IQVIA Institute, "Long-term Market Sustainability for Infused Biosimilars in the U.S.," January 2024 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/long-term-market-sustainability-for-infused-biosimilars-in-the-us/iqvia-us-biosimilars-sustainability-01-2024-forweb.pdf).

IQVIA Institute, "Medicine Use and Spending in the US: A Review of 2018 and Outlook to 2023," May 2019, pp. 1-56 (https://www.mass.gov/doc/medicine-use-and-spending-in-the-us-a-review-of-2018-and-outlook-to-2023/download).

IQVIA Institute, "Orphan Drugs in the United States: Exclusivity, Pricing, and Treated Population," December 2018, pp. 1-22 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/orphan-drugs-in-the-united-states-exclusivity-pricing-and-treated-populations.pdf).

IQVIA, "Available IQVIA Data" (https://www.iqvia.com/insights/the-iqvia-institute/available-iqvia-data).

IQVIA, "National Sales Insights" (https://www.iqvia.com/-/media/iqvia/pdfs/us/fact-sheet/iqvia-nsp-data-fact-sheet-2021.pdf).

IQVIA, "National Sales Perspectives & National Prescription Audit Overview," 2017.

J&J, "2024 Proxy Statement and Additional Definitive Proxy Solicitation Materials," filed March 13, 2024 (https://s203.q4cdn.com/636242992/files/doc_downloads/Annual_meeting/2024/2024-JNJ-Proxy-Statement-full-package.pdf).

Janssen Biotech, Inc. v. Amgen Inc., 1:22-cv-1549-MN (D. Del.), Plaintiff's Motion for a Preliminary Injunction, ECF No. 24.

Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 27 n.46 (1984).

Jeremias S., "Welcome Wezlana: The First Stelara Biosimilar to Launch in the US," January 21, 2025 (https://www.centerforbiosimilars.com/view/welcome-wezlana-the-first-stelara-biosimilar-to-launch-in-the-us).

Johanns J., *et al.*, United States Patent No. 10,961,307, March 30, 2021, (https://patentimages.storage.googleapis.com/7f/42/f0/e801526b8dcdef/US10961307.pdf).

Johnson & Johnson, "Johnson & Johnson Completes Acquisition of Momenta Pharmaceuticals, Inc.," October 1, 2020 (https://www.jnj.com/media-center/press-releases/johnson-johnson-completes-acquisition-of-momenta-pharmaceuticals-inc).

Johnson & Johnson, "Tibotec Therapeutics Becomes Janssen Therapeutics, Part Of The Janssen Pharmaceutical Companies," June 22, 2011 (https://www.jnj.com/media-center/press-releases/tibotec-therapeutics-becomes-janssen-therapeutics-part-of-the-janssen-pharmaceutical-companies).

Johnson & Johnson, "Timeline of Our Story: Centocor Joins Johnson & Johnson, 1999" (https://ourstory.jnj.com/centocor-joins-johnson-johnson).

Kaiser Family Foundation, "Follow The Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain," Health Strategies Consultancy, March 2005 (https://www.kff.org/wp-content/uploads/2013/01/follow-the-pill-understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf).

Kakani P., M. Chernew, and A. Chandra, "Rebates in the Pharmaceutical Industry: Evidence from Medicines Sold in Retail Pharmacies in the U.S.," NBER Working Paper No. 26846, March 2020 (http://www.nber.org/papers/w26846).

Kaplow L. and C. Shapiro, "Antitrust," *Handbook of Law and Economics*, 2, 2007, eds., in Polinsky A. and S. Shavell, pp. 1090-93.

Ko C., et al., "AGA Clinical Practice Guidelines on the Management of Mild-to-Moderate Ulcerative Colitis," *Gastroenterology*, 156(3), 2019, pp. 748-64 (https://www.gastrojournal.org/article/s0016-5085(18)35407-6/fulltext).

Kolios A., *et al.*, "Paradoxical Ulcerative Colitis During Adalimumab Treatment of Psoriasis Resolved by Switch to Ustekinumab," *British. Journal of Dermatology*, 178(2), 2018, pp. 551-5.

Layton T., *et al.*, "Healthcare Rationing in Public Insurance Programs: Evidence from Medicaid," *American Economic Journal: Economic Policy*, 14(4), 2022, pp. 397-431.

Levine A., *et al.*, "Specialty Drug Coverage Varies Between Health Plans' Medical and Pharmacy Benefit Policies," *Journal of Managed Care and Specialty Pharmacy*, 29(6), 2023, pp. 607-13 (https://pmc.ncbi.nlm.nih.gov/articles/PMC10387921/pdf/jmcp.2023.29.6.607.pdf).

Lichtenstein G., *et al.*, "ACG Clinical Guideline: Management of Crohn's Disease in Adults," *American Journal of Gastroenterology*, 113(4), 2018, pp. 481-517 (https://journals.lww.com/ajg/fulltext/2018/04000/acg_clinical_guideline__management_of_crohn_s.10.aspx).

Maas A., "Optum's Nuvaila Is Sole Distributor of First Stelara Biosimilar, Wezlana," *AIS Health*, January 9, 2025 (https://aishealth.mmitnetwork.com/blogs/radar-on-specialty-pharmacy/optum-s-nuvaila-is-sole-distributor-of-first-stelara-biosimilar-wezlana).

Maas A., "PBM Private-Label Units Are Drawing Pharma Contracting, Scrutiny," *AIS Health*, October 3, 2024 (https://aishealth.mmitnetwork.com/blogs/spotlight-on-market-access/pbm-private-label-units-are-drawing-pharma-contracting-scrutiny).

Managed HealthCare Executive, "IQVIA: Rebates put Biosimilar Manufacturers at a Disadvantage," Formulary Watch, February 2024 (https://www.managedhealthcareexecutive.com/view/iqvia-rebates-put-biosimilar-manufacturers-at-a-disadvantage).

Mattingly J., "Understanding Drug Pricing," *U.S. Pharmacist*, June 20, 2012 (https://www.uspharmacist.com/article/Understanding-drug-pricing).

Mayo Clinic, "Crohn's Disease: Overview," October 29, 2024 (https://www.mayoclinic.org/diseases-conditions/crohns-disease/symptoms-causes/syc-20353304).

Mayo Clinic, "Psoriasis" (https://www.mayoclinic.org/diseases-conditions/psoriasis/symptoms-causes/syc-20355840).

Mayo Clinic, "Ulcerative Colitis: Overview," November 22, 2022 (https://www.mayoclinic.org/diseases-conditions/ulcerative-colitis/symptoms-causes/syc-20353326).

