## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CAREFIRST BLUECHOICE, INC, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JOHNSON & JOHNSON and JANSSEN BIOTECH, INC.<br><br>Defendants. | Civil Action No. 2:23-cv-00629-JKW-LRL |

**EXPERT REBUTTAL REPORT OF NICOLE MAESTAS, PH.D.**

**CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY – SUBJECT TO PROTECTIVE ORDER** [i]

---

[i] Some material referenced or quoted in this Report refers to material that has been designated as "Confidential Information," "Highly Confidential—Attorneys' Eyes Only Information," or "Highly Confidential – Outside Attorneys' Eyes Only Information." It is the responsibility of each party to confirm that all such material has been properly redacted before sharing it with parties to this litigation who would not be able to view such materials under the governing Protective Orders entered in these coordinated actions.

**TABLE OF CONTENTS**

I.     ASSIGNMENT AND EXECUTIVE SUMMARY ............................................................. 1

II.    OVERVIEW OF AREAS WHERE DR. JENA AND I AGREE ...................................... 2

III.   REPLIES TO DR. JENA'S CRITICISMS OF MY ANALYSIS OF DIRECT
       EVIDENCE........................................................................................................................ 6

       A.    J&J's Gross Margins on Stelara................................................................................ 7

       B.    Ustekinumab Price Declines After Biosimilar Entry Indicate Market Power. ........ 26

       C.    Misconduct as Direct Evidence of Market Power ................................................... 41

       D.    Summary of Direct Evidence of Market Power........................................................ 42

IV.    REPLIES TO DR. JENA'S CRITICISMS OF MY ANALYSIS OF INDIRECT
       EVIDENCE........................................................................................................................ 43

       A.    Dr. Jena Ignores the Standard Procedure for Assessing Indirect Evidence of Market
             Power: Dr. Jena Does not Define the Relevant Market and his Purported Market
             Shares are Incorrect................................................................................................... 45

       B.    Dr. Jena's Criticisms of My Natural Experiments are Invalid and Inconsistent with
             Econometric Theory................................................................................................... 46

       C.    Hypothetical Monopolist Test (HMT) ...................................................................... 76

       D.    Summary of Indirect Evidence of Market Power ..................................................... 77

V.     REPLIES TO DR. JENA'S OTHER FLAWED STATEMENTS REGARDING
       CLINICAL AND ECONOMIC SUBSTITUTION ........................................................... 78

       A.    Dr. Jena's Evaluation of "Clinical Substitutability"................................................ 79

       B.    Dr. Jena's Evaluation of "Economic Substitutability" ............................................ 88

       C.    Summary of Dr. Jena's Faulty Clinical and Economic Substitutability Analyses .. 96

VI.    CONCLUSION................................................................................................................... 97

## I.    ASSIGNMENT AND EXECUTIVE SUMMARY

1.    On May 5, 2025, Defendants in this matter submitted expert reports. I have been retained by counsel for the indirect-purchaser or health plan plaintiffs in this matter (collectively, "The health plans")[1] to respond to Dr. Anupam Jena's May 5, 2025 expert report[2] regarding my Affirmative Report on market power submitted on March 3, 2025.[3] My qualifications are described in my Affirmative Report and not repeated here.[4] Attachment A lists the additional materials I have relied upon and cited in this rebuttal. Where relevant, I have updated exhibits from my Affirmative Report with data from Defendants and third-party data vendors that have become available since my Affirmative Report was filed.

2.    The health plans allege that Defendant J&J engaged in an anticompetitive scheme designed to delay biosimilar entry of Stelara (ustekinumab) until 2025.[5] My assignment is to provide institutional background about the organization and economics of the U.S. pharmaceutical market and analyze whether J&J had market power with respect to Stelara. I accomplished this in my Affirmative Report by showing there is both direct and indirect evidence of market power (either of which is sufficient to demonstrate market power). *Direct evidence* of J&J's market power includes evidence of Stelara's sustained supracompetitive prices and J&J's abnormally high gross profit margins for Stelara. *Indirect evidence* of J&J's market power includes dramatic increases in Stelara sales over time despite their supracompetitive pricing of Stelara; empirical regression results from natural experiments showing that potential economic substitutes had no economic ability to constrain J&J from pricing Stelara at supracompetitive levels; and conclusions of the Hypothetical Monopolist test showing that the relevant antitrust market is brand and biosimilar Stelara, and that J&J had substantial market power in that relevant

---

[1] Second Amended Class Action Complaint and Demand for Jury Trial, in this matter, November 19, 2024, (hereafter referred to as "Health Plans Complaint").

[2] Expert Report of Dr. Anupam B Jena, M.D., Ph.D., in this matter, May 5, 2025 (hereafter referred to as "Jena Report").

[3] Expert Report of Nicole Maestas, Ph.D., in this matter, March 3, 2025 (hereafter referred to as "Maestas Report" or "my Affirmative Report").

[4] There have been no changes to my compensation, qualifications, and list of cases. My updated publications since the filing of my Affirmative Report are as follows: I. Lopez-Garcia, N. Maestas, and K.J. Mullen, "Aging and Work Capacity," *Journal of the Economics of Ageing*, 31, 2025 and H. Clark, B. Ravesteijn, K.J. Mullen, and N. Maestas, "The Prevalence of Functional Limitations in the United States Workforce," *Proceedings of the National Academy of Sciences*, 122(23), 2025.

[5] Health Plans Complaint, ¶¶ 128-262.

---

market during the period of interest. Based on the facts of the case and these analyses, I conclude that J&J had *substantial market power* with respect to Stelara.

3.      After a careful review of Dr. Jena's report, I am of the opinion to a reasonable degree of professional certainty that none of his rendered opinions nor criticisms cause me to alter my conclusions. I find that Dr. Jena's arguments are incorrect, misleading, irrelevant, and/or invalid. This rebuttal report proceeds as follows: Section II summarizes the areas where Dr. Jena and I agree on the economics of the pharmaceutical industry and antitrust theory that is relevant to this matter. Section III responds to Dr. Jena's criticism of my analysis of direct evidence, Section IV responds to Dr. Jena's criticism of my analysis of indirect evidence, and Section V responds to other flawed arguments by Dr. Jena related to clinical and economic substitutability. To the extent that I do not address a particular statement from Dr. Jena, there should be no suggestion that I agree with it.

