# Exhibit 98

## (Redacted)

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

**COPY**

----------------------------x

CAREFIRST OF MARYLAND,       :

INC., GROUP HOSPITALIZATION:

and, MEDICAL SERVICES,       :

INC., CAREFIRST BLUECHOICE,:

INC., and CFA, LLC, d/b/a  :

CAREFIRST ADMINISTRATORS,  :

on behalf of themselves and:

all others similarly       :

situated,                  :

          Plaintiffs,      :

v.                         : CIVIL ACTION NO.

JOHNSON & JOHNSON and       : 2:23-cv-00629-JHW-LRL

Janssen Biotech, INC.,     :

          Defendants.      :

----------------------------x

HIGHLY CONFIDENTIAL

PURSUANT TO THE PROTECTIVE ORDER

Videotaped Zoom Hybrid

Deposition of COLLEEN MARANO, PH.D.


Thursday, February 13, 2025, 9:06 a.m.

BEFORE: Cassandra E. Ellis, RMR, RDR, CRR, RSA

Colleen Marano, Ph.D.                    Highly Confidential

at least from a company point of view, we presented those protocols to the regulatory authorities for their approval to proceed.

We executed the protocols, and that execution included data review while the study was ongoing and blinded, locking the database, reporting the data, interpreting the data, writing the clinical study reports for the -- of that data, and then creating the submission package for the files that ultimately went to the regulatory health authorities to seek their approval for the indication.

Q.   The clinical trial protocol, just to make sure that the jury and judge understand, the clinical trial protocol is the Phase III study of ulcerative colitis?

A.   That's correct.

Q.   And the regulatory authorities that you were talking about, in terms of the eventual submission that includes -- and the regulatory authorities that you were referring to include the United States FDA; correct?

A.   That is correct.

Q.   Okay.  Now, in connection with the Stelara protocol, that was what one would call a

Colleen Marano, Ph.D.                    Highly Confidential                                    16

direct-to-Phase III approach; correct?

A.    Yes.

Q.    In other words, the proposal was to skip having to undertake any kind of Phase II study; correct?

A.    Correct.

Q.    And there were materials that were put together for the FDA in order to present those to the FDA, in order to get the FDA's acceptance to the potential to have Janssen skip Phase II and go directly to Phase III; correct?

MS. ANTONS:  Objection to form.

You may answer.

A.    So we were -- we were asked to put together a Phase III protocol to take to regulatory authorities for approval to move ahead with Phase III.

Q.    And so materials were put together and given to the FDA in connection with the approach that was being suggested by Janssen for going direct to a Phase III study; correct?

A.    Yes.

Q.    The materials that were submitted you were involved in; correct?

A.    Yes, I was a reviewer and potential

BlueBear Reporting LLC

Colleen Marano, Ph.D.                    Highly Confidential

drafter of some of the information that was provided in the protocol.

Q.   Can you explain to the jury how many others at Janssen were involved in preparing and/or reviewing the materials that went to the FDA in connection with the direct-to-Phase III approach for Stelara and UC?

A.   So within a -- within the development of a clinical trial protocol I always say it takes a village.  So there are subject matter experts across a range of functions, including, you know, our clinical group, which was comprised of myself and a physician with whom I was working with, statisticians, pharmacologists, biomarker scientists, discovery scientists, regulatory, data management, all of those folks will, at some point or other, either contribute to the protocol or review that protocol to determine that it's actually operationally feasible.

And then the team will put that together and it goes through a series of reviews, which are then reviewed by our more senior management folks.

Q.   The final product that goes to the

FDA, then, is carefully prepared by the people at Janssen and reviewed before it's submitted; is that fair to say?

MS. ANTONS:  Objection to form.

A.    Yes, it goes through a thorough review process.

Q.    Okay.  Now, before I turn to that -- those materials that were presented to the FDA, the concept of going direct from -- to Phase III, skipping Phase II, a part of that consideration was because there was patent expiration that was going to occur for Stelara; correct?

