# Exhibit 100

## (Redacted)

COPY

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

----------------------------x

CAREFIRST OF MARYLAND, :
INC., GROUP HOSPITALIZATION:
and MEDICAL SERVICES, :
INC., CAREFIRST BLUECHOICE,:
INC., and CFA, LLC, d/b/a :
CAREFIRST ADMINISTRATORS, :
on behalf of themselves and:
all others similarly :
situated, :
Plaintiffs, :
v. : CIVIL ACTION NO.
JOHNSON & JOHNSON and : 2:23-cv-00629-JHW-LRL
Janssen Biotech, INC., :
Defendants. :

----------------------------x

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

30(b)(6) Videotaped Zoom Hybrid

Deposition of JOHNSON & JOHNSON/JANSSEN

through ERIC DICHTER, and in his personal capacity

Thursday, February 20, 2025

9:04 a.m.

BEFORE: Cassandra E. Ellis, RMR, RDR, CRR, RSA

A. This was yesterday.
Q. In the morning or the afternoon?
A. I don't recall, specifically.
Q. How long have you worked at J&J?
A. A little over 21 years.
Q. In the time period 2015 to the present, has J&J ever had anything in writing that addresses the topics in either topic 11 or topic 12?
A. There are internal procedures and checklists that exist.
Q. In writing?
A. I believe so, yeah.
Q. Please describe them.
A. I have a general understanding of them and, essentially, they mostly relate to any new rules with respect to patents, patent rules.
Q. What do you mean?
A. If there are any new rules that impact these -- would impact our procedures, then we get writing from the departments. We have a rules committee, and they'll communicate any -- any changes in rules.
Q. Do you have a copy of the rules?
A. No, I don't.

Q. What role, if any, do the inventors have at J&J for determining what goes in, or what does not go in, the specification of an application?

MR. GORDON: Object to the form.

Go ahead.

A. The inventors do not have a role of determining what goes in specification. They provide information to the patent attorney or patent agent, and we make that determination.

Q. The "we" there being the -- the lawyer?

A. Correct.

Q. Or maybe the lawyer and patent agent? Excuse me.

A. Yes.

Q. What role, if any, do the inventors have at J&J for determining what goes into the materials that are included in an information disclosure statement, an IDS?

MR. GORDON: Object to the form.

A. The inventor does not have a role in determining. They'll provide information they're aware of to the patent attorney, patent agents, paralegal, and we'll determine --

A. The patent, the -- I don't know the number off the top of my head, but the patent, I think it's the '307 patent or --

Q. That is the number.

A. Okay.

The patent prosecutions and patent prosecution documents, and some related clinical -- clinical documents.

Q. Okay. Anything else refresh your memory about things that had happened in the past?

A. Any other documents or any other --

Q. Documents.

A. Only a few reports that are -- a few reports and presentations I reviewed.

Q. Reports like what?

A. Internal R&D reports and documents.

Q. Okay. Now, when did you first have job responsibilities at J&J that related to Stelara?

A. It started sometime in 2004, soon after I joined the company.

Q. And what was your responsibility?

A. I was the patent attorney that supports the product or -- am -- was and am the

patent attorney that primarily supports the product.

Q. Are there any other attorneys at J&J that support Stelara in the IP department?

A. Not that support the prosecution and patent -- maintenance patents, patents -- basic patent prosecution filing and those tasks, no, just me.

Q. Who is your supervisor?

A. At what time?

Q. At the timeframe 2015 to the present.

A. I believe in 2015 my supervisor was Ken Dow, and then at some point, in the next few years, my supervisor was Brian Carey. And then I believe in 2020 my supervisor became Melissa Miller. And my present supervisor, as of the last six months or so, is Eve Frank.

Q. Okay. Now, what responsibilities, if any, did Dow, Carey, Miller and/or Frank, have with respect to reviewing filings that you were preparing and making with the United States patent office regarding Stelara ustekinumab?

A. They didn't have any responsibilities for that.

been any other patent agents who have worked with you in connection with ustekinumab or Stelara patent prosecution matters?

A. Ken Singleton may have, until he retired.

Q. What responsibilities, if any, did Mr. Ralat and/or Mr. Singleton have with respect to researching prior art in connection with ustekinumab?

A. They did not have any specific responsibilities to research prior art.

Q. Okay. Did they have any responsibilities with respect to the drafting of any documents in connection with patent prosecutions for ustekinumab?

