# Exhibit 105

## (Redacted)

Case 2:23-cv-00629-JKW-LRL   Document 530-12   Filed 09/17/25   Page 2 of 58
PageID# 27407

***HIGHLY CONFIDENTIAL***
***ATTORNEYS' EYES ONLY***

**ORIGINAL**

- - -

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

```
------------------------------x
CAREFIRST OF MARYLAND,        : CIVIL ACTION NO.
INC., GROUP HOSPITALIZATION   : 2:23-cv-00629-JKW-LRL
AND MEDICAL SERVICES, INC.,   :
and CAREFIRST BLUECHOICE,     :
INC., on behalf of            :
themselves and all others     :
similarly situated,           :
        Plaintiff(s),         :
                              :
        v.                    :
                              :
JOHNSON & JOHNSON and         :
JANSSEN BIOTECH, INC.,        :
        Defendant(s).         :
------------------------------x
```

- - -
May 14, 2025
- - -

Video-Teleconferenced/Videotaped Deposition

of LUIS A. RALAT, Ph.D., held at the law offices

of DECHERT LLP, Cira Centre, 2929 Arch Street,

Philadelphia, PA 19104, beginning at 9:03 a.m.,

on the above date, before Denise D. Bach, a

Registered Professional Reporter, Certified

Court Reporter, License No. XI0003990, and

Notary Public, PA, NJ, DE & NY.


BLUEBEAR JOB NO. 2257

5/14/2025
Luis Ralat, Ph.D.                    Highly Confidential Attorneys' Eyes Only                    Page: 22

a bar and I am not certified by the American Bar Association for any state to practice law.

Q.    Okay.  So, the patent bar that you're talking about to become a patent agent is different from the bar that you take to become a lawyer.

Is that right?

A.    Yes.

Q.    Okay.  And you took and passed the patent bar in 2014?

A.    Yes.

Q.    How many times did you take the exam?

A.    Two times.

Q.    Did you become a patent agent while you were at Johnson & Johnson?

A.    Yes.

Q.    Have you worked anywhere other than Johnson & Johnson since becoming a patent agent?

A.    No.

Q.    In 2018, you were a patent manager at J&J, that was your title.

Right?

A.    Yes.

DR. ANTONS:  Objection to form.

THE WITNESS:  I mean, for -- if you're looking -- if your question is in general, any search matters.

BY MS. OGNIBENE:

Q.    Okay.  And what --

A.    It doesn't, it doesn't, it doesn't mat -- it doesn't have to have a name of calling it an invalidity search or freedom to operate search.  If you're truly interested in understanding the, you know, the patentability of something, you don't have to be even a patent agent, you can just go and Google and search the technology and see whether it's already being practiced somewhere.

So, I, I don't know that it needs to have a name.

Q.    In the 2018, 2019 time period when you were a patent agent at J&J, what was your personal practice in deciding whether or not to run any kind of search in the patent drafting process?

DR. ANTONS:  Objection to form, and that's getting into privileged information. I'm going to instruct you not to answer.

MS. OGNIBENE:  On what basis?

DR. ANTONS:  You asked what his decision is, decision in deciding whether or not to run a patent drafting process.  That's asking for his work product as a patent agent, which is privileged.

BY MS. OGNIBENE:

Q.    Who decides whether or not any kind of searches are done in the process of patent drafting?

A.    The attorney that I work with makes -- so, I work under the direction of an attorney.  I don't have decision-making power to say, we're going to do this or we're going to do that.

If I am asked to do a patentability search, I will do it.  If I am asked to do a freedom to operate search, I will do that.  If I'm pulled into a due diligence, I will do that.

So, I don't have a say as to this is what I will do or not do.

Q.    So, if you're helping draft a patent application, you may not run searches on your own, you need approval from the prosecuting

Luis Ralat, Ph.D.

attorney?

A.    I can make recommendations, but the direction would come from the attorney I'm supporting.

Q.    Okay.  So, unless you're specifically asked or get approval to a request to run a specific search, you don't run it.

Is that right?

DR. ANTONS:  You can answer that question "yes" or "no."

THE WITNESS:  If -- can you repeat the question?

BY MS. OGNIBENE:

Q.    Sure.  So, unless you're specifically asked or you get approval to a request to run a search in the process of drafting a patent, you don't do it?

DR. ANTONS:  Objection to form.

THE WITNESS:  No.  Again, if you remember earlier, I said I have about 12 applications a year.  That's not counting freedom to operate work that I have to do, due diligence work.  I am part of some committees. Also volunteer work within and out -- within and outside of J&J.

So, if I -- I have a lot on my plate, so, no, I have enough to fill my time to run a patent -- to go and run a patentability search that I wasn't requested to run.

BY MS. OGNIBENE:

Q.    Okay.  So, in all instances, the decision is made by the attorney.

Is that right?

A.    I think so, yes.

Q.    Once a decision to run a patentability search, for example, is made, what was your role in conducting the search?

A.    If the answer -- if the attorney tells me, you need to run a patentability search, what do I do?  Is that your question?

Q.    Uh-huh.

DR. ANTONS:  And I'm going to instruct the witness not to answer that on the basis of privilege.

MS. OGNIBENE:  And what's the basis of your privilege claim?

DR. ANTONS:  He just said an attorney would tell him what to do, and you're asking him what he's doing in response to that instruction.

BlueBear Reporting LLC

understand by material?

BY MS. OGNIBENE:

Q.      Uh-huh.

A.      What I understand as material is information that the patent office -- would be important for the patent office to use to evaluate the patentability of an application.

