**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CAREFIRST BLUECHOICE, INC., on behalf of themselves and all others similarly situated, | Case No. 2:23-cv-00629-JKW-LRL |
| Plaintiffs, | **ORAL ARGUMENT REQUESTED** |
| v. | |
| JOHNSON & JOHNSON and JANSSEN BIOTECH, INC., | |
| Defendants. | |

**DEFENDANTS JOHNSON & JOHNSON AND JANSSEN BIOTECH, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE PROPOSED EXPERT
TESTIMONY OF DR. ANUPAM B. JENA**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD.......................................................................................................... 4

    I.     *Daubert* Standard ................................................................................................... 4

    II.    Monopoly Power.................................................................................................... 5

ARGUMENT ....................................................................................................................... 7

    I.     Dr. Jena's Opinions On Direct Evidence Of Monopoly Power Are Consistent With The Law And The Facts............................................................... 7

        A.    Dr. Jena's Opinions Regarding Stelara's "Competitive Price" Are Consistent With The Weight Of Authority In Similar Antitrust Cases. ...................................................................................................... 7

        B.    Dr. Jena's Criticism Of Dr. Maestas' Reliance On Profit Margins Is Consistent With Established Law. ...................................................... 16

    II.    Dr. Jena's Indirect Evidence Opinions Are Consistent With Established Law. ..................................................................................................................... 19

        A.    Plaintiffs Misstate The Law With Respect To Cross-Price Elasticity. ................................................................................................. 19

        B.    Dr. Jena Provides Evidence Consistent With Cross-Price Elasticity Between Stelara And Clinical Substitutes. ............................................. 22

        C.    Dr. Jena's Opinions On Clinical Substitutability Are Relevant And Consistent With Established Law. ......................................................... 25

CONCLUSION.................................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ACTOS Antitrust Litig.*,
 783 F. Supp. 3d 749 (S.D.N.Y. 2025)................................................................................*passim*

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962)...............................................................................................................*passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)..............................................................................................................4, 5

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
 504 U.S. 451 (1992)..............................................................................................................25

*Hangarter v. Provident Life & Acc. Ins. Co.*,
 373 F.3d 998 (9th Cir. 2004) ...............................................................................................14

*In re HIV Antitrust Litig.*,
 656 F. Supp. 3d 963 (N.D. Cal. 2023)................................................................................*passim*

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
 99 F. Supp. 3d 610 (D. Md. 2015)........................................................................................5

*In re Intuniv Antitrust Litig.*,
 496 F. Supp. 3d 639 (D. Mass. 2020) ..................................................................................17, 24

*It's My Party, Inc. v. Live Nation, Inc.*,
 811 F.3d 676 (4th Cir. 2016) ...............................................................................................6, 10

*Janssen Biotech, Inc. v. Celltrion Healthcare Co. Inc.*,
 2017 WL 8229441 (D. Mass. Feb. 6, 2017) .......................................................................5

*Kumho Tire Co., Ltd. v. Carmichael*,
 526 U.S. 137 (1999)..............................................................................................................4

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
 838 F.3d 421 (3d Cir. 2016)..................................................................................................25

*Ohio v. Am. Express Co.*,
 585 U.S. 529 (2018)..............................................................................................................20

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
 562 F. Supp. 2d 392 (E.D.N.Y. 2008) ..................................................................................6

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002)............................................................................................26

*Seabury Mgmt., Inc. v. Pro. Golfers' Ass'n of Am., Inc.*,
  52 F.3d 322 (4th Cir. 1995) (unpublished table decision) ......................................................20

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
  2018 WL 563144 (D. Mass. Jan. 25, 2018) ............................................................................17

*Spintouch, Inc. v. Outform, Inc.*,
  2022 WL 17363902 (C.D. Cal. Sept. 28, 2022) ......................................................................27

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
  986 F.2d 589 (1st Cir. 1993)................................................................................................11

*U.S. v. Stanley*,
  533 F. App'x 325 (4th Cir. 2013) ..........................................................................................5

*United States v. Eastman Kodak Co.*,
  63 F.3d 95 (2d Cir. 1995)....................................................................................................23

*United States v. Google LLC*,
  747 F. Supp. 3d 1 (D.D.C. 2024)............................................................................................6

*United States v. Google LLC*,
  778 F. Supp. 3d 797 (E.D. Va. 2025) .......................................................................5, 6, 7, 21

*United States v. Wilson*,
  484 F.3d 267 (4th Cir. 2007) .................................................................................................4

*Westberry v. Gislaved Gummi AB*,
  178 F.3d 257 (4th Cir. 1999) ..............................................................................................4, 5

*In re Xyrem (sodium oxybate) Antitrust Litig.*,
  2024 WL 4023561 (N.D. Cal. Aug. 26, 2024) ................................................................ *passim*

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  No. 2:18-MD-2836, 2021 WL 6689718 (E.D. Va. Nov. 1, 2021)..............................20, 22, 24

*In re Zetia (Ezetimibe) Antitrust Litigation*,
  587 F. Supp. 3d 356 (E.D. Va. 2022) ................................................................................ *passim*

**Other Authorities**

Federal Rule of Evidence 702.......................................................................................4, 5

Defendants Johnson & Johnson and Janssen Biotech, Inc. (collectively, "J&J") respectfully submit this opposition to Plaintiffs' Motion to Exclude the Proposed Expert Testimony of Dr. Anupam B. Jena (D.I. 450).

## <u>INTRODUCTION</u>

Plaintiffs have moved to exclude the opinions of Dr. Anupam Jena, a physician and economist at Harvard Medical School and Massachusetts General Hospital. Dr. Jena provides opinions about a threshold issue in this case—whether J&J possessed monopoly power with respect to Stelara. Dr. Jena opines that Stelara faced robust competition from many medications that are used to treat the same conditions as Stelara, and that these competing products constrained the price that J&J was able to charge for Stelara. Dr. Jena's opinions directly rebut those of Plaintiffs' expert, Dr. Nicole Maestas, that J&J was a monopolist. Plaintiffs seek to exclude Dr. Jena's opinions on the basis that they are contrary to law, contrary to the facts, and unhelpful. Plaintiffs are wrong: at best, Plaintiffs' critiques are the stuff of cross-examination, not exclusion. Notably, Plaintiffs declined to depose Dr. Jena and thus took a pass on the opportunity to explore their critiques with him.

First, Plaintiffs challenge Dr. Jena's opinions regarding Stelara's "competitive price" and margins. Plaintiffs contend that Stelara's "competitive price" is the price of biosimilar versions of Stelara when they entered the market, and measure J&J's margins based solely on Stelara's manufacturing costs. Dr. Jena disagrees, explaining that Plaintiffs' position on the competitive price and margins ignores costs incurred by branded manufacturers like J&J but not biosimilar manufacturers, such as research and development ("R&D") costs of drugs that never make it to market. Plaintiffs argue that these positions are contrary to law. But multiple federal courts presiding over similar cases have rejected Plaintiffs' positions on the competitive price and the

1

calculation of margins for the precise reasons articulated by Dr. Jena. And Plaintiffs' own expert agrees that branded manufacturers must account for R&D in pricing, including that related to products that never make it to market, remain profitable.

