**A UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

|  |  |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CAREFIRST BLUECHOICE, INC., on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>JOHNSON & JOHNSON and JANSSEN BIOTECH, INC.,<br><br>      Defendants. | Civil Action No. 2:23-cv-00629<br><br>District Judge Jamar K. Walker<br><br>Magistrate Judge Lawrence R. Leonard |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

INTRODUCTION ..............................................................................................................1

LEGAL STANDARD.........................................................................................................1

STATEMENT OF UNDISPUTED OR DISPUTED FACTS ............................................1

ARGUMENT......................................................................................................................5

I.      A reasonable jury could find J&J defrauded the PTO examiner. ...........................5

        A.      Facts regarding J&J's *Walker Process* fraud on the PTO...........................5

        B.      J&J's affirmative misrepresentations and omissions were
                material. ......................................................................................................16

        C.      J&J intended to deceive the PTO.............................................................21

                i.      J&J acted with intent to deceive when it told the PTO
                        that NCT 236's success was not predictable and
                        withheld contradictory FDA submissions.....................................23

                ii.     J&J intended to deceive the PTO by withholding
                        Ochsenkühn...................................................................................27

II.     A reasonable jury could find J&J willfully acquired the Momenta
        biosimilar patents. ...............................................................................................29

        A.      Facts regarding J&J's acquisition of the Momenta biosimilar
                patents. .......................................................................................................30

        B.      J&J's argument about its "lack-of-specific-intent" is
                meritless. ....................................................................................................31

        C.      J&J's instantaneous-injury argument lacks merit. ...................................32

III.    A reasonable jury could find J&J's monopolistic acts delayed
        biosimilar entry. ...................................................................................................35

        A.      Facts regarding J&J's causation of biosimilar delay. ...............................35

        B.      The evidence shows that J&J's monopolistic acts caused
                biosimilar delay and consequent antitrust injury. .....................................37

        C.      The injury flows from J&J's monopolistic acts..........................................37

        D.      J&J's use of the '307 patent was part of the monopolistic
                scheme that caused biosimilar delay.........................................................38

- ii -

IV.     The plaintiffs' state law claims survive J&J's attacks and are not preempted.................................................................................................................40

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Actos Antitrust Litig.*,
   783 F. Supp. 3d 749 (S.D.N.Y. 2025) ....................................................................32

*Alcon Rsch., Ltd. v. Apotex, Inc.*,
   2013 WL 2244338 (S.D. Ind. May 21, 2013) ........................................................24

*Am. Sales Co., LLC v. Pfizer, Inc.*,
   No. 2:14-cv-361-ALWA, 2015 WL 13264206 (E.D. Va. Nov. 6, 2015) ..........................22, 26

*Am. Tobacco Co. v. United States*,
   328 U.S. 781 (1946) ..............................................................................................32

*Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*,
   850 F.3d 52 (1st Cir. 2017) ...................................................................................35

*In re Apex Exp. Corp.*,
   190 F.3d 624 (4th Cir. 1999) ..............................................................................1, 22

*Asghari-Kamrani v. United Servs. Auto. Ass'n*,
   No. 2:15-cv-478-RGD, 2017 WL 11455318 (E.D. Va. Apr. 13, 2017) ..................................22

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) ..............................................................................................32

*Aventis Pharma S.A. v. Hospira, Inc.*,
   675 F.3d 1324 (Fed. Cir. 2012) .............................................................................25

*Bittaker v. Woodford*,
   331 F.3d 715 (9th Cir. 2003) .................................................................................27

*Bristol-Myers Squibb Co. v. Ben Venue Labs.*,
   90 F. Supp. 2d 522 (D.N.J. 2000) .........................................................................26

*United States* ex rel. *Bunk v. Gov't Logistics N.V.*,
   842 F.3d 261 (4th Cir. 2016) .................................................................................22

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
   2017 WL 3493799 (N.D. Ill. Aug. 14, 2017) ........................................................27

*Crawl Space Door Sys., Inc. v. SmartVent Prods., Inc.*,
   No. 2:19-cv-00320-RAJ-RJK, 2020 WL 13691776 (E.D. Va. Apr. 28, 2020) ......................33

*Crucible, Inc. v. Stora Kopparbergs Bergslags AB*,
   701 F. Supp. 1157 (W.D. Pa. 1988) ......................................................................34

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) ...............................................................................39

*Dykes v. Portfolio Recovery Assocs., LLC*,
306 F.R.D. 529 (E.D. Va. 2015) ...........................................................................40

*EIS, Inc. v. IntiHealth Ger GmbH*,
2023 WL 6799332 (D. Del. Aug. 23, 2023) ..........................................18, 21, 23, 28

*Giuliano v. SanDisk LLC*,
705 F. App'x 957 (Fed. Cir. 2017) .......................................................................29

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
748 F.3d 1326 (Fed. Cir. 2014)............................................................................20

*Kaiser Found. Health Plan, Inc. v. Abbott Lab'ys, Inc.*,
552 F.3d 1033 (9th Cir. 2009) .............................................................................29

*Kove IO, Inc. v. Amazon Web Servs., Inc.*,
2024 WL 450028 (N.D. Ill. Feb. 6, 2024) ......................................................23, 28

*In re Loestrin 24 Fe Antitrust Litig.*,
433 F. Supp. 3d 274 (D.R.I. 2019)..................................................................25, 26

*McGuire Oil Co. v. Mapco, Inc.*,
958 F.2d 1552 (11th Cir. 1992) ...........................................................................35

*Merck & Co., Inc. v. Biocraft Labs., Inc.*,
874 F.2d 804 (Fed. Cir. 1989)..............................................................................18

*In re Metoprolol Succinate Patent Litig.*,
2006 WL 120343 (E.D. Mo. Jan. 17, 2006), *rev'd in part*,
494 F.3d 1011 (Fed. Cir. 2007).............................................................................29

*Mitsubishi Heavy Indus., Ltd. v. Gen. Electric Co.*,
2012 WL 4336208 (M.D. Fla. Sept. 21, 2012) .....................................................28

*Morrison v. Nissan Motor Co.*,
601 F.2d 139 (4th Cir. 1979) ...............................................................................22

*Nobelpharma Ab v. Implant Innovations, Inc.*,
930 F. Supp. 1241 (N.D. Ill. 1996), *aff'd*, 141 F.3d 1059 (Fed. Cir. 1998)............24

*Nordberg, Inc. v. Telsmith, Inc.*,
82 F.3d 394 (Fed. Cir. 1996)................................................................................29

*Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*,
424 F.3d 1347 (Fed. Cir. 2005).............................................................................29

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007)....................................................................................17, 21

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)........................................................................................................1, 19

*Ritz Camera & Image, LLC v. Sandisk Corp.*,
    700 F.3d 503 (Fed. Cir. 2012).............................................................................................5

*Salix Pharms., Ltd. v. Norwich Pharms. Inc.*,
    98 F.4th 1056 (Fed. Cir. 2024) .........................................................................................21

*SCM Corp. v. Xerox Corp.*,
    645 F.2d 1195 (2d Cir. 1981)......................................................................................33, 34

*Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*,
    2021 WL 982728 (D. Del. Mar. 16, 2021) .......................................................................23

*Synthon IP, Inc. v. Pfizer Inc.*,
    472 F. Supp. 2d 760 (E.D. Va. 2007),
    *aff'd in part*, 281 F. App'x 995 (Fed. Cir. 2008)..............................................................25, 29

*Sysmex Corp. v. Beckman Coulter, Inc.*,
    2022 WL 1503987 (D. Del. May 6, 2022)........................................................................ *passim*

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011)....................................................................17, 21, 22, 27

*Times-Picayune Publ'g Co. v. United States*,
    345 U.S. 594 (1953).........................................................................................................31

*TransWeb, LLC v. 3M Innovative Props. Co.*,
    812 F.3d 1295 (Fed. Cir. 2016).......................................................................................28

*Unigene Lab'ys v. Apotex, Inc.*,
    655 F. 3d 1352 (Fed. Cir. 2011).......................................................................................21

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare
    Fund v. Takeda Pharm. Co. Ltd.*,
    11 F.4th 118 (2d Cir. 2021) ......................................................................................31, 32

*United States v. Duke Energy Corp.*,
    208 F.R.D. 553 (M.D.N.C. 2002), *vacated on other grounds*,
    2010 WL 3023517 (M.D.N.C. July 28, 2010)........................................................................27

*United States v. Evans*,
    74 F.4th 597 (4th Cir. 2023) ............................................................................................32

*In re Wellbutrin XL Antitrust Litig.*,
   868 F.3d 132 (3d Cir. 2017)...............................................................................................38

*Xitronix Corp. v. KLA-Tencor Corp.*,
   882 F.3d 1075 (Fed. Cir. 2018)............................................................................................5

*Young v. City of Mount Ranier*,
   238 F.3d 567 (4th Cir. 2001) .............................................................................................40

**Statutes**

35 U.S.C. § 103.....................................................................................................................17

**Other Authorities**

37 C.F.R. § 1.56....................................................................................................................15

Fed. R. Civ. P. 56...............................................................................................................1, 22

Manual of Patent Examining Procedure ...............................................................................19

## INTRODUCTION

A reasonable jury could find in favor of the plaintiffs on both the *Walker Process* and the Momenta patent acquisition aspects of the monopolistic scheme. As to the former, there is an abundance of disputed facts, a situation not atypical for fraud cases. As to the latter, J&J raises no legally material challenge, so the *plaintiffs* are entitled to partial summary judgment in their favor. The impact of J&J's monopolistic acts is also disputed, and so, as with fraud, causation is a fact-intensive matter for the jury. J&J's motion should be denied in its entirety.

## LEGAL STANDARD

Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding the motion, the court must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *In re Apex Exp. Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and courts "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (internal quotations omitted).

## STATEMENT OF UNDISPUTED OR DISPUTED FACTS

The plaintiffs do not dispute J&J's numbered paragraphs: 1–2, 6–7, 12–14, 16, 18, 20–21, 23–24, 30–32, 34, 37, and 44–45. The plaintiffs dispute the following facts, as indicated.

3.     " ██████████ " is a term of art in patent law irrelevant to this case.

4.     J&J mischaracterizes the cite regarding success rate; the quote adds "can be lower for certain disease areas like oncology (~40%) or higher for others . . . (~70%)." J&J Unger-Davis Decl. (ECF Nos. 444, 449, 457) (J&J Ex.) Ex. 5 ¶ 47.

1

5.      UNIFI was not the only such study. *See, e.g.*, J&J Ex. 71.

8.      This is incomplete without the facts offered in Fact Nos. 55–63, *infra*.[1]

9.      Disputed. Dr. Ochsenkühn conducted a clinical study testing the same dosing regimen claimed in the '307 patent and found that ustekinumab worked to treat UC. J&J Ex. 71. It is misleading to say "███████████████████████████," because what's relevant is that drugs that "███████████████." Ex. 94 at -319;[2] Ex. 95 (Szapary Tr.) at 62. J&J took the position there was ███████████████████. J&J Ex. 3 at -148; Ex. 130 at -282; Ex. 96 at 4–5; Ex. 97 at -484; Ex. 98 (Marano Tr.) at 44; J&J Ex. 70.

10.     Disputed. The efficacy of ustekinumab for UC was known. *See* Fact Nos. 50–56, 60–63; Ex. 176. J&J convinced FDA its concerns were unfounded. Ex. 94 at -319; J&J Ex. 70.

11.     Disputed in part. UNIFI's futility analysis did not suggest a lack of probable success or signal J&J's expectations. *See* Response to Fact Nos. 9, 50–51, 53–56, 60–63; Ex. 78 (Dontabhaktuni Rebuttal) ¶ 51; Ex. 176.

12.     Disputed. J&J's statement in its 2018 Induction-phase Clinical Study Report (CSR) that "it was reasonable to propose that ustekinumab may also be effective in the treatment of UC" due to the relationship between CD and UC concerns *expectations*, not results. J&J Ex. 13 at -761; J&J Ex. 14 at 24; *see also* Fact No. 60.

15.     Disputed in part. The UNIFI results were not innovative. Ex. 130 at -147; J&J Ex. 3 at 4, 16–18, 29; Ex. 81 (Warfield) ¶ 39; Ex. 94 at -319; Ex. 95 (Szapary Tr.) at 62; Ex. 97; Ex. 98 (Marano Tr.) at 44; Ex. 176; *see* Fact Nos. 50-56, 63.

