# EXHIBIT 178 B

to 180 minutes, preferably 60 minutes to 120 minutes, such as 30 minutes, 60 minutes, 90 minutes, 120 minutes, 150 minutes, or 180 minutes.

In yet another exemplary regimen of providing safe and effective treatment of severely active UC in a subject in need thereof, a total dosage of about 90 mg of an anti-IL-12/IL-23p40 antibody is administered subcutaneously to the subject per administration. For example, the total volume of the composition administered is appropriately adjusted to provide to the subject the target dosage of the antibody at 40 mg, 50 mg, 60 mg, 70 mg, 80 mg, 90 mg, 100 mg, 110 mg, 120 mg, 130 mg or 140 mg per administration. The target dosage per administration can be administered in a single subcutaneous injection or in multiple subcutaneous injections, such as 1, 2, 3, 4, 5, or more subcutaneous injections.

The total dosage of the anti-IL-12/IL-23p40 antibody can be administered once per day, once per week, once per month, once every six months, etc. for a period of one day, one week, one month, six months, 1 year, 2 years or longer. Multiple administrations of the anti-IL-12/IL-23p40 antibody, each at a total dosage of described herein, can be administered to a subject in need thereof.

Dosage forms (composition) suitable for internal administration generally contain from about 0.001 milligram to about 500 milligrams of active ingredient per unit or container.

For parenteral administration, the antibody can be formulated as a solution, suspension, emulsion, particle, powder, or lyophilized powder in association, or separately provided, with a pharmaceutically acceptable parenteral vehicle. Examples of such vehicles are water, saline, Ringer's solution, dextrose solution, and 1-10% human serum albumin. Liposomes and nonaqueous vehicles, such as fixed oils, can also be used. The vehicle or lyophilized powder can contain additives that maintain isotonicity (e.g., sodium chloride, mannitol) and chemical stability (e.g., buffers and preservatives). The formulation is sterilized by known or suitable techniques.

Suitable pharmaceutical carriers are described in the most recent edition of Remington's Pharmaceutical Sciences, A. Osol, a standard reference text in this field.

Many known and developed modes can be used according to the present invention for administering pharmaceutically effective amounts of an IL-12/IL-23p40 antibody. IL-12/IL-

23p40 or IL-23 antibodies of the present invention can be delivered in a carrier, as a solution, emulsion, colloid, or suspension, or as a dry powder, using any of a variety of devices and methods suitable for administration by inhalation or other modes described here within or known in the art.

Formulations for parenteral administration can contain as common excipients sterile water or saline, polyalkylene glycols, such as polyethylene glycol, oils of vegetable origin, hydrogenated naphthalenes and the like. Aqueous or oily suspensions for injection can be prepared by using an appropriate emulsifier or humidifier and a suspending agent, according to known methods. Agents for injection can be a non-toxic, non-orally administrable diluting agent, such as aqueous solution, a sterile injectable solution or suspension in a solvent. As the usable vehicle or solvent, water, Ringer's solution, isotonic saline, etc. are allowed; as an ordinary solvent or suspending solvent, sterile involatile oil can be used. For these purposes, any kind of involatile oil and fatty acid can be used, including natural or synthetic or semisynthetic fatty oils or fatty acids; natural or synthetic or semisynthtetic mono- or di- or tri-glycerides. Parental administration is known in the art and includes, but is not limited to, conventional means of injections, a gas pressured needle-less injection device as described in U.S. Pat. No. 5,851,198, and a laser perforator device as described in U.S. Pat. No. 5,839,446 entirely incorporated herein by reference.

Alternative Delivery

The invention further relates to the administration of an anti-IL-12/IL-23p40 or IL-23 antibody by parenteral, subcutaneous, intramuscular, intravenous, intrarticular, intrabronchial, intraabdominal, intracapsular, intracartilaginous, intracavitary, intracelial, intracerebellar, intracerebroventricular, intracolic, intracervical, intragastric, intrahepatic, intramyocardial, intraosteal, intrapelvic, intrapericardiac, intraperitoneal, intrapleural, intraprostatic, intrapulmonary, intrarectal, intrarenal, intraretinal, intraspinal, intrasynovial, intrathoracic, intrauterine, intravesical, intralesional, bolus, vaginal, rectal, buccal, sublingual, intranasal, or transdermal means. An anti-IL-12/IL-23p40 or IL-23 antibody composition can be prepared for use for parenteral (subcutaneous, intramuscular or intravenous) or any other administration particularly in the form of liquid solutions or suspensions; for use in vaginal or rectal

administration particularly in semisolid forms, such as, but not limited to, creams and suppositories; for buccal, or sublingual administration, such as, but not limited to, in the form of tablets or capsules; or intranasally, such as, but not limited to, the form of powders, nasal drops or aerosols or certain agents; or transdermally, such as not limited to a gel, ointment, lotion, suspension or patch delivery system with chemical enhancers such as dimethyl sulfoxide to either modify the skin structure or to increase the drug concentration in the transdermal patch (Junginger, et al. In "Drug Permeation Enhancement;" Hsieh, D. S., Eds., pp. 59-90 (Marcel Dekker, Inc. New York 1994, entirely incorporated herein by reference), or with oxidizing agents that enable the application of formulations containing proteins and peptides onto the skin (WO 98/53847), or applications of electric fields to create transient transport pathways, such as electroporation, or to increase the mobility of charged drugs through the skin, such as iontophoresis, or application of ultrasound, such as sonophoresis (U.S. Pat. Nos. 4,309,989 and 4,767,402) (the above publications and patents being entirely incorporated herein by reference).

## EMBODIMENTS

The invention provides also the following non-limiting embodiments.

1. A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising administering to the subject a pharmaceutical composition comprising a clinically proven safe and clinically proven effective amount of an anti-IL-12/IL-23p40 antibody, wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6.

CORRECTED SPECIFICATION

2. The method of embodiment 1, wherein the antibody comprises the heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and the light chain variable region of the amino acid sequence of SEQ ID NO:8.
3. The method of embodiment 1, wherein the antibody comprises a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.
4. The method of any one of embodiments 1 to 3, wherein the antibody is administered intravenously to the subject, preferably at week 0 of the treatment, at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration.
5. The method of any one of embodiments 1 to 4, wherein the antibody is further administered subcutaneously to the subject, preferably at week 8 of the treatment, at a dosage of about 90 mg per administration.
6. The method of any one of embodiments 1 to 5, wherein the subject had previously failed or were intolerant of at least one therapy selected from the group consisting of an anti-TNF, vedolizumab, corticosteroids, azathioprine (AZA), and 6 mercaptopurine (6 MP), or the subject had demonstrated corticosteroid dependence.
7. The method of embodiment 5, wherein the antibody is administered in a maintenance dose every 8 weeks after the treatment at week 8 or every 12 weeks after the treatment at week 8.
8. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having a clinical remission based on at least one of the global definition and the US definition by week 16, preferably by week 8, more preferably by week 2, of the treatment and the clinical remission continues at least 44 weeks after week 0.
9. The method of embodiment 8, wherein the subject is in corticosteroid-free clinical remission at least 44 weeks after week 0.
10. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having an endoscopic healing continuing at least 44 weeks after week 0.

11. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as achieving a clinical response based on the Mayo endoscopy subscore continuing at least 44 weeks after week 0.
12. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having a change from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score continuing at least 44 weeks after week 0.
13. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having a mucosal healing continuing at least 44 weeks after week 0.
14. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having a decrease from baseline in Mayo score continuing at least 44 weeks after week 0.
15. The method of embodiment 7, wherein the subject is a responder to the treatment with the antibody and is identified as having a normalization of one or more biomarkers selected from the group consisting of C-reactive protein, fecal lactoferrin and fecal calprotectin continuing at least 44 weeks after week 0.
16. The method of embodiment 7, wherein the subject is in clinical response as determined by a decrease from baseline in the Mayo score by $\geq$30% and $\geq$3 points and a decrease from baseline in the rectal bleeding subscore $\geq$1 points or a rectal bleeding subscore of 0 or 1 continuing at least 44 weeks after week 0.
17. A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising:
    a. intravenously administering to the subject an anti-IL-12/IL-23p40 antibody in a first pharmaceutical composition at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration at week 0 of the treatment, and
    b. subcutaneously administering to the subject the anti-IL-12/IL-23p40 antibody in a second pharmaceutical composition at a dosage of 90 mg per administration, preferably at week 8 of the treatment,

wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6; and

wherein the subject had previously failed or were intolerant of at least one therapy selected from the group consisting of: an anti-TNF, vedolizumab, corticosteroids, azathioprine (AZA), and 6 mercaptopurine (6 MP), or the subject had demonstrated corticosteroid dependence.

18. The method of embodiment 17, wherein the antibody comprises the heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and the light chain variable region of the amino acid sequence of SEQ ID NO:8.
19. The method of embodiment 17, wherein the antibody comprises a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.
20. The method of any one of embodiments 1-19, wherein the pharmaceutical composition for intravenous administration further comprises a solution comprising 10 mM L-histidine, 8.5% (w/v) sucrose, 0.04% (w/v) polysorbate 80, 0.4 mg/mL L-methionine, and 20 μg/mL EDTA disodium salt, dehydrate, at pH 6.0.
21. The method of any one of embodiments 1-20, wherein the pharmaceutical composition for subcutaneous administration further comprises a solution comprising 6.7 mM L-histidine, 7.6% (w/v) sucrose, 0.004% (w/v) polysorbate 80, at pH 6.0.
22. The method of any one of embodiments 1-21, wherein the subject is a responder to the treatment with the antibody and is identified as having a clinical remission based on at least one of the global definition and the US definition by week 16, preferably by week 8, more preferably by week 2, of the treatment.

23. The method of any one of embodiments 1-22, wherein the subject is a responder to the treatment with the antibody and is identified as having an endoscopic healing by week 16, preferably by week 8, more preferably by week 2, of the treatment.
24. The method of any one of embodiments 1-23, wherein the subject is a responder to the treatment with the antibody and is identified as achieving a clinical response based on the Mayo endoscopy subscore by week 16, preferably by week 8, more preferably by week 2, of the treatment.
25. The method of any one of embodiments 1-24, wherein the subject is a responder to the treatment with the antibody and is identified as having a change from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score by week 16, preferably by week 8, more preferably by week 2, of the treatment.
26. The method of any one of embodiments 1-25, wherein the subject is a responder to the treatment with the antibody and is identified as having a mucosal healing by week 16, preferably by week 8, more preferably by week 2, of the treatment.
27. The method of any one of embodiments 1-26, wherein the subject is a responder to the treatment with the antibody and is identified as having a decrease from baseline in Mayo score by week 16, preferably by week 8, more preferably by week 2, of the treatment.
28. The method of any one of embodiments 1-27, wherein the subject is a responder to the treatment with the antibody and is identified as having a normalization of one or more biomarkers selected from the group consisting of C-reactive protein, fecal lactoferrin and fecal calprotectin by week 16, preferably by week 8, more preferably by week 2, of the treatment.
29. The method of any one of embodiments 1-28, wherein the subject is in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1 by week 16, preferably by week 8, more preferably by week 2, of the treatment.

30. The method of any one of embodiments 17-21, wherein the subject is not a responder to the treatment with the antibody by week 8 and is a responder to the treatment by week 16 of the treatment.
31. A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising:
    a. intravenously administering to the subject an anti-IL-12/IL-23p40 antibody in a first pharmaceutical composition at a dosage of about 6.0 mg/kg body weight of the subject or 130 mg per administration at week 0 of the treatment, and
    b. subcutaneously administering to the subject the anti-IL-12/IL-23p40 antibody in a second pharmaceutical composition at a dosage of 90 mg per administration, preferably at week 8 of the treatment,

    wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6 followed by a maintenance therapy

    wherein the maintenance therapy comprises subcutaneously administering to the subject the anti-IL-12/IL-23p40 antibody at a dosage of 90 mg per administration, once every 8 weeks or once every 12 weeks, and wherein the maintenance therapy is provided for 44 weeks.
32. A pharmaceutical composition of an anti-IL-12/IL-23p40 antibody, comprising an antibody and packaging comprising one or more drug product label elements disclosed in Annex I including data from a randomized, double-blind, placebo-controlled, clinical study in adult men and women with moderately to severely active ulcerative colitis (UC), wherein the antibody comprises: (i) a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity

determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6; (ii) a heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and a light chain variable region of the amino acid sequence of SEQ ID NO:8; or (iii) a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.

33. A method of selling a drug product comprising ustekinumab, comprising: manufacturing ustekinumab; promoting that a therapy comprising ustekinumab is safe and effective for treatment of a subject with ulcerative colitis, wherein performing the steps a) and b) results in a health care professional (HCP) to purchase the drug product; thereby selling the drug product.

Having generally described the invention, the same will be more readily understood by reference to the following Examples, which are provided by way of illustration and are not intended as limiting. Further details of the invention are illustrated by the following non-limiting Examples. The disclosures of all citations in the specification are expressly incorporated herein by reference.

EXAMPLES

**Example 1: Induction Study of ustekinumab in the treatment of ulcerative colitis in humans**

The following multicenter, randomized, double-blind, placebo-controlled, clinical study in adult men and women with moderately to severely active ulcerative colitis (UC) was performed: A Phase 3, Randomized, Double-blind, Placebo-controlled, Parallel-group, Multicenter Study to Evaluate the Safety and Efficacy of ustekinumab Induction and Maintenance Therapy in Subjects with Moderately to Severely Active Ulcerative Colitis

*Overall rationale*

A study was performed to assess the efficacy of intravenous (IV) administration of ustekinumab in subjects with moderately to severely active ulcerative colitis who demonstrated inadequate response or failure to tolerate conventional (corticosteroids or 6-mercaptopurine/azathioprine [6-MP/AZA]) or biologic therapy (TNF antagonist and/or the integrin antagonist, vedolizumab). Subjects received a single 130 mg, a single 6 mg/kg IV dose, or placebo at Week 0. Subjects who demonstrated no clinical response at Week 8 received an additional IV or subcutaneous (SC) dose at Week 8.

*Objectives*

The primary objectives of the study included (1) evaluating the efficacy of ustekinumab in inducing clinical remission in subjects with moderately to severely active UC; and (2) evaluating the safety of the IV ustekinumab in subjects with moderately to severely active UC.

The secondary objectives of the study included (1) evaluating the efficacy of IV ustekinumab in inducing endoscopic healing (i.e. improvement in the endoscopic appearance of

mucosa) in subjects with moderately to severely active UC; (2) evaluating the efficacy of IV ustekinumab in inducing clinical response in subjects with moderately to severely active UC; (3) evaluating the impact of IV ustekinumab on disease-specific health-related quality of life; (4) evaluating the efficacy of ustekinumab treatment on mucosal healing (i.e, endoscopic healing and histologic healing); (5) evaluating the efficacy of induction therapy with IV ustekinumab by biologic failure status; and (6) evaluating the pharmacokinetics (PK), immunogenicity, and pharmacodynamics (PD) of ustekinumab induction therapy in subjects with moderately to severely active UC, including changes in C-reactive protein (CRP), fecal calprotectin, fecal lactoferrin, and other PD biomarkers.

The exploratory objectives of the study included (1) evaluating response using the Mayo score without the physician's global assessment (PGA) subscore and (2) evaluating the performance of the Bristol Stool Form Scale (BSFS) score.

*Experimental Design*

The Phase 3 development program for ustekinumab comprised 2 separate studies, an induction study and a maintenance study. In the induction study, subjects were randomized at Week 0 into one of three treatment groups: placebo, low-dose ustekinumab, and high-dose ustekinumab. At Week 8, all subjects were evaluated for the primary endpoint of clinical remission and clinical response. Subjects who achieved a clinical response at Week 8 were eligible to enter the maintenance study. Subjects who did not achieve clinical response at Week 8 received a second dose of ustekinumab at Week 8 of treatment.

At Week 16, subjects who did not achieve clinical response at Week 8 were re-evaluated for clinical response. Subjects who achieved clinical response at Week 16 were eligible to enter the maintenance study. Subjects who did not achieve clinical response at Week 16 were not eligible to enter the maintenance study and had a safety follow-up visit approximately 20 weeks after their last dose of study agent (Week 8).

Subjects who were in clinical response to IV ustekinumab during induction comprised the primary population in the maintenance study. The maintenance study is a randomized withdrawal study designed to evaluate maintenance therapy using SC ustekinumab and is currently ongoing.

*Dosage and administration*

Subjects received a single IV dose of ustekinumab or placebo at Week 0 of the study. The induction study antibodies with the administered doses are as follows:

- Ustekinumab at a low, fixed does of 130 mg
- Ustekinumab at a high, weight-range based dose of ~6 mg/kg:
    - Ustekinumab 260 mg (body-weight ≤55 kg)
    - Ustekinumab 390 mg (body-weight >55 kg but ≤85 kg)
    - Ustekinumab 520 mg (body-weight >85 kg)

Subjects who did not present a clinical response received a second dose of ustekinumab at Week 8. The study antibodies with the second administered doses are as follows:

- Subjects who were randomized to placebo at Week 0 received 1 dose of ustekinumab ~6 mg/kg IV + placebo SC (to maintain the blind) at Week 8.
- Subjects who were randomized to ustekinumab at Week 0 received 1 dose of ustekinumab 90 mg SC + placebo IV (to maintain the blind) at Week 8.

*Safety Evaluations*

Safety was evaluated based on AEs and clinical laboratory test results (i.e., hematology and serum chemistry). Adverse events were either voluntarily reported by the subject or were obtained by means of interviewing subjects in a non-directed manner at study visits. Safety evaluations included the following clinical laboratory tests:

- Hematology: Hemoglobin (Hb), hematocrit, red blood cell count, white blood cell (WBC) count, and platelets.
- Serum Chemistry: Sodium, potassium, chloride, blood urea nitrogen (BUN), creatinine, aspartate aminotransferase (AST), alanine aminotransferase (ALT), total and direct bilirubin, alkaline phosphatase, calcium, phosphate, albumin, total protein.
- Screening: Serology for human immunodeficiency virus antibody, serology for hepatitis C virus (HCV) antibody, serology for hepatitis B virus (HBV) antibody, hepatitis B surface antigen, HBV surface antibody (anti-HBs), and HBV core (anti-HBc) antibody

total, QuantiFERON-TB Gold test, pregnancy (β human chorionic gonadotropin [β-HCG]).

*Pharmacokinetics*

Blood samples for the measurement of serum ustekinumab concentrations were collected at Week 0 (pre- and postinfusion) and Weeks 2, 4, and 8. Analyses of serum ustekinumab concentrations were performed using a validated electrochemiluminescent immunoassay (ECLIA) method on the Meso Scale Discovery (MSD®) platform (Gaithersburg, MD, USA). The lowest quantifiable concentration in a sample for the ECLIA method using the MSD platform was 0.1688 μg/mL.

*Immunogenicity*

Antibodies to ustekinumab were evaluated using serum samples collected from all subjects. Analyses of antibodies to ustekinumab were performed using a validated, drug-tolerant, electrochemiluminescence immunoassay (ECLIA), in which ustekinumab was used to capture and detect induced immune responses to ustekinumab. Antibody titers were determined for all subjects who had antibodies to ustekinumab and the neutralizing antibody (Nab) status of anti-drug antibody positive samples were determined.

*Efficacy Evaluation*

Efficacy evaluations were collected throughout the study. Mayo score and partial Mayo score, Uceraltive Colitis Endoscopic Index of Severity (UCEIS), Bristol Stool Form Scale (BSFS), C-reactive protein (CRP), fecal lactoferrin, fecal calprotectin, Inflammatory Bowel Disease Questionnaire (IBDQ), 36-item Short Form Health Survey (SF-36), and EuroQoL-5D Health Questionnaire were all evaluated to determine efficacy. The efficacy criteria were defined as follows:

- Clinical remission (global submissions): Mayo score ≤2 points, with no individual subscore >1.
- Clinical remission (US submissions): absolute stool number ≤3, rectal bleeding subscore of 0, and Mayo endoscopy subscore of 0 or 1.

- Clinical response: a decrease from induction baseline in the Mayo score by ≥30% and ≥3 points, with either a decrease from baseline in the rectal bleeding subscore ≥1 or a rectal bleeding subscore of 0 or 1.
- Endoscopic healing (i.e., improvement in the endoscopic appearance of the mucosa): Mayo endoscopy subscore of 0 or 1.
- Histologic healing: based on the Geboes score and is defined as 0 to <5% neutrophils in epithelium and no crypt destruction, erosions, ulcerations, or granulations.
- Mucosal healing: both endoscopic healing and histologic healing.
- Normal or inactive mucosal disease: Mayo endoscopy subscore of 0.
- Symptomatic remission: Mayo stool frequency subscore of 0 or 1 and a rectal bleeding subscore of 0.
- Normalization of CRP concentration: CRP concentration ≤3 mg/L.
- Normalization of fecal lactoferrin concentration: fecal lactoferrin concentration ≤7.24 µg/g.
- Normalization of fecal calprotectin concentration: fecal calprotectin concentration ≤250 mg/kg.
- Modified Mayo score response:
  - Definition 1: a decrease in the modified Mayo score of ≥2 points and ≥35% and either a decrease in the rectal bleeding subscore of ≥1 or a rectal bleeding subscore of 0 or 1.
  - Definition 2: a decrease in the modified Mayo score of ≥2 points and ≥30% and either a decrease in rectal bleeding of ≥1 or a rectal bleeding score of 0 or 1.

**Safety Results**

Intravenous ustekinumab doses of both ~6 mg/kg and 130 mg were generally well-tolerated with a safety profile that was generally comparable with placebo through Week 8.Of the 960 subjects in the safety analysis set, 1 or more treatment-emergent AEs was reported through Week 8 for 50.0%, 41.4%, and 48.0% of subjects in the ~6 mg/kg, 130 mg, and placebo

groups, respectively. Through Week 8, serious adverse effects (SAEs) were reported for 3.1%, 3.7%, and 6.6% of subjects in the ~6 mg/kg, 130 mg, and placebo groups, respectively.

AEs within 1 hour of infusion were 0.9%, 2.2%, and 1.9% in the ~6 mg/kg, 130 mg, and placebo groups, respectively.

The proportions of subjects with 1 or more infections were 15.3%, 15.9%, and 15.0% in the ~6 mg/kg, 130 mg, and placebo groups, respectively. Serious infections were reported for 0.3%, 0.6%, and 1.3% of subjects in the ~6 mg/kg, 130 mg, and placebo groups, respectively.

**Pharmacokinetics Results**

Serum samples were collected at Week 0 (preadministration), Week 0 (1 hr post-administration, Week 2, Week 4, and Week 8. For subjects randomized to ustekinumab treatment, a single IV infusion of ustekinumab was given either as a weight-based tiered dose of ~6 mg/kg (ie, 260 mg for subjects with body-weight ≤55 kg, 390 mg for subjects with body-weight >55 kg and ≤85 kg, or 520 mg for subjects with body-weight >85 kg), or as a fixed dose of 130 mg. Considering that the median body-weight of subjects in the 130 mg group was 72 kg, the ustekinumab 130 mg dose corresponded to ~2 mg/kg on a per-kg basis. Thus, on average, ustekinumab exposure in the ~6 mg/kg group was approximately 3 times that of the 130 mg group. In line with this expectation, after a single IV administration of ustekinumab ~6 mg/kg or 130 mg, median serum ustekinumab concentrations were approximately dose proportional at all sampling timepoints through Week 8. Median peak serum ustekinumab concentrations, which were observed 1 hour after the end of the infusion at Week 0, were 127.0 μg/mL and 43.16 μg/mL for the ~6 mg/kg and 130 mg groups, respectively. At Week 8, the time of the primary efficacy endpoint, the median serum ustekinumab concentrations were 8.59 μg/mL and 2.51 μg/mL for the ~6 mg/kg and 130 mg groups, respectively.

Subjects who were not in clinical response at Week 8 following administration of placebo IV at Week 0 received ustekinumab ~6 mg/kg IV at Week 8, while subjects who were not in clinical response at Week 8 following administration of ustekinumab IV at Week 0 received ustekinumab 90 mg SC at Week 8. Among subjects who received placebo IV at Week 0 and who subsequently received ustekinumab ~6 mg/kg IV at Week 8, median serum ustekinumab concentration at Week 16 (8 weeks after the ustekinumab IV dose) was slightly

higher than that observed at Week 8 (among subjects who received ustekinumab ~6 mg/kg IV at Week 0 [10.51 µg/mL versus 8.59 µg/mL, respectively]). Among subjects who received ustekinumab 90 mg SC at Week 8 (following their initial IV ustekinumab dose at Week 0), the median serum ustekinumab concentration at Week 16 was slightly higher in subjects who received ustekinumab ~6 mg/kg IV at Week 0 compared to those who received ustekinumab 130 mg at Week 0 (1.92 µg/mL versus 1.59 µg/mL, respectively)

**Immunogenicity Results**

Of the 635 subjects in the ustekinumab groups with appropriate samples for the assessment of antibodies to ustekinumab, 4 (0.6%) subjects were positive for antibodies to ustekinumab through Week 8. Of these 4 subjects, 2 (50%) were positive for NAbs.

Of 822 subjects who received ustekinumab at any time through Week 16, and had appropriate samples for the assessment of anti-drug antibodies (ADAs), 18 subjects (2.2%) were positive for antibodies to ustekinumab through the final safety visit. Of these, 4 of 15 subjects (26.7%) were positive for NAbs among those evaluable for NAbs through the final safety visit. Among subjects who received ustekinumab 90 mg SC at Week 8, the incidence of antibodies to ustekinumab through Week 16 was numerically higher in the 130 mg IV→90 mg SC group compared to the ~6 mg/kg IV→90 mg SC group (4.5% [6 of 132 subjects] vs 1.0% [1 of 101 subjects]).

**Efficacy Results**

Clinical Remission at Week 8- Global Definition

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved clinical remission (15.5% and 15.6%, respectively) compared with subjects in the placebo group (5.3%; p<0.001 for both comparisons; Table 1).

Table 1. Number of Subjects in Clinical Remission (Global Definition) at Week 8

| | | Ustekinumab IV | | |
|---|---|---|---|---|
| | Placebo IV | 130 mg | 6 mg/kg | Combined |
| Primary Efficacy Analysis Set | 319 | 320 | 322 | 642 |

| | | | | |
|---|---|---|---|---|
| Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical remission | 17 (5.3%) | 50 (15.6%) | 50 (15.5%) | 100 (15.6%) |
| Adjusted Treatment difference | | 10.3 | 10.2 | 10.2 |
| (97.5% CI) | | (5.7, 14.9) | (5.6, 14.8) | (6.6, 13.9) |
| p-value | | <0.001 | <0.001 | <0.001 |

N= number of subjects; CI= confidence interval

Clinical Remission at Week 8- US Definition

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved clinical remission (18.9% and 16.6%, respectively) compared with subjects in the placebo group (6.3%; p<0.001 for both comparisons; Table 2).

Table 2. Number of Subjects in Clinical Remission (US Definition) at Week 8

| | | Ustekinumab IV | | |
|---|---|---|---|---|
| | Placebo IV | 130 mg | 6 mg/kg | Combined |
| Primary Efficacy Analysis Set | 319 | 320 | 322 | 642 |
| Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical remission | 20 (6.3%) | 53 (16.6%) | 61 (18.9%) | 114 (17.8%) |
| Adjusted Treatment difference | | 10.3 | 12.7 | 11.5 |
| (97.5% CI) | | (4.8, 15.8) | (7.0, 18.4) | (7.0, 16) |
| p-value | | <0.001 | <0.001 | <0.001 |

N= number of subjects; CI= confidence interval

Endoscopic Healing at Week 8

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved endoscopic healing (27.0% and 26.3%, respectively) compared with subjects in the placebo group (13.8%; p<0.001 for both comparisons; Table 3).

Table 3. Number of Subjects with Endoscopic Healing at Week 8

| | | Ustekinumab IV | | |
|---|---|---|---|---|

| | Placebo IV | 130 mg | 6 mg/kg | Combined |
|---|---|---|---|---|
| Primary Efficacy Analysis Set | 319 | 320 | 322 | 642 |
| Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects with endoscopic healing | 44 (13.8%) | 84 (26.3%) | 87 (27.0%) | 171 (26.6%) |
| Adjusted Treatment difference | | 12.4 | 13.3 | 12.8 |
| (95% CI) | | (6.5, 18.4) | (7.3, 19.3) | (7.9, 17.8) |
| (97.5% CI) | | (5.2, 19.2) | (6.4, 20.1) | (7.2, 18.5) |
| p-value | | <0.001 | <0.001 | <0.001 |

N= number of subjects; CI= confidence interval

Clinical Response at Week 8

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved clinical response (61.8% and 51.3%, respectively) compared with subjects in the placebo group (31.3%; $p<0.001$ for both comparisons; Table 4).

Table 4. Number of Subjects in Clinical Response

| | | Ustekinumab IV | | |
|---|---|---|---|---|
| | Placebo IV | 130 mg | 6 mg/kg | Combined |
| Primary Efficacy Analysis Set | 319 | 320 | 322 | 642 |
| Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical response | 100 (31.3%) | 164 (51.3%) | 199 (61.8%) | 363 (56.5%) |
| Adjusted Treatment difference | | 19.9 | 30.5 | 25.2 |
| (95% CI) | | (12.8, 27.3) | (23.2, 37.8) | (18.9, 31.5) |
| (97.5% CI) | | (11.4, 28.3) | (22.2, 38.8) | (18.0, 32.4) |
| p-value | | <0.001 | <0.001 | <0.001 |

N= number of subjects; CI= confidence interval

Change in Baseline in Total IBDQ Score at Week 8

At baseline, median IBDQ scores were similar across all treatment groups. At Week 8, the median improvements from baseline in the IBDQ scores were significantly greater in the

~6 mg/kg and 130 mg groups (31.0 and 31.5, respectively) compared with the placebo group (10.0; p<0.001 for both comparisons).

Clinical Remission at Week 8

When remission was assessed as clinical remission (global definition) with a rectal bleeding subscore of 0 at Week 8, the proportions of subjects who achieved this endpoint were almost identical to that observed based on the primary efficacy analysis (global definition). Significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved this endpoint (15.2% and 15.3%, respectively) compared with subjects in the placebo group (5.3%; p<0.001 for both comparisons).

Symptomatic Remission at Week 8

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved symptomatic remission (44.7% and 41.3%, respectively) compared with subjects in the placebo group (22.6%; p<0.001 for both comparisons).

Histologic Healing at Week 8

Histologic healing was defined as 0 to <5% neutrophils in epithelium and no crypt destruction, erosions, ulcerations, or granulations. At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved histologic healing (35.6% and 37.9%, respectively) compared with subjects in the placebo group (21.9%; p<0.001 for both comparisons).

Change from Baseline in Mayo Score at Week 8

At baseline, the mean Mayo scores were the same across all treatment groups (8.9 for all groups). At Week 8, the mean decreases from baseline in Mayo scores were significantly greater in the ~6 mg/kg and 130 mg groups (3.5 and 3.2, respectively) compared with the placebo group (1.8; p<0.001 for both comparisons).

Change from Baseline in partial Mayo Score Through Week 8

At baseline, the mean partial Mayo scores were the same across all treatment groups (6.2 for all groups). As early as Week 2 and continuing for visits through Week 8, the mean decreases in the partial Mayo score were significantly greater in the ~6 mg/kg and 130 mg groups compared with the placebo group. At Week 2, the mean decreases from baseline in the partial

Mayo scores were 1.6 and 1.5, in the ~6 mg/kg and 130 mg, respectively, compared with 1.0 in the placebo group ($p<0.001$ for both comparisons). At Week 8, the mean decreases from baseline in the partial Mayo scores were 2.9 and 2.6, in the ~6 mg/kg and 130 mg, respectively, compared with 1.5 in the placebo group ($p<0.001$ for both comparisons).

UCEIS Score at Week 8

The UCEIS score provides an overall assessment of endoscopic severity of UC, based on mucosal vascular pattern, bleeding, and ulceration. The score ranges from 3 to 11 with a higher score indicating more severe disease by endoscopy. The UCEIS score was assessed only during the central read of the video of the endoscopy.

At baseline, the mean UCEIS scores were similar across all treatment groups (7.6, 7.5, 7.5 in the ~6 mg/kg, 130 mg and placebo groups, respectively). At Week 8, the mean decreases from baseline in UCEIS scores were significantly greater in the ~6 mg/kg and 130 mg groups (1.3 and 1.1, respectively) compared with the placebo group (0.5; $p<0.001$ for both comparisons).

At Week 8, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups had a UCEIS score of ≤4 (20.2% and 19.1%, respectively) compared with subjects in the placebo group (11.0%; $p<0.001$ and $p=0.004$, respectively). It is hypothesized that a UCEIS score of ≤4 is associated with Mayo endoscopic subscores of 0 or 1 that have defined endoscopic healing in this study.

Bristol Stool Form Scale Score

The BSFS score at a visit was the average of the 3-day daily average of the BSFS score prior to the visit. The same 3 days used to calculate the stool frequency and rectal bleeding subscores of the Mayo score were used to calculate the average BSFS score for the visit.

Approximately 40% (370/961) of randomized subjects had BSFS score collected at baseline. At baseline, 99.2% (367/370) of the subjects had average BSFS scores of ≥3 and the majority of subjects (54.3%) had average BSFS scores of ≥6, indicating diarrhea. As early as Week 2 and continuing for visits through Week 8, the proportions of subjects with diarrhea (average BSFS scores of ≥6) were smaller in the ~6 mg/kg and 130 mg groups compared with the placebo group. At Week 8, 22.8%, 21.1%, and 32.0% of subjects had diarrhea (average BSFS

scores of ≥6) in the ~6 mg/kg, 130 mg and placebo groups, respectively. Furthermore, at Week 8 the proportion of subjects with normal stool (≥3 and <5) was greater in the ~ 6mg/kg and 130 mg groups compared with placebo (48.3%, 48.9%, and 29.3%, respectively).

Normalization of C-reactive Protein

C-reactive protein (CRP) is used as a marker of inflammation in subjects with IBD. In UC, elevated CRP has been associated with severe clinical activity, an elevated sedimentation rate, and active disease as detected by colonoscopy. C-reactive protein was assayed using a validated, high-sensitivity CRP assay.

