# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| CareFirst of Maryland, Inc., et al.<br><br>Plaintiffs,<br><br>v.<br><br>Johnson & Johnson and Janssen Biotech, Inc.,<br><br>Defendants. | Case No. 2:23-cv-00629-JKW-LRL |

## EXPERT DECLARATION OF BYRON CRYER, M.D.

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Executed on: Apr 24, 2025

Byron Cryer, M.D.

      treatment of adult subjects with moderately to severely active Crohn's disease (the first approval for Crohn's disease was received on 11 Nov. 2016), moderate to severe plaque psoriasis, or active psoriatic arthritis, as well as for pediatric subjects (12 to 17 years old) with moderate to severe plaque psoriasis.

'307 patent, column 2, lines 38-61.

63. The '307 patent also discloses that ustekinumab showed preliminary effectiveness in Crohn's disease in two "clinical studies CRD3001 and CRD3002." '307 patent, columns 2-3, lines 62-12. The patent states that "[i]n both studies, ustekinumab demonstrated clinically significant efficacy compared with placebo." '307 patent, columns 2-3, lines 62-12. It then states that "[p]rior to the present invention, no studies had been conducted with ustekinumab for UC." '307 patent, column 3, lines 12-14.

64. A person of ordinary skill in the art would understand that the phrase "no studies" in the patent refers to there not being any prior clinical studies, i.e., controlled clinical trials, testing ustekinumab as a treatment for ulcerative colitis. The prior paragraph discussing the Crohn's disease clinical studies refers to them as "studies." '307 patent, column 3, lines 9-12. Given this, it is clear to a person of ordinary skill in the art that the statement "no studies had been conducted with ustekinumab for UC" refers to the absence of a properly controlled clinical study. Prior to the UNIFI trial conducted by J&J and described in the patent, there had not been such a study for ustekinumab as a treatment for UC.

65. The paragraph which follows this statement notes that the "present application relates to *clinically proven* safe and *clinically proven* effective methods and compositions for treatment of moderately to severely active ulcerative colitis (UC)." This further supports my opinion that the term "studies" as used in column 3 refers to "clinical studies" because it suggests that the inventors attempted to address the issue of "no studies" by initiating a clinical study.

20

The Examples of the '307 patent also repeatedly refer to clinical studies as "study" or "studies." '307 patent, Examples 1-2.

66. The '307 patent then provides data in its Examples describing the results of the UNIFI Phase III clinical trial conducted by J&J. That trial tested ustekinumab as a treatment for moderate to severely active ulcerative colitis.

67. Example 1 of the '307 is entitled "Induction Study of Ustekinumab in the Treatment of Ulcerative Colitis in Humans." '307 patent, column 42, lines 12-15. This Example describes the induction part of the UNIFI Phase III clinical trial where patients were administered an intravenous dose of ustekinumab. The example discloses a "multicenter, randomized, double-blind, placebo-controlled, clinical study" in patients with "moderately to severely active ulcerative colitis." '307 patent, column 42, lines 17-20. In the induction study, J&J assessed "the efficacy of intravenous (IV) administration of ustekinumab" in patients who demonstrated inadequate response or failure to tolerate other therapies. '307 patent, column 42, lines 26-36. Subjects in the study received a single 130 mg, a single 6 mg/kg IV dose, or placebo at Week 0. Subjects who did not have any clinical response after 8 weeks received an additional IV dose or a subcutaneous dose at week 8. '307 patent, column 42, lines 33-36. The IV portion of the trial had 971 subjects in total (642 on one of the two IV doses and 319 on the placebo). '307 patent, Table 1.

68. Example 1 describes how efficacy evaluations were made and refers to specific clinical endpoints based on the Mayo score, partial Mayo score, Mayo endoscopy subscores, mucosal healing, and responses to the Inflammatory Bowel Disease Questionnaire (IBDQ). '307 patent, column 44, lines 16-60. Many of these endpoints align with the clinical endpoints

21

claimed in the claims of the '307 patent. '307 patent, column 44, lines 16-60; '307 patent, claim 1.

