**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CAREFIRST BLUECHOICE, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JOHNSON & JOHNSON and JANSSEN BIOTECH, INC.,<br><br>Defendants. | Civil Action No. 2:23-cv-00629<br><br>District Judge Jamar K. Walker<br><br>Magistrate Judge Lawrence R. Leonard |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE* NO. 1 TO PRECLUDE J&J FROM OFFERING CERTAIN ARGUMENT AND EVIDENCE ON TOPICS FOR WHICH J&J WITHHELD DISCOVERY BASED ON THE ATTORNEY-CLIENT PRIVILEGE**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS ................................................................................................................ 4

    A.    J&J blocked discovery concerning the '307 Patent by invoking the attorney-client privilege. ....................................................................... 4

    B.    J&J asserted privilege over evidence concerning the strength of the '307 Patent. ................................................................................................ 9

    C.    J&J withheld documents that likely would shed light on when J&J attorneys learned of the Momenta biosimilar patents on the basis of privilege. .................................................................................................. 10

III.  LEGAL STANDARD......................................................................................... 11

IV.   ARGUMENT...................................................................................................... 15

    A.    J&J should not be permitted to make arguments and solicit testimony regarding knowledge and materiality that it blocked during discovery.......................................................................................... 15

    B.    J&J witnesses should be precluded from offering their subjective views on the strengths and weaknesses of the '307 patent, including their views on the likely outcome of any district court litigation or *inter partes* review regarding that patent. ....................................... 18

    C.    J&J placed at-issue its knowledge and awareness of the Momenta patents, requiring evidence of its subjective beliefs to be precluded from trial. ............................................................................................... 20

V.    CONCLUSION.................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
  306 F.R.D. 234, 241–42 (N.D. Cal. 2015) ...............................................................17

*Brown v. Town of Front Royal, Virginia*,
  2022 WL 1321570 (W.D. Va. May 3, 2022) ...........................................................14

*Cornett Management Co., LLC v. Lexington Ins. Co.*,
  2007 WL 1140253 (N.D. W.Va. Apr. 17, 2007) ....................................................14

*Courtade v. United States*,
  243 F. Supp. 3d 699 (E.D. Va. 2017) .......................................................................1

*Energy Heating, LLC v. Heat On-The-Fly, LLC*,
  889 F.3d 1291 (Fed. Cir. 2018)...............................................................................18

*Galaxy Computer Servs., Inc. v. Baker*,
  325 B.R. 544 (E.D. Va. 2005).................................................................................23

*Gaull v. Wyeth Lab'ys, Inc.*,
  687 F. Supp. 77 (S.D.N.Y. 1988) ...........................................................................12

*Hearn v. Rhay*,
  68 F.R.D. 574 (E.D. Wash. 1975).................................................................12, 13, 23

*Int'l Tel. & Tel. Corp. v. United Tel. Co. of Fla.*,
  60 F.R.D. 177 (M.D. Fla. 1973)..........................................................................11, 12

*Janssen Biotech, Inc. v. Amgen Inc.*,
  C.A. No. 22-1549 (D. Del.) ......................................................................................9

*LendingTree, LLC v. Zillow, Inc.*,
  2013 WL 6385297 (W.D.N.C. Dec. 6, 2013) ........................................................13

*In re Lidoderm Antitrust Litigation*,
  2016 WL 4191612 (N.D. Cal. Aug. 9, 2016) .............................................18, 21, 22

*Penn Nat'l Mut. Cas. Ins. Co. v. Va. Elec. & Power Co.*,
  2021 WL 6203177 (E.D.N.C. May 19, 2021) ........................................................21

*SD3, LLC, v. Black & Decker (U.S.), Inc.*,
  No. 1:14-cv-00191-CMH-IDD, 2016 WL 4722001 (E.D. Va. July 29, 2016),
  *aff'd in part, rev'd in part*, 2016 WL 11784677 (E.D. Va. Sept. 12, 2016)............13

*Small v. Hunt*,
  152 F.R.D. 509 (E.D.N.C. 1994) ................................................................................................12

*United States v. Duke Energy Corp.*,
  208 F.R.D. 553 (M.D.N.C. 2002) ..............................................................................................11

*Walker Process Equipment., Inc. v. Food Machinery Corp.*,
  382 U.S. 172 (1965)...............................................................................................................1, 13

**Other Authorities**

37 C.F.R. § 1.56(b) .........................................................................................................................1

## I.    INTRODUCTION

This motion is about fairness. "[A] party cannot 'us[e] the [attorney-client] privilege as both a shield and a sword. . . . [P]arties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials.'" *Courtade v. United States*, 243 F. Supp. 3d 699, 702 (E.D. Va. 2017) (quoting *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003)).

The plaintiffs sought testimony on five topic areas during discovery:

1.    The views and/or beliefs of inventors, patent agents, or patent prosecutors[1] associated with U.S. Patent No. 10,961,307 (the '307 patent) regarding the materiality[2] of documents not provided to the U.S. Patent and Trademark Office (PTO)[3] during prosecution of the '307 patent;

---

[1] The '307 patent inventors, patent agents, and/or patent prosecutors include Eric Dichter, Luis Ralat, Kimberly Shields-Tuttle, Katherine Li, Jewel Johanns, Richard Strauss, Colleen Marano, Hongyan Zhang, Christopher O'Brien, and Omoniyi Adedokun.

[2] The word "materiality" covers both the meaning of the word as understood under 37 C.F.R. § 1.56(b) and *Walker Process Equipment., Inc. v. Food Machinery Corp.*, 382 U.S. 172 (1965).

