## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

CAREFIRST OF MARYLAND, INC.,
GROUP HOSPITALIZATION AND
MEDICAL SERVICES, INC., and
CAREFIRST BLUECHOICE, INC., on behalf
of themselves and all others similarly situated,

Plaintiffs,

v.

JOHNSON & JOHNSON and JANSSEN
BIOTECH, INC.,

Defendants.

Civil Action No. 2:23-cv-00629-JKW-LRL

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS JOHNSON & JOHNSON AND JANSSEN BIOTECH, INC.'S MOTION *IN LIMINE* NO. 2 TO PRECLUDE EVIDENCE RELATED TO PLAINTIFFS' ATTEMPT TO EXPAND THE SCOPE OF THE ALLEGED FRAUD**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................. 1

II.   LEGAL STANDARD...................................................................................... 2

III.  ARGUMENT .................................................................................................. 3

A.    Evidence concerning J&J's enforcement of its unlawfully obtained patents is highly relevant and will be appropriately described to the jury. ................................................................................................................. 3

1.    J&J's settlements with biosimilar competitors are continuations of its anticompetitive conduct and are relevant to antitrust injury. .......................................................... 4

2.    J&J's settlements are relevant to J&J's motive, intent, and knowledge. ...................................................................... 7

3.    J&J seeks to put its patent enforcement and settlement conduct at issue by claiming that this conduct offered "procompetitive" benefits. .......................................... 8

B.    J&J's efforts to limit the plaintiffs' proof concerning their *Walker Process* fraud claims are procedurally improper and are not justified by the Rules of Evidence. ...................................................... 9

1.    The Court should not preclude the plaintiffs from offering evidence regarding withheld prior art. ...................................... 11

a.    The plaintiffs have not "abandoned" any prior art evidence. ...................................................................... 12

b.    The Court has not barred all use of certain prior art at trial. ...................................................................... 14

c.    The prior art evidence is relevant to materiality and intent. ...................................................................... 15

d.    The prior art evidence is relevant to J&J's misrepresentations about the lack of studies concerning the use of ustekinumab to treat UC. .......................... 19

2.    Dr. Ralat owed duties to the PTO as the author of the '307 patent application. .................................................................. 21

- i -

3.    J&J's affirmative statements gave rise to a duty of reasonable inquiry. ................................................................... 25

IV.    CONCLUSION ........................................................................................ 26

## TABLE OF AUTHORITIES

**Cases**

*A.Hak Indus. Servs. BV & A.Hak Intank Serv., LLC v. TechCorr USA Mgmt., LLC*,
2014 WL 12591696 (N.D. W.Va. Dec. 18, 2014) .................................................................10

*In re Asacol Antitrust Litig.*,
233 F. Supp. 3d 247 (D. Mass. 2017) ...........................................................................7, 16

*Aventis Pharma S.A. v. Hospira, Inc.*,
675 F.3d 1324 (Fed. Cir. 2012) .....................................................................................20

*Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*,
652 F. Supp. 1400 (D. Md. 1987) .................................................................................2, 21

*Bd. of Trade of City of Chicago v. United States*,
246 U.S. 231 (1918) ...........................................................................................................7

*Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*,
51 F.3d 1229 (4th Cir. 1995) ...........................................................................................13

*E.I. DuPont De Nemours & Co. v. Kolon Indus., Inc.*,
564 F. App'x 710 (4th Cir. 2014) ...............................................................................3, 10

*Emami v. Bolden*,
241 F. Supp. 3d 673 (E.D. Va. 2017) ...........................................................................2, 19

*Folse v. McCormick*,
2024 WL 110679 (S.D. W. Va. Jan. 10, 2024) ...............................................................9

*In re HIV Antitrust Litigation*,
2023 WL 5670808 (N.D. Cal. Mar. 19, 2023) ...............................................................16

*Int'l Wood Processors v. Power Dry, Inc.*,
792 F.2d 416 (4th Cir. 1986) ...........................................................................................5

*Louzon v. Ford Motor Co.*,
718 F.3d 556 (6th Cir. 2013) .......................................................................................2, 21

*McGowan v. Murphy-Brown, LLC*,
2018 WL 2416583 (E.D.N.C. May 29, 2018) ...............................................................13

*Mountain Valley Pipeline, LLC v. 5.88 Acres of Land, Owned by Flora*,
2021 WL 1235377 (W.D. Va. Mar. 31, 2021) ...............................................................2, 21

*Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*,
 424 F.3d 1347 (Fed. Cir. 2005)............................................................................................24

*Pantech Corp. v. OnePlus Tech. (Shenzen) Co., Ltd.*,
 No. 5:22-cv-69, ECF No. 234 (E.D. Tex. Mar. 1, 2024) (J&J Ex. 4)...............................13, 19

*Pantech Corp. v. OnePlus Tech. (Shenzhen) Co.*,
 2024 WL 5510402 (E.D. Tex. Aug. 20, 2024) ........................................................................19

*PerDiemCo, LLC v. Industrack, LLC*,
 No. 2:15-cv-727 (E.D. Tex.) .....................................................................................13, 14, 19

*Prof'l Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
 508 U.S. 49 (1993)......................................................................................................................6

*Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc.*,
 2022 WL 585812 (W.D. Va. Feb. 25, 2022) ...............................................................................1

*SCM Corp. v. Xerox Corp.*,
 645 F.2d 1195 (2d Cir. 1981).......................................................................................................5

*Shuffle Tech Int'l LLC v. Scientific Games Corp.*,
 2017 WL 3838096 (N.D. Ill. Sept. 1, 2017) .............................................................................26

*Synthon IP, Inc. v. Pfizer Inc.*,
 472 F. Supp. 2d 760 (E.D. Va. 2007), *aff'd in part*, 281 F. App'x 995 (Fed.
 Cir. 2008) ............................................................................................................................20, 24

*Therasense, Inc. v. Becton, Dickinson & Co.*,
 649 F.3d 1276 (Fed. Cir. 2011)............................................................................................16, 20

*Thurston v. Washington Metro. Area Transit Auth.*,
 No. 1:24-cv-00832-WBP, 2025 WL 819109 (E.D. Va. Mar. 14, 2025)...............................2, 21

*United States v. Ferguson*,
 140 F.4th 538 (4th Cir. 2025) .....................................................................................................2

*United States v. Kiza*,
 855 F.3d 596 (4th Cir. 2017) .......................................................................................................2

*Vir2us, Inc. v. Sophos Inc.*,
 No. 2:19-cv-18, 2025 WL 299392 (E.D. Va. Jan. 24, 2025)....................................................13

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
 382 U.S. 172 (1965).......................................................................................................... *passim*

*In re Zetia (Ezetimibe) Antitrust Litigation*,
 No. 2:18-MD-2836-DEM, 2023 WL 4155408 (E.D. Va. Mar. 31, 2023)..............................2, 3

**Statutes**

35 U.S.C. § 103 .................................................................................................................16

**Rules**

37 C.F.R. § 1.56 ...............................................................................................19, 21, 22, 24

37 C.F.R. § 11.18 .............................................................................................................25

Fed. R. Civ. P. 56 ............................................................................................................13

Fed. R. Evid. 401 .........................................................................................................2, 26

Fed. R. Evid. 403 ......................................................................................................3, 6, 26

# I.    INTRODUCTION

At trial, the plaintiffs will present evidence that J&J engaged in a monopolistic scheme to protect its supracompetitive prices for Stelara by unlawfully obtaining and enforcing patents to delay competition. The plaintiffs' central theory has remained unchanged throughout this litigation: J&J unlawfully obtained two sets of patents—the '307 patent and the Momenta patents—and then asserted those patents against all its would-be competitors (biosimilar ustekinumab manufacturers) to obtain licensed entry dates that extended J&J's monopoly over ustekinumab for nearly two years. *Compare* ECF No. 1 (Initial Compl.) ¶¶ 3–8 *with* ECF No. 641 (Third Am. Compl., "TAC") ¶¶ 3–8.

