UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CAREFIRST OF MARYLAND, INC., *et al.*, on behalf of themselves and all others similarly situated,

  Plaintiffs,

v.              Case No. 2:23cv629

JOHNSON & JOHNSON and
JANSSEN BIOTECH, INC.,

  Defendants.

## OPINION & ORDER

  This is an antitrust action filed by Plaintiffs Carefirst of Maryland, Inc., Group Hospitalization and Medical Services Inc., and Carefirst Bluechoice Inc. (collectively, "CareFirst") alleging that Defendants Johnson & Johnson and Janssen Biotech, Inc. (collectively, "J&J") used monopoly power to unlawfully delay the introduction of biosimilar competitors for their drug ustekinumab (sold under the brand name "Stelara"). CareFirst alleges J&J did so by: (1) defrauding the United States Patent and Trademark Office to obtain its method-of-use patent ("the '307 patent") that covers the use of ustekinumab to treat ulcerative colitis (*Walker Process* fraud); (2) acquiring a portfolio of biosimilar manufacturing patents from Momenta; and (3) enforcing those patents to delay biosimilar competition from the market.

  J&J filed two motions to exclude three of CareFirst's experts. In the first motion, J&J seeks to exclude CareFirst's expert Dr. Paul Warfield, who is offered to provide testimony as a person of ordinary skill in the art. ECF No. 433. J&J seeks to exclude Dr. Warfield's opinions on the grounds that they are not relevant or reliable, and do not help the jury determine any issue in the case. ECF No. 434. CareFirst filed a memorandum in opposition, ECF No. 557, and J&J filed

a reply, ECF No. 604. In the second motion, J&J seeks to exclude CareFirst's experts Drs. Wallace and Gaspari. ECF No. 431. J&J seeks to exclude Drs. Wallace and Gaspari because their opinions are irrelevant and unhelpful to the jury. ECF No. 432. CareFirst filed a memorandum in opposition, ECF No. 555, and J&J filed a reply, ECF No. 603. The Court held a hearing on December 16, 2025, which, relevant to the instant motions, only focused on Dr. Warfield's testimony. ECF No. 795. Because the issues raised by J&J in both motions overlap, the Court addresses them together. Accordingly, both motions to exclude are fully briefed and ripe for disposition.

For the reasons explained below, J&J's Motion to Exclude Dr. Warfield, ECF No. 433, is **GRANTED IN PART** and **DENIED IN PART**, and J&J's Motion to Exclude Drs. Wallace and Gaspari, ECF No. 431, is **DENIED**.

## I. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under Rule 702, a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent of the expert must demonstrate it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also United States v. Wilson*, 484 F.3d 267, 274–75 (4th Cir. 2007). Accordingly, the Court is tasked with "a special gatekeeping obligation on the trial judge to ensure

2

that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (cleaned up).

The *reliability* of expert testimony is a "flexible inquiry" that requires the Court to ensure an expert's opinion is "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Id.* (emphasis in original) (quotation omitted). Trial courts have "broad latitude" to determine "reasonable measure of reliability in a particular case," which can "depend on[] the nature of the issue, the expert's particular expertise, and the subject of [the expert's] testimony." *Id.* (alteration in original) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). The *relevancy* of expert testimony depends on whether the opinion "has 'a valid scientific connection to the pertinent inquiry" to "ensure that the expert helps the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (internal quotations and citation omitted). Ultimately, if an opinion is not relevant to a fact at issue, it must be excluded. *Id.*

While some experts may proffer "[p]urely scientific testimony... characterized by its falsifiability or refutability, or testability," other experts may proffer testimony based on their experience, which does not "rely on anything like the scientific method." *Wilson*, 484 F.3d at 274. In those instances, it is a function of the Court's gatekeeping role to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (quoting *Kumho Tire Co.*, 526 U.S. at 152). Thus, an experiential expert must still "explain how [his] experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *Wilson*, 484 F.3d at 274 (citation and quotation omitted).