Mayo Clinic, "Ulcerative colitis" (https://www.mayoclinic.org/diseases-conditions/ulcerative-colitis/diagnosis-treatment/drc-20353331).

Mehr S., "PBM Private Labeling A Boon or Bane to Biosimilar Drug Makers," BR&R, November 26, 2024 (https://biosimilarsrr.com/2024/11/26/pbm-private-labeling-a-boon-or-bane-to-biosimilar-drug-makers).

Menon A. and H. Kung Wong, "The State of Biosimilars in 2023," *Biologics HQ*, March 17, 2023, pp.1-10 (https://biologicshq.com/the-state-of-biosimilars-in-2023).

Mehr S., "A New Wave of Ustekinumab Biosimilar Launches, Discounted up to 90%" (https://biosimilarsrr.com/2025/02/25/a-new-wave-of-ustekinumab-biosimilar-launches-discounted-up-to-90/).

Morath E., "America's Hidden Workforce Returns," *Wall Street Journal*, January 26, 2019 (https://www.wsj.com/articles/americas-hidden-workforce-returns-11548478801).

National Institute of Arthritis and Musculoskeletal and Skin Diseases, "Overview of Psoriasis," October 2023 (https://www.niams.nih.gov/health-topics/psoriasis).

National Institute of Arthritis and Musculoskeletal and Skin Diseases, "Overview of Psoriatic Arthritis," August 2024 (https://www.niams.nih.gov/health-topics/psoriatic-arthritis).

National Institute of Arthritis and Musculoskeletal and Skin Diseases, "Psoriasis: Diagnosis, Treatment, and Steps to Take," October 2023 (https://www.niams.nih.gov/health-topics/psoriasis/diagnosis-treatment-and-steps-to-take).

National Institute of Diabetes and Digestive and Kidney Diseases, "Definition & Facts for Crohn's Disease" (https://www.niddk.nih.gov/health-information/digestive-diseases/crohns-disease/definition-facts).

National Institute of Diabetes and Digestive and Kidney Diseases, "Definition & Facts for Ulcerative Colitis" (https://www.niddk.nih.gov/health-information/digestive-diseases/ulcerative-colitis/definition-facts).

NCAA v. Board of Regents, 468 U.S. 85, 109 n.38 (1984).

Novartis, "Sandoz Announces Exclusive Deal to Commercialize Biosimilar Ustekinumab, Further Reinforcing Growing Pipeline and Immunology Patient Offering," September 11, 2023 (https://www.novartis.com/news/media-releases/sandoz-announces-exclusive-deal-commercialize-biosimilar-ustekinumab-further-reinforcing-growing-pipeline-and-immunology-patient-offering).

NPF, "Biologics" (https://www.psoriasis.org/biologics/).

NPF, "Oral Treatments" (https://www.psoriasis.org/oral-treatments/).

NPF, "Phototherapy for Psoriasis" (https://www.psoriasis.org/phototherapy/).

NPF, "Topicals" (https://www.psoriasis.org/topical-treatments/).

Ochsenkühn T., *et al*., "P759 Ustekinumab as Rescue Treatment in Therapy-Refractory or -Intolerant Ulcerative Colitis," *Journal of Crohn's & Colitis*, 12(Suppl 1), 2018.

OptumRx, "Optum Rx Medicare Prescription Drug Plan: Your 2024 Comprehensive Formulary," August 1, 2024 (https://content-hub.optumrx.com/media/2024-08/2024-EGWP-Formulary.pdf).

Optum, "Biosimilars to Save Billions in this Decade," May 4, 2023 (https://business.optum.com/en/insights/biosimilar-savings.htm).

Paavola A., "CVS Health Reportedly Launching a GPO called Zinc," *Becker's Hospital Review*, June 30, 2020 (https://www.beckershospitalreview.com/pharmacy/cvs-health-reportedly-launching-a-gpo-called-zinc.html).

Pagliarulo N., "J&J to phase out Janssen name in corporate rebrand," *Biopharma Dive*, September 15, 2023 (https://www.biopharmadive.com/news/janssen-brand-retire-johnson-johnson-innovative-medicine/693744).

Perloff J., *Microeconomics*, 6th ed., Addison-Wesley for Pearson Education, 2012.

Pharmaceutical Strategies Group (PSG), "State of Specialty Spend and Trend Report," Summer 2024, pp. 1-35 (https://link.psgconsults.com/2024-spend-and-trend-report).

Pirisi A., "Link Between TNF Blockers and Rare Lymphoma," *The Lancet Oncology*, 12(6), 2011.

Prentice H., United States Patent No. 8,852,889, October 7, 2014 (https://patentimages.storage.googleapis.com/c3/be/4d/9f7686fe78363f/US8852889.pdf).

Prentice H., United States Patent No. 9,217,168, December 22, 2015 (https://patentimages.storage.googleapis.com/c7/b3/0a/c826d4c378319c/US9217168.pdf).

Prentice H., United States Patent No. 9,475,858, October 25, 2016 (https://patentimages.storage.googleapis.com/a7/d4/ab/cad50a0cb8 2445/US9475858.pdf).

Prentice H., United States Patent No. 9,663,810, May 30. 2017 (https://patentimages.storage.googleapis.com/df/74/5e/5747fdabec834f/US9663810.pdf).

PSG, "Stelara Biosimilars: Preparing for the Upcoming Market Shift," December 16, 2024 (https://www.psgconsults.com/blog/stelara-biosimilars-preparing-for-the-upcoming-market-shift).

R. H., "ASP Drug Pricing in Healthcare: What Providers Need to Know in 2024," *MD Clarity*, January 27, 2023 (https://www.mdclarity.com/blog/asp-drug-pricing-healthcare).

Refinitiv Streetevents, "Edited Transcript: JNJ.N – Q4 2024 Johnson & Johnson Earnings Call," January 22, 2025 (https://s203.q4cdn.com/636242992/files/doc_financials/2024/q4/FINAL-FINAL-UPDATE-JNJ-USQ_Transcript_2025-01-22-1.pdf).

Reschovsky J., E. Rich, and T. Lake, "Factors Contributing to Variations in Physicians' Use of Evidence at The Point of Care: A Conceptual Model," *Journal of General Internal Medicine,* 30(Suppl. 3), 2015, pp. S555-S561.

Rosenthal M.*, et al.*, "Demand Effects of Recent Changes in Prescription Drug Promotion," *Forum for Health Economics & Policy*, 6(1), 2003, pp. 1-26.

Rubin D.D., et al., "ACG Clinical Guideline: Ulcerative Colitis in Adults," *American Journal of Gastroenterology*, 114(3), 2019, pp. 384-413 (https://journals.lww.com/ajg/fulltext/2019/03000/acg_clinical_guideline__ulcerative_colitis_in.10.aspx).