## II.      OVERVIEW OF AREAS WHERE DR. JENA AND I AGREE

4.      It is important to highlight at the opening of this report that Dr. Jena and I agree on many things that are relevant to the facts of this matter. Specifically, we share the following opinions, which are well-established in economic theory, antitrust, and the economics of the pharmaceutical industry. We also agree on many of the relevant facts in this matter which I list below.

Economic and Antitrust Theory

- Courts recognize market power as the ability of a firm to price its product above its marginal cost.[6]

- The Lerner Index quantifies how much higher a firm's price is relative to its marginal cost.[7]

- Cross-price elasticity of demand is the relevant standard for determining economic substitutability.[8]

---

[6] Jena Report, ¶ 54 ("The Supreme Court has defined market power as 'the ability to raise prices above those that would be charged in a competitive market.'").

[7] Jena Report, ¶ 173 ("The Lerner Index is a measure of the extent to which firms price above marginal cost.").

[8] Jena Report, ¶ 116 ("Economic substitutability can be observed where there exists positive cross-price elasticity of demand between two products.").

- Measurement of cross-price elasticity between two products requires a change in the price of at least one of the products.[9]

- There is no specific market share threshold for concluding whether a firm has market power.[10]

- Natural experiments are an accepted quasi-experimental methodology.[11] Proper design and implementation of a natural experiment are necessary for the conclusions of the experiment to be valid and reliable.[12]

Pharmaceutical Industry

- The patent system creates incentives for pharmaceutical and biologic manufacturers to invest in research and development (R&D). [13]

- The patent system grants firms exclusivity for a *limited period*.[14]

---

[9] Jena Report, ¶ 56 ("Economic substitutability is the extent to which a consumer shifts their demand from one product to another in response to *changes in their relative prices*. To assess the extent of economic substitutability between two products, economists often consider the cross-price elasticity of demand, which measures the extent to which a consumer's demand for one product changes *in response to a change in the price of another product*."). Jena Report, ¶ 116 ("Stelara would have positive cross-price elasticity with an alternative medication if patients would switch to buying the alternative when faced with an *increase in the relative price of Stelara*."), *emphasis* added.

[10] Jena Report, ¶¶ 20 and 151 ("there is no single market share that necessarily constitutes market power").

[11] Jena Report, ¶ 190 ("Natural experiments, or quasi-experiments, are commonly used in academic literature, including in my own research."). Note that Dr. Jena also seems to agree with many of the specifications included in my empirical models in my Affirmative Report (see fn. 184 below). For example, as I did in my Affirmative Report, Dr. Jena estimates linear regression models, uses the same estimation window, and the same interrupted time series specification.

[12] Jena Report, ¶ 190 ("the reliability of conclusions that can be drawn from a natural experiment depends on whether it is properly designed and implemented.").

[13] Jena Report, ¶¶ 23, 163, and 164 ("the patent system creates economic incentives for J&J and other biologic manufacturers to continue investing in R&D…"; "the patent system creates economic incentives for J&J and other biologic manufacturers to continue investing in R&D to obtain patents and FDA approvals for additional indications."; "The patent system incentivizes pharmaceutical firms to make costly and risky investments in R&D by granting firms exclusivity for a limited period of time if they are able to develop a safe and effective medication and bring it to market.").

[14] Jena Report, ¶ 164 ("The patent system incentivizes pharmaceutical firms to make costly and risky investments in R&D by *granting firms exclusivity for a limited period of time* if they are able to develop a safe and effective medication and bring it to market.") and Jena Report, ¶ 23 ("the patent system creates economic incentives for J&J and other biologic manufacturers to continue investing in R&D to obtain patents and FDA approvals for additional indications by *granting firms exclusivity for a limited period*."). *Emphasis* added.

- Newly approved biologic drugs receive longer exclusivity periods than small molecule drugs (up to 4 times longer).[15]

- PBMs prioritize clinical attributes when determining formularies.[16] Economic attributes (e.g., net price, rebates) are considered secondarily and only among drugs that produce similar clinical outcomes.[17]

- Formulary changes for drugs often occur in January, which can change the prices consumers face and alter their demand for drugs.[18]

- Drugs are differentiated on multiple non-price characteristics.[19]

- The Biologics Price Competition and Innovation Act (BPCIA) provided an abbreviated pathway for biosimilar drug approval, for the purpose of reducing development costs and time.[20]

---

[15] Jena Report, ¶ 35 ("Once approved, the FDA grants biologics a longer period of exclusivity than branded small molecule drugs. Biologic exclusivity prohibits the submission of biosimilar applications for four years and the approval of applications for 12 years within the first licensure date for a biologic. In contrast, branded small molecule drugs have a three- to seven-year exclusivity period based on their active ingredient and the rarity of diseases or conditions for which they are indicated.").

[16] Jena Report, ¶ 82 ("committees conduct systematic assessments of medical and clinical literature to ensure that their decisions are evidence-based and consistent with current clinical standards."). Dr. Jena cites the Academy of Managed Care Pharmacy, "Formulary Management" (https://www.amcp.org/concepts-managed-care-pharmacy/formulary-management) ("A drug formulary, or preferred drug list, is a continually updated list of medications and related products supported by current evidence-based medicine, judgement of physicians, pharmacists and other experts in the diagnosis and treatment of disease and preservation of health. […] The medications and related products listed on a formulary are determined by a pharmacy and therapeutics (P&T) committee or equivalent entity.").

[17] Jena Report, ¶ 82 ("Where drugs are determined to be clinically equivalent—meaning that they achieve similar therapeutic outcomes—they are further evaluated for other factors such as 'cost, supplier services, [and] ease of delivery[.]'").

[18] Jena Report, ¶ 197 ("formulary changes dictating consumer payments often occur in January—the beginning of the new insurance year for most consumers. As consumer prices change in January, they often move to other, more cost-effective alternatives, which can cause prescription volumes to change around the beginning of the year as well.").

[19] Jena Report, ¶ 137 ("Another important outcome of post-marketing surveillance and continued research into existing medications is the potential to obtain new indications. This type of innovation is another non-price factor that drug manufacturers use to differentiate their products and gain a competitive advantage."); Jena Report, ¶ 145 ("Other manufacturers of biologic medications indicated to treat the Relevant Conditions also strive to differentiate their product by communicating various non-price factors such as efficacy, safety, and convenience.").