MS. ANTONS:  Objection, form.

A.    I am -- I was asked to deliver a protocol.  The conversations that take place in order for the business decisions to be made, and the strategy, are made well beyond my -- above my grade.

Q.    But you were told that there was a concern regarding patent expiry --

MS. ANTONS:  Objection.

BY MR. SOBOL:

Q.    -- correct?

MS. ANTONS:  Objection, form.

BY MR. SOBOL:

Q.    Isn't that correct?

MS. ANTONS:  You can answer if you understand it.

A.    There -- there is knowledge of when the patents would expire.  We were asked to deliver the protocol within a timeframe, and so we did.

MR. SOBOL:  Let's go to tab 605.

(Exhibit No. PX00185 was marked for identification.)

MR. SOBOL:  Hand that to you.

DOCUMENT TECH:  You want to mark this as?

MS. OGNIBENE:  We're at PX185.

(Exhibit No. PX00185 was marked for identification.)

BY MR. SOBOL:

Colleen Marano, Ph.D.    Highly Confidential    22



Colleen Marano, Ph.D.                    Highly Confidential                                    23









you spend preparing for the deposition?

          A.    About eight hours.

               MR. SOBOL:  Okay.  Now, I'd like to
mark tab 333 as the next exhibit.

               MR. BELLIN:  Thank you.

               MR. SOBOL:  Number?

               MS. OGNIBENE:  This will be PX187.

               (Exhibit No. PX00187 was marked for
identification.)

BY MR. SOBOL:



Q.   Okay.  So when presenting, then -- oh, and then -- so the people that are identified here on the second page, agenda, Szapary, Strauss, yourself, Shields, Rubenstein, Szapary again, who are they?

A.   So Philippe Szapary is a physician who -- who was the compound development team lead at this time, that's the CDTL.

Rick Strauss is a pediatric gastroenterologist, he's a physician with whom I

was working with, at the time, this all started.

I -- obviously I'm here as the clinical scientist who was working through, you know, in partnership with Rick, but working with the team to get the protocol materials developed.

Kim Shields was the global regulatory lead for Stelara.  And Teresa Rubenstein global -- she was part of our -- by virtue of that bullet, she's in our -- sign-of early strategic commercial marketing group.

Q.    Okay.

A.    Commercial -- clinical commercial group.



A.    Correct.

BlueBear Reporting LLC



















2/13/2030
Case 2:23-cv-00629-JKW-LRL    Document 530-5    Filed 09/17/25    Page 29 of 63
Colleen Marano, Ph.D.                    PageID# 27240
Highly Confidential

55





MR. SOBOL:  Okay.  Let's go off the record.

THE VIDEOGRAPHER:  The time is now 10:03.

We're off the record.

(Recess.)

THE VIDEOGRAPHER:  The time is now 10:15.

We're back on the record.

MR. SOBOL:  So tab 14 has previously been marked as both 49 and 151.  What are we supposed to do in that situation?

MS. OGNIBENE:  Let's use 151.

MR. SOBOL:  All right.  We'll use 151.

(Previously marked Exhibit No. PX00151 was identified for the record.)

BY MR. SOBOL:

Q.   So Exhibit 151 has been placed before you, this document -- well, you might have seen it during your preparation, but I'm going to orient you to it now, anyway.

So you'll see this is an e-mail from you to Mr. O'Brien, dated November of 2015, regarding, I think, somewhat facetiously, some light reading material?

A.   Correct.  And it's Dr. O'Brien.

Q.   Dr. O'Brien?  Okay.

And the various attachments that you give to Dr. O'Brien relate to some regulatory filings; correct?

A.   The -- yes.

Q.   Now the first document is the protocol for the UC treat -- treatment for Stelara; correct?

A.   Correct.

Q.   And when you had testified earlier this morning about a protocol that had been reviewed by people at the organiza -- at Janssen, and then provided to the FDA, this is

the protocol that we were -- you were referring to earlier; correct?