A. They would perform some drafting for my review.

Q. For the time period then, from 2015 to the present, is it fair to say that you, personally, and no other employee at J&J has had the responsibility for approving the filing of documents with the United States Patent Office for ustekinumab?

A. Yes, I think that's correct.

MR. SOBOL: Let's go to tab 504,

which we'll mark as Exhibit 291.

MS. KHAN: It's already marked as 191.

MS. OGNIBENE: This has been previously marked.

MR. SOBOL: We won't mark it as 2891 because I've been told that it was previously marked as what?

MS. KHAN: It was 191 previously.

MR. SOBOL: 191?

MS. KHAN: Yep.

MR. SOBOL: Put a 191 on that, please.

(Previous Exhibit No. PX00191 was identified for record.)

BY MR. SOBOL:

Q. I placed the document before you, who is Pascale Marty-Ethgen?

A. She used to work at Janssen and used to be the compound development team leader for Stelara.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

MR. SOBOL: Okay. Let's go off the record.

THE VIDEOGRAPHER: The time is now 10:22.

We're off the record.

(Recess.)

THE VIDEOGRAPHER: The time is now 10:42.

We're back on the record.

BY MR. SOBOL:

Q. I'm going to be going through a series of patent applications with you, sir. This will not be eventful, I think, for a bit, but I want to make sure we get some particular facts on the record, okay?

A. Okay.

MR. SOBOL: Let's go to tab 28, which has previously been marked as Exhibit 197.

(Previously marked Exhibit No. PX00197 was identified for the record.)

BY MR. SOBOL:

Q. Do you have the document before you?

A. I do.

Q. You'll see that this is application '501, dated September 24, 2018; correct?

A. Yes, that's correct.

Q. This is the first in the series of applications that led to the '307 patent; correct?

A. I don't know that, off the top of

my head. I'd have to look at the '307 patent to confirm that.

Q. Okay. Well, if you turn three pages in, PDF 3, you'll see there's a listing of inventors, there are five inventors, Johannes, Li, Marano, Strauss and Zhang?

A. I see that, yes.

Q. And then, if you go a few more pages in, you'll see that there's an abstract at page 4 of the PDF?

A. Should I be looking online or at the hard copy?

Q. If you look online you should be able to see it there's an abstract.

A. Yeah, I see it online, yes.

Q. Okay. And this looks consistent with the abstract applications, plural, that were being filed in connection with what ended up being the '307 patent; correct?

MR. GORDON: Object to the form.

A. I don't know. I would have to check the abstracts of the other documents.

Q. Okay. If we go to PDF 9, you'll see that there's a sequence listing, a field of the invention, and then a background of the

invention; correct?

A. On screen, I see a background. I see part of a background of the invention on the screen.

Q. Yes, this is the first page of the --

A. In reference to a sequence, this is not a sequence listing, just a reference to a sequence listing, yes.

Q. Fair enough.

This is about nine pages in on the paper document, if you'd like to orient yourself, also, to the paper document

A. Okay.

[redacted]

[redacted]

Q. And what research, if any, did you and/or Mr. Ralat undertake in order to determine whether it was consistent with your understanding of these topics?

A. I'm not aware of what Mr. Ralat did or any research that he did, I'm not aware that he did any research, and I did not do any research.

MR. SOBOL: Let's go to tab 29, please, which we'll have marked as the next deposition exhibit.

will identify later, this is the beginning of an office communication dated July 16, 2020; correct?

A. Yes, this looks like the cover page for office action from July 16, 2020.

Q. Okay.

MR. GORDON: Can I just ask a question, before you go to the next question? In terms of the record that goes with the transcript, are we going to keep in the -- the tabs?

MR. SOBOL: Yes.

MR. GORDON: So I think, yeah, I think we should have tabs and not Post-Its --

MR. SOBOL: Yeah.

MR. GORDON: -- in the final transcript.

MR. SOBOL: Yeah, that's what I meant. We'll make a record of that later.

MR. GORDON: Okay. Yeah.