Q.      Who decides whether or not something is material for purposes of including it in the IDS?

A.      The attorney.

Q.      What role do you play in deciding whether or not something is included in an IDS?

A.      I don't play a role.  That is the attorney's decision.

Q.      Do you make recommendations?

DR. ANTONS:  You can answer that "yes" or "no."

THE WITNESS:  I'm trying to think. Make sure that I'm accurate.

Yes.

BY MS. OGNIBENE:

Q.      And so how do you decide in making your recommendations what might be important to the patent office?

Luis Ralat, Ph.D.                    Highly Confidential Attorneys' Eyes Only                    Page: 74

DR. ANTONS:  Objection.  Calls for a legal conclusion and is seeking mental decision-making process of the patent agent.

I'm going to instruct you not to answer.

MS. OGNIBENE:  What's the basis?

DR. ANTONS:  You're asking him how he makes his decision in what might be important to the patent office.

BY MS. OGNIBENE:

Q.    Dr. Ralat, do you understand that companies like J&J have a duty to disclose material references in an IDS?

A.    Yes.

Q.    Do you have that duty?

DR. ANTONS:  Objection to form.

THE WITNESS:  Could you be explicit as to what you mean, duty, in what circumstance do you mean?

BY MS. OGNIBENE:

Q.    Sure.

So, if you're making recommendations about what to include in the IDS as a part of the patent prosecution process, do you have any duties to the PTO in that process?

DR. ANTONS:  Objection to form.

THE WITNESS:  If I'm understanding your question correctly, yes.

BY MS. OGNIBENE:

Q.      And what is your duty?

A.      To disclose all potentially material references to the patent office for their review.

Q.      And when you say, I consider it to be potentially material if it's important to the patent office, what do you mean by "important"? How are you using that word?

A.      Did I use that word?

Q.      Yes.

A.      Then strike that.

Any reference that is potentially material for the patent office to review.

Q.      And how are you using the word "potentially material"?  How would you explain that to the jury?

DR. ANTONS:  And I'm going to caution the witness, to the -- you can only answer that to the extent you have an understanding independent of what you have learned through attorney-client communications.

Luis Ralat, Ph.D.
Highly Confidential - Attorneys' Eyes Only

that you wanted it to be -- that the goal was for it to be granted?

A.       Yes.

DR. ANTONS:  Objection to form.

THE WITNESS:  The goal -- I think any goal of a patent application is to eventually obtain a patent.

BY MS. OGNIBENE:

Q.       Okay.  And to obtain a patent, J&J had to prove that the claimed invention, that the use of Stelara to treat ulcerative colitis was new or novel.

Is that right?

DR. ANTONS:  Objection to form. Lacks foundation.  Calls for a legal conclusion.

BY MS. OGNIBENE:

Q.       You can answer.

A.       So, in order to obtain the patent -- I'm sorry, could you repeat the question?

Q.       Sure.  And to obtain a patent, J&J had to show that the claimed invention, the use of Stelara to treat ulcerative colitis, was new or novel.

Correct?

BlueBear Reporting LLC

A.      To obtain a patent, you have to pass whatever the patent office and the laws are.

Q.      And being a patent agent and sitting for the patent bar, you understand that one of those requirements, among many, is that the claimed invention has to be novel or new.

Is that right?

DR. ANTONS:  Same objections.

THE WITNESS:  Yes.

BY MS. OGNIBENE:

Q.      Let's take a look at the provisional application for the use of Stelara to treat UC patents.  This is going to be Tab 28 and Exhibit 197.  This is a very large file so it's going to be on the computer in front of you.

(Discussion was held off the record.)

MS. OGNIBENE:  Anniliese, can you please make sure that Amanda and Judah both have access to the link.

(Discussion was held off the record.)

THE WITNESS:  So this thing says

Luis Ralat, Ph.D.                    Highly Confidential Attorneys' Eyes Only                    Page: 86

"Join Audio" and it's blocking my view.  Should I click on that?

MS. OGNIBENE:  No.

(Pause.)

BY MS. OGNIBENE:

Q.        And, Dr. Ralat, this is what we're talking about.  If any of it is not clear, if you can't see it, please just ask.

MS. OGNIBENE:  Kaelan, if you mind -- if you wouldn't mind making the filing date and the application number just a little bit bigger so that Dr. Ralat can see.

That's great.  Thanks, Kaelan.

BY MS. OGNIBENE:

Q.        So, the application number here is 62-735501.

Do you see that, Dr. Ralat?

A.        I do.

Q.        And the filing date is September 24th, 2018?

A.        Correct.

Q.        Are you familiar with this patent application?

DR. ANTONS:  And, Dr. Ralat, if you want to look at other pages of this

BlueBear Reporting LLC

document, not just the cover page, please feel

free to recommend they move the document.

THE WITNESS:  So, to be clear,

this cover page I never saw until yesterday when

counsel showed it to me.  So, I only worked in

the actual body of the application, not, not --

I never saw this cover page before until

yesterday.

BY MS. OGNIBENE:

Q.     Okay.  Are you familiar with the

501 application?

A.     Yes.

Q.     And this was the application that

you helped draft?

A.     Yes.

MS. OGNIBENE:  Okay.  If we could

go to the next page, Kaelan, and actually

page 3.  Thank you.  And if we could just make

that top like third of it maybe bigger so that

everybody can see.  Okay.

BY MS. OGNIBENE:

Q.     This says "Provisional Application

Cover Sheet."

Do you see that?

A.     Yes.

Luis Ralat, Ph.D.                    Highly Confidential Attorneys' Eyes Only                    Page: 88

Q.    And the docket number is JBI6010USPSP.

Do I have that right?