Second, Plaintiffs argue that Dr. Jena's opinions are contrary to law because he does not measure cross-price elasticity of demand, a tool for determining whether a change in the relative price of potential alternative therapies affected demand for Stelara. In support, they rely on this Court's decision in *In re Zetia (Ezetimibe) Antitrust Litigation,* 587 F. Supp. 3d 356 (E.D. Va. 2022)), which granted summary judgment for plaintiffs on market definition because the Court found they provided conclusive proof of the lack of cross-price elasticity between Zetia and other treatments, and that defendants failed to provide countervailing evidence (but declined to exclude Dr. Jena's opinions). But the record in this case is very different from that in *Zetia.* Here, Plaintiffs have failed to provide conclusive proof of the alleged lack of cross-price elasticity between Stelara and potential alternatives. And, critically, Dr. Jena's opinions provide ample evidence consistent with the existence of cross-price elasticity. There is at the very least a disputed factual issue on this point.

Plaintiffs' critiques are contrary to existing law and reflect nothing more than disagreement with the substance of Dr. Jena's testimony. This is not a sufficient basis for exclusion.

## **BACKGROUND**

Dr. Anupam Jena is an expert economist retained by J&J to opine on issues related to monopoly power. He is a Professor of Health Care Policy and Medicine at Harvard Medical School and a physician in the Department of Medicine at Massachusetts General Hospital. PEX

2

5, Jena Report ¶ 1.[1]  He is also a Research Associate at the National Bureau of Economic Research. *Id*. ¶ 3.  As a physician, Dr. Jena treats a wide variety of acute and chronic medical conditions, including ulcerative colitis, Crohn's disease, psoriatic arthritis, and psoriasis, typically in consultation with other physicians.  *Id*. ¶ 2.  As an economist, Dr. Jena specializes in the economics of pharmaceutical markets, physician prescribing decisions, and natural experiments in health care. *Id*. ¶ 3.  He has published more than 200 peer-reviewed articles in medical and economics journals. *Id*.

Dr. Jena opines that the relevant market is broader than Stelara and biosimilar ustekinumab and that Stelara competes with multiple drugs for the treatment of each of its indicated conditions. *Id*. ¶ 16.  To form his opinion, Dr. Jena first considered evidence from clinical guidelines, Pharmacy Benefit Managers' ("PBM") formularies, J&J documents, the parties' expert physicians, and patient treatment patterns to identify a set of clinical substitutes for Stelara for each of the conditions it is approved to treat.  *Id*. ¶ 63.  Dr. Jena then analyzed pricing and prescription data as well as J&J internal documents to determine whether these clinical substitutes were also economic substitutes for Stelara.  *Id*. ¶ 116-17.  Dr. Jena opined that Stelara competed with multiple medications based on price and non-price factors, and that Stelara's net prices, and its share of patients receiving treatment, decreased as competition intensified, including due to the entry of new clinical substitutes.  *Id*. Sections V.C.(i)-(ii).  Dr. Jena concluded that the evidence is consistent with positive cross-price elasticity between Stelara and many economic substitutes.  *Id*. ¶ 117; Ex. 1, Jena Decl., ¶ 5.  Finally, Dr. Jena found that from 2010 to 2024, ▮▮▮▮▮▮▮▮

---

[1]    J&J's exhibits, referred to as "Ex." in the brief, are attached to the Declaration of Amanda Antons in Support of J&J's Opposition to Plaintiffs' Motion to Exclude the Proposed Expert Testimony of Dr. Anupam B. Jena.  Plaintiffs' exhibits, referred to as "PEX," are attached to the declaration of Hannah Brennan (Dkt. Nos. 456, 458, 459).

███████████████████████████████████████████

PEX 5, Jena Report ¶ 150.

Dr. Jena also rebutted opinions offered by Dr. Nicole Maestas, who was retained by Plaintiffs to define the relevant antitrust market in this case. Dr. Jena opines, in part, that Dr. Maestas' reliance on J&J's margins and forecasted price declines after biosimilar entry ignore real-world evidence of price declines even before biosimilar entry and branded manufacturers' unique cost structure, which includes substantial R&D investments and losses, that biosimilar manufacturers do not incur. *Id.* Section VI. Dr. Jena also criticizes Dr. Maestas' "natural experiments" on the basis that, among other things, they do not demonstrate a lack of cross-price elasticity between Stelara and non-ustekinumab drugs. *Id.* Section VII.B. After making corrections to Dr. Maestas' natural experiments, Dr. Jena found a statistically significant shift in demand away from Stelara when non-ustekinumab drugs entered the market. *Id.* Section VII.B.(ii). In short, using Plaintiffs' own models, Dr. Jena found evidence consistent with cross-price elasticity of demand.

Plaintiffs have moved to exclude Dr. Jena's opinions on the basis that he (1) focuses on facts that are not relevant to the market power inquiry, and (2) provides opinions contrary to settled law. For the reasons explained below, both arguments are meritless.

## **LEGAL STANDARD**

### I.    *Daubert* **Standard**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. *See United States v. Wilson*, 484 F.3d 267, 274-75 (4th Cir. 2007); *see also* Fed. R. Evid. 702. Expert testimony is admissible under Rule 702 "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999)

(citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)).  The first prong requires the court to examine "whether the reasoning or methodology underlying the expert's proffered opinion is reliable" and the second prong asks the court to analyze "whether the opinion is relevant to the facts at issue." *Id.*; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting *Daubert*, 509 U.S. at 597)).

Rule 702 "was intended to liberalize the introduction of relevant expert evidence." *Westberry*, 178 F.3d at 261.  The Court "need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Id.*  Indeed, the "inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Id.* at 261 (quoting *Daubert*, 509 U.S. at 594–95).  And the "trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *U.S. v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013) (internal quotations omitted) (quoting Fed. R. Evid. 702 advisory committee's note).  However, expert opinions that are based on "an erroneous understanding of the law" are inadmissible because they are unhelpful to the jury. *Janssen Biotech, Inc. v. Celltrion Healthcare Co. Inc.*, 2017 WL 8229441, at *1 (D. Mass. Feb. 6, 2017).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## II.    Monopoly Power

Plaintiffs must prove that J&J possessed monopoly power, which is the power to control prices—i.e., price substantially above the competitive level—or exclude competition.  "A plaintiff

can show that a defendant had monopoly power . . . either directly or indirectly." *United States v. Google LLC*, 778 F. Supp. 3d 797, 849 (E.D. Va. 2025). "Direct proof of monopoly power includes evidence that a defendant profitably charged supracompetitive prices." *Id.; Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 99 F. Supp. 3d 610, 624 (D. Md. 2015) (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir.2007) ("A party may establish monopoly power . . . 'through 'direct evidence of supracompetitive prices and restricted output.''")). Direct evidence of monopoly power "is often difficult or impossible to prove." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008) (internal citation omitted); *In re ACTOS Antitrust Litig.*, 783 F. Supp. 3d 749, 771 (S.D.N.Y. 2025) (explaining that "[c]ourts often rely on indirect proof of market power because direct measures are often difficult or impossible to prove" (internal citation and quotes omitted)).