---

[1] Cites to Fact Nos. are to the plaintiffs' statement of undisputed facts contained herein.

[2] Ex. Nos. 1–93 are to the Declaration of Hannah W. Brennan (ECF 456). Ex. Nos. 94 onward are to the Declaration of Abbye R. K. Ognibene filed with this opposition. Appendix A to this brief provides a chart of all exhibit numbers and the corresponding ECF numbers.

17.    Disputed in part. While the selected statements appear in the application, they are incomplete. Ex. 106 ('307) at PDF 5–6. Dr. Ralat and Mr. Dichter's testimony require credibility determinations. *See* Section I.C., *infra*; J&J Ex. 71.

19.    Disputed in part. A POSA would not limit "studies" to *clinical* ones. Ex. 4 (Bahr Rebuttal) ¶¶ 111–12. The relevant inquiry is an examiner's understanding." Section I.B., *infra*.

22.    Disputed in part. The examiner's reason for allowing the application is not limited to consideration of the '908 publication, as suggested. Ex. 106 ('307) at PDF 250, 928–37.

25.    Disputed. A reasonable factfinder could infer that the prosecutors and several inventors knew of the prior art and its materiality. *See* Fact Nos. 51, 56, 60–61, 66–68 (Jostins and Granlund), 71–74 (Ochsenkühn). The prior art shows a POSA that Stelara was likely to be a clinically proven effective treatment for UC. Ex. 81 (Warfield) ¶¶ 37–42, 142–48.

26.    Disputed as incomplete. *See* Fact Nos. 69, 71–74.

27.    Disputed as incomplete. *See* Fact Nos. 55–56, 60–63, 66–69.

28.    Disputed as incomplete. *See* Fact Nos. 69–70.

29.    Disputed as incomplete. The evidence supports a finding that several people with a duty of candor knowingly withheld material information and made misrepresentations to the PTO. *See* Fact Nos. 69–85. Dr. Ralat and Mr. Dichter's testimony requires credibility determinations. *See* Section I.C., *infra*.

33.    Disputed. ▮▮▮▮▮▮▮ was only one value driver of the acquisition. J&J Ex. 44 (M. Miller Tr.) at 51. J&J conducted diligence on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 70, 76, 240; Ex. 101 at -917 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 103 (DeFranco Tr.) at 68, 194, 246,

261–72, 284 (J&J hired outside counsel regarding ███████████████████████); Ex. 102 at PL00063232 (████████████████████████████).

35.    Disputed. J&J's corporate representative did not testify that ██████████ ████████████████████████████████████████████. Ms. DeFranco testified that ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████. Ex. 103 (DeFranco Tr.) at 49, 261–84. There is no citation to the complete record before J&J's board of directors for the Momenta acquisition.

36.    Disputed in part. J&J cites no evidence that it submitted any information about the Momenta patents to the FTC or DOJ. *Compare* Ex. 26 at -758–59 (Agreement and Plan of Merger ████████████████████████████████) *with* Ex. 75 (Notification and Report Form for Momenta acquisition ████████████████████████████).

38.    Disputed in part. J&J prevented discovery into what it knew, and when, on this topic. Fact No. 93. There is no evidence J&J was unaware of the biosimilar manufacturers' cell culture media; J&J's expert admitted he did not know if J&J used competitive intelligence nor asked J&J if it was aware of this information. Ex. 30 (D. Miller Tr.) at 43–45; Ex. 104 (Way Tr.) at 121–24. The first phase 3 biosimilar clinical results were reported about 18 months after J&J acquired Momenta. J&J Ex. 46 ¶ 84.

39.    Disputed in part. J&J ████████████████████████████████ ███████████. Ex. 52 at -348, -350; Ex. 80 (D. Miller Tr.) at 27. J&J blocked discovery into when it decided to argue the "potential" that a biosimilar "might infringe" the '307. Fact No. 93.

40.    Undisputed. There is no evidence regarding when J&J chose to sue Amgen over

4

the Momenta patents. *See* Fact No. 93.

41.    Disputed in part. *See* Response to J&J Fact No. 40, *supra*. J&J also

██████████████████████████████████████████████████. Fact No. 94.

42.    Disputed in part. Amgen ████████████████████████████████████

████████████████████████████. *See* Fact Nos. 99–101.

43.    Disputed in part. The other ████████████████████████████

████████████████████████████. *See* Fact Nos. 99–101.

## ARGUMENT

### I.    A reasonable jury could find J&J defrauded the PTO examiner.

*Walker Process Equipment, Inc. v. Food Machinery & Chem. Corp.* held that injured parties may recover damages when a patent applicant obtains a patent through fraud and uses it to block competition. 382 U.S. 172, 177 (1965). "A *Walker Process* antitrust claim is a separate cause of action from a patent declaratory judgment action" and is "governed by principles of antitrust law." *Ritz Camera & Image, LLC v. Sandisk Corp.*, 700 F.3d 503, 508 (Fed. Cir. 2012); *see* ECF No. 119 (MTD) at 19–20. *Walker Process* claims do "no[t] dispute [] the validity of the [patent] claims—patent law is only relevant to determine if [J&J] intentionally made misrepresentations." *Xitronix Corp. v. KLA-Tencor Corp.*, 882 F.3d 1075, 1078 (Fed. Cir. 2018).

### A.    Facts regarding J&J's *Walker Process* fraud on the PTO.

46.    In March 2021, the PTO issued U.S. Patent No. 10,961,307 (the '307 patent), which expires in September 2039. Ex. 67 ('307); Ex. 12 (J&J's 2nd RFA Resp.) at No. 109.

47.    The inventors of the '307 patent are Colleen Marano, Kimberly Shields-Tuttle, Jewel Johanns, Katherine Li, Richard Strauss, Hongyan Zhang, Christopher O'Brien, and Omoniyi Adedokun. Ex. 67 ('307).

48.    Two J&J employees drafted the applications that led to the '307 patent: Eric

Dichter (patent counsel) and Luis Ralat (patent agent). Ex. 105 (Ralat Tr.) at 74–75, 85–87, 89–90, 198–202; Ex. 100 (Dichter Tr.) at 29, 59–62, 97; Ex. 106 ('307) at 2.

49.    J&J's Stelara Compound Development Team (CDT) was a "cross-functional team within J&J that was responsible for the development of Stelara." Ex. 107 (Shields-Tuttle Tr.) at 49, 66; Ex. 98 (Marano Tr.) at 70. It secured J&J funding and sought FDA approval for the clinical trial studying ustekinumab in UC (NCT 236) and pursued Stelara patents. Ex. 107 (Shields-Tuttle Tr.) at 49–51; Ex. 105 (Ralat Tr.) at 179–80 (CDT discussed IP strategy); Ex. 98 (Marano Tr.) at 70. Every ███████████████████████████████████████ ███████████████. Ex. 109 at 1; Ex. 112; Ex. 113. Mr. Dichter, Dr. Marano, and Ms. Shields-Tuttle were on the CDT from 2014 (when J&J began seeking FDA approval for a UC indication) through 2021 (when it obtained the '307 patent). Ex. 67; Ex. 107 (Shields-Tuttle Tr.) at 51–52; Ex. 109; Ex. 115 (Dichter, Marano, and Shields "core" members in May 2021).

50.    By September 24, 2018, a POSA would have had a reasonable expectation that a phase 3 clinical trial studying the use of ustekinumab to treat UC would achieve the clinical trial's endpoints. Ex. 81 (Warfield) ¶¶ 37–41, 142–48, 167–71, 201–03; Fact Nos. 51–56, 60.

51.    By September 24, 2018, the scientific literature showed that UC and Crohn's disease are highly similar, i.e., that the proteins that ustekinumab neutralizes cause the inflammatory response underlying both. Ex. 118 (Jostins) ("nearly all the biological mechanisms involved in [Crohn's] play some role in [UC]" and vice versa); Ex. 119 (Granlund) (similarity of gene expression in UC and Crohn's); J&J Ex. 3 at 4 ("████████████████████████████████ ████"), 16–18, 29; Ex. 87 at -549; Ex. 130 at -147, -272, -281–83, -319; Ex. 98 (Marano Tr.) at 38–44, 46, 58–68; Ex. 107 (Shields-Tuttle Tr.) at 127 (disease similarity supported direct-to-phase 3 approach); Ex. 176; Ex. 81 (Warfield) ¶¶ 66–67, 142–48; 188–93; Ex. 94 at -319.

6

52.     On September 23, 2016, FDA approved Stelara to treat Crohn's, i.e., Stelara was shown to be clinically effective for Crohn's in J&J's phase 3 testing. Ex. 12 at No. 62.

53.     By September 24, 2018, scientific literature demonstrated that drugs for Crohn's disease are also effective in UC. J&J Ex. 3 at 4 ("███████████████████████ ███"), 17 (same), 29 (same); Ex. 130 at -147, -282, -319; Ex. 98 (Marano Tr.) at 43–44, 46, 68; Ex. 95 (Szapary Tr.) at 29–30; Ex. 81 (Warfield) ¶¶ 145–48, 173–75; Ex. 94 at -319; Ex. 176.

54.     By September 24, 2018, published studies determined that ustekinumab would successfully treat UC. J&J Ex. 71 (2018 Ochsenkühn study administering same dosage of ustekinumab as claimed in '307 patent (Ex. 67 at 64 (Claims 6, 7, 9)) and concluding "[u]stekinumab was effective" to treat UC, and "large ongoing trials will confirm [its] findings and ustekinumab could become a new therapeutic option for refractory UC"); Ex. 120 (retrospective Afonso study concluding that "Ustekinumab is a therapeutic approach for IBD treatment in clinical practice"); Ex. 121 (Kolios report where "ustekinumab . . . resulted in complete cessation of colitis"); Ex. 81 (Warfield) ¶¶ 172–81.

55.     By September 24, 2018, J&J (including the '307 inventors), had taken the position *internally* that ███████████████████████████████████ ████████████████████████████████. J&J Ex. 4 (Shields and Strauss discussing "███████████████"); Ex. 122 at -437 (same); Ex. 123 (███████████████████ ████████████████████████████████████████████████ ██████████████████████"); Ex. 124 (similar); Ex. 125 at slide 19 ("clinical program will demonstrate efficacy"), slide 20 ("Anticipated US approval: 2019"); Ex. 77 (Dontabhaktuni) ¶ 48; Ex. 78 (Dontabhaktuni Rebuttal) ¶¶ 64–69; *cf.*, Ex. 107 (Shields-Tuttle Tr.) at 15, 17–18, 29–30, 81 (as regulatory affairs leader, agreed with an ████████████████████████).

7

56.     By September 24, 2018, J&J's CDT internally stated that ███████████

████████████████████████████████████████████████████████████████████████

██████████. Ex. 123; J&J Ex. 3 at slide 4, slides 16–17 ("████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██"), slide 18 ("████████████████████████████████████████████████████████

████████████████████████████"), slide 29 (███████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████"); Ex. 127 at -995; Ex. 128 at 1, 24 ("██████████

██████████████████████████"); Ex. 129 at -254 (citing ███████████); Ex. 98
(Marano Tr.) at 34, 38–44, 46; Ex. 107 (Shields-Tuttle Tr.) at 101, 114, 127, 184–87.

57.     The Stelara CDT's "██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████. Ex. 131 at -563 ("██████████████████████████████████████████

███████████████████████████."); Ex. 132 at -217 ("████████████████████████

████████████████████████████████████████."); Ex. 133 at PDF 71 (same); Ex. 109 at 5,
7 ("████████████████████████████████████████████████████████████████████

███████████████████████."); Ex. 126 at PDF 4 (similar); J&J Ex. 3 slides 4, 33, 36; Ex. 134 at -
773; Ex. 127; Ex. 98 (Marano Tr.) at 21–24, 27-28, 40–41, 54–56; Ex. 110 at -949 (██████

██████████████████████████████████); Ex. 107 (Shields-Tuttle Tr.) at 57–58.

58.     Based, in part, on the █████████████████████████████████████████

██████████████. Ex. 109 at PDF 7; J&J Ex. 3 at slides 39–40.

59.     Pharmaceutical companies test drugs in three phases: phase 1 tests safety, phase 2

tests efficacy, and phase 3 confirms safety and efficacy in a larger number of subjects. Ex. 77 (Dontabhaktuni) ¶ 14. In 2015, J&J convinced the FDA, based on the similarities between UC and CD, to let it skip phase 2 trials testing ustekinumab's efficacy in treating UC and proceed directly to phase 3. Ex. 94 at -319; J&J Ex. 70.