At baseline, the proportion of subjects who had abnormal CRP (>3 mg/L) was similar across all treatment groups; overall, 59.2% of randomized subjects had abnormal CRP concentrations at baseline. As early as Week 2 and continuing for visits through Week 8, among subjects who had abnormal values at baseline, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved normalization of CRP (≤3 mg/L) compared with the placebo group. At Week 8, 38.7% and 34.1% of subjects achieved normalization of CRP in the ~6 mg/kg and 130 mg groups, respectively, compared with 21.1% of subjects in the placebo group ($p<0.001$ for both comparisons).

Normalization of Fecal Lactoferrin

At baseline, the proportions of subjects with abnormal fecal lactoferrin (>7.24 µg/g) were similar across all treatment groups; overall 90.0% of randomized subjects had abnormal fecal lactoferrin concentrations at baseline. At Week 4 and Week 8, among subjects who had abnormal values at baseline, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved normalization of fecal lactoferrin (≤7.24 µg/g) compared with the placebo group. At Week 8, 14.6% and 17.2% of subjects in the ~6 mg/kg and 130 mg groups, respectively, achieved normalization of fecal lactoferrin compared with 9.3% of subjects in the placebo group ($p=0.042$, $p=0.006$, respectively, for the ustekinumab groups).

Normalization of Fecal Calprotectin

At baseline, the proportions of subjects with abnormal fecal calprotectin (>250 mg/kg) were slightly greater in the ~6 mg/kg group (85.1%) compared with the placebo group (78.4%); 82.5% of subjects in the 130 mg group had abnormal fecal calprotectin at baseline. At

Week 2 and Week 4, among subjects who had abnormal values at baseline, significantly greater proportions of subjects in the ~6 mg/kg and 130 mg groups achieved normalization of fecal calprotectin (≤250 mg/kg). At Week 8, among subjects with abnormal fecal calprotectin at baseline, the proportions of subjects with normalized fecal calprotectin, though not significant, were numerically greater in the ustekinumab ~6 mg/kg and 130 mg groups (25.5% and 24.2%, respectively), compared with subjects in the placebo group (20.4%; p=0.148, p=0.301 for both comparisons, respectively).

**Example 2: Maintenance Study of ustekinumab in the treatment of ulcerative colitis in humans**

*Methodology*

In this randomized-withdrawal maintenance study, all subjects enrolled were to be responders to study agent administered in the induction study. Primary (randomized) population: Subjects who were in clinical response to IV ustekinumab following induction comprised the primary population in the maintenance study. This population included the following: subjects who were randomized to receive ustekinumab (ie, 130 mg IV or ~6 mg/kg IV) at Week 0 of the induction study and were in clinical response at induction Week 8; and subjects who were randomized to receive placebo at Week 0 of the induction study and were not in clinical response at induction Week 8 but were in clinical response at induction Week 16 after receiving a dose of IV ustekinumab (~6 mg/kg) at induction Week 8 (placebo → ustekinumab ~6 mg/kg IV). These subjects were randomized in a 1:1:1 ratio at maintenance Week 0 to receive ustekinumab 90 mg SC every 8 weeks (q8w), ustekinumab 90 mg SC every 12 weeks (q12w), or placebo SC. Nonrandomized population: Additional subjects entering the maintenance study were not randomized in the primary population and received maintenance treatment in this study as follows: ustekinumab induction delayed responders (ie, subjects who were not in clinical response to IV ustekinumab at induction Week 8 but were in clinical response at induction Week 16 after receiving ustekinumab 90 mg SC at induction Week 8) received ustekinumab 90 mg SC q8w; and placebo induction responders (ie, subjects who were in clinical response to placebo IV induction)

received placebo SC. Nonrandomized subjects were followed for both efficacy and safety but were not included in the key efficacy analyses.

All subjects received their assigned dose of SC study agent at the maintenance Week 0 visit. Thereafter, to maintain the blind, all subjects received study agent at all scheduled study agent administration visits. Subjects were assessed for clinical flare at every visit and, if loss of clinical response was confirmed, were eligible for rescue medication. The main portion of the maintenance study was through Week 44 and a long-term study extension will continue through Week 220.

*Number of Subjects (planned and analyzed):*

783 subjects who completed the induction study and were in clinical response to induction study agent were enrolled in this maintenance study. The numbers of subjects in each treatment group at maintenance Week 0 were as follows:

- Randomized (primary) population (523 subjects [327 subjects were planned]):
  - 176 subjects were randomized to ustekinumab 90 mg SC q8w.
  - 172 subjects were randomized to ustekinumab 90 mg SC q12w.
  - 175 subjects were randomized to placebo SC.
- Nonrandomized population (260 subjects):
  - 157 subjects who were ustekinumab induction delayed responders (ie, were not in clinical response to ustekinumab at induction Week 8 but were in clinical response at induction Week 16) received ustekinumab 90 mg SC q8w.
  - 103 subjects who were in clinical response to placebo IV induction (placebo induction responders) received placebo SC.

*Diagnosis and Main Criteria for Inclusion:*

All subjects enrolled into this randomized-withdrawal maintenance study were those with moderately to severely active UC who had an inadequate response or had failed to tolerate conventional therapy (ie, corticosteroids or immunomodulators) or biologic therapy (ie, a TNF

antagonist and/or vedolizumab), and demonstrated a clinical response to study agent during the induction study. This included subjects who were in clinical response to IV ustekinumab, in clinical response to IV placebo, or in delayed clinical response to ustekinumab, and had not received a protocol-prohibited medication change during the induction study.

**Criteria for Evaluation:**

- Pharmacokinetics (PK): Serum ustekinumab concentration
- Immunogenicity: Antibodies to ustekinumab
- Pharmacodynamics (PD)/biomarkers: Serum biomarkers; fecal microbiome; RNA expression and histologic assessment of disease activity and healing in mucosal biopsies
- Genetics and epigenetics: Whole blood deoxyribonucleic acid (DNA)
- Efficacy: Mayo score and partial Mayo score, UC Endoscopic Index of Severity (UCEIS), CRP, fecal lactoferrin, and fecal calprotectin
- Health-related Quality of Life: Inflammatory Bowel Disease Questionnaire (IBDQ), 36-item Short Form Health Survey (SF-36), EuroQoL-5D Health Questionnaire (EQ-5D)
- Health economics: UC disease-related hospitalizations and surgeries; productivity Visual Analog Scale (VAS), and Work Productivity and Activity Impairment Questionnaire-General Health (WPAI-GH)
- Safety: Adverse events (AEs), serious adverse events (SAEs), infections, injection site reactions, allergic reactions, hematology and chemistry parameters, vital signs, physical examinations, and early detection of tuberculosis

*ENDPOINTS*

- The **primary endpoint** was clinical remission at Week 44. The definition of clinical remission (as well as the testing procedure) is different for submissions in the US and outside the US to accommodate the global and US preferred definitions of clinical remission. Each definition of clinical remission was applied to all subjects in the primary efficacy analysis set.
  - The global definition of the primary endpoint of clinical remission was defined as a Mayo score ≤2 points, with no individual subscore >1.

- The US definition of clinical remission was defined as an absolute stool number ≤3, a Mayo rectal bleeding subscore of 0, and a Mayo endoscopy subscore of 0 or 1.

- The **major secondary endpoints**, listed in the order in which they were tested, were:
  - Maintenance of clinical response through Week 44
  - Endoscopic healing at Week 44
  - Clinical remission and not receiving concomitant corticosteroids (corticosteroid-free clinical remission) at Week 44
  - Maintenance of clinical remission through Week 44 among the subjects who had achieved clinical remission at maintenance baseline

  For the 3rd and 4th major secondary endpoints, the global definition of clinical remission was used to support submissions for countries outside the US and the US definition of clinical remission was used to support the submission in the United States.

Demographic and baseline disease characteristics were summarized based on the 961 subjects in the primary efficacy analysis set.

Analyses of multiplicity-controlled endpoints, except for the fourth major secondary endpoint related to maintenance of clinical remission, were conducted using a Cochran-Mantel-Haenszel (CMH) chi square test stratified by clinical remission (global definition) status at maintenance baseline (yes/no as determined by the IWRS) and induction treatment (placebo IV [I-0] → ustekinumab ~6 mg/kg IV [I-8], ustekinumab 130 mg IV [I-0], or ustekinumab ~6 mg/kg IV [I-0]). For the fourth major secondary endpoint (maintenance of clinical remission), a CMH chi-square test stratified by induction treatment was used.

Global and US-specific multiple testing procedures were prespecified to control the overall Type 1 error rate at the 0.05 level over the multiplicity-controlled endpoints in this study (Section 3.11.2.7.3). All statistical testing was performed at the 2-sided 0.05 significance level. Nominal p-values are presented.

Safety was assessed by summarizing the frequency and type of treatment-emergent adverse events (AEs), laboratory parameters (hematology and chemistry), and vital signs parameters. Safety summaries are provided separately for randomized subjects, nonrandomized subjects, and all treated subjects. Presentation of the safety data focuses on the randomized population.

**RESULTS:**

STUDY POPULATION

A total of 783 subjects who completed the induction study and were in clinical response to induction study agent were enrolled in this maintenance study. Of these, 523 subjects were in the targeted primary population for the maintenance study and were randomized to receive a SC administration of ustekinumab or placebo at maintenance Week 0 (176, 172, and 175 subjects in the ustekinumab 90 mg SC q8w, ustekinumab 90 mg SC q12w, and placebo groups, respectively). The remaining 250 subjects were in the nonrandomized population, including 157 ustekinumab induction delayed responders (who received ustekinumab 90 mg SC q8w) and 103 placebo induction responders (who received placebo). All enrolled subjects who were assigned treatment at maintenance baseline received their study agent at that time.

Prior to Week 40 (last dosing visit of the maintenance study), 85 subjects (16.3%) in the primary population discontinued study agent. The proportion of subjects who discontinued study agent was greater in the placebo group (24.6%) than those in the ustekinumab q8w and q12w groups (10.2% and 14.0%, respectively). The most common reasons for discontinuation were lack of efficacy and an adverse event due to worsening of UC. Prior to Week 44, 29 subjects (5.5%) in the primary population terminated study participation; the most common reason for termination of study participation was withdrawal of consent.

Baseline clinical disease characteristics were representative of a population of subjects with moderately to severely active UC that was refractory to available therapies and were generally well-balanced across the 3 treatment groups. The median duration of disease was 6.05 years and the median baseline Mayo score was 9.0, with 86.9% and 13.1% presenting with moderate and severe UC, respectively. At induction baseline, 52.2% of subjects in the primary population of the maintenance study were taking corticosteroids, 26.6% were taking immunomodulatory drugs, and 70.7% were taking aminosalicylates. The majority of subjects (93.5%) had an inadequate response to, or were intolerant of, corticosteroids and/or 6-MP/AZA, or demonstrated corticosteroid dependence at induction baseline. Overall in the primary population, 47.6% of subjects had a history of documented biologic failure and 52.4% of subjects did not. Also, 47.2% had failed at

least 1 anti-TNF whereas 13.4% had failed both an anti-TNF and vedolizumab, and 49.3% were naïve to biologic therapy; 2 subjects were biologic failures to only vedolizumab.

*EFFICACY RESULTS*

Ustekinumab maintenance therapy demonstrated efficacy in a population of subjects with moderately to severely active UC who had previously failed or were intolerant of conventional or biologic therapies, including TNF antagonists and/or vedolizumab, and were in clinical response 8 weeks after receiving a single dose of ustekinumab IV induction therapy.

Based on the pre-specified global and US-specific multiple testing procedures, statistical significance can be claimed for both ustekinumab dose regimens (90 mg q8w and 90 mg q12w) for the primary endpoint of clinical remission at Week 44 and the three major secondary endpoints of maintenance of clinical response through Week 44, endoscopic healing at Week 44, and corticosteroid-free clinical remission at Week 44. Additionally, statistical significance can be claimed for maintenance of clinical remission through Week 44 (among the subjects who had achieved clinical remission at maintenance baseline) for both ustekinumab doses based on the US-specific testing procedure, and for the ustekinumab q12w regimen based on the global testing procedure.

- Clinical Efficacy in the Primary Population (ie, Subjects in Clinical Response 8 Weeks After Receiving Ustekinumab IV Induction Therapy)
  - Primary Endpoint: Clinical Remission
    - The proportions of subjects in clinical remission (based on the global definition) at Week 44 were significantly greater in the ustekinumab q8w group and ustekinumab q12w group (43.8% and 38.4%, respectively) compared with subjects in the placebo group (24.0%; p<0.001 and p=0.002, respectively).
    - The proportions of subjects in clinical remission (based on the US-specific definition) at Week 44 were significantly greater in the ustekinumab q8w group and ustekinumab q12w group (42.6% and 39.5%, respectively) compared with subjects in the placebo group (24.6%; p<0.001 and p=0.002, respectively).

- The effect of ustekinumab on achieving clinical remission (based on both the global and US specific definitions) was generally consistent across subgroups (including subjects who were biologic failures and those who were not biologic failures as well as subjects who were receiving concomitant immunomodulators or corticosteroids at induction baseline and those who were not) and was robust to prespecified changes in data-handling rules.

– Major Secondary Endpoints: Maintenance of Clinical Response, Endoscopic Healing, Corticosteroid-Free Clinical Remission, and Maintenance of Clinical Remission

- The proportions of subjects who maintained clinical response through Week 44, achieved endoscopic healing, achieved corticosteroid-free remission (applying both global and US specific definitions of clinical remission) were significantly greater ($p<0.01$) in the ustekinumab q8w and q12w groups compared with that in the placebo group.
- The proportions of subjects who maintained clinical remission among the subjects who had achieved clinical remission at maintenance baseline was numerically greater for both the ustekinumab q8w and q12w groups compared with that in the placebo group (applying both the global and US specific definition of clinical remission). Statistical significance ($p<0.01$) was achieved for both comparisons of the q8w and q12w groups versus placebo using the US-specific definition of clinical remission; however, statistical significance was only achieved for the q12w group ($p<0.01$) compared to placebo using the global definition of clinical remission.

– Other Histologic, Mucosal, Clinical, and Endoscopic Endpoints

The analyses summarized below were not adjusted for multiplicity. Statements of statistical significance are based on nominal p-values.

- The proportions of subjects who achieved histologic healing (ie, neutrophil infiltration in <5% of crypts, no crypt destruction, and no erosions, ulcerations, or granulation tissue) at Week 44 were significantly ($p<0.001$) greater in the ustekinumab q8w and q12w groups compared with the placebo group.

- The proportions of subjects who achieved mucosal healing (a combination of endoscopic healing and histologic healing) at Week 44 were significantly ($p<0.01$) greater in the ustekinumab q8w and q12w groups compared with the placebo group.
- Applying both global and US-specific definitions of clinical remission, the proportions of subjects achieving corticosteroid-free remission for at least 90 days prior to Week 44 was significantly greater ($p<0.01$) in the ustekinumab q8w and q12w groups compared with that in the placebo group. Furthermore, among subjects receiving corticosteroids at maintenance baseline, significantly greater proportions of subjects ($p<0.05$) were in clinical remission and not receiving concomitant corticosteroids for at least 90 days prior to Week 44 in the ustekinumab q8w and q12w groups compared with those in the placebo group.
- The efficacy of ustekinumab maintenance treatment was also demonstrated in clinical outcomes as measured by maintained improvement in the partial Mayo score, maintenance of symptomatic remission as well as maintenance of endoscopic healing. Further evidence of the efficacy of ustekinumab maintenance treatment was observed in partial Mayo remission and symptomatic remission over time as well as symptom control (stool frequency and rectal bleeding).

– Inflammatory Biomarkers
  - Over time through Week 44, the ustekinumab treatment groups maintained their CRP, fecal lactoferrin, and fecal calprotectin concentration levels observed at maintenance baseline, whereas median CRP, fecal lactoferrin, and fecal calprotectin concentrations worsened (increased) in the placebo group.
  - At Week 44, the proportion of subjects with normalized CRP, fecal calprotectin and fecal lactoferrin were generally significantly greater in the ustekinumab q8w and q12w groups compared with the placebo group.

– Clinical Endpoints by Biologic Failure Status

- For subjects with and subjects without a history of biologic failure, the proportions of subjects who achieved each of the primary and major secondary endpoints and mucosal healing were generally greater in the ustekinumab q8w and q12w groups compared with subjects in the placebo group.
- In some cases, where treatment effects were similar in the biologic non-failure and failure populations, there was a consistent trend in the biologic-failure subjects across endpoints that the treatment effect for the ustekinumab q8w group was greater than that for the ustekinumab q12w group. This trend was not observed in the biologic non-failure population.

– Efficacy Based on Inflammatory Biomarker Subgroups

- Among subjects with a higher inflammatory burden (elevated CRP and/or elevated fecal inflammatory markers) at either induction or maintenance baseline, while both dosages generally demonstrated efficacy compared to placebo, the efficacy of ustekinumab q8w seemed to be better across the range of clinical endpoints than the ustekinumab q12w group. However, in subjects with low inflammatory burden at baseline, the ustekinumab q8w and q12w groups demonstrated similar efficacy over the endpoints.

– Health-Related Quality of Life

- Through Week 44, subjects in the ustekinumab q8w and q12w groups were generally able to maintain improvement in health-related quality of life as assessed using the IBDQ, SF 36 and EQ 5D instruments compared to subjects in the placebo group.

– Outcomes for the Ustekinumab 90 mg q8w Dose and Ustekinumab 90 mg q12w Dose

- While both the ustekinumab q8w and q12w groups demonstrated generally similar efficacy for the primary and major secondary endpoints, q8w was modestly better than q12w based on the following more objective and stringent measures of efficacy, including:

- Endoscopic and mucosal healing at Week 44
- Durable partial Mayo remission at Week 44
- Corticosteroid-free clinical remission as well as the elimination of corticosteroids for at least 90 days prior to Week 44 among subjects receiving corticosteroids at maintenance baseline

- Furthermore, when efficacy was examined over time (for the following endpoints), the q8w group showed greater efficacy than the q12w group:
  - Mayo stool frequency and rectal bleeding subscores indicating inactive or mild disease (ie, subscores of 0 or 1), as well as an absolute stool number $\leq 3$ over time through Week 44.
  - Partial Mayo remission and symptomatic remission over time through Week 44
  - Median changes from baseline in fecal lactoferrin and calprotectin concentrations over time through Week 44.

- Efficacy in Ustekinumab Induction Delayed Responders

  Subjects who were delayed responders to ustekinumab induction therapy were able to maintain clinical response and achieve clinical remission, endoscopic, histologic, and mucosal healing (a combination of endoscopic healing and histologic healing) while receiving ustekinumab 90 mg q8w.

- Efficacy and Pharmacokinetics/Immunogenicity
  - In general, during maintenance, a positive association was observed between serum ustekinumab concentration and the clinical efficacy outcomes of clinical remission and endoscopic healing. In addition, lower levels of inflammation, as measured by CRP, were observed in subjects with higher serum ustekinumab concentrations.
  - Among subjects receiving maintenance ustekinumab, the development of antibodies to ustekinumab did not appear to have an impact on clinical efficacy as measured by multiple endpoints such as clinical remission, endoscopic healing, clinical response, and change from maintenance baseline in Mayo score; however, the interpretation of the data is limited by the small sample size.

–

*PHARMACOKINETIC AND IMMUNOGENICITY RESULTS*

- Following maintenance treatment with ustekinumab 90 mg SC q8w or q12w, steady-state was reached at approximately 8 or 12 weeks after subjects began receiving ustekinumab 90 mg SC q8w, or ustekinumab 90 mg SC q12w maintenance dose regimens, respectively. Median steady state trough serum ustekinumab concentrations over time were approximately 3-fold greater the concentrations in the ustekinumab q8w group (2.69 µg/mL to 3.09 µg/mL) than in the q12w group (0.92 µg/mL to 1.19 µg/mL).
- Following maintenance dose regimens of ustekinumab 90 mg SC q8w or q12w, serum ustekinumab concentrations were sustained through Week 44 in almost all subjects, with a smaller proportion of subjects with undetectable trough concentrations over time in the 90 mg q8w group (0.7% to 2.4%) compared to those in the 90 mg q12w group (4.9% to 7.1%). The median ustekinumab concentration in subjects in the placebo group was below detectable levels by Week 16.
- The impact of the different ustekinumab IV induction doses on serum ustekinumab concentrations during maintenance continued to diminish over time, as expected.
- Median trough serum ustekinumab concentrations tended to be lower in subjects with higher body weight.
- Nonrandomized subjects in the ustekinumab induction delayed responders group tended to have lower serum ustekinumab concentrations over time compared to randomized subjects in the ustekinumab q8w group following SC administration of the same ustekinumab dose regimen of 90 mg q8w.
- Among 680 treated subjects with appropriate samples for the assessment of antibodies to ustekinumab, 39 (5.7%) were positive for antibodies to ustekinumab through 52 weeks of treatment, the majority with antibody titers ≤1:800. Of the 39 treated subjects who were positive for antibodies to ustekinumab in this maintenance study, 11 (28.2%) were positive for neutralizing antibodies.

- In all randomized treatment groups, median serum ustekinumab concentrations were lower over time in subjects who were positive for antibodies to ustekinumab compared with levels in subjects who were negative for antibodies to ustekinumab.

SAFETY RESULTS

Subcutaneous maintenance regimens of ustekinumab 90 mg administered q12w or q8w through Week 44 were generally well tolerated and consistent with the known safety profile of ustekinumab.

- AEs were reported in 77.3%, 69.2%, and 78.9% of subjects in the ustekinumab q8w, ustekinumab q12w, and placebo groups, respectively.
  - Reasonably related AEs were reported in 26.1%, 17.4%, and 28.6% of subjects in the ustekinumab q8w, ustekinumab q12w, and placebo groups, respectively.
- Infections (as identified by the investigator) were reported in 48.9%, 33.7%, and 46.3% of subjects in the ustekinumab q8w, ustekinumab q12w, and placebo groups, respectively.
  - Infections requiring oral or parenteral antibiotic treatment were reported in 22.7%, 15.7%, and 19.4% of subjects in the ustekinumab q8w, ustekinumab q12w, and placebo groups, respectively.
- Serious infections were infrequent among randomized subjects and were reported in 1.7%, 3.5%, and 2.3% in the ustekinumab q8w, ustekinumab q12w, and placebo groups, respectively. Opportunistic infections were identified in 3 subjects (all in the randomized population); cytomegalovirus colitis was diagnosed for 2 subjects in the ustekinumab q12w group and 1 subject was diagnosed with concurrent moderate AEs of ophthalmic and labial herpes. No cases of active TB were reported among ustekinumab-treated subjects through Week 44.
- The proportion of randomized subjects with AEs leading to discontinuation of study agent was higher in the placebo group than in the q12w and q8w groups and the most frequent AEs leading to discontinuation in the placebo group was worsening UC.
- Among all treated subjects, including delayed ustekinumab induction responders, the overall safety profile was consistent with that observed in the randomized population.

- There was 1 death reported for a subject who was a delayed ustekinumab induction responder and was receiving ustekinumab q8w. The cause of death was attributed to acute respiratory failure that occurred during thyroid surgery for a multinodular goiter.
- Among all treated subjects, 2 subjects (1 subject in the ustekinumab induction delayed-responders group [receiving ustekinumab q8w] and 1 subject randomized to the placebo group who had received ustekinumab IV during induction) reported serious major adverse cardiovascular events; both events were associated with perioperative complications.
- Among all treated subjects, there were 6 subjects for whom malignancies were reported (5 ustekinumab-treated subjects and 1 placebo-only subject).
  - Three ustekinumab-treated subjects reported non-melanoma skin cancers (NMSCs); all had either a prior history of azathioprine or 6-MP treatment and 2 were on concomitant immunomodulator therapy at the time of the diagnosis.
  - Two ustekinumab-treated subjects were reported to have solid tumors; one subject with a papillary renal cell carcinoma (q12w) and one subject with colon cancer (q8w); both tumors were detected early during the subject's participation in this maintenance study.
- There were no cases of anaphylaxis or delayed hypersensitivity reactions identified among ustekinumab treated subjects.
- There were no notable differences in the proportions of subjects with post-baseline maximum toxicity Grade $\geq$1 chemistry and hematology laboratory between the placebo and respective ustekinumab groups. Grade 3 and Grade 4 chemistry and hematology laboratory values were infrequent.

*HEALTH ECONOMICS AND MEDICAL RESOURCE UTILIZATION RESULTS*

- Through Week 44, fewer subjects in the combined ustekinumab group had a UC disease-related hospitalization or surgery compared with the placebo group.
- At Week 44, change from maintenance baseline in productivity visual analog scores (VAS) demonstrated improvement in subjects in the ustekinumab treatment groups and worsening in subjects in the placebo group.

- At Week 44, percentages within each of the 4 WPAI-GH domains were maintained from maintenance baseline for the ustekinumab treatment groups, with additional improvement observed in subjects in the ustekinumab q8w group for percent impairment while working due to health, percent overall work impairment due to health, and percent activity impairment due to health. For subjects in the placebo group, percentages for all 4 WPAI-GH domains worsened (ie, increased).

CONCLUSIONS

- The ustekinumab maintenance study provided consistent and definitive evidence that the ustekinumab 90 mg SC q12w and q8w dose regimens were both effective in adult subjects with moderately to severely active UC who had responded to a single IV ustekinumab induction dose.
  - The efficacy of ustekinumab was observed in subjects who were biologic failures as well as those who failed conventional but not biologic therapy (ie, biology-naïve).
  - Of note, while both doses of ustekinumab were effective, the q8w dose regimen demonstrated modestly better efficacy across several objective and/or more stringent endpoints (eg, endoscopic healing and durable partial Mayo remission) as well as in overtime analyses of symptomatic and partial Mayo remission.
- Maintenance dosing with ustekinumab SC dose regimens of 90 mg q12w and 90 mg q8w was generally well-tolerated over 44 weeks in this population of adult subjects with moderate to severe ulcerative colitis.
- The safety and efficacy data from this study support a positive benefit/risk profile for ustekinumab SC maintenance therapy.

The European Commission has approved STELARA® (ustekinumab) for the treatment of ulcerative colitis (UC) in Europe as of September 4, 2019. The approved label is shown in Annex I below describing the intravenous preparation (Sections 1-10) and subcutaneous preparation (Sections 1-10).

The present invention comprises a pharmaceutical composition of an anti-IL-12/IL-23p40 antibody and packaging comprising one or more label elements disclosed in Annex I, wherein the antibody comprises: (i) a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6; (ii) a heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and a light chain variable region of the amino acid sequence of SEQ ID NO:8; or (iii) a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.

**ANNEX I**

**SUMMARY OF PRODUCT CHARACTERISTICS**

## 1. NAME OF THE MEDICINAL PRODUCT

STELARA 130 mg concentrate for solution for infusion

## 2. QUALITATIVE AND QUANTITATIVE COMPOSITION

Each vial contains 130 mg ustekinumab in 26 mL (5 mg/mL).

Ustekinumab is a fully human IgG1κ monoclonal antibody to interleukin (IL)-12/23 produced in a murine myeloma cell line using recombinant DNA technology.

For the full list of excipients, see section 6.1.

## 3. PHARMACEUTICAL FORM

Concentrate for solution for infusion.

The solution is clear, colourless to light yellow.

## 4. CLINICAL PARTICULARS

### 4.1 Therapeutic indications

Crohn's Disease

STELARA is indicated for the treatment of adult patients with moderately to severely active Crohn's disease who have had an inadequate response with, lost response to, or were intolerant to either conventional therapy or a TNFα antagonist or have medical contraindications to such therapies.

Ulcerative colitis

STELARA is indicated for the treatment of adult patients with moderately to severely active ulcerative colitis who have had an inadequate response with, lost response to, or were intolerant to either conventional therapy or a biologic or have medical contraindications to such therapies (see section 5.1).

**4.2 Posology and method of administration**

STELARA concentrate for solution for infusion is intended for use under the guidance and supervision of physicians experienced in the diagnosis and treatment of Crohn's disease or ulcerative colitis. STELARA concentrate for solution for infusion should only be used for the intravenous induction dose.

Posology

Crohn's Disease and Ulcerative Colitis

STELARA treatment is to be initiated with a single intravenous dose based on body weight. The infusion solution is to be composed of the number of vials of STELARA 130 mg as specified in Label Table 1 (see section 6.6 for preparation).

*Label Table 1 Initial intravenous dosing of STELARA*

| **Body weight of patient at the time of dosing** | **Recommended dose[a]** | **Number of 130 mg STELARA Vials** |
|---|---|---|
| ≤ 55 kg | 260 mg | 2 |
| > 55 kg to ≤ 85 kg | 390 mg | 3 |
| > 85 kg | 520 mg | 4 |

[a] Approximately 6 mg/kg

The first subcutaneous dose should be given at week 8 following the intravenous dose. For the posology of the subsequent subcutaneous dosing regimen, see section 4.2 of the STELARA solution for injection (vial) and solution for injection in pre-filled syringe SmPC.

*Elderly (≥ 65 years)*

No dose adjustment is needed for elderly patients (see section 4.4).

*Renal and hepatic impairment*

STELARA has not been studied in these patient populations. No dose recommendations can be made.

*Paediatric population*

The safety and efficacy of STELARA for the treatment of Crohn's disease or ulcerative colitis in children less than 18 years have not yet been established. No data are available.

Method of administration

STELARA 130 mg is for intravenous use only. It should be administered over at least one hour. For instructions on dilution of the medicinal product before administration, see section 6.6.

**4.3 Contraindications**

Hypersensitivity to the active substance or to any of the excipients listed in section 6.1.

Clinically important, active infection (e.g. active tuberculosis; see section 4.4).

**4.4 Special warnings and precautions for use**

Traceability

In order to improve the traceability of biological medicinal products, the tradename and the batch number of the administered product should be clearly recorded.

Infections

Ustekinumab may have the potential to increase the risk of infections and reactivate latent infections. In clinical studies, serious bacterial, fungal, and viral infections have been observed in patients receiving STELARA (see section 4.8).

Caution should be exercised when considering the use of STELARA in patients with a chronic

infection or a history of recurrent infection (see section 4.3).

Prior to initiating treatment with STELARA, patients should be evaluated for tuberculosis infection. STELARA must not be given to patients with active tuberculosis (see section 4.3). Treatment of latent tuberculosis infection should be initiated prior to administering STELARA. Anti-tuberculosis therapy should also be considered prior to initiation of STELARA in patients with a history of latent or active tuberculosis in whom an adequate course of treatment cannot be confirmed. Patients receiving STELARA should be monitored closely for signs and symptoms of active tuberculosis during and after treatment.

Patients should be instructed to seek medical advice if signs or symptoms suggestive of an infection occur. If a patient develops a serious infection, the patient should be closely monitored and STELARA should not be administered until the infection resolves.

Malignancies

Immunosuppressants like ustekinumab have the potential to increase the risk of malignancy. Some patients who received STELARA in clinical studies developed cutaneous and non-cutaneous malignancies (see section 4.8).

No studies have been conducted that include patients with a history of malignancy or that continue treatment in patients who develop malignancy while receiving STELARA. Thus, caution should be exercised when considering the use of STELARA in these patients.

All patients, in particular those greater than 60 years of age, patients with a medical history of prolonged immunosuppressant therapy or those with a history of PUVA treatment, should be monitored for the appearance of non-melanoma skin cancer (see section 4.8).

Systemic and respiratory hypersensitivity reactions

*Systemic*

Serious hypersensitivity reactions have been reported in the postmarketing setting, in some cases several days after treatment. Anaphylaxis and angioedema have occurred. If an anaphylactic or

other serious hypersensitivity reaction occurs, appropriate therapy should be instituted and administration of STELARA should be discontinued (see section 4.8).

*Respiratory*
Cases of allergic alveolitis and eosinophilic pneumonia have been reported during post-approval use of ustekinumab. Clinical presentations included cough, dyspnoea, and interstitial infiltrates following one to three doses. Serious outcomes have included respiratory failure and prolonged hospitalisation. Improvement has been reported after discontinuation of ustekinumab and also, in some cases, administration of corticosteroids. If infection has been excluded and diagnosis is confirmed, discontinue ustekinumab and institute appropriate treatment (see section 4.8).

Vaccinations
It is recommended that live viral or live bacterial vaccines (such as Bacillus of Calmette and Guérin (BCG)) should not be given concurrently with STELARA. Specific studies have not been conducted in patients who had recently received live viral or live bacterial vaccines. No data are available on the secondary transmission of infection by live vaccines in patients receiving STELARA. Before live viral or live bacterial vaccination, treatment with STELARA should be withheld for at least 15 weeks after the last dose and can be resumed at least 2 weeks after vaccination. Prescribers should consult the Summary of Product Characteristics for the specific vaccine for additional information and guidance on concomitant use of immunosuppressive agents post-vaccination.

Patients receiving STELARA may receive concurrent inactivated or non-live vaccinations.

Long term treatment with STELARA does not suppress the humoral immune response to pneumococcal polysaccharide or tetanus vaccines (see section 5.1).

Concomitant immunosuppressive therapy
In psoriasis studies, the safety and efficacy of STELARA in combination with immunosuppressants, including biologics, or phototherapy have not been evaluated. In psoriatic arthritis studies, concomitant MTX use did not appear to influence the safety or efficacy of

STELARA. In Crohn's disease and ulcerative colitis studies, concomitant use of immunosuppressants or corticosteroids did not appear to influence the safety or efficacy of STELARA. Caution should be exercised when considering concomitant use of other immunosuppressants and STELARA or when transitioning from other immunosuppressive biologics (see section 4.5).

Immunotherapy

STELARA has not been evaluated in patients who have undergone allergy immunotherapy. It is not known whether STELARA may affect allergy immunotherapy.

Serious skin conditions

In patients with psoriasis, exfoliative dermatitis has been reported following ustekinumab treatment (see section 4.8). Patients with plaque psoriasis may develop erythrodermic psoriasis, with symptoms that may be clinically indistinguishable from exfoliative dermatitis, as part of the natural course of their disease. As part of the monitoring of the patient's psoriasis, physicians should be alert for symptoms of erythrodermic psoriasis or exfoliative dermatitis. If these symptoms occur, appropriate therapy should be instituted. STELARA should be discontinued if a drug reaction is suspected.

Special populations

*Elderly (≥ 65 years)*

No overall differences in efficacy or safety in patients age 65 and older who received STELARA were observed compared to younger patients in clinical studies in approved indications, however the number of patients aged 65 and older is not sufficient to determine whether they respond differently from younger patients. Because there is a higher incidence of infections in the elderly population in general, caution should be used in treating the elderly.