69. The safety results of the study show that intravenous ustekinumab was well-tolerated and safe:

> Intravenous ustekinumab doses of both ~6 mg/kg and 130 mg were generally well-tolerated with a safety profile that was generally comparable with placebo through Week 8.0f the 960 subjects in the safety analysis set, 1 or more treatment-emergent AEs was reported through Week 8 for 50.0%, 41.4%, and 48.0% of subjects in the ˜6 mg/kg, 130 mg, and placebo groups, respectively. Through Week 8, serious adverse effects (SAEs) were reported for 3.1%, 3.7%, and 6.6% of subjects in the ~6 mg/kg, 130 mg, and placebo groups, respectively. AEs within 1 hour of infusion were 0.9%, 2.2%, and 1.9% in the ~6 mg/kg, 130 mg, and placebo groups, respectively. The proportions of subjects with 1 or more infections were 15.3%, 15.9%, and 15.0% in the ~6 mg/kg, 130 mg, and placebo groups, respectively. Serious infections were reported for 0.3%, 0.6%, and 1.3% of subjects in the ~6 mg/kg, 130 mg, and placebo groups, respectively.

'307 patent, columns 44-45, lines 62-11.

70. The efficacy results showed statistically significantly greater proportions of subjects in the ustekinumab groups achieving clinical remission, endoscopic healing, clinical response, than the placebo group. '307 patent, columns 46-47, lines 7-48. These results are illustrated in Tables 1 through 4 of the '307 patent:

TABLE 1

Number of Subjects in Clinical Remission (Global Definition) at Week 8

|  | Placebo IV | Ustekinumab IV | | |
|---|---|---|---|---|
|  |  | 130 mg | 6 mg/kg | Combined |
| Primary Efficacy Analysis Set | 319 | 320 | 322 | 642 |
| Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical remission | 17 (5.3%) | 50 (15.6%) | 50 (15.5%) | 100 (15.6%) |
| Adjusted Treatment difference |  | 10.3 | 10.2 | 10.2 |
| (97.5% CI) |  | (5.7, 14.9) | (5.6, 14.8) | (6.6, 13.9) |
| p-value |  | <0.001 | <0.001 | <0.001 |

N = number of subjects; CI = confidence interval

Table 1 shows that 15.5% and 15.6% of subjects in the ustekinumab groups achieved clinical remission as compared to only 5.3% in the placebo group. The low p-value shows that these results are statistically significant.

TABLE 2

Number of Subjects in Clinical Remission (US Definition) at Week 8

|  | Placebo IV | Ustekinumab IV | | |
|---|---|---|---|---|
|  |  | 130 mg | 6 mg/kg | Combined |
| Primary Efficacy Analysis Set | 319 | 320 | 322 | 642 |
| Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical remission | 20 (6.3%) | 53 (16.6%) | 61 (18.9%) | 114 (17.8%) |
| Adjusted Treatment difference |  | 10.3 | 12.7 | 11.5 |
| (97.5% CI) |  | (4.8, 15.8) | (7.0, 18.4) | (7.0, 16) |
| p-value |  | <0.001 | <0.001 | <0.001 |

N = number of subjects; CI = confidence interval

23

Table 2 shows that 18.9% and 16.6% of subjects in the ustekinumab groups achieved clinical remission under the U.S. definition as compared to only 6.3% in the placebo group. The low p-value shows that these results are statistically significant.

TABLE 3

| | Placebo | Ustekinumab IV | | |
|---|---|---|---|---|
| | IV | 130 mg | 6 mg/kg | Combined |
| Primary Efficacy Analysis Set Week 8 (N) | 319 | 320 | 322 | 642 |
| | 319 | 320 | 322 | 642 |
| Subjects with endoscopic healing | 44 (13.8%) | 84 (26.3%) | 87 (27.0%) | 171 (26.6%) |
| Adjusted Treatment difference | | 12.4 | 13.3 | 12.8 |
| (95% CI) | | (6.5, 18.4) | (7.3, 19.3) | (7.9, 17.8) |
| (97.5% CI) | | (5.2, 19.2) | (6.4, 20.1) | (7.2, 18.5) |
| p-value | | <0.001 | <0.001 | <0.001 |

N = number of subjects;
CI = confidence interval

Table 3 shows that 27% and 26.3% of subjects in the ustekinumab groups achieved endoscopic healing as compared to only 13.8% in the placebo group. The low p-value shows that these results are statistically significant.