[3] The "documents not provided to the U.S. Patent and Trademark Office" means any materials J&J submitted to the FDA and other health authorities that contain representations that ustekinumab would likely be effective to treat ulcerative colitis (NCT 236) and any version (including posters, abstracts, or summaries) of:

    a.  Thomas Ochsenkühn, et al., *P759 Ustekinumab as Rescue Treatment in Therapy-Refractory or -Intolerant Ulcerative Colitis*, 12 J. Crohn's & Colitis S495 (2018) (the Ochsenkühn Study);

    b.  Antonios G.A. Kolios, et al., *Paradoxical Ulcerative Colitis During Adalimumab Treatment of Psoriasis Resolved by Switch to Ustekinumab*, 178 Brit. J. Dermatology 551 (2018) (the Kolios Study);

    c.  L. Senra Afonso, et al., *CP-202 Ustekinumab Treatment in Refractory Inflammatory Bowel Disease*, 24 Eur. J. Hosp. Pharmacy (2017) (the Afonso Study);

    d.   L. Jostins, et al., *Host-Microbe Interactions Have Shaped the Genetic Architecture of Inflammatory Bowel Disease*, 491 Nature 7422 (2012) (the Jostins Study); and/or

- 1 –

2.      Any conversations between the '307 patent inventors, patent agents, and/or patent prosecutor regarding any of the documents not provided to the PTO;

3.      Whether any J&J patent agent, patent prosecutor, attorney, outside counsel, and/or outside consultant searched for, found, knew of, and/or withheld any version of (including posters, abstracts, or summaries, or later versions of or updates to the same study) the Ochsenkühn Study, the Kolios Study, and the Afonso Study;

4.      The subjective views and/or beliefs of any J&J employee , and/or any attorney representing J&J or providing J&J legal advice, concerning: (1) the strengths and/or weaknesses of the '307 patent; and (2) the likelihood the '307 patent would be upheld or invalidated in *inter partes* review petitions before the Patent and Trademark Office or litigation; and

5.      When J&J employees or attorneys first became aware of (1) the fact that J&J acquired any of the following patents: U.S. Patent No. 8,852,889 (the '899 Patent), U.S. Patent No. 9,217,168 (the '168 Patent), U.S. Patent No. 9,475,858 (the '858 Patent), or U.S. Patent No. 9,663,810 (the '810 Patent) (collectively, the "Momenta patents"); (2) the content of any of the Momenta patents; or (3) the potential for using the Momenta patents to sue or threaten to sue any biosimilar manufacturers.

J&J denied the plaintiffs discovery into these topics by asserting the attorney-client privilege. Put another way, instead of providing documents and testimony that would allow the plaintiffs to assess, test, and challenge J&J's arguments and defenses concerning its liability under federal and state monopolization, state consumer protection, and unjust enrichment laws, J&J cut off testimony and withheld responsive documents by asserting the attorney-client privilege.

Despite these withholdings, J&J in its motion for summary judgment asserted that the plaintiffs failed to uncover evidence that "anyone at J&J [knew] about the materiality" of the prior art references and FDA submissions J&J withheld from the PTO. ECF No. 444 (J&J Br.) at

---

e.  A. Granlund., et al., *Whole Genome Gene Expression Meta-Analysis of Inflammatory Bowel Disease Colon Mucosa Demonstrates Lack of Major Differences between Crohn's Disease and Ulcerative Colitis*, 8 PloS One 2 (2013) (the Granlund Study).

10–11 (Fact Nos. 25 & 27) & 24. And J&J argues that the plaintiffs failed to prove that anyone with a duty of candor knew about the prior art references. *Id.* at 10 (Fact No. 25) & 24. J&J further asserts that no one ███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ *Id.* at 2.[4] In so arguing, J&J ignored the reality that the plaintiffs attempted to discover *exactly this information*—asking questions during depositions and sending requests for production that targeted these topics—but were thwarted by J&J's assertion of privilege. To persuade the jury to find in its favor, the plaintiffs anticipate that J&J will attempt a similar tactic at trial: it will encourage the jury to draw inferences from the absence of discovery that it blocked. Indeed, J&J has indicated that it will take this tactic one step further and attempt to preclude the plaintiffs from telling the jury that J&J shielded discovery into these topics based on the attorney-client privilege.

Having invoked privilege and thereby prevented discovery, J&J should now be precluded from arguing that such information does not exist. Having made a tactical decision to rest on the attorney-client privilege, it is wholly inappropriate for J&J to make arguments or solicit testimony asserting that such information does not exist or has not been discovered. For example, J&J should not be permitted to argue that the plaintiffs have uncovered no documents showing that J&J's attorneys were aware of the Momenta biosimilar patents because J&J used the attorney-client privilege to deny the plaintiffs discovery, such as emails between its attorneys, concerning this topic (as evidenced by J&J's privilege log). Likewise, J&J should not be allowed

---

[4] The plaintiffs dispute this contention and believe, based on the evidence developed to date and to be developed at trial, that the facts presented amply support the plaintiffs' claims.

to assert that its attorneys never uncovered the Ochsenkühn study in prior art searches, when it refused to produce those searches on privilege grounds.

To be clear, the plaintiffs are not seeking to alter the burdens of persuasion and proof. While J&J should be precluded from asserting that "no evidence exists" as to the relevant topics, such preclusion would not impair J&J's ability to assert that the plaintiffs have not presented sufficient evidence to prove their claims. Similarly, the preclusion would apply to block J&J from presenting argument or evidence concerning its subjective views on patent strength, but it would not prevent J&J from presenting objective evidence on that topic.

This motion is intended to strike a balance. It would be fundamentally unfair for J&J to rely on privilege to prevent the plaintiffs from uncovering potentially inculpatory evidence and then selectively present untested arguments on those same topics to bolster its defense. Preclusion of argument and testimony on the five topics above is the appropriate remedy, as any disclosure at this point would be severely belated and prejudicial to the plaintiffs' case.