While J&J's Motion *in Limine* No. 2 (ECF No. 666, "J&J MIL No. 2") purports to seek exclusion under Rules of Evidence 402 and 403, what J&J really seeks are substantive findings on whether the plaintiffs have met their burden of proof on specific aspects of their claims. This is an improper use of motions *in limine* which "are not proper procedural devices for the wholesale disposition of theories or defenses." *Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc.*, 2022 WL 585812, at *2 (W.D. Va. Feb. 25, 2022) (internal quotation omitted). Specifically, J&J seeks to preclude argument and evidence relating to (1) whether "J&J's enforcement of and settlements related to" the patents "were themselves antitrust violations," (2) the prior art "that Plaintiffs have abandoned or the Court has dismissed," (3) whether certain J&J employees owed "a duty of candor" and/or "knew about or withheld the information . . . from the . . . PTO," and (4) "any purported duty to conduct prior art searches." J&J MIL No. 2 at 1.

J&J's motion attempts to deprive the jury of highly relevant evidence concerning J&J's misconduct by misrepresenting the plaintiffs' claims, ignoring the operative law and this Court's prior orders, and asking the Court to engage in fact-finding through a motion *in limine*—a procedurally improper request. The jury should be permitted to hear the relevant evidence

concerning J&J's misconduct, and J&J has failed to show that any of the evidence it seeks to exclude would be unduly prejudicial. To be clear, the plaintiffs will only seek to use evidence and argument as permitted by the Court and the Federal Rules of Evidence; they will not mischaracterize their claims nor seek relief for alleged misconduct that the evidence does not support. The jury will then decide whether the plaintiffs have met their proof. The plaintiffs respectfully submit that J&J's motion should be denied.

## II.    LEGAL STANDARD

Motions *in limine* are intended to help the Court and the parties streamline evidentiary issues for trial by excluding categories of *evidence*, not *theories* of liability or damages. *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013); *Thurston v. Washington Metro. Area Transit Auth.*, No. 1:24-cv-00832-WBP, 2025 WL 819109, at *1 (E.D. Va. Mar. 14, 2025); *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987) ("a motion *in limine* is not the appropriate procedure vehicle" to "narrow or fix the issues to be tried"). As such, it is procedurally improper to seek exclusion through a motion *in limine* (rather than summary judgment) on issues where there remain genuine disputes of material fact. *Mountain Valley Pipeline, LLC v. 5.88 Acres of Land, Owned by Flora*, 2021 WL 1235377, at *8 (W.D. Va. Mar. 31, 2021).

Motions *in limine* "'should be granted only when the evidence is clearly inadmissible on all potential grounds.'" *Emami v. Bolden*, 241 F. Supp. 3d 673, 681–82 (E.D. Va. 2017) (quoting *United States v. Verges*, No. 1:13-cr-222-JCC, 2014 WL 559573, at *3 (E.D. Va. Feb. 12, 2014)); *see also In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836-DEM, 2023 WL 4155408, at *1 (E.D. Va. Mar. 31, 2023) (same). While irrelevant evidence is properly excluded under Rule 401, "[r]elevance is an exceptionally low bar[.]" *United States v. Ferguson*, 140 F.4th 538, 544 (4th Cir. 2025); *see also United States v. Kiza*, 855 F.3d 596, 604 (4th Cir. 2017) (the

"threshold for determining whether evidence is relevant is comparatively low"). Likewise, Rule 403 permits the exclusion of relevant evidence "only when that unfair prejudice substantially outweighs the probative value of the evidence" and "therefore evidence should be excluded only sparingly." *Zetia*, 2023 WL 4155408 at *1 (quoting *United States v. Mohr*, 318 F.3d 613, 619–20 (4th Cir. 2003) and *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996)). In Rule 403 balancing, courts should "ordinarily . . . give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *E.I. DuPont De Nemours & Co. v. Kolon Indus., Inc.*, 564 F. App'x 710, 715 (4th Cir. 2014) (citation and quotation omitted).

## III.    ARGUMENT

### A.    Evidence concerning J&J's enforcement of its unlawfully obtained patents is highly relevant and will be appropriately described to the jury.

J&J seeks to preclude the plaintiffs from arguing that its settlements with its biosimilar competitors, standing alone, constitute an antitrust violation. If the request is that limited, then there is nothing to preclude. The prior proceedings in this case—along with the Third Amended Complaint and this Court's Rule 12(b)(6) order—are clear: the alleged monopolization scheme is founded on J&J's unlawful acquisition *and* later enforcement of the '307 and Momenta biosimilar patents. The settlements that J&J procured through its monopolistic acts are both *results and continuations* of J&J's anticompetitive actions: the patents allowed J&J to obtain agreements delaying biosimilar competition, depriving the plaintiffs of cheaper drugs. At no time have the plaintiffs argued that the settlements *standing alone* are an antitrust violation. As a result, this Court drew the line between the antitrust violation and the antitrust injury wrought by the settlements appropriately. ECF No. 119 (MTD Order) at 26–29.

However, J&J seems to ask the Court to preclude the plaintiffs from adducing evidence regarding the antitrust injury that resulted from the settlements or implying that the settlements

were a part of the overall anticompetitive scheme. That argument, of course, has been core to the case since its inception. *See, e.g.*, ECF No. 1 (Initial Compl.) ¶ 8; ECF No. 641 (TAC) ¶ 8. Evidence concerning these settlements is highly relevant and characterizing them as anticompetitive is entirely consistent with the law.

1. **J&J's settlements with biosimilar competitors are continuations of its anticompetitive conduct and are relevant to antitrust injury.**

Just as it did during Rule 12 briefing, J&J seeks to reframe the plaintiffs' allegations concerning the anticompetitive conduct and injury at issue, claiming that because "enforcing the '307 patent and the Momenta Manufacturing Patents" is not "an antitrust violation," the plaintiffs cannot argue that such enforcement "constituted anticompetitive conduct." ECF No. 666 (J&J MIL No. 2) at 2–3 & n.1; *see also* ECF No. 46 (J&J MTD Br.) at 22–24 ("The Settlement Agreements Do Not Constitute Actionable Exclusionary Conduct"). As the Court has held, this argument fails.

*First*, J&J asserts that because the plaintiffs allege that the way J&J *obtained* the patents is the relevant misconduct, it cannot tell the jury that their *enforcement* was unlawful. But, as this Court has recognized, the chain is clear and interconnected: the basis for J&J's antitrust *liability* is its acquisition of the Momenta and '307 patents, while the purchasers' antitrust *injury* (the supra-competitive prices they continued to pay) flows from the settlements J&J secured with biosimilar competitors using those patents. MTD Order at 36–37 (citing *Amphastar Pharmaceuticals Inc. v. Momenta Pharmaceuticals, Inc.*, 850 F.3d. 52 (1st Cir. 2017)). Antitrust injury is of course entwined with liability, as it is "'injury of the type the antitrust laws were designed to prevent *and that flows from that which makes defendants' acts unlawful*.'" *Id.* at 16 (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986)) (emphasis added).

*Second*, J&J advocates for line-drawing that neither logic nor the law support. It seeks to exclude the center link in a three-piece chain, arguing that the plaintiffs may argue to the jury that (1) obtaining the patents was anticompetitive and (3) the resulting prices were supra- or anticompetitive,[1] but cannot argue (2) the link in the center—the enforcement that the acquisitions made possible and which caused the supracompetitive prices—was anticompetitive or unlawful. ECF No. 666 (J&J MIL No. 2) at 2–3 & n.1. Besides being impractical and confusing, J&J's position finds no support in the law: the settlements are both a continuation of the unlawful act and independently relevant to antitrust injury.

As to the Momenta patents, the law is clear: J&J's assertion of unlawfully obtained patents is a *continuing* anticompetitive act that cannot be severed from the acquisition in the way J&J seeks. *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir. 1981) ("Where… the acquisition itself is unlawful, the *subsequent exercise of the ordinarily lawful exclusionary power inherent in the patent would be a continuing wrong, a continuing unlawful exclusion of potential competitors*.") (emphasis added); *Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 429 (4th Cir. 1986) (patent enforcement "constitutes an *anticompetitive extension* of the patent monopoly"). As a matter of law, J&J's assertion of the Moment patents is an anticompetitive act flowing from its unlawful acquisition, and the plaintiffs may refer to it as such.