As emphasized by the Fourth Circuit, in cases where expert testimony is challenged on

3

relevance or reliability grounds, the district court's gatekeeping function is "indispensable" and "cannot be overstated." *Id.* at 283–84. However, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013) (per curiam) (unpublished)). "Indeed, *Daubert* itself stressed the importance of the 'conventional devices' of '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' (rather than wholesale exclusion by the trial judge) as 'the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

## II. ANALYSIS

First, CareFirst proffers Dr. Paul Warfield, a gastroenterologist, as a physician expert in this matter.[1] Dr. Warfield offered as a person of ordinary skill in the art—a hypothetical person who is presumed to know the relevant prior art. *See In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed.

---

[1] Dr. Warfield's full expert report opines on the following topics:

> (1) what are Crohn's disease and ulcerative colitis and how are they diagnosed and treated; (2) Stelara (ustekinumab) and its use in the treatment of Crohn's disease and ulcerative colitis; and (3) whether there were or are any other drugs that are therapeutically interchangeable with ustekinumab in the treatment of Crohn's disease or ulcerative colitis.

ECF No. 434, attach. 3 at 5. Additionally, he provides opinions on the following additional topics:

> (1) Would it have been probable or obvious in September 2018 that, given ustekinumab's mechanism of action and efficacy in treating Crohn's, the drug also would have been effective in treating ulcerative colitis; (2) Would it have been probable, given the language of the clinicaltrials.gov posting of NCT-236 prior to September 2018 that ustekinumab would have treated ulcerative colitis based on the seven options of endpoints specified in the '307 patent claims; (3) the teachings and key conclusions of [the alleged prior art references]; and (4) what a gastroenterologist treating patients with U.C. would have concluded if they had read all of those articles prior to September 24, 2018.

*Id.*

4

Cir. 1995). Relevant to the instant motion, J&J seeks to exclude Dr. Warfield's opinions on the following topics: (1) the "therapeutic interchangeability" of Stelara with other medications used for the treatment of inflammatory bowel disease; (2) the "obviousness" of using Stelara to treat ulcerative colitis, and an assessment of prior art publications; and (3) the NCT-236 posting. ECF No. 434 at 15–28.

Second, CareFirst offers the opinions of Drs. Wallace and Gaspari, who are both physicians, to explain to the jury how Stelara and other drugs treat Crohn's disease, ulcerative colitis, psoriatic arthritis, and plaque psoriasis. J&J only seeks to exclude Drs. Wallace and Gaspari's opinions on therapeutic interchange, for largely the same reasons they seek to exclude Dr. Warfield's opinions on the same subject. *See* ECF No. 432.

The Court first addresses the admissibility of the therapeutic interchange opinions from all three experts and then addresses the remainder of J&J's challenges to Dr. Warfield's opinions about obviousness, prior art, and NCT-236.

### A. Drs. Warfield, Wallace, and Gaspari's Therapeutic Interchangeability Opinions

The experts' "therapeutic interchangeability" opinions relate to the CareFirst's monopolization claim, and specifically to whether J&J possessed monopoly power in a relevant antitrust market with respect to Stelara. *See* ECF No. 434 at 15 (Warfield); ECF No. 432 at 12 (Wallace and Gaspari). J&J argues that, for two reasons, Dr. Warfield, Dr. Wallace, and Dr. Gaspari's opinions concerning therapeutic interchangeability should be excluded. First, they argue that the proper standard to determine the relevant market is whether Stelara is "reasonably interchangeable" and not "therapeutic interchangeability." ECF No. 434 at 15–18 (Warfield); ECF No. 432 at 12–16 (Wallace and Gaspari). Second, they argue that all three expert opinions depart from how they, or any other physician actually prescribes treatments for inflammatory bowel