Samsung Bioepis, "Biosimilar Market Report," 2024 (https://www.samsungbioepis.com/upload/attach/SB+Biosimilar+Market+Report+Q1+2024.pdf).

Samuelson R., "Are Aging and the Economic Slowdown Linked?" *The Washington Post*, August 21, 2016 (https://www.washingtonpost.com/opinions/are-aging-and-the-economic-slowdown-linked/2016/08/21/ffd6b270-6626-11e6-96c0-37533479f3f5_story.html).

Sandoz Press Release, "Sandoz launches biosimilar Pyzchiva® (ustekinumab-ttwe) in the US, offering new treatment for around 12 million patients [1-4]" Sandoz, February 24, 2025 (https://www.sandoz.com/sandoz-launches-biosimilar-pyzchivar-ustekinumab-ttwe-us-offering-new-treatment-around-12-million/).

Sands B., *et al.*, "Ustekinumab as Induction and Maintenance Therapy for Ulcerative Colitis," *New England Journal of Medicine,* 381(13), 2019, pp. 1201-14 (https://www.nejm.org/doi/full/10.1056/NEJMoa1900750).

San-Juan-Rodriguez A., *et al.*, "Trends in List Prices, Net Prices, and Discounts for Originator Biologics Facing Biosimilar Competition," *JAMA Network Open*, 2(12), 2019, pp. 1-4.

San-Juan-Rodriguez A., *et al.*, "Trends in List Prices, Net Prices, and Discounts of Self-Administered Injectable Tumor Necrosis Factor Inhibitors," *Journal of Managed Care and Specialty Pharmacy*, 27(1), 2021, pp. 112-17.

Sbidian E., *et al.*, "Systemic Pharmacological Treatments for Chronic Plaque Psoriasis: A Network Meta-Analysis (Review)," *Cochrane Database of Systemic Reviews*, 12, 2017 (https://orca.cardiff.ac.uk/id/eprint/109935/1/Systemic%20pharmacological%20treatment%20COCHRANE%20J%20Ingram.pdf).

Scherer F., "The Pharmaceutical Industry: Prices and Progress," *New England Journal of Medicine*, 351(9), 2004, pp. 927-32.

Schwartz R., "Amgen Launches Wezlana™ as the First Stelara® Interchangeable Biosimilar through Optum's Nuvaila," *JD Supra*, January 17, 2025 (https://www.jdsupra.com/legalnews/amgen-launches-wezlana-tm-as-the-first-5034283).

Schweitzer S., *Pharmaceutical Economics and Policy*, 2nd ed., Oxford University Press, 2007.

Segal, "Q1 2025 Trends Focus: Biosimilars," 2025 (https://www.segalco.com/consulting-insights/q1-2025-trends-focus-biosimilars).

Senra Afonso L., *et al.*, "CP-202 Ustekinumab treatment in refractory inflammatory bowel disease," *Eur. J. Hosp. Pharmacy*, 24, 2017.

Shrank W., *et al.*, "Physicians' Perceived Knowledge of and Responsibility for Managing Patients' Out-of-Pocket Costs for Prescription Drugs," *Annals of Pharmacotherapy*, 40(9), 2006, pp. 1534-40.

Shrank W., *et al.*, "Physicians' Perceptions of Relevant Prescription Drug Costs: Do Costs to the Individual Patient or to the Population Matter Most?" *American Journal of Managed Care*, 12(9), 2006, pp. 545-51.

Singh J., *et al.*, "2018 American College of Rheumatology/National Psoriasis Foundation Guideline for the Treatment of Psoriatic Arthritis," *Journal of Psoriasis and Psoriatic Arthritis*, 4(1), 2019, pp. 31-58.

Singh S., *et al.*, "AGA Living Clinical Practice Guideline on Pharmacological Management of Moderate-to-Severe Ulcerative Colitis," *AGA Institute*, 167(7), 2024, pp. 1307-1343 (https://www.gastrojournal.org/action/showPdf?pii=S0016-5085%2824%2905563-X).

Sloan C., *et al.*, "Accuracy of Physician Estimates of Out-of-Pocket Costs for Medication Filling," *JAMA Network Open*, 4(11), 2021, pp. 1-11.

Small L., "2025 Formularies: Humira Is Out, White-Label Biosimilars Are In," *AIS Health*, February 20, 2025 (https://aishealth.mmitnetwork.com/blogs/spotlight-on-market-access/2025-formularies-humira-is-out-white-label-biosimilars-are-in).

Smith A., "Drug Pricing – Market Access and Reimbursement," *Edison Investment Research*, March 4, 2019 (https://d3s3shtvds09gm.cloudfront.net/73579d92f172e58fc26c1cdcac6d3605.pdf).

Sommer J., "Women Outlive Men. Why Do They Retire Earlier?" *New York Times*, July 6, 2018 (https://www.nytimes.com/2018/07/06/business/women-men-longevity-retirement.html).

SSR Health, "US Brand Rx Net Price Tool" (https://www.ssrhealth.com/us-brand-rx-net-price-tool).

Stipulation and Proposed Order of Dismissal with Prejudice, in the matter of Janssen Biotech Inc. v. Amgen Inc., May 22, 2023 (https://www.pearceip.law/wp-content/uploads/2023/05/Janssen-v-Amgen-dismissal.pdf).

Tarr G., *et al*., "Superheroes in Autoimmune Warfare: Biologic Therapies in Current South African Practice," *South African Medical Journal*, 104(11), 2014, pp. 787-91.

Testimony of D. Troy, "Drug Price Competition and Patent Term Restoration Act of 1984 (Hatch Waxman Amendments)," before the Senate Committee on the Judiciary, August 1, 2003 (https://www.judiciary.senate.gov/imo/media/doc/troy_testimony_08_01_03.pdf).

Teva Press Release, "Alvotech and Teva Secure U.S. License Date for AVT04, a Proposed Biosimilar to Stelara®," June 12, 2023 (https://www.tevapharm.com/news-and-media/latest-news/alvotech-and-teva-secure-u.s.-license-date-for-avt04-a-proposed-biosimilar-to-stelara).

Teva Press Release, "Teva and Alvotech Announce SELARSDI™ (ustekinumab-aekn) Injection Now Available in the U.S.," *TevaPharm,* February 21, 2025 (https://www.tevapharm.com/news-and-media/latest-news/teva-and-alvotech-announce-selarsdi-ustekinumab-aekn-injection-now-available-in-the-u.s).