[20] Jena Report, ¶ 38 ("This pathway was established under the Biologics Price Competition and Innovation Act of 2009 with the goal of reducing development time and costs for biosimilars and increasing patient access.").

---

- Biosimilars must demonstrate biosimilarity to the referenced biologic, which means the product has no meaningful clinical difference to the reference product.[21]

- Brand biologics do not compete primarily on price, but biosimilars do. [22]

- IQVIA data are the gold standard for pharmaceutical sales analysis.[23]

Relevant Facts of this Matter

- Stelara was approved in September 2009 and launched in October 2009.[24]

- Stelara is available in multiple forms; it can be taken as a subcutaneous injection, using a single-dose pre-filled syringe or a single-dose vial, or it can be taken as an intravenous infusion.[25]

- Stelara was launched with approval for the treatment of moderate to severe plaque psoriasis. Stelara was approved for the treatment of psoriatic arthritis in September 2013. Stelara was approved for the treatment of moderate to severe active Crohn's disease (CD) in September 2016, and for the treatment of moderate to severe ulcerative colitis (UC) in October 2019.[26]

- Stelara is one of multiple drugs that treat these conditions.[27] Among these drugs, Stelara was not seen as the first-line treatment, and patients typically start on other products before trying Stelara.[28]

- The first biosimilar version of Stelara was introduced in January 2025, after which multiple biosimilar versions became available.[29]

---

[21] Jena Report, ¶ 37 ("Biosimilars are close copies of the reference biologic with no clinically meaningful differences in terms of safety and effectiveness.").

[22] Jena Report, ¶ 130 ("biosimilars, in contrast to biologics, compete primarily on price.").

[23] Dr. Jena uses these data in his Figures 16-20, 32, and 36-40, and his own academic research: A.B. Jena, *et al.,* "Me-too innovation in pharmaceutical markets," *Forum for Health Economics &* Policy, 12(1), 2009, Article 5, p. 4; A.B. Jena and T.J. Philipson, "Cost Effectiveness as Price Control," *Health Affairs*, 26(3), 2007, pp. 696-703, p. 702.

[24] Jena Report, Appendix F.

[25] Jena Report, ¶ 45.

[26] Jena Report, Appendix F.

[27] Jena Report, ¶¶ 17-18, 70, 74, 77, and 80.

[28] Jena Report, ¶¶ 114-115 ("Patients who are ultimately treated with Stelara frequently do not initiate treatment with Stelara but switch from a clinical substitute to Stelara during the course of their treatment. This pattern is observed in patient populations for each of the Relevant Conditions. Even among patients with similar demographic characteristics, treatment for each of the Relevant Conditions does not begin with Stelara in the majority of cases.").

[29] Jena Report, ¶ 24.

---

- The price of ustekinumab biosimilars is substantially lower than the price of Stelara prior to biosimilar entry.[30]

- Price competition with biosimilars resulted in a decline in Stelara's net price that was larger than Stelara's prior declines in net price. [31]

## III.    REPLIES TO DR. JENA'S CRITICISMS OF MY ANALYSIS OF DIRECT EVIDENCE

5.    As I explained in my Affirmative Report, direct evidence of market power involves evaluation of a firm's prices and profit margins to determine whether the firm set the price of the focal product at supracompetitive levels for a sustained period of time.[32] I present multiple forms of direct evidence of market power in my Affirmative Report: J&J's extraordinarily high gross margins on Stelara, expected large price declines for ustekinumab following biosimilar entry, documented early evidence of price declines upon actual biosimilar entry, and an alleged anticompetitive scheme to delay biosimilar entry. These forms of direct evidence all point to the same conclusion: J&J had market power with respect to Stelara.

6.    Dr. Jena argues that I "misinterpret[] the economic significance of the evidence regarding Stelara's pricing and margins and incorrectly conclude[] that J&J possessed market power over [the] pricing of Stelara."[33] Dr. Jena's attempt to cast doubt on my methodology to evaluate direct evidence contradicts the standard and broadly accepted methods of evaluating market power. First, Dr. Jena claims that gross profit margins and the Lerner Index are not appropriate for evaluating market power in the pharmaceutical industry because pharmaceutical products have low marginal costs and high fixed costs. The Lerner Index has been a widely used method for assessing market power for decades and is perfectly applicable to the pharmaceutical industry. Second, Dr. Jena argues that the anticipated price declines following the entry of Stelara biosimilars, as predicted by J&J and several biosimilar manufacturers, result not from the entry of biosimilars but from competition outside the molecule. Dr. Jena has no empirical support for this speculation, which is also inconsistent with the forecasts themselves. Third, Dr. Jena argues that the price of biosimilar Stelara is not the relevant competitive price. For this claim, Dr.

---

[30] Jena Report, ¶ 130 and Figure 25.

[31] Jena Report, ¶ 130 ("Although the decline in Stelara's net price following the entry of biosimilars is steeper than in previous periods, the magnitude of the response is not unexpected given that biosimilars, in contrast to biologics, compete primarily on price.").

[32] Maestas Report, ¶ 65.

[33] Jena Report, ¶ 154.

Jena ignores both economic theory and standard rules of antitrust to makes a specious argument that brand biologics and biosimilars cannot price the same because they have "different cost structures."[34] Overall, contrary to Dr. Jena's flawed assertions, my methodology for evaluating direct evidence follows the standard method of market power analysis, and the direct evidence evaluated using standard methods demonstrates that J&J had substantial market power regarding Stelara.

### A.    J&J's Gross Margins on Stelara



---

[34] Jena Report, ¶ 208.