A.    Correct.

Q.    When putting together the information in the protocol the clinical department and others at Janssen were trying to be true, accurate, and complete in the submissions that you were making to the FDA; correct?

A.    Correct.

Q.    You'll see that in the bottom right-hand corner of the documents there's a -- an alphanumeric numbering system.  If you can go to the page that ends with 8147, please.

A.    Okay.  I'm there.

Q.    This provides a synopsis, at the top, some general information, and in the third paragraph down starts with data from, data from completed Phase II studies of ustekinumab in Crohn's disease, along with the shared biology and the similar response to current treatments between Crohn's disease and UC, provide a substantial scientific and clinical rationale to justify a direct-to-Phase-3 approach to the study of ustekinumab in UC.  That's what this

states here; correct?

A.    Yes, it does state that.

Q.    And that was true, at the time, that Janssen stated this to the FDA; correct?

A.    Yes.

Q.    Please go to the page that ends 8163.  Tell me when you're there.

A.    I'm here.  8163, correct?

Q.    Yep.

A.    Yes.

Q.    Okay.  There's an introduction and then there's a background section, and in the fourth paragraph down, in the background section, it states:  Ustekinumab has not been previously evaluated in UC.  However, the efficacy and safety of ustekinumab in Crohn's disease has been evaluated in two completed Phase II clinical studies, (identification numbers given), and two completed Phase III induction studies (identification numbers given), a Phase III maintenance study (identification number) is ongoing, that's what this states; correct?

A.    Yes, correct.

Q.    And that was true at the time?

MS. ANTONS:  Objection to form.

A.   Yes, it was true at the time.

Q.   Okay.  If you go to the pages that are marked 8255 and 8256, you'll see that there are references in the protocol?

A.   Yes, I see those references.

Q.   And 14 cites the Granlund article that we have identified earlier; correct?

A.   Correct.

Q.   And 19 cites the Jostins article that we had identified; correct?

A.   Correct.

Q.   If you turn to the page that ends 8268, please.

This is the beginning of a separate attachment to the e-mail, this is a briefing document for Pre-IND/Pre-Phase III meeting; correct?

A.   Yes, that is correct.

Q.   Dated in December of 2014?

A.   Yes, that is correct.

Q.   And what is this document?

A.   This was a document that was prepared to be submitted to the FDA to discuss our plans, and our rationale for those plans

with FDA to gain alignment on how we might
proceed.

Q.    Please turn to the page that is
8272.  There's an introduction on this page;
correct?

A.    Yes.

Q.    And the second to last paragraph
reads as follows:  Given the similarities and
the biology and the treatment of Crohn's disease
and UC, as well as the efficacy and safety of
ustekinumab treatment demonstrated to date in
subjects with Crohn's disease, the sponsor will
be pursuing a direct to Phase III approach for
the development of ustekinumab for UC, that's
what this states; correct?

A.    That is what the document states,
yes.

Q.    And that was true at the time that
Janssen stated that to the FDA; correct?

MS. ANTONS:  Objection to form.

A.    Yes, that was true.

Q.    Please turn to 8281.  You'll see
that at 2.3, at the bottom of this page, there
starts, A Rationale for the use of Ustekinumab
in Ulcerative Colitis; correct?

A.    Yes, that is correct.

Q.    And the discussion that goes on for the rest of that page, the next page, and onto the page after that; correct?

A.    Yes, that is correct.

Q.    If you look in the middle of the page -- the second page of this rationale, 8282. And you go about a third of the way up the -- from the bottom of the first full paragraph, you'll see something that begins:  This suggests that therapies.  Tell me when you find that in the document, please.

A.    I see the statement.

Q.    Okay.  This suggests that therapies targeting IL-12/IL-23 could be efficacious in both Crohn's disease and UC.  Ustekinumab, which neutralizes both IL-12 and IL-23 by binding to the common p40 subunit of these cytokines -- cytokines has already demonstrated efficacy in Phase II study in subjects with moderate to severe Crohn's disease citation and is currently being studied in a global Phase III program for the treatment of Crohn's disease another citation, that's what this says; correct?