BY MR. SOBOL:

Q. So this is the cover page for an office action dated July 16, 2020; correct?

A. Yes.

Q. And the -- the office action is a

rejection of all claims, 1 through 33; correct?
A. The office action objects to certain claims and rejects certain claims. I'd have to refresh to look through as to which claims are rejected.
Q. Okay.
A. But yes, all -- all claims 1 through 33 were rejected.
Q. If you turn to page 6, in the upper right-hand corner of the office action summary, and then the detailed action sheet, page 6 in the upper right-hand corner?
A. Yes.
Q. And here it indicates that claims 1 through 33 were rejected under 102A1; correct?
A. Yes.
Q. And there's a reference to a CT cite; correct?
A. Yes, a clinicaltrials.gov citation.
Q. And what was that?
A. The -- the reject -- this rejection has it in shorthand, so I need to go back to where it was first introduced in the office action, to comment, if I can find that.
I believe I know what it is, but I

just want to verify, because there's no citation in the rejection of what clinicaltrials.gov is.

It's 72 -- 7236 is the citation that was on the sheet the examiner provided, but I don't see a copy of it, so I want to be sure what I'm commenting on.

Q. Okay. Have you found the page that you were looking for?

A. I found the citation to it, but I don't have a copy of the CT.gov citation, so I can answer based on what I think it is, but I don't have the citation.

Q. Okay. When you say you don't have the citation, you mean you don't have a physical copy of it, like it wasn't in the file, is that what you mean, or what are you saying?

A. Before me now there's no -- there's no document with the content of that CT.gov citation in the rejection.

Excuse me.

Q. Correct. So what is it that you believe that this is?

A. I believe that it's a clinical trial posting of the ustekinumab trial in ulcerative colitis prior to the trial being

carried out. There's -- there's typically a posting of trials on clinicaltrials.gov website.

Q. Okay. What research, if any, had you done regarding the existence of a clinical trial posting for ustekinumab that existed before you filed the September 2018 provisional application?

A. I don't recall having done any research on that.

Q. What about Mr. Ralat or anyone else at J&J?

A. I'm not aware of anyone else having done that type of research.

Q. If you go two more pages in, or one more page in, I think, do you have a notice of references cited?

A. I do.

Q. Okay. And you'll see that in the notice of references cited, down at the bottom, the examiner under V, letter V, Victor, has a website identification there; correct?

A. Yes, I see that.

Q. And it appears that the examiner accessed this site on or about July 13, 2020; correct?

A. That's what it says in the record, yes.

Q. Had you done any internet search for clinical trials that existed in public postings before the September 2018 application was filed?

A. I don't recall having done any research like that.

Q. Okay. If we can put this document aside for a bit.

In this time period then, of July of 2020, when you received this rejection from the patent examiner, what, if anything, did you do in response to the rejection?

A. I read the entire office action, and I formulated a proposed response, and at some point talked to the examiner, as is common practice when we get an office action or rejection, to discuss with the examiner the merits of the action and discuss the invention.

Q. Okay. Now, at this time, in the summer of 2020, were you working on something called the Stelara loss of exclusivity summit?

A. I don't recall working on it in the summer of 2020.

MR. SOBOL: Okay. Let's go off the record.

THE VIDEOGRAPHER: The time is now 11:35.

We're off the record.

(Recess.)

THE VIDEOGRAPHER: The time is now 12:01.

We're back on the record.

BY MR. SOBOL:

Q. During the breaks, during the day today, have you discussed your testimony with counsel?

A. No, I haven't.

Q. Some follow-up questions regarding the lawsuit that was filed by J&J against Amgen.

I know that you've indicated that you weren't involved in connection with the Momenta patents and the litigation, were you involved at all regarding the '307 patent and the filing of the litigation against Amgen?

A. I was not involved in a litigation decision. Obviously I was aware of the '307 patent because I prosecuted it.

Q. Do you have any role, other than

years, during those six years you were responsible for, if I understand it correctly, prosecuting the patent applications in connection with Stelara; is that right?

A. That's correct.

Q. A drug product; correct?

A. An antibody biologic product, yes.

Q. All right. And how many -- how often would you look to see if the federal circuit has made decisions in connection with pharmaceutical products during that six years, from 2012 to 2018?

A. I don't know how often, periodically I would get updates from e-mails from various sources, internal and external.

Q. Okay. Now, before September of 2018, had you ever filed a patent application in connection with an invention that related to a Phase III clinical study?

A. I'm not -- I don't think I had, I don't know for sure, because I have filed on other clinical trials, but not -- probably not a Phase III at that date.

Q. Before you filed the first application, in September 2018, regarding the

Phase III clinical study of Stelara in ulcerative colitis, what, if anything, did you do to familiarize yourself with the law that applied to the disclosure of clinical studies?