A.    Yeah, JBI6010USPSP.

Q.    You were much quicker at that than I am.

And what is a docket number?

A.    That is a internal matter number that we use.

Q.    Okay.  So that's a J&J number?

A.    That is a J&J number.

Q.    Okay.  And listed here is the inventor/applicants.

Do you see that?

A.    Yes.

Q.    And it lists Jewel Johanns, Katherine Li, Colleen Marano, Richard Strauss, and Hongyan Zhang.

Do you see that?

A.    I do see that.

Q.    Do you understand that those were, at this point, the claimed inventors of the UC for Stelara -- or Stelara for UC patent?

A.    Yes.

Q.    And the title is, "Safe and

Effective Method of Treating Ulcerative Colitis With Anti-IL-12/IL-23 Antibody."

Is that correct?

A.    I do see that.

Q.    And the reference to anti-IL-12/IL-23 antibody, do you understand that to be Stelara or ustekinumab?

A.    Yes.

MS. OGNIBENE:  Okay.  If we could turn, Kaelan, if you don't mind, to PDF page 9.

BY MS. OGNIBENE

Q.    Towards the bottom of this page, it says "Background of the Invention."

Do you see that, Dr. Ralat?

A.    You said page 9?

Q.    Yes.

A.    I see page 1.

Q.    Yeah, this is the right page.

A.    Oh, okay.  All right.

Q.    Yeah.  Do you see the background of the invention section in front of you?

A.    I do, yes.

Q.    Okay.  Did you write this background?

DR. ANTONS:  Object to form.

5/14/2025
Luis Ralat, Ph.D.                    Highly Confidential 2 74212eys' Eyes Only

THE WITNESS:  I drafted the application, which would include the background.

BY MS. OGNIBENE:

Q.      So you did write the background?

DR. ANTONS:  Object to form.

THE WITNESS:  Yes.

BY MS. OGNIBENE:

Q.      What resources did you use in writing the background of the invention section?

A.      Those that were provided by the inventors.

Q.      Okay.  Did you run any searches in preparing this application?

DR. ANTONS:  I am going to object on the basis of privilege and instruct the witness not to answer.

MS. OGNIBENE:  He can't answer "yes" or "no"?

DR. ANTONS:  You can answer "yes" or "no" to that question.

THE WITNESS:  Did I run any searches in preparation of this application?

BY MS. OGNIBENE:

Q.     Yes.

A.     I don't recall doing so.

Q.     Okay.  Besides talking to the inventors, did you talk to anyone else in drafting this application?

DR. ANTONS:  You can answer that question "yes" or "no."

THE WITNESS:  Yes.

BY MS. OGNIBENE:

Q.     Did you talk to anyone in R&D?

A.     No.

Q.     Did you talk to anyone in med affairs?

A.     No.

Q.     Did you talk to any, other than the inventors, any non-lawyers at J&J?

A.     No.

Q.     Other than, I'm assuming Mr. Dichter, did you talk to any in-house lawyers?

A.      No.

Q.      Did you talk to any outside lawyers?

A.      I don't recall doing so.

Q.      Outside of the listed inventors here and Dr. Dichter, did you have conversations with anyone else about the patent application?

A.      No.

Q.      And aside from the materials provided by the inventors, did you review anything else in drafting the background section?

DR. ANTONS:  You can answer that "yes" or "no."

THE WITNESS:  Did I review anything else other than the materials provided?

BY MS. OGNIBENE:

Q.      Yes.

A.      No.

Q.      For outside of the background section, for the rest of the patent application, did you review any materials other than what was provided by the inventors?

A.      I don't recall doing so.

Q.      Okay.  Did you write the claims?

A.    I drafted claims.  I don't recall if the way they look in their final form were as drafted or whether there were some amendments made by Eric.

Q.    When we're looking at the background section, so, for example, the first sentence at the end, it cites a couple of citations, it has Baumgart and Sandborn, Danese and Fiocchi, for example.

How did you select -- how did you find these sources?

A.    As provided by the scientists and clinicians.

Q.    Meaning the inventors?

A.    Yes, I think it was the inventors, but I -- at the time, they were just scientists. I didn't characterize them as inventors.

Q.    Right, right.  That's a disconnect between you and I.

Did you utilize any help from the medical writing group at J&J?

A.    No.

Q.    What role did Mr. Dichter have in drafting the application for the UC for -- Stelara for UC patent?

Q.    And you have a Ph.D.

Correct?

A.    I do.

Q.    What's your Ph.D. in?

A.    Biochemistry.

Q.    So, you would know good science much better than I.

Do you have any recollection about whether or not the UC for Stelara clinical trials were blinded?

A.    I -- after -- only after receiving the clinical trial did I know the -- what sort of study was conducted.

Q.    Okay.  And by receiving the clinical trial, do you mean the clinical trial protocol?

A.    The clinical trial protocol, yes.

Q.    And you received that during the drafting process?

A.    I did.

Q.    Do you recall when that was?

A.    I do not, but it was probably around the same 2018 period.

MS. OGNIBENE:  Okay.  So, let's take a look at Tab 1333, which we'll mark as

I'm so sorry, I skipped an important step here.

MS. OGNIBENE:  This will be Exhibit 405.

(Exhibit No. PX00405, J&J Clinical Protocol/UNIFI Study, Bates JNJ-STELARA_ 003705334-5481, was marked for identification.)

MS. OGNIBENE:  And, for the record, Exhibit 405 starts Bates JNJ-STELARA_003705334.

And if we can turn to the next page, Kaelan, if you don't mind, and if we could just, like, blow up the title so that everyone can see it, Kaelan, like, down to where it says ustekinumab, perhaps.  Yeah, that's perfect.