Because of this, plaintiffs frequently rely on indirect proof to show market power. *ACTOS*, 783 F. Supp. 3d at 771. "Indirect proof is derived 'from the structure and composition of the relevant market.'" *Google LLC*, 778 F. Supp. 3d at 849 (E.D. Va. 2025) (internal citation omitted). Indirect evidence is a surrogate for direct proof and requires defining the relevant market and assessing a defendant's share of that market. *ACTOS*, 83 F. Supp. 3d at 771. Defining a relevant antitrust market for purposes of assessing monopoly power involves determining whether the product at issue is "reasonably interchangeable" with other products or the "'extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.*, the cross-elasticity of demand.'" *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) and *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992)). This analysis can include consideration of other practical indicia of the marketplace as well. *Brown Shoe Co. v.*

*United States*, 370 U.S. 294, 325 (1962); *see also United States v. Google LLC*, 747 F. Supp. 3d 1, 108-09 (D.D.C. 2024) (explaining that the *Brown Shoe* factors are "evidentiary proxies for direct proof of substitutability" and bind the court) (internal quotes and citations omitted).

## ARGUMENT

Plaintiffs have moved to exclude Dr. Jena's opinions related to monopoly power on the basis that they are contrary to the law, irrelevant and contrary to the facts, and therefore unhelpful to the jury. Br. at 1-2. These arguments fail.

## I.    Dr. Jena's Opinions On Direct Evidence Of Monopoly Power Are Consistent With The Law And The Facts.

### A.    Dr. Jena's Opinions Regarding Stelara's "Competitive Price" Are Consistent With The Weight Of Authority In Similar Antitrust Cases.

Plaintiffs seek to exclude the entirety of Dr. Jena's opinions on monopoly power on the grounds that the "premise of Dr. Jena's report conflicts with the law of market power." *Id.* at 12. Specifically, Plaintiffs argue that (1) Dr. Jena's opinions on "competitive price" are contrary to law, *id.* at 10-12; (2) Dr. Jena failed to consider the scope of the challenged conduct in determining the "competitive price" for Stelara, *id.*, (3) Dr. Jena "ignored" the price of biosimilars when determining the "competitive price," *id.* at 11, and (4) that his competitive price opinion is not supported by the factual record, *id.* at 21-26. They are wrong about each of these points.

### 1.    Dr. Jena's "Competitive Price" Opinion Is Consistent With The Law.

According to Plaintiffs, the "[m]onopoly power inquiry starts with a threshold inquiry: What is the relevant 'competitive level' for the case?" *Id.* at 8. Determining the "competitive level," according to Plaintiffs, is a necessary step in determining whether a firm can "raise prices substantially above the competitive level." *See id.* (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 199 n.1 (4th Cir. 2002)). Prices substantially above the competitive level can constitute *direct proof* of monopoly power. *See Google LLC*, 778 F. Supp. 3d at 849 (explaining that "[d]irect

7

proof of monopoly power includes evidence that a defendant profitably charged supracompetitive prices" and indirect proof is derived "from the structure and composition of the relevant market.") (citation omitted).[2]

Here, Plaintiffs' position is that, as a matter of law, the "competitive price" is the price of biosimilar ustekinumab when it entered the market.  Br. at 9.  They are wrong.  Multiple courts in similar pharmaceutical cases have rejected this exact position and found that the "competitive price" can be different from the price at which generics entered the market.  *See ACTOS*, 783 F. Supp. 3d at 771-73; *In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963, 984 (N.D. Cal. 2023); *In re Xyrem (sodium oxybate) Antitrust Litig.*, 2024 WL 4023561, at *20 (N.D. Cal. Aug. 26, 2024) ("There is an insufficient basis . . . to hold as a matter of law that the generic price is the competitive price and, thus, that prices that exceed the generic price are supracompetitive.").

The recent decision in *In re ACTOS Antitrust Litigation* is instructive.  783 F. Supp. 3d at 771-73.  In *ACTOS*, plaintiffs moved for summary judgment on direct evidence of monopoly power and relied on expert testimony establishing that the branded manufacturer charged prices for the brand product that fell sharply after generics entered.  *Id.* at 771-72.  The court explained that "this evidence does not establish beyond dispute that [the branded manufacturer] was controlling prices in a supracompetitive manner."  *Id.* at 772.  The court went on to emphasis that "[a]s many other courts have explained, this pricing pattern happens when virtually every pharmaceutical patent expires—and does not automatically establish monopoly power."  *Id.* According to the court, this is due to the "different business models of brands . . . . which develop

---

[2]    Plaintiffs claim that Dr. Jena's "competitive price" opinion, which is in response to Dr. Maestas' opinion that the "competitive price" is the biosimilar price, "infects his entire report." Br. at 12.  This is incorrect.  Because determining the competitive price is only part of the direct proof inquiry, Dr. Jena's opinion is limited to responding to Dr. Maestas's direct proof opinion that the competitive price is the biosimilar price.

new drugs from scratch [and] must heavily invest in upfront costs, including research and development . . . and substantial marketing and promotional activities." *Id.* (internal quotes and citations omitted).    As a result, the court found that "[t]he bare fact that a brand charged more for a patented drug during its patent term thus says little about the brand's market power, as such pricing patterns may reflect the reality of the brand-name business." *Id.* at 773 (internal quotes and citations omitted).

And the court in *HIV Antitrust Litigation* reached the same conclusion.  656 F. Supp. 3d at 983-984.  There, plaintiffs argued that "once a generic version of a brand drug is available, then the competitive price for the brand drug is the price of the generic; thus, the brand drug price which exceeds the generic drug price is necessarily supracompetitive." *Id.* at 983.  The court found that "under Plaintiffs' position, in any generic competition case, the competitive price will be the generic price which, in turn, would seem to render most brand name pharmaceutical companies . . . *per se* monopolists prior to generic entry." *Id.* at 984 (internal quotes and citations omitted). The court explained that "this is a difficult proposition to embrace" and rejected Plaintiffs' motion for summary judgment on direct evidence of market power.  *Id.* at 984-85.

Consistent with this caselaw, Dr. Jena explains that Plaintiffs' position that the competitive price for the brand is the biosimilar price ignores the fact that branded biologic manufacturers incur significantly higher costs to bring products to market than biosimilar manufacturers.  PEX 5, Jena Report ¶ 156.  This includes up-front R&D investments and losses that stem from a longer, more complex, and riskier regulatory pathway than biosimilar manufacturers.  *Id.* ¶¶ 156-62. Biosimilars, on the other hand, benefit from the substantial R&D investments made by branded manufacturers, have relatively little regulatory risk, and more limited up-front costs. *Id.* ¶¶ 156-57 (explaining that biosimilars rely on the R&D and regulatory submissions of the brand, resulting

in significantly lower risk).  As a result, Dr. Jena opines, Stelara's "competitive price" is expected to be higher than the net price of biosimilar ustekinumab.  *Id.* ¶ 169.

Plaintiffs' expert, Dr. Michael Malecki, agrees with this view.  He testified that the price of branded pharmaceuticals must include R&D costs, including those incurred developing medications that never make it to market.  Ex. 2, Deposition of Michael Malecki at 31:10-23.  Dr. Malecki explained that if prices do not cover those costs, branded companies will not have the resources to develop new medications.  *See id.*

Plaintiffs claim the *Zetia* court rejected Dr. Jena's opinions regarding the appropriate measure of competitive price.  Br. at 11-12 (citing 587 F. Supp. 3d 356 (E.D. Va. 2022)).  But Plaintiffs misread *Zetia*, which *did not* hold that the "competitive price" is the generic or biosimilar price.  In *Zetia*, Judge Smith found that plaintiffs had conclusively demonstrated cross-price elasticity[3], a tool that is used to determine whether there is *indirect evidence* of monopoly power. *Zetia*, 587 F. Supp. 3d at 363; *see also It's My Party*, 811 F.3d at 683 (describing cross-price elasticity as relevant to the market definition analysis).  Because plaintiffs in *Zetia* had conclusively demonstrated cross-price elasticity, and defendants had failed to rebut it, Judge Smith entered summary judgment for plaintiffs.  *Zetia*, 587 F. Supp. 3d at 363-66.  Judge Smith did not rule on whether there was direct evidence of market power or what the "competitive price" would be.  *Id.* at 360 n.4.