60.  By September 24, 2018, J&J had taken the position *externally* that NCT 236 could reasonably be expected to achieve its endpoints. Beginning in 2015, J&J repeatedly told the FDA that given UC and Crohn's shared biology and response to treatments and Stelara's successful use in Crohn's, the likelihood (or expectation) that ustekinumab would effectively treat UC was so great that conducting a phase 2 study of that use *was unnecessary*. Ex. 130 at -272, -282, -306 (citing Jostins and Granlund), -317–20, -343; Ex. 135 at -341–42; Ex. 98 (Marano Tr.) at 57–68; Ex. 95 (Szapary Tr.) at 23–26, 28–30; J&J Ex. 13 at -760–61; Ex. 176.

61.  Multiple '307 patent inventors drafted, reviewed, or submitted the documents in which these representations were made. Ex. 98 (Marano Tr.) at 57–68; Ex. 136 (O'Brien Tr.) at 49–50; Ex. 107 (Shields-Tuttle Tr.) at 165–66 ("entire team" would have reviewed the clinical protocol before it was submitted to FDA). ██████████████████████████████ ██████████. Ex. 137 at 8–9; Ex. 130 at -346, -373; Ex. 107 (Shields-Tuttle Tr.) at 146.

62.  In 2015, J&J submitted NCT 236's protocol to the FDA. Multiple '307 patent inventors worked on it. Ex. 98 (Marano Tr.) at 16–18, 35–36, 152–53; Ex. 136 (O'Brien Tr.) at 22–23, 25–26, 63; Ex. 116 (Strauss Tr.) at 28–29; Ex. 107 (Shields-Tuttle Tr.) at 165–66; Ex. 138 at -510 (Drs. Marano and O'Brien as "Project Physicians" for the protocol and trial); Ex. 139 at PDF 5. Every inventor participated in NCT 236. Ex. 116 (Strauss Tr.) at 28, 32, 106–07.

63.  In the NCT 236 protocol, J&J repeated the same representations regarding the similarities between UC and Crohn's and the drugs used to treat them. J&J told the FDA:

9

"considering the similarities in the genetics and biology of UC and Crohn's disease, it is reasonable to assume that ustekinumab will also be effective in UC." Ex. 139 at 41; *see also id.* at 7 (data from Crohn's "along with the shared biology and the similar response to current treatments between Crohn's disease and UC, provide *a substantial scientific and clinical rationale* to justify a direct-to-Phase-3 approach to the study of ustekinumab in UC"), 25 (citing Jostins and Granlund), 114 (same), 123; Ex. 130 (Protocol Amendment 1) at -147, -165, -181, -255 (same); Ex. 140 (Protocol Amendment 2) at -359, -377, -392, -468 (same); Ex. 107 (Shields-Tuttle Tr.) at 163–166, 267–68; Ex. 98 (Marano Tr.) at 57–68.; Ex. 176.

64.    In drafting and prosecuting the applications leading to the '307 patent, J&J made misrepresentations to, and concealed information from, the PTO regarding the reasonable expectation that NCT 236 would succeed. *See* Ex. 65 (Bahr) Section VII.C.3; Fact Nos. 60–80.

65.    In 2018, J&J (through Mr. Dichter and Dr. Ralat) submitted three provisional applications on a method of effectively treating UC by administering ustekinumab: application Nos. 62/735,501, 62/895,774, and 62/769,818. Ex. 106 ('307) at PDF 3. On September 24, 2019, J&J submitted nonprovisional application No. 16/580,509 claiming the same method of use and priority to the provisional applications.[3] Ex. 106 ('307) at PDF 1–3. Neither the claims nor the specifications of the four applications differ substantially. Ex. 114 (comparison of '501 and '509 backgrounds); *compare* Ex. 141 ('501) *with* Ex. 106 ('307); Ex. 82 (Matovcik Reply) ¶¶ 35–41.

66.    Prior to filing the '501 application, Mr. Dichter and Dr. Ralat obtained the NCT 236 protocol and 2018 Induction CSR. Ex. 100 (Dichter Tr.) at 134–36 (protocol); J&J Ex. 13 (CSR); Ex. 142 at Rows 2–4 (███████████████); Ex. 105 (Ralat Tr.) at 118, 150–51.

---

[3] Efficacy was measured by a subject hitting certain endpoints (e.g., "is identified as having a clinical remission," "endoscopic healing," etc.). Ex. 106 ('307) at 151–56 (claims 1, 24–26).

J&J submitted the induction CSR to the FDA. *Id.* at 141–44, 146, 156–58; J&J Ex. 13 at -749, -752–56, 766; Ex. 140 (protocol); Ex. 142 at Row No. 1 (███████████████████).

67.    Under Mr. Dichter's supervision, Dr. Ralat drafted the background section of the '501 application, which became the background section of the '509 application. Fact No. 48; Ex. 114; Ex. 105 (Ralat Tr.) at 84–85, 198–202, 234, 237–39. Dr. Ralat copied text from the Induction CSR and the NCT 236 protocol to draft this section. *Compare* J&J Ex. 13 (Induction CSR) at -760–61 *to* Ex. 141 ('501 application) at 9–11 (paragraphs 1–5 in patent background are from the CSR nearly verbatim aside from in-text citations); *compare* Ex. 140 at -376 (protocol's first paragraph) *to* Ex. 141 ('501 application) at 10–11 (paragraph 1) (footnotes become text and one new sentence in application); Ex. 105 (Ralat Tr.) at 118, 141–42, 150–51, 221–24, 230–31.

68.    In copying language from the Induction CSR and the NCT 236 protocol, Dr. Ralat *deleted* language (and studies) regarding the similarities between Crohn's and UC and *deleted* J&J's representations that those similarities provided a reasonable expectation that ustekinumab would effectively treat UC. For example, he deleted J&J's statement that "based on the similarities in the genetics and biology of UC and Crohn's disease, *it was reasonable to propose that ustekinumab may also be effective in the treatment of UC*." *Compare* J&J Ex. 13 at -761 (first full paragraph) *with* Ex. 141 at 11–12 (paragraph 6); *see* Ex. 105 (Ralat Tr.) at 225–26, 229–30 (parts of CSR omitted from '501). Dr. Ralat also deleted the description of and citations to Jostins and Granlund. *Compare* Ex. 140 at -376 *with* Ex. 141 at 10–11 (paragraph 2); Ex. 105 (Ralat Tr.) at 234. He omitted language from the protocol asserting a "substantial scientific and clinical rationale to justify a direct-to-Phase 3 approach to [studying] ustekinumab in UC." Ex. 140 at -377; Ex. 177 (blue highlighted text was copied from the CSR and protocol into the patent; yellow highlighted text was material to the application yet deleted or omitted). Dr. Ralat's

11

justification for these deletions was that J&J's "goal" before the FDA (to "convince" the FDA to approve the UC indication) was different than its "goal" before the PTO (to convince the PTO to issue a patent). Ex. 105 (Ralat Tr.) at 84–85, 234, 237–38.

69.    During the prosecution of the '307 patent, Mr. Dichter, Dr. Ralat, and the inventors did not submit to the PTO (i) the NCT 236 protocol, (ii) any of J&J's submissions to the FDA or foreign health authorities regarding NCT 236, (iii) the Induction or Maintenance CSRs, and (iv) Jostins, Granlund, or Ochsenkühn. Ex. 106 ('307) at 252–928 (J&J's 1st IDS), 943–2103 (J&J 2nd IDS). J&J asserted privilege over Dr. Ralat's knowledge of these references' materiality and Mr. Dichter's conversations with the inventors regarding the protocol and FDA submissions. Ex. 100 (Dichter Tr.) at 56–58; Ex. 105 (Ralat Tr) at 60–63, 73–75, 226–27. Mr. Dichter affirmed that the purpose of an IDS was "to disclose references that we were aware of to the examiner" and testified that his general practice was to "cite to anything that could potentially be relevant to the examination of the application." Ex. 100 (Dichter Tr.) at 129–31.

70.    While the PTO examiner found and used a CT.gov web posting of the NCT 236 trial, the record does not show the PTO having or considering (i) the NCT 236 protocol, (ii) any of J&J's submissions to the FDA regarding NCT 236, (iii) the NCT 236 CSRs, or (iv) Jostins, Granlund, or Ochsenkühn. *See* Ex. 106 ('307) at 234–42; Ex. 4 (Bahr Rebuttal) ¶¶ 61–65.

71.    Multiple Stelara CDT members and inventors working on NCT 236 attended conferences in February 2018 (ECCO) and June 2018 (DDW) where Dr. Ochsenkühn presented his 2018 study results. Ex. 143 (Li Tr.) at 61; Ex. 136 (O'Brien Tr.) at 67, 102–03, 134–35 (Dr. O'Brien was the physician responsible for NCT 236 when he attended ECCO and DDW); Ex. 98 (Marano Tr.) at 125–28 (when Dr. Marano attended DDW, her work on NCT 236 was nearly full-time); Ex. 144 (Ochsenkühn Tr.) at 32, 38, 47; Ex. 95 (Szapary Tr.) at 96–97 (Dr. Szapary

12

and "a large presence" from J&J attended DDW); J&J Ex. 71. J&J *invited* and *paid* Dr.

Ochsenkühn to attend DDW to present his research, including at J&J's "special" session for key

opinion leaders and J&J employees. Ex. 144 (Ochsenkühn Tr.) at 38–44, 46, 60; Exs. 145 & 146.

72.     Ochsenkühn[4] and descriptions thereof were ███████████████ , including

to ███████████████ . Ex. 147 at -112 at PDF 3, 43 (Marano & O'Brien received

Ochsenkühn); Ex. 148 at -366, -368–69 PDF at 3, 11 (same); J&J Ex. 34 at -554, -558–59 (same

re ███████████████████████████ ); Ex. 149 at -101, -109 (same re

Strauss); Ex. 150 at -304, PDF 17 (Li in metadata); Ex. 151 at -381, PDF at 4, 45 (Marano &

O'Brien in metadata); Ex. 152 at -557, -564 (Marano & O'Brien); Ex. 153 at -809, -816, PDF 57

( ███████████ ); J&J Ex. 38 at -381, -393 (summary of ██████████████

██████████████████████████ ); J&J Ex. 39 at -945–46

( ████████████████████████████████████

█████████████████████████ ).

73.     J&J included ████████████████████████████

██████████████████ . Ex. 154 at -199, PDF 253–61 ( ████████████

████████████████ ). Inventor Dr. Marano ████████████ . *Id*. at -198.

74.     J&J asserted privilege and refused to produce discovery or answer questions

regarding whether the inventors, Mr. Dichter, or Dr. Ralat searched for, found, and/or withheld

Ochsenkühn. Ex. 155 at Nos. 123–25 (J&J Objections to RFPs); Ex. 66 (Matovcik) ¶ 65.

75.     In the '509 application, J&J represented that "[p]rior to the present invention, *no*

---

[4] Dr. Ochsenkühn presented his research at ECCO in February 2018 (J&J Ex. 71) and in June 2018 at DDW. "Ochsenkühn" as used herein refers to both presentations and his article, as they all concern the same study. Exs. 147, 148, J&J Ex. 34, 149, and 150 refer to the February 2018 poster while Exhibits 152, 153, 150 refer to the February 2018 presentation. Exhibits 152, 153, J&J Ex. 38, and J&J Ex. 39 refer to the June 2018 presentation.

*studies had been conducted with ustekinumab for UC.*" Ex. 106 ('307) at PDF 6 (emphasis added); Ex. 141 ('501) at PDF 11. This is false. *See* Fact No. 54.

76. The inventors, Mr. Dichter, and Dr. Ralat undertook no diligence to ensure this statement was correct. *See, e.g.*, Ex. 136 (O'Brien Tr.) at 27–32; Ex. 105 (Ralat Tr.) at 85–87, 89–93, 198–202; Ex. 100 (Dichter Tr.) at 62, 182–84; Ex. 98 (Marano Tr.) at 154–55, 160–64, 175–76; Ex. 107 (Shields-Tuttle Tr.) at 223; Ex. 116 (Strauss Tr.) at 118–120; Ex. 143 (Li Tr.) at 120–21, 123, 134–35.