Sodium content

STELARA contains less than 1 mmol sodium (23 mg) per dose, i.e. essentially 'sodium-free'. STELARA is however, diluted in sodium chloride 9 mg/ml (0.9%) solution for infusion. This

should be taken into consideration for patients on a controlled sodium diet (see section 6.6).

**4.5 Interaction with other medicinal products and other forms of interaction**

Live vaccines should not be given concurrently with STELARA (see section 4.4).

No interaction studies have been performed in humans. In the population pharmacokinetic analyses of the phase III studies, the effect of the most frequently used concomitant medicinal products in patients with psoriasis (including paracetamol, ibuprofen, acetylsalicylic acid, metformin, atorvastatin, levothyroxine) on pharmacokinetics of ustekinumab was explored. There were no indications of an interaction with these concomitantly administered medicinal products. The basis for this analysis was that at least 100 patients (> 5% of the studied population) were treated concomitantly with these medicinal products for at least 90% of the study period. The pharmacokinetics of ustekinumab was not impacted by concomitant use of MTX, NSAIDs, 6-mercaptopurine, azathioprine and oral corticosteroids in patients with psoriatic arthritis, Crohn's disease or ulcerative colitis, or prior exposure to anti-TNFα agents, in patients with psoriatic arthritis or Crohn's disease or by prior exposure to biologics (i.e. anti-TNFα agents and/or vedolizumab) in patients with ulcerative colitis.

The results of an *in vitro* study do not suggest the need for dose adjustments in patients who are receiving concomitant CYP450 substrates (see section 5.2).

In psoriasis studies, the safety and efficacy of STELARA in combination with immunosuppressants, including biologics, or phototherapy have not been evaluated. In psoriatic arthritis studies, concomitant MTX use did not appear to influence the safety or efficacy of STELARA. In Crohn's disease and ulcerative colitis studies, concomitant use of immunosuppressants or corticosteroids did not appear to influence the safety or efficacy of STELARA. (see section 4.4).

**4.6 Fertility, pregnancy and lactation**

Women of childbearing potential

Women of childbearing potential should use effective methods of contraception during treatment and for at least 15 weeks after treatment.

Pregnancy

There are no adequate data from the use of ustekinumab in pregnant women. Animal studies do not indicate direct or indirect harmful effects with respect to pregnancy, embryonic/foetal development, parturition or postnatal development (see section 5.3). As a precautionary measure, it is preferable to avoid the use of STELARA in pregnancy.

Breast-feeding

It is unknown whether ustekinumab is excreted in human breast milk. Animal studies have shown excretion of ustekinumab at low levels in breast milk. It is not known if ustekinumab is absorbed systemically after ingestion. Because of the potential for adverse reactions in nursing infants from ustekinumab, a decision on whether to discontinue breast-feeding during treatment and up to 15 weeks after treatment or to discontinue therapy with STELARA must be made taking into account the benefit of breast-feeding to the child and the benefit of STELARA therapy to the woman.

Fertility

The effect of ustekinumab on human fertility has not been evaluated (see section 5.3).

**4.7 Effects on ability to drive and use machines**

STELARA has no or negligible influence on the ability to drive and use machines.

**4.8 Undesirable effects**

Summary of the safety profile

The most common adverse reactions (> 5%) in controlled periods of the adult psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies with ustekinumab were

nasopharyngitis and headache. Most were considered to be mild and did not necessitate discontinuation of study treatment. The most serious adverse reaction that has been reported for STELARA is serious hypersensitivity reactions including anaphylaxis (see section 4.4). The overall safety profile was similar for patients with psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis.

Tabulated list of adverse reactions

The safety data described below reflect exposure in adults to ustekinumab in 14 phase 2 and phase 3 studies in 6,709 patients (4,135 with psoriasis and/or psoriatic arthritis, 1,749 with Crohn's disease and 825 patients with ulcerative colitis). This includes exposure to STELARA in the controlled and non-controlled periods of the clinical studies for at least 6 months or 1 year (4,577 and 3,253 patients respectively with psoriasis, psoriatic arthritis, Crohn's disease or ulcerative colitis) and exposure for at least 4 or 5 years (1,482 and 838 patients with psoriasis respectively).

Label Table 2 provides a list of adverse reactions from adult psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies as well as adverse reactions reported from post-marketing experience. The adverse reactions are classified by System Organ Class and frequency, using the following convention: Very common (≥ 1/10), Common (≥ 1/100 to < 1/10), Uncommon (≥ 1/1,000 to < 1/100), Rare (≥ 1/10,000 to < 1/1,000), Very rare (< 1/10,000), not known (cannot be estimated from the available data). Within each frequency grouping, adverse reactions are presented in order of decreasing seriousness.

*Label Table 2 List of adverse reactions*

| **System Organ Class** | **Frequency: Adverse reaction** |
| --- | --- |
| Infections and infestations | Common: Upper respiratory tract infection, nasopharyngitis, sinusitis<br>Uncommon: Cellulitis, dental infections, herpes zoster, lower respiratory tract infection, viral upper respiratory tract infection, vulvovaginal mycotic infection |

| | |
|---|---|
| Immune system disorders | Uncommon: Hypersensitivity reactions (including rash, urticaria)<br>Rare: Serious hypersensitivity reactions (including anaphylaxis, angioedema) |
| Psychiatric disorders | Uncommon: Depression |
| Nervous system disorders | Common: Dizziness, headache<br>Uncommon: Facial palsy |
| Respiratory, thoracic and mediastinal disorders | Common: Oropharyngeal pain<br>Uncommon: Nasal congestion<br>Rare: Allergic alveolitis, eosinophilic pneumonia |
| Gastrointestinal disorders | Common: Diarrhoea, nausea, vomiting |
| Skin and subcutaneous tissue disorders | Common: Pruritus<br>Uncommon: Pustular psoriasis, skin exfoliation, acne<br>Rare: Exfoliative dermatitis |
| Musculoskeletal and connective tissue disorders | Common: Back pain, myalgia, arthralgia |
| General disorders and administration site conditions | Common: Fatigue, injection site erythema, injection site pain<br>Uncommon: Injection site reactions (including haemorrhage, haematoma, induration, swelling and pruritus), asthenia |

Description of selected adverse reactions

Infections

In the placebo-controlled studies of patients with psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis, the rates of infection or serious infection were similar between ustekinumab-treated patients and those treated with placebo. In the placebo-controlled period of these clinical studies, the rate of infection was 1.36 per patient-year of follow-up in ustekinumab-treated patients, and 1.34 in placebo-treated patients. Serious infections occurred at the rate of 0.03 per patient-year of follow-up in ustekinumab-treated patients (30 serious infections in 930 patient-years of follow-up) and 0.03 in placebo-treated patients (15 serious

infections in 434 patient-years of follow-up) (see section 4.4).

In the controlled and non-controlled periods of psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, representing 11,581 patient-years of exposure in 6,709 patients, the median follow up was 1.0 years; 1.1 years for psoriatic disease studies, 0.6 year for Crohn's disease studies and 1.0 years for ulcerative colitis studies. The rate of infection was 0.91 per patient-year of follow-up in ustekinumab-treated patients, and the rate of serious infections was 0.02 per patient-year of follow-up in ustekinumab-treated patients (199 serious infections in 11,581 patient-years of follow-up) and serious infections reported included pneumonia, anal abscess, cellulitis, diverticulitis, gastroenteritis and viral infections.

In clinical studies, patients with latent tuberculosis who were concurrently treated with isoniazid did not develop tuberculosis.

Malignancies

In the placebo-controlled period of the psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, the incidence of malignancies excluding non-melanoma skin cancer was 0.11 per 100 patient-years of follow-up for ustekinumab-treated patients (1 patient in 929 patient-years of follow-up) compared with 0.23 for placebo-treated patients (1 patient in 434 patient-years of follow-up). The incidence of non-melanoma skin cancer was 0.43 per 100 patient-years of follow-up for ustekinumab-treated patients (4 patients in 929 patient-years of follow-up) compared to 0.46 for placebo-treated patients (2 patients in 433 patient-years of follow-up).

In the controlled and non-controlled periods of psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, representing 11,561 patient-years of exposure in 6,709 patients, the median follow-up was 1.0 years; 1.1 years for psoriatic disease studies, 0.6 year for Crohn's disease studies and 1.0 years for ulcerative colitis studies. Malignancies excluding non-melanoma skin cancers were reported in 62 patients in 11,561 patient-years of follow-up (incidence of 0.54 per 100 patient-years of follow-up for ustekinumab-treated patients). The

incidence of malignancies reported in ustekinumab-treated patients was comparable to the incidence expected in the general population (standardised incidence ratio = 0.93 [95% confidence interval: 0.71, 1.20], adjusted for age, gender and race). The most frequently observed malignancies, other than non-melanoma skin cancer, were prostate, colorectal, melanoma and breast cancers. The incidence of non-melanoma skin cancer was 0.49 per 100 patient-years of follow-up for ustekinumab-treated patients (56 patients in 11,545 patient-years of follow-up). The ratio of patients with basal versus squamous cell skin cancers (3:1) is comparable with the ratio expected in the general population (see section 4.4).

Hypersensitivity and infusion reactions

In Crohn's disease and ulcerative colitis intravenous induction studies, no events of anaphylaxis or other serious infusion reactions were reported following the single intravenous dose. In these studies, 2.2% of 785 placebo treated patients and 1.9% of 790 patients treated with the recommended dose of ustekinumab reported adverse events occurring during or within an hour of the infusion.

*Paediatric population*

Undesirable effects in paediatric patients 12 years and older with plaque psoriasis

The safety of ustekinumab has been studied in a phase 3 study of 110 patients from 12 to 17 years of age for up to 60 weeks. In this study, the adverse events reported were similar to those seen in previous studies in adults with plaque psoriasis.

Reporting of suspected adverse reactions

Reporting suspected adverse reactions after authorisation of the medicinal product is important. It allows continued monitoring of the benefit/risk balance of the medicinal product. Healthcare professionals are asked to report any suspected adverse reactions via the national reporting system listed in Appendix V.

**4.9 Overdose**

Single doses up to 6 mg/kg have been administered intravenously in clinical studies without

dose-limiting toxicity. In case of overdose, it is recommended that the patient be monitored for any signs or symptoms of adverse reactions and appropriate symptomatic treatment be instituted immediately.

## 5. PHARMACOLOGICAL PROPERTIES

### 5.1 Pharmacodynamic properties

Pharmacotherapeutic group: Immunosuppressants, interleukin inhibitors, ATC code: L04AC05.

Mechanism of action

Ustekinumab is a fully human IgG1κ monoclonal antibody that binds with specificity to the shared p40 protein subunit of human cytokines interleukin (IL)-12 and IL-23. Ustekinumab inhibits the bioactivity of human IL-12 and IL-23 by preventing p40 from binding to the IL-12Rβ1 receptor protein expressed on the surface of immune cells. Ustekinumab cannot bind to IL-12 or IL-23 that is already bound to IL-12Rβ1 cell surface receptors. Thus, ustekinumab is not likely to contribute to complement- or antibody-mediated cytotoxicity of cells with IL-12 and/or IL-23 receptors. IL-12 and IL-23 are heterodimeric cytokines secreted by activated antigen presenting cells, such as macrophages and dendritic cells, and both cytokines participate in immune functions; IL-12 stimulates natural killer (NK) cells and drives the differentiation of CD4+ T cells toward the T helper 1 (Th1) phenotype, IL-23 induces the T helper 17 (Th17) pathway. However, abnormal regulation of IL 12 and IL 23 has been associated with immune mediated diseases, such as psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis.

By binding the shared p40 subunit of IL-12 and IL-23, ustekinumab may exert its clinical effects in psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis through interruption of the Th1 and Th17 cytokine pathways, which are central to the pathology of these diseases.

In patients with Crohn's disease and ulcerative colitis, treatment with ustekinumab resulted in a decrease in inflammatory markers including C-Reactive Protein (CRP) and fecal calprotectin during the induction phase, which were then maintained throughout the maintenance phase.

Immunisation

During the long term extension of Psoriasis Study 2 (PHOENIX 2), adult patients treated with STELARA for at least 3.5 years mounted similar antibody responses to both pneumococcal polysaccharide and tetanus vaccines as a non-systemically treated psoriasis control group. Similar proportions of adult patients developed protective levels of anti-pneumococcal and anti-tetanus antibodies and antibody titers were similar among STELARA-treated and control patients.

Clinical efficacy

Crohn's Disease

The safety and efficacy of ustekinumab was assessed in three randomized, double-blind, placebo-controlled, multicenter studies in adult patients with moderately to severely active Crohn's disease (Crohn's Disease Activity Index [CDAI] score of ≥ 220 and ≤ 450). The clinical development program consisted of two 8-week intravenous induction studies (UNITI-1 and UNITI-2) followed by a 44 week subcutaneous randomized withdrawal maintenance study (IM-UNITI) representing 52 weeks of therapy.

The induction studies included 1409 (UNITI-1, n = 769; UNITI-2 n = 640) patients. The primary endpoint for both induction studies was the proportion of subjects in clinical response (defined as a reduction in CDAI score of ≥ 100 points) at week 6. Efficacy data were collected and analyzed through week 8 for both studies. Concomitant doses of oral corticosteroids, immunomodulators, aminosalicylates and antibiotics were permitted and 75% of patients continued to receive at least one of these medications. In both studies, patients were randomised to receive a single intravenous administration of either the recommended tiered dose of approximately 6 mg/kg (see Table 1, section 4.2), a fixed dose of 130 mg ustekinumab, or placebo at week 0.

Patients in UNITI-1 had failed or were intolerant to prior anti-TNFα therapy. Approximately 48% of the patients had failed 1 prior anti-TNFα therapy and 52% had failed 2 or 3 prior anti-TNFα therapies. In this study, 29.1% of the patients had an inadequate initial response (primary

non-responders), 69.4% responded but lost response (secondary non-responders), and 36.4% were intolerant to anti-TNFα therapies.

Patients in UNITI-2 had failed at least one conventional therapy, including corticosteroids or immunomodulators, and were either anti-TNF-α naïve (68.6%) or had previously received but not failed anti-TNFα therapy (31.4%).

In both UNITI-1 and UNITI-2, a significantly greater proportion of patients were in clinical response and remission in the ustekinumab treated group compared to placebo (Label Table 3). Clinical response and remission were significant as early as week 3 in ustekinumab treated patients and continued to improve through week 8. In these induction studies, efficacy was higher and better sustained in the tiered dose group compared to the 130 mg dose group, and tiered dosing is therefore the recommended intravenous induction dose.

*Label Table 3: Induction of Clinical Response and Remission in UNITI-1 and UNITI 2*

| | **UNITI-1*** | | **UNITI-2**** | |
|---|---|---|---|---|
| | **Placebo N = 247** | **Recommended dose of ustekinumab N = 249** | **Placebo N = 209** | **Recommended dose of ustekinumab N = 209** |
| Clinical Remission, week 8 | 18 (7.3%) | 52 (20.9%)[a] | 41 (19.6%) | 84 (40.2%)[a] |
| Clinical Response (100 point), week 6 | 53 (21.5%) | 84 (33.7%)[b] | 60 (28.7%) | 116 (55.5%)[a] |
| Clinical Response (100 point), week 8 | 50 (20.2%) | 94 (37.8%)[a] | 67 (32.1%) | 121 (57.9%)[a] |
| 70 Point Response, week 3 | 67 (27.1%) | 101 (40.6%)[b] | 66 (31.6%) | 106 (50.7%)[a] |
| 70 Point Response, week 6 | 75 (30.4%) | 109 (43.8%)[b] | 81 (38.8%) | 135 (64.6%)[a] |

Clinical remission is defined as CDAI score < 150; Clinical response is defined as reduction in CDAI score by at least 100 points or being in clinical remission
70 point response is defined as reduction in CDAI score by at least 70 points
* Anti-TNFα failures
** Conventional therapy failures
a $p < 0.001$
b $p < 0.01$

The maintenance study (IM-UNITI), evaluated 388 patients who achieved 100 point clinical response at week 8 of induction with ustekinumab in studies UNITI-1 and UNITI-2. Patients

were randomized to receive a subcutaneous maintenance regimen of either 90 mg ustekinumab every 8 weeks, 90 mg ustekinumab every 12 weeks or placebo for 44 weeks (for recommended maintenance posology, see section 4.2 of the STELARA Solution for injection (vial) and Solution for injection in pre filled syringe SmPC).

Significantly higher proportions of patients maintained clinical remission and response in the ustekinumab treated groups compared to the placebo group at week 44 (see Label Table 4).

*Label Table 4: Maintenance of Clinical Response and Remission in IM-UNITI (week 44; 52 weeks from initiation of the induction dose)*

| | **Placebo*** **N = 131**[†] | **90 mg ustekinumab every 8 weeks** **N = 128**[†] | **90 mg ustekinumab every 12 weeks** **N = 129**[†] |
|---|---|---|---|
| Clinical Remission | 36% | 53%[a] | 49%[b] |
| Clinical Response | 44% | 59%[b] | 58%[b] |
| Corticosteroid-Free Clinical Remission | 30% | 47%[a] | 43%[c] |
| Clinical Remission in patients: | | | |
| in remission at the start of maintenance therapy | 46% (36/79) | 67% (52/78)[a] | 56% (44/78) |
| who entered from study CRD3002[‡] | 44% (31/70) | 63% (45/72)[c] | 57% (41/72) |
| who are Anti-TNFα naïve | 49% (25/51) | 65% (34/52)[c] | 57% (30/53) |
| who entered from study CRD3001[§] | 26% (16/61) | 41% (23/56) | 39% (22/57) |

Clinical remission is defined as CDAI score < 150; Clinical response is defined as reduction in CDAI of at least 100 points or being in clinical remission

* The placebo group consisted of patients who were in response to ustekinumab and were randomized to receive placebo at the start of maintenance therapy.

† Patients who were in 100 point clinical response to ustekinumab at start of maintenance therapy

‡ Patients who failed conventional therapy but not anti-TNFα therapy

§ Patients who are anti-TNFα refractory/intolerant

a $p < 0.01$

b $p < 0.05$

c nominally significant ($p < 0.05$)

In IM-UNITI, 29 of 129 patients did not maintain response to ustekinumab when treated every 12 weeks and were allowed to dose adjust to receive ustekinumab every 8 weeks. Loss of response was defined as a CDAI score ≥ 220 points and a ≥ 100 point increase from the CDAI score at baseline. In these patients, clinical remission was achieved in 41.4% of patients 16 weeks after dose adjustment.

Patients who were not in clinical response to ustekinumab induction at week 8 of the UNITI-1 and UNITI-2 induction studies (476 patients) entered into the non-randomized portion of the maintenance study (IM-UNITI) and received a 90 mg subcutaneous injection of ustekinumab at that time. Eight weeks later, 50.5% of the patients achieved clinical response and continued to receive maintenance dosing every 8 weeks; among these patients with continued maintenance dosing, a majority maintained response (68.1%) and achieved remission (50.2%) at week 44, at proportions that were similar to the patients who initially responded to ustekinumab induction.

Of 131 patients who responded to ustekinumab induction, and were randomized to the placebo group at the start of the maintenance study, 51 subsequently lost response and received 90 mg ustekinumab subcutaneously every 8 weeks. The majority of patients who lost response and resumed ustekinumab did so within 24 weeks of the induction infusion. Of these 51 patients, 70.6% achieved clinical response and 39.2% percent achieved clinical remission 16 weeks after receiving the first subcutaneous dose of ustekinumab.

In IM-UNITI, patients who completed the study through week 44 were eligible to continue treatment in a study extension. Among patients who entered the study extension, clinical remission and response were generally maintained through week 92 for both patients who failed TNF-therapies and those who failed conventional therapies.

No new safety concerns were identified in this study extension with up to 2 years of treatment in patients with Crohn's Disease.

*Endoscopy*

Endoscopic appearance of the mucosa was evaluated in 252 patients with eligible baseline endoscopic disease activity in a substudy. The primary endpoint was change from baseline in Simplified Endoscopic Disease Severity Score for Crohn's Disease (SES-CD), a composite score across 5 ileo-colonic segments of presence/size of ulcers, proportion of mucosal surface covered by ulcers, proportion of mucosal surface affected by any other lesions and presence/type of narrowing/strictures. At week 8, after a single intravenous induction dose, the change in SES-CD score was greater in the ustekinumab group (n = 155, mean change = -2.8) than in the placebo group (n = 97, mean change = -0.7, p = 0.012).

*Fistula Response*

In a subgroup of patients with draining fistulas at baseline (8.8%; n = 26), 12/15 (80%) of ustekinumab-treated patients achieved a fistula response over 44 weeks (defined as ≥ 50% reduction from baseline of the induction study in the number of draining fistulas) compared to 5/11 (45.5%) exposed to placebo.

*Health-related quality of life*

Health-related quality of life was assessed by Inflammatory Bowel Disease Questionnaire (IBDQ) and SF-36 questionnaires. At week 8, patients receiving ustekinumab showed statistically significantly greater and clinically meaningful improvements on IBDQ total score and SF-36 Mental Component Summary Score in both UNITI-1 and UNITI-2, and SF-36 Physical Component Summary Score in UNITI-2, when compared to placebo. These improvements were generally better maintained in ustekinumab-treated patients in the IM-UNITI study through week 44 when compared to placebo. Improvement in health-related quality of life was generally maintained during the extension through week 92.

Ulcerative colitis

The safety and efficacy of ustekinumab was assessed in two randomized, double-blind, placebo-controlled, multicenter studies in adult patients with moderately to severely active ulcerative colitis (Mayo score 6 to 12; Endoscopy subscore ≥ 2). The clinical development program

consisted of one intravenous induction study (referred to as UNIFI-I) with treatment of up to 16 weeks followed by a 44 week subcutaneous randomized withdrawal maintenance study (referred to as UNIFI-M) representing at least 52 weeks of therapy.

Efficacy results presented for UNIFI-I and UNIFI-M were based on central review of endoscopies.

UNIFI-I included 961 patients. The primary endpoint for the induction study was the proportion of subjects in clinical remission at week 8. Patients were randomised to receive a single intravenous administration of either the recommended tiered dose of approximately 6 mg/kg (see Label Table 1, section 4.2), a fixed dose of 130 mg ustekinumab, or placebo at week 0.

Concomitant doses of oral corticosteroids, immunomodulators, and aminosalicylates were permitted and 90% of patients continued to receive at least one of these medications. Enrolled patients had to have failed conventional therapy (corticosteroids or immunomodulators) or at least one biologic (a TNFα antagonist and/or vedolizumab). 49% of patients had failed conventional therapy, but not a biologic (of which 94% where biological-naïve). 51% of patients had failed or were intolerant to a biologic. Approximately 50% of the patients had failed at least 1 prior anti-TNFα therapy (of which 48% were primary non-responders) and 17% had failed at least 1 anti-TNFα therapy and vedolizumab.

In UNIFI-I a significantly greater proportion of patients were in clinical remission in the ustekinumab treated group compared to placebo at week 8 (Label Table 5). As early as Week 2, the earliest scheduled study visit, and at each visit thereafter, a higher proportion of ustekinumab patients had no rectal bleeding or achieved normal stool frequency as compared with placebo patients. Significant differences in partial Mayo score and symptomatic remission were observed between ustekinumab and placebo as early as Week 2.

Efficacy was higher in the tiered dose group (6 mg/kg) compared to the 130 mg dose group in select endpoints, and tiered dosing is therefore the recommended intravenous induction dose.

*Label Table 5: Summary of Key Efficacy Outcomes in UNIFI-I (Week 8)*

| | **Placebo N = 319** | **Recommended dose of ustekinumab[£] N =322** |
|---|---|---|
| Clinical Remission* | 5% | 16%[a] |
| In patients who failed conventional therapy, but not a biologic | 9% (15/158) | 19% (29/156)[c] |
| In patients who failed biological therapy[¥] | 1% (2/161) | 13% (21/166)[b] |
| In patients who failed both a TNF and vedolizumab | 0% (0/47) | 10% (6/58)[c] |
| Clinical Response[§] | 31% | 62%[a] |
| In patients who failed conventional therapy, but not a biologic | 35% (56/158) | 67% (104/156)[b] |
| In patients who failed biological therapy[¥] | 27% (44/161) | 57% (95/166)[b] |
| In patients who failed both a TNF and vedolizumab | 28% (13/47) | 52% (30/58)[c] |
| Mucosal Healing[†] | 14% | 27%[a] |
| In patients who failed conventional therapy, but not a biologic | 21% (33/158) | 33% (52/156)[c] |
| In patients who failed biological therapy | 7% (11/161) | 21% (35/166)[b] |
| Symptomatic Remission[‡] | 23% | 45%[b] |
| Combined Symptomatic Remission and Mucosal Healing[⸸] | 8% | 21%[b] |

£ Infusion dose of ustekinumab using the weight-based dosage regimen specified in *Label Table 1*.

* Clinical remission is defined as Mayo score $\leq 2$ points, with no individual subscore $> 1$.

§ Clinical response is defined as a decrease from baseline in the Mayo score by $\geq 30\%$ and $\geq 3$ points, with either a decrease from baseline in the rectal bleeding subscore $\geq 1$ or a rectal bleeding subscore of 0 or 1.

¥ A TNF$\alpha$ antagonist and/or vedolizumab.

† Mucosal healing is defined as a Mayo endoscopic subscore of 0 or 1.

‡ Symptomatic remission is defined as a Mayo stool frequency subscore of 0 or 1 and a rectal bleeding subscore of 0.

⸸ Combined symptomatic remission and mucosal healing is defined as a stool frequency subscore of 0 or 1, a rectal bleeding subscore of 0, and an endoscopy subscore of 0 or 1.

a $p < 0.001$

b Nominally significant ($p < 0.001$)

c Nominally significant ($p < 0.05$)

UNIFI-M, evaluated 523 patients who achieved clinical response with single IV administration of ustekinumab in UNIFI-I. Patients were randomized to receive a subcutaneous maintenance regimen of either 90 mg ustekinumab every 8 weeks, 90 mg ustekinumab every 12 weeks or

placebo for 44 weeks (for recommended maintenance posology, see section 4.2 of the STELARA Solution for injection (vial) and Solution for injection in pre filled syringe SmPC).

Significantly greater proportions of patients were in clinical remission in both ustekinumab treated groups compared to the placebo group at week 44 (see Label Table 6).

*Label Table 6: Summary of Key Efficacy Measures in UNIFI-M (week 44; 52 weeks from initiation of the induction dose)*

| | **Placebo*** N = 175 | **90 mg ustekinumab every 8 Weeks** N = 176 | **90 mg ustekinumab every 12 Weeks** N = 172 |
|---|---|---|---|
| Clinical Remission** | 24% | 44%[a] | 38%[b] |
| In patients who failed conventional therapy, but not a biologic | 31% (27/87) | 48% (41/85)[d] | 49% (50/102)[d] |
| In patients who failed biological therapy[¥] | 17% (15/88) | 40% (36/91)[c] | 23% (16/70)[d] |
| In patients who failed both a TNF and vedolizumab | 15% (4/27) | 33% (7/21)[e] | 23% (5/22)[e] |
| Maintenance of Clinical Response through week 44[§] | 45% | 71%[a] | 68%[a] |
| In patients who failed conventional therapy, but not a biologic | 51% (44/87) | 78% (66/85)[c] | 77% (78/102)[c] |
| In patients who failed biological therapy[¥] | 39% (34/88) | 65% (59/91)[c] | 56% (39/70)[d] |
| In patients who failed both a TNF and vedolizumab | 41% (11/27) | 67% (14/21)[e] | 50% (11/22)[e] |
| Mucosal Healing[†] | 29% | 51%[a] | 44%[b] |
| Maintenance of Clinical Remission through week 44[£] | 38% (17/45) | 58% (22/38) | 65% (26/40)[c] |
| Corticosteroid Free Clinical Remission[€] | 23% | 42%[a] | 38%[b] |
| Durable Remission[ǀ] | 35% | 57%[c] | 48%[d] |
| Symptomatic Remission[‡] | 45% | 68%[c] | 62%[d] |
| Combined Symptomatic Remission and Mucosal Healing[⸸] | 28% | 48%[c] | 41%[d] |

* Following response to IV ustekinumab.

** Clinical remission is defined as Mayo score ≤2 points, with no individual subscore > 1.

§ Clinical response is defined as a decrease from baseline in the Mayo score by ≥30% and ≥3 points, with either a decrease from baseline in the rectal bleeding subscore ≥1 or a rectal bleeding subscore of 0 or 1.

¥ A TNFα antagonist and/or vedolizumab.

† Mucosal healing is defined as a Mayo endoscopic sub-score of 0 or 1.

£ Maintenance of clinical remission through Week 44 is defined as patients in clinical remission through Week 44 among patients in clinical remission at maintenance baseline.

€ Corticosteroid-free clinical remission is defined as patients in clinical remission and not receiving corticosteroids at Week 44.

| Durable Remission is defined as partial Mayo remission at ≥80% of all visits prior to Week 44 and in partial Mayo remission at last visit (Week 44).

‡ Symptomatic remission is defined as a Mayo stool frequency subscore of 0 or 1 and a rectal bleeding subscore of 0.

⸸ Combined symptomatic remission and mucosal healing is defined as a stool frequency subscore of 0 or 1, a rectal bleeding subscore of 0, and an endoscopy subscore of 0 or 1.

a $p < 0.001$

b $p < 0.05$

c Nominally significant ($p < 0.001$)

d Nominally significant ($p < 0.05$)

e Not statistically significant

The beneficial effect of ustekinumab on clinical response, mucosal healing and clinical remission was observed in induction and in maintenance both in patients who failed conventional therapy but not a biologic therapy, as well as in those who had failed at least one prior TNFα antagonist therapy including in patients with a primary non-response to TNFα antagonist therapy. A beneficial effect was also observed in induction in patients who failed at least one prior TNFα antagonist therapy and vedolizumab, however the number of patients in this subgroup was too small to draw definitive conclusions about the beneficial effect in this group during maintenance.

*Week 16 Responders to Ustekinumab Induction*

Ustekinumab treated patients who were not in response at week 8 of UNIFI-I received an administration of 90 mg SC ustekinumab at week 8 (36% of patients). Of those patients, 9% of patients who were initially randomized to the recommended induction dose achieved clinical remission and 58% achieved clinical response at Week 16.

Patients who were not in clinical response to ustekinumab induction at week 8 of the UNFI-I study but were in response at week 16 (157 patients) entered into the non-randomized portion of

UNIFI-M and continued to receive maintenance dosing every 8 weeks; among these patients, a majority (62%) maintained response and 30% achieved remission at week 44.

*Endoscopic Normalization*

Endoscopic normalization was defined as a Mayo endoscopic subscore of 0 and was observed as early as week 8 of UNIFI-I. At week 44 of UNIFI-M, it was achieved in 24% and 29% of patients treated with ustekinumab every 12 or 8 weeks, respectively, as compared to 18% of patients in the placebo group.

*Histologic & Histo-Endoscopic Mucosal Healing*

Histologic healing (defined as neutrophil infiltration in < 5% of crypts, no crypt destruction, and no erosions, ulcerations, or granulation tissue) was assessed at week 8 of UNIFI-I and Week 44 of UNIFI-M. At week 8, after a single intravenous induction dose, significantly greater proportions of patients in the recommended dose group achieved histologic healing (36%) compared with patients in the placebo group (22%). At Week 44 maintenance of this effect was observed with significantly more patients in histologic healing in the every 12 week (54%) and every 8 week (59%) ustekinumab groups as compared to placebo (33%).

A combined endpoint of histo-endoscopic mucosal healing defined as subjects having both mucosal healing and histologic healing was evaluated at week 8 of UNIFI-I and week 44 of UNIFI-M. Patients receiving ustekinumab at the recommended dose showed significant improvements on the histo-endoscopic mucosal healing endpoint at week 8 in the ustekinumab group (18%) as compared to the placebo group (9%). At week 44, maintenance of this effect was observed with significantly more patients in histo-endoscopic mucosal healing in the every 12 week (39%) and every 8 week (46%) ustekinumab groups compared to placebo (24%).

*Health-related quality of life*

Health-related quality of life was assessed by Inflammatory Bowel Disease Questionnaire (IBDQ), SF-36 and EuroQoL-5D (EQ-5D) questionnaires.

At week 8 of UNIFI-I, patients receiving ustekinumab showed significantly greater and clinically meaningful improvements on IBDQ total score, EQ-5D and EQ-5D VAS, and SF-36 Mental Component Summary Score and SF-36 Physical Component Summary Score when compared to placebo. These improvements were maintained in ustekinumab-treated patients in UNIFI-M through week 44.

Patients receiving ustekinumab experienced significantly more improvements in work productivity as assessed by greater reductions in overall work impairment and in activity impairment as assessed by the WPAI-GH questionnaire than patients receiving placebo.

*Hospitalizations and ulcerative colits (UC) related surgeries*

Through week 8 of UNIFI-I, the proportions of subjects with UC disease related hospitalizations were significantly lower for subjects in the ustekinumab recommended dose group (1.6%, 5/322) compared with subjects in the placebo group (4.4%, 14/319) and no subjects underwent UC disease related surgeries in subjects receiving ustekinumab at the recommended induction dose compared to 0.6% (2/319) subjects in the placebo group.

Through week 44 of UNIFI-M, a significantly lower number of UC-related hospitalizations was observed in subjects in the combined ustekinumab group (2.0%, 7/348) as compared with subjects in the placebo group (5.7%, 10/175). A numerically lower number of subjects in the ustekinumab group (0.6%, 2/348) underwent UC disease related surgeries compared with subjects in the placebo group (1.7%, 3/175) through week 44.

Immunogenicity

Antibodies to ustekinumab may develop during ustekinumab treatment and most are neutralising. The formation of anti-ustekinumab antibodies is associated with increased clearance of ustekinumab in patients with Crohn's disease or ulcerative colitis. No reduced efficacy was observed. There is no apparent correlation between the presence of anti-ustekinumab antibodies and the occurrence of injection site reactions.

Paediatric population

The European Medicines Agency has deferred the obligation to submit the results of studies with ustekinumab in one or more subsets of the paediatric population in Crohn's Disease and ulcerative colitis (see section 4.2 for information on paediatric use).

**5.2 Pharmacokinetic properties**

Following the recommended intravenous induction dose, median peak serum ustekinumab concentration, observed 1 hour after the infusion, was 126.1 μg/mL in patients with Crohn's disease and 127.0 μg/mL in patients with ulcerative colitis.