24

**TABLE 4**

| | | Ustekinumab IV | | |
|---|---|---|---|---|
| | Placebo IV | 130 mg | 6 mg/kg | Combined |
| Primary Efficacy Analysis Set Week 8 (N) | 319 | 320 | 322 | 642 |
| Subjects in clinical response | 100 (31.3%) | 164 (51.3%) | 199 (61.8%) | 363 (56.5%) |
| Adjusted Treatment difference | | 19.9 | 30.5 | 25.2 |
| (95% CI) | | (12.8, 27.3) | (23.2, 37.8) | (18.9, 31.5) |
| (97.5% CI) | | (11.4, 28.3) | (22.2, 38.8) | (18.0, 32.4) |
| p-value | | <0.001 | <0.001 | <0.001 |

N = number of subjects;
CI = confidence interval

Table 4 shows that 61.8% and 51.3% of subjects in the ustekinumab groups had a clinical response as compared to only 31.3% in the placebo group. The low p-value shows that these results are statistically significant.

71. Example 1 also notes that, at week 8, the median improvements from baseline in IBDQ scores were "significantly greater" in the ustekinumab groups than in placebo. '307 patent, columns 47-48.

72. Example 2 of the '307 is entitled "Maintenance Study of Ustekinumab in the Treatment of Ulcerative Colitis in Humans." '307 patent, column 49, lines 57-60. This Example describes the maintenance part of the UNIFI Phase III clinical trial where patients were administered subcutaneous 90 mg doses of ustekinumab every 8 weeks or 12 weeks. The subjects who were in clinical response after receiving doses of ustekinumab intravenously were randomized into three groups: (1) "ustekinumab 90 mg SC every 8 weeks"; (2) "ustekinumab 90 mg SC every 12 weeks"; or (3) placebo. '307 patent, columns 49-50, lines 61-13. The study was conducted for 44 weeks and included 783 subjects in total. '307 patent, column 50, lines 35-

25

55. Efficacy endpoints similarly included Mayo scores, partial Mayo scores, endoscopic scores, endoscopic healing, and IBDQ questionnaire responses. '307 patent, column 51, lines 10-56.

73. The patent then discloses the results of the UNIFI Phase III maintenance study. It notes that "statistical significance can be claimed for both ustekinumab dose regimens" for the primary endpoint of clinical remission at Week 44 and the three major secondary endpoints of maintenance of clinical response, endoscopic healing, and corticosteroid free clinical remission at week 44. '307 patent, column 53, lines 6-19. The patent then provides the statistical data for each endpoint, identifying with statistical significance all the endpoints met by ustekinumab as a treatment. '307 patent, columns 53-55. The conclusion of the data is that:

> The ustekinumab maintenance study provided consistent and definitive evidence that the ustekinumab 90 mg SC q12w and q8w dose regimens were both effective in adult subjects with moderately to severely active UC who had responded to a single IV ustekinumab induction dose.
>
> The efficacy of ustekinumab was observed in subjects who were biologic failures as well as those who failed conventional but not biologic therapy (i.e., biology-naïve).
>
> Of note, while both doses of ustekinumab were effective, the q8w dose regimen demonstrated modestly better efficacy across several objective and/or more stringent endpoints (e.g., endoscopic healing and durable partial Mayo remission) as well as in overtime analyses of symptomatic and partial Mayo remission.
>
> Maintenance dosing with ustekinumab SC dose regimens of 90 mg q12w and 90 mg q8w was generally well-tolerated over 44 weeks in this population of adult subjects with moderate to severe ulcerative colitis.
>
> The safety and efficacy data from this study support a positive benefit/risk profile for ustekinumab SC maintenance therapy.
>
> '307 patent, column 58, lines 19-43.