## II.     FACTS

**A.     J&J blocked discovery concerning the '307 Patent by invoking attorney-client privilege.**

During prosecution of the '307 Patent, J&J employees who owed the PTO a duty of candor—i.e., patent attorney Mr. Dichter, patent agent Dr. Ralat, and all of the patent inventors—did not submit to the PTO, *inter alia*, (i) the NCT 236 protocol, (ii) any of J&J's submissions to the U.S. Food and Drug Administration (FDA) or foreign health authorities regarding NCT 236, and (iii) the Ochsenkühn Study, the Kolios Study, the Afonso Study, the

Jostins article, or the Granlund article. Ex. 1 ('307) at 252–928 (J&J's 1st Information Disclosure Statement (IDS)), 943–2103 (J&J's 2nd IDS).[5]

During written discovery and in depositions, the plaintiffs sought evidence concerning (1) the '307 Patent prosecutors' and inventors' *knowledge* of these relevant materials, and (2) their *views on the materiality* of these documents. The plaintiffs served document requests targeted to these topics and deposed seven of the ten patent inventors and patent prosecutors for the '307 Patent (Mr. Dichter, Dr. Ralat, Ms. Shields-Tuttle, Dr. Li, Dr. Strauss, Dr. Marano, and Dr. O'Brien). This discovery sought evidence concerning these individuals' knowledge of relevant documents and the process(es) J&J followed in applying for the '307 patent. Rather than produce the relevant documents and permit questioning during depositions, J&J asserted its attorney-client privilege, refused to make the relevant productions, and instructed current and former employees not to answer related questions. J&J's election prevented the plaintiffs from exploring key documents and topics concerning whether the '307 patent prosecutors and inventors knew of the relevant references, as well as their views on the documents' materiality to the '307 patent.

*First*, J&J asserted privilege and refused to produce discovery regarding whether anyone at J&J (or at J&J's direction) searched for, found, and/or withheld the Ochsenkühn Study, the Kolios Study, and the Afonso Study in connection with the '307 patent application. Ex. 2 (J&J's Objs. and Resps. to Pls.' 3rd Set of RFPs) at Nos. 123–25. Specifically, J&J refused to produce documents concerning its patentability searches, patent audits, or freedom to operate searches. As plaintiffs' expert (Dr. Lisa Matovcik) explained in her expert report, reasonable patent

---

[5] All exhibits cited herein are to the Declaration of Hannah W. Brennan in Support of Plaintiffs' Affirmative Motions *in Limine*. Certain exhibits were also stamped as deposition exhibits and include a plaintiffs' exhibit (PX) number. To avoid confusion, the plaintiffs use new exhibit numbers, not the PX numbers.

attorneys routinely conduct "inquiries into information relevant to patentability" when seeking a patent. Ex. 3 (Matovcik) ¶ 65. "These inquiries typically include literature and patent searches, including patentability searches and freedom to operate searches." *Id.* At the outset of this case, the plaintiffs asked J&J to produce the results of such searches and inquiries. Rather than deny it ran such searches, J&J refused to produce information on these searches, stating that the request for production that targeted them "expressly and exclusively calls for the production of documents protected by the attorney-client privilege." Ex. 2 (J&J's Objs. and Resps. to Pls.' 3rd Set of RFPs) at Nos. 123–25. Similarly, when plaintiffs' counsel asked Dr. Luis Ralat—one of the drafters of the '307 patent—whether he ran any patentability searches in preparing the application, J&J's counsel objected based on privilege and directed Dr. Ralat not to provide a substantive answer other than to respond "yes" or "no." Ex. 4 (Ralat Tr.) at 90:19–91:7. The plaintiffs also asked Dr. Ralat about his "personal practice in deciding whether or not to run any kind of search in the patent drafting process" during 2018 and 2019. *Id.* at 60:18–22. J&J's counsel instructed Dr. Ralat not to answer on the basis that the question was "getting into privileged information." *Id.* at 60:23–61:6.

*Second*, J&J asserted privilege and refused to produce discovery regarding whether the individuals who owed the PTO a duty of candor with respect to the '307 patent (the patent's prosecutors and inventors) viewed certain references as material to the patentability of that application. For example, when the plaintiffs asked Dr. Ralat what information needs to be included in an information disclosure statement (IDS), Dr. Ralat responded that "[t]o my understanding, any reference that could be material to patentability." Ex. 4 (Ralat Tr.) at 72:3–14. Materiality, Dr. Ralat stated, was determined by the patent attorney, but Dr. Ralat could make recommendations. *Id.* at 61:8–62:4. When the plaintiffs asked Dr. Ralat how he determined

what information was material to the patent application, J&J's counsel instructed Dr. Ralat not to answer based on the attorney-client privilege. According to J&J's counsel, "[the plaintiffs were] asking [Dr. Ralat] how he makes his decision in what might be important to the patent office"— i.e., how he determines materiality. *Id.* at 73:23–74:9. Likewise, J&J counsel instructed Dr. Ralat not to answer when asked why he omitted certain language and references when drafting the '307 patent application (*id.* at 226:9–25) and whether he had a duty to disclose withheld materials—specifically articulating that such testimony is privileged because "[w]hether or not he had a duty to disclose this particular information… *involves a whole analysis of materiality, et cetera.*" *Id.* at 227:2–11.

J&J also prevented the inventors of the '307 patent and Dr. Ralat from disclosing the contents of



. When the plaintiffs asked Dr. Strauss

Ex. 5 (Strauss Tr.) at 14:16–24. The plaintiffs then asked whether Dr. Strauss

*Id.* at 17:16–23.

*Id.* at 17:24–18:5. Similarly, the plaintiffs asked Dr. Marano whether she understood that she "had any duty to inquire regarding prior art, the scientific literature, regarding the use of Stelara in ulcerative colitis that pre-dated when the patent was filed." Ex. 6 (Marano Tr.) at 161:13–17. But J&J's counsel

instructed Dr. Marano not to answer based on privilege. *Id.* at 161:11–162:3. J&J's counsel instructed Katherine Li, another inventor, ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ Ex. 7 (Li Tr.) at 144:15–21. As a result, J&J has precluded the plaintiffs from obtaining relevant evidence concerning the inventors' views on the materiality of references J&J did not submit to the PTO.