The law on the '307 patent is equally clear: the Supreme Court has "concluded that the *enforcement* of a patent procured by fraud on the Patent Office may be violative of [Section] 2 of the Sherman Act provided the other elements necessary to a [Section] 2 case are present."

---

[1] J&J's motion is silent on this topic, and thus it has waived any claim to the (meritless) argument that discussions of supracompetitive or anticompetitive prices is irrelevant. Nor could the law support such a claim, as supracompetitive prices are "undoubtably" the type of antitrust injury the plaintiffs must show. MTD Order at 16–17.

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965). The plaintiffs allege that J&J enforced—through actual or threatened litigation—a patent procured by fraud. Such conduct, if proven, violates the Sherman Act and is, thus, anticompetitive. The plaintiffs may refer to it as such.

J&J's attempt to tie its argument to the Court's dismissal of the plaintiffs' sham allegations fails. ECF No. 666 (J&J MIL No. 2) at 3. The plaintiffs have consistently maintained that J&J fraudulently obtained the '307 patent, and, thus, it is unenforceable (*see, e.g.*, ECF No. 1 (Initial Compl.) ¶¶ 5, 6, 93, 135), while *also* noting that it is invalid for obviousness and anticipation. *See, e.g., id.* ¶¶ at 124, 128, 130, 132.[2] The sham allegations sought an additional theory of liability: to prove sham, the plaintiffs would have had to prove that J&J's enforcement of the '307 patent was objectively baseless and that J&J asserted it for an improper purpose. *Prof'l Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993). With the sham theory dismissed, the plaintiffs no longer have that theory of wrongdoing. But the absence of that claim does not render the plaintiffs' arguments regarding anticipation or obviousness irrelevant. Under the operative complaint, the plaintiffs are permitted to argue that (1) J&J "lacked a basis to enforce the '307 Patent" (compare J&J MIL No. 2. at 3) because J&J knew it was procured through fraud and was thus unenforceable, (2) the '307 patent was weak, and (3) and that a reasonable patent practitioner would not have believed it would upheld either in litigation or through *inter partes* review. This evidence is relevant.

J&J's speculative Rule 403 concerns do not outweigh this relevance. The jury will not be presented with any argument or instructions concerning a sham litigation theory or its elements. There is no risk that the plaintiffs' relevant arguments about the weakness of the '307 patent and

---

[2] *See* MTD Order at 57–60.

its role in J&J's overall scheme will lead to confusion about sham—a theory the jury will have heard nothing about. To the extent the Court has concerns about language, the plaintiffs will agree not to use the term "sham" at trial.

### 2.    J&J's settlements are relevant to J&J's motive, intent, and knowledge.

J&J's patent settlements are relevant and admissible evidence concerning J&J's motive for unlawfully obtaining patents. *See, e.g.*, *In re Asacol Antitrust Litig.*, 233 F. Supp. 3d 247, 266 (D. Mass. 2017) (evidence that "serves to illustrate the context and motive underlying the alleged anticompetitive conduct" is relevant and admissible) (citation omitted); *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918) ("knowledge of intent may help the court to interpret facts and to predict consequences").

The plaintiffs have consistently alleged that J&J engaged in a scheme motivated by its intent to delay biosimilar competition and that J&J's vehicle for delay was unlawfully procuring patents it could then use to cudgel competitors into settlements with delayed entry dates, prolonging J&J's monopoly. *See, e.g.*, ECF No. 1 (Initial Compl.) ¶¶ 4, 8 ("J&J's goal was not to win litigation; instead, J&J sought to use the unlawfully acquired patents to *delay entry* of would-be biosimilars through settlements that would buy J&J additional exclusivity beyond September 2023."). Discovery has borne out that motive. *See, e.g.*, Ex. 46 (PX72) at -789 (J&J Stelara strategy document listing ███████████████████████████████████████████ ; *id.* at -790 (same); *id.* at -792 (analyzing strategy of ███████████████████████████████████████████████████████████████ ██████████████).[3] J&J's claim that evidence that its patent enforcement was "motivated by

---

[3] Exhibit Nos. 1–43 are to the Declaration of Hannah W. Brennan in Support of Plaintiffs' Affirmative Motions *in limine* (ECF No. 687). Exhibit Nos. 44 onward are to the Declaration of Abbye R. K. Ognibene in Support of Plaintiffs' Opposition to Defendants' Motions *in limine*

anticompetitive intent . . . do[es] not bear on any remaining issues" is false. ECF No. 666 (J&J MIL No. 2) at 3.

J&J's argument to the contrary concerning the Momenta patents (*id.* at 3–4), simply repeats its incorrect interpretation of the intent standard, which has been fully briefed for this Court. *See* ECF No. 549 (Pls.' Opp. to Mot. for Summ. J.) at 31–32. And while J&J claims that "[e]vidence about enforcement is of no probative value" to the plaintiffs' claims concerning the '307 patent (ECF No. 666 (J&J MIL No. 2) at 4), the record reflects a different reality. J&J's strategy concerning the '307 patent ██████████████████████████████████ ████. *See* ECF No. 549 (Pls.' Opp. to Mot. for Summ. J.) at ¶ 57. J&J recognized that ██████ ██████ for the UC indication (the use claimed by the '307 patent) was ████████████████ ██████████████████. *Id.* Indeed, J&J pursued a direct-to-phase 3 strategy for its NCT 236 trial (the trial serving as J&J's basis for the '307 patent) ██████████████ ████████████████████████████████████████ ████████████████████████. Ex. 46 (PX72), slide 40. J&J fails to provide a sufficient basis to exclude this highly relevant evidence.

### 3.    J&J seeks to put its patent enforcement and settlement conduct at issue by claiming that this conduct offered "procompetitive" benefits.

While J&J moves this Court to prevent the plaintiffs from labeling its lawsuits and settlements as "anticompetitive," it *also* seeks to argue that those *same settlements* are "procompetitive" benefits for its alleged conduct (an argument the plaintiffs argue is factually and legally improper). *See* ECF No. 684 (Pls. MIL No. 2) at 13–16. It cannot have it both ways.

---

(Ognibene Decl.) filed contemporaneously with this opposition. Appendix A to this brief provides a chart of all Exhibit Nos. and the corresponding docket number (ECF No.).

J&J argues that its "the acquisition of the '307 Patent and Momenta Patents *and J&J's subsequent enforcement of those patents against biosimilar manufacturers* are lawful because they were procompetitive and justified by legitimate business reasons." ECF No. 260 (J&J Answer) at 90. As to the '307 patent, J&J claims its conduct was procompetitive because, *inter alia*, "J&J obtained the '307 Patent, *and later enforced that patent*, to protect J&J's significant investment and to allow J&J to fund future clinical research." Pls.' MIL Ex. 14 (J&J's First Supp. Obj. & Resps. to Pls.' 2nd Set of Interrogatories.) at 14 (Answer to No. 8). As to the Momenta patents, J&J claims that its acquisition was procompetitive because, *inter alia*, "J&J's acquisition of those patents resulted in *J&J licensing the Momenta Patents to multiple biosimilar manufacturers* years prior to their expiration." *Id.* at 15.

Fairness requires that J&J cannot *both* argue to the jury that its settlements were procompetitive *and* bar the plaintiffs from arguing the opposite.

**B.     J&J's efforts to limit the plaintiffs' proof concerning their *Walker Process* fraud claims are procedurally improper and are not justified by the Rules of Evidence.**

J&J's effort to exclude relevant evidence concerning the plaintiffs' *Walker Process* fraud allegations is devoid of authority under the Federal Rules and is instead an improper use of a motion *in limine* to resolve contested factual issues through evidentiary exclusions. J&J's arguments amount to a contortion of the history of this case and an attack on the sufficiency of the evidentiary record. But "[t]he ultimate determination of whether a party has presented sufficient evidence for a question to reach the jury is not properly resolved in a motion *in limine*." *Folse v. McCormick*, 2024 WL 110679, at *3 (S.D. W. Va. Jan. 10, 2024). The Court should deny J&J's improper motion for summary judgment on issues not timely raised.