5

disease treatments in practice. ECF No. 434 at 15–18 (Warfield); ECF No. 432 at 12–16 (Wallace and Gaspari). Accordingly, J&J contends that the opinions lack a proper "fit" with the issues in this case and are not helpful to the jury.[2] In response, CareFirst argues that the experts' definition of "therapeutic interchangeability" is appropriate, and that their opinions are consistent with how physicians practice and each of their own prescribing practices. ECF No. 555 at 10–21.[3]

Both of J&J's arguments for excluding the experts' therapeutic interchangeability opinions are not proper grounds to preclude them from testifying at trial. Both issues go to the weight of the experts' opinion, not their admissibility. First, the core of J&J's argument is centered on the experts' definition of "therapeutic interchangeability," which they contend was solely supplied by counsel and not derived from their clinical experience. ECF No. 434 at 16 (Warfield); ECF No. 432 at 13 (Wallace and Gaspari). It appears to the Court that J&J simply disputes the experts' definition, and the experts' application of the definition to reduce size of the relevant market. For example, with respect to Dr. Warfield, J&J claims that the phrase "'therapeutic interchangeability' [] derives from the regulatory concept of '[t]herapeutic interchange', which governs when a pharmacy is permitted to automatically substitute a biosimilar for a branded biologic prescribed by a physician." ECF No. 434 at 10 (citing Warfield Dep. 155:3–16, 162:9—14, ECF No. 434, attach. 2 at 59; Warfield Reply ¶ 22, ECF No. 434, attach. 4 at 7). However, upon reading Dr. Warfield's deposition and reply report, it does not appear that Dr. Warfield's testimony and opinion align with J&J's statement of how he defines therapeutic interchangeability. J&J claims

---

[2] J&J does not dispute any of the expert's qualifications to offer their opinions. *See generally* ECF No. 434 (Warfield); ECF No. 432 (Wallace and Gaspari).

[3] While J&J addressed the therapeutic interchange issue in its Motion to Exclude Dr. Warfield and separately in its Motion to Exclude Drs. Wallace and Gaspari, CareFirst addressed its opposition to the therapeutic interchange issue only in its opposition to Drs. Wallace and Gaspari. *See* ECF No. 555. In that opposition, they also address the therapeutic interchange issue as to Dr. Warfield's opinions. *See id.*

that *Dr. Warfield* explained that the phrase refers to a narrow regulatory concept. *Id.* But neither Dr. Warfield, nor J&J, cite any specific "regulatory concept" sufficient to allow the Court to determine that Dr. Warfield is doing any such thing.

Further, citing Dr. Warfield's reply report, J&J states that Dr. Warfield explained that therapeutic interchange "is the act of a *pharmacist*—not a physician—'switching a prescribed drug' for another drug without consulting the physician." ECF No. 434 at 10 (citing Warfield Reply ¶ 19, ECF No. 434, attach. 4 at 7). However, that is not what Dr. Warfield's reply report states. It states, "[t]herapeutic interchange is the act of switching a prescribed drug for another drug in the same therapeutic class that is believed to be therapeutically interchangeable but may be chemically different. Therapeutic interchange is different from generic substitution which involves changing medications which are chemically identical." Warfield Reply ¶ 19, ECF No. 434, attach. 4 at ¶ 7. Dr. Warfield does not mention a pharmacist, and specifically states that to him, therapeutic interchange is *different* from generic substitution. Thus, it appears J&J disagrees with the experts' definition of therapeutic interchange, but their argument does not persuade the Court that the experts' definitions are inherently wrong requiring exclusion of their opinions.

Second, J&J argues that the experts should be precluded from testifying at trial because their opinions do not reflect their actual treatment practices (which, J&J contends, are not relevant anyways), or prescribing practices of physicians generally. This too, goes to the weight of the experts' testimony and not its admissibility. J&J is free to cross-examine the experts at trial, both about their definition of therapeutic interchange, and about prescribing practices. At this stage in the litigation, it would not be appropriate for the Court, through a *Daubert* motion, to essentially set the controlling definition of the market and exclude CareFirst's theory of the makeup of the market. Here, all three experts use their knowledge and experience as physicians to explain the

7

treatment and prescribing practices for patients, and their testimony has a reliable foundation and will be helpful to the jury. Accordingly, the experts' therapeutic interchange opinions are admissible.