Tomassi M. and N. Economides, "Biosimilar Makers Carve New Path Via Contracting, Partnering" (https://www.oliverwyman.com/our-expertise/perspectives/health/2024/jun/biosimilar-makers-carve-new-path-via-contracting-partnering.html).

Tran-Minh M., M. Allez, and J. Gornet, "Successful Treatment With Ustekinumab for Chronic Refractory Pouchitis," *Journal of Crohn's & Colitis*, 11(9), 2017.

Tseng C., *et al*., "Health Information Technology and Physicians' Knowledge of Drug Costs," *American Journal of Managed Care*, 16(4), 2010, pp. e105-10.

U.S. Congressional Budget Office, "Research and Development in the Pharmaceutical Industry," October 2006 (https://www.cbo.gov/sites/default/files/109th-congress-2005-2006/reports/10-02-drugr-d.pdf).

U.S. Federal Trade Commission (FTC), "Generic Drug Entry Prior to Patent Expiration: An FTC Study," July 2002 (https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf).

U.S. Food and Drug Administration (FDA), Stelara Label, March 18, 2024 (https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/125261s163lbl.pdf).

U.S. Samsung Bioepis Press Release, "Samsung Bioepis Secures US License Date for SB17, a Proposed Biosimilar to Stelara®," *BioSpace*, November 30, 2023 (https://www.biospace.com/samsung-bioepis-secures-us-license-date-for-sb17-a-proposed-biosimilar-to-stelara).

Ubel P., *et al*., "Study of Physician and Patient Communication Identifies Missed Opportunities to Help Reduce Patients' Out-of-Pocket Spending," *Health Affairs*, 35(4), 2016, pp. 654-61.

United States Census Bureau, "Quick Facts: Norfolk city, Virginia," updated July 1, 2023 (https://www.census.gov/quickfacts/fact/table/norfolkcityvirginia/PST045223).

Wehrwein P., "Wezlana, First Stelara Biosimilar To Hit the Market, Available Only Through Optum's Nuvaila," *Managed Healthcare Executive*, January 22, 2025 (https://www.managedhealthcareexecutive.com/view/wezlana-first-stelara-biosimilar-to-hit-the-market-available-only-through-optum-private-label).

Werden G., "Demand Elasticities in Antitrust Analysis," *Antitrust Law Journal*, 66(2), 1998, pp. 363-414.

Wineinger N., Y. Zhang, and E. Topol, "Trends in Prices of Popular Brand-Name Prescription Drugs in the United States," *JAMA Network Open*, 2(5), 2019, pp. 1-9.

**Electronic data**

IQVIA National Prescription Audit (NPA) Data.

IQVIA National Sales Perspective (NSP) Data.

IQVIA Xponent Data.

ProspectoRx Data.

SSR Health Data.

**ATTACHMENT C**

**ATTACHMENT C: BACKGROUND ON CONVENTIONAL PRESCRIPTION DRUGS**

### 1) Conventional Prescription Drug Approval Process

1.    Conventional prescription drugs must be approved by the FDA via a New Drug Application (NDA).[1] Conventional prescription drugs are small molecule products. New drugs are subject to extensive research and testing prior to approval by the FDA, including multiple phases of clinical trials.[2] Clinical trial requirements for the approval of new drugs includes three phases: 1) safety and dosage trials with a small number of healthy volunteers, 2) efficacy and side effect trials with a small number of patients that have the relevant condition, 3) efficacy and safety trials with a larger number of patients that have the relevant condition.[3]

2.    Following approval of an NDA, the FDA grants the brand company regulatory exclusivity, a defined period during which they are permitted to be the exclusive seller of that product.[4] The length of regulatory exclusivity granted by the FDA varies depending on the attributes of the NDA. New chemical entities (NCE) receive five years of exclusivity.[5] Orphan drugs, or drugs used to treat rare conditions affecting fewer than 200,000 people, are eligible for seven years of exclusivity.[6] If drugs are studied and approved for use in pediatric populations, they are eligible for an additional six months of exclusivity.[7] If drug manufacturers conduct additional clinical investigations, they may be eligible for an additional three

---

[1] FDA, "New Drug Application (NDA)," January 21, 2022 (https://www.fda.gov/drugs/types-applications/new-drug-application-nda).

[2] "At the preclinical stage, the FDA will generally ask, at a minimum, that sponsors: (1) develop a pharmacological profile of the drug; (2) determine the acute toxicity of the drug in at least two species of animals, and (3) conduct short-term toxicity studies." FDA, "Drug Development and Review Definitions," August 20, 2015 (https://www.fda.gov/drugs/investigational-new-drug-ind-application/drug-development-and-review-definitions).

[3] FDA, "Step 3: Clinical Research," January 2018 (https://www.fda.gov/patients/drug-development-process/step-3-clinical-research).

[4] FDA, "Frequently Asked Questions on Patents and Exclusivity," February 2020 (https://www.fda.gov/drugs/development-approval-process-drugs/frequently-asked-questions-patents-and-exclusivity).

[5] *Ibid.* FDA, "Exclusivity and Generic Drugs: What Does It Mean?" (https://www.fda.gov/files/drugs/published/Exclusivity-and-Generic-Drugs--What-Does-It-Mean-.pdf).

[6] *Ibid.*

[7] IQVIA Institute, "Orphan Drugs in the United States: Exclusivity, Pricing, and Treated Population," December 2018, pp. 1-22, p. 18 (https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/orphan-drugs-in-the-united-states-exclusivity-pricing-and-treated-populations.pdf).

years of exclusivity.[8] Regulatory exclusivity for brand pharmaceutical products is designed to incentivize pharmaceutical companies to invest in innovative products.

3.      Like the regulatory exclusivity granted by the FDA, patents are designed to incentivize pharmaceutical companies to invest in novel products. The U.S. Patent and Trademark Office (PTO) encourages innovation by granting individuals or entities protection over their intellectual property for a limited period of time. Pharmaceutical products are covered by three main types of patents: drug substance, drug product, and method-of-use.[9] A single drug is often covered by multiple patents, and patents can be applied for at any time, even after a drug is approved and marketed.[10]

4.      Drug substance patents pertain to the active ingredient of the given product.[11] Drug product patents cover the formulation or composition of a drug product.[12] Method-of-use patents cover the method of using the product, or the indication for which the product is used.[13] Patent terms expire 20 years from the date on which the patent application was filed.[14] Patent exclusivity is independent of the regulatory exclusivity that is granted by the FDA. The FDA plays no role in evaluating or granting patents; their role is purely ministerial: Brand manufacturers report their patents to the FDA, and the FDA simply lists the reported patent information in their Orange Book.[15]

---

[8] FDA, "Frequently Asked Questions on Patents and Exclusivity," *op. cit.*

[9] FDA, "Frequently Asked Questions on Patents and Exclusivity," *op. cit.* See also FDA, "Approved Drug Products with Therapeutic Equivalence Evaluations," 34th ed., 2014, *op. cit.*, p. ADA 123; 21 C.F.R. § 314.53(b).