██████████████████████████████████████████████████████████████████

███████████████████████████████████████████ █

█ ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████ █ ████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ █ ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████ █ ██████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████













██████████████████ ██████████████████████████████████████████

█████████████████████████ █████████████████████████████████████

██████████████████████████████ ████████████████████████████████

█████████████████████████████████████████████ ██



██   ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████

---

██ ███████████████████████████████████████████████████████████

█████████████████████████████████████████

██ ██████████████

██ ███████████████

██ █████████████











███████████████████████████████████████████████████

███████████████████████████ ██ ████████████████

██████

██    ███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ ██ ██████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████ ██ ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

██    ████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ ██ ██████████████

██████████████████████████████████████

██████████████████████████████████████████████

██████████████████ ██ ████████████████████████

_____

██  ██████████████████

██  ████████████████

██  ██████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████

██  ████████████████

██  ██████████████████████████████████████████
████████████████████████████████████





████████████████████████████████████████████████████████████████████

████████████████

██    ████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ ██  █████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

      ██    ████████████████████████████████████████████████████████

██    ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ ██ ████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████

██    ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ ██ ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████

──────────────────────────────

██  ██████████████████████████████████████████████████████

██  ████████████████████████████

██  ████████████████████████████

██  ██████████████████████

██████████████

██ ████████████████████████████████████████████████
████████████████████ ███████████████████████████████████
████████████████████████ █████████ ██████████████████████████
███████████████████████ ████████████████████████████████████
████████████████████ █████████████████████████████████████████

██ ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████ ████████████████████████████

██████████████

██ ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

██ ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████









██████████████████

██   ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████   ████   ████████████████████████

██████████████████████████████████████████   ████████████████████████   ██

██████████████████████████████████████████████████



██████████████████

██   ████████████████████████████████████████████████████████████████   ██   ████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

_____

██   ██████████████████████████████████████████████████████

██   ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

███████████████████████████████████████████ ███████ ███

██████████████████████████████████████████████████████ ██

███████████████ ████████████████████████████████████



███████████████

██     █████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ ████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ █████████████████████████████████

─────────────────────────────

██ ███████████████████████████████████████████████████

██ ███████████████████████

██ ███████████████████████



███████████████████ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

  ███ ████████████████████████████████████████████████████████████████████

      █████████████████████████████████████████████████████████████████████

      ███████████████████████████████████████████████████████

 ███    ████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████ ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████ ██████████████████████████████████████████

████████████████████████████

      ██████████████████████████████████████████████████████████████████████

      ███████████████████████████████████████████████████████████████████████

      ███████████████

      ██████████████████████████████████████████████████████████████████

      ███████████████████████████████████████████████████████████████████████

      ████████████████████████████████████████████████████████████████████ ██













[content redacted]



---







### D.    Summary of Direct Evidence of Market Power

61.    My opinions on direct evidence of market power with respect to Stelara are unchanged. Overall, these forms of direct evidence all point to the same conclusion: J&J had market power with respect to Stelara (Exhibit 12).

---





## IV.     REPLIES TO DR. JENA'S CRITICISMS OF MY ANALYSIS OF INDIRECT EVIDENCE

62.     As I laid out in my Affirmative Report, indirect evidence of market power involves defining the relevant market and then assessing whether the defendant had market power in that market with respect to the product of interest (Stelara in this matter). In my Affirmative Report, I employ two well-established methods for this purpose. First, I analyze natural experiments using empirical econometric regression

---

[179] This is an updated version of Exhibit 16 of my Affirmative Report.

analyses to estimate cross-price elasticities of demand.[180] Second, per the DOJ and FTC antitrust guidelines, I employ the Hypothetical Monopolist Test (HMT).[181] Results from both of these methods imply the same conclusion: J&J had substantial market power with respect to Stelara over the relevant period, i.e., J&J had a monopoly in the relevant antitrust market of the sale of ustekinumab in the United States.

63.     While Dr. Jena does not define a relevant market, he nonetheless makes several claims that all or virtually all clinical substitutes he has identified are economic substitutes based on flawed reasoning that is inconsistent with fundamental economic theory.[182] Dr. Jena even goes so far as to calculate Stelara's market share within a "market" that includes drugs for which his model found no evidence of substitution (clinical or economic). All of this is out of line with the standard accepted methodology of defining the relevant market as the set of products that are substituted based on price ("economic substitutes") and then assessing market power within that set of products.

64.     Dr. Jena agrees that economic substitution is assessed by measurement of cross-price elasticity of demand.[183] Dr. Jena also agrees with many of my specifications for these econometric regression analyses.[184] However, Dr. Jena makes some purported corrections to my models that are incorrect, inconsistent with basic economics, and lead to invalid results. In this section, I explain the problems with

---

[180] Maestas Report, Section VII.D. This method was accepted and well-regarded in the *In Re Zetia Antitrust Litigation*. In fact, Dr. Jena was a Defendant Expert that rebutted Plaintiff expert Dr. Martha Starr in that case as well, but the Court (which is the same as in this matter) granted summary judgment of the relevant market in favor of the Plaintiffs. See Report and Recommendation, *In Re Zetia Antitrust Litigation,* WL 6689718, United States District Court, E.D. Virginia, Norfolk Division, November 1, 2021 (Case is hereafter referred to as "*In Re Zetia Antitrust Litigation*"). The order granting summary judgement stated, "the court agrees with Judge Miller's conclusion [in the Report and Recommendation dated November 1, 2021] **that cross-price elasticity is the ultimate determinative factor for relevant product market definition**." See Memorandum Order, *In Re Zetia Antitrust Litigation,* February 24, 2022, p. 4, **emphasis** added.

[181] Maestas Report, Section VII.E.

[182] The Zetia court found that "while Jena's testimony is admissible, it fails to address cross-price elasticity of demand and is therefore insufficient to create a genuine dispute of material fact regarding the relevant market." Report and Recommendation, *In Re Zetia Antitrust Litigation,* November 1, 2021, p. 6. Dr. Jena makes the same fundamental error in this matter.

[183] Jena Report, ¶ 56 ("To assess the extent of economic substitutability between two products, economists often consider the cross-price elasticity of demand, which measures the extent to which a consumer's demand for one product changes in response to a change in the price of another product.").

[184] As I did in my Affirmative Report, Dr. Jena uses natural experiments to estimate linear regression models. He uses the same estimation windows (12 months before and after generic entry), the same interrupted time series specification that allows level and trend changes post-generic entry, and the same dependent variable (the quantity demanded of Stelara prescriptions). Jena Report, Figure 39 and Appendix G.