A.    That's what it says.

Q.    And then it says:  The efficacy demonstrated to date for both ustekinumab and Crohn's disease is relevant to UC given the fundamental biologic similarities between the two diseases, citations, that's what this also says; correct?

A.    That's what it states, yes.

Q.    And those statements were correct at the time that FDA -- at the time that Janssen made them to the FDA; correct?

MS. ANTONS:  Objection to form.

A.    Yes, they were correct and true.

Q.    There then is the next paragraph, where Janssen writes to the FDA, and says: Therefore, the available nonclinical evidence supports a common biology shared between UC and Crohn's disease that includes a role for IL-12 and IL-23 in the pathogenesis of UC as they have in Crohn's disease.

The efficacy of ustekinumab has been observed in both Phase II and Phase III studies in Crohn's disease (citations given), together with the shared biology and similar response to current treatments.

These data provide a substantial

scientific as well as clinical rationale to justify taking a phase -- direct to Phase III approach to the study of ustekinumab and UC.

That's what this states; correct?

A.   Yes, that states here.

Q.   And that was true when stated by Janssen to the FDA; correct?

MS. ANTONS:  Objection to form.

A.   That is true.  I will call out that in the next sentence, which was not read, is that since this is a direct to Phase III program we had planned an interim analysis because we -- oh, I'm sorry.  I never know what to do with my hands.

We had planned an interim analysis because while we thought that this data was supportive of the rationale we were uncertain, there was a level of uncertainty, so we introduced -- we did have an interim analysis for futility in the -- in the first part of the study to determine if we were making the right decision.

Q.   Please turn to the page that's 8288.

A.   8288?  Okay.

Q.   Okay.  This statement occurs in a section that's discussing the dose selection rationale; correct?

A.   I do see the section:  Dose Selection Rationale, yes.

Q.   And the last paragraph of the Dose Selection Rationale section states as follows:  In summary, given the biological similarities and similar response to therapies between Crohn's disease and UC, as well as the efficacy and safety of ustekinumab treatment demonstrated to date in subjects with Crohn's disease in Phase II and Phase III studies, the dose regimens and strategies identified for ustekinumab from the Crohn's disease development program will be used in this direct to Phase III UC development program, that's what this states; correct?

A.   That is correct.

Q.   And that was true at the time that Janssen stated it to the FDA; correct?

MS. ANTONS:  Objection to form.

A.   Yes, that was true, and that was our intended strategy.

Q.   And then if we turn to page 8291,

please.  And, in context, if you look at the prior page there's some questions by the FDA to which Janssen is responding; do you see that?

A.    Yes.  These are questions that we pose to the FDA.

Q.    And then you write -- well, it is written at 8291, the second paragraph from the bottom.

A.    Mm-hmm.

Q.    There is no doubt that the pathophysiology of UC in Crohn's disease is similar.  In the largest and most comprehensive analysis of the genetic architecture of IBD most genetic loci for IBD, including those of IL-12 and IL-23, are common to both UC and Crohn's disease, citation.

These authors conclude that, quote, this degree of sharing of genetic risks suggests that nearly all of the biologic mechanisms involved in one disease have some role in the other, end quote.

That's what's written here; correct?

A.    That is what is written here, yes.

Q.    And that was true when stated to

the FDA?

A.    Correct.

MS. ANTONS:    Objection to form.

BY MR. SOBOL:

Q.    And the citation is, I believe, to the Jostins' article that we identified earlier; correct?

A.    I would have to see the reference page and the number, I don't -- in the document.

Q.    Sure.  Let's go to page 8306.

A.    14, citation 14 is Jostin.



BlueBear Reporting LLC





Q.   And what is the compound development lead?

A.   The compound development team lead is an individual who oversees a cross-functional group that represents all aspects of -- from clinical, regulatory, commercial, market access, that really guides, you know, guides the overall, you know, guides the compound through various phases of development and for multiple indications.