A. I did not do anything, specifically, because I was generally familiar with how to file patent applications on various subject matters related to pharmaceuticals biotech products.

Q. So you assumed you knew everything you needed to know?

MR. GORDON: Object to the form.

A. I believed that I had the foundation to make a filing of that sort on clinical trials.

Q. Is there any other lawyer in the -- I can't remember how many it was, but I guess 50 to 70 in the US group lawyer at J&J in the IP department that is familiar with the decisions of the federal circuit regarding the disclosure of clinical studies prior to the filing of a patent application?

MR. GORDON: Object to the form, calls for speculation.

A. I don't know who was familiar with

A. It was -- it would periodically you would talk to your colleagues about what was happening, but not often the substance of what you're doing, more in general terms of what projects you were handling.

Q. So in August or September of 2018, in connection with the Stelara application that you were filing, did you ask anybody about whether there was any kind of facts or law that you should be aware of, familiar with, when filing an application in connection with the results of a Phase III clinical trial?

MR. GORDON: I'm going to object and just instruct the witness, you can answer that question yes or no, but don't recall -- don't disclose the substance of any communications, if they occurred.

(Instruction)

A. I don't recall talking to anybody about that.

Q. Okay. Since the time that you looked at this IPR, have you gone back and read in re Montgomery?

A. I don't know the in re Montgomery cite by its -- by its federal circuit citation

Q. Did you report the results of your interview to anyone at J&J?

A. I don't recall, specifically. I could have discussed it with my boss, but I don't recall specifically that I did.

Q. Do you recall generally whether you did?

A. No, I don't.

Q. Now, looking at the exhibit that's before you, and the applicant-initiated interview summary, this is a document that's prepared by the examiner; correct, not -- not by you?

A. That is correct.

Q. And here there's a statement, Mr. Dichter discussed the CT reference and suggested the addition of various endpoints, that is -- excuse me, let me start this again.

Mr. Dichter discussed the CT reference, and suggested the addition of various endpoints to, for example, claim one, in order to obviate the reference, that's what this says; correct?

A. Yes, that's what it says.

Q. Do you recall doing that?

A. I recall generally discussing the cited reference, the CT.gov reference.
Q. And what is it that you told the examiner?
A. I don't recall exactly what I told the examiner.
Q. What, generally, did you tell him?
A. I recall discussing the CT reference, the clinical posting, and differentiating claim elements from that reference.
Q. So what did you say --
A. I don't recall.
Q. -- to the examiner?
A. I don't recall specifically.
Q. What do you recall generally having told him?
A. I recall discussing the elements, what -- what was in the CT reference and what was in the claims, and how the claims would have been allowable in view of the CT reference.
Q. And how would -- how would it be allowable in light of the CT reference?
A. That the claims would be novel and non-obvious in light -- in -- in view -- even in

view of the CT reference.

Q. How so?

A. That the CT reference would not anticipate or render obvious the subject matter of the claims.

Q. Why?

A. Because the CT reference would not anticipate the subject matter of the claims or render the claims obvious.

Q. So are those the words you would have used, and no other words?

A. It's possible I could have used other words, but those are generally the words I would use.

Q. So what is it about the claims that makes them novel or -- well, novel or not obvious, given the CT reference?

A. The claims have elements in them that are not -- that are novel and not obvious. I -- I would have to go through the claims to explain it.

Q. Well, is it because the results of the Phase III study were now in the claims, themselves?

A. The achievement of endpoints

recited in the claims would -- would now be in the claims, and that was one differentiating factor, yes.

Q. And how would that differentiate it?

A. Because the CT reference or the CT.gov reference did not disclose that patients in the trial would satisfy those clinical endpoints for ulcerative colitis.

Q. Now, it's written here by the examiner, in the next sentence: It was generally argued that while the CT reference may suggest various endpoints, given the nature of Phase III clinical trials it would not have been obvious that the endpoints would have been met by the claimed antibody, nor would a specific patient population defined by such endpoints, be anticipated.

That's what's written here; correct?

A. Yes.

Q. Is that what you told the examiner back then?

A. I don't recall specifically using those words, but that's along the lines of what

attributable to each -- each person, but it could have been any of the three groups of people.

Q. Well, I guess my question is: Do you know where these references came from?

A. I know that as a collective they came from the inventors, my own knowledge, or Dr. Ralat's knowledge or information provided to him.