BY MS. OGNIBENE:

Q.    Dr. Ralat, this appears to be a J&J clinical protocol.

Do you see that?

A.    I do see that.

Q.    And it's a protocol for the Stelara for UC clinical study, also called the UNIFI study.

Do you see that?

A.    I do see that.

Q.    And underneath, it says

"Protocol," gives the number, Phase 3, Amendment 2.

Do you see that?

A.    I do see that.

Q.    Okay.

MS. OGNIBENE:  And if you can scroll down just a little bit, Kaelan if you don't mind.

BY MS. OGNIBENE:

Q.    The date here is April 20th, 2016.

Do you see that?

A.    What am I seeing again?

MS. OGNIBENE:  Can you scroll down a little bit more, Kaelan.  There we go.

BY MS. OGNIBENE:

Q.    Do you see it says "Status: Approved," and the date is April 20th, 2016.

A.    I do see that.

Q.    Okay.

MS. OGNIBENE:  And if we could switch, Kaelan, really quick over to the privilege log.  And, again, because the cover email is withheld, I'm just trying to orient us on where this document came from.

So, this is going to be the first

Luis Ralat, Ph.D.                    Highly Confidential - Attorneys' Eyes Only                    Page: 143

tab, Kaelan, the one ending 334, which is the
Bates number, and if we can please go to Row 6,
and if you could make that a little bit bigger
for Dr. Ralat.  Okay.

BY MS. OGNIBENE:

Q.     Do you see here, Dr. Ralat, that
that Bates number is the same as the document
that you have in front of you, the cover page
for the email?  It's not in front of you
anymore.

This is the Bates number from the
same document that we're looking at when we
slide back to it, you can confirm it ends in
334.

A.     Okay.

Q.     And under "To," "From" -- or "To,"
"Sender," it says Eric Dichter.

Do you see that?

A.     Yes.

Q.     And recipient is yourself?

A.     I see that.

Q.     And the date is 6/20/2018.

Do you see that as well?

A.     I do see that.

Q.     Okay.

MS. OGNIBENE:  And if we can scroll over, Kaelan.

BY MS. OGNIBENE:

Q.    The subject line says, "Forward: UNIFI Protocol and IP Unblinding."

Do you see that?

A.    I do see that.

Q.    Okay.  And you'll notice that this has an "FW" in front of it indicating that it was forwarded.

Correct?

A.    I do see that.

Q.    Okay.

MS. OGNIBENE:  Kaelan, if we could move all the way to the left and go back up to the top just so we can orient Dr. Ralat on who it was forwarded from.

BY MS. OGNIBENE:

Q.    Dr. Ralat, you see here in the top entry that the sender/author is Meredith Hans Moore?

A.    I see that.

Q.    And this document was sent to Eric Dichter, Ian Harris, and Colleen Marano.

Do you see that?

A.    I do see that.

Q.    And the created or sent date is June 19th, 2018, the day before it was forwarded to you.

Correct?

A.    I see that.

MS. OGNIBENE:  And if we can scroll over just a little bit.  Thank you, Kaelan.

BY MS. OGNIBENE:

Q.    And the subject file name is the same, correct, "UNIFI Protocol and IP Unblinding"?

A.    I see that.

Q.    Do you recognize that?  Okay.

I believe you testified earlier today that you weren't familiar or don't recall Mr. Harris's role or who he is.

Do I have that right?

A.    You do have that right.

Q.    Okay.  What about Ms. Marano?

A.    I also don't recall her role either.

Q.    And what about Ms. Hans Moore?

A.    I don't recall her role either.

Q.      Okay.

MS. OGNIBENE:  We can pop back over to the protocol, Kaelan, thank you so much.

BY MS. OGNIBENE:

Q.      Again, that was just to kind of get us oriented of how this document made its way to you.

So, in June of 2018, this April 2016 document was forwarded to you by your boss, Eric Dichter.

Is that right?

A.      Yes.  At the time he was not my boss.

Q.      Okay.  Your colleague, is that fair?

A.      Sure.

Q.      And Mr. Dichter, as you've testified, was running the IP, the patent submissions for the Stelara for UC efforts.

Correct?

A.      Yes, to the best of my knowledge, it looked like he was.

Q.      Okay.

MS. OGNIBENE:  If we could turn, Kaelan, if you don't mind, to PDF page 7.  And

clinicians were aiming to do was not conveyed to me.

BY MS. OGNIBENE:

Q.      Okay.  Did you understand more globally that this clinical trial was a part of J&J's efforts to obtain FDA approval for an ulcerative colitis indication for Stelara?

A.      I understand that.

███████████████████████████████████

Q.      Okay.

MS. OGNIBENE:  If we could take a look, Kaelan, at the third paragraph under "Synopsis."  If we could scoot over a little bit, unless it's just mine, I can't see.  There we go.

BY MS. OGNIBENE:

Q.      This third paragraph reads, "Data from completed Phase 2 studies of ustekinumab" -- which do you understand that to be Stelara?

A.      Yes.

Q.      -- "in Crohn's disease along with the shared biology and the similar response to current treatments between Crohn's disease and UC provide a substantial scientific and clinical rationale to justify a direct-to-Phase 3 approach to the study of ustekinumab in UC."

Is that correct?

A.      I do see that, yes.

Q.      Okay.  And if we move just further down the page, it says, "Objectives and Hypotheses."

Do you see that?

Luis Ralat, Ph.D.                    Highly Confidential Attorneys' Eyes Only

marked as Exhibit 406 and has been shared in the chat. This is also going to be electronic.