---

[3]    Cross-price elasticity measures the change in quantity demanded of one product associated with the change in price of another product.  If there is a positive cross-price elasticity, the two products are economic substitutes, and if there is a zero or negative cross-price elasticity, the products are not substitutes.

**2. Dr. Jena Did Not Improperly Fail To Consider The "Scope of the Challenged Conduct."**

Plaintiffs also argue that Dr. Jena's "competitive price" opinions should be excluded because he "fail[ed] to consider the scope of the challenged conduct . . . to inform his opinion." Br. at 10. According to Plaintiffs, to determine the "competitive level," Dr. Jena was required to analyze the alleged anticompetitive conduct at issue and its "potential for genuine adverse effects on competition," which here, was the alleged delay of lower-cost biosimilar versions of Stelara. Br. at 9. Put simply, Plaintiffs argue that because they *allege* J&J was trying to delay biosimilar competition, the so-called competitive price for ustekinumab *must* be the price of ustekinumab following biosimilar entry. They are wrong.

Notably, this exact argument was recently rejected in *HIV Antitrust Litig.*, 656 F. Supp. 3d at 984. In that case, plaintiffs argued that because defendants were trying to delay generic competition, the "competitive price" was the price of the generic drug. *Id.* at 983. The court explained that "Plaintiffs' position is problematic for several reasons." *Id.*

First, Plaintiffs' proposed inquiry applies, in certain instances, to defining a product market (an exercise relevant in assessing indirect evidence), not to determining whether prices were supracompetitive, which is a direct evidence inquiry. *Id.* (explaining that *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 598 (1st Cir. 1993), which Plaintiffs rely on here, addresses a product market). This is because looking to the alleged anticompetitive conduct, and the specific market that it targeted, might in some cases shed light on how the defendant viewed the market. But even then, the court in *HIV* explained market definition is only "informed", not determined, by the alleged anticompetitive conduct. *Id.* at 983-84. "Otherwise, an antitrust plaintiff might well have an incentive to manipulate what the relevant market is by narrowly defining what the anticompetitive conduct is." *Id.* at 984 n.15. Second, the court observed that "under Plaintiffs'

11

position, in any generic competition case, the competitive price will be the generic price which, in turn, would seem to render most brand name pharmaceutical companies . . . *per se* monopolists prior to generic entry." *Id.* at 984 (internal quotes and citations omitted).[4]

Plaintiffs' argument here should be rejected for the same reason: Analyzing the scope of the challenged conduct says nothing about whether Stelara's price was above competitive levels. Accordingly, this is not a basis to exclude Dr. Jena's opinions.

### 3. Dr. Jena Did Not Fail To Consider the Effect Of Biosimilar Entry On Stelara's Price.

Next, Plaintiffs argue that Dr. Jena's opinions should be excluded because he supposedly "affirmatively refuse[d] to consider the effect of biosimilar entry" on the price of Stelara. Br. at 10-11. According to Plaintiffs, the price drop that occurred when biosimilars entered is conclusive evidence that Stelara was priced above competitive levels. *See id.* But Dr. Jena does not "refuse to consider" or "ignore" the effect of biosimilar entry on price. Had Plaintiffs not strategically declined to take Dr. Jena's deposition, he would have explained this. Nor does he dispute that a price reduction actually happened when biosimilars entered. He simply rejects Plaintiffs position, for the reasons laid out in his Report—reasons with which other courts considering the issue have agreed, *see supra* 8—that the biosimilar price represents the "competitive price" of Stelara. PEX 5, Jena Report ¶¶ 22, 155-62, 168-69. Of course, disagreement between experts is a basis for cross examination, not exclusion.

---

[4]    Plaintiffs also rely on *In re Aggrenox Antitrust Litig.* in support of their position that determining the competitive price requires considering the nature of the challenged conduct. Br. at 10 n. 4; 199 F. Supp. 3d 662, 665 (D. Conn. 2016). But *Aggrenox* was a discovery ruling, and other courts have expressed skepticism at its persuasive value. *See ACTOS*, 783 F. Supp. 3d at 774 (explaining that "[w]hile [plaintiffs] make much of the discovery ruling in [*Aggrenox*] . . . , the more apt decisions are those that denied summary judgment to plaintiffs who offered similarly non-dispositive direct evidence").

Further, Stelara's price had been declining long before biosimilar entry. Dr. Jena's analysis shows ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *Id.* ¶¶ 129, 182-83 & fig.25. The history of declining net prices demonstrates that Stelara faced price competition even prior to biosimilar entry. In short, Dr. Jena is not ignoring the effect of biosimilar entry, he simply disagrees with the determinative importance Plaintiffs assign to it. Nor is Dr. Jena, as Plaintiffs claim, "creating a special set of rules that allow supracompetitive biologic prices to be considered 'competitive.'" Br. at 11. To the contrary, as noted above, multiple courts in similar antitrust cases have agreed with Dr. Jena's view that the biosimilar price is not necessarily the competitive price. *See ACTOS*, 783 F. Supp. 3d at 771-73; *HIV Antitrust Litig.*, 656 F. Supp. 3d at 984; *Xyrem*, 2024 WL 4023561, at *20 ("There is an insufficient basis . . . to hold as a matter of law that the generic price is the competitive price and, thus, that prices that exceed the generic price are supracompetitive.").

### 4. Dr. Jena's Opinion That The Competitive Price Is Higher Than The Biosimilar Price Is Consistent With The Facts.

Plaintiffs also claim that Dr. Jena's opinion that the competitive price for Stelara must take into account, among other things, the unique R&D investments and losses incurred by branded manufacturers is inconsistent with the record. Br. at 21-26. Specifically, they argue that Dr. Jena's reliance on research and development costs and the costs from failed investments as a reason the competitive price for Stelara is necessarily higher finds no support in the record. *Id.* at 21-23.

Plaintiffs' argument blatantly—and apparently strategically—ignores the substantial record supporting Dr. Jena's conclusion. For example, Dr. Jena relied on testimony from J&J's corporate representative on Stelara's pricing, who testified that profits from Stelara help fund R&D, and specifically, that profits from Stelara are used to fund other drugs. *See, e.g.*, PEX 5,

Jena Report ¶ 161 n.331 (relying on testimony from Brian Smith, J&J's corporate representative, that J&J's profits from Stelara help fund R&D). Additionally, J&J's contemporaneous documents reflect that J&J's sales provide the resources necessary to invest in R&D. *Id.* ¶ 162 n.332 (citing 2020 Stelara Commercial Considerations slide deck explaining that J&J ensures that sale of medications provides necessary resources to invest in R&D). Indeed, as noted above, Plaintiffs' own experts agree that a brand drug manufacturer could not remain profitable if they did not account for these costs in their pricing. Ex. 2, Deposition of Michael Malecki at 31:10-23 (explaining that to make a positive return on their investment, biopharmaceutical manufacturers must price in the cost of bringing drugs to market, and also the cost of failed drugs that do not make it to market).