77. On July 16, 2020, the PTO rejected the '509 application as "unpatentable" over a web post summarizing NCT 236 (which did not disclose the justification for it nor that it was direct to phase 3) on ClinicalTrials.gov (CT.gov). The examiner concluded the post "teaches the use of this drug for the instantly claimed purpose." Ex. 106 ('307) at PDF 235, 240; Ex. 100 (Dichter Tr.) at 71–75. The examiner did not include a printout of the CT.gov posting he viewed in the file wrapper. Ex. 106 ('307) at PDF 234–48.

78. In response to the examiner's rejection, Mr. Dichter emphasized that the CT.gov reference contained no results and twice misrepresented that there was no reasonable expectation that NCT 236 would succeed. Ex. 106 ('307) at PDF 250 (in an interview, Mr. Dichter told the examiner that "*it would not have been obvious* that the endpoints [of NCT 236] would have been met by the claimed antibody") (emphasis added); *id.* at 929–30 (in written remarks, Mr. Dichter stated, "*Due to the uncertainty of clinical outcomes* and the failure of numerous medicines to satisfy designated clinical trial endpoints, the posting of elements of a clinical trial in advance of conduct of the trial do not anticipate or render obvious the subject matter of the claims.") (emphasis added); Ex. 100 (Dichter Tr.) at 152 (confirming he wrote the statement).

79. Mr. Dichter's representation to the PTO—that there was no reasonable

14

expectation that NCT 236 would succeed—was false. *See* Fact No. 50.

80.     J&J made these false statements and omissions with the specific intent to deceive the PTO. *See* Fact Nos. 49, 64–79, 81–85.

81.     By September 2019, Mr. Dichter had worked at J&J for about 15 years. Ex. 100 (Dichter Tr.) at 15. From 2015 to 2025, he was the only J&J employee responsible for filing documents with the PTO concerning ustekinumab. *Id.* at 36. Mr. Dichter prosecuted the entire patent family related to using ustekinumab to treat UC. Ex. 106 (’307) at PDF 2; Ex. 70 (’310) at PDF 3; Ex. 156 (’201) at PDF 3; Ex. 100 (Dichter Tr.) at 45-46.

82.     Both before submitting the ’509 application and during its prosecution, Mr. Dichter . Ex. 109; Ex. 117; Ex. 111; Ex. 169 at -714, -734_0004 (                    ); Ex. 157 (“

                                    ”); Ex. 100 (Dichter Tr.) at 37–38, 40–44; Ex. 98 (Marano Tr.) at 70–73.

83.     By September 2019, Dr. Ralat had worked at J&J for seven years, five as a licensed patent agent. Ex. 105 (Ralat Tr.) at 22; Ex. 158.

84.     Each ’307 patent inventor executed a declaration swearing they “reviewed and understood the contents of the Application” and “acknowledge[d] the duty to disclose information which is material to patentability as defined in [37 C.F.R. § 1.56].” Ex. 106 (’307) at PDF 2158–73.

85.     Mr. Dichter, Dr. Ralat, and the inventors withheld the NCT 236 protocol from the PTO. With respect to the trial, Mr. Dichter only submitted a one-page printout of the CT.gov

15

posting, which had no details about the trial's basis, its direct-to-phase 3 status, or the reasonable expectation that it would succeed. He did submit a protocol for a clinical trial testing ustekinumab to treat *lupus*. Ex. 106 ('307) at 422–569, 928; Ex. 100 (Dichter Tr.) at 131–32.

86.    The examiner relied on J&J's misrepresentations and omissions to overcome the initial rejection and issued the '307 patent. Ex. 106 ('307) at PDF 2121.

87.    After the '307 patent issued, J&J filed a similar application in October 2023. U.S. Patent Application No. 18/383,310 ('310 application) was a continuation of the '307 and claimed a method of treating UC with ustekinumab. Ex. 70 ('310) at PDF 1–2. The only difference between the '310 application and the '307 patent is that the '310 claims ustekinumab dosages based on the weight. Ex. 82 (Matovcik Reply) ¶¶ 165–71; Ex. 70 ('310, claim 1) at PDF 153–54; Ex. 67 ('307) at -448–50 (claims 6, 19, 33–34). The '310 application has the same inventors as the '307 and the owner/assignee was also Janssen. Ex. 70 ('310) at PDF 160–63, 172.

88.    On January 16, 2025, PTO Examiner Landsman—the same examiner who issued the '307 patent—found the '310 application obvious over the CT.gov posting. Ex. 159 ('310) at PDF 5. The examiner also rejected the claims as obvious in view of Ochsenkühn, which Mr. Dichter submitted as prior art to the '310 patent. *Id.* at 4, 6; Ex. 100 (Dichter Tr.) at 175–76.

### B.    J&J's affirmative misrepresentations and omissions were material.

*Walker Process* fraud requires "(1) a false representation or deliberate omission of a fact material to patentability, (2) made with the intent to deceive the patent examiner, (3) on which the patent examiner justifiably relied in granting the patent, and (4) but for which misrepresentation or deliberate omission the patent would not have been granted." MTD at 12–13. Materiality means "the patent would not have issued but for the patent examiner's justifiable reliance on the patentee's misrepresentation or omission." *Id.* at 22 (quoting *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007)).

Here, the PTO examiner found a CT.gov web posting (i.e., prior art) that disclosed NCT 236 and rejected the '307 patent claims as anticipated or obvious in light of that reference because the posting "teaches the use of this drug for the instantly claimed purpose." Fact No. 77. To overcome the rejection, J&J (through its counsel, Mr. Dichter) twice misrepresented that there was no reasonable expectation that NCT 236 would succeed. Fact No. 78. Based on Mr. Dichter's misrepresentations, the examiner issued the '307 patent. Fact No. 86.

A misrepresentation or omission is material if the PTO, upon truthful disclosure, would have rejected the claims as obvious. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292–93 (Fed. Cir. 2011) (an omission is material if disclosure of the omitted fact would have prevented issuance of the patent). "[I]f the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date . . . to a person having ordinary skill in the art," a patent cannot be granted. 35 U.S.C. § 103.[5] "[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). Here, information is material if it tends to show that, by September 2018, there was a reasonable probability that NCT 236 would achieve the study's endpoints (i.e., that ustekinumab would treat UC).

*J&J's misrepresentation that there was no reasonable expectation NCT 236 would succeed.* J&J statements to the PTO in October 2020—e.g., that "it would not have been obvious that the endpoints [of NCT 236] would have been met by the claimed antibody"—were material. Fact Nos. 77–80, 86. A reasonable jury could find that "the patent would not have issued but for the patent examiner's justifiable reliance on the [Mr. Dichter's] misrepresentation[s]" and J&J's

---

[5] A person of ordinary skill in the art is also known as a POSA.

17

omissions (through Dr. Ralat, Mr. Dichter, and the '307 inventors) of the FDA materials and prior art that contradicted this representation. MTD at 22; *see* Fact Nos. 60–80.

*J&J's concealment of its statements to the FDA*. J&J's repeated statements to the FDA, including citations to supporting scientific papers, were material to the '307 patent's issuance. J&J's inventors repeatedly told the FDA that studies testing ustekinumab in Crohn's, "along with the shared biology and the similar response to current treatments between Crohn's disease and UC, provide a substantial scientific and clinical rationale to justify a direct-to-Phase-3 approach to the study of ustekinumab in UC"—i.e., to believe ustekinumab would be effective in treating UC. Fact Nos. 63. J&J told the FDA that science supported the "reasonable [] assum[ption] that ustekinumab will also be effective in UC." *Id.* J&J's inventors repeatedly cited scientific articles supporting this statement (including Jostins and Granlund). Fact Nos. 56, 60–63. These real-time statements to the FDA show there was a reasonable probability that NCT 236 would achieve the study's endpoints, and J&J's contrary representations to the PTO were false. Because the PTO's allowance of the '307 patent was solely predicated on J&J's argument that the outcome of the clinical trials was nonobvious, Fact No. 86, a reasonable jury could find that the PTO would not have allowed the patent had it known that J&J told the FDA the exact opposite when seeking approval for the study. Fact Nos. 60–63; *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989); *EIS, Inc. v. IntiHealth Ger GmbH*, 2023 WL 6799332, at \*6 (D. Del. Aug. 23, 2023) (denying summary judgment on materiality where the applicant failed to submit a translation of the *full* article rather than an *abstract*).

J&J argues that the concealed statements to the FDA are not material because they are "cumulative" of the '307 patent's specification. But the omissions speak for themselves: while Dr. Ralat copied *large portions* of the FDA materials (including the Induction CSR and the NCT

18

236 protocol) into the application, he *omitted* the portions stating that J&J had a substantial scientific and clinical reason to expect that ustekinumab would effectively treat UC and *deleted* citations to the Jostins and Granlund references supporting this statement. Fact No. 68. These statements and references were not cumulative. It is one thing for J&J to provide general information about "UC and CD's genetic similarities," ECF No. 444 (J&J) at 30, and quite another to disclose that these similarities provided such a "substantial scientific and clinical rationale" to expect ustekinumab would effectively treat UC that they justified skipping phase 2 efficacy trials entirely.[6] Indeed, Dr. Ralat admitted that these facts were presented differently to the two different federal agencies, in direct contradiction to PTO rules. Fact No. 68; *see* 87 Fed. Reg. 45764-02, 2022 WL 2986909, at *45765; MPEP 2001.06(E). Before the FDA, J&J's goal was to skip efficacy trials by showing ustekinumab would work to treat UC. Fact Nos. 57, 59, 68. But before the PTO, J&J's goal was to "obtain[] a patent"—which required showing that "the use of Stelara to treat [UC] was new or novel" (i.e., not obvious). Fact No. 68. A reasonable jury could find that J&J's statements to the FDA—not the PTO—were accurate and that Dr. Ralat deleted these representations when drafting the patent because they did not advance J&J's goal of proving the purported invention (the use of ustekinumab to treat UC) was non-obvious.

J&J cannot avoid materiality by pointing to Mr. Dichter's and Dr. Ralat's self-serving testimony that the omitted materials were cumulative. J&J at 11, 30–31. This Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 150–51. This testimony is not "evidence [] from disinterested witnesses." *Id.*

---

[6] J&J admits that the FDA submission "stated that based on the Stelara CD clinical results and the genetic similarities between CD and UC, it was 'reasonable to assume' or 'reasonable to propose' that Stelara would be effective in UC" (J&J at 11) but omits the "substantial scientific and clinical rationale" language used therein.

19

J&J also relies on its expert, Dr. Cryer, to argue cumulativeness. J&J at 31. But the plaintiffs' expert, Mr. Robert Bahr (former PTO Deputy Commissioner for Patents and Senior Patent Counsel) disagrees, arguing the submitted references fall far short of the FDA submissions' teachings. Ex. 4 (Bahr Rebuttal) ¶¶ 105–09. This battle of the experts may not be resolved now.

To avoid the FDA submissions' plain materiality, J&J argues this Court "found," as a matter of fact, that the protocol was before the examiner. J&J 30–32. Not so. The Court accepted as true (as required at the motion to dismiss stage) the plaintiffs' misstatement in an earlier complaint that the examiner had the protocol. MTD at 23. But discovery showed that while the examiner found the NCT 236 *CT.gov posting*, he did not have the NCT 236 *protocol* (nor J&J's other FDA submissions). The plaintiffs have since conformed their pleading to this evidence. ECF 336-1 ¶¶ 214, 222–23. J&J cites *no evidence*—other than the Court's procedurally proper reliance on the plaintiffs' outdated complaint—that the NCT protocol was before the PTO.

*Omission of Ochsenkühn*. Ochsenkühn discloses the successful treatment of UC with the exact dose of ustekinumab as the '307 patent claims—i.e., successful results. Fact Nos. 54 & 73. It states its expectation that "large ongoing trials will confirm [its] findings and ustekinumab could become a new therapeutic option for refractory UC." Fact No. 54. A reasonable jury could conclude the PTO would have rejected the '307 patent in light of this reference for four reasons.

*First*, the plaintiffs' experts—Dr. Warfield (a gastroenterologist), Dr. Matovcik (a patent and PTO expert), and Mr. Bahr (a PTO expert)—explain the but-for materiality of Ochsenkühn. It was conducted in a clinical setting by an experienced IBD practitioner who, using the same dosing regimen claimed in the '307 patent, showed that ustekinumab worked to treat UC. Fact Nos. 54, 73, 88. It provides a "reasonable expectation" that ustekinumab will treat UC "successfully." *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014).