Distribution

Median volume of distribution during the terminal phase (Vz) following a single intravenous administration to patients with psoriasis ranged from 57 to 83 mL/kg.

Biotransformation

The exact metabolic pathway for ustekinumab is unknown.

Elimination

Median systemic clearance (CL) following a single intravenous administration to patients with psoriasis ranged from 1.99 to 2.34 mL/day/kg. Median half-life ($t_{1/2}$) of ustekinumab was approximately 3 weeks in patients with ulcerative colitis, Crohn's disease, psoriasis and/or psoriatic arthritis, ranging from 15 to 32 days across all psoriasis and psoriatic arthritis studies.

Dose linearity

The systemic exposure of ustekinumab ($C_{max}$ and AUC) increased in an approximately dose-proportional manner after a single intravenous administration at doses ranging from 0.09 mg/kg to 4.5 mg/kg.

Special populations

No pharmacokinetic data are available in patients with impaired renal or hepatic function.

No specific studies have been conducted with intravenous ustekinumab in elderly or paediatric patients.

In patients with Crohn's disease and ulcerative colitis, variability in ustekinumab clearance was affected by body weight, serum albumin level, sex, and antibody to ustekinumab status while body weight was the main covariate affecting the volume of distribution. Additionally in Crohn's disease, clearance was affected by C-reactive protein, TNF antagonist failure status and race (Asian versus non-Asian). The impact of these covariates was within ±20% of the typical or reference value of the respective PK parameter, thus dose adjustment is not warranted for these covariates. Concomitant use of immunomodulators did not have a significant impact on ustekinumab disposition.

Regulation of CYP450 enzymes

The effects of IL-12 or IL-23 on the regulation of CYP450 enzymes were evaluated in an *in vitro* study using human hepatocytes, which showed that IL-12 and/or IL-23 at levels of 10 ng/mL did not alter human CYP450 enzyme activities (CYP1A2, 2B6, 2C9, 2C19, 2D6, or 3A4; see section 4.5).

### 5.3 Preclinical safety data

Non-clinical data reveal no special hazard (e.g. organ toxicity) for humans based on studies of repeated-dose toxicity and developmental and reproductive toxicity, including safety pharmacology evaluations. In developmental and reproductive toxicity studies in cynomolgus monkeys, neither adverse effects on male fertility indices nor birth defects or developmental toxicity were observed. No adverse effects on female fertility indices were observed using an analogous antibody to IL-12/23 in mice.

Dose levels in animal studies were up to approximately 45-fold higher than the highest equivalent dose intended to be administered to psoriasis patients and resulted in peak serum concentrations in monkeys that were more than 100-fold higher than observed in humans.

Carcinogenicity studies were not performed with ustekinumab due to the lack of appropriate models for an antibody with no cross-reactivity to rodent IL-12/23 p40.

## 6. PHARMACEUTICAL PARTICULARS

### 6.1 List of excipients

EDTA disodium salt dihydrate
L-histidine
L-histidine monohydrochloride monohydrate
L-methionine
Polysorbate 80
Sucrose
Water for injection

### 6.2 Incompatibilities

In the absence of compatibility studies, this medicinal product must not be mixed with other medicinal products. STELARA should only be diluted with sodium chloride 9 mg/mL (0.9%) solution. STELARA should not be administered concomitantly in the same intravenous line with other medicinal products.

### 6.3 Shelf life

3 years.
Do not freeze.

Chemical and physical in-use stability has been demonstrated for 8 hours at 15-25°C.

From a microbiological point of view, unless the method of dilution precludes the risk of microbial contamination, the product should be used immediately. If not used immediately, in-use storage times and conditions are the responsibility of user.

**6.4 Special precautions for storage**

Store in a refrigerator (2°C – 8°C). Do not freeze.

Keep the vial in the outer carton in order to protect from light.

For storage conditions after dilution of the medicinal product, see section 6.3

**6.5 Nature and contents of container**

26 mL solution in a type I glass 30 mL vial closed with a coated butyl rubber stopper.

STELARA is available in a 1 vial pack.

**6.6 Special precautions for disposal and other handling**

The solution in the STELARA vial should not be shaken. The solution should be visually inspected for particulate matter or discoloration prior to administration. The solution is clear, colourless to light yellow. The medicinal product should not be used if the solution is discoloured or cloudy, or if foreign particulate matter is present.

Dilution

STELARA concentrate for solution for infusion must be diluted and prepared by a healthcare professional using aseptic technique.

1. Calculate the dose and the number of STELARA vials needed based on patient weight (see section 4.2, Label Table 1). Each 26 mL vial of STELARA contains 130 mg of ustekinumab. Only use complete vials of STELARA.
2. Withdraw and discard a volume of the sodium chloride 9 mg/mL (0.9%) solution from the 250 mL infusion bag equal to the volume of STELARA to be added. (discard 26 mL sodium chloride for each vial of STELARA needed, for 2 vials-discard 52 mL, for 3 vials-discard 78 mL, for 4 vials- discard 104 mL)
3. Withdraw 26 mL of STELARA from each vial needed and add it to the 250 mL infusion bag. The final volume in the infusion bag should be 250 mL. Gently mix.

4. Visually inspect the diluted solution before administration. Do not use if visibly opaque particles, discoloration or foreign particles are observed.
5. Administer the diluted solution over a period of at least one hour. Once diluted, the infusion should be completed within eight hours of the dilution in the infusion bag.
6. Use only an infusion set with an in-line, sterile, non-pyrogenic, low protein-binding filter (pore size 0.2 micrometer).
7. Each vial is for single use only and any unused medicinal product should be disposed of in accordance with local requirements.

**7. MARKETING AUTHORISATION HOLDER**

Janssen-Cilag International NV
Turnhoutseweg 30
2340 Beerse
Belgium

**8. MARKETING AUTHORISATION NUMBER(S)**

EU/1/08/494/005

**9. DATE OF FIRST AUTHORISATION/RENEWAL OF THE AUTHORISATION**

Date of first authorisation: 16 January 2009
Date of latest renewal: 19 September 2013

**10. DATE OF REVISION OF THE TEXT**

Detailed information on this medicinal product is available on the website of the European Medicines Agency http://www.ema.europa.eu/

## 1. NAME OF THE MEDICINAL PRODUCT

STELARA 45 mg solution for injection

STELARA 90 mg solution for injection

STELARA 45 mg solution for injection in pre-filled syringe

STELARA 90 mg solution for injection in pre-filled syringe

## 2. QUALITATIVE AND QUANTITATIVE COMPOSITION

STELARA 45 mg solution for injection

Each vial contains 45 mg ustekinumab in 0.5 mL.

STELARA 90 mg solution for injection

Each vial contains 90 mg ustekinumab in 1 mL.

STELARA 45 mg solution for injection in pre-filled syringe

Each pre-filled syringe contains 45 mg ustekinumab in 0.5 mL.

STELARA 90 mg solution for injection in pre-filled syringe

Each pre-filled syringe contains 90 mg ustekinumab in 1 mL.

Ustekinumab is a fully human IgG1κ monoclonal antibody to interleukin (IL)-12/23 produced in a murine myeloma cell line using recombinant DNA technology.

For the full list of excipients, see section 6.1.

## 3. PHARMACEUTICAL FORM

STELARA 45 mg solution for injection

Solution for injection.

STELARA 90 mg solution for injection

Solution for injection.

STELARA 45 mg solution for injection in pre-filled syringe

Solution for injection.

STELARA 90 mg solution for injection in pre-filled syringe

Solution for injection.

The solution is clear to slightly opalescent, colourless to light yellow.

## 4. CLINICAL PARTICULARS

### 4.1 Therapeutic indications

Plaque psoriasis

STELARA is indicated for the treatment of moderate to severe plaque psoriasis in adults who failed to respond to, or who have a contraindication to, or are intolerant to other systemic therapies including ciclosporin, methotrexate (MTX) or PUVA (psoralen and ultraviolet A) (see section 5.1).

Paediatric plaque psoriasis

STELARA is indicated for the treatment of moderate to severe plaque psoriasis in adolescent patients from the age of 12 years and older, who are inadequately controlled by, or are intolerant to, other systemic therapies or phototherapies (see section 5.1).

Psoriatic arthritis (PsA)

STELARA, alone or in combination with MTX, is indicated for the treatment of active psoriatic arthritis in adult patients when the response to previous non-biological disease-modifying anti-rheumatic drug (DMARD) therapy has been inadequate (see section 5.1).

Crohn's Disease

STELARA is indicated for the treatment of adult patients with moderately to severely active Crohn's disease who have had an inadequate response with, lost response to, or were intolerant to either conventional therapy or a TNFα antagonist or have medical contraindications to such therapies.

Ulcerative colitis

STELARA is indicated for the treatment of adult patients with moderately to severely active ulcerative colitis who have had an inadequate response with, lost response to, or were intolerant to either conventional therapy or a biologic or have medical contraindications to such therapies (see section 5.1).

**4.2 Posology and method of administration**

STELARA is intended for use under the guidance and supervision of physicians experienced in the diagnosis and treatment of conditions for which STELARA is indicated.

Posology

Plaque psoriasis

The recommended posology of STELARA is an initial dose of 45 mg administered subcutaneously, followed by a 45 mg dose 4 weeks later, and then every 12 weeks thereafter.

Consideration should be given to discontinuing treatment in patients who have shown no response up to 28 weeks of treatment.

*Patients with body weight > 100 kg*

For patients with a body weight > 100 kg the initial dose is 90 mg administered subcutaneously, followed by a 90 mg dose 4 weeks later, and then every 12 weeks thereafter. In these patients, 45 mg was also shown to be efficacious. However, 90 mg resulted in greater efficacy. (see section 5.1, Label Table 4)

Psoriatic arthritis (PsA)

The recommended posology of STELARA is an initial dose of 45 mg administered subcutaneously, followed by a 45 mg dose 4 weeks later, and then every 12 weeks thereafter. Alternatively, 90 mg may be used in patients with a body weight > 100 kg.

Consideration should be given to discontinuing treatment in patients who have shown no response up to 28 weeks of treatment.

*Elderly (≥ 65 years)*

No dose adjustment is needed for elderly patients (see section 4.4).

*Renal and hepatic impairment*

STELARA has not been studied in these patient populations. No dose recommendations can be made.

*Paediatric population*

The safety and efficacy of STELARA in children with psoriasis less than 12 years of age or in children with psoriatic arthritis less than 18 years of age have not yet been established.

Paediatric plaque psoriasis (12 years and older)

The recommended dose of STELARA based on body weight is shown below (Label Tables 1 and 2). STELARA should be administered at Weeks 0 and 4, then every 12 weeks thereafter.

*Label Table 1 Recommended dose of STELARA for paediatric psoriasis*

| **Body weight at the time of dosing** | **Recommended Dose** |
|---|---|
| < 60 kg | 0.75 mg/kg[a] |
| ≥ 60-≤ 100 kg | 45 mg |
| > 100 kg | 90 mg |

[a] To calculate the volume of injection (mL) for patients < 60 kg, use the following formula: *body weight* (kg) x *0.0083* (mL/kg) or see Label Table 2. The calculated volume should be rounded to the nearest 0.01 mL and administered using a 1 mL graduated syringe. A 45 mg vial is available for paediatric patients who need to receive less than the full 45 mg dose.

*Label Table 2 Injection volumes of STELARA for paediatric psoriasis patients < 60 kg*

| **Body weight at time of dosing (kg)** | **Dose (mg)** | **Volume of injection (mL)** |
|---|---|---|
| 30 | 22.5 | 0.25 |
| 31 | 23.3 | 0.26 |
| 32 | 24.0 | 0.27 |
| 33 | 24.8 | 0.27 |
| 34 | 25.5 | 0.28 |
| 35 | 26.3 | 0.29 |
| 36 | 27.0 | 0.30 |
| 37 | 27.8 | 0.31 |
| 38 | 28.5 | 0.32 |
| 39 | 29.3 | 0.32 |
| 40 | 30.0 | 0.33 |
| 41 | 30.8 | 0.34 |
| 42 | 31.5 | 0.35 |
| 43 | 32.3 | 0.36 |
| 44 | 33.0 | 0.37 |
| 45 | 33.8 | 0.37 |
| 46 | 34.5 | 0.38 |
| 47 | 35.3 | 0.39 |
| 48 | 36.0 | 0.40 |
| 49 | 36.8 | 0.41 |
| 50 | 37.5 | 0.42 |
| 51 | 38.3 | 0.42 |
| 52 | 39.0 | 0.43 |
| 53 | 39.8 | 0.44 |
| 54 | 40.5 | 0.45 |
| 55 | 41.3 | 0.46 |
| 56 | 42.0 | 0.46 |
| 57 | 42.8 | 0.47 |
| 58 | 43.5 | 0.48 |
| 59 | 44.3 | 0.49 |

Consideration should be given to discontinuing treatment in patients who have shown no response up to 28 weeks of treatment.

Crohn's Disease and Ulcerative Colitis

In the treatment regimen, the first dose of STELARA is administered intravenously. For the posology of the intravenous dosing regimen, see section 4.2 of the STELARA 130 mg

Concentrate for solution for infusion SmPC.

The first subcutaneous administration of 90 mg STELARA should take place at week 8 after the intravenous dose. After this, dosing every 12 weeks is recommended.

Patients who have not shown adequate response at 8 weeks after the first subcutaneous dose, may receive a second subcutaneous dose at this time (see section 5.1).

Patients who lose response on dosing every 12 weeks may benefit from an increase in dosing frequency to every 8 weeks (see section 5.1, section 5.2).

Patients may subsequently be dosed every 8 weeks or every 12 weeks according to clinical judgment (see section 5.1).

Consideration should be given to discontinuing treatment in patients who show no evidence of therapeutic benefit 16 weeks after the IV induction dose or 16 weeks after switching to the 8-weekly maintenance dose.

Immunomodulators and/or corticosteroids may be continued during treatment with STELARA. In patients who have responded to treatment with STELARA, corticosteroids may be reduced or discontinued in accordance with standard of care.

In Crohn's disease, if therapy is interrupted, resumption of treatment with subcutaneous dosing every 8 weeks is safe and effective.

*Elderly (≥ 65 years)*

No dose adjustment is needed for elderly patients (see section 4.4).

*Renal and hepatic impairment*

STELARA has not been studied in these patient populations. No dose recommendations can be made.

*Paediatric population*

The safety and efficacy of STELARA in treatment of Crohn's disease or ulcerative colitis in children less than 18 years have not yet been established. No data are available.

Method of administration

STELARA 45 mg and 90 mg vials or pre-filled syringes are for subcutaneous injection only. If possible, areas of the skin that show psoriasis should be avoided as injection sites.

After proper training in subcutaneous injection technique, patients or their caregivers may inject STELARA if a physician determines that it is appropriate. However, the physician should ensure appropriate follow-up of patients. Patients or their caregivers should be instructed to inject the prescribed amount of STELARA according to the directions provided in the package leaflet. Comprehensive instructions for administration are given in the package leaflet.

For further instructions on preparation and special precautions for handling, see section 6.6.

**4.3 Contraindications**

Hypersensitivity to the active substance or to any of the excipients listed in section 6.1.

Clinically important, active infection (e.g. active tuberculosis; see section 4.4).

**4.4 Special warnings and precautions for use**

Traceability

In order to improve the traceability of biological medicinal products, the tradename and the batch number of the administered product should be clearly recorded.

Infections

Ustekinumab may have the potential to increase the risk of infections and reactivate latent infections. In clinical studies, serious bacterial, fungal, and viral infections have been observed in patients receiving STELARA (see section 4.8).

Caution should be exercised when considering the use of STELARA in patients with a chronic infection or a history of recurrent infection (see section 4.3).

Prior to initiating treatment with STELARA, patients should be evaluated for tuberculosis infection. STELARA must not be given to patients with active tuberculosis (see section 4.3). Treatment of latent tuberculosis infection should be initiated prior to administering STELARA. Anti-tuberculosis therapy should also be considered prior to initiation of STELARA in patients with a history of latent or active tuberculosis in whom an adequate course of treatment cannot be confirmed. Patients receiving STELARA should be monitored closely for signs and symptoms of active tuberculosis during and after treatment.

Patients should be instructed to seek medical advice if signs or symptoms suggestive of an infection occur. If a patient develops a serious infection, the patient should be closely monitored and STELARA should not be administered until the infection resolves.

<u>Malignancies</u>

Immunosuppressants like ustekinumab have the potential to increase the risk of malignancy. Some patients who received STELARA in clinical studies developed cutaneous and non-cutaneous malignancies (see section 4.8).

No studies have been conducted that include patients with a history of malignancy or that continue treatment in patients who develop malignancy while receiving STELARA. Thus, caution should be exercised when considering the use of STELARA in these patients.

All patients, in particular those greater than 60 years of age, patients with a medical history of prolonged immunosuppressant therapy or those with a history of PUVA treatment, should be monitored for the appearance of non-melanoma skin cancer (see section 4.8).

<u>Systemic and respiratory hypersensitivity reactions</u>

*Systemic*

Serious hypersensitivity reactions have been reported in the postmarketing setting, in some cases

several days after treatment. Anaphylaxis and angioedema have occurred. If an anaphylactic or other serious hypersensitivity reaction occurs, appropriate therapy should be instituted and administration of STELARA should be discontinued (see section 4.8).

*Respiratory*

Cases of allergic alveolitis and eosinophilic pneumonia have been reported during post-approval use of ustekinumab. Clinical presentations included cough, dyspnoea, and interstitial infiltrates following one to three doses. Serious outcomes have included respiratory failure and prolonged hospitalisation. Improvement has been reported after discontinuation of ustekinumab and also, in some cases, administration of corticosteroids. If infection has been excluded and diagnosis is confirmed, discontinue ustekinumab and institute appropriate treatment (see section 4.8).

*Latex sensitivity*

The needle cover on the syringe in the STELARA pre-filled syringe is manufactured from dry natural rubber (a derivative of latex), which may cause allergic reactions in individuals sensitive to latex.

<u>Vaccinations</u>

It is recommended that live viral or live bacterial vaccines (such as Bacillus of Calmette and Guérin (BCG)) should not be given concurrently with STELARA. Specific studies have not been conducted in patients who had recently received live viral or live bacterial vaccines. No data are available on the secondary transmission of infection by live vaccines in patients receiving STELARA. Before live viral or live bacterial vaccination, treatment with STELARA should be withheld for at least 15 weeks after the last dose and can be resumed at least 2 weeks after vaccination. Prescribers should consult the Summary of Product Characteristics for the specific vaccine for additional information and guidance on concomitant use of immunosuppressive agents post-vaccination.

Patients receiving STELARA may receive concurrent inactivated or non-live vaccinations.

Long term treatment with STELARA does not suppress the humoral immune response to pneumococcal polysaccharide or tetanus vaccines (see section 5.1).

Concomitant immunosuppressive therapy

In psoriasis studies, the safety and efficacy of STELARA in combination with immunosuppressants, including biologics, or phototherapy have not been evaluated. In psoriatic arthritis studies, concomitant MTX use did not appear to influence the safety or efficacy of STELARA. In Crohn's disease and ulcerative colitis studies, concomitant use of immunosuppressants or corticosteroids did not appear to influence the safety or efficacy of STELARA. Caution should be exercised when considering concomitant use of other immunosuppressants and STELARA or when transitioning from other immunosuppressive biologics (see section 4.5).

Immunotherapy

STELARA has not been evaluated in patients who have undergone allergy immunotherapy. It is not known whether STELARA may affect allergy immunotherapy.

Serious skin conditions

In patients with psoriasis, exfoliative dermatitis has been reported following ustekinumab treatment (see section 4.8). Patients with plaque psoriasis may develop erythrodermic psoriasis, with symptoms that may be clinically indistinguishable from exfoliative dermatitis, as part of the natural course of their disease. As part of the monitoring of the patient's psoriasis, physicians should be alert for symptoms of erythrodermic psoriasis or exfoliative dermatitis. If these symptoms occur, appropriate therapy should be instituted. STELARA should be discontinued if a drug reaction is suspected.

Special populations

*Elderly (≥ 65 years)*

No overall differences in efficacy or safety in patients age 65 and older who received STELARA were observed compared to younger patients in clinical studies in approved indications, however

the number of patients aged 65 and older is not sufficient to determine whether they respond differently from younger patients. Because there is a higher incidence of infections in the elderly population in general, caution should be used in treating the elderly.

**4.5 Interaction with other medicinal products and other forms of interaction**

Live vaccines should not be given concurrently with STELARA (see section 4.4).

No interaction studies have been performed in humans. In the population pharmacokinetic analyses of the phase III studies, the effect of the most frequently used concomitant medicinal products in patients with psoriasis (including paracetamol, ibuprofen, acetylsalicylic acid, metformin, atorvastatin, levothyroxine) on pharmacokinetics of ustekinumab was explored. There were no indications of an interaction with these concomitantly administered medicinal products. The basis for this analysis was that at least 100 patients (> 5% of the studied population) were treated concomitantly with these medicinal products for at least 90% of the study period. The pharmacokinetics of ustekinumab was not impacted by concomitant use of MTX, NSAIDs, 6-mercaptopurine, azathioprine and oral corticosteroids in patients with psoriatic arthritis, Crohn's disease or ulcerative colitis, or prior exposure to anti-TNFα agents, in patients with psoriatic arthritis or Crohn's disease or by prior exposure to biologics (i.e. anti-TNFα agents and/or vedolizumab) in patients with ulcerative colitis.

The results of an *in vitro* study do not suggest the need for dose adjustments in patients who are receiving concomitant CYP450 substrates (see section 5.2).

In psoriasis studies, the safety and efficacy of STELARA in combination with immunosuppressants, including biologics, or phototherapy have not been evaluated. In psoriatic arthritis studies, concomitant MTX use did not appear to influence the safety or efficacy of STELARA. In Crohn's disease and ulcerative colitis studies, concomitant use of immunosuppressants or corticosteroids did not appear to influence the safety or efficacy of STELARA. (see section 4.4).

**4.6 Fertility, pregnancy and lactation**

Women of childbearing potential

Women of childbearing potential should use effective methods of contraception during treatment and for at least 15 weeks after treatment.

Pregnancy

There are no adequate data from the use of ustekinumab in pregnant women. Animal studies do not indicate direct or indirect harmful effects with respect to pregnancy, embryonic/foetal development, parturition or postnatal development (see section 5.3). As a precautionary measure, it is preferable to avoid the use of STELARA in pregnancy.

Breast-feeding

It is unknown whether ustekinumab is excreted in human breast milk. Animal studies have shown excretion of ustekinumab at low levels in breast milk. It is not known if ustekinumab is absorbed systemically after ingestion. Because of the potential for adverse reactions in nursing infants from ustekinumab, a decision on whether to discontinue breast-feeding during treatment and up to 15 weeks after treatment or to discontinue therapy with STELARA must be made taking into account the benefit of breast-feeding to the child and the benefit of STELARA therapy to the woman.

Fertility

The effect of ustekinumab on human fertility has not been evaluated (see section 5.3).

**4.7 Effects on ability to drive and use machines**

STELARA has no or negligible influence on the ability to drive and use machines.

**4.8 Undesirable effects**

Summary of the safety profile

The most common adverse reactions (> 5%) in controlled periods of the adult psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies with ustekinumab were

nasopharyngitis and headache. Most were considered to be mild and did not necessitate discontinuation of study treatment. The most serious adverse reaction that has been reported for STELARA is serious hypersensitivity reactions including anaphylaxis (see section 4.4). The overall safety profile was similar for patients with psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis.

Tabulated list of adverse reactions

The safety data described below reflect exposure in adults to ustekinumab in 14 phase 2 and phase 3 studies in 6,709 patients (4,135 with psoriasis and/or psoriatic arthritis, 1,749 with Crohn's disease and 825 patients with ulcerative colitis). This includes exposure to STELARA in the controlled and non-controlled periods of the clinical studies for at least 6 months or 1 year (4,577 and 3,253 patients respectively with psoriasis, psoriatic arthritis, Crohn's disease or ulcerative colitis) and exposure for at least 4 or 5 years (1,482 and 838 patients with psoriasis respectively).

Table 3 provides a list of adverse reactions from adult psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies as well as adverse reactions reported from post-marketing experience. The adverse reactions are classified by System Organ Class and frequency, using the following convention: Very common (≥ 1/10), Common (≥ 1/100 to < 1/10), Uncommon (≥ 1/1,000 to < 1/100), Rare (≥ 1/10,000 to < 1/1,000), Very rare (< 1/10,000), not known (cannot be estimated from the available data). Within each frequency grouping, adverse reactions are presented in order of decreasing seriousness.

*Label Table 3 List of adverse reactions*

| **System Organ Class** | **Frequency: Adverse reaction** |
|---|---|
| Infections and infestations | Common: Upper respiratory tract infection, nasopharyngitis, sinusitis<br>Uncommon: Cellulitis, dental infections, herpes zoster, lower respiratory tract infection, viral upper respiratory tract infection, vulvovaginal mycotic infection |

| | |
|---|---|
| Immune system disorders | Uncommon: Hypersensitivity reactions (including rash, urticaria)<br>Rare: Serious hypersensitivity reactions (including anaphylaxis, angioedema) |
| Psychiatric disorders | Uncommon: Depression |
| Nervous system disorders | Common: Dizziness, headache<br>Uncommon: Facial palsy |
| Respiratory, thoracic and mediastinal disorders | Common: Oropharyngeal pain<br>Uncommon: Nasal congestion<br>Rare: Allergic alveolitis, eosinophilic pneumonia |
| Gastrointestinal disorders | Common: Diarrhoea, nausea, vomiting |
| Skin and subcutaneous tissue disorders | Common: Pruritus<br>Uncommon: Pustular psoriasis, skin exfoliation, acne<br>Rare: Exfoliative dermatitis |
| Musculoskeletal and connective tissue disorders | Common: Back pain, myalgia, arthralgia |
| General disorders and administration site conditions | Common: Fatigue, injection site erythema, injection site pain<br>Uncommon: Injection site reactions (including haemorrhage, haematoma, induration, swelling and pruritus), asthenia |

Description of selected adverse reactions

Infections

In the placebo-controlled studies of patients with psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis, the rates of infection or serious infection were similar between ustekinumab-treated patients and those treated with placebo. In the placebo-controlled period of these clinical studies, the rate of infection was 1.36 per patient-year of follow-up in ustekinumab-treated patients, and 1.34 in placebo-treated patients. Serious infections occurred at the rate of 0.03 per patient-year of follow-up in ustekinumab-treated patients (30 serious infections in 930 patient-years of follow-up) and 0.03 in placebo-treated patients (15 serious

infections in 434 patient-years of follow-up) (see section 4.4).

In the controlled and non-controlled periods of psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, representing 11,581 patient-years of exposure in 6,709 patients, the median follow up was 1.0 years; 1.1 years for psoriatic disease studies, 0.6 year for Crohn's disease studies, and 1.0 years for ulcerative colitis studies. The rate of infection was 0.91 per patient-year of follow-up in ustekinumab-treated patients, and the rate of serious infections was 0.02 per patient-year of follow-up in ustekinumab-treated patients (199 serious infections in 11,581 patient-years of follow-up) and serious infections reported included pneumonia, anal abscess, cellulitis, diverticulitis, gastroenteritis and viral infections.

In clinical studies, patients with latent tuberculosis who were concurrently treated with isoniazid did not develop tuberculosis.

<u>Malignancies</u>

In the placebo-controlled period of the psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, the incidence of malignancies excluding non-melanoma skin cancer was 0.11 per 100 patient-years of follow-up for ustekinumab-treated patients (1 patient in 929 patient-years of follow-up) compared with 0.23 for placebo-treated patients (1 patient in 434 patient-years of follow-up). The incidence of non-melanoma skin cancer was 0.43 per 100 patient-years of follow-up for ustekinumab-treated patients (4 patients in 929 patient-years of follow-up) compared to 0.46 for placebo-treated patients (2 patients in 433 patient-years of follow-up).

In the controlled and non-controlled periods of psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis clinical studies, representing 11,561 patient-years of exposure in 6,709 patients, the median follow-up was 1.0 years; 1.1 years for psoriatic disease studies, 0.6 year for Crohn's disease studies and 1.0 years for ulcerative colitis studies. Malignancies excluding non-melanoma skin cancers were reported in 62 patients in 11,561 patient-years of follow-up (incidence of 0.54 per 100 patient-years of follow-up for ustekinumab-treated patients). The

incidence of malignancies reported in ustekinumab-treated patients was comparable to the incidence expected in the general population (standardised incidence ratio = 0.93 [95% confidence interval: 0.71, 1.20], adjusted for age, gender and race). The most frequently observed malignancies, other than non-melanoma skin cancer, were prostate, colorectal, melanoma and breast cancers. The incidence of non-melanoma skin cancer was 0.49 per 100 patient-years of follow-up for ustekinumab-treated patients (56 patients in 11,545 patient-years of follow-up). The ratio of patients with basal versus squamous cell skin cancers (3:1) is comparable with the ratio expected in the general population (see section 4.4).

Hypersensitivity reactions

During the controlled periods of the psoriasis and psoriatic arthritis clinical studies of ustekinumab, rash and urticaria have each been observed in < 1% of patients (see section 4.4).

*Paediatric population*

Undesirable effects in paediatric patients 12 years and older with plaque psoriasis

The safety of ustekinumab has been studied in a phase 3 study of 110 patients from 12 to 17 years of age for up to 60 weeks. In this study, the adverse events reported were similar to those seen in previous studies in adults with plaque psoriasis.

Reporting of suspected adverse reactions

Reporting suspected adverse reactions after authorisation of the medicinal product is important. It allows continued monitoring of the benefit/risk balance of the medicinal product. Healthcare professionals are asked to report any suspected adverse reactions via the national reporting system listed in Appendix V.

**4.9 Overdose**

Single doses up to 6 mg/kg have been administered intravenously in clinical studies without dose-limiting toxicity. In case of overdose, it is recommended that the patient be monitored for any signs or symptoms of adverse reactions and appropriate symptomatic treatment be instituted immediately.

## 5. PHARMACOLOGICAL PROPERTIES

### 5.1 Pharmacodynamic properties

Pharmacotherapeutic group: Immunosuppressants, interleukin inhibitors, ATC code: L04AC05.

Mechanism of action

Ustekinumab is a fully human IgG1κ monoclonal antibody that binds with specificity to the shared p40 protein subunit of human cytokines interleukin (IL)-12 and IL-23. Ustekinumab inhibits the bioactivity of human IL-12 and IL-23 by preventing p40 from binding to the IL-12Rβ1 receptor protein expressed on the surface of immune cells. Ustekinumab cannot bind to IL-12 or IL-23 that is already bound to IL-12Rβ1 cell surface receptors. Thus, ustekinumab is not likely to contribute to complement- or antibody-mediated cytotoxicity of cells with IL-12 and/or IL-23 receptors. IL-12 and IL-23 are heterodimeric cytokines secreted by activated antigen presenting cells, such as macrophages and dendritic cells, and both cytokines participate in immune functions; IL-12 stimulates natural killer (NK) cells and drives the differentiation of CD4+ T cells toward the T helper 1 (Th1) phenotype, IL-23 induces the T helper 17 (Th17) pathway. However, abnormal regulation of IL 12 and IL 23 has been associated with immune mediated diseases, such as psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis.

By binding the shared p40 subunit of IL-12 and IL-23, ustekinumab may exert its clinical effects in psoriasis, psoriatic arthritis, Crohn's disease and ulcerative colitis through interruption of the Th1 and Th17 cytokine pathways, which are central to the pathology of these diseases.

In patients with Crohn's disease and ulcerative colitis, treatment with ustekinumab resulted in a decrease in inflammatory markers including C-Reactive Protein (CRP) and fecal calprotectin during the induction phase, which were then maintained throughout the maintenance phase.

Immunisation

During the long term extension of Psoriasis Study 2 (PHOENIX 2), adult patients treated with STELARA for at least 3.5 years mounted similar antibody responses to both pneumococcal polysaccharide and tetanus vaccines as a non-systemically treated psoriasis control group. Similar proportions of adult patients developed protective levels of anti-pneumococcal and anti-tetanus antibodies and antibody titers were similar among STELARA-treated and control patients.

Clinical efficacy

Plaque psoriasis (Adults)

The safety and efficacy of ustekinumab was assessed in 1,996 patients in two randomised, double-blind, placebo-controlled studies in patients with moderate to severe plaque psoriasis and who were candidates for phototherapy or systemic therapy. In addition, a randomised, blinded assessor, active-controlled study compared ustekinumab and etanercept in patients with moderate to severe plaque psoriasis who had had an inadequate response to, intolerance to, or contraindication to ciclosporin, MTX, or PUVA.

Psoriasis Study 1 (PHOENIX 1) evaluated 766 patients. 53% of these patients were either non-responsive, intolerant, or had a contraindication to other systemic therapy. Patients randomised to ustekinumab received 45 mg or 90 mg doses at Weeks 0 and 4 and followed by the same dose every 12 weeks. Patients randomised to receive placebo at Weeks 0 and 4 crossed over to receive ustekinumab (either 45 mg or 90 mg) at Weeks 12 and 16 followed by dosing every 12 weeks. Patients originally randomised to ustekinumab who achieved Psoriasis Area and Severity Index 75 response (PASI improvement of at least 75% relative to baseline) at both Weeks 28 and 40 were re-randomised to receive ustekinumab every 12 weeks or to placebo (i.e., withdrawal of therapy). Patients who were re-randomised to placebo at week 40 reinitiated ustekinumab at their original dosing regimen when they experienced at least a 50% loss of their PASI improvement obtained at week 40. All patients were followed for up to 76 weeks following first administration of study treatment.

Psoriasis Study 2 (PHOENIX 2) evaluated 1,230 patients. 61% of these patients were either non-responsive, intolerant, or had a contraindication to other systemic therapy. Patients randomised to ustekinumab received 45 mg or 90 mg doses at Weeks 0 and 4 followed by an additional dose at 16 weeks. Patients randomised to receive placebo at Weeks 0 and 4 crossed over to receive ustekinumab (either 45 mg or 90 mg) at Weeks 12 and 16. All patients were followed for up to 52 weeks following first administration of study treatment.