74. Based on the results of the UNIFI study, Stelara was approved by the FDA for the treatment of ulcerative colitis enabling doctors to use Stelara for the treatment of ulcerative colitis. Prior to the results of the UNIFI study and invention by J&J, I was not prescribing

Stelara for the treatment of ulcerative colitis, and guidelines did not endorse the use of Stelara for the treatment of ulcerative colitis. This invention was significant as it enabled physicians to prescribe Stelara for the treatment of ulcerative colitis. It also opened up a new avenue of treatment for patients, providing another form of therapy outside of prior anti-TNF therapies and vedolizumab as some patients did not respond to these therapies. The number of biologic therapies for moderate to severe ulcerative colitis in 2018 was limited, and the invention claimed in the '307 patent provided much needed access to a new therapy for patients and physicians.

### 2. The Claims

75. Based on the specification, including Examples 1 and 2, the '307 patent contains 34 claims directed to methods of treating moderately to severely active ulcerative colitis subjects by administering clinically proven safe and effective doses of ustekinumab for the achievement of at least one of the specific clinical endpoints. There are four independent claims to the '307 patent. Those are claims 1, 19, 33, and 34. '307 patent, claims 1, 19, 33-34. Below I have pasted claim 1 as a representative claim of the patent:

> **Claim 1**: A method of treating moderately to severely active ulcerative colitis (UC) in a subject in need thereof,
>
> comprising administering to the subject a pharmaceutical composition comprising a clinically proven safe and clinically proven effective amount of an anti-IL-12/IL-23p40 antibody,
>
> wherein the antibody comprises a heavy chain variable region and a light chain variable region, the heavy chain variable region comprising: a complementarity determining region heavy chain 1 (CDRH1) amino acid sequence of SEQ ID NO:1; a CDRH2 amino acid sequence of SEQ ID NO:2; and a CDRH3 amino acid sequence of SEQ ID NO:3; and the light chain variable region comprising: a complementarity determining region light chain 1 (CDRL1) amino acid sequence of SEQ ID NO:4; a CDRL2 amino acid sequence of SEQ ID NO:5; and a CDRL3 amino acid sequence of SEQ ID NO:6,
>
> wherein after treating with the antibody, the subject is a responder to treatment by at least one measure of response to treatment selected from the group consisting of:

27

patent which discloses the results of the UNIFI trial showing that these clinical endpoints were achieved in certain patients. The ClinicalTrials.gov reference therefore discloses the existence of a test but does not disclose any results showing that the administration of ustekinumab achieves the claimed clinical endpoints. It therefore does not enable a person of ordinary skill to administer ustekinumab for the purpose of achieving any of the claimed clinical endpoints in a moderately to severely active ulcerative colitis subject without undue experimentation.

376. I understand that Dr. Matovcik agrees that the ClinicalTrials.gov reference does not disclose any results showing that the clinical trial accomplished the claimed clinical endpoints. Matovick Rpt. ¶201. Dr. Matovcik contends that this "deficiency can be cured by combining the disclosure . . . with additional prior art references." As I explain below, I disagree with Dr. Matovcik that each of these additional references provide any expectation that ustekinumab would work as a treatment for ulcerative colitis or would achieve the claimed clinical endpoints.

### c) The Existence of a Phase III Trial Does Not Create an Expectation of Success

377. Additionally, the existence of a Phase III trial does not tell a person of ordinary skill in the art that the trial will succeed. It was well-established in 2018 that many Phase III trials fail and, even where trials progress past Phase I and Phase II, they may fail at Phase III. Takebe 2018 at p.597, 602-603 (observing a "59%" success rate "at Phase III"); Mullard 2016 at p.446 (noting a probability of success of "58% in Phase III trials").

378. The above studies included both biologics and non-biologics, but biologics are not unique. Many biologics, including antibodies like ustekinumab, do not proceed from Phase III to a biologics license application. Numerous studies have been conducted showing that many Phase III clinical trials for biologics fail. BIO 2016 Report at p.20 (noting that "57.2%" of

138

biologic Phase III trials proceed to BLA); BIO 2020 Report at p.15 (stating a "56.7%" rate for biologics from Phase III to BLA), 17 (68.1% success rate for monoclonal antibodies from Phase III to BLA); Hay 2014, Tables 4 and 5 ("63.2%" probability of success for Phase III to BLA for "Biologics" for "All indications"). Even excluding oncology biologics, which historically fail at higher rates than non-oncology biologics, a substantial number of non-oncology biologics have failed to pass Phase III. Hay 2014 at p.42, Table 6 (stating that the Phase III probability of success for "Non-oncology mAbs" is "66.7%" and probability of FDA approval is "55.9%").