J&J's counsel also repeatedly invoked privilege in the depositions of the patent's prosecutors, Dr. Ralat and Mr. Dichter, in response to questions going to the same topic (██ ██████████████████████). When the plaintiffs asked Mr. Dichter if, in connection with the '307 application, he asked "anybody about whether there was any kind of facts or law that [Dichter] should be aware of, familiar with, when filing an application in connection with the results of a Phase III clinical trial," J&J's counsel instructed Mr. Dichter that he "can answer that question yes or no, but [ ] don't disclose the substance of any communications, if they occurred." Ex. 8 (Dichter Tr.) at 110:6–17. W████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* at 140:17–141:13. While Mr. Dichter confirmed that the purpose of an IDS was "to disclose" references "that could potentially be relevant to the examination of the application" (*id.* at 129:10–15), ████████████████████████████████████████████ ████████████████████████████████████████. *Id.* at 56:22–58:19. Similarly, when plaintiffs' counsel asked Dr. Ralat ████████████████████████████████████████████ ████████████████████████████████████████████████████████

██████████████ Ex. 4 (Ralat Tr.) at 150:4–20. Later in the deposition, when the plaintiffs asked Dr. Ralat why language included in a clinical study report provided to the FDA had been omitted from the patent application prepared during the same year, J&J's counsel instructed Dr. Ralat not to answer on privilege grounds. *Id.* at 225:8–226:25. ████████████████

███████████████████████████████████████████████████████████

█████████████████ Ex. 4 (Ralat Tr.) at 102:13–103:23. J&J is therefore precluded from making arguments or presenting evidence to the jury on these topics.

**B.      J&J asserted privilege over evidence concerning the strength of the '307 Patent.**

The plaintiffs also sought discovery into J&J's subjective beliefs on the strength of the '307 Patent and the merits of J&J's assertion of this patent against biosimilar competitors. For example, the plaintiffs' First Set of Requests for Production to J&J sought: (1) "All documents analyzing, forecasting, projecting, or otherwise assessing the likelihood of success of the *Janssen Biotech, Inc. v. Amgen Inc.*, C.A. No. 22-1549 (D. Del.) lawsuit," and (2) "All documents analyzing, forecasting, projecting, or otherwise assessing the likelihood of success of any PTAB petition, including those of Samsung and Biocon." *See* Ex. 9 (J&J's Objs. and Resps. to Pls.' 1st Set of RFPs) at 45 & 52. Discovery into these topics would have allowed the plaintiffs to test J&J's assertion that its settlement agreements with biosimilar manufacturers are procompetitive because they enable biosimilars to enter before the '307 patent's expiration date. Such a defense is invalid if J&J internally acknowledged that the '307 patent was weak (and, therefore, at risk of invalidation in federal patent litigation or *inter partes* review). But, again, J&J refused to produce documents in response to these requests based on the attorney-client privilege.

**C.    J&J withheld documents that likely would shed light on when J&J attorneys learned of the Momenta biosimilar patents on the basis of privilege.**

J&J also refused to produce documents about and prevented testimony on the timing and scope of J&J's knowledge of the Momenta biosimilar patents and their relation to the anticipated launch of biosimilar Stelara. *See, e.g.*, Ex. 9 (J&J's Objs. and Resps. to Pls.' 1st Set of RFPs) at No. 42 (refusing to produce documents regarding J&J's understanding of the scope of the Momenta patents and their relevance to the Amgen biosimilar); Ex. 10 (M. Miller Tr.) at 53:6– 54:9, 96:5–17, 139:13–144:1 ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████; Ex. 11 (DeFranco Tr.) at 108:23–109:11, 191:11–192:4 (██████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ █████).

J&J's voluminous privilege logs indicate ██████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████. Ex. 12, PL0753 (J&J Privilege Logs 0004 & 0005 (Feb. 2024)) at PL00061502–03, PL00061638, PL00057510,

PL00040478, PL00042936, PL00095337 (withholding each ███████ on the ground that it involves provision of "███████").[6]

## III.    LEGAL STANDARD

The attorney-client privilege protects confidential communications between an attorney and their client, as well as others within the scope of the attorney-client relationship, to ensure that communication can be readily and honestly exchanged. But the privilege is not without its limits. Principal among those limits is that "[a] party may not use a privilege . . . as a shield during discovery and then hammer it into a sword for use at the trial." *United States v. Duke Energy Corp.*, 208 F.R.D. 553, 558 (M.D.N.C. 2002); *accord Int'l Tel. & Tel. Corp. v. United Tel. Co. of Fla.*, 60 F.R.D. 177, 185 (M.D. Fla. 1973) ("privilege was intended as a shield, not a sword. Consequently, a party may not insist upon the protection of the privilege for damaging communications while disclosing other selected communications because they are self-serving"). As a result, a party has a clear choice should discovery implicate attorney-client privileged communications: rely on the privilege and withhold the confidential communications for all purposes *or* waive the privilege and permit discovery of the information. A party may not withhold privileged information and then argue that such information does not exist. "The penalty [for failing] to reveal decisions, information, or documents [protected by privilege during] pretrial [is that] defendant [shall be precluded] from using such decisions, information, or documents at trial. *Duke Energy*, 208 F.R.D. at 558.

---

[6] As explained in detail in the plaintiffs' sur-reply in opposition to J&J's motion for summary judgment, J&J's privilege log appears to withhold ████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████. *See* ECF No. 651 (Sur-reply to Mot. for Summ. J.) at 6–7.

- 11 –

Preclusion is the appropriate remedy where the privileged information is put "at issue," *i.e.*, privileged information is selectively used by a party, the use of which may distort the truth-seeking function of trial. *Small v. Hunt*, 152 F.R.D. 509, 512 (E.D.N.C. 1994) ("The 'at issue' doctrine is based on notions of fairness and truth-seeking. . . . '[W]here a party injects part of a communication as evidence, fairness demands that the opposing party be allowed to examine the whole picture.'") (quoting *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F.R.D. 408, 413 (D. Del. 1992)). Courts apply the "at issue" doctrine to determine whether, in the interest of fairness, (a) disclosure of the underlying confidential information is required due to the implied waiver of privilege, or (b) testimony implicating privileged communications should be barred due to the prejudice that would be caused by its belated disclosure. *Gaull v. Wyeth Lab'ys, Inc.*, 687 F. Supp. 77, 83 (S.D.N.Y. 1988) ("Wyeth is free to choose to stand behind its attorney-client privilege, and refuse to produce the opinions. As a consequence, however, Wyeth will be precluded from introducing the opinions or testimony of its counsel as evidence that it satisfied its affirmative duty of due care to determine no infringement existed or that it did not act willfully [sic]."); *Int'l Tel. & Tel. Corp.*, 60 F.R.D. at 186 ("Fundamental fairness and justice requires that if the defendant intends to waive the privilege at trial by the introduction of evidence within that privilege, then the defendant will be required to allow discovery with regard to matters material to that testimony. . . . [T]he failure of a party to allow pre-trial discovery of confidential matter which that party intends to introduce at trial will preclude the introduction of that evidence.").