Likewise, J&J should not be permitted to use vague accusations that evidence is impermissible to force the plaintiffs to disclose how they will use each piece of evidence within

overly broad categories (such as *all* non-Ochsenkühn prior art) to prove their claims at trial. As the Fourth Circuit recently instructed, "broad pre-trial evidentiary rulings, like that requested by a generalized motion *in limine*, present a serious risk of excluding admissible evidence." *A.Hak Indus. Servs. BV & A.Hak Intank Serv., LLC v. TechCorr USA Mgmt., LLC*, 2014 WL 12591696, at *1 (N.D. W.Va. Dec. 18, 2014) (describing *E.I. DuPont*, 564 Fed. Appx. 710). Nonetheless, to show the flaws in J&J's arguments and aid the Court in resolving this motion, the plaintiffs offer a summary of what they intend to present to the jury concerning J&J's patent fraud.[4]

*Drafting Misconduct.* J&J patent agent, Luis Ralat, drafted the '307 patent, with in-house patent attorney, Eric Dichter, overseeing his work. *See* Section III.B.2., *infra*. J&J engaged in three types of fraudulent conduct during drafting. *First*, J&J failed to disclose material references it was duty-bound to provide to the PTO: (1) the Ochsenkühn materials concerning the successful use of Stelara to treat ulcerative colitis (UC),[5] and (2) J&J's protocol for its clinical trial on the use of Stelara to treat UC (NCT 236).[6] *See, e.g.*, ECF No. 549 (Pls.' Opp. to Mot. for Summ. J.) ¶¶ 54, 60–63, 69–74. *Second*, when Dr. Ralat copied J&J's statements to the FDA verbatim into the '307 patent application, he specifically excised material representations

---

[4] The plaintiffs reserve all rights to amend these theories in response to, *inter alia*, orders by this Court or further disclosures by J&J. Because motions *in limine* are not intended to address substantive issues, the plaintiffs do not walk through the law governing each alleged fraudulent act but instead provide this summary as framework for rebutting J&J's relevance arguments.

[5] The plaintiffs allege that J&J intentionally withheld material prior art concerning Dr. Ochsenkühn's study. As J&J notes (ECF No. 665 (J&J MIL No. 1) at n.4), Dr. Ochsenkühn presented his research at two conferences, including by presenting a poster, publishing an abstract, and giving a special session talk to J&J employees. *See* ECF No. 549 (Pls.' Opp. to Mot. for Summ. J.) ¶ 71 & n.4. The plaintiffs reserve all rights to present evidence concerning the abstracts J&J identifies and Dr. Ochsenkühn's posters, requests for funding to J&J, and presentations.

[6] *See* Pls.' Opp. to J&J's MIL No. 7 at Section IV.C. (filed contemporaneously herewith, describing duty to submit to PTO relevant and material documentation submitted to FDA).

concerning the "substantial scientific and clinical rationale" for expecting that ustekinumab would work to treat UC—a rationale which existed *years before* J&J attempted to patent that use—including the Jostins and Granlund articles J&J cited in support. *See, e.g.*, *id.* at ¶¶ 67–69, pp. 24–25. *Third*, J&J told the PTO that "[p]rior to the present invention, no studies had been conducted with ustekinumab for UC"—a demonstrably false statement J&J was duty-bound to verify. *See, e.g.*, *id.* at ¶ 75. Any of these fraudulent acts is sufficient for the jury to find J&J liable for fraud.

*Patent Prosecution*. Mr. Dichter engaged in additional misconduct while prosecuting the '307 patent. In July 2020, the PTO rejected the '307 application as "unpatentable" over a J&J website posting of the NCT 236 trial. *Id.* at ¶ 77. To overcome the rejection, Mr. Dichter twice misrepresented that there was no reasonable expectation NCT 236 would succeed—first in a telephone interview with the examiner and later written remarks. *Id.* at ¶¶ 78–79. Mr. Dichter also failed to disclose any of material references (described above) that he was duty-bound to submit to the PTO during prosecution of the '307 patent.

J&J seeks to preclude broad swaths of evidence concerning these fraudulent acts, including *all* references to *any* of the alleged prior art in the pleadings and expert reports (save the Ochsenkühn materials) and contested evidence about its employees' involvement of the patent application. J&J's motion must be denied, as this evidence concerns disputed issues of fact which remain to be resolved by the jury.

### 1. The Court should not preclude the plaintiffs from offering evidence regarding withheld prior art.

Despite acknowledging that the plaintiffs identify more than 12 pieces of prior art in their expert reports and pleadings, J&J seeks to exclude any mention of all but *two* references (the Ochsenkühn materials) in a vague and unspecific motion supported by fewer than three pages of

argument. J&J's request lacks authority: J&J fails to cite *any* rule of evidence that supports its requested relief. Instead, J&J's ask rests on two faulty premises: that the plaintiffs "abandoned" such evidence or that the Court "dismissed" it. Each is factually inaccurate and legally inadequate to support exclusion. Further, this evidence remains highly relevant to live claims.

### a.     The plaintiffs have not "abandoned" any prior art evidence.

J&J argues that the plaintiffs' failure to cite every relevant piece of prior art (for every relevant use) in opposing J&J's summary judgment motion means that this evidence may not be used for *any purpose* at trial.

*First*, the factual record does not support this claim. J&J fails to cite any affirmative statements by the plaintiffs or their experts disclaiming reliance on this evidence, instead relying only on *its own characterizations* of the evidence. ECF No. 666 (J&J MIL No. 2) at 5. For example, to support its claim that the "Plaintiffs abandoned their prior art theories regarding (1) the scientific publications other the [sic] Ochsenkühn abstracts and Jostins/Granlund and (2) the CT.Gov Postings" (*id.* at 5), J&J cites to a footnote in its own summary judgment brief where it characterizes the plaintiffs' expert reports as "focusing" only on Ochsenkühn, Jostins, and Granlund (despite acknowledging that these experts expressly analyze the prior art J&J seeks to exclude). *Id.* (citing ECF No. 444 (J&J's Summ. J. Br.) at n.4). J&J claims its description of these expert reports justifies exclusion. But J&J's interpretations of the plaintiffs' expert reports do not establish "abandonment" of any claims or evidence in support of them. More fundamentally, J&J ignores that the plaintiffs *did cite and included as exhibits* at summary judgment several of the references J&J labels as "abandoned." *See, e.g.*, ECF No. 549 (Pls.' Opp. to Summ. J.) ¶¶ 54 (re Afonso and Kolios), 75 (referencing same), 77 & 85 (re CT.gov). Even under J&J's own logic, Afonso, Kolios, and CT.gov references were not "abandoned." J&J

offers no basis for their exclusion, as each was also in the initial complaint. *See, e.g.*, ECF No. 1 ¶¶ 103, 108, 111, 113.

      *Second*, J&J's sweeping position does not find support in the law. The plaintiffs are not constrained in what they may present to the jury in a multi-week trial by the limited evidence they could cite within a 40-page response to J&J's framing of summary judgment. *See, e.g.*, *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1233 (4th Cir. 1995) (noting, without criticism, that trial records are often more comprehensive than summary judgment records); 2010 Advisory Committee Notes to Fed. R. Civ. P. 56(e) (instructing a "fact is considered undisputed *only for purposes of the [summary judgment] motion*[,]" i.e., additional evidence may be used to dispute it at trial, and that, if the motion is denied, a party "remains free to contest the fact in further proceedings").