### *B. Dr. Warfield's Prior Art and Obviousness Opinions*

J&J also seeks to exclude Dr. Warfield's prior art and obviousness opinions on the grounds that they are legally insufficient. ECF No. 434 at 18–23. First, J&J argues that Dr. Warfield did not conduct a proper obviousness analysis sufficient to render the '307 patent invalid because he did not consider whether there was a motivation to combine or a reasonable expectation of success. *Id.* at 18–20. Absent that analysis, according to J&J, Dr. Warfield cannot opine on obviousness, and doing so would be a violation of Federal Rule of Civil Procedure 26. *Id.* at 20–23. Second, J&J argues that Dr. Warfield failed to compare the '307 patent claims to the allegedly withheld prior art, rendering his opinion irrelevant. *Id.* at 24–27.

In response, CareFirst argues that Dr. Warfield does not need to conduct a technical obviousness analysis or compare the claims in the '307 patent to the prior art. ECF No. 557 at 17–23. They argue that because this is an antitrust case and not a patent case seeking to invalidate the '307 patent, it would not be proper to impose rigid patent law requirements for invalidation to a case involving *Walker Process* fraud. *Id.* Even so, CareFirst contends, if such an analysis were required, Dr Warfield's report accomplishes that analysis. *Id.* at 23–27.

For the reasons explained below, the Court finds that Dr. Warfield's opinions are legally sufficient to be admissible under *Daubert*. The Court finds that, to the extent an obviousness analysis is required in this case, Dr. Warfield's report sufficiently accomplishes that analysis to be admissible.

8

> *i. The Court does not need to decide whether a technical invalidity analysis is required to establish Walker Process fraud.*

Before turning to the substance of Dr. Warfield's opinion, the Court notes that it is not persuaded by CareFirst's argument that no technical invalidity analysis is required in this *Walker Process* fraud case. To establish a claim for *Walker Process* fraud, the party asserting the claim must establish but-for materiality—that is, "the patent would not have issued but for the patent examiner's justifiable reliance on the patentee's misrepresentation or omission." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir. 2007). If the patent would not have issued considering the alleged misrepresentation or omission, it is invalid. *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070 (Fed. Cir. 1998) ("a misrepresentation or omission must evidence a clear intent to deceive the examiner and thereby cause the PTO to grant an *invalid* patent.") (emphasis added). Consequently, "a patent must be invalid before it can be a candidate for *Walker Process* fraud."[4] *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 546 n.28 (E.D.N.Y. 2005). This is because "[i]t is only when a patentee's dishonest conduct allows him to obtain 'exclusionary rights to which he was not legally entitled under the patent laws' that the Sherman Act comes into play." *King Drug Co. of Florence v. Cephalon, Inc.*, No. 2:06cv1797, 2014 WL 982848, at *11 (E.D. Pa. Mar. 13, 2014) (quoting *E. I. Du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1255 (8th Cir. 1980)).

CareFirst's arguments and citations to case law regarding federal jurisdiction are simply not on point and do not appear dispositive to the issue of whether a validity analysis is required in a case alleging *Walker Process* fraud and requiring but-for materiality. *See* ECF No. 557 at 20–

---

[4] Similarly, courts have found that a finding of invalidity during an infringement action collaterally estops a party from challenging materiality in a subsequent *Walker Process* fraud action. *See King Drug Co. of Florence v. Cephalon, Inc.*, No. 2:06cv1797, 2014 WL 982848, at *11 (E.D. Pa. Mar. 13, 2014) (finding invalidity is a prerequisite to a successful *Walker Process* fraud claim).