[10] Congressional Research Service (CRS), "Patent Listing in FDA's Orange Book," May 1, 2024 (https://crsreports.congress.gov/product/pdf/IF/IF12644).

[11] *Ibid.*

[12] FDA, "Frequently Asked Questions on Patents and Exclusivity," *op. cit.* "By statute, a company seeking FDA approval of a new drug must include in their new drug application…a drug product (formulation or composition) patent." Congressional Research Service, *op cit.*

[13] Congressional Research Service, *op. cit.* FDA, "Patents and Exclusivity," *op. cit.*

[14] FDA, "Patents and Exclusivity," *op. cit.* See also U.S. Federal Trade Commission (FTC), "Generic drug entry prior to patent expiration: An FTC Study," July 2002, pp. 3, 4, and 41 (https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf).

[15] "FDA serves a ministerial role with regard to the listing of patent information." 21 U.S.C. § 355(b)(1)(A)(viii). FDA, "The Listing of Patent Information in the Orange Book," 2021 (https://www.fda.gov/media/155200/download), p. 5; "With respect to patents, FDA has only a 'ministerial' role." FDA, "Prioritizing Public Health: The FDA's Role in the Generic Drug Marketplace," Statement of Janet Woodcock, Director, Center for Drug Evaluation and Research, FDA, September 26, 2016 (https://www.fda.gov/news-events/congressional-testimony/prioritizing-public-health-fdas-role-generic-drug-marketplace-09262016). FDA, "Approved Drug Products with Therapeutic Equivalence Evaluations | Orange Book," May 10, 2024 (https://www.fda.gov/drugs/drug-approvals-and-databases/approved-drug-products-therapeutic-equivalence-evaluations-orange-book).

5.        When regulatory and relevant patent exclusivities end, the time-limited protection against copying the intellectual property has ended, and other companies may enter the market with bioequivalent products. These products are called generic drugs. The current pathway for generics to enter was established in the Hatch-Waxman Act of 1984.

### 2)   Hatch-Waxman Act of 1984

6.        The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, included two main regulatory changes that are important for generic entry. First, for brand drug companies, the Act added two components to encourage brand drug innovation: 1) it allowed an extension to the period of patent exclusivity to make up for time lost in regulatory delays, and 2) it added the aforementioned FDA-granted period of regulatory exclusivity.[16] Second, the Act reduced costs of and barriers to generic drug entry by allowing generic companies to use a streamlined generic drug approval process called an Abbreviated New Drug Application (ANDA). Prior to the Hatch-Waxman Act, a generic company had to replicate all aspects of the drug safety and clinical testing undertaken by the original innovator in their NDA. Under the ANDA process, the generic company only needs to prove that its product is bioequivalent to the original brand drug.[17] Specifically, ANDA generic drugs must contain the same active ingredients as the innovator drug, be identical in strength, dosage, form, route of administration, have the same indications, and be manufactured under the same FDA "good manufacturing practice" standards.[18] By replacing costly and inefficient testing requirements for generic approval with bioequivalence testing, the Act aimed to increase generic entry and, subsequently, cost-savings for patients and other purchasers.

7.        A requirement of filing an ANDA is that generic companies must certify that their generic drug will not infringe (violate) any valid or enforceable patents for the given drug. The Hatch-Waxman Act defined four possible certifications that generic companies can make in their ANDA filing regarding the brand drug's patents, where each certification is named for the section of the Act in which it is defined:[19]

---

[16] R. Caves, M. Whinston, and M. Hurwitz, "Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry," *Brookings Papers: Microeconomics*, 1991, pp. 1-48, p. 10. ABA Pharmaceutical Industry Antitrust Handbook, 2nd ed., *op. cit.*, pp. 95-7.

[17] Caves, Whinston, and Hurtwitz, *op. cit.*, p. 10.

[18] FDA, "What are Generic Drugs?" August 24, 2017 (https://www.fda.gov/drugs/generic-drugs/what-are-generic-drugs).

[19] Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(j)(2)(A)(vii)(I) to (IV) (https://www.govinfo.gov/content/pkg/USCODE-2022-title21/pdf/USCODE-2022-title21-chap9-subchapV-partA-sec355.pdf).

| Paragraph I: | Certifies that the drug has no patents filed; |
|---|---|
| Paragraph II: | Certifies that the drug's patents have expired; |
| Paragraph III: | Certifies that the drug's patents will expire on a particular date; and that the generic drug will not enter before that date; |
| Paragraph IV: | Certifies that the drug's patents are invalid or will not be infringed by the generic drug for which approval is being sought. |

8.      If an ANDA is approved under the Paragraph I or II pathways, the approval is effective immediately, meaning the generic drug can enter the market at any time. If approved under Paragraph III, the ANDA is approved upon expiry of the relevant patent and the generic drug can enter at that time. If a generic company applies for the ANDA under the fourth pathway, known as a Paragraph IV certification, it must inform the brand company of their Paragraph IV ANDA filing. The brand company then can file patent infringement litigation against the generic firm within 45 days of notification of the Paragraph IV filing.[20] If a brand manufacturer files patent infringement litigation, two events are automatically triggered: First, the brand company is granted a stay of ANDA approval for 30-months or until the patent infringement case is resolved, whichever comes earlier.[21] Second, first-to-file generic companies that are successful in challenging an invalid patent via the Paragraph IV pathway are granted an 180-day exclusivity window to market and sell the generic product before other generic companies can enter the market.[22] This exclusivity window for the first company to file a Paragraph IV ANDA for a given drug can be very profitable for the generic company, and is designed to incentivize generic companies to challenge weak or invalid patents as early as possible.[23]

### 3)  Impact of Generic Competition

9.      The Hatch-Waxman Act and other laws, such as state-mandated automatic substitution of generic drugs for their brand counterparts, facilitated a remarkable rise in the number of generic companies

---

[20] 21 U.S.C. § 355(j)(5)(B)(iii).

[21] 21 U.S.C. § 355(c)(3)(C). A paragraph IV filer has the option to launch at risk. See K. Drake, *et al.*, "No Free Launch: At-Risk Entry by Generic Drug Firms," *International Journal of the Economics of Business*, 2022, 29(3), pp. 301-315.

[22] 21 U.S.C. § 355(j)(5).