Dr. Jena's inappropriate "corrections," to my models, but nonetheless I show that the majority of Dr. Jena's changes yields results that are effectively identical to my results.[185]

65.     Finally, Dr. Jena disagrees with my use of the HMT.[186] This is not a matter of personal preference – the HMT is the established method set forth by DOJ and FTC guidelines.[187]

66.     Overall, my methodology to evaluate indirect evidence, through natural experiments and the Hypothetical Monopolist Test (HMT), follows standard methods of market power and market definition analyses. The indirect evidence in this matter clearly indicates that only Stelara and its biosimilars are in the relevant antitrust market, and that J&J had 100% market share over the relevant period, indicating substantial market power with respect to Stelara.[188]

> **A.     Dr. Jena Ignores the Standard Procedure for Assessing Indirect Evidence of Market Power: Dr. Jena Does not Define the Relevant Market and his Purported Market Shares are Incorrect.**

67.     Indirect evidence involves first identifying the relevant antitrust market and then assessing market power within that market. This method is the well-accepted standard in antitrust practice: "The typical procedure followed by antitrust authorities all over the world is to *first define the relevant market* and *then assess market power* in that market."[189] Note that the Zetia court stated that cross-price elasticity is the ultimate determinative factor for relevant product market definition and "products which are interchangeable to some degree, but do not share significant cross-elasticity of demand, are not in the same relevant antitrust product market."[190] ███████████████████████████████████████

███████████████████████████████ ██ ████████████████████

███████████████████████████████████████████████████████

---

[185] As mentioned, Dr. Jena made similar criticisms in the Zetia case and yet, the Zetia court found that Dr. Jena's "critiques go to the weight of admissible evidence, but do not prevent a finding that, as a matter of law, the relevant product market is limited to Zetia and its AB-rated generic equivalents." Memorandum Order, *In Re Zetia Antitrust Litigation,* February 24, 2022, p. 4. Similarly, in this matter, Dr. Jena's criticisms do not negate that Stelara had substantial market power in the relevant market.

[186] Jena Report, Section VII.C.

[187] Maestas Report, ¶ 125.

[188] Maestas Report, Exhibit 23.

[189] M. Motta, *Competition Policy: Theory and Practice*, Cambridge University Press, 2004, p. 117, *emphasis* added.

[190] Memorandum Order, *In Re Zetia Antitrust Litigation,* February 24, 2022, pp. 3-4.

██ ████████████████████████████████████████████████████████





█ █████████████████████████████████████████ ██ ███████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████ ██ █████████████████████
██████████████████████████████████████████████████████████
█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█ █████████████████████████████████████████████████████████
███████████████████████████████████████ ██ █████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

█ ██████████████████
█ ████████████████████████
█ █████████████



















### 3. Autocorrelation

94.    Dr. Jena claims that my empirical models suffer from autocorrelation, and then attempts to correct for this, but does so in a manner at odds with established econometric literature and best practice.

95.    Autocorrelation is a minor issue that has no impact on the results or conclusions of my Affirmative Report, when controlled for appropriately. Econometric correction for possible autocorrelation does not affect the regression *estimated coefficients*; it only affects standard errors, meaning it only influences the estimated *precision* of those estimates (which in turn determines statistical significance). In other words, any purported autocorrelation correction (including the inappropriate ones

used by Dr. Jena) would have *no effect* on the size of my estimated effect on quantity demanded; it would only affect the p-value used to infer whether a result is statistically significant or not.[221] Once I correct Dr. Jena's mistakes in controlling for autocorrelation, my coefficients are unchanged, as expected, and my standard errors are virtually unchanged – meaning that an appropriate control for autocorrelation yields *identical* conclusions to those reported in my Affirmative Report. Dr. Jena finding otherwise is a consequence of his inappropriate methods. I next explain what autocorrelation is, why it happens, and the differences in how Dr. Jena and I account for it, and why he is wrong.

96.     In time series data, data points are often correlated over time. For example, in a dataset of daily temperatures over a period of time, if today's temperature is 50 degrees, it's more likely that tomorrow's temperature will be around 45 to 55 degrees rather than -5 degrees or 103 degrees. Similarly, a product's price today is likely highly correlated with its price yesterday. In regression analysis, autocorrelation means that the residuals, or the portion of the outcome variable that is not explained by the model, are correlated over time.[222]

97.     The econometric literature provides clear theoretical and empirical guidance on how to test for and control for autocorrelation. Dr. Jena and I agree that Newey-West corrected standard errors are a robust and well-established method to control for autocorrelation.[223] To implement the Newey-West method, one needs to specify the pattern of autocorrelation.[224] In other words, controlling for autocorrelation requires understanding the pattern of correlation (similarity) in the residuals over time.

98.     Specifically, it is necessary to specify the number of periods over which the errors are correlated so that the pattern of autocorrelation is properly accounted for. For instance, if data in a given month is correlated with the month prior, that would be called first-order autocorrelation. If the given month's data is correlated with the data two months prior, that is called second-order autocorrelation, and so on.

---

[221] Dr. Jena obscures this lack of impact by reporting a single set of results that combines all of his purported fixes. The differences between Dr. Jena's "corrected" model coefficients (Jena Report, Figure 39) and my Affirmative Report model coefficients (Maestas Report, Exhibit 21) are due to other mistakes in his model specification, as I describe further below.

[222] J.M Wooldridge, *Introductory Econometrics: A Modern Approach,* 5th ed., South-Western Pub, Mason, 2013 (hereafter "Wooldridge 2013"), Chapter 10, p. 353.

[223] *Ibid.* Jena Report, ¶ 199. W. Newey and K. West, "A Simple Positive Semi-Definite, Heteroskedasticity and Autocorrelation Consistent Covariance Matrix." *Econometrica,* 55(3), 1987, pp. 703-708 (hereafter "NW 1987"). W. Newey and K. West, "Automatic Lag Selection in Covariance Matrix Estimation," *The Review of Economic Studies*, 61(4), 1994, pp. 631-653 (hereafter "NW 1994").

[224] C. Baum, M. Schaffer, and S. Stillman, "Enhanced Routines for Instrumental Variables/Generalized Method of Moments Estimation and Testing," *The Stata Journal*, 7(4), 2007, pp. 465-506.