Q.    Okay.  The topic here is Stelara Biosimilar strategy kickoff; what's that?

A.    I think it's what the subject says, you know, Stelara Biosimilar strategy kickoff.

Q.    So what is a Biosimilar?

A.    A Biosimilar, I guess, is the equivalent, loosely speaking, the equivalent to a generic for a pill, but it is a molecule that is not the originator molecule, but that are developed to, you know -- I guess, you know, they're developed to -- you know, as -- to look like Stelara and be available, and it's -- it's done with other biologics, Remicade, et cetera.

Q.    So here then, where it says Stelara Biosimilar strategy kickoff, Stelara would be the brand drug; correct?

A.    Stelara is the brand drug.

MS. ANTONS:  Objection to form.

A.    Yeah.

Q.    And the Biosimilar would be the potential product that would be launched that might compete against Stelara, the brand; correct?

A.    A Biosimilar would be, yes, you would consider that that would be the case.

Q.    Okay.  And so presumably, then, by Stelara Biosimilar strategy kickoff, the subject is to have a kickoff discussion regarding the potential for competition for Stelara by a Biosimilar?

MS. ANTONS:  Objection to form, misstates the document.

You may answer.  Go ahead.



(Recess.)

THE VIDEOGRAPHER:  The time is now 12:50.

We're back on the record.

MR. SOBOL:  Okay.  Let's go to tab 408, please, which has previously been marked as Exhibit 159.

MS. OGNIBENE:  It goes with exhibit previously marked 160, which is the metadata.

(Previously marked Exhibits No. 159 and 160 were identified for the record.)

BY MR. SOBOL:

Q.   So I placed before the witness Exhibit 159 and 160.  160 is the metadata simply showing that the document came from your custodial files.

A.   Okay.

Q.   And then, if you turn to 159, you'll see that this is an e-mail from Janssen Immunology, regarding the subject of DDW 2018 grid booklet, dated May 29 of 2018; correct?

A.   That is correct.

Q.   Okay.  Now, just to put this in context, because we just had the lunch break, there was an ECCO conference back in February of

2/13/2035
Colleen Marano, Ph.D.

Case 2:23-cv-00629-JKW-LRL    Document 530-5    Filed 09/17/25    Page 49 of 63
PageID #27260
Highly Confidential

126

2018; correct?

A.   Correct.

Q.   Apparently a poster by an Ochsenk hn had been presented at that conference, but you did not attend the conference due to an accident; correct?

A.   Correct.

Q.   All right.  And then we've also seen a slide presentation that at least originally was prepared in May of 2018, that had some slides -- three slides regarding the Ochsenk hn article, but you have no recollection regarding the slides or who prepared it or even having seen them?

A.   That was the training deck?

Q.   Correct.

A.   Correct.

Q.   Okay.  Now we're turning to the DDW, which is what?

A.   Digestive disease week.

Q.   And is this in preparation for a conference?

A.   Digestive disease week is a congress that covers a whole range of, you know, digestive-related, hepatology-related types of,

you know, indicate -- you know, indications.

MR. SOBOL:  Bless you.

THE WITNESS:  Gesundheit.

MR. SOBOL:  And -- do you speak German?

THE WITNESS:  I took German in college.  Do I speak German?  No.

BY MR. SOBOL:

Q.    Okay.  The document that's before you, is this a document that's sent to people at Janssen that summarizes information in anticipation of the DDW conference?

A.    Yes, it's a booklet that is generated.

Q.    Okay.  And you went to this DDW conference; correct?

A.    I believe I did.

Q.    Did you review the materials that were given to you in anticipation of the conference?

A.    To be honest with you, I don't usually use these materials, they come, I get copied on them, I throw them into a folder.

I go to the meetings.  DDW's a huge meeting, I kind of, as I mentioned previously I

do -- kind of do my own thing and have my own areas of interest.