Q. And what purpose or purposes were being served by providing these citations in this IDS?

A. The purpose was to disclose references that we were aware of to the examiner in this prosecution.

Q. And how did you become aware of them?

A. Some we were notified -- some were provided by inventors, some we were aware of in our workings in the area, over years, and some from Dr. Ralat and his -- his -- his information that he received.

Q. Over what period of time was this IDS prepared?

A. Probably compiled over a few

months.

Q. What role or Obli- -- excuse me, strike that.

What obligation, if any, did the inventors have to provide information in connection with this IDS?

A. The inventors were -- the inventors provided references that they're aware of, and we took the information and put it in the IDS, to reference it in the IDS.

Q. So is that something that happened at the -- at the initial filing of the application, back in September or so of 2018 or is it your testimony that, no, between July and October of 2020 you or Mr. Ralat went back to the inventors and asked them to update their research and provide new citations?

A. References could be compiled over a long -- long -- a period longer than a few months, and it was just a matter of compiling them and filing the IDS. So I don't know the period, here. I don't recall asking the -- asking the inventors again, in this time period, for references.

Q. Now, what criteria or criterion do

you use to determine whether the reference qualifies as being sufficiently relevant to make its way into the IDS?

A. I rely on the inventors, what they tell me, and patent agent, Dr. Ralat, and my own experience in the field. And I will cite anything that could potentially be relevant to the examination of the application.

Q. And so is it your understanding that you are to cite anything that potentially could be relevant to the examination of the application?

MR. GORDON: Object to the form, misstates the testimony.

A. My practice is to file anything that could be potentially relevant, that's not my obligation.

Q. Okay. If you go to the second page, and you go seven items down?

A. Second page of the IDS?

Q. Yes.

A. Yes.

Q. There is the citation to an NCT relating to lupus and the use of ustekinumab; correct?

A. Seventh entry on which page, are we talking about sheet --

Q. Second page.

A. Sheet one, sheet two, second page of the filing?

Q. Sheet two.

A. Okay. Seventh --

Q. Eighth, sorry, eighth, eight down.

A. Okay. Okay. I see the reference cited, the citation.

Q. Okay. That's to a protocol for undertaking a study of ustekinumab for lupus; correct?

A. Yes, that's what appears to be.

Q. Okay. Now, this application was for -- that related to the use of ustekinumab in ulcerative colitis; correct?

A. Correct.

Q. Why didn't you include the protocol for that?

MR. GORDON: Object to the form, misleads the witness, misstates the document, because it's right there.

A. I believe the protocol was cited and part of the application.

Q. Where is the protocol cited?
A. I believe it's the reference above the one you pointed to.
Q. So you think that's the protocol?
A. Well, the -- I would have to look at the reference to see, but that could be the protocol or it could be another document that's listed, but I believe that it was -- it was cited and part of the application, itself.
Q. Well, is there any other place that you would you go to for the belief that the protocol, itself, was cited to the examiner?
A. I would look on the face of the patent to see what was cited.
Q. Right. Now, you recall that the Phase III study was conducted in the years that preceded 2017, it was conducted during 2015 and 2016; is that correct?
A. I don't know when the Phase III study was -- was conducted.
Q. Okay. Do you know that the protocol was negotiated with the FDA in early 2015 and signed in the middle of 2015?
A. I'm not aware of the timelines.
Q. All right.

A. No.
Q. After the study was conducted after the results of the induction phase, and the maintenance phase came through, some folks at J&J got together and drafted an article about the results from the Phase III study; did you know about that?
A. I know about an article reporting the Phase III study, yes.
Q. Okay. And isn't the item that's immediately above the lupus protocol a draft of the article that was going to be published in the medical journal?
A. It could have -- it could be, I couldn't know for sure without looking at publications, though.
Q. Did you ever see the protocol for the Phase III clinical trial of Stelara and ulcerative colitis?
A. Yes, I did.
Q. You read it?
A. I read through it, yeah.
Q. And when?
A. I don't know the exact timeline, but prior to filing the -- this patent

application, the first provisional.

Q. So you had somewhere handed to you the protocol?

A. I had reviewed it at one point, yes.

MR. SOBOL: Let's go to tab 14, which has previously been marked as Exhibit 49.

(Previously marked Exhibit No. PX0049 was identified for the record.)