(Exhibit No. PX00406, J&J Clinical Protocol/UNIFI Study, Bates JNJ-STELARA_ 003705739-6076, was marked for identification.)

BY MS. OGNIBENE:

Q.      Likewise, the first page of this has been withheld as privileged, Dr. Ralat, but we're going to look at the metadata sheet which is the last possible sheet.

Okay. So, you see at the top, just to orient you a little bit, the Bates is 883. Do you see that? Bates ends 883. Sorry, I'm using my lawyer talk.

A.      Oh, I see.

Q.      The same way that you guys do the patent ends, like, '710, we do, like, Bates 883.

A.      Sorry, I was looking at the chart and not the top line.

Q.      Yeah, well, there's no way, there's no way for you to know the 883 thing. So, sorry about that, that's my fault.

Okay. So, the document has -- ends in Bates 883 and it says the author is Eric Dichter.

Do you see that?

A.    Yes.

Q.    And the custodian was -- is you.

Correct?

A.    Yes.

Q.    And the date on the document is 11/14/2017.

Do you see that?

A.    Yes.

Q.    And the file name is JB15139USPSP1 Prov Spec.

Do you see that?

A.    Yes.

Q.    Okay.  If we could go back to the document, the first page of the document, okay, and to the next page.

Okay.  So this is the attachment. And do you see that this is a clinical study report at the very top here, a J&J clinical study report for the UNIFI Study?

A.    I see that.

Q.    And the UNIFI Study is the clinical trial testing the use of Stelara to treat UC.

Correct?

A.    Yes.

Q.    And it says here, "Protocol: Phase 3 Induction Study."

Do you see that?

A.    Yes.

Q.    Okay.  And earlier today when we were talking about the unblinding -- and we can go back and look at the document if you'd like, Dr. Ralat -- do you recall that it was unblinding TLR, which you believed was top line results and CSR.

Do you recall that?

A.    Yes.

Q.    Do you have any recollection of whether CSR might be the clinical study report?

A.    I did not recall that, but I have no reason to doubt what you're saying.

Q.    Okay.  Do you understand that clinical study reports like this are submitted to the FDA by J&J?

A.    Yes.

MS. OGNIBENE:  And if we can scroll down just a little bit, Kaelan, so that Dr. Ralat can see, a little further, a little further.  Okay.

there's kind of like one group of these that ends on 5, 5 out of 5, and then the next starts 1 out of 3.

Do you see that?

A.    Sorry, what am I looking at?

Q.    The top of it says "Experience" and it lists your positions.

A.    Oh, yeah, yeah, yeah.  Okay.

Q.    I'm looking at the second one that says "Patent Manager."

Do you see that?

A.    Yes.

Q.    And earlier today, I asked you what your role was in commercial considerations and you said you had no role.

Is that correct?

A.    So, did you -- depends on what the context -- was it about Stelara or was it in general?

Q.    I believe I asked you in general.

A.    Okay.  I may have said that.

Q.    Okay.

A.    I don't recall.

Q.    Okay.  Did you have any role in commercial -- in assisting commercial personnel

regarding primary patent and trade secret matters?

A.    So, when it comes to the compound development team, the compound development team oftentimes is composed of many different groups. So, insofar that they're present in a -- in a team and we discuss IP strategy, then, yes, that would also be -- they would be obtaining the same guidance everybody else in the compound development team is.

Q.    Okay.  So you did provide extensive guidance to J&J commercial personnel?

A.    We, the attorney and, and me, if I'm part of the team, but keep in mind that I don't -- I am not the adviser.  The attorney is the adviser.  So, when -- I indirectly may have provided guidance, when it comes to in consultation with the attorney and then the attorney delivers that advice to the team.

Q.    So, it's your testimony today that you indirectly provide guidance through an attorney.

      Is that correct?

A.    Yes.

Q.    Okay.  But you write on your

A.      I don't know that I ever said that I was completely done with the provision -- after the first provisional.  I think I said that I was not involved in the conversion.

Q.      So, you stopped being involved after all three provisionals were submitted?

A.      I think -- like I said, sometimes the -- I distinctly remember the first one because it's the most work-intensive provisional to put together.  I could have been involved with the second and third provisional, but because the, probably the changes were small, I can't recall.  And I think I conveyed that earlier.

Q.      Okay.

A.      But after the conversion, like, after the conversion, I was not involved.

MS. OGNIBENE:  Kaelan, if we could go to the background section of the original provisional application, which is Tab 28.

Just to refresh all of our recollections, this is Exhibit 197 and what we're going to be looking at is PDF page 9.

BY MS. OGNIBENE:

Q.      And do you recall testifying

earlier today, Dr. Ralat, that you wrote this background section of the invention?

A.    Yes.

MS. OGNIBENE:  Kaelan, if we could now turn to the non-provisional application, which is Exhibit 307.

Just give me just a second to get where I need to go here.

And if we could please turn, Kaelan, to PDF page -- that's not the right one. That's it.

BY MS. OGNIBENE:

Q.    One, do you see there's also a background of the invention section here, do you see that?

A.    For the conversion?  Yes.

Q.    Yes, for the conversion.

So, is it your testimony that you did not write this section, "Background of the Invention"?

A.    If it was kept the same as the provisional, then yes --

Q.    Okay.

A.    -- I guess I wrote it.  But if there have been changes, I don't recall if I

made those changes.

Q.      Okay.  Well, I can represent to you that we compared the text in the background of the provisional and the non-provisional, so we can show you what changes were made between when you drafted it and when it was converted.

MS. OGNIBENE:  Kaelan, can you pull that document up.