Plaintiffs also point to a number of "facts" that they claim undermine Dr. Jena's conclusions. These, of course, would be most appropriately addressed through cross-examination. *See, e.g.*, *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") (quoting *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004)). Regardless, Plaintiffs' criticisms are unpersuasive.

First, Plaintiffs claim that J&J's forecasts about biosimilar entry are a smoking gun because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Br. at 22. But Plaintiffs never actually explain *why* it would make sense for ▮▮▮▮▮▮▮▮▮▮▮ to be included in a forecast; they simply conclude that this omission is telling because "the forecasts include a lot of data." *Id.* Regardless, even assuming J&J's forecasts of pricing upon biosimilar entry ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮, this would not be unusual. As the *ACTOS* court explained, the branded company

14

typically recoups those costs during the life of a patent.  783 F. Supp. 3d at 772-73.  It naturally follows that the branded company would not seek to recoup those costs after biosimilar entry.

Second, Plaintiffs grossly mischaracterize the testimony of Brian Smith, J&J's Corporate Representative regarding pricing, ████████████████████████████████████████████.  Br. at 23.  Plaintiffs represented that testimony as follows:

████████████████████████████████████████

████████

Br. at 23 (PEX 11 at 263:3-22).  Mr. Smith's full testimony, free from Plaintiffs' modifications, makes it clear that ████████████████████████████████

████████████████

████████████████████████████████████

████████████████

████████████████████████████████████████

████████████████████████

████████████████████

████.

Ex. 11 at 263:3-22 (emphasis added).  As corrected, Mr. Smith testified that ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Third, Plaintiffs point to the fact that J&J ████████████████████████████

████████████████████████████████████████  Br. at 24-25.

By focusing only on ***Stelara-specific*** R&D, Plaintiffs ignore the unique business model of branded biologic companies and ignore Dr. Jena's related testimony. As Dr. Jena explained, branded biologic companies face higher failure rates than biosimilar manufacturers, and as a result, face higher drug development costs. PEX 5, Jena Report ¶ 159. For example, Dr. Jena points to studies showing that while the average cost of developing a new biologic drug is $1.9 billion, analyses that factor in failures of other pipeline drugs (which would not be shown in Stelara specific R&D numbers) estimate the true cost of new medicine to be up to $5 billion. *See id.* Additionally, revenues from the sale of biologic medications are needed to fund on-going and future drug development. *Id.* ¶¶ 159-162. Plaintiffs ignore this.

### B.      Dr. Jena's Criticism Of Dr. Maestas' Reliance On Profit Margins Is Consistent With Established Law.

Plaintiffs also argue that high profit margins are direct evidence of market power, and that Dr. Jena's reliance on "sunk costs," which they refer to as "R&D and other long-term expenses," to rebut their reliance on gross margins is "contrary to law and economics." Br. at 26. Plaintiffs are wrong on both points.

Dr. Maestas relies on J&J's profit margins for Stelara as direct evidence of market power, but uses J&J's gross margins, which account only for Stelara manufacturing costs. Br. at 26; PEX 6, Maestas Report ¶¶ 71-75. Dr. Jena criticizes Dr. Maestas' reliance on gross margins, in part, because—like Plaintiffs' position on the competitive price—they fail to account for the high fixed costs of bringing biologic drugs to market, the costs of failed drugs, and the cost of future R&D to bring new products to market. PEX 5, Jena Report ¶ 172. Dr. Jena presents an alternative margin comparison that improves Dr. Maestas' analysis by comparing J&J's operating margins to the

operating margins of biologic manufacturers of potential economic substitutes for Stelara.[5]  *Id.* ¶ 176.  Operating margins account for ongoing costs faced by biologic manufacturers, including R&D, marketing expenses, and the cost of production.  *Id.*  Based on this, Dr. Jena concludes that J&J's operating margins were comparable to the operating margins of manufacturers of potential economic substitutes for Stelara.  *Id.* ¶ 178; *ACTOS*, 783 F. Supp. 3d at 773 ("Indeed, the need to offset costly R&D and marketing may well have driven [the brand's] pricing strategy here, in light of the evidence offered by Dr. Jena that [the brand's] operating margins were in line with those enjoyed by other brands.").

Moreover, "whether an entity's gross margins on a product are a dispositive lens through which market power can be assessed is at best a debated proposition."  *Xyrem*, 2024 WL 4023561, at *20; *HIV Antitrust Litig.*, 656 F. Supp. 3d at 984 ("[A]s other courts have recognized, gross margins are not dispositive on the issue of market power.").  This is because gross margin "focuses only on the cost to produce each item, and does not factor in upfront costs like R&D and marketing—the two major expenditures that brands can offset only by setting higher prices for their drugs during their patent terms."  *ACTOS*, 783 F. Supp. 3d at 773.  "[I]n the market for a product with high fixed costs, such as a brand pharmaceutical product, evidence that prices routinely exceed marginal costs may not necessarily be evidence that prices are supracompetitive, because even competitive prices may exceed marginal cost."  *In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 659 (D. Mass. 2020) (internal quotes and citation omitted).  "In other words, high

---

[5]    Dr. Jena does not, as Plaintiffs' argue, "claim[] that operating margins, not profit margins, are the appropriate measure of market power."  Br. at 26.  Dr. Jena is not opining that any measure of margin is an appropriate measure of market power, he simply opines that operating margins more accurately reflect the realities of costs faced in the brand pharmaceutical industry.  PEX 5, Jena Report ¶¶ 176-77.

margins might signal monopoly power, or they might simply reflect the premium that brands must charge to fund research and marketing against competitors." *ACTOS*, 783 F. Supp. 3d at 773.

Because of this, multiple Courts in generic delay cases have declined to enter summary judgment on the basis that gross margins constituted direct evidence of monopoly power. *Id.* at 773-75; *Xyrem*, 2024 WL 4023561, at *20; *HIV Antitrust Litig.*, 656 F. Supp. 3d at 985; *Intuniv*, 496 F. Supp. 3d at 659-660; *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 563144, at *12 (D. Mass. Jan. 25, 2018). And in *ACTOS*, the court did so in part because of Dr. Jena's operating margin analysis. 783 F. Supp. 3d at 773.

Plaintiffs argue that because past R&D is a "sunk cost," it is not, as a matter of both law and economics, factored into future pricing decisions. The cases cited above, however, explain that, in the pharmaceutical industry, R&D *can* be considered when analyzing margins. *Id.*; *Xyrem*, 2024 WL 4023561, at *20; *HIV Antitrust Litig.*, 656 F. Supp. 3d at 984. Indeed, the ABA Handbook on Market Power explains that the Lerner Index,[6] a measure of margin that Dr. Maestas relies on to analyze the extent to which J&J priced above marginal cost, translates poorly to industries (like pharmaceuticals) with high fixed costs and low marginal costs. Ex. 3, A.B.A. Ass'n Section of Antitrust Law, *Market Power Handbook: Competition Law and Economics Foundations*, Second Ed., A.B.A. Publishing, 2012, Sec. III.H.1 ("[F]irms or industries that are unable to recover the full cost of operations, even if some of those costs occurred in the past, will fail. This needs to be taken into account in an assessment of market power.").