20

*Second*, the same PTO examiner rejected the claims of a nearly identical application—the '310 application—as obvious in light of Ochsenkühn. Fact Nos. 87–88. There is no reason the result would have been different for the '509 application had J&J submitted Ochsenkühn, as it did for the '310 application. *See EIS*, 2023 WL 6799332, at *6 (summary judgment as to materiality denied where the German PTO rejected a similar patent based on the concealed art).

*Third*, J&J's ███████████████████. Its "██████████████████████████████ ████████████████████████████████████████████." Fact No. 73.

*Fourth*, J&J's argument that Ochsenkühn was not material because it was not a placebo-controlled, double blind clinical trial is inconsistent with the law. J&J at 10, 28–29, 31. "[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer*, 480 F.3d at 1364. The Federal Circuit recently held that a Phase 2 protocol alongside a journal article rendered a method-of-use drug patent (like the '307 patent) obvious. *Salix Pharms., Ltd. v. Norwich Pharms. Inc.*, 98 F.4th 1056, 1061 (Fed. Cir. 2024). While the court acknowledged that the protocol *did not contain any efficacy or safety data*, the court "rejected the idea" that such data are "always required for a reasonable expectation of success." *Id.* at 1062.

### C.  J&J intended to deceive the PTO.

*Walker Process* fraud requires "the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to the equivalent of intent (scienter)[.]" *Unigene Lab'ys v. Apotex, Inc.*, 655 F. 3d 1352, 1358–59 (Fed. Cir. 2011) (citation omitted);[7] *see also*

---

[7] Before *Unigene* was decided, the Federal Circuit decided *Therasense*, 649 F.3d at 1290, and injected a specific intent requirement into inequitable conduct. In *Unigene*, the Federal Circuit described the *Walker Process* intent requirement as above. Given the similarity of the two doctrines, the requisite intent for *Walker Process* must be more than gross negligence but can be a state of mind so reckless as to the consequences that it is equivalent to specific intent.

21

*Am. Sales Co., LLC v. Pfizer, Inc.*, No. 2:14-cv-361-ALWA, 2015 WL 13264206, at *6 (E.D. Va. Nov. 6, 2015) (same). At summary judgment, "the inquiry is whether, viewing the evidence in the light most favorable to [the plaintiffs], no reasonable trier of fact could find the Applicants acted with the specific intent to deceive the PTO." *Sysmex Corp. v. Beckman Coulter, Inc.*, 2022 WL 1503987, at *4 (D. Del. May 6, 2022), *adopted*, 2022 WL 1744573 (D. Del. May 31, 2022). "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Therasense*, 649 F.3d at 1290.

"[Q]uestions of intent—often tied to issues of credibility—are difficult to determine on summary judgment." *Asghari-Kamrani v. United Servs. Auto. Ass'n*, No. 2:15-cv-478-RGD, 2017 WL 11455318, at *2 (E.D. Va. Apr. 13, 2017). Because "the question of intent is both necessary to proving inequitable conduct yet so difficult to determine on summary judgment, determinations of intent—and thereby inequitable conduct—are best reserved for trial[.]" *Id.* Indeed, the Fourth Circuit cautions against grants of summary judgment in fraud cases. *See, e.g.*, *United States* ex rel. *Bunk v. Gov't Logistics N.V.*, 842 F.3d 261, 276–77 (4th Cir. 2016); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).

J&J misstates the standard, arguing "the plaintiffs must show that deceptive intent is 'the single most reasonable inference able to be drawn from the evidence.'" J&J at 19. This is the showing the plaintiffs must make *at trial* not summary judgment. *Therasense*, 649 F.3d at 1290; *Sysmex*, 2022 WL 1503987, at *4. J&J's argument undermines the purpose of Rule 56: assessing whether "a reasonable jury *could find* in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *In re Apex*, 190 F.3d at 633. As *Sysmex* stressed:

> [Plaintiff] should not be required to prove its case now—i.e., it should not have to actually demonstrate that deceptive intent *is* the single most reasonable inference.

22

> The focus instead should simply be on whether [the plaintiff] has mustered sufficient evidence such that, at the trial stage, a factfinder *could reasonably conclude* that deceptive intent is the single most reasonable inference.

2022 WL 1503987, at *4. While some courts have made the error J&J urges, more careful analyses have declined to repeat it. *See, e.g.*, *id.* (listing decisions applying the wrong standard and explaining the correct one); *Kove IO, Inc. v. Amazon Web Servs., Inc.*, 2024 WL 450028, at *30 (N.D. Ill. Feb. 6, 2024); *EIS*, 2023 WL 6799332, at *9; *Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*, 2021 WL 982728, at *4 (D. Del. Mar. 16, 2021).[8]

### i.    J&J acted with intent to deceive when it told the PTO that NCT 236's success was not predictable and withheld contradictory FDA submissions.

Drawing all inferences in the plaintiffs' favor, a reasonable jury could find that J&J—through Mr. Dichter, Dr. Ralat, and several inventors—acted with intent to deceive the PTO when it misrepresented the NCT 236 results as non-obvious and concealed from the examiner the materials that undermined this assertion, including: (i) the NCT 236 protocol and (ii) J&J's scientific submissions to the FDA in support of its request to skip phase 2 trials. These documents explained that there was a reasonable probability that NCT 236 would succeed (i.e., ustekinumab would successfully treat UC), and they cited references, including Jostins and Granlund, to support that expectation. Dr. Ralat relied on the protocol to draft portions of the '307 patent application, Fact Nos. 67-68. Mr. Dichter admitted to reviewing it to prosecute the patent. Fact Nos. 66–67. Inventors Marano, O'Brien, Strauss, and Shields-Tuttle all worked on the protocol. Fact No. 62. And many of the same inventors worked on similar statements submitted to the FDA (and ███████████████████) regarding J&J's expectation that ustekinumab would effectively treat UC. Fact No. 60–61. Indeed, Marano and Shields-Tuttle

---

[8] Unsurprisingly, J&J cites many of the cases called out by these opinions. J&J at 19, 20 & 23. Application of the correct standard undermines their persuasive value.

23

████████████████████████████████████████████████████████

████████████████████████. Fact No. 56. No explanation exists for concealing these materials from the PTO, particularly where, as here, Mr. Dichter dumped much less relevant information on the PTO. Fact No. 85. Mr. Dichter testified that his usual practice is to submit anything that could be potentially relevant to the PTO. Fact No. 69. Yet, Mr. Dichter concealed these materials from the PTO, even though they directly contradicted statements J&J made to the PTO (through, at times, the '307 patent inventors). Fact Nos. 69, 78–79.

*Dr. Ralat*. Dr. Ralat *specifically deleted* the protocol's statements about J&J's "substantial" expectation that ustekinumab would successfully treat UC—as well as the Jostins and Granlund citations in support—with intent to deceive because he knew they would undermine patentability. Dr. Ralat *confirmed this inference*: he admitted that he deleted this information because J&J's goal in front of the PTO was patent issuance (i.e., including it would undermine issuance). Fact No. 68. Courts have repeatedly denied bids for summary judgment on intent based on this type of selective deletion. *See, e.g.*, *Nobelpharma Ab v. Implant Innovations, Inc.*, 930 F. Supp. 1241, 1254 (N.D. Ill. 1996), *aff'd*, 141 F.3d 1059 (Fed. Cir. 1998) (affirming denial of summary judgment on the issue of intent where a prosecutor used a document referencing prior art to draft an application but "deleted references to [the prior art]"); *Sysmex*, 2022 WL 1503987, at *5 (denying summary judgment on the question of intent where the prosecutor copied language from a relevant prior art reference but failed to submit reference).

J&J's position—that the deletion does not matter because a POSA could have gleaned the deleted text and the content of the citations that supported it from what Dr. Ralat did include—is nonsensical. The jury is free to reject Dr. Ralat's self-serving response. *Alcon Rsch., Ltd. v. Apotex, Inc.*, 2013 WL 2244338, at *8 (S.D. Ind. May 21, 2013) (rejecting argument that

24

examiner would "just 'underst[an]d'" the omitted information because he was examining the patent from a POSA's perspective in finding sufficient evidence of intent to deny summary judgment); *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 312–13 (D.R.I. 2019) (rejecting argument that patent specification disclosed the content of the omitted reference, especially given patentee's statements to PTO directly contradicting the prior art's content).[9] The jury should be allowed to assess Dr. Ralat's credibility in offering this explanation. *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1335–36 (Fed. Cir. 2012) (affirming rejection of prosecutor's "explanation"); *Synthon IP, Inc. v. Pfizer Inc.*, 472 F. Supp. 2d 760, 779–80 (E.D. Va. 2007), *aff'd in part*, 281 F. App'x 995 (Fed. Cir. 2008) (a "mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice") (internal quotation marks omitted).

*Mr. Dichter.* The inference of Mr. Dichter's intent is even stronger. As Mr. Dichter was the only attorney handling the '307 patent's prosecution and Dr. Ralat reported to him, a jury can reasonably infer that Mr. Dichter not only knew of Dr. Ralat's misleading edits but directed him to make them. Of course, Mr. Dichter's oral and written statements in October 2020 were made with the intent that the examiner rely on them, which the examiner did. By then, Mr. Dichter was a highly experienced prosecutor, "intimately familiar" with the company. *Sysmex*, 2022 WL 1503987, at *5; *see* Fact No. 81. He was on J&J's Stelara CDT, which designed NCT 236. Fact No. 49. A few months before he filed the '307 patent, Mr. Dichter became ███████████

████████████████████████████████████████████████

---

[9] J&J cites *1st Media, LLC v. Elec. Arts, Inc.*, but that case specifically acknowledged that evidence of "careful and selective manipulation of where, when, and how much of the most material information to disclose" (present here, but not in that case) supports an inference of specific intent to deceive. 694 F.3d 1367, 1375 (Fed. Cir. 2012).

██████████████████████████████████████████████████████████████████████ .

Fact No. 82. These facts support an inference of intent. *See Sysmex*, 2022 WL 1503987, at *5.

Mr. Dichter knew the protocol was material but withheld it to deceive the PTO. The examiner's rejection based on the NCT 236 CT.gov posting underscored the importance of NCT 236 to patentability. Fact No. 77. But rather than disclose the most complete description of NCT 236 available to him (the protocol), Mr. Dichter chose to withhold it and make statements to the PTO that *directly contradicted* its contents. Fact Nos. 66, 69, 78–79; *see Loestrin*, 433 F. Supp. 3d at 312–13. And while the results of *some* clinical trials may be uncertain, Mr. Dichter knew there were "substantial scientific and clinical" reasons to expect NCT 236 to succeed. Fact Nos. 63, 66; *see Am. Sales*, 2015 WL 13264206, at *7 (rejecting drugmaker's similar attempt to re-characterize a factual misrepresentation as argument); *Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp. 2d 522, 534 (D.N.J. 2000) (rejecting "as a matter of law" drugmaker's claim that statements about undisclosed reference are "mere advocacy"). Mr. Dichter's submission of a *different* and *less relevant* J&J protocol (the lupus protocol) further evinces his intent to deceive; he knew clinical trial protocols could be relevant but withheld the most material one. Fact No. 85. Mr. Dichter's submission of a single-page print-out of the CT.gov webpage for NCT 236—which contained no detail about the trial—strengthens this inference. *Id.*

Finally, while Mr. Dichter denies knowledge of materiality, J&J's counsel shielded from discovery conversations between him and the inventors about the protocol and FDA submissions. Fact No. 69. From this privilege assertion, the jury could infer J&J has more to lose from the contents of these conversations than it has to gain. *Sysmex*, 2022 WL 1503987, at *5.

*The inventors.* The evidence suggests that multiple inventors acted with intent to deceive. Multiple inventors repeatedly argued to the FDA (and ████████████████ ) that ustekinumab

26

would successfully treat UC, marshalled scientific evidence to support that expectation (Jostins and Granlund), and signed oaths to the PTO declaring that they reviewed the patents and were aware of their duties to the PTO. Fact Nos. 60–63, 84. Yet there is no evidence that *any* of the inventors took steps to ensure Jostins, Granlund, or the protocol were submitted to the PTO. These facts are sufficient to preclude summary judgment. *Sysmex*, 2022 WL 1503987, at *6.