Psoriasis Study 3 (ACCEPT) evaluated 903 patients with moderate to severe psoriasis who inadequately responded to, were intolerant to, or had a contraindication to other systemic therapy and compared the efficacy of ustekinumab to etanercept and evaluated the safety of ustekinumab and etanercept. During the 12-week active-controlled portion of the study, patients were randomised to receive etanercept (50 mg twice a week), ustekinumab 45 mg at Weeks 0 and 4, or ustekinumab 90 mg at Weeks 0 and 4.

Baseline disease characteristics were generally consistent across all treatment groups in Psoriasis Studies 1 and 2 with a median baseline PASI score from 17 to 18, median baseline Body Surface Area (BSA) ≥ 20, and median Dermatology Life Quality Index (DLQI) range from 10 to 12. Approximately one third (Psoriasis Study 1) and one quarter (Psoriasis Study 2) of subjects had Psoriatic Arthritis (PsA). Similar disease severity was also seen in Psoriasis Study 3.

The primary endpoint in these studies was the proportion of patients who achieved PASI 75 response from baseline at week 12 (see Label Tables 4 and 5).

*Label Table 4 Summary of clinical response in Psoriasis Study 1 (PHOENIX 1) and Psoriasis Study 2 (PHOENIX 2)*

| | Week 12<br>2 doses (week 0 and week 4) | | | Week 28<br>3 doses (week 0, week 4 and week 16) | |
|---|---|---|---|---|---|
| | PBO | 45 mg | 90 mg | 45 mg | 90 mg |
| **Psoriasis Study 1** | | | | | |
| Number of patients randomised | 255 | 255 | 256 | 250 | 243 |

| | | | | | |
|---|---|---|---|---|---|
| PASI 50 response N (%) | 26 (10%) | 213 (84%)[a] | 220 (86%)[a] | 228 (91%) | 234 (96%) |
| PASI 75 response N (%) | 8 (3%) | 171 (67%)[a] | 170 (66%)[a] | 178 (71%) | 191 (79%) |
| PASI 90 response N (%) | 5 (2%) | 106 (42%)[a] | 94 (37%)[a] | 123 (49%) | 135 (56%) |
| PGA[b] of cleared or minimal N (%) | 10 (4%) | 151 (59%)[a] | 156 (61%)[a] | 146 (58%) | 160 (66%) |
| Number of patients ≤ 100 kg | 166 | 168 | 164 | 164 | 153 |
| PASI 75 response N (%) | 6 (4%) | 124 (74%) | 107 (65%) | 130 (79%) | 124 (81%) |
| Number of patients > 100 kg | 89 | 87 | 92 | 86 | 90 |
| PASI 75 response N (%) | 2 (2%) | 47 (54%) | 63 (68%) | 48 (56%) | 67 (74%) |
| | | | | | |
| **Psoriasis Study 2** | | | | | |
| Number of patients randomised | 410 | 409 | 411 | 397 | 400 |
| PASI 50 response N (%) | 41 (10%) | 342 (84%)[a] | 367 (89%)[a] | 369 (93%) | 380 (95%) |
| PASI 75 response N (%) | 15 (4%) | 273 (67%)[a] | 311 (76%)[a] | 276 (70%) | 314 (79%) |
| PASI 90 response N (%) | 3 (1%) | 173 (42%)[a] | 209 (51%)[a] | 178 (45%) | 217 (54%) |
| PGA[b] of cleared or minimal N (%) | 18 (4%) | 277 (68%)[a] | 300 (73%)[a] | 241 (61%) | 279 (70%) |
| Number of patients ≤ 100 kg | 290 | 297 | 289 | 287 | 280 |
| PASI 75 response N (%) | 12 (4%) | 218 (73%) | 225 (78%) | 217 (76%) | 226 (81%) |
| Number of patients > 100 kg | 120 | 112 | 121 | 110 | 119 |
| PASI 75 response N (%) | 3 (3%) | 55 (49%) | 86 (71%) | 59 (54%) | 88 (74%) |

[a] $p < 0.001$ for ustekinumab 45 mg or 90 mg in comparison with placebo (PBO).

[b] PGA = Physician Global Assessment

*Label Table 5 Summary of clinical response at week 12 in Psoriasis Study 3 (ACCEPT)*

| | **Psoriasis Study 3** | | |
|---|---|---|---|
| | Etanercept 24 doses (50 mg twice a week) | Ustekinumab 2 doses (week 0 and week 4) | |
| | | 45 mg | 90 mg |
| Number of patients randomised | 347 | 209 | 347 |
| PASI 50 response N (%) | 286 (82%) | 181 (87%) | 320 (92%)[a] |
| PASI 75 response N (%) | 197 (57%) | 141 (67%)[b] | 256 (74%)[a] |
| PASI 90 response N (%) | 80 (23%) | 76 (36%)[a] | 155 (45%)[a] |
| PGA of cleared or minimal N (%) | 170 (49%) | 136 (65%)[a] | 245 (71%)[a] |
| Number of patients ≤ 100 kg | 251 | 151 | 244 |
| PASI 75 response N (%) | 154 (61%) | 109 (72%) | 189 (77%) |
| Number of patients > 100 kg | 96 | 58 | 103 |
| PASI 75 response N (%) | 43 (45%) | 32 (55%) | 67 (65%) |

[a] $p < 0.001$ for ustekinumab 45 mg or 90 mg in comparison with etanercept.

[b] $p = 0.012$ for ustekinumab 45 mg in comparison with etanercept.

In Psoriasis Study 1 maintenance of PASI 75 was significantly superior with continuous treatment compared with treatment withdrawal ($p < 0.001$). Similar results were seen with each dose of ustekinumab. At 1 year (week 52), 89% of patients re-randomised to maintenance treatment were PASI 75 responders compared with 63% of patients re-randomised to placebo (treatment withdrawal) ($p < 0.001$). At 18 months (week 76), 84% of patients re-randomised to maintenance treatment were PASI 75 responders compared with 19% of patients re-randomised to placebo (treatment withdrawal). At 3 years (week 148), 82% of patients re-randomised to maintenance treatment were PASI 75 responders. At 5 years (week 244), 80% of patients re-randomised to maintenance treatment were PASI 75 responders.

In patients re-randomised to placebo, and who reinitiated their original ustekinumab treatment regimen after loss of ≥ 50% of PASI improvement 85% regained PASI 75 response within 12 weeks after re-initiating therapy.

In Psoriasis Study 1, at week 2 and week 12, significantly greater improvements from baseline were demonstrated in the DLQI in each ustekinumab treatment group compared with placebo. The improvement was sustained through week 28. Similarly, significant improvements were

seen in Psoriasis Study 2 at week 4 and 12, which were sustained through week 24. In Psoriasis Study 1, improvements in nail psoriasis (Nail Psoriasis Severity Index), in the physical and mental component summary scores of the SF-36 and in the Itch Visual Analogue Scale (VAS) were also significant in each ustekinumab treatment group compared with placebo. In Psoriasis Study 2, the Hospital Anxiety and Depression Scale (HADS) and Work Limitations Questionnaire (WLQ) were also significantly improved in each ustekinumab treatment group compared with placebo.

Psoriatic arthritis (PsA) (Adults)

Ustekinumab has been shown to improve signs and symptoms, physical function and health-related quality of life, and reduce the rate of progression of peripheral joint damage in adult patients with active PsA.

The safety and efficacy of ustekinumab was assessed in 927 patients in two randomised, double-blind, placebo-controlled studies in patients with active PsA (≥ 5 swollen joints and ≥ 5 tender joints) despite non-steroidal anti-inflammatory (NSAID) or disease modifying antirheumatic (DMARD) therapy. Patients in these studies had a diagnosis of PsA for at least 6 months. Patients with each subtype of PsA were enrolled, including polyarticular arthritis with no evidence of rheumatoid nodules (39%), spondylitis with peripheral arthritis (28%), asymmetric peripheral arthritis (21%), distal interphalangeal involvement (12%) and arthritis mutilans (0.5%). Over 70% and 40% of the patients in both studies had enthesitis and dactylitis at baseline, respectively. Patients were randomised to receive treatment with ustekinumab 45 mg, 90 mg, or placebo subcutaneously at Weeks 0 and 4 followed by every 12 weeks (q12w) dosing. Approximately 50% of patients continued on stable doses of MTX (≤ 25 mg/week).

In PsA Study 1 (PSUMMIT I) and PsA Study 2 (PSUMMIT II), 80% and 86% of the patients, respectively, had been previously treated with DMARDs. In Study 1 previous treatment with anti-tumour necrosis factor (TNF)α agent was not allowed. In Study 2, the majority of patients (58%, n = 180) had been previously treated with one or more anti-TNFα agent(s), of whom over 70% had discontinued their anti-TNFα treatment for lack of efficacy or intolerance at any time.

*Signs and symptoms*

Treatment with ustekinumab resulted in significant improvements in the measures of disease activity compared to placebo at week 24. The primary endpoint was the percentage of patients who achieved American College of Rheumatology (ACR) 20 response at week 24. The key efficacy results are shown in Label Table 6 below.

*Label Table 6 Number of patients who achieved clinical response in Psoriatic arthritis Study 1 (PSUMMIT I) and Study 2 (PSUMMIT II) at week 24*

| | **Psoriatic arthritis Study 1** | | | **Psoriatic arthritis Study 2** | | |
|---|---|---|---|---|---|---|
| | **PBO** | **45 mg** | **90 mg** | **PBO** | **45 mg** | **90 mg** |
| **Number of patients randomised** | **206** | **205** | **204** | **104** | **103** | **105** |
| ACR 20 response, N (%) | 47 (23%) | 87 (42%)[a] | 101 (50%)[a] | 21 (20%) | 45 (44%)[a] | 46 (44%)[a] |
| ACR 50 response, N (%) | 18 (9%) | 51 (25%)[a] | 57 (28%)[a] | 7 (7%) | 18 (17%)[b] | 24 (23%)[a] |
| ACR 70 response, N (%) | 5 (2%) | 25 (12%)[a] | 29 (14%)[a] | 3 (3%) | 7 (7%)[c] | 9 (9%)[c] |
| *Number of patients with ≥ 3% BSA[d]* | 146 | 145 | 149 | 80 | 80 | 81 |
| PASI 75 response, N (%) | 16 (11%) | 83 (57%)[a] | 93 (62%)[a] | 4 (5%) | 41 (51%)[a] | 45 (56%)[a] |
| PASI 90 response, N (%) | 4 (3%) | 60 (41%)[a] | 65 (44%)[a] | 3 (4%) | 24 (30%)[a] | 36 (44%)[a] |
| Combined PASI 75 and ACR 20 response, N (%) | 8 (5%) | 40 (28%)[a] | 62 (42%)[a] | 2 (3%) | 24 (30%)[a] | 31 (38%)[a] |
| | | | | | | |
| **Number of patients ≤ 100 kg** | 154 | 153 | 154 | 74 | 74 | 73 |
| ACR 20 response, N (%) | 39 (25%) | 67 (44%) | 78 (51%) | 17 (23%) | 32 (43%) | 34 (47%) |
| *Number of patients with ≥ 3% BSA[d]* | 105 | 105 | 111 | 54 | 58 | 57 |
| PASI 75 response, N (%) | 14 (13%) | 64 (61%) | 73 (66%) | 4 (7%) | 31 (53%) | 32 (56%) |
| **Number of patients > 100 kg** | 52 | 52 | 50 | 30 | 29 | 31 |
| ACR 20 response, N (%) | 8 (15%) | 20 (38%) | 23 (46%) | 4 (13%) | 13 (45%) | 12 (39%) |
| *Number of patients with ≥ 3% BSA[d]* | 41 | 40 | 38 | 26 | 22 | 24 |

| | | | | | | |
|---|---|---|---|---|---|---|
| PASI 75 response, N (%) | 2 (5%) | 19 (48%) | 20 (53%) | 0 | 10 (45%) | 13 (54%) |

[a] $p < 0.001$
[b] $p < 0.05$
[c] p = NS
[d] Number of patients with ≥ 3% BSA psoriasis skin involvement at baseline

ACR 20, 50 and 70 responses continued to improve or were maintained through week 52 (PsA Study 1 and 2) and week 100 (PsA Study 1). In PsA Study 1, ACR 20 responses at week 100 were achieved by 57% and 64%, for 45 mg and 90 mg, respectively. In PsA Study 2, ACR 20 responses at week 52 were achieved by 47% and 48%, for 45 mg and 90 mg, respectively.

The proportion of patients achieving a modified PsA response criteria (PsARC) response was also significantly greater in the ustekinumab groups compared to placebo at week 24. PsARC responses were maintained through weeks 52 and 100. A higher proportion of patients treated with ustekinumab who had spondylitis with peripheral arthritis as their primary presentation, demonstrated 50 and 70 percent improvement in Bath Ankylosing Spondylitis Disease Activity Index (BASDAI) scores compared with placebo at week 24.

Responses observed in the ustekinumab treated groups were similar in patients receiving and not receiving concomitant MTX, and were maintained through weeks 52 and 100. Patients previously treated with anti-TNFα agents who received ustekinumab achieved a greater response at week 24 than patients receiving placebo (ACR 20 response at week 24 for 45 mg and 90 mg was 37% and 34%, respectively, compared with placebo 15%; $p < 0.05$), and responses were maintained through week 52.

For patients with enthesitis and/or dactylitis at baseline, in PsA Study 1 significant improvement in enthesitis and dactylitis score was observed in the ustekinumab groups compared with placebo at week 24. In PsA Study 2 significant improvement in enthesitis score and numerical improvement (not statistically significant) in dactylitis score was observed in the ustekinumab 90 mg group compared with placebo at week 24. Improvements in enthesitis score and dactylitis score were maintained through weeks 52 and 100.

*Radiographic Response*

Structural damage in both hands and feet was expressed as change in total van der Heijde-Sharp score (vdH-S score), modified for PsA by addition of hand distal interphalangeal joints, compared to baseline. A pre-specified integrated analysis combining data from 927 subjects in both PsA Study 1 and 2 was performed. Ustekinumab demonstrated a statistically significant decrease in the rate of progression of structural damage compared to placebo, as measured by change from baseline to week 24 in the total modified vdH-S score (mean ± SD score was 0.97 ± 3.85 in the placebo group compared with 0.40 ± 2.11 and 0.39 ± 2.40 in the ustekinumab 45 mg ($p < 0.05$) and 90 mg ($p < 0.001$) groups, respectively). This effect was driven by PsA Study 1. The effect is considered demonstrated irrespective of concomitant MTX use, and was maintained through Weeks 52 (integrated analysis) and 100 (PsA Study 1).

*Physical function and health-related quality of life*

Ustekinumab-treated patients showed significant improvement in physical function as assessed by the Disability Index of the Health Assessment Questionnaire (HAQ-DI) at week 24. The proportion of patients achieving a clinically meaningful ≥ 0.3 improvement in HAQ-DI score from baseline was also significantly greater in the ustekinumab groups when compared with placebo. Improvement in HAQ-DI score from baseline was maintained through Weeks 52 and 100.

There was significant improvement in DLQI scores in the ustekinumab groups as compared with placebo at week 24, which was maintained through weeks 52 and 100. In PsA Study 2 there was a significant improvement in Functional Assessment of Chronic Illness Therapy-Fatigue (FACIT-F) scores in the ustekinumab groups when compared with placebo at week 24. The proportion of patients achieving a clinically significant improvement in fatigue (4 points in FACIT-F) was also significantly greater in the ustekinumab groups compared with placebo. Improvements in FACIT scores were maintained through week 52.

Paediatric population

The European Medicines Agency has deferred the obligation to submit the results of studies with ustekinumab in one or more subsets of the paediatric population aged 6 to 11 years in moderate to severe plaque psoriasis and juvenile idiopathic arthritis (see section 4.2 for information on paediatric use).

*Paediatric plaque psoriasis*

Ustekinumab has been shown to improve signs and symptoms, and health related quality of life in paediatric patients 12 years and older with plaque psoriasis.

The efficacy of ustekinumab was studied in 110 paediatric patients aged 12 to 17 years with moderate to severe plaque psoriasis in a multicenter, Phase 3, randomised, double blind, placebo controlled study (CADMUS). Patients were randomised to receive either placebo (n = 37), or the recommended dose of ustekinumab (see section 4.2; n = 36) or half of the recommended dose of ustekinumab (n = 37) by subcutaneous injection at Weeks 0 and 4 followed by every 12 week (q12w) dosing. At week 12, placebo treated patients crossed over to receive ustekinumab.

Patients with PASI ≥ 12, PGA ≥ 3 and BSA involvement of at least 10%, who were candidates for systemic therapy or phototherapy, were eligible for the study. Approximately 60% of the patients had prior exposure to conventional systemic therapy or phototherapy. Approximately 11% of the patients had prior exposure to biologics.

The primary endpoint was the proportion of patients who achieve a PGA score of cleared (0) or minimal (1) at week 12. Secondary endpoints included PASI 75, PASI 90, change from baseline in Children's Dermatology Life Quality Index (CDLQI), change from baseline in the total scale score of PedsQL (Paediatric Quality of Life Inventory) at week 12. At week 12, subjects treated with ustekinumab showed significantly greater improvement in their psoriasis and health related quality of life compared with placebo (Table 7).

All patients were followed for efficacy for up to 52 weeks following first administration of study agent. The proportion of patients with a PGA score of cleared (0) or minimal (1) and the proportion achieving PASI 75 showed separation between the ustekinumab treated group and placebo at the first post-baseline visit at week 4, reaching a maximum by week 12. Improvements in PGA, PASI, CDLQI and PedsQL were maintained through week 52 (Label Table 7).

*Label Table 7 Summary of primary and secondary endpoints at week 12 and week 52*

| Paediatric psoriasis study (CADMUS) | | | |
|---|---|---|---|
| | **Week 12** | | **Week 52** |
| | Placebo | Recommended dose of Ustekinumab | Recommended dose of Ustekinumab |
| | N (%) | N (%) | N (%) |
| Patients randomised | 37 | 36 | 35 |
| **PGA** | | | |
| PGA of cleared (0) or minimal (1) | 2 (5.4%) | 25 (69.4%)[a] | 20 (57.1%) |
| PGA of Cleared (0) | 1 (2.7%) | 17 (47.2%)[a] | 13 (37.1%) |
| **PASI** | | | |
| PASI 75 responders | 4 (10.8%) | 29 (80.6%)[a] | 28 (80.0%) |
| PASI 90 responders | 2 (5.4%) | 22 (61.1%)[a] | 23 (65.7%) |
| PASI 100 responders | 1 (2.7%) | 14 (38.9%)[a] | 13 (37.1%) |
| **CDLQI** | | | |
| CDLQI of 0 or 1[b] | 6 (16.2%) | 18 (50.0%)[c] | 20 (57.1%) |
| **PedsQL** | | | |
| Change from baseline Mean (SD)[d] | 3.35 (10.04) | 8.03 (10.44)[e] | 7.26 (10.92) |

[a] $p < 0.001$

[b] CDLQI: The CDLQI is a dermatology instrument to assess the effect of a skin problem on the health-related quality of life in the paediatric population. CDLQI of 0 or 1 indicates no effect on child's quality of life.

[c] $p = 0.002$

[d] PedsQL: The PedsQL Total Scale Score is a general health-related quality of life measure developed for use in children and adolescent populations. For the placebo group at week 12, N = 36

[e] $p = 0.028$

During the placebo controlled period through week 12, the efficacy of both the recommended and half of the recommended dose groups were generally comparable at the primary endpoint

(69.4% and 67.6% respectively) although there was evidence of a dose response for higher level efficacy criteria (e.g. PGA of cleared (0), PASI 90). Beyond week 12, efficacy was generally higher and better sustained in the recommended dose group compared with half of the recommended dosage group in which a modest loss of efficacy was more frequently observed toward the end of each 12 week dosing interval. The safety profiles of the recommended dose and half of the recommended dose were comparable.

Crohn's Disease

The safety and efficacy of ustekinumab was assessed in three randomized, double-blind, placebo-controlled, multicenter studies in adult patients with moderately to severely active Crohn's disease (Crohn's Disease Activity Index [CDAI] score of ≥ 220 and ≤ 450). The clinical development program consisted of two 8-week intravenous induction studies (UNITI-1 and UNITI-2) followed by a 44 week subcutaneous randomized withdrawal maintenance study (IM-UNITI) representing 52 weeks of therapy.

The induction studies included 1409 (UNITI-1, n = 769; UNITI-2 n = 640) patients. The primary endpoint for both induction studies was the proportion of subjects in clinical response (defined as a reduction in CDAI score of ≥ 100 points) at week 6. Efficacy data were collected and analyzed through week 8 for both studies. Concomitant doses of oral corticosteroids, immunomodulators, aminosalicylates and antibiotics were permitted and 75% of patients continued to receive at least one of these medications. In both studies, patients were randomised to receive a single intravenous administration of either the recommended tiered dose of approximately 6 mg/kg (see section 4.2 of the STELARA 130 mg Concentrate for solution for infusion SmPC), a fixed dose of 130 mg ustekinumab, or placebo at week 0.

Patients in UNITI-1 had failed or were intolerant to prior anti-TNFα therapy. Approximately 48% of the patients had failed 1 prior anti-TNFα therapy and 52% had failed 2 or 3 prior anti-TNFα therapies. In this study, 29.1% of the patients had an inadequate initial response (primary non-responders), 69.4% responded but lost response (secondary non-responders), and 36.4% were intolerant to anti-TNFα therapies.

Patients in UNITI-2 had failed at least one conventional therapy, including corticosteroids or immunomodulators, and were either anti-TNF-α naïve (68.6%) or had previously received but not failed anti-TNFα therapy (31.4%).

In both UNITI-1 and UNITI-2, a significantly greater proportion of patients were in clinical response and remission in the ustekinumab treated group compared to placebo (Label Table 8). Clinical response and remission were significant as early as week 3 in ustekinumab treated patients and continued to improve through week 8. In these induction studies, efficacy was higher and better sustained in the tiered dose group compared to the 130 mg dose group, and tiered dosing is therefore the recommended intravenous induction dose.

*Label Table 8: Induction of Clinical Response and Remission in UNITI-1 and UNITI 2*

| | **UNITI-1*** | | **UNITI-2**** | |
|---|---|---|---|---|
| | **Placebo N = 247** | **Recommended dose of ustekinumab N = 249** | **Placebo N = 209** | **Recommended dose of ustekinumab N = 209** |
| Clinical Remission, week 8 | 18 (7.3%) | 52 (20.9%)[a] | 41 (19.6%) | 84 (40.2%)[a] |
| Clinical Response (100 point), week 6 | 53 (21.5%) | 84 (33.7%)[b] | 60 (28.7%) | 116 (55.5%)[a] |
| Clinical Response (100 point), week 8 | 50 (20.2%) | 94 (37.8%)[a] | 67 (32.1%) | 121 (57.9%)[a] |
| 70 Point Response, week 3 | 67 (27.1%) | 101 (40.6%)[b] | 66 (31.6%) | 106 (50.7%)[a] |
| 70 Point Response, week 6 | 75 (30.4%) | 109 (43.8%)[b] | 81 (38.8%) | 135 (64.6%)[a] |

Clinical remission is defined as CDAI score < 150; Clinical response is defined as reduction in CDAI score by at least 100 points or being in clinical remission
70 point response is defined as reduction in CDAI score by at least 70 points
* Anti-TNFα failures
** Conventional therapy failures
a $p < 0.001$
b $p < 0.01$

The maintenance study (IM-UNITI), evaluated 388 patients who achieved 100 point clinical response at week 8 of induction with ustekinumab in studies UNITI-1 and UNITI-2. Patients

were randomized to receive a subcutaneous maintenance regimen of either 90 mg ustekinumab every 8 weeks, 90 mg ustekinumab every 12 weeks or placebo for 44 weeks (for recommended maintenance posology, see section 4.2).

Significantly higher proportions of patients maintained clinical remission and response in the ustekinumab treated groups compared to the placebo group at week 44 (see Label Table 9).

*Label Table 9: Maintenance of Clinical Response and Remission in IM-UNITI (week 44; 52 weeks from initiation of the induction dose)*

| | **Placebo*** <br> **N = 131†** | **90 mg ustekinumab every 8 weeks** <br> **N = 128†** | **90 mg ustekinumab every 12 weeks** <br> **N = 129†** |
|---|---|---|---|
| Clinical Remission | 36% | 53%[a] | 49%[b] |
| Clinical Response | 44% | 59%[b] | 58%[b] |
| Corticosteroid-Free Clinical Remission | 30% | 47%[a] | 43%[c] |
| Clinical Remission in patients: | | | |
| in remission at the start of maintenance therapy | 46% (36/79) | 67% (52/78)[a] | 56% (44/78) |
| who entered from study CRD3002‡ | 44% (31/70) | 63% (45/72)[c] | 57% (41/72) |
| who are Anti-TNFα naïve | 49% (25/51) | 65% (34/52)[c] | 57% (30/53) |
| who entered from study CRD3001§ | 26% (16/61) | 41% (23/56) | 39% (22/57) |

Clinical remission is defined as CDAI score < 150; Clinical response is defined as reduction in CDAI of at least 100 points or being in clinical remission

* The placebo group consisted of patients who were in response to ustekinumab and were randomized to receive placebo at the start of maintenance therapy.

† Patients who were in 100 point clinical response to ustekinumab at start of maintenance therapy

‡ Patients who failed conventional therapy but not anti-TNFα therapy

§ Patients who are anti-TNFα refractory/intolerant

a $p < 0.01$

b $p < 0.05$

c nominally significant ($p < 0.05$)

In IM-UNITI, 29 of 129 patients did not maintain response to ustekinumab when treated every 12 weeks and were allowed to dose adjust to receive ustekinumab every 8 weeks. Loss of

response was defined as a CDAI score ≥ 220 points and a ≥ 100 point increase from the CDAI score at baseline. In these patients, clinical remission was achieved in 41.4% of patients 16 weeks after dose adjustment.

Patients who were not in clinical response to ustekinumab induction at week 8 of the UNITI-1 and UNITI-2 induction studies (476 patients) entered into the non-randomized portion of the maintenance study (IM-UNITI) and received a 90 mg subcutaneous injection of ustekinumab at that time. Eight weeks later, 50.5% of the patients achieved clinical response and continued to receive maintenance dosing every 8 weeks; among these patients with continued maintenance dosing, a majority maintained response (68.1%) and achieved remission (50.2%) at week 44, at proportions that were similar to the patients who initially responded to ustekinumab induction.

Of 131 patients who responded to ustekinumab induction, and were randomized to the placebo group at the start of the maintenance study, 51 subsequently lost response and received 90 mg ustekinumab subcutaneously every 8 weeks. The majority of patients who lost response and resumed ustekinumab did so within 24 weeks of the induction infusion. Of these 51 patients, 70.6% achieved clinical response and 39.2% percent achieved clinical remission 16 weeks after receiving the first subcutaneous dose of ustekinumab.

In IM-UNITI, patients who completed the study through week 44 were eligible to continue treatment in a study extension. Among patients who entered the study extension, clinical remission and response were generally maintained through week 92 for both patients who failed TNF-therapies and those who failed conventional therapies.

No new safety concerns were identified in this study extension with up to 2 years of treatment in patients with Crohn's Disease.

*Endoscopy*

Endoscopic appearance of the mucosa was evaluated in 252 patients with eligible baseline endoscopic disease activity in a substudy. The primary endpoint was change from baseline in

Simplified Endoscopic Disease Severity Score for Crohn's Disease (SES-CD), a composite score across 5 ileo-colonic segments of presence/size of ulcers, proportion of mucosal surface covered by ulcers, proportion of mucosal surface affected by any other lesions and presence/type of narrowing/strictures. At week 8, after a single intravenous induction dose, the change in SES-CD score was greater in the ustekinumab group (n = 155, mean change = -2.8) than in the placebo group (n = 97, mean change = -0.7, p = 0.012).

*Fistula Response*

In a subgroup of patients with draining fistulas at baseline (8.8%; n = 26), 12/15 (80%) of ustekinumab-treated patients achieved a fistula response over 44 weeks (defined as ≥ 50% reduction from baseline of the induction study in the number of draining fistulas) compared to 5/11 (45.5%) exposed to placebo.

*Health-related quality of life*

Health-related quality of life was assessed by Inflammatory Bowel Disease Questionnaire (IBDQ) and SF-36 questionnaires. At week 8, patients receiving ustekinumab showed statistically significantly greater and clinically meaningful improvements on IBDQ total score and SF-36 Mental Component Summary Score in both UNITI-1 and UNITI-2, and SF-36 Physical Component Summary Score in UNITI-2, when compared to placebo. These improvements were generally better maintained in ustekinumab-treated patients in the IM-UNITI study through week 44 when compared to placebo. Improvement in health-related quality of life was generally maintained during the extension through week 92.

<u>Ulcerative colitis</u>

The safety and efficacy of ustekinumab was assessed in two randomized, double-blind, placebo-controlled, multicenter studies in adult patients with moderately to severely active ulcerative colitis (Mayo score 6 to 12; Endoscopy subscore ≥ 2). The clinical development program consisted of one intravenous induction study (referred to as UNIFI-I) with treatment of up to 16 weeks followed by a 44 week subcutaneous randomized withdrawal maintenance study (referred to as UNIFI-M) representing at least 52 weeks of therapy.

Efficacy results presented for UNIFI-I and UNIFI-M were based on central review of endoscopies.

UNIFI-I included 961 patients. The primary endpoint for the induction study was the proportion of subjects in clinical remission at week 8. Patients were randomised to receive a single intravenous administration of either the recommended tiered dose of approximately 6 mg/kg (see Label Table 1, section 4.2), a fixed dose of 130 mg ustekinumab, or placebo at week 0.

Concomitant doses of oral corticosteroids, immunomodulators, and aminosalicylates were permitted and 90% of patients continued to receive at least one of these medications. Enrolled patients had to have failed conventional therapy (corticosteroids or immunomodulators) or at least one biologic (a TNFα antagonist and/or vedolizumab). 49% of patients had failed conventional therapy, but not a biologic (of which 94% where biological-naïve). 51% of patients had failed or were intolerant to a biologic. Approximately 50% of the patients had failed at least 1 prior anti-TNFα therapy (of which 48% were primary non-responders) and 17% had failed at least 1 anti-TNFα therapy and vedolizumab.

In UNIFI-I a significantly greater proportion of patients were in clinical remission in the ustekinumab treated group compared to placebo at week 8 (Label Table 10). As early as Week 2, the earliest scheduled study visit, and at each visit thereafter, a higher proportion of ustekinumab patients had no rectal bleeding or achieved normal stool frequency as compared with placebo patients. Significant differences in partial Mayo score and symptomatic remission were observed between ustekinumab and placebo as early as Week 2.

Efficacy was higher in the tiered dose group (6 mg/kg) compared to the 130 mg dose group in select endpoints, and tiered dosing is therefore the recommended intravenous induction dose.

*Label Table 10: Summary of Key Efficacy Outcomes in UNIFI-I (Week 8)*

| | **Placebo N = 319** | **Recommended dose of ustekinumab£ N =322** |
|---|---|---|
| Clinical Remission* | 5% | 16%[a] |
| In patients who failed conventional therapy, but not a biologic | 9% (15/158) | 19% (29/156)[c] |
| In patients who failed biological therapy¥ | 1% (2/161) | 13% (21/166)[b] |
| In patients who failed both a TNF and vedolizumab | 0% (0/47) | 10% (6/58%)[c] |
| Clinical Response§ | 31% | 62%[a] |
| In patients who failed conventional therapy, but not a biologic | 35% (56/158) | 67% (104/156)[b] |
| In patients who failed biological therapy¥ | 27% (44/161) | 57% (95/166)[b] |
| In patients who failed both a TNF and vedolizumab | 28% (13/47) | 52% (30/58)[c] |
| Mucosal Healing† | 14% | 27%[a] |
| In patients who failed conventional therapy, but not a biologic | 21% (33/158) | 33% (52/156)[c] |
| In patients who failed biological therapy | 7% (11/161) | 21% (35/166)[b] |
| Symptomatic Remission‡ | 23% | 45%[b] |
| Combined Symptomatic Remission and Mucosal Healing⸸ | 8% | 21%[b] |

£ Infusion dose of ustekinumab using the weight-based dosage regimen specified in *Table 1*.

* Clinical remission is defined as Mayo score ≤2 points, with no individual subscore > 1.

§ Clinical response is defined as a decrease from baseline in the Mayo score by ≥30% and ≥3 points, with either a decrease from baseline in the rectal bleeding subscore ≥1 or a rectal bleeding subscore of 0 or 1.

¥ A TNFα antagonist and/or vedolizumab.

† Mucosal healing is defined as a Mayo endoscopic subscore of 0 or 1.

‡ Symptomatic remission is defined as a Mayo stool frequency subscore of 0 or 1 and a rectal bleeding subscore of 0.

⸸ Combined symptomatic remission and mucosal healing is defined as a stool frequency subscore of 0 or 1, a rectal bleeding subscore of 0, and an endoscopy subscore of 0 or 1.

a $p < 0.001$

b Nominally significant ($p < 0.001$)

c Nominally significant ($p < 0.05$)

UNIFI-M, evaluated 523 patients who achieved clinical response with single IV administration of ustekinumab in UNIFI-I. Patients were randomized to receive a subcutaneous maintenance regimen of either 90 mg ustekinumab every 8 weeks, 90 mg ustekinumab every 12 weeks or

placebo for 44 weeks (for recommended maintenance posology, see section 4.2 of the STELARA Solution for injection (vial) and Solution for injection in pre filled syringe SmPC).

Significantly greater proportions of patients were in clinical remission in both ustekinumab treated groups compared to the placebo group at week 44 (see Label Table 11).