379.   A person of skill in the art would understand that J&J's UNIFI study was a direct-to-Phase III approach. A person of skill reviewing ClinicalTrials.gov would see that J&J was testing the same dosing regimen as used with Crohn's disease in ulcerative colitis patients. Because J&J had already established that the dosing regimen was safe, it was reasonable for J&J to proceed directly to a larger Phase III trial.

380.   A person of ordinary skill in the art would not make any conclusions about ustekinumab in ulcerative colitis, particularly as there was no Phase II data showing efficacy. Most Phase III trials follow Phase II trials which show some preliminary evidence of efficacy and safety. But many of those Phase III trials still fail as the statistics above show. In Phase II trials, which are often the first time a biologic is being evaluated for efficacy, the success rates are even lower. Hay 2014 at Table 6 (Non-oncology mAbs success rate of 47.7% from Phase 2 to Phase 3); BIO Report 2016 at p.20 ("34%" rate of success for biologics from Phase II to Phase III); BIO Report 2020 at p.15, 17. Because J&J proceeded with a direct-to-Phase III approach with ulcerative colitis, it took an even greater risk.

381.   I understand that Drs. Matovcik and Warfield have suggested that other references, such as Ochsenkühn, Kolios, Afonso, Tarr, and CADTH, would provide confidence

139

improvement. It is an oversimplification of the science to conclude that any antibody impacting the IL-12/23p40 pathway would work in both ulcerative colitis and Crohn's.

### 11. The NCT 236 Protocol and Pre-IND Briefing Document

485. I understand that Dr. Matovcik and Mr. Bahr both point to certain materials, including Pre-IND materials[16] and the NCT 236 Clinical Trial Protocol, which they argue were not submitted to the Examiner during prosecution. Matovcik Rpt. ¶¶164-170; Bahr Rpt. ¶¶248-259. As explained below, these materials do not alter any of my above opinions regarding the prior art or what it taught. The NCT 236 Protocol and Pre-IND communications with FDA are not prior art to the '307 patent. In addition, based on my review of the prosecution record, these references are cumulative of other information before the Examiner during prosecution.

486. These pre-IND materials are not the sort of documents which I typically review in my daily practice as a gastroenterologist. However, some of the information contained within these documents concerning the design of clinical trials, evidence of efficacy in certain diseases, and other information is the type of information which I do review in my daily practice.

#### a) The NCT 236 Protocol and Pre-IND Briefing Document Are Not Prior Art

487. I understand that for a publication to be prior art to the '307 patent, it must have been publicly accessible to a person of ordinary skill in the art by September 24, 2018. I

---

[16] While I primarily discuss the Pre-IND Briefing Document and NCT 236 Protocol, my opinions in this section of my report (¶¶492-516) apply to all of the pre-IND communications with FDA which are not prior art to the '307 patent. These include: JNJ-STELARA_002258268 (Janssen Pre-Phase 3 Briefing Document); JNJ-STELARA_002258338 (Janssen Scientific Advice Briefing Document); JNJ-STELARA_001838489 (Janssen Clinical Protocol CNT01275); JNJ-STELARA_002258135 (Amendment 1); JNJ-STELARA_001831844 (Amendment 2); JNJ-STELARA_002258317 (Janssen Pre-IND Meeting Minutes).

understand that a reference is publicly accessible if the document has been made available such that persons of ordinary skill in the art exercising reasonable diligence can locate it.

488.   Dr. Warfield states that he understands that "the full phase 3 protocol for NCT-236 was not publicly available as of September 24, 2018." Warfield Rpt. ¶150.  I agree.  The April 20, 2016 version of the NCT 236 Protocol was first uploaded on November 15, 2019 to ClinicalTrials.gov:

**Document Section**

| Study Protocol | • Document Label | Study Protocol |
| --- | --- | --- |
| | Date | 2016-04-20 |
| | Uploaded | 2019-11-15 12:24 |
| | File name | Prot_000.pdf |

https://clinicaltrials.gov/study/NCT02407236?tab=history&a=50#document-section-card.