Courts follow one of two approaches to determine whether a party has placed a privileged communication at issue. In *Hearn*, the court held that a privileged communication was put at issue if the "(1) assertion of the privilege was a result of some affirmative act . . . by the asserting

- 12 –

party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense." *LendingTree, LLC v. Zillow, Inc.*, 2013 WL 6385297, at \*5 (W.D.N.C. Dec. 6, 2013) (quoting *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975)). Under the Third Circuit's approach in *Rhone*, the confidential communications are "placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney-client communication." *LendingTree, LLC*, 2013 WL 6385297, at \*5 (quoting *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 864 (3d Cir. 1994)).

The Fourth Circuit has not expressly adopted an approach, and the analyses for the two tests differ in one respect: "*Rhone* requires that the asserting party use the protected communication, . . . while *Hearn* requires only that the 'asserting party . . . [make] it relevant to the case.'" *See SD3, LLC*, *v. Black & Decker (U.S.), Inc.*, No. 1:14-cv-00191-CMH-IDD, 2016 WL 4722001, at \*2–3 (E.D. Va. July 29, 2016) (citations omitted), *aff'd in part, rev'd in part*, 2016 WL 11784677 (E.D. Va. Sept. 12, 2016).

As shown more fully in the subsequent sections, J&J has placed privileged communications at issue under either test. Under the *Hearn* analysis, the evidence J&J has shielded from discovery relates directly to the plaintiffs' *Walker Process* fraud claim and (to the extent intent must be shown) their monopolization claims concerning the Momenta patents. J&J cannot assert privilege in response to relevant discovery requests and then tell the jury that the evidence it shielded from discovery does not exist. J&J's election with respect to the privilege narrows the arguments it can make in its defense (i.e., J&J should have either permitted fulsome discovery or else refrained from arguing that no evidence exists).

- 13 –

In similar circumstances, courts have found an at-issue waiver. *Cornett Management Co., LLC v. Lexington Ins. Co.*, 2007 WL 1140253 (N.D. W.Va. Apr. 17, 2007) demonstrates this logic. There, employees sued for sexual harassment and the employer's insurer retained counsel. The law firm's fees exceeded the employers' insurance coverage, and the employer sued his insurer, alleging that it directed the firm to engage in unnecessary discovery. *Id.* at *6. In response, the insurer filed a motion to compel disclosure of privileged communications between the employer and the law firm. *Id.*  Citing *Hearn*, the court found at-issue waiver: the plaintiff could not both claim the firm engaged in too much discovery, causing it harm, and also block discovery into his communications with counsel concerning litigation strategy. *Id.* at *4, *6. By putting the litigation strategy at issue, he waived privilege. So too here. J&J cannot claim no evidence exists where it blocked discovery on that same topic.

Likewise under *Rhone*, J&J is using its assertion of privilege to withhold evidence concerning the '307 patent application and knowledge of the Momenta patents in its defense— claiming there is no evidence supporting the plaintiffs' claims on these topics. Where the party's communications with its counsel is "an element of [the party's] defense or [the party] impliedly rel[ies] on that advice to disprove an element of the plaintiff's case," an at-issue waiver has occurred. *See Brown v. Town of Front Royal, Virginia*, 2022 WL 1321570, at *4, 7 (W.D. Va. May 3, 2022) (granting motion to compel employer to produce privileged documents related to harassment investigation and permit the redeposition of a witnesses who testified that "whether a particular action violated the [employer's] sexual harassment policy depended on outside counsel's advice" and finding that, under *Rhone*, employer's reliance on counsel's advice constituted at-issue waiver).

- 14 –

## IV.    ARGUMENT

**A.    J&J should not be permitted to make arguments and solicit testimony regarding knowledge and materiality that it blocked during discovery.**

In seeking summary judgment, J&J argued that: (1) "there is no evidence that anyone at J&J with the duty of candor believed that [the FDA] submissions were material to the patentability of the '307 Patent," J&J Br. at 24, and (2) "there is no evidence of knowledge for any of [the prior art] references." *Id.* at 25. Such arguments would be proper if J&J had permitted fulsome discovery into these topics. However, as shown in Section II.A, J&J repeatedly blocked the plaintiffs' attempts to discover precisely this information through targeted discovery requests and depositions. J&J should not be permitted to withhold evidence regarding the inventors' and patent prosecutors' knowledge and views on materiality and then argue to the jury that such evidence does not exist—all while *also* asserting that the plaintiffs should be barred from mentioning to the jury any invocation of privilege, as J&J has indicated it will argue in its motions *in limine* (filed concurrently with this motion).

Indeed—and even more audaciously—J&J's summary judgment briefing asserts that the "[p]laintiffs did not even *ask* anyone at J&J about the materiality of these submissions, and [p]laintiffs' experts did not identify any evidence suggesting that any duty-bound J&J employee believed these submissions were material." *Id.* at 24 (emphasis in original). The depositions of Dr. Ralat and numerous inventors reveal this to be false: the plaintiffs asked numerous questions regarding each witness's views on materiality and J&J instructed them not to answer. Take Dr. Ralat, for example: when the plaintiffs asked how he determined what information was material to the patent application, J&J's counsel instructed Dr. Ralat not to answer based on the attorney-client privilege. Ex. 4 (Ralat Tr.) at 73:23–74:9. Likewise, when asked whether he had a duty to disclose specific withheld materials, counsel instructed him not to answer. *Id.* at 227:2-11.