      J&J's case law holds no differently. ECF No. 666 (J&J MIL No. 2) at 6. *Vir2us Inc.* does not concern "abandonment"; it holds only that a plaintiff may not present evidence "outside the scope of the remaining issues to be tried" following a summary judgment order. *Vir2us, Inc. v. Sophos Inc.*, No. 2:19-cv-18, 2025 WL 299392, at *5 (E.D. Va. Jan. 24, 2025). No such order exists here. *McGowan v. Murphy-Brown, LLC*, 2018 WL 2416583, at *2 (E.D.N.C. May 29, 2018), excluded "evidence of dismissed and abandoned claims and parties"—such as claims for injunctive relief and evidence concerning defendants in *other* proceedings. Likewise, *Pantech Corp. v. OnePlus Tech. (Shenzen) Co., Ltd.*, No. 5:22-cv-69, ECF No. 234, at 4 (E.D. Tex. Mar. 1, 2024) (J&J Ex. 4), disallowed only prior art that the non-movant conceded was either abandoned or that its "experts did not opine on." J&J does not allege that *any* of the evidence it seeks to exclude was undisclosed in the plaintiffs' expert reports. Finally, J&J's framing of *PerDiemCo, LLC v. Industrack, LLC*, No. 2:15-cv-727 (E.D. Tex.), which lends more support to

the plaintiffs' position than it does J&J's, is misleading. ECF No. 666 (J&J MIL No. 2) at 6–7 & J&J Ex. 5. J&J provides *one page* of a transcript in this patent validity case, which did not concern *Walker Process* issues like materiality, intent, and knowledge. While the underlying briefing appears to be almost entirely under seal and the court's orders shed little light, a review of the full transcript shows that the patentee sought to exclude prior art the defendant did not "contend[] was invalidating." Ex. 58 (Full *PerDiemCo* Tr.) at 12:21. In the page after that excerpted by J&J, the court nonetheless *allowed the references* to be discussed at trial for the purposes they were identified as relevant: as background and to reflect the state of the science— the very purpose for which the plaintiffs seek to introduce many of the prior art references at issue here. *Id.* at 15:22-16:1; *see also id.* at 10:3-7 (describing ruling referenced at 16:1).

### b.    The Court has not barred all use of certain prior art at trial.

Next, J&J claims that the Court "dismissed" all the plaintiffs' *Walker Process* fraud prior art (other than the Ochsenkühn materials) in denying the plaintiffs leave to add allegations about such evidence to the complaint. ECF No. 666 (J&J MIL No. 2) at 5–6. This is inaccurate.

*First*, the Court discussed five studies in its Order: Jostins, Granlund, Bradbury, Downs, and Nakajima ("TAC Prior Art"). ECF No. 592 (TAC Order) at 19–20. The Order therefore has no impact on the relevance of any other prior art.[7] Because the plaintiffs did not "abandon" *any* prior art evidence, as discussed above, and J&J provided only abandonment and dismissal as bases to exclude, the five TAC Prior Art articles are the only ones at issue.

*Second*, J&J ignores that the Court also ordered that to the extent relevant facts about the TAC Prior Art were included in "contradictory statements J&J made to the PTO and FDA"

---

[7] The relevance of J&J's withheld FDA submissions, as opposed to prior art, is not raised in J&J's motion (J&J MIL No. 2 at 5 n.3) and is discussed in the plaintiffs' pposition to J&J's MIL No. 7.

(Category Four), such evidence may be used at trial. TAC Order at 19 n.13 ("Nothing in this Opinion and Order should be taken to preclude CareFirst from using the facts proposed in Category Four as evidence supporting its burden at . . . trial, subject to admissibility."); *see also id.* at 16 n.11 (citing ECF 341-2 (Pls.' Proposed TAC) ¶¶ 150, 152, 169 (which discuss Jostins and Granlund) as within Category Four). The plaintiffs will abide by the Court's instruction. They will not allege that J&J's withholding of the Jostins, Granlund, Bradbury, Downs, or Nakajima references were (alone or in combination) a separate source or theory of fraud. As detailed below, the plaintiffs will only use the facts contained in J&J's contradictory statements to the FDA and PTO for purposes of proving that J&J misrepresented the likelihood that ustekinumab would work to treat UC and knowingly withheld material references (the NCT 236 protocol and the Ochsenkühn materials) from the PTO. Put another way, the plaintiffs will use the facts contained in J&J's contradictory statements to the FDA and PTO to prove materiality, knowledge, and intent. J&J provides no basis to revisit the Court's order permitting this use.

### c.     The prior art evidence is relevant to materiality and intent.

J&J's sweeping motion to exclude prior art "for any purposes" would preclude the plaintiffs' from using the prior art to establish the materiality and intent prongs of the plaintiffs' *Walker Process* claims. J&J appears to equate whether the plaintiffs allege that J&J's withholding of TAC Prior Art constitutes fraud with whether the references are otherwise relevant to the plaintiffs' claims to be tried. While the Court denied leave to add the TAC Prior Art to the complaint, the Court explicitly rejected the relief J&J seeks with this motion: a prohibition on use of the facts contained therein—for any purpose—at trial. As the Court recognized, the plaintiffs need not allege that J&J's withholding of certain prior art constitutes fraud, in-and-of-itself, for the reference to be relevant. TAC Order at 19 n.13. This line-drawing is well-reasoned. As courts recognize, the plaintiffs may introduce relevant evidence even where

it does "not serv[e] as an independent source of liability." *Asacol*, 233 F. Supp. 3d at 267; *see also In re HIV Antitrust Litig.*, 2023 WL 5670808, at *2 (N.D. Cal. Mar. 19, 2023) (denying motion to "categorically bar" evidence relevant to dismissed claims if *also* relevant to surviving claims).

To establish the materiality, the plaintiffs must show that absent the alleged misconduct, the PTO would not have issued the '307 patent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291–93 (Fed. Cir. 2011). For example, the plaintiffs can meet their burden by showing that, if revealed to the PTO, any of J&J's omissions or misrepresentations would have resulted in a rejection for obviousness because the differences between the '307 patent's claims and the prior art (alone or in combination) would have been obvious to a person of skill in the art (POSA) at the relevant time. *See* 35 U.S.C. § 103. The plaintiffs' expert, patent practitioner Dr. Lisa Matovcik, walks through the withheld prior art and compares it (alone or in combination) to prior art known and unknown to the PTO.[8] J&J has argued that experts *must* conduct this analysis to opine on obviousness to the jury (*see* ECF No. 434 at 18–22 & ECF No. 670 at 1), and yet it seeks to hamstring Dr. Matovcik's ability to do so by significantly limiting the evidence she may use to conduct her obviousness analysis (which, as discussed below, also impacts the materiality analysis). J&J cites no law in support of this manifestly unfair result.

Likewise, J&J seeks to preclude the plaintiffs from using the Jostins and Granlund articles "to argue that Stelara was a widely known UC treatment prior to the '307 Patent and that J&J's statements to the PTO that this treatment was non-obvious were misrepresentations." ECF No. 666 (J&J MIL No. 2) at 6. As the Court found, the Jostins and Granlund articles were cited

---

[8] Dr. Matovcik's analysis includes the CT.gov, 2016 Stelara Prescribing Information (prior art absent from J&J's motion), Ochsenkühn, Kolios, and Afonso references. *See* Ex. 3 (Matovcik Rpt. ¶¶ 186–210 & 215–29).

in Category Four and Category Five documents, including in the NCT 236 protocol the Court permitted the plaintiffs to include in the operative complaint. TAC Order at 16 n.11 & 7 n.5. In that protocol (which J&J submitted to the FDA years before it applied for the '307 patent), J&J cites the Jostins and Granlund articles to support its statement that there was a "substantial scientific and clinical rationale to" to think Stelara would work to treat UC. ECF No. 549 (Pls.' Opp. to Summ. J.) ¶ 63. J&J provides no reason to preclude the plaintiffs from discussing at trial citations to Jostins and Granlund *in the NCT 236 protocol*, a reference the Court expressly permitted the plaintiffs to include as a part of their *Walker Process* violations. On this basis alone, J&J's motion fails.

Jostins and Granlund are also relevant and admissible for at least four independent purposes "as evidence supporting [the plaintiffs'] burden at . . . trial," even though J&J's failure to submit them does not form an independent basis for liability. TAC Order at 19 n.13.

*First*, they are relevant to establish the state of the science in September 2018. Indeed, J&J cited them for this very purpose—to convince the FDA that, by late 2015, the state of the science supported skipping Phase 2 efficacy trials for use of ustekinumab to treat UC. *See* ECF No. 549 (Pls.' Opp. to Summ. J.) ¶¶ 59–60. It would be manifestly unfair to permit J&J to argue that the results of NCT 236 were uncertain while depriving the jury of evidence that J&J— including through the '307 inventors—asserted the exact opposite and the basis it provided the FDA for that argument (including Jostins and Granlund).