9

21. For example, *In re Solodyn* and *In re Namenda* involved antitrust claims based on reverse payments—not *Walker Process* fraud. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 563144, at *13 (D. Mass. Jan. 15, 2018); *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 187, 189 (S.D.N.Y. 2018)). In those cases, only "some evidence" of invalidity was required based on the reverse payment argument, and the invalidity analysis was only tangential to the issues in the case. *Solodyn*, 2018 WL 563144, at *13; *Namenda*, 331 F. Supp. 3d. at 187, 189. It does not appear that the same is true for *Walker Process* fraud, because the "misrepresentation or omission must evidence a clear intent to deceive the examiner and thereby cause the PTO to grant an *invalid* patent." *Nobelpharma*, 141 F.3d at 1070 (Fed. Cir. 1998).[5]

Nonetheless, the Court does not find it necessary to decide this issue because even if a technical obviousness analysis is required, Dr. Warfield's report accomplishes that analysis sufficiently to be admissible.

> *ii. To the extent an obviousness analysis is required in this case, Dr. Warfield's report sufficiently accomplishes that analysis.*

Patents are required to encompass "non-obvious subject matter." 35 U.S.C. § 103; *Astrazeneca AB v. Mylan Pharms. Inc.*, 522 F. Supp. 3d 200, 213 (N.D.W. Va. 2021) ("A patent will not issue or may be invalidated if the subject matter of the patent is obvious."). Accordingly, a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time

---

[5] At the hearing, CareFirst argued that a patent invalidity analysis was not required for purposes of *Walker Process* fraud, and directed the Court to consider the Federal Circuit's remand instructions in *Therasense*. There, the Federal Circuit instructed the district court to consider whether the PTO would have considered the prior art unpersuasive in overcoming an obviousness rejection had the allegedly withheld prior art been disclosed. *See Therasense*, 649 F.3d at 1296. CareFirst did not make this argument in their opposition to J&J's Motion to Exclude Dr. Warfield. *See* ECF No. 557.

the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *Id.*

Obviousness "is a question of law based on underlying findings of facts," including "(i) the scope and content of the prior art, (ii) the characteristics and understanding of an individual of ordinary skill in the art at the time of invention, (iii) the differences between the claimed invention and the prior art, and (iv) the evidence of secondary factors of non-obviousness." *DeLorme Publ'g Co. v. BriarTek IP, Inc.*, 60 F. Supp. 3d 652, 679 (E.D. Va. 2014) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)). "The ultimate judgment of obviousness is a legal determination," but "the obviousness inquiry also involves factual determinations within the framework of the *Graham* factors." *Dey, L. P. v. Teva Parenteral Meds., Inc.*, 6 F. Supp. 3d 651, 673-74 (N.D.W. Va. 2014) (citations omitted).

A party seeking to establish obviousness must establish "that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F3d 1342, 1360 (Fed. Cir. 2012). Nonetheless, the Supreme Court has rejected a "rigid approach" in favor of a "expansive and flexible approach" to analyzing obviousness. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007). In evaluating expert reports that consider obviousness, the Federal Circuit had held that "[t]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). If expert testimony about obviousness is "conclusory and factually unsupported," it is subject to exclusion. *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012).