[23] Testimony of D. Troy, "Drug Price Competition and Patent Term Restoration Act of 1984 (Hatch Waxman Amendments)," before the Senate Committee on the Judiciary, August 1, 2003 (https://www.judiciary.senate.gov/imo/media/doc/troy_testimony_08_01_03.pdf).

entering the market after patent expiration. [24] In 1984, only 18.6% of prescription drugs were available as generic versions; by 2009, 74.5% of drugs had a generic available, and by 2019 this further increased to 90%.[25]

10.    Grabowski, *et al.*, show that in 1999-2000, brand drugs maintained on average 44% of all units sold at 12 months following first generic entry, while in 2017-2019 brand drugs maintained on average 23% of all units sold one year after first generic entry.[26] For high-revenue brand drugs there was even greater erosion of market share: brand drugs with revenues of over $250 million only retained on average 18% of all units sold 12 months after generic entry.[27]

11.    Increased competition reduces not only the brand's market share, but also the average price of the drug. Generic price erosion depends on the number of competitors entering the market. A 2017 FDA analysis found that, on average, a single generic competitor resulted in generic prices 39% lower than the pre-generic-entry brand price.[28] As the number of generic competitors increases, so does the cost savings to payors: On average, with six or more competitors, generic prices are 95% lower than pre-generic entry brand prices.[29]

### 4)  Comparison of Conventional and Biological Drug Products

12.    Exhibit C.1 shows a comparison of the Hatch Waxman Act for generics and the BPCIA for biosimilars.

---

[24] Congressional Budget Office (CBO), "How increased competition from generic drugs has affected prices and returns in the pharmaceutical industry," July 1998, p. xiii (https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/6xx/doc655/pharm.pdf).

[25] E.R. Berndt and M. Aitken, "Brand Loyalty, Generic Entry, and Price Competition in Pharmaceuticals in the Quarter Century after the 1984 Waxman-Hatch Legislation," *International Journal of the Economics of Business*, 18(2), July 2011, pp. 177-201, Figure 2; H. Grabowski, *et al.*, "Continuing trends in US brand-name and generic drug competition," *Journal of Medical Economics*, 24(1), August 2021, pp. 908-917, p. 909.

[26] Grabowski, *et al.*, *op. cit.*, p. 913.

[27] *Ibid.*

[28] R. Conrad and R. Lutter, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," December 2019 (https://www.fda.gov/media/133509/download). The article explains their use of AMP prices compared to invoice-based wholesale prices by stating that "[with invoice-based wholesale prices] most of the difference comes from wholesaler markups."

[29] *Ibid.*

---

**Exhibit C.1: Summary Comparison of the Hatch-Waxman Act and the BPCIA[30]**

| Follow-on Regulatory Pathways and Patent Dispute Procedures | | |
|---|---|---|
| Feature | Hatch-Waxman and Generic Drug Approval | BPCIA and Biosimilar (or Interchangeable) Licensure |
| Regulatory Statute | FD&C Act | PHSA |
| Scope | A "drug" is, inter alia, a chemical compound "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease" (21 U.S.C. § 321(g)(1)) | A "biologic" is a medical product derived from natural sources (human, animal, microorganism) and applicable to the prevention, treatment, or cure of disease (42 U.S.C. § 262(i)(1)) |
| Example | Aspirin: $C_9H_8O_4$ | Adalimumab (a.k.a. Humira): $C_{6428}H_{9912}N_{1694}O_{1987}S_{46}$ |
| Terminology | Drug is approved by FDA | Biological product is licensed by FDA |
| General Regulatory Standard | Safe and effective | Safe, pure, and potent |
| New Product Pathway | New drug application (NDA) (21 U.S.C. § 355(b)) | Biologics license application (BLA) (42 U.S.C. § 262(a)) |
| Abbreviated Pathway | Abbreviated new drug application (ANDA) (21 U.S.C. § 355(j)) | Biosimilar (or interchangeable) BLA (42 U.S.C. § 262(k)) |
| Relationship Between New and Follow-on Product | Chemical identity: the active ingredient of the new drug is "the same as" that of the listed drug (if only one ingredient) (21 U.S.C. § 355(j)(2)(A)(ii)) | Biosimilarity: "highly similar to the reference product" without "clinically meaningful differences" (42 U.S.C. § 262(i)(2); see also 42 U.S.C. § 262(k)(4) (interchangeability)) |
| General Exclusivity Term for New Product | 5-year new chemical entity exclusivity (3 years for other new products) | 12-year new biologic exclusivity |
| Follow-On Exclusivity | 180-day patent challenge exclusivity or 180-day competitive generic exclusivity | 12- to 42-month exclusivity for first interchangeable product |
| Patent Listing Requirements | Required to list in NDA any patent that "claims the drug or a method of using the drug" (21 C.F.R. § 314.53(b); 21 U.S.C. § 355(b)(1)) | Not required to list patents in BLA. If patent dance is initiated, BLA holder must list all patents "for which the [BLA holder] believes a claim of patent infringement could reasonably be asserted" (42 U.S.C. § 262(l)(3)(A)(i)) |
| Patent Listing Consequences | ANDA filer need not certify; NDA loses opportunity for 30-month stay | "List it or lose it" (35 U.S.C. § 271(e)(6)(C)) |
| FDA List of Approved Products | The Orange Book | The Purple Book |
| Patent Dispute Procedures | Patent Certification/Notice (21 U.S.C. § 355(b)(2)–(3), (c)(3), (j)(2)(A)–(B), (j)(5)) | The "Patent Dance" (42 U.S.C. § 262(l)) |
| Approval Contingent on Patent Disputes? | Yes, e.g., via the 30-month stay | No |

---

[30] CRS, "The Role of Patents and Regulatory Exclusivities in Drug Pricing," Updated January 30, 2024, Table 3 (https://crsreports.congress.gov/product/pdf/R/R46679).