99.      The Newey-West method requires specifying the number of "lags" up to which it will correct for autocorrelation of the residuals. Lags are the number of time periods in the past we are concerned with. The choice of lags is an empirical one[225] – if the lag structure is specified improperly then the Newey-West method will not yield correct results.[226] Dr. Jena's results suffer from this problem due to incorrect specification of the lag structure. Specifically, Dr. Jena uses the Stata package's automatic bandwidth selection (ABW) procedure, which mechanically selects the number of lags in a given model.[227] The ABW procedure that Dr. Jena uses inappropriately concludes that lags of between 7 and 14 periods are appropriate for my models.[228] Dr. Jena either ignores or does not realize that this ABW methodology does not account for the limited number of time periods that are being analyzed (25 months in this case). For a 25-month estimation period, a lag of 7 or 14 periods is unreasonably large. Extensive econometric literature shows that lags of this size are grossly inappropriate for the number of time periods in the models that we estimate. Specifically, many articles, including those by Newey-West, who Dr. Jena cites, provide formulas to determine the appropriate number of lags while accounting for the number of time periods in the data.[229] These formulas imply that two to three lags are appropriate for models with 25 time periods.[230]

100.      Further, as opposed to a mechanical application of a STATA package yielding an absurd number of lags, the state of the art in econometrics is to use the Cumby-Huizinga (C-H) test to assess the presence of autocorrelation at first and higher orders.[231] The results of the C-H test identify the appropriate number

---

[225] E. Lazarus, *et al.*, "HAR Inference: Recommendations for Practice," *Journal of Business & Economic Statistics,* 36(4), 2018, pp. 541-559. See fns. 229-231 for a discussion on rules of thumb and other guidance in choosing a lag in the Newey-West context.

[226] Indeed, any time-series analyses with improper number of lags will yield erroneous results. See Chapter 15.6 for a discussion in J. H. Stock, and M. W. Watson, *Introduction to Econometrics*, 4th ed., Pearson, 2020, at pp. 572-73 (hereafter "Stock and Watson, 2020").

[227] Ivreg2 with bw(auto) option. The bandwidth choice is estimated automatically using the procedure detailed in NW 1994.

[228] Jena Report, ¶¶ 199-206; Jena Report backup materials, "Figure 39" and "Figure 40" programs.

[229] Dr. Jena cites NW 1994. NW 1994 suggests a lag of $4(n/100)^{2/9}$. Equation 16.17 in Stock and Watson 2020 suggests a lag choice of $0.75(n^{1/3})$. Section 12.4, page 432 in Wooldridge 2013 suggests 12 or 24 lags, *assuming the data allows for it*, and presents the following formulas that accounts for sample size (n): $4(n/100)^{2/9}$ or $n^{1/4}$.

[230] Using our sample size, and rounding to the nearest integer, the $4(n/100)^{2/9}$ formula yields 3 as the number of lags. The formula $0.75(n^{1/3})$ yields 2 as the number of lags. Similarly, $n^{1/4}$ yields 2 lags. The application of these formulas concludes that two or three lags are appropriate, but that a deviation to something as large as 7 lags is certainly inappropriate for the relevant sample size.

[231] R. Cumby and J. Huizinga, "Testing the Autocorrelation Structure of Disturbances in Ordinary Least Squares and Instrumental Variables Regressions," *Econometrica*, 60(1), 1992, pp. 185-95. The C-H test was conducted to allow up to three lags using STATA command *actest.*

---

of lags. For my models, the C-H test suggests a maximum of zero to three lags would be appropriate, depending on the drug of interest (Exhibit 16 below).[232] I re-estimate my models with Newey-West corrected standard errors, using the number of lags specified by the C-H autocorrelation tests, and find that my results are virtually identical to those reported in my Affirmative Report (see Exhibit 16 below). As I stated above, controlling for autocorrelation has no impact on the estimated coefficients – they are identical regardless of whether I use Newey-West standard errors (see Exhibit 16). Allowing the corrected methods of controlling for autocorrelation changes the p-values slightly but does not change any of the conclusions from my Affirmative Report. In other words, there is no evidence of statistically significant substitution between these drugs and Stelara.

---

[232] See backup materials to this rebuttal report.



███████████████████████████ ██ █████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████ █████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ ██████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████ ██ ████

████████████████████████████████████████████████████████

██████████████████████████████████████ ███████████████████

████████████████████████████████████████████████████

███████████████████

██   █████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████ ██████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████













[text redacted]





[REDACTED]









■     ████████ ██ ██████ █████ █████ ███████ ████████ ██████
███ ███████ ██████████

■     ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ ████ ████████
███████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

───────────────────────

■  ████████████████████████████████████████████████
■  ████████████████████████
■  ████████████████████













█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ █ ████████████████

████████████████████████████████████

██ █████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████ ████████████████

████████ █████████████████████████████████ ██████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

██ ██████████████████████████ █████████ ████████████████

████████████████████████████████████ ██████████████

████████████ ██████████████████████ ████████████

█████████████████████████████████████████████████

█████████████████████████ ███████████████████████████

████████████████████████████ ████████████████

---

██ ████████████





███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███ ████████████████████████████████████████████████████████

████████████████████████████████████████



██   ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████ ██ ██████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████ ███████████████████████████



### B.    Dr. Jena's Evaluation of "Economic Substitutability"

145.    As discussed above, indirect evidence is one of two forms of evidence to assess market power. As done in my Affirmative Report, and defended in this rebuttal, the standard method for evaluating indirect evidence of market power is to use potential therapeutic substitutes for the drug of interest to empirically test economic substitution between Stelara and other potential substitutes by estimating cross-price elasticity of demand.[281] This defines the relevant market, and then the market share within the relevant market can be calculated to determine market power. I found, and remain of this conclusion, that other

---

[281] See Section IV above.

drugs are not meaningful economic substitutes for Stelara and therefore Stelara's relevant antitrust market is limited to ustekinumab molecule sales within the U.S.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████ █ █████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████

██    █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ █

        ████████████████████████████████████████████████████████

        ██████████████████████████████████████████████████████████

        ██████████████

██    ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████ █ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████ █ ████████████████████████████

████████████████████████

██    ███████████████████████████████████████████████████████████

████████████████████████████████████████ █ ██████████████████████████

████████████████████████████████████████████████████████████████

─────────────────────────

█ ██████████████████████████████████

█ ██████████████████████████████████

█ ████████████████████████████

█ ██████████████████████

█ ██████████████████████















162.    Dr. Jena mistakenly and misleadingly conflates basic attributes of the pharmaceutical industry with evidence of economic competition. Overall, none of Dr. Jena's arguments or analyses alter my conclusion: there is clear evidence that J&J had substantial market power with respect to Stelara over the relevant time period.