So I will look at either what's available in the abstract book that's provided by the Congress in the old-fashioned days of paper or in the case of an app I might scan the Congress -- the session titles. I typically end up going to largely oral posters, oral presentations, where I can sit down.

There are thousands of abstracts per -- presented over the course of multiple days at DDW, and I'm not a big fan of walking through the halls reading every abstract.

Q.   What drugs were you working on at Janssen at the time that the DDW 2018 conference was being undertaken?

A.   I was working on the Stelara Unifi study.

Q.   Okay. And was that a near full-time job?

A.   Yes.

Q.   When you went to the DDW conference were you interested, at all, in learning anything that was being talked about in terms of the use of Stelara in ulcerative colitis?

A.    Mm-hmm.

Q.    My understanding is that from the record that we've looked at, and your testimony, is that there were discussions regarding first formulating a protocol in the 2014 time period, so as pre-even starting the investigation, could it have been as early as that, that you were first approached regarding possibly being an inventor or is that not consistent with your memory?

A.    That is not consistent with my memory.  At the time, 2014, we were just focused on developing a protocol, you know, and moving forward.

Q.    Okay.  And I take it from your answer, also, you're not saying that you invented the idea of using Stelara in ulcerative colitis; correct?

MS. ANTONS:  Objection, form, and calls for legal conclusion.  And I'm also going to caution the witness not to disclose the substance of any conversations you had with counsel regarding this line of questions.

You may answer, if you understand.

A.    I was asked to develop a protocol,

2/13/2025
Colleen Marano, Ph.D.    Highly Confidential

a clinical trial study design, that could

potentially be designed to the study of Stelara

and ulcerative colitis.

Q.   So someone else had previously had

the idea of using Stelara and ulcerative colitis

because they asked you to do something that

already presupposed that notion?

MS. ANTONS:  Object.

BY MR. SOBOL:

Q.   Is that fair to say?

MS. ANTONS:  Objection to form,

misstates testimony.

A.   I would ask for further -- can you

clarify that question?

Q.   Sure.  Who was the first to use

Stelara in ulcerative colitis?

MS. ANTONS:  Objection, form.

BY MR. SOBOL:

Q.   You can answer.

A.   I mean, as far as I know, we were

the first -- the first patient in was

potentially the first patients dosed with

uste -- with ustekinumab in our controlled

clinical trial.

Q.   So you weren't familiar, at all,

with the off-label use of Stelara for ulcerative

colitis well before the study commenced?

            MS. ANTONS:  Objection, form and

foundation.

       A.   The -- we were working on -- in the

2014, 2015 timeframe, that's when we started,

and there was no -- I mean, at that time, even

Stelara hadn't been approved for Crohn's disease

yet.

            So it was only available for

psoriasis, so I was working, and I think we were

all -- I was working with the idea that we were

going to be the first to study, and we were the

first to initiate the study, to evaluate the

efficacy of Stelara if -- as a treatment for

ulcerative colitis.

       Q.   So what did you do to ever learn

about the prevalence of the use of ulcerative

colitis before the study, itself, began?

            MS. ANTONS:  Objection, form.

            THE WITNESS:  Can you restate that

question?

            MR. SOBOL:  Sure.

  BY MR. SOBOL:

       Q.   What did you do, personally, to

evaluate whether Stelara was already being used, albeit off-label, for ulcerative colitis?

MS. ANTONS:  Objection, form.

A.    In the context of developing the protocol?

Q.    No, just in the context of anything.

MS. ANTONS:  Objection to form.

A.    I did nothing.  I mean, I was conducting the clinical trial.  I mean, we were -- we had -- I came to this program with experience from other clinical trials in ulcerative colitis.

We had ustekinumab, we were asked to develop a clinical trial protocol, and so I acted on that request and we built what we thought was a reasonable rationale, to be hopeful, that this protocol would, you know, address whether or not ustekinumab was efficacious in ulcerative colitis within a registrational, controlled clinical trial.

Q.    Well, if the period of 2014 is too early -- is not consistent with your memory regarding the possibility of your being named as an inventor in the Stelara patent, would it have

Phase III clinical study; is that fair to say?