BY MR. SOBOL:

Q. I put before you what's been marked as Exhibit 49.

This has been the subject of testimony by other witnesses. You'll see that Dr. Marano and Doctor -- Mr. O'Brien are mentioned on the first page, but if you turn to the second page you'll see that there's the title page for the Unifi Phase III study of Stelara in ulcerative colitis, the protocol; do you see that?

A. I do.

Q. And this is a copy of the protocol that you had in your files prior to the time that the applications were filed in connection with the -- the patents for Stelara in the use

of UC; correct?

A. Yes, I had access to it.

Q. And you had read it before you filed the applications; correct?

A. I had read -- yes, I had gone through it, I read portions of it, in more detail than others, but I had read it, yeah.

Q. Okay. Have you read some of the scientific briefings that occurred in and or around the time that preceded the protocol that were made with the FDA?

A. I'm not sure what -- to what you are referring to, scientific briefs, that term doesn't mean anything to me.

Q. Sure. Turn to the Bates page on the document, right in front of you, 8268.

A. Yes, I'm there.

[redacted]

Q. Now, there's a sentence in here that reads as follows: Due to the uncertainty of clinical outcomes, and the failure of numerous medicines to satisfy designated clinical trial endpoints, the posting of elements of a clinical trial in advance of conduct of the trial do not anticipate or render obvious the subject matter of the claims.

Did I read that correctly?

A. Yes, I think so.

Q. Did you write that?

A. I wrote that sentence, yeah.

Q. What research did you conduct before you stated that to the examiner?

A. I relied on my knowledge of the field, from having worked in this area for a number of years.

Q. Did you do anything else?

A. I don't recall having done anything else.

Q. Did you look at the protocol?

A. I don't remember looking at the protocol for responding to this action.

Q. Did you speak to any one of the eight inventors?

in the same paragraph. You read that citation in this document; correct?

A. Yes, I did.

Q. Did you go back and look at that case?

A. I did not.

Q. Were you familiar with it before?

A. Generally, yes. Generally, yes.

Q. If you'll look at the middle of page 7, you'll also see a capital C, where the examiner rejects all 19 claims under 103 as unpatentable over the clinicaltrials.gov in view of Ochsenkuhn; correct?

A. Yes, I see the rejection, it's in -- it's over the clinicaltrials.gov in view of Ochsenkuhn and the Stelara label.

Q. Okay. And have you read the Ochsenkuhn reference?

A. Yes, I'm familiar with it.

Q. And since when?

A. Since it was identified to me during whatever legal proceeding it was cited and identified to me.

Q. Okay. And when it was first identified to you, you decided that it was

worthy of being put in an IDS before the patent office in connection with these applications; correct?

MR. GORDON: Object to the form.

A. I put it in the IDS filed in this application, yes.

Q. Because it was relevant; correct?

MR. GORDON: Object to the form.

A. I didn't make a determination of the relevance. My practice is to be overinclusive and cite anything that could possibly be relevant.

Q. And so if it had been brought to your attention before you would have included it earlier?

MR. GORDON: Object to the form.

A. Perhaps, yes.

MR. SOBOL: Okay. Let's go off the record.

THE VIDEOGRAPHER: The time -- the time is now 3:08.

We're off the record

(Recess.)

THE VIDEOGRAPHER: The time is now 3:26.

supervisor, Mr. Carey or Dr. Miller, at any time, they did not supervise your filing of those; correct?

A. That's correct.

Q. And if I understand it correctly, there were several score or thereabouts lawyers in the IP US group of Johnson & Johnson; correct?

A. I'm sorry, can you repeat your question.

Q. Sure. There were 50 or 70 lawyers in the US group of the IP department of J&J; correct?

A. Yes, this -- and they handled both pharmaceutical and medical device med tech.

Q. Okay. You could have reached out to any one or more of them, at any point, regarding a factual or a legal question regarding the prosecution of these applications that led to the '307, you could have done that; correct?

A. I -- I could have reached out to any of my colleagues, yes.

Q. But you did not, with respect to the prosecution of these applications, you did

it on your own; correct?

A. That's correct.

Q. And if I understand it correctly, during your prosecution of these applications, the applications dealt with a Phase III study that had been conducted in Stelara for ulcerative colitis; correct?

A. Yes, that was the subject matter.

Q. Okay. And if I understand it, at no time did you reach out to anybody to find out what anybody else at J&J had said to the FDA about that study; correct?