We'll label this document Exhibit 411.

(Exhibit No. PX00411, Background of the Invention Document Depicting Changes, was marked for identification.)

MS. OGNIBENE:  And this, Kaelan, is the comparison between the provisional and non-provisional.  That's right.

Can we just make it a little bit bigger for Dr. Ralat so he can see.

BY MS. OGNIBENE:

Q.      Are you familiar with how redlines work, Dr. Ralat?  I don't know if you guys --

A.      Yes, I am familiar.

Q.      Okay.  I didn't want to be dismissive about that, but I also don't know if that's like an attorney thing that we all just

know redlines.  Okay.

As you see here, as reflected, the 001, 002 numbering in the paragraphs was deleted, but the changes in the first paragraph appear to be extremely minimal.

Do you see that?

A.      Yes.

Q.      And the second paragraph, the changes are extremely minimal.

Correct?

A.      Yes.

Q.      And in the third paragraph, the changes are extremely minimal.

Correct?

A.      Yes.

Q.      And in the fourth paragraph, the changes are extremely minimal.

Correct?

A.      Yes.

Q.      And in the fifth paragraph, the changes are extremely minimal.

Correct?

A.      Yes.

Q.      And same with the sixth paragraph?

A.      Yes.

Q.    Okay.  So, based on this comparison, you did, in fact, draft the background section, at least of the non-provisional application, for the use of Stelara to treat UC.

Is that correct?

DR. ANTONS:  I'm going to object to form.  Misstates the testimony and evidence in record.

THE WITNESS:  I drafted the provisional background of the application.  And if this made it all the way to the conversion, then -- and it was kept intact, then I suppose I was still -- authored it.

BY MS. OGNIBENE:

Q.    These are your words that you wrote?

A.    It sounds like it, yes.

Q.    Okay.

MS. OGNIBENE:  We can take that down, Kaelan, thank you.

BY MS. OGNIBENE:

Q.    Earlier today you testified that you make recommendations about what to include in IDS statements as a part of patent

MS. OGNIBENE:  Let's take a look at Tab 1310, Kaelan.  I believe this was marked as Exhibit 406.  And if we could go to the page of Exhibit 410 that is the background section, which is page 23.

Okay.  Oh, this is the clinical study -- yes.  Okay.  That's right.  And if we could also pull up Tab 28 at page 9, which is PX197 at 9.  So, let's put these side by side.

BY MS. OGNIBENE:

Q.    Okay.  Let's take a look at this

Luis Ralat, Ph.D.    Highly Confidential - Attorneys' Eyes Only

document.  And we have them side by side here. There's a highlighted paragraph, but I actually want to bring your attention to the one below it where it says, "The efficacy and safety."

Do you see that on the left?  It's the second full paragraph.

A.    Let me bring this closer because the font is small.

I see the paragraph -- highlighted paragraphs, yes.

Q.    And this is from the CSR report that we looked at earlier.

A.    Okay.

Q.    And then on the right, Paragraph 5 from the provisional application --

MS. OGNIBENE:  We're going to do the paragraph before that, if you don't mind, Kaelan, which starts, "The efficacy and safety."

BY MS. OGNIBENE:

Q.    So, these are call-outs to two paragraphs in these documents.

Without doing a word-by-word compare, do these look substantially similar to you?

DR. ANTONS:  Objection to form.

BY MS. OGNIBENE:

Q.      They both begin, "The efficacy and safety of intravenous IV ustekinumab as induction therapy in Crohn's disease have been evaluated in clinical studies CRD3001 and CRD3002."

That's identical in both. Correct?

A.      That's right.

Q.      "In study CRD3001, subjects with demonstrated prior failure or intolerance to one or more TNF antagonists were evaluated."

Correct?

A.      Right.

Q.      And "In CRD3002, subjects with history of inadequate response to or intolerance of corticosteroids or immunomodulators, but without a history of an inadequate response or intolerance to the TNF antagonists were evaluated."

Correct?

A.      That would be correct.

Q.      So, there is verbatim content in both submissions.

Right?

A.      It sounds like it, yes.

Q.      Okay.  If we can put those comparisons down.

So, I'd like to take a look on the left, which is from the clinical study report that you received in June 2018 from Eric Dichter, where J&J employees told the FDA, "At the time the CNTO1275OCO3001 protocol was developed, no studies had been conducted with ustekinumab for UC."

Correct?

A.      Yes.

Q.      And in the patent background that you drafted for the Stelara for UC application, Paragraph 6 begins in a very similar way, "Prior to the present invention, no studies had been conducted with ustekinumab for UC."

Correct?

A.      That's right.

Q.      And then it further says, and a little bit different, "Particularly, moderately to severely" --

MS. OGNIBENE:  I think we got to roll over pages, Kaelan.

BY MS. OGNIBENE:

Q.    -- "active UC in subjects who had previously failed or were intolerant of a biologic therapy or other conventional therapy or subjects who had demonstrated corticosteroid dependence."

Correct?

A.    Yes.

Q.    Okay.  But if we move over here, the next sentence in the clinical study report after the first topical sentence is, "However, based on the similarities and the genetics and biology of UC and Crohn's disease, it was reasonable to propose that ustekinumab may also be effective in the treatment of UC.  The doses selected for this study for ustekinumab in subjects with UC paralleled those studied in the Phase 3 induction and maintenance studies of ustekinumab in subjects with Crohn's disease."

Is that right?

A.    That's right.

Q.    Do you know, when drafting the background of the invention that was submitted to the PTO, why you omitted materials, information that J&J had submitted to the FDA that same year?

DR. ANTONS:  I'm going to object to form.