By contrast, the cases relied on by Plaintiffs are easily distinguishable. They have nothing to do with the pharmaceutical industry and the unique cost structures faced by brand drug

---

[6]    The Lerner Index is a tool that quantifies the extent to which a firm's price for a product is higher than its marginal cost. PEX 6, Maestas Report ¶ 71. It is calculated as the difference between price and marginal cost, divided by price. *Id.*

manufacturers. *See* Br. at 27 (collecting cases). Regardless, even if the Court were to accept Plaintiffs' position that past R&D is a sunk cost irrelevant to margins, Dr. Jena also explains why brand drug pricing must also account for *current* and *future* investments in drugs in development. PEX 5, Jena Report ¶¶ 161, 172.

In sum, Dr. Jena's opinion that gross margins are not indicative of market power because they fail to account for R&D, marketing expenses, and other long-term costs is consistent with established law and sound economic principles.[7] Although Plaintiffs disagree with Dr. Jena, their criticisms should be addressed through cross-examination, not exclusion.

## II.   Dr. Jena's Indirect Evidence Opinions Are Consistent With Established Law.

Plaintiffs also challenge Dr. Jena's opinions related to indirect evidence of market power, and specifically, his opinions that non-ustekinumab drugs are therapeutic and economic substitutes for Stelara. Again, Plaintiffs' criticisms misstate the law, deliberately ignore the factual record of *this case*, and are without merit.

### A.   Plaintiffs Misstate The Law With Respect To Cross-Price Elasticity.

Plaintiffs argue that Dr. Jena's opinions on therapeutic and economic substitutability should be excluded because they will not assist the trier of fact with determining whether Stelara exhibited cross-price elasticity with other drugs. Br. at 12-13. In short, Plaintiffs' position is that cross-price elasticity of demand is the *sole* yardstick by which market power should be measured,

---

[7]      Plaintiffs seem to concede Dr. Jena's point and explain that "biologic drugs without biosimilar competition have high gross margins is not surprising nor anticompetitive itself." Br. at 28.

and nothing else is relevant to assessing indirect proof of market power.[8]  *See id.*  This is inconsistent with the law and with Plaintiffs' own expert opinion.

In support of this position, Plaintiffs rely principally on a misunderstanding of *Zetia*. Notably, the *Zetia* Court did not find irrelevant the factors identified by the Supreme Court in *Brown Shoe*, which allow courts to look to "practical indicia" of the marketplace in defining a relevant market.  *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836, 2021 WL 6689718, at *10 (E.D. Va. Nov. 1, 2021), *report and recommendation adopted,* 587 F. Supp. 3d 356 (E.D. Va. 2022).  It simply found that when a plaintiff *conclusively* demonstrated a lack of cross-price elasticity of demand, and the defendant did not adequately rebut that evidence, summary judgment was appropriate.  *Zetia*, 587 F. Supp. 3d at 363 ("[T]he court does not find that indirect evidence of market power based on the *Brown Shoe* factors is never relevant . . . .").

Here, by contrast, Plaintiffs fail to provide conclusive evidence of the lack of cross-price elasticity, as explained in J&J's Opposition to Plaintiffs' Motion for Summary Judgment.  *See* J&J Opp. to Plaintiffs' MSJ, Section I.B.1.  Additionally, Dr. Jena has provided compelling evidence consistent with the existence of cross-price elasticity that was not before the Court in *Zetia*.  *See infra* Section II.B (discussing decline of Stelara's net price during the ▮▮▮▮▮▮▮ time period prior to biosimilar entry).

Further, as the Supreme Court has recognized, cross-price elasticity of demand is an *important* but not *exclusive* factor in defining a relevant antitrust market.  Rather, the relevant market is defined as "the area of effective competition," which "typically [] is the arena within

---

[8]    A cross-price elasticity analysis measures the change in quantity demanded of one product associated with the change in price of another product.  PEX 6, Maestas Report ¶¶ 101-102.  If there is a positive cross-price elasticity, the two products are economic substitutes, and if there is a zero or negative cross-price elasticity, the products are not substitutes.  *Id.*  At its core, cross-price elasticity analysis helps determine whether the product at issue is constrained in its pricing.

which significant substitution in consumption or production occurs." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (internal quotes and citations). "[C]ourts should combine different products or services into a single market when that combination reflects commercial realities." *Id.* (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 572 (1966) and *Brown Shoe Co. v. United States,* 370 U.S. 294, 336 (1962)); *Seabury Mgmt., Inc. v. Pro. Golfers' Ass'n of Am., Inc.*, 52 F.3d 322 (4th Cir. 1995) (unpublished table decision) (explaining that the relevant market definition must encompass the realities of competition).

In *Brown Shoe,* the Supreme Court explained that market boundaries could be "determined by examining such practical indicia as industry or public recognition of the []market as a separate economic entity," and "the product's peculiar characteristics", among other things, including the customer base and sensitivity to price changes. 370 U.S. at 325. In *United States v. Google*, the U.S. District Court for the District of Columbia recently explained that "[c]ourts generally consider two categories of evidence when defining the relevant product market: the 'practical indicia' identified by the Supreme Court in *Brown Shoe* . . . and quantitative evidence from expert economists. 747 F. Supp. 3d 1, 108-109 (D.D.C. 2024). The *Google* court explained that the *Brown Shoe* factors are "evidentiary proxies for direct proof of substitutability." *Id.* (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986)). "And while '[t]he *Brown Shoe* practical indicia may indeed be old school' antitrust law, they bind the court." *Id.* at 109 (internal quotations and citations omitted).

Dr. Jena's analysis of clinical and economic substitutability is consistent with Supreme Court precedent and Plaintiffs' own authority. As the Court held in *Zetia*, Plaintiffs' criticisms go to the weight of Jena's testimony, not its admissibility or reliability.

21

**B.      Dr. Jena Provides Evidence Consistent With Cross-Price Elasticity Between Stelara And Clinical Substitutes.**

Dr. Jena opines that there is strong evidence of economic substitution between Stelara and other non-ustekinumab drugs.  PEX 5, Jena Report ¶ 117.  Plaintiffs argue that this opinion should be excluded because it is allegedly not a cross-price elasticity analysis, which according to Plaintiffs, is required by this Court following *Zetia*.  Br. at 16-20.  Plaintiffs are wrong—Dr. Jena presents substantial evidence consistent with the existence of cross-price elasticity.  And Plaintiffs' argument is particularly striking because their own expert did not purport to measure cross-price elasticity.

As an initial matter, as J&J previously explained, the *Zetia* court did not exclude Dr. Jena's opinions.  It simply found that Plaintiffs were entitled to summary judgment because plaintiffs there had conclusively demonstrated a lack of cross-price elasticity.  *Zetia*, 587 F. Supp. 3d at 363.  Here, as noted, Plaintiffs have not done so.  As J&J explained in its Motion to Exclude Dr. Maestas, Plaintiffs' "natural experiments" are not capable of measuring cross-price elasticity of demand.  D.I. 436 at 8-17; Ex. 1, Jena Decl. ¶¶ 6-8.  They either (1) suffer from omitted variable bias, or (2) do not measure the change in Stelara demanded in connection with the price change of another drug.  D.I. 436 at 8-17.  And even assuming that Plaintiffs' natural experiments are capable of demonstrating cross-price elasticity, Dr. Jena's corrections to Plaintiffs' experiments find a statistically significant shift in demand away from Stelara when multiple non-ustekinumab products entered the market.  PEX 5, Jena Report ¶¶ 198-206; Ex. 1, Jena Decl. ¶ 11.  In short, using Plaintiffs' own experiments, Dr. Jena demonstrates evidence consistent with cross-price elasticity.  This was not the case in *Zetia*.  2021 WL 6689718, at *15 (finding that Dr. Jena's corrections to Plaintiffs' natural experiments "would not cause [the model] to find cross-price elasticity where there was none before").