J&J argues that the plaintiffs fail to prove "anyone at J&J [knew] about the materiality of these submissions." J&J at 24. Not so. J&J instructed witnesses not to answer on this topic and withheld related documents. Fact No. 69. Privilege cannot be used as a sword and shield. *See United States v. Duke Energy Corp.*, 208 F.R.D. 553, 558 (M.D.N.C. 2002), *vacated on other grounds*, 2010 WL 3023517 (M.D.N.C. July 28, 2010); *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003) ("parties… may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials.").

Finally, as one of J&J's favored cases—*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 2017 WL 3493799, at *4 (N.D. Ill. Aug. 14, 2017)—noted, "[f]ailing circumstantial evidence suggesting knowledge of materiality, . . . [given] that the technology disclosed in the [] references at issue was so clearly and convincingly material[], . . . familiarity with the references alone should suffice under *Therasense*." The FDA materials constitute such references.

### ii.     J&J intended to deceive the PTO by withholding Ochsenkühn.

Drawing all inferences in the plaintiffs' favor, a reasonable jury could also find that J&J intended to deceive the PTO when its employees concealed the Ochsenkühn reference while affirmatively telling the PTO that "[p]rior to the present invention, *no studies had been conducted with ustekinumab for UC*." Fact Nos. 71–75.

*First*, several inventors had ███████████████████████████. Fact No. 72. They attended conferences where Dr. Ochsenkühn presented this research, which was

27

*directly relevant* their role at J&J. Fact No. 71. Dr. Marano had ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮. Fact No. 73. Such facts show the inventors had knowledge of

Ochsenkühn. *Kove*, 2024 WL 450028, at *29 (knowledge of a reference should be left to the jury

where the inventor had it in his files); *Sysmex*, 2022 WL 1503987, at *6 (prior art in inventors'

files can support an inference of knowledge). And a jury can reject, on credibility grounds, the

inventors' claimed lack of recollection (J&J Fact. No. 25), particularly for Dr. Marano, whose

job was studying the use of Stelara to treat UC. Fact No. 71. *See TransWeb, LLC v. 3M*

*Innovative Props. Co.*, 812 F.3d 1295, 1304–05 (Fed. Cir. 2016) (affirming finding that an

inventor's testimony that he had "no recollection" of seeing prior art at a convention was "simply

not credible"); *EIS*, 2023 WL 6799332, at *9 (summary judgment inappropriate because intent

"inevitably requires a determination of the witness's credibility").

Here, J&J *sponsored* Dr. Ochsenkühn to present the same research at a U.S. conference,

including at a *special session on his research for J&J*, a few months after he had presented it at a

European conference *attended by a '307 inventor*. Fact No. 71. While Mr. Dichter also denied

knowledge of Ochsenkühn prior to 2023 (J&J Fact No. 25), his CDT participation and focus on

Stelara allow the jury to infer the opposite. Fact No. 49; *EIS*, 2023 WL 6799332, at *9;

*Mitsubishi Heavy Indus., Ltd. v. Gen. Electric Co.*, 2012 WL 4336208, at *4 (M.D. Fla. Sept. 21,

2012) (summary judgment denied despite prosecutor denying knowledge).

*Second*, J&J denied the plaintiffs all access to information about whether individuals

searched for, found, and withheld Ochsenkühn by asserting the attorney-client privilege. Fact

No. 74. A prosecutor's denial of "knowledge of the withheld information" must be viewed "in

light of his counsel's invocation of the attorney-client privilege" and the prosecutor's refusal to

"answer several questions relating to his familiarity with" the relevant prior art. *Sysmex*, 2022

WL 1503987, at *5.[10]

 *Third*, "the duty of candor cannot be avoided by willful ignorance or compartmentalization of knowledge within a company in an effort to insulate the patent applicants and their attorneys from information unfavorable to patentability." *Synthon IP*, 472 F. Supp. 2d at 779; *Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1361–62 (Fed. Cir. 2005) (rejecting the "circular logic" that failure of counsel to disclose material facts was excused "because the inventors failed to fully inform them" of those facts); *In re Metoprolol Succinate Patent Litig.*, 2006 WL 120343, at *25 (E.D. Mo. Jan. 17, 2006), *rev'd in part*, 494 F.3d 1011 (Fed. Cir. 2007) ("Astra cannot benefit from its failure to disclose material information to its . . . counsel and then hide behind its argument that he acted in good faith and candor in his prosecution of the patent.").

 *Finally*, the facts surrounding the omitted Ochsenkühn reference cannot be read in isolation. Courts look at the totality of a prosecutors' or inventors' actions when deciding whether the circumstantial evidence is sufficient to suggest intent to deceive. *See Kaiser Found. Health Plan, Inc. v. Abbott Lab'ys, Inc.*, 552 F.3d 1033, 1051 (9th Cir. 2009) (prosecutor's later omission of relevant case law supported inference that his earlier omission of prior art was not a mistake). Here, that context is more than sufficient from a specific intent inference.

## II. A reasonable jury could find J&J willfully acquired the Momenta biosimilar patents.

 J&J raises no legally relevant challenge to the plaintiffs' Momenta patent acquisition theory. The plaintiffs remain entitled to partial summary judgment in *their* favor on this issue.

---

 [10] J&J's assertions of attorney-client privilege to shield discovery into Mr. Dichter's and Dr. Ralat's search for or knowledge of Ochsenkühn undermines J&J's reliance on *Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394, 397 (Fed. Cir. 1996) and *Giuliano v. SanDisk LLC*, 705 F. App'x 957, 961 (Fed. Cir. 2017), where the patentees permitted discovery into prior art searches.

**A.  Facts regarding J&J's acquisition of the Momenta biosimilar patents.**

The plaintiffs incorporate Fact Nos. 16–26 from their Motion for Partial Summary Judgment regarding J&J's acquisition of the Momenta patents, ECF 443, and add the following.

89.    Michael Genus was the "transaction lead" and his team was the "quarterback" for J&J's Momenta acquisition in 2020. Ex. 160 (Genus Tr.) at 24–26. He explained that "[i]n an acquisition, basically you're paying for everything up front; you're assuming all of the risk, and you're acquiring everything that the company has." *Id*. at 19.

90.    J&J knew it was acquiring Momenta's entire patent estate, including the Momenta biosimilar patents, prior to closing the Momenta acquisition. *Id*. at 158–61; Ex. 23; Ex. 26; J&J Ex. 44 (M. Miller Tr.) at 51 ("Johnson & Johnson . . . bought all the patents").

91.    Momenta's and J&J's outside counsel listed the Momenta patents as part of Momenta's patent estate in Annex 4.17(a) that "accompan[ied] the merger agreement." Ex. 160 (Genus Tr.) at 126–28, 159–61; *see also* Ex. 23.

92.    Between the date J&J first ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████. *See* Ex. 52; ECF 443; J&J Fact No. 43.

93.    J&J refused to produce documents or testify about the timing and scope of J&J's knowledge of the Momenta patents. *See, e.g.*, Ex. 162 (J&J Objections to First Set of RFPs) at No. 42 (refusing to produce documents regarding J&J's understanding of the scope of the Momenta patents and their relevance to the Amgen biosimilar); Ex. 161 (M. Miller Tr.) at 53–54, 96, 139–41; Ex. 103 (DeFranco Tr.) at 132, 191–92; Ex. 142 at Rows 7–13 (exemplar ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

30



94.    In its ██████████████████████████████████████████████

████████████████████████████. Ex. 14 ¶ 5. J&J told ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████" *Id.* ¶ 4.

**B.    J&J's argument about its "lack-of-specific-intent" is meritless.**

J&J argues that the word "willful" introduces a specific intent requirement for Sherman Act Section 2 claims. The law rejects this claim. Section 2 willfulness demands only the "mere intent to do the act." *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co. Ltd.* (*Actos*), 11 F.4th 118, 137 (2d Cir. 2021) (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 432 (2d Cir. 1945) (L. Hand, J.) (quotation marks omitted)). A plaintiff need not prove that the defendant intended to do an *improper* act, just that it intended to do the act that had *the effect* of acquiring or maintaining monopoly power. *Actos*, 11 F.4th at 137; *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 626 (1953) ("[T]he completed offense of monopolization under § 2 demands only a general intent to do the act . . . ."). Once a company possesses monopoly power, actions that further that power always constitute willful maintenance: "an '[i]mproper exclusion (exclusion not the result of superior efficiency) is *always* deliberately intended' regardless of any colorable evidence of good faith." *Actos*, 11 F.4th at 137 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 (1985)) (emphasis added). The Supreme Court has long held that "no monopolist

31

monopolizes unconscious of what he is doing." *Aspen Skiing*, 472 U.S. at 602 (quoting

*Aluminum*, 148 F.2d at 432); *see Am. Tobacco Co. v. United States*, 328 U.S. 781, 814 (1946).

The recent *Actos* decision makes that point. There, the Court held that the drugmaker's

argument that Section 2 prohibits only "willfully improper" conduct "misconstrues the standard."

*Actos*, 11 F.4th at 137. Willfulness only requires intent to "do the act." *Id.* (internal citation and

quotation marks omitted); *see also United States v. Evans*, 74 F.4th 597, 604 (4th Cir. 2023)

("the term 'willfully' denotes a 'specific purpose' only in 'exceptional cases.'") (citation

omitted). "Simply put, 'benign intent does not shield anticompetitive conduct from liability' in a

monopolization claim." *Actos*, 11 F.4th at 137(quoting *In re Lipitor Antitrust Litig.*, 868 F.3d

231, 263 (3d Cir. 2017)). The *Actos* court applied this principle in granting the *plaintiffs'* motion

for summary judgment as to the "'willful maintenance' element of monopolization." *In re Actos*

*Antitrust Litig.*, 783 F. Supp. 3d 749, 782 (S.D.N.Y. 2025). Absent this improper intent framing,

J&J's Momenta argument collapses.

### C.    J&J's instantaneous-injury argument lacks merit.

There is no merit to J&J's argument that the "Momenta acquisition" did not affect

competition "at the time the acquisition took place in 2020." J&J at 36–37. *First*, this case

challenges J&J's acquisition of the Momenta *patents*, not of Momenta the company. As a matter

of law, it is meaningless that a monopolist's acquisition of exclusive rights to patents occurs as

part of a corporate merger; that action is "presumptively . . . a § 2 'exclusionary practice,' and

this applies with equal force to the acquisition of a firm that owns such patents." 14 Philip

Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 707a (2024); *see also* MTD at 33 ("Consistent

with the decisions of other courts that have addressed this question, this Court finds that

allegations that a monopolist acquired exclusive rights in a patent related to the subject matter of

the monopoly can constitute anticompetitive conduct.").

*Second*, J&J's instantaneous-antitrust-injury requirement finds no support in the law, the facts of this case, or sound policy: there is no safe harbor "waiting period" after which a monopolist can seek to exclude competitors with patents it unlawfully acquired. This Court held that "a monopolist's acquisition of exclusive rights to patents related to the subject matter of the monopoly can constitute anticompetitive conduct as a matter of law." MTD at 29. In support of this conclusion, the Court cited *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981). *SCM* observed that "[w]here . . . the acquisition itself is unlawful, *the subsequent exercise* of the ordinarily lawful exclusionary power inherent in the patent *would be a continuing wrong*, a continuing unlawful exclusion of potential competitors." 645 F.2d at 1206 (emphasis added). There is no requirement that a monopolist instantaneously deploy its acquired patents for an acquisition to be considered unlawful. Instead, the acquisition itself increases the potential to inflict anticompetitive harm in the future. As this Court wrote,

> It is easy to see how a monopolist's acquisition of exclusive rights over processes to make competitor goods—as is the case here—has the *potential* to harm competition. It can exclude rivals from the market. Put differently, the acquisition of a patent related to the subject matter of the monopoly has the effect of increasing or prolonging the monopolist's market *power* because competitors cannot use the patented invention. That is anticompetitive.

MTD at 32 (emphasis added).