*Label Table 11: Summary of Key Efficacy Measures in UNIFI-M (week 44; 52 weeks from initiation of the induction dose)*

| | **Placebo*** N = 175 | **90 mg ustekinumab every 8 Weeks** N = 176 | **90 mg ustekinumab every 12 Weeks** N = 172 |
|---|---|---|---|
| Clinical Remission** | 24% | 44% [a] | 38% [b] |
| In patients who failed conventional therapy, but not a biologic | 31% (27/87) | 48% (41/85)[d] | 49% (50/102) [d] |
| In patients who failed biological therapy[¥] | 17% (15/88) | 40% (36/91) [c] | 23% (16/70) [d] |
| In patients who failed both a TNF and vedolizumab | 15% (4/27) | 33% (7/21)[e] | 23% (5/22)[e] |
| Maintenance of Clinical Response through week 44[§] | 45% | 71% [a] | 68% [a] |
| In patients who failed conventional therapy, but not a biologic | 51% (44/87) | 78% (66/85) [c] | 77% (78/102) [c] |
| In patients who failed biological therapy[¥] | 39% (34/88) | 65% (59/91) [c] | 56% (39/70) [d] |
| In patients who failed both a TNF and vedolizumab | 41% (11/27) | 67% (14/21)[e] | 50% (11/22)[e] |
| Mucosal Healing[†] | 29% | 51% [a] | 44% [b] |
| Maintenance of Clinical Remission through week 44[£] | 38% (17/45) | 58% (22/38) | 65% (26/40) [c] |
| Corticosteroid Free Clinical Remission[€] | 23% | 42% [a] | 38% [b] |
| Durable Remission[‖] | 35% | 57% [c] | 48% [d] |
| Symptomatic Remission[‡] | 45% | 68% [c] | 62% [d] |
| Combined Symptomatic Remission and Mucosal Healing[⸸] | 28% | 48% [c] | 41% [d] |

* Following response to IV ustekinumab.

** Clinical remission is defined as Mayo score $\leq 2$ points, with no individual subscore > 1.

§ Clinical response is defined as a decrease from baseline in the Mayo score by $\geq 30\%$ and $\geq 3$ points, with either a decrease from baseline in the rectal bleeding subscore $\geq 1$ or a rectal bleeding subscore of 0 or 1.

¥ A TNFα antagonist and/or vedolizumab.

† Mucosal healing is defined as a Mayo endoscopic sub-score of 0 or 1.

£ Maintenance of clinical remission through Week 44 is defined as patients in clinical remission through Week 44 among patients in clinical remission at maintenance baseline.

€ Corticosteroid-free clinical remission is defined as patients in clinical remission and not receiving corticosteroids at Week 44.

| Durable Remission is defined as partial Mayo remission at $\geq 80\%$ of all visits prior to Week 44 and in partial Mayo remission at last visit (Week 44).

‡ Symptomatic remission is defined as a Mayo stool frequency subscore of 0 or 1 and a rectal bleeding subscore of 0.

⸸ Combined symptomatic remission and mucosal healing is defined as a stool frequency subscore of 0 or 1, a rectal bleeding subscore of 0, and an endoscopy subscore of 0 or 1.

[a] $p < 0.001$

[b] $p < 0.05$

[c] Nominally significant ($p < 0.001$)

[d] Nominally significant ($p < 0.05$)

[e] Not statistically significant

The beneficial effect of ustekinumab on clinical response, mucosal healing and clinical remission was observed in induction and in maintenance both in patients who failed conventional therapy but not a biologic therapy, as well as in those who had failed at least one prior TNFα antagonist therapy including in patients with a primary non-response to TNFα antagonist therapy. A beneficial effect was also observed in induction in patients who failed at least one prior TNFα antagonist therapy and vedolizumab, however the number of patients in this subgroup was too small to draw definitive conclusions about the beneficial effect in this group during maintenance.

*Week 16 Responders to Ustekinumab Induction*

Ustekinumab treated patients who were not in response at week 8 of UNIFI-I received an administration of 90 mg SC ustekinumab at week 8 (36% of patients). Of those patients, 9% of patients who were initially randomized to the recommended induction dose achieved clinical remission and 58% achieved clinical response at Week 16.

Patients who were not in clinical response to ustekinumab induction at week 8 of the UNFI-I study but were in response at week 16 (157 patients) entered into the non-randomized portion of

UNIFI-M and continued to receive maintenance dosing every 8 weeks; among these patients, a majority (62%) maintained response and 30% achieved remission at week 44.

*Endoscopic Normalization*

Endoscopic normalization was defined as a Mayo endoscopic subscore of 0 and was observed as early as week 8 of UNIFI-I. At week 44 of UNIFI-M, it was achieved in 24% and 29% of patients treated with ustekinumab every 12 or 8 weeks, respectively, as compared to 18% of patients in the placebo group.

*Histologic & Histo-Endoscopic Mucosal Healing*

Histologic healing (defined as neutrophil infiltration in < 5% of crypts, no crypt destruction, and no erosions, ulcerations, or granulation tissue) was assessed at week 8 of UNIFI-I and Week 44 of UNIFI-M. At week 8, after a single intravenous induction dose, significantly greater proportions of patients in the recommended dose group achieved histologic healing (36%) compared with patients in the placebo group (22%). At Week 44 maintenance of this effect was observed with significantly more patients in histologic healing in the every 12 week (54%) and every 8 week (59%) ustekinumab groups as compared to placebo (33%).

A combined endpoint of histo-endoscopic mucosal healing defined as subjects having both mucosal healing and histologic healing was evaluated at week 8 of UNIFI-I and week 44 of UNIFI-M. Patients receiving ustekinumab at the recommended dose showed significant improvements on the histo-endoscopic mucosal healing endpoint at week 8 in the ustekinumab group (18%) as compared to the placebo group (9%). At week 44, maintenance of this effect was observed with significantly more patients in histo-endoscopic mucosal healing in the every 12 week (39%) and every 8 week (46%) ustekinumab groups as compared to placebo (24%).

*Health-related quality of life*

Health-related quality of life was assessed by Inflammatory Bowel Disease Questionnaire (IBDQ), SF-36 and EuroQoL-5D (EQ-5D) questionnaires.

At week 8 of UNIFI-I, patients receiving ustekinumab showed significantly greater and clinically meaningful improvements on IBDQ total score, EQ-5D and EQ-5D VAS, and SF-36 Mental Component Summary Score and SF-36 Physical Component Summary Score when compared to placebo. These improvements were maintained in ustekinumab-treated patients in UNIFI-M through week 44.

Patients receiving ustekinumab experienced significantly more improvements in work productivity as assessed by greater reductions in overall work impairment and in activity impairment as assessed by the WPAI-GH questionnaire than patients receiving placebo.

*Hospitalizations and ulcerative colitis (UC) related surgeries*

Through week 8 of UNIFI-I, the proportions of subjects with UC disease related hospitalizations were significantly lower for subjects in the ustekinumab recommended dose group (1.6%, 5/322) compared with subjects in the placebo group (4.4%, 14/319) and no subjects underwent UC disease related surgeries in subjects receiving ustekinumab at the recommended induction dose compared to 0.6% (2/319) subjects in the placebo group.

Through week 44 of UNIFI-M, a significantly lower number of UC-related hospitalizations was observed in subjects in the combined ustekinumab group (2.0%, 7/348) as compared with subjects in the placebo group (5.7%, 10/175). A numerically lower number of subjects in the ustekinumab group (0.6%, 2/348) underwent UC disease related surgeries compared with subjects in the placebo group (1.7%, 3/175) through week 44.

Immunogenicity

Antibodies to ustekinumab may develop during ustekinumab treatment and most are neutralising. The formation of anti-ustekinumab antibodies is associated with both increased clearance and reduced efficacy of ustekinumab, except in patients with Crohn's disease or ulcerative colitis where no reduced efficacy was observed. There is no apparent correlation between the presence of anti-ustekinumab antibodies and the occurrence of injection site reactions.

Paediatric population

The European Medicines Agency has deferred the obligation to submit the results of studies with ustekinumab in one or more subsets of the paediatric population in Crohn's Disease and ulcerative colitis (see section 4.2 for information on paediatric use).

**5.2 Pharmacokinetic properties**

Absorption

The median time to reach the maximum serum concentration ($t_{max}$) was 8.5 days after a single 90 mg subcutaneous administration in healthy subjects. The median $t_{max}$ values of ustekinumab following a single subcutaneous administration of either 45 mg or 90 mg in patients with psoriasis were comparable to those observed in healthy subjects.

The absolute bioavailability of ustekinumab following a single subcutaneous administration was estimated to be 57.2% in patients with psoriasis.

Distribution

Median volume of distribution during the terminal phase (Vz) following a single intravenous administration to patients with psoriasis ranged from 57 to 83 mL/kg.

Biotransformation

The exact metabolic pathway for ustekinumab is unknown.

Elimination

Median systemic clearance (CL) following a single intravenous administration to patients with psoriasis ranged from 1.99 to 2.34 mL/day/kg. Median half-life ($t_{1/2}$) of ustekinumab was approximately 3 weeks in patients with psoriasis, psoriatic arthritis, Crohn's disease or ulcerative colitis, ranging from 15 to 32 days across all psoriasis and psoriatic arthritis studies. In a population pharmacokinetic analysis, the apparent clearance (CL/F) and apparent volume of distribution (V/F) were 0.465 l/day and 15.7 l, respectively, in patients with psoriasis. The CL/F of ustekinumab was not impacted by gender. Population pharmacokinetic analysis showed that

there was a trend towards a higher clearance of ustekinumab in patients who tested positive for antibodies to ustekinumab.

Dose linearity

The systemic exposure of ustekinumab ($C_{max}$ and AUC) increased in an approximately dose-proportional manner after a single intravenous administration at doses ranging from 0.09 mg/kg to 4.5 mg/kg or following a single subcutaneous administration at doses ranging from approximately 24 mg to 240 mg in patients with psoriasis.

Single dose versus multiple doses

Serum concentration-time profiles of ustekinumab were generally predictable after single or multiple subcutaneous dose administrations. In patients with psoriasis, steady-state serum concentrations of ustekinumab were achieved by week 28 after initial subcutaneous doses at Weeks 0 and 4 followed by doses every 12 weeks. The median steady-state trough concentration ranged from 0.21 µg/mL to 0.26 µg/mL (45 mg) and from 0.47 µg/mL to 0.49 µg/mL (90 mg). There was no apparent accumulation in serum ustekinumab concentration over time when given subcutaneously every 12 weeks.

In patients with Crohn's disease and ulcerative colitis, following an intravenous dose of ~6 mg/kg, starting at week 8, subcutaneous maintenance dosing of 90 mg ustekinumab was administered every 8 or 12 weeks. Steady state ustekinumab concentration was achieved by the start of the second maintenance dose. In patients with Crohn's disease, median steady-state trough concentrations ranged from 1.97 µg/mL to 2.24 µg/mL and from 0.61 µg/mL to 0.76 µg/mL for 90 mg ustekinumab every 8 weeks or every 12 weeks respectively. In patients with ulcerative colitis, median steady-state trough concentrations ranged from 2.69 µg/mL to 3.09 µg/mL and from 0.92 µg/mL to 1.19 µg/mL for 90 mg ustekinumab every 8 weeks or every 12 weeks. The steady-state trough ustekinumab levels resulting from 90 mg ustekinumab every 8 weeks were associated with higher clinical remission rates as compared to the steady-state trough levels following 90 mg every 12 weeks.

Impact of weight on pharmacokinetics

In a population pharmacokinetic analysis using data from patients with psoriasis, body weight was found to be the most significant covariate affecting the clearance of ustekinumab. The median CL/F in patients with weight > 100 kg was approximately 55% higher compared to patients with weight ≤ 100 kg. The median V/F in patients with weight > 100 kg was approximately 37% higher as compared to patients with weight ≤ 100 kg. The median trough serum concentrations of ustekinumab in patients with higher weight (> 100 kg) in the 90 mg group were comparable to those in patients with lower weight (≤ 100 kg) in the 45 mg group. Similar results were obtained from a confirmatory population pharmacokinetic analysis using data from patients with psoriatic arthritis.

Dosing frequency adjustment

In patients with Crohn's disease and ulcerative colitis, based on observed data and population PK analyses, randomized subjects who lost response to treatment had lower serum ustekinumab concentrations over time compared with subjects who did not lose response. In Crohn's disease, dose adjustment from 90 mg every 12 weeks to 90 mg every 8 weeks was associated with an increase in trough serum ustekinumab concentrations and an accompanying increase in efficacy. In ulcerative colitis, population PK model based simulations demonstrated that adjusting dosing from 90 mg every 12 weeks to every 8 weeks would be expected to result in a 3-fold increase in steady-state trough ustekinumab concentrations. Additionally on the basis of clinical trial data in patients with ulcerative colitis, a positive exposure-response relationship was established between trough concentrations, and clinical remission and mucosal healing.

Special populations

No pharmacokinetic data are available in patients with impaired renal or hepatic function. No specific studies have been conducted in elderly patients.

The pharmacokinetics of ustekinumab were generally comparable between Asian and non-Asian patients with psoriasis and ulcerative colitis.

In patients with Crohn's disease and ulcerative colitis, variability in ustekinumab clearance was affected by body weight, serum albumin level, sex, and antibody to ustekinumab status while body weight was the main covariate affecting the volume of distribution. Additionally in Crohn's disease, clearance was affected by C-reactive protein, TNF antagonist failure status and race (Asian versus non-Asian). The impact of these covariates was within ± 20% of the typical or reference value of the respective PK parameter, thus dose adjustment is not warranted for these covariates. Concomitant use of immunomodulators did not have a significant impact on ustekinumab disposition.

In the population pharmacokinetic analysis, there were no indications of an effect of tobacco or alcohol on the pharmacokinetics of ustekinumab.

Serum ustekinumab concentrations in paediatric psoriasis patients 12 to 17 years of age, treated with the recommended weight-based dose were generally comparable to those in the adult psoriasis population treated with the adult dose, while serum ustekinumab concentrations in paediatric psoriasis patients treated with half of the recommended weight-based dose were generally lower than those in adults.

<u>Regulation of CYP450 enzymes</u>

The effects of IL-12 or IL-23 on the regulation of CYP450 enzymes were evaluated in an *in vitro* study using human hepatocytes, which showed that IL-12 and/or IL-23 at levels of 10 ng/mL did not alter human CYP450 enzyme activities (CYP1A2, 2B6, 2C9, 2C19, 2D6, or 3A4; see section 4.5).

**5.3 Preclinical safety data**

Non-clinical data reveal no special hazard (e.g. organ toxicity) for humans based on studies of repeated-dose toxicity and developmental and reproductive toxicity, including safety pharmacology evaluations. In developmental and reproductive toxicity studies in cynomolgus monkeys, neither adverse effects on male fertility indices nor birth defects or developmental toxicity were observed. No adverse effects on female fertility indices were observed using an

analogous antibody to IL-12/23 in mice.

Dose levels in animal studies were up to approximately 45-fold higher than the highest equivalent dose intended to be administered to psoriasis patients and resulted in peak serum concentrations in monkeys that were more than 100-fold higher than observed in humans.

Carcinogenicity studies were not performed with ustekinumab due to the lack of appropriate models for an antibody with no cross-reactivity to rodent IL-12/23 p40.

**6. PHARMACEUTICAL PARTICULARS**

**6.1 List of excipients**

L-histidine

L-histidine monohydrochloride monohydrate

Polysorbate 80

Sucrose

Water for injections

**6.2 Incompatibilities**

In the absence of compatibility studies, this medicinal product must not be mixed with other medicinal products.

**6.3 Shelf life**

STELARA 45 mg solution for injection

2 years

STELARA 90 mg solution for injection

2 years

STELARA 45 mg solution for injection in pre-filled syringe

3 years

STELARA 90 mg solution for injection in pre-filled syringe

3 years

**6.4 Special precautions for storage**

Store in a refrigerator (2°C – 8°C). Do not freeze.

Keep the vial or pre-filled syringe in the outer carton in order to protect from light.

**6.5 Nature and contents of container**

STELARA 45 mg solution for injection

0.5 mL solution in a type I glass 2 mL vial closed with a coated butyl rubber stopper.

STELARA 90 mg solution for injection

1 mL solution in a type I glass 2 mL vial closed with a coated butyl rubber stopper.

STELARA 45 mg solution for injection in pre-filled syringe

0.5 mL solution in a type I glass 1 mL syringe with a fixed stainless steel needle and a needle cover containing dry natural rubber (a derivative of latex). The syringe is fitted with a passive safety guard.

STELARA 90 mg solution for injection in pre-filled syringe

1 mL solution in a type I glass 1 mL syringe with a fixed stainless steel needle and a needle cover containing dry natural rubber (a derivative of latex). The syringe is fitted with a passive safety guard.

STELARA is available in a 1 vial pack or a pack of 1 pre-filled syringe.

**6.6 Special precautions for disposal and other handling**

The solution in the STELARA vial or pre-filled syringe should not be shaken. The solution

should be visually inspected for particulate matter or discoloration prior to subcutaneous administration. The solution is clear to slightly opalescent, colourless to light yellow and may contain a few small translucent or white particles of protein. This appearance is not unusual for proteinaceous solutions. The medicinal product should not be used if the solution is discoloured or cloudy, or if foreign particulate matter is present. Before administration, STELARA should be allowed to reach room temperature (approximately half an hour). Detailed instructions for use are provided in the package leaflet.

STELARA does not contain preservatives; therefore any unused medicinal product remaining in the vial and the syringe should not be used. STELARA is supplied as a sterile, single-use vial or single-use pre-filled syringe. The syringe, needle and vial must never be re-used. Any unused medicinal product or waste material should be disposed of in accordance with local requirements.

**7. MARKETING AUTHORISATION HOLDER**

Janssen-Cilag International NV
Turnhoutseweg 30
2340 Beerse
Belgium

**8. MARKETING AUTHORISATION NUMBER(S)**

<u>STELARA 45 mg solution for injection</u>
EU/1/08/494/001

<u>STELARA 90 mg solution for injection</u>
EU/1/08/494/002

STELARA 45 mg solution for injection in pre-filled syringe

EU/1/08/494/003

STELARA 90 mg solution for injection in pre-filled syringe

EU/1/08/494/004

**9. DATE OF FIRST AUTHORISATION/RENEWAL OF THE AUTHORISATION**

Date of first authorisation: 16 January 2009

Date of latest renewal: 19 September 2013

**10. DATE OF REVISION OF THE TEXT**

Detailed information on this medicinal product is available on the website of the European Medicines Agency http:// www.ema.europa.eu/

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **18/383,310** | **01/05/2024 04:34:19 PM Z ET** | **JBI6010USCNT1** |

## Title of Invention

Safe and Effective Method of Treating Ulcerative Colitis with Anti-IL12/IL23 Antibody

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 4419 | FILED BY | Christine Kochmann |
| PATENT CENTER # | 63858526 | FILING DATE | 10/24/2023 |
| CUSTOMER # | 27777 | FIRST NAMED INVENTOR | Jewel Johanns |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Eric Dichter |

## Documents

**TOTAL DOCUMENTS: 3**

| DOCUMENT | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|
| JBI6010USCNT1-ResptoNoticetoFileCorrAppln-Signed.pdf | 3 | Applicant Response to Pre-Exam Formalities Notice | 32 KB |
| JBI6010USCNT1-Spec-Statement-Signed.pdf | 1 | Specification | 19 KB |
| JBI6010USCNT1-Substitute-Spec.pdf | 164 | Specification | 1284 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|

| | |
|---|---|
| JBI6010USCNT1-ResptoNoticetoFileCorrAppln-Signed.pdf | DA829D13FFA40B31C882998E8585E99B7DE4E1CB2D6B30044 5CB1FEB64F8A2446FDCAA0E906A14502D0B51579B64D97800 8F39548389B88DCDEC2D83FA0DA6FD |
| JBI6010USCNT1-Spec-Statement-Signed.pdf | 843BE893ADA17FE3FEBFC278C79C0CEADADFE7962D1A43B0 BDBFFE2374E1F0180716AE351190A052C968CBB7C0F4573F0 A0163768E20AA2A42A423435C0B7871 |
| JBI6010USCNT1-Substitute-Spec.pdf | A52DAB603658806D870E02CB550E8EFB0495AF8161FA759124 BDE7A36A1CD1468DE0A5558D82EBE2DA5B1418A0E4344147 FE916323192E4A162067295DFE7E46 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

DOCKET NO. JBI6010USCNT1

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| Applicants: | Johanns, et al. | Confirmation Number: 4419 |
| Serial No.: | 18/383,310 | Art Unit: Not Yet Assigned |
| Filed : | 24 October 2023 | Examiner: Not Yet Assigned |
| For : | Safe and Effective Method of Treating Ulcerative Colitis with Anti-IL12/IL23 Antibody | |

**VERIFIED STATEMENT**

I hereby verify that the Corrected Specification submitted in this application contain corrections to the spacing to specific page numbers as outlined in the Notice to File Corrected Application Papers dated 08 November 2023. No new matter has been added to the application.

Respectfully submitted,

/Eric Dichter/

**Eric Dichter**
**Attorney for Applicants**
**Reg. No. 41,708**

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933-7003
Phone: (215) 628-7966
Date: January 5, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 18/383,310 | 10/24/2023 | | 2240 | JBI6010USCNT1 | 19 | 3 |

**CONFIRMATION NO. 4419**

**UPDATED FILING RECEIPT**

*OC000000066884693*

27777
DAVID A. LANE, JR.
JOHNSON & JOHNSON
ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, NJ 08933-7003

Date Mailed: 01/16/2024

Receipt is acknowledged of this non-provisional utility patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF FIRST INVENTOR, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection.

**Please verify the accuracy of the data presented on this receipt.** If an error is noted on this Filing Receipt, please submit a written request for a corrected Filing Receipt, including a properly marked-up ADS showing the changes with strike-through for deletions and underlining for additions. If you received a "Notice to File Missing Parts" or other Notice requiring a response for this application, please submit any request for correction to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections provided that the request is grantable.

**Inventor(s)**

Jewel Johanns, Devon, PA;
Katherine Li, Wallingford, PA;
Colleen Marano, Malvern, PA;
Richard Strauss, Doylestown, PA;
Hongyan Zhang, Malvern, PA;
Christopher O'Brien, Lafayette Hill, PA;
Omoniyi Adedokun, Phoenixville, PA;
Kimberly Shields-Tuttle, West Chester, PA;

**Applicant(s)**

Janssen Biotech, Inc., Horsham, PA;

**Power of Attorney:** The patent practitioners associated with Customer Number 000027777

**Domestic Priority data as claimed by applicant**

This application is a CON of 17/174,201 02/11/2021
which is a DIV of 16/580,509 09/24/2019 PAT 10,961,307
which claims benefit of 62/895,774 09/04/2019
and claims benefit of 62/769,818 11/20/2018
and claims benefit of 62/735,501 09/24/2018

Foreign Applications for which priority is claimed (You may be eligible to benefit from the Patent Prosecution Highway program at the USPTO. Please see http://www.uspto.gov for more information.) - None.

Foreign application information must be provided in an Application Data Sheet in order to constitute a claim to foreign priority. See 37 CFR 1.55 and 1.76.

**Permission to Access Application via Priority Document Exchange:** Yes

**Permission to Access Search Results:** Yes

Applicant may provide or rescind an authorization for access using Form PTO/SB/39 or Form PTO/SB/69 as appropriate.

**If Required, Foreign Filing License Granted:** 11/07/2023

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 18/383,310**

**Projected Publication Date:** 04/25/2024

**Non-Publication Request:** No

**Early Publication Request:** No
**Title**

Safe and Effective Method of Treating Ulcerative Colitis with Anti-IL12/IL23 Antibody

**Preliminary Class**

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications:** No

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign

patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4258).

## LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

## *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The U.S. offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to promote and facilitate business investment. SelectUSA provides information assistance to the international investor community; serves as an ombudsman for existing and potential investors; advocates on behalf of U.S. cities, states, and regions competing for global investment; and counsels U.S. economic development organizations on investment attraction best practices. To learn more about why the United States is the best country in the world to develop technology, manufacture products, deliver services, and grow your business, visit http://www.SelectUSA.gov or call +1-202-482-6800.

# PATENT APPLICATION FEE DETERMINATION RECORD

Substitute for Form PTO-875

Application or Docket Number
18/383,310

## APPLICATION AS FILED - PART I

| FOR | NUMBER FILED (Column 1) | NUMBER EXTRA (Column 2) | SMALL ENTITY RATE($) | SMALL ENTITY FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | OTHER THAN SMALL ENTITY FEE($) |
|---|---|---|---|---|---|---|---|
| BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | 320 |
| SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | 700 |
| EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | 800 |
| TOTAL CLAIMS (37 CFR 1.16(i)) | 19 minus 20 = | * 0 | | | OR | x = | 0 |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | 3 minus 3 = | * | | | | x = | 0 |
| APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | 420 |
| MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | 0 |
| | | | TOTAL | | | TOTAL | 2240 |

* If the difference in column 1 is less than zero, enter "0" in column 2.

## APPLICATION AS AMENDED - PART II

### AMENDMENT A

| | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE($) | SMALL ENTITY ADDITIONAL FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | OTHER THAN SMALL ENTITY ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| Total (37 CFR 1.16(i)) | * | Minus | ** | = | x = | | OR | x = | |
| Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x = | | OR | x = | |
| Application Size Fee (37 CFR 1.16(s)) | | | | | | | | | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

### AMENDMENT B

| | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | RATE($) | ADDITIONAL FEE($) | | RATE($) | ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| Total (37 CFR 1.16(i)) | * | Minus | ** | = | x = | | OR | x = | |
| Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x = | | OR | x = | |
| Application Size Fee (37 CFR 1.16(s)) | | | | | | | | | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest found in the appropriate box in column 1.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 18/383,310 | 10/24/2023 | Jewel Johanns | JBI6010USCNT1 |

**CONFIRMATION NO. 4419**

**PUBLICATION NOTICE**

*OC000000073594335*

27777
DAVID A. LANE, JR.
JOHNSON & JOHNSON
ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, NJ 08933-7003

Date Mailed: 06/06/2024

**Title:**Safe and Effective Method of Treating Ulcerative Colitis with Anti-IL12/IL23 Antibody

**Publication No.**US-2024-0182557-A1
**Publication Date:**06/06/2024

## NOTICE OF PUBLICATION OF APPLICATION

The above-identified application will be electronically published as a patent application publication pursuant to 37 CFR 1.211, et seq. The patent application publication number and publication date are set forth above.

The publication may be viewed using the USPTO's publicly available Searchable Databases via the Patent Public Search tool at www.uspto.gov. The direct link to access the Patent Public Search tool is currently https://ppubs.uspto.gov/pubwebapp/static/pages/ppubsbasic.html.

The publication process established by the Office does not provide for mailing a copy of the publication to applicant. A copy of the publication may be obtained from the Office upon payment of the appropriate fee set forth in 37 CFR 1.19(a)(1). Orders for copies of patent application publications are handled by the USPTO's Public Records Division. The Public Records Division can be reached by telephone at (571) 272-3150 or (800) 972-6382, by facsimile at (571) 273-3250, by mail addressed to the United States Patent and Trademark Office, Public Records Division, Alexandria, VA 22313-1450 or via the Internet.

In addition, information on the status of the application, including the mailing date of Office actions and the dates of receipt of correspondence filed in the Office, may also be accessed via the Internet through Patent Center, the USPTO's electronic patent application filing and management system. The direct link to access this status information is currently https://patentcenter.uspto.gov/. Prior to publication, such status information is confidential and may only be obtained by applicant using the private side of Patent Center.

Further assistance in electronically accessing the publication, or about Patent Center, is available by calling the Patent Electronic Business Center at 1-866-217-9197.

---

Office of Data Managment, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

| *Notice of References Cited* | Application/Control No. 18/383,310 | Applicant(s)/Patent Under Reexamination Johanns et al. | |
|---|---|---|---|
| | Examiner ROBERT S LANDSMAN | Art Unit 1647 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date YYYY-MM-DD | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| | A | | | | | |
| | B | | | | | |
| | C | | | | | |
| | D | | | | | |
| | E | | | | | |
| | F | | | | | |
| | G | | | | | |
| | H | | | | | |
| | I | | | | | |
| | J | | | | | |
| | K | | | | | |
| | L | | | | | |
| | M | | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date YYYY-MM-DD | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| * | U | https://cdn.clinicaltrials.gov/large-docs/36/NCT02407236/Prot_000.pdf |
| * | V | Stelara® Prescribing Information (Sept. 2009). 16 pages |
| * | W | https://www.ema.europa.eu/en/medicines/human/EPAR/stelara (accessed from the internet 1/8/25) |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in YYYY-MM-DD format are publication dates. Classifications may be US or foreign.

| *Search Notes* | Application/Control No. 18/383,310 | Applicant(s)/Patent Under Reexamination Johanns et al. |
| --- | --- | --- |
| | Examiner ROBERT S LANDSMAN | Art Unit 1647 |

| CPC - Searched* | | |
| --- | --- | --- |
| **Symbol** | **Date** | **Examiner** |
| C07K16/244; A61K9/0019; A61K39/00; A61K47/183; A61P1/04; A61K2039/505, 54, 545; C07K2317/31, 565, 21, 76; A61K39/395 | 01/02/2025 | RL |

| CPC Combination Sets - Searched* | | |
| --- | --- | --- |
| **Symbol** | **Date** | **Examiner** |
| | | |

| US Classification - Searched* | | | |
| --- | --- | --- | --- |
| **Class** | **Subclass** | **Date** | **Examiner** |
| | | | |

* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

| Search Notes | | |
| --- | --- | --- |
| **Search Notes** | **Date** | **Examiner** |
| inventor search in PALM | 01/02/2025 | RL |
| various SEQ ID NOs - results in SCORE | 01/02/2025 | RL |
| PE2E - search strategy in case | 01/02/2025 | RL |
| Reviewed Inter Partes Review of U.S. Patent No. 10,961,307 ( IPR2023-01444) | 01/02/2025 | RL |
| Reviewed Inter Partes Review of U.S. Patent No. 10,961,307 ( IPR2023-01103) | 01/02/2025 | RL |
| STN - search strategy in case | 01/07/2025 | RL |

| *Search Notes* | Application/Control No. 18/383,310 | Applicant(s)/Patent Under Reexamination Johanns et al. |
| --- | --- | --- |
| | Examiner ROBERT S LANDSMAN | Art Unit 1647 |

| Interference Search | | | |
| --- | --- | --- | --- |
| US Class/CPC Symbol | US Subclass/CPC Group | Date | Examiner |
| | | | |

## PE2E SEARCH - Search History (Prior Art)

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | British Equivalents | Time Stamp |
|---|---|---|---|---|---|---|---|
| L1 | 2 | "10961307" | (USPAT) | OR | ON | ON | 2025/01/02 01:05 AM |
| L2 | 2 | "10961307" AND remission.clm. | (USPAT) | OR | ON | ON | 2025/01/02 01:06 AM |
| L3 | 1487475 | (C07K16/244 OR A61K9/0019 OR A61K39/00 OR A61K47/183 OR A61P1/04 OR A61K2039/505 OR A61K2039/54 OR A61K2039/545 OR C07K2317/31 OR C07K2317/565 OR C07K2317/21 OR C07K2317/76 OR A61K39/395).cpc. | (US-PGPUB; USPAT; USOCR; FIT (AU, AP, AT, BE, BG, BR, BY, CA, CH, CN, CS, CU, CZ, DD, DE, DK, EA, EE, EP, ES, FI, FR, GB, HR, HU, ID, IE, IL, IS, IT, JP, KR, LT, LU, LV, MA, OA, RU, SU, WO, MC, MD, MY, NL, NO, NZ, PH, PL, PT, RO, RS, SE, SG, SI, SK, TH, TN, TR, TW, UA, VN); FPRS; EPO; JPO; DERWENT; IBM_TDB) | OR | ON | ON | 2025/01/02 01:16 AM |
| L4 | 222458 | (li OR marano OR strauss OR zhang OR obrien OR adedokun OR shields-tuttle).in. | (USPAT) | OR | ON | ON | 2025/01/03 12:41 AM |
| L5 | 152 | L4 AND ustekinumab | (USPAT) | OR | ON | ON | 2025/01/03 12:41 AM |
| L6 | 2191 | ustekinumab | (USPAT) | OR | ON | ON | 2025/01/03 12:41 AM |
| L7 | 874 | L6 AND L3 | (USPAT) | OR | ON | ON | 2025/01/03 12:41 AM |
| L8 | 135 | l6.clm. | (USPAT) | OR | ON | ON | 2025/01/03 12:41 AM |
| L9 | 152 | L6 AND L4 | (USPAT) | OR | ON | ON | 2025/01/03 12:42 AM |
| L10 | 34935 | "ulcerative colitis" | (USPAT) | OR | ON | ON | 2025/01/03 12:42 AM |
| L11 | 3328 | l10.clm. | (USPAT) | OR | ON | ON | 2025/01/03 12:42 AM |
| L12 | 24 | L8 AND L11 | (USPAT) | OR | ON | ON | 2025/01/03 12:42 AM |

## PE2E SEARCH - Search History (Interference)

There are no Interference searches to show.