489.   I have also seen no evidence that the specific March 17, 2015 NCT 236 Protocol relied upon by Dr. Matovcik (JNJ-STELARA_001838489) was publicly accessible to a person of ordinary skill in the art prior to September 24, 2018.  Until made public on ClinicalTrials.gov, this protocol would have been kept confidential between J&J, the FDA, and investigators participating in the clinical trials.

490.    Dr. Matovcik further cites to a "pre-IND briefing document," produced as JNJ-STELARA_002258268.  Matovcik Rpt. ¶¶15, 165-166.  I have also seen no evidence that this document was publicly accessible to persons of ordinary skill in the art before September 24, 2018.  It is a confidential briefing document for a Pre-IND meeting between J&J and the FDA.  It is my opinion that this document is not prior art to the '307 patent.

### b) The NCT 236 Protocol Was Considered by the PTO

491.   Regardless, it is also my opinion that the NCT 236 Protocol was considered by the PTO during examination of the '307 patent.  The Examiner in a July 16, 2020 non-final

183

rejection specifically rejected certain claims as "being unpatentable over ClinicalTrials.gov ('CT')." July 16, 2020 Non-Final Rejection at p.6. In an accompanying "Notice of References Cited," the Examiner listed the webpage for the NCT 236 clinical trial posting, stating that it was "Accessed from the internet 7/13/20:"



As of July 13, 2020, this webpage contained the full NCT 236 Protocol for the Examiner to review. https://clinicaltrials.gov/study/NCT02407236?tab=history&a=56#version-content-panel. Thus, the Examiner reviewed the NCT 236 Protocol during examination.

### c) The NCT 236 Protocol and Pre-IND Briefing Document Are Cumulative of Other Information Before the Examiner

492. The NCT 236 Protocol and Pre-IND Briefing Document are also cumulative of other information before the Examiner. As explained above, the ClinicalTrials.gov posting was considered by the Examiner during prosecution. See above ¶¶363-365.

493. Dr. Matovcik relies on statements made by J&J in the NCT 236 Protocol and the Pre-IND Briefing Document regarding the relationship between Crohn's disease and ulcerative colitis, and whether it was "reasonable to assume" that ustekinumab will be effective in ulcerative colitis based on data in Crohn's disease. Matovcik Rpt. ¶166; NCT 236 Protocol at JNJ-STELARA_001838529. I believe this is cumulative of the information already before the Examiner during prosecution.

494. During prosecution, J&J identified the Feagan 2016 and Sandborn 2018 for the Examiner in an October 2020 disclosure statement. October 2020 Information Disclosure Statement. Each of these references discloses the effectiveness of Stelara in Crohn's disease and was before the Examiner. Feagan 2016, for example, discloses the "intravenous infusion" of 130

ustekinumab to treat ulcerative colitis or achieve the claimed clinical endpoints simply because of success in Crohn's disease.

500. The NCT 236 Protocol, also known as the UNIFI protocol, is a clinical trial protocol provided to FDA and investigators outlining the objectives of the clinical trial, the hypotheses being tested, the trial's design and rationale, and how data from the trial will be evaluated. NCT 236 Protocol. For the same reasons discussed above with respect to the ClinicalTrials.gov reference, see above ¶¶366-376, the NCT 236 Protocol describes a test and does not disclose a method of treating moderately to severely active ulcerative colitis.

501. I disagree with Dr. Matovcik that the NCT 236 Protocol itself indicates that a person of ordinary skill in the art had a "reasonable expectation of success that ustekinumab" would successfully treat ulcerative colitis and achieve the claimed clinical endpoints. Matovcik Rpt. ¶166. I understand that Dr. Matovcik points to statements in the NCT 236 Protocol and Pre-IND Briefing Document where J&J stated that "considering the similarities in the genetics and biology of UC and Crohn's disease, it is reasonable to assume that ustekinumab will be effective in UC." Matovcik Rpt. ¶166; NCT 236 Protocol at JNJ-STELARA_001838529. In the context of the full documents, I interpret this statement as J&J explaining the rationale to test ustekinumab in ulcerative colitis, not an expectation that ustekinumab would achieve the claimed clinical endpoints.