- 15 –

Drs. Strauss, Li, and Marano were similarly told by counsel not to answer questions concerning ███████████████████████████████████████████ ███████████████████████. Ex. 5 (Strauss Tr.) at 14:16-24, 17:16–18:5; Ex. 7 (Li Tr.) at 144:15-21; Ex. 6 (Marano Tr.) at 161:11–62:3. If the inventors flagged material references for the patent prosecutors, those communications were withheld based on attorney-client privilege. For example, in the deposition of Dr. Christopher O'Brien (another inventor), plaintiffs' counsel asked: "was there any . . . kind of meeting with the clinicians where you all sat down and said: We want to make sure that the patent office has all the relevant scientific information, what should that information be, was there ever a meeting like that?" Ex. 13 (O'Brien Tr.) at 58:19-24. In response, J&J's counsel shielded the contents of that conversation from discovery by asserting that a J&J attorney would have been present at such meetings and, therefore, Dr. O'Brien could not discuss their contents. *Id.* at 59:10-12. By blocking the plaintiffs from discovering the contents of the conversations between the '307 inventors and the patent prosecutors, J&J necessarily blocked the plaintiffs from reviewing the conversations most likely to contain these individuals' views on the materiality of withheld materials.

The same is true with respect to the inventors' and patent prosecutors' knowledge of the relevant prior art references (the Ochsenkühn Study, the Kolios Study, the Afonso Study). A patentability search, patent audit, or freedom to operate search might well have turned up such references. But J&J withheld these searches based on privilege and similarly limited any testimony about such searches on grounds. *See* Ex. 4 (Ralat Tr.) at 60:18–63:25. It is simply unfair for J&J to block such discovery and then insist its prosecutors lacked all knowledge of the withholdings; J&J's privilege assertions severely impaired the ability to test such claims.

- 16 –

Under similar circumstances, courts have found that this use of privilege as both a sword and a shield constitutes at-issue waiver, subjecting the underlying testimony or evidence to disclosure. In *Apple Inc. v. Samsung Elecs. Co., Ltd.*, the court held that Samsung implicitly waived privilege as to certain documents by using them to assert that Samsung inadvertently (rather than intentionally) violated a protective order and to challenge whether any confidential information had been used. 306 F.R.D. 234, 241–42 (N.D. Cal. 2015). Samsung argued, *inter alia*, that there was "no evidence that anyone deliberately, with a purpose of sharing information that should not be shared at any time[,] disclosed that information." *Id.* at 242; *see also id.* at 243 n.65 (noting that in establishing its defense, Samsung asserted "[t]here is *no evidence* that Quinn Emanuel or Samsung ever realized that the [confidential] report transmitted in December 2012 had been transmitted before."). The court held that such an attempted use to claim innocence, based on advice and communications with counsel, cannot stand without disclosing the evidence to the opposing party so that the veracity of such claims can be tested: "In the context of defenses aimed to mitigate Samsung's admitted disclosure of confidential information contrary to the protective order, however, these arguments go beyond 'mere denials' [of the underlying claim] . . . . They go the merits [sic]. A party may neither disclose nor dispute contents of documents while simultaneously concealing other portions under a claim of privilege, when the truth of the party's statements 'can only be assessed by examination of the privileged communication.'" *Id*. at 244 (internal citations omitted).

J&J's invocation of privilege significantly impaired the plaintiffs' ability to gather evidence on the very allegations J&J now claims there is no evidence to support. The patent prosecution process not only included an attorney but was directed by an attorney; J&J's liberal exercise of its privilege means that a comprehensive evidentiary record could not be assembled

- 17 –

in discovery. "[W]hen the record shows that attorney-client advice played a significant role in formulating a party's subjective beliefs on central issues in the case, the adversaries are entitled to disclosure of the otherwise privileged material to test the credibility of those subjective beliefs." *In re Lidoderm Antitrust Litig.*, 2016 WL 4191612, at *1 (N.D. Cal. Aug. 9, 2016). In the absence of disclosure, preclusion is appropriate. *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1303 (Fed. Cir. 2018) (defendant "was the one who asserted the attorney-client privilege in the first instance and was also the one who failed to follow up later by deposing or otherwise making [the witness] available for examination prior to trial. [Defendant] cannot have it both ways. Accordingly, we conclude that the district court did not abuse its discretion in excluding this evidence on [defendant's] advice of counsel defense.").

The plaintiffs respectfully request that J&J be limited to arguments that comport with the bounds its assertions of privilege. J&J should not be permitted to argue that there is "no evidence" that an individual with a duty of candor did not know about the (1) FDA submissions, and (2) the relevant prior art references (the Ochsenkühn Study, the Kolios Study, and the Afonso Study). Likewise, J&J should not be precluded from arguing or soliciting testimony regarding the inventors' and patent prosecutors' views on the materiality of these references.

**B.      J&J witnesses should be precluded from offering their subjective views on the strengths and weaknesses of the '307 patent, including their views on the likely outcome of any district court litigation or *inter partes* review regarding that patent.**

In discovery, the plaintiffs sought documents and solicited testimony regarding J&J's subjective views on the strength of the '307 patent and the likelihood that it would be invalidated in an *inter partes* review (IPR) or lawsuit. J&J denied the plaintiffs all discovery into J&J's communications and documents on this topic. *See* Section II.B, *supra*.

J&J also prevented its employees from testifying on these topics. For example, when plaintiffs' counsel asked a J&J attorney, Ms. Denise DeFranco, about ███████████████████

- 18 –

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████. Ex. 11 (DeFranco

Tr.) at 183:19–84:9. But for the assertion of privilege, Ms. DeFranco's testimony would have

allowed the plaintiffs to explore ████████████████████████████████████████████

███████████████████████████████████.

These privilege assertions foreclose J&J from offering any testimony or argument at trial

regarding its subjective views on the strength or weakness of the '307 patent. J&J should not be

permitted to assert that *it subjectively believed* this patent offered robust protection or that its

inclusion in the settlement agreements was procompetitive (a justification that only carries force

if that patent is valid) when it prevented plaintiffs from testing those assertion during discovery.