*Second*, Jostins and Granlund constitute facts relevant to the plaintiffs' burden of proof concerning the materiality of (1) the NCT 236 protocol, which cites to each study; (2) the "substantial scientific and clinical rationale" to believe Stelara would work to treat UC (which included cites to the studies) that J&J provided to the FDA but excised from the '307 patent

application; and (3) Mr. Dichter's misrepresentations about the likely success of NCT 236. J&J's inventors repeatedly cited Jostins and Granlund (internally and externally) as supporting the likelihood that Stelara would work to treat UC as early as 2015. ECF No. 549 (Pls.' Opp. to Summ. J.) ¶¶ 56, 59–63. J&J seeks to argue to the jury that the NCT 236 protocol was not material to the '307 application, i.e., that the protocol was not relevant to whether the use of ustekinumab to treat UC was inventive or obvious in 2018 or was cumulative to other materials before the PTO. *See* ECF No. 444 (J&J Summ. J. Br.) at 23–24 & 30–32. Facts that contradict J&J's position—such as the inventors' use of Jostins and Granlund to argue the opposite to the FDA or Dr. Ralat's decision to affirmatively delete references to them because they did not support patentability—are highly relevant to the plaintiffs' claims (and placed at issue *by J&J*).

*Third*, Jostins and Granlund are relevant to the involved J&J employees' intent in committing these three fraudulent acts. In claiming that ustekinumab would work to treat UC to the FDA, J&J employees (including multiple named inventors) cited Jostins and Granlund. Dr. Ralat testified that, although he relied on the NCT 236 protocol to draft portions of the '307 patent application, he specifically deleted language concerning the rationale for thinking the trial would work (*including* the protocol's references to Jostins and Granlund) because J&J's goals in front of the FDA and PTO differed. ECF No. 549 (Pls.' Opp. to Summ. J.) ¶ 68. This is strong circumstantial evidence that Dr. Ralat intended to mislead the PTO. *Id*. at p. 24. Likewise, that multiple patent inventors cite Jostins and Granlund (internally and externally) as supporting their 2015 expectation that Stelara would work to treat UC supports the inference that Mr. Dichter and Dr. Ralat withheld evidence about that expectation (and the basis for it) because to mislead the PTO into thinking the "invention" was novel in 2018. *Id.* at pp. 23–24, 26–27.

In sum, "[t]here is nothing before the court indicating that the evidence Defendant has moved to exclude would be inadmissible. On the contrary, there are numerous factors that point to its relevance." *Emami*, 241 F. Supp. 3d at 689. J&J cites only two cases in support of its broad request for complete preclusion (*PerDiemCo* and *Pantech*) but neither supports overturning the Court's prior ruling. Read in full, the *PerDiemCo* transcript shows that the court held the *opposite*: allowing the defendant to use prior art to show the "state of the art" and "what one of ordinary skill in the art would have known"—even where the prior art was not alleged to be invalidating. Ex. 58 at 11:2-7. Further, neither *PerDiemCo* nor *Pantech* support the preclusion of prior art to show whether "J&J's statements to the PTO . . .were misrepresentations" (ECF No. 666 (J&J MIL No. 2) at 6), as neither case concerned fraud or inequitable conduct. *Id*.; *Pantech Corp. v. OnePlus Tech. (Shenzhen) Co.*, 2024 WL 5510402, at *1 (E.D. Tex. Aug. 20, 2024) (describing claims and defenses in this *patent validity case* at trial).

J&J fails to establish that prior art evidence is irrelevant or that it would be unduly prejudicial. J&J's motion (and the law) do not support the sweeping breadth of the relief it seeks.

### d. The prior art evidence is relevant to J&J's misrepresentations about the lack of studies concerning the use of ustekinumab to treat UC.

The '307 application contains an affirmative representation that "[p]rior to the present invention"—i.e., before September 2018—"no studies had been conducted with ustekinumab for UC." ECF No. 549 (Pls.' Opp. to Summ. J.) ¶ 75. As discussed in Section III.B.3., *infra*, having made an affirmative representation of fact to the PTO, J&J had a duty to verify it was true. Each '307 patent inventor executed a declaration to the PTO swearing they "reviewed and understood the contents of the Application" and "acknowledge[d] the duty to disclose information which is material to patentability as defined in [37 C.F.R. § 1.56]." *Id.* at ¶ 84.

The plaintiffs are entitled to present any evidence that, despite J&J's representation about the lack of UC studies and each inventor's declaration, J&J employees were in fact aware of pre-2018 studies concerning the use of ustekinumab to treat UC, including the prior art J&J seeks to exclude. Indeed, the plaintiffs cited the Kolios and Afonso studies for exactly this purpose in opposing summary judgment. *Id.* at ¶¶ 54 & 75. Such evidence is relevant for multiple purposes, including the intent, knowledge, and credibility of the relevant J&J witnesses on this subject.

For example, although '307 patent inventor Kimberly Shields-Tuttle affirmed that J&J's "no studies" comment in 2018 was correct in her declaration to the PTO (*id.* at ¶ 84), she testified that, ███████████████████████████████████████████████████████

███████████████████████████████. Ex. 57 (Shields-Tuttle Tr.) at 230:14–32:2. ███████████████████████████████████████████████

███████. *Id.* at 227:17–30:9. ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████. *Id.* at 261:16–62:5. Duty-bound inventors with similar ustekinumab for UC studies in their files provided similar testimony. ECF No. 549 (Pls.' Opp. to Summ. J.) ¶ 76.

The plaintiffs are entitled to use this evidence—and evidence like it—to show, *inter alia*, that J&J's statement was false, that J&J employees with a duty to the PTO knew it was false,[9] and/or as circumstantial evidence of intent. *Therasense*, 649 F.3d at 1290. Evidence that directly contradicts J&J's employees' statements (and declarations) to the PTO is also highly relevant to credibility determinations. *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1335–36 (Fed. Cir. 2012) (upholding factfinders' rejections of patentee's self-serving testimony); *Synthon*

---

[9] Many of the '307 inventors appear on J&J's witness list, but not the plaintiffs' list. The plaintiffs reserve the right to use prior art evidence in any cross examination of these witnesses concerning relevant topics such as materiality, knowledge, and intent.

*IP, Inc. v. Pfizer Inc.*, 472 F. Supp. 2d 760, 779–82 (E.D. Va. 2007), *aff'd in part*, 281 F. App'x 995 (Fed. Cir. 2008).

**2.    Dr. Ralat owed duties to the PTO as the author of the '307 patent application.**

J&J's attempt to use a motion *in limine* to resolve the contested factual issues of whether "the record shows" that J&J's patent agent Dr. Luis Ralat owed the PTO a duty to with respect to the '307 patent is procedurally improper.[10] ECF No. 666 (J&J MIL No. 2) at 7. Again, J&J cites no rule of evidence that supports the procedural propriety of its motion. *Thurston*, 2025 WL 819109, at *1; *Banque*, 652 F. Supp. at 1401; *Louzon*, 718 F.3d at 561; *Mountain Valley Pipeline*, 2021 WL 1235377, at *8. Further, J&J's motion blatantly misrepresents the evidence and contradicts J&J's prior statements to the Court.

To prove their *Walker Process* fraud claims, the plaintiffs must prove at least one J&J employee substantively involved in the '307 patent prosecution engaged in misconduct before the PTO with the requisite intent. As J&J admits, "[e]ach attorney or agent who prepares or prosecutes" a patent owes such duties to the PTO.[11] ECF No. 666 (J&J MIL No. 2) at 7 (citing 37 C.F.R. § 1.56(c)).[12]

---

[10] The plaintiffs will not argue that Phillipe Szapary, Brian Carey, Melissa Miller, Ian Harris, or Pascale Marty-Ethgen owed duties to the PTO unless any of these witnesses appear at trial and present testimony that supports such an argument. The plaintiffs reserve all rights to question these witnesses (or designate deposition testimony) concerning all relevant subject matters.