Here, Dr. Warfield offers a cursory review of each alleged prior art reference and offers the key conclusion of each reference.[6] Warfield Report ¶¶ 172–196, ECF No. 434 at 51–56. With respect to the Ochsenkühn references, Dr. Warfield finds that the key conclusion "is that patients with ulcerative colitis refractory to currently available medical therapy may benefit from use of ustekinumab therapy." *Id.* ¶ 180, ECF No. 434 at 53. For the Jostins letter and Grandlund study, he finds that both "provide[] data that would predict efficacy for ustekinumab in treating ulcerative colitis, as had been demonstrated for patients with Crohn's disease. *Id.* ¶ 189, 192, ECF No. 434 at 55. He offers the individual conclusion for each reference that "[a]s a gastroenterologist treating patients with ulcerative colitis, [he] would have been eager and willing to use ustekinumab off-label for ulcerative colitis patients if possible, and would have anticipated future FDA approval for use in patents with ulcerative colitis after reading [the reference] prior to September 24, 2018." *Id.* ¶¶ 179–81, 188–93, ECF No. 434 at 53–56. Specific to Jostins and Grandlund, Dr. Warfield opines that those references, along with Aggletopolulou "in combination provide data that would predict efficacy for ustekinumab in treating ulcerative colitis, as had been demonstrated for patients with Crohn's disease." *Id.* ¶ 195, ECF No. 434 at 56. Finally, he offers the following relevant conclusions: (1) "[i]t would have been probable that ustekinumab would have been shown to be effective in treating ulcerative colitis based on the seven endpoints specific in the '307 patent claims; (2) "[t]he Afonso, Kolios, *Ochsenkühn*, Canadian Clinical Trials, and Tarr references collectively reach the following key conclusion: that the medication ustekinumab demonstrated efficacy in treating ulcerative colitis; and (3) "[i]f I had reviewed Afonso, Kolios, *Ochsenkühn*,

---

[6] Dr. Warfield reviewed eight allegedly withheld prior art references. Warfield Report ¶¶ 172–96, ECF No. 434 at 51–56. Following the Court's Order granting in part J&J's Motion for Summary Judgment, only three of those allegedly withheld references—Ochsenkühn, Jostins, and Grandlund—remain as bases for CareFirst's argument of fraud on the PTO. *See* ECF No. 794 at 26–39 (Opinion & Order on Summary Judgment, Dec. 15, 2025).

12

Canadian Clinical Trials, and Tarr references as of September 24, 2018, I would have thought that there would be a high likelihood that ustekinumab would have been effective in treating ulcerative colitis." *Id.* ¶¶ 201–03, ECF No. 434 at 56–57 (emphasis added).

Reviewing Dr. Warfield's report, he offers enough of an analysis of a motivation to combine and reasonable expectation of success for his opinions to be admissible. He appears to combine Jostins and Grandlund (along with Aggletopolulou) to conclude they provide data that would predict efficacy in treating ulcerative colitis, based on its similarities with Crohn's disease. *Id.* ¶ 195, ECF No. 434 at 56. He then offers that Ochsenkühn, along with other references, teach that ustekinumab demonstrated efficacy in treating ulcerative colitis, and that he thought there would be a high likelihood that ustekinumab would be effective in treating ulcerative colitis based on the stated references. *Id.* ¶¶ 201–02, ECF No. 434 at 57. This analysis offers "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Innogenetics*, 512 F.3d at 1373 (citation omitted).

Dr. Warfield's analysis does more than the excluded experts in both *Innogenetics* and *ActiveVideo*. In *Innogenetics*, the Federal Circuit held that court did not err in excluding an expert report where the expert simply listed a number of prior art references and offered a generic conclusion that "to one skilled in the art it would have been obvious to perform" the method claims of the patent at issue. 512 F.3d 1363, 1373. The court reasoned that the expert did not "state how or why a person ordinarily skilled in the art would have found the claims of the [] patent obvious in light of some combination of those particular references." *Id.* at 1373. Similarly, in *Active Video*, the Federal Circuit affirmed the district court's decision that an expert's testimony was "conclusory and factually unsupported" where the expert "failed to explain how specific references could be combined, which combination(s) of elements in specific references would yield a

13

predictable result, or how any specific combination would operate or read on the asserted claims." 694 F.3d 1312, 1327. There, the expert's testimony based on obviousness was a "conclusory statement that a person of ordinary skill in the art would have known, based on the 'modular' nature of the claimed components, how to combine any number of references to achieve the claimed inventions." *Id.* (finding that such testimony is "fraught with hindsight bias."). Unlike *Innogenetics* and *ActiveVideo*, Dr. Warfield does more than provide a conclusory analysis. He explains the key teachings and offers them in combination to opine that they demonstrated efficacy in treating ulcerative colitis.