**ATTACHMENT D**



█ ███████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████ █████████████████████████████████████████████████████████████
██████████████████████



███████████████████████████████████████████████████████████████████████████████
███████████████████████████████

████████████████████████████████████████████████████████████████████████████



**ATTACHMENT E**

**ATTACHMENT E: REVIEW OF CLINICAL GUIDELINES AND J&J DOCUMENTS**

*Overview of Plaque Psoriasis, Psoriatic Arthritis, Crohn's Disease, and Ulcerative Colitis and Drugs Used to Treat these*

1.      According to the National Institute of Health (NIH), plaque psoriasis is the most common form of psoriasis, "a chronic (long-lasting) disease in which the immune system becomes overactive, causing skin cells to multiply too quickly."[1] The NIH also states that psoriatic arthritis is related to psoriasis, and that psoriatic arthritis "can be characterized by stiff, swollen, or painful joints; neck or back pain; or Achilles heel pain."[2] The AAD and NPF have produced a joint guideline for treating psoriasis, and more specifically plaque psoriasis and psoriatic arthritis. According to the AAD-NPF Guidelines, psoriatic arthritis affects approximately a third of psoriatic patients.[3]

2.      Clinical guidelines identify classes of treatment for plaque psoriasis and psoriatic arthritis, corresponding to the severity of the condition. The symptoms of psoriasis can range from mild to severe, and treatments include therapies based on severity and that account for a patient's comorbidities.[4] The clinical guidelines for psoriatic arthritis emphasize that there are not widely agreed upon definitions of disease severity for that condition, so patients should be evaluated on a case-by-case basis.[5] While there is

---

[1] "Psoriasis is a chronic (long-lasting) disease in which the immune system becomes overactive, causing skin cells to multiply too quickly. Patches of skin become scaly and inflamed, most often on the scalp, elbows, or knees, but other parts of the body can be affected as well. Scientists do not fully understand what causes psoriasis, but they know that it involves a mix of genetics and environmental factors." National Institute of Arthritis and Musculoskeletal and Skin Diseases, "Overview of Psoriasis," October 2023 (https://www.niams.nih.gov/health-topics/psoriasis).

[2] *Ibid.* "Most people who develop psoriatic arthritis already have psoriasis (a skin disease) when they are diagnosed, but a small group have joint pain before the skin rash." National Institute of Arthritis and Musculoskeletal and Skin Diseases, "Overview of Psoriatic Arthritis," August 2024 (https://www.niams.nih.gov/health-topics/psoriatic-arthritis).

[3] C. Elmets, *et al.*, "Joint AAD-NPF Guidelines of Care for the Management and Treatment of Psoriasis with Awareness and Attention to Comorbidities," *Journal of the American Academy of Dermatology*, 80(4), 2019, pp. 1073-113 (hereafter referred to as "AAD-NPF Guidelines"). See also J. Singh, *et al.*, "2018 American College of Rheumatology/National Psoriasis Foundation Guideline for the Treatment of Psoriatic Arthritis," *Journal of Psoriasis and Psoriatic Arthritis*, 4(1), 2019, pp. 31-58.

[4] National Institute of Arthritis and Musculoskeletal and Skin Diseases, "Psoriasis: Diagnosis, Treatment, and Steps to Take," October 2023 (https://www.niams.nih.gov/health-topics/psoriasis/diagnosis-treatment-and-steps-to-take); T. Badri, P. Kumar, and A. Oakley, "Plaque Psoriasis," 2025 (https://www.ncbi.nlm.nih.gov/books/NBK430879).

[5] Singh, *et al.*, *op. cit.*

---

no cure for plaque psoriasis nor psoriatic arthritis, these therapies can help manage symptoms.[6] The therapies to treat PsO and PsA include:

3.      *Symptomatic treatments* are first-line therapies that can alleviate symptoms but do not treat the underlying cause, which for psoriasis includes "[t]opical treatments – medications applied to the skin … [that] slow down or normalize excessive cell reproduction and reduce inflammation caused by psoriasis."[7] Most topical treatments can be purchased over-the-counter (OTC) and others are available by prescription only.

4.      *Phototherapy* is often considered a second-line therapy for psoriasis after symptomatic treatments.[8] Phototherapy "involves exposing the skin to ultraviolet light on a regular basis and under medical supervision"[9] to "slow rapidly growing skin cells; suppress an overly active immune system; reduce inflammation and allow the skin to heal; [and] reduce or eliminate the itch."[10]

5.      *Oral small molecules* are prescription drugs that are often used for psoriasis when topical and phototherapy treatments are inadequate.[11] Therefore, most "mature" oral medications to treat psoriasis are considered second-line therapies.[12] However, some "newer" oral small molecules are considered third-line therapies because their "efficacy/safety profile is much different from that of other [oral small molecules.]"[13] These include janus kinase inhibitors ("JAK inhibitors").

6.      *Biologics* "are different from traditional systemic drugs that impact the entire immune system. Biologics only target specific parts of the immune system. The biologics used to treat psoriatic diseases block the action of a specific type of immune cell called a T-cell or they block proteins in the immune system, such as tumor necrosis factor-alpha (TNF-alpha), interleukin 17-A, or interleukins 12 and 23.

---

[6] Cleveland Clinic, "Plaque Psoriasis," April 25, 2022 (https://my.clevelandclinic.org/health/diseases/22842-plaque-psoriasis); Cleveland Clinic, "Psoriatic Arthritis," September 19, 2023 (https://my.clevelandclinic.org/health/diseases/13286-psoriatic-arthritis).

[7] NPF, "Topicals" (https://www.psoriasis.org/topical-treatments/).

[8] E. Sbidian, *et al.*, "Systemic Pharmacological Treatments for Chronic Plaque Psoriasis: A Network Meta-Analysis (Review)," *Cochrane Database of Systemic Reviews*, 12, 2017, (https://orca.cardiff.ac.uk/id/eprint/109935/1/Systemic%20pharmacological%20treatment%20COCHRANE%20J%20Ingram.pdf).

[9] NPF, "Phototherapy for Psoriasis" (https://www.psoriasis.org/phototherapy/).

[10] AAD, "Psoriasis Treatment: Phototherapy" (https://www.aad.org/public/diseases/psoriasis/treatment/medications/phototherapy).

[11] NPF, "Oral Treatments" (https://www.psoriasis.org/oral-treatments/).