## VI.    CONCLUSION

163.    Dr. Jena's report does not change my conclusions. Review of both direct and indirect evidence shows that J&J had substantial market power with respect to Stelara.

_____

Nicole Maestas, Ph.D.

June 10, 2025

**ATTACHMENT A**

**ATTACHMENT A: MATERIALS RELIED ON OR CONSIDERED**

**(IN ADDITION TO MATERIALS LISTED IN MAESTAS MARCH 2025 REPORT, ATTACHMENT B)**

**Legal Documents**

Expert Report of Dr. Anupam B Jena, M.D., Ph.D., in this matter, May 5, 2025.

Expert Report of Nicole Maestas, Ph.D., in this matter, March 3, 2025.

Reply Expert Report of Paul Warfield, M.D., in this matter, June 10, 2025.


**Bates Numbered Documents**

JNJ-STELARA_000721493

JNJ-STELARA_003375929

JNJ-STELARA_003381004

JNJ-STELARA_003632361

JNJ-STELARA_003706084

JNJ-STELARA_003706095


**Other Documents**

46brooklyn, "Is 2024 the start of a brave new world in drug pricing?" January 12, 2024.

Alation, "Data Radicals: Measuring the (Data) Culture of Medicine" (https://www.alation.com/podcast/episodes/measuring-medicines-data-culture-anupam-b-jena/).

Alltucker, K., "Pharma companies raise prices on over 900 drugs amid 'historic' negotiations," *USA Today*, February 4, 2024.

American Bar Association (ABA), *Econometrics: Legal, Practical and Technical Issues*, 2nd ed., ABA Publishing, 2014.

ABA, *Market Power Handbook: Competition Law and Economic Foundations* (epub version), 2nd edition, 2012.

Angelis, A., *et al.*, "High drug prices are not justified by industry's spending on research and development," *BMJ*, 380, 2023.

Angrist, J.D. and J.S. Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion*, Princeton University Press, 2009.

Azoulay, P., "Do Pharmaceutical Sales Respond to Scientific Evidence?" *Journal of Economics and Management Strategy*, 11(4), 2002, pp. 551-94.

Baum, C., Schaffer M., and Stillman S., "Enhanced Routines for Instrumental Variables/Generalized Method of Moments Estimation and Testing," *The Stata Journal*, 7(4), 2007, pp. 465-506.

BioSpace, "U.S. Pharmaceutical Market Size to Reach USD 1,093.79 Billion By 2033," July 2024 (https://www.biospace.com/u-s-pharmaceutical-market-size-to-reach-usd-1-093-79-billion-by-2033).

Bosworth, A., *et al*., "Changes in the List prices of Prescription Drugs, 2017-2023," *Assistant Secretary for Planning and Evaluation (ASPE) Office of Health Policy Issue Brief*, October 6, 2023, pp. 1-15.

Browning, E.K., and Zupan M.A., *Microeconomics: Theory and Applications*, 13th ed., 2020.

Celltrion Press Release, "STEQEYMA® (ustekinumab-stba), a biosimilar to STELARA® (ustekinumab), now available in the United States," *PR Newswire*, March 12, 2025 (https://www.prnewswire.com/news-releases/steqeyma-ustekinumab-stba-a-biosimilar-to-stelara-ustekinumab-now-available-in-the-united-states-302399685.html).

Congressional Budget Office (CBO), "Research and Development in the Pharmaceutical Industry," October 2006. (https://www.govinfo.gov/content/pkg/GOVPUB-Y10-PURL-LPS75169/pdf/GOVPUB-Y10-PURL-LPS75169.pdf).

Cumby, R., and Huizinga J., "Testing the Autocorrelation Structure of Disturbances in Ordinary Least Squares and Instrumental Variables Regressions," *Econometrica*, 60(1), 1992, pp. 185-95.

Datta, A., and Dave D., "Effects of Physician-Directed Pharmaceutical Promotion on Prescription Behaviors: Longitudinal Evidence," *Health Economics*, 26(4), 2017, pp. 450-68.

Davis, P., and Garcés E., *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010.

Di Giacomo, M., "GMM Estimation of a Structural Demand Model for Yogurt and the Effects of the Introduction of New Brands," *Empirical Economics*, 2008, 34(3), pp. 537-565.

Dorfman, R., and Steiner P.O., "Optimal Advertising and Optimal Quality," *American Economic Review*, 44(5), 1954, pp. 826-36.

Econlib, "Anupam Bapu Jena on Random Acts of Medicine," September 11, 2023 (https://www.econtalk.org/anupam-bapu-jena-on-random-acts-of-medicine/#audio-highlights).

Elzinga, K., and Mills D., "The Lerner Index of Monopoly Power: Origins and Uses," *American Economic Review*, 101(3), 2011, pp. 558-64.

Everhart, A., *et. al.*, "Physician variation in the de-adoption of ineffective statin and fibrate therapy," *Health Services Research*, 56(5), February 20, 2021, pp. 919-931.

FDA, Supplemental Approval Letter for BLA 125261/S-168 and BLA 761044/S-016, April 1, 2025 (https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2025/125261Orig1s168,%20761044Orig1s016ltr.pdf).

Federal Trade Commission (FTC), "FTC Launches Inquiry Into Prescription Drug Middlemen Industry," June 7, 2022 (https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-launches-inquiry-prescription-drug-middlemen-industry).

Federal Trade Commission (FTC), "Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies," July 2024 (https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf).

Freakonomics, "Introducing a New 'Freakonomics of Medicine' Podcast," June 9, 2021 (https://freakonomics.com/podcast/introducing-a-new-freakonomics-of-medicine-podcast-ep-465/).

Hausman, J., "Valuation of New Goods Under Perfect and Imperfect Competition," in T. Bresnahan and R. Gordon, eds., The Economics of New Goods, Chicago, IL: University of Chicago Press for the NBER, 1997, pp. 207-48.

Hayes, A., "SG&A: Selling, General, and Administrative Expenses," Investopedia, May 13, 2025 (https://www.investopedia.com/terms/s/sga.asp#:~:text=Examples%20include%20marketing%2C%20advertising%2C%20rent,%2C%20utilities%2C%20and%20distribution%20costs.).