MS. ANTONS:  Objection to form, mischaracterizes testimony.

A.    The clinical trial was what I had to offer.  The design of the clinical trial on the endpoints that we tested in the clinical trial.

Q.    Okay.  Did you understand that you had any other obligations or duties, other than what you just testified about?

MS. ANTONS:  Objection to form, and to the extent you have -- your understanding is based on any conversations with counsel I'm going to instruct you not to answer.  You can answer that question yes or no.

THE WITNESS:  Can you repeat the question?

MR. SOBOL:  Sure.

THE WITNESS:  I'm just --

BY MR. SOBOL:

Q.    I have to go back, because you had given an answer, and my question -- so if I understand what you're saying, and I'm not trying to put words in your mouth, you saw your job was to make sure that whatever was written

in materials that were presented to you about the patent, that those materials accurately reflected the conduct of what occurred during the Phase III clinical study.

You answered, the clinical trial was what I had to offer, the design of the clinical trial on the endpoints that we tested in the clinical trial.

And then I asked:  Did you understand that you had any other obligations or duties, other than as you just testified?

A.    I did not.

Q.    Okay.  Did you understand that you had any duty to inquire regarding prior art, the scientific literature, regarding the use of Stelara in ulcerative colitis that pre-dated when the patent was filed?

MS. ANTONS:  Objection to form, and I'm going to object on the basis of privilege and instruct you not to answer.

BY MR. SOBOL:

Q.    Well, it's a yes or a no question.

Did you understand that you had any duty to inquire regarding prior art where the scientific literature regarding the use of

Stelara ulcerative colitis that pre-dated when the patent application was first filed?

MS. ANTONS:  I'm going to make the same objections, and misstates the law, would instruct the witness not to answer.

BY MR. SOBOL:

Q.  Well, do you recall any conversations, yes or no, that you ever had with a lawyer at J&J regarding your duties as an inventor?

A.  I do not.

Q.  So if you were going to be testifying regarding your understanding, it would not be based upon what a lawyer told you, because you don't have any recollection regarding a lawyer telling you anything about your duties from J&J; correct?

MS. ANTONS:  Objection to form.

A.  I don't have a recollection of those conversations.

Q.  Okay.

A.  If they took place.

Q.  All right.  So other than ensuring that what was in papers accurately reflected what had occurred during the Phase III study,

it's your testimony that you -- your understanding was that you had no further obligations or duties in connection with being an inventor on the patent; isn't that fair to say?

MS. ANTONS:  Objection to form, foundation, calls for a legal conclusion.

BY MR. SOBOL:

Q.    You may answer.

A.    That was my understanding.

MR. SOBOL:  I got the impression you were sending me something, before, but, oh, well, apparently I was supposed to recognize it on this.

BY MR. SOBOL:

Q.    What recollection, if any, do you have regarding your personal involvement in the patent application process for the Stelara UC patent?

MS. ANTONS:  And I'm going to caution the witness not to disclose the substance of any conversations you had with counsel in answering that question.

A.    I don't have, really, much strong recollection.  These things come, somebody else

BlueBear Reporting LLC

2/13/2025 Case 2:23-cv-00629-JKW-LRL Document 530-5 Filed 09/17/25 Page 60 of 63
Colleen Marano, Ph.D. PageID# 27271 164

Highly Confidential

has this idea, they come in the middle of everything that's going on, so again, my -- I really don't have any strong recollections of the process, you know, other than the fact that the protocol formed the basis for some components, and that I provided that information for -- for -- for the patent, and that was where my responsibility, and my connections to the patent lie, you know, fell.

Q.   Lawyers sometimes pick up on something that is just a part of our creature habit, if you will.

When you say strong recollections, are you saying that you have recollections, but they're not strong or are you saying I really don't remember

A.   I really -- I really don't remember.

Q.   Okay.  And when you say the protocol, do you mean the original protocol or do you mean the study results or do you mean both?