A. That's correct.

Q. Okay. You didn't contact any of the inventors regarding that subject; correct?

A. That's correct.

Q. Not Mr. Johannes, or Li, Marano, Strauss, Zhang, O'Brien, Adedokun -- I'll say this wrong -- Adedokun, Joe Adedokun, and Shields-Tuttle; right? You didn't speak to any of them about what had been told the FD- -- to the FDA about the Phase III study; correct?

A. That's correct.

Q. You -- were you even aware that the Phase III study was a direct-to-phase that they

had skipped the Phase II process?

A. Yes.

MR. GORDON: Objection to form. Object to the form.

Go ahead.

A. Yes, I was aware of that.

Q. Okay. Now, if I also understand your testimony here today, the inventors did not have any kind of ongoing obligation to provide you relevant literature in connection with the prosecution of these applications; is that correct?

MR. GORDON: Object to the form, misstates prior testimony.

A. The inventors were told -- were asked to provide informa -- references relevant to the invention at -- at -- at a certain time or times during the prosecution, but I'm not speaking -- I don't know about their -- what you're talking about with respect to their obligation.

Q. Well, they were asked information at the beginning of the process; correct?

A. Yes.

Q. Right. And they weren't -- you

MR. GORDON: Object to the form, calls for speculation.

A. My paralegal would have reached out at my suggestion.

Q. You testified earlier that you did review the protocol for the Phase III study; correct?

A. Yes, the Phase III ulcerative colitis ustekinumab study, yes.

Q. And are you aware of a -- of a patent practice, a patent office practice, some guidance that suggests making sure that information that's provided to the FDA is consistent -- excuse me -- information that's provided to the PTO is consistent with the information that's being provided to the FDA, are you familiar with that?

A. I'm aware of some guidance or commentary on that, yes.

Q. What actions, if any, did you take to ensure that you complied with that in connection with the applications that led to the '307?

A. I didn't take any specific actions. I -- I had read the protocol and I handled the

prosecution of the application.

Q. When you were prosecuting these patent applications that led to the '307 did you ever ask your supervisor, Mr. Carey, for information that might be useful in connection with this matter?

A. No, I don't recall doing that.

Q. Did ask you Dr. Miller, your supervisor for a different period?

A. I don't recall doing that.

Q. Austin Clayton?

A. No, I didn't ask Austin. He's not a patent attorney. I didn't ask Austin Clayton.

Q. Okay. Jen De Camara?

A. No, I didn't ask Jen De Camara.

Q. Denise DeFranco?

A. No, I didn't ask Denise.

Q. Ken Singleton?

A. No, I didn't ask him.

Q. You did ask or rely upon Luis Ralat; correct?

MR. GORDON: Object to the form.

A. Luis Ralat assisted in the drafting of the provisional application and collecting information, so I relied on him for that, yes.

ERRATA TO DEPOSITION OF: Eric Dichter

DATE OF DEPOSITION: February 20, 2025

CASE: *CareFirst Group of Maryland, Inc., et al. -v- Johnson & Johnson et al.*

The following are the corrections I have made to my deposition transcript:

| Page | Line | Correction/Change and Reason |
|---|---|---|
| 33 | 6 | "and patent – maintenance patents, patents –" to "of and maintenance of patents" – clarification |
| 35 | 8 | "Tom" to "Tong" – mistranscription |
| 54 | 25 | "bring" to "bringing" – clarification |
| 93 | 12 | "filed and protected" to "filed for protection" – clarification |
| 117 | 21 | "Dr. Miller?" to "Dr. Miller." – clarification |
| 122 | 12 | "period." to "period?" – clarification |
| 148 | 4 | "in the examiner" to "with the examiner" – clarification |
| 149 | 8 | "may have been draft" to "may have been drafting" – clarification |
| 151 | 15 | "a clinic - - a posting" to "a clinical posting" – clarification |
| 156 | 10 | "on patent invention or" to "on a patent, invention, or" – clarification |
| 157 | 14 | "participation" to "anticipation" – clarification |
| 175 | 13 | "Ochsenkuhn" to "Ochsenkühn" – correct spelling |
| 199 | 22 | "Ochsenkuhn" to "Ochsenkühn" – correct spelling<br>"distinguish the nature" to "distinguish. The nature" – clarification |

EXECUTED this 12th day of March 2025.

Eric Dichter