And, Counsel, if you want to ask a question that isn't seeking privileged information, you can rephrase.  Otherwise, I'm going to ask the witness not to answer that question.

BY MS. OGNIBENE:

Q.    J&J represented to the FDA in 2018 concerning the use of Stelara to treat UC that it was -- that "based on the similarities in the genetics and biology of UC and Crohn's disease, it was reasonable to propose that ustekinumab may also be effective in the treatment of UC."

Is that correct?

A.    I see that, yes.

Q.    But you, when drafting the background of the application, did not make that same representation to the PTO.

Is that correct?

A.    I did not, it looks like, no.

Q.    Okay.  Why not?

DR. ANTONS:  I'm going to instruct the witness not to answer that question on the basis of privilege.

BY MS. OGNIBENE:

Q.       Did you have a duty to tell the PTO the representations you had made to the FDA?

DR. ANTONS:  I'm going -- same instruction.

MS. OGNIBENE:  Whether or not he had a duty is privileged?

DR. ANTONS:  Whether or not he had a duty to disclose this particular information, that involves a whole analysis of materiality, et cetera.  So...

BY MS. OGNIBENE:

Q.       Generally, do you understand that, as a patent agent, you have a duty to disclose to the PTO representations made to the FDA concerning the same subject matter?

A.       Yes.

Q.       Did you do that here?

A.       So, I think you're focused here on just this -- so, can we, can we go back to the JBI6010USPSP document, not -- I mean, the protocol, we can get back to that, or the CSR, we can get back to that, but let's focus on the application.

Can we go into maybe paragraph 4

or 5?

Q.    Sure.  They're both on the screen in front of you.

A.    Okay.  So, in paragraph 4, the patent office received information about all the evidence suggesting that there are multiple lines of evidence that suggest that inflammatory bowel disease, and UC is there, and Crohn's disease is there, is mediated by Th1 or Th17 cells with strong contribution from the proinflammatory cytokines.

The patent office and the skilled person would have understood the relationship between the genetic markers that you are mentioning and the relationship between Crohn's disease and this.

Let's remember that when we are drafting -- since we're going into the duties, when drafting a patent application, you're drafting the patent application in such a way that a skilled person in the art would understand the invention.  Not for the everyday person, we're talking about the skilled person.  The skilled person would have understood the relationship of the genetic markers here and how

they are related to ulcerative colitis and Crohn's disease.

So, the skilled person was not being misled.  The skilled person, in other words, a clinician, a scientist, somebody who would look at this would have understood that relationship.

There's not always the need to take the, the skilled person by the hand around hypotheses like the one you just presented.

MS. OGNIBENE:  Okay.  I'm going to move to strike as nonresponsive.

BY MS. OGNIBENE:

Q.      My question is, looking at this, it's very clear that this -- wholesale pieces of this are identical across what you said to the PTO and what you said to the FDA.

So, my question is, did you tell the PTO that, "Based on the similarities and the genetics and biology of UC and Crohn's disease that J&J believes it was reasonable to propose that ustekinumab may also be effective in the treatment of UC."

My question is just, did you tell that to the PTO?

A.      That exact statement like you're saying that appeared in the protocol versus what appears in the application, no.  But the inference is there.

Q.      Let's turn to, since we're talking about the protocol, let's go ahead and turn to the protocol, which is Exhibit 1309, and let's take a look at page 403.  Tab 1309, Exhibit 405, and then let's keep up the provisional application where we were, which is at page 9.

Here we're looking at the brief summary of the invention on the left, which is from the provisional application that you drafted for the UC for Stelara patent application, and on the right we're looking at the over-rationale for the study that was provided to the FDA in the clinical protocol for the clinical study concerning the use of Stelara to treat UC.

MS. OGNIBENE:  I think we want to go up a page on the left, Kaelan, one more.  One more.  Sorry.

BY MS. OGNIBENE:

Q.      Okay.  Looking at page 1, Background of this Invention, you testified

earlier today that you used this clinical protocol to draft this background.

Correct?

A.    Yes.

Q.    Indeed, looking at the first paragraphs of both, there's a lot of similarity there.

Correct?

A.    That's right.

Q.    Okay.  And moving to the next page of the background section, the Paragraph 2 here looks substantially similar to Paragraph 2 in over-rationale for this study.

Correct?

A.    Yes.

Q.    And the first sentence is, "The involvement of the IL-20 -- 12/23 pathway and the pathogenesis of IBD is well-established and an important role for IL-12/IL-23 pathway and intestinal inflammation has been elucidated in colitis."

Do you see that?

A.    Yes.

Q.    Okay.  And on the right, it's a little bit different.  It says, "The involvement

of the IL-12/23 pathway in the pathogenesis of

IBD is well-established.  Early studies show

that treatment with anti-IFN-y Mab or anti-IL-12

P-40 Mab prevented disease in experimental

colitis models."

             Do you see that?

    A.     Yes.

    Q.     Okay.  Another difference is that

this paragraph ends, "Th1 and Th17-related genes

are upregulated comparably in the mucosa of both

UC and Crohn's disease patients suggesting that,

once established, the inflammatory mechanisms at

the mucosal level between the two diseases are

largely the same.  Similar conclusions were

reached in a genome-wide association study of

IBD patients conducted by Jostins and

colleagues."

             That last sentence from the

over-rationale for the study which was provided

by the FDA is not included in your submission to

the PTO.

             Is that correct?

    A.     I mean, I have not read the whole

background that I drafted.  It's been a while.

But I'm going to take your word on that that was

not in the background.