Dr. Jena, on the other hand, points to substantial economic evidence showing that Stelara's pricing was constrained by other non-ustekinumab drugs, which is consistent with the existence of cross-price elasticity. First, Dr. Jena opined that J&J increased rebate payments for Stelara in response to growing competitive pressure from other non-ustekinumab medications. PEX 5, Jena Rep. ¶ 129; Ex. 1, Jena Decl. ¶ 5. As a result, the net price of Stelara, which accounts for rebates, ████████████████████████████████████. PEX 5, Jena Rep. ¶¶ 129-31. Plaintiffs argue that Dr. Jena's analysis of rebating is flawed and was rejected in *Zetia*. Br. at 19. According to Plaintiffs, competing for formulary placement through rebates does not show that other products constrained the price of Stelara to its competitive price. *Id*. But multiple courts in drug delay cases have disagreed, finding that rebating is evidence that the brand was constrained in its pricing. *See Xyrem,* 2024 WL 4023561, at *20 (explaining that the branded manufacturer's "active implementation of coupon and rebate programs is evidence it was constrained, to some degree, in its pricing of Xyrem"); *Intuniv*, 496 F. Supp. 3d at 664 ("Defendants have put forth evidence of Shire's use of rebates and coupons, which undercuts Plaintiffs' arguments for cross-price elasticity").

Moreover, Plaintiffs ignore a substantial difference between this case and *Zetia*. Here, due to competitive pressure, J&J's increased rebating outpaced list price increases.[9] Br. at 19. As a result, J&J's increase in rebating during the ████████████████████████████████████ ██████████████████████ PEX 5, Jena Rep. ¶ 129 & fig.25 (████████████████████████████ ██████████████████████████). Dr. Jena explains that these net price decreases coincided with the entry of other non-ustekinumab products that competed with Stelara. *See, e.g.*,

---

[9]    In *Zetia*, there was not evidence that the brand increased rebating to such a degree prior to generic entry that net prices significantly fell over time. *See generally* 2021 WL 6689718; 587 F. Supp. 3d 356.

*id.* ¶ 130 (noting that Stelara's net price declined by ████████████████████████

████████████ ).  Price declines in the face of competitive entry are evidence that J&J's pricing

was constrained by other non-ustekinumab drugs.  The court mentioned no such evidence in *Zetia*.

Second, Dr. Jena also explained that, in competitive markets, it is expected that a

manufacturer will consider the price of competing products when setting prices, as the competing

products constrain the price a manufacturer is able to charge while remaining profitable.  PEX 5,

Jena Report ¶ 118.  Consistent with this, J&J monitored and benchmarked Stelara's list price

against alternative medications.  *Id.* ¶¶ 119-121; Ex. 1, Jena Decl. ¶ 5.  Courts have recognized

that this is evidence consistent with cross-price elasticity.  *See HIV Antitrust Litig.*, 656 F. Supp.

3d at 986 (explaining that "[t]here is also evidence that Gilead considered the prices of other HIV

drugs in setting the pricing for its drugs" and that this constituted "some evidence of cross-

elasticity of demand").  Further, J&J's list price increases for Stelara did not outpace competitors.[10]

PEX 5, Jena Report ¶ 120.

Plaintiffs claim that Dr. Jena's reliance on J&J's benchmarking of Stelara's price against

other products, instead of the competitive price, runs afoul of the Cellophane Fallacy.  Br. at 17.

Plaintiffs' reliance on the Cellophane Fallacy is circular and unhelpful.  As Plaintiffs recognize,

for the Cellophane Fallacy to apply, "current prices [must] represent an exercise of monopoly

power."  *Id.*  In the face of monopoly prices, "even poor substitutes look good to the consumer,"

which can result in substitution to products that are not true economic substitutes.  *Id.* (quoting

*United States v. Eastman Kodak Co*., 63 F.3d 95, 105 (2d Cir. 1995)).  But for the Cellophane

Fallacy to apply, there must already have been a predicate determination that the manufacturer

---

[10]    Plaintiffs, and Dr. Maestas, ████████████████████████████████████

████████████████████████████████ " Br. at 18.  This is a disagreement

between experts, not a basis for exclusion.

actually charged monopoly prices. *Eastman Kodak*, 63 F.3d at 105 (explaining that "the government's contention *assumes* that Kodak film is priced well above competitive levels, and we do not believe that the small but declining price premium that Kodak obtains for its film bears out this assumption." (emphasis added)). Here, there has been no such determination. *See supra*, Section I.A. In short, the Cellophane Fallacy may explain why substitution happened in the face of monopoly prices; it cannot explain whether there were monopoly prices in the first place.

Finally, Plaintiffs also argue that Dr. Jena improperly considers promotional expenditures evidence of cross-elasticity. Br. at 19-20. But that argument misconstrues Dr. Jena's opinion. He does not opine that sales and marketing expenditures are price competition, but that they are a non-price factor that informs the market definition analysis. PEX 5, Jena Report ¶ 138. As Dr. Jena explained, "sales and marketing activity is one dimension along which drug manufacturers can compete." *Id.* Given that Stelara ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, it would be "difficult to rationalize" expenditures of this magnitude if Stelara did not compete with other medications. *Id.* This is precisely the type of "practical indicia" of competition the Supreme Court held should be considered in defining a relevant antitrust market in *Brown Shoe*.

In sum, Dr. Jena has pointed to substantial evidence showing that Stelara's price was constrained by competition from non-ustekinumab products, which is consistent with the existence of cross-price elasticity.

## C.    Dr. Jena's Opinions On Clinical Substitutability Are Relevant And Consistent With Established Law.

To determine which products should be analyzed as potential economic substitutes, Dr. Jena first determines that there are many clinical substitutes for Stelara. *Id.* ¶ 106. In addition to reviewing clinical guidelines, Dr. Jena analyzed insurance claims data, which demonstrated that

there were many examples of patients switching between Stelara and other large molecule medications when managing the conditions that Stelara is indicated to treat. *Id.* ¶ 113 fig.18. Plaintiffs concede that the market definition analysis starts with identifying the potential clinical substitutes but challenge the way in which Dr. Jena conducted his analysis. They are wrong.

The first step of the market definition inquiry is to consider the "the extent to which Defendants' product is interchangeable with alternative products in the field." *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 436 (3d Cir. 2016); *Eastman Kodak*, 504 U.S. at 482 (explaining that the market is composed of products that have reasonable interchangeability). For Stelara, that involves first identifying the functional alternatives for the treatment of plaque psoriasis, psoriatic arthritis, moderate-to-severe ulcerative colitis, and Crohn's disease. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) ("Products will be considered to be reasonably interchangeable if consumers treat them as 'acceptable substitutes.'" (citation omitted)). Here, there is no dispute that doctors have many therapeutic alternatives for treating the conditions for which Stelara is approved.[11]  PEX 6, Maestas Report ¶ 107, Ex. 17 (identifying more than 20 potential therapeutic substitutes for Stelara).