J&J offers no legal support for its argument. Instead, it obfuscates the true question at issue in the two primary cases it cites: whether the defendant was *a monopolist in the relevant market* at the time of the acquisition. The inquiry was not, as J&J insists, whether the defendant *used* the acquired patent(s) *to block competition* at the time of the acquisition.[11] *SCM*, 645 F.2d

---

[11] J&J also quotes *Crawl Space Door Sys., Inc. v. SmartVent Prods., Inc.*, No. 2:19-cv-00320-RAJ-RJK, 2020 WL 13691776 at *5 (E.D. Va. Apr. 28, 2020)—a case that has nothing to

at 1207–09 ("In scrutinizing acquisitions of patents under § 2 of the Sherman Act, the focus should be upon the market power that will be conferred by the patent in relation to the market position then occupied by the acquiring party."); *Crucible, Inc. v. Stora Kopparbergs Bergslags AB*, 701 F. Supp. 1157, 1160 (W.D. Pa. 1988) (the court must "determine whether . . . there existed a relevant product market . . . at the time of the patents acquisitions"). Both courts concluded that because the defendant was not a monopolist *at the time of the acquisition*, there was no Section 2 violation. *SCM Corp*, 645 F.2d at 1208 (no violation because the defendant acquired the relevant patents "at least eight years prior to the appearance of the relevant product market . . . over which those patents eventually afforded it monopoly power"); *Crucible*, 701 F. Supp. at 1161–62 (no violation because "there was no relevant market" when the defendant acquired the patents). These cases support the plaintiffs'—not J&J's—position. J&J was a monopolist in the U.S. market for ustekinumab at the time it acquired the Momenta biosimilar patents. ECF 443 at 3–13. J&J has not argued otherwise.

J&J next twists the Court's words, arguing that a monopolist *may* acquire exclusive rights in a patent related to the subject matter of the monopoly so long as it waits some unknown amount of time before using it to block competition. *See* J&J at 36 (citing MTD at 29). Not so. Whether J&J asserted the patents two days or two years after it acquired them is irrelevant. J&J's patent acquisition was an antitrust violation and its later assertion of those patents to delay competition caused the plaintiffs' injury and damages.[12] J&J fails to carry its burden.

---

do with patent acquisition—for the basic proposition that "a monopolist's act must have an anticompetitive effect." J&J at 33. By citing to *SCM* immediately thereafter, J&J attempts to impose a temporal requirement on the anticompetitive *effect*. For the reasons stated *infra*, the only timing question is whether J&J was a monopolist when it engaged in the anticompetitive *conduct* (i.e. when it acquired the patents).

[12] The law warns of the dangers of conflating conduct that violates the antitrust laws due to

### III.     A reasonable jury could find J&J's monopolistic acts delayed biosimilar entry.

A reasonable jury could find J&J's monopolistic acts delayed biosimilar entry. Given the genuine disputes of fact, summary judgment as to causation is improper.

### A.  Facts regarding J&J's causation of biosimilar delay.

95.     The FDA approved Amgen's biosimilar ustekinumab, Wezlana, on October 31, 2023, ███████████████████████████████████████████. Ex. 6 (Maestas) ¶¶ 81, 95.

96.     Six other biosimilar manufacturers received FDA approval in the months that followed Amgen's October 2023 FDA approval. *See, e.g.*, *id.* ¶¶ 82–91.

97.     Earlier competition from FDA-approved ustekinumab biosimilars would have significantly reduced ustekinumab prices. *See, e.g.*, *id.* ¶¶ 81–97.

98.     J&J



███████. *See id.* ¶¶ 77–79, 81, 84; Ex. 11 (Smith Tr.) at 20–21.

99.     J&J

. *See* Exs. 39–41, 43–45, 51; J&J Answer (ECF 260) ¶ 7; Ex. 12 (J&J's 2nd RFA Resp.) Nos. 113–16, 175; Ex. 19 (Pls.' 1st RFA Resp.) Nos. 17–20 (requesting plaintiffs admit patent expiry dates).

100.     Three experts—Dr. Rau (biosimilar manufacturing), Ms. Wang

---

the *potential* to injure competition and conduct that *does* injure competition. *See Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 57 (1st Cir. 2017) ("There is an important difference, for purposes of the *Noerr–Pennington* doctrine, between using litigation . . . as a basis of antitrust liability and awarding damages for efforts to use the courts to carry out private cartel agreements." (internal quotation marks omitted)); *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1561 (11th Cir. 1992); MTD at 36 (citing *Amphastar*).

(commercialization of drug products), and Mr. Clark (pharmaceutical decision-making)—all opine that, absent J&J's use of the '307 and Momenta patents, reasonable manufacturers would have launched biosimilar ustekinumab upon or shortly after FDA approval in 2023-2024, ███████ ██████████████████████. Ex. 38 (Rau) ¶ 16; Ex. 73 (Clark) ¶ 20; J&J Ex. 63 (Wang) ¶ 20.

101. J&J ████████████████████████████████████████████. J&J first sued Amgen on the '307 patent and then, ██████████████████████████████████████████. *Compare* Ex. 46 ¶ 6 *with* Ex. 14 ¶ 11. J&J ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████t. *See* Ex. 52; Ex. 53; Ex. 71 (██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████") ; Ex. 12 (J&J's 2nd RFA Resp.) No. 197; Ex. 42 (████████████████████████████████████████████████████ ████); Ex. 86 at –041 (██████████████); Ex. 55; Ex. 163 (J&J letter ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████") ; Ex. 164 (same ██████████); Ex. 165 (same ██████████); Ex. 166 (same █ ██████); Ex. 167 (same ██████); Ex. 168 at slide 6 (in a ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████"). 

102. Every ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████. Exs. 39–41, 43–45, 51.

B.      **The evidence shows that J&J's monopolistic acts caused biosimilar delay and consequent antitrust injury.**

Substantial evidence supports a reasonable jury finding that, in the absence of J&J's monopolistic scheme, Amgen's biosimilar product would have entered the U.S. market for ustekinumab more than a year sooner, followed by six more competing biosimilars. Fact Nos. 95–102. This earlier competition would have significantly lowered ustekinumab prices sooner. Fact No. 97. Prior to its wrongful conduct, J&J ███████████████████████████ █████████████████████████. Fact No. 98. ████████████████████████ ████████████████████████. *Id.* However, through J&J's assertion of the '307 and Momenta patents ████████████████████████████████████████ ████████████████████████████████. Fact Nos. 99, 101–02. The plaintiffs' experts in drug commercialization and sales, pharmaceutical decision-making, public health and pharmacoeconomics, and biosimilar manufacturing all agree: absent J&J's use of the '307 and Momenta patents, reasonable manufacturers would have launched biosimilar ustekinumab upon or shortly after FDA approval of their products in 2023 and 2024, ████████████████████ ████. Fact No. 100. With no real answer to this evidence, J&J "lodge[s] a series of causation arguments all of which quickly unravel under scrutiny." MTD at 35.

C.      **The injury flows from J&J's monopolistic acts.**

J&J argues that the delayed biosimilar entry dates "stem from lawful settlements, not anticompetitive conduct." J&J at 37. But the plaintiffs do not challenge the settlements as unlawful under *Actavis.* Rather, the plaintiffs challenge J&J's actions in *acquiring* the patents that led to the settlement. At the motion to dismiss stage, this Court acknowledged that when an FDA-approved biosimilar is delayed in entering the market "because of its settlement agreement with defendants," such "facts are sufficient to allege causation." MTD at 34–35. These

37

allegations are now proven: Amgen and six other biosimilar manufacturers gained FDA approval in 2023 and 2024, but J&J's assertions of its ill-begotten patents ███████████████████. Fact Nos. 95–96, 98–102. This Court observed that it is "quite easy" to understand that the "mere enforcement of patents" would lead a biosimilar manufacturer to "delay its entry." MTD at 35.

J&J articulates the plaintiffs' causal path to injury in its brief and admits that "there is no dispute that biosimilar manufacturers have every incentive to launch their biosimilar Stelara products as quickly as possible." J&J at 38. But due to J&J's enforcement of the patents, "biosimilar manufacturers here [] faced a choice": they could either "launch at risk of an adverse patent decision" or reach agreement with J&J on "entry dates." *Id.* J&J admits "every biosimilar manufacturer settled with J&J" and that "the purportedly delayed entry dates flow from these agreements." *Id.* There is no need, as J&J suggests, for the plaintiffs to "second-guess the judgments of sophisticated biosimilar manufacturers." *Id.* Their actions were a direct result of J&J's enforcement of illegally obtained patents.[13] Simply put, without the '307 and Momenta patents, there would have been no risk to mitigate through delay-causing settlements with J&J.

### D.    J&J's use of the '307 patent was part of the monopolistic scheme that caused biosimilar delay.

Nor is there merit to J&J's argument that the plaintiffs "cannot show antitrust injury for their *Walker Process* claim." J&J at 39. To be sure, the evidence shows that if J&J *only* had the '307 patent, that patent, standing alone, likely would not have delayed biosimilar entry.[14] But

---

[13] *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132 (3d Cir. 2017), cited by J&J, has no applicability here. There, a non-party having no relationship to the parties in the case had a patent that would bar generic entry regardless of the brand's actions, breaking the causal chain. *Id.* at 165. Here, delayed biosimilar entry is—even according to J&J's own admission—a direct result of J&J having asserted its own patents.

[14] The plaintiffs plan to prove a scheme that includes wrongdoing with respect to both the '307 and Momenta patents. However, if the jury finds no wrongdoing with respect to the former, the '307 patent is not an intervening act and that finding would not bar earlier biosimilar entry.

this case addresses J&J's anticompetitive *scheme*, not a standalone *Walker Process* claim. "It is foundational that alleged anticompetitive conduct must be considered as a whole." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354 (4th Cir. 2024). So too for causation. As this Court observed, the plaintiffs are required to show that the "defendants' antitrust violation" caused the alleged injury; here that means the plaintiffs must prove "the enforcement of the '307 patent and acquisition of the Momenta patents caused a biosimilar to delay its entry into the market." MTD at 34.

There is substantial evidence that J&J used Momenta patents (expiring in 2032 and 2033) *alongside* the '307 patent (expiring six or more years later, in September 2039) to delay biosimilar entry. Fact Nos. 95–96, 98–102. Every settlement J&J extracted from the biosimilar companies ███████████████████████████████████████████████████████. Fact No. 102. And the '307 patent played a particularly important role in J&J's overall scheme: it enabled J&J to initiate a lawsuit against Amgen. J&J first asserted the '307 patent against Amgen, then obtained discovery, and ███████████████████████████. Fact No. 101. And J&J used the '307 patent to █████████████████████████████████████████████████ ██████████████████████. *Id.* J&J's assertion of the '307 patent forced biosimilars to "necessarily weigh the costs of prolonged litigation against the costs of settling or delaying entry," MTD at 35, especially given that the '307 patent did not expire for another 17 years. Fact No. 46. There is ample evidence from which a reasonable jury could conclude that J&J's use of the '307 patent was part of the monopolistic scheme that caused biosimilar delay.

This Court has rejected J&J's argument that the '307 "patent by itself is not alleged to be the cause of any actual biosimilar exclusion." MTD at 35. As the Court explained, that "argument introduces a requirement that does not exist in the law—that the alleged conduct be

39

the exclusive cause of harm. Defendants' conduct must be a material and but-for cause of the harm; however, it does not need to be the *sole* cause." *Id.* at 35–36. The argument should be rejected again.

## IV.    The plaintiffs' state law claims survive J&J's attacks and are not preempted.

The plaintiffs agree that the substantive requirements of their state law claims are to be interpreted consistently with federal antitrust law. But the procedural standing rules are markedly different. Here, there is no pending challenge to state law standing. J&J did not move to dismiss any of the new claims or allegations in the Second Amended Complaint. "As a general rule, an amended pleading ordinarily supersedes the original and renders it of no legal effect." *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) (internal quotation marks omitted); *see also Dykes v. Portfolio Recovery Assocs., LLC*, 306 F.R.D. 529, 530 (E.D. Va. 2015) (directing that "motions directed at superseded pleadings must be denied as moot"). J&J has not challenged the standing alleged in the operative complaint. Since J&J has not raised defenses unique to state law, all the plaintiffs' state law claims survive for the reasons stated herein. Finally, J&J's throwaway remark about preemption fails. The issue was previously briefed, *see* ECF No. 98 at 15–20, and rejected by this Court. MTD at 39–42.