PTO/SB/08A (08-00)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

**Substitute for form 1449A/PTO**

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT

(use as many sheets as necessary)

Sheet 1 of 3

| | |
|---|---|
| *Application Number* | To Be Assigned |
| *File Date* | Herewith |
| *First Named Inventor* | Jewel Johanns |
| *Group Art Unit* | To Be Assigned |
| *Examiner Name* | To Be Assigned |
| *Attorney Docket Number* | JBI6010USCNT1 |

**U.S. PATENT DOCUMENTS**

| Examiner Initials | Cite No.[1] | U.S. Patent Document Number | Kind Code[2] (if known) | Name of Patentee or Applicant of Cited Document | Date of Publication of Cited Document mm-dd-yyyy | Pages, Columns, Lines, where relevant passages or relevant figures appear |
|---|---|---|---|---|---|---|
| | | US 2009/0181027 | A1 | Dal Monte, et al. | 07/16/2009 | |
| | | US 2018/0252728 | A1 | Amgen, Inc. | 09/06/2018 | |
| | | 6902734 | B2 | Giles-Komar, et al. | 06/07/2005 | |
| | | 7166285 | B2 | Giles-Komar, et al. | 07/23/2007 | |
| | | 7063964 | B2 | Giles-Komar, et al. | 06/20/2006 | |
| | | 7279157 | B2 | Giles-Komar, et al. | 10/09/2007 | |
| | | 7560247 | B2 | Giles-Komar, et al. | 07/14/2009 | |
| | | 7887807 | B2 | Giles-Komar, et al. | 02/15/2011 | |
| | | 8084233 | B2 | Giles-Komar, et al. | 12/27/2011 | |
| | | 8329171 | B2 | Giles-Komar, et al. | 12/11/2012 | |
| | | 8703141 | B2 | Giles-Komar, et al. | 04/22/2014 | |
| | | 9409984 | B2 | Giles-Komar, et al. | 08/09/2016 | |
| | | 9676848 | B2 | Giles-Komar, et al. | 06/13/2017 | |
| | | 10259867 | B2 | Giles-Komar, et al. | 04/16/2019 | |
| | | 10519231 | B2 | Giles-Komar, et al. | 12/31/2019 | |
| | | 6300478 | B1 | Trinchieri, et al. | 10/09/2001 | |
| | | 5891680 | | Lieschke, et al. | 04/06/1999 | |
| | | 5811523 | | Trinchieri et. al | 09/22/1998 | |
| | | 5648467 | | Trinchieri et. al | 07/15/1997 | |
| | | 5457038 | | Trinchieri et. al | 10/10/1995 | |
| | | 6225117 | B1 | Gately et. al | 05/01/2001 | |
| | | 5780597 | | Gately et. al | 07/14/1998 | |
| | | 6338848 | B1 | Leonard et. al | 01/15/2002 | |
| | | 6495667 | B1 | Bazan | 12/17/2002 | |
| | | 5547852 | | Seller et. al | 08/20/1996 | |
| | | 6086876 | | Karp et. al | 07/11/2000 | |
| | | 6914128 | B1 | Salfeld, et al. | 07/05/2005 | |
| | | US 2020/0062841 | A1 | Giles-Komar, et al. | 02/27/2020 | |
| | | US 2020/0262908 | A1 | Mitchell Lawrence Jones | 08/2020 | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /R.S.L/

**FOREIGN PATENT DOCUMENTS**

| Examiner Initials | Cite No.[1] | Foreign Patent Document Office[3] | Number[4] | KindCode[5] | Name of Patentee or Applicant of Cited Document | Date of Publication of Cited Document mm-dd-yyyy | Pages, Columns, Lines, where relevant passages or relevant figures appear | T[6] |
|---|---|---|---|---|---|---|---|---|
| | | WO | 97/15327 | A | US HEALTH | 05/01/1997 | | |
| | | WO | 96/33735 | A | CELL GENESYS INC. | 10/31/1996 | | |
| | | WO | 01/19373 | A2 | BASF AG. | 03/22/2001 | | |
| | | WO | 92/05256 | A1 | GENETICS INSTITUTE, INC. | 04/02/1992 | | |
| | | WO | 90/05147 | A1 | GENETICS INSTITUTE, INC. | 05/17/1990 | | |
| | | WO | 99/37682 | A2 | F. HOFFMANN- LA ROCHE AG | 07/29/1999 | | |
| | | WO | 00/56772 | A1 | BASF AG | 09/28/2000 | | |
| | | EP | 804581 | B1 | CORIXA CORP. | 09/20/2001 | | |
| | | EP | 433827 | B1 | F. HOFFMANN LA ROCHE AG | 03/04/1998 | | |
| | | EP | 790255 | A2 | F. HOFFMANN LA ROCHE AG | 08/20/1997 | | |
| | | EP | 0640689 | A2 | F. HOFFMAN LA ROCHE AG | 03/01/1995 | | |
| | | PCT | WO 00/34459 | A1 | Protein Design Labs, Inc. | 06/15/2000 | | |
| | | EP | EP 1 137 766 | B1 | Protein Design Labs, Inc. | 09/28/2005 | | |
| | | CL | 688-2000 | | Genetics Institute LLC | 03/24/2000 | | |
| | | PCT | WO 2017/049035 | A1 | Amgen, Inc. Medimmune, LLC | 03/23/2017 | | |
| | | PCT | WO 2017/112536 | A1 | Amgen, Inc. Medimmune, LLC | 06/29/2017 | | |

**OTHER PRIOR ART - NON PATENT LITERATURE DOCUMENTS**

| Examiner's Initials* | Cite No.[1] | Include name of the author (in CAPITOL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published | T[2] |
|---|---|---|---|
| | | Adedokun, et al, "Ustekinumab Pharmacokinetics and Exposure Response in a Phase 3 Randomized Trial of Patients with Ulcerative Colitis," Clinical Gastroenterology and Hepatology, 18: 2244-2255 (2020). | |
| | | Adedokun, et al., "Pharmacokinetics and Exposure Response Relationships of Ustekinumab in Patients with Crohn's Disease," Gastroenterology, 154: 1660-1671 (2018). | |
| | | Ahern et al., "Interleukin-23 Drives Intestinal Inflammation through Direct Activity on T Cell," Immunity. 33(2):279-288 (2010) | |
| | | Allocca, et al., "Can IL-23 be a good target for ulcerative colitis?" Best Practice & Research Clinical Gastroenterology, 32-33: 95-102 (2018). | |
| | | Anderson et al., "Meta-analysis identifies 29 additional ulcerative colitis risk loci, increasing the number of confirmed associations to 47," Nature Genetics, 43(3):246-252 (2011) | |
| | | Baumgart, et al., "Crohn's Disease," Lancet, 380: 1590-1605 (2012). | |
| | | Berg et al., "Enterocolitis and Colon Cancer in Interleukin-10-deficient Mice are Associated with Aberrant Cytokine Production and CD4+ TH1-like Responses," Journal of Clinical Investigations, 98:1010-1020 (1996) | |
| | | Steven Brant, "Promises, Delivery, and Challenges of Inflammatory Bowel Disease Risk Gene Discovery," Clinical Gastroenterology and Hepatology, 11(1):22-26 (2013) | |
| | | Colombel et al., "Adalimumab for Maintenance of Clinical Response and Remission in Patients with Crohn's Disease: The CHARM Trial," Gastroenterology. 132:52–65 (2007) | |
| | | Danese, et al., "Ulcerative Colitis," New England Journal of Medicine, 365:1715-1725 (2011) | |
| | | Davidson et al., "IL-12, But Not IFN-γPlays a Major Role in Sustaining the Chronic Phase of Colitis in IL-10-Deficient Mice," Journal of Immunology, 161:3143–3149 (1998) | |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /R.S.L/

| | | | |
|---|---|---|---|
| | | Feagan et al., "Vedolizumab as Induction and Maintenance Therapy for Ulcerative Colitis," New England Journal of Medicine, 369:699 710 (2013) | |
| | | Feagan, et al., "Ustekinumab as Induction and Maintenance Therapy for Crohn's Disease," New England Journal of Medicine, 375 (20): 1946-1960 (2016). | |
| | | Geremia et al., "Innate and adaptive immunity in inflammatory bowel disease," Autoimmunity Reviews, 13:3-10 (2014). | |
| | | Hanauer et al., "Maintenance infliximab for Crohn's Disease: the ACCENT I randomized trial," Lancet. 359:1541-1549 (2002) | |
| | | Hanauer, et al., "IM-UNITI: Three-year Efficacy, Safety, and Immunogenicity of Ustekinumab Treatment of Crohn's Disease," Journal of Crohn's and Colitis: 23-32 (2020). | |
| | | Hibi, et al., "Efficacy and safety of ustekinumab in Japanese patients with moderately to severely active Crohn's disease: a subpopulation analysis of phase 3 induction and maintenance studies," Intestinal Research, 15(4): 475-486 (2017). | |
| | | Janssen Biotech, Inc., Highlights of Prescribing Information, September, 2016. | |
| | | Janssen Research & Development, LLC, "A Study to Evaluate the Safety and Efficacy of Ustekinumab Induction and Maintenance Therapy in participants with Moderately to Severely Active Ulcerative Colitis (UNIFI)," (12/19/2019). | |
| | | Janssen Research & Development, LLC, "A Multicenter, Randomized, Double-blind, Placebo-controlled, Proof-of-Concept Study of Ustekinumab in Subjects with Active Systemic Lupus Erythematosus," Clinical Trial Number NCT0239061, Approved 01/18/2017. | |
| | | Kolios, et al., "Paradoxical ulcerative colitis during adalimumab treatment of psoriasis resolved by switch to uktekinumab," British Journal of Dermatology, 178: 333-334 (2018). | |
| | | Li, et al., "Relationship Between Combined Histologic and Endoscopic Endpoints and Efficacy of Ustekinumab Treatment in Patients with Ulcerative Colitis," Gastroenterology, S0016-5085 (20): 35107-6 (Journal Pre-proof August 2020). | |
| | | Loftus, et al., "Epidemiology of inflammatory bowel disease," Gastroenterology Clinics of North America, 31:1-20 (2002) | |
| | | Edward V. Loftus, Jr., "Clinical Epidemiology of Inflammatory Bowel Disease: Incidence, Prevalence, and Environmental Influences," Gastroenterology, 126(6):1504-1517 (2004). | |
| | | Neurath et al., "Antibodies to Interleukin 12 Abrogate Established Experimental Colitis in Mice," Journal of Experimental Medicine, 182(5):1281-1290 (1995) | |
| | | Neurath, "Cytokines in inflammatory bowel disease," Nature Revs Immunology, 14(5):329-42 (2014) | |
| | | Ocshenkuhn, et al., "Clinical Outcomes with Ustekinumab as Recue Treatment in Therapy-Refractory or -Intolerant Ulcerative Colitis: Real World Experience in a Large Since Center Cohort, AGA Abstracts, Abstract Number Tu1713, May 2018. | |
| | | Ochsenkuhn, et al., "Ustekinumab as rescue treatment in therapy-refractory or -intolerant ulcerative colitis," Abstracts of the 13th Congress of ECCO, Abstract Number P759, January 2018. | |
| | | Panaccione, et al., "Briakinumab or Treatment of Crohn's Disease: Results of a Randomized Trial," Inflammatory Bowel, 21: 1329-1340 (2015). | |
| | | Papp, et al., "Efficacy and Safety of Ustekinumab, A Human Interleukin-12/23 Monoclonal Antibody, in Patients with Psoriasis: 52 Week Results from a Randomised, Double-Blind, Placebo-Controlled Trial (PHOENIX 2), The Lancet, 371: 1675-1684 (2008). | |
| | | Sandborn et al., "Adalimumab Induces and Maintains Clinical Remission in Patients With Moderate-to-Severe Ulcerative Colitis," Gastroenterology. 142:257–265 (2012) | |
| | | Sandborn et al., "A Randomized Trial of Ustekinumab, a Human Interleukin-12/23 Monoclonal Antibody, in Patients with Moderate-to-Severe Crohn's Disease," Gastroenterology. 135(4):1130-1141 (2008) | |
| | | Sandborn et al., "Vedolizumab as Induction and Maintenance Therapy for Crrohn's Disease," New England Journal of Medicine, 369:711-721 (2013) | |
| | | Sandborn, et al., "Long-Term Efficacy and Safety of Ustekinumab for Crohn's disease through the second year of therapy," Alimentary Pharmacology & Therapeutics, 48: 65-77 (2018). | |
| | | Sandborn, et al., "Ustekinumab Induction and Maintenance Therapy in Refractory Crohn's Disease," The New England Journal of Medicine, 367: 1519-1528 (2012). | |
| | | Sands, et al., "Safety and Efficacy of Ustekinumab Induction Therapy in Patients with Moderate to Severe Ulcerative Colitis: Results from the Phase 3 UNIFI Study," American College of Gastroenterology Conference, Philadelphia, Pennsylvania (October 2018). (Poster Presentation). | |
| | | Sands, et al, "Ustekinumab as Induction and Maintenance Therapy for Ulcerative Colitis," The New England Journal of Medicine, 381(13): 1201-1214 (2019). | |
| | | Schoch, et al, "Charge-mediated influence of the antibody variable domain on FcRn-dependent pharmacokinetics," Proceedings of the National Academy of Science, 112(19): 5997-6002 (2015). | |
| | | Simon, et al., "Ustekinumab for the treatment of Crohn's disease: can it find its niche?" Therapeutic Advances in Gastroenterology, 9 (1): 26-36 (2016). | |
| | | Tally et al., "An Evidence-Based Systematic Review of Medical Therapies for Inflammatory Bowel Disease," American Journal of Gastroenterology, 106 Suppl 1:S2-S25 (2011) | |
| | | Uhlig et al., "Differential Activity of IL-12 and IL-23 in Mucosal and Systemic Innate Immune Pathology," Immunity. 25:309 318 (2006) | |
| | | Yen et al., "IL-23 is essential for T cell-mediated colitis and promoted inflammation via IL-17 and IL-6," The Journal of Clinical Investigation, 116(5):1310-1316 (2006) | |

| | | | |
|---|---|---|---|
| | | Yu et al., "Expression of Interleukin-22/STAT3 signaling pathway in ulcerative colitis and related carcinogenesis," World Journal of Gastroenterology, 19(17):2638-2649 (2013) | |
| | | PCT Search Report dated 01/13/2020. | |
| | | www.ema.europa.eu/en/medicines/human/EPAR/stelara. Accessed from the internet 07/13/2020. Date provided by GOOGLE Search 01/15/2009. | |
| | | Clinicaltrials.gov/ct2/show/NCT02407236. Accessed from the internet 07/13/2020. | |

| | | | |
|---|---|---|---|
| Examiner Signature | /ROBERT S LANDSMAN/ | Date Considered | 01/02/2025 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

1 Unique citation designation number. 2 Applicant is to place a check mark here if English language Translation is attached.

Burden Hour Statement: This form is estimated to take 2.0 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U. S. Patent and Trademark Office, Washington, DC 20231.
DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /R.S.L/

```
     FILE 'MEDLINE, BIOSIS, SCISEARCH' ENTERED AT 07:22:48 ON 07 JAN 2025
L1          5311 IL12
L2          1829 IL23
L3           405 L1 AND L2
L4            66 L3 AND P40
L5            24 "IL12/IL23P40"
L6            90 L4 OR L5
L7        178384 "ULCERATIVE COLITIS"
L8            20 L6 AND L7
L9            12 L8 AND PY<=2018
L10            7 DUP REM L9 (5 DUPLICATES REMOVED)
L11         6495 (JOHANNS OR LI OR MARANO OR STRAUSS OR ZHANG OR OBRIEN OR ADEDO
L12            0 L3 AND L11
```

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/383,310 | 10/24/2023 | Jewel Johanns | JBI6010USCNT1 | 4419 |

27777 7590 01/16/2025

DAVID A. LANE, JR.
JOHNSON & JOHNSON
ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, NJ 08933-7003

| EXAMINER | |
|---|---|
| LANDSMAN, ROBERT S | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1647 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/16/2025 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

IPIMManagem@ITS.JNJ.com
jnjuspatent@its.jnj.com
pair_jnj@firsttofile.com

| *Office Action Summary* | Application No. 18/383,310 | Applicant(s) Johanns et al. | |
|---|---|---|---|
| | Examiner ROBERT S LANDSMAN | Art Unit 1647 | AIA (FITF) Status Yes |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --***

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☐ Responsive to communication(s) filed on _____.
☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☐ This action is **FINAL.** 2b) ☑ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) 1-19 is/are pending in the application.
5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) 1-19 is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined allowable, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.
11)☑ The drawing(s) filed on 24 October 2023 is/are: a)☑ accepted or b)☐ objected to by the Examiner.
Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
**Certified copies:**
a)☐ All b)☐ Some** c)☐ None of the:
1.☐ Certified copies of the priority documents have been received.
2.☐ Certified copies of the priority documents have been received in Application No. _____.
3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date ______.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date ______.
4) ☐ Other: ______.

## DETAILED ACTION

***Notice of Pre-AIA or AIA Status***

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

***1. Election of Species***

This application contains claims directed to the following patentably distinct species –

- in claim 9/16 – either "(a)" or "(b)"

The species are independent or distinct because each composition requires its own potentially non-overlapping search. In addition, these species are not obvious variants of each other based on the current record. Therefore, there is a search and/or examination burden for the patentably distinct species as set forth above.

Applicant is required under 35 U.S.C. 121 to elect a single disclosed species, or a single grouping of patentably indistinct species, for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable. Currently, all claims are generic.

**Applicant is advised that the reply to this requirement to be complete must include (i) an election of a species or a grouping of patentably indistinct species to be examined** even though the requirement may be traversed (37 CFR 1.143) **and (ii) identification of the claims encompassing the elected species or grouping of patentably indistinct species**, including any claims subsequently added. An argument that a claim is allowable or that all claims are generic is considered nonresponsive unless accompanied by an election.

The election may be made with or without traverse. To preserve a right to petition, the election must be made with traverse. If the reply does not distinctly and specifically point out supposed errors in the election of species requirement, the election shall be treated as an election without traverse. Traversal must be presented at the time of election in order to be considered timely. Failure to timely traverse the requirement will result in the loss of right to petition under 37 CFR 1.144. If claims are added after the election, applicant must indicate which of these claims are readable on the elected species or grouping of patentably indistinct species.

Should applicant traverse on the ground that the species, or groupings of patentably indistinct species from which election is required, are not patentably distinct, applicant should submit evidence or

identify such evidence now of record showing them to be obvious variants or clearly admit on the record that this is the case. In either instance, if the examiner finds one of the species unpatentable over the prior art, the evidence or admission may be used in a rejection under 35 U.S.C. 103(a) of the other species.

Upon the allowance of a generic claim, applicant will be entitled to consideration of claims to additional species which depend from or otherwise require all the limitations of an allowable generic claim as provided by 37 CFR 1.141.

***2. Election by Telephone***

A voicemail was left with Eric Dichter on 12/12/24, which was returned the same day. Mr, Dichter elected the species of part (b) in claims 9/16. However, upon further consideration, both species have been examined.

***3. Additional Information***

Applicant is advised that the reply to this requirement to be complete must include an election of the invention to be examined even though the requirement be traversed (37 CFR 1.143).

The election of an invention or species may be made with or without traverse. To preserve a right to petition, the election must be made with traverse. If the reply does not distinctly and specifically point out supposed errors in the restriction requirement, the election shall be treated as an election without traverse. Traversal must be presented at the time of election in order to be considered timely. Failure to timely traverse the requirement will result in the loss of right to petition under 37 CFR 1.144. If claims are added after the election, applicant must indicate which of these claims are readable on the elected invention or species.

Should applicant traverse on the ground that the inventions have unity of invention (37 CFR 1.475(a)), applicant must provide reasons in support thereof. Applicant may submit evidence or identify such evidence now of record showing the inventions to be obvious variants or clearly admit on the record that this is the case. Where such evidence or admission is provided by applicant, if the examiner finds one of the inventions unpatentable over the prior art, the evidence or admission may be used in a rejection under 35 U.S.C. 103(a) of the other invention.

Applicant is reminded that upon cancellation of claims to a non-elected invention, the inventorship must be amended in compliance with 37 CFR § 1.48(b) if one or more of the currently named inventors is

no longer an inventor of at least one claim remaining in the application. Any amendment of inventorship must be accompanied by a diligently-filed petition under 37 CFR § 1.48(b) and by the fee required under 37 CFR § 1.17 (h).

***4. Formal Matters***

Claims 1-19 are pending and are the subject of this Office Action.

***5. Claim Rejections - 35 USC § 103***

In the event the determination of the status of the application as subject to AIA 35 U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the statutory basis (i.e., changing from AIA to pre-AIA) for the rejection will not be considered a new ground of rejection if the prior art relied upon, and the rationale supporting the rejection, would be the same under either status.

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.

The factual inquiries for establishing a background for determining obviousness under 35 U.S.C. 103 are summarized as follows:

1. Determining the scope and contents of the prior art.
2. Ascertaining the differences between the prior art and the claims at issue.
3. Resolving the level of ordinary skill in the pertinent art.
4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

This application currently names joint inventors. In considering patentability of the claims the examiner presumes that the subject matter of the various claims was commonly owned as of the effective filing date of the claimed invention(s) absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and effective filing dates of each claim that was not commonly owned as of the effective filing date of the later invention in order for the examiner to consider the applicability of 35 U.S.C. 102(b)(2)(C) for any potential 35 U.S.C. 102(a)(2) prior art against the later invention.

A. Claims 1-19 are rejected under 35 U.S.C. 103 as being unpatentable over Clinica1Trials.gov Identifier: NCT02407236 ("NCT-236"). The instant claims are drawn to using an antibody to treat UC. The antibody comprises SEQ ID NO:1-8, 10 and 11, which are the sequences for ustekinumab. The instant specification (page 2, lines 18-22) also acknowledges that "[t]he involvement of the IL-12/23 pathway in the pathogenesis of IBD is well established, and an important role for the IL-12/IL-23 pathway in intestinal inflammation has been elucidated in colitis". **The only reason NCT-236 does not anticipate the instant claims is due to the fact that it does not teach the exact dosages based on subject weight in claim 1(a).**

Ustekinumab (Stelara®) was approved by the FDA in 2009 for treatment of adults with chronic moderate to severe plaque psoriasis (see "Stelara Prescribing Information" herewith - published on the Janssen website by at least February 25, 2017) and for the treatment of Crohn's in 2016 (see "Stelara label 761044lbl" herewith; published on the Janssen website by at least February 25, 2017 – believed to be cited on the IDS dated 10/24/23 as "Janssen Biotech, Inc., Highlights of Prescribing Information, September, 2016" under the following link –

https://web.archive.org/web/20170225220025/http://www.accessdata.fda.go)v/drugsatfda docs/label/2016/761044lbl.pdf)

and was available for intravenous and subcutaneous administration, and the clinical studies demonstrated that it was well-tolerated intravenously and subcutaneously (Stelara label 761044lbl). The Stelara references are not being used as a basis for rejection, only to show the characteristics and indications of Stelara®.

Janssen publicized the design of this Phase 3 clinical trial for ustekinumab in UC treatment (NCT02407236) on ClinicalTrials.gov by April 2015, which discloses all aspects of the instantly claimed UC treatment regimen (see entire document, especially "Purpose", "Primary Outcome Measures",

"Secondary Outcome Measures" and "Criteria") other than the exact dose to administer for a given subject weight (e.g. claim 1(a)). The trial used either 130 mg or 6mg/kg. These results were published by Sands et al. (cited on the instant IDS submitted 10/24/23). Sands is not believed to be need as prior art; however, In re Montgomery, 677 F.3d 1375 (Fed. Cir. 2012); affirmed the Board's determination that claims directed to a method of using ramipril to prevent strokes were inherently anticipated by a clinical trial summary (HOPE) that disclosed a protocol for administering ramipril to stroke-prone patients, because "administering ramipril to stroke-prone patients inevitably treats or prevents stroke." 677 F.3d at 1381.

Regarding instant claims 9(a) and 10(a), page 16 of the "Stelara label 761044lbl" teaches the IV infusion is available as 130 mg of ustekinumab in 26 mL, supplied as a single-dose 30 mL comprising EDTA disodium salt dihydrate (0.52 mg), L- histidine (20 mg), L-histidine hydrochloride monohydrate (27 mg), L-methionine (10.4 mg), Polysorbate 80 (10.4 mg) and sucrose (2210 mg).

B. Claims 9 and 10 are rejected under 35 U.S.C. 103 as being unpatentable over Clinica1Trials.gov Identifier: NCT02407236 in view of "Stelara label 761044lbl".

Though NCT-236 does not teach claims 9(b), 10(b), nor the specific dose administered in claims 1, 11 and 18 based on the weight/mass of the subject, where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller,* 220 F.2d 454, 454, 105 USPQ 223,235, (CCPA 1955). Furthermore, "discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." In re Boesch, 617 F.2d 272, 276, 205 USPQ 215, 219 (CCPA 1980). See also Merck & Co. v. Biocraft Labs. Inc., 874 F.2d 804, 809, 10 USPQ2d 1843, 1847-48 (Fed. Cir. 1989) (determination of suitable dosage amounts in diuretic compositions considered a matter of routine experimentation and, therefore, obvious). **It is noted that claim 9 is met regardless of (b) since the claim is recited in the alternative.**

Furthermore, Stelara® teaches a subcutaneous formulation of ustekinumab with the same ingredients as claims 9(b) and 10(b), except for minor differences, including L-histidine, which Stelara® teaches at a range of 4.8-6.4 mM, as opposed to the instant claims which recite "6.7 mM L-histidine."

Regarding histidine as well as the other constituents of the composition, the instant specification discloses that formulations, including the use of histidine and histidine monohydrochloride hydrate "are prepared using…routine methods well known to those of ordinary skill in the art (paragraph [0157]) and "[v]ariations of this process would be recognized by one of ordinary skill in the art. For example, the order the components are added, whether additional additives are used, the temperature and pH at which the

formulation is prepared, are all factors that can be optimized for the concentration and means of administration used".

Since the instant specification recognizes that pH is a known variable to be optimized, and the concentration of L-histidine affects pH, Stelara®'s 4.8-6.4 mM L-histidine makes obvious the claimed 6.7 mM L-histidine. See E.I. DuPont de Nemours & Co. v. Synvina C.V., 904 F.3d 996, 1006 (Fed. Cir. 2018) ("it is not inventive to discover the optimum or workable ranges by routine experimentation.").

C. Claims 1-19 are rejected under 35 U.S.C. 103 as being unpatentable over Clinica1Trials.gov Identifier: NCT02407236 in view of Ochsenkühn (cited on the IDS submitted 10/24/23) and further in view of "Stelara label 761044lbl" (Stelara®).

Ochsenkühn disclose the claimed method of treating UC with ustekinumab by administering a dosage that Stelara® teaches was safe. Furthermore, Ochsenkühn reports patients that qualified as "responders" according to the criteria enumerated in the claims. Given this, one of ordinary skill in the art would have reasonably expected that the claimed methods of treatment were clinically safe and effective and would achieve the claimed results.

**Though the Examiner does not believe a rejection under 35 USC 102 is warranted, the following arguments regarding case law from the *inter partes* review of parent U.S. Patent No. 10,961,307, which is relevant to the instant application, are provided below -**

Regarding the three rejections above under 35 USC 103, In re Gleave, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (single prior art reference that discloses each claim limitation, either explicitly or inherently, anticipates); cf. Impax Lab'ys v. Aventis Pharms., 468 F.3d 1366, 1383 (Fed. Cir. 2006) ("[P]roof of efficacy is not required for a prior art reference to be enabling for purposes of anticipation." (see 21XI)

Furthermore, see, e.g., In re Montgomery, 677 F.3d 1375 (Fed. Cir. 2012); King Pharms. v. Eon Labs., 616 F.3d 1267 (Fed. Cir. 2010). In re Montgomery addressed this exact issue, affirming the Board's determination that claims directed to a method of using ramipril to prevent strokes were inherently anticipated by a clinical trial summary (HOPE) that disclosed a protocol for administering ramipril to stroke-prone patients, because "administering ramipril to stroke-prone patients inevitably treats or prevents stroke." 677 F.3d at 1381. HOPE described "a large, simple randomized trial of … ramipril … and vitamin E … in the prevention of myocardial infarction, stroke, or cardiovascular death," which recruited "[o]ver

9000 [patients] at high risk for cardiovascular events such as myocardial infarction and stroke." Id. at 1378. Just as in the present case, "[t]he HOPE study ultimately found that patients receiving ramipril had a statistically 23 significant reduction in the risk of stroke, but these results were not published until after Montgomery's priority date." Id. at 1378

While the Federal Circuit acknowledged that the HOPE protocol "d[id] not disclose actual results," it highlighted the HOPE protocol's nature as "an advanced stage of testing designed to secure regulatory approval" and explained "[w]e have repeatedly held that '[n]ewly discovered results of known processes directed to the same purpose are not patentable because such results are inherent.'" Id. at 1381-83 (citation omitted). The court explained that "[i]t is well established that a patent may be secured, and typically is secured, before the conclusion of clinical trials," and invoked the MPEP, which states, "[i]f an applicant has initiated human clinical trials for a therapeutic product or process, [Patent & Trademark] Office personnel should presume that [] the applicant has established that the subject matter of that trial is reasonably predictive of having the asserted therapeutic utility." Id. at 1382-83 (quoting § 2107.03). NCT-236 is a fully enabled Phase 3 clinical trial summary that describes methods for administering ustekinumab to patients with moderately to severely active UC and monitoring their response, just as recited in the claims of the '307. Similarly, King Pharmaceuticals v. Eon Labs held that claims directed to methods of "increasing the bioavailability of metaxalone by administration of an oral dosage form with food" were anticipated because "the natural result of taking metaxalone with food is an increase in the bioavailability of the drug." 616 F.3d at 1270, 1275-1276 (Fed. Cir. 2010). While "prior art disclose[d] taking metaxalone with food, but not the natural result of this process," the claims were nevertheless anticipated as "[a]n increase in metaxalone's bioavailability is… an inherent aspect of the prior art." Id. at 1275-76. Other courts have followed this precedent. For example, in GlaxoSmithKline v. Glenmark Pharmaceuticals, USA, the district court held that claims directed to a method of using carvedilol to decrease mortality risk in congestive heart failure patients were anticipated by prior art which "summarized a planned 'multicentre trial' … 'to evaluate [the drug's] efficacy and safety,'" even though the results of the trial were unavailable before the priority date. 2017 WL 8944995, at *2, *18 (D. Del. May 2, 2017). The court found "if there are no actual differences in the treatment protocol when one is treating the symptoms of CHF versus when one is attempting to decrease a CHF patient's risk of mortality, then practicing the treatment protocol described in [the prior art] … will necessarily (or inherently) result in 'decreas[ing] [ ] the risk of mortality' in CHF patients." Id. at *14 (emphasis in original). In line with these decisions, the Federal Circuit in Schering Corporation v. Geneva Pharmaceuticals held that a patent covering DCL, an antihistamine compound, was inherently anticipated by a prior art compound, loratadine, becauseloratadine results in the creation of DCL in a patient's body after ingestion. 339 F.3d 1373, 1380- 1381 (Fed. Cir. 2003). The Federal Circuit held that it was irrelevant that "secret tests of loratadine before the critical date" were not prior art, because the

prior art "need only describe how to make DCL," and "disclose[d] administering loratadine to a patient." Id. The court explained "[a]nticipation does not require the actual creation or reduction to practice of the prior art subject matter; anticipation requires only an enabling disclosure." Id. at 1380.

While In re Montgomery stated that the results of the HOPE study "were not published until after Montgomery's priority date and thus are irrelevant to an anticipation analysis," 677 F.3d at 1378, subsequent Federal Circuit precedent makes 26 F.3d 1322, 1329-30 (Fed. Cir. 2020). Likewise, in Monsanto Technology v. E.I. DuPont de Nemours & Company, the Federal Circuit held that declarations that were not published may nevertheless be used in an anticipation analysis "in support of the prior art already of record" because "[i]t is well established that such reliance on extrinsic evidence is proper in an inherency analysis." 878 F.3d 1336, 1345 (Fed. Cir. 2018).

***6. Nonstatutory Double Patenting***

The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees. A nonstatutory double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on nonstatutory double patenting provided the reference application or patent either is shown to be commonly owned with the examined application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement. See MPEP § 717.02 for applications subject to examination under the first inventor to file provisions of the AIA as explained in MPEP § 2159. See MPEP § 2146 *et seq.* for applications not subject to examination under the first inventor to file provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

The filing of a terminal disclaimer by itself is not a complete reply to a nonstatutory double patenting (NSDP) rejection. A complete reply requires that the terminal disclaimer be accompanied by a reply requesting reconsideration of the prior Office action. Even where the NSDP rejection is provisional the reply must be complete. See MPEP § 804, subsection I.B.1. For a reply to a non-final Office action, see 37 CFR 1.111(a). For a reply to final Office action, see 37 CFR 1.113(c). A request for reconsideration while not provided for in 37 CFR 1.113(c) may be filed after final for consideration. See MPEP §§ 706.07(e) and 714.13.

The USPTO Internet website contains terminal disclaimer forms which may be used. Please visit www.uspto.gov/patent/patents-forms. The actual filing date of the application in which the form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or PTO/AIA/26) should be used. A

web-based eTerminal Disclaimer may be filled out completely online using web-screens. An eTerminal Disclaimer that meets all requirements is auto-processed and approved immediately upon submission. For more information about eTerminal Disclaimers, refer to www.uspto.gov/patents/apply/applying-online/eterminal-disclaimer.

Claims 1-19 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-34 of U.S. Patent No. 10,961,307 (16/580,509). Although the claims at issue are not identical, they are not patentably distinct from each other because both sets of claims are drawn to the same invention. Slight variation occurs, for example, in patent claim 6 and 7 regarding dosing and administration. However, these species would still render obvious the instant generic claims.

***7. Prior Art of Interest Not Relied Upon***

The following references, which were cited in parent application 16/580,509 (U.S. Patent No. 10,961,307), are provided below. However, they do not appear to teach any more than the prior art cited above under 35 USC 103.

A. Patent Application No. US2020/0262908 (Jones et al. - cited on 1449 submitted 10/24/23). Claims 384 and 387 teach the use of ustekinumab for the treatment of UC. However, claim 384 appears to be focused on an ingestible device for delivery of antibodies. No data has been presented in the '908 application which would make the instant claim limitations in, e.g. claim 1, anticipated, nor obvious. Furthermore, in the absence of any dosing data or discussion in the '908 specification, the Examiner cannot make the case that the (untaught) amount of ustekinumab would have the inherent effects (i.e. meeting the "endpoint" requirements of the instant claims.

B. Stelara® EMA (https://www.ema.europa.eu/en/medicines/human/EPAR/stelara). The "medicine overview" was first published 2/9/09 and the "product information" was first published 1/23/09. However, both have been updated to a date after the instant effective filing date. It is believed that the initial publications would meet the instant limitations regarding the use of Stelara®, including the therapeutic formulations, for UC.

***8. Conclusion***

No claim is allowable.

***Advisory information***

Any inquiry concerning this communication or earlier communications from the examiner should be directed to ROBERT S LANDSMAN whose telephone number is (571)272-0888. The examiner can normally be reached M-F 8 AM – 6 PM (eastern).

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Joanne Hama, can be reached at (571)272-2911. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

/ROBERT S LANDSMAN/
Primary Examiner, Art Unit 1647

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/383,310 | 10/24/2023 | Jewel Johanns | JBI6010USCNT1 | 4419 |

27777 7590 04/01/2025

DAVID A. LANE, JR.
JOHNSON & JOHNSON
ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, NJ 08933-7003

| EXAMINER | |
|---|---|
| LANDSMAN, ROBERT S | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1647 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 04/01/2025 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

IPIMManagem@ITS.JNJ.com
jnjuspatent@its.jnj.com
pair_jnj@firsttofile.com

| | | | | |
|---|---|---|---|---|
| ***Applicant-Initiated Interview Summary*** | **Application No.** 18/383,310 | **Applicant(s)** Johanns et al. | | |
| | **Examiner** ROBERT S LANDSMAN | **Art Unit** 1647 | **AIA (First Inventor to File) Status** Yes | **Page** **1 of 1** |

| **All Participants** (applicant, applicants representative, PTO personnel) | **Title** | **Type** |
|---|---|---|
| ROBERT S LANDSMAN | Primary Examiner | Telephonic |
| Eric Dichter | Attorney of Record | |

**Date of Interview:** 26 March 2025

**Issues Discussed:**

**35 U.S.C. 103**

Mr. Dichter requested clarification regarding the rejections under 35 USC 103. Essentially, the question revolved around the use of the ClinicalTrials.gov reference. This reference was also cited in the parent over similar claims and the parent has since been allowed. The Examiner indicated that the IPR raised points the Examiner wanted to add to the record via rejections. A phone interview is tentatively scheduled for Friday March 28, 2025 to further discuss these rejections. Otherwise, the interview will be attempted the following week. Agreement was not currently reached.