502. The NCT 236 Protocol has no results or data regarding the treatment of ulcerative colitis. Like the ClinicalTrials.gov posting, it does not disclose any evidence showing that ustekinumab is an effective treatment for ulcerative colitis or that ustekinumab can achieve the claimed clinical endpoints. The protocol does not provide any data regarding any ulcerative colitis patients treated with ustekinumab. A person of ordinary skill in the art reviewing this

document could therefore not conclude or expect that ustekinumab would treat ulcerative colitis. It is only after the results of the UNIFI study were obtained, as reflected in the '307 patent, that there were data supporting the claimed invention.

503. At most, the full NCT 236 Protocol reflects a hope that ustekinumab would work to treat ulcerative colitis, not an expectation that it would treat ulcerative colitis. The NCT 236 Protocol outlines the "objectives" of the trial. NCT 236 Protocol at JNJ-STELARA_001838495-96. One of the primary objectives for the induction (IV) and maintenance (SC) studies was to "evaluate the efficacy" of ustekinumab in ulcerative colitis patients. NCT 236 Protocol at JNJ-STELARA_001838495-96. In other words, the *purpose* of the trial was to determine whether ustekinumab could successfully treat moderate to severe ulcerative colitis. If J&J and the FDA already knew that ustekinumab treated ulcerative colitis, there would have been no need to conduct the clinical trial.

504. The "hypotheses" in the NCT 236 protocol were the following:

**Hypotheses**

**Induction Study:** Ustekinumab is superior to placebo in inducing clinical remission at Week 8 in subjects with moderately to severely active UC.

**Maintenance Study:** Ustekinumab maintenance therapy is superior to placebo in achieving clinical remission at Week 44 of maintenance in subjects with moderately to severely active UC who were induced into clinical response with ustekinumab.

NCT 236 Protocol at JNJ-STELARA_001838496. A hypothesis is an assumption or educated guess about the study outcome. Persons of ordinary skill in the art do not know whether a hypothesis is correct until they complete the trial and obtain data either confirming or disproving the hypothesis. Thus, a clinical trial is conducted to determine whether the hypothesis is correct. A person of ordinary skill in the art would not call it a hypothesis if they already knew the outcome.

505. If J&J expected ustekinumab to effectively treat ulcerative colitis, they also would not have included a futility analysis in the clinical trial design. In the NCT 236 Protocol design, J&J planned to conduct an interim analysis 8 weeks into the trial "to assess for futility" based on the induction study data from the first 30% of randomized subjects. NCT 236 Protocol at JNJ-STELARA_001838497. If based on early data the "probability of success at the end of the study" was too low, the study could "be stopped for futility." NCT 236 Protocol at JNJ-STELARA_001838582. Thus, J&J included an interim analysis to determine if it was futile and potentially halt the study before its completion. A person of ordinary skill in the art would understand that not every clinical trial protocol includes a futility analysis. NCT 830 Protocol at p.86 ("No interim analysis is planned" in vedolizumab Phase III trial). The inclusion of a futility analysis reflects uncertainty by both J&J and the FDA regarding whether ustekinumab would treat ulcerative colitis or achieve the claimed clinical endpoints in the UNIFI trial.

506. There was no preceding Phase II trial. J&J took a risk and proceeded directly to conducting a Phase III clinical trial. There was a significant risk that the trial could fail, which is why J&J included a futility analysis. Pre-IND Briefing Document at JNJ-STELARA_002258282 ("Since this is a direct to Phase 3 program, there will be an interim analysis for futility . . . This analysis is described in the Protocol Elements Document and is intended to minimize subject exposure to ustekinumab if efficacy is not observed").

507. A clinical trial sponsor needs a rationale to test a drug. The FDA will not permit a sponsor to conduct a Phase III clinical trial without some reason to think the drug may work. As the NCT 236 Protocol and Pre-IND Briefing Document explain, Crohn's disease and ulcerative colitis are similar diseases with common—but not identical—genetic markers. Given that Phase II data with ustekinumab in Crohn's disease was promising and safety had been established, J&J

190