*Bowne of New York City, Inc. v. AmBase Corp.* supports preclusion. 150 F.R.D. 465 (S.D.N.Y.

1993). There, the plaintiff sought evidence concerning the defendant's role in the belated

distribution of shareholder proxy statements that delayed sale of the defendant's subsidiary. *Id.* at

469. The defendant asserted privilege over 1,500 documents and certain testimony in deposition.

*Id.* at 470. The plaintiff argued that the defendant "cannot withhold testimony reflecting the

knowledge of various attorneys, both in-house and from the [outside counsel], concerning what

caused the missed mailing because that testimony is vital to determining whether the fault for

this misfortune rested . . . with [defendant] or its attorneys or its accountants, all of whom were

involved in the effort to complete the shareholder documents." *Id.* at 487–88. In finding at-issue

waiver, the court noted that "even if a party does not attempt to make use of a privileged

communication, he may waive the privilege if he asserts a factual claim the truth of which can

only be assessed by examination of a privileged communication." *Id.* at 488. In *Bowne*, the

deposition testimony established that both inside and outside counsel had played a role in the

- 19 –

organization, coordination, and ultimately delivery of the proxy statement. *Id.* at 489. Deprived of an opportunity to assess and evaluate that role and—importantly—any direction the attorneys were provided, it would not be possible for a factfinder to allocate fault to the proper parties. *Id.*

The same risk applies here. J&J has prevented discovery on its subjective beliefs regarding the validity of the '307 patent and the risk of an adverse invalidity finding in an IPR or in litigation. Without access to relevant but privileged evidence, the plaintiffs have no way to test whether J&J truly believed the patent was viable. Given the stage of litigation, it is not practicable for J&J to disclose evidence it has thus-far shielded. J&J has exercised its right to withhold privileged information on this topic; it must now accept the consequences of that election and not solicit any testimony regarding its subjective views on the strengths or weaknesses of the '307 patent or the outcome of any litigation or IPR concerning that patent.

## C.    J&J placed at issue its knowledge and awareness of the Momenta patents, requiring evidence of its subjective beliefs to be precluded from trial.

J&J insists that "to have had the requisite intent to monopolize a market by acquiring these patents to block biosimilar competition, ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████" J&J Br. at 35–36. In its summary judgment papers, J&J asserts that the plaintiffs' claim relating to the acquisition of the Momenta patents fails, in part, because at the time of the acquisition, "████████████████████████████████████████████████

████████████; and (3) J&J could not have known what manufacturing processes a potential future biosimilar manufacture would use, let alone that any Momenta patents would cover those processes." *Id.* at 2. J&J further contends that the Momenta patents were not discussed at all in connection with, and therefore played no role in, its acquisition of Momenta. *Id.* at 34–35.

- 20 –

J&J's position stands in stark contrast to what the plaintiffs have been able to piece together in discovery in light of J&J's privilege assertions. J&J refused to produce "documents and communications concerning J&J's understanding of the scope of the Momenta patents and their relevance to the Amgen biosimilar Ustekinumab product." Ex. 9 (J&J's Objs. and Resps. to Pls.' 1st Set of RFPs) at No. 42. Dr. Miller, the J&J employee who analyzed assets, including patents, in connection with the Momenta acquisition, was instructed not to answer questions concerning ███████████████████████████████████████████████████ ██████████████████████████████████████. Ex. 10 (M. Miller Tr.) at 53:6–54:9, 96:5–17, 139:13–144:1. J&J also submitted extensive privilege logs detailing relevant documents that were withheld for privilege, ████████████████████████████████████████████ ███████████████████████████. *See* Section II.C, *supra* (citing withheld email families by subject line). The underlying documents on the privilege log were never produced.[7]

*In re Lidoderm Antitrust Litigation*, a case arising from a brand and generic's settlement of their patent dispute that resulted in the delayed launch of the generic drug, involved a comparable fact pattern. 2016 WL 4191612 (N.D. Cal. Aug. 9, 2016). Prompted by ongoing privilege disputes, the court ordered defendants to identify all the subjective beliefs they intended to rely on at trial with respect to five topics concerning the settlement. *Id.* at *1–2. The

---

[7] Denise DeFranco's deposition testimony regarding the timeline of her awareness of the Momenta patents does not remedy J&J's withholding. First, as explained in the plaintiffs' sur-reply in opposition to J&J's motion for summary judgment, Ms. DeFranco provided three different accounts of when she learned of the existence of the Momenta patents. *See* ECF No. 651 at 2–4. More fundamentally, the plaintiffs are entitled to test Ms. DeFranco's assertions by reference to relevant documents. *See Penn Nat'l Mut. Cas. Ins. Co. v. Va. Elec. & Power Co.*, 2021 WL 6203177, at *5 (E.D.N.C. May 19, 2021) ("[A] deposition is not a substitute for responding to requests for production of documents").

defendants identified between 11 and 29 subjective beliefs, which the court then analyzed to determine if they relied on or were informed by legal advice. The court concluded:

> [M]any of the subjective statements identified by defendants rely in significant part on legal advice. The depositions of defense fact witnesses and the assertions of privilege in those depositions demonstrate that legal advice was provided and considered. The privilege logs likewise show that legal advice was provided on these topics and considered by senior management, and confirm that defendants' settlement negotiators and often primary decision-makers were the attorneys."

*Id.* at \*5–6. *Lidoderm* recognized that it was not possible or practicable to get to the truth concerning the motivations, concerns, interests, and incentives that would help a fact-finder determine if the settlement was anticompetitive by screening away access to probative information for the opposing party. Allowing the defendant to introduce its subjective beliefs without disclosing the corresponding privileged evidence would allow the holder of the privilege to craft a narrative that could not be adequately questioned or challenged. The appropriate remedy, if "defendants choose to rely on a subjective belief [that] directly implicate[s] attorney-client advice," was to find an at-issue waiver and either require production of the withheld evidence or preclude the defendant from asserting their subjective beliefs at trial. *Id.* at \*2, \*6.