[11] While J&J initially correctly states that the duty extends to "[e]very other person who is *substantively* involved in the preparation or prosecution" (J&J MIL No. 2 at 7), elsewhere it incorrectly frames the standard as "substantially involved." *Id*. at 9. The standard under 37 C.F.R. § 1.56(c) is "substantively" involved, not substantially involved. As the MPEP makes clear, this "is intended to make clear that the duty does not extend to typists, clerks, and similar personnel who assist with an application" but otherwise "extends broadly." MPEP § 2001.01.

[12] The plaintiffs (and their experts) dispute J&J's claim that persons involved in provision (as opposed to nonprovisional) applications owe no duties to the PTO in connection with those submissions. For purposes of this motion, however, the Court need not reach that dispute: as

The '307 patent application was drafted by J&J employee and patent agent, Luis Ralat, who was overseen by J&J employee and patent attorney Eric Dichter. J&J submitted three provisional applications before submitting a nonprovisional application (the '509 application), which issued as the '307 patent. *See* ECF No. 549 (Pls.' Opp. to J&J's Mot. for Summ. J.) ¶ 65. In this motion, J&J admits that Dr. Ralat drafted the three provisional applications but denies he drafted the nonprovisional application, claiming he "indisputably" was "completely disconnected from . . . the non-provisional '509 Application that resulted in the '307 Patent." ECF No. 666 (J&J MIL No. 2) at 8. This is a non-distinction. The relevant specifications are identical. *See* Ex. 54 (comparison of '501 and '509 applications)). J&J should be estopped from making such a claim, given that it made the *opposite representation* in its motion for summary judgment:

> Specifically, *the '509 Application's specification* explicitly disclosed the genetic relationship between CD and UC to the PTO . . . *and Dr. Ralat— the drafter of this section*—testified that a person of ordinary skill would understand that this section conveyed J&J's expectation that its UNIFI trial would be successful for UC.

ECF No. 444 (J&J's Summ. J. Br.) at 24 (emphasis added). This was no errant drafting error. J&J repeats the claim elsewhere, arguing that the "no studies" misrepresentation—which was indisputably included in the '509 *nonprovisional* application—was drafted by Dr. Ralat. *Id.* at 29 ("There is no record evidence that the duty-bound J&J employees knew about the 'prior art' references, and the uncontradicted evidence demonstrates that Mr. Dichter and *Dr. Ralat* believed this statement was accurate *when they included it in the specification*.") (emphasis added). The law is clear: "Each attorney or agent who prepares" a patent owes duties to the PTO. 37 C.F.R. § 1.56(c). J&J admits (repeatedly) that Dr. Ralat drafted the portions of the '307 patent

---

discussed herein, Dr. Ralat admits that he drafted the language of the nonprovisional application, as submitted to the PTO, and therefore he owed duties to the PTO with respect to this application.

applications (provisional and nonprovisional). It cannot be that J&J can assert Dr. Ralat is the author of statements in the '509 nonprovisional application when it wants to present his rationale for the statement as a defense (*see* ECF No. 444 (J&J's Summ. J. Br.) at ¶¶ 17 & 27, p. 24) but deny he is the author here.[13] Its motion should be denied.

This latest about-face on Dr. Ralat's role follows a pattern of shifting sands. For months, J&J resisted *any* discovery concerning Dr. Ralat; it used this same argument, telling the plaintiffs and the Court that "Dr. Ralat was not involved in the '307 Patent's prosecution—he did not participate in drafting, reviewing, revising, finalizing, approving, overseeing, preparing, and/or submitting the '307 Patent application to the PTO." ECF No. 217 at 11. But at his deposition, Dr. Ralat testified that no one at J&J, including outside counsel, had even asked him about his involvement before making this representation. Ex. 59 (Ralat Tr.) at 18:23–19:14. At his deposition, Dr. Ralat admitted that he did, in fact, write the language in the '509 nonprovisional application. He confirmed that the relevant language (located in the specification of the four applications) *does not differ substantively* (*id.* at 200:2–201:25) and thus the '509 application contained his words:

> Q. Okay. So, based on this comparison, you did, in fact, draft the background section, at least of the non-provisional application, for the use of Stelara to treat UC. Is that correct?
>
> [Objection Omitted]. . .
>
> THE WITNESS: I drafted the provisional background of the application. And if this made it all the way to the conversion, then -- and it was kept intact, then I suppose I was still -- authored it.
>
> Q. These are your words that you wrote?

---

[13] Likewise, it is unfair for J&J to claim here that the evidence shows Dr. Ralat was "completely disconnected" from the nonprovisional application when it shielded from discovery why he was in communications with the inventors around the same time it was submitted. *See* ECF No. 682 (Pls.' MIL No. 1) at 9.

A. It sounds like it, yes.

*Id.* at 202:1-18 (discussing Ex. 54 (comparison of '501 and '509 applications)). Dr. Ralat also testified that he had a "duty to disclose to the PTO representations made to the FDA concerning the same subject matter" (*id.* at 227:13-17) but failed to do so here. *Id.* at 229:14–230:4.

J&J may attempt to thread the needle by claiming that because Dr. Ralat originally "drafted this sentence" in the '509 *non*provisional application when he was "preparing the provisional application," he owes no duty to the PTO. *See* ECF No. 444 (J&J's Summ. J. Br.) at ¶ 17. The law contains no provision permitting misconduct before the PTO if the first draft was for a different purpose.[14] The law is clear: "Each attorney or agent who prepares" a patent owes duties to the PTO. 37 C.F.R. § 1.56(c). J&J admits (repeatedly) that Dr. Ralat drafted the portions of the '307 patent applications (provisional and non-provisional).

*Finally*, J&J's broad request to "preclude *all evidence, argument, or testimony* regarding what non-duty-bound J&J employees knew about or did with the allegedly non-disclosed references" fails for the same reasons as its broad request to exclude *all* references to prior art, regardless of the purpose for which it is offered. What J&J employees knew about the withheld materials is clearly relevant to probe J&J's course of conduct concerning patent submission. "[T]he duty of candor cannot be avoided by willful ignorance or compartmentalization of knowledge within a company in an effort to insulate the patent applicants and their attorneys from information unfavorable to patentability." *Synthon IP*, 472 F. Supp. 2d at 779; *Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1361–62 (Fed. Cir. 2005)

---

[14] Nor would such a carve-out make any logical sense. So structured, the law would allow patentees to evade their duties to the PTO by simply copying and pasting, wholesale, all content from a provisional application into the nonprovisional, even where they knew the provisional contained material representations or omissions.

(rejecting the "circular logic" that failure of counsel to disclose material facts was excused "because the inventors failed to fully inform them" of those facts). Who at J&J knew about J&J's omissions or misrepresentations to the PTO, what they knew, and who they informed (and why or why not) is all relevant to the plaintiffs' claims. J&J fails to support exclusion.

### 3. J&J's affirmative statements gave rise to a duty of reasonable inquiry.

When Dr. Ralat and Mr. Dichter drafted the '307 patent application and submitted it to the PTO, they included the factual assertion that "[p]rior to the present invention, no studies had been conducted with ustekinumab for UC[.]" Ex. 1 ('307 File Wrapper) at 6. They were thus required by law to certify that "[t]o the best of [their] knowledge, information and belief, formed after an inquiry reasonable under the circumstances," their "allegations and other *factual contentions*"—including their "no studies" contention—had "evidentiary support[.]" 37 C.F.R. § 11.18(b)(2). This duty applies to "*all documents* filed in the Office in patent, trademark, and other non-patent matters"—including provisional applications. 37 C.F.R. § 11.18(a).

Having made a factual assertion about the *absence* of prior art, Mr. Dichter, Dr. Ralat, and the inventors had a legal obligation to confirm (*after a reasonable inquiry*) that it was accurate. 37 C.F.R. § 11.18(b)(2). While J&J is correct that a patent applicant generally has no obligation to search for prior art (including studies on the use of ustekinumab for UC), a duty arose when J&J employees *affirmatively chose to make an assertion about the absence of prior art* to the PTO. *Id.* The plaintiffs will not present evidence that there is a duty to conduct a prior art search writ large, but rather that such a duty can arise under the law should the applicant *choose* to speak on the issue and *choose* to assert that no such art exists, as J&J did here. There is no basis to exclude this testimony, which is entirely consistent with the law. Should J&J wish to prevent any confusion, it is free to explain this point either on direct of its own witnesses or on cross examination of the plaintiffs' experts.