Similarly, Dr. Warfield offers that a skilled artisan would have had a reasonable expectation of success to achieve the claimed invention because, according to him, the references demonstrate that ustekinumab demonstrated efficacy in treating ulcerative colitis, and he would have been "eager to use ustekinumab off-label for ulcerative colitis patients," and "would have anticipated future FDA approval for use in patients with ulcerative colitis after reading [the references] prior to September 24, 2018." *Id.*, ¶¶ 179–81, 188–93, ECF No. 434 at 53–56. J&J contends that this does not suffice to establish "reasonable expectation of success" because at his deposition, Dr. Warfield couched his "eager to use" statement in terms of a "Hail Mary" or "last best effort" before colectomy for a patient who failed FDA-approved treatments. ECF No. 434 at 21–22. It appears to the Court that Dr. Warfield was not testifying that he would *only* use ustekinumab as a "Hail Mary" or "last best effort," just that doing so would be an option. Regardless, that addresses the weight of Dr. Warfield's testimony, not its admissibility.

Finally, J&J faults Dr. Warfield for failing to conduct a claim-by-claim analysis of the '307 patent. ECF No. 434 at 23–27. However, that also is not grounds to exclude his testimony in this case. An obviousness inquiry "compares claimed subject matter to the prior art." *Geneva Pharms.,*

14

*Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377 n.1 (Fed. Cir. 2003). But, the Federal Circuit has "never mandated that such a rigid motivation-to-combine analysis is necessary in every case." *Google LLC v. Sonos, Inc.*, No. 2023-1259, 2024 WL 2350509, at *3 (Fed. Cir. May 23, 2024) Rather, "[t]he law has always evaluated the motivation to combine elements based on the combination of prior art references that together disclose all of the elements of the invention." *Id.* (quoting *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1352 (Fed. Cir. 2020)).

Dr. Warfield purports do this analysis and to compare the claimed subject matter to the prior art—as it stands to him. According to Dr. Warfield, the seven clinical endpoints in the '307 patent are not unique, they only offer "standard practice for assessing ulcerative colitis treatment outcomes." Warfield Report ¶¶ 168–69, ECF No. 434 at 51. Thus, seven clinical endpoints are "simply routine measures employed in ulcerative colitis research, providing multiple broad ways to show effectiveness of ustekinumab." *Id.* ¶ 171, ECF No. 434 at 51. It appears that, to Dr. Warfield, the claims of the '307 patent require efficacy of using ustekinumab to treat ulcerative colitis.[7] Through their argument, it appears J&J has a different view of what the claims of the '307 patent require. *See* ECF No. 434 at 25 ("The claims of the '307 patent therefore, require the use of specific dosages of ustekinumab and the achievement of specific clinical endpoints in a moderate to severe ulcerative colitis subject."). But, the correctness of Dr. Warfield's interpretation of the '307 patent or J&J's interpretation of the '307 patent is not for the Court to decide on this *Daubert* motion.

To be clear, the Court is by no means finding that Dr. Warfield's analysis is sufficient to *establish* obviousness and invalidity for purposes of establishing but-for materiality in this *Walker Process* fraud case. Rather, the Court finds that Dr. Warfield conducts a legally sufficient analysis

---

[7] To the extent that the alleged prior art references *do* arguably contain references to the clinical endpoints, Dr. Warfield cites them. Warfield Report ¶¶ 173–196, ECF No. 434, attach. 3 at 52–56.

to be reliable and helpful to the jury. His testimony is subject to the "traditional and appropriate means of attacking shaky but admissible evidence," including "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Accordingly, Dr. Warfield's obviousness and prior art opinions are admissible.