[12] Sbidian, *et al.*, *op. cit.*

[13] Sbidian, *et al.*, *op. cit.*

These cells and proteins all play a major role in developing psoriasis and psoriatic arthritis (PsA)."[14] Biologics are considered third-line therapies for psoriasis and can be further broken down into drug classes: such as tumor necrosis factor (TNF) antagonists ("anti-TNFs" or "TNF inhibitors"), interleukin inhibitors ("IL-12," "IL-17," or "IL-23"), and cytotoxic T-lymphocyte associated protein 4 ("CTLA4").[15]

7.        Treatments for psoriatic arthritis include many of the same medications used to treat psoriasis, including oral small molecules and biologic drugs including Stelara, TNF inhibitors, and IL-17 inhibitors.[16]

8.        According to the NIH, Crohn's disease and ulcerative colitis are common inflammatory bowel diseases (IBD).[17]  Crohn's disease "is a chronic disease in which abnormal reactions of the immune system cause inflammation in your digestive tract. Most commonly, Crohn's disease affects your small intestine and the beginning of your large intestine. However, the disease may affect any part of your digestive tract, from your mouth to your anus…. Crohn's disease most often begins slowly and may get worse over time. Symptoms can range from mild to severe. When people have symptoms, it's called a flare. In between flares, most people have periods of remission—times when symptoms disappear. Periods of remission can last for weeks or years."[18] Ulcerative colitis "is a chronic disease in which abnormal reactions of the immune system cause inflammation and ulcers on the inner lining of your large intestine. Ulcerative colitis can begin gradually and become worse over time. However, it can also start suddenly. Symptoms can range from mild to severe. In between periods of flares – times when people have symptoms – most people have periods of remission – times when symptoms disappear. Periods of remission can last for weeks or years."[19]

9.        Clinical guidelines identify classes of treatment for CD and UC, corresponding to the severity of the condition.[20] The clinical guidelines for IBD conditions emphasize that treatment for a patient is

---

[14] NPF, "Biologics" (https://www.psoriasis.org/biologics/).

[15] Sbidian, *et al.*, *op. cit.*

[16] Singh, *et al.*, *op. cit.*

[17] National Institute of Diabetes and Digestive and Kidney Diseases, "Definition & Facts for Crohn's Disease" (https://www.niddk.nih.gov/health-information/digestive-diseases/crohns-disease/definition-facts); National Institute of Diabetes and Digestive and Kidney Diseases, "Definition & Facts for Ulcerative Colitis" (https://www.niddk.nih.gov/health-information/digestive-diseases/ulcerative-colitis/definition-facts).

[18] National Institute of Diabetes and Digestive and Kidney Diseases ("Definition & Facts for Crohn's Disease"), *op. cit.*

[19] National Institute of Diabetes and Digestive and Kidney Diseases ("Definition & Facts for Ulcerative Colitis"), *op. cit.*

[20] "Mild disease is characterized by patients who are ambulatory and are eating and drinking normally…. There is <10% weight loss and there are no complications such as obstruction, fever, abdominal mass, or dehydration. These

---

conditional and should be reviewed in a case-by-case manner. According to the ACG, "When treating patients with CD, the agents chosen to treat the disease are chosen based upon the patient's clinical presentation and prognosis; that is, the risk of progression of their disease."[21] Similar to plaque psoriasis and psoriatic arthritis, there is no cure for Crohn's disease nor ulcerative colitis; however, "[t]he goal of treatment [for both] is to keep people in remission long term."[22] Therapies to treat CD and UC are separated into two broad groups of treatment: *short- and long-term therapies.* This includes:

10.      *Symptomatic treatments* are therapies that can alleviate symptoms (or flares) in the short term, but do not treat the underlying cause, such as anti-diarrheal (some available OTC) and antibiotics.[23] Some small molecule prescription drugs such as budesonide are considered first-line therapies for mild-to-moderate Crohn's Disease,[24] and drugs such as standard-dose mesalamine or diazo-bonded 5-ASA, are considered first-line therapies for mild to moderate UC.[25] They can come in forms such as oral tablets or rectal suppositories.[26]

11.      *Short-term induction therapy* (to induce remission of moderate to severe CD or UC) and *short-term maintenance therapy* (to maintain remission of moderate to severe CD or UC in the short-term) include s*mall molecule drugs.* While steroids are "used primarily for the treatment of flares of CD…. Conventional corticosteroids are effective for reducing the signs and symptoms of active CD and induction of remission in patients with moderately to severely active CD…. [Conventional

---

patients may have diarrhea and abdominal pain and the serum CRP is usually increased.… Those patients with severe disease may be cachectic with significant weight loss. They may have complications such as obstruction or intra-abdominal abscess. Symptoms persist despite aggressive therapy. These patients are often hospitalized." G. Lichtenstein, *et al.*, "ACG Clinical Guideline: Management of Crohn's Disease in Adults," *American Journal of Gastroenterology*, 113(4), 2018, pp. 481-517 (https://journals.lww.com/ajg/fulltext/2018/04000/acg_clinical_guideline__management_of_crohn_s.10.aspx). "Mild colitis is defined as fewer than 4 bowel movements daily.… Severe disease is defined by bowel frequency greater than 6 times a day in conjunction with fever, tachycardia, anemia, or an elevation in [erythrocyte sedimentation rate (ESR)]." DD. Rubin, *et al.*, "ACG Clinical Guideline: Ulcerative Colitis in Adults," *American Journal of Gastroenterology*, 114(3), 2019, pp. 384-413 (https://journals.lww.com/ajg/fulltext/2019/03000/acg_clinical_guideline__ulcerative_colitis_in.10.aspx).

[21] Liechtenstein, *op cit.*

[22] National Institute of Diabetes and Digestive and Kidney Diseases ("Definition & Facts for Crohn's Disease"), *op. cit.*; National Institute of Diabetes and Digestive and Kidney Diseases ("Definition & Facts for Ulcerative Colitis"), *op. cit.*

[23] L. Ghazi and P. Roy, "Crohn Disease Medication," *Medscape*, February 3, 2025 (https://emedicine.medscape.com/article/172940-medication#showall).

[24] Liechtenstein, *op cit.*

[25] C. Ko, *et al.*, "AGA Clinical Practice Guidelines on the Management of Mild-to-Moderate Ulcerative Colitis," *Gastroenterology*, 156(3), 2019, pp. 748-64 (https://www.gastrojournal.org/article/s0016-5085(18)35407-6/fulltext).

[26] *Ibid.*

corticosteroids] have historically been used as a 'bridge' to permit symptom control until immunomodulators and/or biologic agents become effective."[27] Drugs in this category are classified as first- or second-line therapy. Often small molecule drugs for maintenance therapy are used in combination with other first-, second-, and third-line therapies. Some small molecule drugs, such as certain immunomodulators, used in the short-term may be used in the long-term for UC patients.[28] Sometimes biologics are used to induce remission as well.[29]

12.    *Long-term maintenance therapy* includes biologics and "newer" oral small molecules to maintain remission of moderate to severe CD or UC.[30] Frequently recommended treatments include: TNF antagonists, interleukin inhibitors, JAK inhibitors,[31] and sphingosine-1-phosphate (S1P) receptor modulators.



























█    █████████████████████████████████████████████████████████████████

██████████████████████ ██ ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ██ ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

█    ████████████████████████████████

█    ████████████████████████████████

█    ████████████████████████████████

█    █████████████████████████████████████████

█    ████████████████████████████████████████████████████████████████████████
██████████████████████████████████



**ATTACHMENT F**







**ATTACHMENT G**