Hikma Press Release, "Bio-Thera Solutions and Hikma Pharmaceuticals announce FDA approval of STARJEMZA® (ustekinumab-hmny) Injection, a biosimilar referencing STELARA® (ustekinumab) Injection," May 27, 2025 (https://www.hikma.com/media/grgp4tq1/starjemza-fda-approval-pr-rev32-final-27-may.pdf).

House Committee on Oversight and Accountability, "The Role of Pharmacy Benefit Managers in Prescription Drug Markets," July 23, 2024, pp. 1-51. (https://oversight.house.gov/wp-content/uploads/2024/07/PBM-Report-FINAL-with-Redactions.pdf).

Hovenkamp, H., *Principles of Antitrust*, West Academic Publishing, 2017.

IQVIA Institute, "IQVIA Pharmetric® Plus," April 8, 2022 (https://www.iqvia.com/-/media/iqvia/pdfs/library/fact-sheets/iqvia-pharmetrics-plus-fs.pdf).

Jena, A.B., and T.J. Philipson, "Cost Effectiveness as Price Control," *Health Affairs*, 26(3), 2007, pp. 696-703.

Katz, A., "Making Sense of Nonsense: Intellectual Property, Antitrust, and Market Power," *Arizona Law Review,* 49(4), 2007, pp. 837-909.

Kennedy, P., *A Guide to Econometrics*, 6th ed., Wiley-Blackwell, 2008.

Kenvue, "Kenvue Becomes a Fully Independent Company Following Final Separation from Johnson & Johnson," August 23, 2023 (https://investors.kenvue.com/financial-news/news-details/2023/Kenvue-Becomes-a-Fully-Independent-Company-Following-Final-Separation-from-Johnson--Johnson/default.aspx).

Kirby, M., *et al.,* "Prescription switching: Rationales and risks," *International Journal of Clinical Practice*, 74(1), October 1, 2019.

Lazarus, E., *et al.,* "HAR Inference: Recommendations for Practice," *Journal of Business & Economic Statistics*, 36(4), 2018, pp. 541-559.

Lerner, A.P., "The Concept of Monopoly and the Measurement of Monopoly Power," *Review of Economic Studies*, 1(3), 1934, pp. 157-75.

Lupkin, S., "What to know about January's annual drug price hikes," *NPR*, January 17, 2024.

Manchanda, P., and Chintagunta P., "Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis," *Marketing Letters*, 15(2-3), 2004, pp. 129-45.

Mankiw N.G., *Principles of Economics*, 3rd ed., 2004.

Mankiw N.G., *Principles of Economics*, 7th ed., 2015.

Mankiw N.G., *Principles of Economics*, 9th ed., 2021.

Mattingly II, T., Hyman D., and Bai G., "Pharmacy Benefit Managers: History, Business Practices, Economics, and Policy," *JAMA Health Forum*, 4(11), November 3, 2023, pp. 1-14.

Motta, M., *Competition Policy: Theory and Practice*, Cambridge University Press, 2004.

Newey, W., and West K., "A Simple Positive Semi-Definite, Heteroskedasticity and Autocorrelation Consistent Covariance Matrix." *Econometrica,* 55(3), 1987, pp. 703-708.

Newey, W., and West K., "Automatic Lag Selection in Covariance Matrix Estimation," *The Review of Economic Studies*, 61(4), 1994, pp. 631-653.

Oster, E., "Random Acts of Data With Dr. Anupam Jena," July 12, 2023 (https://parentdata.org/random-acts-of-data/).

Patel, R., "Exclusivity-Which One is For Me?" (https://www.fda.gov/media/135234/download).

Rubinfeld, D., "Econometric Issues in Antitrust Analysis," *Journal of Institutional and Theoretical Economics,* 166(1), 2010, pp. 62-77.

Salop, S., "The First Principles Approach to Antitrust, Kodak, and Antitrust at the Millennium," *Antitrust Law Journal*, 68, 2000, pp. 187-202.

Sertkaya, A., *et al.*, "Costs of Drug Development and Research and Development Intensity in the US, 2000-2018," *JAMA Network Open,* 7(6), 2024.

Stock, J. H., and Watson M. W., *Introduction to Econometrics*, Pearson, 2020.

U.S. Federal Trade Commission, Complaint Counsel's Post-Trial Reply Brief, *In the Matter of Impax Laboratories, Inc*., Public Docket No. 9373, February 14, 2018 (https://www.ftc.gov/system/files/documents/cases/180214ccposttrialreplybrief589661.pdf).

United States District Court for the Middle District of North Carolina, Memorandum Opinion and Order, *FTC v. Syngenta Crop Protection AG*, 1:22CV828, January 12, 2024.

United States District Court, E.D. Virginia, Alexandria Division, Memorandum Opinion, *U.S. v, Google LLC*, 1:23-cv-108 (LMB/JFA), April 17, 2025.

United States District Court, E.D. Virginia, Norfolk Division, *In Re Zetia Antitrust Litigation,* WL 6689718, November 1, 2021.

United States District Court, E.D. Virginia, Norfolk Division, Memorandum Order, *In Re Zetia Antitrust Litigation,* February 24, 2022.

United States District Court, Eastern District of Pennsylvania, *Federal Trade Commission v. AbbVie Inc*. (Androgel), Civil Action No. 14-5151, Findings of Fact and Conclusions of Law, June 29, 2018.

United States Supreme Court, *FTC v. Actavis, Inc.*, 133, 2223-2247 (2013).

Venkataramani, A.S., Bor J., and Jena A.B., "Regression discontinuity designs in healthcare research," *BMJ,* 352(1216), March 14, 2016.

Werden, G., and Froeb L., "Correlation, Causality, and All that Jazz: The Inherent Shortcomings of Price Tests for Antitrust Market Delineation," *Review of Industrial Organization*, 8(3), 1993, pp. 329-53.

Wooldridge, J.M., *Introductory Econometrics: A Modern Approach, 5th Edition*, South-Western Pub, Mason, 2013.

Wouters, O., and Kesselheim A., "Quantifying Research and Development Expenditures in the Drug Industry," *JAMA Network Open,* 7(6)*,* 2024.

Wouters, O.J., *et al.*, "Association of Research and Development Investments With Treatment Costs for New Drugs Approved From 2009 to 2018," *JAMA Network Open*, 5(9), 2022.

**Electronic Data**

IQVIA PharMetrics Plus Data.

**ATTACHMENT B**













**ATTACHMENT C**