MS. ANTONS:  Objection to form.

A.   The protocol, itself, and I guess I don't know the result, I mean, I don't know if

2/13/2026
Colleen Marano, Ph.D.
Case 2:23-cv-00629-JKW-LRL    Document 530-5    Filed 09/17/25    Page 61 of 63
PageID# 27272
Highly Confidential
175

A.    I don't recall that, I mean, we had the protocol with language, we had communications with FDA.  I don't know that -- I'm not sure I understand how you're drawing the connections between that and what we have in the patent.

Q.    Well, whether there are connections or not, simply saying you were filing an application with the FDA, not you -- strike that, let me go back.

Someone from Janssen was going to file a patent application with the United States Patent Office, and in that application there would be information relating to the topic of Stelara and ulcerative colitis; correct?

A.    That was --

MS. ANTONS:  Objection, form.

A.    That is the topic of this patent, yes.

Q.    Okay.  Now, in connection with that, you personally did not see it your job to ensure that the information that was being provided in that patent application was consistent with what had been previously told to the FDA back in 2015; correct?

2/13/2026
Colleen Marano, Ph.D.
Case 2:23-cv-00629-JKW-LRL    Document 530-5    Filed 09/17/25    Page 62 of 63
PageID #2727ial
Highly Confidential
176

MS. ANTONS:  Objection, form.

A.    I don't recall doing -- being asked to do a one-to-one comparison.

Q.    Okay.  And do you know anybody else who would have had that responsibility?

MS. ANTONS:  Objection, form and foundation.

A.    And again, to be quite honest with you, I don't know.  I don't know whose responsibility that was.

Q.    Who made the decision, when filing the application with the patent office, who made the decision to exclude identifying the protocol, itself?

MS. ANTONS:  Objection, form and foundation.

A.    I didn't know that the -- I don't recall that the protocol wasn't included.  I mean, elements of the protocol, in terms of our endpoints, are included in the patent.

Q.    Right.  But I'm talking about the protocol document, itself.

A.    I do not understand patents, at all.  I don't -- so I don't know why decision -- you know, such decisions, I don't even know if

ERRATA TO DEPOSITION OF:  Colleen Marano

DATE OF DEPOSITION:  February 13, 2025

CASE:  *CareFirst Group of Maryland, Inc., et al. -v-  Johnson & Johnson et al.*

The following are the corrections I have made to my deposition transcript:

| Page | Line | Correction/Change and Reason |
|---|---|---|
| 24 | 18 | "then" to "they" (Transcription error) |
| 44 | 17 | "grouped" to "approved" (Transcription error) |
| 51 | 21 | "the Stelara" to "Stelara" (Clarification) |
| 84 | 25 | "AGI" to "AGA" (Transcription error) |
| 85 | 1 | "CDH" to "CGH" (Transcription error) |
| 94 | 10 | "metadata state" to "metadata states that" (Clarification) |
| 102 | 18, 20 | "Johannes" to "Johanns" (Transcription error) |
| 108 | 25 | "in ulcerative colitis" to "of ulcerative colitis" (Clarification) |
| 121 | 8, 15, 17 | "Ochsenk hn" to "Ochsenkuhn" (Transcription error) |
| 122 | 17 | "Ochsenk hn" to "Ochsenkuhn" (Transcription error) |
| 123 | 11 | "Ochsenk hn" to "Ochsenkuhn" (Transcription error) |
| 126 | 10 | "Ochsenk hn" to "Ochsenkuhn" (Transcription error) |
| 131 | 4 | "Ochsenk hn" to "Ochsenkuhn" (Transcription error) |
| 185 | 2, 17 | "Ochsenk hn" to "Ochsenkuhn" (Transcription error) |
| 186 | 19 | "Ochsenk hn" to "Ochsenkuhn" (Transcription error) |
| 194 | 19 | "antidotal" to "anecdotal" (Transcription error) |

EXECUTED this 19th day of March 2025.

Colleen Marano