Q.    So, when you were deciding what to move from the over-rationale -- overall rationale for this study into the background section of the patent, you chose to exclude this portion.

Correct?

A.    That's what it appears like.

Q.    Okay.  If we could move to the next page on the right of Amendment 2, please.

A.    But, again, sorry, just again in paragraph 4, the Th1 and those other markers are mentioned, maybe not in those exact words, but I believe they're mentioned.

Can you please move to paragraph 4 of the provisional application?

Q.    Absolutely.

MS. OGNIBENE:  That's on the left, Kaelan, if we could just go down one page.  Oh, the other direction, my friend, down to 4.  Yeah.  One more.  Thank you.

THE WITNESS:  So, if you look at Line 4, "As mediated by Th1 or Th17 cells," so the mention of those genes, perhaps I don't describe all the mucosal, you know, issues that

are mentioned in there, but, again, the skilled person who understands the role of Th1 or Th17 cells would infer, would understand this.

So, you know, the ball was not hidden.  It is right there in front of them what these cells -- the studies about these cells are in paragraph 4.

BY MS. OGNIBENE:

Q.      But the study by Jostins and his colleagues was omitted.

Correct?

DR. ANTONS:  Objection to form.

THE WITNESS:  Apparently so.

BY MS. OGNIBENE:

Q.      Okay.  So, not all the same information was presented to the FDA and the PTO, correct, because you omitted some of the studies?

DR. ANTONS:  Objection to form.

THE WITNESS:  Yes.  And, of course, they are two separate agencies, right, with different goals.

BY MS. OGNIBENE:

Q.      Yeah, but you understand that you have a duty to disclose to one what you disclose

to the other.

Correct?

DR. ANTONS:  Objection, form.

THE WITNESS:  Yes, I would have a duty, again, had I worked in the non-provisional.  And I don't know for certain if those references that you are pointing out were or were not disclosed in the IDS.

BY MS. OGNIBENE:

Q.    I'm sure your counsel can lead you to it if they were, but I can represent to you that I have not seen them.

MS. OGNIBENE:  Turning to the next page of the Amendment 2 protocol if you don't mind, Kaelan.  Okay.

BY MS. OGNIBENE:

Q.    The second full paragraph starts, "These data, along with the shared biology of and similar response to current treatments between Crohn's disease and UC, provide a substantial scientific and clinical rationale to justify a direct-to-Phase 3 approach to the study of ustekinumab in UC."

Do you see that?

A.    Yes.

Q.      Was that same representation that was made to the FDA in 2016 included in the background section concerning your representations to the PTO in 2018?

A.      It appears that, not word for word, but the studies, a large number of studies seem to have been incorporated into the background section.

Q.      So, while employees for J&J told the PTO -- the FDA in 2016 that there was a substantial scientific and clinical rationale to study -- to justify a direct-to-Phase 3 approach to the study of Stelara in UC, J&J employees, including yourself when drafting the background, did not tell the PTO two years later that there was a substantial and scientific clinical rationale to justify that.

Correct?

DR. ANTONS:  Object to form. Misstates evidence, for the record.

BY MS. OGNIBENE:

Q.      You may answer.

A.      I did not participate in the prosecution, so I don't know what was said on the record in the prosecution of this

application.

Q.    Okay.  But talking just about what you drafted, what you drafted which we've already established was what was submitted to the FDO -- FD- -- PTO in the non-provisional did not include J&J's representation that it had a substantial scientific and clinical rationale to justify a direct-to-Phase 3 approach to the study of Stelara in UC.

Is that right?

DR. ANTONS:  Same objections.

THE WITNESS:  That is, that is correct.  It looks like those statements were not there and I, again, will point out that the goals of the two different agencies are very different.

Here, in the protocol, you're trying to convince the regulatory agencies that you should treat the patients with this molecule and the rationale for doing so versus in the patent application you're trying to establish the invention and the rationale for the invention.

So, the two, the two documents are not -- don't have the same goal, don't have to

Luis Ralat, Ph.D.        Highly Confidential Attorneys' Eyes Only        Page: 238

include everything word for word.  And different -- and there are different reviewers for this and different audiences for this.  So, what I would put, for example, in a journal article is probably not the same thing that I would put for analytical protocol submission and it's probably not the same thing that I would put into a patent application.

So, to try to say that those two documents need to read word for word identically is a misrepresentation of the goals of the two different agencies.

BY MS. OGNIBENE:

Q.    Well, let's talk about the goals.

The goal in the Phase 3 submission to the FDA was to convince the FDA that the use of Stelara to treat UC was sufficiently effective and safe to skip Phase 2 clinical studies.

Is that right?

DR. ANTONS:  Objection to form. Lacks foundation.

THE WITNESS:  Again, I don't know what the goal of this submission was.  I was not involved in the decision-making about skipping

Phase 2.  I can only take this by face value and all I see here is that this submission is to justify a Phase 3 study for ulcerative colitis with Stelara, and I don't see anything here saying, therefore, we should skip Phase 2 for these, these reasons.  I don't see that in anything you've been showing me.

BY MS. OGNIBENE:

Q.     Isn't that what it means when this says, "This data, along with the shared biology of and similar response to current treatments between Crohn's disease and UC, provide a substantial scientific and clinical rationale to justify a direct-to-Phase 3 approach to the study of ustekinumab in UC"?

Isn't that what they're saying, that the similarities between the drugs and the similar response to treatments justifies going direct-to-Phase 3?  That's what it says here, right?

A.     Again, I don't know what the intention of those words are.  If it would have said, and clinical rationale to justify skipping Phase 2 and going directly to Phase 3, then, yes, maybe.  But, again, this is -- the goals of