Courts have denied summary judgment for plaintiffs on market definition where clinical substitute analysis showed multiple treatment options and switching analysis demonstrated that brand patients switched to other products prior to generic entry. *HIV Antitrust Litig.*, 656 F. Supp. 3d at 986 ("Plaintiffs' medical experts admit that there are other drugs that can be used to treat HIV (including non-Gilead drugs), and there is evidence that some HIV patients did switch from

---

[11]    Dr. Maestas identified the following potential therapeutic substitutes: Xeljanz, Xeljanz XR, Rinvoq, Otezla, Zeposia, Velsipity, Humira/biosimilars, Cimzia, Enbrel, Simponi, Simponi Aria, Remicade, Actemra/biosimilars, Kevzara, Siliq, Taltz, Cosentyx, Bimzelx, Tremfya, Syrizi, Ilumya, Omvoh, Entyvio, Tysabri, Orencia.  PEX 6, Maestas Report ¶ 107, Ex. 17.

one of Defendants' drugs to those other HIV drugs (including non-Gilead drugs), even before generic entry."). In short, Dr. Jena's analysis of therapeutic substitutes is an accepted component of the market definition analysis.[12]

Plaintiffs' critiques of the manner in which Dr. Jena conducted his switching analysis fail.[13] Br. at 15-16. First, Plaintiffs claim that the IQVIA PharMetrics Plus claims data Dr. Jena relies on, "accounts for a miniscule percentage of Stelara prescriptions and is not a representative sample of Stelara patients." Br. at 15. According to Plaintiffs,' this represents only ▓% of the Stelara syringes captured in IQVIA National Prescription Audit (NPA) data, which is the "gold standard for prescription data." PEX 7, Maestas Reply Report ¶ 134. This is incorrect, and Dr. Maestas relies on an outdated version of the IQVIA PharMetrics Plus data to lodge this criticism. Ex. 1, Jena Decl. ¶ 18. In fact, Dr. Jena's analysis relies on a newly expanded version that features insured U.S. patients, not just those who are commercially insured, as Plaintiffs claim. *Id.* As a result, Dr. Jena was able to analyze switching patterns for ▓▓▓▓▓▓ of Stelara patients. PEX 5, Jena Report ¶ 113 fig.18. Moreover, Plaintiffs' complaints about Dr. Jena's sample size are not a basis for exclusion. *See, e.g.*, *Spintouch, Inc. v. Outform, Inc.*, 2022 WL 17363902, at *5 (C.D. Cal. Sept. 28, 2022) ("[C]omplaints regarding sample size and selection bias are more appropriately addressed through cross-examination and rebuttal evidence.") (citation omitted).

---

[12]    Plaintiffs also argue that this is not a cross-price elasticity analysis. Br. at 15. J&J does not dispute this—Dr. Jena's switching analysis, PEX 5, Jena Report ¶¶ 106-115, is evidence of therapeutic interchangeability and supports his conclusion that there are "many clinical substitutes to Stelara for the treatment of each of the Relevant Conditions." *Id.* ¶ 106; Ex. 1, Jena Decl. ¶ 16.

[13]    Plaintiffs also argue that Dr. Jena's analysis of clinical substitutability is "contrary to law" because he supposedly never performs the second step, which is an analysis of whether clinical substitutes compete with Stelara economically. Br. at 13-14. J&J has already addressed this argument—Dr. Jena provided ample evidence consistent with economic competition and cross-price elasticity between Stelara and non-ustekinumab products. *See supra*, Section II.B.

Plaintiffs also characterize Dr. Jena's "definition of a Stelara patient" as "haphazard." Br. at 15-16. Specifically, they claim that "any patient who had at least one Stelara prescription is a Stelara patient, no matter how many prescriptions they had for other drugs." *Id.* at 15. This criticism is without merit, and approximately nine out of every ten Stelara patients in Dr. Jena's analysis had two or more claims for Stelara for a given condition. Ex. 1, Jena Decl. ¶ 18. Plaintiffs mischaracterize other results from Dr. Jena's switching analysis, arguing that a patient with 109 claims from 2011 to 2024, only one of which was for Stelara, provides 108 examples of switching. Br. at 16. Not true, and Dr. Jena makes no such claim. Ex. 1, Jena Decl. ¶ 18. Instead, Dr. Jena reports the unique number of patients with a claim for Stelara that also had a claim for a Stelara substitute, not the number of claims that they had. *Id.* In short, Dr. Jena's analysis counts this patient as a single example, not 108 examples, of switching. *Id.* Also, Plaintiffs' criticisms on this point go to the weight of Dr. Jena's testimony, not its reliability. *See HIV Antitrust Litig.*, 656 F. Supp. 3d at 986 n.17 (explaining that criticisms of expert's switching analysis could be made to a jury but were not dispositive for summary judgment purposes). Plaintiffs' criticisms go to the weight to be given to Dr. Jena's opinions and are material for cross-examination, not exclusion.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.

Dated: September 17, 2025

Respectfully submitted,

*/s/ Christina Guerola Sarchio*
George G. Gordon *(pro hac vice)*
Julia E. Chapman *(pro hac vice)*
Katherine Unger Davis *(pro hac vice)*
Forrest E. Lovett (*pro hac vice)*
Judah Bellin (*pro hac vice*)
David M. Costigan (*pro hac vice*)
Agnese Whitt (*pro hac vice*)
Madeline Holler (*pro hac vice*)
**DECHERT LLP**
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Tel.: (215) 994 4000
Fax: (215) 994-2222
george.gordon@dechert.com
julia.chapman@dechert.com
katherine.ungerdavis@dechert.com
forrest.lovett@dechert.com
judah.bellin@dechert.com
david.costigan@dechert.com
agnese.nadalini@dechert.com
madeline.holler@dechert.com

Christina Guerola Sarchio VSB No. 87166
**DECHERT LLP**
1900 K Street, NW
Washington, DC 20006
Tel.: (202) 261-3300
Fax: (202) 261-3333
christina.sarchio@dechert.com

Katherine A. Helm *(pro hac vice)*
**DECHERT LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel.: (212) 698-3500
Fax: (212) 698-3599
khelm@dechert.com

Amanda K. Antons (*pro hac vice)*
**DECHERT LLP**
230 Northgate Street #209
Lake Forest, IL 60045
Tel.: (312) 646-5800

Fax: (312) 646-5858
amanda.antons@dechert.com

*Counsel for Defendants Johnson & Johnson and Janssen Biotech, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2025, I caused to be served a copy of the foregoing

J&J's Opposition to Plaintiffs' Motion to Exclude the Proposed Expert Testimony of Dr. Anupam

B. Jena on all counsel of record via the Court's CM/ECF system.

*/s/ Christina Guerola Sarchio*
Christina Guerola Sarchio, Esq.
VSB No. 87166
**DECHERT LLP**
1900 K Street, NW
Washington, DC 20006
Tel.: (202) 261-3300
Fax: (202) 261-3333
christina.sarchio@dechert.com

*Counsel for Defendants Johnson & Johnson and Janssen Biotech, Inc.*