Dated: September 17, 2025                Respectfully submitted,

**GLASSER AND GLASSER, P.L.C.**

*/s/ William H. Monroe, Jr.*
William H. Monroe, Jr. (VSB No. 27441)
Marc C. Greco (VSB No. 41496)
Kip A. Harbison (VSB No. 38648)
Michael A. Glasser (VSB No. 17651)
**GLASSER AND GLASSER, P.L.C.**
Crown Center, Suite 600
580 East Main Street
Norfolk, VA 23510
Telephone: (757) 625-6787

40

bill@glasserlaw.com
marcg@glasserlaw.com
kip@glasserlaw.com
michael@glasserlaw.com

Thomas M. Sobol (*pro hac vice*)
Hannah W. Brennan (*pro hac vice*)
Abbye R. K. Ognibene (*pro hac vice*)
Whitney E. Street (*pro hac vice*)
Hannah Schwarzschild (*pro hac vice*)
Rebekah Glickman-Simon (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
One Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
tom@hbsslaw.com
hannahb@hbsslaw.com
abbyeo@hbsslaw.com
whitneyst@hbsslaw.com
hannahs@hbsslaw.com
rebekahgs@hbsslaw.com

Peter D. St. Phillip (*pro hac vice*)
Uriel Rabinovitz (*pro hac vice*)
Raymond Girnys (*pro hac vice*)
Noelle Ruggiero (*pro hac vice*)
Alexis Castillo (*pro hac vice*)
Thomas Griffith *(pro hac vice)*
Peyton A. Woodward (*pro hac vice)*

**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
PStPhillip@lowey.com
URabinovitz@lowey.com
RGirnys@lowey.com
NRuggiero@lowey.com
ACastillo@lowey.com
tgriffith@lowey.com
pwoodward@lowey.com

John Radice (*pro hac vice*)
April Lambert (*pro hac vice*)
Kenneth Pickle (*pro hac vice*)
Charles Kopel (*pro hac vice*)

41

**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Telephone: (646) 245-8502
jradice@radicelawfirm.com
alambert@radicelawfirm.com
kpickle@radicelawfirm.com
ckopel@radicelawfirm.com

*Counsel for Plaintiffs CareFirst of Maryland, Inc.,*
*Group Hospitalization and Medical Services, Inc.,*
*and CareFirst BlueChoice, Inc.*

**CERTIFICATE OF SERVICE**

I, William H. Monroe, Jr., certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.

Dated: September 17, 2025                                        */s/ William H. Monroe, Jr.*
                                                                    William H. Monroe, Jr.

# Appendix A

| Plaintiffs' Exhibit No. | ECF No. | Description |
| --- | --- | --- |
| 1 | 456-1 | Byron Cryer Declaration |
| 2 | 456-2 | Byron Cryer Transcript Excerpts |
| 3 | 456-3 | Andrew Hirshfeld Rebuttal Report |
| 4 | 456-4 | Robert Bahr Rebuttal Report |
| 5 | 456-5 | Anupam Jena Report |
| 6 | 456-6 | Nicole Maestas Report |
| 7 | 456-7 | Nicole Maestas Rebuttal Report |
| 8 | 456-8 | Jeffrey Way Report |
| 9 | 456-9 | Jeffrey Way Rebuttal Report |
| 10 | 456-10 | Bates Stamped Document |
| 11 | 456-11 | Brian Smith Transcript Excerpts |
| 12 | 456-12 | Case Document |
| 13 | 456-13 | Bates Stamped Document |
| 14 | 456-14 | Bates Stamped Document |
| 15 | 456-15 | Bates Stamped Document |
| 16 | 456-16 | Bates Stamped Document |
| 17 | 458-1 | Bates Stamped Document |
| 18 | 458-2 | Bates Stamped Document |
| 19 | 458-3 | Case Document |
| 20 | 458-4 | Melissa Miller Transcript Excerpts |
| 21 | 458-5 | Bates Stamped Document |
| 22 | 458-6 | Bates Stamped Document |
| 23 | 458-7 | Bates Stamped Document |
| 24 | 458-8 | Case Document |
| 25 | 458-9 | Bates Stamped Document |
| 26 | 458-10 | Bates Stamped Document |
| 27 | 458-11 | Denise DeFranco Transcript Excerpts |
| 28 | 458-12 | Michael Genus Transcript Excerpts |
| 29 | 458-13 | Case Document |
| 30 | 458-14 | Douglas Miller Transcript Excerpts |
| 31 | 458-15 | Bates Stamped Document |
| 32 | 458-16 | Bates Stamped Document |
| 33 | 458-17 | Bates Stamped Document |
| 34 | 458-18 | Bates Stamped Document |

| 35 | 458-19 | Bates Stamped Document |
|----|--------|------------------------|
| 36 | 458-20 | Bates Stamped Document |
| 37 | 458-21 | Bates Stamped Document |
| 38 | 458-22 | Tiffany Rau Report |
| 39 | 458-23 | Bates Stamped Document |
| 40 | 458-24 | Bates Stamped Document |
| 41 | 458-25 | Bates Stamped Document |
| 42 | 458-26 | Bates Stamped Document |
| 43 | 458-27 | Bates Stamped Document |
| 44 | 458-28 | Bates Stamped Document |
| 45 | 458-29 | Bates Stamped Document |
| 46 | 458-30, 458-31, 458-32 | Bates Stamped Document |
| 47 | 458-33 | Bates Stamped Document |
| 48 | 458-34 | Bates Stamped Document |
| 49 | 458-35 | Bates Stamped Document |
| 50 | 458-36 | Bates Stamped Document |
| 51 | 458-37 | Bates Stamped Document |
| 52 | 458-38 | Bates Stamped Document |
| 53 | 458-39 | Bates Stamped Document |
| 54 | 458-40 | Bates Stamped Document |
| 55 | 458-41 | Bates Stamped Document |
| 56 | 458-42 | Case Document |
| 57 | 458-43 | Bates Stamped Document |
| 58 | 458-44 | Bates Stamped Document |
| 59 | 458-45 | Bates Stamped Document |
| 60 | 458-46 | Bates Stamped Document |
| 61 | 458-47 | Bates Stamped Document |
| 62 | 458-48 | Case Document |
| 63 | 458-49 | Luis Ralat Transcript Excerpts |
| 64 | 458-50 | Bates Stamped Document |
| 65 | 459-1 | Robert Bahr Report |
| 66 | 459-2 | Lisa Matovcik Report |
| 67 | 459-3 | Bates Stamped Document |
| 68 | 459-4 | Clinical Trials Posting |
| 69 | 459-5 | Article |

| 70 | 459-6 | Patent Application |
|---|---|---|
| 71 | 459-7 | Bates Stamped Document |
| 72 | 459-8 | Debbie Feinstein Declaration |
| 73 | 459-9 | Todd Clark Report |
| 74 | 459-10 | Docket Excerpt |
| 75 | 459-11 | Bates Stamped Document |
| 76 | 459-12 | Bates Stamped Document |
| 77 | 459-13 | Aruna Dontabhaktuni Report |
| 78 | 459-14 | Aruna Dontabhaktuni Reply Report |
| 79 | 460-1 | Sue Lim Rebuttal Report |
| 80 | 460-2 | Douglas Miller Declaration |
| 81 | 460-3 | Paul Warfield Report |
| 82 | 460-4 | Lisa Matovcik Reply Report |
| 83 | 460-5 | Article |
| 84 | 460-6 | Bates Stamped Document |
| 85 | 460-7 | Bates Stamped Document |
| 86 | 460-8 | Bates Stamped Document |
| 87 | 460-9 | Bates Stamped Document |
| 88 | 460-10 | Bates Stamped Document |
| 89 | 460-11 | Bates Stamped Document |
| 90 | 460-12 | Bates Stamped Document |
| 91 | 460-13 | Inter Partes Document |
| 92 | 460-14 | Inter Partes Document |
| 93 | 460-15 | Article |
| 94 | 530-1 | Bates Stamped Document |
| 95 | 530-2 | Philippe Szapary Transcript Excerpts |
| 96 | 530-3 | Bates Stamped Document |
| 97 | 530-4 | Bates Stamped Document |
| 98 | 530-5 | Colleen Marano Transcript Excerpts |
| 99 | 530-6 | Bates Stamped Document |
| 100 | 530-7 | Eric Dichter Transcript Excerpts |
| 101 | 530-8 | Bates Stamped Document |
| 102 | 530-9 | Privilege Log Excerpt |
| 103 | 530-10 | Denise DeFranco Transcript Excerpts |
| 104 | 530-11 | Jeffrey Way Transcript Excerpts |

3

| 105 | 530-12 | Luis Ralat Transcript Excerpts |
|---|---|---|
| 106 | 531-1, 531-2, 531-3, 532-1, 532-2 | '307 Patent Wrapper |
| 107 | 532-3 | Kimberly Shields-Tuttle Transcript Excerpts |
| 108 | 532-4 | Beth Wallace Transcript Excerpts |
| 109 | 532-5 | Bates Stamped Document |
| 110 | 532-6 | Bates Stamped Document |
| 111 | 532-7 | Bates Stamped Document |
| 112 | 532-8 | Bates Stamped Document |
| 113 | 532-9 | Bates Stamped Document |
| 114 | 532-10 | Patent Application Comparison |
| 115 | 532-11 | Bates Stamped Document |
| 116 | 532-12 | Richard Strauss Transcript Excerpts |
| 117 | 532-13 | Bates Stamped Document |
| 118 | 532-14 | Article |
| 119 | 532-15 | Article |
| 120 | 532-16 | Bates Stamped Document |
| 121 | 532-17 | Bates Stamped Document |
| 122 | 532-18 | Bates Stamped Document |
| 123 | 532-19 | Bates Stamped Document |
| 124 | 532-20 | Bates Stamped Document |
| 125 | 532-21 | Bates Stamped Document |
| 126 | 532-22 | Bates Stamped Document |
| 127 | 532-23 | Bates Stamped Document |
| 128 | 532-24 | Bates Stamped Document |
| 129 | 532-25 | Bates Stamped Document |
| 130 | 533-1, 533-2 | Bates Stamped Document |
| 131 | 533-3 | Bates Stamped Document |
| 132 | 533-4 | Bates Stamped Document |
| 133 | 533-5 | Bates Stamped Document |
| 134 | 533-6 | Bates Stamped Document |
| 135 | 533-7 | Bates Stamped Document |
| 136 | 533-8 | Christopher O'Brien Transcript Excerpts |
| 137 | 533-9 | Bates Stamped Document |

| 138 | 533-10 | Bates Stamped Document |
| 139 | 534-1 | Bates Stamped Document |
| 140 | 534-2 | Bates Stamped Document |
| 141 | 534-3, 534-4 | Patent Wrapper |
| 142 | 534-5 | Privilege Log Excerpt |
| 143 | 534-6 | Katherine Li Transcript Excerpts |
| 144 | 534-7 | Thomas Ochsenkühn Transcript Excerpts |
| 145 | 534-8 | Plaintiffs' Exhibit |
| 146 | 534-9 | Plaintiffs' Exhibit |
| 147 | 535-1, 535-2 | Bates Stamped Document |
| 148 | 535-3 | Bates Stamped Document |
| 149 | 535-4 | Bates Stamped Document |
| 150 | 535-5 | Bates Stamped Document |
| 151 | 535-6, 536-1 | Bates Stamped Document |
| 152 | 536-2 | Bates Stamped Document |
| 153 | 536-3 | Bates Stamped Document |
| 154 | 536-4 | Bates Stamped Document |
| 155 | 536-5 | Case Document |
| 156 | 536-6 | '201 Patent Wrapper |
| 157 | 536-7 | Bates Stamped Document |
| 158 | 536-8 | Plaintiffs' Exhibit |
| 159 | 536-9 | '310 Patent Wrapper |
| 160 | 536-10 | Michael Genus Transcript Excerpts |
| 161 | 536-11 | Melissa Miller Transcript Excerpts |
| 162 | 536-12 | Case Document |
| 163 | 536-13 | Bates Stamped Document |
| 164 | 536-14 | Bates Stamped Document |
| 165 | 536-15 | Bates Stamped Document |
| 166 | 536-16 | Bates Stamped Document |
| 167 | 536-17 | Bates Stamped Document |
| 168 | 536-18 | Bates Stamped Document |
| 169 | 536-19 | Bates Stamped Document |
| 170 | 536-20 | Robert Bahr Transcript Excerpts |
| 171 | 536-21 | Todd Clark Transcript Excerpts |

5

| 172 | 536-22 | Aruna Dontabhaktuni Transcript Excerpts |
| 173 | 536-23 | Lisa Matovcik Transcript Excerpts |
| 174 | 536-24 | Anthony Gaspari Transcript Excerpts |
| 175 | 536-25 | Paul Warfield Transcript Excerpts |
| 176 | 536-26 | Plaintiffs' Exhibit |
| 177 | 536-27 | Plaintiffs' Exhibit |