/ROBERT S LANDSMAN/
Primary Examiner, Art Unit 1647

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**
Please further see:
MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/383,310 | 10/24/2023 | Jewel Johanns | JBI6010USCNT1 | 4419 |

27777 7590 04/07/2025
DAVID A. LANE, JR.
JOHNSON & JOHNSON
ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, NJ 08933-7003

| EXAMINER |
|---|
| LANDSMAN, ROBERT S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1647 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 04/07/2025 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

IPIMManagem@ITS.JNJ.com
jnjuspatent@its.jnj.com
pair_jnj@firsttofile.com

| ***Examiner-Initiated Interview Summary*** | **Application No.** 18/383,310 | **Applicant(s)** Johanns et al. | | |
|---|---|---|---|---|
| | **Examiner** ROBERT S LANDSMAN | **Art Unit** 1647 | **AIA (First Inventor to File) Status** Yes | **Page** **1 of 2** |

| **All Participants** (applicant, applicants representative, PTO personnel) | **Title** | **Type** |
|---|---|---|
| ROBERT S LANDSMAN | Primary Examiner | Telephonic |
| Eric DIchter | Attorney of Record | |

**Date of Interview:** 01 April 2025

**Issues Discussed:**

**35 U.S.C. 103**

Applicants telephoned the Examiner on March 26, 2025 to inquire about the rejection under 35 USC 103 in the instant application in light of its withdrawal in the parent application, 16/580,509, which has similar claims and which issued as U.S. Patent No. 10,961,307.

A tentative interview was scheduled for March 26, 2025. However, this interview was postponed until April 1, 2025. The Examiner left a voicemail with Mr. Dichter summarizing/explaining the following -

In the parent application, Applicants amended the claims to add that the subject is a responder to treatment based on measurements of treatment responses. They argued that ClinicalTrials does not teach treating moderate to severe UC using the recited antibody wherein the subject is a responder to treatment based on achieving the claimed measure of response. Further discussion can be found in the prosecution history of the parent. However, a major point argued by Applicants is that ClinicalTrials results were posted after the instant effective filing date and that the uncertainty of clinical outcomes and the failure of numerous medicines to satisfy designated endpoints do not anticipate or render obvious the parent instant invention. The Examiner has considered this; however, upon further review of the ClinicalTrials reference.

The parent and instant applications use ustekinumab, which is taught in the ClinicalTrials reference. A further look at the reference (see the section with headers identified as "Outcome Measure" and " Measure Description") shows it teaches desired endpoints of clinical remission based on both the global definition and US definition which are identical to those recited in the instant claims.

While results may have been posted after the instant effective filing date, it appears that the parameters (global and US definitions of remission) were present prior. While uncertainty of clinical trials may be common, these were the desired endpoints of the Trial and it would have been expected that administering the same drug as the Trial would have produced essentially the same results. It is noted that, in the "Experimental: Induction Study - Ustekinumab 6 mg/kg Iv", "Participants will be randomized to receive ustekinumab approximating 6 mg/kg of body weight, as intravenous infusion at Week 0." These numbers fall into the range of mg/kg recited in instant claim 1.

Applicants are free to contact the Examiner to further discuss the issue.

| *Examiner-Initiated Interview Summary* | **Application No.** 18/383,310 | **Applicant(s)** Johanns et al. | | |
|---|---|---|---|---|
| | **Examiner** ROBERT S LANDSMAN | **Art Unit** 1647 | **AIA (First Inventor to File) Status** Yes | **Page** **2 of 2** |

| | /ROBERT S LANDSMAN/<br>Primary Examiner, Art Unit 1647 |
|---|---|

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**
Please further see:
MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing

**Applicant recordation instructions:** It is not necessary for applicant to provide a separate record of the substance of interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/383,310 | 10/24/2023 | Jewel Johanns | JBI6010USCNT1 | 4419 |

27777 7590 05/22/2025

DAVID A. LANE, JR.
JOHNSON & JOHNSON
ONE JOHNSON & JOHNSON PLAZA
NEW BRUNSWICK, NJ 08933-7003

| EXAMINER |
|---|
| LANDSMAN, ROBERT S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1647 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/22/2025 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

IPIMManagem@ITS.JNJ.com
jnjuspatent@its.jnj.com
pair_jnj@firsttofile.com

| *Applicant-Initiated Interview Summary* | **Application No.** 18/383,310 | **Applicant(s)** Johanns et al. | | |
|---|---|---|---|---|
| | **Examiner** ROBERT S LANDSMAN | **Art Unit** 1647 | **AIA (First Inventor to File) Status** Yes | **Page** 1 of 3 |

| **All Participants** (applicant, applicants representative, PTO personnel) | **Title** | **Type** |
|---|---|---|
| ROBERT S LANDSMAN | Primary Examiner | Telephonic |
| Eric Dichter | Attorney of Record | |

**Date of Interview:** 19 May 2025

**Issues Discussed:**

| ***Applicant-Initiated Interview Summary*** | **Application No.** 18/383,310 | **Applicant(s)** Johanns et al. | | |
|---|---|---|---|---|
| | **Examiner** ROBERT S LANDSMAN | **Art Unit** 1647 | **AIA (First Inventor to File) Status** Yes | **Page** 2 of 3 |

**35 U.S.C. 103**

Mr. Dichter contacted the Examiner on May 16, 2025 to discuss the rejections of record. The conversation focused on the ClinicalTrials.gov reference (primary reference). A detailed conversation was held via phone on May 19, 2025. Points raised by Mr. Dichter were provided to the Examiner's supervisor. Those points are as follows -

1. There was an IPR in this case over parents, of which some references/rationale was incorporated into the instant rejections.

2. Applicants argue that the primary reference does not have results. The Examiner agrees. The reference basically recite hypothetical endpoints which essentially recite the claimed limitations.

3. These endpoints were used in the rejections of record and a conclusion was drawn that stated it would have been obvious to have performed the invention given the fact that the endpoint are basically identical to Applicants' limitations. Applicants, argued that hypotheticals should not be relied upon.

4. Applicants stated that the claims have a regimen and that the subject needs to respond to the endpoints (again, differentiating from the hypothetical).

5. Applicants argue that the secondary references (cited on the IPR – Ox and Cunn) are just observations, but the endpoints are not clear and no placebo was used to compare effects.

6. Essentially, Applicants argue that the clinical post is not the protocol, nor a complete description of the trial, just a summary. The actual trial results do not get posted for a couple years (which is after Applicants' effective filing date).

To these points, the supervisor provided the following summarized feedback, which was read to Mr. Dichter on May 19. 2025 -

1. If the ClinicalTrials.gov printout showed the method steps were known at the time of filing, then it appears it would be prior art. The outcome of the results as recited in the claims would occur following the treatment regardless if you knew what they were.

2. If the outcome in the claims were different from what occurred in the prior art (or here, post-filing art), either a) something in the claimed method is missing or incorrect or b) the outcome is unexpected.

Mr. Dichter said he will consider these comments, which echo those in the rejections dated 1/16/25 and will follow up with the Examiner.

| Applicant-Initiated Interview Summary | Application No. 18/383,310 | Applicant(s) Johanns et al. | | |
|---|---|---|---|---|
| | Examiner ROBERT S LANDSMAN | Art Unit 1647 | AIA (First Inventor to File) Status Yes | Page 3 of 3 |

| | |
|---|---|
| | /ROBERT S LANDSMAN/<br>Primary Examiner, Art Unit 1647 |

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**
Please further see:
MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>18/383,310 | Filing Date<br>10/24/2023 | ☐ To be Mailed |
|---|---|---|---|

ENTITY: ☑ LARGE ☐ SMALL ☐ MICRO

## APPLICATION AS FILED - PART I

| FOR | (Column 1)<br>NUMBER FILED | (Column 2)<br>NUMBER EXTRA | | RATE ($) | FEE ($) |
|---|---|---|---|---|---|
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | | x $100 = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | | x $480 = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | | TOTAL | |

## APPLICATION AS AMENDED - PART II

| | | (Column 1) | | (Column 2) | (Column 3) | | | |
|---|---|---|---|---|---|---|---|---|
| AMENDMENT | 07/16/2025 | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 19 | Minus | ** 20 | = 0 | | x $200 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 3 | = 0 | | x $600 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | |
| | | | | | | | TOTAL ADD'L FEE | 0 |

| | | (Column 1) | | (Column 2) | (Column 3) | | | |
|---|---|---|---|---|---|---|---|---|
| AMENDMENT | | CLAIMS REMAINING AFTER AMENDMENT | | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | | x $0 = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | | x $0 = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | |
| | | | | | | | TOTAL ADD'L FEE | |

| | |
|---|---|
| * If the entry in column 1 is less than the entry in column 2, write "0" in column 3. | LIE |
| ** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20". | /CHRISTINE V MOORE/ |
| *** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3". | |
| The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1. | |

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

UNITED STATES PATENT AND TRADEMARK OFFICE

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **18/383,310** | **07/16/2025 04:44:09 PM Z ET** | **JBI6010USCNT1** |

## Title of Invention

Safe and Effective Method of Treating Ulcerative Colitis with Anti-IL12/IL23 Antibody

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 4419 | FILED BY | Christine Kochmann |
| PATENT CENTER # | 71401351 | FILING DATE | 10/24/2023 |
| CUSTOMER # | 27777 | FIRST NAMED INVENTOR | Jewel Johanns |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Eric Dichter |

## Documents

**TOTAL DOCUMENTS: 2**

| DOCUMENT | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|
| JBI6010USCNT1 Signed Response to OA of January 16 2025 Final 071625 CPDF.pdf | 11 | Amendment/Request for Reconsideration-After Non-Final Rejection | 104 KB |
| JNI6010USCNT1 Terminal Disclaimer.pdf | 2 | Claims | 170 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| JBI6010USCNT1 Signed Response to OA of January 16 2025 Final 071625 CPDF.pdf | A617DB1CD3CE3992BAD45AC6377881F780623F08ACD16FF2376BEE62A68BCC50648C51CCDF0DB72452E62E17AC687BE0A28DDE6D3DF00D8A81381A9232E1194D |

| | |
|---|---|
| JNI6010USCNT1 Terminal Disclaimer.pdf | E0EFF3ED9424027381E2F0538E51379E585422608A81DC3A59D52A30453793FA6AF246A4280943A2F74CEE03507BCBE565C91A55A5882408C37D7098838D66E6 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

PTO/AIA/26 (04-14)
Approved for use through 11/30/2027. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) JBI6010USCNT1 |
|---|---|

In re Application of: Janssen Biotech, Inc.

Application No.: 18/383,310

Filed: October 24, 2023

For: Safe and Effective Method of Treating Ulcerative Colitis with Anti-IL12/IL23 Antibody

The applicant, Janssen Biotech, Inc., owner of 100 percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of **prior patent** No. 10,961,307 as the term of said **prior patent** is presently shortened by any terminal disclaimer. The applicant hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the applicant does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:

expires for failure to pay a maintenance fee;
is held unenforceable;
is found invalid by a court of competent jurisdiction;
is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
has all claims canceled by a reexamination certificate;
is reissued; or
is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. ☐ The undersigned is the applicant. If the applicant is an assignee, the undersigned is authorized to act on behalf of the assignee.

I hereby acknowledge that any willful false statements made are punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

2. ☑ The undersigned is an attorney or agent of record. Reg. No. 41,708

/Eric Dichter/ — Signature
July 16, 2025 — Date

Eric Dicher — Typed or printed name

Attorney for Applicant — Title
(215) 628-7966 — Telephone Number

☑ Terminal disclaimer fee under 37 CFR 1.20(d) included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **If filing this completed form by mail, send to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013), https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf.

Routine uses of the information in this record may include disclosure to: 1) law enforcement, in the event that the system of records indicates a violation or potential violation of law; 2) a federal, state, local, or international agency, in response to its request; 3) a contractor of the USPTO having need for the information in order to perform a contract; 4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record; 5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record; 6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations; 7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals; 8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)); 9) the Office of Personnel Management (OPM) for personnel research purposes; and 10) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.

UNITED STATES
PATENT AND TRADEMARK OFFICE

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC PAYMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **18/383,310** | **07/16/2025 04:44:09 PM Z ET** | **JBI6010USCNT1** |

## Title of Invention

Safe and Effective Method of Treating Ulcerative Colitis with Anti-IL12/IL23 Antibody

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | - |
| CONFIRMATION # | 4419 | FILED BY | Christine Kochmann |
| PATENT CENTER # | 71401351 | AUTHORIZED BY | Eric Dichter |
| CUSTOMER # | 27777 | FILING DATE | 10/24/2023 |
| CORRESPONDENCE ADDRESS | - | FIRST NAMED INVENTOR | Jewel Johanns |

## Payment Information

| PAYMENT METHOD | PAYMENT TRANSACTION ID | PAYMENT AUTHORIZED BY |
|---|---|---|
| **DA / 100750** | **E20257FG44336715** | **Christine Kochmann** |

**PRE-AUTHORIZED ACCOUNT**

**100750**

**PRE-AUTHORIZED CATEGORY**

**37 CFR 1.16 (National application filing, search, and examination fees); 37 CFR 1.17 (Patent application and reexamination processing fees); 37 CFR 1.19 (Document supply fees); 37 CFR 1.20 (Post Issuance fees); 37 CFR 1.21 (Miscellaneous fees and charges)**

| FEE CODE | DESCRIPTION | ITEM PRICE($) | QUANTITY | ITEM TOTAL($) |
|---|---|---|---|---|
| 1814 | STATUTORY DISCLAIMER, INCLUDING TERMINAL DISCLAIMER | 183.00 | 1 | 183.00 |
| 1253 | EXTENSION FOR RESPONSE WITHIN THIRD MONTH, EXCEPT PROVISIONAL APPLICATIONS | 1590.00 | 1 | 1590.00 |
| | | | **TOTAL AMOUNT:** | **$1,773.00** |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized

by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | | |
|---|---|---|---|
| Applicant | : | Johanns et al. | Confirmation Number: 4419 |
| Serial No. | : | 18/383,310 | Art Unit: 1647 |
| Filed | : | 24 October 2023 | Examiner: LANDSMAN, ROBERT |
| Title | : | SAFE AND EFFECTIVE METHOD OF TREATING ULCERATIVE COLITIS WITH ANTI-IL12/IL23 ANTIBODY | |

## AMENDMENT AND RESPONSE TO OFFICE COMMUNICATION

This paper is a response to the Office Communication dated 16 January 2025. A three-month extension of time is being filed concurrently herewith. A general authorization is hereby given to deduct any fees that may be required by this paper, or any future reply, to Deposit Account 10-0750/JBI6010USCNT1/ED in the name of Johnson & Johnson.

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 7 of this paper.

**CERTIFICATE OF EFS TRANSMISSION**

I hereby certify that this paper (along with any paper referred to as being attached or enclosed): is being transmitted to the United States Patent and Trademark Office on the date shown below via the "Electronic Filing System" in accordance with 37 C.F.R. § 1.6(a)(4)

| Christine A. Kochmann | /Christine A. Kochmann/ | July 16 2025 |
|---|---|---|
| Type or print name | Signature | Date |

**AMENDMENTS TO THE CLAIMS**

The following is a complete, marked-up listing of revised claims with a status identifier in parenthesis, underlined text indicating insertions, and strike-through and/or double-bracketed text indicating deletions. This listing of claims will replace all prior versions and listings of claims in the application:

What is claimed:

1. (Currently Amended) A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising:
(a) at week 0 of the treatment, intravenously administering to the subject an anti-IL-12/IL-23p40 antibody at a dosage of (1) 260 mg if the subject weighs ≤55 kg, (2) 390 mg if the subject weighs >55 kg and ≤85 kg, or (3) 520 mg if the subject weighs >85 kg; and
(b) at week 8 of the treatment and further in a maintenance regimen of every 8 weeks or 12 weeks thereafter, subcutaneously administering to the subject the antibody at a dosage of 90 mg, wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1, a CDRH2 amino acid sequence of SEQ ID NO:2, and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4, a CDRL2 amino acid sequence of SEQ ID NO:5, and a CDRL3 amino acid sequence of SEQ ID NO:6, and wherein after treatment, the subject is a responder by at least one measure of response selected from the group consisting of: (i) having a clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1, (ii) having an endoscopic healing with a Mayo endoscopy subscore of 0 or 1, (iii) achieving a clinical response based on the Mayo endoscopy subscore, (iv) having improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score, (v) having a mucosal healing, (vi) having a decrease from baseline in Mayo score, and (vii) in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1, wherein the

subject had previously failed an anti-TNF and vedolizumab and/or, prior to week 0 of the treatment, had a duration of disease of at least 6 years.

2. (Original) The method of claim 1, wherein after treatment, the subject is a responder by at least one measure of response selected from the group consisting of: (i) having an endoscopic healing with a Mayo endoscopy subscore of 0 or 1, (ii) achieving a clinical response based on the Mayo endoscopy subscore, (iii) having improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score, (iv) having a mucosal healing, (v) having a decrease from baseline in Mayo score, and (vi) in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1.

3. (Original) The method of claim 1, wherein after treatment, the subject is in corticosteroid-free clinical remission at least 44 weeks after week 0.

4. (Original) The method of claim 1, wherein the subject achieves a clinical remission based on at least one of the global definition and the US definition by week 16 of the treatment, and further the clinical remission continues at least 44 weeks after week 0.

5. (Original) The method of claim 1, wherein the subject had previously failed or was intolerant of at least one therapy selected from the group consisting of an anti-TNF, vedolizumab, corticosteroids, azathioprine (AZA), and 6 mercaptopurine (6 MP), or the subject had demonstrated corticosteroid dependence.

6. (Original) The method of claim 5, wherein the subject had previously demonstrated corticosteroid dependence, and after treatment the subject is in corticosteroid-free clinical remission at least 44 weeks after week 0.

7. (Original) The method of claim 1, wherein the antibody comprises a heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and a light chain variable region of the amino acid sequence of SEQ ID NO:8.

8. (Original) The method of claim 1, wherein the antibody comprises a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.

9. (Original) The method of claim 1, wherein:

in (a), the antibody is in a first pharmaceutical composition comprising 10 mM L-histidine, 8.5% (w/v) sucrose, 0.04% (w/v) polysorbate 80, 0.4 mg/mL L-methionine, and 20 μg/mL EDTA disodium salt, dehydrate, at pH 6.0; or

in (b) the antibody is in a second pharmaceutical composition comprising 6.7 mM L-histidine, 7.6% (w/v) sucrose, 0.004% (w/v) polysorbate 80, at pH 6.0.

10. (Original) The method of claim 1, wherein:
in (a), the antibody is in a first pharmaceutical composition comprising 10 mM L-histidine, 8.5% (w/v) sucrose, 0.04% (w/v) polysorbate 80, 0.4 mg/mL L-methionine, and 20 μg/mL EDTA disodium salt, dehydrate, at pH 6.0; and
in (b) the antibody is in a second pharmaceutical composition comprising 6.7 mM L-histidine, 7.6% (w/v) sucrose, 0.004% (w/v) polysorbate 80, at pH 6.0.

11. (Currently Amended) A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising:
(a) at week 0 of the treatment, intravenously administering to the subject an anti-IL-12/IL-23p40 antibody at a dosage of (1) 260 mg if the subject weighs ≤55 kg, (2) 390 mg if the subject weighs >55 kg and ≤85 kg, or (3) 520 mg if the subject weighs >85 kg; and
(b) at week 8 of the treatment and further in a maintenance regimen of every 8 weeks or 12 weeks thereafter, subcutaneously administering to the subject the antibody at a dosage of 90 mg, wherein the antibody comprises a heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and a light chain variable region of the amino acid sequence of SEQ ID NO:8, and wherein after treatment, the subject is in corticosteroid-free clinical remission at least 44 weeks after week 0<u>, wherein the subject had previously failed an anti-TNF and vedolizumab and/or, prior to week 0 of the treatment, had a duration of disease of at least 6 years</u>.

12. (Original) The method of claim 11, wherein the subject archives a clinical remission based on at least one of the global definition and the US definition by week 16 of the treatment, and further the clinical remission continues at least 44 weeks after week 0.

13. (Original) The method of claim 11, wherein the subject had previously failed or was intolerant of at least one therapy selected from the group consisting of an anti-TNF, vedolizumab, corticosteroids, azathioprine (AZA), and 6 mercaptopurine (6 MP), or the subject had demonstrated corticosteroid dependence.

14. (Original) The method of claim 13, wherein the subject had demonstrated corticosteroid dependence, and after treatment the subject is in corticosteroid-free clinical remission at least 44 weeks after week 0.

15. (Original) The method of claim 11, wherein the antibody comprises a heavy chain of the amino acid sequence of SEQ ID NO:10 and a light chain of the amino acid sequence of SEQ ID NO:11.

16. (Original) The method of claim 11, wherein:
in (a), the antibody is in a first pharmaceutical composition comprising 10 mM L-histidine, 8.5% (w/v) sucrose, 0.04% (w/v) polysorbate 80, 0.4 mg/mL L-methionine, and 20 μg/mL EDTA disodium salt, dehydrate, at pH 6.0; or
in (b) the antibody is in a second pharmaceutical composition comprising 6.7 mM L-histidine, 7.6% (w/v) sucrose, 0.004% (w/v) polysorbate 80, at pH 6.0.

17. (Original) The method of claim 11, wherein:
in (a), the antibody is in a first pharmaceutical composition comprising 10 mM L-histidine, 8.5% (w/v) sucrose, 0.04% (w/v) polysorbate 80, 0.4 mg/mL L-methionine, and 20 μg/mL EDTA disodium salt, dehydrate, at pH 6.0; and
in (b) the antibody is in a second pharmaceutical composition comprising 6.7 mM L-histidine, 7.6% (w/v) sucrose, 0.004% (w/v) polysorbate 80, at pH 6.0.

18. (Currently Amended) A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof, comprising:

(a) at week 0 of the treatment, intravenously administering to the subject an anti-IL-12/IL-23p40 antibody at a dosage of (1) 260 mg if the subject weighs ≤55 kg, (2) 390 mg if the subject weighs >55 kg and ≤85 kg, or (3) 520 mg if the subject weighs >85 kg; and
(b) at week 8 of the treatment and further in a maintenance regimen of every 8 weeks thereafter,

subcutaneously administering to the subject the antibody at a dosage of 90 mg,

wherein the antibody comprises a heavy chain variable region of the amino acid sequence of SEQ ID NO:7 and a light chain variable region of the amino acid sequence of SEQ ID NO:8, and wherein after treatment, the subject is a responder by at least one measure of response selected from the group consisting of: (i) having a clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1, (ii) having an endoscopic healing with a Mayo endoscopy subscore of 0 or 1, (iii) achieving a clinical response based on the Mayo endoscopy subscore, (iv) having improvements from baseline in Inflammatory Bowel Disease Questionnaire (IBDQ) score, (v) having a mucosal healing, (vi) having a decrease from baseline in Mayo score, and (vii) in clinical response as determined by a decrease from baseline in the Mayo score by ≥30% and ≥3 points and a decrease from baseline in the rectal bleeding subscore ≥1 points or a rectal bleeding subscore of 0 or 1, wherein the subject had previously failed an anti-TNF and vedolizumab and/or, prior to week 0 of the treatment, had a duration of disease of at least 6 years.

19. (Original) The method of claim 18, wherein after treatment, the subject is in corticosteroid-free clinical remission at least 44 weeks after week 0.

## REMARKS

Claims 1-19 are pending in the application and stand rejected. Claims 1, 11 and 18 have been amended. Support for the amendments can be found in the originally filed application (specifically, from page 79, line 22, to page 80, line 2) and claims. No new matter has been added. All changes to the claims are made without prejudice and Applicant reserves the right to pursue at a later date any and all of the cancelled subject matter supported by the disclosure of the application. Entry of the claim amendments is respectfully requested.

## Examiner Interviews

Applicant acknowledges with appreciation the interviews granted by Examiner Landsman on March 26, 2025, April 1, 2025 and May 19, 2025, during which the pending rejections and subject matter of the claims were discussed. No agreements were reached during those interviews.

## Rejections Under 35 U.S.C § 103

Claims 1-19 stand rejected under 35 U.S.C. § 103, as allegedly being unpatentable over ClinicalTrials.gov Identifier: NCT02407236 ("NCT-236"). In response, Applicant respectfully submits that the claims as examined are not obvious over NCT-236 as NCT-236 does not disclose nor suggest the subject matter of claims 1-19 for the reasons set forth below.

At a threshold level, NCT-236 does not disclose or suggest that "wherein after treatment [with the anti-IL-12/IL-23p40 antibody], the subject is a responder by at least one measure of response selected from the group consisting of …." NCT-236 merely summarizes certain elements of a clinical trial without disclosing any results of the trial. It is well-established that the results of clinical trials are uncertain and, thus, the requirement to run clinical trials for new therapies to be approved. In this regard, achieving desired clinical endpoints in clinical trials is far from certain. NCT-236 describes a mere summary of endpoints to be measured without a detailed clinical protocol; this content does not provide any reasonable certainty that the trial will achieve these endpoints.

There are many examples of clinical trials that fail to meet the efficacy limitations that are being described in their clinical trial posting. See, e.g., the following articles describing the failure of different drugs during the clinical trials designed to test the specific efficacies disclosed in the clinical trial posting: (1) Tradipitant being tested in gastroparesis failed a Phase III clinical

trial looking to reduce nausea symptoms against placebo, as the drug failed to beat out placebo in reducing the patients' symptoms (https://endpts.com/vandas-gastric-drug-flops-in-late-stage-test-crashing-the-biotechs-stock/); (2) amcenestrant failed the AMEERA-3 trial by not meeting the primary endpoint of improving progression-free survival over an endocrine treatment of a physician's choice (https://endpts.com/sanofis-first-big-trial-for-top-cancer-drug-ends-in-setback/); (3) TNX-102 failed the final analysis of a Phase III clinical trial by missing statistical significance over placebo for a primary endpoint of reduction in daily pain (https://endpts.com/tonixs-lead-drugfails-phiii-again-sending-stock-even-closer-to-zero/); and (4) rilzabrutinib failed a clinical trial for pemphigus by failing to outperform a placebo in spurring complete remission of the skin lesions caused by the disease (https://endpts.com/a-top-pick-in-paul-hudsons-campaign-torevive-the-pipeline-at-sanofi-blows-up-in-phiii/). These are just a few examples of the many clinical trials that fail due to not reaching an efficacy limitation disclosed in the clinical trial posting.

In addition, the rejection relies on *In re Montgomery*, 677 F.3d 1375 (Fed. Cir. 2012) for the proposition that a clinical trial summary can inherently anticipate claims directed to a method of treatment. The reliance on *In re Montgomery* is misplaced in this instance as it does not support the principle that a clinical trial posting inherently discloses specific patient responses as recited in the present claims (e.g., "having a clinical remission based on at least one of the global definition of clinical remission with Mayo score ≤2 points with no individual subscore >1 and the US definition of clinical remission with absolute stool number ≤3, rectal bleeding subscore of 0 and Mayo endoscopy subscore of 0 or 1"). *In re Montgomery* merely acknowledged that "a result is only inherent if it inevitably flows from the prior art disclosure," but found inherency because it determined that practicing the prior art, "treating stroke-prone patients with ramipril," would "inevitably" lead to the claimed result, "reducing the risk of stroke." *Id.* at 1381-82. Essentially, it indicated that every patient taking ramipril would have a reduced risk of stroke, even if some of them eventually had a stroke.

In contrast, the present claims recite specific efficacy limitations that do not necessarily result from practicing NCT-236. Accordingly, the claims are not rendered obvious by NCT-236 and withdrawal of this rejection is respectfully requested. Further supporting the lack of inherency are the clinical results themselves, as not all ulcerative colitis patients treated in the

placebo-controlled clinical trial described in the present application meet the recited clinical endpoints (e.g., see page 80, lines 20-24, demonstrating that 43.8% and 38.4% of patients were in clinical remission according to global definition at Week 44 of maintenance (52 weeks after initial dose)).

Applicant further submits that claims 1, 11 and 18 have been amended to more clearly define the invention and not in acquiescence to the grounds for rejection. The claims, as amended, recite additional features that are not disclosed nor suggested by NCT-236, i.e., that “a subject had previously failed an anti-TNF and vedolizumab and/or, prior to week 0 of the treatment, had a duration of disease of at least 6 years.” The amendments are supported by the specification (as described in detail above in the initial paragraph of the Remarks) and no new matter has been added.

Claims 9 and 10 stand rejected under 35 U.S.C. § 103, as allegedly being unpatentable over NCT-236 in view of "Stelara label 761044lbl." In response, Applicant respectfully submits that the subject matter of claims 9 and 10 is not disclosed nor suggested by NCT-236 in view of Stelara label 761044lbl for the reasons set forth above traversing the rejection of claims 1-19 under 35 U.S.C. § 103 over NCT-236. The teachings of Stelara label 761044lbl do not remedy these deficiencies as it does not disclose or suggest treatment of ulcerative colitis.

Claims 1-19 stand rejected under 35 U.S.C. § 103, as allegedly being unpatentable over NCT-236 in view of Ochsenkühn and further in view of Stelara label 761044lbl. In response, Applicant respectfully submits that the subject matter of claims 1-19 is not disclosed nor suggested by NCT-236 in view of Ochsenkühn and further in view of Stelara label 761044lbl for the reasons set forth above traversing the rejection of claims 1-19 under 35 U.S.C. § 103 over NCT-236 alone. The teachings of Ochsenkühn and Stelara label 761044lbl do not remedy these deficiencies.

In particular, Ochsenkühn is merely a retrospective analysis of ulcerative colitis patients treated with ustekinumab. Ochsenkühn does not describe a placebo-controlled, appropriately powered clinical study measuring the endpoints recited in the claims. Accordingly, Ochsenkühn does not describe the claimed endpoints, nor does it provide a reasonable expectation of success for achieving these specific endpoints nor at the time points recited in the present claims. As described in more detail below, the so called “responders” reported by Ochsenkühn do not have

predictive value in whether a subject treated with ustekinumab would satisfy the ulcerative colitis endpoints recited in the claims.

Ulcerative colitis is a relapsing and remitting disease that is increasing in incidence and prevalence. The treatment goal is to achieve prompt symptom amelioration and heal the disease. Periods of remission can last for months or years. Nevertheless, patients often relapse into disease symptoms (see, page 2 of the specification, lines 3-5 in the Background of the Invention section). Accordingly, without a sufficiently powered, controlled clinical study, it is difficult to determine whether the period of remission is due to treatment or due to the natural cycle of the disease or any other reason, including the placebo effect. Concern about the placebo effect is particularly pronounced because Ochsenkühn informed his patients that "surgical removal of their colon" was the "only other option."

In addition, Ochsenkühn's anecdotal observations do not describe a patient population that would provide predictability in whether a subject with "moderately to severely active ulcerative colitis" would respond to ustekinumab treatment and meet the endpoints required by the claims. In fact, 6 of the 17 subjects described by Ochsenkühn were already in clinical remission before being administered ustekinumab. One of ordinary skill in the art would not be able to consider these 6 subjects in evaluating whether ustekinumab effectively treated their ulcerative colitis.

Additionally, Ochsenkühn used a different standard to measure the clinical remission endpoint, i.e., the modified Truelove and Witts colitis activity index (also referred to as the Lichtiger index), while the present invention uses the Mayo score. None of the observed patients described by Ochsenkühn had "severely active ulcerative colitis" and many would not be considered to have "moderately to severely active ulcerative colitis." Ochsenkühn reports patients having a score of 1-11 at the beginning of treatment. A score of 11 using the Lichtiger index qualifies as "moderate" ulcerative colitis, which is commonly defined as patients having a score of 9-14. Scores of greater than 14 more commonly qualify as severe, and Ochsenkühn reports no patients having scores indicative of "severe" or "severely active" ulcerative colitis. Because the median score at the start of therapy described by Ochsenkühn was 8, one of ordinary skill in the art would understand that many of the 17 subjects were either in remission or only had mild ulcerative colitis at the beginning of therapy.

The claims, as amended, recite additional features (described in detail above) that are not disclosed nor suggested by Ochsenkühn or Stelara label 760144lbl. Accordingly, the combination teachings of NCT-236, Ochsenkühn and Stelara label 761044lbl do not render obvious the subject matter of claims 1-19 and withdrawal of these rejections is respectfully requested.

## **Double Patenting**

Claims 1-19 stand provisionally rejected on the grounds of nonstatutory double patenting as allegedly being unpatentable over claims 1-34 of U.S. Patent No. 10.961,307. In response, Applicant files herewith a terminal disclaimer over U.S. Patent No. 10.961,307 and withdrawal of this rejection is respectfully requested.

Applicant submits that the claims are in condition for allowance and, if the Examiner does not agree, hereby requests an interview on the merits before issuing any additional written rejection. The Examiner is invited to contact the undersigned for any matters related to this application.

Respectfully submitted,

/Eric Dichter/

Eric Dichter
Attorney for Applicant
Reg. No. 41,708

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933-7003
Telephone: 215-628-7966
Date: 16 July 2025

| *Application Number* | Application/Control No. | Applicant(s)/Patent under Reexamination | |
|---|---|---|---|
| * 18/383,310 * | 18/383,310 | Johanns et al. | |
| | **Examiner** LANDSMAN, ROBERT S | **Art Unit** 1647 | |

| **Document Code - DISQ** | **Internal Document - DO NOT MAIL** |
|---|---|

| **TERMINAL DISCLAIMER** | ☑ APPROVED | ☐ DISAPPROVED |
|---|---|---|
| **Date Filed: 16 July 2025** | **This patent is subject to a Terminal Disclaimer** | |

**Approved/Disapproved by:**

/TRINA STEPTOE/

**Technology Center: OPLC**

**Telephone: (571)272-2577**