The same outcome (and rationale) is appropriate here. While, as this Court has recognized, J&J is wrong on the intent required to support a monopolization claim (*see* ECF No. 119 (MTD Order) at 32),[8] J&J has consistently predicated its defense on its lack of knowledge of the ███████████████████████████████████████████. J&J Br. at 36 ("██████ ███████████████████████████████████████████████████████████████████ ████████████████████████."). As is apparent from testimony and the privilege log, the

---

[8] Holding that where "the acquisition of a patent related to the subject matter of the monopoly has the effect of increasing or prolonging the monopolist's market power because competitors cannot use the patented invention," that acquisition "is anticompetitive."

- 22 –

answers to questions concerning J&J's knowledge of the Momenta patents have been shielded by privilege. Without access to the communications withheld as privileged concerning the Momenta patents in 2020 through 2022, the plaintiffs are deprived of contemporaneous, original source material that will demonstrate what J&J knew and when. When J&J employees were instructed not to answer questions concerning their knowledge of the Momenta patents, the plaintiffs were precluded from exploring topics that might contradict or conclusively refute J&J's arguments as to its knowledge. *Galaxy Computer Servs., Inc. v. Baker*, 325 B.R. 544, 559 (E.D. Va. 2005) ("plaintiff's objections during the deposition 'likely precluded as full an exploration of documents and issues . . . as the defendant would have been entitled to make, had there been a contemporaneous judicial finding of waiver of attorney-client privilege'") (quoting *Engineered Prods. Co. v. Donaldson Co., Inc.*, 313 F. Supp. 2d 951, 1023 (N.D. Iowa 2004).

If J&J was not claiming lack of knowledge of the Momenta patents as a defense, its invocation of privilege might have less import. But not only is J&J asserting such a defense, that defense appears to be flatly contradicted by the limited discovery available to the plaintiffs concerning the relevant period. Based on the privilege log and the deposition testimony confirming the extensive involvement of counsel, any testimony presented at trial by J&J concerning the company's knowledge of the patents would necessarily disclose some aspects of one or multiple privileged communications, or share information derived from advice from counsel. Under *Rhone*, such testimony would be viewed as supporting J&J's lack of knowledge defense; but it could only be vetted if the underlying privileged evidence were made available. Under *Hearn*, what J&J employees knew and when is relevant regardless of whether J&J claimed a lack of knowledge. Accordingly, under either test, the Court has ample grounds on which to preclude testimony on this topic.

- 23 –

## V.    CONCLUSION

For these reasons, the plaintiffs respectfully ask the Court to enter the accompanying order precluding J&J's counsel, experts, and fact witnesses from presenting evidence or argument at summary judgment or trial concerning: (1) The views and/or beliefs of any inventor, patent agent, or patent prosecutor associated with the '307 patent regarding the materiality of documents not provided to the PTO during prosecution of the '307 patent; (2) any conversations between the '307 patent inventors, patent agents, and/or patent prosecutors regarding any of the documents not provided to the PTO; (3) whether any J&J patent agent, patent prosecutor, attorney, outside counsel, or outside consultant searched for, found, knew of, and/or withheld any version of (including posters, abstracts, summaries, or later versions of or updates to the same study) the Ochsenkühn Study, the Kolios Study, and the Afonso Study; (4) the subjective views and/or beliefs of any J&J employee or any attorney representing J&J or providing J&J legal advice on: (a) the strengths and weaknesses of the '307 patent; and (b) the likelihood the '307 patent would be upheld or validated in *inter partes* review petitions before the PTO or litigation; and (5) when J&J employees or attorneys first became aware of the Momenta patents, the content of any of the Momenta patents, and/or the potential for using the Momenta patents to sue or threaten to sue any biosimilar manufacturers.

Dated: November 4, 2025                    Respectfully submitted,

                                            *s/ Marc C. Greco*
                                            Marc C. Greco (VSB No. 41496)
                                            William H. Monroe, Jr. (VSB No. 27441)
                                            Kip A. Harbison (VSB No. 38648)
                                            Michael A. Glasser (VSB No. 17651)
                                            **GLASSER AND GLASSER, P.L.C.**
                                            Crown Center, Suite 600
                                            580 East Main Street
                                            Norfolk, VA 23510
                                            Telephone: (757) 625-6787

bill@glasserlaw.com
marcg@glasserlaw.com
kip@glasserlaw.com
michael@glasserlaw.com

Thomas M. Sobol (*pro hac vice*)
Hannah W. Brennan (*pro hac vice*)
Abbye R. K. Ognibene (*pro hac vice)*
Whitney E. Street (*pro hac vice*)
Rebekah Glickman-Simon (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
One Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
tom@hbsslaw.com
hannahb@hbsslaw.com
abbyeo@hbsslaw.com
whitneyst@hbsslaw.com
rebekahgs@hbsslaw.com

Peter D. St. Phillip (*pro hac vice*)
Uriel Rabinovitz (*pro hac vice*)
Raymond Girnys (*pro hac vice*)
Noelle Ruggiero (*pro hac vice*)
Alexis Castillo (*pro hac vice*)
Thomas Griffith *(pro hac vice)*
Peyton A. Woodward (*pro hac vice)*
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
PStPhillip@lowey.com
URabinovitz@lowey.com
RGirnys@lowey.com
NRuggiero@lowey.com
ACastillo@lowey.com
tgriffith@lowey.com
pwoodward@lowey.com

John Radice (*pro hac vice*)
April Lambert (*pro hac vice*)
Kenneth Pickle (*pro hac vice*)
Charles Kopel (*pro hac vice*)
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540

- 25 –

Telephone: (646) 245-8502
jradice@radicelawfirm.com
alambert@radicelawfirm.com
kpickle@radicelawfirm.com
ckopel@radicelawfirm.com

*Counsel for Plaintiffs CareFirst of Maryland, Inc.,
Group Hospitalization and Medical Services, Inc.,
and CareFirst BlueChoice, Inc.*

**CERTIFICATE OF SERVICE**

I, Marc C. Greco, certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.

Dated: November 4, 2025                                    */s/ Marc C. Greco*
                                                          Marc C. Greco