This evidence should be permitted for the additional reason that expert testimony on the "standard behavior of counsel participating in prosecution of a patent"—including whether pharmaceutical companies typically run prior art searches before investing in a patent or its supporting clinical trials—is independently relevant to the *Walker Process* fraud intent inquiry. *See Shuffle Tech Int'l LLC v. Scientific Games Corp.*, 2017 WL 3838096, at *9 (N.D. Ill. Sept. 1, 2017) (permitting testimony "regarding the typical behavior of in-house and external IP counsel" as "circumstantial evidence of [] intent to defraud the PTO."). This inquiry helps the jury understand the basis for those behaviors and how deviations can indicate an intent to deceive. *Id.*

There is no basis under Rule 401 to exclude what is clearly relevant evidence, nor under Rule 403 given J&J's ample opportunities to prevent confusion.

## IV.    CONCLUSION

The plaintiffs respectfully submit that J&J's motion should be denied in its entirety.


Dated: November 18, 2025

Respectfully submitted,

*/s/ William H. Monroe, Jr.*
William H. Monroe, Jr. (VSB No. 27441)
Marc C. Greco (VSB No. 41496)
Kip A. Harbison (VSB No. 38648)
Michael A. Glasser (VSB No. 17651)
**GLASSER AND GLASSER, P.L.C.**
Crown Center, Suite 600
580 East Main Street
Norfolk, VA 23510
Telephone: (757) 625-6787
bill@glasserlaw.com
marcg@glasserlaw.com
kip@glasserlaw.com
michael@glasserlaw.com

Thomas M. Sobol (*pro hac vice*)
Hannah W. Brennan (*pro hac vice*)
Abbye R. K. Ognibene (*pro hac vice*)
Whitney E. Street (*pro hac vice*)
Rebekah Glickman-Simon (*pro hac vice*)

**HAGENS BERMAN SOBOL SHAPIRO LLP**
One Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
tom@hbsslaw.com
hannahb@hbsslaw.com
abbyeo@hbsslaw.com
whitneyst@hbsslaw.com
rebekahgs@hbsslaw.com

Peter D. St. Phillip (*pro hac vice*)
Uriel Rabinovitz (*pro hac vice*)
Raymond Girnys (*pro hac vice*)
Noelle Ruggiero (*pro hac vice*)
Alexis Castillo (*pro hac vice*)
Thomas Griffith (*pro hac vice*)
Peyton A. Woodward (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
PStPhillip@lowey.com
URabinovitz@lowey.com
RGirnys@lowey.com
NRuggiero@lowey.com
ACastillo@lowey.com
tgriffith@lowey.com
pwoodward@lowey.com

John Radice (*pro hac vice*)
April Lambert (*pro hac vice*)
Kenneth Pickle (*pro hac vice*)
Charles Kopel (*pro hac vice*)
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Telephone: (646) 245-8502
jradice@radicelawfirm.com
alambert@radicelawfirm.com
kpickle@radicelawfirm.com
ckopel@radicelawfirm.com

*Counsel for Plaintiffs CareFirst of Maryland, Inc.,*
*Group Hospitalization and Medical Services, Inc.,*
*and CareFirst BlueChoice, Inc.*

## CERTIFICATE OF SERVICE

I, William H. Monroe, Jr., certify that, on this date, the foregoing document was filed electronically via the Court's CM/ECF system, which will send notice of the filing to all counsel of record, and parties may access the filing through the Court's system.

Dated: November 18, 2025                    */s/ William H. Monroe, Jr.*
                                             William H. Monroe, Jr.

# Appendix A

| Plaintiffs' Exhibit No.<br><br>Note: 1-43 were previously filed with the plaintiffs' motions *in limine* | ECF No. | Sealed ECF No. | Description |
|---|---|---|---|
| 1 | 687-1, 687-2, 687-3, 688-1, 688-2 | | '307 Patent Wrapper |
| 2 | 688-3 | | Case Document |
| 3 | 688-4 | | Lisa Matovcik Expert Report |
| 4 | 688-5 | 698-1 | Luis Ralat Transcript Excerpts |
| 5 | 688-6 | 698-2 | Richard Strauss Transcript Excerpts |
| 6 | 688-7 | | Colleen Marano Transcript Excerpts |
| 7 | 688-8 | 698-3 | Katherine Li Transcript Excerpts |
| 8 | 688-9 | 698-4 | Eric Dichter Transcript Excerpts |
| 9 | 688-10 | | Case Document |
| 10 | 688-11 | 698-5 | Melissa Miller Transcript Excerpts |
| 11 | 688-12 | 698-6 | Denise DeFranco Transcript Excerpts |
| 12 | 688-13 | 698-7 | Privilege Log Excerpt |
| 13 | 688-14 | | Christopher O'Brien Transcript Excerpts |
| 14 | 688-15 | | Case Document |
| 15 | 688-16 | | Public Data |
| 16 | 688-17, 689-1, 689-2 | | Byron Cryer Expert Declaration |
| 17 | 689-3, 690-1, 690-2, 690-3 | | Bates Stamped Document |
| 18 | 690-4 | 698-8 | Debbie Feinstein Expert Declaration |
| 19 | 6905 | | Michael Malecki Expert Report |
| 20 | 690-6 | 698-9 | Dr. John Johnson Expert Report |
| 21 | 690-7 | | Public Report |

| 22 | 690-8 | | Public Report |
|---|---|---|---|
| 23 | 690-9 | | Public Report |
| 24 | 690-10 | | Public Report |
| 25 | 690-11 | | Article |
| 26 | 690-12 | | Article |
| 27 | 691-1 | 698-10 | Bates Stamped Document |
| 28 | 691-2 | 698-11 | Bates Stamped Document |
| 29 | 691-3 | 698-12 | Bates Stamped Document |
| 30 | 691-4, 691-5, 691-6 | | J&J Public Report |
| 31 | 691-7 | | J&J Public Report |
| 32 | 692-1 | | J&J Public Report |
| 33 | 692-2 | 698-13 | Bates Stamped Document |
| 34 | 692-3 | 698-14 | Bates Stamped Document |
| 35 | 692-4 | | Article |
| 36 | 692-5 | | Article |
| 37 | 692-6 | | Article |
| 38 | 692-7 | | J&J Public Report |
| 39 | 692-8 | | J&J Public Report |
| 40 | 692-9 | 698-15 | Bates Stamped Document |
| 41 | 692-10 | 698-16 | Brian Smith Transcript Excerpts |
| 42 | 692-11 | 698-17 | Bates Stamped Document |
| 43 | 692-12 | 698-18 | Bates Stamped Document |
| 44 | 712-1 | | '310 Patent Wrapper Excerpt |
| 45 | 712-2 | | J&J Exhibit List Excerpt |
| 46 | 712-3 | | Bates Stamped Document |
| 47 | 712-4 | | Aaron Kesselheim Expert Report Excerpt |
| 48 | 712-5 | | Nicole Maestas Supplemental Expert Report Excerpt |
| 49 | 712-6 | | Andrew Hirshfeld Rebuttal Expert Report Excerpt |
| 50 | 712-7, 712-8 | | J&J Public Report |
| 51 | 712-9 | | J&J Trial Witness List |
| 52 | 712-10 | | Brian Smith Transcript Excerpt |

| 53 | 713-1, 713-2 | | J&J Public Report |
|---|---|---|---|
| 54 | 713-3 | | Patent Application Comparison |
| 55 | 713-4 | | Lisa Matovcik Reply Expert Report |
| 56 | 713-5 | | Bates Stamped Document |
| 57 | 713-6 | | Kimberly Shields-Tuttle Transcript Excerpt |
| 58 | 713-7 | | ECF Document |
| 59 | 713-8 | | Luis Ralat Transcript Excerpt |
| 60 | 713-9 | | Attorney Email Correspondence |
| 61 | 713-10 | | Paul Warfield Opening Expert Report |