### C. Dr. Warfield's Opinion on the NCT-236 Posting

Finally, J&J seeks to exclude Dr. Warfield's opinions regarding the NCT-236 posting on CT.gov. ECF No. 434 at 27–30. J&J argues that the Court dismissed CareFirst's theory that the NCT-236 posting was material for purposes of *Walker Process* fraud.[8] *Id.* Because that theory has been dismissed, J&J argues that Dr. Warfield's opinions about the NCT-236 posting are irrelevant and should be excluded. *Id.*

In response, CareFirst argues that they have since filed a proposed third amended complaint, which alleges that while the PTO examiner had a version of the NCT-236 CT.gov posting, the examiner did not have the NCT-236 protocol. ECF No. 557 at 30. Based on that theory, CareFirst contends that the *protocol* contradicts Mr. Dichter's representation that there was no reasonable expectation that Stelara would effectively treat ulcerative colitis. ECF No. 557.

Since the parties completed briefing, the landscape of this issue has changed at least twice. First, the Court permitted CareFirst to amend its complaint to allege that the PTO examiner did not have the NCT-236 *protocol* before him. *See* ECF No. 592 at 8. So, while the Court had dismissed CareFirst's theory involving misrepresentations of the NCT-236 CT.gov *posting*, it allowed CareFirst to proceed with the theory involving misrepresentations of the NCT-236 *protocol*. *See id.* Second, the Court granted summary judgment on several of CareFirst's alleged misrepresentations for purposes of *Walker Process* fraud, including its theory involving the

---

[8] *See* ECF No. 119 at 21–23 (Opinion & Order on J&J's Motion to Dismiss, Aug. 16, 2024).

16

misrepresentation of the NCT-236 *posting*. *See* ECF No. 794 at 28–29 (Opinion & Order on Summary Judgment, Dec. 15, 2025).

Based on these circumstances, the Court finds that CareFirst cannot offer Dr. Warfield's opinions about the NCT-236 CT.gov posting to establish it was improperly withheld from the PTO or but-for material. Those opinions, in light of the Court's decision on summary judgment, are not admissible because they are not relevant to any issue in this case.

The Court fails to see why Dr. Warfield's opinions on the NCT-236 posting would be relevant to any other issue in the case. However, all of CareFirst's theories of this case are not before the Court on this *Daubert* motion. The Court cannot say with one hundred percent certainty that there are no circumstances whatsoever where Dr. Warfield's opinions on the NCT-236 posting would be relevant. At the hearing, CareFirst argued that Dr. Warfield's opinions on the NCT-236 posting were still relevant to evaluating whether the posting inherently anticipated the '307 patent.

Nonetheless, the Court agrees with J&J that Dr. Warfield did not offer an opinion on the NCT-236 *protocol*. *See* ECF No. 604. To the extent CareFirst seeks his testimony and opinions on the NCT-236 protocol, that would be inadmissible because there is no evidence that Dr. Warfield considered the protocol, or made any opinions related to the protocol. Warfield Report ¶¶ 149–171, ECF No. 434, attach. 3 at 46–51. Accordingly, to the extent CareFirst seeks to offer Dr. Warfield's opinions about the NCT-236 CT.gov posting to establish it was improperly withheld from the PTO or but-for material, that opinion and related testimony are inadmissible. Similarly, to the extent CareFirst seeks to offer Dr. Warfield's opinions about the NCT-236 protocol, that is similarly inadmissible.

## III. CONCLUSION

For the reasons explained above, J&J's Motion to Exclude Dr. Warfield, ECF No. 433, is **GRANTED IN PART** and **DENIED IN PART**, and J&J's Motion to Exclude Drs. Wallace and Gaspari, ECF No. 431, is **DENIED**.

The Clerk is **DIRECTED** to forward a copy of this Order to all counsel of record.

It is so **ORDERED**.

_____
Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
December 23, 2025